Laurence ("Laird") J. Lucas (ISB # 4733)
llucas@advocateswest.org
Todd C. Tucci (ISB # 6526)
ttucci@advocateswest.org
Talasi B. Brooks (ISB # 9712)
tbrooks@advocateswest.org
*Advocates for the West*
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT, and CENTER FOR BIOLOGICAL DIVERSITY, | ) ) ) | No. 01:18-cv-187 |
| | ) | **COMPLAINT** |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | |
| RYAN K. ZINKE, Secretary Of Interior; DAVID BERNHARDT, Deputy Secretary of Interior; and UNITED STATES BUREAU OF LAND MANAGEMENT, an agency of the United States, | ) ) ) ) ) | |
| *Defendants.* | ) ) | |

## INTRODUCTION

1.      Plaintiffs challenge the Trump Administration's unlawful actions to lease and

develop oil and gas resources on public lands, or managed by the United States, that will

adversely impact essential habitats and populations across the range of the greater sage-grouse

(*Centrocercus urophasianus*), and violate bedrock environmental laws including the Federal

Land Policy and Management Act ("FLPMA"), National Environmental Policy Act ("NEPA"),

and Administrative Procedure Act ("APA").

COMPLAINT -- 1

2.      The greater sage-grouse is deeply imperiled because of the loss, fragmentation, and degradation of its native sagebrush habitats across the Interior West. Multiple peer-reviewed studies have found that infrastructure and human activity associated with oil and gas development adversely affect greater sage-grouse and their habitat through direct mortality, habitat loss, displacement and behavioral effects, noise, spread of invasive plants, disease transmission, and other means. Defendant Bureau of Land Management ("BLM") directly manages approximately 45% of all remaining occupied greater sage-grouse habitat, as well as managing mineral leasing for substantial additional areas of occupied habitat on Forest Service and split estate (private surface and federal minerals) lands.

3.      In 2010, the U.S. Fish and Wildlife Service determined that greater sage-grouse "warranted" listing under the Endangered Species Act ("ESA"), based on threats including impacts of oil and gas development, and lack of adequate regulatory mechanisms for oil and gas development of federal minerals and on public lands. As a result, between approximately 2011 and 2015, BLM adopted interim policies in large part barring the issuance of new oil and gas leases in what was preliminarily identified as "core" greater sage-grouse habitats.

4.      In September 2015, BLM and U.S. Forest Service completed their National Greater Sage-grouse Planning Strategy, which amended or revised 98 BLM Resource Management Plans ("RMPs") and Forest Service land use and resource plans ("Forest Plans") (jointly, "land use plans") to designate sage-grouse habitats across the species' range, and impose new management protections intended to prevent, mitigate, or compensate for further sage-grouse population declines and habitat losses.

5.      Although these 2015 "Sage-Grouse Plan Amendments" vary across states and planning areas in the specifics of their management of oil and gas leasing and development, they

COMPLAINT -- 2

all consistently mandate that BLM "prioritize oil and gas leasing and development" outside of sage-grouse habitats, including Sagebrush Focal Areas ("SFAs"), Priority Habitat Management Areas ("PHMAs"), General Habitat Management Areas ("GHMAs"), and other identified high-value habitats.

6.      In October 2015, the Fish and Wildlife Service determined that ESA listing is "not warranted," finding that the Sage-Grouse Plan Amendments provide adequate regulatory mechanisms, and specifically citing the Plan Amendments' requirement that "priority will be given to leasing and development of fluid mineral resources, including geothermal, underline outside of sage-grouse habitat." 80 Fed. Reg. 59858, 59876 (Oct. 2, 2015) (emphasis added).

7.      Beginning in early 2016, some BLM Field Offices resumed leasing, subject to the Sage-Grouse Plan Amendments, of federal fluid minerals affecting sage-grouse habitats. On September 1, 2016, BLM issued guidance for "Implementation of Greater Sage-Grouse Resource Management Plan Revisions or Amendments – Oil & Gas Leasing and Development Sequential Prioritization," Instruction Memorandum 2016-143.

8.      In January 2017, the new Trump Administration began working systematically to dismantle and/or avoid protections for public lands and their resources in order to promote oil, gas, and other fossil fuel development.  Defendant Ryan Zinke, Trump's Secretary of Interior, and Defendant David Bernhart, a former energy industry lobbyist who is now Deputy Secretary of Interior, have led the charge – to the point that the Department of Interior recently put an oil rig on employee identification badges.  *See* D. Grandoni & J. Eilperin, "Oil rigs and cowboys: Interior agency gives employees new cards to wear," *Washington Post* (3/15/18).

9.      In an October 2017 "Final Report: Review of the Department of Interior Actions that Potentially Burden Domestic Energy," Zinke's Interior Department identified sage-grouse

management plans, and the prioritization requirement in particular, as "burdens" to the Administration's announced policy of promoting domestic oil and gas extraction. Defendant Zinke has further announced his intention to revise the Sage-Grouse Plan Amendments in order to weaken their protections.

10.     Defendants have issued a series of orders, reports, and directives reducing consideration of impacts to sage-grouse and opportunities for public involvement in the oil and gas leasing process.  Among others, on December 27, 2017, without amending or revising its land use plans under FLPMA or NEPA, BLM issued Instruction Memorandum 2018-026, effectively repealing the prioritization requirement of the 2015 Sage-Grouse Plan Amendments.

11.     Following these directives, BLM has offered and sold – without prior review or analysis of site-specific and cumulative impacts to greater sage-grouse populations and habitat – hundreds of thousands of acres of oil and gas leases within or affecting sage-grouse habitats designated in the Sage-Grouse Plan Amendments, including SFAs, PHMAs, and GHMAs. These leasing actions violate the Sage-Grouse Plan Amendments' provisions and requirements, including that oil and gas leasing be prioritized outside sage-grouse habitats. Over a million acres of similar lease sales are slated to be offered and sold by BLM in coming months.  Individually and cumulatively, these oil and gas leases threaten substantial degradation and fragmentation of key sage-grouse habitats, and harm to sage-grouse populations, as illustrated on the following map Plaintiffs have prepared using BLM data (but not including proposed eastern Idaho June 2018 split estate lease sale near Gray's Lake, discussed below in paragraphs 230-38):



12.     BLM has also commenced approval of large oil and gas development projects in or affecting priority sage-grouse habitats, including the Normally Pressurized Lance ("Lance") project, a massive proposed development of some 3,500 oil and gas wells within critical sage-grouse winter habitat and connectivity corridors for sage-grouse and other sagebrush-obligate wildlife.  This Court previously addressed the Lance project in related BLM sage-grouse litigation.  *See* Memorandum Decision and Order, *W. Watersheds Project v. Salazar*, No. 08-cv-516-BLW, 2012 WL 5880658 (D. Idaho Nov. 20, 2012), ECF Docket No. 31. The Court declined to enjoin the Lance project at that time because it was not yet final; now, however,

BLM is moving forward in approving the Lance project even though it poses severe threats to sage-grouse and other wildlife habitats and populations.

13.     Defendants are also acting unlawfully to limit, exclude, and/or preclude environmental review and involvement by Plaintiffs and other members of the public in BLM's oil and gas leasing and development decisions. On January 31, 2018, BLM issued Instruction Memorandum 2018-034, which adopted a series of "policy" changes instructing its Field Offices to accelerate oil and gas leasing and reduce environmental review and public comment.  IM 2018-034 directs BLM offices to accelerate approval of oil and gas leases at the expense of conducting full environmental analysis, and drastically limits public involvement in leasing decisions. These changes affect and injure substantial rights and interests of Plaintiffs and the public, and were adopted in violation of NEPA and without compliance with the procedures and substantive requirements of law, including the APA.

14.     Plaintiffs thus seek judicial review and reversal of the challenged oil and gas leases and development projects, as identified below, as well as IMs 2018-026 and 2018-034. Plaintiffs also seek declaratory and injunctive relief ordering Defendants to adhere to NEPA and provide adequate notice and comment for future BLM oil and gas leasing and development decisions; and requiring Defendants to comply with law in future administration of oil and gas resources affecting sage-grouse on the public lands.

## JURISDICTION AND VENUE

15.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question) because this action arises under the laws of the United States and their implementing regulations, including FLPMA, 43 U.S.C. §§ 1701 *et seq.*; NEPA, 42 U.S.C. §§ 4321 *et seq.*; the APA, 5

U.S.C. §§ 701 *et seq*.; the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq*.; and the Equal

Access to Justice Act, 28 U.S.C. §§ 2412 *et seq*.

16.     An actual, justiciable controversy now exists between Plaintiffs and Defendants.

The challenged actions are final and subject to judicial review pursuant to 5 U.S.C. §§ 702, 704,

and 706. The requested relief is proper under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 701-06.

17.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because Plaintiff Western

Watersheds Project resides in this district and Plaintiff Center for Biological Diversity has staff

andr members in this district; Defendant BLM has offices and staff that manage greater sage-

grouse habitats on public lands and administer federal fluid minerals in Idaho; and a substantial

part of the events or omissions giving rise to the claims herein occurred within this district.

18.     The federal government has waived sovereign immunity under 5 U.S.C. § 701.

**PARTIES**

19.    Plaintiffs in this action are as follows:

A.     WESTERN WATERSHEDS PROJECT is an Idaho non-profit corporation, which

is dedicated to protecting and conserving the public lands and natural resources in Idaho and the

American West.  Western Watersheds Project is headquartered in Hailey, Idaho, and has

additional staff and offices in Boise, as well as Wyoming, Montana, Nevada, Arizona, Utah, and

Oregon.  Western Watersheds Project has long-standing interests in preserving and conserving

greater sage-grouse populations and habitat in Idaho and other states across the range of the

greater sage-grouse.  It is the plaintiff in the related BLM sage-grouse litigation involving the

Normally Pressured Lance project, *see W. Watersheds Project v. Salazar*, No. 1:08-cv-516-BLW

(D. Idaho), and is a co-plaintiff in *W. Watersheds Project et al. v. Schneider et al*., No. 1:16-cv-

083-BLW (D. Idaho), which challenges aspects of the Sage-Grouse Plan Amendments, as well as other sage-grouse cases before this Court.

B.      Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a non-profit organization dedicated to the preservation, protection, and restoration of biodiversity, native species, and ecosystems. The Center was founded in 1989 and is based in Tucson, Arizona, with offices or staff throughout the country, including Idaho, Nevada, Oregon, California, and Colorado.  It has more than 63,000 members, including many who reside in, explore, and enjoy the native species and ecosystems of the Interior Mountain West, where the greater sage-grouse is found. The Center is actively involved in species and habitat protection issues worldwide, including throughout the western United States, and continues to actively advocate for increased protections for greater sage-grouse and other sagebrush obligates in Idaho, Montana, Nevada, Wyoming, and elsewhere. The Center's officers, staff, and members regularly seek out greater sage-grouse on public lands for recreational, scientific, educational and other pursuits, and intend to continue to do so in the future. The Center has an organizational interest in Defendants' management of habitat for imperiled species; and has participated in prior sage-grouse litigation before this and other courts, including *W. Watersheds Project et al. v. Schneider et al.*, No. 1:16-cv-083-BLW (D. Idaho).

20.     The decline of the greater sage-grouse in Idaho and other states across its range is of great concern to Plaintiffs and their officers, staff, members, and supporters; and the preservation and recovery of the species and its sagebrush-steppe habitat are highly important to Plaintiffs and their officers, staff, members, and supporters.

21.     Plaintiffs' officers, staff, members, and supporters work, live, and/or recreate throughout the public lands of the sagebrush-steppe ecosystem of Idaho and other states which are

occupied by greater sage-grouse; and they regularly visit and utilize the public lands in Idaho and

other states to observe and study the greater sage-grouse and the sagebrush-steppe ecosystem.

Plaintiffs' members, supporters and staff derive recreational, aesthetic, scientific, inspirational,

educational, and other benefits from these activities and have an interest in preserving the possibility

of such activities in the future.  Their use and enjoyment of the sage-grouse depends on its

continued existence within, and the scientifically sound management of, public lands and federal

fluid mineral resources within the greater sage-grouse range.

22.    Many of Plaintiffs' activities – including research and advocacy – have focused on

preserving the remaining habitats of greater sage-grouse on public lands in Idaho and other states

across the sage-grouse range; and in restoring those habitats to protect and recover greater sage-

grouse populations.  Plaintiffs have sought to participate in the BLM's oil and gas leasing and

development decisions challenged in this action, including by submitting scoping and other

comments, and submitting detailed protests of the BLM's challenged decisions, but often have not

been given sufficient notice or opportunity to do so.  Plaintiffs have exhausted all legally required

administrative remedies before bringing this action.

23.    Defendants' violations of FLPMA, NEPA, APA, and other provisions of law in

adopting the Challenged Decisions (as identified below) have injured the aesthetic, commercial,

conservation, scientific, recreational, educational, wildlife preservation, procedural, and other

interests of Plaintiffs and their officers, staff, members, and supporters.  These are actual, concrete

injuries caused by Defendants' violations of law, for which judicial relief is required to remedy

those harms.  The relief sought herein would redress these injuries.  Plaintiffs have no adequate

remedy at law.

24.    Defendants in this action are as follows:

COMPLAINT -- 9

A.    RYAN K. ZINKE is Secretary of Interior, and has responsibility for approving the Challenged Decisions identified below. He is sued solely in his official capacity.

B.    DAVID BERNHARDT is Deputy Secretary of Interior, and has responsibility for approving and implementing many of the unlawful policy changes and other aspects of the Challenged Decisions, as identified below. He is sued solely in his official capacity.

C.    BUREAU OF LAND MANAGEMENT is an agency or instrumentality of the United States, within the Department of Interior. BLM is charged with statutory duties to manage public lands under its jurisdiction under FLPMA, NEPA and other authorities, and to manage leasing and development of federal oil and gas resources in accordance with all requirements of law. BLM is the agency responsible for issuing the oil and gas leases and other decisions challenged herein.

## STATEMENT OF RELEVANT FACTS

### I.    THE GREATER SAGE-GROUSE.

25.    The plight of the greater sage-grouse is well-known to this Court from prior cases, including the 2008 BLM RMP/sage-grouse litigation referenced above, as well as ESA listing and other cases. *See, e.g.*, *W. Watersheds Project v. Salazar*, No. 08-cv-516-BLW, 2011 WL 4526746 (D. Idaho 2011) ("*Salazar*") (holding that BLM "test case" RMPs violated NEPA and FLPMA for failing to address sage-grouse conservation needs); *W. Watersheds Project v. U.S. Fish and Wildlife Serv.*, 535 F. Supp.2d 1173 (D. Idaho 2007) (reversing 2005 "not warranted" ESA listing determination for greater sage-grouse); *W. Watersheds Project v. Jewell*, 56 F. Supp. 3d 1182 (D. Idaho 2014) (BLM violated NEPA and FLPMA in renewing grazing permits in key sage-grouse habitat in southern Idaho); *W. Watersheds Project v. Salazar*, 843 F. Supp. 2d 1105 (D. Idaho 2012) (BLM violated NEPA and FLPMA in renewing grazing permits in southern

Idaho without considering cumulative impacts on sage-grouse and RMP duties to prioritize protection of sage-grouse as a sensitive species).

26.     The greater sage-grouse is a "sagebrush obligate" species, meaning it relies on the sagebrush steppe ecosystem for all its habitat needs.  The fate of the sage-grouse thus depends on ensuring that healthy and well-distributed sagebrush steppe habitat exists across its range.

27.     Greater sage-grouse once numbered in the millions across the western U.S and Canada, but loss and fragmentation of their native sagebrush-steppe habitats have caused populations to decline precipitously over the last century.  The current population of greater sage-grouse is estimated at less than 5% of historic population levels, *i.e.*, sage-grouse populations have experienced a 95% or more decline.

28.     Federal agencies, principally BLM and the Forest Service, manage over half the remaining sagebrush steppe.  Although cooperation among federal and state agencies, private land owners, and others is important to conserve sage-grouse and sagebrush habitat, the federal government and federal lands are key to ensuring conservation of the species.

29.     Greater sage-grouse is a landscape species that uses a variety of seasonal habitats throughout the year.  Sage-grouse breeding sites (leks) and associated nesting and brood-rearing habitats, as well as winter concentration areas, are especially important to the species' life cycle. The grouse have high fidelity to leks, and most hens will nest within four miles of the lek where they mated.  Sage-grouse also return to the same winter habitats year after year.  Anthropogenic disturbance and disruptive activities, noise, and habitat degradation in breeding, nesting, brood-rearing, and winter habitats negatively affect sage-grouse productivity.

30.     Energy development has well-documented adverse effects on sage grouse survival, breeding, and behavior.  Roads, pipelines, wells, and other infrastructure cause direct

COMPLAINT -- 11

habitat loss and fragmentation. Surface development can disrupt breeding activities and cause birds to abandon suitable habitat, resulting in population declines.  Noise associated with energy development is also known to disrupt the sage-grouse life cycle. Research suggests that drilling activity can affect sage-grouse more than 12 miles away.

31.     Multiple peer-reviewed studies have documented the adverse effects from oil and gas development on sage-grouse habitat use, breeding, and survival and recovery. As noted in one recent peer-reviewed study (Gamo & Beck 2017, pp. 189-90): "Energy development has been shown to specifically impact male sage-grouse lek attendance, lek persistence, recruitment of yearling male and female grouse to leks, nest initiation and site selection, nest survival, chick survival, brood survival, summer survival of adult females, early brood-rearing habitat selection, adult female summer habitat selection, and adult female winter habitat selection."  Another recent study (Green et al. 2017), confirms that sage-grouse lek attendance remains stable only where no oil and gas development is present within 6,400m, a level of protection far greater than that provided by the BLM's 2015 Sage-Grouse Plan Amendments.

**2010 ESA Listing Decision**

32.     After this Court reversed and remanded the 2005 "not warranted" ESA listing determination, *W. Watersheds Project v. U.S. Fish and Wildlife Serv.*, 535 F. Supp.2d 1173 (D. Idaho 2007), the Fish and Wildlife Service published a new finding in March 2010 that ESA listing was "warranted," based on the best available science.  But the Service determined that proceeding with a listing rule was "precluded" at that time by limited resources and higher priority species.  *See* 75 Fed. Reg. 13910 (March 5, 2010) ("March 2010 Finding").

33.     The March 2010 Finding stressed the inadequacy of existing regulatory mechanisms to protect greater sage-grouse from the many identified threats to grouse habitats

COMPLAINT -- 12

and populations – particularly focusing on BLM and Forest Service land use plans, which did not include measures necessary to ensure conservation of sage-grouse.  The March 2010 Finding underscored that BLM's existing regulatory mechanisms to protect sage-grouse populations and habitats from energy development (particularly oil and gas) were inadequate and not scientifically based, including BLM's use of 0.25 mile and 0.6 mile "buffers" around sage-grouse leks.

### National Greater Sage-grouse Planning Strategy

34.     Partly in response to this Court's rulings in the 2008 sage-grouse/RMP litigation, *W. Watersheds Project v. Salazar*, No. 08-cv-516-BLW, and citing the March 2010 Finding, BLM launched the National Greater Sage-Grouse Planning Strategy in August 2011 to review and amend BLM RMPs across the sage-grouse range. The Forest Service later joined the National Greater Sage-Grouse Planning Strategy to amend its Forest Plans across the sage-grouse range as well.

35.     The charter for the National Sage-Grouse Planning Strategy established a National Technical Team ("NTT") to serve "as an independent, technical and science-based team to ensure the best information related to greater sage-grouse management is fully reviewed, evaluated and provided to the BLM for consideration in the land use planning process."

36.     On December 21, 2011, BLM released the NTT's "Report on National Greater Sage-grouse Conservation Measures" ("NTT Report"), which BLM filed with this Court in the related BLM sage-grouse/RMP litigation.  *See* SAGE GROUSE NATIONAL TECHNICAL TEAM, A REPORT ON NATIONAL GREATER SAGE-GROUSE CONSERVATION MEASURES 6-7 (Dec. 21, 2011), Hearing Exhibit 6, *Salazar,* No. 08-cv-516-BLW, ECF No. 167-14.   Based on the evidence and testimony at the remedies hearing in that litigation, the Court found that the NTT Report

"contains the best available science concerning the sage-grouse" at the time.  Memorandum

Decision and Order, *Salazar*, 2012 WL 5880658 at *2 (Nov. 21, 2012), ECF No. 231.

    37.    The NTT Report (p. 7) emphasized that the designation and protection of priority

sage-grouse habitats is key to conserving the greater sage-grouse:

> The overall objective is to protect priority sage-grouse habitats from anthropogenic disturbances that will reduce distribution or abundance of sage-grouse. Priority sage-grouse habitats are areas that have the highest conservation value to maintaining or increasing sage-grouse populations. These areas would include breeding, late brood-rearing, winter concentration areas, and where known, migration or connectivity corridors.

    38.    The NTT Report also explained that the "primary potential risks to sage-grouse

from energy and mineral development" are: 1) direct disturbance, displacement, or mortality of

grouse; 2) direct loss of habitat, or loss of effective habitat through fragmentation and reduced

habitat patch size and quality; and 3) cumulative landscape-level impacts.  *Id.* at 18.

    39.    The NTT Report extensively discussed the scientific literature on the impacts of

energy development on sage-grouse, *id.* at 19-21, and concluded that:

> There is strong evidence from the literature to support that <u>surface-disturbing energy or mineral development within priority sage-grouse habitats is not consistent with the goal to maintain or increase populations or distribution</u>. . . . Breeding populations are severely reduced at well pad densities commonly permitted.  Magnitude of losses varies from one field to another, but findings suggest that impacts are universally negative and typically severe.

*Id.* at 19 (emphasis added; citations omitted).

    40.    The NTT Report found that BLM's existing 0.25-mile "No Surface Occupancy"

("NSO") buffers around leks, and seasonal timing stipulations applying 0.6-mile buffers around

leks, are inadequate to protect sage-grouse, stating that "[e]ven a 4-mile NSO [non-surface

occupancy] buffer would not be large enough to offset all the impacts" of energy development.

*Id.* at 21.

COMPLAINT -- 14

41.     The NTT Report concluded that "the conservation strategy most likely to meet the objective of maintaining or increasing sage-grouse distribution and abundance is <u>to exclude energy development and other large-scale disturbance from priority habitats</u>, and where valid existing rights exist, <u>minimize those impacts by keeping disturbances to 1 per section with direct surface disturbance impacts held to 3% of the area or less.</u>" *Id.* (emphasis added).

42.     The NTT Report (pp. 22-23) provided other recommendations for conservation measures to limit adverse impacts of energy development on greater sage-grouse, including:

- "Close priority sage-grouse habitat areas to fluid mineral leasing,"

-  "Do not allow new surface occupancy on federal leases within priority habitat, this includes winter concentration areas during any time of the year," and

- "Apply a seasonal restriction on exploratory drilling that prohibits surface-disturbing activities during the nesting and early brood-rearing season in all priority sage-grouse habitats during this period."

43.     BLM issued Instruction Memorandum ("IM") 2012-044 on December 27, 2011, which required that the NTT Report's recommendations must be considered within the National Sage-Grouse Planning Strategy.

**COT Report**

44.     The Fish and Wildlife Service convened a separate "Conservation Objectives Team" ("COT") of federal and state experts, which was tasked with producing recommendations "regarding the degree to which threats need to be reduced or ameliorated to conserve the greater sage-grouse so that it would no longer be in danger of extinction or likely to become in danger of extinction in the foreseeable future," *i.e.,* would not need to be listed under the ESA.

45.     In March 2013, the Fish and Wildlife Service released the team's findings – known as the "COT Report" – which was peer-reviewed and based on the best scientific and

commercial data available.  *See* GREATER SAGE-GROUSE (*CENTROCERCUS UROPHASIANUS*)
CONSERVATION OBJECTIVES: FINAL REPORT (U.S. Fish and Wildlife Service, 2013).

46.     The COT Report identified "Priority Areas for Conservation" ("PACs"), which it
termed "key habitats essential for sage-grouse conservation."  The PACs "were identified using
the best available information" and were described as "highly important for long-term viability
of the species and should be a primary focus of our collective conservation efforts."

47.     Subsequently, in an October 27, 2014 letter to the BLM and Forest Service, titled
"Greater Sage-Grouse: Additional Recommendation to Refine Land Use Allocations in Highly
Important Landscapes," the Service identified a sub-category of lands within the PACs called
sage-grouse "stronghold" areas – the most vital sage-grouse areas within the priority habitats
designated as PACs.

**2015 Sage-Grouse Plan Amendments.**

48.     On May 29, 2015, BLM and Forest Service released fourteen final Environmental
Impact Statements ("EISs") and Proposed Land Use Plan Amendments for the National Greater
Sage-Grouse Planning Strategy, which (along with the 2014 Lander RMP) would amend 98
BLM RMPs and Forest Plans across the sage-grouse range.

49.     BLM and Forest Service finalized the National Greater Sage-Grouse Planning
Strategy through issuance of four Records of Decision ("RODs") in September 2015, which
(along with the prior Lander RMP) amended or revised each of the 98 BLM and Forest Service
land use plans within the National Planning Strategy region. These plan amendments are called
"Approved Resource Management Plan Amendments" ("ARMPAs") or "Approved Resource
Management Plans" ("ARMPs") for the BLM lands, and "Land Management Plan Amendments"
("LMPAs") for Forest Service lands.

50.     The four September 2015 RODs were comprised of two RODs separately issued by BLM and two other RODs by the Forest Service for the Rocky Mountain and Great Basin regions, respectively.  The two BLM RODs are as follows:

(a)     BLM's "Record of Decision and Approved Resource Management Plan Amendments for the Rocky Mountain Region, Including the Greater Sage-grouse Sub-Regions of Lewistown, North Dakota, Northwest Colorado, Wyoming, and the Approved Resource Management Plans for Billings, Buffalo, Cody, HiLine, Miles City, Pompeys Pillar National Monument, South Dakota, Worland," dated September 21, 2015 ("BLM Rocky Mountain ROD"); and

(b)     BLM's "Record of Decision and Approved Resource Management Plan Amendments for the Great Basin Region, Including the Greater Sage-grouse Sub-Regions of Idaho and Southwestern Montana, Nevada and Northeastern California, Oregon, Utah, dated September 21, 2015 ("BLM Great Basin ROD").

51.     BLM asserted in these Great Basin and Rocky Mountain RODs that it relied on the "best available science" in reaching the management decisions approving the various plan amendments.  *See, e.g.*, BLM Rocky Mountain ROD at 1-12 ("BLM used the best available science") & 1-33 (revised/amended plans "are grounded in the best available science").

52.     The FEISs, RODs, and individual plan amendments (ARMPAs, ARMPs, and LMPAs) are collectively termed the "Sage-Grouse Plan Amendments" in this Complaint.

**Habitat Designations In Sage-Grouse Plan Amendments.**

53.     The Sage-Grouse Plan Amendments designated a variety of sage-grouse habitats across the species' range for heightened management protections in order to help conserve the species, including SFAs, PHMAs, GHMAs, and other sage-grouse habitats, as illustrated by this

map from BLM's Rocky Mountain ROD, p. 1-13:



54.    Of these, PHMAs are defined as "lands identified as having the highest value to

maintaining sustainable GRSG [greater sage-grouse] populations." *See, e.g.,* Idaho &

Southwestern Montana Final EIS at ES-4.  The boundaries of the PHMAs "largely coincide with areas identified as Priority Areas for Conservation in the COT report," *i.e.*, the PACs.  *Id.* SFAs were identified "as a subset of PHMA" derived from the sage-grouse "stronghold areas" within the PACs, as set forth in the Service's October 2014 letter referenced above.  *Id.*

55.     GHMAs were defined as "BLM-administered and National Forest System lands that require some special management to sustain GRSG populations."  *Id.*

**Management Direction in Sage-Grouse Habitat Areas.**

56.     The Sage-Grouse Plan Amendments applied a range of specific different management directions to these sage-grouse habitats, to provide "management direction that avoids and minimizes additional disturbance in [greater sage-grouse] habitat management areas." *See* BLM Great Basin ROD, S-1.  BLM's obligations to conserve sage-grouse habitat extend to both BLM-managed surface lands, and "split estate" lands with BLM-managed mineral estate. *See, e.g.,* Idaho/Southwestern Montana ARMP at 2-27

57.     The "management responses" adopted in the Sage-Grouse Plan Amendments were intended to address the key threats to sage-grouse habitats and populations from the COT Report.  *Id.* at 1-17, Table 1-4; BLM Rocky Mountain ROD, at 1-18, Table 1-4.  They included measures to limit human disturbances, including "conditions of approval" ("COAs") on existing fluid mineral leases and required lease stipulations for newly-issued fluid mineral leases; "disturbance caps" in PHMAs and other priority habitats; "lek buffers" and other "required design features" ("RDFs") when authorizing actions in sage-grouse habitats; and requiring "mitigation to provide a net conservation gain" from third-party actions that result in sage-grouse habitat loss or degradation.  *Id.*

58.     With respect to fluid mineral energy development – which includes oil and gas, as well as geothermal resources – the Sage-Grouse Plan Amendments adopted a number of different measures, including requiring "no surface occupancy" ("NSO") stipulations in SFAs and PHMAs outside of Wyoming and portions of Montana (with differences among some of the plans, and allowing waiver, modification or exception in some instances).  *Id.*

59.     Although the sage-grouse priority habitat designations and management restrictions adopted under the Sage-Grouse Plan Amendments represent a significant step forward, the Sage-Grouse Plan Amendments adopt lease-specific stipulations for fluid mineral development development which are not always consistent with the best available science, including the NTT Report and COT Report.  Thus, for example, the "Wyoming Nine" Sage-Grouse Plan Amendments adopted inadequate "lek buffers," allow excessive surface disturbance in sage-grouse habitats, and provide for BLM to approve modifications, waivers, and exceptions for energy developments to further degrade and fragment sage-grouse habitats, thus harming sage-grouse populations.

60.     Plaintiffs Western Watersheds Project and Center for Biological Diversity are challenging these and other inadequacies of the Sage-Grouse Plan Amendments in the related sage-grouse litigation before this Court, *W. Watersheds Project et al. v. Schneider et al.*, No. 1:16-cv-083-BLW (D. Idaho).  By bringing this litigation to enforce, in part, the Sage-Grouse Plan Amendments that are being violated by Defendants, Plaintiffs do not waive their challenges to the inadequacies of those Plan Amendments in other respects identified in that litigation.  As noted below, inadequacies of the Sage-Grouse Plan Amendments in allowing oil and gas and other energy development within sage-grouse habitats contributes to the harms posed by Defendants' actions as challenged herein.

**BLM Duty To Prioritize Oil And Gas Leasing/Development Outside Of Sage-grouse Habitats.**

61.     While the Sage-Grouse Plan Amendments differed in their specific requirements for management limitations on fluid mineral energy development in priority sage-grouse habitats, all the Plan Amendments directed that BLM will: "Prioritize the leasing and development of fluid mineral resources outside GRSG [greater sage-grouse] habitat."  BLM Great Basin ROD, p. 1-17, Table I-4 (underscore added); BLM Rocky Mountain ROD, p. 1-19, Table 1-4 (same). These requirements are incorporated into Management Directions for the individual ARMPAs, ARMPs, and LMPAs.

62.     Prioritizing leasing and development of oil and gas resources outside sage-grouse habitats formed part of the "Habitat Protection and Surface Disturbance Measures in PHMAs and GHMAs," which the RODs stated "will be applied in both PHMAs and GHMAs."  *See* BLM Great Basin ROD, p. 1-23; BLM Rocky Mountain ROD, p. 1-25.  BLM explained that this "Prioritization Objective":

> is to further limit future surface disturbance and encourage new development in areas that would not conflict with GRSG [greater sage-grouse]. This objective is intended to guide development to lower conflict areas and as such protect important habitat and reduce the time and cost associated with oil and gas leasing development by avoiding sensitive areas, reducing the complexity of environmental review and analysis of potential impacts on sensitive species, and decreasing the need for compensatory mitigation.

*Id.* (emphasis added).

63.     Moreover, BLM explained that this "Prioritization Objective" along with the other "Habitat Protection and Surface Disturbance Measures in PHMAs and GHMAs" (including lek buffers and RDFs) would result in protecting sage-grouse habitats and populations:

> In summary, all forms of new development in PHMAs and GHMAs would either be closed, excluded, avoided, or developed only if the resultant effect were a net conservation gain to the GRSG [greater sage-grouse] or its habitat, ensuring that existing habitat would be protected or restored through compensatory mitigation.

COMPLAINT -- 21

BLM Great Basin ROD, p. 1-24 & BLM Rocky Mountain ROD, p. 1-26 (underscore added).

64.     The Sage-Grouse Plan Amendments adopted by BLM for individual Field Offices under to the Great Basin and Rocky Mountain RODs also require prioritization of oil and gas leasing and development outside of priority sage-grouse habitats as a key plan component addressing COT Report threats. *E.g.*, Idaho & SW Montana ARPMA, p. 1-10, Table 1-6. To this end, they incorporate specific language echoing the RODs' commitment to avoid oil and gas leasing in key sage-grouse habitats. *Id*. at 2-26 ("Priority will be given to leasing and development of fluid mineral resources, including geothermal, outside of PHMA, IHMA [Important Habitat Management Areas], and GHMA"); Nevada/Northeast California ("NV/NE CA") ARMPA 1-10 ("Prioritize the leasing and development of fluid mineral resources outside GRSG habitat"); Billings ARMP (MD FLUIDS-15) (same). Similarly, the Idaho/SW Montana Sage-Grouse Plan Amendment (p. 2-26) provides: "Priority will be given to leasing and development of fluid mineral resources, including geothermal, outside of PHMA, IHMA, and GHMA."

65.     The Final EISs for the Sage-Grouse Plan Amendments further explain that these restrictions are intended to avoid, minimize, or mitigate impacts on sage-grouse priority habitats from oil and gas development. *E.g.*, NV/NE CA Final EIS at 2-20 ("In PHMAs and GHMAs, apply the concept of 'avoid, minimize, and compensatory mitigation' for all human disturbance not already excluded or closed, so as to avoid adverse effects on GRSG and its habitat"). Under this approach, "[t]he first priority would be to avoid new disturbance; where this is not feasible, the second priority would be to minimize and mitigate any new disturbance." *Id*. Thus, "[n]ew leases would be prioritized in non-habitat areas first and then in the least suitable habitat for GRSG." ID/SW MT Final EIS at 4-199.

COMPLAINT -- 22

66.     As the Sage-Grouse Plan Amendments explain, they "prioritize[] development outside of GRSG habitat, and focus[] on a landscape-scale approach to conserving GRSG habitat…. Land use allocations in the Proposed Plan would limit or eliminate new surface disturbance in PHMA, while minimizing disturbance in GHMA." *See, e.g.,* Miles City ARMP at 2-3; *see also* WY RMPA Final EIS at 2-13 (same).  The Wyoming RMPA Final EIS further explains that, "when authorizing development of fluid mineral resources [in sage-grouse habitats], work with the operator to minimize impacts to Greater Sage-Grouse and their habitat, such as locating facilities in non-habitat areas first and then in the least suitable habitat." *Id.* at 2-76.

**BLM Instruction Memorandum 2016-143**

67.     On September 1, 2016, BLM issued Instruction Memorandum 2016-143, titled "Implementation of Greater Sage-Grouse Resource Management Plan Revisions or Amendments – Oil & Gas Leasing and Development Sequential Prioritization."  It "provides guidance on prioritizing implementation decision for [BLM] oil and gas leasing and development, to be consistent with" the Sage-Grouse Plan Amendments under the BLM's Great Basin and Rocky Mountain RODs.

68.     The stated goals of IM 2016-143 are "to ensure consistency across BLM offices when implementing the GRSG Plans decision aimed at avoiding or limiting new surface disturbance" in PHMAs, including SFAs, and "minimizing surface disturbance" in GHMAs; and "to provide clarity to the BLM Field Offices on how to move forward with oil and gas leasing and development activities within designated GRSG habitats."

69.     IM 2016-143 was "intended to ensure consideration of the lands outside of GHMAs and PHMAs for leasing and development before considering lands within GHMAs and,

thereafter, to ensure consideration of lands within GHMAs for leasing and development before considering any lands within PHMAs for leasing and development in an effort to focus future surface disturbance outside of the most important areas for sage-grouse conservation consistent with the conservation objectives and provisions in the GRSG plans."

70.     IM 2016-143 identified similar sequences and factors for oil and gas development approvals in proximity to PHMAs and GHMAs, including prioritizing lands outside PHMAs/GHMAs and other factors to ensure meeting the Sage-Grouse Plan Amendments' conservation goals.

71.     IM 2016-143 further directed that BLM Authorized Officers consider whether "mitigation will be sufficient to achieve the net conservation gain mitigation standard" in the Sage-Grouse Plan Amendments, including by asking owners of existing leases in SFAs, PHMAs, "or other sensitive GRSG habitats to relinquish those leases as an offset to the potential impacts to GRSG and their habitats from activities arising from implementation decision or activities."

72.     IM 2016-143 further provided for deferring lease reinstatements or denying them, to ensure compliance with the Sage-Grouse Plan Amendments.  IM 2016-143 also directed that where a lease in PHMA or GHMA has expired because no drilling has occurred, "BLM will not re-offer these parcels."

## II.     TRUMP ADMINISTRATION'S EFFORTS TO OPEN SAGE-GROUSE HABITATS TO OIL AND GAS LEASING AND DEVELOPMENT

73.     Shortly after Donald J. Trump assumed office as President of the United States, he began taking actions to promote oil and gas and other fossil fuel development within the United States, and to rescind numerous steps taken by the Obama Administration to protect public lands and the climate from fossil fuel impacts.

74.     On March 28, 2017, President Trump issued Executive Order ("EO") 13783, titled "Promoting Energy Independence and Economic Growth."  It directed that all executive departments and agencies "immediately review existing regulations that potentially burden the development or use of domestically produced energy resources and appropriately suspend, revise, or rescind those that unduly burden the development of domestic energy resources beyond the degree necessary to protect the public interest or otherwise comply with the law."

75.     EO 13783 gave all federal agencies 180 days to submit a final report with "specific recommendations that, to the extent permitted by law, could alleviate or eliminate aspects of agency actions that burden domestic energy production."

**Secretarial Order 3349: "American Energy Independence"**

76.     On March 29, 2017, in an initial response to EO 13783, Defendant Interior Secretary Zinke issued Secretarial Order ("SO") 3349, titled "American Energy Independence." SO 3349 directed all bureaus with the Department of Interior – including BLM – to examine specific actions impacting oil and gas development, and any other actions affecting other energy development.

77.     SO 3349 revoked prior Secretarial Order 3330, "Improving Mitigation Policies and Practices of the Department of the Interior," adopted under the Obama Administration; and directed all Interior bureaus and offices to review all actions taken under that Order for possible reconsideration, modification, or rescission.

78.     Minimization of oil and gas and other energy development in sage-grouse habitat was an important part of the Sage-Grouse Plan Amendments, but mitigation directions and obligations have now been effectively rescinded, without conducting plan amendments or revisions under FLPMA or any new NEPA or other evaluation.

COMPLAINT -- 25

**Secretarial Order No. 3351: "Strengthening the Department of the Interior's Energy Portfolio."**

79.     On May 1, 2017, Defendant Zinke issued Secretarial Order 3351, titled "Strengthening the Department of the Interior's Energy Portfolio."

80.     SO 3351 stated that the Dept. of Interior is "committed to an America-first energy strategy" that "maximizes the use of American resources." SO 3351 established a "Counselor to the Secretary for Energy Policy," responsible for "[i]dentifying regulatory burdens that unnecessarily encumber energy exploration development, production, transportation; and developing strategies to eliminate or minimize these burdens."

**Secretarial Order 3353 – "Greater Sage-Grouse Conservation and Cooperation with Western States"**

81.     On June 7, 2017, Defendant Zinke issued Secretarial Order 3353, titled "Greater Sage-Grouse Conservation and Cooperation with Western States."

82.     SO 3353 stated that: "Sage-grouse protections can affect energy development because these activities often share the same land across the 11 western states and 67 million acres of Federal land that are affected by sage grouse habitat."

83.     SO 3353 established a Department of Interior "Sage-Grouse Review Team" with instructions "to review the 2015 Sage-Grouse Plans and associated policies, giving appropriate weight to the value of energy and other development on public lands within BLM's overall multiple-use mission and to be consistent with the policy set forth in Secretarial Order 3349, 'American Energy Independence'."

84.     SO 3353 directed that the Sage-Grouse Review Team be composed of representatives of BLM, Fish and Wildlife Service, and US Geological Survey ("USGS"), but did not require that they be scientists or sage-grouse experts.  In fact, the members of the Review

Team were closely tied to the oil and gas, coal, and other industries, without scientific background with sage-grouse conservation or public lands management.

85.     The oil and gas industry provided substantial and direct input to the Sage-Grouse Review Team, including by offering a list of proposed "policy" changes and plan revisions, which the Sage-Grouse Review Team largely adopted and recommended, even while the conservation community was excluded from the review process.

**Secretarial Order 3354: "Supporting and Improving the Federal Onshore Oil and Gas Leasing Program and Federal Solid Mineral Leasing Program"**

86.     On July 6, 2017, Defendant Zinke issued Secretarial Order 3354, titled "Supporting and Improving the Federal Onshore Oil and Gas Leasing Program and Federal Solid Mineral Leasing Program."

87.     The stated purpose of SO 3354 was "to ensure that quarterly oil and gas lease sales are consistently held and to identify other ways the Department of Interior may promote the exploration and development of Federal onshore oil and gas and solid mineral resources."  It directed that BLM report to the Counselor for Energy Policy within 45 days on, *inter alia*, "progress made to support and improve the quarterly lease sales" and on "a strategy to process the large number of currently pending permitting applications, and improve the permitting process."

**DOI Final Report: "Review of the Department of the Interior Actions that Potentially Burden Domestic Energy"**

88.     On October 24, 2017, the Department of Interior released its "DOI Final Report: Review of the Department of the Interior Actions that Potentially Burden Domestic Energy, Report to the Secretary of Interior" ("DOI Report").

89.     The DOI Report noted that BLM "administers more land than any other Federal agency, consisting of more than 245 million surface acres and 700 million acres of subsurface mineral development," and stated that "BLM is revising and reforming its leasing processes . . . and delaying, revising, or rescinding burdensome regulations and policies to improve domestic energy production and support jobs."

90.     Under the "list of specific actions BLM is undertaking to reduce burdens on the production of energy on BLM managed resources," the DOI Report included the following:

(a) "Revise and Replace Policy, Oil and Gas: IM 2010-117, 'Oil and Gas Leasing Reform – Land Use Process and Lease Parcel Reviews'": The DOI Report stated that BLM would "revise and reform" its leasing policy and "streamline the leasing process" from "beginning to end."  It further stated that until "the policy revisions are completed, BLM is setting quarterly lease sale acreage targets to address the acreage currently nominated," and "identifying ways to augment support staff for potential sales in those offices with greatest number of parcels nominated."

(b) "Revise Policy, Oil and Gas: IM 2016-143, 'Implementation of Greater Sage-grouse Resource Management Plan Revisions or Amendments – Oil & Gas Leasing and Development Sequential Prioritization'": The DOI Report stated that IM 2016-143 is "being reviewed for the purpose of enhancing consistency and certainty for oil and gas development in areas of sage-grouse habitat as directed by EO13783."  It stated that the IM "may have added administrative burdens since it requires additional analysis and staff time to screen parcels and weigh potential impacts to the Greater Sage-grouse before the parcels are offered for leasing.  It also requires additional analysis and staff time to process drilling permit approvals near Greater Sage-grouse areas." The DOI Report said revisions would give industry "greater certainty in leasing,

exploration and production activities due to availability of acreage for oil and gas development."
The Report further stated that "BLM will measure success by assessing changes in industry's
interest in nominating acreage for competitive sale and developing existing leases in areas affected
by the Greater Sage-grouse amendments to RMPs."

(c) "Review of General Greater Sage-grouse Conservation Policies and Plans": The DOI
Report cited the 2015 Sage-Grouse Plan Amendments and implementing 2016 Instruction
Memoranda, and referenced the August 2017 Review Team Report (see below), stating: "The
BLM anticipates that some of the actions outlined in the Review Team's report to the Secretary
could be implemented in the near future through changes in policy (through issuance of IMs, for
example), technical assistance or training.  Other actions may require amending the land use
plans."

(d)  "Other Recommendations for Alleviating or Eliminating Action That Could Directly
or Indirectly Burden Energy Exploration or Production":  Here the DOI Report identified
additional steps BLM is planning to take, including review of land use designations, leasing
stipulations and conditions of approval, and protest regulations and policy.

**August 2017 Sage-grouse Review Team Report**

91.     On August 4, 2017, the DOI Sage-Grouse Review Team issued a "Report In
Response To Secretarial Order 3353" ("August 2017 SG Report") which made recommendations
for numerous modifications of the Sage-Grouse Plan Amendments to relax restrictions on oil,
gas and other fossil fuel development in sage-grouse habitats, in response to EO 13783 and SO
3353.

92.     The DOI Sage-Grouse Review Team was dominated by non-scientists, and the
recommendations of the Review Team closely mirrored the comments submitted by oil and gas

industry lobbyists seeking removal or reduction of the Sage-Grouse Plan Amendments' habitat designations and management restrictions.

93.     The August 2017 SG Report asserted that the "areas of leasing prioritization" and the "PHMA stipulation's waiver, exception, and modification language" should be "issues of focus for the BLM" moving forward.  The Report identified that "[l]easing prioritization options include policy clarification while developing the approach to revise IMs for leasing prioritization either nationally or State-by-State."  In addition, for SFAs, "longer term options include considering potential plan amendment(s) to modify or remove SFA fluid mineral stipulations."

94.     The August 2017 SG Report recommended revisiting "processes for calculating the amount of surface disturbance and the density of energy and mining facilities," "mitigation and net conservation gain" requirements of the 2015 Sage-grouse Plan Amendments, BLM's Habitat Assessment Framework and other protocols for gathering and evaluating data on sage-grouse habitats.  It also recommended loosening "hard triggers" under adaptive management provisions of the Plan Amendments, providing greater flexibility in "required design features" for energy development projects, and altering priority habitat designations, among other industry-sponsored recommendations.

95.     Appendix A to the August 2017 SG Report provided a more detailed table of specific recommendations for "policy" changes and/or revisions of the 2015 Sage-grouse Plan Amendments.  The very first recommendation in Appendix A was entitled "Lease prioritization instruction memorandum," and recommended: "Rescind the National IM," *i.e.*, IM 2016-143, and "clarify to staff [that] leasing is not restricted in GRSG habitat."

96.     On August 4, 2017, the same day that the August 2017 SG Report was issued, Defendant Zinke issued a memorandum to Defendant Deputy Secretary of Interior David

Bernhardt, titled "Improving the BLM's 2015 Sage-Grouse Plans," which directed Bernhardt "to ensure implementation of the recommendations and direct BLM . . . to immediately begin implementing the short- and long-term recommendations in the Report."

97.    Among the August 2017 SG Report's recommendations identified in Zinke's August 4, 2017 directive to Bernhardt was: "Modify or issue new policy on fluid mineral leasing and development, including the prioritization policy."

**Instruction Memorandum No. 2018-026**

98.    On December 27, 2017, BLM adhered to the August 2017 SG Report recommendations and Zinke directive by issuing IM 2018-026, titled "Implementation of Greater Sage-Grouse Resource Management Plan Revisions or Amendments – Oil & Gas Leasing and Development Prioritization Objective."

99.    IM 2018-026 "replaces IM 2016-143," the prior Instruction Memorandum to guide implementing the 2015 Sage-Grouse Plan Amendments. BLM did not provide public notice, an opportunity for comment, or respond to comments prior to adopting IM 2018-026.

100.    The stated purpose of IM 2018-026 "is to ensure consistency, certainty, and clarity when implementing an objective [in the Plan Amendments] to prioritize oil and gas leasing outside of GRSG habitat, while continuing to move forward expeditiously with oil and gas leasing and development, yet providing protections for GRSG and GRSG habitat management areas."

101.    Under the heading "Policy/Action," IM 2018-026 provided that the "BLM's Authorized Officer, acting under the delegated authority of the Secretary of Interior, has discretion to determine which public lands will be offered at a lease sale. . . This IM does not prohibit leasing or development in GHMA or PHMA. . ." (underscore added).

102.    IM 2018-026 adopted specific provisions for "Leasing: Sequential Prioritization of Oil and Gas Leasing in Proximity to PHMAs and GHMAs," which provided that BLM State Offices "will first consider leasing EOIs [Expressions of Interest] for lands outside of PHMAs and GHMAs" as the "first priority for leasing in any given lease sale" (emphasis added).  It further provided "parcels may be leased within GRSG habitat management areas without first leasing parcels in non-habitat areas."

103.    IM 2018-026 directed that BLM Field Offices may ignore the prioritization requirement of the Sage-Grouse Plan Amendments at the leasing stage, stating: "In effect, the BLM does not need to lease and develop outside of GRSG habitat management areas before considering any leasing and development within GRSG habitat."

104.    This approach for supposedly "prioritizing" leases outside of sage-grouse habitats on a lease sale basis eviscerates the explicit intent and language of the 2015 Sage-grouse Plan Amendments that require prioritization of oil and gas, both leasing and development, outside of sage-grouse priority and general habitats in order to conserve remaining populations and habitats; and it does so without legally required plan amendments or NEPA compliance.

**Instruction Memorandum 2018-034**

105.    On January 31, 2018, BLM issued Instruction Memorandum 2018-034, titled "Updating Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews."  IM 2018-034 overhauled the oil and gas leasing requirements established in IM 2010-117 during the Obama Administration. Its stated purpose is to "simplify and streamline the leasing process to alleviate unnecessary impediments and burdens, to expedite the offering of lands for lease, and to ensure quarterly oil and gas lease sales are held consistently in accordance with the Mineral Leasing Act (30 U.S.C. § 226), Executive Order 137873, and Secretary Order 3354."

106.    The new IM 2018-034 eliminated language in BLM's prior IM 2010-117 that "there was no presumed preference for oil and gas" over other uses of public lands, and imposed substantive changes intended to promote oil and gas leasing and development, including:

(a)  rescinding BLM's use of Master Leasing Plans, a front-end planning strategy designed to take a landscape-level approach to reviewing proposed leasing;

(b)  removing public participation requirements during the NEPA review of parcels identified for potential leasing, by replacing language from IM 2010-117 stating that BLM offices "will" provide for public participation during the NEPA process with a provision that they "may" provide for public participation;

(c)  stating that "BLM will no longer use a rotating schedule for lease sales, as described in IM No. 2010-117," and instead directing that "the timeframe for parcel review for a specific lease sale is to be no longer than 6 months," and each State Office "will review all lands that are identified in EOIs [Expressions of Interest] that were submitted before the EOI cutoff date for a particular quarterly lease sale and will offer all parcels determined to be eligible and available within the State Office's jurisdiction"; and

(d)  announcing that BLM would no longer "defer" lease sales when an RMP amendment or revision is pending, but instead will use the existing RMP to approve the lease sale no matter how old or outdated it might be, and discouraging further environmental review by requiring Washington office approval of any decision to defer a nominated parcel for additional analysis.

107.    IM 2018-034 also allows BLM State Offices to shorten their review process before offering oil and gas leases in numerous ways, including by:

(a) providing that "site visits are not required and should only be considered when deemed necessary by the authorized officer on a case-by-case basis";

COMPLAINT -- 33

(b) encouraging BLM State or Field offices to use "existing NEPA document(s)" and a "Determination of NEPA Adequacy (DNA)" instead of new NEPA environmental reviews, and providing that no public comment period is required where a DNA is used;

(c) allowing BLM to provide only a 10-day public protest period from the day the sale notice is posted, rather than the 30-day public protest period that BLM previously followed; and

(d) allowing BLM to proceed with lease sales before it even resolves protests, and giving BLM up to 60 days after receiving payment on a lease to resolve protests.

108.    BLM did not provide public notice, an opportunity for comment, or respond to comments prior to adopting IM 2018-034.

109.    BLM is now implementing IM 2018-034 in its administration of federal minerals and oil and gas leasing on public lands, including in and affecting priority sage-grouse habitats. As addressed further below, *see* Cumulative and Pending Actions *infra*, upcoming lease sales for 2018 are allowing only a 10-day protest period, and certain sales are already limiting environmental review and public comment to a 15-day "review period."  Many new sales are also avoiding any lease-level NEPA analysis by resorting to use of DNAs and reliance on inadequate RMPs and/or other prior documents.

110.    Plaintiffs and the public are substantially injured and prejudiced by BLM's "policy" changes undertaken through IM 2018-034, including by allowing BLM to avoid NEPA compliance in future oil and gas leasing, and its failure to allow adequate time or opportunity for public comment and protest of proposed oil and gas lease sales.

111.    IM 2018-034 has substantially altered how BLM processes and approves oil and gas leases on public lands, and directly affects the rights of Plaintiffs and members of the public to have notice, opportunity to comment, and petition the agency for relief.  IM 2018-034 was

issued without public notice or comment, despite its substantial changes and impacts upon public involvement.  As alleged below, the challenged portions of IM 2018-034 constitute a legislative rule that was adopted in violation of APA, NEPA, and FLPMA's requirements for notice, comment, and public involvement in federal lands' decision-making, and thus is unlawful and should be reversed and set aside by the Court.

112.    BLM oil and gas leasing decisions that have been made, or hereafter are made, under IM 2018-026 and/or IM 2018-034 are unlawful and should be reversed and set aside as well, including the "Final Actions" identified in the Challenged Decisions section below.

### III.    EFFECTS OF BLM ACTIONS OPENING SAGE-GROUSE HABITATS TO OIL AND GAS LEASING AND DEVELOPMENT.

### A.    BLM Is Selling Once-Deferred Leases In Sage-grouse Habitats.

113.    While the National Greater Sage-Grouse Planning Strategy was underway, BLM deferred offering approximately five million acres of industry-nominated oil and gas leases in seven western states due to sage-grouse concerns.  These included 2.2 million acres in Nevada, 1.6 million acres in Wyoming, 600,000 acres in Montana, and more than 300,000 acres each in Colorado and Utah.  In 2011 and 2012, BLM issued national and state guidance to its offices, generally requiring deferral of "core" sage grouse habitat, on interim leasing policies pending the National Greater Sage-Grouse Planning Strategy.

114.    After the Sage-Grouse Plan Amendments were finalized in September 2015, BLM continued to defer some industry-nominated oil and gas leases affecting sage-grouse habitats due to conflicts with sage-grouse needs, expressly based on determinations that deferral was necessary in order to comply with the conservation goals and prioritization requirements of the Great Basin and Rocky Mountain RODs.

COMPLAINT -- 35

115.    For example, in the Wyoming May 2016 lease sale, BLM deferred all or portions of 13 proposed leases, encompassing 12,226 acres, in order to comply with the ARMPAs that "direct the BLM to prioritize oil and gas leasing and development in a manner that minimizes resource conflicts in order to protect important [sage-grouse] habitat and reduce development time and costs."

116.    Colorado and Montana BLM declined to offer nominated leases in GHMA and PHMA through December 2016.  Utah BLM largely followed suit, although it offered approximately 136 acres of GHMA in its December 2016 lease sale.

117.    Nevada and Wyoming BLM began leasing some, but not all, industry-nominated parcels in sage-grouse habitats in 2016.  Nevada BLM deferred leasing nominated lands within four miles of a lek where development could affect sage-grouse.  Wyoming BLM began ramping up its offering of leases including sage-grouse habitats in 2016, while continuing to defer some nominated tracts or portions of nominated tracts over sage-grouse concerns.

118.    As set forth in detail below, in response to the Trump Administration directives above, BLM is now moving quickly to encourage re-nomination of and to offer oil and gas leases in sage-grouse habitats, including through its series of quarterly oil and gas competitive lease offerings in Idaho, Wyoming, Montana, Utah, Colorado, North Dakota, and Nevada.

119.    BLM's lease offerings since adoption of the Sage-Grouse Plan Amendments, along with its publicly-announced future offerings for 2018, encompass an estimated 2.39 million acres across the sage-grouse range, and affect "core" sage-grouse populations as well as smaller isolated sage-grouse populations covered by both BLM's Rocky Mountains and Great Basin RODs for the Sage-Grouse Plan Amendments.

COMPLAINT -- 36

120.    Particularly in Wyoming, which holds the most and best remaining habitat in the eastern portion of the greater sage-grouse's remaining range, BLM oil and gas leasing of core areas has increased drastically from 2017 to 2018.  As recently reported: "The BLM plans to offer seven times more acres of sage grouse habitat in its first quarter lease sale in Wyoming this year than it did in its first quarter lease sale last year, according to BLM data analyzed by The Nature Conservancy and confirmed by the BLM." Elizabeth Shogren, "More prime sage grouse habitat is open for drilling," *High Country News*, Jan. 11, 2018.

> **B.     BLM Has Abandoned Sage-grouse Plan Amendment Requirements to Prioritize Leasing Outside Sage-grouse Habitats.**

121.    In addition to offering a large volume of previously-deferred leases in sage-grouse habitats, BLM is also offering leases in and around sage-grouse habitats that have been nominated by the oil and gas industry – violating the requirements of the Sage-grouse Plan Amendments that oil and gas leasing be prioritized outside of sage-grouse habitats.

122.    After President Trump's "Energy Dominance" Executive Order and Secretary Zinke's Secretarial Order 3353, BLM began implementing a de facto policy of leasing effectively all nominated lands within and outside of sage-grouse habitats, in direct conflict with the Plan Amendments' prioritization requirements, as detailed further below in the "Challenged Decisions" section below.

123.    As a result of these Trump Administration directives and "policy" changes, BLM has now abandoned the prioritization requirement of the Sage-Grouse Plan Amendments, as not being consistent with the "national interest to promote clean and safe development of our Nation's vast energy resources, while at the same time avoiding regulatory burdens that unnecessarily encumber energy production, constrain economic growth, and prevent job

creation."  As stated by Wyoming BLM in its December 2017 lease sale EA: "A decision to defer parcels in PHMA and/or GHMA would not be consistent with these objectives."

124.    Between January 2017 and March 2018, BLM has offered at least 1.9 million acres of oil and gas leases on public lands and minerals in western states outside Alaska.  In 2017, the amount of public land offered in the lower 48 states increased by 56 percent compared to 2016, to more than 1.6 million acres.   Based on BLM's public notices of upcoming oil and gas lease auctions, it will be offering at least another 3.47 million acres in western states outside Alaska through the third quarter of 2018.

125.    This pace of leasing will likely accelerate during the final quarter of 2018 and in 2019-2021.  As set forth in its October 2017 "Burdens Report," BLM is instructed to "measure success" against increased industry acreage nominations, permit requests, and development within areas affected by the Sage-Grouse Plan Amendments. The only practicable way that BLM can satisfy those instructions is offer all or virtually all lease parcels nominated by the oil and gas industry, irrespective of whether they may lie in or near sage-grouse habitats.

126.    The "Final Actions" challenged herein include oil and gas leases awarded by BLM during 2017 and 2018, in which at least 152,397 acres of SFAs and 336,263 acres of PHMAs have been leased – the most important sage-grouse habitats, according the Sage-grouse Plan Amendments.  Another 537,619 acres of GHMAs or other sage-grouse habitats are included in these Final Actions as well.

127.    In addition to the Final Actions identified below, over the last two years BLM has issued other oil and gas leases in sage-grouse habitats in Colorado, Wyoming, Nevada, and Montana, which are identified below in the "Cumulative and Pending Actions" section. Cumulatively, BLM leases issued, sold, or made available for noncompetitive leasing from

January 2017 through March 2018 include approximately 796,870 acres of SFA, PHMA, GHMA and other sage-grouse habitats.

128.    The Cumulative and Pending Actions identified below include additional pending oil and gas lease auctions that BLM is planning during 2018, for which BLM has thus far announced plans to offer an additional approximately 1,156,480 acres (not including the fourth quarter of 2018) within priority and general sage-grouse habitats.

129.    The cumulative impacts of Defendants' past, present, and future leasing actions demonstrate that BLM's oil and gas leasing is not being prioritized outside of sage-grouse habitats, as required by the Sage-Grouse Plan Amendments and the best available science; nor will BLM comply with those requirements unless enjoined or directed otherwise by this Court.

**C.    Current Leases Threaten Sage-grouse Habitats and Populations.**

130.    Defendants have frequently defended their actions approving oil and gas leasing affecting sage-grouse populations and habitats by claiming that leasing decisions do not, in themselves, cause surface disturbances or other degradation threats to sage-grouse habitats and populations.  This is not accurate: BLM's awarding of oil and gas leases in fact poses substantial and imminent threats to sage-grouse, and harms Plaintiffs' interests in conserving sage-grouse across the Interior West.

131.    As BLM acknowledged through the National Greater Sage-Grouse Planning Strategy and the 2015 Sage-Grouse Plan Amendments, granting oil and gas leases is an irrevocable commitment of resources which may preclude or impair later efforts to prevent surface disturbance, noise, human presence, or other adverse impacts that harm sage-grouse populations and habitats.

132.     BLM's oil and gas leases require that the subject mineral interests be developed within the period of the leases, normally ten years.  Awarding oil and gas leases in sage-grouse habitats poses imminent threats of surface disturbances, noise and other harmful actions from exploratory and other actions within ten years.  BLM routinely and improperly avoids addressing this fact, and the likely impacts of such development on sage-grouse, by purporting to defer its analysis until a permit for application to drill has been submitted – when in fact permits to drill are rarely if ever denied by BLM on sage-grouse conservation grounds – thereby violating NEPA and decreasing conservation protection of sage-grouse.

133.     In addition, even though the Sage-Grouse Plan Amendments represented an important step forward in public lands management to conserve sage-grouse, as noted above they are inconsistent in their protections of sage-grouse habitats from energy development in many ways, and allow BLM to grant modifications, waivers, or exceptions for Sage-Grouse Plan Amendment measures intended to protect sage-grouse, including NSOs and COAs in priority habitats.  Although Plaintiffs are not challenging the Sage-Grouse Plan Amendments in this action, these deficiencies further underscore that irreparable harms to sage-grouse populations and habitats will occur as BLM proceeds to issue more leases and approve drilling and field developments in sage-grouse habitats.

134.     For example, many of the oil and gas leases that BLM is now approving, particularly in Wyoming, do not impose NSO requirements to protect priority habitats, as discussed in the Challenged Decisions below, and/or they allow future modifications, waivers or exceptions. Further, the leasing approvals generally do not contain an evaluation of whether existing or foreseeable levels of habitat disturbance are consistent with the disturbance density objectives of the Sage-Grouse Plan Amendments.

COMPLAINT -- 40

135.    Given its expressed intention to expand use of modifications, waivers, and exceptions to sage-grouse stipulations, BLM under the Trump Administration will foreseeably approve such modifications, waivers, or exceptions to allow surface disturbances in priority sage-grouse habitats as part of its expressed goal of aiding oil and gas development on public lands.  The direct, indirect, and cumulative impacts posed by these leases have not been addressed by BLM in any NEPA-compliant document.

**D.    BLM's Practice of Routinely Granting and Extending Lease Suspensions Creates Long-Term Threats To Sage-Grouse It Has Not Studied.**

136.    Awarding leases in sage-grouse habitats also allows the lessees to claim the right to develop the leases not only for the ten-year lease term, but also for decades longer, by obtaining lease "suspensions" from BLM.  This imposes long-term threats to sage-grouse by allowing oil and gas operators to prevent BLM from protecting sage-grouse habitats potentially for decades into the future.

137.    The Mineral Leasing Act of 1920 (as amended) imposes statutory obligations for lessees of federal minerals, which include due diligence requirements and royalty payments to facilitate energy development and provide a return to U.S. taxpayers. The Act provides for "suspension" of leases, which tolls the operating and production requirements of a lease, including the obligations to make rental and royalty payments, and extends the primary term of the lease by the length of the suspension.

138.    While the leases are suspended, the likelihood of future development and habitat destruction persists, which precludes or impairs other multiple uses for the benefit of the public and conservation of wildlife, including sage-grouse.

139.    Suspended oil and gas leases occupy a significant amount of the federal mineral estate. BLM data acquired by The Wilderness Society in April 2015 show 3.25 million acres of

federal leases held in suspension. This is nearly 10% of the total federal minerals currently under lease by the oil and gas industry.

140.    Many suspended leases have been under suspension for decades. Of the 3.25 million acres of federal leases in suspension as of April 2015, according to The Wilderness Society report, 32% of all suspended leases were acquired between 1940 and 1995, 25% were acquired between 1996 and 2009, and 43% were acquired between 2010 and 2015.

141.    Although BLM has routinely granted lease suspensions, the Mineral Leasing Act directs that BLM may "assent to" a request for a lease suspension only where suspending operations and production would be "in the interest of conservation of natural resources."  BLM has failed and refused to address its duty to ensure the "conservation of natural resources" is served by lease suspensions, including sage-grouse conservation.

142.    In approving the Final Actions below, BLM never evaluated the adverse and cumulative impacts posed by lease suspensions for oil and gas leases, including pre-2016 leases lacking protective stipulations now required under the 2015 Sage-Grouse Plan Amendments, that it is now granting or extending within sage-grouse habitats.  Based on BLM's prior actions and Defendants' current policy directives it is highly likely that BLM will grant additional lease suspensions affecting sage-grouse habitats, and undermine sage-grouse conservation into the future without adequate environmental review and in violation of law.

## THE CHALLENGED DECISIONS

143.    Defendant BLM has approved and continues to approve, without pre-leasing consideration of impacts to sage-grouse, a large and growing number of oil and gas leases and developments affecting sage-grouse habitats which threaten further loss, fragmentation, and degradation of those habitats and harms to sage-grouse across its range.

COMPLAINT -- 42

144.     These include the "Final Actions" that BLM has approved since the Trump Administration took office, as identified below, as well as the "Cumulative and Pending Actions" (also identified below) which have been approved and/or are proposed by BLM and slated for approval in the near future.

145.     Each of the Final Actions is a final agency action subject to judicial review under the APA, 5 U.S.C. § 706, for which one or more Plaintiffs have fully exhausted all required administrative remedies and have Article III and prudential standing to challenge in this action.

146.     For each lease sale identified below, the Final Actions by Defendants include issuance of a Record of Decision or Decision Notice ("Decisions"), Determination of NEPA Adequacy ("DNA"), and/or Finding of No Significant Impact ("FONSI"); Dismissal and/or Denial of requests for State Director Review (otherwise known as Protests); issuance of competitive oil and gas leases under 30 U.S.C. § 226; and/or the ongoing offering of oil and gas leases for noncompetitive sale under 30 U.S.C. § 226.

147.     The Final Actions are individually and cumulatively unlawful under FLPMA, NEPA, their implementing regulations, and the APA. Each threatens harm to greater sage-grouse habitats and populations, and poses adverse direct, indirect, and cumulative effects that BLM has not adequately studied under NEPA. Individually and together, the Final Actions also violate FLPMA's land use plan "consistency" requirement by violating terms and requirements of the Sage-Grouse Plan Amendments; and are not consistent with the best available science. Individually and together, the Final Actions are thus arbitrary, capricious, an abuse of discretion, and not in accordance with law under the APA. The Court may properly consider all the Final Actions in this litigation because of their common legal and procedural violations, adverse impacts to sage-grouse, and harms to Plaintiffs' substantial rights and interests.

148.    Along with IM 2018-026 and IM 2018-034, the Final Actions constitute the "Challenged Decisions" at issue in this Complaint.

149.    In addition, BLM has approved other leases, and is engaged in upcoming oil and gas lease approvals and developments slated to be completed within the next one to two years, including those identified below as "Cumulative and Pending Actions."  These Cumulative and Pending Actions underscore cumulative adverse impacts that BLM has not studied under NEPA. Plaintiffs plan to amend this Complaint to include the Pending Actions once they become final; and reserve the right to add other similar final actions that BLM may approve while this case is pending, including additional oil and gas leases, lease suspensions, approvals of permits to drill, and/or oil and gas field development projects.

## I.    FINAL ACTIONS.

### A.    February 2017 Wyoming Lease Sales (High Plains and Wind River/Bighorn Basin Districts)

150.    In February 2017, BLM conducted a competitive oil and gas lease sale for 283 industry-nominated parcels in the BLM's High Plains and Wind River/Bighorn Basin Districts in Wyoming, parcel numbers WY-1702-001 through WY-1702-283.

151.    The governing RMPs for the offered lease parcels are the Buffalo, Casper, and Newcastle RMPs, in the High Plains District; and the Cody, Worland and Lander RMPs for the Wind River/Bighorn Basin District.  All these governing RMPs were amended by the Sage-Grouse Plan Amendments approved in BLM's Rocky Mountain ROD, with the exception of the Lander RMP which was revised in 2014 and included similar sage-grouse conservation measures as those adopted in the other RMPs.

152.    The High Plains District portion of the February 2017 Wyoming lease sales were approved based on an Environmental Assessment ("EA"), No. DOI-BLM-WY-P000-2016-0001-

EA, and associated FONSI.   The Wind River/Bighorn Basin portion of the February 2017

Wyoming lease sales were approved based on a separate Environmental Assessment, No. DOI-

BLM-WY-R000-2016-0002-EA and associated FONSI.

153.    On August 24, 2016, Plaintiff Center for Biological Diversity and other groups

submitted comments on these EAs and the proposed February 2017 Wyoming lease sales to the

BLM's High Plains and Wind River/Bighorn Basin district offices.   The comments expressly

advised BLM that the proposed lease sale would include sage-grouse habitats and violate the

Sage-Grouse Plan Amendments' requirement that oil and gas leasing be prioritized outside of

sage-grouse habitats; and identified numerous impacts and threats to sage-grouse that BLM did

not adequate evaluate under NEPA, and other legal violations posed by the lease sales.

154.    At the February 2017 Wyoming lease sale, BLM offered a total of 184,981.59

acres, of which 183,353.36 acres sold.  These included 2,848.97 acres in PHMA, and 34,254.50

acres in GHMA.  Thus, 37,243.86 acres sold in the June 2017 Wyoming sale were within

designated sage-grouse habitats under the Sage-Grouse Plan Amendments.

155.    The February 2017 Wyoming leases sold by BLM affect particularly important

sage-grouse populations. The High Plains District portion of the lease sale included 68 parcels

within BLM-designated sage-grouse management areas, 16 within PHMA.

156.    In the EAs and Decisions/FONSIs, BLM failed to adequately address potential

adverse impacts to sage-grouse or justify its decision to offer leases in high-value sage-grouse

habitats.  This is especially concerning because Wyoming BLM's ARMPAs do not require the

same No Surface Occupancy (NSO) stipulation in SFAs or PHMAs that other Sage-Grouse Plan

Amendments do, and developing the leases will degrade these important sagebrush habitats and

harm the grouse populations that use them. BLM's prioritization analysis also did not factor in

the Wyoming BLM's established pattern of leasing large swaths of sage-grouse habitat and how the proposed leasing might combine with other past and foreseeable future leasing in the area to harm sage-grouse.

157.    The EAs supporting the sales failed to provide any site-specific information about the sales and affected sage-grouse habitats and populations, including quantifying the affected acreage, mapping the affected populations, or assessing existing levels of disturbance within those populations.

**B.    June 2017 Montana Lease Sale (Miles City District)**

158.    In June 2017, BLM BLM conducted a competitive oil and gas lease sale for 156 industry-nominated parcels in the BLM's Miles City District, for the parcel numbers identified in Appendix A hereto.

159.    The governing RMP for the offered lease parcels is the Miles City RMP, which was amended by the Sage-Grouse Plan Amendments approved in BLM's Rocky Mountain ROD.

160.    On December 7, 2016, BLM issued an Environmental Assessment for the lease sale, No. DOI-BLM-MT-C020-0134-EA, and allowed 30 days for public comment.

161.    Plaintiffs Western Watersheds Project and Center for Biological Diversity each submitted comments on January 6, 2017.  The comments advised BLM that the proposed lease sale would include sage-grouse habitats and violate the Sage-Grouse Plan Amendments' requirement that oil and gas leasing be prioritized outside of sage-grouse habitats; and fall short of what the best available science calls for to protect the birds.  They also called for a more robust analysis of threats to sage-grouse associated with oil and gas leasing, like roads, noise, and degradation of wintering habitats; and identified numerous impacts and threats to sage-grouse that BLM did not adequate evaluate under NEPA, and other legal violations.

COMPLAINT -- 46

162.    On March 14, 2017, BLM issued an updated EA for the lease sale. The EA's

discussion of impacts to greater sage-grouse was limited to the following statements:

> The Greater Sage-grouse occurs across 11 Western states, including portions of
> the analysis area. The analysis area includes the following delineated Greater
> sage-grouse habitat management areas: Priority Habitat Management Areas
> (PHMA) with one lease parcel, Restoration Habitat Management Areas (RHMA)
> with two lease parcels, and General Habitat Management Areas (GHMA) with 66
> lease parcels. All of the parcels are greater than 3.1 miles from a Greater Sage-
> grouse lek. The remaining 87 lease parcels are not within Greater sage-grouse
> habitat management areas. Further discussion on Greater sage-grouse habitat
> delineations are discussed further in the MCFO ARMP Chapter 2 pgs 2-1 through
> 2-16 (BLM, 2015a).

163.    On April 13, 2017, Plaintiff Center for Biological Diversity submitted a protest to

BLM on the proposed lease sale under 43 C.F.R. § 3120.1-3. The protest again established that

the proposed lease sale would include sage-grouse habitats and violate the Sage-Grouse Plan

Amendments' requirement that oil and gas leasing be prioritized outside of sage-grouse habitats,

and that the EA did not provide sufficient site-specific information and analysis to adequately

evaluate impacts on sage-grouse and their habitats, on specific parcels identified in Appendix A.

It informed BLM that the EA's analysis of impacts to winter concentration areas was inadequate

and that measures, like noise limits, imposed to protect sage-grouse were inadequate.  It

identified numerous impacts and threats to sage-grouse that BLM did not adequate evaluate

under NEPA and other legal violations.

164.    BLM denied the protest and approved the June 2017 Montana lease sale June 12,

2017. Decision Record, DOI-BLM-MT-C020-2016-000134-EA.

165.    BLM offered 69,265.06 acres in the June 2017 Montana lease sale, of which

15,611.47 acres were sold at competitive auction. The unsold parcels remain open for

noncompetitive sale to any eligible bidder through June 2019.  Of the parcels sold, 15,499.08

acres were offered in GHMA, of which 4,086.87 acres sold.  Another 39.19 acres were offered

and sold in "other" sage-grouse habitats.  Thus, 4,126.06 acres sold in the June 2017 Montana sale were within designated sage-grouse habitats under the Sage-Grouse Plan Amendments.

166.    While the Environmental Assessment supporting the sale recited the language of IM 2016-143, it contained no evidence of if or how that guidance was applied at the site-specific level.  In fact, all of the parcels in sage-grouse habitat fall within four miles of a lek—a distance in which important life-history habitat features for sage-grouse exist.

### C.    June 2017 Wyoming Lease Sale (High Desert District)

167.    In June 2017, BLM conducted a competitive oil and gas lease sale for 28 industry-nominated parcels in BLM's High Desert District, lease numbers WY-1705-001 through WY-1705-026.

168.    The governing RMPs for the offered lease parcels are the Kemmerer, Pinedale, Rawlins, and Rock Springs RMPs.  All these governing RMPs were amended by the Sage-Grouse Plan Amendments approved in BLM's Rocky Mountain ROD and the BLM's May 2015 Final EIS for the Wyoming Greater Sage-Grouse Proposed Land Use Plan Amendments.

169.    In May 2016, BLM issued Environmental Assessment DOI-BLM-WY-D040-2016-0188-EA and allowed 30 days for public comment on the proposed sale.  Plaintiff Center for Biological Diversity submitted timely comments.

170.    On February 28, 2017, Plaintiff Center for Biological Diversity submitted joint comments with another conservation group to BLM on the EA and proposed lease sale. The comments advised BLM that the proposed lease sale would include sage-grouse habitats and violate the Sage-Grouse Plan Amendments' requirement that oil and gas leasing be prioritized outside of sage-grouse habitats; and identified numerous impacts and threats to sage-grouse that BLM did not adequate evaluate under NEPA.

171.    On March 3, 2017, Plaintiff Center for Biological Diversity, jointly with another conservation group, submitted a protest of the proposed June 2017 Wyoming lease sale to BLM under 43 C.F.R. § 3120.1-3.  BLM denied the protest on June 19, 2017.  The protest again established that the proposed lease sale would include sage-grouse habitats and violate the Sage-Grouse Plan Amendments' requirement that oil and gas leasing be prioritized outside of sage-grouse habitats; and identified numerous impacts and threats to sage-grouse that BLM did not adequate evaluate under NEPA.

172.    BLM approved the June 2017 Wyoming lease sale through a final EA, No. DOI-BLM-WY-D040-2016-0188-EA, issued in May 2017, and associated FONSI, and Decision Record on June 21, 2017.

173.    BLM offered 32,026.71 acres at the June 2017 Wyoming lease sale, all which sold.  These included 6,546.79 acres in SFAs, 1,702.28 acres in PHMA, and 18,933.55 acres in GHMA.  Thus, 27,182.62 acres sold in the June 2017 Wyoming sale were within designated sage-grouse habitats under the Sage-Grouse Plan Amendments.

174.    The six parcels located in PHMA all were located in the Greater South Pass PHMA.  In 2017, the U.S. Fish and Wildlife Service described the Greater South Pass population as "Wyoming's Greater South Pass sage-grouse core area—the greatest concentration of sage-grouse breeding habitat in the world." Newer research (Edmunds et al. 2017) has identified the Greater South Pass population as not only the largest in the state, but one of the most severely declining Core Areas.

175.    Each of the six parcels was within 2 miles of leases currently held for production, and has moderate to high oil and gas potential.  One of the parcels had an active lek within its boundaries.   BLM disclosed that the parcels "may provide nesting, wintering, and/or breeding

habitat for Greater Sage-Grouse." EA 48. But BLM did not fully evaluate impacts of the leases upon sage-grouse habitats and populations.

176.    This is especially concerning because Wyoming BLM's ARMPAs do not require the same no surface occupancy (NSO) stipulation in SFAs that the other plans do, and developing the leases will degrade these important sagebrush habitats and harm the grouse populations that use them. BLM's prioritization analysis also did not factor in the Wyoming BLM's established pattern of leasing large swaths of sage-grouse habitat and how the proposed leasing might combine with other past and foreseeable future leasing in the area to affect sage-grouse.

**D.    September 2017 Wyoming Lease Sale (High Plains and Wind River/Bighorn Basin Districts)**

177.    In September 2017, BLM conducted a competitive oil and gas lease sale for 11 industry-nominated parcels in BLM's High Plains and Wind River/Bighorn Basin Districts, lease numbers WY-1708-155 through WY-1708-174.

178.    The governing RMPs for the offered lease parcels are the Buffalo, Casper and Newcastle RMPs, in the High Plains District; and the Cody, Worland and Lander RMPs for the Wind River/Bighorn Basin District. All these governing RMPs were amended by the Sage-Grouse Plan Amendments approved in BLM's Rocky Mountain ROD, with the exception of the Lander RMP which was revised in 2014 and included similar sage-grouse conservation measures as those adopted in the other RMPs.

179.    On January 17, 2017, BLM issued an Environmental Assessment for the lease sale, No. DOI-BLM-WY-R000-2017-0001-EA, and allowed 30 days for public comment.

180.    The High Plains District portion of the September 2017 lease sale, in particular, marked a large increase in new leasing of greater sage-grouse habitat in the Powder River Basin.

COMPLAINT -- 50

Although BLM stated that it elected to defer 17 parcels "consistent with the BLM's sage-grouse conservation plans and strategy, which direct the BLM to prioritize oil and gas leasing and development in a manner that minimizes resource conflicts in order to protect important habitat and reduce development time and costs," it nevertheless offered for lease 75 parcels within PHMA and 61 parcels within sage-grouse habitat outside of designated priority habitat management areas.

181.    The September 2017 High Plains leasing EA's analysis of effects on sage-grouse were limited to stating only that "Several parcels located within designated PHMAs have NSO, CSU, and/or TLS stipulations applied to protect sage-grouse and their seasonal habitats." The EA lacks any quantification of the acreage affected, visual depiction of the extent or siting of affected parcels, analysis of the particular breeding populations that will be affected, or their viability and population trend. Without this information, it is impossible for either BLM or the public to understand whether new leasing—in light of land ownership and use, existing leases, and existing development— can meet the disturbance and density objectives of the Buffalo, Casper and Newcastle RMPs' sage-grouse amendments.

182.    Plaintiffs Western Watersheds Project and Center for Biological Diversity each submitted comments on January 6, 2017.  The comments advised BLM that the proposed lease sale would include sage-grouse habitats and violate the Sage-Grouse Plan Amendments' requirement that oil and gas leasing be prioritized outside of sage-grouse habitats; and identified numerous impacts and threats to sage-grouse that BLM did not adequate evaluate under NEPA and other violations of law.

183.    On February 16, 2017, Plaintiff Center for Biological Diversity submitted protests to BLM's High Plains and Wind River/Bighorn Basin Districts on the proposed lease sale under

COMPLAINT -- 51

43 C.F.R. § 3120.1-3. The protests again established that the proposed lease sale would include sage-grouse habitats and violate the Sage-Grouse Plan Amendments' requirement that oil and gas leasing be prioritized outside of sage-grouse habitats; and identified numerous impacts and threats to sage-grouse that BLM did not adequate evaluate under NEPA and other violations of law.

184. BLM denied the protests and approved the September 2017 Wyoming lease sale through a FONSI and Decision Record issued on September 20, 2017.

185.  BLM offered a total of 111,467 acres at sale on September 21, 2017 of which at least 107,009 acres sold.

### E.   September 2017 Utah Lease Sale (Sheeprocks)

186. In September 2017, BLM conducted a competitive oil and gas lease sale for 9 industry-nominated parcels affecting the Sheeprocks sage-grouse population, located in BLM's West Desert District, Fillmore Field Office, Utah State Office.

187. The governing RMP for the offered lease parcels is the 1987 House Range Resource Area Resource Management Plan, which was amended by the Utah Sage-Grouse Plan Amendments approved in BLM's Great Basin ROD.

188. Of the nine Sheeprocks lease sale parcels, Parcels 001, 002, 003, and 007 contain PHMA while Parcel 008 is directly adjacent to PHMA.

189. On May 1, 2017, Plaintiffs Western Watersheds Project, Center for Biological Diversity, and another group provided comments to the BLM's Fillmore Field Office on the proposed Sheeprocks lease sale. The comments advised BLM that the proposed lease sale would include sage-grouse habitats and violate the Sage-Grouse Plan Amendments' requirement that oil and gas leasing be prioritized outside of sage-grouse habitats; and identified numerous impacts

and threats to sage-grouse that BLM did not adequately evaluate under NEPA, along with other violations of law.

190.   BLM posted public notice of the proposed Sheeprocks lease sale on June 1, 2017, and allowed a 30-day public protest period.   On June 2, 2017, BLM also released an Environmental Assessment ("Sheeprocks EA"), #DOI-BLM-UT-W020-2017-0001-EA.

191.   On June 30, 2017, Plaintiffs Western Watersheds Project, Center for Biological Diversity, and another group submitted a protest to BLM's Utah State Office on the proposed Sheeprocks lease sale under 43 C.F.R. § 3120.1-3. The protest again established that the proposed lease sale would include sage-grouse habitats and violate the Sage-Grouse Plan Amendments' requirement that oil and gas leasing be prioritized outside of sage-grouse habitats; and identified numerous impacts and threats to sage-grouse that BLM did not adequate evaluate under NEPA and other violations of law.

192.   On September 12, 2017, while Plaintiffs' protest was still pending, BLM conducted an auction of the Sheeprocks lease parcels.  Three parcels totaling 4,101.71 acres, including one parcel encompassing PHMA, were sold. The six leases offered for sale by BLM that did not receive bids remain available for noncompetitive sale.

193.   On September 22, 2017, BLM denied Plaintiffs' protest and approved the Sheeprocks lease sale through a Decision Record, FONSI, and final Environmental Assessment, #DOI-BLM-UT-W020-2017-0001-EA.

194.   The Sheeprocks population of greater sage-grouse is located in central Utah, within an area designated as the Sheeprocks Sage-Grouse Management Area.  The Sheeprocks sage-grouse population experienced a nearly 40 percent decrease over four years, and saw its male numbers drop from 190 in 2006 to just 23 in 2015.

195.    The Sheeprocks sage-grouse population was identified by the COT Report (pp. 71-2) as "a relatively isolated population center" that "is considered high risk." The COT Report underscored that preserving peripheral populations like Sheeprocks is essential to arresting the decline of sage-grouse toward extinction and Endangered Species Act listing. *Id.*, pp. 12-13.

196.    BLM approved the September 2017 Sheeprocks lease sale based on the EA and associated FONSI, even though the EA admitted that oil and gas activities on the lease sale parcels "will contribute to reduced habitat quantity/quality, habitat fragmentation, and reduced connectivity as well as may alter seasonal movements and habitat use. Because [the Sheeprocks] population of sage-grouse is small and in a critical population decline, the resistance and resiliency of this population to recovery . . . could be further imperiled."

197.    On October 31, 2017, Plaintiffs filed a Notice of Appeal, Statement of Reasons, and Petition for Stay of the Sheeprock leases with the Interior Board of Land Appeals ("IBLA").

198.    The IBLA denied Plaintiffs' petition for stay, and the Notice of Appeal has now been dismissed.

**F.    December 2017 Montana Lease Sale (Miles City District)**

199.    In December 2017, BLM conducted a competitive lease sale for 204 parcels encompassing 99,265.87 acres, located in BLM's Miles City Field Office, for the parcel numbers identified in Appendix A hereto.  The governing RMP for the lease sales is the Miles City RMP, which was amended by the Rocky Mountain ROD.

201.    On September 14, 2017, BLM issued an EA, DOI-BLM-MT-C020-2017-0051-EA, for the December 2017 Montana lease sale, and allowed a 30-day public comment period.

202.    Plaintiff the Center for Biological Diversity submitted comments on the lease sale on August 10, 2017, raising numerous issues, including that the EA failed to analyze site-specific

COMPLAINT -- 54

impacts associated with the non-NSO leases.  Another environmental group commented that BLM had failed to comply with its obligation to prioritize leasing outside of greater sage-grouse habitat or consider a reasonable range of alternatives.

203.     On October 13, 2017, Plaintiff the Center for Biological Diversity and others filed a timely protest of the lease sale under 43 C.F.R. § 3120.1-3.  The protest showed that BLM's EA and proposed FONSI violated NEPA and FLPMA by failing to disclose or evaluate site-specific indirect and cumulative impacts to greater sage-grouse populations and habitat from oil and gas development, and by failing to prioritize leasing outside of greater sage-grouse habitat. In particular, the protest noted that the proposed lease sale included 180 parcels of GHMA, 45 of which were within 2 miles of a lek.

204.     BLM dismissed the protest on December 8, 2017.  Also on December 8, 2017, BLM signed a Decision Record, finalizing the decision to offer all 204 nominated lease parcels for sale on December 11-12, 2017.

205.     According to BLM data, the lease sale included approximately 54,132 acres of GHMA and approximately 840 acres of Restoration Habitat Management Areas.  None of the acres were removed as a result of the protest.

206.     At the lease sale, 25,168.76 acres, comprising 55 parcels, received bids.  In addition, 66,699.68 acres, comprising 132 parcels, received noncompetitive offers in the lease sale.  While the EA cited IM 2016-143 in an appendix, BLM failed to comply with the prioritization direction and offered all parcels containing sage-grouse habitat for sale.

207.     BLM responded to comments complaining about its failure to prioritize leasing outside of sage-grouse habitats, in part by explaining that some of the now-offered leases had previously been deferred for almost two years.

208.    The Montana December 2017 lease sale further contained a large concentration –
132 parcels – of lands within sage-grouse habitat in southeastern Montana isolated from and
undisturbed by existing oil and gas development.

G.    **March 2018 Montana Lease Sale (Billings, Butte, and North
Central Montana Districts and North Dakota)**

209.    In March 2018, BLM conducted a competitive lease sale for 109 parcels located
in BLM's Billings Field Office, Butte Field Office, and North Central Montana District Office,
for the lease parcels identified in Appendix A hereto.

210.    The governing RMPs for the lease parcels are the HiLine, Butte, and Billings
RMPs (the North Dakota parcel was withdrawn).  The HiLine and Billings RMPs were amended
by the Sage-Grouse Plan Amendments approved in BLM's Rocky Mountain ROD.  The Butte
RMP was not amended by the Sage-Grouse Plan Amendments, but does incorporate sage-grouse
management objectives.

211.    BLM issued four EAs for the March 2018 Montana lease sale, DOI-BLM-MT-
L002-2017-0004-EA (HiLine), DOI-BLM-MT-L002-2017-0003-EA (Butte), DOI-BLM-MT-
L002-2017-0002-EA (Billings), and DOI-BLM-MT-C030-2017-0133-EA (North Dakota).

212.    On September 20, 2017, Plaintiff Center for Biological Diversity submitted
comments on the sale, alerting BLM to its obligations to analyze impacts on sage-grouse and to
prioritize oil and gas leasing outside of sage-grouse habitat.

213.    On October 30, 2017, Plaintiff Center for Biological Diversity submitted
comments on the draft EAs, again reminding BLM of its obligations to analyze impacts on sage-
grouse and to prioritize oil and gas leasing outside of sage-grouse habitat.

214.    On January 12, 2017, Plaintiffs Center for Biological Diversity and Western
Watersheds Project filed a timely protest of the sale under 43 C.F.R. § 3120.1-3.

215.    The protest again challenged BLM's decision to lease nearly 24,000 acres of sage-grouse habitats in the sale, without prioritizing oil and gas leasing outside of sage-grouse habitats.  It also stated that a more detailed analysis of sage-grouse impacts was required, including the sage-grouse populations and seasonal habitats that may be affected by the proposed leases, and the implications of development for local and regional grouse survival and recovery. It notified BLM of the requirement that it consider the cumulative, range-wide impacts of all of its leasing in sage-grouse habitat.

216.    Plaintiffs presented substantial scientific analysis and studies to support their protest, including a study demonstrating how habitat fragmentation from oil and gas development threatens sage-grouse populations.  Plaintiffs also noted that the EAs failed to consider a reasonable range of alternatives, including not leasing sage-grouse habitats.

217.    On March 6, 2018, BLM denied Plaintiffs' protest.

218.    On March 9, 2018, BLM issued its decision to offer 76 lease parcels encompassing 52,297 federal mineral acres.  The surface acres affected included 9,788 acres of GHMA, 13,649 acres of PHMA, and 519 acres of other sage-grouse habitat.

**H.     March 2018 Wyoming Lease Sale (High Plains and Wind River/Bighorn Basin Districts)**

219.    In March 2018, BLM conducted a competitive oil and gas lease sale for 89 nominated parcels in the Wind River/Bighorn Basin Districts and 81 parcels in the High Plains District, for the lease parcel numbers identified in Appendix A hereto.

220.    The governing RMPs for the offered lease parcels on the Wind River/Bighorn Basin Districts are the Lander, Cody, Worland, and Rawlins RMPs.  The governing RMPs for the offered lease parcels on the High Plains District are the Buffalo, Casper, and Newcastle RMPs.  All these governing RMPs were amended by the Sage-Grouse Plan Amendments

COMPLAINT -- 57

approved in BLM's Rocky Mountain ROD, with the exception of the Lander RMP which was revised in 2014 and included similar sage-grouse conservation measures to those adopted in the other RMPs.

221.    The Wind River/Bighorn Basin District portion of the March 2018 Wyoming lease sales were approved based on an Environmental Assessment, No. DOI-BLM-WY-R000-2017-0002-EA, and associated FONSI.   The High Plains portion of the March 2018 Wyoming lease sales were approved based on a separate Environmental Assessment, No. DOI-BLM-WY-P000-2017-0002-EA and associated FONSI.

222.    On December 29, 2017, Plaintiffs Center for Biological Diversity, Western Watersheds Project, and others submitted a timely protest of the proposed March 2018 Wyoming lease sales to the BLM's High Plains and Wind River/Bighorn Basin district offices, under 43 C.F.R. § 3120.1-3.

223.    Plaintiffs' protest explained that the decision to offer the nominated parcels for leasing violated the Sage-Grouse Plan Amendments' direction to prioritize leasing outside of sage-grouse habitats.  It also showed that the EAs failed to include adequate site-specific information to take the required "hard look" at whether oil and gas development was possible consistent with the Sage-Grouse Plan Amendments' lek buffer requirements, and whether development could affect the species.  The protest further challenged the EAs' failure to consider the impacts of the proposed leasing on sage-grouse with reference to the current state of sage-grouse populations in the affect portion of their range.  It notified BLM that the EAs' failure to acknowledge BLM's widespread and ongoing pattern of leasing sage-grouse habitat contrary to the Sage-Grouse Plan amendments was unlawful.

224.    The final leases offered for sale included 16,478 acres of GHMA, 102,030 acres of PHMA, and 6,764 acres of SFA.  BLM's own Field Biologist recommended deferring WY-181Q-054 on the High Plains District, because it falls within a sage-grouse "core area," but BLM elected to offer the parcel anyway.  All of the acres sold.  There is no evidence that BLM attempted to prioritize leasing outside of sage-grouse habitats for this sale.

225.    On or about March 20, 2018, BLM dismissed and/or denied protests filed by Plaintiffs Center for Biological Diversity and Western Watersheds Project, as well as other protesting organizations.

**II.    CUMULATIVE AND PENDING ACTIONS.**

226.    In addition to the Final Actions identified above, cumulative actions affecting Defendants' leasing and development of greater sage-grouse habitat include the following Cumulative and Pending Actions:

**A.    Wyoming December 2017 Lease Sale (Cumulative Action)**

227.    On December 14, 2017, BLM offered for sale 45 parcels totaling 72,884 acres in Wyoming, including approximately 4303 acres of PHMA and 13,535 acres of GHMA.

228.    In its Environmental Assessment for the December 2017 Wyoming Lease Sale, BLM expressly concluded that "deferring any parcels in PHMA and/or GHMA would not be consistent with the Presidential Executive Order [13783] which specifies that: 'It is in the national interest to promote clean and safe development of our Nation's vast energy resources, while at the same time avoiding regulatory burdens that unnecessarily encumber energy production, constrain economic growth, and prevent job creation.' A decision to defer parcels in PHMA and/or GHMA would not be consistent with these objectives."

COMPLAINT -- 59

**B.      Nevada March 2018 Lease Sale (Cumulative Action)**

229.    On March 13, 2018, BLM offered for sale 39 leases within its Elko, Nevada,

District. Those leases, totaling 69,515 acres, contained approximately 15,059 acres of PHMA

and 15,607 acres of GHMA. BLM's EA for the March 2018 Nevada lease sale contained no site-

specific disclosure or analysis of the impacts of lease issuance and potential development on

greater sage-grouse in Nevada.

**C.      Idaho BLM's Lease Sale (Pending Action)**

230.    In March 2017, BLM's Idaho Falls District offered 836 acres of leases in GHMA.

231.    On June 1, 2017, BLM's Pocatello Field Office opened a 30-day public comment

period in response to the Expression of Interest that had been filed for the parcel. On August 21,

2017, BLM's Pocatello Field Office issued a Determination of NEPA Adequacy, DOI-BLM-ID-

I020-2017-0020-DNA.

232.    The RMP governing this lease sale is the Pocatello RMP, which was amended by

the Idaho and Southwestern Montana Greater Sage-Grouse Approved Resource Management

Plan Amendment adopted by the BLM's Great Basin ROD. The lease sale parcel is located on

private land completely within identified sage-grouse GHMA.  It is approximately two to five

miles from Grays Lake National Wildlife Refuge, which contains the largest high-elevation

bulrush marsh in the world, as well as the world's largest nesting population of greater sandhill

cranes.

233.    Plaintiffs Center for Biological Diversity and Western Watersheds Project timely

protested the sale on December 20, 2017, under 43 C.F.R. § 3120.1-3, raising numerous issues

concerning the proposed sale's failure to comply with the Sage-Grouse Plan Amendments,

including the failure to prioritize leasing outside of sage-grouse habitats and to take a hard look at impacts to the area's fragmented and little-studied population of greater sage-grouse.

234.     On January 10, 2018, BLM temporarily withdrew the parcel from lease offering while it conducted further review, thus postponing the March 2018 lease sale.

235.     On March 27, 2018, BLM published an EA for this sale, DOI-BLM-ID-I020-2018-0012-EA.  The BLM allowed only a 15-day comment period on the EA.  Plaintiffs submitted timely comments on the EA on April 10, 2018.

236.     The EA discloses that the entirety of the lease offered is within GHMA but does not discuss compliance with the Sage-Grouse Plan Amendment's requirement to prioritize leasing and development outside of sage-grouse habitat.  The EA does not contain any sage-grouse lease stipulations based on the Sage-Grouse Plan Amendments and instead substitutes a Lease Notice, which states that the entire lease area is GHMA. The Lease Notice defers BLM's decisions about which sage-grouse protection measure would be required to the future, asserting that "conditions of approval would be imposed on exploration and other development activities within the entire lease area on a case-by-case basis in accordance with the ARMPA management decisions, buffers, seasonal restrictions, and required design features (RDFs)."

237.     Greater sage-grouse in the lease area are part of the East-Central Idaho population, which the FEIS for the Idaho/Southwestern Montana Sage-Grouse Plan Amendment described as a small population at risk for fragmentation (p. 3-22). The COT Report described the East-Central Idaho sage-grouse population as "isolated/small size" and "high risk" with a "low probability of persistence" COT Report at 22, 76-77. Such a greater sage-grouse population is nevertheless valuable because it helps ensure the species continues to exist by contributing to its redundancy, representation, and resilience. *See* COT Report at 12. Preserving peripheral

populations is essential to arresting the decline of greater sage-grouse toward extinction and Endangered Species Act listing. See COT Report at 12-13.

238.   The EA did not analyze the cumulative impacts of oil and gas leasing and development and sage-grouse and their habitat in eastern Idaho. The EA does not assess the current state of sage-grouse populations in that portion of the species' range, including the individual populations and seasonal habitats that may be affected by the proposed leases, and the implications of development for local and regional grouse survival, connectivity, and possible recovery. In fact, the EA's cumulative impacts section does not even mention greater sage-grouse and instead generically lists cumulative impacts to "Wildlife Resources, including Migratory Birds, Special Status Animals." Such impacts would increase the risk that this vulnerable, isolated, and understudied population of sage-grouse will not persist.

239.   On April 27, 2018, BLM announced that it intends to offer this entire area in its June 2018 Utah lease sale, addressed further below.

**D.    Normally Pressurized Lance Project (Pending Action)**

240.   The "Normally Pressurized Lance Natural Gas Development Project" ("Lance") was previously addressed by this Court in the BLM RMP/sage-grouse litigation, *W. Watersheds Project v. Salazar*, No. 08-cv-516-BLW.

241.   Encana Oil and Gas (USA) prepared a Plan of Development dated June 29, 2011 for the Lance project, which it submitted to BLM.  *See id.,* Hearing Exhibit 30.  The Plan described the Lance project as covering approximately 141,000 acres in the BLM's Pinedale and Rock Springs Field Offices.  *Id.*, p. 1.  Approximately 70 wells were already drilled in the project area, *id.*; and Encana proposed to develop the field by drilling up to 350 new wells each year for a 10-year period.  *Id.*, pp. 1-2.  The project components would include "3,500 additional wells

with associated well pads, access roads, pipelines, compressor stations and other ancillary facilities." *Id.*, p. 2.

242.    The Lance project area is adjacent to the Jonah Field in the BLM's Pinedale Field Office, one of the most "intensively developed" oil and gas fields in the country, and farther north is the Pinedale Anticline Project Area ("PAPA"), another intensively developed oil and gas field.  Together, the Jonah and PAPA oil and gas developments have caused substantial loss, fragmentation and degradation of key sage-grouse habitats, resulting in substantial reductions of sage-grouse populations in western Wyoming that once were among the most prolific and productive sage-grouse populations across the range.

243.    The Lance field also includes known sage-grouse winter concentration areas that are critical for sustaining sage-grouse populations in southwestern Wyoming.  In addition, the Land field is located within the longest pronghorn antelope migration route known in the United States, running from Grand Teton National Park to Seedskadee National Wildlife Refuge, and known worldwide as the "Path of the Pronghorn."

244.    On July 7, 2017, BLM moved forward to approve Lance project by issuing a Draft EIS, DOI-BLM-WY-D010-2011-0001-EIS.  It allowed 45 days for public comment.

245.    The governing RMPs for the Lance project are the Pinedale Field Office and Green River RMPs, which were amended by the Sage-Grouse Plan Amendments and approved in the BLM's Rocky Mountains ROD.

246.    The Draft EIS disclosed that the Project Area supports year-round sage-grouse populations, including 48,036 acres of PHMA, which composes 34 percent of the project area. DEIS 4-310.  The project area includes 27,292 acres of sage-grouse winter concentration areas, and 1,259 acres of SFAs.  *Id*.  It contains 10 occupied leks and one unoccupied lek.  DEIS 3-225.

247.    The larger 11-mile project "analysis area" contains 368,554 acres of PHMA, 430,163 acres of Core Management Areas, 31,532 acres of winter concentration areas, 503,247 acres of GHMAs, and 168,293 acres of SFAs.  It contains 44 occupied leks and 12 unoccupied leks.  DEIS 3-225.  There are a total of 92 documented leks that occur in the Cumulative Impact Analysis Area for the project.  DEIS 4-450.

248.    Results of BLM winter surveys documented flocks of sage-grouse larger than 50 individuals within the survey area, with nearly 2,000 individual grouse recorded collectively throughout the western portion of the project area.  About 750 of these individuals are thought to use the project area year-round, whereas about 40 percent of them only travel to the project area in winter.  Although they are vitally important to sage-grouse survival, these winter concentration areas are outside of sage-grouse PHMA, and therefore fewer protections apply in these areas.  DEIS 3-225.

249.    Plaintiffs the Center for Biological Diversity and Western Watersheds Project submitted timely comments on the Draft EA on November 20, 2017.  The comments raised numerous related to sage-grouse, as well as impacts on other wildlife species, including pronghorn antelope.

250.    Upon information and belief, BLM intends to complete its NEPA process and approve development of the Lance project by the end of 2018 or early 2019, without adequate protections and safeguards for sage-grouse, pronghorn, and other wildlife, and without complying with the Sage-Grouse Plan Amendments, NEPA, and other requirements of law.

**E.    Nevada June 2018 Lease Sale (Battle Mountain District) (Pending Action)**

251.    In January 2018, Nevada BLM released an EA, DOI-BLM-NV-B020-2018-0017-EA, for its June 2018 oil and gas lease sale, and allowed 30 days for public comment.

252.    The proposed leasing would occur on BLM's Battle Mountain District, and the governing RMPs are the Tonopah and Shoshone Eureka RMPs, which were amended by the Nevada and Northeastern California Sage-Grouse Land Use Plan Amendments adopted through BLM's Great Basin ROD.

253.    The proposed lease sale includes 166 nominated parcels, NV-18-06-001 to 166. The parcels comprise 313,715 acres, including 21,710 acres of GHMA, 64,908 acres of PHMA, and 24,015 acres other sage-grouse habitats.  Approximately 70% of the proposed leases are within occupied greater sage-grouse range. The lease sale would impact nesting, brooding, summer and winter habitats—and in particular, habitats of value in the Little Fish Lake Valley and Monitor Valley, where thriving sage-grouse populations exist.  One parcel occurs in close proximity to a well-attended lek.  The EA does not mention the obligation to prioritize leasing outside of sage-grouse habitat.

254.    Sage-grouse in Nevada have lost substantial habitat to factors including wildfire and cheatgrass. Because of relatively limited oil and gas production and development in the state, habitat loss to oil and gas has thus far been limited. The June 2018 lease sale, however, would convey rights to potentially vast development in what the Nevada Department of Wildlife deems the most productive grouse habitat in southern Nevada.

255.    Both Monitor and Fish Lake Valleys are within the Monitor Population Management Unit (PMU). According to the Nevada state Sage Grouse Conservation Plan for South Center Nevada, "the Monitor PMU has a large population, extensive acreage of existing habitat, and over 70 known leks." These 73 leks are the most of any PMU in the South Central planning unit of Nevada, and are of critical importance of maintaining sage-grouse populations and habitat within the PMU.

256.    On February 14, 2018, during the 30-day comment period, Plaintiffs Center for Biological Diversity and Western Watersheds Project submitted timely public comments. Plaintiffs' comments informed the agency that the EA failed to adequately analyze the leasing decision's harm to sage-grouse because it did not provide any information about existing conditions or anticipated impacts affecting the species, and that the proposed leasing violates the land use plan's requirement to prioritize leasing outside of sage-grouse habitat.  They also established that the EA failed to consider an adequate range of alternatives because it only considered a no leasing alternative and an alternative to lease all sage-grouse habitat, and that it failed to analyze the cumulative impacts of the leasing along with other proposed leasing in sage-grouse range on the sage-grouse.

257.    Upon information and belief, BLM will post a Notice of Competitive Lease sale at least 45 days prior to the June 2018 lease sale, and, pursuant to IM 2018-034, will require lease sale protests to be filed within 10 days.  Such abbreviated period for protests is inadequate and harms Plaintiffs' ability to fully address the issues necessary for their protests.

**F.    Utah September 2018 Lease Sale (Pending Action)**

258.    On or about March 30, 2018, BLM announced 15-day comment and scoping periods for multiple EAs for its proposed September 10-14, 2018, Utah oil and gas lease sale. These include separate EAs for BLM Utah's West Desert and Salt Lake Field Offices.

259.    BLM acknowledges that most of the proposed Salt Lake FO lease sale falls within designated Priority Habitat Management Areas for greater sage-grouse, stating: "Most of the parcels (25,752 acres) are within PHMA, including all of the parcels in Rich and Summit Counties (Rich Population Area) and about half of the Utah County parcels (Carbon Population

COMPLAINT -- 66

Area) (Figures 8 and 13, respectively). Seasonal habitats within the lease parcel area include breeding and nesting, brood-rearing/summer, and winter habitats."

260.     The Rich population area is one of the largest and most stable in Utah, and important for connectivity to grouse populations in Idaho and Wyoming. BLM did not analyze whether these parcels are appropriate to prioritize for leasing, or whether its management objectives could be better met by prioritizing the leasing of other lands and minerals outside of PHMA.

261.     The Salt Lake and Price RMPs, as amended by the 2015 GRSG ARMPA, require that "[p]riority will be given to leasing and development of fluid mineral resources, including geothermal, outside of PHMA and GHMA. When analyzing leasing and authorizing development of fluid mineral resources, including geothermal, in PHMA and GHMA, and subject to applicable stipulations for the conservation of GRSG, priority will be given to development in non-habitat areas first and then in the least suitable habitat for GRSG."

262.     The Salt Lake September 2018 lease sale EA proposes leasing areas a majority of which fall within one of the most important sage-grouse population areas in the state, as well as a second area (the Emma Park population) that is already at risk due to anthropogenic disturbance. The EA provides no evidence that BLM has considered, let alone prioritized, whether other lands outside of sage-grouse habitat might be more suitable for new leasing than extensive areas of PHMA within the Rich and Emma Park population areas.

263.     The Salt Lake September 2018 lease sale EA fails entirely to assess the foreseeable impacts on specific grouse habitats from development outside the No Surface Occupancy Area of the leasehold itself – including access from private surface, or from Wyoming BLM lands where PHMA is not subject to the No Surface Occupancy Stipulation.

COMPLAINT -- 67

Without the analysis of factors including importance of the lands in question for habitat function, it is impossible for BLM understand how offering leases within sage-grouse habitat is consistent with ARMPA requirement to prioritize leasing outside such habitat.

264.    Upon information and belief, Utah BLM plans to offer these parcels for lease in September 2018, and pursuant to IM 2018-034, will require lease sale protests to be filed within 10 days of posting notice of the lease sale. Such abbreviated period for protests is inadequate and harms Plaintiffs' ability to fully address the issues necessary for their protests.

### G.    Converse County Oil and Gas Project (Pending Action)

265.    On May 16, 2014, Wyoming BLM published a Federal Register notice announcing its intent to prepare an Environmental Impact Statement for a proposed 1.5 million-acre oil and gas development project in Converse County, Wyoming.  79 Fed. Reg. 28538 (May 16, 2014). The notice opened a 30-day public comment period.

266.    The Converse County project area includes lands administered by BLM's Casper Field Office, as well as a portion of the Thunder Basin National Grasslands, administered by the U.S. Forest Service. The governing land use plans are the Casper RMP and the Thunder Basin National Grassland Land and Resource Management Plan, both of which were amended by the Sage-Grouse Land Use Plan Amendments adopted through the BLM's and Forest Service's Rocky Mountain RODs, respectively.

267.    The Converse County project would drill up to 5,000 new oil and gas wells over 10 years, and construct associated roads and infrastructure.  The operators request exceptions to the timing limitations, well density limits, and other measures imposed for greater sage-grouse in non-core areas to maximize efficiencies.

268.    BLM issued a Draft EIS for the Converse County project on January 26, 2018, DOI-BLM-WY-P060-2014-0135-EIS, and allowed 45 days for public comment.

269.    The Draft EIS disclosed that the Proposed Action would disturb (in "estimated incremental acres"), 11,177 acres of PHMA, 4,158 acres of habitat within a 2-mile lek buffer, and 11,584 acres of "sagebrush shrubland habitat." However, elsewhere it mentions that the project area contains 199,281 acres of PHMA (and 284,375 acres of PHMA within the "greater sage-grouse analysis area"), and 1,287,429 acres of GHMA in the project area (and 1,752,212 acres of GHMA within the "greater sage-grouse analysis area"). DEIS 3.18-47.

270.    The proposed project would affect the Douglas PHMA, the North Glenrock PHMA, the Thunder Basin PHMA, the M Creek PHMA, and the Bill PHMA. DEIS 3.18-48 to 49. For the portions of PHMA in the project area, Douglas PHMA lek attendance has declined 38 percent since 2006, Thunder Basin PHMA lek attendance has declined by 75 percent since 2006, M Creek lek attendance has declined by 100 percent since 2006, and the Bill PHMA contains no leks. Lek attendance has only increased in the North Glenrock PHMA, where it has increased by 322 percent since 2006—to almost 16 birds. The leks that would be affected by the proposed project are already close to extirpation.

271.    The DEIS also disclosed that while the Wyoming Sage-Grouse Plan Amendments cap disturbance in sage-grouse habitats to a biologically-inadequate 5 percent, this cap is already exceeded in four of five areas assessed. Combined, disturbance in the areas assessed is 18.9 percent, far above any cap the best available science recommends to protect grouse. In most areas, existing disturbance is more than double the 5 percent the Plans allow.

272.    On March 12, 2018, Plaintiffs Center for Biological Diversity and Western Watersheds Project timely submitted comments on the Draft EIS. Plaintiffs' comments also

incorporated by reference scoping comments submitted on June 30, 2014 by Western

Watersheds Project's Executive Director, Erik Molvar.

273.    Plaintiffs' comments stressed the importance of up-front site-specific analysis to

adequately consider the impacts of the project on sage-grouse, and noted that the analysis failed

to adequately consider impacts to sage-grouse and the proposed action did not conform to the

governing land use plans' sage-grouse provisions.  In particular, the comments noted numerous

respects in which the project as proposed violated the land use plans' sage-grouse requirements,

including the requirement to prioritize oil and gas development outside of sage-grouse habitat.

274.    According to the Forest Service's current Schedule of Planned Actions for the

Medicine Bow-Routt National Forest and Thunder Basin National Grassland, BLM and the

Forest Service plan to issue a Final EIS in January 2019 and a final decision in February 2019.

275.    Upon information and belief, BLM under the Trump/Zinke directives above will

approve the Converse County project in the imminent and foreseeable future despite its

potentially harmful impacts on for sage-grouse and in violation of law, including NEPA,

FLPMA and the APA.

### FIRST CLAIM FOR RELIEF:
### FINAL ACTIONS VIOLATE FLPMA AND APA
### (FLPMA Consistency Requirement)

276.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

277.    This First Claim for Relief challenges Defendants' violations of FLPMA, 43 U.S.C.

§§ 1701 *et seq.*, in approving the Final Actions as identified above, both collectively and

individually.  This claim is brought under the judicial review provisions of the APA, 5 U.S.C. § 706.

278.    Enacted in 1976, FLPMA governs BLM's management of the public lands.  *See* 43

U.S.C. §§ 1701 *et seq.* In FLPMA, Congress directed that public lands:

> be managed in a manner that will protect the quality of the scientific,
> scenic, historical, ecological, environmental, air and atmospheric, water
> resource and archeological values; that, where appropriate, will preserve
> and protect certain public lands in their natural condition; that will provide
> food and habitat for fish and wildlife and domestic animals; and that will
> provide for outdoor recreation and human occupancy and use.

43 U.S.C. § 1701(a)(8).

279.   In enacting FLPMA, Congress found that "the national interest will be best realized if the public lands and their resources . . . and their present and future use is projected through a land use planning process," and it adopted FLPMA in part to establish "goals and objectives . . . as guidelines for public land use planning . . . ." 43 U.S.C. § 1701(a)(2), (7).

280.   FLMPA directs that the Secretary of Interior (and hence BLM, which has been delegated the Secretary's authority in management of the public lands) develop and periodically revise lands use plans, and adhere to those plans in management decision-making.  *See* 43 U.S.C. § 1712(a) (Secretary "shall, with public involvement and consistent with the terms and conditions of this Act, develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands"); *id.* § 1732(a) (Secretary "shall manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans").  When a land use plan is revised, existing resource plans and permits, contracts and other instruments are to be revised within a "reasonable period of time."  43 C.F.R. § 1610.5-3.

281.   The Sage-Grouse Plan Amendments approved by BLM through the September 2015 Great Basin and Rocky Mountain RODs amended or revised the applicable land use plans governing BLM's administration of the public lands and federal fluid mineral resources where it is now approving extensive oil and gas leasing and development affecting sage-grouse habitats and populations under the Challenged Decisions, including the Final Actions identified above.

COMPLAINT -- 71

282.    The Final Actions, individually and collectively, disregard and violate the directions of the Sage-Grouse Plan Amendments, including that oil and gas leasing and development shall be prioritized away from SFAs, PHMAs and GHMAs in order to protect and conserve sage-grouse habitats and populations, and requirements to protect sage-grouse habitats (including SFAs, PHMAs, and "core" areas) from harmful impacts of oil and gas development, including through NSOs, lek buffers, surface disturbance density caps, and others. Accordingly, the Final Actions, individually and collectively, are not "in accordance with the land use plans" in violation of FLPMA, 43 U.S.C. § 1732(a).

283.    Defendants' approval of the Final Actions, individually and collectively, is thus arbitrary, capricious, an abuse of discretion, and not in accordance with law under FLPMA and the APA, and will allow serious ecological degradation as well as harm to the public and Plaintiff's interests, unless reversed by this Court.

284.    The Pending Actions, as identified and discussed above, are likely to be approved by Defendants in violation of FLPMA and the APA for similar reasons, and thus are appropriate for judicial review and entry of declaratory and/or injunctive relief by this Court once they become Final Actions.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### SECOND CLAIM FOR RELIEF:
### FINAL ACTIONS VIOLATE FLPMA AND APA
### (Failure to Follow Best Available Science)

285.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

286.    This Second Claim for Relief challenges Defendants' approval of the Final Actions, individually and collectively, which are contrary to the best available science and do not comport with the standards and procedures adopted by BLM in the Great Basin and Rocky

COMPLAINT -- 72

Mountain RODs and the Sage-Grouse Plan Amendments.  This claim is brought under the judicial review provisions of the APA, 5 U.S.C. § 706.

288.    In addition, or in the alternative, Plaintiffs seek declaratory relief with respect to Defendants' violations as alleged herein under 28 U.S.C. § 2201-02.

289.    FLPMA imposes procedural and substantive statutory requirements upon Defendants' management of the public lands and federal fluid mineral resources in question here, including mandates relating to land use planning, multiple use/sustained yield, preventing unnecessary or undue degradation of the public lands and resources, and/or prohibiting actions that will permanently impair the quality of the environment. 43 U.S.C. §§ 1701(c), 1702(b), 1712 & 1732(a)-(b).

290.    To fulfill its statutory mandates under FLPMA and other requirements of law, Defendant BLM committed to using the best available science to adopt conservation measures sufficient to maintain and enhance populations and distribution of greater sage-grouse by protecting and improving sagebrush habitats and ecosystems to sustain those populations.  In the National Greater Sage-Grouse Planning Strategy EISs and RODs, BLM specifically and repeatedly asserted that it employed and utilized the best available science in approving the Sage-Grouse Plan Amendments.

291.    The Final Actions, individually and collectively, do <u>not</u> follow the best available science in numerous respects, as alleged in detail above and in Plaintiffs' comments, protests, appeals and other submissions to BLM.

292.    Accordingly, the Final Actions are arbitrary, capricious, an abuse of discretion, not in accordance with law under FLPMA and the APA, and have caused or threaten serious prejudice and injury to the rights and interests of Plaintiffs and their members and staff.

293.    The Pending Actions, as identified and discussed above, are likely to be approved by Defendants contrary to the best available science and in violation of FLPMA and the APA for similar reasons, and thus are appropriate for judicial review and entry of declaratory and/or injunctive relief by this Court once they become Final Actions.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### THIRD CLAIM FOR RELIEF:
### FINAL ACTIONS VIOLATE NEPA AND APA

294.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

295.    This Third Claim for Relief challenges Defendants' approval of the Final Actions, individually and collectively, as violating the requirements of NEPA, 42 U.S.C. §§ 4321 *et seq.*, and NEPA's implementing regulations, 40 C.F.R. §§ 1500 *et seq.*  This claim is brought under the judicial review provisions of the APA, 5 U.S.C. § 706.

296.    NEPA is America's basic "charter for protection of the environment." 40 C.F.R. § 1500.1(a).  The Council on Environmental Quality ("CEQ") promulgated regulations implementing NEPA, which are binding on all federal agencies.  *Id*. §§ 1500-1518.4.

297.    NEPA requires federal agencies to ensure fully informed decision-making and provide for public participation in environmental analysis and decision-making.  *Id*. § 1500.1(b)-(c).

298.    NEPA requires federal agencies to prepare an EIS for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  "Environmental information [must be made] available to public officials and citizens before decisions are made and before actions are taken."  40 C.F.R. § 1500.1(b).

299.    One of NEPA's fundamental goals is to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of

man." 42 U.S.C. § 4321. The scope of NEPA review is quite broad, including disclosure and consideration of all reasonable alternatives, 40 C.F.R. § 1502.14(a), and direct, indirect, and cumulative effects, *id.* § 1508(b).

300. Direct effects are caused by the action and occur at the same time and place as the proposed project. *Id.* § 1508.8(a). Indirect effects are caused by the action and are later in time or farther removed in distances, but are still reasonably foreseeable. *Id.* § 1508.8(b). Both types of impacts include "effects on natural resources and on the components, structures, and functioning of affected ecosystems." *Id.* § 1508.8.

301. A cumulative impact is defined as:

> [T]he impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

*Id.* § 1508.7.

302. NEPA obligates the agency to make available to the public high-quality information, including accurate scientific analyses, expert agency comments, and public comments before decisions are made and actions are taken. The CEQ's NEPA regulations require that information used to inform NEPA analysis "must be of a high quality," and that "[a]ccurate scientific analysis . . . [is] essential to implementing NEPA." *Id.* § 1500.1(b). The agency's analysis must be based on professional and scientific integrity. *Id.* § 1502.24.

303. NEPA and the implementing CEQ regulations also require a federal agency to prepare a supplemental NEPA analysis whenever significant changes in circumstances or information, or the nature of a proposed action occur. 40 C.F.R. § 1502.9(c).

COMPLAINT -- 75

304.    In approving the Final Actions, BLM violated NEPA by failing to prepare any up-to-date and comprehensive EIS, supplemental EIS, or other lawful NEPA analysis addressing the "policy" changes and lease commitments it has made since adopting the 2015 Sage-Grouse Plan Amendments in favor of efforts to "reduce burdens" on the oil and gas industry and promote more extensive oil and gas development on public lands, including in or affecting key sage-grouse populations and habitats.

305.    In addition, BLM violated NEPA in approving the Final Actions by utilizing inadequate analyses and failing to address key impacts or threats to sage-grouse populations and habitats, including direct, indirect and cumulative impacts. These NEPA inadequacies and violations for each of the Final Actions include, but are not limited to:

A.    Failure to address impacts to "core" and isolated sage-grouse populations;

B.    Failure to address connectivity between key sage-grouse populations and habitats, including consideration of how local and regional populations are inter-connected and threatened;

C.    Failure to address the direct, indirect and cumulative adverse impacts of the oil and gas leasing and development being authorized by BLM across the sage-grouse range, along with cumulative and synergistic impacts of multiple threats at the regional and range-wide scales, and the cumulative impacts of other anthropogenic activities authorized in sage-grouse habitats;

D.    Failure to address the likely impacts of climate change to sage-grouse populations and habitats;

E.    Failure to address how the revocation of the Interior Department's mitigation policy and abandonment of mitigation requirements for sage-grouse protection may further

COMPLAINT -- 76

contribute to loss and degradation of sage-grouse habitats and decline of sage-grouse populations;

F.       Failure to analyze or consider site-specific information concerning specific sage-grouse seasonal habitats and populations to be impacted by proposed oil and gas leasing and development;

G.       Failure to consider a range of reasonable alternatives, including alternatives considering no or limited leasing of sage-grouse habitat for each leasing action;

H.       Failure to analyze, consider, and disclose the cumulative impacts of the Final Actions, together with the Cumulative and Pending Actions, on the environment, including the range-wide viability of the greater sage-grouse.

306.     Because of the foregoing violations, Defendants' approval of the Final Actions was arbitrary, capricious, an abuse of discretion, not in accordance with law under NEPA and the APA, and have caused or threaten serious prejudice and injury to the rights and interests of Plaintiffs and their members and staff.

307.     The Pending Actions, as identified and discussed above, are likely to be approved by Defendants in violation of NEPA and the APA for similar reasons, and thus are appropriate for judicial review and entry of declaratory and/or injunctive relief by this Court once they become Final Actions

WHEREFORE, Plaintiffs pray for relief as set forth below.

**FOURTH CLAIM FOR RELIEF:**
**IM 2018-034 VIOLATES FLPMA, NEPA, AND THE APA**
**(Public Participation Requirements)**

308.     Plaintiffs reallege and incorporate by reference the preceding paragraphs.

309.    This Fourth Claim for Relief challenges BLM's adoption of IM 2018-034 as violating the public participation requirements of FLPMA, 43 U.S.C. § 1739(e), NEPA, 42 U.S.C. §§ 4321 *et seq*., and NEPA's implementing regulations, 40 C.F.R. §§ 1500 *et seq*.  This claim is brought under the judicial review provisions of the APA, 5 U.S.C. § 706.

310.    FLPMA Section 309(e) provides that the public must be allowed meaningful participation in public lands management decisions.  43 U.S.C. § 1739(e).  It requires that: "In exercising his authorities under this Act, the Secretary [of Interior] <u>shall</u> establish procedures, including public hearings where appropriate, to give the Federal, State, and local governments <u>and the public</u> adequate notice and an opportunity to comment upon the formulation of standards and criteria for, and <u>to participate in</u>, the preparation and execution of plans and programs for, <u>and the management of, the public lands</u>."  *Id.* (emphasis added).

311.    The Department of the Interior's regulations implementing FLPMA further require that "[t]he public shall be provided opportunities to meaningfully participate in and comment on the preparation of plans, amendments and related guidance and be given early notice of planning activities."  43 C.F.R. § 1610.2(a).

312.    The FLPMA mandate to involve the public in all public lands management decisions applies not just to the development of plans and programs, but also to the "actual management of public lands." *Donald K. Majors*, 123 IBLA 142, 147 (1992). "There are strong indications that Congress intended some form of public input for all decisions that may have significant impact on federal lands." *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 322 (1987) (citing H.R. Rep. No. 1163, 94th Cong., 2d Sess. 7 (1976), U.S. Code Cong. & Ad. News 1976, p. 6181), *rev'd on other grounds*, 497 U.S. 871 (1990).

313.    NEPA and implementing CEQ regulations further require federal agencies to involve the public in preparing and considering environmental documents that implement the Act.  40 C.F.R. § 1506.6; *id.* § 1506.6(b)(1) (requiring federal agencies to "[p]rovide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected"); *id.* 1506.6(a) (requiring agencies to "make diligent efforts to involve the public in preparing and implementing their NEPA procedures"); *id.* § 1501.4(b) (requiring agencies to "involve . . . the public, to the extent practicable, in preparing [EAs]"); *id.* § 1502.19(a) (requiring public circulation of draft and final EISs); *see also id.* § 1500.1(b) (providing that "public scrutiny [is] essential to implementing NEPA" and direct federal agencies to "insure that environmental information is available to public officials and citizens before decisions are made.").

314.    Department of Interior regulations implementing the Mineral Leasing Act, 30 U.S.C. § 226, further provide that the inclusion of particular parcels in a Notice of Competitive Lease Sale may be subject to protest or appeal. 43 C.F.R. § 3120.1-3.

315.    As discussed above, IM 2018-034 makes public participation in the NEPA process for oil and gas lease sale review merely discretionary. IM 2018-034 replaced language from IM 2010-117 stating that BLM offices "will" provide for public participation with a provision that they "may" do so, thus violating the public participation requirement under CEQ regulations.

316.    Moreover, IM 2018-034 purports to allow BLM to limit or exclude public involvement in oil and gas leasing decisions in other ways, including by avoiding new NEPA analysis, and providing that public protests of a lease sale must be submitted within only 10 days, in contrast to the prior 30-day time period.

COMPLAINT -- 79

317.    In light of the unreasonable constraints on public participation created by multiple provisions of IM 2018-034, including requiring Plaintiffs and other members of the public to formulate and submit protests on oil and gas lease sales within only 10 days, IM 2018-034 deprives Plaintiffs and the public of the meaningful opportunity to participate in leasing decisions, including the Pending Actions identified above, in violation of FLPMA and NEPA.

318.    Accordingly, Defendants' adoption of IM 2018-034 is arbitrary, capricious, an abuse of discretion, and not in accordance with law under FLPMA, NEPA and the APA, which has caused or threatens serious prejudice and injury to the rights and interests of Plaintiffs and their officers, members and staff.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### FIFTH CLAIM FOR RELIEF:
### IM 2018-034 VIOLATES THE APA
#### (Failure to undertake notice-and-comment rulemaking)

319.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

320.    This Fifth Claim for Relief challenges BLM's adoption of IM 2018-034 as violating requirements for public notice and comment in agency rulemaking under 5 U.S.C. § 553.  This claim is brought under the judicial review provisions of the APA, 5 U.S.C. § 706.

321.    The APA requires federal agencies to provide public notice of, and an opportunity for public comment on, all legislative rules. *See* 5 U.S.C. § 553.

322.    IM 2018-034 constitutes a legislative rule because it effectively rescinds CEQ regulations requiring agencies to "involve the public" in the NEPA review process. *See* 40 C.F.R. §§ 1506.6, 1500.1(b), & 1501.4(b).

323.    IM 2018-034 also constitutes a legislative rule because it contains rules which bind the agency and impose or affect individual rights and duties, including the rights of

Plaintiffs and the public to exercise their rights to protest or appeal oil and gas leasing decisions under the Mineral Leasing Act.

324.     IM 2018-034 also constitutes a legislative rule because it so severely forecloses effective opportunities for public participation in the BLM's oil and gas lease sale process – including in the Pending Decisions above – that it jeopardizes the substantive rights and interests of Plaintiffs and other members of the public under NEPA, FLPMA, the Mineral Leasing Act, and other applicable laws.

325.     By failing to provide public notice or an opportunity for public comment before issuing IM 2018-034, Defendants failed to observe procedures required by law, in contravention of the APA.  Accordingly, IM 2018-034 is arbitrary, capricious, and contrary to law, in violation of the APA, which has caused or threatens serious prejudice and injury to the rights and interests of Plaintiffs and their members and staff.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### SIXTH CLAIM FOR RELIEF:
### IM 2018-026 VIOLATES FLPMA AND THE APA
### (Failure to Provide Notice and Comment on Resource Management Plan Amendments)

326.     Plaintiffs reallege and incorporate by reference the preceding paragraphs.

327.     This Sixth Claim for Relief challenges BLM's adoption of IM 2018-026 as effectively amending the Sage-Grouse Plan Amendments without conforming to the requirements of FLPMA, NEPA, and the APA. This claim is brought under the judicial review provisions of the APA, 5 U.S.C. § 706.

328.     As noted above, FLPMA requires that the Secretary of Interior develop land use plans and manage the public lands in accordance with those plans.  43 U.S.C. §§ 1712(a) & 1732(a).  The land use plans are to be developed and revised "with public involvement and

consistent with the terms and conditions of this Act." *Id.*, § 1712(a). BLM has adopted land use planning regulations, which provide further requirements and guidance for the development or revision of land use plans under FLPMA. *See* 43 C.F.R. Subpart 1601. BLM must conduct appropriate NEPA analysis for land use plan amendments as well.

329.    Under the APA, an agency must generally publish public notice of proposed rulemakings, including BLM land use plan revisions. 5 U.S.C. § 553. The APA carves out a "narrow" exception to this requirement for interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice. 5 U.S.C. § 553(b)(A). This exception does not apply when notice or hearing is required by statute. 5 U.S.C. § 553.

330.    IM 2018-026 violates FLPMA, NEPA, and the APA because it effectively amends BLM's Sage-Grouse Plan Amendments to remove the requirement to prioritize oil and gas leasing outside of sage-grouse habitats, without public notice or hearing, and without NEPA-compliant analysis.

331.    Accordingly, Defendants' adoption of IM 2018-026 is arbitrary, capricious, an abuse of discretion, and not in accordance with law under FLPMA, NEPA, and the APA, which has caused or threatens serious prejudice and injury to the rights and interests of Plaintiffs and their members and staff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

A.    Order, adjudge, and declare Defendants violated NEPA, FLPMA, their implementing regulations and policies, and/or the APA in approving each and all of the Final Actions identified above;

COMPLAINT -- 82

B.     Reverse, set aside, hold unlawful, and/or vacate each and all of the Final Actions, and remand them to Defendants;

C.     Issue declaratory and/or injunctive relief requiring Defendants to adhere to the requirements of NEPA, FLPMA, and the APA in their ongoing and future oil and gas lease sales and development approvals, including with respect to the Pending Actions identified above;

D.     Declare and adjudge that IM 2018-026 and/or IM 2018-034 are unlawful under FLPMA, NEPA, and/or the APA, and reverse, set aside and enjoin Defendants from continuing to implement either or both of them;

E.     Enter such other declaratory and/or injunctive relief as Plaintiffs may specifically request hereafter;

F.     Award Plaintiffs their reasonable costs, litigation expenses, and attorney's fees associated with this litigation under the Equal Access to Justice Act, 28 U.S.C. §§ 2412 *et seq.*, and/or all other applicable authorities; and/or

G.     Grant such further relief as the Court deems necessary or appropriate in order to remedy Defendants' violations of law, vindicate the interests of Plaintiffs and the public, and preserve and protect the public lands and resources at issue.

Dated this 30th day of April, 2018.          Respectfully submitted,

*/s/ Laurence ("Laird") J. Lucas*
Laurence ("Laird") J. Lucas (ISB # 4733)
Todd C. Tucci (ISB # 6526)
Talasi B. Brooks (ISB #9712)
*Advocates for the West*
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)

Attorneys for Plaintiffs

## APPENDIX A

**June 2017 Montana Lease Sale Parcels:** MTM 105431-4H, MTM 105431-66, MTM 105431-67, MTM 105431-74, MTM 105431-77, MTM 105431-84, MTM 105431-8X, MTM 105431-KJ, MTM 105431-KL, MTM 105431-KP, MTM 105431-KV, MTM 105431-KW, MTM 105431-L4, MTM 105431-L8, MTM 105431-MK, MTM 105431-ML, MTM 105431-PB, MTM 105431-PG, MTM 105431-PH, MTM 105431-QE, MTM 105431-QF, MTM 105431-QH, MTM 105431-QN, MTM 105431-QR, MTM 105431-QT, MTM 105431-RR, MTM 105431-VR, MTM 105431-VY, MTM 105431-WF, MTM 105431-XG, MTM 108952-AA, MTM 108952-AB, MTM 108952-AG, MTM 108952-AP, MTM 108952-AQ, MTM 108952-AV, MTM 108952-AW, MTM 108952-B4, MTM 108952-B6, MTM 108952-BT, MTM 108952-CA, MTM 108952-CE, MTM 108952-CL, MTM 108952-CN, MTM 108952-CP, MTM 108952-CQ, MTM 97300-FF, MTM 97300-JY

**December 2017 Montana Lease Sale Parcels:** MTM 108952-C4, MTM 108952-C6, MTM 108952-DB, MTM 108952-C7, MTM 108952-DC, MTM 105431-M3, MTM 105431-M9, MTM 105431-NC, MTM 105431-M4, MTM 105431-MU, MTM 105431-MP, MTM 105431-MV, MTM 105431-M6, MTM 105431-ND, MTM 105431-NE, MTM 105431-NL, MTM 105431-NM, MTM 105431-NF, MTM 105431-NA, MTM 105431-MW, MTM 105431-MR, MTM 105431-MQ, MTM 105431-NB, MTM 105431-NG, MTM 105431-NP, MTM 105431-NH, MTM 105431-N7, MTM 105431-N8, MTM 105431-N9, MTM 105431-PC, MTM 105431-PD, MTM 105431-PE, MTM 105431-PF, MTM 105431-PJ, MTM 105431-MM, MTM 105431-LV, MTM 105431-LW, MTM 105431-MD, MTM 105431-LQ, MTM 105431-LR, MTM 105431-LT, MTM 105431-MF, MTM 105431-QG, MTM 105431-NV, MTM 105431-NW, MTM 105431-N3, MTM 105431-RA, MTM 105431-RC, MTM 105431-RF, MTM 105431-RJ, MTM 105431-RK, MTM 105431-RL, MTM 105431-RN, MTM 105431-RP, MTM 105431-R4, MTM 105431-TD, MTM 105431-TH, MTM 105431-TJ, MTM 105431-TP, MTM 105431-TW, MTM 105431-T4, MTM 105431-RB, MTM 105431-RQ, MTM 105431-RT, MTM 105431-RU, MTM 105431-T6, MTM 105431-T7, MTM 105431-UA, MTM 105431-UQ, MTM 105431-LM, MTM 105431-LN, MTM 105431-U7, MTM 105431-VA, MTM 105431-VC, MTM 105431-VD, MTM 105431-VL, MTM 105431-W6, MTM 105431-VT, MTM 105431-VU, MTM 105431-VV, MTM 105431-VW, MTM 105431-VX, MTM 105431-V3, MTM 105431-V7, MTM 105431-V9, MTM 105431-WA, MTM 105431-WB, MTM 105431-WC, MTM 105431-WD, MTM 105431-WE, MTM 105431-WG, MTM 105431-WH, MTM 105431-WJ, MTM 105431-WP, MTM 105431-WQ, MTM 105431-X3, MTM 105431-WY, MTM 105431-W7, MTM 105431-XA, MTM 105431-XB, MTM 105431-XL, MTM 105431-HC, MTM 105431-HD, MTM 105431-HE, MTM 105431-J3, MTM 108952-CW, MTM 105431-X4, MTM 105431-X8, MTM 105431-YD, MTM 105431-6X, MTM 105431-6Y, MTM 105431-68, MTM 105431-69, MTM 105431-YE, MTM 105431-YF, MTM 105431-YH, MTM 105431-YM, MTM 105431-YL, MTM 105431-YQ, MTM 105431-YT, MTM 105431-YU, MTM 105431-YV, MTM 105431-YX, MTM 105431-YY, MTM 105431-Y3, MTM 105431-Y4, MTM 105431-Y6, MTM 105431-Y9, MTM 105431-QK, MTM 105431-QL, MTM 105431-QM, MTM 105431-HK, MTM 105431-HL, MTM 105431-HM, MTM 105431-3A, MTM 105431-3B, MTM 105431-3C, MTM 105431-3J, MTM 105431-3Q, MTM 105431-3R, MTM 105431-3T, MTM 105431-3U, MTM 105431-3V, MTM 105431-3W, MTM 105431-3X, MTM 105431-3Y, MTM 105431-34, MTM 105431-4G, MTM 105431-4J, MTM 105431-4M, MTM 105431-4N, MTM 105431-4P,

MTM 105431-4Q, MTM 105431-4R, MTM 105431-6G, MTM 97300-J2, MTM 105431-QP, MTM 105431-QQ, MTM 105431-QU, MTM 105431-QV, MTM 105431-QW, MTM 105431-7K, MTM 105431-7N, MTM 105431-7R, MTM 105431-76, MTM 105431-8B, MTM 105431-8C, MTM 105431-8T, MTM 105431-8Y, MTM 105431-83, MTM 105431-9A, MTM 105431-9E, MTM 105431-9J, MTM 105431-99, MTM 105431-9V, MTM 105431-9X, MTM 108952-AC, MTM 108952-AD, MTM 108952-AE, MTM 108952-AM, MTM 108952-AN, MTM 108952-AR, MTM 108952-AT, MTM 108952-AU, MTM 108952-A9, MTM 108952-BE, MTM 108952-BV, MTM 108952-A3, MTM 108952-BJ, MTM 108952-BL, MTM 108952-B3, MTM 108952-B7, MTM 108952-B8, MTM 108952-CC, MTM 108952-CD, MTM 108952-CF, MTM 108952-CK, MTM 105431-KR, MTM 105431-KT, MTM 105431-KU, MTM 97300-EP, MTM 97300-FE, MTM 108952-CV, MTM 97300-GG.

**March 2018 Montana Lease Sale Parcels:** MTM 108952-GT, MTM 108952-GR, MTM 108952-GQ, MTM 105431-JM, MTM 108952-GP, MTM108952-GN, MTM 108952-EP, MTM 108952-GM, MTM 108952-GL, MTM 108952-GJ, MTM 108952-GK, MTM 108952-GH, MTM 108952-GG, MTM 108952-EN, MTM 108952-GF, MTM 108952-GE, MTM 108952-GD, MTM 108952-GB, MTM 108952-GC, MTM 108952-GA, MTM 108952-F8, MTM 108952-F9, MTM 108952-F7, MTM 108952-DH, MTM 108952-DJ, MTM 108952-DV, MTM 108952-DW, MTM 108952-D6, MTM 108952-DX, MTM 108952 DF, MTM 108952-DG, MTM 108952-DD, MTM 108952-DE, MTM 108952-DY, MTM 108952-DK, MTM 108952-DL, MTM 105431-WK, MTM 108952-DM, MTM 108952-DN, MTM 108952-DP, MTM 108952-DQ, MTM 108952-DR, MTM 108952-F3, MTM 108952-FQ, MTM 108952-FX, MTM 108952-FW, MTM 108952-EE, MTM 108952-EF, MTM 108952-EC, MTM 108952-D7, MTM 108952-EA, MTM 108952-D8, MTM 108952-D9, MTM 108952-ED, MTM 108952-EB, MTM 105431-HW, MTM 79010-8R, MTM 108952-EG, MTM 108952-EP, MTM 108952-EQ, MTM 108952-ER, MTM 79010-JJ, MTM 108952-DU, MTM 108952-FV, MTM 108952-FM, MTM 108952-FN, MTM 108952-FD, MTM 108952-FE, MTM 105431-KQ, MTM 105431-KG, MTM 108952-FF, MTM 108952-FG, MTM 108952-FH, MTM 108952-FJ, MTM 108952-FK, MTM 108952-FL, MTM 108952-G6, MTM 108952-EL, MTM 108952-G4, MTM 108952-EM, MTM 108952-EJ, MTM 108952-FU, MTM 108952-FT, MTM 108952-F4, MTM 108952-FR, MTM 93069, MTM 108952-CR, MTM 108952-CT, MTM 108952-FC, MTM 108952-CU, MTM 108952-BQ, MTM 108952-E6, MTM 108952-FB, MTM 108952-E7, MTM 108952-E8, MTM 108952-E9, MTM 108952-FA, MTM 108952-PX, MTM 79010-A8, MTM 79010-B4, MTM 79010-A4, MTM 79010-B3, MTM 79010-B9, MTM 79010-C1, MTM 79010-HS, MTM 79010-HQ, MTM 105431-HR, MTM 105431-HT, MTM 79010-CI.

**March 2018 Wyoming Lease Sale Parcels:** WY-181Q-032; WY-181Q-033; WY-181Q-034; WY-181Q-037; WY-181Q-042; WY-181Q-043; WY-181Q-044; WY-181Q-073; WY-181Q-074; WY-181Q-075; WY-181Q-076; WY-181Q-077; WY-181Q-078; WY-181Q-079; WY-181Q-080; WY-181Q-081; WY-181Q-085; WY-181Q-086; WY-181Q-087; WY-181Q-088; WY-181Q-089; WY-181Q-090; WY-181Q-091; WY-181Q-092; WY-181Q-093; WY-181Q-094; WY-181Q-095; WY-181Q-096; WY-181Q-097; WY-181Q-098; WY-181Q-099; WY-181Q-100; WY-181Q-101; WY-181Q-102; WY-181Q-103; WY-181Q-104; WY-181Q-105; WY-181Q-106; WY-181Q-107; WY-181Q-108; WY-181Q-109;WY-181Q-110; WY-181Q-111; WY-181Q-112; WY-181Q-113; WY-181Q-114; WY-181Q-115;WY-181Q-116;WY-181Q-117; WY-181Q-118; WY-181Q-119; WY-181Q-120; WY-181Q-121;WY-181Q-

124;WY-181Q-125; WY-181Q-126; WY-181Q-127; WY-181Q-128; WY-181Q-129; WY-181Q-130; WY-181Q-131; WY-181Q-132; WY-181Q-133; WY-181Q-134; WY-181Q-135;WY-181Q-136;WY-181Q-137;WY-181Q-138;WY-181Q-139;WY-181Q-140; WY-181Q-141;WY-181Q-142;WY-181Q-143;WY-181Q-144;WY-181Q-145; WY-181Q-146; WY-181Q-147; WY-181Q-150; WY-181Q-153.