Laurence ("Laird") J. Lucas (ISB # 4733)
llucas@advocateswest.org
Todd C. Tucci (ISB # 6526)
ttucci@advocateswest.org
Talasi B. Brooks (ISB # 9712)
tbrooks@advocateswest.org
Sarah K. Stellberg (ISB # 10538)
sstellberg@advocateswest.org
*Advocates for the West*
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, and CENTER FOR BIOLOGICAL DIVERSITY, | Case No. 1:18-cv-00187-REB |
| *Plaintiffs,* | **PLAINTIFFS' OPENING BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| RYAN K. ZINKE, Secretary of Interior; DAVID BERNHARDT, Deputy Secretary of Interior; and UNITED STATES BUREAU OF LAND MANAGEMENT, an agency of the United States, | |
| *Defendants.* | |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION………………………………………………………………………… 1

LEGAL BACKGROUND………………………………………………………………… 3

    I.     THE FEDERAL LAND POLICY AND MANAGEMENT ACT (FLPMA)…… 3

    II.    THE NATIONAL ENVIRONMENTAL POLICY ACT (NEPA)…………………4

    III.   OIL AND GAS LEASING ON PUBLIC LANDS……………………………… 6

STATEMENT OF RELEVANT FACTS………………………………………………….. 8

        A.    The Sage-Grouse Plan Amendments…………………………………… 8

        B.    Prior BLM Lease Review Process…………………………………… 9

        C     Trump Administration Efforts to Exclude Environmental Reviews and
             Public Participation in Leasing Decisions………………………………10

        D.    BLM Is Now Applying IM 2018-034……………………………………12

ARGUMENT…………………………………………………………………………………15

    I.     APPLICABLE LEGAL STANDARDS…………………………………………15

    II.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS……………… 16

        A.    IM 2018-034 Is a Final Agency Action Reviewable under the APA……16

        B.    IM 2018-034 is Procedurally Invalid Under FLMPA, NEPA and
             the APA……………………………………………………………………17

             1.    <u>BLM Unlawfully Issued IM 2018-034 Without Notice-and-</u>
                   <u>Comment Procedures Required Under FLPMA and the APA</u>….18

             2.    <u>BLM Unlawfully Issued IM 2018-034 Without Notice-and-</u>
                   <u>Comment Procedures Required Under CEQ's NEPA</u>
                   <u>Regulations…</u>……………………………………………………20

        C.    BLM's Elimination of Critical Opportunities for Public Participation in
             Leasing Decisions is Arbitrary, Capricious, and Contrary to Law……...20

        1.   IM 2018-034 is Contrary to FLPMA's Public Participation
            Requirements……………………………………………………...20

        2.   IM 2018-034 Violates NEPA and Implementing Regulations by
            Failing to Involve the Public "To the Extent Practicable"………….. 25

        3.   BLM Failed to Consider the Benefits of Public Participation or
            Provide a Basis for Its Departure from IM 2010-117………………..27

III.    MANY FORMS OF IRREPARABLE HARM WARRANT AN
        INJUNCTION…………………………………………………………………30

      A.     Irreparable Environmental Harm from Oil and Gas Development………30

      B.     Irreparable Harm from Bureaucratic Commitment to Leasing…………. 32

      C.     Irreparable Harm to Plaintiff Organizations and the Public…………….34

IV.    THE BALANCE OF HARDSHIPS FAVORS AN INJUNCTION……………. 35

V.     THE PUBLIC INTEREST FAVORS GRANTING AN INJUNCTION………..36

VI.    NO BOND SHOULD BE REQUIRED…………………………………………37

CONCLUSION……………………………………………………………………… 37

## INTRODUCTION

Plaintiffs Western Watersheds Project (WWP) and Center for Biological Diversity (Center) seek a narrowly-tailored preliminary injunction barring Federal Defendants Ryan Zinke *et al.* from unlawfully restricting environmental reviews and public participation in upcoming Bureau of Land Management (BLM) oil and gas leasing decisions under recently-adopted Instruction Memorandum (IM) 2018-034, and directing them to continue following BLM procedures under prior IM 2010-117—including by allowing 30-day comment and protest periods before any oil and gas leases are sold—until Plaintiffs' challenges to IM 2018-034 can be adjudicated on the merits. (Copies of IM 2018-034 and IM 2010-117 are attached as Exhibits A & B to the accompanying Declaration of Laird J. Lucas).[1]

Over the past year, the Trump Administration has steadily disregarded the notion, enshrined in federal law, that public lands exist for the benefit of all American people. In the name of "energy dominance," the new Administration has made sweeping changes to its land management practices to prioritize oil and gas development above all else, eroding basic principles of government transparency, public participation, and balanced stewardship of our public lands. In doing so, the Administration has flouted the law.

IM 2018-034 is one such change. BLM issued this Instruction Memorandum on January 31, 2018—without any public notice, comment, or environmental review—directing BLM

---

[1] Specifically, Plaintiffs seek the following injunctive relief regarding IM 2018-034:
    (a) Enjoin IM 2018-034, Section III.B.5 - "Public Participation" and reinstate IM 2010-117, Section III.C.7 - "Public Participation";
    (b) Enjoin IM 2018-034, Section III.D - "NEPA Compliance Documentation" and reinstate IM 2010-117, Section III.E - "NEPA Compliance Documentation";
    (c) Enjoin IM 2018-034, Section IV.B - "Lease Sale Parcel Protests" and reinstate IM 2010-117, Section III.H - "Lease Sale Parcel Protests"; and
    (d) Enjoin IM 2018-034: Section III.A - "Parcel Review Timeframes" and reinstate IM 2010-117, Section III.A- "Parcel Review Timeframes."

offices to discard procedures under prior IM 2010-117 for environmental reviews and to sharply limit public involvement in oil and gas leasing decisions. These include making comment periods on proposed leases optional at the discretion of BLM field staff and restricting the former 30-day protest period to just 10 days.

These changes unreasonably inhibit Plaintiffs—and all American citizens—from weighing in on decisions affecting their public lands. They are also unlawful, for three reasons. *First*, BLM promulgated IM 2018-034 without notice-and-comment rulemaking required under the Federal Land Policy and Management Act (FLPMA), National Environmental Policy Act (NEPA), and Administrative Procedure Act (APA). *Second*, the revised procedures disregard BLM's obligations, under both FLPMA and NEPA, to allow for public participation in land management decisions. *Third*, BLM failed to provide a reasoned explanation for its rejection of IM 2010-117's public involvement and environmental review procedures, violating the APA.

BLM is scheduled to issue many more oil and gas leases on millions of acres of public lands in the coming months—including quarterly lease sales in mid-September and December 2018 affecting greater sage-grouse habitats—before this case can be decided on the merits. As documented in the accompanying Declarations,[2] Plaintiffs are environmental organizations that routinely review and seek to influence federal oil and gas leasing decisions, including to protect greater sage-grouse and other valuable wildlife from the well-documented harms associated with oil and gas development.  As described in the Declarations, Plaintiffs, their members, and the

---

[2] *See* Declarations of Plaintiffs' representatives Michael Saul, Erik Molvar, Kelly Fuller, and Laura Cunningham, which establish facts demonstrating Plaintiffs' Article III standing and irreparable injury warranting injunctive relief.  In addition, the Declarations of Linda F Baker, Kevin Emmerich, Shaleas Harrison, and Jeff Kuyper are from other conservationists around the West who are harmed by IM 2018-034, and underscore the irreparable injury and public interest supporting the requested injunction.  The accompanying Declaration of Laird J. Lucas attaches the IMs and other BLM materials cited in this brief for the Court's convenience.

public will suffer several forms of irreparable harm if BLM is permitted to issue upcoming leases proposed for the September and December 2018 quarterly lease auctions without adequate public input and environmental reviews under IM 2018-034. In contrast, there will be no harm to the BLM from preserving the prior status quo of 30-day comment and protest periods in leasing decisions until this case can be adjudicated on the merits. Because Plaintiffs have demonstrated a likelihood of success on the merits and irreparable harm, and the public interest and balance of equities tip decidedly in their favor, the Court should grant the injunction motion and enjoin implementation of IM 2018-034 as requested.

## LEGAL BACKGROUND

### I.   THE FEDERAL LAND POLICY AND MANAGEMENT ACT (FLPMA).

Enacted in 1976, FLPMA governs BLM's management of the public lands.  *See* 43 U.S.C. §§ 1701 *et seq.* In FLPMA, Congress directed that public lands:

> be managed in a manner that will protect the quality of the scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use.

43 U.S.C. § 1701(a)(8).

To help achieve these purposes, FLPMA requires that land use plans—called Resource Management Plans (RMPs) for BLM lands—be developed with public input, and followed in managing the public lands. *See* 43 U.S.C. § 1712(a) (Secretary "shall, with public involvement and consistent with the terms and conditions of this Act, develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands"); *id.* § 1732(a) (Secretary "shall manage the public lands . . . in accordance with the land use plans").

In addition, FLPMA Section 309(e) requires that the public be allowed meaningful participation in public lands management decisions. *See* 43 U.S.C. § 1739(e). It provides:

> In exercising his authorities under this Act, the Secretary, by regulation, shall establish procedures . . . to give the Federal, State, and local governments and the public adequate notice and an opportunity to comment upon the formulation of standards and criteria for, and to participate in, the preparation and execution of plans and programs for, and the management of, the public lands.

43 U.S.C. § 1739(e). FLPMA Section 310 further directs BLM to follow APA procedures in promulgating rules and regulations under FLPMA, without regard to the "public property" exemption which allowed BLM to avoid rulemaking in the past.  *See* 43 U.S.C. § 1740.  FLPMA Section 102 reiterates that "it is the policy of the United States that [the Secretary of Interior] be required to establish comprehensive rules and regulations after considering the views of the general public[.]" 43 U.S.C. § 1701(a).

FLPMA thus mandates that DOI and BLM involve the public in the "actual management of public lands." *Donald K. Majors*, 123 IBLA 142, 147 (1992). "There are strong indications that Congress intended some form of public input for all decisions that may have significant impact on federal lands." *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 322 (D.C. Cir. 1987) (citing H.R. Rep. No. 1163, 94th Cong., 2d Sess. 7 (1976), U.S. Code Cong. & Ad. News 1976, p. 6181), *rev'd on other grounds*, 497 U.S. 871 (1990).

As explained below, Federal Defendants violated these FLPMA mandates in adopting IM 2018-034 without undertaking notice-and-comment rulemaking, and in applying IM 2018-034 to exclude or sharply limit public participation in BLM oil and gas leasing decisions.

## II.      THE NATIONAL ENVIRONMENTAL POLICY ACT (NEPA).

Congress adopted NEPA to "encourage productive and enjoyable harmony between man and his environment," and "to promote efforts which will prevent or eliminate damage to the

environment and biosphere," among other stated purposes.  42 U.S.C. § 4321. The Council on

Environmental Quality (CEQ) has promulgated regulations implementing NEPA, which are binding

on all federal agencies. 40 C.F.R. §§ 1500-1518.4.  The CEQ regulations reaffirm that NEPA

requires federal agencies to ensure fully informed decision-making and provide for public

participation in environmental analysis and decision-making.  *Id.* § 1500.1(b)-(c).

NEPA is designed to ensure that federal agencies "will have available, and will carefully

consider, detailed information concerning significant environmental impacts" of their actions before

they occur. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); 40 C.F.R. §

1500.1(c).  NEPA "also guarantees that the relevant information will be made available to the larger

[public] audience that may also play a role in both the decision-making process and the

implementation of that decision." *Robertson,* 490 U.S. at 349; 40 C.F.R. § 1500.1(b).

Under the CEQ regulations, federal agencies may adopt their own agency-specific

procedures for fulfilling their NEPA obligations. *See* 40 C.F.R. § 1507.3.  But agencies must

consult with CEQ while developing these procedures, and publish the proposed regulations in the

Federal Register for public review and comment. *Id.* § 1507.3(a). Agencies must also "continue

to review their policies and procedures and in consultation with the [CEQ] to revise them as

necessary to ensure full compliance with the purposes and provisions of the Act." *Id.  See also*

40 C.F.R. § 1506.6 ("Agencies shall: . . . (a) Make diligent efforts to involve the public in

preparing . . . their NEPA procedures").

As explained below, Federal Defendants violated NEPA and the CEQ regulations by

adopting IM 2018-034 without undertaking notice-and-comment rulemaking or conferring with

CEQ, thereby excluding or sharply limiting public participation in BLM's NEPA evaluations of

proposed oil and gas leasing decisions.

### III.     OIL AND GAS LEASING ON PUBLIC LANDS.

The Mineral Leasing Act, 30 U.S.C. § 181 *et seq.*, authorizes BLM to lease federal lands "which are known or believed to contain oil or gas deposits." 30 U.S.C. § 226(a). BLM State Offices issue these leases primarily through quarterly auctions, also called "competitive sales." *See* 30 U.S.C. § 226(b)(1)(A); 43 C.F.R. 3120.1-2(a). BLM builds the parcel list for each sale primarily through industry nominations, called "Expressions of Interest." 43 C.F.R. 3120.1-1. However, the decision whether to include any particular parcel in a lease sale falls squarely within the BLM's discretion. *W. Energy All. v. Salazar*, 709 F.3d 1040, 1044 (10th Cir. 2013).

After specific parcels are nominated, BLM conducts an initial review to ensure each parcel is eligible for leasing under the applicable RMP. *See* BLM Oil & Gas Adjudication Handbook, H-3120-1–Competitive Leases, at 2–11 (Feb. 18, 2013) (Lucas Decl. Ex. C).[3] For the eligible parcels, BLM then conducts an interdisciplinary review of the parcels—focusing on conflicts with wildlife, recreation, cultural resources, water and air quality, and other resource values—to ensure compliance with NEPA, FLPMA, and other statutory requirements such as the National Historic Preservation Act, Clean Air Act, and Endangered Species Act. *Id.* This review process can result in parcel rejections, deferrals, and/or stipulations being placed on the leases to protect the environment or other resource values. *See* 43 C.F.R. § 3101.1-3.

As part of its lease parcel review and NEPA compliance, BLM must prepare a full "Environmental Impact Statement" (EIS) where the proposed action will have a significant environmental impact. *See* BLM NEPA Handbook, H-1790-1 (Jan. 2008) (Lucas Decl. Ex. D).[4]

---

[3] *Also available at* https://www.blm.gov/sites/blm.gov/files/uploads/Media_Library_BLM_Policy_h3120.pdf.

[4] *Also available at* https://www.ntc.blm.gov/krc/uploads/366/NEPAHandbook_H-1790_508.pdf.

Where the proposed action will not have a significant environmental impact, BLM may prepare a more limited "Environmental Assessment" (EA) and "Finding of No Significant Impact" (FONSI) justifying the decision not to prepare an EIS. *Id.* at 2–3. Although not provided for under NEPA, BLM also often employs a "Determination of NEPA Adequacy" (DNA) to assert that prior NEPA documents adequately analyzed a proposed lease and thus avoid conducting any new NEPA analysis. *Id.* at 3.

After this review process, and at least 45 days prior to the start of the lease sale, BLM must post a Notice of Competitive Lease Sale ("Sale Notice") announcing the list of parcels included in the auction. *See* 30 U.S.C. § 226(f); 43 C.F.R. § 3120.4-2. Ordinarily, the Sale Notice is posted along with the final NEPA document (EIS, EA, or DNA) supporting the lease sale.

BLM does not usually notify local communities or the public that specific parcels are to be auctioned for lease, so the public must review all Draft EAs and Sale Notices to identify leases of concern. *See* Fuller Decl. ¶ 30-41. The posting of a Draft EA or a Sale Notice triggers a public protest period during which individuals and organizations may file a written protest against the inclusion of any or all parcels in the upcoming auction. *See* BLM Handbook H-3120-1, at 18. BLM may then decide to deny the protest and lease the protested parcels, or uphold the protest and withdraw parcels from the lease sale. *See id.* at 47.

At the lease sale, parcels are sold to the highest bidder at an online auction. *See id.* at 35. Leases are issued after all outstanding protests are resolved and payment is received from the successful bidder. *Id.* If a protested parcel is subsequently withdrawn, the high bidder is refunded its payment to BLM for that parcel. *Id.* at 27.

Oil and gas leases confer "the right to use so much of the leased lands as is necessary to explore for, drill for, mine, extract, remove and dispose of all the leased resource in a leasehold."

43 C.F.R. § 3101.1-2. Leases are valid for 10 years but can be held indefinitely if they are producing oil or gas "in paying quantities." *Id.* §§ 3120.2-1; 3107.2-1. BLM also frequently grants lease "suspensions," which toll the 10-year lease term and allow lessees to hold leases indefinitely, without any obligation to develop them or pay annual rents. *See* 30 U.S.C. § 209; Complaint, ¶¶ 136-42 (describing lease suspensions).

## STATEMENT OF RELEVANT FACTS

### A.  The Sage-Grouse Plan Amendments.

As explained in detail in the Complaint, BLM and the U.S. Forest Service recently completed a National Greater Sage-Grouse Planning Strategy that resulted in 2015 Sage-Grouse Plan Amendments to all BLM RMPs across the sage-grouse range. The plans identified priority sage-grouse habitats and imposed management restrictions intended to protect them from adverse impacts of oil and gas leasing and development—restrictions which Federal Defendants are now violating through their emphasis on oil and gas leasing and development over all other public land values.  *See* Complaint (ECF No. 1), ¶¶ 1-14, 30-66, 73-114.

Oil and gas development has well-documented adverse effects on sage-grouse, including through habitat loss and fragmentation from roads, pipelines, wells, and other infrastructure, as well as noise and other impacts. *Id.* ¶¶ 30-31, 37-42.  The best available science – including independent studies as well as reports from Department of Interior (DOI) and U.S. Fish and Wildlife Service expert teams – underscore that sage-grouse habitats must be protected from disturbance by oil and gas development.  *Id.*  Indeed, the DOI's own experts concluded that "the conservation strategy most likely to meet the objective of maintaining or increasing sage-grouse distribution and abundance is to exclude energy development and other large-scale disturbance from priority habitats."  *Id.* ¶ 41 (quoting DOI report).

To avoid or reduce the threats of oil and gas development across the sage-grouse range, one of the key provisions of the Sage-Grouse Plan Amendments was BLM's commitment to prioritize oil and gas leasing and development <u>outside</u> of the designated sage-grouse habitats. *Id.* ¶¶ 5, 61-66. BLM explained that this "prioritization":

> is to further limit future surface disturbance and encourage new development in areas that would not conflict with GRSG [greater sage-grouse]. <u>This objective is intended to guide development to lower conflict areas and as such protect important habitat and reduce the time and cost associated with oil and gas leasing development by avoiding sensitive areas, reducing the complexity of environmental review and analysis of potential impacts on sensitive species, and decreasing the need for compensatory mitigation</u>.

*Id.* ¶ 62 (emphasis added). Although not the subject of this injunction motion, BLM recently moved to jettison this prioritization directive through issuance of IM 2018-026, which Plaintiffs are challenging for violating FLPMA, NEPA and the APA. *Id.* ¶¶ 98-104, 326-331.

### B. Prior BLM Lease Review Process.

Before January 2018, when IM 2018-34 was adopted, BLM's oil and gas lease review process was governed by IM 2010-117, *Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews* (May 17, 2010) (Lucas Decl., Ex. B). BLM issued IM 2010-117 in response to a scathing DOI review of its oil and gas leasing program. *See* Deputy Sec'y David J. Hayes, *Report To Secretary Ken Salazar Regarding The Potential Leasing Of 77 Parcels In Utah* (June 11, 2009) (Lucas Decl. Ex. E).[5] DOI recommended numerous reforms to BLM's lease review process, including greater public participation to improve BLM decisions:

> BLM should seek better communication and cooperation with other stakeholders who have concerns regarding decisions to allow oil and gas development on other sensitive landscapes that have unique values. . . . BLM has its own inherent stewardship responsibilities that should inform its decision-making when evaluating whether to allow commercial development of BLM lands in or near sensitive, treasured landscapes. BLM officials also should be attentive to the input of other stakeholders who seek to protect such lands because of the competing values they represent. . . . Decisions whether to offer

---

[5] *Also available at* https://www.doi.gov/node/11113.

> specific parcels for oil and gas development must be made on a case-by-case basis, taking into account competing resource values and site-specific circumstances. This decision will be better informed if . . . interested organizations are provided a meaningful opportunity for input and dialogue before parcels are announced for public sale. . . .

*Id.*; *see also* General Accounting Office, *BLM's Management of Public Protests to Its Lease Sales Needs Improvement,* GAO-10-670 (2010).

IM 2010-117 aimed to improve the quality and transparency of BLM's environmental reviews and provide meaningful public involvement in the process. *See* IM 2010-117, Purpose. It clarified that under federal law, "there is no presumed preference for oil and gas development over other uses." *Id.* at Policy/Analysis. It also expressly required BLM field offices to provide for public participation in every lease sale:

> Public Participation: State and field offices *will provide for public participation* as part of the review of parcels identified for potential leasing through the NEPA compliance documentation process (see section III.E). *State and field offices will identify groups and individuals with an interest in local BLM oil and gas leasing*, including surface owners of split estate lands where Federal minerals are being considered for leasing. Interested groups, individuals, and potentially affected split estate surface owners . . . *will be invited to comment during the NEPA compliance process*.

*See id.* § III.C.7 (emphasis added).  IM 2010-117 required BLM field offices to provide a 30-day public review and comment periods for all proposed sales, as well as a 30-day protest period after BLM's initial analysis determined to offer proposed parcels for lease. *See id.* § III.H. IM 2010-117 also directed BLM offices to extend review timeframes "as necessary, to ensure there is adequate time for the field offices to conduct comprehensive parcel reviews." *Id.* § III(A).

## C. Trump Administration Efforts to Exclude Environmental Reviews and Public Participation in Leasing Decisions.

On March 28, 2017, President Donald Trump issued Executive Order (EO) No. 13783, *Promoting Energy Independence and Economic Growth*, directing federal agencies to immediately review "all existing regulations, orders, guidance documents, policies, and any

other similar agency actions . . . that potentially burden the development or use of domestically produced energy resources." 82 Fed. Reg. 16,093 (Mar. 28, 2017).

In accordance with EO 13783, DOI released a report in late 2017 identifying "harmful regulations and unnecessary policies" affecting domestic energy production. *See* DOI, *Final Report: Review of the Department of the Interior Actions that Potentially Burden Domestic Energy,* 82 Fed. Reg. 50531 (Nov. 1, 2017).[6] This DOI Report identified BLM's compliance with NEPA and associated public input as "burdensome" regulations it would seek to modify. *Id.*

Consistent with the DOI report, BLM issued IM 2018-034 on January 31, 2018, titled *Updating Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews. See* Lucas Decl. Ex. A.[7] BLM issued the IM without any public notice, comment, NEPA review, or publication in the Federal Register. IM 2018-034 overhauled BLM's lease sale review process for the stated purpose of "alleviat[ing] unnecessary impediments and burdens to" oil and gas leasing, "consistent with Executive Order 13783." *Id.* The IM superseded existing procedures under the former IM 2010-117 and "any conflicting guidance or directive found in the BLM Manual or Handbook." *Id.*

Under IM 2018-034, BLM State Offices are required to shorten their lease sale review process to six months, in part by limiting public participation opportunities. The major changes it made to public participation include:

(1) replacing the language from IM 2010-117 stating that BLM offices "will" provide for public participation during the NEPA process with a provision that they "may" provide for

_____

[6] *Also available at*
https://www.doi.gov/sites/doi.gov/files/uploads/interior_energy_actions_report_final.pdf.

[7] *Also available at* https://www.blm.gov/policy/im-2018-034.

OPENING BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION -      11

public participation, meaning that once-mandatory public participation in the NEPA review process is now left to the agency's discretion, *see* IM 2018-034 § III.B.5;

(2) eliminating the prior 30-day public review and comment period, *id.* § III.D;

(3) shortening the deadline for public protests of proposed lease sales from 30 days to just 10 days, *id.* § IV.B; and

(4) limiting the parcel review process to six months, meaning that the agency has far less time to take the public's input into account*, id.* § III.A.

IM 2018-034 also eliminated the rotational lease schedule, meaning that state quarterly sales must include all parcels nominated across the state, as opposed to parcels in a rotating set of districts, *id.*, and it further discarded the language in IM 2010-117 stating that "there was no presumed preference for oil and gas" over other uses of public lands.  *Id.*

### D.      BLM Is Now Applying IM 2018-034.

BLM is now moving to implement IM 2018-034 in its 2018 oil and gas leasing reviews and sales, and will continue doing so unless enjoined by this Court.

Specifically, BLM offices have been providing only 15-day comment periods on upcoming lease sales EAs, no public comment opportunity on lease sale DNAs, and only 10-day protest periods *See* Saul Decl. ¶ 23-40; Fuller Decl. ¶ 18-21, 54-60. These include a proposed Idaho lease sale slated for auction in June 2018, which BLM suddenly deferred after this case was filed; Utah and Nevada lease sales in June and September 2018, which include extensive sage-grouse habitats; a second Wyoming lease sale recently added to the September 2018 quarterly auction also encompassing priority sage-grouse habitats, in which BLM issued an EA subject to only a 14-day comment period on May 24, 2018; and North Dakota lease parcels slated for Montana's September 2018 lease sale, for which BLM allowed only a 15-day public

scoping period. *Id.;* Lucas Decl., Ex. H (BLM news release on Sept. 2018 Wyoming lease sale).

Similarly, BLM recently denied a request to allow a 30-day comment period, advising that it

"will continue to follow current administration guidance, and will not extend the current 15-day

comment period" for a 2018 Colorado lease sale. *See* Lucas Decl. Ex. G.[8]

These highly abbreviated periods for public comment and protests present irreparable

harms to Plaintiffs and the public.  As explained in the accompanying Saul, Molvar, Fuller and

Cunningham Declarations, Plaintiffs' staff regularly monitor BLM lease sale proposals and seek

to provide detailed, scientifically-based, and ground-truthed comments and protests to alert BLM

to how sensitive sage-grouse and other wildlife may be adversely impacted by proposed oil and

gas lease sales.  They do this to improve BLM's decision-making, ensure that BLM is

conforming to the 2015 Sage-Grouse Plan Amendments and other applicable laws, and exhaust

their administrative remedies if they need to challenge leases in federal court. *Id*.  Other public

interest conservation groups similarly seek to monitor and provide timely, accurate, and

meaningful comments and protests to help protect public lands and resources. *See* Baker,

Emmerich, Kuypers, Harrison Declarations. But under IM 2018-034, Plaintiffs and other

members of the public are deprived of timely information about BLM's proposed oil and gas

leases and cannot meet the abbreviated deadlines for public comments or protests, much less

provide the sort of detailed, accurate, scientifically-grounded, and field-verified comments that

are needed to properly alert BLM to the resource issues at stake, and preserve their rights to

challenge oil and gas leases if necessary.  As explained by the Center's Michael Saul, who heads

their team working on BLM oil and gas leasing and development:

> These multiple factors – increase in proposed leasing, decreased availability of
> information, shortened comment periods, and shortened protest periods – has irreparably

---

[8] *Also available at* https://protectnps.org/colorado-blm-denies-coalition-request-for-an-extension/

injured and impaired the Center's ability to effectively carry out its mission of providing detailed, accurate input on leasing decisions. It has caused our staff, due to resource limitations, to forego comment on lease sales such as the BLM's 2018 North and South Dakota lease sale. It has also required staff to work outside normal business hours and forego vacations in order to meet abbreviated, unexpected, and frequently-overlapping comment and protest deadlines.

Expanded leasing, limited NEPA review, and curtailed comment and protest periods adversely affect the Center's mission of encouraging better-informed BLM decision-making. Where the Center can provide detailed, science-based comments, BLM has been known to eliminate proposed parcels and/or add additional protective stipulations addressing wildlife impacts. These include, as just a couple examples I am familiar with, deferral of leasing in desert tortoise critical habitat in Nevada, deferral of leasing in pallid sturgeon critical habitat in Montana, and the repeated deferral of a proposed Idaho lease sale parcel near Gray's Lake National Wildlife Refuge. When confronted with multiple large, simultaneous, and minimally-documented lease sales in multiple states, Center staff face a much more difficult task in identifying, compiling, and submitting the type of detailed, site-specific information that BLM offices have stated is required for consideration of comments and protests.

BLM's series of recent policy changes aimed at increasing oil and gas leasing, decreasing environmental review, and decreasing public involvement will foreseeably have adverse and irreparable effects on multiple key elements of the Center's organizational mission. The most immediate harm, however, is that by increasing the amount of greater sage-grouse habitat under lease for oil and gas, particularly with no or minimal pre-leasing consideration of site-specific impacts, BLM's policies and actions will increase the human-caused threats to that species' survival and recovery, and will irrevocably forego, for at least ten years, the ability to adopt science-based protections for those sage-grouse habitats.

See Saul Decl., ¶¶ 30-32.  Similarly, WWP's Executive Director Erik Molvar explains:

Western Watersheds Project's ability to ensure public oversight when BLM proposes to undertake unlawful activities depends upon our ability to obtain information and provide input through reviewing BLM's environmental analyses, conducting site visits, independently surveying affected areas, assessing impacts, and participating in public processes.  The shortened public comment and protest periods make it much harder, if not impossible, for us to provide the thorough review that can most aid BLM decision-making. . . .

The proposed oil and gas leasing now undertaken without adequate comment per the new Administration's direction, including through IM 2018-034, will cause irreparable harm to my and Western Watersheds Project's scientific, recreational, aesthetic, spiritual, and other interests in the persistence of sage-grouse and intact sagebrush habitats, as well as the scenic, cultural, paleontological, ecological, and other values the areas to be leased support in their undeveloped state.  If afforded an adequate opportunity to comment on

and/or protest these proposed lease sales, Western Watersheds Project could utilize the full force of its sage-grouse expertise to provide the agency with information that might cause it to defer or withdraw parcels from leasing. Even if the agency did not ultimately alter its decision, receiving Western Watersheds Project's full input would undoubtedly improve the quality of the agency's analysis because the agency would be more informed about the full impacts of its decision to issue leases that could lead to the destruction or impoverishment of these ecologically rich and important areas.

Molvar Decl. ¶ 33, 52.

Because BLM is now providing even less notice to Plaintiffs and the public about upcoming oil and gas leases, it is difficult to know the full extent of upcoming oil and gas lease auctions that BLM plans to conduct later in 2018 and into 2019. *See* Saul, Fuller, Molvar Declarations. But the available information indicates that the pace of BLM oil and gas leasing is escalating, including in priority sage-grouse habitats that are supposed to be protected under the 2015 Sage-Grouse Plan Amendments. *Id.* Quarterly lease sales slated for September 2018 and December 2018 will be conducted by BLM using the abbreviated notice, comment and protest periods directed by IM 2018-034, unless enjoined by the Court, causing irreparable harm to Plaintiffs, the public, and the public lands and their vital sage-grouse and other resources. *Id.*

## ARGUMENT

### I. APPLICABLE LEGAL STANDARDS.

To win a preliminary injunction, Plaintiffs must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities" tips in their favor, and (4) an "injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011), *quoting Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Under the Ninth Circuit's sliding scale approach, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as" the

irreparable injury and public interest elements are satisfied. *All. for the Wild Rockies*, 632 F.3d at 1135 (internal quotation marks omitted).

Violations of NEPA and FLPMA are reviewed under the APA, 5 U.S.C. § 706(2). *See Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 581 F.3d 1063, 1070 (9th Cir. 2009). The reviewing court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, . . . in excess of statutory jurisdiction, . . . [or] without observance of procedure required by law. . . ." 5 U.S.C. § 706(2)(A).

## II.   PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS.

### A.  IM 2018-034 Is a Final Agency Action Reviewable under the APA.

The APA authorizes judicial review of "*final agency action* for which there is no other adequate remedy in a court." 5 U.S.C. § 704 (emphasis added). An agency action is deemed "final" when two conditions are met: (1) "the action must mark the 'consummation' of the agency's decision making process" and (2) "the action must be one by which 'rights or obligations have been determined,'" or from which "legal consequences flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted).

In the Ninth Circuit, "courts consider whether the practical effects of an agency's decision make it a final agency action, regardless of how it is labeled." *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1094–95 (9th Cir. 2014). A court must "therefore focus on both the 'practical and legal effects of the agency action,' and define the finality requirement 'in a pragmatic and flexible manner.'" *Havasupai Tribe v. Provencio*, 876 F.3d 1242, 1250 (9th Cir. 2017), *quoting Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (citations omitted). "[C]ertain factors provide an indicia of finality, such as whether the action amounts to a definitive statement of the agency's position, whether the action has a direct and

immediate effect on the day-to-day operations of the party seeking review, and whether immediate compliance with the terms is expected." *Indus. Customers of Nw. Utilities v. Bonneville Power Admin.*, 408 F.3d 638, 646 (9th Cir. 2005).

BLM's issuance of IM 2018-034 is an "agency action," as it satisfies the APA definition of a "rule." *See* 5 U.S.C. § 551(4) (defining "rule" as "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy"). By definition, a rule is an "agency action." 5 U.S.C. § 551(13).

BLM's issuance of IM 2018-034 is also "final." As for the first element of *Bennett*, the IM is the "consummation of the [BLM's] decision-making process" regarding its lease review process. 520 U.S. at 177. The IM states as much. *See* IM 2018-034 ("This policy is effective immediately"). As for the second element of *Bennett*, the IM is written in mandatory language, signifying that "immediate compliance with the terms is expected." *Indus. Customers*, 408 F.3d at 646 (9th Cir. 2005). As noted, BLM offices are following and applying IM 2018-034 to avoid or limit public notice, comment, and protest periods for 2018 lease sales and have consistently treated the IM as controlling. *See* Molvar, Fuller, Saul Declarations (recounting how BLM has applied and followed IM 2018-034 in numerous 2018 lease proposals); Lucas Decl. Exs F & G H (BLM notices re applying IM 2018-034).

Accordingly, IM 2018-034 is a final agency action subject to challenge under the APA. *See W. Energy All. v. Salazar*, 10-CV-237F, 2011 WL 3738240, at *6 (D. Wyo. Aug. 12, 2011) (holding that a BLM Instruction Memorandum was a reviewable final agency action).

### B.      IM 2018-034 is Procedurally Invalid Under FLMPA, NEPA and the APA.

Plaintiffs are likely to succeed on the merits of their claims that BLM violated FLMPA, NEPA, and the APA by failing to issue IM 2018-034 through notice-and-comment rulemaking.

*See* Complaint (ECF No. 1), Fourth and Fifth Claims for Relief.  There are two separate

procedural violations here, either of which justify injunctive relief.

1.    <u>BLM Unlawfully Issued IM 2018-034 Without Notice-and-Comment Procedures</u>
<u>Required Under FLPMA and the APA.</u>

First, as noted above, FLMPA Section 309(e) provides that: "In exercising his authorities

under this Act, the Secretary, *by regulation*, shall establish procedures . . . to give the Federal,

State, and local governments and the public adequate notice and an opportunity to comment

upon the formulation of standards and criteria for, and to participate in, the preparation and

execution of plans and programs for, and the management of, the public lands." 43 U.S.C. §

1739(e) (emphasis added). FLPMA Section 310 further directs BLM to follow APA rulemaking

procedures. *See* 43 U.S.C. § 1740.

Where Congress has explicitly directed an agency to proceed "by regulation" on some

subject, the agency has no discretion to use a less formal method. *See MST Express v. Dep't of

Transp.*, 108 F.3d 401 (D.C. Cir. 1997) (vacating guidance on vehicle safety rating procedures,

because the agency "failed to carry out its statutory obligation" to establish these procedures "by

regulation"); *Ethyl Corp. v. EPA*, 306 F.3d 1144 (D.C. Cir. 2002) (vacating an EPA guidance

document because Congress explicitly directed EPA to proceed "by regulation" on that subject).

Here, IM 2018-034 falls within the scope of FLPMA Section 309, because it establishes

procedures for public participation in oil and gas leasing, a BLM management decision.  Yet

BLM adopted IM 2018-034 by fiat, without notice-and-comment rulemaking as required by

FLPMA and the APA. Accordingly, BLM's issuance of IM 2018-034 was procedurally invalid.

The District of Columbia district court has confirmed that Section 309(e) requires BLM

to structure public participation opportunities by notice-and-comment rulemaking. *See Nat. Res.

Def. Council v. Jamison*, 815 F. Supp. 454 (D.D.C. 1992). In *Jamison*, plaintiffs challenged

BLM's adoption of public participation procedures for coal leasing in an handbook, instead of a formal rule. *Id.* at 468. The court granted summary judgment for plaintiffs, holding that Section 309(e) uses the imperative "shall" and "Congress left the Secretary no discretion in how to provide that guarantee: notice and comment rulemaking." *Id.*

The plain language reading of Section 309(e) is also consistent with agency practice in other arenas. BLM has promulgated detailed regulations regarding public participation in the land-use planning process, pursuant to FLPMA Section 202. *See* 48 Fed. Reg. 20364 (May 5, 1983) (codified at 43 C.F.R. Part 1600). Following the *Jamison* decision, BLM also promulgated regulations on public participation in coal leasing. *See* 64 Fed. Reg. 12,142 (Mar. 11, 1999) (codified at 43 C.F.R. §§ 3400, 3420).[9]

Similar to *Jamison*, here BLM has flouted FLPMA Section 309(e) by never adopting regulations for public participation in its oil and gas leasing programs.  Its decision to sharply reduce public involvement in BLM oil and gas leasing decisions via IM 2010-034 without promulgating regulations using APA notice-and-comment procedures violates both the letter and spirit of FLPMA Section 309(e). Accordingly, IM 2018-034 must be vacated and set aside as an agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).[10]

---

[9]  The Forest Service has similarly promulgated regulations governing public participation under an almost identical provision of the Forest and Rangeland Renewable Resources Planning Act, which requires it "by regulation, [to] establish procedures . . . to give the . . . public adequate notice and an opportunity to comment upon the formulation of standards, criteria, and guidelines applicable to Forest Service programs,"16 U.S.C. § 1612(a). *See* 83 Fed. Reg. 13646 (Mar. 30, 2018) (codified at 36 C.F.R. Part 216) (revising public participation requirements in Forest Service planning); *see also* 77 Fed. Reg. 21260 (Apr. 9, 2012) (same).

[10] Although IM 2010-117 was also adopted without APA notice-and-comment procedures, it is appropriate for the Court to exercise its equitable discretion in imposing injunctive relief by requiring Federal Defendants to continue applying IM 2010-117's procedures, since they are more consistent with FLPMA's mandates for public involvement in public lands decisions and were intended to improve BLM oil and gas leasing decisions, as explained above.

2.      BLM Unlawfully Issued IM 2018-034 Without Notice-and-Comment Procedures
        Required Under CEQ's NEPA Regulations.

Second, BLM's issuance of IM 2018-034 also violated its obligation to proceed by

notice-and-comment rulemaking when updating its NEPA procedures.

As noted above, the CEQ regulations direct federal agencies to adopt and revise their

own agency-specific NEPA procedures through consultation with CEQ, and by publishing the

proposed regulations in the Federal Register for public review and comment. *See* 40 C.F.R. §

1507.3; *see also* 40 C.F.R. § 1506.6 ("Agencies shall: . . . (a) Make diligent efforts to involve the

public in preparing . . . their NEPA procedures").  Here, BLM used IM 2018-034 to revise its

NEPA procedures for oil and gas leasing, without publishing the proposed changes in the Federal

Register for public comment, in violation of the CEQ regulations and NEPA. BLM's failure to

follow proper procedures to adopt the changes to its oil and gas leasing process as required by

the CEQ regulations compounds its FLPMA violations, and again demonstrates that injunctive

relief is proper because Plaintiffs are likely to prevail on this claim.

C.      **BLM's Elimination of Critical Opportunities for Public Participation in
        Leasing Decisions is Arbitrary, Capricious, and Contrary to Law.**

Plaintiffs are also likely to succeed on their claim that IM 2018-034 is arbitrary,

capricious, and contrary to public participation requirements under FLPMA and NEPA.

1.      IM 2018-034 is Contrary to FLPMA's Public Participation Requirements.

As quoted above, FLPMA Section 309(e) requires that the Secretary of Interior must

"*give . . . the public adequate notice and an opportunity to comment* upon the formulation of

standards and criteria for, and to participate in, the preparation and execution of plans and

programs for, and the management of, the public lands." 43 U.S.C. § 1739(e) (emphasis added).

FLMPA Section 103 further defines "public involvement" as "the opportunity for participation

by affected citizens in rule making, decision making, and planning with respect to the public lands, including public meetings or hearings held at locations near the affected lands, or advisory mechanisms, or such other procedures as may be necessary to provide public comment in a particular instance." 43 U.S.C. § 1702(d).

As Chief Judge Winmill of this Court previously held, these provisions require public involvement in BLM management decisions, including for livestock grazing. *See W. Watersheds Project v. Kraayenbrink*, No. 4:05-cv-297, 2006 WL 2348080, at *7 (D. Id. 2006) ("This statutory language values public input on long-range issues . . . as well as on day-to-day issues ('the management of' and 'execution of' those long-range plans)")*; see also Natl. Parks and Conservation Ass'n v. F.A.A.*, 998 F.2d 1523, 1531 (10th Cir. 1993) ("Congress, through FLPMA . . . , has determined that the public has a right to participate in actions affecting public lands").

Like grazing decisions, oil and gas leasing decisions fall into the "management" category of Section 309(e). Therefore, under FLPMA, public participation is required for such decisions. IM 2018-034 violates this mandate, for four reasons.

*First*, by removing the term "will" and replacing it with a "may," *see* IM 2018-034 § III.C.5., BLM has granted itself impermissible discretion in determining whether to involve the public in oil and gas leasing decisions. Again, FLPMA directs that BLM "*shall* establish procedures. . . to give . . . the public adequate notice and an opportunity to comment upon . . . and to participate in the preparation and execution of plans and programs for, and the management of, the public lands." 43 U.S.C. § 1739(e) (emphasis added). The term "shall" makes this provision mandatory. *See Firebaugh Canal Co. v. United States*, 203 F.3d 568, 573-74 (9th Cir. 2000). As Judge Winmill made clear, BLM cannot meet its obligation under Section 309 through discretionary public participation opportunities. *W. Watersheds Project v.*

*Kraayenbrink*, 538 F. Supp. 2d 1302, 1315-16 (D. Id. 2008) ("Congress, in FLPMA, did not give the BLM any discretion to cut the public out of these management and execution issues. Yet the BLM seeks to grant itself that forbidden discretion in its regulatory revisions").[11]

*Second*, by declaring that public comment is not required in lease sales supported by a DNA and making no provision for public comment on lease sales supported by an EA, IM 2018-034 fails to satisfy BLM's obligation to provide, at a bare minimum, an opportunity for public comment in leasing decisions. Among the requirements in FLPMA Section 309(e) is the obligation "to give . . . the public *adequate notice and an opportunity to comment upon*. . . the management of[] the public lands." The definition of "public involvement" confirms that soliciting public comments is the goal, and a "necessary" element of, the requirement of Section 309(e). *See* 43 U.S.C. 1702(d) ("public involvement" means "the opportunity for participation by affected citizens in rule making, decision making, and planning with respect to the public lands, including public meetings or hearings held at locations near the affected lands, or advisory mechanisms, or such other procedures *as may be necessary to provide public comment in a particular instance*") (emphasis added). IM 2018-034 contravenes this statutory command by failing to provide for public comment in all lease sales.

*Third*, by relegating public input to the adversarial protest and appeals process for many lease sales, BLM has deprived the public of meaningful involvement in the formulation of BLM leasing decisions. Again, Judge Winmill held that protest and appeals processes complement—

---

[11] On appeal, the Ninth Circuit affirmed most of this merits decision, but remanded to the District Court to consider Plaintiffs' FLPMA claim under the *Chevron* framework. *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 499-500 (9th Cir. 2011). BLM is not entitled to *Chevron* deference here, however, because IM 2018-034 – in contrast with the grazing regulations at issue in *Kraayenbrink* – was not issued through notice and comment procedures. *Cf. United States v. Mead Corp.*, 533 U.S. 218, 230 (2001).

but are not adequate substitutes for—pre-decisional participation. *See Kraayenbrink*, 538 F.Supp.2d at 1309, 1316 (holding that BLM violated FLPMA Section 309(e) by "cut[ting the interested public] out of the discussions between the BLM and the ranchers at the formulation stage of decisions," even though the public still had the opportunity to protest and appeal grazing decisions). [12] Protests and administrative appeals occur late in the decision-making process, and ask the agency to reconsider a decision already made. To be meaningful, public participation must occur early enough to influence the agency's decision as it is being formulated, when officials are most receptive to information and can more readily modify their decision in response to public input. *See id.* at 1314 ("a proposed decision carries with it an inevitable momentum favoring that result").[13] Protests and appeals are also narrow in scope. At that late stage, parties are limited to arguing that BLM's proposed lease sale fails to comply with all applicable laws, regulations, and policies.[14] Therefore, protest and appeals are not an adequate substitute for early comment periods.

---

[12] DOI itself admits that the appeals process is "not part of the public participation required by Section 309(e) of FLPMA," 68 Fed. Reg. 33,793, 33,796 (June 5, 2003).

[13] FLPMA's legislative history confirms Congress intended BLM to permit "early public participation at the 'formulation' stage, before the decision is made." *See W. Watersheds Project v. Kraayenbrink*, 4:06-cv-00275-BLW, Docket No. 18 (Aug. 11, 2006) (Order on Motion for Preliminary Injunction). The House Report explained that Congress "expect[ed] the Secretaries to provide means for input by the interested public *before decisions are made*." H.R. Rep. No. 94-1163, at 7 (1976) (emphasis added). A 1970 report by the Public Land Law Review Commission, which inspired the public participation provisions of FLPMA, recommended meaningful public participation in "both in initial decisions and in appeals." *See* PLLRC, *One-Third of the Nation's Land* 24 (1971); S. Rep. No. 94-583, at 46 (1975) (confirming that the FLPMA adopted the PLLRC recommendations regarding public participation).

[14] *See, e.g.*, *Thomas E. Smigel*, 155 IBLA 158 (2001) (noting that on appeal, a party challenging a lease sale "must show that the determination was premised on a clear error of law, a demonstrable error of fact, or that the analysis failed to consider a substantial environmental question of material significance").

*Fourth and finally*, the unreasonably short comment and protest deadlines of IM 2018-034 inhibit the public's ability to meaningfully review and comment on BLM oil and gas leasing decisions. The public receives no notice when specific parcels are nominated for leasing. This means that BLM's publication of a Draft EA or Sale Notice is often the public's first indication of which lands will be up for auction. In a matter of 10 or 15 calendar days—which amounts to just 6 to 11 working days—would-be commenters and protesters must scramble to prepare their submissions.  The effective turnaround time is often shorter. Comments and protests are not considered filed until received, and BLM prohibits electronic submission, *see* 43 C.F.R. 1822.11, so many parties must mail them in advance to ensure timely receipt. *See* Fuller, Emmerich, Cunningham Declarations.

Preparing meaningful public comments is a time-consuming process, as the accompanying Declarations underscore. To have any chance of improving the agency's decision-making, parties generally must (1) survey the parcel maps to determine which public lands will be included in the sale; (2) review up to hundreds of pages of BLM reports and environmental studies; (3) assess potential impacts to the lease parcels and surrounding areas, encompassing tens or hundreds of thousands of acres, including to fish and wildlife populations or their habitats, air or water quality, archaeological sites or cultural resources, and recreation or other uses; (4) gather and review available data and scientific literature; (5) conduct site visits to "ground truth" BLM's assumptions and data; (6) engage knowledgeable members and experts; (7) track down and review the relevant land use plans, agency manuals, regulations, and statutes to evaluate potential violations of law or policy; (8) write comments to sufficiently raise key issues with the BLM; (9) circulate draft comments for feedback or sign-on by partner organizations; and (10) obtain organizational approval for submission of the final comments.

*See* Saul Decl., ¶ 17-30; Fuller Decl., ¶ 30-36.  Accomplishing these tasks in 30 days was difficult for even the most efficient and experienced professional staff. Doing so in as little as six working days is practically impossible. *Id.* As demonstrated in the accompanying Baker, Emmerich, Harrison, and Kuyper Declarations, many other conservation groups concerned about oil and gas leasing and development in areas they seek to protect – ranging from California and Nevada to Wyoming and Utah – have also been injured by trying to comment or protest within the allotted deadlines, and the quality of their submissions has suffered.

The increasing size and scope of lease sales has only compounded the burden. BLM's elimination of the rotational lease schedule means sales are no longer geographically limited to particular BLM districts but are spread across entire states. Additionally, the number of acres offered for lease has increased dramatically to 11,859,396 acres in 2017 as compared to just 1,946,953 acres in 2016. *See* BLM, Oil and Gas Statistics, Table 11: Acreage Offered at Competitive Lease Sale Auctions Since January 1, 2009, https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/oil-and-gas-statistics (last visited June 22, 2018).

For all these reasons, IM 2018-034 is in direct and unreasonable disregard of BLM's obligation under FLPMA Section 309(e) to involve the public in oil and gas leasing decisions.

    2.   <u>IM 2018-034 Violates NEPA and Implementing Regulations by Failing to Involve the Public "To the Extent Practicable".</u>

BLM has also violated the public participation requirements under NEPA. NEPA requires federal agencies to provide opportunities for public participation in their decisions that could affect the environment. *See Trustees for Alaska v. Hodel*, 806 F.2d 1378 (9th Cir. 1986) ("One of the policies of NEPA is to encourage and facilitate public involvement in decisions concerning environmental issues"); *Robertson*, 490 U.S. at 349 (under NEPA, the public is entitled to "play a role in the decision-making process and the implementation of that decision").

The CEQ regulations implementing NEPA specifically direct federal agencies to encourage and facilitate public involvement "to the fullest extent possible," 40 C.F.R. § 1500.2, and identify public scrutiny as an "essential" part of the NEPA process, *id.* § 1500.1(b). *See also id.* § 1501.4(b) (Agencies must "involve . . . the public, to the extent practicable"); *id.* § 1506.6 ("Agencies shall: . . . (a) Make diligent efforts to involve the public in preparing and implementing their NEPA procedures"). They also provide that "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b).

The Ninth Circuit has ruled that "[a]gencies must give the public an adequate pre-decisional opportunity to participate in and inform the agency's NEPA analysis and decision-making process." *See Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 953 (9th Cir. 2008).  The public "must be given an opportunity to comment on draft EAs," *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 970 (9th Cir. 2003), and provided "sufficient environmental information . . . to weigh in with their views and thus inform the agency decision-making process." *Bering Strait*, 524 F.3d at 953. "A complete failure to involve or even inform the public" is insufficient. *See Citizens for Better Forestry*, 341 F.3d at 970. *See also Sierra Nevada Forest Protec. Campaign v. Weingardt*, 376 F. Supp. 2d 984, 992 (E.D. Cal. 2005) ("the agency must offer significant pre-decisional opportunities for informed public involvement in the environmental review process").

Additionally, agencies cannot unreasonably limit the time for public comments. For example, in *Fund For Animals v. Norton*, 281 F. Supp. 2d 209, 226 (D.D.C. 2003), the court held that two weeks was insufficient time in which to comment on a draft EA. *See also Save Our*

*Ecosystems v. Clark*, 747 F.2d 1240, 1247 (9th Cir. 1984) (holding five-day public comment period on a portion of an EA insufficient).

BLM has failed on both counts. First, BLM has been providing only 15-day timeframes for public comment on draft EAs under the new IM, an unusually short period not justified by any exigent circumstances. Second, IM 2018-034 gives BLM offices illegitimate discretion to exclude the public from the NEPA process altogether, by making public comment on EAs discretionary and expressly disavowing its obligation to allow comment on DNAs. This violates the Ninth Circuit's admonition that agencies *must* allow public comment on EAs. *See Citizens for Better Forestry*, 341 F.3d at 970. While there is no established requirement for public comment periods on DNAs, an agency must always "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures," 40 C.F.R. §§ 1506.6(a); 1501.4(e)(1). A complete failure to involve the public—whether through scoping, public hearings, comment periods, or other methods—violates these regulations. *See Citizens for Better Forestry,* 341 F.3d at 970 (noting that the CEQ regulations "must mean something.").

   3.   <u>BLM Failed to Consider the Benefits of Public Participation or Provide a Basis for Its Departure from IM 2010-117.</u>

Plaintiffs are also likely to succeed in their further claim that IM 2018-034 must be set aside as "arbitrary and capricious" under the APA, 5 U.S.C. § 706(2)(A). Agency action is "arbitrary and capricious" if the agency "[1] relied on factors which Congress has not intended it to consider, [2] entirely failed to consider an important aspect of the problem, [3] offered an explanation for its decision that runs counter to the evidence before the agency, or [4] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1115 (9th Cir. 2007) (quotations omitted). BLM's sharp restriction of

public participation opportunities in its leasing decisions through IM 2018-34 was arbitrary and capricious, because BLM (i) entirely failed to consider important aspects of the problem; (ii) offered an explanation for its decision that runs counter to available evidence; and (iii) departed from past policies without explanation.

*First*, the rationales stated in IM 2018-034 and the October 2017 DOI Report reveal that BLM only took into account the costs to the oil and gas industry of complying with IM 2010-117 and completely ignored its benefits. *See* IM 2018-034 (justifying changes to "expedite" and remove "unnecessary impediments and burdens" to offering of lands for lease); *see also* DOI Report, 82 Fed. Reg. 50532 (stating that IM 2010-117 had "resulted in longer time frames in analyzing and responding to protests and appeals").

Cost and expedition are important considerations. However, BLM failed to demonstrate that it considered the benefits of 2010-117 in improved public participation and BLM decision-making. Likewise, BLM did not consider how IM 2018-034 would adversely impact the quality or scale of public participation, the quality of its decision-making, or its responsibilities as a steward of public lands. Without considering both costs <u>and</u> benefits of public participation, BLM was arbitrary. *See State v. BLM*, 277 F. Supp. 3d 1106, 1122 (N.D. Cal. 2017) (BLM was arbitrary and capricious where it "only took into account the costs to the oil and gas industry of complying with [the prior administration's rule] and completely ignored the benefits").[15]

---

[15] A decision based only on cost concerns would also be contrary to FLPMA and NEPA, which reflect a conscious decision by Congress to require public participation regardless of its costs. The House Report accompanying FLPMA explained that "some expenditures will always be justified to insure public exposure of proposed decisions[.]" H.R. Rep. No. 94-1163, at 7 (1976). The PLLRC Report, which precipitated FLMPA's public input requirements, similarly explained that "greater concern for third party interests, both in initial decisions and in appeals, raises possibilities of additional delay, but this risk is outweighed by the benefits we believe will flow from greater public participation." *See* PLLRC Report at 254.

*Second*, BLM "offered an explanation for its decision that runs counter to the evidence before the agency." BLM justified IM 2018-034 in part on its determination that former levels of public participation—including 30-day comment and protest periods—were "unnecessary[.]" This suggestion is both speculative and unsupported by any evidence. Common sense and experience suggest that pre-decisional comment periods, and timeframes longer than 10 to 15 days, are necessary for meaningful public engagement.

*Third and finally*, IM 2018-034 is an unexplained departure from IM 2010-117. As noted above, BLM issued the former procedures in response to substantial public criticism and detailed review of its lease sale review process. In now changing those procedures, BLM failed to point to any changed circumstances which countermanded the earlier factual findings regarding the inadequacy of BLM's prior leasing procedures. The only changed circumstance appears to be the new Administration's position with respect to the value of public participation. "New presidential administrations are entitled to change policy positions, but to meet the requirements of the APA they must give reasoned explanations for those changes and 'address [the] prior factual findings' underpinning a prior regulatory regime." *State v. BLM*, 277 F. Supp. 3d at 1123, citing *Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015). "An agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate." *Kake,* 795 F.3d at 969 (citations omitted). Here, BLM has tried to do just this, by rescinding IM 2010-117 without addressing the factual findings which precipitated those reforms.

In short, Plaintiffs have made a strong showing that they are likely to prevail on the merits of their claims that IM 2018-034 was adopted in violation of FLPMA, NEPA, and the APA, warranting injunctive relief.

III.    **MANY FORMS OF IRREPARABLE HARM WARRANT AN INJUNCTION.**

As established above, BLM is implementing IM 2018-034 in 2018 lease sales, allowing only a 15-day comment period, or avoiding public comment altogether by resorting to use of DNAs, and allowing only a 10-day protest period. Those abbreviated public procedures are being applied to September 2018 quarterly lease sales being offered in Wyoming, Nevada, Utah, and other states; and even larger sales affecting sage-grouse habitats will be offered in the December 2018 lease sale. *See* Saul Decl.,¶¶ 35-43.

As detailed below, allowing BLM to continue issuing oil and gas leases under IM 2018-034 without adequate environmental review or public input would irreparably harm Plaintiffs and the public, in at least three ways. First are environmental or aesthetic harms to public lands threatened by oil and gas leases. Second, allowing lease sales to go forward under IM 2018-034 will create "irreversible momentum" and bias any future NEPA and FLPMA compliance. Third, requiring Plaintiffs to comply with the unreasonable deadlines under IM 2018-034 will cause the organizations irreparable harm.  All three harms justify a preliminary injunction.

A.    **Irreparable Environmental Harm from Oil and Gas Development.**

BLM is poised to sell and issue leases covering millions of acres, including potentially hundreds of thousands of acres of priority sage-grouse habitats, in its upcoming September and December 2018 lease sales. *See* Saul, Molvar, Fuller Declarations. Once these leases issue, BLM will no longer have the authority to prevent development on lands that lack "no surface occupancy" (NSO) restrictions—including many leases in sage-grouse priority habitats. *Id.*[16]

---

[16] As explained in the Complaint, ¶¶ 56-60, 130-135, the 2015 Sage-Grouse Plan Amendments adopted NSO restrictions and other measures to protect sage-grouse habitats from surface disturbances associated with oil and gas development, which the Trump Administration is now disregarding in approving new oil and gas leases and developments.

*See Connor v. Burford*, 848 F.2d 1441, 1451 (9th Cir. 1988) ("the sale of a[n] oil and gas lease [that does not prohibit surface use] constitutes the 'point of commitment;' after the lease is sold the government no longer has the ability to prohibit potentially significant inroads on the environment"). While BLM has some authority to impose conditions on lessees through drilling permits, it cannot preclude development altogether. *Id.* Therefore, once upcoming leases issue without NSO restrictions, oil and gas companies will have the right to construct and maintain access roads, wells, drill pads, pipelines, and other infrastructure. These activities irreparably harm public lands in many ways, by marring pristine landscapes, destroying fragile ecosystems, disturbing or displacing fish and wildlife populations, and eliminating recreation opportunities. *See* Molvar, Fuller, Cunningham, Saul Declarations. BLM itself has acknowledged that the upcoming 2018 sales will adversely affect wildlife, recreation, and view sheds.[17]

The fact that the environmental impacts of the upcoming sales are uncertain does not weigh against a finding of irreparable harm, because the very purpose of NEPA is to analyze and consider such impacts before they may be approved. By offering the upcoming lease sales without adequate public input or involvement, BLM has created a risk that environmental effects will be overlooked or underestimated. *See Catron Cnty. Bd. of Comm'rs, New Mexico v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1433 (10th Cir. 1996) (*quoting Sierra Club v. Marsh*, 872 F.2d 497, 504 (1st Cir.1989) (Breyer, J.)) ("The 'risk implied by a violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation' by the acting federal agency"). As attested in the accompanying Declarations, Plaintiffs' members and staff

---

[17] *See, e.g.*, BLM, Environmental Assessment – September 2018 Oil and Gas Lease Sale – Fillmore Field Office Parcels, at 24-26 (Jan. 10, 2018); BLM, Environmental Assessment - September 2018 Competitive Oil and Gas Lease Sale - Salt Lake Field Office Area Parcels, at 32-56 (Mar. 2018); BLM, Environmental Assessment – June 21, 2018 Wyoming Competitive Lease Sale Parcels, at 95-135 (June 2018).

OPENING BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION -      31

personally use areas included in upcoming lease sales for recreational, aesthetic, and professional purposes. See Molvar, Fuller, Cunningham, Saul Declarations.  Plaintiffs members also demonstrate that they will be harmed by alteration of the scenic character of these public lands; by adverse impacts to the wildlife they support, including the greater sage-grouse; and by the contamination of water and oil and other resource degradation associated with oil and gas development on public lands.  *Id.*

      **B.**     **Irreparable Harm from Bureaucratic Commitment to Leasing.**

Moreover, allowing the upcoming September and December 2018 lease sales to go forward without adequate NEPA and FLPMA compliance will generate "irreversible bureaucratic momentum," again warranting injunctive relief here.  "Once large bureaucracies are committed to a course of action, it is difficult to change that course—even if new, or more thorough, NEPA statements are prepared and the agency is told to 'redecide.'" *Com. of Mass. v. Watt*, 716 F.2d 946, 952–53 (1st Cir. 1983). Thus, if BLM is allowed to proceed with leasing, there is a risk that subsequent NEPA analysis, informed by proper public input, will be skewed toward BLM's original decision. *Id.*

Courts have long held that NEPA violations justify an injunction in the face of inadequate environmental review, even where no immediate surface-disturbing activities are likely. *See Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 995 (8th Cir. 2011); *Davis v. Mineta*, 302 F.3d 1104, 1115 & n.7 (10th Cir. 2002); *Sierra Club v. Marsh*, 872 F.2d 497, 499–504 (1st Cir. 1989); *Massachusetts v. Watt*, 716 F.2d 946, 952–53 (1st Cir.1983); *Calvert Cliffs′ Coordinating Comm., Inc. v. U. S. Atomic Energy Commn.*, 449 F.2d 1109, 1128 (D.C. Cir. 1971); *see also* 40 C.F.R. § 1502.5 (EIS should be implemented in manner assuring it "will not be used to rationalize or justify decisions already made").

For example, in *Massachusetts v. Watt*, 716 F.2d 946 (1st Cir. 1983), then-Judge Breyer

held that BLM's issuance of mineral leases without NEPA compliance created a risk of

irreversible bureaucratic momentum, warranting a preliminary injunction to preserve the status

quo. Judge Breyer rejected the government's argument that a lease sale itself cannot hurt the

environment because subsequent agency approvals are required before drilling can occur. *Id.* at

952. "[S]et[ting] aside the agency's action at a later date will not necessarily undo the harm," he

observed. *Id.* "The agency as well as private parties may well have become committed to the

previously chosen course of action, and new information—a new EIS—may bring about a new

decision, but it is that much less likely to bring about a different one. . . . Once large

bureaucracies are committed to a course of action, it is difficult to change that course—even if

new, or more thorough, NEPA statements are prepared and the agency is told to 'redecide.'" *Id.*

at 952–53. For this reason, the court enjoined the lease sale. *Id.* at 953.

The Ninth Circuit and its district courts have cited with approval the First Circuit's

reasoning that bureaucratic inertia can cause irreparable harm. *See N. Cheyenne Tribe v. Hodel*,

851 F.2d 1152, 1157 (9th Cir. 1988) ("Bureaucratic rationalization and bureaucratic momentum

are real dangers, to be anticipated and avoided"); *West v. Sec'y of Dep't of Transp.*, 206 F.3d 920,

930 n. 14 (9th Cir. 2000) (citing *Marsh*, 872 F.2d 497, approvingly), *Idaho ex rel. Kempthorne v.

U.S. Forest Serv.*, 142 F. Supp. 2d 1248, 1264 (D. Idaho 2001) ("The Court finds . . . merit in the

wisdom of the First Circuit Court of Appeals analysis [in *Watt*] that the purpose of NEPA "is to

require consideration of environmental factors before project momentum is irresistible, before

options are closed, and before agency commitments are set in concrete") (citations omitted);

*Montana Wilderness Ass'n v. Fry*, 408 F. Supp. 2d 1032, 1038 (D. Mont. 2006) (enjoining

ongoing natural gas development pending BLM's revision of unlawful NEPA analysis, citing

*Northern Cheyenne Tribe*); *Friends of the Earth v. Hall*, 693 F. Supp. 904, 913 (W.D. Wash. 1988) ("the risk of bias resulting from the commitment of resources prior to a required thorough environmental review is the type of irreparable harm that results from a NEPA violation").

Here, too, the passage of time will generate irreversible momentum toward leasing, making it more difficult for BLM to choose some other course of action after adequately involving the public, even if drilling has not commenced. Once BLM issues the leases, companies will start expending resources on exploration plans. BLM may be wary of changing its mind and subjecting itself to industry lawsuits. *See, e.g., Impact Energy Resources, LLC v. Salazar*, 693 F.3d 1239, 1244 (10th Cir. 2012) (lawsuit by high bidders challenging BLM's decision to withdraw leases); *Mosely v. U.S.*, 15 Cl. Ct. 193 (Cl. Ct. 1988) (lawsuit challenging BLM's cancellation of a mineral lease as an unlawful taking); *Connor*, 848 F.2d at 1461 (observing that lessees "may have claims for damages against the government" under some circumstances). Rents collected will be distributed to the federal and state treasuries, making it difficult to reimburse lessees. 30 U.S.C. § 191. Each of these steps "represents a link in a chain of bureaucratic commitment that will become progressively harder to undo the longer it continues." *Watt*, 716 F.2d at 952-53. The more time and resources BLM and lessees are allowed to invest, the greater the likelihood that future compliance with NEPA and FLPMA will prove to be a merely empty gesture. Therefore, an injunction is necessary to ensure that Plaintiffs can obtain meaningful relief in this case.

### C.     Irreparable Harm to Plaintiff Organizations and the Public.

Third, a preliminary injunction will also prevent the costs and difficulties to Plaintiffs and the public in attempting to comply with IM 2018-034, which are substantial and unrecoverable. Plaintiffs routinely review, comment on, and protest oil and gas lease sales, and have already

experienced substantial hardships complying with IM 2018-034.  *See* Saul, Molvar, Fuller,

Cunningham Declarations. Due to BLM's implementation of IM 2018-034, both Plaintiffs have

spent and will continue spending additional time and resources tracking oil and gas lease sale

notices to avoid missing comment or protest deadlines.  *Id.*  Plaintiffs have been forced to divert

organizational resources from other programs to prepare comments or protests within BLM's

new 10- and 15-day timelines.  *Id.* If an injunction is not granted, Plaintiffs will irreparably lose

the ability to spend their limited resources on other programs. *Id.*

An injunction will also prevent irreparable harm to the broader public, including many

individuals and organizations that may be discouraged or precluded from filing comments and

protests under the allotted deadlines. The accompanying Declarations provide just a few

examples of the hardships BLM's new procedures have placed upon local community groups

concerned about the protection and management of public lands. *See* Baker, Emmerich,

Harrison, and Kuyper Declarations.  These groups have suffered irreparable harm to their ability

to effectively inform BLM leasing decisions already, and injunctive relief would benefit them –

as members of the public – by avoiding such irreparable harms in the future. *Id.*

## IV.    THE BALANCE OF HARDSHIPS FAVORS AN INJUNCTION.

To determine whether injunctive relief is appropriate, courts apply a "traditional balance

of the harms analysis." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 737 (9th Cir.

2001). Although the Supreme Court has rejected a presumption of irreparable injury from NEPA

violations, the Court has noted that "[e]nvironmental injury, by its nature, can seldom be

adequately remedied by money damages and is often permanent or at least of long duration, i.e.,

irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Accordingly, in the

face of irreparable harm to the environment, courts will withhold or limit injunctive relief only in

"unusual circumstances." *Nat'l Parks*, 241 F.3d at 738 n.18 (citation omitted); s*ee also N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843 (9th Cir. 2007) ("[i]njunctive relief is typically appropriate in environmental cases").

Plaintiffs' proposed injunctive relief is narrowly tailored, limiting any potential harm to Federal Defendants and the oil and gas industry. Their motion seeks only to retain specific provisions of IM 2010-117 while this case is adjudicated on the merits. Reverting to its prior 30-day comment and protest periods for future sales would not impose any additional workload or staffing requirements on BLM. Oil and gas companies may allege harm from the slight delay in lease issuance. However, NEPA and FLPMA contemplate some delay while the process is undertaken, and "loss of anticipated revenues . . . does not outweigh potential irreparable damage to the environment." *Nat'l Parks*, 241 F.3d at 738. *See also Park County Res. Council v. U.S. Dept. of Agric.*, 817 F.2d 609, 618 (10th Cir. 1987) ("Any increased costs from delay in drilling while an EIS is being prepared on the lease issue is not sufficient to establish prejudice, because NEPA contemplates just such a delay"). In fact, imposing the 30-day public participation periods now minimizes the risk that leases issued under the challenged policy would have to be later revoked, after BLM and private industry have invested time and capital developing the parcels.

For all these reasons, the balance of hardships tips decidedly in favor of an injunction.

## V.     THE PUBLIC INTEREST FAVORS GRANTING AN INJUNCTION.

Congress has recognized through passage of NEPA and FLPMA that there is a strong public interest in requiring BLM to involve the public in its land management decisions. There is also an undeniable "public interest in preserving nature and avoiding irreparable environmental injury," *Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (en banc), and "in careful consideration of environmental impacts before major federal projects go forward," *Alliance for*

*the Wild Rockies*, 632 F.3d at 1138. Not only would the requested injunction benefit Plaintiffs, but it would benefit many other public interest conservation organization and members of the public concerned about oil and gas leasing and development on public lands they cherish and seek to protect. *See* Baker, Emmerich, Harrison, and Kuyper Declarations. Therefore, the public interest strongly favors a stay.

**VI.   NO BOND SHOULD BE REQUIRED.**

Plaintiffs are non-profit environmental groups seeking to advance the public interest in this litigation. Therefore, the Court should waive the bond requirement, or impose a nominal bond of $100 under the public interest exception to Fed. R. Civ. P. 65(c). *See Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully pray that this Court grant this motion and issue the requested preliminary injunction prohibiting Federal Defendants from implementing the specified provisions of IM 2018-034 and ordering BLM to continue applying the prior public participation and other specified provisions of IM 2010-117 in upcoming September 2018 and other BLM oil and gas lease proposed sales, until the Court has adjudicated Plaintiffs' challenges to IM 2018-034 on the merits.

DATED: July 6, 2018                      Respectfully submitted,

                                         /s/   *Laird J. Lucas*
                                         Laurence ("Laird") J. Lucas (ISB # 4733)
                                         Todd C. Tucci (ISB # 6526)
                                         Talasi B. Brooks (ISB # 9712)
                                         Sarah K. Stellberg (ISB # 10538)
                                         *Advocates for the West*

                                         *Attorneys for Plaintiffs*