Laurence ("Laird") J. Lucas (ISB # 4733)
llucas@advocateswest.org
Todd C. Tucci (ISB # 6526)
ttucci@advocateswest.org
Talasi B. Brooks (ISB # 9712)
tbrooks@advocateswest.org
Sarah K. Stellberg (ISB # 10538)
sstellberg@advocateswest.org
*Advocates for the West*
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT, and CENTER FOR BIOLOGICAL DIVERSITY, | ) ) ) ) | Case No. 01:18-cv-187-REB |
| *Plaintiffs*, v. | ) ) ) | **DECLARATION OF MICHAEL SAUL** |
| RYAN K. ZINKE, Secretary of Interior; DAVID BERNHARDT, Deputy Secretary of Interior; and UNITED STATES BUREAU OF LAND MANAGEMENT, an agency of the United States, | ) ) ) ) ) ) | |
| _____*Defendants.*_____ | ) | |

I, Michael A. Saul, hereby declare as follows:

1.      I am over twenty-one years of age have personal knowledge of the matters stated

herein and, if called as a witness, could and would competently testify thereto.

2.      I have been both a member and employee of the Center for Biological Diversity ("Center") since 2014. I am currently employed as Senior Attorney for the Center's Public Lands Program. In this role, I engage in administrative and legal advocacy to protect wildlife and wildlife habitat on public lands and work towards mitigating adverse impacts of public lands fossil fuel development.

3.      My office is located in Denver, Colorado, and I can be contacted at msaul@biologicaldiversity.org

4.      I hold a Bachelor of Arts degree from Yale College and a Juris Doctor degree from Yale Law School. I have eighteen years of experience in public lands and wildlife law. I have been involved in efforts to protect greater sage-grouse habitat on BLM lands since 2002.

5.      As a Senior Attorney with the Center for Biological Diversity, my responsibilities are focused on policy, advocacy, and litigation over public lands fossil fuel development, with a particular emphasis on attempting to mitigate adverse impacts to climate and wildlife habitat from oil and gas, coal, tar sands, and oil shale extraction, development, and combustion.

6.      I have worked on legal issues relating to sage-grouse conservation since 2002, and for the Center since 2014. In that capacity, I have developed familiarity with legal, policy, planning, and scientific issues relating to sage-grouse conservation and oil and gas development.

7.      I also personally enjoy traveling to view sage-grouse, particularly during their spring mating displays, also known as "lekking," and have made trips to view greater sage-grouse lekking displays on BLM public lands in Colorado, Wyoming, and Nevada, most recently in the Monitor Valley of central Nevada in May 2018. I plan to return to view greater sage-grouse again next spring in north central and northwest Colorado, and, if possible, in Nevada.

8.      The Center is a membership based 501(c)(3) non-profit corporation incorporated in California and headquartered in Tucson, Arizona.   In addition to our California and Arizona offices, the Center maintains offices in multiple states including Idaho, Colorado, Nevada, and Utah.

9.      The Center's primary mission is to protect threatened and endangered species and their habitats in both the United States and abroad.  Although we pursue these objectives nationwide, much of our work focuses on advocating for habitat protection on western public lands. The Center specifically works to protect public lands administered by the Bureau of Land Management (BLM) in multiple states from the adverse impacts of fluid mineral leasing and development, particularly impacts to greater sage-grouse, sagebrush habitat, and other sagebrush obligates.

10.     The Center's members include many individuals who reside in, explore, and enjoy the native species and ecosystems of the Interior Mountain West, where the greater sage-grouse is found. The Center's staff has and continues to actively advocate for increased protections for species and habitats in the lands managed by the BLM at multiple levels including, but not limited to: comments on proposed land use and forest plans, comments on proposed leasing and development decisions and associated National Environmental Policy Act documents, administrative protests, appeals to the Interior Board of Land Appeals, litigation, public education, publication of research papers, social media advocacy, and lobbying.

11.     The Center is a membership-based nonprofit that relies upon the voluntary contributions of members, supporters, and donors to support its operations.  Based on review of the Center's membership database, as of August 4, 2017, the Center has over 58,500 members, and more than 1.3 million online supporters worldwide. The Center often appears before

DECLARATION OF MICHAEL SAUL—3

Congress, federal agencies, and in the federal courts to represent its members and goals and to advocate for the conservation of endangered, threatened, and at-risk species and their habitat.

12.     Center members, officers, and staff regularly observe, photograph, document, and study greater sage-grouse on public lands for recreational, scientific, educational, and other pursuits and intend to continue to do so in the future. The Center advocates on behalf of members interested in protecting the many native, imperiled, and sensitive sagebrush-dependent species and their habitats that may be affected by oil and gas development.

13.     Based on communications with Center members, officers, and staff, I have direct knowledge that Center members, officers, and staff have observed and photographed greater sage-grouse on public land (BLM and Forest Service) in states including Idaho, Colorado, Nevada, Utah, Wyoming, and California.

14.     The Center has been engaged in a campaign to research, document, and raise awareness of environmental consequences of oil and gas development and hydraulic fracturing in on BLM public lands. This campaign includes, among other efforts, publication of reports on climate and wildlife impacts of oil and gas leasing and development; a nationwide campaign to advocate for improved consideration of the climate, air, water, health, and wildlife impacts of BLM fossil fuel leasing; and regular commenting, administrative protests, administrative appeals, and litigation over Bureau of Land Management oil and gas leasing activities on western public lands.

15.     The Center has been involved for over a decade in efforts to protect at-risk grouse species, including the greater sage-grouse, Bi-state sage-grouse, Gunnison sage-grouse, and lesser prairie chicken. In addition to the Center's oil and gas monitoring activities, these advocacy efforts have included litigation over the listing and protection of the Bi-state sage-

grouse, Gunnison sage-grouse, and lesser prairie chicken, as well as ongoing litigation over the BLM and Forest Service's 2015 sage-grouse land management plan amendments.

16. The Center's public lands fossil fuels team consists of three attorneys, a paralegal, a campaigner, and a researcher; and the team works with the Center's scientists, Geographic Information System specialists, and other staff to research and document the environmental consequences of proposed public lands oil and gas leasing and development. One element of the team's responsibilities includes attempting to monitor and comment on all new proposed oil and gas leases within greater sage-grouse habitat.

17. Center staff attempt to monitor all BLM proposed oil and gas activities through multiple methods, including: regular inspection of the BLM's National Environmental Policy Act register (ePlanning), queries to the National Fluid Minerals Management System for proposed Applications for Permits to Drill, Freedom of Information Act requests, calls and visits to BLM field offices, monitoring of the BLM website, monitoring of EnergyNet (the private company that administers BLM fluid mineral lease auctions), monitoring of Expressions of Interest (when posted), and monitoring of third-party mapping sites.

18. The Center maintains a spreadsheet of known ongoing BLM oil and gas planning, leasing, and development actions, and its public lands fossil fuel team conducts weekly meetings to monitor comment, protest, and appeal deadlines and allocate staff time to engaging with these decisions.

19. It is Center policy to attempt, to the maximum extent possible, to bring accurate, detailed, and site-specific scientific and other information to the attention of the BLM (and Forest Service, where applicable) in an effort to promote responsible, informed decision-making

on public land oil and gas decisions, and to promote decisions that mitigate harm to greater sage-grouse, other wildlife, and other public land resources.

20.     Obtaining accurate information regarding proposed oil and gas leasing decisions, particularly when the agency provides minimal or no environmental documentation, requires considerable time and effort. At a minimum, informed analysis and comment requires obtaining and mapping geographic information, identifying appropriate databases and information sources, identifying species, habitats, populations and resources that may be affected, identifying and reaching out to appropriate area or subject matter experts, and identifying, summarizing, and compiling relevant literature.

21.     Since 2017, and particularly since early 2018, BLM efforts to limit or eliminate National Environmental Policy Act analysis, reduce public disclosure and participation, and otherwise limit public involvement in oil and gas leasing decisions has greatly impaired and complicated the Center's efforts to provide detailed, accurate public comment on oil and gas leasing and development decisions, and injured our ability to achieve the Center's mission and goals with respect to protection of  public lands and resources (including sage-grouse) from adverse impacts of oil and gas leasing and development.

22.     In particular, the Center's efforts to provide detailed, accurate, informative, and timely comment on oil and gas leasing decisions, and the work of its staff, have been complicated and adversely affected by three major trends – a massive increase in designated sage-grouse habitat proposed for leasing, the BLM's increasing reliance on minimal or no National Environmental Policy Act documentation for leasing decisions, and series of January 2018 policy changes incorporated in the BLM's Instruction Memorandum 2018-034, which replaced prior Instruction Memorandum 2010-117.

23.     Beginning in 2017, the Department of Interior and Bureau of Land Management issued a series of orders, reports, and directives reducing consideration of impacts to sage-grouse and opportunities for public involvement in the oil and gas leasing process. Among others, on December 27, 2017, without amending or revising its land use plans under FLPMA or NEPA, BLM issued Instruction Memorandum 2018-026, effectively repealing the prioritization requirement of the 2015 Sage-Grouse Plan Amendments and drastically increasing the proposed leasing of sage-grouse habitat while decreasing pre-leasing environmental analysis.

24.     As of April 2018, according to Center staff and scientists' review of BLM lease parcel data and sage-grouse habitat layers obtained from the BLM , since 2017 BLM had offered and/or leased approximately 796,870 acres of Priority and General Habitat Management Areas ("PHMA" and "GHMA") for greater sage-grouse, and proposed an additional approximately 1,156,480 acres for leasing in the second, third, and fourth quarters of 2018.

25.     On January 31, 2018, BLM issued Instruction Memorandum 2018-034, which adopted a series of "policy" changes instructing its Field Offices to accelerate oil and gas leasing and reduce environmental review and public comment. IM 2018-034 directs BLM offices to accelerate approval of oil and gas leases at the expense of conducting full environmental analysis, and drastically limits public involvement in leasing decisions.

26.     In particular, as a result of IM 2018-034, BLM will no longer use a rotating schedule for lease sales, as described in IM No. 2010-117. Each state office will review all lands that are identified in Expressions of Interest ("EOIs") that were submitted before the EOI cutoff date for a particular quarterly lease sale and will offer all parcels determined to be eligible and available within the state office's jurisdiction. This has resulted in massive, unpredictable, and duplicative lease sale announcements with cursory documentation.

27.     In one example, for the Wyoming BLM third-quarter 2018 lease sale, the agency issued, for public comment, two Environmental Assessments for two regions of the state in January 2018. Subsequently, in May 2018, the BLM unexpectedly issued a third Environmental Assessment covering 270 parcels and approximately 350,000 acres spread across eleven field offices covering virtually the entire state of Wyoming, with only fifteen days allowed for public comment. BLM stated "We are analyzing the parcels for this sale in two sets because new policy regarding lease sales was issued after we had originally begun the review process for this sale, and to comply with the policy's requirement to offer lands statewide at the quarterly sales and to meet the policy's review timeframes."

28.     IM 2018-034 further limits pre-leasing environmental analysis, review, and disclosure by encouraging field offices to decline preparation of Environmental Assessments or Environmental Impact Statements in favor of "Determinations of NEPA Adequacy" that provide no disclosure of site-specific impacts. A Determination of NEPA Adequacy is typically a cursory document of under ten pages that provides no information whatsoever regarding species, habitats, and resources that may be affected by a proposed oil and gas lease sale and resulting development, greatly increasing the demands on the Center and other conservation organizations to conduct independent research to determine the species, habitats, and other resources that may be affected by a proposed lease sale, sometimes encompassing tens or hundreds of thousands of acres.

29.     IM 2018-034 also greatly increases the burden of providing informed comment and feedback to the BLM by (a) generally eliminating comments periods on Determinations of NEPA Adequacy, (b) limiting comment periods on Environmental Assessments, when prepared,

to fifteen days, and (c) shortening deadlines for administrative review ("protest") of proposed lease sales from thirty to a mere ten days.

30.     These multiple factors – increase in proposed leasing, decreased availability of information, shortened comment periods, and shortened protest periods – has irreparably injured and impaired the Center's ability to effectively carry out its mission of providing detailed, accurate input on leasing decisions. It has caused our staff, due to resource limitations, to forego comment on lease sales such as the BLM's 2018 North and South Dakota lease sale. It has also required staff to work outside normal business hours and forego vacations in order to meet abbreviated, unexpected, and frequently-overlapping comment and protest deadlines.

31.     Expanded leasing, limited NEPA review, and curtailed comment and protest periods adversely affect the Center's mission of encouraging better-informed BLM decision-making. Where the Center can provide detailed, science-based comments, BLM has been known to eliminate proposed parcels and/or add additional protective stipulations addressing wildlife impacts. These include, as just a couple examples I am familiar with, deferral of leasing in desert tortoise critical habitat in Nevada, deferral of leasing in pallid sturgeon critical habitat in Montana, and the repeated deferral of a proposed Idaho lease sale parcel near Gray's Lake National Wildlife Refuge. When confronted with multiple large, simultaneous, and minimally-documented lease sales in multiple states, Center staff face a much more difficult task in identifying, compiling, and submitting the type of detailed, site-specific information that BLM offices have stated is required for consideration of comments and protests.

32.     BLM's series of recent policy changes aimed at increasing oil and gas leasing, decreasing environmental review, and decreasing public involvement will foreseeably have adverse and irreparable effects on multiple key elements of the Center's organizational mission.

The most immediate harm, however, is that by increasing the amount of greater sage-grouse habitat under lease for oil and gas, particularly with no or minimal pre-leasing consideration of site-specific impacts, BLM's policies and actions will increase the human-caused threats to that species' survival and recovery, and will irrevocably forego, for at least ten years, the ability to adopt science-based protections for those sage-grouse habitats.

33.     If BLM leasing policies, including IM 2018-034, continue to be applied to future lease sales, including the third and fourth quarter lease sales for 2018 (to be conducted in September and December, 2018, respectively), the Center will continue to suffer harm, both in the increased difficulty of providing detailed and documented comments and protests on multiple large lease sales in an abbreviated time-frame, and, more concretely, when oil and gas lease are issued, and development foreseeably occurs, on public lands that have never been fully and accurately examined for the wildlife and other resources that may be affected.

34.     Once fluid mineral leases are issued, under the Mineral Leasing Act, Federal Land Policy and Management Act, and implementing regulations, lessees acquire the ability to use as much of the surface as is required to extract oil and gas, for a term of at least ten years (or much longer if hydrocarbons are produced in paying quantities or the lease becomes part of a larger producing unit). For those leases that do not explicitly preserve the right to prohibit surface occupancy, the BLM's ability to require mitigation measures if potential impacts are subsequently discovered is greatly curtailed. Once a lease has been issued, it cannot be revoked absent very limited statutorily-prescribed circumstances. Even leases found to have been illegally issued by court decision are not automatically revoked, typically instead triggering subsequent proceedings by BLM to determine whether or how to continue the leases.

35.     Based on Center staff review of proposed third- and, to the extent known, fourth-quarter 2018 leases, the trend of increasing leasing of sensitive habitats with decreased environmental review will continue, unless enjoined. For example, the massive second-round Wyoming Third Quarter 2018 lease sale encompasses approximately 350,000 acres of public land and minerals, some 63% fall within Priority Habitat Management Areas for greater sage-grouse, and approximately 98% within some form of sage-grouse habitat. Based on BLM's minimal disclosure and necessarily-rushed review of available public information, this proposed lease sale would also have severe and unexamined consequences on winter and migration habitats for mule deer and pronghorn, and on the scenic, watersheds, and recreational values of irreplaceable portions of the Northern Red Desert. The BLM's Wyoming fourth quarter sale has not yet been announced, but media reports state that it may encompass 900,000 or more acres including significant big game and sage-grouse habitats—and that acreage may increase further due to BLM's self-imposed EOI-processing deadlines under IM 2018-034.

36.     Similarly, Nevada's third and fourth quarter 2018 lease sales have not yet been announced, but based on recent patterns of activity, we expect that hundreds of thousands of acres of public land, much of it within Priority or General Habitat Management Areas for greater sage-grouse, will be proposed for lease with minimal (or no, if Determinations of NEPA Adequacy are used) environmental disclosure and analysis, requiring the Center to attempt to compile accurate and detailed information for hundreds of square miles of remote Nevada basins within a fifteen-day comment period and ten-day protest period.

37.     BLM Utah's third quarter 2018 lease sale includes seven parcels in the Fillmore Field Office and 26 parcels in the Salt Lake Field office. Most of the Salt Lake Field office parcels (25,752 acres) are within sage-grouse Priority Habitat Management Areas, including all

of the parcels in Rich and Summit Counties (Rich Population Area) and about half of the Utah County parcels (Carbon Population Area). Seasonal habitats within the lease parcel area include breeding and nesting, brood-rearing/summer, and winter habitats.

38.     As the BLM has acknowledged, the Rich population area is one of the largest and most stable in Utah, and important for connectivity to grouse populations in Idaho and Wyoming. Nevertheless, BLM has failed to engage in analysis, as required by the RMP, as to whether these parcels are appropriate for leasing, or whether its management objectives could be better met by prioritizing the leasing of other lands and minerals outside of PHMA.

39.     BLM Utah's fourth quarter 2018 lease sale has not yet been announced, but according to information from the BLM, we expect a statewide offering of parcels, likely, pursuant to IM 2018-034, with no environmental analysis other than a cursory Determination of NEPA Adequacy. BLM Utah has additionally announced that it plans to issue or lift suspensions on an additional 94 lease parcels in the Price and Richfield Field Offices initially offered or issued prior to 2008.

40.     On July 2, 2018, BLM also issued a preliminary announcement of its intent to offer approximately a quarter-million acres of oil and gas leases scattered across the entire state of Colorado, including significant areas within two of the state's most critical remaining habitats for greater sage-grouse, the Northwest Colorado and North Park areas, with a 15-day comment period for the public to comment on massive areas of public land scattered across multiple geographic, geological, hydrological and ecological regions.

41.     In addition to these proposed lease sales in sage-grouse habitat, IM 2018-034's requirements, including arbitrary processing deadlines, minimizing pre-leasing analysis, and

discouraging lease deferrals—will result in two other particularly egregious lease sales with inadequate prior consideration or public comment.

42.     The proposed September 2018 lease sale includes exceptional-quality recreational lands and wildlife habitat in the Huerfano River basin of southeastern Colorado, just east of the Sangre de Cristo Wilderness, raising major concerns on impacts to local recreation, big game habitat, fisheries and aquatic habitat recreation, scenic values for the Wilderness and Great Sand Dunes National Park, and Navajo Nation cultural properties.

43.     Under IM 2018-034 deadlines, BLM has also proposed, under a cursory Determination of NEPA Adequacy that in turn relies to a decades-old Resource Management Plan without any discussion of oil and gas impacts, fluid mineral leasing in northern Arizona for the first time in years. Despite virtually no active oil and gas activity in the area, because of the irrevocable potential for harm to the potential threats to resources in the area – including scarce surface and ground water, endangered fish, cultural properties, and neighboring National Parks – the Center's mission has required it to expend substantial staff time investigating the possible consequences of these highly speculative proposed leases and advocating for resource protection.

44.     In our experience, BLM decisions authorizing drilling activity (referred to by the agency as Applications for Permit to Drill, or APDs) do not provide an adequate opportunity for public notice and comment on the unavoidable environmental impacts of oil and gas leasing, for several reasons. First, based on our review of available data, over 50% of all APDs are processed under either Categorical Exclusions or Determinations of NEPA Adequacy, which generally provide no public notice or public comment. Second, under current BLM practice, tracking APDs and their potential impacts is difficult and burdensome for the public. Bare notice of APD applications are posted with no descriptive information on a database, the Automated Fluid

Minerals Management System, that requires considerable effort by the Center, other organizations, and the public to map, identify, and evaluate the affected parcels. Third, particularly where leases do not prohibit surface occupancy, as is the case of the vast majority of BLM fluid mineral leases, BLM authority to actually mitigate impacts at the permitting stage is limited.

45.     Based on statements by the President, the Secretary of the Interior, the Deputy Secretary, and on DOI and BLM Executive Orders, reports, Instruction Memoranda and Bulletins, the Center expects the trend of more proposed leases, less analysis, shorter comment and protest periods, to continue and accelerate. This will significantly impair both the day-to-day work of our public lands team, and the resulting substantive decisions by the BLM. If the rules put in place by IM 2018-034 are allowed to continue for the third and fourth quarter 2018 lease sales, inadequate pre-leasing review and shortened public involvement will necessarily result in a failure to identify resources – at-risk species, critical habitats, sensitive watersheds, exceptional recreational resources, cultural artifacts, and more – that could be protected by either adequate stipulations or deferral of leasing for further analysis.

46.     The requested injunctive relief that Plaintiffs are seeking from this Court will help prevent irreparable injury to the Center, its members and staff, the public, and the public lands and vital resources, such as sage-grouse.  Ordering BLM to stop following IM 2018-034 regarding public notice, comment and protests, and instead to revert back to the prior 30 day public comment and protest periods, would help protect the interests of the Center, my own interests, and the public interest by providing for more timely and meaningful public notice and input to BLM's oil and gas leasing decisions, help protect  the environment, and improve public lands decision-making.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed in Denver, Colorado on July 5, 2018.

_____
Michael Saul