Laurence ("Laird") J. Lucas (ISB # 4733)
llucas@advocateswest.org
Todd C. Tucci (ISB # 6526)
ttucci@advocateswest.org
Talasi B. Brooks (ISB # 9712)
tbrooks@advocateswest.org
Sarah K. Stellberg (ISB # 10538)
sstellberg@advocateswest.org
*Advocates for the West*
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, and CENTER FOR BIOLOGICAL DIVERSITY, | No. 01:18-cv-187-REB |
| *Plaintiffs,* | **DECLARATION OF KELLY FULLER** |
| v. | |
| RYAN K. ZINKE, Secretary Of Interior; DAVID BERNHARDT, Deputy Secretary of Interior; and UNITED STATES BUREAU OF LAND MANAGEMENT, an agency of the United States, | |
| *Defendants.* | |

I, Kelly Fuller, declare as follows:

1.     The following facts are personally known to me, and if called as a witness I would and could truthfully testify to these facts.

2.     I am currently employed by Western Watersheds Project (WWP) as its Energy Campaign Coordinator.

DECLARATION OF KELLY FULLER—1

**Personal and Professional Background**

3.      I grew up hiking and camping in the American West, and I became aware of the many threats to its wildlife and public lands after I started going on camping trips with the conservation group Desert Survivors.  Through Desert Survivors, I first began drafting public comments on actions that impacted the California desert, in the early 2000s.

4.      In 2005-2006, I co-founded the Sunrise Powerlink Campaign, a 12-group coalition of community and conservation organizations opposed to a high-voltage transmission line slated to be constructed through a 600,000-acre state park.  As part of that campaign I represented the Sierra Club's San Diego chapter to the media, government agencies, and the public.  I also led a 78-mile walk through the California desert along the route of the proposed transmission line.  In response to public pressure, the transmission line was re-routed to avoid the state park.

5.      In 2007, I began working for Voyageurs National Park Association in Minneapolis, Minnesota—first as a volunteer and later as an employee, serving as interim Executive Director for several months in 2008.  I wrote the group's communications materials, tracked proposed legislation; represented the organization to legislators, agencies, and NGOs; and also coordinated fundraising efforts.

6.      In 2008, I began working as Communications Director for Plains Justice, in Vermillion, South Dakota.  There, I created the first Great Plains communications campaign against the Keystone XL pipeline.  I assisted farmers, ranchers, and other community members with communications and organizing against proposed coal facilities in two states and organized multi-state coalitions of environmental, community, and tribal groups.

7.      From November 2010 through June 2013 I served as the Wind Campaign Coordinator for the American Bird Conservancy in Washington D.C.  There, I tracked, analyzed, and commented on proposed regulations, Incidental Take Permits, Habitat Conservation Plans, Eagle Take Permits, and Environmental Assessments related to wind energy on public and private lands nationwide. I also organized a national campaign for bird-smart wind energy and taught volunteers how to protect birds by commenting on wind projects in their communities.

8.      From July 2013 to June 2015, I served first as a consultant and then as Executive Director to the Protect Our Communities Foundation.  There, I again worked on energy policy.  I tracked, analyzed, and commented on project scoping, an air permit, and environmental impact analyses for various energy projects.  I also led a successful organizing campaign that convinced the Forest Service and California Public Utilities Commission to extend scoping for a five-agency power line project on public lands.

9.      Through these experiences, as well as my current position, I have helped community members and groups participate in energy projects in at least two dozen states.

**WWP's Interests In Oil And Gas Leasing And Development**

10.     Beginning in February of 2017, I have worked for WWP.  My position there primarily involves participating in public processes.  I track proposed actions and draft comment letters on all types of energy projects, including oil and gas projects.

11.     WWP's mission is to protect and restore western watersheds and wildlife through education, public policy initiatives, and legal advocacy.  WWP works to influence and improve public lands management throughout the West with a primary focus on the negative impacts of livestock grazing on 250 million acres of western public lands, including harm to ecological,

biological, cultural, historic, archeological, scenic resources, wilderness values, roadless areas, Wilderness Study Areas and designated Wilderness.

12.     Although WWP primarily focuses its advocacy efforts on public lands grazing, it is also concerned about oil and gas leasing and development, particularly where that development is slated to occur in sagebrush habitat crucial to sage-grouse and other species.  I was hired specifically to help track and comment on energy projects that imperil resources that are priorities for WWP's advocacy efforts.

13.     WWP has a longstanding interest in preserving the sagebrush steppe ecosystem.

14.     WWP also has a longstanding interest in protecting the sage-grouse, an iconic ground-dwelling bird that depends upon the sagebrush ecosystem to survive.  For almost two decades, WWP has advocated for protecting the sage-grouse from activities like grazing and oil and gas development that disturb the species and destroy its habitat.

15.     Other environmental organizations frequently draw on WWP's expertise concerning sage-grouse when projects that may impact sage-grouse are proposed.  They consult with WWP when writing public comments concerning sage-grouse issues and I frequently review and contribute sage-grouse analysis to those comments when WWP is a co-signatory.

16.     Almost all of the sagebrush steppe is grazed.  Oil and gas leasing and development compounds the damage to the sagebrush steppe from widespread overgrazing. Science also shows that oil and gas development devastates the sagebrush steppe ecosystem, and sage-grouse population declines commonly follow intensive oil and gas leasing and development.

17.     Through public comments, WWP can advocate to protect sensitive wildlife populations and their key habitats from proposed oil and gas leasing and development, and

provide oversight to ensure that the agency complies with the law.  WWP can also encourage the agency to mitigate wildlife and habitat impacts to render oil and gas leasing and development less harmful.

18.     In my experience, information gained through the public comment process can help BLM make better decisions.  For example, the deferred Idaho oil and gas lease sale challenged in this Complaint was originally proposed to be offered under a Determination of NEPA Adequacy, without any additional NEPA analysis, even though it was hydrologically connected to nearby Gray's Lake Wildlife Refuge, which is home to sensitive bird populations, and occurred within sage-grouse habitat.  After receiving public comments, the agency elected to conduct an environmental assessment, analyzing and disclosing the lease's environmental impacts.  BLM then deferred leasing the parcel, presumably as a result of the serious concerns the public comments raised.  When the agency offered the parcel for lease again, it conducted an EA and issued a FONSI along with its EA, but after receiving highly critical public comments again, it decided to defer leasing the Idaho parcel altogether a second time.

**Work With WWP**

19.     In my capacity as Energy Campaign Coordinator of WWP, I have drafted or helped draft comments on at least 11 proposed oil and gas lease sales or development projects and 8 other energy or mining projects.  While I diligently track oil and gas leasing and development projects for WWP, my focus is broader than that, and I also participate on WWP's behalf in public processes surrounding a wealth of other energy generation, transmission, and extraction/mining projects.

20.     More specifically, I was the primary author of comments on the Idaho June 2018 lease sale Environmental Assessment and lease sale protest.  BLM allowed only a 15-day

comment period on that EA and only a 10-day protest period, which severely constrained my ability to raise all of the issues I thought important.  The lease parcel occurs entirely within sage-grouse general habitat management area (GHMA).  The sale would impact the East-Central Idaho population, which is a small population previously described as isolated and at "high risk" with a "low probability of persistence."  Portions of the leasing area are hydrologically connected to the Gray's Lake National Wildlife Refuge, and would impact numerous sensitive birds and wildlife that depend on the important habitat there or that use the lease area itself for habitat.  WWP's members who visit the refuge and adjacent Caribou-Targhee National Forest for recreation and wildlife watching would also be affected.

21.     After we filed our complaint in this action, BLM decided to defer leasing this area.  I reached out to Jim Fincher, BLM Idaho's Minerals Branch Chief, but he would not tell me why BLM deferred the parcel, or even whether the parcel was deferred due to a resource issue.  He refused to tell me whether there is a mandatory waiting period before BLM can offer a deferred parcel for lease again, but stated that Idaho BLM would not approve the permanent withdrawal from leasing of this area.  He also told me to file a Freedom of Information Act request to learn why the Idaho BLM state director used his discretion to defer the parcel.  WWP then filed a FOIA request as he suggested, but the BLM's response to our FOIA request completely redacted the Idaho BLM state director's reason for the deferral.

22.     The area was previously deferred from leasing in January 2018, after being scheduled for auction in BLM's March 2018 Idaho lease sale.  It was scheduled for auction again and then deferred from BLM's June 2018 Utah lease sale.  The expressions of interest that led it to be scheduled for lease sale auction twice in 2018 are still identified on BLM's National Fluids

Lease Sale System website as "pending."  Thus, I expect this parcel will be offered again for lease soon.

23.     I was the sole author of comments on the Environmental Assessment for the Utah June 2017 Richfield Field Office oil and gas lease sale.  While not challenged in our Complaint, 11 of the 20 parcels offered in that sale contained sage-grouse PHMA within the Parker Mountain Population Area.  The proposed action included potential lease development in important sage-grouse winter habitat and risked impacts to bald and golden eagles, as well as mule deer and elk.

24.     I was the primary author of public comments and secondary author of the subsequent protest on the Utah September 2017 Fillmore Field Office oil and gas lease sale (*Sheeprocks* sale).  Of the nine lease sale parcels offered in this sale, four occur within sage-grouse priority habitat management areas (PHMAs), while one occurs directly adjacent to PHMA.  Portions of the sale occur within the "Sheeprocks Sage-Grouse Management Area." The sage-grouse population in that area experienced nearly a 40 percent decrease over four years and saw its male numbers drop from 190 in 2006 to just 23 in 2015.  As a result of this alarming decline the State of Utah's wildlife management agency began efforts to augment this population by translocating birds from other populations to prevent it from becoming extirpated.  Leasing these parcels risks to further impact this already-imperiled population.

25.     I was the primary author of public comments on the Wyoming Converse County oil and gas development DEIS.  That is a massive, 1.5 million-acre oil and gas development project in Converse County, Wyoming involving public lands administered by BLM's Casper Field Office and the Forest Service-managed Thunder Basin National Grasslands.  It will involve drilling up to 5,000 new oil and gas wells over 10 years, along with associated roads and

infrastructure.  The project area includes almost 200,000 acres of PHMA and over a million acres of GHMA, and would affect numerous sage-grouse populations with declining trends.  Lek attendance has only increased in one of the five PHMAs within the project analysis area—up 322% since 2006 to almost 16 birds.  Lek attendance at the other PHMAs has declined from 38% to 100% since 2006. Nevertheless, the agencies plan to approve the development plan, waiving or otherwise altering necessary sage-grouse protections.  We anticipate a final decision on this project in early 2019.

26.     I worked with WWP Executive Director Erik Molvar to draft comments on the Wyoming Normally Pressured Lance Project DEIS.  That project entails a massive development of 3,500 oil and gas wells—350 wells a year for 10 years—within important sage-grouse winter habitat and connectivity corridors for sage-grouse and other wildlife.  It covers approximately 141,000 acres in BLM's Pinedale and Rock Springs Field Offices, including 27,292 acres of sage-grouse winter concentration areas and 1,259 acres of Sagebrush Focal Areas (SFAs)—some of the most high value sage-grouse habitats.  Impacts to the winter concentration areas will affect the nearly 2,000 sage-grouse that either use the project area year round or travel to the project area in the winter.  Because BLM released the project's Final Environmental Impact Statement on June 22, 2018, I expect a final decision will issue on this project by the end of this summer.

27.     I have communicated extensively with Wyoming BLM's Rock Springs Field Office concerning the upcoming EA for the Desolation Road Application for Permit to Drill (APD).  These communications are time consuming.  It is not possible for me to track other APDs as closely as I have tracked this one, due to my other work priorities and commitments.

28.     I also reviewed or contributed content to oil and gas lease sale EA comments and protests prepared by the Center for Biological Diversity in Nevada, Montana, Utah, and Wyoming.

29.     I primarily strive to take the lead commenting on oil and gas projects where there are significant threats to resources that are important to WWP, but they might not receive much public comment.  For instance, I wrote comments on the Sheeprocks sale, challenged in our Complaint, because of the serious risks to sage-grouse and high-value sagebrush habitat in a part of Utah that does not include features that commonly attract public notice.

30.     To monitor upcoming oil and gas lease sales and development, I have asked many BLM field offices to place me on their notification lists because I know from experience that some BLM field offices maintain notification lists for other public land uses such as livestock grazing, mining, and communications towers.  With the exception of BLM Colorado, which maintains a state office oil and gas lease sale email list, I have been told that BLM offices do not have notification lists for oil and gas.  The lack of oil and gas notification lists means that I must manually search BLM's ePlanning, state-specific Regional Oil and Gas Lease Sale, and Automated Fluid Minerals Support System (AFMSS) 2 websites to learn of new lease sales and proposed development in several different states.  This is very time-consuming and before the changes put in place by BLM's new Instruction Memoranda (IMs), I usually did it about once a month.  In areas of particular interest, like BLM's Rock Springs Field Office, I also regularly call and email the agency project leads to request information about upcoming opportunities for public involvement.

31.     Each of the BLM websites I use presents its own challenges.  Searching BLM's ePlanning website for comment opportunities on oil and gas leases and development projects

turns up not only upcoming lease sales, but also applications for permits to drill, decisions to develop existing leases, and decisions to expand developments on existing leases.  These may be anything from one or two wells to extensive fields impacting hundreds of thousands of acres of sage-grouse habitat.  My initial searches frequently turn up dozens of proposed projects, which I have to sort through to identify lease sales and development projects of interest.  BLM's state-specific Regional Oil and Gas Lease Sale websites are simpler to search, but the information found there is only about lease sales and is often incomplete or outdated.  BLM's Automated Fluid Minerals Support System (AFMSS) 2 website is glitchy, and I often have to conduct the same search several times a few minutes apart because it doesn't always return the same results.

32.    To ensure that the BLM considers the interests of WWP's members during lease sales, I have to review the NEPA documentation for every leasing proposal listed on BLM's ePlanning website in WWP's geographic areas of interest to determine which leases to prioritize for comment.  I cannot comment on every lease sale.  WWP members sometimes contact WWP to find out if we have commented on lease sales in areas of particular interest to them, and when I have not been able to, they are disappointed.

33.    Then, I have to evaluate each NEPA document to provide meaningful feedback to the agency.  I need to examine the proposed project in detail, determine what wildlife may be impacted, and assess whether the NEPA documents accurately and fully describe impacts to the environment.  I also need to locate and review the applicable Resource Management Plan to ensure that the proposed action is consistent with that plan, as well as any other past NEPA analyses that are incorporated by reference into the current NEPA document. These Resource Management Plans and other past NEPA analyses are not always available online, and sometimes I have to ask BLM more than once to provide them to me so I can review them.

BLM does not always provide me the documents incorporated by reference before the comment deadline even though 40 CFR 1502.21 says the agency must make them reasonably available to the public within the time allowed for comment.

34.     This process often requires a great deal of additional research.  For instance, I have to review scientific research about species that may be affected by proposed lease sales and development projects.  I have to find the latest relevant scientific papers and make sure I understand what they say so that I can gauge whether what the agency is proposing is going to be truly harmful.  I have to investigate whether there is relevant, publicly available data about the status of wildlife populations.  Because most of BLM's NEPA documentation at the lease sale stage does not include any site-specific information concerning the status of local wildlife populations, I have to go out and find that information on my own so that I can understand whether BLM is fairly analyzing and disclosing environmental impacts.

35.     I also need to understand site-specific information about the condition of the local sagebrush ecosystem.  This includes reading scientific articles to gain an in-depth knowledge of sagebrush ecosystem functions, as well as relying on WWP's institutional knowledge to understand the condition of grazing allotments that overlap with leased parcels and proposed developments.  When I can, I also reach out to WWP members so that I can incorporate their experiences and knowledge into our comments.  That outreach is time consuming because first I have to determine which of our members might have interests in these areas, then contact them and await their response.  BLM's new abbreviated comment and protest periods make this process much more difficult.

36.     I frequently consult with other groups about the proposed sales, or work to co-author comments and protests with them.  This requires the exchange of numerous drafts that

must be subject to review and approval by all organizations—a time-consuming process.  It is extremely difficult to coordinate drafting and review of comments and protests within the abbreviated time periods for submission.

**WWP's Harms From 15-day Comment Period And 10-Day Protest Period**

37.     The shortened public comment and protest periods under the new BLM IM 2018-034 have made it much harder to track, submit comments on, and protest lease sales and development projects that will harm sensitive habitats and wildlife, or have been done without adequate legal compliance.

38.     For instance, I used to look at ePlanning once a month to identify oil and gas leasing decisions on which WWP might be interested in commenting.  Now, because I cannot predict when BLM will receive and respond to expressions of interest, looking at sales once a month risks allowing sales of interest to fall through the cracks.  To do an adequate job of tracking and commenting on proposed lease sales, I would need to thoroughly review the ePlanning website twice a month or more.  Because of how time-consuming an adequate review is, I simply do not have time to do this, lessening my ability to ensure that BLM considers the interests of WWP's members.

~~39.~~     It has also become much harder to predict where and when BLM will offer oil and gas leases.  It used to be that BLM leasing cycled through field offices on a rotating schedule, making it possible to predict months in advance when certain areas of a state would come up for lease. That process has changed due to IM 2018-034, which eliminated the rotating field office leasing schedules.  Now, BLM must offer up a lease within a certain number of days after receiving an expression of interest, with limited exceptions.

40.   The public can look up those expressions of interest on BLM's National Fluid Lease Sales System website, but for most people that website is useless.  It does not include maps of parcels that have been nominated for leasing, only the parcels' township and section numbers.  Turning those township and section numbers into maps requires specialized mapping software and knowledge to use it that most members of the public simply do not have.

41.   Even when I use the various BLM websites, I still cannot predict when BLM will publish a draft EA document for an upcoming lease sale, triggering the start of a 15-day (or shorter) comment period.  For instance, I used to look at ePlanning once a month to identify oil and gas leasing decisions on which WWP might be interested in commenting, but under the BLM's new IMs, looking at sales once a month risks allowing sales of interest to fall through the cracks.  If I fail to comment on a lease sale within the 15-day deadline, WWP may forfeit its opportunity to protest the sale administratively or challenge that sale in federal court.  To do an adequate job of tracking and commenting on proposed lease sales, I would need to thoroughly review the ePlanning website twice a month or more.  Because of how time-consuming an adequate review is, I simply do not have time to do this.

42.   It is also difficult to predict when 10-day protest periods will occur.  A few BLM offices post tentative dates for protest periods ahead of time on the state-specific Regional Oil and Gas Lease Sale websites, but not every office does this and even when an office does, those dates are only tentative.

43.   As a result of the new abbreviated Environmental Assessment and protest comment periods, I have to keep my personal schedule open in case I have to work through the weekend to meet comment period deadlines.  For example, the 10-day protest period for the June 2018 Idaho lease sale started on a Friday, which caused the comment period to include four

weekend days and only six weekdays.  It was not as simple as just rescheduling my work time because two other 10-day lease sale protests in which WWP was interested were happening simultaneously.

44.     Another example happened this spring.  I was signed up to go on a trip with the U.S. Fish & Wildlife Service to help with sage-grouse lek counts.  Due to the new shortened comment and protest periods under IM 2018-034, I withdrew from the trip to ensure that I would be available if a 10-day protest period or 15-day EA comment period popped up at the same time.  The short timeframes have also reduced the quality of my participation.

45.     Rather than conducting the extensive independent research necessary to truly understand on-the-ground conditions on the parcels at issue, I now must work from my personal knowledge base and without adequate time for outreach to WWP's members to ensure their knowledge of the leasing areas is included.  This means that the public record is not as rich and does not have as much value in informing the agency's consideration of relevant issues, which is even more important since the quality of the agency's analysis is also suffering under the pressures to quickly offer nominated parcels for leasing.

46.     Because of the short timeframes, I am unable to provide as much sage-grouse or other wildlife information as I would like to because there is not enough time.  When I am the primary drafter of comments, I am unable to address as many issues as I would like to, and when I contribute to other groups' comments on behalf of WWP I often do not have sufficient time to review and draft comprehensive sections on sage-grouse and other wildlife issues because of the short turnaround time to complete drafts for sign-on.

47.     For example, with respect to the Idaho lease sale that was slated for June 2018, there was a long list of issues I would have liked to address in the leasing decision protest

concerning impacts to the Grays Lake National Wildlife Refuge that I was not able to discuss because of the short comment period.  I was also not able to draft independent comment for the September Wyoming lease sale, or to provide as much sage-grouse and migratory bird information as I would have liked to for the Nevada June Battle Mountain lease sale.

48.     I simply cannot adequately participate in leasing decisions on behalf of WWP under the constraints imposed by these new policies in IM 2018-034.

49.     This risks impacts that will devastate sage-grouse populations and other wildlife as a result of these large-scale leasing and development projects.  Without allowing for adequate public participation in BLM decision-making—and without allowing for BLM to adequately consider potential impacts in the first instance due to the condensed timeline for producing environmental analyses—serious harms to sage-grouse and other wildlife are being swept through the cracks.  In many cases, analysis of site-specific conditions necessary to really understand impacts to sage-grouse and sagebrush habitat is not occurring at the leasing stage because the agency claims it will conduct site-specific analysis at the application for permit to drill (APD) phase.  But, in my experience, the agency rarely conducts full NEPA analysis at the APD phase, and instead proceeds with projects under categorical exclusions or determinations of NEPA adequacy.  This results in a shell game by which the agency avoids required analysis and public disclosure of serious ecological risks associated with oil and gas leasing and development. In particular, this practice avoids considering impacts on localized sage-grouse populations, which is necessary to understand potential rangewide effects.

50.     This will only get worse with BLM's new Information Bulletin IB 2018-061, which instructs BLM offices to "expedite the processing of APDs or infrastructure proposals for fluid mineral development by first considering if it can rely on existing NEPA analyses for

assessing the impacts of a proposed action and the possible alternatives" and if BLM cannot make a Determination of NEPA Adequacy based on past analysis, to consider whether it can use a Categorical Exclusion.

51.     This uninformed decision making harms WWP's organizational mission of protecting and restoring western watersheds and wildlife.  WWP has been working for decades to protect sage-grouse.  The species is suffering a death by a thousand cuts.  Oil and gas leasing and development is one of the largest threats sage-grouse face, particularly in the eastern half of their range.  WWP staff, members, and supporters regularly visit sage-grouse leks and the sagebrush ecosystem, for spiritual, recreational, aesthetic, scientific, and other reasons.  It is much harder to protect these birds without adequate oversight.  If I hadn't found out about the sage-grouse issues on the Sheeprocks lease sale and alerted other conservation groups, for instance, the sage-grouse issues associated with that lease sale wouldn't have received the attention they deserve.  It lets our members and supporters down when I am not able to adequately participate on behalf of WWP, representing their interests.  If WWP doesn't participate in agency decision-making, it's harder for other public to participate as well.

52.     The Trump administration's policies under Secretary Zinke's leadership have made it harder and harder to maintain adequate oversight.  For example, under new BLM guidance, the agency no longer publicizes when declines in sage-grouse populations or habitat trip the hard and soft triggers invoking greater sage-grouse protections in the plans.  Thus, populations may be gravely imperiled, but there is no way for the public to find out about it unless they file a Freedom of Information Act request, something which most members of the public do not know how to do.

53.     These harms are likely to continue into the future, and we anticipate they will be compounded in upcoming lease sales.

54.     For instance, in June, 2018, Nevada BLM offered for sale 166 parcels of oil and gas leases on the Battle Mountain District, comprising 313,715 acres.  The lease parcels included 21,710 acres of GHMA, 64,908 acres of PHMA, and 24,015 acres other sage-grouse habitats. Approximately 70% of the proposed acres for lease were in sage-grouse habitat, potentially affecting important habitats in the Little Fish Lake Valley and Monitor Valley.  WWP's ability to provide input on these lease sales suffered due to the new extremely short public comment and protest periods under IM 2018-034.

55.     Twenty-two of these Battle Mountain District parcels received competitive bids on June 12, 2018.  By June 28, 2018, BLM had received noncompetitive offers for an additional 24 Battle Mountain District parcels.  Twenty of the 46 parcels that received bids or offers and are thus expected to be leased include greater sage-grouse PHMA, GHMA, winter habitat, early brood-rearing habitat, late brood-rearing habitat, or have been identified as being near sage-grouse leks.  Therefore, we continue to be concerned about impacts to sage-grouse.

56.     In September 2018, we are expecting 360 parcels, comprising some 366,088 acres to be offered for sale on Wyoming BLM's Buffalo, Casper, Cody, Lander, Newcastle, Pinedale, Rawlins, Rock Springs, and Worland Field Offices.  Some or all of the sale parcels include SFA, PHMA, State Wildlife Habitat Management Areas, citizen-proposed wilderness, and lands with wilderness characteristics.  WWP's ability to provide input on these lease sales will suffer due to the new extremely short protest periods.

57.     The upcoming September 2018 BLM Wyoming lease sale is an especially challenging one for the public because BLM Wyoming held a 30-day public comment period for

two Environmental Assessments analyzing 106 parcels but then held only a two-week

Environmental Assessment comment period for an additional 254 parcels.  Thus, for the

additional 254 parcels, the public had more than twice the number of parcels to review in less

than half the amount of time.

58.    In September 2018, we are expecting the following leases will be offered for sale

in Utah: seven parcels totaling 8.832 acres in Juab County on the Fillmore Field Office and 26

parcels totaling 36,396 acres on the Salt Lake Field Office.  It is unclear from the BLM websites

whether the agency will also offer 76 parcels on the Price Field Office, 16 suspended lease

parcels in Wayne County, and two "Sold but not issued" parcels in Emery County.  BLM

solicited scoping comments on those parcels earlier this year but does not appear to have issued

EAs for them afterwards.  Some or all of the parcels proposed for leasing occur within sage-

grouse SFA, PHMA, or GHMA.  WWP's ability to provide input on these lease sales has and

will suffer due to the new extremely short public comment and protest periods.

59.    We expect to see a fourth quarter lease sale in Wyoming in December 2018.  We

have requested that BLM provide a 30-day comment period for its Environmental Assessment

but do not know if the agency will grant our request or when the EA will be released for public

comment.

60.    We expect future lease sales in Idaho but are uncertain of their dates.  In addition

to the nominated lands that BLM offered for lease and then deferred twice this year, BLM's

National Fluids Lease Sale System website shows that on June 23, 2018, BLM Idaho received 43

expressions of interest nominating land between the Cascade and Deadwood Reservoirs in Idaho

for oil and gas leasing.  Based on their geographic coordinates, some or all of these expressions

of interest are within the Boise National Forest.  We think this will be a highly controversial

location due to its nearness to Boise, recreational value, and sensitive wildlife habitat.  Oil and

gas leasing of national forest lands is conducted by BLM, so BLM Idaho will have to evaluate

these expressions of interest for leasing.  IM 2018-034 instructs BLM state offices to review all

expressions of interest and offer for lease those that it determines to be eligible and available.

BLM is to complete these reviews within six months, with limited exceptions, but it is unclear

from the IM whether that is six months from when the land is nominated or six months from the

expressions of interest cutoff date for a particular lease sale.  IM 2018-034 also instructs BLM to

post cutoff dates for each state on the National Fluids Lease Sale System website.  Currently that

website does not include cutoff dates for Idaho, which makes it even more difficult to know

when to start checking BLM websites to see if these nominated Idaho lands are being offered for

lease.

61.    We also are expecting final decisions on the Normally Pressured Lance and

Converse County projects, two enormous projects in key sage-grouse habitat, by 2019.  Because

BLM issued a Final EIS for the Normally Pressured Lance project on June 22, it is possible we

will see a final decision on that project by the end of the summer.

62.    Under the current regulatory regime, it's hard to know what's next until (or

unless) specific sales, projects, and Applications for Permit to Drill are posted on BLM's

ePlanning, state-specific Regional Oil and Gas Lease Sale, or Automated Fluid Minerals Support

System (AFMSS) 2 websites.  We will keep monitoring for sales that could harm sage-grouse

and offering comments on those sales to aid the agency's decision-making process, but our

ability to do this has been impaired by the new shortened comment and protest periods.

63.    We strive to participate in projects at the leasing phase when possible.  The

leasing phase is a pivotal point in the oil and gas development process; if BLM receives a bid on

a lease, BLM cannot prevent future development, but only condition the terms.  Once a lease is

bid upon, the lease-holder basically gets to drill.  It is also extremely hard to track and comment

on Applications for Permit to Drill (APDs) that follow lease sales.  IM 2017-074 instructs BLM

to post APDs for 30 days on the Automated Fluid Minerals Support System (AFMSS) 2 website.

The public can comment then, but that website does not include NEPA analysis or maps, nor

does it identify the lease sale to which the APDs are related.  To know where these APDs are

located, the public has to generate its own maps from the geographic coordinates on the AFMSS

2 website.  That requires specialized software and knowledge how to use it, which most

members of the public do not have.  Later on, those APDs for which BLM prepares

Environmental Assessments or Environmental Impact Statements will have public comment

periods, but to find those you have to keep checking BLM's ePlanning website.  Many if not

most APDs are granted with little to no NEPA analysis or opportunity for public involvement.  I

am closely tracking one APD on the Rock Springs Field Office, but I am not capable of devoting

the level of effort that takes to numerous other APDs.

  64. We expect to see more expressions of interest, leading to more lease offerings

under the Trump administration's liberalized oil and gas policies.  BLM seems to be lowering its

standards for environmental protection and public involvement under this administration.  Thus,

more oil and gas development is likely, in more poorly designed and considered lease sales, and

public oversight is being eliminated from the process by these new policies designed to restrict

public participation.  This threatens irreparable harms to WWP's interests in informed, well-

considered environmental decision-making, and in preserving the remaining sagebrush steppe

and species that depend on it from additional degradation and decimation.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 29th day of June, 2018, in Depoe Bay, Oregon.


_____
Kelly Fuller