Laurence J. ("Laird") Lucas (ISB # 4733)
llucas@advocateswest.org
Todd C. Tucci (ISB # 6526)
ttucci@advocateswest.org
Talasi B. Brooks (ISB # 9712)
tbrooks@advocateswest.org
Sarah Stellberg (ISB #10538)
sstellberg@advocateswest.org
Advocates for the West
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, ) <br> and CENTER FOR BIOLOGICAL ) <br> DIVERSITY, ) <br> ) <br>     *Plaintiffs*, ) <br> v. ) <br> ) <br> RYAN K. ZINKE, Secretary Of Interior; ) <br> DAVID BERNHARDT, Deputy Secretary ) <br> of Interior; and UNITED STATES ) <br> BUREAU OF LAND MANAGEMENT, ) <br> an agency of the United States, ) <br> ) <br>     *Defendants*. ) | No. 01:18-cv-187-REB <br><br> **DECLARATION OF LINDA F BAKER** |

I, Linda F Baker, declare as follows:

    1.    The following facts are personally known to me, and if called as a witness I would and could truthfully testify to these facts.

    2.    I hold a B.A. degree in English and Spanish teaching from Utah State University in Logan, Utah.

DECLARATION OF LINDA F BAKER—1

3.     I am Executive Director of the Upper Green River Alliance, a nonprofit conservation group working to protect and preserve the air quality, water quality, natural habitats and native wildlife of the Upper Green River Valley in western Wyoming.  I have served in this position since June 2002.  In this capacity, I work with local residents, set strategic conservation priorities, analyze natural resource data, create informational maps and datasets, serve on local working groups, and advocate for the responsible management of approximately two million acres of BLM-managed public lands and resources in the Upper Green River Valley.

4.     I have lived in the Upper Green River Valley since 1981, and am a landowner outside the town of Pinedale, with a home overlooking the longest-known mule deer migration corridor in the U.S.  Pronghorn antelope, mule deer, sage-grouse, and moose are regular visitors to my property.

5.     I am a hunter, skier, angler and hiker. My partner and I hunt on the valley's public lands in the ancient tradition of falconry, using peregrine falcons and gyrfalcons.

6.     I have been employed in the Upper Green River Valley in many capacities including: recreation specialist for the U.S. Forest Service in Big Piney, Wyoming, laborer in geophysical (oil and gas) exploration, middle school English and Spanish teacher, Associate Director of the Sublette County Library, and High School Equivalency (GED) and English as a Second Language adult education instructor.

7.     I have volunteered my time to serve on local, state, and federal government working groups, cooperating with other members representing agriculture, recreation, public at large, oil, gas, and mining companies, and government.  I served as the conservation representative on the Wyoming Game & Fish Department's (WGFD) State-Wide Sage-Grouse Working Group tasked with created the Wyoming State-Wide Sage-Grouse Conservation Plan.  I

served on the Sublette County, Wyoming Master Plan committee. Nominated by Secretary of Interior Gail Norton, I served four terms as chair and co-chair of the Bureau of Land Management's (BLM's) Pinedale Anticline Working Group (PAWG), and its task groups for wildlife, air quality, and water quality. The PAWG was convened to provide BLM with recommendations on Adaptive Management of all natural resources in the Pinedale Anticline Natural Gas Project area. I served on the Trapper's Point Working Group, tasked with assessing proposed oil and gas leasing on BLM-managed lands at the pronghorn migration corridor bottleneck called "Trapper's Point" outside Pinedale. I served as the conservation representative on Encana's (now Jonah Energy's) Normally Pressured Lance (NPL) natural gas project "Operator Committed Practices" committee. The "Operator Committed Practices" committee assembled all stakeholder representatives to consider Best Management Practices and recommendations for the proposed NPL project.

**Upper Green River Alliance's Involvement in Public Lands Management**

8. Upper Green River Alliance is a non-profit conservation organization based in Pinedale, Wyoming. The organization is recognized as an IRS 501(c)(3) charitable entity.

9. Upper Green River Alliance has over 200 supporters in Wyoming where oil and gas leases are currently being offered for sale and may be offered for sale in the future.

10. Our staff has been actively associating with and educating the public about oil and gas leasing and development, through workshops, conferences, brochures, overflights, and meetings.

11. Our staff regularly attends public meetings and informational workshops held by the Pinedale, Wyoming Bureau of Land Management, to learn about and comment on proposed oil and gas leasing, existing natural gas field development, and public resource management.

12. The Upper Green River Alliance seeks to protect and preserve the air quality, water quality, native habitats, fish, wildlife, and other natural resources on public lands in the Upper Green River Valley, and enforce the nation's public lands and environmental laws.

13. The Upper Green River Alliance staff has engaged extensively in local, state, and national media outreach work focused on public lands management. Our staff has been quoted in publications and media outlets including CBS, National Geographic, Smithsonian, High Country News, Field & Stream, Jackson Hole News & Guide, Wyoming Public Radio, PBS TV, Fly Fisherman, N.Y. Times, Audubon, L.A. Times, Bugle, ABC Nightline, Casper Star-Tribune, Pinedale Roundup, Wyoming Public Radio, Mother Jones, Christian Science Monitor, and the Washington Post.

14. Through the efforts of our staff working with a local rancher and the WGFD, we coordinated a successful campaign that prevented the sale of 2,700 acres of oil and gas leases at the critical pronghorn migration bottleneck at Trapper's Point. This resulted in the creation of the Trapper's Point Working Group, and eventually the BLM's designation of the Trapper's Point Area of Critical Environmental Concern (ACEC).

15. We coordinated with the Wyoming Game and Fish Department (WGFD), Wyoming Dept. of Transportation, local business leaders and area conservation groups to create and maintain the Trapper's Point interpretive site outside Pinedale on US Scenic Highway 191.

16. Working with local residents and an atmospheric physicist, we conducted photo documentation of flaring incidents on public lands of the Upper Green River Valley, including in the Jonah Natural Gas Field and the Pinedale Anticline Natural Gas field.

17. Working with pilots from other conservation organizations, we hosted middle school students on overflights of natural gas development on public lands, and conducted educational workshops in the Pinedale Middle School.

18. We hosted a two-day Wyoming Conservation Congress in Pinedale entitled "Wells, Wildlife and Quality of Life" attended by 350 residents and media representatives, Wyoming Governor Dave Freudenthal, and ranchers from the Power River Basin and the Upper Green River Basin. This resulted in creation of the Governor's Wyoming Wildlife Trust Fund.

19. During the development of the Pinedale BLM Resource Management Plan (RMP) in 2008, we developed the "Responsible Energy Development" proposal as an RMP alternative. Based on our crucial wildlife habitat maps created with GIS data from the WGFD, we recommended that BLM designate certain vital, overlapping wildlife habitats as unavailable for oil and gas leasing in the Pinedale RMP. This resulted in BLM's designation of five Areas of Critical Environmental Concern covering 453,700 acres.

**Upper Green River Alliance's Concerns With Impacts of Oil and Gas Development**

20. Upper Green River Alliance staff and supporters have enjoyed for decades the clean air and waterways of the Wind River Range, Wyoming Range and Gros Ventre Range. We take pleasure in exploring the area's unique deserts, and watching its amazing wildlife migrations and red-cloud sunsets. We celebrate our public lands in every season and for many reasons, including the solitude of floating and fishing on local creeks, rivers, and scenic, mountain lakes, hunting in the vast sagebrush grasslands, and hiking and skiing among our mountain peaks and valleys. We make a living here, and enjoy a rare quality of life in our wild Wyoming home.

DECLARATION OF LINDA F BAKER—5

21. As each natural gas well has been drilled, we have witnessed our air quality go from pristine to polluted.  We are concerned about the safety of our groundwater, as more than 90 industrial water wells have became tainted with hydrocarbons in the natural gas fields.  And we have endured the crush of roughnecks and their families who overcrowded our schools, roads, and medical clinic, bringing with them a 700% increase in drunkenness arrests, family violence, and sex offenses.  During the most recent oil and gas boom, we were unprepared to host this mass of oil and gas migrants, and we lost a sense of safety in our town of 2,000.

22. Because of the teeming wildlife populations that live here, and the advent of huge, natural gas projects and associated funding opportunities, the Upper Green River Valley has been a magnet for wildlife research.  Through long-term, peer-reviewed, scientific studies, unacceptable population declines have been documented as a result of oil and gas development.

23. Historic, native mule deer herds that live on the public lands covered by the Pinedale Anticline natural gas field have declined by 40%.  In the same gas field, Greater sage-grouse populations have declined by as much as 53%.  Pronghorn antelope are now avoiding the most heavily developed areas in the Pinedale Anticline, with winter habitat predicted to be of very high use declining by 82%.  The BLM Pinedale Anticline Record of Decision requires the use of Adaptive Management and Best Management Practices when downward wildlife trends have exceeded pre-designated levels.  While these unacceptable wildlife declines continue their descending spiral, BLM has failed to find successful mitigation methods that reverse these alarming trends.  Adaptive Management has failed in the Pinedale Anticline gas field, and BLM has not established BMPs that can successfully mitigate natural gas drilling's impacts.

24. The decline in our native wildlife populations has been accompanied by the loss and degradation of sagebrush/grassland habitats because of invasive weed infestations in natural

gas fields, and along the roads that serve them.  Specifically, cheatgrass invasion has been documented at hundreds of sites, by data collected in the BLM's Pinedale Anticline and Jonah Field Data Management Systems.  While the Records of Decision for both natural gas fields direct the operators to conduct annual monitoring and reporting, and eradicate invasive weed species, records indicate that operators have failed in this responsibility, and BLM has not enforced ROD requirements. Once established, non-native cheatgrass rapidly replaces native vegetation, is unpalatable to wildlife and domestic stock alike, is extremely difficult to eradicate, and has seeds that survive 20 years or more in the soil.  Again, Adaptive Management has failed. BLM has failed to achieve responsible, multiple use of public resources, resulting in degraded habitats that serve neither wildlife nor domestic stock.

25.     Once the capitol of clean air, the Upper Green River Valley has become a dangerous place to breathe due to high levels of winter-time ozone: not only for healthy residents, but especially for those with existing breathing problems, our youth, and the elderly. Experts writing in the *New England Journal of Medicine* conclude that people are at risk of premature death from respiratory causes that are associated with increases in ozone concentration.  The Wyoming Dept. of Environmental Quality has stated that, "elevated ozone … is primarily due to local emissions from oil and gas development activities: drilling, production, storage, transport, and treating…. approximately 94% of VOC [volatile organic compound] emissions in the UGRB [Upper Green River Basin] and 60% of NOx emissions are attributable to oil and gas production and development."  BLM has failed to correctly analyze emission levels during the EIS processes for all existing natural gas projects under their purview. In fact, new scientific research indicates that BLM consistently under-estimates the emission levels of ozone precursors and particulate matter resulting from oil and gas development by as

DECLARATION OF LINDA F BAKER—7

much as 60%. Upper Green River Alliance's analysis of air quality impacts also indicate that the Jonah Field and Pinedale Anticline natural gas projects EIS air quality models severely underestimated emission levels. This has resulted in public safety concerns for local residents.

26. Upper Green River Alliance staff and supporters are acutely aware, as they go about their daily lives, that these documented declines in wildlife populations, air quality, water quality, and quality of community life cause harm to their aesthetic, recreational, scientific, biological, and spiritual motives for living in this remote, cold, desert landscape in western Wyoming. In particular, our personal interests in observing, studying, and enjoying the spectacle of this place's extraordinary natural wonders are wounded by the overwhelming multitude of declines seen in our natural resources and native habitats, all caused by natural gas development.

**My Personal Concerns With the Impacts of Oil and Gas Development**

27. I personally have the same concerns with the impacts of natural gas development previously mentioned. In addition, I am personally concerned not only for the future of my friends and neighbors in this valley but for the American West and its precious water resources.

28. As the northernmost headwaters of the Colorado River system, the Upper Green River Valley provides waters that eventually serve about four million downstream users. With the advent of increased global temperatures, melting Wind River Range glaciers that supply our rivers and aquifers, declines in potable water reserves, and an over-allocated Colorado River, the necessity of understanding the amount of surface and groundwater we currently have and are projected to use is of paramount importance for human survival in the arid American West.

29. During my service on the Pinedale Anticline Working Group, I became aware of a confusing mix of water oversight by state and federal officials. Ground and surface water monitoring was conducted but not analyzed, there was no baseline water monitoring data before

natural gas drilling began against which to measure impacts, monitoring protocols used were incorrect and changed several times, and field personnel were not appropriately educated. It remains difficult even now for interested laypersons to understand the quality and quantity of our vital water resources, and to clarify which agencies are responsible for what tasks. To make matters worse, there appear to be widespread turf wars where water management is concerned. In my opinion, less analysis, through curtailed public comment and protest periods, of ground and surface water impacts from oil and gas leasing and development is not only wildly, unnecessarily reckless, but hazardous to human health and safety.

30. To educate myself through reading, research, and "data-mining" over a period of three years, I created a water information database and set of interactive, online maps for the Upper Green River Valley. This database included permitted water well locations, amounts of groundwater used in gas fields, hydrocarbon contamination sites, produced water injection sites, geologic fault lines, and much more, and was intended to inform, educate, and encourage the State of Wyoming to create a similar database and a unified, state water department.

31. However, in my interactions with state regulators, it became clear to me that neither the State of Wyoming nor BLM has fully quantified or comprehended the serious impacts to and significant drain on the state's surface and ground waters that will result from future, proposed, natural gas development. I believe this is one of the most pressing and important issues of our time. I know from experience that it takes significant time, research, cooperation, and contemplation to address these important issues, for which abbreviated leasing comment periods are completely inadequate.

DECLARATION OF LINDA F BAKER—9

**My Personal Interests are Harmed by Shortened Comment and Protest Periods**

32.     Because of my 20-year investment in serving, preserving and protecting the Upper Green River Valley's natural resources, and years of living with and learning about our air, water, and wildlife, I am acutely aware of the time and effort it takes to understand the extensive and complex impacts associated with oil and gas leasing and development.

33.     I believe that these public resources, these extraordinary wildlife populations, these remnant pockets of clear air and clean water are among the last vestiges of a rich, natural heritage on the North American continent, in an increasingly rare and inter-connected ecosystem. I value these gems as some people value their children, and I live to preserve and protect them. To witness their destruction and degradation causes me acute, intense, emotional and psychological pain, especially because I have long believed in honorable, informed resource managers in whose hands the future of these assets lie.  I believe in a United States government that holds these public lands as a sacred trust for all Americans to enjoy.  I do not believe it is legal or even fair for BLM to allow one industry to completely dominate and degrade our public commonwealth.  In the Upper Green River Valley, the areas that geologists believe have oil and gas potential are already held by mineral leases, with more than 13,000 wells already drilled or permitted.  Hundreds of these wells are "shut in", while companies await higher prices to produce from them.  Rapid leasing without ample opportunity for public review, or consideration of the severe impacts to other natural resources that results from stripping important habitats, only serves to enrich oil and gas companies by making their stockholders believe they have more potential wealth than they actually do.  BLM is complicit in this lie.  The rest of America's public land owners are deprived of the fortunes inherent in clean, breathable air, safe and abundant water supplies, intact ecosystems, and a valuable, natural heritage for this and future

generations.  To think that federal BLM land managers would allow our public resources' death by a thousand cuts is unbearable and unacceptable.

34. The abbreviated comment and protest periods presently provided by the Bureau of Land Management for oil and gas lease sales are plainly inadequate to allow me full and thorough scrutiny, and to provide substantive, knowledgeable comments on proposals to lease parcels of public land for oil and gas development.

35. It takes time, sometimes weeks or months and certainly more than 10 days, to review habitat maps for pronghorn, sage-grouse, mule deer and moose in an area proposed for leasing.  It takes huge amounts of time to consider all the potential consequences from leasing and drilling, based on what we know already.  Leasing and drilling impact air quality and water quality, the very essentials of life, and both are incredibly complex issues that can only be understood by taking the time to evaluate laws, statutes, and standards.  Four times a year, a dedicated individual could take days out of her normal life to analyze, review, edit, and write a protest, if she didn't have any other obligations.  But it is humanly impossible to carve out that kind of precious time from a life, and ludicrous for BLM to demand that impacted individuals take only one and a half weeks for lease parcel protest.  With this IM, BLM places a huge, impossible burden on my ability to oversee responsible management of public lands.  I am harmed beyond measure by BLM's thoughtless directive.

**Upper Green River Alliance is Harmed by Shortened Comment and Protest Periods**

36. Concerning public participation, BLM's IM 2018-034 (III.B.5.) states that, "state and field offices *may* provide for public participation during the NEPA process…" [emphasis added].  In this IM, BLM implies that providing opportunities for public participation is optional for state and field offices.  This flies in the face of the traditions wrought by neighborly

cooperation and civil discourse that are the hallmarks of small town life in the American West where BLM-managed lands lie. Since UGRA staff first learned the definitions of acronyms such as NEPA, FLPMA, and CEQ, we have participated at the field office level with resource managers, wildlife biologists, and range conservationists to consider on-the-ground impacts of energy proposals.  Far from the granite halls of Washington DC, where diesel fumes and car horns replace the scent of sagebrush and the silence of the plains, people here talk to find common ground. Public participation is a necessity for UGRA staff and supporters.  It is insulting and rude for BLM to shun its Western neighbors, and promotes nothing but vitriolic wrath in response.

37.     BLM's IM states that, "Field or state offices will post the NEPA compliance documentation on the BLM ePlanning website and in the public room 45 days prior to the start of the sale."  In addition, BLM's IM states that, "A 10-day public protest period will begin the day the sale notice is posted, along with applicable NEPA documentation."  So on the day that NEPA compliance documentation is posted, the public protest period simultaneously begins.  After the 10-day protest period ends, there is no reason for Upper Green River Alliance to continue to read the NEPA documentation if response to BLM is not permitted, so the remaining 35 days of NEPA availability is pointless and a waste of time.  BLM's rationale with this timeline makes no sense and exacerbates the public's confusion.

38.     Due to the short, new comment periods, Upper Green River Alliance staff and supporters are rarely able to meet with BLM professionals, or conduct site visits with BLM to observe on-the-ground conditions.  This ham-strings our staff, supporters and interested, public land owners and managers alike, for each group has experience, education, and local, historical

knowledge that can inform and improve BLM decision-making, and could provide valuable insight into ecological changes over time.

39. For example, due to the shortened comment period, we were unable to provide comments on the September lease sale parcels which lie just south of Pinedale and with which we are personally familiar, due to work schedules and personal commitments. We could have provided historical knowledge and scientific research that BLM may not have had time or resources to research and employ, but we were not able to because of the extremely short protest period and competing priorities.

40. Because of the time-consuming process of providing substantive, well-researched comments, and staying current with oil and gas lease sales under the new IMs, we are often forced to forego some of life's other priorities like work and family commitments. This has harmed Upper Green River Alliance's ability to participate in agency decisions that affect our commonwealth of water, air, and wildlife.

41. Our inability to adequately participate in the leasing phase is particularly important because once a lease has been sold, we know from years of experience with the BLM that a parcel may remain open to development for years beyond the normal 10-year term. In such cases, impact analyses may not reflect current conditions, and may fail to consider the most recent resource information or Best Management Practices.

42. Furthermore, BLM customarily allows successful leaseholders to design oil and gas developments on lease parcels, even forgoing historic, seasonal timing limitations to allow drilling year-round in crucial winter wildlife habitats, as on the Pinedale Anticline, resulting in significant wildlife population declines.

DECLARATION OF LINDA F BAKER—13

43.     It is also very difficult for our supporters and the public to participate beyond the leasing phase, at the Application for Permit to Drill (APD) phase, despite BLM's false claims that drilling decisions and stipulations are prepared at this point where there is ample opportunity for public involvement.  APDs are difficult to track because BLM does not make them available online.  Instead, APDs (and Notices of Staking) are posted for 30 days in a binder in the BLM Field Office where the development is proposed.  Interested citizens have to travel to the BLM Field Office every 30 days to review a hardcopy if they wish to comment on an APD.  This is prohibitively expensive, time-consuming, and difficult, especially for working folks.

44.     Furthermore, an APD's Conditions of Approval (COAs) or Findings of No Significant Impact (FONSIs) are not made publicly available by BLM, so the only information that the public has to base their comments on is a physical parcel location.  This deprives the public of information on the presence and distribution of sensitive wildlife species, and crucial ranges such as wildlife migration corridors that may be impacted by development.

45.     The leasing and development of the public lands managed by BLM, and the restrictions placed on public processes intended to allow public input to help the agency fairly evaluate the actions' environmental impacts, threaten lasting damage to the intended mission of the Upper Green River Alliance. With this severely restricted comment period, our staff and supporters' established scientific, educational, aesthetic, recreational, and spiritual interests in conserving, preserving, and restoring the ecological integrity of our home ecosystem withers.

I declare under penalty of perjury that the foregoing statements are true and correct.  Executed this 6th day of July, 2018 at Pinedale, Wyoming.

>                         */s/ Linda F. Baker*
>                         Linda F Baker

DECLARATION OF LINDA F BAKER—14