

**U.S. DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT (/)**
(/)

# OIL AND GAS LEASING REFORM LAND USE PLANNING AND LEASE PARCEL REVIEWS

*IM 2010-117*
Instruction Memorandum

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C. 20240
http://www.blm.gov (/)

May 17, 2010

In Reply Refer To:

1610/3100 (210/310) P

EMS TRANSMISSION 05/17/2010

Instruction Memorandum No. 2010-117

Expires:  09/30/2011

To:            All Field Officials

From:        Director

Subject:        Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews                                                           DD: 07/02/2010; 08/16/2010; 05/18/2011

**Program Areas:**   Oil and Gas, Planning, and National Environmental Policy Act (NEPA).

**Purpose:**  This Instruction Memorandum (IM) establishes a process for ensuring orderly, effective, timely, and environmentally responsible leasing of oil and gas resources on Federal lands.  The leasing process established in this IM will create more certainty and predictability, protect multiple-use values when the Bureau of Land Management (BLM) makes leasing decisions, and provide for consideration of natural and cultural resources as well as meaningful public involvement.

**Policy/Action:**  The following policy applies to the leasing of Federal minerals under BLM-administered surface[1] state-owned surface, and private surface estates.  The BLM does not manage leasing on tribal lands; therefore, this policy does not apply to tribal lands.  In addition, sections I through III. F of this policy do not apply to the leasing of Federal minerals under lands managed by other Federal surface management agencies.  Those sections, however, do apply to split estate lands within National Forest System (NFS) units if leasing decisions for such lands have not been analyzed in documentation prepared jointly by the U.S. Forest Service (FS) and the BLM for lands within the external boundaries[2] of NFS units.

This policy (1) addresses land use plan review, state office standardization of lease stipulations, and adaptive management; (2) introduces the Master Leasing Plan concept; and (3) identifies process requirements for reviewing oil and gas leasing expressions of interest.[3]

The U.S. Department of the Interior protects America's natural resources and heritage, honors our cultures and tribal communities, and supplies the energy to power our future.  The Department fulfills its broad-ranging missions through the work of its bureaus and offices, including the BLM, the Bureau of Indian Affairs, the Bureau of Reclamation (BOR), the National Park Service (NPS), and the U.S. Fish and Wildlife Service (FWS).

As a land management agency with a multiple-use mission, the BLM will make land use decisions that sustain the health and productivity of the public lands for the use and enjoyment of present and future generations.  The BLM recognizes that, in some cases, leasing of oil and gas resources may not be consistent with protection of other important resources and values, including units of the National Park System; national wildlife refuges; other specially designated areas; wildlife; and cultural, historic, and paleontological values.  Under applicable laws and policies, there is no presumed preference for oil and gas development over other uses.  In making its oil and gas leasing and development decisions, the BLM will consult and coordinate with other land and resource managers (Federal and non-Federal), as appropriate.

It is BLM policy to exercise its discretionary authorities, including its oil and gas leasing authority, through the use of an informed, deliberative process that includes—

- Communication with the public, tribal governments, and Federal, state, and local agencies;
- Consideration of current science and other available data;
- Compliance with existing laws, regulations, and policies; and
- Consideration of important resources and values.

To that end, state offices will continue to respond to expressions of interest from industry in leasing particular parcels, but will also take the initiative to strategically plan for leasing and development in areas that have the potential for oil and gas development but have not been fully leased.

Upon issuance, this policy will guide land use planning and leasing procedures for future parcels not currently under review by the field offices as of the date of this IM. For parcels currently under review by the field offices, State Directors will determine whether it is appropriate to apply any part of this policy to those parcels (i.e., a Master Leasing Plan or the Interdisciplinary Review of Lease Sale Parcels process, including potential site visits and a closer look at program-specific guidance).

Each state office will develop an implementation plan and timeline to execute this IM, as explained in section IV of this IM, and will submit this implementation plan and timeline to the Director for review and approval by August 16, 2010. Lease parcels undergoing review in conformance with this IM and a Director-approved implementation plan will no longer be subject to the leasing briefing paper process set forth in the memorandum from the Acting Director, dated February 13, 2009. State offices will also submit a post-implementation report, as explained in section IV of this IM, to the Washington Office (WO) by May 18, 2011.

  I. Land Use Planning – Adequacy, Consistency, and Adaptive Management

A. <u>Resource Management Plan Adequacy</u>

As outlined in the Land Use Planning Handbook (H-1601-1), the Resource Management Plan (RMP) underlies fluid minerals leasing decisions. Through RMP effectiveness monitoring and periodic RMP evaluations, state and field offices will examine resource management decisions to determine whether the RMPs adequately protect important resource values in light of changing circumstances, updated policies, and new information (H-1601-1, section V, A, B). The results of such reviews and evaluations may require field office resource information updates and land use plan maintenance, amendment, or revision. In some cases state and field office staff may determine that the public interest would be better served by further analysis and planning prior to making any decision whether or not to lease. For instance, new information may be available or relevant environmental conditions may have changed (e.g., species habitat and population levels may have decreased or wilderness characteristics may have become evident). In such circumstances, additional review may better inform the decision-maker. While an RMP may designate land as "open" to possible leasing, such a designation does not mandate leasing.

B. <u>Stipulation Consistency</u>

Each state office will form an Interdisciplinary Consistency Review Team(s) (IDCR Team) for lands under its jurisdiction. The primary purpose of the IDCR Team is to ensure that lease stipulations are written in a WO-approved format, stipulation language is consistent within each state office for the protection of similar resources or resource settings,[4] and stipulations edge-match across administrative boundaries. As part of this consistency review, state offices will request review by the Office of the Solicitor, usually the Regional Solicitor's Office, to ensure the enforceability of existing, new, or revised lease stipulations.

To establish a baseline for this task and to aid the WO in development of updated stipulation consistency guidance, state offices are to provide copies of all lease stipulations currently used within the state to the WO, including RMP lease stipulations not currently in statewide stipulation databases. Stipulations must be provided in Microsoft Word format, organized by protected resource, and submitted to WO-310 (Jim Perry) via email by July 2, 2010.

The IDCR Teams will work with the field offices within their state(s) and across state administrative boundaries to ensure lease stipulations edge-match appropriately across BLM administrative boundaries and other appropriate units such as a species range or an ecoregion. Edge-matching will ensure similar stipulations align on each side of the boundary, except in the circumstances described in endnote 4. Coordination may be necessary with appropriate Federal, state, and local resource management agencies as well as BLM national program leads to help ensure common resource issues are addressed appropriately and consistently.

Field offices will maintain or amend RMPs to accommodate any changes in lease stipulations in accordance with the guidance found in the Land Use Planning Handbook (H-1601-1, sections 6H and 7B).

C. <u>Adaptive Management</u>

In applying an Adaptive Management approach[5] to oil and gas related activities to address changing resource conditions, RMPs and associated lease stipulations, including those lease stipulations developed at the national level, must conform to the *Exceptions, Waivers, and Modifications of Fluid Minerals Stipulations and Conditions of Approval, and Associated Rights-of-way Terms and Conditions* (WO-IM-2008-032, dated November 27, 2007, incorporated by reference into this IM).[6] As appropriate, stipulations will use Adaptive Management principles, incorporate the best

available science, and address changing resource conditions.  Additionally, plan and lease stipulation "modification" criteria must also allow for an increasing level of environmental protection when changing circumstances warrant stronger measures to meet goals, objectives, and outcomes identified in RMPs.

Successful adaptive management is dependent on active monitoring.  On September 30, 2009, the WO issued WO-IM-2009-224, *Use and Application of the Fluid Minerals Surface and Environmental Monitoring Program Element – MW,* incorporated by reference into this IM.  The purpose of the WO-IM-2009-224 is to ensure adequate monitoring of oil and gas development.  The IM requires field offices to conduct monitoring in conformance with approved decision documents and their associated NEPA documentation, assess environmental impacts from development, determine whether the BLM's standards are being met, and evaluate whether permit requirements are effective in achieving their desired intent.  Congress has provided substantial monitoring funding to the BLM through the oil and gas program.  Oil and gas environmental protection specialists, wildlife biologists, archaeologists, soil scientists, air resource specialists, and hydrologists are some of the resource specialists that are expected to be funded from 1310, 1711, 9131, or 9141 accounts to conduct program element MW monitoring site visits in support of the oil and gas program.

  II. Master Leasing Plans

RMPs identify oil and gas planning decisions, such as areas closed to leasing, open to leasing, or open to leasing with major or moderate constraints (lease stipulations) based on known resource values and  reasonably foreseeable oil and gas development scenarios.  Many of the BLM's RMPs completed since 2005 also establish resource condition objectives and the general/typical best management practices that will be employed to accomplish these objectives in areas open to leasing.  In some areas, however, additional planning and analysis may be necessary prior to new oil and gas leasing because of changing circumstances, updated policies, and new information.  Criteria for determining whether such additional planning and analysis is warranted are listed below.

This policy introduces the Master Leasing Plan (MLP) concept as a mechanism for completing the additional planning, analysis, and decision-making that may be necessary for areas meeting the listed criteria.  Field offices may be familiar with Master Development Plans (MDP) (e.g., Plans of Development (POD), Full-Field Development analysis documents, etc.), that support individual post-lease development decisions.  Unlike the MDP, the MLP process will be conducted before lease issuance and will reconsider RMP decisions pertaining to leasing.  Similar to the MDP, the MLP will analyze likely development scenarios and varying mitigation levels, but at a less site-specific level than would typically be conducted in an MDP where a development plan has been fully defined by the operator(s).

The MLP process will be conducted through the NEPA process using an interdisciplinary team that will coordinate and/or consult with the public and other stakeholders that may be affected by the BLM's MLP decisions.  The MLP will ordinarily be initiated as a land use plan amendment.  However, if it is anticipated that the likely outcome of the MLP will not result in the creation of new lease stipulations or changes to existing RMP decisions warranting a plan amendment, it may not be necessary to initiate the MLP as a plan amendment.  The MLP process may also be combined with a plan revision process if schedules permit.

The preparation of an MLP is required when all four of the following criteria are met:

- A substantial portion of the area to be analyzed in the MLP is not currently leased.
- There is a majority Federal mineral interest.
- The oil and gas industry has expressed a specific interest in leasing, and there is a moderate or high potential for oil and gas confirmed by the discovery of oil and gas in the general area.
- Additional analysis or information is needed to address likely resource or cumulative impacts if oil and gas development were to occur where there are:
  - multiple-use or natural/cultural resource conflicts;
  - impacts to air quality;
  - impacts on the resources or values of any unit of the National Park System, national wildlife refuge, or National Forest wilderness area, as determined after consultation or coordination with the NPS, the FWS, or the FS; or
  - impacts on other specially designated areas.

An MLP may also be completed under other circumstances at the discretion of the Field Manager, District Manager, or State Director.

The MLP should enable field offices to (1) evaluate in-field considerations, such as optimal parcel configurations and potential development scenarios; (2) identify and address potential resource conflicts and environmental impacts from development; (3) develop mitigation strategies; and (4) consider a range of new constraints, including prohibiting surface occupancy or closing areas to leasing.

  A. <u>Identifying and Evaluating Potential Resource Conflicts in an MLP</u>

The following is a non-exhaustive list of important national and local resource issues that should be considered when developing an MLP:

- Ambient air quality and potential impacts, including cumulative impacts, to air quality from development.
- The effect of oil and gas leasing on lands that the BLM may identify as having wilderness characteristics and lands with special designations such as lands within the National Landscape Conservation System and Areas of Critical Environmental Concern.
- Special Recreation Management Areas.

- Nearby state, tribal, or other Federal agency lands, including NPS and FWS lands that could be adversely affected by BLM-authorized oil and gas development.
- Important cultural resources, including traditional cultural properties of importance to Native American tribes and historic trails.
- Scientifically significant paleontological resources.
- Fisheries and wildlife habitat, migration corridors, and rare plants.
- Status of visual resource inventories and appropriate designations of Visual Resource Management Classes.
- Watershed conditions, steep slopes, and fragile soils.
- Municipal watersheds and aquifers.
- Public health and safety (e.g., management of fluids and emissions).
- The ability to achieve interim and final reclamation standards (Gold Book, Chapter 6).

  B. Potential MLP Decisions

As a general rule, resource protections identified through the MLP process will be addressed as new or modified plan decisions that may include lease stipulations for new leases and/or closing certain areas to leasing. For existing leases in the MLP area, new or modified plan decisions should be applied as conditions of approval, provided they are consistent with rights granted under the existing leases.[7] The following are examples of other planning decisions that may be made through the MLP process with supporting NEPA analysis:

- Phased leasing.
- Lease stipulations including No Surface Occupancy, Timing Limitation, and Controlled Surface Use.
- Planned or required unitization of Federal lands.
- Phased development.
- Caps on new surface disturbance, pending acceptable interim or final reclamation.
- Best management practices, such as:
  - Use of existing infrastructure.
  - Multiple wells on a single pad.
  - Requirements to reduce or capture emissions.
  - Liquids gathering systems to centralized offsite production facilities.
  - Placement of all linear disturbances in corridors.
  - Extensive interim reclamation of roadway disturbance to the road surface and of pads to the wellhead.
  - Final reclamation restoring the landform and native plant community.

  III. Lease Parcel Review and Lease Issuance Process

The purpose of lease parcel review by the field offices is to determine the conditions under which leasing and eventual development should occur if allowed to proceed. Lease parcel reviews for expressions of interest will be conducted and documented simultaneously with the NEPA compliance process. The goal of the parcel review and NEPA compliance process is to (1) determine parcel availability; (2) evaluate existing stipulations; (3) identify new stipulations, if applicable; (4) provide for public involvement; and (5) develop detailed background information for the NEPA compliance process.

  A. Parcel Review Timeframes

State offices will continue to hold lease sales four times per year, as required by the Mineral Leasing Act, section 226(b)(1)(A), and 43 CFR 3120.1-2(a), when eligible lands are determined by the state office to be available for leasing.[8] However, state offices will develop a sales schedule with an emphasis on rotating lease parcel review responsibilities among field offices throughout the year to balance the workload and to allow each field office to devote sufficient time and resources to implementing the parcel review policy established in this IM. State offices will extend field office review timeframes, as necessary, to ensure there is adequate time for the field offices to conduct comprehensive parcel reviews.

  B. State Office Leasing Targets

When developing leasing performance targets/units of accomplishment for program element EI (Develop and Issue Federal Fluid Mineral Leases), state and field offices will take into account the process requirements identified in this IM and adjust the targets/units of accomplishment as appropriate. State and field offices will ensure that the parcel review process is efficient, yet allows adequate time for a thorough and complete review.

  C. Interdisciplinary Review of Lease Sale Parcels

Field offices will form an Interdisciplinary Parcel Review Team (IDPR Team) of resource specialists to review lease sale parcels and ensure compliance with NEPA (see III. E. NEPA Compliance Documentation, below) and other legal and policy requirements. The IDPR Team will include subject matter experts for the resources potentially affected by leasing. When appropriate, the IDPR Team should consider including staff specialists from other agencies when lands and/or resources that are administered by those agencies could be impacted by future development on the lease parcels under review. To benefit from the team's skills, experience, and expertise, the parcel reviews should be conducted in a group setting, thereby encouraging group discussion and interaction. Data and recommendations should be reviewed and discussed as a team, allowing parcels to be compared and contrasted in an open discussion. The IDPR Team must be familiar with current oil and gas development technologies

and impacts, and should periodically visit areas of existing oil and gas development as a team to gain a better understanding of the potential impacts of development on prospective lease sale parcels. The IDPR Team will ensure the following steps are performed for the review of parcels in each lease sale, including review of split estate parcels where the mineral estate is federally owned. In instances where an MLP has been completed, the IDPR Team may determine that the MLP constituted a sufficient review. Managers will ensure team members have sufficient time to conduct these reviews.

1. <u>Gather and Assess Existing Information</u>:

Field offices will gather and evaluate existing environmental resource information and compliance documentation (e.g., NEPA analysis, Endangered Species Act (ESA) and National Historic Preservation Act (NHPA) resource data and consultation) upon which a leasing decision may be based. The field offices will then determine the need for additional information and develop strategies to obtain any data that may be required to support a leasing decision. Generally speaking, it is anticipated that this information will have been developed at the land use planning stage or subsequently, such as through an MLP process, if any has been conducted. However, in some circumstances it may be necessary to defer parcels from leasing while additional resource information is collected and analyzed.

2. <u>Plan Conformance and Adequacy</u>:

Field offices will determine whether leasing the parcel is in conformance with the RMP. In addition, the field office will evaluate whether oil and gas management decisions identified in the RMP (including lease stipulations) are still appropriate and provide adequate protection of resource values (including, but not limited to, biological, cultural, visual, and socioeconomic resource values). If the lease stipulations do not provide adequate resource protection, it may be necessary to develop new lease stipulations or revise existing ones. A lease stipulation may be revised consistent with modification criteria found in the RMP, or as necessary given conditions or issues not anticipated in the RMP.

Generally, the creation or revision of a lease stipulation that is not clearly consistent with the terms, conditions, and decisions of the approved RMP, or a stipulation that is revised to change from a moderate constraint to a major constraint may not be in conformance with the RMP (43 CFR 1601.0-5(b)); therefore, a plan amendment may be necessary. New or revised stipulations must be based on best available information and science and must be reviewed by the Department of the Interior, Office of the Solicitor.

Planning decisions for oil and gas leasing are defined in the Land Use Planning Handbook as (1) open to leasing; (2) open to leasing subject to moderate constraints; (3) open to leasing subject to major constraints; or (4) closed to leasing (H-1601-1, Land Use Planning Handbook, Appendix C, 23). If a proposed modification to the terms of a stipulation changes the extent, but does not result in a new planning decision (e.g., the timing limitation protective radius increases from 2 miles to 3 miles, but the stipulation remains a moderate constraint), no plan amendment is required. The site-specific NEPA compliance documentation for the lease, however, may need to analyze the proposed stipulation modification if this analysis has not already been conducted in the NEPA documentation associated with the land use plan (see section III.E below; see also WO-IM-2008-032). Conversely, if a proposed change in the terms of a stipulation would change the degree of the constraint from moderate to major or would result in the creation of a new lease stipulation not contemplated in the RMP, a plan amendment would likely be required and, if necessary, the parcel(s) should be withheld from leasing until the plan is amended. For example, if nesting habitat formerly identified in the RMP for protection with a timing limitation stipulation (moderate) would now be protected with a No Surface Occupancy (NSO) stipulation (major), a NEPA analysis appropriate for a land use plan amendment would be required. Similarly, if a proposed restriction would limit development to 1 well location per 640 acres when the RMP analyzed development of 16 well locations per 640 acres (substantial change not analyzed in the RMP and its associated NEPA documentation), NEPA analysis appropriate for a land use plan amendment would also be required in this instance.

Resources on the ground change over time (e.g., new leks are occupied while others are abandoned). Prior to the lease sale, the field office will review its latest inventory information and apply protective lease stipulations to new leases as provided for in the RMP. Applying an existing RMP lease stipulation (e.g., NSO around a lek) to a proposed new lease, based on new inventory data (e.g., the discovery of a new lek), is considered to be in conformance with the RMP and is addressed through plan maintenance. Plan maintenance is the appropriate planning tool even if the land area where the new resource is found (e.g., new lek) had been designated in the RMP as covered by standard lease terms. See oil and gas plan maintenance examples in H-1601-1, Land Use Planning Handbook, VI, (H), 44.

3. <u>Program-Specific Guidance</u>:

Field offices will review parcels in light of the most current national and local program-specific guidance to determine availability of parcels for leasing and/or applicable stipulations (e.g., to address conservation strategies and protect archaeological resources, traditional cultural properties, paleontological resources, specially designated areas on or near BLM-administered lands, sensitive species, watersheds, fisheries and wildlife habitat, visual resources, air quality, and wilderness qualities).

4. <u>Other Considerations</u>:

There are other considerations that should be taken into account when determining the availability of parcels for lease. The following is a non-exhaustive list of considerations, further refinement of which may depend on the IDPR Team's review and site visits. Field offices should consider whether:

- There is a risk of drainage to Federal mineral resources due to development of nearby non-Federal parcels if the parcel is not leased (based upon a determination made by a Petroleum Engineer or Petroleum Geologist).
- In undeveloped areas, non-mineral resource values are greater than potential mineral development values.[9]
- Stipulation constraints in existing or proposed leases make access to and/or development of the parcel or adjacent parcels operationally infeasible, such as an NSO parcel blocking access to parcels beyond it or consecutive and overlapping timing restrictions that do not allow sufficient time to drill or produce the lease without harm to affected wildlife resources.
- Parcel configurations would lead to unacceptable impacts to resources on the parcels or on surrounding lands and cannot be remedied by reconfiguring.
- The topographic, soils, and hydrologic properties of the surface will not allow successful final landform restoration and revegetation in conformance with the standards found in Chapter 6 of the Gold Book, as revised.
- Construction and use of new access roads or upgrading existing access roads to an isolated parcel would have unacceptable impacts to important resource values.
- Leasing would result in unacceptable impacts to the resources or values of any unit of the National Park System or national wildlife refuge.
- Leasing would result in unacceptable impacts to specially designated areas (whether Federal or non-Federal) and would be incompatible with the purpose of the designation.

5. <u>Site Visits</u>:

In light of changing resource values, new information, and current policy, the IDPR Team or a subset of the team will usually conduct site visits to validate existing data or gather new information in order to make an informed leasing recommendation.  However, the site visits are not a substitute for acquiring the site-specific cultural or wildlife data that is typically gathered during the permit approval stage.  Site visits are highly recommended in any case involving new leasing in an area not already under oil and gas development.  It is anticipated that, at least initially, the majority of lease sale parcels under review will require site visits.  For a parcel that is inaccessible due to location or other factors, it may be sufficient to conduct a review from a nearby vantage point or to use remote-sensing data (e.g., aerial photos, satellite imagery, and topographic maps).  The IDPR Team will use data collected from site visits to evaluate the RMP oil and gas leasing management decisions, identify the resource values, evaluate the adequacy of associated stipulations in the RMP, and provide information for the NEPA compliance process.  If there is a high level of confidence in the data available to evaluate the parcel, such as would result from the recent completion of an MLP, a site visit may not be necessary.  The IDPR Team will document whether site visits occurred, or why not, and any findings as part of the administrative file.

6. <u>Internal and External Coordination</u>:

In order to achieve greater coordination and communication in managing shared landscapes, such as airsheds, viewsheds, watersheds, and soundscapes, state and field offices will coordinate and/or consult on the parcel review and NEPA analysis with stakeholders that may be affected by the BLM's leasing decisions.[10] Stakeholders may include parties such as:

- Federal agencies (e.g., FS, NPS, FWS, BOR, and U.S. Department of Defense).
- Adjacent BLM state and field offices, if lease nominations span or are close to administrative boundaries.
- National Landscape Conservation System managers.
- Tribal governments.
- State and local agencies (e.g., fish and game, environmental quality, and historic preservation).
- Local community stakeholders (e.g., managers of municipal watersheds and local parks).

7. <u>Public Participation</u>:

State and field offices will provide for public participation as part of the review of parcels identified for potential leasing through the NEPA compliance documentation process (see section III.E).  State and field offices will identify groups and individuals with an interest in local BLM oil and gas leasing, including surface owners of split estate lands where Federal minerals are being considered for leasing.  Interested groups, individuals, and potentially affected split estate surface owners[11] will be kept informed of field office leasing and NEPA activities through updated websites and email lists, and will be invited to comment during the NEPA compliance process.

D. <u>ESA, NHPA, and Tribal Consultation Compliance Documentation</u>

State and field offices will meet the ESA, NHPA, and General Procedural Guidance for Native American Consultation requirements for lease issuance, and will attach, at a minimum, the standard ESA and NHPA lease stipulations (Attachment 1) to any lease that is offered.  Generally, it is anticipated that the information necessary to meet this compliance requirement will have been developed at the land use planning stage (see Gather and Assess Existing Information, III. C. 1 above).  If state or field offices determine that current information is inadequate to support the decision about whether to lease, the processes for fulfilling the BLM's obligations under the ESA, NHPA, and tribal consultation requirements should be synchronized, tracked, and coordinated with the NEPA compliance process.

E. <u>NEPA Compliance Documentation</u>

The IDPR Team will complete site-specific NEPA compliance documentation for all BLM surface and split estate[12] lease sale parcels. The IDPR Team may include the review of multiple parcels in a single document. Site-specific NEPA compliance documentation must incorporate appropriate information gained through the lease parcel review process described above. In accordance with this IM, the NEPA compliance documentation for oil and gas leasing must include an opportunity for public review, as described below, and the field office must verify that all legal requirements have been met (e.g., ESA and NHPA).

If, through the lease parcel IDPR Team review process, the authorizing official confirms that the proposed leasing action is adequately analyzed in an existing NEPA document, such as that prepared during the MLP process, and is in conformance with the approved RMP, a Determination of NEPA Adequacy (DNA) may be used to document NEPA compliance for the leasing decision (H-1790-1, National Environmental Policy Act Handbook, section 5.1).[13] Although not required by law or regulation, field offices will provide a 30-day public review and comment period for the DNA. After consideration of any public comments received on the document, the field office will either finalize the DNA or initiate other appropriate NEPA compliance review. It is expected that the DNA process will only be appropriate in cases where the existing NEPA documentation has adequately incorporated the most current program-specific guidance. If a DNA is not appropriate, then the field office will determine the appropriate NEPA compliance documentation (e.g., environmental assessment (EA) or environmental impact statement (EIS)) to be prepared.

Most parcels that the field office determines should be available for lease will require site-specific NEPA analysis. This analysis will typically take the form of an EA, which would be tiered, as appropriate, to the RMP/EIS or a MLP/EA or EIS, if one has been completed for any of the parcels. Scoping for these EAs is optional; however, the interdisciplinary review of lease sale parcels will provide input on the issues, impacts, and potential alternatives to be addressed in the EA. The EA will analyze a no action alternative (no leasing), a proposed leasing action (leasing the parcel(s) in conformance with the land use plan), and any alternatives to the proposed action that may address unresolved resource conflicts. In cases where the field office determines that the necessary terms and conditions under which leasing would be appropriate are not in conformance with the RMP, it will be necessary to amend the RMP before leasing is appropriate. If it is necessary to amend the RMP, the leasing EA (or EIS) must either meet the standards for NEPA documentation to support a plan amendment (see 43 CFR part 1600), or the affected lease parcels must be withdrawn or deferred from leasing until a plan amendment or revision can be completed at a later date.

Although not required by law or regulation, field offices will provide a 30-day public review and comment period for the EA and unsigned Finding of No Significant Impact (FONSI) for oil and gas leasing before forwarding the leasing recommendation to the State Director (see section III. F). Note: Plan amendments are subject to additional public involvement and protest requirements (43 CFR 1610.2). The field office will finalize the EA and FONSI considering any public comment received on those documents. If a FONSI is not warranted, the field office may recommend that the parcel be withheld from leasing or that an EIS be prepared to address the site-specific issues in compliance with NEPA.

F. Leasing Recommendation

The Field Manager or District Manager will forward the finalized EA and FONSI (or finalized DNA, if appropriate) and a recommendation for each parcel reviewed to the State Director. This recommendation is not an appealable or protestable decision. Field office recommendations may include:

- Offering a lease parcel with standard stipulations only.
- Offering a lease parcel with existing, revised, and/or new stipulations.
- Offering a lease parcel with modification of parcel boundaries.
- Deferring a lease parcel from leasing, in whole or in part, pending further evaluation of specified issues.
- Withholding a lease parcel from offering in an area that is already closed in the existing RMP.
- Withholding a lease parcel from offering, in whole or in part.
- Withholding a lease parcel from offering, in whole or in part, and initiating a plan amendment to close the area to future leasing.

G. Public Notification of Lease Sale

Field or state offices will post the NEPA compliance documentation on the appropriate website and make the documentation available in the public room(s). The state office will post the final sale notice at least 90 days prior to the sale date. Each sale notice will include a link to the NEPA compliance documentation.

H. Lease Sale Parcel Protests

A 30-day protest period will begin the day the sale notice is posted, as it has in the past. The earlier posting of the sale notice will provide the state and field offices with at least 60 days to review protests before the oil and gas lease sale. The process outlined in this IM—which includes site-specific parcel analysis and increased public participation—will help identify, address, and resolve most issues before the lease sale. When possible, state offices should attempt to resolve protests before the sale of the protested parcels. Protests that are not resolved do not prevent bidding on protested parcels at the auction. Protest decisions should advise the protesting parties of their right to appeal denied protests to the Interior Board of Land Appeals (IBLA), but that appeals will not automatically halt the auction or issuance of leases.

I. Lease Issuance

Before issuing a lease, the authorized officer at the state office will (1) sign decisions resolving all protests concerning the parcel, and (2) sign a decision record (or record of decision for an EIS) supporting issuance of the lease(s) that provides a rationale for the leasing decision, taking into account, among other things, the NEPA analysis. If a particular parcel or parcels are not the subject of a protest, sale or issuance of such parcels

should not be held up pending resolution of protests on any other parcels proposed for sale. Field or state offices will post the NEPA compliance decision documents and protest decisions on the appropriate website and make the documentation available in the public room(s).

IV. Implementation Plan and Report

Each state office will develop an implementation plan and timeline for accomplishing the tasks outlined in this IM. The implementation plan will be submitted not later than August 16, 2010, to the WO for review and approval by the Director.

The implementation plan should identify:

- A process for ensuring that lease stipulations are written in a WO-approved format, are consistent within the state for the protection of similar resources or resource settings, and edge-match appropriately across BLM administrative boundaries.
- A process for identifying areas currently meeting the criteria for initiation of the MLP process.
- MLPs or similar focused planning efforts that have been initiated or may be appropriate to initiate in the near term and any plans for initiating MLPs.
- The formation of IDPR Teams in each field office that has a lease parcel review workload.
- A rotational parcel review schedule.
- Steps, criteria, and timeframes to address the backlog of deferred parcels.

State offices will submit a post-implementation report to the WO by May 18, 2011.

The post-implementation report should identify:

- Each aspect of implementation including the effect on workloads.
- Implementation success and recommendations for improvement.
- Actions taken to enhance internal and external coordination.
- The effect implementation of this policy has had on public involvement, including lease protests, appeals, and litigation as well as any effect on the BLM's responses, decision outcomes, and changed timeframes.
- Work products, such as one copy of a leasing EA and FONSI from each affected field office.

**Timeframe:** This policy is effective upon issuance. This policy will guide land use planning and leasing procedures for all future parcels not currently under review by the field offices as of the date of this IM. For parcels currently under review by the field offices, each State Director will determine whether it is appropriate to apply any part of this policy to those parcels. By July 2, 2010, state offices will provide to WO-310 (Jim Perry) via email, copies of all lease stipulations currently used in the state, including RMP lease stipulations not currently in statewide stipulation databases. By August 16, 2010, state offices will submit an implementation plan and timeline to the WO for approval by the Director. A post-implementation report will be submitted to the WO by May 18, 2011. It is expected that this policy will be fully implemented by the state offices no later than May 18, 2011.

**Budget Impact:** This policy will result in additional costs for NEPA review, planning, responses to protests, and associated oil and gas program costs. It is anticipated that performance targets/units of accomplishments for resource programs will need to be adjusted.

**Background:** On October 7, 2009, an interagency review team issued the Final Review of 77 Oil and Gas Lease Parcels Offered in BLM-Utah's December 2008 Lease Sale (UT-77 Report). The UT-77 Report was a follow-up to a report issued by the Deputy Secretary of the U.S. Department of the Interior on June 11, 2009. The report presented a number of findings and recommendations for improving the oil and gas land use planning and lease sale parcel review processes. An interdisciplinary team of program specialists and managers reviewed the UT-77 Report, and many of the report findings and recommendations are incorporated in this policy.

**Manual/Handbook Sections Affected:** This IM transmits policy that will be incorporated into BLM Handbooks H-1790-1, National Environmental Policy Act; H-1624-1, Planning for Fluid Mineral Resources; H-3101-1, Issuance of Leases; and H-3120-1, Competitive Leases.

**Coordination:** This policy was coordinated with the U.S. Department of the Interior Office of the Solicitor, and the Renewable Resources and Planning, National Landscape Conservation System, and Minerals and Realty Management directorates.

**Contact:** If there are any questions concerning this IM, please contact Michael D. Nedd, Assistant Director, Minerals and Realty Management, at 202-208-4201. Your staff may contact Jim Perry, Senior Natural Resource Specialist, Washington Office Division of Fluid Minerals (WO-310), at 202-912-7145 or jim_perry@blm.gov (mailto:jim_perry@blm.gov); Robyn Shoop, Senior Mineral Leasing Specialist, Washington Office Division of Fluid Minerals (WO-310), at 202-912-7157 or robyn_shoop@blm.gov (mailto:robyn_shoop@blm.gov); or Shannon Stewart, Planning and Environmental Analyst, Washington Office Division of Decision Support, Planning and NEPA (WO-210), at 202-912-7219 or shannon_stewart@blm.gov (mailto:shannon_stewart@blm.gov).

| Signed by: | Authenticated by: |
| --- | --- |
| Robert V. Abbey | Robert M. Williams |

Director                                               Division of IRM Governance, WO-560

2 Attachments

   1 - Standard Endangered Species Act and National Historic Preservation Act Lease Stipulations (1 p)

   2 - Endnotes (2 pp)

## Endnotes

[1] This policy will be implemented across the BLM as described above.  Certain parts of this policy, however, will not apply to the National Petroleum Reserve Alaska (NPR-A) because the BLM manages that area under some statutory authorities, such as the Naval Petroleum Reserves Production Act of 1976, 42 U.S.C. 6501 et seq., that apply only to that area.  The Alaska State Office's plan for implementing this policy will identify those parts of the policy that will not apply to leasing in the NPR-A.

[2] The external boundary of an NFS unit is defined as the outer boundary of an area encompassing all the National Forest System lands administered by a single administrative unit.  The area often encompasses private lands and other governmental agency lands.

[3] The term expression of interest also includes Pre-sale Offers.

[4] Stipulations for protection of identical resource values may differ if such variance is substantiated by ecological, cultural, or other resource-specific factors that are scientifically validated (e.g., all mule deer winter habitat timing limitation stipulations in a state should be worded similarly unless there are, for example, ecological reasons for varying the effective seasonal closure date of the stipulation across the field office or state).

[5] Adaptive Management: The U.S. Department of the Interior Technical Guide Adaptive Management Working Group, U.S. Department of the Interior, Washington, DC.  See also the Department of the Interior regulations regarding implementation of NEPA at 43 CFR 46.145, as well as associated guidance issued by the Department's Office of Environmental Policy and Compliance.

[6] WO-IM-2008-032 provides guidance for (1) incorporating exception, waiver, and modification criteria into a land use plan; (2) making changes to leasing decisions/stipulations in the land use plan; and (3) reviewing and approving lease stipulation exceptions, waivers, and modifications for leases that have already been issued.

[7] See 43 CFR 1610.5-3(b)  ("the field manager shall take appropriate measures, subject to valid existing rights, to make operations and activities under existing permits [and] contracts, … conform to the approved plan or amendment within a reasonable period of time.")

[8] Eligible lands include those identified in 43 CFR 3120.1-1 as being available for leasing (BLM Manual 3120, Competitive Leases).  They are considered available for leasing when all statutory requirements have been met, including compliance with the NEPA, appropriate reviews have been conducted, and lands have been allocated for leasing in the RMP (BLM Handbook H-3101-1, Issuance of Leases).

[9] This consideration is a policy decision that is not dependent upon the economic values that may be assigned to competing resources.

[10] The process for internal and external coordination outlined in this IM is in addition to the direction under the existing regulations, handbooks, and desk guide that require consultation, coordination, and cooperation with other Federal agencies, Tribal governments, and state and local governments for all BLM planning and NEPA efforts from initiation of the land use plan through the planning, leasing, and permitting decisions, as appropriate (43 CFR 1610.3-1; 43 CFR 46.155; BLM Land Use Planning Handbook H-1601-1 I.E; BLM NEPA Handbook H-1790-1 Chapter 12; BLM Desk Guide to Cooperating Agency Relationships 2005).

[11] In addition to the notification sent to surface owners, as required in WO-IM-2009-184, *Courtesy Notification of Surface Owners When Split-Estate Lands are Included in an Oil and Gas Notice of Competitive Lease Sale* (July 24, 2009), incorporated by reference into this IM, the state or field office will also invite affected split estate surface owners to comment during the 30-day public review and comment period for the Environmental Assessment and unsigned Finding of No Significant Impact.

[12] This requirement does not apply to split estate lands within NFS units if leasing decisions for such lands are analyzed in documentation prepared jointly by the FS and the BLM for lands within the external boundaries of NFS units.

[13] The NEPA document to which the DNA refers must contain sufficient detail to address the potential direct, indirect, and cumulative effects of the proposed action(s).  Consideration must be given to new information, new or revised program-specific guidance, and new or revised lease stipulations contemplated for the lease parcel that may or may not be analyzed in the existing NEPA document.

VIEW ALL POLICIES

Return to the Policies (/media/blm-policy/Instruction%20Memorandum)

IM2010-117_att1.pdf (/download/file/fid/15040)
IM2010-117_att2.pdf (/download/file/fid/15041)

FISCAL YEAR

2010

---

FOIA (/ABOUT/FOIA)
CAREERS (/CAREERS)
CONTACT US (/CONTACT)
MAPS (/MAPS)
INFORMATION CENTER (/MEDIA)
FEEDBACK (/FEEDBACK)
REPORT MISCONDUCT (/PROGRAMS/PUBLIC-SAFETY-AND-FIRE/LAW-ENFORCEMENT/REPORT-MISCONDUCT)
PRIVACY POLICY (HTTPS://WWW.DOI.GOV/PRIVACY)
DISCLAIMER (HTTPS://WWW.DOI.GOV/DISCLAIMER)
NOTICES (HTTPS://WWW.DOI.GOV/NOTICES)
ACCESSIBILITY (HTTPS://WWW.DOI.GOV/ACCESSIBILITY)
BUDGET AND PERFORMANCE (HTTPS://WWW.DOI.GOV/BPP)
AGENCY FINANCIAL REPORT (HTTPS://WWW.DOI.GOV/PFM/AFR)
NO FEAR ACT (HTTPS://WWW.DOI.GOV/PMB/EEO/NO-FEAR-ACT)

USA.GOV (HTTPS://WWW.USA.GOV/)
WHITE HOUSE (HTTPS://WWW.WHITEHOUSE.GOV/)
DEPARTMENT OF THE INTERIOR (HTTP://WWW.DOI.GOV/)

**Follow us on:**