**BLM**

# National Environmental Policy Act

Handbook H-1790-1

BLM



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

January 2008

BLM/WO

Bureau of Land Management (BLM)
National Environmental Policy Act Program
Office of the Assistant Director, Renewable Resources and Planning (WO-200)
1849 C Street NW, Mail Stop 1050LS
Washington, DC 20240

email:  NEPA@blm.gov

Available at BLM's Printed Materials and Distribution Section (PMD)
Fax Number 303-236-0845 or BLM_NCS_PMDS@blm.gov
Cover Photograph – Grand Staircase Escalante National Monument by Peg Sorensen

# TABLE OF CONTENTS

**HANDBOOK USER'S GUIDE** ................................................................................................ **IX**

**CHAPTER 1—NEPA BASICS** .................................................................................................. **1**

1.1    INTRODUCTION TO THE NEPA ........................................................................... 1
1.2    DEPARTMENTAL GUIDANCE AND THIS BLM HANDBOOK .......................... 2
1.3    DOCUMENTS USED TO MEET NEPA REQUIREMENTS ................................... 2
1.4    THE NEPA APPROACH .......................................................................................... 3

**CHAPTER 2—ACTIONS EXEMPT FROM THE NEPA AND EMERGENCY ACTIONS** ......... **9**

2.1    CONGRESSIONALLY EXEMPT ACTIONS .......................................................... 9
   2.1.1   *CERCLA* ........................................................................................................ *9*
2.2    ACTIONS MANDATED BY STATUTE .................................................................. 9
2.3    EMERGENCY ACTIONS ...................................................................................... 10
   2.3.1   *Types of Emergency Actions* ..................................................................... *10*
   2.3.2   *Procedures for Emergency Actions* ........................................................... *11*
      2.3.2.1    Wildfire Suppression Actions ............................................................... 11
      2.3.2.2    Emergency Actions other than Wildfire Suppression ........................... 11

**CHAPTER 3—ACTIONS REQUIRING NEPA COMPLIANCE** ............................................ **13**

3.1    DETERMINING WHEN THE NEPA APPLIES ................................................... 13
3.2    PROPOSALS ORIGINATING WITHIN THE BLM ............................................ 13
   3.2.1   *Policies and Rulemaking* ........................................................................... *14*
   3.2.2   *Land Use Plan (LUP) Development* ........................................................... *15*
3.3    PROPOSALS SUBMITTED TO THE BLM BY OTHER ENTITIES ................... 15
   3.3.1   *Proposals for the BLM to Fund Actions* .................................................... *15*
   3.3.2   *Proposals Involving Mineral Estate* .......................................................... *16*

**CHAPTER 4—CATEGORICAL EXCLUSIONS** ..................................................................... **17**

4.1    CATEGORICAL EXCLUSIONS ESTABLISHED BY THE ENERGY POLICY ACT ......................... 17
4.2.   CATEGORICAL EXCLUSIONS ESTABLISHED BY THE DEPARTMENT OF THE INTERIOR
       OR THE BLM ........................................................................................................ 18
   4.2.1   *Identifying Potential Categorical Exclusions* ............................................ *18*
   4.2.2   *Determining if an Extraordinary Circumstance Precludes Use of a Categorical Exclusion* ... *19*
   4.2.3   *Documentation Requirements* ..................................................................... *19*
      4.2.3.1    Documentation Requirements When Using Hazardous Fuels and Post-Fire Rehabilitation CXs ... 19
      4.2.3.2    Documentation Requirements When Using CXs Not Established by Statute ............... 20

**CHAPTER 5—USING EXISTING ENVIRONMENTAL ANALYSES** ................................... **21**

5.1    DETERMINATION OF NEPA ADEQUACY ....................................................... 22
   5.1.1   *Identifying Existing Environmental Documents* ........................................ *22*
   5.1.2   *Reviewing Existing Environmental Documents* .......................................... *23*
   5.1.3   *Document the Review* ................................................................................. *24*
   5.1.4   *FONSIs, Decisions, Protests, and Appeals* ................................................ *25*
5.2    INCORPORATION BY REFERENCE AND TIERING ......................................... 25
   5.2.1   *Incorporation by Reference* ....................................................................... *26*
   5.2.2   *Tiering* ........................................................................................................ *27*
5.3    SUPPLEMENTING AN EIS ................................................................................. 29
   5.3.1   *When Supplementation is Appropriate* ...................................................... *29*
   5.3.2   *When Supplementation is Not Appropriate* ................................................ *30*
   5.3.3   *The Supplementation Process* ..................................................................... *31*
5.4    ADOPTING ANOTHER AGENCY'S NEPA ANALYSES .................................... 31
   5.4.1   *Adopting Another Agency's EIS* ................................................................ *31*
   5.4.2   *Adopting Another Agency's EA* ................................................................. *32*

**CHAPTER 6—NEPA ANALYSIS** ................................................................................................33
  6.1     OUTLINE OF ANALYTICAL STEPS ...........................................................................33
  6.2     PURPOSE AND NEED ....................................................................................................35
    *6.2.1   The Role of the Purpose and Need Statement* .........................................................36
    *6.2.2   The Decision to be Made*.........................................................................................36
  6.3     SCOPING ........................................................................................................................38
    *6.3.1     Internal Scoping* ...................................................................................................39
    *6.3.2     External Scoping* ..................................................................................................39
  6.4     ISSUES ............................................................................................................................40
    *6.4.1   Identifying Issues for Analysis*................................................................................41
    *6.4.2   Issues Not Analyzed*................................................................................................42
  6.5     PROPOSED ACTION ......................................................................................................42
    *6.5.1   Description of the Proposed Action* ........................................................................43
      6.5.1.1   Design Features of the Proposed Action ....................................................44
    *6.5.2   Defining the Scope of Analysis of the Proposed Action* ..........................................44
      6.5.2.1     Connected Actions ..................................................................................45
      6.5.2.2     Cumulative Actions ................................................................................48
      6.5.2.3   Similar Actions ..........................................................................................49
  6.6     ALTERNATIVES DEVELOPMENT ..............................................................................49
    *6.6.1   Reasonable Alternatives* .........................................................................................49
      6.6.1.1     Developing Alternatives Under The Healthy Forests Restoration Act .....51
    *6.6.2     No Action Alternative* ..........................................................................................51
    *6.6.3   Alternatives Considered but Eliminated From Detailed Analysis*............................52
  6.7     AFFECTED ENVIRONMENT AND USE OF RELEVANT DATA .................................53
    *6.7.1   Affected Environment* .............................................................................................53
    *6.7.2   Use of Relevant Data* ..............................................................................................53
  6.8     ENVIRONMENTAL EFFECTS .......................................................................................54
    *6.8.1   Effects Analysis* ......................................................................................................54
      6.8.1.1   Defining Environmental Effects ................................................................54
      6.8.1.2   Analyzing Effects ......................................................................................55
    *6.8.2   Direct and Indirect Effects* .....................................................................................56
    *6.8.3   Cumulative Effects* ..................................................................................................57
      6.8.3.1   Cumulative Effects Issues ..........................................................................57
      6.8.3.2   Geographic Scope of the Cumulative Effects Analysis ..............................58
      6.8.3.3   Timeframe of the Cumulative Effects Analysis ..........................................58
      6.8.3.4   Past, Present, and Reasonably Foreseeable Actions ...................................58
      6.8.3.5   Analyzing the Cumulative Effects ..............................................................59
    *6.8.4   Mitigation and Residual Effects* ..............................................................................61
  6.9     PUBLIC INVOLVEMENT AND RESPONDING TO COMMENTS..................................62
    *6.9.1   Involving and Notifying the Public*..........................................................................63
    *6.9.2   Comments*................................................................................................................65
      6.9.2.1   Substantive Comments ..............................................................................65
      6.9.2.2   Comment Response ...................................................................................66

**CHAPTER 7 — DETERMINING WHETHER AN EA OR EIS IS APPROPRIATE** .......................................69

  7.1     ACTIONS REQUIRING AN EA ......................................................................................69
  7.2     ACTIONS REQUIRING AN EIS ......................................................................................69
  7.3     SIGNIFICANCE...............................................................................................................70

**CHAPTER 8—PREPARING AN ENVIRONMENTAL ASSESSMENT** ...........................................75

  8.1     PREPARING TO WRITE AN ENVIRONMENTAL ASSESSMENT (EA).........................75
  8.2     PUBLIC INVOLVEMENT ...............................................................................................76
  8.3     EA FORMAT ...................................................................................................................77
    *8.3.1   Introduction* ...........................................................................................................77
    *8.3.2   Purpose and Need for Action and Decision to be Made* ...........................................77
    *8.3.3   Scoping and Issues* ..................................................................................................78

8.3.4    Proposed Action and Alternatives ................................................................................. 78
    8.3.4.1    Description of the Proposed Action ........................................................................ 78
    8.3.4.2    Alternatives in an EA ............................................................................................. 79
        8.3.4.2.1    Alternatives Considered but Eliminated from Detailed Analysis ...................... 80
    8.3.4.3    Conformance ........................................................................................................... 81
8.3.5    Affected Environment ...................................................................................................... 81
8.3.6    Environmental Effects ...................................................................................................... 81
8.3.7    Tribes, Individuals, Organizations, or Agencies Consulted ............................................ 82
8.3.8    List of Preparers .............................................................................................................. 82
8.4    DETERMINATION OF SIGNIFICANCE ............................................................................ 82
8.4.1    Significant Impacts -Transitioning from an EA to an EIS .............................................. 82
8.4.2    The Finding of No Significant Impact (FONSI) .............................................................. 83
8.5    THE DECISION RECORD ................................................................................................... 84
8.5.1    Documenting the Decision ............................................................................................... 84
8.5.2    Terminating the EA Process ............................................................................................. 86
8.6    IMPLEMENTATION ............................................................................................................ 86

CHAPTER 9—PREPARING AN ENVIRONMENTAL IMPACT STATEMENT ........................... 87

9.1    PREPARING TO WRITE AN EIS ....................................................................................... 87
9.1.1    Develop Preparation Plan ................................................................................................ 87
    9.1.1.1    Develop Strategy for Public Involvement and Interagency/Intergovernmental ... 88
    Coordination and Consultation .......................................................................................... 88
9.1.2    Publish the Notice of Intent ............................................................................................. 88
9.1.3    Scoping ............................................................................................................................. 89
9.2    EIS FORMAT ....................................................................................................................... 91
9.2.1    Cover Sheet ...................................................................................................................... 92
9.2.2    "Dear Reader" Letter ....................................................................................................... 92
9.2.3    Summary .......................................................................................................................... 92
9.2.4    Table of Contents ............................................................................................................ 92
9.2.5    Chapter 1—Introduction ................................................................................................. 93
9.2.6    Issues ................................................................................................................................ 93
9.2.7    Chapter 2—Proposed Action and Alternatives ............................................................... 93
    9.2.7.1    Reasonable Alternatives for an EIS ........................................................................ 94
    9.2.7.2    Features Common to All Alternatives ..................................................................... 94
    9.2.7.3    Agency Preferred Alternative ................................................................................. 95
9.2.8    Chapter 3—Affected Environment .................................................................................. 96
9.2.9    Chapter 4—Environmental Effects .................................................................................. 96
9.2.10   Chapter 5 - Consultation and Coordination .................................................................... 97
    9.2.10.1    Public Involvement and Scoping .......................................................................... 98
    9.2.10.2    List of Preparers .................................................................................................. 98
9.2.11   Other Material .................................................................................................................. 98
9.3    ISSUING THE DRAFT EIS .................................................................................................. 99
9.3.1    File with the EPA ............................................................................................................. 99
9.3.2    Notify the Public and Government Agencies of the Availability of the Draft EIS  fo r Review
            and Comment ............................................................................................................... 99
9.3.3    Distribute the Draft EIS ................................................................................................. 100
9.3.4    Public Meetings and Hearings ....................................................................................... 100
9.4    THE FINAL EIS ................................................................................................................. 101
9.4.1    Abbreviated Final EIS ................................................................................................... 101
9.4.2    Full Text Final EIS ........................................................................................................ 101
9.5    SUPPLEMENTS TO DRAFT AND FINAL EISs .............................................................. 101
9.6    ISSUING THE FINAL EIS ................................................................................................. 102
9.6.1    Comments Received Following Issue of the Final EIS .................................................. 102
9.7    ISSUING THE RECORD OF DECISION .......................................................................... 102
9.7.1    ROD Format ................................................................................................................... 103

9.8    TERMINATING THE EIS PROCESS ..........................................................................................104

**CHAPTER 10—MONITORING** .........................................................................................................**105**

10.1    PURPOSES OF AND REQUIREMENTS FOR MONITORING .........................................105
10.2    DEVELOPING A MONITORING PLAN OR STRATEGY ................................................106
10.3    IMPLEMENTING MONITORING ......................................................................................107

**CHAPTER 11—AGENCY REVIEW OF ENVIRONMENTAL IMPACT STATEMENTS** ...........**109**

11.1    OBTAINING COMMENTS ON YOUR EIS ........................................................................109
11.2    COMMENTING ON ANOTHER FEDERAL AGENCY'S EIS ..........................................109

**CHAPTER 12—COOPERATING AGENCIES, JOINT LEAD AGENCIES, AND ADVISORY
COMMITTEES** ..................................................................................................**111**

12.1    COOPERATING AGENCY STATUS IN DEVELOPMENT OF NEPA DOCUMENTS ....................111
    *12.1.1    When Another Agency is Cooperating in Preparation of a NEPA Analysis Document
        with the BLM as a Lead* ..........................................................................................*112*
    *12.1.2    When the BLM is Cooperating in Preparation of a NEPA Analysis Document
        With Another Agency as Lead* ...............................................................................*112*
    *12.1.3    Deciding Whether to be a Cooperating Agency* .....................................................*113*
    *12.1.4    Procedures for Working as a Cooperating Agency* ................................................*113*
12.2    JOINT LEAD AGENCIES IN DEVELOPMENT OF NEPA DOCUMENTS........................113
12.3    WORKING WITH ADVISORY COMMITTEES AND THE FEDERAL ADVISORY
    COMMITTEE ACT ..............................................................................................................114
    *12.3.1    Guidance for Meeting With Groups* ......................................................................*115*
    *12.3.2    Alternatives to Chartered Groups* .........................................................................*116*

**CHAPTER 13—ADMINISTRATIVE PROCEDURES** ...................................................................**117**

13.1    PUBLISHING NOTICES IN THE *FEDERAL REGISTER*.................................................117
    *13.1.1    Procedures for Publishing Notices in the Federal Register* ...................................*117*
        13.1.1.1    Publication Requirements...............................................................................118
        13.1.1.2    Typing and Format Requirements....................................................................119
        13.1.1.3    Submission Requirements................................................................................119
        13.1.1.4    Publication Date...............................................................................................120
13.2    PRINTING EISs ...................................................................................................................120
13.3    FILING EISs WITH THE EPA .............................................................................................120
    *13.3.1    Significance of EPA Publication Dates* .................................................................*121*
    *13.3.2    Procedures for Filing with the EPA* ......................................................................*121*
13.4    RECORDKEEPING PROCEDURES ...................................................................................122
        13.4.1    Environmental Documents and Supporting Records—The Administrative Record....................122
    *13.4.2    Other Environmental Records* ...............................................................................*123*
13.5    CONTRACTING NEPA WORK............................................................................................124

**CHAPTER 14—ADAPTIVE MANAGEMENT** ..............................................................................**127**

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

**GLOSSARY** ...................................................................................................**129**

**ACRONYMS** ...................................................................................................**137**

**APPENDIX 1**   SUPPLEMENTAL AUTHORITIES TO BE CONSIDERED........**139**

**APPENDIX 2**   USING CATEGORICAL EXCLUSIONS ESTABLISHED BY THE ENERGY POLICY ACT OF 2005 .............................................................................**141**

**APPENDIX 3**   DEPARTMENTAL CATEGORICAL EXCLUSIONS.................**145**

**APPENDIX 4**   BLM CATEGORICAL EXCLUSIONS ....................................**147**

**APPENDIX 5**   CATEGORICAL EXCLUSIONS: EXTRAORDINARY CIRCUMSTANCES ..........................**155**

**APPENDIX 6**   CATEGORICAL EXCLUSION DOCUMENTATION FORMAT WHEN USING CATEGORICAL EXCLUSIONS NOT ESTABLISHED BY STATUTE.................................**157**

**APPENDIX 7**   DOCUMENTATION REQUIREMENTS FOR HAZARDOUS FUELS ACTIONS

AND POST-FIRE REHABILITATION ACTIONS ........................................**159**

**APPENDIX 8**   WORKSHEET DETERMINATION OF NEPA ADEQUACY (DNA) .......................................**161**

**APPENDIX 9**   RECOMMENDED EA FORMAT.............................................**165**

**APPENDIX 10**  ITEMS TO INCLUDE IN THE ADMINISTRATIVE RECORD ...................................**167**

**APPENDIX 11**  FEDERAL REGISTER ILLUSTRATIONS ............................**169**

## FIGURES

FIGURE 1.1   NEPA SCREENING PROCESS.............................................................**5**

FIGURE 1.2   SCREENING FOR LAND USE PLAN CONFORMANCE ......................**7**

FIGURE 6.1   THE NEPA PROCESS .........................................................................**34**

FIGURE 6.2  DESIGN FEATURES AND MITIGATION MEASURES..........................**44**

FIGURE 8.1   EA PROCESS .....................................................................................**86**

FIGURE 9.1   THE EIS PROCESS .............................................................................**91**

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

This page intentionally left blank.

## HANDBOOK USER'S GUIDE

The purpose of this Bureau of Land Management (BLM) Manual Handbook (H-1790-1) is to help us comply with the National Environmental Policy Act (NEPA), the Council on Environmental Quality's (CEQ) NEPA regulations (40 CFR Parts 1500–1508) and the Department of the Interior NEPA manual.  "We" (BLM) have written it for use by "you," the reader involved in the NEPA process.  The "NEPA process" means all measures necessary for compliance with the requirements of the Purpose (section 2 of the Act) and the Congressional Declaration of National Environmental Policy (Title 1 of the Act).  Meeting our NEPA compliance responsibilities requires help from all levels of our agency, including decision-makers, program managers, specialists, interdisciplinary team members, and BLM contractors.

The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment (40 CFR 1500.1(c)).  Early chapters in this Handbook address the legal requirements and our analytical approach to complying with the NEPA.  We then explain content requirements of specific types of NEPA compliance documents.

Following the introductory material in Chapter 1, Chapters 2 through 5 address the procedural determinations of whether a NEPA analysis is necessary and, if so, the degree to which it may be already covered in an existing NEPA document.  Chapter 6 identifies the essential analytical elements that are common to NEPA analysis, regardless of whether you are preparing an Environmental Assessment or an Environmental Impact Statement.  Chapters 7 through 9 help you identify whether an Environmental Assessment or Environmental Impact Statement is needed, and describe the various sections of these documents.  The remaining Chapters 11 through 15 address monitoring, cooperating agencies, working with advisory committees, administrative procedures, and adaptive management.

A requirement to meet NEPA compliance is that we encourage and facilitate public involvement in decisions which affect the quality of the human environment (40 CFR 1500.2(d)).  Information relating to public participation in the NEPA process is contained primarily in Chapters 6, 8, 9, and 12.

To assist you in carrying out your NEPA responsibilities, this Handbook includes references to documents contained in the BLM NEPA Handbook Web Guide (Web Guide).  The Web Guide includes copies of official guidance, such as CEQ citations, and provides examples for your use in complying with the NEPA.  For example, an interdisciplinary team preparing an EIS with tribal or county cooperators can review a number of sample memorandums of understanding (MOUs) written to identify the responsibilities of cooperating agency status.  These MOUs serve as models, although they are not official guidance.  The Web Guide also contains excerpts of BLM NEPA documents.  Other materials include helpful ideas, tools, and techniques for making the NEPA process more efficient and effective and for adding clarity to the NEPA documents.  References to the Web Guide are shown in this Handbook in blue text.

TC - x

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

This page intentionally left blank.

# CHAPTER 1—NEPA BASICS

General
1.1  Introduction to the NEPA
1.2  Departmental Guidance and this Handbook
1.3  Documents Used to Meet NEPA Requirements
1.4  The NEPA Approach
1.5  Conformance with the Existing Land Use Plan
1.6  Consistency with Other Authorities

## GENERAL

This chapter provides an overview of the National Environmental Policy Act (NEPA) and related direction which is pertinent to the Bureau of Land Management (BLM) planning and decision-making process.

## 1.1  INTRODUCTION TO THE NEPA

The National Environmental Policy Act was passed by Congress in 1969 and signed into law on January 1, 1970.  This legislation established a landmark national environmental policy which, among other things, encourages environmental protection and informed decision-making.  It provides the means to carry out these goals by:

- mandating that every Federal agency prepare a detailed statement of the effects of "major Federal actions significantly affecting the quality of the human environment."

- establishing the need for agencies to consider alternatives to those actions.

- requiring the use of an interdisciplinary process in developing alternatives and analyzing environmental effects.

- requiring that each agency consult with and obtain comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved.

- requiring that detailed statements and the comments and views of the appropriate Federal, State, tribal, and local agencies be made available to the public.

> The stated purpose of the NEPA and the mission of the BLM are fully compatible.  Our mission is to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations.  This closely mirrors BLM's multiple use and sustained yield mandates under the Federal Land Policy and Management Act.  The NEPA declares that the Federal government's continuing policy is to create and maintain conditions under which people and nature can exist in productive harmony and fulfill the social, economic, and other requirements of present and future generations of Americans.

In addition to setting policy goals for environmental planning, the NEPA created the Council on Environmental Quality (CEQ), in the Executive Office of the President, to be the "caretaker" of the NEPA.  The CEQ issued final regulations for Implementing the Procedural Provisions of NEPA (40 CFR 1500–1508) in 1978 (revised in 1986), and added to them in 1981 with a guidance document titled "Forty Most Asked Questions Concerning CEQ's NEPA Regulations." The NEPA and the CEQ regulations establish procedures to ensure proper consideration of environmental concerns, but they do not dictate a particular result or decision.  The CEQ regulations also require that agencies "make diligent efforts to involve the public in preparing and implementing their NEPA procedures" (40 CFR 1506.6(a)).

## 1.2  DEPARTMENTAL GUIDANCE AND THIS BLM HANDBOOK

The Department of the Interior's (DOI) NEPA policy is found in the Departmental Manual (DM) Part 516.  Chapter 11 of the manual (516 DM 11) is specific to the BLM's management of the NEPA process. The DOI, through the Office of Environmental Policy and Compliance (OEPC), also continuously updates a series of environmental statement, review, and compliance memoranda, which further interpret DM Part 516.

This Handbook contains direction for use by BLM employees from all levels of our organization, including decision-makers, program managers, specialists, interdisciplinary team members, and any BLM contractors involved in the NEPA process. "We" (BLM) believe it will help "you" (the reader) help us in meeting the legal requirements of the NEPA.

For more information see the BLM Planning and NEPA Library Web page.

## 1.3  DOCUMENTS USED TO MEET NEPA REQUIREMENTS

The BLM uses various types of documents to meet our NEPA requirements.  Environmental analysis documents, which must be made available to the public, include environmental impact statements (EISs) and environmental assessments (EAs) (40 CFR 1506.6(b)).  If a proposed action will have a significant environmental impact, you must prepare an environmental impact statement (EIS) (40 CFR 1502.1).  The EIS process is initiated with publication of a notice of intent (NOI) and requires public scoping.  Draft EISs are made available for public review and comment, and final EISs include our responses to comments received.  You must document your decision on the action in a record of decision (ROD) (40 CFR 1505.2).

If it is unclear whether the action would have a significant effect, you prepare an environmental assessment (EA) (40 CFR 1508.9(a)).  If the analysis in an EA shows the action would not have a significant effect, a "Finding of No Significant Impact" (FONSI) documents that there is no need for an EIS (40 CFR 1508.13).

If the proposed action belongs to a category of actions that have no potential for significant environmental impacts, you may categorically exclude the action from analysis in an EA or EIS before deciding to implement it.  To categorically exclude an action, the proposed action must fit within the list of statutory, Departmental, or BLM categorical exclusions (CXs) (516 DM 2.3(A)).

The BLM NEPA procedures also provide for the use of existing NEPA analysis documents.  If a proposed action is adequately covered by an existing EIS or EA, then you may document a "Determination of NEPA Adequacy" (DNA) (516 DM 11.6).

> As NEPA analysis documents are not agency decisions, they are not subject to BLM administrative protest or appeal provisions.  However, a decision based on a CX, an EA and FONSI, or an EIS is an agency action and may be protested or appealed, regardless of the type of NEPA compliance documentation completed.

## 1.4   THE NEPA APPROACH

As described by the CEQ regulations, the NEPA "is our basic national charter for protection of the environment" (40 CFR 1500.1).  According to the regulations, "The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment" (40 CFR 1500.1(c)).  Analysis and disclosure of the effects of a proposed action and its alternatives are the underlying NEPA principles that move agencies toward achieving this goal.

Figure 1.1, "NEPA Screening Process," is a flow chart that shows our NEPA screening process. The NEPA process starts when the BLM has a proposal for action (see section **3.1, *Determining When NEPA Applies***).  The CEQ regulations require that the NEPA process begin and be "integrate[d] with other planning at the earliest possible time to ensure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts" (40 CFR 1501.2).

Several factors guide the timing of NEPA analysis and agency decision-making (40 CFR 1502.5 and 1506.1).  For example:

–   You must finish all of the steps necessary for completing the NEPA process prior to issuance of a formal decision, to enable you to make a well-informed decision (40 CFR 1505.1(d), 40 CFR 1506.1, 516 DM 1.2(D)).

–   You must not authorize any action that would limit the choice of alternatives being analyzed under the NEPA until the NEPA process is complete (40 CFR 1506.1).  However, this requirement does not apply to actions previously analyzed in a NEPA document that are proposed for implementation under an existing land use plan.  For instance, an existing plan will continue to guide the BLM's processing of site-specific permits on existing oil and gas leases.  Drilling permits, sundry notices, and similar authorizations will be allowed as long as the actions do not exceed limits that were delineated in the existing land use plan (LUP) and analyzed in the associated NEPA document.

4

You must prepare NEPA analyses using an interdisciplinary approach, and the disciplines of the preparers must be appropriate to the scope of the analysis and to the issues identified in the scoping process (40 CFR 1502.6).  The requirement for an interdisciplinary approach is met when preparer(s) consult with all appropriate sources for the analysis of affected resources.  This may include staff from other BLM offices or other Federal or non-Federal agencies, as needed, to provide a rational basis for decision-making.

The CEQ regulations require NEPA documents to be "concise, clear, and to the point" (40 CFR 1500.2(b), 1502.4).  Analyses must "focus on significant environmental issues and alternatives" and be useful to the decision-maker and the public (40 CFR 1500.1).  Discussions of impacts are to be proportionate to their significance (40 CFR 1502.2(b)).  Similarly, the description of the affected environment is to be no longer than is necessary to understand the effects of the alternatives (40 CFR 1502.15).  "Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail." (40 CFR 1500.1).

**Figure 1.1   NEPA Screening Process**



\* See Chapters 4 and 5 for documentation requirements.

## 1.5   CONFORMANCE WITH THE EXISTING LAND USE PLAN

All actions approved or authorized by the BLM must conform to the existing land use plan where one exists (43 CFR 1610.5-3, 516 DM 11.5).  Although it is not a NEPA requirement, the BLM includes within all its NEPA documents a statement about the conformance of the proposed action and alternatives with the existing land use plan (LUP).  The BLM's planning regulations state that the term "conformity" or "conformance" means that "… a resource management action shall be specifically provided for in the plan, or if not specifically mentioned, shall be clearly consistent with the terms, conditions, and decisions of the approved plan or amendment" (43 CFR 1601.0-5(b)).

A proposal for an action that has been clearly identified and provided for in the LUP would be considered to be in conformance with the plan.

If the LUP is silent about an activity, review the plan direction including the broad and programmatic goals and objectives.  In this evaluation, there are four possible conclusions:

1. the activity contributes to meeting plan goals and objectives and is not inconsistent with the plan, and hence it can be considered to be in conformance;
2. the proposal is not in conformance, but the proposal can be modified to be in conformance;
3. the proposal is not in conformance, but amendment of the LUP is warranted to allow the activity; or
4. the proposal is not in conformance, and the proposal does not warrant further consideration through an LUP amendment.

If you determine that the proposed action does not conform to the LUP, you may modify the proposal to conform, or consider a plan amendment to allow the action.  In the case of externally-generated proposals, working with the applicant before submission of a proposed action to suggest modifications to their initial proposal may result in conformance with the LUP.

When a proposal cannot be modified and does not warrant amendment of the LUP, drop the proposal.  (See **Figure 1.2,** *Screening for Land Use Plan Conformance*)*.*

**Figure 1.2   Screening for Land Use Plan Conformance**



## 1.6  CONSISTENCY WITH OTHER AUTHORITIES

In addition to the BLM's planning regulations related to LUP conformance, there are a number of other authorities, such as program-specific guidance and Executive Orders, for you to remember when considering an action.

We recommend that you document your compliance with other authorities at the same time that you document NEPA compliance.  These other authorities do not constitute NEPA requirements for analysis, but some contain specific direction about NEPA compliance. More generally, other authorities may be relevant during several steps of the NEPA process.  For example, other laws, regulations, and policies may be useful to consider in formulating the purpose and need for action (see section **6.2, *Purpose and Need***), identifying issues for analysis (see section **6.4, *Issues***), formulating alternatives (see section **6.6, *Alternatives Development***), identifying any regulatory thresholds (see section **6.8.3.5, *Analyzing the Cumulative Effects***), and developing the rationale for decision selection (see sections **8.5.1, *Documenting the Decision*** and **9.7.1, *ROD Format***).  In addition, other laws and regulations may factor into the determination of whether effects are significant (see section **7.3, *Significance***).

The list of supplemental authorities contained in **Appendix 1, *Supplemental Authorities to be Considered***, is not exhaustive and will change over time.  This list is not a checklist for NEPA compliance, but may be consulted when developing NEPA documents.  See section **6.4, *Issues*** for additional guidance.

# CHAPTER 2—ACTIONS EXEMPT FROM THE NEPA AND EMERGENCY ACTIONS

General
2.1   Congressionally Exempt Actions
2.2   Actions Mandated by Statute
2.3   Emergency Actions

## GENERAL

Some types of actions are or can be exempt from NEPA requirements.   However, the NEPA has broad-reaching applicability, and situations where actions are exempt are rare.  In an emergency, when action must be taken immediately, there are procedures for complying with the NEPA (see section **2.3, *Emergency Actions***).

Be aware that even if an action is exempt from the NEPA or if alternative arrangement procedures are used, you may need to analyze that action as part of a cumulative effects analysis for a future action (see section **6.8.3, *Cumulative Effects***).

## 2.1   CONGRESSIONALLY EXEMPT ACTIONS

Some actions are congressionally exempt from NEPA compliance.  This is uncommon and is applicable only on a case-by-case basis.  Review the relevant statutory language to determine the extent and scope of the action being exempted.  Any actions that are outside the scope of a statutory exemption would require appropriate NEPA analysis.  *An example of an action that is congressionally exempt from the NEPA is one where a law directs the BLM to take action, such as closing an area to a specific use, and the law states that the provisions of the NEPA do not apply.*

### 2.1.1   CERCLA

It is the position of the Department of Justice that the NEPA is not applicable to cleanups conducted pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. sections 9601 et seq. (CERCLA).  Requirements for environmental analysis and public participation during CERCLA cleanups are addressed in the CERCLA Handbook.  For further information regarding this issue, or how it may apply at a particular site, contact the Office of the Solicitor.

## 2.2   ACTIONS MANDATED BY STATUTE

If the BLM is required by law to take an action, the NEPA may not be triggered.  *For example, Public Law 105-167 mandates the BLM to exchange certain mineral interests.  In this situation, the NEPA would not apply because the law removes the BLM's decision-making discretion.*  Also, if there is a clear and unavoidable conflict between NEPA compliance and another statutory authority, NEPA compliance is not required.  *For example, if the timing of another statutory authority makes NEPA compliance impossible, the NEPA is not triggered.*

Be aware however, that some statutorily mandated actions do require NEPA analysis.  *For example, an Act may direct the BLM to lease a specific parcel of land, as described in the preceding example, yet require the BLM to comply with the provisions of the NEPA.*  We recommend that you consult with the Office of the Solicitor if there are potential conflicts between the NEPA and other statutory provisions.

## 2.3   EMERGENCY ACTIONS

In the event of an emergency situation, immediately take any action necessary to prevent or reduce risk to public health or safety, property, or important resources (516 DM 5.8). Thereafter, other than those actions that can be categorically excluded, the decision-maker must contact the BLM Washington Office, Division of Planning and Science Policy (WO-210) to outline subsequent actions.  The CEQ regulations (40 CFR 1506.11) provide that in an emergency "alternative arrangements" may be established to comply with NEPA.  Alternative arrangements do not waive the requirement to comply with NEPA, but establish an alternative means for compliance.

The CEQ regulations for alternative arrangements for dealing with such emergencies are limited to the actions necessary to control the immediate effects of the emergency.  Other portions of the action, follow-up actions, and related or connected actions remain subject to normal NEPA requirements, so you must complete appropriate NEPA analysis before these actions may be taken (40 CFR 1506.11).

The "alternative arrangements" take the place of an EIS and only apply to Federal actions with significant environmental impacts (see section **7.3,** *Significance*).  If the proposed action does not have significant environmental effects, then the alternative arrangements at 40 CFR 1506.11 do not apply.

If you anticipate the proposed emergency response activity will have significant environmental effects, we recommend that you assess whether an existing NEPA analysis has been prepared (e.g., implementing preexisting plans) or whether there is an applicable exemption.  *For example, certain Federal Emergency Management Agency (FEMA) response actions are exempt from the NEPA (see the NEPA Handbook Web Guide).*

### 2.3.1   Types of Emergency Actions

The following actions are typically considered emergency actions, provided they must immediately be taken to protect public health and safety or important resources:

- cleanup of a hazardous materials spill.
- wildland fire suppression activities related to ongoing wildland fires.
- emergency stabilization actions following wildland fires or other disasters.

Emergency stabilization actions that are not immediately needed to protect public health and safety or important resources must undergo normal NEPA procedures (40 CFR 1506.11). Generally, follow-up actions such as fire rehabilitation, abandoned mine land reclamation, or flood cleanup are not considered emergency actions.

### 2.3.2    Procedures for Emergency Actions

#### 2.3.2.1    Wildfire Suppression Actions

You must take immediate action to manage all wildfires consistent with land use and fire management plans.  The BLM Washington Office will consult with the OEPC on an annual basis to discuss anticipated fire suppression activities for the upcoming fire season and any changes in fire suppression standards and operating procedures.  The OEPC will consult with the CEQ, as appropriate. Prescribed fire projects are not considered wildfire suppression activities, and must undergo normal NEPA procedures (40 CFR 1506.11).

#### 2.3.2.2    Emergency Actions other than Wildfire Suppression

You must take immediate action to prevent or reduce risk to public health or safety or important resources (516 DM 5.8).  Thereafter, other than those actions that can be categorically excluded, you must contact the BLM Washington Office (WO-210) to outline subsequent actions. We recommend that you address the following factors when contacting WO-210 in the event of an emergency situation:

- nature and scope of the emergency.
- actions necessary to control the immediate effects of the emergency.
- potential adverse effects of the proposed action.
- components of the NEPA process that can be followed and that provide value to decision-making (e.g., coordination with affected agencies and the public).
- duration of the emergency.
- potential mitigation measures.

The BLM WO-210 will expedite the necessary consultation with the Office of the Solicitor, the OEPC, and the CEQ for those emergency actions anticipated to have significant environmental impacts.  Once alternative arrangements have been established, the CEQ will provide documentation describing the alternative arrangements and the considerations on which they are based.  During any follow-up activities, the OEPC and the BLM will jointly be responsible for consulting with the CEQ.  If the BLM action is not expected to have significant environmental impacts, contact the BLM WO-210.  The BLM WO-210 will consult with the OEPC to consider any appropriate action.  The Web Guide provides WO-210 contact information, including non-duty hour procedures.  Also, see 516 DM 5.8 for guidance on emergencies.

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

When time permits, actions that are not categorically excluded and that are not expected to have significant environmental effects can be analyzed with an environmental assessment.  We recommend that you use the techniques described throughout this handbook to prepare a focused, concise, and timely environmental assessment:

- narrowly focus the purpose and need.
- limit alternatives to those that would achieve the purpose and need.
- if there is consensus about the proposed action, do not analyze in detail the no action or other action alternatives.
- tailor public involvement and use informal scoping (telephone calls, on-site discussions with affected parties) to identify issues of concern.
- limit the analysis to issues of concern.

# CHAPTER 3—ACTIONS REQUIRING NEPA COMPLIANCE

General
3.1   Determining When the NEPA Applies
3.2   Proposals Originating Within the BLM
3.3   Proposals Submitted to the BLM by Other Entities

## GENERAL

The NEPA process is initiated when a proposal for Federal action exists. The sections of this chapter discuss when the NEPA applies for various types of proposals that the BLM considers.

## 3.1   DETERMINING WHEN THE NEPA APPLIES

A proposal for Federal action triggers the NEPA.  The CEQ regulations define major Federal actions to include adoption of official policy (that is, rules and regulations), adoption of formal plans, adoption of programs, and approval of specific projects (40 CFR 1508.18).  The NEPA process is initiated when a proposal has been developed by, or submitted to the BLM. Identification of existing conditions and of possible actions does not trigger the NEPA.

---

A BLM proposal is a Federal action when: (1) we have a goal and are actively preparing to make a decision on one or more alternative means of accomplishing that goal (40 CFR 1508.23); (2) the proposed action and effects are subject to BLM control and responsibility (40 CFR 1508.18); (3) the action has effects that can be meaningfully evaluated (40 CFR 1508.23); and (4) effects of the proposed action are related to the natural and physical environment, and the relationship of people with that environment (40 CFR 1508.8; 40 CFR 1508.14).

---

As a Federal agency, the BLM must meet NEPA requirements whenever it is the BLM's decision that would result in an effect on the human environment, even when the effect would be beneficial and regardless of who proposes the action or where it would take place (40 CFR 1508.18).

## 3.2   PROPOSALS ORIGINATING WITHIN THE BLM

The BLM develops land use plans and proposes or approves actions to implement those plans. The BLM land use plans (LUP) require preparation of an EIS.  Amendments of LUPs require an EA or EIS.  The BLM's Land Use Planning Handbook (H-1601-1) provides additional guidance for complying with the NEPA for planning actions and implementation actions.  Examples of implementation actions are construction of trails; timber sales; fuels reduction projects; and development of camping sites.  Implementation actions require preparation of an EA or EIS, unless the action can be categorically excluded (see **section 4.2.1, *Identifying Potential Categorical Exclusions***).

> Internal BLM projects are held to the same NEPA analysis requirements as externally-generated projects.  It is important not to overlook the analysis requirements of any BLM-initiated projects, including such relatively low-impact actions as approving a buried powerline in a previously disturbed area or installing a wildlife guzzler.

### 3.2.1    Policies and Rulemaking

Federal actions include "Adoption of official policy, such as rules, regulations, and interpretations …" (40 CFR 1508.18(b)(1)).  When we propose a policy, we must evaluate it to determine whether it is a major Federal action significantly affecting the quality of the human environment, and thus triggers the need to prepare an EIS (40 CFR 1502.4(b)).  This evaluation involves a three part test to determine whether the following apply: the action must (1) be federally approved or conducted, (2) major, and (3) have a significant environmental impact.  However, it is not always as clear whether a proposed policy will affect the human environment.  The BLM must evaluate if the proposed action would authorize any activity or commit any resources, thus affecting the human environment (40 CFR 1508.18).

Adoption of official policy of an administrative, financial, legal, technical or procedural nature is often too broad, speculative, or conjectural to allow for a meaningful analysis.  Such actions may be categorically excluded (see **Appendix 3, *Departmental Categorical Exclusions*, CX #1.10**).  *An example of a categorically excluded procedural action is the BLM's proposed revision of our Departmental NEPA Manual chapter (516 DM chapter 11; Federal Register, January 25, 2006).*

Departmental policy requires that all rulemaking documents be published in the Federal Register for public comment, and that the notice include a Record of Compliance with a statement whether the proposed policy would or would not constitute a major Federal action significantly affecting the quality of the human environment (318 DM 4).  This statement may be supported by:
- an EIS;
- an EA and FONSI;
- an explanation that the action is categorically excluded; or
- an explanation that the action does not constitute a major Federal action significantly affecting the quality of the human environment, and a detailed statement under the National Environmental Policy Act of 1969 is not required.

*An example of rulemaking that required preparation of an EIS is revision to our grazing regulations is found at 43 CFR part 4100 (Federal Register, December 8, 2003 and July 12, 2006).*

### 3.2.2   Land Use Plan (LUP) Development

Sections 201 and 202 of the Federal Land Policy and Management Act of 1976 (FLPMA, 43 U.S.C. 1711-1712) and regulations in 43 CFR part 1600 establish BLM land use planning requirements.  The BLM LUPs are designed to provide guidance for future management actions and the development of subsequent, more detailed and limited-scope plans for resources and uses.  The BLM Land Use Planning Handbook (H-1601-1) provides supplemental guidance for preparing, revising, amending and maintaining LUPs.  Land use plans include both resource management plans (RMPs) and management framework plans (MFPs).

Development of a new plan (including replacement of a MFP with an RMP) requires preparation of an EIS, as does revision of an existing LUP (43 CFR 1601.0-6).  An existing plan may be amended to make changes in the terms, conditions and decision of an approved plan.  The amendment process is tailored to the anticipated level of public interest and potential for significant impacts, and requires preparation of an EA or EIS.  *An example of an EA-level LUP amendment is to establish or adjust a herd management area on public lands used by wild horses, in accordance with the Wild Free-Roaming Horse and Burro Act of 1971.*  Actions to maintain LUPs usually may be categorically excluded (see section **4.2.1,** *Identifying Potential Categorical Exclusions*).

### 3.3   PROPOSALS SUBMITTED TO THE BLM BY OTHER ENTITIES

Other entities who submit proposals include applicants for use or development of resources on lands administered by the BLM.  Other entities include non-Federal organizations and individuals, other Federal, State and local agencies, and tribal entities.  As part of considering a proposal submitted to the BLM by others, the decision-maker must determine if it is in conformance with the LUP (43 CFR 1610.5-3, 516 DM 11.5) and what level or type of NEPA documentation is required (see section **1.3** *Documents Used to Meet NEPA Requirements*).  The following are some examples of proposals from outside the BLM:

- *applications for a permit to drill, a special recreation permit, a right-of-way grant, or a grazing authorization*
- *a proposal by the Animal and Plant Health Inspection Service to control grasshoppers on lands administered by the BLM.*
- *a proposal from a State wildlife agency for the BLM to cooperate in restoring wildlife habitat.*

### 3.3.1   Proposals for the BLM to Fund Actions

Whenever the BLM receives a proposal to fund projects on public lands that we manage, the NEPA is triggered.  Occasionally, the BLM has funds to distribute to non-Federal entities to perform work on lands not administered by the BLM.  If the BLM exercises control over the implementation of the action such that the effect can be meaningfully evaluated, NEPA analysis is required.  If the BLM distributes the funds according to a predetermined formula or through a State clearing house for subsequent distribution to projects not individually identified, then the NEPA is not triggered.

*For example, the BLM has a cooperative agreement with a State agency to fund fuel reduction projects on private or State lands.  If the cooperative agreement describes the criteria to select the projects but leaves the specifics of project selection to the State agency, then the NEPA is not triggered.  On the other hand, if the BLM is making a decision to fund or not fund a specific project on lands not administered by the BLM, then NEPA is triggered.*

### 3.3.2    Proposals Involving Mineral Estate

Where the BLM manages both surface resources and subsurface resources, any proposal to develop locatable or leaseable mineral resources triggers the NEPA. Where the BLM does not manage both surface and subsurface resources (split estate), whether or not a proposal requires NEPA compliance depends on the specific situation.

–    Proposals where the BLM manages the subsurface resources and another Federal agency manages the surface.  The NEPA is triggered by a proposal to develop the subsurface resource. The BLM must establish a cooperating agency relationship with the other Federal agency (see section **12.1, *Cooperating Agency Status in Development of NEPA Analysis Documents*)**.

–    Proposals where the BLM manages the subsurface resources and the surface is non-Federal. On split estate lands where the reserved Federal minerals are open to leasing or location (location is the act of staking a mining claim under the General Mining Law), the NEPA is triggered by an operator or mining claimant's proposal to explore for or develop the subsurface resource.  The BLM is responsible for NEPA compliance, and you must document effects on surface and subsurface resources (40 CFR 1508.8).  An exception to this policy refers to Stock Raising Homestead Act lands and applies only when the surface owner and the mining claimant are the same party (IM 2005-114; 43 CFR 3809).

–    Proposals where the BLM manages the surface and the subsurface is non-Federal.  As with any proposal, the NEPA is triggered by a request for the BLM to authorize surface disturbance. *For example, the BLM is responsible for documenting NEPA compliance for an access road right-of-way application, regardless of the use for which the access is requested.*

# CHAPTER 4—CATEGORICAL EXCLUSIONS

General
4.1   Categorical Exclusions Established by the Energy Policy Act
4.2   Categorical Exclusions Established by the Department of the Interior or the BLM

## GENERAL

Categorical exclusions (CXs) are categories of actions that Federal agencies have determined do not have a significant effect on the quality of the human environment (individually or cumulatively) and for which, therefore, neither an EA nor an EIS is required (40 CFR 1508.4). A CX is a form of NEPA compliance, without the analysis that occurs in an EA or an EIS. It is not an exemption from the NEPA.

When using CXs, other procedural requirements may still apply: for example, tribal consultation, and consultation under the National Historic Preservation Act and the Endangered Species Act.

> You are encouraged to apply categorical exclusions, where appropriate, because they speed NEPA compliance (40 CFR 1500.5(k).

While use of a CX is not subject to protest or appeal, a decision on the action being taken may be subject to protest and appeal. Consult program-specific guidance and include applicable protest and appeal provisions with the documentation of the decision on the action.  See the NEPA Handbook Web Guide for program-specific protest and appeal information.

If there is high public interest in an action that will be categorically excluded, you may elect to involve the public (for example, through notification or scoping).  Public involvement may be valuable in determining whether extraordinary circumstances apply. There may be program-specific guidance for public notification of the decision.  Even if there is no program-specific guidance, you may elect to provide public notification of a decision based on a CX, depending on the public interest in the action.

Though not required, you may elect to prepare an EA for proposed actions otherwise excluded when the decision-maker believes that an EA would be helpful in planning or decision-making (40 CFR 1501.3 and 516 DM 3.2(B)).  We recommend that you include in the NEPA document the rationale for completing an EA when a CX could be used.

Guidance for the use of CXs differs for some specific CXs as described below.

## 4.1  CATEGORICAL EXCLUSIONS ESTABLISHED BY THE ENERGY POLICY ACT

Section 390 of the Energy Policy Act of 2005 established five statutory CXs that apply only to oil and gas exploration and development pursuant to the Mineral Leasing Act.  The CXs do not apply to geothermal actions.  These CXs are listed in **Appendix 2, *Using Categorical Exclusions Established by the Energy Policy Act of 2005.***

The decision-maker must include in the well file or case file a brief rationale as to why one or more Energy Act CXs apply.  No other documentation for application of Energy Act CXs is required. These CXs are different in application from the Departmental CXs and the BLM non-Energy Act CXs. Energy Policy Act CXs do not require review for extraordinary circumstances. This is because these CXs are established by statute, and their application is governed by that statute. However, other procedural requirements still apply, such as consultation under the Endangered Species Act and National Historic Preservation Act.

Issue a decision document for the proposed activity.  Apply environmental best management practices (BMPs) and other suitable mitigation measures to permit approvals in accordance with current national policy. Best Management Practices or conditions of approval can be implemented with a CX and do not require additional NEPA documentation.

Detailed guidance for using these statutory CXs is described in **Appendix 2, *Using Categorical Exclusions Established by the Energy Policy Act 2005***.

## 4.2.  CATEGORICAL EXCLUSIONS ESTABLISHED BY THE DEPARTMENT OF THE INTERIOR OR THE BLM

This section outlines procedures for using categorical exclusions established by the Department of the Interior or the BLM in accordance with CEQ regulations (40 CFR 1508.4).

### 4.2.1    Identifying Potential Categorical Exclusions

Verify that the proposed action fits within one of the Departmental CXs (**Appendix 3, *Departmental Categorical Exclusions***) or a BLM CX (**Appendix 4, *BLM Categorical Exclusions)***.  Both the Departmental and BLM lists of CXs need to be reviewed to determine if the proposed action falls into one of the listed categories, as the two lists are not the same.

Some proposed actions may fit within more than one CX.  In determining the appropriate CX to use, select the CX that most closely matches the objectives of the proposed action and is the most specific.

Several CXs include acreage limitations (**Appendix 3, *Departmental Categorical Exclusions*** and **Appendix 4, *BLM Categorical Exclusions)***.  Where multiple treatments are proposed, for instance, consider the total area treated, rather than adding together overlapping acreage of different treatments.  *For example, the BLM CX for vegetation treatment (see **Appendix 4, BLM Categorical Exclusions**) includes an acreage limitation of 1000 acres for vegetation management projects other than prescribed fire.  A proposed action of invasive plant removal on 600 acres, followed by mechanical cutting on 500 overlapping acres does not exceed the 1000-acre limitation. If the mechanical cutting were proposed on 500 acres that did not overlap with the 600 acres of invasive plant removal, the proposed action would exceed the 1000-acre limitation.*

### 4.2.2    Determining if an Extraordinary Circumstance Precludes Use of a Categorical Exclusion

Extraordinary circumstances preclude the use of a Departmental or BLM CX.  Extraordinary circumstances are those circumstances for which the Department has determined that further environmental analysis is required for an action, and therefore an EA or EIS must be prepared (516 DM 2.3(A)(3)).  All categorically excluded actions must be subjected to sufficient review to determine if any of the extraordinary circumstances apply (see **Appendix 5,** *Categorical Exclusions: Extraordinary Circumstances*).

If any extraordinary circumstances apply, an EA or EIS must be prepared (516 DM 2.3(A)(3)). While there is no requirement for an interdisciplinary process or public involvement when reviewing whether extraordinary circumstances apply, the decision-maker may choose to do so.

If any of the extraordinary circumstances apply to the proposed action, determine whether the proposal can be modified to alleviate or resolve the circumstances that are considered extraordinary.  If this can be done, and if applicable, the proponent agrees to the change, then the proposed action may be modified and categorically excluded.  If the proposed action cannot be modified or the proponent refuses to accept a proposed change, prepare an EA or EIS.  If an extraordinary circumstance indicates there are significant effects, then an EIS must be prepared (516 DM 4) (see section **7.2,** *Actions Requiring an EIS*).

Some actions may require considerable review to determine whether any extraordinary circumstances apply. *For example, a significant impact on a threatened or endangered species is an extraordinary circumstance* (see **Appendix 5,** *Categorical Exclusions: Extraordinary Circumstances*)*. It might be readily determined that an action would have some effect on a threatened or endangered species (which would not necessarily constitute an extraordinary circumstance). Determining whether that effect would be significant might require considerable review.* If there is uncertainty about whether one or more of the extraordinary circumstances apply, we recommend that you prepare an EA to determine whether an EIS is required.

If none of the extraordinary circumstances apply to the proposed action (or modified action), then it may be categorically excluded.

### 4.2.3    Documentation Requirements

#### 4.2.3.1    Documentation Requirements When Using Hazardous Fuels and Post-Fire Rehabilitation CXs

Categorical exclusions for hazardous fuels and post-fire rehabilitation (see **Appendix 3,** *Departmental Categorical Exclusions***, #1.12 and #1.13**) have specific documentation requirements. The OEPC requires you to prepare a specific memorandum documenting the use of these two categorical exclusions and documenting the decision to implement the proposed project (DM ESM 03-2).  The documentation must follow the template provided in **Appendix 7,** *Documentation Requirements for Hazardous Fuels Actions and Post-Fire Rehabilitation Actions*.  You must include this document in the case or project file.

**4.2.3.2      Documentation Requirements When Using CXs Not Established by Statute**

For most actions that are categorically excluded, we recommend that you document which categorical exclusion applies. Documentation would often not be necessary for:

- Actions that have no environmental effect (for example, personnel actions (516 DM 2, Appendix 1 (1.1)) or routine financial transactions (516 DM 2 Appendix 1, (1.3))).
- Actions that have negligible environmental effect (for example, nondestructive data collection (516 DM 2, Appendix 1 (1.6)) or installation of routine signs and markers (516 DM 11.9 (G.2))).  The NEPA Handbook Web Guide provides additional examples and discussion.

If you document which categorical exclusion applies, you must use the form provided in **Appendix 6**, *Categorical Exclusion Documentation Format When Using Categorical Exclusions Not Established by Statute*. This form must be included in the case or project file. This form does not constitute a decision document, and you must issue a decision document that meets program specific guidance.

# CHAPTER 5—USING EXISTING ENVIRONMENTAL ANALYSES

General
5.1  Determination of NEPA Adequacy
5.2  Incorporation by Reference and Tiering
5.3  Supplementing an EIS
5.4  Adopting Another Agency's NEPA Analyses

## GENERAL

You may use existing environmental analyses to analyze effects associated with a proposed action, when doing so would build on work that has already been done, avoid redundancy, and provide a coherent and logical record of the analytical and decision-making process.

Address the following questions before using existing environmental analyses:

- Have any relevant environmental analyses related to the proposed action been prepared (for example, LUP/EIS, programmatic EIS)?

- Who prepared or cooperated in the preparation of the analyses (i.e., the BLM or another agency)?

- Do any of the existing analyses fully analyze the proposed actions, alternatives, and effects?

- Are there new circumstances or information that have arisen since the original analysis was conducted?

The answers to these questions will determine the degree to which you might rely on the existing NEPA analyses.  Use of existing analyses may range from considering them as the basis for decision-making (following a Determination of NEPA Adequacy (DNA) or adoption of another agency's NEPA analysis); using components of them (through tiering or incorporation by reference); or supplementing them with new analysis.

## 5.1   DETERMINATION OF NEPA ADEQUACY

> A **Determination of NEPA Adequacy** confirms that an action is adequately analyzed in existing NEPA document(s) and is in conformance with the land use plan.

Not all new proposed actions will require new environmental analysis.  In some instances an existing environmental analysis document may be relied upon in its entirety, and new NEPA analysis will not be necessary (516 DM 11.6).  The following are examples of some of the typical situations in which an existing environmental analysis might be relied upon in its entirety.

− *An applicant requests a special recreation permit for a 4-wheel vehicle race on an established route, which is analyzed in an EA, selected in a decision document, and implemented.  Later, another applicant requests a special recreation permit for a motorcycle race on the same route. Review the existing EA to determine if it adequately addresses this similar action and if new information and resource concerns have arisen.*

− *A proposed action for a landscape-scale timber harvest project is analyzed in an EIS and selected in a ROD.  For implementation of a subsequent individual timber sale developed consistent with the ROD, review the EIS to determine if its analysis adequately addresses the specific effects of the individual timber sale.*

You may also use the DNA to evaluate new circumstances or information prior to issuance of a decision to determine whether you need to prepare a new or supplemental analysis (see section **5.3,** *Supplementing an EIS*).  For example:

*A proposed action to construct a road is analyzed in an EIS, but a decision is delayed for several years until funding becomes available.  Before reaching a decision, review the existing EIS to determine if it is still adequate in light of new information and resource concerns that may have arisen in the intervening years.*

To determine if existing documents are adequate, identify and review each relevant environmental document, as described below.

### 5.1.1   Identifying Existing Environmental Documents

A new proposed action may rely on a single or multiple existing NEPA documents. The NEPA documents that may be relevant include:

- EISs associated with BLM Resource Management Plans.
- EISs or EAs associated with Resource Management Plan Amendments.
- EISs or EAs on BLM programmatic actions.
- EISs or EAs associated with BLM activity plans, projects, or permit approval actions.
- EISs or EAs prepared by other agencies, including those on programmatic, land use, and activity or project-specific plans or actions, with the BLM as a cooperating agency.
- EISs or EAs prepared by other agencies without the BLM as a cooperating agency.

If the existing document is an EIS or EA prepared by another agency, the BLM must adopt the EIS or EA in order to use it for NEPA compliance.  Follow the procedures for adoption rather than a DNA (see section **5.4, *Adopting Another Agency's NEPA Analyses***).

### 5.1.2   Reviewing Existing Environmental Documents

Review existing environmental documents and answer the following questions to determine whether they adequately cover a proposed action currently under consideration:

- Is the new proposed action a feature of, or essentially similar to, an alternative analyzed in the existing NEPA document(s)?  Is the project within the same analysis area, or if the project location is different, are the geographic and resource conditions sufficiently similar to those analyzed in the existing NEPA document(s)? If there are differences, can you explain why they are not substantial?

- Is the range of alternatives analyzed in the existing NEPA document(s) appropriate with respect to the new proposed action, given current environmental concerns, interests, and resource values?

- Is the existing analysis valid in light of any new information or circumstances (such as rangeland health standard assessments, recent endangered species listings, updated lists of BLM-sensitive species)?  Can you reasonably conclude that new information and new circumstances would not substantially change the analysis of the new proposed action?

- Are the direct, indirect, and cumulative effects that would result from implementation of the new proposed action similar (both quantitatively and qualitatively) to those analyzed in the existing NEPA document?

We recommend that your answers be substantive and detailed and contain specific citations to the existing EA or EIS (see section **5.1.3, *Document the Review***). If you answer "yes" to all of the above questions, additional analysis will not be necessary. If you answer "no" to any of the above questions, a new EA or EIS must be prepared (516 DM 11.6). However, it may still be appropriate to tier to or incorporate by reference from the existing EA or EIS or supplement the existing EIS (provided that the Federal action has not yet been implemented).

In addition to answering the above questions, evaluate whether the public involvement and interagency review associated with existing EAs or EISs are adequate for the new proposed action.  In general, where the new proposed action has not already been discussed during public involvement for the existing EA or EIS, some additional public involvement for the new proposed action will be necessary.  For example,

> *In the example above of a permit for a motorcycle race relying on the existing EA prepared for a 4-wheel vehicle race on the same route, provide some additional public involvement prior a decision on the permit, unless the public involvement for the EA specifically discussed the motorcycle race.*

*In the example above of a timber sale relying on the existing EIS for a landscape-scale timber harvest project, provide some additional public involvement prior a decision on the timber sale, unless the public involvement for the EIS specifically described the individual timber sale.*

*In the example above of a decision on road construction delayed after preparation of an EIS, additional public involvement may or may not be necessary depending on the new information or resource concerns that may have arisen.  Evaluate whether additional public involvement would assist in determining whether the existing EIS is still adequate for the action.*

If you conclude that additional public involvement is necessary, the type of public involvement is at the discretion of the decision-maker.  Public involvement may include any of the following: external scoping, public notification before or during your review of the existing EA or EIS, public meetings, or public notification or review of a completed DNA Worksheet (see section **5.1.3,** *Document the Review*).

Some actions may be appropriate to implement with either a DNA or CX.  When the new proposed action is clearly a feature of an action analyzed in an existing NEPA document and the existing analysis remains valid, a DNA would generally be preferable to using a CX, because a DNA would rely on a NEPA analysis to support decision making.

### 5.1.3   Document the Review

The DNA worksheet is not itself a NEPA document.  The DNA worksheet documents the review to determine whether the existing NEPA documents can satisfy the NEPA requirements for the proposed action currently under consideration. The DNA worksheet can be found in **Appendix 8,** *Worksheet [for] Determination of NEPA Adequacy (DNA)*.

When relying on an existing environmental analysis for a new proposed action, we recommend that you document the review using the DNA worksheet.

When evaluating new circumstances or information prior to issuance of a decision, as described in section **5.1,** *Determination of NEPA Adequacy*, you may document your review using the DNA worksheet or in other documents, such as decision documentation or responses to comments.  The Web Guide contains examples of completed DNA worksheets.

### 5.1.4    FONSIs, Decisions, Protests, and Appeals

If the new proposed action is a feature of the selected alternative analyzed in an existing EA, you do not need to prepare a new FONSI because the existing FONSI already made the finding that the selected alternative would have no significant effects.  However, you must prepare a new FONSI before reaching a decision if the new proposed action is:

1.  essentially similar to, but not specifically a feature of, the selected alternative
2.  a feature of, or essentially similar to, an alternative that was analyzed in the EA or EIS, but was not selected.

Be sure to evaluate whether the new FONSI must be made available for public review before reaching a decision (see section **8.4.2, *The Finding of No Significant Impact***).

The DNA worksheet is not a decision document.  For a new action for which a DNA has been prepared, you usually must prepare decision documentation consistent with program-specific guidance.

There may be program-specific guidance for public notification of decisions.  Even if there is no program-specific guidance, you may elect to provide public notification of a decision based on a DNA, depending on the public interest in the action and the public involvement that was provided for the existing NEPA analysis.

The signed conclusion in the DNA worksheet is an interim step in the BLM's internal review process and does not constitute an appealable decision.  The decision on the action being implemented may be subject to protest or appeal under 43 CFR Part 4 and program-specific regulations.  See the Web Guide for examples of DNA-level decisions.

## 5.2  INCORPORATION BY REFERENCE AND TIERING

Incorporation by reference and tiering provide opportunities to reduce paperwork and redundant analysis in the NEPA process.  When incorporating by reference, you refer to other available documents that cover similar issues, effects and/or resources considered in the NEPA analysis you are currently preparing.  Incorporation by reference allows you to briefly summarize the relevant portions of these other documents rather than repeat them.

Tiering is a form of incorporation by reference that refers to previous EAs or EISs.  Incorporation by reference is a necessary step in tiering, but tiering is not the same as incorporation by reference.  Tiering allows you to narrow the scope of the subsequent analysis, and focus on issues that are ripe for decision-making, while incorporation by reference does not.  You may only tier to EAs or EISs, whereas you may incorporate by reference from any type of document.

### 5.2.1   Incorporation by Reference

The CEQ regulations direct that:

> Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. The incorporated material shall be cited in the statement and its content briefly described. No material may be incorporated by reference unless it is reasonably available for inspection by potentially interested parties within the time allowed for comment. Material based on proprietary data which is itself not available for review and comment shall not be incorporated by reference (40 CFR 1502.21).

Incorporation by reference is useful in preparing both EAs and EISs.  It involves two steps: citation and summarization.

1.  **Cite** the source of the incorporated material.  Give the name of the document and page numbers where the incorporated material can be found.  Make this citation as specific as possible so there is no ambiguity for the reader about what material is being incorporated. If unpublished, state where cited material is available.

2.  **Summarize** the incorporated material.  Briefly describe the content of the incorporated material and place it in the context of the NEPA document at hand.  For example, if analysis is incorporated by reference from one NEPA document into another, summarize the previous analysis, and explain what you conclude based on that previous analysis and how it relates to the action in question.  The summary of the incorporated material must be sufficient to allow the decision-maker and other readers to follow the analysis and arrive at a conclusion.

If a document incorporated by reference is central to the analysis in the EIS, circulate the document for comment as part of the draft.  For example, circulate incorporated material with the draft EIS if it provides the bulk of the analysis, or it addresses effects which are highly controversial, or if it is likely to provide a basis for the decision (see section **9.7.1, *ROD Format***).  In such instances, it may be more appropriate to attach the material as an appendix rather than incorporate it by reference.

Any material may be incorporated by reference, including non-NEPA documents, as long as the material is reasonably available for public inspection.  There are many ways to make incorporated material available for public inspection, such as mailing the material upon request or posting the material on the Internet.  At a minimum, incorporated material must be available for inspection in the applicable BLM office.  If the material is not or cannot be made reasonably available, it cannot be incorporated by reference.  For example, privileged data that are not readily available (such as some seismic data, company financial data, cultural inventories) may be referenced, but not incorporated by reference.  Instead, summarize the information as fully as possible with mention that the privileged information is not available for public review.

In addition, other material may be simply referenced in a NEPA document, without being incorporated by reference.  Without following the above procedures for incorporation by reference, such material would not be made part of the NEPA document. It may be appropriate to simply reference material when it provides additional information for the reader, but is not essential to the analysis. If such referenced material is otherwise reasonably available (such as published material including books or journal or newspaper articles), you do not need to make it available for inspection at the BLM office.  If any such material is essential to the analysis in the NEPA document, incorporate it by reference as described above.  See the Web Guide for an example of incorporation by reference.

## 5.2.2   Tiering

Tiering is using the coverage of general matters in broader NEPA documents in subsequent, narrower NEPA documents (40 CFR 1508.28, 40 CFR 1502.20).  This allows the tiered NEPA document to narrow the range of alternatives and concentrate solely on the issues not already addressed.  Tiering is appropriate when the analysis for the proposed action will be a more site-specific or project-specific refinement or extension of the existing NEPA document.

Before you tier to a NEPA document, evaluate the broader NEPA document to determine if it sufficiently analyzed site-specific effects and considered the current proposed action.  If so, a DNA will be more appropriate than a subsequent, tiered NEPA document (see section **5.1, *Determination of NEPA Adequacy***).

When preparing a tiered NEPA document:

1. state that it is tiered to another NEPA document;
2. describe the NEPA document to which it is tiered; and
3. incorporate by reference the relevant portions of the NEPA document to which it is tiered (cite and summarize, as described in section **5.2.1, *Incorporation by Reference***).

You may tier to a NEPA document for a broader action when the narrower action is clearly consistent with the decision associated with the broader action.  In the tiered document, you do not need to reexamine alternatives analyzed in the broader document.  Focus the tiered document on those issues and mitigation measures specifically relevant to the narrower action but not analyzed in sufficient detail in the broader document.

Tiering can be particularly useful in the context of the cumulative impact analysis.  A programmatic EIS will often analyze the typical effects anticipated as a result of the individual actions that make up a program, as well as the total effects of the overall program.  An EA prepared in support of an individual action can be tiered to the programmatic EIS.  You may prepare an EA for an action with significant effects, whether direct, indirect or cumulative, if the EA is tiered to a broader EIS which fully analyzed those significant effects. Tiering to the programmatic EIS would allow the preparation of an EA and FONSI for the individual action, so long as the remaining effects of the individual action are not significant.  If there are new circumstances or information that would result in significant effects of an individual action not considered in the EIS, tiering to the EIS cannot provide the necessary analysis to support a FONSI for the individual action (see sections **7.1, *Actions Requiring an EA***, and **8.4.2, *The Finding of No Significant Impact* (*FONSI*)**).

Note that in some instances, a broader EIS might fully analyze significant effects on some resources affected by the individual action, but not all resources. The tiered EA for the individual action need not re-analyze the effects on resources fully analyzed in the broader EIS, but may instead focus on the effects of the individual action not analyzed in the broader EIS. The FONSI for such an individual action could rely on the analysis in the broader EIS as well as the tiered EA, and would explain which parts of the EIS it is relying upon. An EIS would need to be prepared for the individual action only if there are significant effects that have not been analyzed in the broader EIS.

For example:

> *If an LUP EIS analyzed the effects of a typical individual juniper control project and the total effects of a juniper control program, an individual juniper control project implemented as part of that overall program would generally be expected to have no significant effects, beyond those already analyzed in the LUP EIS.*

In such instances, focus the EA on determining if, and how, any new circumstances or information would change the effects anticipated by the EIS. The EA in such instances may also consider mitigation of effects analyzed in the EA or already analyzed in the broader EIS, including reducing or avoiding effects that are not significant.

The following are examples of some of the typical situations in which tiering is appropriate.

– *LUP/EIS tiered to a programmatic EIS: tiering the analysis of a proposed grazing program in an LUP to the programmatic EIS for regulations for the fundamentals of rangeland health. Tiering to the programmatic EIS would allow the LUP EIS to exclude alternatives that would establish grazing at levels that would not achieve the fundamentals of rangeland health.*

– *Activity Plan NEPA document tiered to a LUP/EIS: tiering an allotment management plan EA to the analysis in the LUP/EIS that analyzed the effects of the livestock management objectives and management actions for the area. Tiering to the LUP EIS would allow the allotment management plan EA to exclude alternatives that would set grazing levels different than those established in the LUP EIS.*

– *Project-specific NEPA document tiered to Activity Plan NEPA: tiering an EA for building a fence to an allotment management plan EA. (Note that this action may sometimes be appropriate with a DNA, as described in Sec. 5.1.) If the allotment management plan decided to use fencing, as opposed to reducing grazing levels, to exclude cows from riparian areas, tiering to the allotment management plan EA would allow the fence EA to exclude alternatives that would reduce grazing levels to reduce riparian impacts.*

– *Project-specific NEPA document tiered to a LUP/EIS: in the absence of an allotment management plan, tiering an EA for building a fence to the general analysis of fencing in the grazing section of the LUP/EIS. (Note that this action may sometimes be appropriate with a DNA, as described in section **5.1, Determination of NEPA Adequacy**).*

## 5.3   SUPPLEMENTING AN EIS

"Supplementation" has a particular meaning in the NEPA context. The Supreme Court has explained that supplementation of an EIS is necessary only if there remains major Federal action to occur.  (See *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004)).  In the case of a land use plan, implementation of the Federal action is the signing of a Record of Decision. You must prepare a supplement to a draft or final EIS if, after circulation of a draft or final EIS but prior to implementation of the Federal action:

- you make substantial changes to the proposed action that are relevant to environmental concerns (40 CFR 1502.9(c)(1)(i));
- you add a new alternative that is outside the spectrum of alternatives already analyzed (see Question 29b,CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981*); or
- there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its effects (40 CFR 1502.9(c)(1)(ii)).

A supplemental EIS must provide a basis for rational decision-making and give the public and other agencies an opportunity to review and comment on the analysis of the changes or new information (40 CFR 1502.9(c)(4)).  Supplementing is used to meet the purposes of the NEPA as efficiently as possible, avoiding redundancy in the process.

Supplementation is a process applied only to draft and final EISs, not EAs. If you make changes to the proposed action; add an alternative outside the spectrum of those already analyzed; or if new circumstances or information arise that alters the validity of an EA analysis prior to the implementation of the Federal action, prepare a new EA.

### 5.3.1   When Supplementation is Appropriate

"Substantial changes" in the proposed action may include changes in the design, location, or timing of a proposed action that are relevant to environmental concerns (i.e., the changes would result in significant effects outside of the range of effects analyzed in the draft or final EIS).

Adding a new alternative analyzed in detail requires preparation of a supplement if the new alternative is outside the spectrum of alternatives already analyzed and not a variation of an alternative already analyzed. For example:

> *Comments on a draft EIS for a transmission line right-of way suggest an entirely new route for the right-of-way that would be a reasonable alternative.  The new route would result in effects outside the range of effects analyzed in the draft.  Prepare a supplemental draft EIS to analyze this new route.*

Describing additional alternatives that are considered but eliminated from detailed analysis does not require supplementation.

"New circumstances or information" are "significant" and trigger the need for supplementation if they are relevant to environmental concerns and bearing on the proposed action and its effects (i.e., if the new circumstances or information would result in significant effects outside the range of effects already analyzed). New circumstances or information that trigger the need for supplementation might include the listing under the Endangered Species Act of a species that was not analyzed in the EIS; development of new technology that alters significant effects; or unanticipated actions or events that result in changed circumstances, rendering the cumulative effects analysis inadequate.

### 5.3.2    When Supplementation is Not Appropriate

Supplementation is not necessary if you make changes in the proposed action that are not substantial (i.e., the effects of the changed proposed action are still within the range of effects analyzed in the draft or final EIS).

If a new alternative is added after the circulation of a draft EIS, supplementation is not necessary if the new alternative lies within the spectrum of alternatives analyzed in the draft EIS or is a minor variation of an alternative analyzed in the draft EIS. In such circumstances, the new alternative may be added in the final EIS. For example:

> *A draft EIS for an oil field development project analyzed the effects of drilling 500, 1,000, and 5,000 wells. The addition of a 3,000-well alternative could be analyzed in the final EIS without a supplemental draft EIS.*

Supplementation is not appropriate when new information or changed circumstances arise after the Federal action has been implemented. If the new information or changed circumstances impedes the use of the EIS for subsequent tiering for future decision-making, prepare a new EIS or EA and incorporate by reference relevant material from the old EIS. For example:

> *An EIS for an oil field development project is prepared and a decision issued. EAs or EISs prepared for subsequent applications of permit to drill (if they cannot be categorically excluded) are tiered to the field development EIS. New drilling technology developed after the preparation of the EIS results in significant impacts not analyzed in the field development EIS. These changed circumstances do not require that the field development EIS be supplemented. However, because the EAs or EISs for applications of permit to drill need the EIS for tiering, you may wish to prepare a new field development EIS.*

When new circumstances or information arise prior to the implementation of the Federal action, but your evaluation concludes that they would not result in significant effects outside the range of effects already analyzed, document your conclusion and the basis for it. If the new circumstances or information arise after publication of a draft EIS, document your conclusion in the final EIS. If the new circumstances or information arise after publication of the final EIS, document your conclusion in the ROD.

### 5.3.3    The Supplementation Process

Supplemental EISs will vary in scope and complexity depending upon the nature of the proposed changes or new information or circumstances.  Supplemental EISs are prepared, circulated, and filed with the same requirements as EISs, except that supplemental EISs do not require scoping (40 CFR 1502.9) (see section **9.5, *Supplements to Draft and Final EISs***). A supplemental EIS may incorporate by reference the relevant portions of the EIS being supplemented or may circulate the entire EIS along with the supplemental EIS.

When a supplement is prepared after circulation of a draft EIS, but before preparation of a final EIS, you must prepare and circulate a draft supplemental EIS and then prepare a final EIS. When a supplement is prepared after circulation of a final EIS, you must prepare and circulate a draft supplemental EIS and then prepare and circulate a final supplemental EIS, unless alternative procedures are approved by the CEQ (40 CFR 1502.9(c)(4)). Consult with the OEPC and the Office of the Solicitor before proposing alternative arrangements to the CEQ.


## 5.4   ADOPTING ANOTHER AGENCY'S NEPA ANALYSES

If an EIS or EA prepared by another agency is relevant to a BLM proposed action, you may prepare a new EIS or EA and incorporate by reference the applicable portions of the other agency's document (see section **5.2.1, *Incorporation by Reference***). Or you may adopt an EIS or EA prepared by another agency, after following certain steps described below.

### 5.4.1    Adopting Another Agency's EIS

You may use another agency's EIS for BLM decision-making after adopting the EIS. "An agency may adopt a Federal draft or final [EIS] or portion thereof provided that the statement or portion thereof meets the standards for an adequate statement under these [the CEQ] regulations" (40 CFR 1506.3(a)). Adopting another agency's EIS reduces paperwork, eliminates duplication, and makes the process more efficient. You may adopt an EIS that meets all CEQ, DOI, and BLM requirements for preparation of an EIS.  You must prepare your own ROD on adopted EISs (Question 30, CEQ*, Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981*).

If the BLM is a cooperating agency in the preparation of an EIS, you may adopt it without recirculating the EIS if you conclude that your comments and suggestions have been satisfied (40 CFR 1506.3(c)).  For example:

> *The Forest Service, with the BLM as a cooperator, prepared an EIS for the Biscuit Fire Recovery Project, which addressed actions on both Forest Service and BLM-managed lands in Oregon.  The BLM adopted the EIS and prepared a separate ROD for actions on BLM-managed lands.*

If the BLM is not a cooperating agency in the preparation of an EIS, you may adopt it after recirculating the document consistent with the following requirements:

- If the BLM proposed action is substantially the same as the action covered by the other agency's EIS, you can adopt the EIS after recirculating the document as a final EIS. When recirculating the final EIS, you must identify the BLM proposed action (40 CFR 1506.3(b)).

- If the BLM adopts an EIS that is not final within the agency that prepared it, or if the action the EIS assesses is the subject of a referral or if the adequacy of the EIS is the subject of judicial action that is not final, the BLM must indicate its status in the recirculated draft and final EIS (40 CFR 1506.3(c)).

### 5.4.2    Adopting Another Agency's EA

You may use another agency's EA for a BLM FONSI and BLM decision-making after adopting the EA, consistent with the following requirements (see *CEQ Guidance Regarding NEPA Regulations*, 48 Fed. Reg. 34263 (July 28, 1983)):

- The BLM must independently evaluate the information contained in the EA, and take full responsibility for its scope and content. You must evaluate the information contained in the EA to ensure that it adequately addresses environmental impacts of the BLM's proposed action and ensure that the EA to be adopted satisfies the BLM's own NEPA procedures. If the BLM has acted as a cooperating agency, you must ensure that any concerns which it has raised during the process of preparing the EA have been adequately addressed (*CEQ Guidance Regarding NEPA Regulations*, 48 Fed. Reg. 34263 (July 28, 1983)). An interdisciplinary team may be useful in evaluating another agency's EA for adoption.

- If you conclude that environmental impacts are adequately addressed, you must issue your own FONSI to document your formal adoption of the EA, and your conclusions regarding the adequacy of the EA (*CEQ Guidance Regarding NEPA Regulations*, 48 Fed. Reg. 34263 (July 28, 1983)). In certain limited circumstances, you must publish or otherwise make the FONSI available for public review for thirty days (see section **8.4.2, *The Finding of No Significant Impact***).

- You must prepare your own decision record in accordance with program-specific requirements following adoption of the EA and the issuance of the FONSI (see section **8.5, *The Decision Record***).

# CHAPTER 6—NEPA ANALYSIS

General
6.1   Outline of Analytical Steps
6.2   Purpose and Need
6.3   Scoping
6.4   Issues
6.5   Proposed Action
6.6   Alternatives Development
6.7   Affected Environment and Use of Relevant Data
6.8   Environmental Effects
6.9   Public Involvement and Responding to Comments

## GENERAL

There are a variety of ways to comply with the NEPA; the scope of your analysis and documentation will depend on your proposal and its environmental effects.  This chapter is broadly focused on NEPA analysis, not on documentation requirements. The CEQ regulations prescribe specific steps for the preparation of an EIS.  The process of preparing an EA is more flexible. This chapter describes NEPA concepts and outlines typical steps of NEPA analysis.  For detailed documentation and format requirements for EAs and EISs, see **Chapter 8,** ***Preparing an Environmental Assessment*** and **Chapter 9,** ***Preparing an Environmental Impact Statement***.

While the NEPA process is much the same for all BLM actions, some programs have specific requirements for NEPA analysis. Become aware of and consult program-specific guidance when beginning the NEPA process.

## 6.1   OUTLINE OF ANALYTICAL STEPS

For an internally generated project (one in which the BLM is developing the proposed action), the usual analytical steps for an EA or EIS are as follows:

- Identify the purpose and need for action and describe the proposed action to the extent known.
- Develop a scoping strategy and conduct scoping.
- Identify issues requiring analysis.
- Refine the proposed action.
- Develop reasonable alternatives to the proposed action.
- Identify, gather and synthesize data.
- Analyze and disclose the impacts of each alternative.
- Identify potential mitigation measures to reduce adverse impacts.

Many of these steps are iterative; for example, developing alternatives may lead to the identification of additional issues requiring analysis.  At several points in the process, you may loop back to an earlier step to make refinements.

34

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

For an externally generated project (one in which a non-BLM party has developed a proposed action), the analysis steps are the same except that the first step in the process is when you accept a proposal regarding an action to be taken, and move forward into NEPA analysis.

**Figure 6.1   The NEPA Process**



## 6.2  PURPOSE AND NEED

The CEQ regulations direct that an EIS "…shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action" (40 CFR 1502.13).  The CEQ regulations also direct that EAs "…shall include brief discussions of the need for the proposal…" (40 CFR 1508.9(b)).

The CEQ regulations do not differentiate the "purpose" of the action from the "need" for the action.  However, distinguishing the "purpose" and the "need" as two separate aspects of the purpose and need statement may help clarify why the BLM is proposing an action.  For many types of actions, the "need" for the action can be described as the underlying problem or opportunity to which the BLM is responding with the action.  The "purpose" can be described as a goal or objective that we are trying to reach.  Often, the "purpose" can be presented as the solution to the problem described in the "need" for the action.  *For example, the "need" for a culvert replacement project might describe how the existing culvert blocks fish passage; the "purpose" might be to replace the culvert with one that allows fish passage.*

Regardless of whether the "purpose" and the "need" are treated as distinct or synonymous, the purpose and need statement as a whole describes the problem or opportunity to which the BLM is responding and what the BLM hopes to accomplish by the action.

We recommend that the purpose and need statement be brief, unambiguous, and as specific as possible.  Although the purpose and need statement cannot be arbitrarily narrow, you have considerable flexibility in defining the purpose and need for action.  To the extent possible, construct the purpose and need statement to conform to existing decisions, policies, regulation, or law.  The purpose and need for the action is usually related to achieving goals and objectives of the LUP; reflect this in your purpose and need statement.

The purpose and need statement for an externally generated action must describe the BLM purpose and need, not an applicant's or external proponent's purpose and need (40 CFR 1502.13).  The applicant's purpose and need may provide useful background information, but this description must not be confused with the BLM purpose and need for action.  The BLM action triggers the NEPA analysis.  It is the BLM purpose and need for action that will dictate the range of alternatives and provide a basis for the rationale for eventual selection of an alternative in a decision.  See the Web Guide for examples of purpose and need statements.

> The purpose and need statement should explain why the BLM is proposing action.  Note that you must describe the purpose and need for the **action**, not the purpose and need for the document.

### 6.2.1    The Role of the Purpose and Need Statement

We recommend that you draft your purpose and need statement early in the NEPA process. Including a draft purpose and need statement with scoping materials will help focus internal and external scoping comments.  Reexamine and update your purpose and need statement as appropriate throughout the NEPA process, especially when refining the proposed action and developing alternatives.

A carefully crafted purpose and need statement can be an effective tool in controlling the scope of the analysis and thereby increasing efficiencies by eliminating unnecessary analysis and reducing delays in the process.  The purpose and need statement dictates the range of alternatives, because action alternatives are not "reasonable" if they do not respond to the purpose and need for the action (see section **6.6.1**, ***Reasonable Alternatives***).  The broader the purpose and need statement, the broader the range of alternatives that must be analyzed.  The purpose and need statement will provide a framework for issue identification and will form the basis for the eventual rationale for selection of an alternative.  Generally, the action alternatives will respond to the problem or opportunity described in the purpose and need statement, providing a basis for eventual selection of an alternative in a decision.

*For example, in the culvert replacement example above (see section* **6.2**, ***Purpose and Need***)*, the scope of the analysis would be narrowed by describing a more specific "purpose" of replacing the existing culvert to allow cutthroat trout fish passage in the spring; reasonable alternatives might include analyzing various culvert sizes, or moving the culvert.  Conversely, the scope of the analysis would be broadened by describing a more general "purpose" of improving fish passage; reasonable alternatives might include culvert removal and road decommissioning.*

Examples of purpose and need statements and related decisions are found in the next section, **6.2.2**, ***The Decision to be Made***, and examples of combined and separated purpose and need statements can be found in the Web Guide.

### 6.2.2    The Decision to be Made

You may include in the purpose and need statement a description of your decision(s) to be made based on the NEPA analysis. Tying the purpose and need for your proposal to your decision helps establish the scope for the NEPA analysis.  A clear explanation of the decision(s) at hand is also helpful in public involvement; it helps to set expectations and explain the focus of the BLM's NEPA analysis.  In describing the BLM's decision(s) to be made, you must retain the flexibility to select among alternatives that meet the purpose and need, and are within the BLM's jurisdiction (40 CFR 1506.1(a)(2)). As with the purpose and need, the description of the decision(s) to be made may be broad or narrow.

For externally generated actions, the description of the decision(s) to be made helps differentiate your role in the action from the external proponent's role.  For NEPA documents prepared with cooperating agencies with jurisdiction by law, we recommend that you explicitly identify the decisions to be made by each agency (see section **12.1, *Cooperating Agency Status in Development of NEPA Documents***).

> **Jurisdiction by law** means another governmental entity (Tribal, Federal, State, or local agency) has authority to approve, veto, or finance all or part of a proposal (40 CFR 1508.15). The CEQ regulations provide for establishing a cooperating agency relationship with such entities in development of a NEPA analysis document.

*Examples:*

The following examples are adapted from actual BLM actions.  These are not intended to provide a template to be copied, but as examples for general consideration.  Because the purpose and need statement controls the scope of the analysis and is directly tied to the eventual rationale for selection, it is important that the purpose and need statement be tailored to the specific action in question.

An externally generated implementation action.  *The purpose of the action is to provide the owners of private land located in Township X South, Range X West, Section X, with legal access across public land managed by the BLM.  The need for the action is established by the BLM's responsibility under FLPMA to respond to a request for a Right-of-Way Grant for legal access to private land over existing BLM roads and a short segment of new road to be constructed across public land.*
Decision to be made**:** The BLM will decide whether or not to grant the right of way, and if so, under what terms and conditions.

An internally generated implementation action.  *The purpose of the action is to modify current grazing practices on the X Allotment by adjusting timing and levels of livestock use so that progress can be made toward meeting the fundamentals of rangeland health.  The need for the action is that fundamentals of rangeland health are not being met for watersheds, riparian areas, and threatened and endangered plants in the X Allotment, based on a current assessment.  Active erosion is evident and exotic annual grasses dominate the understory.  The assessment found that current livestock grazing management practices do not meet the fundamentals of rangeland health.*
Decision to be made:  The BLM will decide whether or not to issue a grazing permit with modifications from the current permit.

A Land Use Plan revision**,** *(Note: this example is abbreviated from the detail that would customarily be appropriate for revision of an LUP).  The purpose of the X Field Office LUP revision is to ensure that public lands are managed according to the principles of multiple use identified in FLPMA while maintaining the valid existing rights and other obligations already established.  The need for the action is that changing resource demands and technology have changed the type and level of impacts to various resources, as detailed in the LUP evaluation. Specifically, the emergence of new exploration and extraction technologies in oil and gas*

*development may result in impacts not previously analyzed. Alternatives will address the availability of unleased lands for future oil and gas leasing; potential stipulations to be attached to new leases or leases to be reoffered if existing leases are relinquished; and mitigation measures to be considered in reviewing applications for permits to drill. This need is limited, because most oil and gas resources in the planning area have already been leased, and the LUP revision will maintain valid existing rights. The LUP evaluation also noted other changes in resource conditions and uses that could result in impacts not previously analyzed.*

<u>Decision to be made:</u>  The BLM will revise the LUP and identify areas available for oil and gas leasing, leasing stipulations, and mitigation measures to consider in reviewing applications for permits to drill.

## 6.3  SCOPING

Scoping is the process by which the BLM solicits internal and external input on the issues, impacts, and potential alternatives that will be addressed in an EIS or EA as well as the extent to which those issues and impacts will be analyzed in the NEPA document. Although it is not required, you may also elect to scope for issues and impacts associated with actions under CX or DNA review.  Begin considering cumulative impacts during the scoping process; use scoping to begin identifying actions by others that may have a cumulative effect with the proposed action, and identifying geographic and temporal boundaries, baselines and thresholds.  Scoping also helps to begin identifying incomplete or unavailable information and evaluating whether that information is essential to a reasoned choice among alternatives.

> "There shall be an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action.  This process shall be termed scoping."  (40 CFR 1501.7)

Scoping is one form of public involvement in the NEPA process.  Scoping occurs early in the NEPA process and generally extends through the development of alternatives. (The public comment period for a DEIS or public review of an EA are not scoping).

Developing the purpose and need statement will enhance the scoping process, even if you have not yet fully developed a proposed action. A preliminary purpose and need statement will allow BLM staff, other agencies, and the public to give more focused input on issues or the proposal. Additionally, sharing what is known about the No Action alternative and the consequences of not meeting the need for action may facilitate effective scoping comments.

### 6.3.1   Internal Scoping

Internal scoping is simply the use of BLM and cooperating agency staff to help determine what needs to be analyzed in a NEPA document.  Internal scoping is an interdisciplinary process; at a minimum, use scoping to define issues, alternatives, and data needs.  Additionally, this is an opportunity to identify other actions that may be analyzed in the same NEPA document.  You may use internal scoping to:

- formulate and refine the purpose and need.
- identify any connected, cumulative, or similar actions associated with the proposal.
- start preparation for cumulative effects analysis.
- decide on the appropriate level of documentation.
- develop a public involvement strategy.
- decide other features of the NEPA process.

### 6.3.2   External Scoping

External scoping involves notification and opportunities for feedback from other agencies, organizations, tribes, local governments, and the public.  You do not need to conduct external scoping at the same time as internal scoping; frequently you first conduct some internal scoping to develop a preliminary range of alternatives and issues.  These alternatives and issues may then be shared during external scoping, and you will likely build upon these preliminary issues as scoping continues.

External scoping can be used to identify coordination needs with other agencies; refine issues through public, tribal and agency feedback on preliminary issues; and identify new issues and possible alternatives.  Tribal consultation centers on established government-to-government relationships, and it is important that you allow sufficient time and use the appropriate means of contacting tribes when conducting scoping.  External scoping serves to build agency credibility and promote constructive dialogue and relations with tribes, agencies, local governments and the public.

The CEQ regulations mandate external scoping for EISs, and such scoping has formal requirements (see section **9.1.3, *Scoping***).  The time-limited scoping period that follows the publication of a Notice of Intent to prepare an EIS is referred to as formal scoping.  However, you should not limit scoping for an EIS to the formal scoping period.

External scoping for EAs is optional.  See section **8.3.3, *Scoping and Issues*** for a discussion of when external scoping is appropriate for an EA.

External scoping may help identify alternatives to the proposed action, as well as refine the proposed action. External scoping may result in refinement of issues for analysis. Preliminary issues may be clarified and new issues identified in the external scoping process. You will use external scoping to begin identifying past, present, and reasonably foreseeable actions by others that could have a cumulative effect together with the BLM action (see section **6.8.3.4,** *Past, Present, and Reasonably Foreseeable Actions)*. External scoping can be used to identify permits, surveys, or consultations required by other agencies. Scoping may also generate information that may be used during the permitting or consultation process.

External scoping methods include but are not limited to: *Federal Register* notices, public meetings, field trips, direct mailing, media releases, newsletters, NEPA registers, and email notifications. You may also seek help from other agencies, organizations, tribes, local governments, and the public in identifying interested parties that may not yet have been reached by scoping efforts.

## 6.4 ISSUES

The CEQ regulations provide many references to "issues," though the regulations do not define this term explicitly. At 40 CFR 1501.7(a)(2), 40 CFR 1501.7(a)(3), 40 CFR 1502.1 and 1502.2(b), the CEQ explains that issues may be identified through scoping and that only significant issues must be the focus of the environmental document . Significant issues are those related to significant or potentially significant effects (see section **7.3,** *Significance*).

For the purpose of BLM NEPA analysis, an "issue" is a point of disagreement, debate, or dispute with a proposed action based on some anticipated environmental effect. An issue is more than just a position statement, such as disagreement with grazing on public lands. An issue:

- has a cause and effect relationship with the proposed action or alternatives;
- is within the scope of the analysis;
- has not be decided by law, regulation, or previous decision; and
- is amenable to scientific analysis rather than conjecture.

Issues point to environmental effects; as such, issues can help shape the proposal and alternatives. (For externally generated proposals, the proposed action is not developed through scoping, but other action alternatives are). Issues may lead to the identification of design features that are incorporated into the proposed action (see section **6.5.1.1,** *Design Features of the Proposed Action*) or mitigation measures (see section **6.8.4,** *Mitigation and Residual Effects*).

> "Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail." (40 CFR 1500.1(b))

### 6.4.1   Identifying Issues for Analysis

Preliminary issues are frequently identified during the development of the proposed action through internal and external scoping.   Additionally, supplemental authorities that provide procedural or substantive responsibilities relevant to the NEPA process may help identify issues for analysis.  See **Appendix 1**, ***Supplemental Authorities to be Considered***, for a list of some common supplemental authorities.  There is no need to make negative declarations regarding resources described in supplemental authorities that are not relevant to your proposal at hand.

While many issues may arise during scoping, not all of the issues raised warrant analysis in an EA or EIS.  Analyze issues raised through scoping if:

- Analysis of the issue is necessary to make a reasoned choice between alternatives. That is, does it relate to how the proposed action or alternatives respond to the purpose and need? (See section **6.6**, ***Alternatives Development***).

- The issue is significant (an issue associated with a significant direct, indirect, or cumulative impact, or where analysis is necessary to determine the significance of impacts).

When identifying issues to be analyzed, it is helpful to ask, "Is there disagreement about the best way to use a resource, or resolve an unwanted resource condition, or potentially significant effects of a proposed action or alternative?"  If the answer is "yes," you may benefit from subjecting the issue to analysis.

> Entire resources cannot be issues by themselves, but concerns over how a resource may be affected by the proposal can be issues.

It is useful to phrase issues in the form of questions, as this can help maintain the focus of the analysis, which would need to answer the questions. For example:

*The BLM is analyzing the construction and operation of a wind farm on public lands.  "Wildlife" is not considered an issue—this is too broad for reasonable analysis, and it is not clearly related to the effects of the action.  We suggest, "What would be the effect of the alternatives on sage grouse nesting?" as a more explicit issue statement.*

The Web Guide contains examples of issues identified for analysis.

## 6.4.2    Issues Not Analyzed

You need not analyze issues associated with the proposed action that do not meet the criteria described in section **6.4.1.,** ***Identifying Issues for Analysis***.  We recommend that you document such externally generated issues along with rationale for not analyzing them in the administrative record or in the EA or EIS itself.  You have more flexibility in tracking internally generated issues.  For example, in a preliminary brainstorming session, it may not be important to record all issues raised.  However, if after careful and detailed consideration you determine not to analyze an internally-generated issue, we recommend that you document the reasons in the administrative record, or in the EA or EIS.  The detail used to explain why an issue was not analyzed is largely dependent on how the issue was presented and why you are not analyzing it.  See the Web Guide for an example of how issues not analyzed can be treated in a NEPA document.

## 6.5   PROPOSED ACTION

The CEQ regulations state that a "proposal" exists at that stage in the development of an action when an agency subject to the NEPA has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated (40 CFR 1508.23).  A "proposed action" may be described as a proposal for the BLM to authorize, recommend, or implement an action to address a clear purpose and need, and may be generated internally or externally.

When developing the proposed action, it is important to understand how it will be used in the environmental analysis.  You can use a preliminary description of the proposed action during scoping to focus public involvement.  The proposed action is one possible option to meet the purpose and need.  Alternatives are developed to consider different reasonable paths to take to accomplish the same purpose and need as the proposed action.

The level of detail used to describe a proposed action will vary by the nature and stage of the project.  For example, the level of detail available at the beginning of a project may be very limited, but details will be better defined after scoping.  The details and description of a proposed action in a programmatic analysis will be different than one in the analysis of a site-specific implementation action.  The level of detail used in describing the proposed action will influence the specificity of the analysis and the assumptions made in analyzing the environmental consequences.  The Web Guide contains example descriptions of Proposed Actions.

### 6.5.1   Description of the Proposed Action

A detailed description of the proposed action at the outset of the analysis process is beneficial for many reasons.  Clearly described proposed actions can result in:

- more focused and meaningful public input.
- more focused and meaningful internal (BLM) participation.
- more complete identification of issues.
- development of reasonable alternatives.
- sound analysis and interpretation of effects.
- focused analysis.
- a sound and supportable decision.

Detailed descriptions of proposed actions usually include five elements:

1.  Who   "Who" is the Federal agency that is going to guide the analysis and make the decision.  Even for externally proposed projects, you will be making the decision to authorize or recommend an action.  For externally proposed projects, it is important to identify the external proponent and their role in implementing your decision.

2.  What   "What" is the specific activity or activities proposed. You must provide sufficient detail in the description of the activities so that the effects of the proposed action may be compared to the effects of the alternatives, including the No Action alternative (40 CFR 1502.14(b)).  That comparison provides the clear basis for choice by the decision-maker.

3.  How   "How" relates to the specific means by which the proposal would be implemented.  Include project design features, including construction activities, operations, and schedules.  It may also be appropriate to include maps, photographs, and figures.  Means, measures, or practices to reduce or avoid adverse environmental impacts may be included in the proposed action as design features (see section **6.5.1.1, *Design Features of the Proposed Action***).

4.  When   "When" is the timeframe in which the project will be implemented and completed.  If the proposed action has identifiable phases, describe the duration of those phases.  The timing for monitoring integral to the proposed action should also be described.

5.  Where   "Where" is the location(s) where the proposed action will be implemented and should be described as specifically as possible.  Maps at a relevant scale may be provided to support the narrative.

#### 6.5.1.1    Design Features of the Proposed Action

Design features are those specific means, measures or practices that make up the proposed action and alternatives.  You may identify design features, especially those that would reduce or eliminate adverse effects after the initial formulation of alternatives, as the impact analysis is being conducted.  In this situation, you may add these design features to the proposed action or alternatives.  Standard operating procedures, stipulations, and best management practices are usually considered design features.  For example, *if the proposed action sites a reserve pit for drilling fluids away from areas of shallow groundwater, this is a design feature, not mitigation.*

Because the formulation of alternatives and the impact analysis is often an iterative process, you might not be able to identify the means, measures or practices until the impact analysis is completed.  If any means, measures, or practices are not incorporated into the proposed action or alternatives, they are considered mitigation measures (see section **6.8.4, *Mitigation and Residual Effects***).

**Figure 6.2  Design Features and Mitigation Measures**



#### 6.5.2    Defining the Scope of Analysis of the Proposed Action

After initial development of the proposed action, evaluate whether there are connected or cumulative actions that you must consider in the same NEPA document (40 CFR 1508.25).  In addition, evaluate whether there are similar actions that you wish to discuss in a single NEPA document.  The CEQ regulations refer only to an EIS in discussion of including connected, cumulative, and similar actions in a single EIS.  For an EA, we recommend that you consider connected or cumulative actions in the same EA, and similar actions may be discussed at your discretion. Considering connected or cumulative actions in a single EA is particularly important in the evaluation of significance (see section **7.3, *Significance***).

**6.5.2.1   Connected Actions**

Connected actions are those actions that are "closely related" and "should be discussed" in the same NEPA document (40 CFR 1508.25 (a)(1)).  Actions are connected if they automatically trigger other actions that may require an EIS; cannot or will not proceed unless other actions are taken previously or simultaneously; or if the actions are interdependent parts of a larger action and depend upon the larger action for their justification (40 CFR 1508.25 (a)(i, ii, iii)). Connected actions are limited to actions that are currently proposed (ripe for decision).  Actions that are not yet proposed are not connected actions, but may need to be analyzed in cumulative effects analysis if they are reasonably foreseeable.

If the connected action is also a proposed BLM action, we recommend that you include both actions as aspects of a broader "proposal" (40 CFR 1508.23), analyzed in a single NEPA document. You may either construct an integrated purpose and need statement for both the proposed action and the connected action, or you may present separate purpose and need statements for the proposed action and the connected action. Regardless of the structure of the purpose and need statement(s), you must develop alternatives and mitigation measures for both actions (40 CFR 1508.25(b)), and analyze the direct, indirect, and cumulative effects of both actions (40 CFR 1508.25(c)).

For example,
> *The BLM proposes prescribed burning to attain desired vegetation characteristics. The BLM also proposes subsequent seeding of the same site to contribute to attaining those same desired vegetation characteristics, which is a connected action. We recommend that you include the prescribed burning and seeding as aspects of a broader proposal, analyzed in a single NEPA document.*

If the connected action is an action proposed by another Federal agency, you may include both actions as aspects of a broader proposal analyzed in a single NEPA document, as described above. Evaluate whether a single NEPA document would improve the quality of analysis and efficiency of the NEPA process, and provide a stronger basis for decision-making.  Also consider the timing of the other agency action and the capabilities of the other agency to act as a cooperating agency or joint lead agency (see sections **12.1 *Cooperating Agency Status in Development of NEPA Documents*** and **12.2 *Joint Lead Agencies in Development of NEPA Documents***).

For example,
> *The BLM proposes constructing a trail to provide recreation access to BLM-managed lands from a campground the Forest Service proposes to construct on adjacent Forest Service lands. The Forest Service campground construction is a connected action. You and the Forest Service may elect to include the BLM trail construction and the Forest Service campground construction as aspects of a broader proposal, analyzed in a single NEPA document, either as joint lead agencies, or with one agency as lead and the other as cooperating.*

If you do not include the connected action with the proposed action as aspects of a broader proposal analyzed in a single NEPA document, you must, at a minimum, demonstrate that you have considered the connected action in the NEPA document for the proposed action (40 CFR 1508.25) (i.e., describe the connected action and its relationship to the proposed action, including the extent to which the connected action and its effects can be prevented or modified by BLM decision-making on the proposed action). In this case, a separate NEPA document would need to be prepared for the connected action. It may be useful to incorporate by reference portions of the NEPA document completed for the connected action, if available, into the NEPA document for the proposed action.

A non-Federal action may be a connected action with a BLM proposed action. The consideration of a non-Federal connected action is limited in your NEPA analysis, because the NEPA process is focused on agency decision making (40 CFR 1500.1(c), 40 CFR 1508.18, 40 CFR 1508.23). Therefore, you are not required to include a non-Federal connected action together with a BLM proposed action as aspects of a broader proposal, analyzed in a single NEPA document. Proposals are limited to Federal actions (40 CFR 1508.23). You would not have to develop and present the purpose and need for the non-Federal action, and you are not required to consider alternatives available to the non-Federal party for its action. If there are effects on BLM managed resources, it may be useful to develop and suggest alternatives or mitigation for those non-Federal connected actions (see **section 6.8.4, *Mitigation and Residual Effects***).

As with a Federal connected action, you must, at a minimum, demonstrate that you have considered the non-Federal connected action in the NEPA document for the proposed action (40 CFR 1508.25) (i.e., describe the connected action and its relationship to the proposed action, including the extent to which the connected action and its effects can be prevented or modified by BLM decision-making on the proposed action).

If the connected non-Federal action and its effects can be prevented by BLM decision-making, then the effects of the non-Federal action are properly considered indirect effects of the BLM action and must be analyzed as effects of the BLM action (40 CFR 1508.7, 40 CFR 1508.25(c)).

For example,

> *You receive a right-of-way request from a private company to build a road across BLM-managed land to provide access to adjacent private land, on which the company plans to create and operate a quarry. The creation and operation of the quarry cannot proceed unless the road is constructed. The road cannot be constructed without the grant by BLM of a right-of-way. The grant of the right-of-way must be analyzed as a BLM action: the BLM can grant or deny the right-of-way request. The construction of the road and the creation and operation of the quarry are connected actions.*
>
> *Alternatives: You must analyze the proposed action of granting the right-of-way, and consider the alternative of denying the right-of-way (the No Action alternative) and any other reasonable alternatives related to the right-of-way request.  Because the construction of the road, and the creation and operation of the quarry would not be BLM actions, you do not need to consider alternatives to the road construction and creation and operation of the quarry.*

> *Direct and Indirect Effects: You must analyze the direct and indirect effects of granting the right-of-way.  You must also analyze the direct and indirect effects of constructing the road and creating and operating the quarry, because these effects could be prevented by a BLM decision to deny the right-of-way request, and therefore are properly considered indirect effects of the BLM right-of-way grant.*
>
> *Cumulative Effects:  You must analyze the cumulative impact of the right-of-way grant, the road construction, and quarry creation and operation, taking into account the effects in common with any other past, present, and reasonably foreseeable future actions.*

If the connected non-Federal action cannot be prevented by BLM decision-making, but its effects can be modified by BLM-decision-making, then the changes in the effects of the connected non-Federal action must be analyzed as indirect effects of the BLM proposed action.  Effects of the non-Federal action that cannot be modified by BLM-decision-making may still need to be analyzed in the cumulative effects analysis for BLM action, if they have a cumulative effect together with the effects of the BLM action (see section **6.8.3 *Cumulative Effects***).

For example,

> *You receive a right-of-way request from a private company to build a road across BLM-managed land to provide access to adjacent private land, on which the company plans to create and operate a quarry.  In contrast to the example above, the creation and operation of the quarry could proceed with other, reasonably foreseeable, road access.  However, conditions on the grant by BLM of a right-of-way could modify the effects of the quarry creation and operation (e.g., right-of-way conditions limiting the amount and timing of haul could alter the timing of quarry creation activities and consequent effects).  The grant of the right-of-way must be analyzed as a BLM action. The effects of the road construction must be analyzed as indirect effects of the BLM right-of-way grant. The changes in the effects of the quarry creation and operation must be analyzed as indirect effects of the conditions on the BLM right-of-way grant. The unchanged effects of the quarry creation and operation would be analyzed in the cumulative effects analysis for the BLM action to the extent they would have a cumulative effect together with the effects of the BLM action.*

If the non-Federal action cannot be prevented by BLM decision-making and its effects cannot be modified by BLM decision-making, the effects of the non-Federal action may still need to be analyzed in the cumulative effects analysis for BLM action, if they have a cumulative effect together with the effects of the BLM action (see section **6.8.3 *Cumulative Effects***). While analysis of the effects of these non-Federal actions provides context for the analysis of the BLM action, their consideration in the determination of the significance of the BLM action is limited (see section **7.3, *Significance***).

For example,

> You receive a right-of-way request from a private company to build a road across BLM-managed land to provide access to adjacent private land, on which the company plans to create and operate a quarry.  The creation and operation of the quarry could proceed with other, reasonably foreseeable, road access. Conditions on the grant by BLM of a right-of-way would not modify the effects of the quarry creation and operation. The grant of the right-of-way must be analyzed as a BLM action. The road construction is a connected action, and its effects must be analyzed as indirect effects of the BLM right-of-way grant. However, the quarry creation and operation are not connected actions; their effects would be analyzed in the cumulative effects analysis for the BLM action to the extent they would have a cumulative effect together with the effects of the BLM action.

### 6.5.2.2    Cumulative Actions

Cumulative actions are proposed actions which potentially have a cumulatively significant impact together with other proposed actions and "should be discussed" in the same NEPA document (40 CFR 1508.25(a)(2)).

If the cumulative action is a BLM or other Federal proposed action, you may include both actions as aspects of a broader proposal, analyzed in a single NEPA document, as described above for connected actions.

For example,

> The BLM proposes construction of a campground to enhance developed recreation opportunities.  The campground construction would contribute sediment to a nearby stream.  Separately, the BLM proposes a culvert replacement to remove a fish passage barrier.  The culvert replacement would contribute sediment to the same stream.  The culvert replacement is a cumulative action to the campground construction campground construction and culvert replacement. You may include the campground construction and culvert replacement as aspects of a broader proposal, analyzed in a single NEPA document. In this case, separate purpose and need statements for the campground construction and culvert replacement would likely be more appropriate than attempting to create a single, integrated purpose and need statement.

If you do not include the cumulative action with the proposed action as aspects of a broader proposal analyzed in a single NEPA document, you must, at a minimum, demonstrate that you have considered the cumulative action in the NEPA document for the proposed action (40 CFR 1508.25):

- describe the cumulative action; and
- include analysis of the effects of the cumulative action in the cumulative effects analysis of the proposed action.

It may be useful to incorporate by reference portions of the NEPA document completed for the cumulative action, if available, into the NEPA document for the proposed action.

Non-Federal actions which potentially have a cumulatively significant impact together with the proposed action must be considered in the same NEPA document (40 CFR 1508.25). Identifying an action as a cumulative non-Federal action is a component of your cumulative effects analysis of the proposed action (see section **6.8.3,** *Cumulative Effects*).

### 6.5.2.3    Similar Actions

Similar actions are proposed or reasonably foreseeable Federal actions that have similarities that provide a basis for evaluating their environmental consequences together with the proposed action (40 CFR 1508.25(a)(3).  Similarities are not limited to type of action; such similarities include, for instance, common timing or geography.  You may include similar proposed actions as aspects of a broader proposal, analyzed in a single NEPA document, as described above for connected and cumulative actions, when a single NEPA document would improve the quality of analysis and efficiency of the NEPA process, and provide a stronger basis for decision-making

If other Federal actions with a common timing or geography are interdependent with the proposed action, they would be considered as connected actions (see section **6.5.2.1,** *Connected Actions*).  If other Federal actions with common timing or geography would have a cumulative effect together with the proposed action, they would be considered as cumulative actions (see section **6.5.2.2,** *Cumulative Actions*).

If you include similar actions as aspects of a broader proposal, analyzed in a single NEPA document, evaluate the purpose and need and the range of alternatives to ensure that they adequately address the similar actions.

## 6.6   ALTERNATIVES DEVELOPMENT

### 6.6.1    Reasonable Alternatives

The NEPA directs the BLM to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources;…"  (NEPA Sec102(2)(E)).

The range of alternatives explores alternative means of meeting the purpose and need for the action.  As stated in section **6.2.1,** *The Role of the Purpose and Need Statement*, the purpose and need statement helps define the range of alternatives.  The broader the purpose and need statement, the broader the range of alternatives that must be analyzed.  You must analyze those alternatives necessary to permit a reasoned choice (40 CFR 1502.14).  For some proposals there may exist a very large or even an infinite number of possible reasonable alternatives.  When there are potentially a very large number of alternatives, you must analyze only a reasonable number to cover the full spectrum of alternatives (see Question 1b, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981*).  When working with cooperating agencies, your range of alternatives may need to reflect the decision space and authority of other agencies, if decisions are being made by more than one agency.

In determining the alternatives to be considered, the emphasis is on what is "reasonable" rather than on whether the proponent or applicant likes or is itself capable of implementing an alternative. "Reasonable alternatives include those that are *practical or feasible* from the technical and economic standpoint and using common sense, rather than simply *desirable* from the standpoint of the applicant." (Question 2a, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981*).  You can only define whether an alternative is "reasonable" in reference to the purpose and need for the action.  See **Chapter 8, *Preparing an Environmental Assessment*** and **Chapter 9, *Preparing an Environmental Impact Statement*** for discussion of reasonable alternatives for an EA and EIS. For externally generated action, the range of alternatives will typically include at least denying the request (No Action); approving the request as the proponent proposed; or approving the request with changes BLM makes to the proponent's proposal.

For example,

> *An EIS for an oil field development project has a purpose and need which (in abbreviated form) is to determine whether to permit oil exploration and development within the project area consistent with existing leases and to develop practices for oil development consistent with the land use plan.  The EIS would typically analyze at least the following alternatives:*
> - *No Action, which would entail no new drilling beyond what is currently permitted;*
> - *The proponent's proposal for field development; and*
> - *The proponent's proposal with additional or different design features recommended by the BLM to reduce environmental effects. This alternative would include design features that differ from the proponent's proposal, such as alternative well locations, alternative access routes, additional timing or spacing constraints, offsite mitigation, different methods for treating produced water, horizontal well drilling, or other technologies.*

In some situations it may be appropriate for you to analyze a proposed action or alternative that may be outside the BLM's jurisdiction (Question 2b, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981*).  Such circumstances would be exceptional and probably limited to the broadest, most programmatic EISs that would involve multiple agencies.  For most actions, we recommend that the purpose and need statement be constructed to reflect the discretion available to the BLM, consistent with existing decisions and statutory and regulatory requirements; thus, alternatives not within BLM jurisdiction would not be "reasonable."

*Note*: Though not required, a manager may elect to analyze in detail an alternative that might otherwise be eliminated to assist in planning or decision-making. In such cases, explain in the NEPA document why you are electing to analyze the alternative in detail.

**6.6.1.1     Developing Alternatives Under The Healthy Forests Restoration Act**

The Healthy Forests Restoration Act of 2003 (HFRA) (P.L. 108-148) contains provisions for expedited environmental analysis of projects implemented under its authority.  For authorized projects (see HFRA Section 102 to determine which projects are authorized), HFRA allows fewer alternatives to be analyzed compared with that which CEQ regulations prescribe.

For areas within the wildland–urban interface and within 1.5 miles of the boundary of an at-risk community (as defined in Section 101 of HFRA), you are not required to analyze any alternative to the proposed action, with one exception: if the at-risk community has adopted a Community Wildfire Protection Plan and the proposed action does not implement the recommendations in the plan regarding the general location and basic method of treatments, you are required to analyze the recommendations in the plan as an alternative to the proposed action.
For areas within the wildland–urban interface, but farther than 1.5 miles from the boundary of an at-risk community, you are not required to analyze more than the proposed action and one additional action alternative.

For the two previous scenarios, you are not required to present a separate section called the "No Action alternative." However, you must document the current and future state of the environment in the absence of the proposed action. This constitutes consideration of a No Action Alternative.  Document this in your purpose and need section (HFRA 104(d)).

For authorized HFRA projects in all other areas, the analysis must describe the proposed action, a No Action alternative, and an additional action alternative, if one is proposed during the scoping or collaboration process.

Additional information on HFRA can be obtained from the Healthy Forests Initiative and Healthy Forests Restoration Act Interim Field Guide, February 2004 (see the Web Guide).

**6.6.2     No Action Alternative**

The CEQ regulations direct that EISs describe the No Action alternative (40 CFR 1502.14(d)). HFRA, however, removes this regulatory requirement for actions taken under its authority (see section **6.6.1.1, *Developing Alternatives Under the HFRA***).  The No Action alternative is the only alternative that must be analyzed in an EIS that does not respond to the purpose and need for the action.

The No Action alternative provides a useful baseline for comparison of environmental effects (including cumulative effects) and demonstrates the consequences of not meeting the need for the action (see sections **8.3.4.2, *Alternatives in an EA,*** and **9.2.7.1, *Reasonable Alternatives for an EIS*** for discussion of the No Action alternative for EAs and EISs).

The description of the No Action alternative depends on the type of action proposed:

– **For land use planning actions:**  The No Action alternative is to continue to implement the management direction in the land use plan (i.e., the land use plan as written). Any other management approach should be treated as an action alternative.  If, for example, plan evaluation identifies that implementation has not been in accordance with the management direction in the land use plan, you may consider continued non-conforming implementation as an action alternative, if it is a reasonable alternative (see section **6.1.1,** *Reasonable Alternatives*).

– **For internally generated implementation actions:**  the No Action alternative is not to take the action.

– **For externally generated proposals or applications**:  the No Action alternative is generally to reject the proposal or deny the application.  (The sole exception to this is for renewal of a grazing permit, for which the No Action alternative is to issue a new permit with the same terms and conditions as the expiring permit).  The analysis of the No Action alternative must only analyze what is reasonably foreseeable if the application is denied (see Question 3, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981*).

The No Action alternative may constitute a benchmark at one end of the spectrum of alternatives. Therefore, defining the No Action alternative might require reference to the action alternatives that will be analyzed.  A No Action alternative that is outside of BLM jurisdiction or contrary to law or regulation might be useful to consider as a baseline for comparison.  *For example, when revising an LUP that has been implemented and subsequently found legally inadequate, analysis of continued management under that existing LUP might provide useful comparison in the analysis of the action alternatives in the revised LUP.*  The Web Guide provides some examples of No Action alternatives.

### 6.6.3   Alternatives Considered but Eliminated From Detailed Analysis

If you consider alternatives during the EIS process but opt not to analyze them in detail, you must identify those alternatives and briefly explain why you eliminated them from detailed analysis (40 CFR 1502.14).  Explain why you eliminated an alternative proposed by the public or another agency from detailed analysis.  We recommend you do the same in an EA.  See the Web Guide for examples of "alternatives considered but eliminated from detailed analysis."

You may eliminate an action alternative from detailed analysis if:

- it is ineffective (it would not respond to the purpose and need).
- it is technically or economically infeasible (consider whether implementation of the alternative is likely given past and current practice and technology; this does not require cost-benefit analysis or speculation about an applicant's costs and profits).
- it is inconsistent with the basic policy objectives for the management of the area (such as, not in  conformance with the LUP).
- its implementation is remote or speculative.
- it is substantially similar in design to an alternative that is analyzed.
- it would have substantially similar effects to an alternative that is analyzed.

## 6.7   AFFECTED ENVIRONMENT AND USE OF RELEVANT DATA

### 6.7.1   Affected Environment

The affected environment section succinctly describes the existing condition and trend of issue-related elements of the human environment that may be affected by implementing the proposed action or an alternative.  The CEQ regulations discuss "human environment" at 40 CFR 1508.14; the term broadly relates to biological, physical, social and economic elements of the environment.  We recommend that the descriptions of the specific elements be quantitative wherever possible, and of sufficient detail to serve as a baseline against which to measure the potential effects of implementing an action.  The affected environment section of the environmental analysis is defined and limited by the identified issues.

Your description of the affected environment will provide the basis for identifying and interpreting potential impacts in a concise manner.  Describe the present condition of the affected resources within the identified geographic scope and provide a baseline for the cumulative effects analysis.  Identifying past and ongoing actions that contribute to existing conditions will be helpful for the cumulative effects analysis (see section **6.8.3, *Cumulative Effects***).  Additionally, identify any regulatory thresholds and characterize what is known about stresses affecting the resources and biological or physical thresholds.  These biological or physical thresholds are often poorly understood; it may be helpful to identify as part of the analysis the threshold conditions of resources beyond which change could cause significant impacts.  This may not be possible for many resources because of incomplete or unavailable information (40 CFR 1502.22).

Your descriptions of the affected environment must be no longer than is necessary to understand the effects of the alternatives.  Data and analyses in a statement must be commensurate with the importance of the impact; with less important material, you may summarize, consolidate, or simply reference the material (40 CFR 1502.15).

### 6.7.2   Use of Relevant Data

Data and other information used to describe existing conditions and trends may be obtained from other documents and summarized and incorporated by reference or otherwise appropriately referenced.  You may also obtain data and other information from cooperating agency partners or other agencies, organizations, or individuals, as identified during scoping.

The CEQ regulations require the BLM to obtain information if it is "relevant to reasonably foreseeable significant adverse impacts," if it is "essential to a reasoned choice among alternatives," and if "the overall cost of obtaining it is not exorbitant" (40 CFR 1502.22).  If information essential to reasoned choice is unavailable or if the costs of obtaining it are exorbitant (excessive or beyond reason), you must make a statement to this effect in the EIS or EA.  In this statement, you must discuss what effect the missing information may have on your ability to predict impacts to the particular resource.  If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, you must include within the EIS or EA:

1.  a statement that such information is incomplete or unavailable;
2.  a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment;
3.  a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment, and
4.  the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. For the purposes of this section, "reasonably foreseeable" includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.
    (40 CFR 1502.22(b)).

## 6.8   ENVIRONMENTAL EFFECTS

### 6.8.1   Effects Analysis

#### 6.8.1.1      Defining Environmental Effects

Your EA or EIS must identify the known and predicted effects that are related to the issues (40 CFR 1500.4 (c), 40 CFR 1500.4(g), 40 CFR 1500.5(d), 40 CFR 1502.16) (see *6.4 Issues*).  An issue differs from an effect; an issue describes an environmental problem or relation between a resource and an action, while effects analysis predicts the degree to which the resource would be affected upon implementation of an action.

> The terms "**effects**" and "**impacts**" are synonymous in the CEQ regulations (40 CFR 1508.8) and in this handbook.

Effects can be ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health.  Effects may also include those resulting from actions that may have both beneficial and detrimental effects, even if on balance the agency believes that the effects will be beneficial (40 CFR 1508.8).

Analyze relevant short-term and long-term effects and disclose both beneficial and detrimental effects in the NEPA analysis.  We recommend you define the duration of long term and short-term, as it can vary depending on the action and the scope of analysis.  You must consider and analyze three categories of effects for any BLM proposal and its alternatives: direct, indirect, and cumulative (40 CFR 1508.25(c)).

To help decision-makers understand how a resource will be affected, focus the discussion of effects on the context, intensity, and duration of these effects (see section **7.3, Significance**).

Your effects analysis must also identify possible conflicts between the proposed action (and each alternative) and the objectives of Federal, State, regional, local, and tribal land use plans, policies, or controls for the area concerned (40 CFR 1502.16(c)).

### 6.8.1.2    Analyzing Effects

The effects analysis must demonstrate that the BLM took a "hard look" at the impacts of the action.  The level of detail must be sufficient to support reasoned conclusions by comparing the amount and the degree of change (impact) caused by the proposed action and alternatives (40 CFR 1502.1).  See the Web Guide for recent examples of how the Interior Board of Land Appeals (IBLA) has dealt with the concept of "hard look."

> A "**hard look**" is a reasoned analysis containing quantitative or detailed qualitative information.

Use the best available science to support NEPA analyses, and give greater consideration to peer-reviewed science and methodology over that which is not peer-reviewed.

> Analytical documents to support Federal agency decision-making include EISs and EAs, but neither are considered publications of scientific research subject to peer review.  You may choose to have your NEPA analysis reviewed by members of the scientific community as part of public review of the document.  Such review may be desirable to improve the quality of the analysis or share information; this does not constitute formal peer-review.

Describe the methodology and analytical assumptions for the effects analysis as explained below:

> Methodology:  Your NEPA document must describe the analytical methodology sufficiently so that the reader can understand how the analysis was conducted and why the particular methodology was used (40 CFR 1502.24).  This explanation must include a description of any limitations inherent in the methodology.  If there is substantial dispute over models, methodology, or data, you must recognize the opposing viewpoint(s) and explain the rationale for your choice of analysis.  You may place discussions of methodology in the text or in the appendix of the document.  To the extent possible, we recommend that the analysis of impacts be quantified.

Assumptions:  We recommend that your NEPA document state the analytical assumptions, including the geographic and temporal scope of the analysis (which may vary by issue), the baseline for analysis, as well as the reasonably foreseeable future actions (see section **6.8.3, *Cumulative Effects***).  You must also explain any assumptions made when information critical to the analysis was incomplete or unavailable (40 CFR 1502.22).  See section **6.7.2, *Use of Relevant Data***, for more discussion of incomplete or unavailable information.

Analytical assumptions may include any reasonably foreseeable development (RFD) scenarios for resources, such as RFDs for oil and gas development.  A reasonably foreseeable development scenario is a baseline projection for activity for a defined area and period of time, and though commonly used in minerals development, these scenarios may be used for other resources as well.  Examples of reasonably foreseeable development scenarios can be found in the Web Guide.

Clarity of expression, logical thought processes, and rational explanations are more important than length or format in the discussion of impacts.  Following these guidelines will help the decision-maker and the public understand your analysis.

- Use objective, professional language without being overly technical.
- Avoid subjective terms such as "good," "bad," "positive," and "negative." The term "significant" has a very specific meaning in the NEPA context (see section **7.3, *Significance***).  While it is a common descriptor, do not use it in NEPA documents unless it is intended to take on the NEPA meaning.
- Avoid the use of acronyms.

## 6.8.2   Direct and Indirect Effects

EAs and EISs must analyze and describe the direct effects and indirect effects of the proposed action and the alternatives on the quality of the human environment (40 CFR 1508.8).  The value in requiring analysis of both direct and indirect effects is to make certain that no effects are overlooked.  Because it can be difficult to distinguish between direct and indirect effects, you do not have to differentiate between the terms.  When you are uncertain which effect is direct and which is indirect, it is helpful to describe the effects together.  Effects are weighted the same; you do not consider an indirect effect less important than a direct effect in the analysis.  Examples of direct and indirect effects can be found in the Web Guide.

**Direct effects** are those effects "…which are caused by the action and occur at the same time and place" (40 CFR 1508.8(a)).

**Indirect effects** are those effects "…which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable.  Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density, or growth rate, and related effects on water and air and other natural systems, including ecosystems"  (40 CFR 1508.8(b)).

### 6.8.3    Cumulative Effects

The purpose of cumulative effects analysis is to ensure that Federal decision-makers consider the full range of consequences of actions (the proposed action and alternatives, including the No Action alternative).  Assessing cumulative effects begins early in the NEPA process, during internal and external scoping.

> The CEQ regulations define **cumulative effects** as "…the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such actions" (40 CFR 1508.7).

"Analyzing cumulative effects is more challenging than analyzing direct or indirect effects, primarily because of the difficulty of defining the geographic (spatial) and time (temporal) boundaries.  For example, if the boundaries are defined too broadly, the analysis becomes unwieldy; if they are defined too narrowly, significant issues may be missed, and decision-makers will be incompletely informed about the consequences of their actions" (CEQ, "Considering Cumulative Effects Under the National Environmental Policy Act").

In addition to the direction described below, the Web Guide contains a list of "Principles of cumulative effects analysis" that is useful in guiding effective cumulative effects analysis, as well as examples of cumulative effects.  The Web Guide also includes "Steps in cumulative effects analysis to be addressed in each component of environmental impact assessment" from the CEQ's "Considering Cumulative Effects Under the National Environmental Policy Act (Table 1-5)."

The following sections lay out steps in cumulative effects analysis.  This is not a required format for documentation but is a useful way to think about the process and ensure an adequate analysis.

### 6.8.3.1    Cumulative Effects Issues

Determine which of the issues identified for analysis (see section **6.4, *Issues***) may involve a cumulative effect with other past, present, or reasonably foreseeable future actions.  If the proposed action and alternatives would have no direct or indirect effects on a resource, you do not need a cumulative effects analysis on that resource.  Be aware that minor direct and indirect effects can potentially contribute to synergistic cumulative effects that may require analysis (see section **6.8.3.5 *Analyzing the Cumulative Effects***).

For example, *the BLM proposes to build a campground near private land where a private utility company proposes to build and operate a power generation structure.  The NEPA document must analyze the direct, indirect, and cumulative effects of your action of constructing a campground.  If the campground construction would affect sage grouse habitat, but have no effect on air quality, and the power generation structure would affect sage grouse habitat and air quality, your NEPA document for the campground construction must describe the cumulative effects on sage grouse habitat, but not on air quality.*

In another example, *the BLM is reviewing a proposal to develop a natural gas field that will affect air quality but not affect any sensitive plants.  The State is proposing a large prescribed burn, which will affect air quality and a sensitive plant population.  The NEPA document needs to discuss the cumulative effects on air quality, but not on sensitive plants.*

### 6.8.3.2   Geographic Scope of the Cumulative Effects Analysis

We recommend that you establish and describe the geographic scope for each cumulative effects issue, which will help bound the description of the affected environment (see section **6.7.1, *Affected Environment***). Describe in your EA or EIS the rationale for the geographic scope established.  The geographic scope is generally based on the natural boundaries of the resource affected, rather than jurisdictional boundaries.  The geographic scope will often be different for each cumulative effects issue.  The geographic scope of cumulative effects will often extend beyond the scope of the direct effects, but not beyond the scope of the direct and indirect effects of the proposed action and alternatives.  As noted above, if the proposed action and alternatives would have no direct or indirect effects on a resource, you do not need to analyze cumulative effects on that resource.

For example*, if a proposal affects water quality and air quality, the appropriate cumulative effects analysis areas may be the watershed and the airshed.*

### 6.8.3.3   Timeframe of the Cumulative Effects Analysis

We recommend that you establish and describe the timeframe for each cumulative effects issue—that is, define long-term and short-term, and incorporate the duration of the effects anticipated.  Long-term could be as long as the longest lasting effect. Timeframes, like geographic scope, can vary by resource.  For example, *the timeframe for economic effects may be much shorter than the timeframe for effects on vegetation structure and composition.* Base these timeframes on the duration of the direct and indirect effects of the proposed action and alternatives, rather than the duration of the action itself.  Describe in your EA or EIS the rationale for the timeframe established.

### 6.8.3.4   Past, Present, and Reasonably Foreseeable Actions

The cumulative effects analysis considers past, present, and reasonably foreseeable future actions that would affect the resource of concern within the geographic scope and the timeframe of the analysis.  In your analysis, you must consider other BLM actions, other Federal actions, and non-Federal (including private) actions (40 CFR 1508.7).

You must consider past actions within the geographic scope to provide context for the cumulative effects analysis (40 CFR 1508.7).  Past actions can usually be described by their aggregate effect without listing or analyzing the effects of individual past actions (CEQ, *Guidance on the Consideration of Past Actions in Cumulative Effects Analysis,* June 24, 2005). Summarize past actions adequately to describe the present conditions (see section **6.7.1, *Affected Environment***).

In some circumstances, past actions may need to be described in greater detail when they bear some relation to the proposed action. For example, past actions that are similar to the proposed action might have some bearing on what effects might be anticipated from the proposed action or alternatives. You should clearly distinguish analysis of direct and indirect effects based on information about past actions from a cumulative effects analysis of past actions. (CEQ, *Guidance on the Consideration of Past Actions in Cumulative Effects Analysis,* June 24, 2005).

You must consider present actions within the geographic scope (40 CFR 1508.7).  Present actions are actions which are ongoing at the time of your analysis.

You must include reasonably foreseeable future actions within the geographic scope and the timeframe of the analysis (40 CFR 1508.7).  You cannot limit reasonably foreseeable future actions to those that are approved or funded.  On the other hand, you are not required to speculate about future actions.  Reasonably foreseeable future actions are those for which there are existing decisions, funding, formal proposals, or which are highly probable, based on known opportunities or trends.  Reasonably foreseeable development scenarios may be valuable sources of information to assist in the BLM's cumulative effects analysis.  When considering reasonably foreseeable future actions, it may be helpful to ask such questions as:

- Is there an existing proposal, such as the submission of permit applications?
- Is there a commitment of resources, such as funding?
- If it is a Federal action, has the NEPA process begun (for example, publication of an NOI)?

Analyzing future actions, such as speculative developments, is not required but may be useful in some circumstances.  Including assumptions about possible future actions may increase the longevity of the document and expand the value for subsequent tiering. For example:

> *The EIS for oil and gas leasing in the Northwest NPR-A Planning Area in Alaska included analysis of permanent road construction, even though it is not feasible at this time.  By including assumptions and analysis about such possible future road construction in the EIS, new NEPA analysis might not be required if such permanent roads become feasible in the future.*

### 6.8.3.5    Analyzing the Cumulative Effects

For each cumulative effect issue, analyze the direct and indirect effects of the proposed action and alternatives together with the effects of the other actions that have a cumulative effect. Cumulative effects analysis will usually need to be addressed separately for each alternative, because each alternative will have different direct and indirect effects.

The following structure is not a required format, but may be useful in constructing the cumulative effects analysis. For each cumulative effect issue:

- Describe the existing condition (see section **6.7, *Affected Environment***).  The existing condition is the combination of the natural condition and the effects of past actions. The natural condition is the naturally occurring resource condition without the effects of human actions. Detailed description of the natural condition may not be possible for some resources because of incomplete or unavailable information (40 CFR 1502.22) or may not be applicable for some resources. Describe the effects of past actions, either individually or collectively, to understand how the existing condition has been created.
- Describe the effects of other present actions.
- Describe the effects of reasonably foreseeable actions.
- Describe the effects of the proposed action and each action alternatives.
- Describe the interaction among the above effects.
- Describe the relationship of the cumulative effects to any thresholds.

See the Web Guide for an example of cumulative effects analysis.

**Figure 6.3 Cumulative Effects**
*Bars in this graph represent effects of actions.*
*This graphic most clearly represents additive cumulative effects.*



Figure 6.3

The analysis of the No Action alternative describes the cumulative effect of past, other present, and reasonably foreseeable actions, without the effect of the proposed action or action alternatives. The analysis of the proposed action will include those same effects, as well as the effects of the proposed action, and thus will demonstrate the incremental difference resulting from the proposed action.  Regardless of how you present the analysis, you must be able to describe the incremental differences in cumulative effects as a result of the effects of the proposed action and alternatives (40 CFR 1508.7).

Describe the interaction among the effects of the proposed action and these various past, present, and reasonably foreseeable actions.  This interaction may be:

• __additive:__ the effects of the actions add together to make up the cumulative effect.
• __countervailing:__ the effects of some actions balance or mitigate the effects of other actions.
• __synergistic:__ the effects of the actions together is greater than the sum of their individual effects.

How the different effects interact may help determine how you may best describe and display the cumulative effects analysis.  It will often be helpful to describe the cause-and-effect relations for the resources affected to understand if the cumulative effect is additive, countervailing, or synergistic.

The cumulative effects analysis provides a basis for evaluating the cumulative effect relative to any regulatory, biological, socioeconomic, or physical thresholds.  Describe how the incremental effect of the proposed action and each alternative relates to any relevant thresholds.

## 6.8.4    Mitigation and Residual Effects

Mitigation includes specific means, measures or practices that would reduce or eliminate effects of the proposed action or alternatives. Mitigation measures can be applied to reduce or eliminate adverse effects to biological, physical, or socioeconomic resources. Mitigation may be used to reduce or avoid adverse impacts, whether or not they are significant in nature.  Measures or practices should only be termed mitigation measures if they have not been incorporated into the proposed action or alternatives. If mitigation measures are incorporated into the proposed action or alternatives, they are called design features (see section **6.5.1.1, *Design Features of the Proposed Action***). You must describe the mitigation

> **Mitigation** measures are those measures that could reduce or avoid adverse impacts and have not been incorporated into the proposed action or an alternative.
>
> Mitigation can include (40 CFR 1508.20):
> • Avoiding the impact altogether by not taking a certain action or parts of an action.
> • Minimizing impact by limiting the degree of magnitude of the action and its implementation
> • Rectifying the impact by repairing, rehabilitation, or restoring the affected environment.
> • Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.
> • Compensating for the impact by replacing or providing substitute resources or environments."

measures that you are adopting in your decision documentation.  Monitoring is required to ensure the implementation of these measures (40 CFR 1505.2(c)) (see section **10.1, *Purposes of and Requirements for Monitoring***).

In an EIS, all "relevant, reasonable mitigation measures that could improve the project are to be identified," even if they are outside the jurisdiction of the agency (see Question 19b, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981*).  When presenting mitigation measures not within the BLM's jurisdiction, it is particularly beneficial to work with other agencies (see **Chapter 12, Cooperating Agencies, Joint Lead Agencies, and Advisory Committees**).

Socioeconomic impacts are usually indirect and largely fall on communities and local government institutions, by definition located outside BLM-managed lands.  While some mitigation strategies are within the BLM's control, (such as regulating the pace of mineral exploration and development to minimize rapid, disruptive social change), most mitigation strategies require action by other government entities—typically cities, counties, and State agencies.  In supporting local and State efforts to mitigate socioeconomic impacts, you "may provide information and other assistance, sanction local activities, encourage community and project proponent agreements, and cooperate with responsible officials to the fullest extent feasible" (BLM Handbook of Socio-Economic Mitigation, IV-2).

You may need to identify mitigation measures that would reduce or eliminate the effects of a non-Federal action when it is a connected action to the BLM proposed action (see section **6.8.2.1.1, *Connected Non-Federal Actions***).  For such non-Federal actions, the relevant, reasonable mitigation measures are likely to include mitigation measures that would be carried out by other Federal, State or local regulatory agencies or tribes.  Identifying mitigation outside of BLM jurisdiction serves to alert the other agencies that can implement the mitigation. In describing mitigation under the authority of another government agency, you must discuss the probability of the other agency implementing the mitigation measures (see Question 19b, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981*).

For an action analyzed in an EA, mitigation can be used to reduce the effects of an action below the threshold of significance, avoiding the need to prepare an EIS (see section **7.1, *Actions Requiring an EA***).

During impact analysis, analyze the impacts of the proposed action (including design features) and with all mitigation measures (if any) applied, as well as any further impacts caused by the mitigation measures themselves.  Address the anticipated effectiveness of these mitigation measures in reducing or avoiding adverse impacts in your analysis.  Describe the residual effects of any adverse impacts that remain after mitigation measures have been applied.

## 6.9  PUBLIC INVOLVEMENT AND RESPONDING TO COMMENTS

Public involvement is an important part of the NEPA process.  The level of public involvement varies with the different types of NEPA compliance and decision-making.  Public involvement begins early in the NEPA process, with scoping, and continues throughout the preparation of the analysis and the decision.

> **The public must be notified of its privacy rights.** See *IM 2007-092, April 4, 2007*.
> **Include the following statement in all information requesting public comment:** "Before including your address, phone number, e-mail address, or other personal identifying information in your comment, be advised that your entire comment –including your personal identifying information –may be made publicly available at any time. While you can ask us in your comment to withhold from public review your personal identifying information, we cannot guarantee that we will be able to do so."

## 6.9.1   Involving and Notifying the Public

The CEQ regulations require that agencies "make diligent efforts to involve the public in preparing and implementing their NEPA procedures" (40 CFR 1506.6(a)). There are a wide variety of ways to engage the public in the NEPA process. For EA public involvement, see sections **8.2,** *Public Involvement;* **8.3.3,** *Scoping and Issues;* and **8.3.7,** *Tribes, Individuals, Organizations, or Agencies Consulted*. For EIS public involvement, see sections **6.3,** *Scoping* and **9.2.10.1,** *Public Involvement and Scoping*.

A primary goal of public involvement is to ensure that all interested and affected parties are aware of your proposed action. Knowing your community well is the first step in determining the interested and affected parties and tribes. You may already have a core list of those interested in and potentially affected by the BLM's proposed actions; this may provide a good starting point. Work with your public affairs officer and other BLM staff, community leaders, and governmental agencies (Federal, State, and local) to help determine interested and affected parties and tribes.

Public meetings or hearings are required when there may be substantial environmental controversy concerning the environmental effects of the proposed action, a substantial interest in holding the meeting, or a request for a meeting by another agency with jurisdiction over the action (40 CFR 1506.6 (c)). You may determine that it is efficient to combine public meetings for the NEPA with hearings required by another law (an example is requirements in the Alaska National Interest Lands Conservation Act that require hearings if certain findings are made regarding the effects of a proposed action on subsistence). There are more stringent requirements for conducting the hearing and recording the proceedings. You must maintain records of public meetings and hearings including a list of attendees (as well as addresses of attendees desiring to be added to the mailing list) and notes or minutes of the proceedings. Consult 455 DM 1 for procedural requirements related to public hearings. Check individual program guidance to determine requirements for public meetings and hearings.

In many cases, people attending field trips and public meetings will be interested and/or affected parties. Make sure that you have attendance sheets that capture contact information at your field trips and meetings; these will provide you with a list of people who may want to be contacted about and involved in the NEPA process. In some cases, those affected by your proposed action may not be actively engaged in the NEPA process. In these cases, it is still important for you to reach out to those individuals, parties, or tribes, and we recommend using a variety of methods to help inform and engage those affected.

Notification methods include, but are not limited to: newsletters, Web sites or online NEPA logs, bulletin boards, newspapers, and *Federal Register* Notices.  EISs have very specific notification requirements, detailed in **Chapters 9 and 13**.  Also refer to **Chapters 4, 5, and 8** for more discussion of DNAs, CXs, and EAs.

The CEQ regulations explicitly discusses agency responsibility towards interested and affected parties at 40 CFR 1506.6.  The CEQ regulations require that agencies shall:

(a) Make diligent efforts to involve the public in preparing and implementing their NEPA procedures

(b) Provide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected.

In all cases the agency shall mail notice to those who have requested it on an individual action. In the case of an action with effects of national concern notice shall include publication in the Federal Register and notice by mail to national organizations reasonably expected to be interested in the matter and may include listing in the 102 Monitor. An agency engaged in rulemaking may provide notice by mail to national organizations who have requested that notice regularly be provided. Agencies shall maintain a list of such organizations.

In the case of an action with effects primarily of local concern the notice may include:

>   (i) Notice to State and areawide clearinghouses pursuant to OMB Circular A- 95 (Revised).
>   (ii) Notice to Indian tribes when effects may occur on reservations.
>   (iii) Following the affected State's public notice procedures for comparable actions.
>   (iv) Publication in local newspapers (in papers of general circulation rather than legal papers).
>   (v) Notice through other local media.
>   (vi) Notice to potentially interested community organizations including small business associations.
>   (vii) Publication in newsletters that may be expected to reach potentially interested persons.
>   (viii) Direct mailing to owners and occupants of nearby or affected property.
>   (ix) Posting of notice on and off site in the area where the action is to be located.

(c) Hold or sponsor public hearings or public meetings whenever appropriate or in accordance with statutory requirements applicable to the agency. Criteria shall include whether there is:

>   (i) Substantial environmental controversy concerning the proposed action or substantial interest in holding the hearing.
>   (ii) A request for a hearing by another agency with jurisdiction over the action supported by reasons why a hearing will be helpful. If a draft environmental impact statement is to be considered at a public hearing, the agency should make the statement available to the public at least 15 days in advance (unless the purpose of the hearing is to provide information for the draft environmental impact statement).

(d) Solicit appropriate information from the public.

(e) Explain in its procedures where interested persons can get information or status reports on environmental impact statements and other elements of the NEPA process.

(f) Make environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act (5 U.S.C. 552), without regard to the exclusion for interagency memoranda where such memoranda transmit comments of Federal agencies on the environmental impact of the proposed action. Materials to be made available to the public shall be provided to the public without charge to the extent practicable, or at a fee which is not more than the actual costs of reproducing copies required to be sent to other Federal agencies, including the Council.

## 6.9.2    Comments

The BLM has both the duty to comment on other agencies' EISs and to obtain comments on our EISs in cases of jurisdiction by law or special expertise.  For more discussion of these requirements, see **Chapter 11, *Agency Review of Environmental Impact Statements***.

Comments on the document and proposed action may be received in response to a scoping notice or in response to public review of an EA and FONSI or draft EIS.  Comments received at other times in the process may not need a formal response.  However, all substantive comments received before reaching a decision must be considered to the extent feasible (40 CFR 1503.4). Comments must be in writing (including paper or electronic format or a court reporter's transcript taken at a formal hearing), substantive, and timely, in order to merit a written response. You may receive oral comments at public meetings and workshops – it is helpful to write these down to revisit during the NEPA process.  To ensure that the true intent of the comment is captured, offer the commenter the opportunity to record his or her comment in writing. The geographic origin of a comment does not alter whether it is substantive.

The requirements for BLM responses to comments differ between EAs and EISs (see section **8.2, *Public Involvement***, and section **9.6.1, *Comments Received Following Issue of the Final EIS***). When an EA and unsigned FONSI are made available for public comment, we recommend that you respond to all substantive and timely comments.  You may respond to substantive, timely comments in the EA or in the decision record.  If a substantive and timely comment does not lead to changes in the EA or decision, you may reply directly to the commenter, and we recommend that you document the reply in either the EA or the decision record (see section **8.5.1, *Documenting the Decision***).  When preparing a final EIS, you must respond to all substantive written comments submitted during the formal scoping period and public comment period (see section **9.4, *The Final EIS***).  You are not required to respond to comments that are not substantive or comments that are received after the close of the comment period, but you may choose to reply (516 DM 4.19(A) and (B)) (see section **6.9.2.2, *Comment Response***). However, be cautious about not responding to untimely comments from agencies with jurisdiction by law or special expertise (see section **11.1 *Obtaining Comments on Your EIS***).

## 6.9.2.1    Substantive Comments

Substantive comments do one or more of the following:

- question, with reasonable basis, the accuracy of information in the EIS or EA.
- question, with reasonable basis, the adequacy of, methodology for, or assumptions used for the environmental analysis.
- present new information relevant to the analysis.
- present reasonable alternatives other than those analyzed in the EIS or EA.
- cause changes or revisions in one or more of the alternatives.

Comments that are not considered substantive include the following.

- comments in favor of or against the proposed action or alternatives without reasoning that meet the criteria listed above (such as "we disagree with Alternative Two and believe the BLM should select Alternative Three").
- comments that only agree or disagree with BLM policy or resource decisions without justification or supporting data that meet the criteria listed above (such as "more grazing should be permitted").
- comments that don't pertain to the project area or the project (such as "the government should eliminate all dams," when the project is about a grazing permit).
- comments that take the form of vague, open-ended questions.

Examples of substantive comments can be found in the Web Guide.

### 6.9.2.2    Comment Response

The CEQ regulations at 40 CFR 1503.4 recognize several options for responding to substantive comments, including:

- modifying one or more of the alternatives as requested.
- developing and evaluating suggested alternatives.
- supplementing, improving, or modifying the analysis.
- making factual corrections.
- explaining why the comments do not warrant further agency response, citing cases, authorities, or reasons to support the BLM's position.

*Preparing to Respond to Comments*
When you anticipate receiving a large number of comments, we recommend that you develop an organized system for receiving and cataloging comments before the comments start arriving. Training (formal or informal) to ensure that staff understand their responsibilities and the system's organization may be valuable.  For proposals that may have a large number of comments, we recommend that you develop a systematic way to track substantive comments and the BLM's response, such as in a searchable database.  Commenters may wish to know how the BLM responded to their comments; having a well-organized means of determining this will facilitate the process.

*Responding to Substantive Comments*
You may respond to comments in several ways:

- write a letter to the commenter and record your response in the administrative record.
- present the comment and your response in the NEPA document.
- present the comment and your response in the decision document.

The CEQ recommends that responses to substantive comments should normally result in changes in the text of the NEPA document, rather than as lengthy replies to individual comments in a separate section (see Question 29a, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981)*. If the comments are made with respect to the BLM decision, you may respond to the comments in the decision documentation or Record of Decision rather than in the EIS or EA.

A short response to each substantive comment and a citation to the section or page where the change was made may be appropriate. Similar comments may be summarized and one response given to each group of similar comments; this approach is especially useful when a large number of comments is received.

If public comments on a draft EIS identify impacts, alternatives, or mitigation measures that were not addressed in the draft, the decision-maker responsible for preparing the EIS must determine if they warrant further consideration. If they do, the decision-maker must determine whether the new impacts, new alternatives, or new mitigation measures must be analyzed in either the final EIS or a supplemental draft EIS (see Question 29b, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981)* (see section **5.3, Supplementing an EIS**). Similarly, we recommend that the decision-maker responsible for preparing an EA consider whether public comments identify impacts, alternatives or mitigation measures that warrant preparation of a new EA.

Comments that express a professional disagreement with the conclusions of the analysis or assert that the analysis is inadequate may or may not lead to changes in the NEPA document. When there is disagreement within a professional discipline, a careful review of the various interpretations is warranted. In some instances, public comments may necessitate a reevaluation of analytical conclusions. If, after reevaluation, the decision-maker responsible for preparing the EA or EIS does not think that a change is warranted, we recommend that your response provide the rationale for that conclusion. Thorough documentation of methodology and assumptions in the analysis may improve the reader's understanding of the BLM's analytical methods, and may reduce questions (see section **6.8.1.2, Analyzing Effects**).

*Responding to Nonsubstantive Comments*
You are not required to respond to nonsubstantive comments such as those comments merely expressing approval or disapproval of a proposal without reason. However, you may wish to acknowledge the comment, and may do so in a variety of methods, including but not limited to sending postcards, letters, or email responses.

This page was intentionally left blank.

# CHAPTER 7—DETERMINING WHETHER AN EA OR EIS IS APPROPRIATE

7.1   Actions Requiring an EA
7.2   Actions Requiring an EIS
7.3   Significance

## 7.1   ACTIONS REQUIRING AN EA

Actions are analyzed in an EA if the actions are not categorically excluded, not covered in an existing environmental document, and not normally subject to an EIS.  Use the EA analysis to determine if the action would have significant effects; if so, you would need to prepare an EIS. If the action would not have significant effects, prepare a Finding of No Significant Impact (FONSI) (see section **8.4.2, *The Finding of No Significant Impact (FONSI)***).  If you have already decided to prepare an EIS, you do not need to first prepare an EA (see section **7.2, *Actions Requiring an EIS***).

An EA may demonstrate that a proposed action would have effects that are significant but could be reduced or avoided through mitigation.  You may use a mitigated FONSI rather than an EIS if you are able to reasonably conclude, based on the EA analysis, that the mitigation measures would be effective in reducing effects to nonsignificance.  The FONSI must clearly identify whether the mitigation measures are needed to reduce effects to nonsignificance.  You must describe the mitigation measures you are adopting in the decision documentation, and must provide monitoring to ensure the implementation of these measures (see section **10.2, *Developing a Monitoring Plan or Strategy***).

You may prepare an EA for an action that has some significant impacts if the EA is tiered to a broader EIS which fully analyzed those significant impacts (see section **5.2.2, *Tiering)*.  For such a tiered EA, you must document in the FONSI a determination that the potentially significant effects have already been analyzed, and no other effects reach significance. Only significant effects that have not been analyzed in an existing EIS will trigger the need for a new EIS.

Note: Though not required, a decision-maker may elect to prepare an EA for an action that is categorically excluded or covered by an existing environmental document to assist in planning or decision-making. In such cases, explain in the EA why you are electing to prepare an EA.

## 7.2   ACTIONS REQUIRING AN EIS

Actions whose effects are expected to be significant and are not fully covered in an existing EIS must be analyzed in a new or supplemental EIS (516 DM 11.8(A)).  You must also prepare an EIS if, after preparation of an EA, you determine that the effects of the proposed action would be significant and cannot be mitigated to a level of nonsignificance (see section **7.1, *Actions Requiring an EA***).  If you determine during preparation of an EA that the proposed action would have significant effects and cannot be mitigated to a level of nonsignificance, you do not need to complete preparation of the EA before beginning preparation of an EIS (516 DM 11.7(E)) (See section **8.4.1, *Significant Impacts – Transitioning from an EA to an EIS***).

The following actions normally require preparation of an EIS:

(1)  Approval of Resource Management Plans.
(2)  Proposals for Wild and Scenic Rivers and National Historic Scenic Trails.
(3)  Approval of regional coal lease sales in a coal production region.
(4)  Decision to issue a coal preference right lease.
(5)  Approval of applications to the BLM for major actions in the following categories:
    (a)  Sites for steam-electric power plants, petroleum refineries, synfuel plants, and industrial structures
    (b)  Rights-of-way for major reservoirs, canals, pipelines, transmission lines, highways and railroads
(6)  Approval of operations that would result in liberation of radioactive tracer materials or nuclear stimulation
(7)  Approval of any mining operation where the area to be mined, including any area of disturbance, over the life the mining plan is 640 acres or larger in size.

"If, for any of these actions it is anticipated that an EIS is not needed based on potential impact significance, an environmental assessment will be prepared…." (516 DM 11.8(B) and (C)).

*Note*: Though not required, a decision-maker may elect to prepare an EIS for an action that does not have significant effects to assist in planning or decision-making. In such cases, explain in the Notice of Intent and the EIS why you are electing to prepare an EIS.

## 7.3  SIGNIFICANCE

Whether an action must be analyzed in an EA or EIS depends upon a determination of the significance of the effects.  "Significance" has specific meaning in the NEPA context and you must use only this meaning in NEPA documents.

> **Significance** is defined as effects of sufficient context and intensity that an environmental impact statement is required.  The CEQ regulations refer to both significant effects and significant issues (for example, 40 CFR 1502.2(b)).  The meaning of significance should not be interpreted differently for issues than for effects: significant issues are those issues that are related to significant or potentially significant effects.

The CEQ regulations explain in 40 CFR 1508.27:
> "'Significantly' as used in the NEPA requires considerations of both context and intensity:
>
> (a) Context.  This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality.  Significance varies with the setting of the proposed action.  For instance, for a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole.  Both short-term and long-term effects are relevant.

(b) Intensity.  This refers to the severity of effect.  Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action…." (40 CFR 1508.27).

Note that to determine the severity of effect, you must look at direct, indirect, and cumulative effects (40 CFR 1508.25(c)).

The CEQ regulations include the following ten considerations for evaluating intensity.

***Impacts that may be both beneficial and adverse*** (40 CFR 1508.27(b)(1)).  In analyzing the intensity of effects, you must consider that effects may be both beneficial and adverse.  Even if the effect of an action will be beneficial on balance, significant adverse effects may exist. *For example, removal of a dam may have long-term beneficial effects on an endangered fish species.  However, the process of removing the dam may have short-term adverse effects on the fish.*

The consideration of intensity must include analysis of both these beneficial and adverse effects, not just a description of the net effects. Only a significant adverse effect triggers the need to prepare an EIS.

***Public health and safety*** (40 CFR 1508.27(b)(2)).  You must consider the degree to which the action would affect public health and safety which may require, for example, evaluation of hazardous and solid wastes, air and water quality.  In the context of evaluating significance, consideration of these resource effects should describe their relation to public health and safety.  Economic or social effects are not intended by themselves to require preparation of an environmental impact statement (40 CFR 1508.14.).

***Unique characteristics of the geographic area*** (40 CFR 1508.27(b)(3).  "Unique characteristics" are generally limited to those that have been identified through the land use planning process or other legislative, regulatory, or planning process; for example:

- prime and unique farmlands as defined by 7 CFR 657.5.
- caves designated under 43 CFR 37.
- wild and scenic rivers, both designated and suitable.
- designated wilderness areas and wilderness study areas.
- areas of critical environmental concern designated under 43 CFR 1610.7-2.

***Degree to which effects are likely to be highly controversial*** (40 CFR 1508.27(b)(4)).  You must consider the degree to which the effects are likely to be highly controversial.  Controversy in this context means disagreement about the nature of the effects, not expressions of opposition to the proposed action or preference among the alternatives. There will always be some disagreement about the nature of the effects for land management actions, and the decision-maker must exercise some judgment in evaluating the degree to which the effects are likely to be highly controversial.  Substantial dispute within the scientific community about the effects of the proposed action would indicate that the effects are likely to be highly controversial.

***Degree to which effects are highly uncertain or involve unique or unknown risks*** (40 CFR 1508.27(b)(5)).  You must consider the degree to which the effects are likely to be highly uncertain or involve unique or unknown risks.  As with controversy, there will always be some uncertainty about the effects of land management actions, and the decision-maker must exercise some judgment in evaluating the degree to which the effects are likely to be highly uncertain.  Similarly, there will always be some risk associated with land management actions, but the decision-maker must consider whether the risks are unique or unknown. (Refer to the Web Guide for examples of both risks that are unique or unknown, and risks that are not).

***Consideration of whether the action may establish a precedent for future actions with significant impacts*** (40 CFR 1508.27(b)(6)).  You must consider the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.  You must limit this consideration to future actions that are reasonably foreseeable, not merely possible (see section **6.8.3.4, *Past, Present, and Reasonably Foreseeable Actions***).

***Consideration of whether the action is related to other actions with cumulatively significant impacts*** (40 CFR 1508.27(b)(7)).  You must consider whether the action is related to other actions with cumulatively significant effects (40 CFR 1508.27(b)(7).  Other actions are "related" to the action if they are connected or cumulative (see sections **6.5.2.1, *Connected Actions*** and **6.5.2.2, *Cumulative Actions***).  You must analyze the effect of past, present, and reasonably foreseeable future actions, regardless of who undertakes such other actions, in the cumulative effects analysis for the proposed action. This analysis provides the context for understanding the effects of the BLM action (see section **6.8.3, *Cumulative Effects***). In determining the significance of the BLM action, you count only the effects of the BLM action together with the effects of connected and cumulative actions to the extent that the effects can be prevented or modified by BLM decision making (see section **6.5.2.1 *Connected Actions***).

For example:

*The BLM proposes to construct a trail to provide recreation access to BLM-managed lands from a campground the Forest Service proposes to construct on adjacent Forest Service lands.  The Forest Service campground is a connected action (see section **6.5.2.1, Connected Actions**). In this example, you must count the effects of both the BLM trail construction and the Forest Service campground construction in determining significance.*

*The BLM proposes to construct a campground, which would contribute sediment to a nearby stream; the BLM proposes to replace a culvert, which would contribute sediment to the same stream.  The culvert replacement is a cumulative action (see section **6.5.2.2, Cumulative Actions**). In this example, you must count the effects of both the campground construction and the culvert replacement in determining significance.*

*The BLM receives a right-of-way request for access for timber harvest on adjacent private land. The timber harvest on private land would be a connected action, because the timber harvest and the right-of-way request are interdependent parts (see section **6.5.2.1, Connected Actions**). Whether you count the effects of the timber harvest in determining the significance of the right-of-way grant would depend on whether the effects of the timber harvest could be prevented by BLM decision making (see section **6.5.2.1. Connected Actions**). In this example, that determination would likely depend on whether the private party has other reasonable access for timber harvest (see section **6.6.3, Alternatives Considered but Eliminated From Detailed Analysis** for discussion of "reasonable").*

- *If the private party has no other reasonable access (and therefore the harvest could not proceed without the right-of-way grant), the effects of the timber harvest would count towards the significance of the right-of-way grant. If the private party has no other reasonable access, the No Action alternative (i.e., denying the right-of-way request) would assume that the timber harvest would not occur. In this case, the effects of the timber harvest would be part of the incremental difference in cumulative effects between the No Action alternative (denying the right-of-way request) and the Proposed Action (granting the right-of-way).*

- *If the private party has other reasonable access, the effects of the timber harvest would not count towards the significance of the right-of-way grant. The No Action alternative would assume that the timber harvest would occur using the other reasonable access. In this case, the effects of the timber harvest would not be part of the incremental difference in cumulative effects between the No Action alternative and the Proposed Action (see section **6.8.3.5, Analyzing the Cumulative Effects**).*

***Scientific, cultural, or historical resources, including those listed in or eligible for listing in the National Register of Historic Places*** (40 CFR 1508.27(b)(8))**.** This factor represents a specific sub-set of the factor, "unique characteristics of the geographic area." Significance may arise from the loss or destruction of significant scientific, cultural, or historical resources. For resources listed in or eligible for listing in the National Register of Historic Places, significance depends on the degree to which the action would adversely affect these resources.

***Threatened or endangered species and their critical habitat*** (40 CFR 1508.27(b)(9))**.** Significance depends on the degree to which the action would adversely affect species listed under the Endangered Species Act or their designated critical habitat. A determination under the Endangered Species Act that an action would adversely affect a listed species or critical habitat does not necessarily equate to a significant effect in the NEPA context. The NEPA analysis and ESA effects determinations have different purposes and use slightly different analytical approaches (for example, regarding connected actions, reasonably foreseeable actions, and cumulative effects). Although ESA documents, such as biological assessments and biological opinions, provide useful information, you must base your evaluation of the degree to which the action would adversely affect the species or critical habitat on the analysis in the EA.

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

***Any effects that threaten a violation of Federal, State, or local law or requirements imposed for the protection of the environment*** (40 CFR 1508.27(b)(10)).  This factor will often overlap with other factors: for example, violations of the Clean Water Act or Clean Air Act would usually involve effects that would adversely affect public health and safety.

# CHAPTER 8—PREPARING AN ENVIRONMENTAL ASSESSMENT

General
8.1   Preparing to Write an Environmental Assessment (EA)
8.2   Public Involvement
8.3   EA Format
8.4   Determination of Significance
8.5   The Decision Record
8.6   Implementation

## GENERAL

> An **environmental assessment** is a tool for determining the "significance" of environmental impacts; it provides a basis for rational decision making.

The steps for performing an EA-level analysis follow the NEPA analysis steps laid out in **Chapter 6**, *NEPA Analysis*.  This chapter builds on the foundation laid in Chapter 6 and provides specific direction and guidance for preparing an EA.  **Chapter 8**, *Preparing an Environmental Assessment* also addresses the transition steps necessary to shift to preparation of an EIS when an EA process identifies significant effects or the likelihood of significant effects (see section **8.4.1**, *Significant Impacts – Transitioning from an EA to an EIS*).

## 8.1   PREPARING TO WRITE AN ENVIRONMENTAL ASSESSMENT (EA)

An EA is intended to be a concise public document that provides sufficient evidence and analysis for determining the significance of effects from a proposed action (40 CFR 1508.9) and that serves as a basis for reasoned choice.  Based upon the EA analysis, either an EIS or a FONSI will be prepared.

The CEQ has advised agencies to keep EAs to no more than approximately 10-15 pages (Question 36a, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations,* March 23, 1981).  Concise and well-written documents foster effective communications with the public and informed decision-making.  This handbook was developed to assist in streamlining NEPA documents while retaining their informative character, and provides suggestions and tools for preparing concise EAs.

You may reduce the length of the EA by thoughtful crafting of the purpose and need for action; developing a proposed action that specifically addresses the purpose and need; and maintaining focus on the relevant issues.  Consistent focus on the issues associated with the proposed action will help you identify reasonable alternatives and potential effects.  Other streamlining techniques include the use of tiering and incorporation by reference (see section *5.2, Incorporation by Reference and Tiering*).

A longer EA may be appropriate when a proposal is so complex that a concise document cannot meet the goals of 40 CFR 1508.9 or when it is extremely difficult to determine whether the proposal could have significant environmental effects.  Carefully consider complex proposals and the criteria for when an EIS may be appropriate (see **Chapter 7,** ***Determining Whether an EA or an EIS is Appropriate***), rather than proceeding with a lengthy EA just to avoid the EIS process.

## 8.2  PUBLIC INVOLVEMENT

You must have some form of public involvement in the preparation of all EAs.  The CEQ regulations do not require agencies to make EAs available for public comment and review.  In certain limited circumstances, agencies are required to make FONSIs available for public review (40 CFR 1501.4(e)(2) (see section **8.4.2,** ***The Finding of No Significant Impact (FONSI)***).  The CEQ regulations direct agencies to encourage and facilitate public involvement in the NEPA process to the fullest extent possible (40 CFR 1500.2(d), 40 CFR 1506.6).  This means that while some public involvement is required in the preparation of an EA, you have the discretion to determine how much, and what kind of involvement works best for each individual EA.  For preparation of an EA, public involvement may include any of the following: external scoping, public notification before or during preparation of an EA, public meetings, or public review and comment of the completed EA and unsigned FONSI.  The type of public involvement is at the discretion of the decision-maker.  When you need to prepare many EAs for similar projects in a short timeframe, it may be helpful to prepare a programmatic EA to cover those projects and to facilitate focused public involvement

Before and during the preparation of the EA, be very thoughtful about the level of public involvement that may be necessary with respect both to the decision to be made and the analysis of the environmental consequences of that decision.  As discussed in section **6.9,** ***Public Involvement and Responding to Comments***, consider providing for public involvement very early in the process.  It is helpful to prepare a public involvement strategy that allows you to adjust the amount and nature of public participation throughout the analysis process. In the strategy, identify the objectives for public involvement to assist in determining the need for, level and nature of that involvement.

Internal scoping, while not considered public involvement, is used to set the stage for external scoping if the decision-maker determines that it is necessary. Internal and external scoping are introduced in section **6.3,** ***Scoping*** and discussed in more detail in section **8.3.3***, Scoping and Issues*. Internal scoping is integral to the preparation of all environmental assessments.

In addition to public involvement in the preparation of EAs, you must notify the public of the availability of a completed EA and FONSI (40 CFR 1506.6(b)).  In addition, some FONSIs must be made available for a 30-day public review, as described in section **8.4.2,** ***The Finding of No Significant Impact (FONSI)***.  In situations that do not require public review of the FONSI, the unsigned FONSI and completed EA may be released for public review at the decision-maker's discretion.  Section **8.4.2,** ***The Finding of No Significant Impact (FONSI)*** discusses the preparation of FONSIs and provides information regarding their release for public review.

## 8.3   EA FORMAT

The CEQ regulations state that an EA must contain brief discussions of the need for the proposal, the alternatives considered, the environmental effects of the proposed action and alternatives, and a listing of agencies and persons consulted (40 CFR 1508.9 (b)).  Also, the BLM requires certain information in the EA, and there may be particular program-specific requirements for an EA. Refer to the Web Guide for a current description of program-specific requirements related to EAs.  Content and format requirements for EA-level LUP amendments can be found in the BLM's Land Use Planning Handbook H-1601-1.

We recommend that you organize an EA so that the flow of information is logical and easy to follow.  The following recommended EA format is intended to present the analytical information in a manner that both informs decision-making and enhances general reader understanding of the proposal, the analysis process, and the results.  This recommended format is provided in outline form in **Appendix 9**, ***Recommended EA Format.***

### 8.3.1   Introduction

Provide the following identifying information at the beginning of an EA, or in the introduction:

- **Title, EA number, and type of project.**  Consult the appropriate State, District, or Field Office guidance regarding the assignment of EA numbers.
- **Location of proposal.**  Identify the general location of the proposed action (details of the location are in the proposed action). Use maps where appropriate to assist in identifying the specific location of the proposed action.
- **Name and location of preparing office.**
- **Identify the subject function code, lease, serial, or case file number** (where applicable).  Identify, for example, the right-of way case file number, the application for a permit to drill identifier, etc.
- **Applicant name** (where applicable).  The applicant's address may also be included. (Note: Applicant name and address may be protected under the *Privacy Act*: refer to program-specific guidance and the exemptions under the *Freedom of Information Act, which is referenced in the Web Guide*).

The EA introduction also typically includes background information that provides context for the purpose and need statement.

### 8.3.2   Purpose and Need for Action and Decision to be Made

As discussed in section **6.2.1**, ***The Role of the Purpose and Need Statement,*** the purpose and need statement frames the range of alternatives.  We recommend that you develop the purpose and need statement very early in the NEPA process and include it in scoping.

We recommend including a section in the EA that describes the "Decision to be Made." Describing the decision to be made clearly spells out the BLM's decision space and the focus of the NEPA analysis; in addition, it may serve as a vehicle for describing the nature of other decisions that will be made by other entities in order to implement the proposed action and any alternatives.  Refer to the discussion and examples in section **6.2.1**, ***The Decision to be Made***.

### 8.3.3    Scoping and Issues

The topics of internal and external scoping are introduced in section **6.3,** *Scoping*.  Internal scoping, as discussed, is used to formulate the purpose and need; identify connected, similar and cumulative actions associated with the proposal; begin preparations for the cumulative effects analysis; determine the appropriate level of documentation; and prepare a public participation strategy.  While external scoping for EAs is optional (40 CFR 1501.7), the benefits of external scoping for an EA are essentially the same as for an EIS, as discussed in section **6.3.2,** *External Scoping*.

When evaluating the need for scoping, consider factors such as: the size or scale of the proposed action; whether the proposal is routine or unique; who might be interested or affected; and whether or not external scoping has been conducted for similar projects and what the results have been.  It is up to the decision-maker to determine the need for and level of scoping to be conducted.  We recommend that you document in the EA your rationale for determining whether or not to conduct external scoping.  If you conduct external scoping, document the scoping process, the comments received, and the issues identified and how they were addressed in the EA.   If you receive numerous comments, a summary of the comments may suffice for the EA; however, be sure to retain the comments and to document their disposition in the administrative record.  See sections **8.3.7,** *Tribes, Individuals, Organizations, or Agencies Consulted*, and **8.5.1,** *Documenting the Decision,* for additional discussions regarding public involvement and managing comments.

Regardless of the level of scoping conducted, we recommend that you identify and document issues associated with the proposed action (see sections **6.3,** *Scoping* and **6.4,** *Issues*).  As discussed in section **6.4.1,** *Identifying Issues for Analysis*, you do not need to analyze all issues identified in the scoping process.  Analyze an issue if its analysis will help in making a reasoned choice among alternatives, or if it is, or may be, related to a potentially significant effect.  In addition, the decision-maker may elect to analyze other issues to assist in planning or decision-making.  In such cases explain in the EA why you are electing to identify the issue for analysis.

### 8.3.4    Proposed Action and Alternatives

You must describe the proposed action and alternatives considered, if any (40 CFR 1508.9(b)) (see sections **6.5,** *Proposed Action* and **6.6,** *Alternative Development*).  Illustrations and maps can be used to help describe the proposed action and alternatives.  The sub-sections below provide detailed guidance for how to describe the proposed action and how to develop and describe appropriate alternatives.

#### 8.3.4.1    Description of the Proposed Action

Provide a description of the proposed action (see section **6.5,** *Proposed Action* for guidance).  Generally describe the relationship between the purpose and need and the proposed action.  To identify potential connected and cumulative actions that may need to be included with the proposed action, refer to sections **6.5.2.1,** *Connected Actions and 6.5.2.2, Cumulative Actions*.  Be sure to include design features specific to the proposed action (see section **6.5.1.1,** *Design Features of the Proposed Action*).

## 8.3.4.2     Alternatives in an EA

EAs shall "…include brief discussions…of alternatives as required by section 102(2)(E),…"  (40 CFR 1508.9(b)).  Section 102(2)(E) of the NEPA provides that agencies of the Federal Government shall "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."

Although the regulation at 40 CFR 1508.9(b) makes no specific mention of the No Action alternative with respect to EAs, the CEQ has interpreted the regulations generally to require some consideration of a No Action alternative in an EA.  The CEQ has issued guidance stating: "you may contrast the impacts of the proposed action and alternatives with the current condition and expected future condition in the absence of the project.  This constitutes consideration of a no-action alternative as well as demonstrating the need for the project." (CEQ Memorandum to Federal NEPA Contacts: Emergency Actions and NEPA (September 8, 2005), CEQ Memorandum to Secretary of Agriculture and Secretary of Interior: Guidance for Environmental Assessments of Forest Health Projects (December 9, 2002)).  Therefore, at a minimum, your EA must include documentation of the current and future state of the environment in the absence of the proposed action.  This discussion does not need to be a separate section called "No Action Alternative," but can be part of the environmental effects section of the EA to show the change in effects brought about by the proposed action or alternatives.  Examples of how to do this can be found on the web guide.

You may analyze the No Action alternative with the same level of treatment as the proposed action and any action alternatives, if this will assist in your decision-making.  In such cases, it may be clearer to provide this analysis in a separate analysis of the No Action alternative in an environmental effects section.  Including such a separate analysis may provide a useful context for comparing environmental effects of the various alternatives, and demonstrates the consequences of not meeting the need for the action.

You must consider alternatives if there are unresolved conflicts concerning alternative uses of available resources (40 CFR 1508.9(b)).  There are no unresolved conflicts concerning alternative uses of available resources if consensus has been established about the proposed action based on input from interested parties, or there are no reasonable alternatives to the proposed action that would be substantially different in design or effects.  (However, the analysis of effects may result in new issues that require development and consideration of another alternative).

Consensus about the proposed action may be established by conducting scoping for the proposed action, but it may also be possible to establish consensus through other means of public involvement.  For example, scoping and/or public comments on a programmatic NEPA document may provide a basis for concluding that there is consensus about a subsequent specific action that is tiered to the programmatic document.  Document the basis for concluding that there is consensus about a proposed action and identify the interested parties that participated in the consensus-building process.

Many conflicts concerning alternative uses of available resources are resolved in existing land use plan (LUP) and other programmatic decisions.  Such programmatic decisions often establish "basic policy objectives for management of the area," which may ultimately limit the "reasonable" alternatives to a proposed action to implement an LUP or programmatic decision (see section **6.6.1, *Reasonable Alternatives***).  The purpose and need statement for implementation actions may be constructed in the context of the existing LUP or programmatic decisions; thus, alternatives that are not in conformance typically will not be "reasonable." However, some proposed actions and alternatives will intentionally not be in conformance with the LUP because the intent is to amend or revise LUP direction; hence the alternatives are reasonable to analyze.

If alternatives relevant to the proposed action have been described and analyzed in a previous environmental document, it may be sufficient to incorporate by reference the description and analysis from the previous document (see section **5.2, *Incorporation by Reference and Tiering***). In addition, you may use tiering to reduce the range of alternatives (see section **5.2, *Incorporation by Reference and Tiering***, for further discussion of tiering).

In addition, for EAs, you need only analyze alternatives that would have a lesser effect than the proposed action.  However, be cautious in dismissing an alternative from analysis in an EA because it would have a "greater effect."  For many management actions, characterizing the overall effects of alternatives as "lesser" or "greater" will be difficult, because alternatives will often have lesser effects on some resources and greater effects on other resources when compared to the proposed action.

For projects proposed under the Healthy Forests Restoration Act of 2003 (HFRA) (P.L. 108-148), refer to specific guidance regarding analysis of alternatives in section **6.6.1, *Reasonable Alternatives,*** as it provides guidance different from that included in this section.

While analysis of alternatives is not always required in EAs, a decision-maker may choose to analyze alternatives in detail to assist in identifying trade-offs or in decision-making and planning.  In such cases, explain in the EA why you are electing to analyze the alternative in detail.

### 8.3.4.2.1      Alternatives Considered but Eliminated from Detailed Analysis

We recommend that the EA contain a description of alternatives to the proposed action that were considered but not analyzed in detail.  Include alternatives that were recommended by members of the public or agencies but dismissed from detailed analysis after preliminary investigation. Document the reasons for dismissing an alternative in the EA (see section **6.6.3, *Alternatives Considered but Eliminated from Detailed Analysis*** for additional discussion).

### 8.3.4.3    Conformance

In this section, discuss whether or not the proposed action is in conformance with the land use plan; identify directly relevant laws, regulations, policies, program guidance, and local permitting requirements that are germane to the proposed action.  An exhaustive list or discussion of all applicable laws or regulations is not appropriate.

We recommend that you also evaluate and disclose whether or not any alternatives considered are in conformance with the land use plan and as described above.  Determining "conformance" early in the process will indicate if a plan amendment is necessary to implement an alternative.

### 8.3.5    Affected Environment

We recommend that the EA contain a brief description of the environment likely to be affected by the proposed action or alternatives.  Limit the description of the affected environment to that information relevant to understanding the effect(s) of the proposed action or alternative (see sections **6.7.1,** *Affected Environment* and **6.7.2,** *Use of Relevant Data*).  You may present the affected environment description as its own section, or combined with environmental effects.

### 8.3.6    Environmental Effects

The EA must describe and provide the analysis of environmental effects of the proposed action and each alternative analyzed in detail (40 CFR 1508.9(b)).  An issue identified through internal or external scoping must be analyzed if analysis is necessary to :

- make a reasoned choice among alternatives (if any), or

- determine the significance of effects (see section **6.8,** *Environmental Effects*).

The effects analysis must address direct, indirect and cumulative effects related to each issue (see section **6.8,** *Environmental Effects*).  Tiering to a broader NEPA analysis may limit the need for analysis, especially cumulative effects analysis (see section **6.8.3,** *Cumulative Effects*).

Discussion of impacts may either be organized by alternative with impact topics as subheadings or by impact topic with alternatives as subheadings.  Generally, if impacts to a particular resource for one alternative are the same as another alternative, make reference to that section in the EA rather than repeating the information.

The EA must also identify and analyze mitigation measures, if any, which may be taken to avoid or reduce potentially significant effects (see Question 39, CEQ*, Forty Most Asked Questions Concerning CEQ's NEPA Regulations,* March 23, 1981).  You must describe and analyze the anticipated effectiveness of mitigation measures and any direct, indirect, and cumulative effects that remain after the application of all mitigation measures—that is, residual effects.  Although described and analyzed in the body of the EA, the mitigation measures that will be implemented are explicitly adopted in the decision record.  Refer to section **6.8.4,** *Mitigation and Residual Effects* for additional information regarding mitigation measures.

### 8.3.7    Tribes, Individuals, Organizations, or Agencies Consulted

The EA must list tribes, individuals, organizations, and agencies consulted (40 CFR 1508.9(b)). Long contact lists may be referenced or provided in an appendix to the EA. It may be appropriate to provide brief statements regarding the purpose for the contacts and the results. You may include comments received from tribes and the public in this section, though you may also include them in the discussion of scoping and issues earlier in the EA, or describe them in the decision record (see sections **8.3.3, *Scoping and Issues*** and **8.5.1, *Documenting the Decision***). If large numbers of substantive comments are received, you may summarize them in the EA or decision record, but you must retain the comment letters in the administrative record. It is important that you not only evaluate and summarize the substantive comments, but be able to demonstrate that you considered them.

### 8.3.8    List of Preparers

We recommend that you provide a list of the specialists who prepared the EA and their area of expertise.

## 8.4  DETERMINATION OF SIGNIFICANCE

Based upon the analysis, provide a determination as to whether or not the selected alternative will have significant environmental effects (see section **7.3, *Significance***). This determination yields different results, as outlined below.

### 8.4.1    Significant Impacts -Transitioning from an EA to an EIS

If you determine that the effects of the alternative you wish to select are significant, you cannot approve the action unless it is either analyzed in an EIS or modified to avoid significant effects.

In the event that you determine an EIS is necessary, draw the EA preparations to a close (retain all documents). You must publish in the *Federal Register* a Notice of Intent (NOI) to prepare an EIS (refer to section **13.1, *Publishing Notices in the Federal Register***). You may integrate the information assembled and analysis completed for the EA into the EIS and use it for scoping for the EIS. Information related to how and when scoping was conducted for the EA, the results, and any comments received can still be very helpful. However, the scoping for the EA does not take the place of the scoping required after publication of the NOI for the EIS unless a public notice for scoping for the EA said that preparation of an EIS was a possibility and that comments would still be considered (see Question 13, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations,* March 23, 1981).

When transitioning to an EIS, organize materials used for the EA so that pertinent portions may be integrated into the EIS. As discussed above, information about the scoping process and issues, contact lists used for scoping, and comments received may be especially helpful. Discussions from the EA of the purpose and need, proposed action and alternatives may streamline the initiation of the EIS process. Descriptions of the affected environment and the analyses of effects, including assumptions and methodologies, may also be directly incorporated into the EIS.

## 8.4.2    The Finding of No Significant Impact (FONSI)

The FONSI is a document that explains the reasons why an action will not have a significant effect on the human environment and, why, therefore, an EIS will not be required (40 CFR 1508.13).  The FONSI must succinctly state the reasons for deciding that the action will have no significant environmental effects (40 CFR 1508.13, Questions 37a, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations,* March 23, 1981).  The FONSI need only provide a basis for the conclusion that the selected alternative(s) will have no significant effect. Alternatives that are not selected but may have significant effects do not trigger the preparation of an EIS nor do they have to be described in the FONSI.  We recommend that the FONSI address the relevant context and intensity factors described in section **7.3, *Significance***.

There are two situations when a FONSI is prepared:

- EA analysis shows that the action would have no significant effects.
- EA analysis shows that the action would have no significant effects beyond those already analyzed in an EIS to which the EA is tiered (see section **5.2.2, *Tiering***). You may find that your action has significant effects and still reach a FONSI, provided that those significant effects were fully analyzed in the EIS to which your EA tiered (see section **5.2.2, *Tiering***).  In this case, we recommend that you state in the FONSI that there are no significant impacts beyond those analyzed in the EIS to which this EA is tiered.

The EA must be attached to the FONSI or incorporated by reference into the FONSI (40 CFR 1508.13, Question 37a, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations,* March 23, 1981). The FONSI must note any other relevant environmental documents related to the findings, and must be signed and dated by the decision-maker (40 CFR 1501.7(a)(5), 40 CFR 1508.13).  The FONSI is not the authorizing document for the action: the decision record is the authorizing document.

Some FONSIs must be made available for a 30-day public review before the determination of whether to prepare an EIS (40 CFR 1501.4 (e)(2); also see 40 CFR 1501.4 (e)(1)).  Public review is necessary if or when:

- the proposal is a borderline case, (such as when there is a reasonable argument for preparation of an EIS)
- it is an unusual case, a new kind of action, or a precedent-setting case, such as a first intrusion of even a minor development into a pristine area
- there is either scientific or public controversy over the effects of the proposal
- it involves a proposal that is similar to one that normally requires preparation of an EIS

You must also allow a period of public review of the FONSI if the proposed action is construction in a wetland or would be located in a floodplain. (Question 37b, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981*, citing E.O. 11990, sec. 2(b) and E.O. 11988, sec. 2(a)(4)).

In addition, the decision-maker may decide to release the unsigned FONSI and EA for public review and comment even if the proposal does not meet the criteria described above.  Consider the complexity of the project and issues, as well as the level of public interest, in determining the length of review and comment period.  Releasing the documents for public review and comment is typically done to allow the public, agencies and tribes the opportunity to respond to the analysis of impacts and to further long-term collaborative efforts.

If you release the EA and FONSI for public review, we recommend that you not sign the FONSI until the public review is completed and any necessary changes made to the EA.  Include a discussion of comments received on the EA and FONSI and their disposition in the decision record (see **8.5.1,** ***Documenting the Decision***).

The FONSI is signed before issuance of the decision record.  The FONSI must not be combined with the EA or decision record, although these may be attached to each other (516 DM 2.3(C)).

No format requirement exists for a FONSI; however, a suggested format and examples are provided in the Web Guide.

## 8.5   THE DECISION RECORD

Neither the EA nor the FONSI is a decision-making document.  Decisions regarding proposed actions analyzed in an EA are documented in accordance with program-specific requirements.  While the NEPA does not require a specific decision document regarding actions for which an EA has been completed, the BLM has chosen to use the "decision record" (DR) to document the decision regarding the action for which the EA was completed.  The decision cannot be implemented until the DR is signed.  Refer to section **8.3.6,** ***Environmental Effects*** and **Chapter 10,** ***Monitoring****,* for discussion of mitigation and monitoring to be included in the DR.  Check for and follow program-specific requirements on the content and format of a DR.  If there are no program-specific requirements for the DR or if they are only general, use the guidance in section **8.5.1,** ***Documenting the Decision*** to organize the content and format of the DR.

### 8.5.1   Documenting the Decision

Organize the DR using the content outline below:

1.   Identify compliance with major laws pertinent to the decision, such as the Endangered Species Act, National Historic Preservation Act, and the Clean Water Act.  Also describe conformance with the LUP, and other applicable laws, regulations, and policies.

2.   Identify the selected alternative.  Describe as precisely as possible specific features of the decision, or incorporate by reference the description of the selected action in the EA.  Identify mitigation and monitoring measures that have been selected to be implemented.  While incorporating by reference to describe the alternative and mitigation measures is encouraged, the specifics of what is being approved must be made clear.  The DR must also identify any limitations on when the decision may be implemented.

3. Reference the FONSI indicating that the action has been analyzed in an EA and found to have no significant impacts, thus an EIS is not required.

4. Summarize the public involvement undertaken and comments received and describe how substantive comments were considered in making the decision (see also sections **6.9.2, Comments,** and **8.3.7, Tribes, Individuals, Organizations, or Agencies Consulted**).

Note: We recommend that you address timely comments received on the EA or FONSI during review, and that you document your responses, as described below:

a. Integrate comments that provide substantive new information relevant to the analysis, FONSI or decision be integrated into the EA (which becomes a "new" EA), with any changes to the FONSI reflected in a new FONSI, and the comment and its import acknowledged in the DR. If the EA and FONSI are substantively changed, the new EA and FONSI may need to be circulated for public review and comment. It is within the decision-makers' discretion to determine whether or not to circulate the new EA and FONSI for public review and comment.

b. Substantive comments that provide minor corrections or updates to the EA may be simply integrated into the EA and acknowledged in the DR. There typically will be no need to re-circulate the EA and FONSI for public review and comment; however, that determination is left to the discretion of the decision-maker.

c. If a substantive comment does not lead to changes in the EA, FONSI or DR, you may reply directly to the commenter. For this situation, we recommend that you document your reply in the administrative record.

d. While you are not required to respond to non-substantive comments, you may wish to acknowledge them. See section **6.9.2.2, Comment Response** for methods to acknowledge comments.

5. Explain the rationale for the decision, explaining how the selected alternative addresses the purpose and need for action and why it was selected over other alternatives. Include all program-specific requirements.

6. Describe protest and appeal opportunities.

7. The decision-maker must sign and date the DR.

8. You must provide notice of the signed DR, FONSI, and EA (40 CFR 1506.6(b), Question 38, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations,* March 23, 1981) (see section **6.9.1, Involving and Notifying the Public**).

The Web Guide provides several examples of Decision Records and an optional format.

### 8.5.2   Terminating the EA Process

When you terminate the EA process prior to completion, complete your administrative record, documenting the reason or reasons for aborting the process.  If you have given public notice of the EA process, inform interested persons and parties that you are terminating the EA process.

### 8.6   IMPLEMENTATION

A decision may not be implemented until the FONSI and DR have been signed and all other program-specific procedural requirements have been met (such as applicable protest and appeals procedures).

Implementation of the action, including any mitigation and monitoring measures adopted in the decision record, must be in accordance with the decision described in the DR.  Program-specific guidance regarding protest and appeal provisions and timing of implementation relative to public notification can be found in the Web Guide.

**Figure 8.1   EA Process**



# CHAPTER 9—PREPARING AN ENVIRONMENTAL IMPACT STATEMENT

General
9.1     Preparing to Write an EIS
9.2     EIS Format
9.3     Issuing the Draft EIS
9.4     The Final EIS
9.5     Supplements to Draft and Final EISs
9.6     Issuing the Final EIS
9.7     Preparing and Issuing the Record of Decision
9.8     Terminating the EIS Process

## GENERAL

The steps for performing an EIS-level analysis follow the NEPA analysis steps laid out in **Chapter 6,** *NEPA Analysis*.  This chapter should be consulted as the BLM begins and works through the analytical process.

## 9.1  PREPARING TO WRITE AN EIS

### 9.1.1   Develop Preparation Plan

You must develop a preparation plan (also referred to as "prep plan") before initiating an EIS for land use plans (*BLM Land Use Planning Handbook H-1610-1*, pages 17–18, March 11, 2005). We recommend that you develop a preparation plan for other EISs.  The preparation plan facilitates coordination between participants involved in the preparation of the EIS and those with approval and oversight responsibility.  A properly prepared preparation plan provides the foundation for the entire planning process by identifying the issues to be addressed; the skills needed to address the issues; a preliminary budget that can be used for cost estimates; important legal, regulatory and policy guidance; and available and needed data and metadata.

Appendix F-1 in the *BLM Land Use Planning Handbook H-1601-1* describes in detail what goes into a preparation plan for an LUP; the contents may be tailored to fit any action effort involving an EIS.  We recommend that preparation plans contain the following information and discrete sections:
  • Introduction and Background
  • Anticipated Issues and Management Concerns
  • Important Legal, Regulatory and Policy Guidance
  • Data and GIS Needs, Including Data Inventory
  • Participants in the Process
  • Process for EIS Development
  • Schedule
  • Communications Strategy
  • Budget

Links to examples of a non-LUP prep plan and an LUP or EIS prep plan can be found in the Web Guide.

### 9.1.1.1    Develop Strategy for Public Involvement and Interagency/Intergovernmental Coordination and Consultation

The public involvement and interagency or intergovernmental coordination and consultation strategy is an integral part of the EIS process.  We recommend that it be described in the preparation plan and that it remain flexible.

We recommend that the public involvement strategy: identify tribes, individuals, organizations and other agencies known to be interested or affected by the proposed action; identify agencies with special expertise or jurisdiction by law; identify possible cooperating agencies (see **Chapter 12, *Cooperating Agencies, Joint Lead Agencies, and Advisory Committees***); identify the role, if any, of the BLM Resource Advisory Council; identify schedules for scoping, including public meetings, and timing for electronic and postal mail notifications; identify the process for tracking and recording public involvement and include lists of contacts.  The public involvement strategy will likely be updated during the EIS process.

Public notice (see section **6.9.1**, ***Involving and Notifying the Public*** for a discussion on the various ways the public can be notified) must be provided for any EIS-related meetings or hearings (40 CFR 1506(b) (see sections **9.3.2, *Notify the Public and Government Agencies of the Availability of the Draft EIS for Review and Comment; 9.4.2, Full Text Final EIS; 9.7, Issuing the Record of Decision;*** and **13.1, *Publishing Notices in the Federal Register*** for additional guidance).  The BLM must also provide public notice of the availability of the draft and final EIS documents, as well as the Record of Decision (40 CFR 1506(b), Question 34a, CEQ*, Forty Most Asked Questions Concerning CEQ's NEPA Regulations,* March 23, 1981)).

Ensure the public involvement strategy is sensitive to language or cultural barriers.  Hold meetings in ways that accommodate cultural traditions, values and methods of communication.  Follow the requirements of the Federal Advisory Committee Act of 1972 (FACA).  See **Chapter 12, *Cooperating Agencies, Joint Lead Agencies, and Advisory Committees*** for additional information on the FACA.

### 9.1.2    Publish the Notice of Intent

Publishing the Notice of Intent (NOI) in the *Federal Register* begins the formal scoping process and serves as the official legal notice that the BLM, or when the BLM is the lead agency, the BLM and its cooperators, are commencing an EIS.  The NOI must include:

- A description of the purpose & need, the draft proposed action, & possible alternatives, if available.  For some BLM-initiated actions, where the proposed action has not yet been developed in detail, the reason for initiating the EIS must be clearly stated.
- A description of the agency's proposed scoping process; this should include whether, when, and where any scoping meetings will be held.  If the time and place of scoping meetings is not known, the NOI must state how the time and place will be announced.
- The name and address of the BLM contact for the proposed action and EIS (40 CFR 1508.22).
- For planning documents, also identify preliminary planning issues and planning criteria.  (See the *BLM Land Use Planning Handbook, H-1601-1*, pages 18–19, March 11, 2005).

The BLM requires that the NOI be formatted in accordance with *Federal Register* guidance on notices (see section **13.1, *Publishing Notices in the Federal Register***).  An example of an NOI can be found in the Web Guide.  Check program guidance for any additional information that must be included in the NOI.  For example, there is a specific format for a call for nominations for oil and gas leasing.  See the Web Guide for an example of an NOI that also includes a call for nominations for oil and gas.

A revised NOI may be required if there are any substantial changes to the proposed action or if substantial new circumstances or information arise that relate to the proposal or its impacts, such that the BLM would essentially be starting over with the NEPA process.  Minor changes may be addressed in the Notice of Availability (NOA) for the draft EIS.

Additional guidance on publishing notices in the *Federal Register* for EISs can be found in **Chapter 13, *Administrative Procedures***.  Contact your State office for current briefing and approval procedures for NOIs and NOAs.

### 9.1.3    Scoping

Scoping is the process required by the CEQ for EISs by which the BLM solicits input on the issues and impacts that will be addressed in a NEPA document as well as the degree to which those issues and impacts will be analyzed.  The intent of scoping is to focus the analysis on significant issues and reasonable alternatives, to eliminate extraneous discussion, and to reduce the length of the EIS.  No guidance is provided by the CEQ for the length of scoping periods. Check individual program guidance for any prescribed minimum periods.

Scoping must be conducted both internally with appropriate BLM staff, and externally with interested and affected public, agencies, tribes, and organizations (40 CFR 1501.7) (see section **6.3, *Scoping*** for more discussion of scoping).

Formal public scoping begins following publication of an NOI.  Informal internal and external scoping may occur before the formal scoping period begins. Scoping can provide valuable information in identifying issues related to cumulative effects.

The CEQ regulations at 40 CFR 1501.7 require the following in an agency's scoping process:

- Invite participation from affected Federal, State, local, and tribal organizations and interested persons.
- Determine the scope or extent of the EIS and the significant issues to be analyzed.  Scoping is valuable in identifying connected, cumlative, and similar actions.
- Eliminate those issues raised that are not related to potentially significant impacts or those that have been covered in other environmental documents.  Make assignments for preparation of the EIS between the lead and cooperating agencies.
- Identify any environmental documents being prepared that have relevance to, but are not part of, the scope of this EIS.
- Identify other environmental review and consultation requirements.
- Discuss the relationship between the timing of the preparation of the EIS and the agency's tentative planning and decision-making schedule.

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

In addition to publishing the NOI in the *Federal Register*, we recommend a notice announcing the beginning of the formal scoping process be published in local newspapers and be sent to interested agencies, organizations, and other stakeholders.

Prepare a scoping report that discusses the issues raised during the scoping process, the issues to be addressed in the EIS, the issues that will not be addressed in the EIS and why (see section **6.4, Issues**), a list of participants in the scoping process, and the views of those participants.  See the Web Guide for an example of a scoping report.

**Figure 9.1   The EIS Process**



# Figure 9.1 - EIS Process

Develop Pre-plan → *Notice of Intent* → Scoping

Alternative Development and Environmental Analysis → Prepare DEIS → *Notice of Availability*

Circulate Draft EIS → Public comment on DEIS
Minimum 45 day period → Respond to comments and select Preferred Alternative

Prepare FEIS → *Notice of Availability* → Circulate FEIS

*30 day wait period* → Record of Decision → **Notification of Availability**

## 9.2   EIS FORMAT

This section outlines a suggested format for an EIS, although the specific elements and their order should remain flexible.  For example, in some instances it may be desirable to combine chapters three and four in this outline into one chapter.  The BLM Land Use Planning Handbook provides a recommended format for planning-related EISs.

### 9.2.1   Cover Sheet

The cover sheet must not exceed one page and must include:

- a list of responsible agencies including the lead agency and any cooperating agencies.
- the title and location of the proposed action that is the subject of the statement.
- the name, address, and telephone number of the BLM contact person.
- designation of the statement as a draft, final, or supplemental.
- a one-paragraph abstract of the statement that identifies significant impacts and alternatives to the proposed action or proposal.
- the date by which comments must be received. (40 CFR 1502.11)

It is optional to include the name and title of the person responsible for preparing the EIS and the decision-maker for the action.

### 9.2.2   "Dear Reader" Letter

You may use a letter signed by the decision-maker responsible for preparing the EIS to request review and comment on the draft. You may use this letter to inform the reader of other details pertinent to the review.  For example, if you anticipate an abbreviated final EIS, the letter may suggest that the reader retain the draft for reference.  Make sure you include the privacy language discussed in section **6.9, *Public Involvement and Responding to Comments***.  Be specific about what you want the reader to focus on, but remember that the reader can decide which areas to address.  See the Web Guide for an example of a Dear Reader letter.

### 9.2.3   Summary

The EIS must contain a summary identifying the areas of controversy (including issues raised by agencies and the public), the issues to be resolved (including the choice among alternatives), and the major conclusions of the analysis. The summary normally must not exceed 15 pages, and must focus on the key points of each section  (40 CFR 1502.12).

### 9.2.4   Table of Contents

Ensure that the table of contents is sufficiently detailed to allow the reader to quickly locate major subject matter in the EIS, particularly specific impact topics and alternatives analyzed in the document.

### 9.2.5    Chapter 1—Introduction

This chapter includes the following:

- purpose and need; and we recommend you include decisions to be made (see section **6.2, *Purpose and Need***);

- the general location, including maps when appropriate;

- major authorizing laws and regulations;

- an explanation of the relationship of the proposed action to BLM policies, plans, and programs;

- the relationship to non-BLM policies, plans, and programs—including discussions of any land use planning or zoning statutes or requirements that may affect or limit the proposal.  You must identify or reference any germane land use planning or zoning statutes or requirements (40 CFR 1502.16(c), 40 CFR 1506.2(d)).  An exhaustive list of all applicable laws and regulations is not appropriate; and

- a list of all Federal permits, licenses, and other entitlements that must be obtained in implementing the proposal (40 CFR 1502.25(b)).  It is optional to list authorizing actions by State and local entities.  To the fullest extent possible, the environmental analyses for these related permits, licenses, and approvals must be integrated and performed concurrently (40 CFR 1502.25, 40 CFR 1506.2(b).

### 9.2.6    Issues

Issues may be raised by the public, other agencies, or the BLM throughout the NEPA analysis process.  See section **6.4, *Issues***, for a complete discussion of issues.  Include in the administrative record or the EIS supporting documentation indicating why an identified issue was not analyzed.

The section of the EIS describing the issues for analysis (and issues identified, but not analyzed) may be organized into its own chapter, as an appendix, or may be presented within other chapters of the EIS.

### 9.2.7    Chapter 2—Proposed Action and Alternatives

The EIS must describe the proposed action and alternatives (40 CFR 1502.14) (see sections **6.5, *Proposed Action*** and **6.6, *Alternatives Development***).  The EIS must consider a range of reasonable alternatives, including the Proposed Action and No Action alternative, and provide a description of alternatives eliminated from further analysis (if any exist) with the rationale for elimination (40 CFR 1502.14(a)).  The CEQ regulations direct that an EIS include a description of the No Action alternative (40 CFR 1502.14(d)) (see section **6.6.2, *No Action Alternative***).  The No Action alternative is the only alternative that must be analyzed in an EIS that does not respond to the purpose and need for the action.

This chapter must also document:

- design features that would minimize potentially significant impacts (40 CFR 1502.14(f));
- LUP conformance (except for EISs prepared for approval, amendment, or revision of LUPs) (516 DM 11.5);
- the BLM's preferred alternative(s), if one or more exists (40 CFR 1502.14(e); and
- summary of effects (usually in a table) (40 CFR 1502.14) (see section **9.2.9,** *Environmental Effects*)

### 9.2.7.1    Reasonable Alternatives for an EIS

The CEQ regulations direct that an EIS "rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives that were eliminated from detailed study, briefly discuss the reasons for their having been eliminated" (40 CFR 1502.14(a): see also NEPA Sec. 102(2)(C)(iii)).

> For projects proposed under the Healthy Forests Restoration Act of 2003 (P.L. 108–148) refer to specific guidance regarding analysis of alternatives in section **6.6.1,** *Reasonable Alternatives*.

The CEQ regulations also direct that an EIS "…include reasonable alternatives not within the jurisdiction of the lead agency" (40 CFR 1502.14(c)) (see section **6.6.1,** *Reasonable Alternatives*). When there are multiple agencies cooperating to develop one EIS for several agency-specific decisions, the alternatives should be developed to ensure that each agency will be able to develop its ROD from the FEIS.

### 9.2.7.2    Features Common to All Alternatives

Describe features that are common to all alternatives. These features need only be described in detail once. For example, identify common features in the description of the proposed action and cross-reference to that description in the discussion of each alternative to which they apply. Another option is to describe common features under a separate heading.

Common features typically include standard operating procedures and other BLM requirements prescribed by law, regulation or policy. This may also include a description of relevant laws, regulations, required permits, licenses, or approvals.

For a land use plan amendment or revision we recommend that you include management direction carried forward from the existing plan.

### 9.2.7.3       Agency Preferred Alternative

The CEQ regulations at 40 CFR 1502.14(e) direct that an EIS "…identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference."  The preferred alternative may be identified in an explanatory cover letter to the draft EIS

> Note that BLM planning regulations at 43 CFR 1610.4–7 require identification of the preferred alternative in a draft EIS for a resource management plan.

or within the text.  The final EIS must identify the preferred alternative unless another law prohibits the expression of such a preference. Publication of an EIS without identifying the preferred alternative must be approved by the OEPC and the Office of the Solicitor (516 DM 4.10(b)(3)).

The identification of a preferred alternative does not constitute a commitment or decision in principle, and there is no requirement to select the preferred alternative in the ROD.  The identification of the preferred alternative may change between a draft EIS and final EIS.  Various parts of separate alternatives that are analyzed in the draft can also be "mixed and matched" to develop a complete alternative in the final as long as the reasons for doing so are explained.  Selection in the ROD of an alternative other than the preferred alternative does not require preparation of a supplemental EIS if the selected alternative was analyzed in the EIS.  In any case, you must provide the rationale for selection in the ROD (40 CFR 1502(b)).

When an EIS is prepared jointly, the lead agency with responsibility for preparing the EIS and ensuring its adequacy is responsible for identifying the agency's preferred alternative (see Question 4c, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981*).  Whereas the BLM must work with cooperators and other interested parties to encourage consensus on a preferred alternative, the preferred alternative in the EIS represents the preference of the lead agency.  Cooperators and other interested parties can express their preferences through scoping and comments on the draft EIS.  The BLM will occasionally prepare an EIS with another Federal agency as "joint lead" agencies (40 CFR 1506.2(b)).  In such circumstances, the joint lead agencies must work towards reaching consensus about the preferred alternative.  If consensus cannot be reached, we recommend that each joint lead agency clearly identify their preferred alternative and explain the basis for their preference and why consensus could not be reached. (See section **12.2, *Joint Lead Agencies in Development of NEPA Documents***).

The proposed action may be, but is not necessarily, the BLM's preferred alternative.  For internally proposed actions implementing the LUP, the proposed action will often end up as the BLM's preferred alternative.  For external proposals or applications, the proposed action may not turn out to be the BLM's preferred alternative, because the BLM will often present an alternative that would incorporate specific terms and conditions on the applicant.

## 9.2.8   Chapter 3—Affected Environment

You must provide brief description of the environment likely to be affected by the proposed action or alternatives.  Limit the description of the affected environment to that information relevant to understanding the effect(s) of the proposed action or alternative (see sections **6.7.1, *Affected Environment*** and **6.7.2, *Use of Relevant Data***).  You may present the affected environment description as its own section, or combined with environmental effects. If the EIS will be used to document compliance with any supplemental authorities, some of which are listed in **Appendix 1, *Supplemental Authorities to be Considered***, it may be necessary to provide a description of the resources of concern.

## 9.2.9   Chapter 4—Environmental Effects

The EIS must describe and provide the analysis of environmental effects of the proposed action and each alternative analyzed in detail (40 CFR 1502.16).  Describe the assumptions and assessment criteria used in analyzing impacts.  Identify any time-frames, rates of change, and other common data applied to the analysis.  Explain assumptions used when information critical to the analysis was incomplete or unavailable.  Include relevant reasonably foreseeable development scenarios for certain programmatic EISs and for cumulative effects analysis.  See section **6.8.1.2, *Analyzing Effects*** for a discussion of when methodologies must be discussed in the main text and when they may be placed in an appendix.   See section **6.7.2, *Use of Relevant Data***, for a discussion of incomplete or unavailable information.

> "The discussion will include the environmental impacts of the alternatives including the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented" (40 CFR 1502.16).

Discussion of impacts may either be organized by alternative with impact topics as subheadings or by impact topic with alternatives as subheadings.  Generally, if impacts to a particular resource for one alternative are the same as another alternative, make reference to that section in the EIS rather than repeating the information.

Based on the effects analysis in this chapter, develop a summary comparison of effects by alternative and include the summary in the section that describes the alternatives in Chapter 2. You must describe direct, indirect, and cumulative impacts of each alternative (40 CFR 1508.25(c)).  We recommend that you quantify the effects analysis as much as possible and describe effects in terms of their context, duration, and intensity.  Base the analysis of impacts on the assumption that all standard operating procedures and other standard BLM-wide requirements will be followed in implementing the proposed action and alternatives unless changes in such practices are specifically being addressed in the analysis or considered in an alternative.

You must consider long-term impacts and the effect of foreclosing future options.  Describe the relation between short-term uses of the environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources that would be involved in the proposal if it is implemented (40 CFR 1502.16).

All "relevant, reasonable mitigation measures that could improve the project are to be identified," even if they are outside the jurisdiction of the agency (See Question 19b, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations*, March 23, 1981).  See section **6.8.4,** *Mitigation and Residual Effects*, for more discussion of mitigation measures including the difference between these measures and design features of the alternatives.  If mitigation measures are identified, those measures must be analyzed "even for impacts that by themselves would not be considered significant" (See Question 19a, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations*, March 23, 1981). Analyze and compare the effectiveness of mitigation measures proposed and the effects if the project were to proceed without mitigation.  Include an assessment of any residual direct, indirect, or cumulative effects that will remain after application of the mitigation measures.

---

Question 5b, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations*, *March 23, 1981*.

5b. Is the analysis of the "**proposed action**" in an EIS to be treated differently from the analysis of alternatives?

A. The degree of analysis devoted to each alternative in the EIS is to be substantially similar to that devoted to the "proposed action." Section 1502.14 is titled "Alternatives including the proposed action" to reflect such comparable treatment. Section 1502.14(b) specifically requires "substantial treatment" in the EIS of each alternative including the proposed action.  This regulation does not dictate an amount of information to be provided, but rather, prescribes a level of treatment, which may in turn require varying amounts of information, to enable a reviewer to evaluate and compare alternatives**.**

---

## 9.2.10   Chapter 5 - Consultation and Coordination

Include a brief history of the public involvement (including scoping) undertaken, a list of agencies (including cooperating agencies) and organizations consulted, a list of preparers and their expertise, and a list of recipients of the EIS.  In the final EIS, include a response to comments section.

### 9.2.10.1    Public Involvement and Scoping

- Summarize the scoping process, including efforts to involve the public in preparation of the EIS.  Briefly describe the scoping meetings (when, where, how many, topics), the major issues that arose during scoping if they have not been discussed in Chapter 1, and the comments received.
- Include names of any Federal, State, or local agencies, major organizations or individuals consulted.
- Identify any unresolved environmental issues or conflicts discussed during scoping.
- Include a list of all agencies, organizations, and people to whom you will send copies.  This list may be organized alphabetically under "Federal agencies," "State and local agencies," "Indian tribes," "organizations," and "individuals."  If this list of individuals is excessively long, you may place it in the administrative record instead of the EIS, but note in the EIS that a complete list is found in the administrative record.  In the final EIS, provide an updated list of recipients, as necessary, to indicate who will be receiving the final EIS.

Although not required, you may find it to be useful to provide a discussion of the government-to-government consultation process that was followed during the EIS process.  The BLM Handbook H-8120-1 contains examples of program guidance for Native American consultation, and the BLM Manual 8120, *Tribal Consultation Under Cultural Resources*, provides detailed guidance for this consultation.  See the Web Guide for a copy of H-8120-1.

### 9.2.10.2    List of Preparers

The EIS must include a list of individuals, including names and qualifications, primarily responsible for preparing the document or significant supporting reports (40 CFR 1502.10(h) and 40 CFR 1502.17).

### 9.2.11   Other Material

- The last section of the EIS may include a bibliography, glossary, index of key words, and appendices.
- The bibliography includes a list of references cited in the EIS, including written material and personal communications.
- Define in a glossary, using plain language, any technical or other terms not understandable to an average lay reader.  Either in the glossary or in a separate list define any acronyms used in the EIS.
- You must include an alphabetically ordered index that contains enough key words from the EIS to allow the reader to find the information (see Questions 26a and 26b, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations*, *March 23, 1981*).
- Appendices are for support of critical analyses in the EIS.  An appendix is not a data bank or library for total reference support, but contains only major substantiating data, essential relevant descriptions of environmental components, or other information necessary for complete use of the EIS for analytical or decision-making purposes. You

may keep other supporting material in the administrative record and make it available if requested, instead of including it as an appendix.

## 9.3   ISSUING THE DRAFT EIS

Once approved, print the draft EIS, file it with the Environmental Protection Agency (EPA), and issue it for public review and comment.  See **Chapter 13,** *Administrative Procedures*, for information on printing the draft EIS.

### 9.3.1   File with the EPA

File the draft EIS with the EPA in accordance with procedures identified in Chapter 13.  The EPA will then publish notice of the filing in the *Federal Register*.  The date the EPA notice appears in the *Federal Register* initiates the public review period.  Consult program-specific guidance for additional requirements regarding filing procedures.

### 9.3.2   Notify the Public and Government Agencies of the Availability of the Draft EIS for Review and Comment

You must provide public notification of the availability of the draft EIS, and that notification must include publication of a notice of availability (NOA) in the *Federal Register* for actions with effects of national concern (40 CFR 1506.6(b)). You must publish an NOA in the *Federal Register* for a draft EIS prepared for a LUP or LUP amendment (*BLM Land Use Planning Handbook H-1601-1*). The CEQ regulations at 40 CFR 1503.1 require that the BLM obtain comments from Federal agencies with jurisdiction by law or special expertise; and that we request comments from appropriate State and local agencies, tribes, and any agency that requests a copy of the EIS.  There are no content or format requirements for an NOA other than those associated with the preparation of notices for publication in the *Federal Register* (see section **13.1,** *Publishing Notices in the* **Federal Register**).  In addition to announcing the availability of a document and the public review period, where applicable, the NOA will generally identify the purpose and need of the action, describe the proposed action and alternatives, and indicate the dates and location of public meetings on the document.  Consult program-specific guidance for any other content requirements.  A sample notice is shown in **Appendix 11,** *Federal Register Illustrations*.  Sample NOAs for draft and final EISs are available in the Web Guide.  Check with your State NEPA coordinator and Public Affairs Chief for information about the appropriate documentation to include with your NOA.  Public affairs will also assist with procedures for notifying appropriate members of the Congressional Delegation from your State.

The public comment period for all draft EISs must last at least 45 days (516 DM 4.26), but some programs require longer comment periods.  For example, a draft EIS for a LUP or LUP amendment must be available for a 90-day comment period (*BLM Land Use Planning Handbook H-1601-1,* page 23).  Check program guidance requirements.

A press release is usually prepared for national media, local media, or both to announce the availability of the draft and to announce any public meetings or hearings.

### 9.3.3    Distribute the Draft EIS

"Agencies shall circulate the entire draft and final environmental impact statements except for certain appendices as provided in Sec. 1502.18(d) and unchanged statements as provided in Sec. 1503.4(c). However, if the statement is unusually long, the agency may circulate the summary instead, except that the entire statement shall be furnished to:

> (a) Any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved and any appropriate Federal, State or local agency authorized to develop and enforce environmental standards.
>  (b) The applicant, if any.
>  (c) Any person, organization, or agency requesting the entire environmental impact statement.
>  (d) In the case of a final environmental impact statement any person, organization, or agency which submitted substantive comments on the draft.

If the agency circulates the summary and thereafter receives a timely request for the entire statement and for additional time to comment, the time for that requestor only shall be extended by at least 15 days beyond the minimum period" (40 CFR 1502.19).

Distribute the draft EIS before or on the same day copies are transmitted to the EPA for filing (see section **13.3.2,** *Procedures for Filing with the EPA* for more discussion).  Provide two copies to the BLM Library at the National Science and Technology Center in Denver and two copies to the BLM Planning Office in Washington, D.C. (WO-210).  The standard distribution of EISs to other Interior and Federal agencies is described in the Web Guide.  You must make copies available to any requesting party (40 CFR 1505.5(f)).  Make sufficient copies available for review in appropriate BLM offices, including the State Office, and for distribution to those who request a copy during the review period.  The use of Web sites to distribute draft and final EISs and RODs is encouraged, as is the use of compact disks or other electronic media.  However, do not underestimate the number of paper copies that will be needed; there are still many people who will want a paper copy.  The State NEPA coordinator can provide guidance on this process.  The BLM may charge requesting parties the cost of production for a document copy in a particular format or in multiple copies.

### 9.3.4    Public Meetings and Hearings

You may hold public meetings or hearings to receive comments on the draft EIS. (See section **6.9.1,** *Involving and Notifying the Public*).  You must maintain records of public meetings and hearings including a list of attendees (as well as addresses of attendees desiring to be added to the mailing list) and notes or minutes of the proceedings.  Consult 455 DM 1 for procedural requirements related to public hearings.  Check individual program guidance to determine requirements for public meetings and hearings.  See section **6.9.2,** *Comments*, for a discussion of how to manage and process comments on the draft.

## 9.4   THE FINAL EIS

Following public review of the draft EIS, the lead agency prepares a final EIS (unless a decision is made to terminate the EIS).

### 9.4.1   Abbreviated Final EIS

In deciding whether an abbreviated EIS is appropriate, consider the extent of the changes made to the EIS as a result of comments on the draft.  If you make only minor changes to the draft EIS in response to comments, then you may prepare an abbreviated final EIS.  An abbreviated final EIS only contains a cover sheet, an explanation of the abbreviated EIS, copies of substantive comments received on the draft, responses to those comments, and an *errata* section with specific modifications and corrections to the draft EIS made in response to comments (40 CFR 1503.4).  Abbreviated EISs require that the reader have access to both the draft and the final EIS. Because a draft EIS is usually required to understand changes in an abbreviated EIS, send the appropriate number of draft EISs with the abbreviated final EIS to the EPA when filing the final. See the Web Guide for examples of abbreviated EISs.

### 9.4.2   Full Text Final EIS

If you make major changes to the draft EIS, the final EIS should be a complete full text document.  The content of a full text document is substantially the same as the corresponding draft EIS except that it includes copies of substantive comments on the draft EIS, responses to those comments and changes in or additions to the text of the EIS in response to comments (40 CFR 1503.4).  A full text final EIS may incorporate by reference some of the text or appendices of the draft EIS (see section **5.2.1, *Incorporation by Reference***).

## 9.5   SUPPLEMENTS TO DRAFT AND FINAL EISs

See section **5.3, *Supplementing an EIS*,** for a discussion of when to supplement a draft or final EIS.  The standard procedural and documentation requirements for preparing an EIS described in this chapter also apply to supplementing an EIS, with the following exceptions:

- Additional scoping is optional (40 CFR 1502.9 (c)).

- We recommend that the supplemental EIS identify the EIS being supplemented on the cover page, and explain the relationship of the supplement to the prior analysis early in the text.

- We recommend that the supplemental EIS identify the changes in the proposed action or the new information or changed circumstances that require the BLM to prepare the supplement.

- The OEPC and the Office of the Solicitor must be consulted before proposing to the CEQ to prepare a final supplement without preparing an intervening draft (516 DM 4.5(B)).

You must circulate a supplement in the same manner as a draft or final EIS (40 CFR 1502.9(c)). If there is good reason to believe the interested and affected public will have a copy of the draft or final EIS, you only need to circulate the supplement. If you do not circulate the EIS being supplemented with the supplement, it must be reasonably available for public inspection (40 CFR 1506.6(f)).

## 9.6   ISSUING THE FINAL EIS

Once the final EIS is prepared, print it, file it with the EPA, and distribute it to the public. (See **Chapter 13,** *Administrative Procedures* for guidance on printing, filing, and distributing the EIS.) You must provide public notification of the availability of the final EIS, and that notification must include publication of a notice of availability (NOA) in the *Federal Register* for actions with effects of national concern (40 CFR 1506.6(b)). You must publish an NOA in the *Federal Register* for a final EIS prepared for a LUP or LUP amendment (*BLM Land Use Planning Handbook* H-1601-1). (See section **13.1,** *Publishing Notices in the Federal Register* for guidance on publishing notices). The State NEPA coordinator and Public Affairs Chief can provide information about the appropriate documentation to include with an NOA. The date the EPA notice appears in the *Federal Register* initiates the required minimal 30-day availability period. Although this is not a formal public comment period, you may receive comments. Also note that while you may have requested comment from agencies with jurisdiction by law or special expertise, you do not need to delay preparation and issuance of the final EIS when such agencies do not comment within the prescribed timeframe (516 DM 4.19(A)).

### 9.6.1   Comments Received Following Issue of the Final EIS

Any comments received may be addressed in the ROD. However, review any comments on the final EIS, to determine if they have merit; for example, if they identify significant new circumstances or information relevant to environmental concerns and bear upon the proposed action. If so, the decision-maker preparing the EIS must determine whether to supplement the draft or the final EIS or if minor changes can be made to the existing EIS. Refer to section **9.5,** *Supplements to Draft and Final EISs*, when supplementing a draft or final EIS. Check program guidance for additional review requirements. For example, there is a 60-day Governor's consistency review requirement for LUPs (*BLM Land Use Planning Handbook* H-1601-01, pages 24-25).

## 9.7   ISSUING THE RECORD OF DECISION

A ROD is prepared to document the selected alternative and any accompanying mitigation measures. The ROD is must be signed by the decision-maker. The ROD may be integrated with any other record prepared by the BLM (40 CFR 1505.2). Examples would be findings for floodplains required by E.O.11988 and for wetlands required by E.O. 11990. No action concerning a proposal may be taken until the ROD has been issued, except under conditions specified in 40 CFR 1506.1 (see section **1.4,** *The NEPA Approach*).

Except as described below, the ROD cannot be issued until the later of the following dates:
- 90 days after the publication of the EPA's notice of filing of the draft EIS.
- 30 days after publication of the EPA's notice of filing of the final EIS (40 CFR 1506.10(b)).

You must provide public notification of the availability of the ROD, and that notification must include publication of a notice of availability (NOA) in the *Federal Register* for actions with effects of national concern (40 CFR 1506.6(b), Question 34a, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981*). You must provide a copy of the ROD to those who have requested it (40 CFR 1506.6(b), Question 34a, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981*).  We recommend that you provide a copy of the ROD to substantive commenters on the draft or final EIS and to others known to have a strong interest in the proposal(s).  Generally, the funding office in Washington will specify WO or other distribution requirements.  For example, a copy of the decision documents for LUPs or plan amendments must be provided to WO-210 (Planning and Science Policy).  Consult program-specific guidance for additional requirements on the distribution of RODs or records which incorporate RODs.

If the decision is subject to 30-day appeal to the Interior Board of Land Appeals (IBLA), then the ROD may be issued at the same time the final EIS is filed (40 CFR 1506.10(b)).  This allows both 30-day periods to run concurrently.  If the ROD is issued at the same time the final EIS is filed, the EIS must identify and explain the appeal provisions.  If the ROD is issued in full force and effect, then it cannot be issued until 30 days after publication of the EPA's notice of filing the final EIS (40 CFR 1506.10(b)(2)).

Consult program specific guidance for any additional requirements regarding protest and appeal procedures and preparation of RODs.

### 9.7.1   ROD Format

A suggested format which satisfies the ROD content requirements specified in 40 CFR 1505.2, is provided below.  The Land Use Planning Handbook provides a recommended format for planning-related RODs.  There is also an example of a ROD in the Web Guide.

Introductory Material.  A cover sheet that provides introductory material may be prepared.  This includes the title, project or case file identification number, preparing office and office location, cooperating agencies, signatures, date of signatures, and titles of the responsible and concurring officials.

Summary.  A summary is needed only if the ROD exceeds 10 pages.

Decision.  Include a concise description of the approved action.  Identify all important aspects of details of the decision.  Provide a clear description of what is and what is not being approved.  Attach to the ROD stipulations and other design features that are part of the decision or incorporated by reference.  Present any committed mitigation measures and related monitoring and enforcement activities, if any, for the selected alternative (see **Chapter 10, *Monitoring***).  Indicate whether all practicable mitigation measures have been adopted.  You must identify any mitigation measures which were not selected with a brief explanation of why such measures were not adopted (40 CFR 1505.2(a)).

Alternatives.  Identify all of the alternatives considered.  When it is necessary to summarize the alternatives, thematic descriptions including major aspects may be helpful.  You must identify the the environmentally preferable alternative in this section (40 CFR 1505.2 (b)).  The environmentally preferred alternative best promotes the national environmental policy in Section 101 of the NEPA.  This is ordinarily the alternative that causes the least damage to the biological and physical environment and best protects, preserves and enhances the resources that are present.  (See Question 6a, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations*, March 23, 1981).

Management Considerations.  Provide the rationale for the decision.  Discuss factors which were important and relevant to the decision (40 CFR 1505.2 (b)).  Explain how the alternatives respond to the purpose and need for the action.

Public Involvement.  Briefly describe efforts to seek public views throughout the EIS process.

## 9.8  Terminating the EIS Process

When you terminate the EIS process without completing a Record of Decision, complete your administrative record, documenting the reason or reasons for aborting the process.  Publish a notice in the *Federal Register*, referencing the relevant Notice of Intent to prepare the EIS and stating that you are terminating the EIS short of completion.  If you have already published a draft EIS, we recommend that you inform all who commented on the draft that you are ending the process and briefly explain why.

# CHAPTER 10—MONITORING

General
10.1   Purposes of and Requirements for Monitoring
10.2   Developing a Monitoring Plan or Strategy
10.3   Implementing Monitoring

## GENERAL

Monitoring can provide important information, including whether decisions were implemented as designed, their effectiveness in achieving desired outcomes and the effectiveness of mitigation measures.  Monitoring can also determine whether the impact analysis was accurate.  In certain instances, as described below, monitoring is required.

## 10.1   PURPOSES OF AND REQUIREMENTS FOR MONITORING

The level and intensity of monitoring varies according to the purpose being served.  In developing a NEPA-related monitoring program, carefully consider the following purposes of monitoring.

### To Ensure Compliance with Decisions

We recommend monitoring to ensure that actions taken comply with the terms, conditions, and mitigation measures identified in the decision.  This monitoring may identify underlying reasons for non-compliance.  You must provide compliance monitoring where mitigation measures are required to reach a FONSI.

### To Measure the Effectiveness or Success of Decisions and the Accuracy of Analysis

While not required by the NEPA, monitoring can be implemented to determine if the decisions are achieving intended environmental objectives, and whether predicted environmental effects were accurate.  This could include the validation of conceptual models and assumptions used in the analysis.

### To Determine How to Modify Decisions if the Purpose and Need or Desired Outcomes Are Not Being Achieved.

If decisions are not meeting the purpose and need or achieving desired outcomes, monitoring may be used to identify necessary changes.

In a record of decision (ROD), a monitoring and enforcement program shall be adopted and summarized where applicable for any mitigation (40 CFR 1505.2(c)).  The ROD must identify the monitoring and enforcement programs that have been selected and plainly indicate that they were adopted as part of the agency's decision (see Question 34c, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations*, March 23, 1981).  The ROD must delineate the monitoring measures in sufficient detail to constitute an enforceable commitment, or incorporate by reference the portions of the EIS that do so (see Question 34c, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations*, March 23, 1981).

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

The decision record on an EA may also impose requirements for mitigation and related monitoring and enforcement activities.  Monitoring activities which are adopted in a decision record must be implemented as specified.

In situations where there is incomplete or unavailable information relevant to reasonably foreseeable significant adverse impacts essential to a reasoned choice among alternatives, and it is not feasible to obtain that information prior to making a decision, we recommend that you establish a monitoring program to assess resources or values that may be impacted in order to determine if subsequent action needs to be taken.

We recommend that you coordinate monitoring that stems from the NEPA analysis process with other BLM monitoring activities.  The BLM Manual 1734 - Inventory and Monitoring Coordination, provides additional guidance on the BLM's inventory and monitoring programs.

## 10.2  DEVELOPING A MONITORING PLAN OR STRATEGY

Except for monitoring activities specifically addressed in the decision document, the responsible manager has discretion in scheduling monitoring activities, determining monitoring approaches or methodologies, and establishing monitoring standards.  We recommend a written monitoring plan that incorporates monitoring schedules, approaches, and standards.  Consider Bureau-wide and program specific monitoring policies and strategies in developing a monitoring plan (see BLM Manual 1734, Inventory and Monitoring Coordination).

We recommend that you consider the following factors when developing a monitoring plan.

Coverage – We recommend that you tailor the scope of monitoring activities to meet the intended purpose of monitoring.  *For example, monitoring activities may be limited to determining if the action is implemented as planned (compliance monitoring), or they may be designed to also include determination of whether the action is meeting goals and objectives (effectiveness monitoring).*

Frequency – The establishment of specific time frames are recommended for each monitoring activity.

Intensity/Complexity – The intensity and complexity of monitoring activities will vary according to the issues at hand and with the purpose of the monitoring.  *For example, compliance monitoring to determine if an action is being implemented as described in the decision document may be relatively simple.  However, determining whether implementation of an action is achieving complex ecological objectives, would involve more complex monitoring techniques and analysis.*

## 10.3  IMPLEMENTING MONITORING

It is important that managers establish priorities for implementing monitoring activities.  The following are situations or circumstances that warrant high priority for monitoring and that should be considered in determining important cases:

- A ROD adopts mitigation measures to reduce environmental impacts (monitoring required).
- Decisions authorize actions involving new or untested procedures or methods, or involve a high degree of uncertainty regarding the effects of the procedure or method.
- Effects are based on incomplete or unavailable information.
- Uncertainty exists about the interactive effects of multiple resources or uses.
- The decision may affect highly sensitive or important resource values.

> Agencies may provide for monitoring to assure that their decisions are carried out and should do so in important cases (40 CFR 1505.3).

This page intentionally left blank.

# CHAPTER 11—AGENCY REVIEW OF ENVIRONMENTAL IMPACT STATEMENTS

11.1   Obtaining Comments on Your EIS
11.2   Commenting on Another Federal Agency's EIS

## 11.1   OBTAINING COMMENTS ON YOUR EIS

When preparing an EIS, you must obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved (40 CFR 1503.1(a)(1)).  We recommend responding to comments from these agencies, even if the comments are untimely.  However, you do not need to delay the preparation and issuance of a final EIS when such agencies do not comment within the prescribed timeframe (516 DM 4.19(A)).

## 11.2   COMMENTING ON ANOTHER FEDERAL AGENCY'S EIS

When the BLM has jurisdiction by law or special expertise with respect to a project's environmental impacts, the BLM must comment on the EISs of other Federal agencies (40 CFR1503.2).  The BLM may be asked to review or provide comment on other environmental documents as well.  If the BLM does not have comments on an EIS where it has jurisdiction by law or special expertise, it must reply to that effect.  (Generally, if the BLM has jurisdiction by law or special expertise, the BLM will be a cooperating agency in the NEPA process.  See **Chapter 12, *Cooperating Agencies, Joint Lead Agencies, and Advisory Committees*.**)

The OEPC coordinates review of other agencies' EISs and assigns agency responsibilities for review.  This includes setting the schedule for review and requesting extensions.

When a cooperating agency comments on a BLM document, or when the BLM is a cooperating agency, the comment must (40 CFR 1503.3):

- describe alternative methods for analyzing impacts if it criticizes methodology in the EIS.
- specify mitigation measures it finds acceptable if it criticizes the level of impact.

Guidance for reviewing and commenting on NEPA documents that are prepared by other agencies but that may affect BLM-managed resources is provided in 516 DM 7.  This chapter of the manual describes the roles and responsibilities of the Department and agencies, how different reviews are handled, and the content and process for performing such reviews.

This page intentionally left blank.

# CHAPTER 12—COOPERATING AGENCIES, JOINT LEAD AGENCIES, AND ADVISORY COMMITTEES

General
12.1   Cooperating Agency Status in Development of NEPA Documents
12.2   Joint Lead Agencies in Development of NEPA Documents
12.3   Working with Advisory Committees and the Federal Advisory Committee Act

## GENERAL

This chapter discusses means for consulting with and obtaining the views of appropriate entities as part of the NEPA process.

## 12.1   COOPERATING AGENCY STATUS IN DEVELOPMENT OF NEPA DOCUMENTS

The CEQ regulations (40 CFR 1501.6) provide for and describe both lead and cooperating agency status, and emphasize agency cooperation early in the NEPA process.  Upon request of the lead agency, any other Federal agency which has "jurisdiction by law" shall be a cooperating agency.  Jurisdiction by law means the other agency has authority to approve, veto, or finance all or part of the proposal (40 CFR 1508.15).  *For example, the Federal Communication Commission approves applications for BLM communication facilities and has NEPA procedures (47 CFR 1.1301 to 1.1319) for the preparation of environmental documents associated with such applications.  The BLM or FCC may participate as either lead or cooperating agency in the preparation of these documents.  You must contact FCC and agree on appropriate lead and cooperating agency status.*

In addition, any other Federal agency which has "special expertise" with respect to any environmental issue which will be addressed by the NEPA analysis may participate as a cooperating agency.  Special expertise means "…statutory responsibility, agency mission, or related program experience" (40 CFR 1508.26).  When the BLM is a lead agency, another agency may request that we designate it a cooperating or joint lead agency.  Any State, tribal, or local agency with jurisdiction by law or special expertise may by agreement be a cooperating agency (40 CFR 1508.5; 516 DM 2.5c).  Cooperating agency status is most commonly applied to preparation of an EIS, but may also be applied to an EA (DM ESM02-2).

> The BLM publication "A Desk Guide to Cooperating Agency Relationships" (2005) defines the lead agency–cooperating agency relationship and explores ways to create more effective government partnerships in the preparation of NEPA documents and land use plans.

Requirements for working with cooperating agencies were added to the BLM's planning regulations in 2005 (43 CFR 1601.0-5, 1610.3-1, and 1610.4).  Our Land Use Planning Handbook (H-1601-1) provides additional guidance for collaborative planning and preparation of an EIS or EA for approval, amendment, or revision of an LUP.

### 12.1.1   When Another Agency is Cooperating in Preparation of a NEPA Analysis Document with the BLM as a Lead

You must invite eligible governmental entities (Federal, State, local, and tribal) to participate as cooperating agencies when preparing an EIS (516 DM 2.5(e)).  You must also consider any requests by eligible governmental entities to participate as a cooperating agency with respect to a particular EIS, and will either accept or deny such requests.  If such a request is denied, the BLM will inform the other agency and state in writing, within the EIS, the reasons for such denial.  Throughout the preparation of an EIS, you must collaborate, to the fullest extent practicable, with all cooperating agencies, concerning those issues relating to their jurisdiction or special expertise (516 DM 2.5(f)).  Prepare a Memorandum of Understanding (MOU) with any cooperating agency, clearly defining the roles and responsibilities of each agency.

### 12.1.2   When the BLM is Cooperating in Preparation of a NEPA Analysis Document With Another Agency as Lead

Functioning as a cooperating agency in preparation of an EIS or EA provides you several advantages:

–   You may adopt the EIS without recirculating it when, after an independent review of the analysis, you conclude that your comments and suggestions have been satisfied (40 CFR 1506.3(c)).

–   You, and the lead agency, may save staff time and dollars when compared to each agency preparing its own document.

–   You can ensure that the NEPA analysis document meets all Departmental and BLM requirements or standards.

–   Expanding the scope of a NEPA analysis to consider connected and cumulative actions of all cooperating agencies into a single document improves overall interagency coordination.

–   Agencies working cooperatively help the public to participate effectively and efficiently.  The public involvement in the NEPA process takes place in the larger context of multiple agencies.  Thus, the public can better understand the entire scope of a proposal, rather than being presented with a piece of it now and another piece later.  The public can participate effectively with fewer meetings to attend and letters to write.

–   You can ensure that the NEPA analysis specifically addresses the action that you must consider before making your decision.  This avoids the struggle to adapt another agency's documentation to fit our proposed action.

### 12.1.3    Deciding Whether to be a Cooperating Agency

When another Federal agency intends to prepare a NEPA analysis document, and you have a related decision to make, formally ask to be a cooperating agency as early as possible.  You must notify the OEPC of either the acceptance or rejection of a cooperating agency request (516 DM 2.5(B)).

If another agency asks you to be a cooperating agency in preparation of a NEPA document for an action in which the BLM has *jurisdiction by law*, you must be a cooperating agency (40 CFR 1501.6).

If another agency asks you to be a cooperating agency in preparation of a NEPA analysis document in which the BLM has *special expertise*, you may elect to be a cooperating agency.  In deciding, consider what resources you have to commit to the document preparation.

### 12.1.4    Procedures for Working as a Cooperating Agency

An interagency memorandum of understanding (MOU) between the BLM and the lead agency must be prepared (516 DM 2.5(G)).  It must identify a BLM contact and specify any special resource needs, data requirements, and issues that need to be addressed in the analysis.  The MOU must also identify the responsibilities of the lead and cooperating agencies (a sample MOU is in the Web Guide).

We recommend that the BLM be identified as a cooperating agency in the notice of intent (NOI) published in the *Federal Register*, and that the BLM be identified as a cooperating agency in the NEPA analysis document, preferably on the cover sheet.

After adopting the NEPA document, the BLM must issue its own decision (and FONSI for an EA) (Questions 30, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981*), *CEQ Guidance Regarding NEPA Regulations*, 48 Fed. Reg. 34263 (July 28, 1983)) (see section **5.4,** *Adopting Another Agency's NEPA Analysis*).  This may be done in an individual decision document or in a decision document signed by more than one agency, as long as it is clear that only the BLM decision-maker is making a decision regarding resources under BLM authority.

## 12.2   JOINT LEAD AGENCIES IN DEVELOPMENT OF NEPA DOCUMENTS

In order to eliminate duplication while satisfying NEPA and comparable State and local requirements, the CEQ regulations (40 CFR 1506.2(b)) encourage Federal agencies to be joint leads with State and local agencies.  When two agencies have approximately equal pieces of a proposal being considered and want to make this situation clear to their respective partners, they may agree to be joint lead agencies.

A Memorandum of Understanding (MOU) must be signed by both agencies, clearly defining the roles and responsibilities of each (516 DM 2.5(G)).  Only one agency must be identified as the agency responsible for filing the EIS with the EPA.

We recommend that the agencies be identified as joint lead agencies in the NOI and in the NEPA documents.  We recommend that the cover sheet clearly identify the joint leads, and the logos of both agencies be displayed on the cover of the NEPA documents.

We recommend that an EIS preparation plan be developed and signed by both agencies, and identify such things as: the decisions to be made by each agency, the make up of the core team and ID team and their responsibilities, estimated budget and financial obligations of each agency, review responsibilities, and tentative schedules.

You must issue your own ROD for an EIS, and your own FONSI and decision record for an EA. (Questions 30, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981*), *CEQ Guidance Regarding NEPA Regulations, 48 Fed. Reg. 34263 (July 28, 1983)*) This applies to any Federal lead or cooperating agency, and all other cooperating agency procedures apply as well. This may be done in an individual decision document or in a decision document signed by more than one agency, as long as it is clear that only the BLM decision-maker is making a decision regarding resources under BLM authority.

## 12.3   WORKING WITH ADVISORY COMMITTEES AND THE FEDERAL ADVISORY COMMITTEE ACT

The Federal Advisory Committee Act (FACA) was enacted to reduce narrow special-interest group influence on decision-makers, to foster equal access to the decision-making process for the general public, and to control costs by preventing the establishment of unnecessary advisory committees.  The FACA applies whenever a statute or an agency official establishes or uses a committee, board, commission or similar group for the purpose of obtaining advice or recommendations on issues or policies within the agency official's responsibility.

See H-1601-1, Appendix B for determining when the FACA applies, FACA requirements, and avoiding violations of the FACA.  More in-depth information can be found in the BLM FACA Guidebook, available from the BLM ADR (Alternative Dispute Resolution) and Conflict Prevention Program, in hard copy and online at www.blm.gov/adr.

### 12.3.1   Guidance for Meeting With Groups

If participants with the BLM in a collaborative group are solely Federal, State, tribal, or local government employees operating in their official capacities, the group is exempt from the administrative requirements of the FACA.

If participants include nongovernmental members and they will meet regularly or formally, there are a number of circumstances that will require a FACA charter.

> The BLM's managers and staff must understand the provisions of the FACA both when they are gathering public input for decision-making processes and when they are working in collaborative efforts.  In essence, any time a group will be consulted or will be providing recommendations to a BLM official, the BLM should verify whether the FACA applies and, if so, ensure that the FACA requirements are followed.

–   The BLM establishes, manages, or controls the group.  A FACA charter is usually necessary if the BLM will be making decisions on or otherwise controlling group membership, sending out meeting invitations, or hosting the meeting.

–   The BLM also manages or controls the group's agenda, takes a leadership role in the group, and facilitates the meetings.  Funding the group or holding a disproportionate number of the group's meetings on BLM property may also be seen as indicators of management or control.

–   A FACA charter may be necessary if the BLM is seeking group advice or specific group recommendations to the agency from a nongovernmental group.

If the BLM wishes to have a central role in the formation and agenda of the group, consider pursuing a charter for a FACA committee.  Refer to the Office of the Solicitor for additional information.

To avoid the need for a FACA charter, publicize the meetings of the group, and open group membership to all.

> Meetings of collaborative community working groups should adhere to general open government criteria.  For example: *invite the public to meetings; publish timely notice in local forums; accept public comments; and keep records of group meeting minutes, attendance, and other documents used by the group.*  Even when meetings with other governmental agencies are exempt from the FACA, BLM employees should be aware of State "open meetings" laws or similar County ordinances.  For example, *an LUP strategy session attended by BLM representatives and a quorum of County Commissioners may need to be open to the public.*

### 12.3.2    Alternatives to Chartered Groups

– The BLM can establish a working group with solely governmental entities—other Federal, State, tribal, and local government employees working in their official capacities.

– One of the non-Federal entities involved can take the lead in organizing and setting up the group.  The FACA only applies to Federal agencies, so if a tribal, State, county, or local agency or public interest group is willing to put the collaborative group together, control membership, and set up meetings, the BLM can participate without violating the FACA.

– In some situations, the BLM can form a working group as a subcommittee of a preexisting Resource Advisory Committee (RAC) or other FACA-chartered advisory committee.  Make sure the working group always reports to the RAC or chartered committee and not directly to the BLM.

– Sometimes group advice is not the desired outcome— the BLM only needs input from a variety of public stakeholders.  Or sometimes the BLM needs to educate the community about its programs and decisions.  Here, the best approach may be to hold town hall-style meetings with open public participation.  Such meetings will not violate the FACA as long as the BLM is not seeking group advice, but rather is sharing information or seeking a range of advice from individuals.

# CHAPTER 13—ADMINISTRATIVE PROCEDURES

General
13.1    Publishing Notices in the *Federal Register*
13.2    Printing EISs
13.3    Filing EISs With The EPA
13.4    Recordkeeping Procedures
13.5    Contracting NEPA Work

## GENERAL

There are a number of administrative requirements associated with NEPA analysis.  This chapter discusses how to publish the required *Federal Register* notices, print EISs, prepare the administrative record, and store environmental records.  Additionally, this chapter provides guidance on using contractors to assist with NEPA analysis or documentation.

## 13.1    PUBLISHING NOTICES IN THE *FEDERAL REGISTER*

You must publish various notices in the *Federal Register* during the course of the NEPA process:

- a notice of intent (NOI) to prepare an EIS in the *Federal Register* (40 CFR 1501.7).

- a notice of availability (NOA) for draft, final, and supplemental EISs for land use plans and land use plan amendments, and for actions with effects of national concern (*BLM Land Use Planning Handbook H-1601-1, 40 CFR 1506.6(b)(2)*).  You must file EISs with the Environmental Protection Agency (EPA), who publishes its own *Federal Register* notice (see section **9.3.1, *File with the EPA***).

- an NOA for RODs for actions with effects of national concern (40 CFR 1506.6(b)(2)).

- notices announcing NEPA-related hearings, public meetings, or the availability of EAs and FONSIs on issues of national concern (40 CFR 1506.6(b)(2)).

Offices should follow the most current guidance on review and submission of *Federal Register* notices.

### 13.1.1    Procedures for Publishing Notices in the *Federal Register*

The Office of the Federal Register (OFR) has established procedures and formats to be used when preparing a notice for publication.  Individuals should consult the latest version of the *Document Drafting Handbook* prepared by the OFR for detailed guidance on the preparation of notices for publication in the *Federal Register*.  The handbook can be found online at: http://www.archives.gov/federal-register/write/handbook/.

### 13.1.1.1     Publication Requirements

A *Federal Register* notice should include the following items:

1. <u>The billing code.</u>  The billing code is assigned by the Government Printing Office and can be obtained from the BLM's printing officer.  It must appear on each document submitted for publication.

2. <u>Headings.</u>  Each notice should begin with headings that identify the BLM and the subject matter of the notice.  Headings for a notice should be in this format:

   - Department Name (DEPARTMENT OF THE INTERIOR).
   - Subagency Name (Bureau of Land Management).
   - Agency Docket Number (optional).
   - Subject Heading.

3. <u>Authority citations.</u>  You must cite the authority that authorizes you to issue your notice; you are encouraged to use the shortest form possible.   This may appear in narrative form within the text or in parentheses on a separate line following the text.

4. <u>Text.</u>  The text of the notice may be organized in any logical format, but the OFR recommends the preamble format, shown below:

   - AGENCY:
   - ACTION:
   - SUMMARY:
   - DATES:
   - ADDRESSES:
   - FOR FURTHER INFORMATION:
   - SUPPLEMENTARY INFORMATION:

5. <u>Signature.</u>  Notices must be signed by an authorized official.  There must be three copies, each with original signatures, preferably in blue ink (this helps OFR determine that the signatures are original and not photocopies).  The signature block should not be on a page by itself.

See the illustrations provided by the *Federal Register* in **Appendix 11,** ***Federal Register Illustrations***.

## 13.1.1.2    Typing and Format Requirements

(Refer to **Appendix 11, *Federal Register* Illustrations**)

– Documents must be prepared on 8 ½″ × 11″ bond paper or photocopy.

– Documents must be typed on one side of the paper and double-spaced.  Any quoted material, footnotes, and notes to tables may be single-spaced.

– Documents must have one-inch margins on the top, bottom, and right side of the page.  On the left side, the margin will be one and one-half inches wide.

   All headings must be typed flush with the left margin.  Section headings must be typed out in full on a line separate from the text and underlined.  Pages of the document must be numbered consecutively, starting with the second page.

   The following items must be typed in all capital letters (see illustrations):

   (a)  FEDERAL REGISTER
   (b)  Name of Agency (but not the name of the subagency. i.e., DEPARTMENT OF THE INTERIOR, Bureau of Land Management)
   (c)  Preamble captions

– The use of abbreviations, symbols, and style must be in accordance with guidance in the *Document Drafting Handbook* prepared by the OFR.

– All signatures must be original and appear on a page with text.  The name and title of the individual who signs the notice must by typed directly below the signature line.  No second-party signatures will be accepted.

## 13.1.1.3    Submission Requirements

– The *Federal Register* notice may or may not need to be submitted and reviewed by the Washington Office or the Department.  Review current policy before submitting the notices to the OFR, to ensure compliance with requirements.

– The notice must be submitted in triplicate to the OFR.  Duplicate originals are recommended (each original is signed in ink, preferably blue, by the issuing official).  It is permissible to submit one original and two copies (each with an original signature), or it is also acceptable to submit one original and two certified copies.  Certified copies must include the name and title of the issuing official typed or stamped on the copy, a statement that reads "Certified to be a true copy of the original document," and the signature of the certifying official.

– See the Web Guide for the current mailing addresses of the OFR.

### 13.1.1.4      Publication Date

Notices are published in the *Federal Register* on the third business day after they are received by the OFR (for example, if the notice is received and accepted on a Monday, the notice will be published on Thursday).

## 13.2   PRINTING EISs

Prepare all EISs for printing in accordance with the BLM Manual Section 1551.  Work closely with your external affairs staff and your state printing specialist when preparing to print an EIS.

Send two hard copies of the final EIS and the ROD to the BLM Library at the National Science and Technology Center in Denver.

## 13.3   FILING EISs WITH THE EPA

You must file all draft, final, and supplemental EISs with the EPA (40 CFR 1506.9).  The *Federal Register* publishes a notice prepared by the EPA every Friday.  The notice lists all draft, final, and supplemental EISs received and filed with the EPA during the previous week.

Whereas the EPA only publishes notices for EISs on Fridays, the *Federal Register* publishes daily.  The BLM strives to publish the BLM notice for an EIS on the same Friday as the EPA notice publishes.  The BLM notice should not be published before the EPA notice.  For further discussion on publishing notices in the *Federal Register*, see section **13.1,** ***Publishing Notices in the Federal Register***.

The filing procedures for delegated EISs are slightly different from the filing procedures for nondelegated EISs, as discussed in section **13.3.2,** ***Procedures for Filing with the EPA***.

–      A delegated EIS is one for which the decision authority on the proposed action rests by delegation with a single Assistant Secretary or subordinate officer.

–      A nondelegated EIS is one for which the decision authority on the proposed action requires the approval of more than one Assistant Secretary (or bureaus under more than one Assistant Secretary), OR is an EIS reserved or elevated to the Secretary (or Office of the Secretary) by expressed interest of the Secretary, Deputy Secretary, the Chief of Staff, the Solicitor, or the Assistant Secretary for Policy, Management, and Budget, OR is of a highly controversial nature or one in which the Secretary has taken a prominent public position in a highly controversial issue, OR faces a high probability of judicial challenge to the Secretary.

The Web Guide contains a general schedule for the filing and publishing of *Federal Register* notices.

### 13.3.1    Significance of EPA Publication Dates

The date that the EPA notice appears in the *Federal Register* also serves as the official date for announcing the availability of a draft, final, or supplemental EIS, and starting the required comment and protest periods.

–    For draft EISs, this starts the public review period.

–    For final EISs, this notice initiates the 30-day period during which implementation cannot occur (see section.**9.3.1,** *File with the EPA*).

–    For land use planning actions, the EPA notice starts the 30-day protest period (40 CFR 1506.10).

### 13.3.2    Procedures for Filing with the EPA

The following procedures will ensure timely publication of the EPA notice for both delegated and nondelegated EISs.   For a nondelegated EIS, however, the OEPC approves and files the EIS with the EPA.   When you are working on a nondelegated EIS, consult with the OEPC early regarding the schedule and preparation of the EIS.

1.    Prepare a transmittal letter to the EPA.  For a draft EIS, indicate the length of the public review period.  The BLM may request a specific date for the EIS to be listed in the EPA's *Federal Register* notice (Friday publication dates only).  (For nondelegated EISs, the transmittal letter is signed by the OEPC.  Before the EIS is sent to the EPA, it must be approved and cleared to print by the OEPC).

2.    Mail or deliver to the EPA the transmittal letter and five copies of the EIS (draft, final, or supplemental) with a complete distribution list of individuals and organizations to whom the EIS is being distributed.  (Arrangements may be made with the EPA and the printer for direct distribution of the EIS to the EPA to save time).

The distribution list does not need to include addresses, and may be either printed in the EIS or inserted in the EIS.  Send the letter, EISs, and distribution lists to the current addresses listed in the Web Guide.

The EPA maintains a Web site with information and addresses associated with submitting EISs, see the Web Guide for this information.

3.    Ensure that the transmittal letter and required attachments are sent to the EPA in sufficient time to guarantee that *Federal Register* publication occurs on the intended date and that public review requirements are satisfied (section **9.3.2,** *Notify the Public and Government Agencies of the Availability of the Draft EIS for Review and Comment*).  The documents must be received by the EPA at least five business days before the date the notice will appear in the *Federal Register*.  Documents must also be received in the Office of Federal Activities before 2:30 pm to be logged as received for that business day.  (The Office of Federal Activities coordinates the EPA's review of all Federal EISs).

4.  Concurrent with the transmittal to the EPA, provide a copy of the transmittal letter, including the distribution list, and three copies of the EIS to the Office of Environmental Policy and Compliance (OEPC), 1849 C Street NW (2342-MIB), Washington, DC 20240. Contact the OEPC at 202-208-3891 to obtain the Environmental Statement control number. Immediately provide the Environmental Statement control number to the EPA.  The EPA will not prepare a notice to publish in the *Federal Register* without the Environmental Statement control number.

5.  Before or on the same day copies are transmitted to the EPA, distribute copies of the EIS to individuals or organizations included on the distribution list.  If the printer is mailing the EISs, arrange the shipping dates with the printer.

## 13.4   RECORDKEEPING PROCEDURES

### 13.4.1   Environmental Documents and Supporting Records—The Administrative Record

The administrative record is the paper trail that documents the BLM's decision-making process and the basis for the BLM's decision.  The administrative record establishes that you complied with relevant statutory, regulatory, and agency requirements, demonstrating that you followed a reasoned decision-making process.  It is imperative that the BLM maintain complete and well-organized files (indexed or searchable) of environmental documents and supporting records in its administrative record.  Such documents and records may be either hard copy or electronic. Begin compiling and organizing the administrative record as early in the NEPA process as possible.  Official file copies of BLM environmental documents and supporting records must be maintained by the originating office.  Environmental documents include:

- environmental assessments (EAs)
- findings of no significant impact (FONSIs)
- environmental impact statements (EISs)
- notices of intent (NOIs)
- Records of decision (RODs)
-

(40 CFR 1508.10, Question 34a, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981*).

Supporting records consist of material generated or used in the preparation of environmental documents.  As a guiding principle, these records must demonstrate both the process and information used to reach the final decision.  Such records include, but are not limited to:

- mailing lists
- summaries of public meetings (including attendance lists)
- records pertaining to consultations
- documents or studies incorporated by reference
- technical reports prepared by staff
- materials submitted by applicants
- records of contractual work related to the project
- cost recovery forms and records

A more complete list of potential supporting records can be found in **Appendix 10,** *Items to Include in the Administrative Record*.  The Web Guide includes a PowerPoint presentation on developing an administrative record.

Not all information in the administrative record is necessarily available to the public; information that is confidential must be marked as such.

We recommend you keep administrative records as long as you plan to rely upon that NEPA analysis.  The originating offices are to retain the official file copies of the NEPA document and its supporting record.  These documents are not to be stored indeterminately; the documents may be destroyed when superseded, obsolete, or no longer needed for administrative or reference purposes (BLM Manual 1220, Appendix 2).  At least one copy of draft, final, and supplemental EISs and RODs must be available in the lead State Office or Washington program office, as appropriate.

The lead State Office (or Washington program office, for programmatic or legislative environmental analyses) must determine where and for how long copies of environmental documents and documents incorporated by reference must be maintained.  In accordance with the National Archives Records Administration, the BLM follows a General Records Schedule for management of its records, including NEPA records.  This schedule is found in the BLM Manual 1220, Records and Information Management, Appendix 2—GRS/BLM Combined Records Schedules, which is available in the Web Guide.

In some instances, program-specific guidance identifies distribution and availability requirements.  For example, grazing operator case files are permanent records, and have their own schedule for storage in the field before being moved to the Federal Records Center, and on to the National Archives Records Administration.  The BLM records that may contain Indian fiduciary trust records are to be treated as permanent records, and you must coordinate these through BLM records administrators.

### 13.4.2    Other Environmental Records

Your office may have environmental records that do not fall under the scope of environmental documents as defined above (for example, categorical exclusion review records, or reviews done to determine adequacy of an existing NEPA document).  The originating office must also keep these environmental records in an official file, as discussed in section **13.4.1,** *Environmental Documents and Supporting Records—The Administrative Record*.

For records relating to the review of other agency environmental documents, the BLM office that actually assembles comments and prepares the response should maintain official files.  Thus, when the BLM is assigned as a lead agency for the Department in responding to other Federal agency's EISs, the State Office or Washington program office assigned to prepare the response maintains the official files (including all support material) for both the BLM and the Department.  The cutoff for these files is the end of the fiscal year in which the review was completed.  The documents may be destroyed two years after this cutoff date, as long as they are not needed for any purposes (BLM Manual 1220, Appendix 2).

## 13.5  CONTRACTING NEPA WORK

Contracting may be used for the preparation of a NEPA document or for certain portions of the analyses.  Contracting an environmental document does not eliminate the BLM's active role in the NEPA process; you must still put forth substantial efforts to develop the contract, meet frequently with the contractor, review all products, and develop necessary partnerships with counties, the state, Tribes, other Federal agencies, and other BLM offices. The contractor-developed work becomes your work: you are responsible for all content within NEPA document and the supporting materials, which must be included in the administrative record.  Additionally, decisions and findings are those of the BLM, not of the contractor, and these must reflect a review of underlying NEPA document.  As such, we recommend that you prepare the findings and decision records, not the contractor.

The CEQ provides guidance for contracting EAs and EISs at 40 CFR 1506.5(b) and (c).  The BLM may permit an applicant to prepare the EA.  An applicant may also pay a contractor to prepare an EA (this is called third-party contracting).  When an applicant or contractor prepares an EA, the BLM must independently evaluate the information submitted and its accuracy, and the environmental issues.  Though the applicant or contractor prepares the EA, the BLM is responsible for the scope and content of the EA.

The CEQ provides more specific guidance for contracting an EIS.  The BLM remains responsible for all of the content within the EIS.  Additionally, the BLM or a cooperating agency (ies) must select the cooperator, and a conflict of interest disclaimer must be included in the EIS.  The CEQ speaks directly to this requirement at 40 CFR 1506.5(c):

> It is the intent of these regulations that the contractor be chosen solely by the lead agency, or by the lead agency in cooperation with cooperating agencies, or where appropriate by a cooperating agency to avoid any conflict of interest. Contractors shall execute a disclosure statement prepared by the lead agency, or where appropriate the cooperating agency, specifying that they have no financial or other interest in the outcome of the project. If the document is prepared by contract, the responsible Federal official shall furnish guidance and participate in the preparation and shall independently evaluate the statement prior to its approval and take responsibility for its scope and contents. Nothing in this section is intended to prohibit any agency from requesting any person to submit information to it or to prohibit any person from submitting information to any agency.

While the CEQ only requires this disclaimer for EISs, we recommend including such statements in your contractor-prepared EAs as well.  Additionally, when using third-party contracting, we recommend an MOU between the BLM and the applicant.   This MOU must:

- establish the roles and responsibilities of each party; and
- specify that all costs of using a contractor in the preparation of the NEPA document will be borne by the applicant.

There are two principle approaches for contracting environmental documents:  standard federal contracting procedures (competitive procurement), and third party contracting.  Procurement of contracts is subject to the Federal Acquisition Regulation (48 CFR 1.6).  Third party contracting may be used most effectively for non-Bureau energy initiatives (for example, power plants and certain rights-of-way).  The key element in both approaches is the BLM control of analytical standards used, of the products produced, and of the schedule.  Work with your procurement personnel early in the process when considering contracting.  See the NEPA Web guide for more information and suggestions on contracting.

The BLM Washington Office or your State Office may establish policy related to contracting NEPA work.  We recommend working with your State NEPA coordinators to ensure that any applicable guidance is used in this process.

This page intentionally left blank.

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

# CHAPTER 14—ADAPTIVE MANAGEMENT

**[Chapter Reserved for Adaptive Management]**

This page intentionally left blank.

# Glossary

**affect**—to bring about a change.  As a verb, affect is most commonly used in the sense "to influence" or "impact." The adjective "affected" means acted upon or influenced.

**alternatives**—other options to the proposed action by which the BLM can meet its purpose and need.  The BLM is directed by the NEPA to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.…"  (NEPA Sec 102(2)E)

**alternative arrangements**—where emergency circumstances make it necessary to take an action with significant environmental impact, the Federal agency taking the action may consult with Council on Environmental Quality about alternative arrangements to observing the provisions of their regulations to implement the NEPA.  Such arrangements must be limited to actions necessary to control the immediate impacts of the emergency.  Other actions remain subject to NEPA review (40 CFR 1506.11).

**appeal**—an opportunity, provided by the Secretary of the Interior, for a qualified person to obtain a formal review, by an independent board, of the procedures and authority followed by an Interior agency in making a decision.

**at-risk community**—In summary, a group of homes or structures for which a significant threat to human life or property exists as a result of a wildland fire.  When using the NEPA provisions of the Healthy Forests Restoration Act, the definition of "at-risk community" in the Act must be used.  See Title 1, Healthy Forests Restoration Act of 2003 (P.L. 108-148), or The Healthy Forests Initiative and Healthy Forests Restoration Act Interim Field Guide, February 2004 (available online at www.healthyforests.gov).

**categorical exclusion**—a category of actions (identified in agency guidance) that do not individually or cumulatively have a significant effect on the human environment, and for which neither an environmental assessment nor an EIS is required (40 CFR 1508.4).

**community wildfire protection plan**—In summary, a collaborative plan developed by State and local governments and communities, in conjunction with adjacent Federal land-management agencies, which identifies areas and priorities for hazardous fuels reduction treatments on Federal and non-Federal lands.  When using the NEPA provisions of the Healthy Forests Restoration Act, the definition of "community wildfire protection plan" in the act must be used. See Title 1, Healthy Forests Restoration Act of 2003 (P.L. 108-148), or The Healthy Forests Initiative and Healthy Forests Restoration Act Interim Field Guide, February 2004 (available online at www.healthyforests.gov).

**conformance**—means that a proposed action shall be specifically provided for in a land use plan or, if not specifically mentioned, shall be clearly consistent with the terms, conditions, and decisions of the approved plan or amendment.  The BLM policy requires that a statement of land use plan conformance be included in a NEPA compliance document.

**connected action**—those actions that are "closely related" and "should be discussed" in the same NEPA document (40 CFR 1508.25 (a)(1)).  Actions are connected if they automatically trigger other actions that may require an EIS; cannot or will not proceed unless other actions are taken previously or simultaneously; or if the actions are interdependent parts of a larger action and depend upon the larger action for their justification (40 CFR 1508.25 (a)(1)).  Connected actions are limited to actions that are currently proposed (ripe for decision). Actions that are not yet proposed are not connected actions, but may need to be analyzed in cumulative effects analysis if they are reasonably foreseeable.

**cooperating agency**—assists the lead Federal agency in developing an EA or an EIS.  A cooperating agency may be any agency that has special jurisdiction by law or special expertise for proposals covered by the NEPA (40 CFR 1501.6).  Any Federal, State, tribal, or local government jurisdiction with such qualifications may become a cooperating agency by agreement with the lead agency.

**cumulative action**—proposed actions, which, when viewed with the proposed action, potentially have cumulatively significant impacts related to one or more identified issues.  Cumulative actions "should be discussed" in the same NEPA document (40 CFR 1508.25(a)(2)).

**cumulative effect**—"…the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such actions" (40 CFR 1508.7 and 1508.25).

**decision-maker**—the BLM official who has been delegated authority to approve an action and is responsible for issuing a decision to implement a proposed action.  Synonyms include authorized official, authorized officer, responsible official, and responsible manager.

**decision record (DR)**—the BLM document associated with an EA that describes the action to be taken when the analysis supports a finding of no significant impact.

**delegated EIS**—an EIS for which the decision authority for the proposed action rests by delegation with a single Assistant Secretary or a subordinate officer.

**departmental policy**—a policy established by the U.S. Department of the Interior

**design features**—measures or procedures incorporated into the proposed action or an alternative, including measures or procedures which could reduce or avoid adverse impacts. Because these features are built into the proposed action or an alternative, design features are not considered mitigation.

**Determination of NEPA Adequacy (DNA)**—an interim step in the BLM's internal analysis process that concludes that a proposed action is adequately analyzed in an existing NEPA document (an EIS or EA).  Where applicable, the determination also addresses conformance with an approved land use plan.

**direct effect**—". . . those effects which are caused by the action and occur at the same time and place" (40 CFR 1508.8(a).

**effect**—impact to the human environment brought about by an agent of change, or action. Effects analysis predicts the degree to which the environment will be affected by an action.  The CEQ uses both the terms "effect" and "impact" in the NEPA regulations; these terms are synonymous in the NEPA context.  As a noun, other synonyms include consequence, result and outcome.  Effects can be both beneficial and detrimental, and may be direct, indirect, or cumulative.

**emergency action**—immediate steps or response taken by the BLM to prevent or reduce risk to public health or safety or important resources.

**externally generated proposal**—a proposal that has been developed by an individual or group external to the BLM.

**extraordinary circumstances**—those circumstances for which the Department has determined that further environmental analysis is required for an action, and therefore an EA or EIS must be prepared.

**Federal action**—a BLM proposal is a Federal action when: (1) the proposal is at a stage in development where we have a goal and are actively preparing to make a decision on one or more alternative means of accomplishing that goal (40 CFR 1508.23); (2) the proposed action and effects are subject to BLM control and responsibility (40 CFR 1508.18); (3) the action has effects that can be meaningfully evaluated (40 CFR 1508.23); and (4) effects of the proposed action are related to the natural and physical environment, and the relationship of people with that environment (40 CFR 1508.8; 40 CFR 1508.14).

**Federal Register**—the official daily publication for rules, proposed rules, and notices of Federal agencies and organizations, as well as executive orders and other presidential documents.  The *Federal Register* is published by the Office of the Federal Register, National Archives and Records Administration (NARA).

**Finding of No Significant Impact (FONSI)**—a finding that explains that an action will not have a significant effect on the environment and, therefore, an EIS will not be required (40 CFR 1508.13).

**hard look**—a reasoned analysis containing quantitative or detailed qualitative information.

**human environment**—includes the natural and physical environment and the relationship of people with that environment.  When economic or social effects and natural or physical environmental effects are interrelated, then the analysis must discuss all of these effects on the human environment (40 CFR 1508.14).

**implementation action**—an action that implements land use plan decisions.

**incorporation by reference**—citation and summarization in a NEPA document of material from another reasonably available document that covers similar actions, issues, effects, or resources.

**indirect effect**—effects that "…are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable.  Indirect effects may include growth-inducing effects and other effects related to induced changes in the pattern of land use, population density, or growth rate, and related effects on water and air and other natural systems, including ecosystems" (40 CFR 1508.8(b)).

**internally generated proposal**—a proposal developed by the BLM.

**impact**—see "effect"

**issue**—a point or matter of discussion, debate, or dispute about the potential environmental effects or impacts, of an action.  Issues point to environmental effects and may drive the development of alternatives to the proposed action.

**jurisdiction by law**—means another governmental entity (Federal, State, tribal, or local agency) has authority to approve, veto, or finance all or part of a proposal (40 CFR 1508.15).  The CEQ guidance provides for establishing a cooperating agency relationship with such entities in development of a NEPA analysis document.

**land use plan**—a set of decisions that establish management direction for land within an administrative area, as prescribed under the planning provisions of the Federal Land Policy and Management Act; an assimilation of land-use-plan level decisions developed through the planning process outlined in 43 CFR part 1600, regardless of the scale at which the decisions were developed.  The term includes both Resource Management Plans and Management Framework Plans (H-1601-1, Glossary, page 4).

**legislation**—includes a bill or legislative proposal to Congress developed by or with the significant cooperation and support of a Federal agency, but does not include requests for appropriations (40 CFR 1508.17).

**Legislative EIS**—an environmental impact statement prepared on proposals made by Federal agencies for legislation that significantly affects the quality of the human environment.  The term "legislation" in this context does not include proposed legislation initiated *by* Congress or Federal agency requests *to* Congress for appropriations.  Rather, it includes any bill or legislative proposal submitted *to* Congress that is developed by or has the significant cooperation and support of a Federal agency (i.e., the Federal agency is the primary proponent of the legislation).  Special rules apply to the preparation and review of legislative EISs. (40 CFR 1506.8)

**may**—you are free to decide whether or not to follow the guidance described.

**Mitigated FONSI**—a finding that explains that an action will not have significant effects because of the adoption of mitigation measures and, therefore, an EIS would not be required.

**mitigation**—measures or procedures which could reduce or avoid adverse impacts and have not been incorporated into the proposed action or an alternative.  Mitigation can be applied to reduce or avoid adverse effects to biological, physical, or socioeconomic resources.

**must**—you are required to follow the guidance described.

**nondelegated EIS**—an EIS for which the decision authority on the proposed action requires the approval of more than one Assistant Secretary (or bureaus under more than one Assistant Secretary); <u>OR</u> an EIS reserved or elevated to the Secretary (or Office of the Secretary) by expressed interest of the Secretary, Deputy Secretary, the Chief of Staff, the Solicitor, or the Assistant Secretary for Policy, Management, and Budget; <u>OR</u> an EIS of a highly controversial nature or one in which the Secretary has taken a prominent public position in a highly controversial issue; <u>OR</u> an EIS that faces a high probability of judicial challenge to the Secretary.

**notice of availability (NOA)**—the *Federal Register* notice that an EIS (draft or final) or record of decision is available.  Publication of a notice of filing of an EIS by the Environmental Protection Agency formally begins the public comment period.  A NOA may also be published for an EA.

**notice of intent (NOI)**—this *Federal Register* notice announces that an environmental impact statement or an EA-level land use plan amendment will be prepared.  Publication of this notice formally starts the scoping process.

**preferred alternative**—the alternative the BLM believes would reasonably accomplish the purpose and need for the proposed action while fulfilling its statutory mission and responsibilities, giving consideration to economic, environmental, technical and other factors.  This alternative may or may not be the same as the BLM's or the proponent's proposed action.

**proposal**—the stage in the development of an action when a Federal agency has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and the effects can be meaningfully evaluated (40 CFR 1508.23).  When the BLM receives or makes a proposal, the NEPA process begins.

**proposed action**—a proposal for the BLM to authorize, recommend, or implement an action to address a clear purpose and need.  A proposal may be generated internally or externally.

**protest**—an opportunity for a qualified party to seek an administrative review of a proposed decision in accordance with program-specific regulations.  For example, a protest may be filed with the Director of the BLM for review of a proposed resource management plan or plan amendment (43 CFR 1610.5-2),or a proposed grazing decision may be protested for review by the authorized officer (43 CFR 4160.2).

**reasonably foreseeable action**—actions for which there are existing decisions, funding, formal proposals, or which are highly probable, based on known opportunities or trends.

**reasoned choice** – a choice based on a hard look at how the proposed action or alternatives respond to the purpose and need**.**

**recommend—** unless you have a good rationale for not doing so, you must follow the guidance described.

**record of decision (ROD)—** the decision document associated with an EIS (40 CFR 1505.2).

**regulation—** an official rule. Within the Federal government, certain administrative agencies (such as the BLM) have a narrow authority to control conduct within their areas of responsibility. A rule (also called a regulation or rulemaking) is a statement you publish in the Federal Register to implement or interpret law or policy (see Administrative Procedure Act, 5 U.S.C. 551(4) ("'rule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency…")). A rule is generally published as a proposed rule and then as a final rule. Once a rule is published in final, it is codified in the Code of Federal Regulations and remains in effect until it is modified by publication of another rule. (318 DM 1).

**residual effects—** those effects remaining after mitigation has been applied to the proposed action or an alternative.

**resource management plan—** (also known as Land Use Plan or Management Framework Plan). A set of decisions that establish management direction for land within an administrative area, as prescribed under the planning provisions of the Federal Land Policy and Management Act of 1976, as amended, P.L. 94-579, 90 Stat. 2743; an assimilation of land use plan-level decisions developed through the planning process outlined in 43 CFR 1600, regardless of the scale at which the decisions were developed.

**ripe for decision—** the circumstance existing when a contemplated action has reached the time when the facts have developed sufficiently to permit an intelligent and useful decision to be made. A Federal action is "ripe for decision" as soon as the agency receives or makes a proposal (40 CFR 1502.5).

**scope—** the extent of the analysis in a NEPA document.

**scoping (internal and external)—** the process by which the BLM solicits internal and external input on the issues and effects that will be addressed, as well as the degree to which those issues and effects will be analyzed in the NEPA document. Scoping is one form of public involvement in the NEPA process. Scoping occurs early in the NEPA process and generally extends through the development of alternatives (the public comment periods for EIS review are not scoping). Internal scoping is simply the use of BLM staff to decide what needs to be analyzed in a NEPA document. External scoping, also known as formal scoping, involves notification and opportunities for feedback from other agencies, organizations and the public.

**significance—** see "significant impact."

**significant impact—** effects of sufficient context and intensity that an environmental impact statement is required. The CEQ regulations at 40 CFR 1508.27(b) include ten considerations for evaluating intensity.

**similar action—**BLM actions which, when viewed with other reasonably foreseeable or proposed Federal actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography.  When it stands to improve the quality of analysis and efficiency of the NEPA process, similar actions may be analyzed in a single NEPA document.  (40 CFR 1508.25)

**special expertise—**means another governmental (Federal, State, tribal, or local) agency who has statutory responsibility, agency mission, or related program experience (40 CFR 1508.26).  The CEQ guidance provides for establishing a cooperating agency relationship with such entities in development of a NEPA analysis document.

**substantive comment—**a comment that does one or more of the following:
questions, with reasonable basis, the accuracy of information in the EIS or EA; questions, with reasonable basis or facts,  the adequacy of, methodology for, or assumptions used for the environmental analysis; presents reasonable alternatives other than those presented in the EIS or EA; or prompts the BLM to consider changes or revisions in one or more of the alternatives.

**supplementation—** the process of updating or modifying a draft or final EIS if, after circulation of a draft or final EIS but prior to implementation of the Federal action:
- you make substantial changes to the proposed action that are relevant to environmental concerns (40 CFR 1502.9(c)(1)(i));
- you add a new alternative that is outside the spectrum of alternatives already analyzed (see Question 29b, CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981)*; or
- there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its effects (40 CFR 1502.9(c)(1)(ii)).

**third-party contracting—**contracting for the preparation of NEPA documents that is funded by the non-BLM proponent of an action.  The BLM must still approve this analysis.

**tiering—**using the coverage of general matters in broader NEPA documents in subsequent, narrower NEPA documents, allowing the tiered NEPA document to narrow the range of alternatives and concentrate solely on the issues not already addressed.

**we—**as used in this Handbook, refers to the BLM.

**wildland–urban interface—**In summary, the area where structures and other human development meet or intermingle with undeveloped wildland.  When using the NEPA provisions of the Healthy Forests Restoration Act, the definition of "wildland urban interface" in the Act must be used.  See Title 1, Healthy Forests Restoration Act of 2003 (P.L. 108-148), or The Healthy Forests Initiative and Healthy Forests Restoration Act Interim Field Guide, February 2004 (available online at www.healthyforests.gov).

**you—**when used in the Handbook, refers to BLM staff and contractors responsible for NEPA compliance.

Glossary - 136

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

This page was intentionally left blank.

# Acronyms

**APD**—application for permit to drill
**BLM**—U.S. Department of the Interior**,** Bureau of Land Management
**BMP**—best management practices
**CEQ**—Council on Environmental Quality
**CFR**—Code of Federal Regulations
**CX**—categorical exclusion
**DM**—Departmental Manual
**DNA**—Determination of NEPA Adequacy
**DR**—decision record (for an EA)
**EA**—environmental assessment
**EIS**—environmental impact statement
**E.O.**—executive order
**EPA**—Environmental Protection Agency
**ESA**—Endangered Species Act of 1973, as amended
**ESM**—Environmental Statement Memoranda
**FACA**—Federal Advisory Committee Act
**FONSI**—finding of no significant impact
**GIS**—geographic information system
**HFRA**—Healthy Forests Restoration Act of 2003
**IBLA**—Interior Board of Land Appeals
**IM**—Instruction Memorandums [or memoranda]
**MOU**—memorandum of understanding
**NEPA**—National Environmental Policy Act of 1969, as amended
**NOA**—notice of availability
**NOI**—notice of intent
**OEPC**—U.S. Department of the Interior, Office of Environmental Policy and Compliance
**P.L.**—public law
**RAC**—Resource Advisory Committee
**RFD**—reasonably foreseeable development
**RMP**—resource management plan
**ROD**—record of decision (for an EIS)
**WO**—BLM Washington Office

Appendix 2 - 138
H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

This page was intentionally left blank.

# APPENDIX 1
## Supplemental Authorities To Be Considered

The NEPA is only one of many authorities that contain procedural requirements that pertain to treatment of elements of the environment when the BLM is considering a Federal action.  The following list includes some of the other authorities that may apply to BLM actions.

| Element | Authority | Manual Section |
|---|---|---|
| Air Quality | The Clean Air Act as amended (42 USC 7401 et seq.) | 7300 |
| Cultural Resources | National Historic Preservation Act, as amended (16 USC 470) | 8100 |
| Fish Habitat | Magnuson-Stevens Act Provision: Essential Fish Habitat (EFH): Final Rule (50 CFR Part 600; 67 FR 2376, January 17, 2002). | NA |
| Forests and Rangelands | Healthy Forests Restoration Act of 2003 (P.L. 108-148) | NA |
| Migratory Birds | Migratory Bird Treaty Act of 1918, as amended (16 USC 703 et seq.) | NA |
| Native American Religious Concerns | American Indian Religious Freedom Act of 1978 (42 USC 1996) | 8100 |
| Threatened or Endangered Species | Endangered Species Act of 1983, as amended (16 USC 1531) | 6840 |
| Wastes, Hazardous or Solid | Resource Conservation and Recovery Act of 1976 (43 USC 6901 et seq.)  Comprehensive Environmental Repose Compensation, and Liability Act of 1980, as amended (43 USC 9615) | 9180 9183 |
| Water Quality Drinking–Ground | Safe Drinking Water Act, as amended (43 USC 300f et seq.)  Clean Water Act of 1977 (33 USC 1251 et seq.) | 7240 9184 |
| Wild and Scenic Rivers | Wild and Scenic Rivers Act, as amended (16 USC 1271) | 8014 |
| Wilderness | Federal Land Policy and Management Act of 1976 (43 USC 1701 et seq.); Wilderness Act of 1964 (16 USC 1131 et seq.) | 8500 |
| Environmental | E.O. 12898, "Environmental Justice" February 11, 1994 | NA |

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

| Element | Authority | Manual Section |
|---|---|---|
| Justice Floodplains | E.O. 11988, as amended, Floodplain Management, 5/24/77 | 7260 |
| Migratory Birds | E.O. 131186, "Responsibilities of Federal Agencies to Protect Migratory Birds" January 10, 2001 | NA |
| Wetlands-Riparian Zones | E.O. 11990 Protection of Wetlands 5/24/77 | 6740 |

# APPENDIX 2
# Using Categorical Exclusions
# Established by
# the Energy Policy Act of 2005

The Energy Policy Act (P.L. 109-58) prescribes the following five categorical exclusions (CX) for activities whose purpose is for exploration or development of oil or gas:

1.  *Individual surface disturbances of less than five acres so long as the total surface disturbance on the lease is not greater than 150 acres and site-specific analysis in a document prepared pursuant to the NEPA has been previously completed.*

2.  *Drilling an oil and gas well at a location or well pad site at which drilling has occurred within five years prior to the date of spudding the well.*

3.  *Drilling an oil or gas well within a developed field for which an approved land use plan or any environmental document prepared pursuant to NEPA analyzed drilling as a reasonably foreseeable activity, so long as such plan or document was approved within five years prior to the date of spudding the well.*

4.  *Placement of a pipeline in an approved right-of-way corridor, so long as the corridor was approved within five years prior to the date of placement of the pipeline.*

5.  *Maintenance of a minor activity, other than any construction or major renovation of a building or facility.*

Specific instructions for using these five CXs are identified below.

1.  *Individual surface disturbances of less than five acres so long as the total surface disturbance on the lease is not greater than 150 acres and site-specific analysis in a document prepared pursuant to the NEPA has been previously completed.*

Use of this CX requires the decision-maker to do three things before applying this exclusion to any authorization.  First, the decision-maker must determine that the action under consideration will disturb less than five acres on the site.  If more than one action is proposed for a lease (for example, two or more wells), each activity is counted separately and each may disturb up to five acres.  Similarly, the five-acre limit must be applied separately to each action requiring discrete BLM action, such as each APD, even though for processing efficiency purposes the operator submits for BLM review a large Master Development Plan addressing many wells.

Second, the decision-maker must determine that the current unreclaimed surface disturbance readily visible on the entire leasehold is not greater than 150 acres, including the proposed action.  This would include disturbance from previous rights-of-way issued in support of lease development.  If one or more Federal leases are committed to a BLM-approved unit or communitization agreement, the 150-acre threshold applies separately to each lease.  For larger

leases, the requirement for adequate documentation would be satisfied with a copy of the most recent aerial photograph in the file with an explanation of recent disturbance that may not be shown on the aerial photos.  Maps, tally sheets, or other visual aids may be substituted for aerial photographs.

Finally, this CX includes the requirement of a site-specific NEPA document.  For the purposes of this CX, a site-specific NEPA analysis can be either an exploration and/or development EA/EIS, an EA/EIS for a specific Master Development Plan, a multi-well EA/EIS, or an individual permit approval EA/EIS.  The NEPA document must have analyzed the exploration and/or development of oil and gas (not just leasing) and the action/activity being considered must be within the boundaries of the area analyzed in the EA or EIS.  The NEPA document need not have addressed the specific permit or application being considered.

This CX may also be applied to geophysical exploration activities provided the above requirements have been met.  For example, if an oil and gas exploration and development EIS analyzes the site-specific impacts of 3D geophysical exploration within the oil and gas field, this CX may apply to subsequent 3D geophysical activities conducted within the field.

The above requirements, that is, the five acre threshold, 150 acre unreclaimed disturbance limit, and a site-specific NEPA document that addressed oil and gas development, are the only applicable factors for review pursuant to this statute, but all must be satisfied in order to use this CX.

2.   *Drilling an oil and gas well at a location or well pad site at which drilling has occurred within five years prior to the date of spudding the well.*

The well file narrative to support use of this CX must state the date when the previous well was completed or the date the site had workover operations involving a drilling rig of any type or capability; this also includes completion of any plugging operations.  A "location or well pad" is defined as a previously disturbed or constructed well pad used in support of drilling a well. "Drilling" in the context of, "Drilling has occurred within five years" refers to any drilled well including injection, water source, or any other service well.  Additional disturbance or expansion of the existing well pad is not restricted as long as it is tied to the original location or well pad. This exclusion does not extend to new well sites merely in the general vicinity of the original location or well pad.

If the operator delays in spudding the new well and the time period between the previous well completion and spudding exceed five years, the operator must suspend preparation for drilling operations until the BLM completes NEPA compliance for the proposed well and issues a new decision on the APD.  Therefore, the APD must contain a condition of approval (COA) stating that "If the well has not been spudded by *(the date the CX is no longer applicable)*, this APD will expire and the operator is to cease all operations related to preparing to drill the well."

The above requirements, that is, the drilling of a well at an existing location or well pad and the five year limitation are the only two applicable factors for review pursuant to this statute, but must both be satisfied in order to use this CX.

3. *Drilling an oil or gas well within a developed field for which an approved land use plan or any environmental document prepared pursuant to NEPA analyzed drilling as a reasonably foreseeable activity, so long as such plan or document was approved within five years prior to the date of spudding the well.*

The proposed well must be within a developed oil and gas field. A developed field is any field in which a "confirmation well" has been completed. Normally, this is after the third well in a field. The pending APD must also be within the reasonably foreseeable development scenario (RFD) used in either a land use plan EIS or subsequent developmental EA or EIS. Finally, the new well must be spudded within five years of that previous NEPA document. This provision applies to "any environmental document" that analyzed drilling, meaning any document adopted by any Federal agency pursuant to the NEPA, regardless of whether it was adopted by the BLM. Because the 5-year period is again tied to the spudding of the pending well, the APD must contain a COA that if no well is spudded by the date the CX is no longer applicable, the APD will expire, thus requiring the operator to obtain a new APD. For example, "If the well has not been spudded by *(the date the categorical exclusion is no longer applicable)*, this APD will expire and the operator is to cease all operations related to preparing to drill the well."

Full field development EISs do not need to be prepared where the development envisioned was analyzed in the land use plan EIS. As long as the development foreseen does not exceed the number of wells and/or surface disturbance analyzed in the prior NEPA document, no additional NEPA documentation is required because of changes in the density of development.

All of the following requirements must be met to use this CX.

   (1) The proposed APD is within a developed oil or gas field. A developed field is defined as any field in which a confirmation well has been completed.

   (2) There is an existing NEPA document (including that supporting a land use plan) that contains a reasonably foreseeable development scenario encompassing this action.

   (3) The NEPA document was finalized or supplemented within five years of spudding the well.

4. *Placement of a pipeline in an approved right-of-way corridor, so long as the corridor was approved within five years prior to the date of placement of the pipeline.*

The 5-year time period is to be calculated from the date the decision was made approving the corridor, including any amendments to the corridor. The time period extends to the date placement of any portion of the new pipeline is concluded, provided that placement activities began within the 5-year period. If the operator delays in beginning to place the pipeline, and the time period between the approval of the corridor and placement exceeds five years, the authorized officer must suspend the right-of-way authorization until the BLM completes NEPA compliance for the proposed right-of-way and issues a decision. To avoid problems, the right-of-way must contain a term or condition that provides for the suspension of the authorization if placement does not begin before the last date that the CX is available, thus requiring the operator to obtain a new right-of-way.

Existing right-of-way corridors of any type can be used for new pipeline placement, such as the burial of a pipeline or pipeline conduit in an existing roadbed or along a power line right-of-way, could qualify for the exclusion.  The term "right-of-way corridor" in Section 390 is not limited to those authorized under 43 CFR 2800, but is a more generalized term that applies to any type of corridor or right-or-way (whether on or off lease) approved under any authority or vehicle of the BLM, including Sundry Notices.  Additional disturbance or width needed to properly or safely install the new pipeline may be authorized under this exclusion if it is within the approved right-of-way corridor.  Creation of a new right-of-way completely outside and not overlapping into a portion of the existing corridor is not authorized.

The above requirements, that is, the placement of a pipeline in an existing corridor of any type and placement of the pipe within five years of approval (or amendment), are the only two applicable factors for review pursuant to this statute and both must be satisfied to use this CX.

Other types of new right-of-way applications cannot be excluded from NEPA analysis under this exclusion, for example, above ground power lines, or new roads; however, existing right-of-way corridors, such as roads, may be used for new pipeline or pipeline conduit in an existing roadbed.

5.   *Maintenance of a minor activity, other than any construction or major renovation of a building or facility.*

This CX applies to maintenance of minor activities, such as maintenance of the well or wellbore, a road, wellpad, or production facility.  The exclusion does not cover construction or major renovation of a building or facility.  The addition of a compressor or a gas processing plant would therefore not be eligible for this CX.

Note:  CX numbers one through four reference prior approvals made following NEPA analysis. Field Offices must apply the same or more effective mitigating measures considered in the parent NEPA documents to all actions approved under any CX.  Additionally, BMPs are to be applied as necessary to reduce impacts to any authorization issued, regardless of the NEPA analysis or exclusion used.

# APPENDIX 3
# Departmental Categorical Exclusions

The following actions are categorical exclusions (CXs) pursuant to 516 DM 2, Appendix 1.
However, individual actions must be subjected to sufficient review to determine if any of the
extraordinary circumstances listed in **Appendix 5,** ***Categorical Exclusions: Extraordinary
Circumstances*** apply**.**  If any of the extraordinary circumstances apply, an EA or an EIS must be
prepared.  In addition, see **Appendix 4,** ***BLM Categorical Exclusions*** for a list of BLM
excludable activities.

1.1   Personnel actions and investigations and personnel services contracts.

1.2   Internal organizational changes and facility and office reductions and closings.

1.3   Routine financial transactions including such things as salaries and expenses,
procurement contracts (in accordance with applicable procedures and Executive Orders for
sustainable or green procurement), guarantees, financial assistance, income transfers, audits,
fees, bonds, and royalties.

1.4   Departmental legal activities including, but not limited to, such things as arrests,
investigations, patents, claims, and legal opinions.  This does not include bringing judicial or
administrative civil or criminal enforcement actions which are outside the scope of NEPA in
accordance with 40 CFR 1508.18(a).

1.5   Reserved.

1.6   Nondestructive data collection, inventory (including field, aerial, and satellite surveying
and mapping), study, research, and monitoring activities.

1.7   Routine and continuing government business, including such things as supervision,
administration, operations, maintenance, renovations, and replacement activities having limited
context and intensity (e.g., limited size and magnitude or short-term effects).

1.8   Management, formulation, allocation, transfer, and reprogramming of the Department's
budget at all levels.  (This does not exclude the preparation of environmental documents for
proposals included in the budget when otherwise required.)

1.9   Legislative proposals of an administrative or technical nature (including such things as
changes in authorizations for appropriations and minor boundary changes and land title
transactions) or having primarily economic, social, individual, or institutional effects; and
comments and reports on referrals of legislative proposals.

1.10   Policies, directives, regulations, and guidelines that are of an administrative, financial,
legal, technical, or procedural nature and whose environmental effects are too broad, speculative,
or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA
process, either collectively or case-by-case.

1.11    Activities which are educational, informational, advisory, or consultative to other agencies, public and private entities, visitors, individuals, or the general public.

1.12    Hazardous fuels reduction activities using prescribed fire not to exceed 4,500 acres, and mechanical methods for crushing, piling, thinning, pruning, cutting, chipping, mulching, and mowing, not to exceed 1,000 acres. Such activities:  Shall be limited to areas (1) in wildland–urban interface and (2) Condition Classes 2 or 3 in Fire Regime Groups I, II, or III, outside the wildland–urban interface; Shall be identified through a collaborative framework as described in "A Collaborative Approach for Reducing Wildland Fire Risks to Communities and the Environment 10-Year Comprehensive Strategy Implementation Plan;" Shall be conducted consistent with agency and Departmental procedures and applicable land and resource management plans; Shall not be conducted in wilderness areas or impair the suitability of wilderness study areas for preservation as wilderness; Shall not include the use of herbicides or pesticides or the construction of new permanent roads or other new permanent infrastructure; and may include the sale of vegetative material if the primary purpose of the activity is hazardous fuels reduction.

1.13    Post-fire rehabilitation activities not to exceed 4,200 acres (such as tree planting, fence replacement, habitat restoration, heritage site restoration, repair of roads and trails, and repair of damage to minor facilities such as campgrounds) to repair or improve lands unlikely to recover to a management approved condition from wildland fire damage, or to repair or replace minor facilities damaged by fire.  Such activities:  Shall be conducted consistent with agency and Departmental procedures and applicable land and resource management plans; Shall not include the use of herbicides or pesticides or the construction of new permanent roads or other new permanent infrastructure; and Shall be completed within three years following a wildland fire.

# APPENDIX 4
# BLM Categorical Exclusions

The following actions are designated as categorical exclusions (CXs) pursuant to 516 DM 11.9.

Before any action described in the following list is used, the list of "extraordinary circumstances" described in **Appendix 5, Categorical Exclusions: *Extraordinary Circumstances*** must be reviewed for applicability. If any of the extraordinary circumstances are applicable to the action being considered, either an EA or an EIS must be prepared for the action. When no "extraordinary circumstances" apply, the following activities do not require the preparation of an EA or EIS.  In addition, see **Appendix 3, *Departmental Categorical Exclusions*** for a list of DOI-wide CXs.

The following actions are designated as categorical exclusions.  The subject headings are for organizational purposes only - any program may use any of the CXs.

**A.  Fish and Wildlife**
1. Modification of existing fences to provide improved wildlife ingress and egress.
2. Minor modification of water developments to improve or facilitate wildlife use (e.g., modify enclosure fence, install flood valve, or reduce ramp access angle).
3. Construction of perches, nesting platforms, islands, and similar structures for wildlife use.
4. Temporary emergency feeding of wildlife during periods of extreme adverse weather conditions.
5. Routine augmentations, such as fish stocking, providing no new species are introduced.
6. Relocation of nuisance or depredating wildlife, providing the relocation does not introduce new species into the ecosystem.
7. Installation of devices on existing facilities to protect animal life, such as raptor electrocution prevention devices.

**B.  Oil, Gas, and Geothermal Energy**
1. Issuance of future interest leases under the Mineral Leasing Act for Acquired Lands, where the subject lands are already in production.
2. Approval of mineral lease adjustments and transfers, including assignments and subleases.
3. Approval of unitization agreements, communitization agreements, drainage agreements, underground storage agreements, development contracts, or geothermal unit or participating area agreements.
4. Approval of suspensions of operations, force majeure suspensions, and suspensions of operations and production.
5. Approval of royalty determinations, such as royalty rate reductions.
6. Approval of Notices of Intent to conduct geophysical exploration of oil, gas, or geothermal, pursuant to 43 CFR 3150 or 3250, when no temporary or new road construction is proposed.

## C. Forestry

1. Land cultivation and silvicultural activities (excluding herbicide application) in forest tree nurseries, seed orchards, and progeny test sites.
2. Sale and removal of individual trees or small groups of trees which are dead, diseased, injured, or which constitute a safety hazard, and where access for the removal requires no more than maintenance to existing roads.
3. Seeding or reforestation of timber sales or burn areas where no chaining is done, no pesticides are used, and there is no conversion of timber type or conversion of non-forest to forest land.  Specific reforestation activities covered include: seeding and seedling plantings, shading, tubing (browse protection), paper mulching, bud caps, ravel protection, application of non-toxic big game repellant, spot scalping, rodent trapping, fertilization of seed trees, fence construction around out-planting sites, and collection of pollen, scions and cones.
4. Pre-commercial thinning and brush control using small mechanical devices.
5. Disposal of small amounts of miscellaneous vegetation products outside established harvest areas, such as Christmas trees, wildings, floral products (ferns, boughs, etc.), cones, seeds, and personal use firewood.
6. Felling, bucking, and scaling sample trees to ensure accuracy of timber cruises.  Such activities:
   a. Shall be limited to an average of one tree per acre or less,
   b. Shall be limited to gas-powered chainsaws or hand tools,
   c. Shall not involve any road or trail construction,
   d. Shall not include the use of ground based equipment or other manner of timber yarding, and
   e. Shall be limited to the Coos Bay, Eugene, Medford, Roseburg, and Salem Districts and Lakeview District - Klamath Falls Resource Area in Oregon.
7. Harvesting live trees not to exceed 70 acres, requiring no more than 0.5 mile of temporary road construction.  Such activities:
   a. Shall not include even-aged regeneration harvests or vegetation type conversions.
   b. May include incidental removal of trees for landings, skid trails, and road clearing.
   c. May include temporary roads which are defined as roads authorized by contract, permit, lease, other written authorization, or emergency operation not intended to be part of the BLM transportation system and not necessary for long-term resource management.  Temporary roads shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources; and
   d. Shall require the treatment of temporary roads constructed or used so as to permit the reestablishment by artificial or natural means, or vegetative cover on the roadway and areas where the vegetative cover was disturbed by the construction or use of the road, as necessary to minimize erosion from the disturbed area.  Such treatment shall be designed to reestablish vegetative cover as soon as practicable, but at least within 10 years after the termination of the contract.
   Examples include, but are not limited to:
   a. Removing individual trees for sawlogs, specialty products, or fuelwood.

    b. Commercial thinning of overstocked stands to achieve the desired stocking level to increase health and vigor.

8. Salvaging dead or dying trees not to exceed 250 acres, requiring no more than 0.5 mile of temporary road construction.  Such activities:

    a. May include incidental removal of live or dead trees for landings, skid trails, and road clearing.

    b. May include temporary roads which are defined as roads authorized by contract, permit, lease, other written authorization, or emergency operation not intended to be part of the BLM transportation system and not necessary for long-term resource management.  Temporary roads shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources; and

    c. Shall require the treatment of temporary roads constructed or used so as to permit the reestablishment, by artificial or natural means, of vegetative cover on the roadway and areas where the vegetative cover was disturbed by the construction or use of the road, as necessary to minimize erosion from the disturbed area. Such treatment shall be designed to reestablish vegetative cover as soon as practicable, but at least within 10 years after the termination of the contract.

    d. For this CX, a dying tree is defined as a standing tree that has been severely damaged by forces such as fire, wind, ice, insects, or disease, and that in the judgment of an experienced forest professional or someone technically trained for the work, is likely to die within a few years. Examples include, but are not limited to:

        (i) Harvesting a portion of a stand damaged by a wind or ice event.

        (ii) Harvesting fire damaged trees.

9. Commercial and non-commercial sanitation harvest of trees to control insects or disease not to exceed 250 acres, requiring no more than 0.5 miles of temporary road construction. Such activities:

    a. May include removal of infested/infected trees and adjacent live uninfested/uninfected trees as determined necessary to control the spread of insects or disease; and

    b. May include incidental removal of live or dead trees for landings, skid trails, and road clearing.

    c. May include temporary roads which are defined as roads authorized by contract, permit, lease, other written authorization, or emergency operation not intended to be part of the BLM transportation system and not necessary for long-term resource management.  Temporary roads shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources; and

    d. Shall require the treatment of temporary roads constructed or used so as to permit the reestablishment, by artificial or natural means, of vegetative cover on the roadway and areas where the vegetative cover was disturbed by the construction or use of the road, as necessary to minimize erosion from the disturbed area. Such treatment shall be designed to reestablish vegetative cover as soon as practicable, but at least within 10 years after the termination of the contract. Examples include, but are not limited to:

    (i)    Felling and harvesting trees infested with mountain pine beetles and immediately adjacent uninfested trees to control expanding spot infestations; and

    (ii)   Removing or destroying trees infested or infected with a new exotic insect or disease, such as emerald ash borer, Asian longhorned beetle, or sudden oak death pathogen.

## D. Rangeland Management

1. Approval of transfers of grazing preference.
2. Placement and use of temporary (not to exceed one month) portable corrals and water troughs, providing no new road construction is needed.
3. Temporary emergency feeding of livestock or wild horses and burros during periods of extreme adverse weather conditions.
4. Removal of wild horses or burros from private lands at the request of the landowner.
5. Processing (transporting, sorting, providing veterinary care, vaccinating, testing for communicable diseases, training, gelding, marketing, maintaining, feeding, and trimming of hooves of) excess wild horses and burros.
6. Approval of the adoption of healthy, excess wild horses and burros.
7. Actions required to ensure compliance with the terms of Private Maintenance and Care agreements.
8. Issuance of title to adopted wild horses and burros.
9. Destroying old, sick, and lame wild horses and burros as an act of mercy.
10. Vegetation management activities, such as seeding, planting, invasive plant removal, installation of erosion control devices (e.g., mats/straw/chips), and mechanical treatments, such as crushing, piling, thinning, pruning, cutting, chipping, mulching, mowing, and prescribed fire when the activity is necessary for the management of vegetation on public lands.  Such activities:

    a. Shall not exceed 4,500 acres per prescribed fire project and 1,000 acres for other vegetation management projects;

    b. Shall not be conducted in Wilderness areas or Wilderness Study Areas;

    c. Shall not include the use of herbicides, pesticides, biological treatments or the construction of new permanent roads or other new permanent infrastructure;

    d. May include temporary roads which are defined as roads authorized by contract, permit, lease, other written authorization, or emergency operation not intended to be part of the BLM transportation system and not necessary for long-term resource management.  Temporary roads shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources; and

    e. Shall require the treatment of temporary roads constructed or used so as to permit the reestablishment, by artificial or natural means, of vegetative cover on the roadway and areas where the vegetative cover was disturbed by the construction or use of the road, as necessary to minimize erosion from the disturbed area.  Such treatment shall be designed to reestablish vegetative cover as soon as practicable, but at least within 10 years after the termination of the contract.

11. Issuance of livestock grazing permits/leases where:
   a. The new grazing permit/lease is consistent with the use specified on the previous permit/lease, such that
      (i) the same kind of livestock is grazed,
      (ii) the active use previously authorized is not exceeded, and
      (iii) grazing does not occur more than 14 days earlier or later than as specified on the previous permit/lease, and
   b. The grazing allotment(s) has been assessed and evaluated and the Responsible Official has documented in a determination that the allotment(s) is
      (i) meeting land health standards, or
      (ii) not meeting land health standards due to factors that do not include existing livestock grazing.

**E. Realty**
1. Withdrawal extensions or modifications, which only establish a new time period and entail no changes in segregative effect or use.
2. Withdrawal revocations, terminations, extensions, or modifications; and classification terminations or modifications which do not result in lands being opened or closed to the general public land laws or to the mining or mineral leasing laws.
3. Withdrawal revocations, terminations, extensions, or modifications; classification terminations or modifications; or opening actions where the land would be opened only to discretionary land laws and where subsequent discretionary actions (prior to implementation) are in conformance with and are covered by a Resource Management Plan/EIS (or plan amendment and EA or EIS).
4. Administrative conveyances from the Federal Aviation Administration (FAA) to the State of Alaska to accommodate airports on lands appropriated by the FAA prior to the enactment of the Alaska Statehood Act.
5. Actions taken in conveying mineral interest where there are no known mineral values in the land under Section 209(b) of the Federal Land Policy and Management Act of 1976 (FLPMA).
6. Resolution of class one color-of-title cases.
7. Issuance of recordable disclaimers of interest under Section 315 of FLPMA.
8. Corrections of patents and other conveyance documents under Section 316 of FLPMA and other applicable statutes.
9. Renewals and assignments of leases, permits, or rights-of-way where no additional rights are conveyed beyond those granted by the original authorizations.
10. Transfer or conversion of leases, permits, or rights-of-way from one agency to another (e.g., conversion of Forest Service permits to a BLM Title V Right-of-way).
11. Conversion of existing right-of-way grants to Title V grants or existing leases to FLPMA Section 302(b) leases where no new facilities or other changes are needed.
12. Grants of right-of-way wholly within the boundaries of other compatibly developed rights-of-way.
13. Amendments to existing rights-of-way, such as the upgrading of existing facilities, which entail no additional disturbances outside the right-of-way boundary.
14. Grants of rights-of-way for an overhead line (no pole or tower on BLM land) crossing over a corner of public land.

15. Transfers of land or interest in land to or from other bureaus or federal agencies where current management will continue and future changes in management will be subject to the NEPA process.
16. Acquisition of easements for an existing road or issuance of leases, permits, or rights-of-way for the use of existing facilities, improvements, or sites for the same or similar purposes.
17. Grant of a short rights-of-way for utility service or terminal access roads to an individual residence, outbuilding, or water well.
18. Temporary placement of a pipeline above ground.
19. Issuance of short-term (3 years or less) rights-of-way or land use authorizations for such uses as storage sites, apiary sites, and construction sites where the proposal includes rehabilitation to restore the land to its natural or original condition.
20. One-time issuance of short-term (3 years or less) rights-of-way or land use authorizations which authorize trespass action where no new use or construction is allowed, and where the proposal includes rehabilitation to restore the land to its natural or original condition.

**F. Solid Minerals**

1. Issuance of future interest leases under the Mineral Leasing Act for Acquired Lands where the subject lands are already in production.
2. Approval of mineral lease readjustments, renewals, and transfers including assignments and subleases.
3. Approval of suspensions of operations, force majeure suspensions, and suspensions of operations and production.
4. Approval of royalty determinations, such as royalty rate reductions and operations reporting procedures.
5. Determination and designation of logical mining units.
6. Findings of completeness furnished to the Office of Surface Mining Reclamation and Enforcement for Resource Recovery and Protection Plans.
7. Approval of minor modifications to or minor variances from activities described in an approved exploration plan for leasable, salable, and locatable minerals (e.g., the approved plan identifies no new surface disturbance outside the areas already identified to be disturbed).
8. Approval of minor modifications to or minor variances from activities described in an approved underground or surface mine plan for leasable minerals (e.g., change in mining sequence or timing).
9. Digging of exploratory trenches for mineral materials, except in riparian areas.
10. Disposal of mineral materials, such as sand, stone, gravel, pumice, pumicite, cinders, and clay, in amounts not exceeding 50,000 cubic yards or disturbing more than 5 acres, except in riparian areas.

## G. Transportation

1. Incorporation of eligible roads and trails in any transportation plan when no new construction or upgrading is needed.
2. Installation of routine signs, markers, culverts, ditches, waterbars, gates, or cattleguards on/or adjacent to roads and trails identified in any land use or transportation plan, or eligible for incorporation in such plan.
3. Temporary closure of roads and trails.
4. Placement of recreational, special designation, or information signs, visitor registers, kiosks, and portable sanitation devices.

## H. Recreation Management

1. Issuance of Special Recreation Permits for day use or overnight use up to 14 consecutive nights; that impacts no more than 3 staging area acres; and/or for recreational travel along roads, trails, or in areas authorized in a land use plan. This CX cannot be used for commercial boating permits along Wild and Scenic Rivers. This CX cannot be used for the establishment or issuance of Special Recreation Permits for "Special Area" management (43 CFR 2932.5).

## I. Emergency Stabilization

1. Planned actions in response to wildfires, floods, weather events, earthquakes, or landslips that threaten public health or safety, property, and/or natural and cultural resources, and that are necessary to repair or improve lands unlikely to recover to a management-approved condition as a result of the event. Such activities shall be limited to: repair and installation of essential erosion control structures; replacement or repair of existing culverts, roads, trails, fences, and minor facilities; construction of protection fences; planting, seeding, and mulching; and removal of hazard trees, rocks, soil, and other mobile debris from, on, or along roads, trails, campgrounds, and watercourses. These activities:
   a. Shall be completed within one year following the event;
   b. Shall not include the use of herbicides or pesticides;
   c. Shall not include the construction of new roads or other new permanent infrastructure;
   d. Shall not exceed 4,200 acres; and
   e. May include temporary roads which are defined as roads authorized by contract, permit, lease, other written authorization, or emergency operation not intended to be part of the BLM transportation system and not necessary for long-term resource management. Temporary roads shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources; and
   f. Shall require the treatment of temporary roads constructed or used so as to permit the reestablishment by artificial or natural means, or vegetative cover on the roadway and areas where the vegetative cover was disturbed by the construction or use of the road, as necessary to minimize erosion from the disturbed area. Such treatment shall be designed to reestablish vegetative cover as soon as practicable, but at least within 10 years after the termination of the contract

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

**J. Other**

1. Maintaining land use plans in accordance with 43 CFR 1610.5-4.
2. Acquisition of existing water developments (e.g., wells and springs) on public land.
3. Conducting preliminary hazardous materials assessments and site investigations, site characterization studies and environmental monitoring.  Included are siting, construction, installation and/or operation of small monitoring devices such as wells, particulate dust counters and automatic air or water samples.
4. Use of small sites for temporary field work camps where the sites will be restored to their natural or original condition within the same work season.
5. Reserved.
6. A single trip in a one month period for data collection or observation sites.
7. Construction of snow fences for safety purposes or to accumulate snow for small water facilities.
8. Installation of minor devices to protect human life (e.g., grates across mines).
9. Construction of small protective enclosures, including those to protect reservoirs and springs and those to protect small study areas.
10. Removal of structures and materials of no historical value, such as abandoned automobiles, fences, and buildings, including those built in trespass and reclamation of the site when little or no surface disturbance is involved.
11. Actions where the BLM has concurrence or co-approval with another DOI agency and the action is categorically excluded for that DOI agency.
12. Rendering formal classification of lands as to their mineral character, waterpower, and water storage values.

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

# APPENDIX 5
# Categorical Exclusions:
# Extraordinary Circumstances

Before any non-Energy Act CX is used, you must conduct sufficient review to determine if any of the following extraordinary circumstances apply (516 DM 2, Appendix 2).  If any of the extraordinary circumstances are applicable to the action being considered, either an EA or an EIS must be prepared for the action. Part 516 of the Departmental Manual (516 DM 2, Appendix 2) states that extraordinary circumstances exist for individual actions within CXs which may:

2.1   Have significant impacts on public health or safety.

2.2   Have significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands (Executive Order 11990); floodplains (Executive Order 11988); national monuments; migratory birds; and other ecologically significant or critical areas.

2.3   Have highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources [NEPA Section 102(2)(E)].

2.4   Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks.

2.5   Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects.

2.6   Have a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects.

2.7   Have significant impacts on properties listed, or eligible for listing, on the National Register of Historic Places as determined by either the bureau or office.

2.8   Have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species, or have significant impacts on designated Critical Habitat for these species.

2.9   Violate a Federal law, or a State, local, or tribal law or requirement imposed for the protection of the environment.

2.10  Have a disproportionately high and adverse effect on low income or minority populations (Executive Order 12898).

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

2.11    Limit access to and ceremonial use of Indian sacred sites on Federal lands by Indian religious practitioners or significantly adversely affect the physical integrity of such sacred sites (Executive Order 13007).

2.12    Contribute to the introduction, continued existence, or spread of noxious weeds or non-native invasive species known to occur in the area or actions that may promote the introduction, growth, or expansion of the range of such species (Federal Noxious Weed Control Act and Executive Order 13112).

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

# APPENDIX 6
# Categorical Exclusion Documentation Format When Using Categorical Exclusions Not Established by Statute

**A.  Backgound**
BLM Office: _____        Lease/Serial/Case File No.: _____

Proposed Action Title/Type: _____
Location of Proposed Action:  _____
Description of Proposed Action: _____
_____
_____
_____
_____

**B. Land Use Plan Conformance**
Land Use Plan Name: _____   Date Approved/Amended:_____
The proposed action is in conformance with the applicable LUP because it is specifically
provided for in the following LUP decision(s): _____
_____
_____
_____

_____   The proposed action is in conformance with the LUP, even though it is not specifically
provided for, because it is clearly consistent with the following LUP decision(s) (objectives,
terms, and conditions): _____
_____
_____
_____

**C:  Compliance with NEPA:**
The Proposed Action is categorically excluded from further documentation under the National
Environmental Policy Act (NEPA) in accordance with 516 DM 2, Appendix 1, _____
[Insert appropriate CX number and text, or a paraphrase of the text] or 516 DM 11.9, _____
[Insert appropriate CX number and text, or a paraphrase of the text].

This categorical exclusion is appropriate in this situation because there are no extraordinary
circumstances potentially having effects that may significantly affect the environment.  The
proposed action has been reviewed, and none of the extraordinary circumstances described in
516 DM2 apply.

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)


I considered _____
_____ [Insert any pertinent
design features incorporated into the project design, or relevant situations discussed during
project design, and explain why there is no potential for significant impacts].


**D: Signature**

Authorizing Official: _____     Date: _____
                                       (Signature)
Name: _____
Title: _____


**Contact Person**

For additional information concerning this CX review, contact [Insert contact name, title, office
name, mailing address, and telephone number].


**Note:**  A separate decision document must be prepared for the action covered by the CX.

# APPENDIX 7
# Documentation Requirements for Hazardous Fuels Actions and Post-Fire Rehabilitation Actions

## Decision Memorandum on Action and for Application of:
## Departmental Categorical Exclusion 1.12 (or 1.13 or both)
## Project Name

**U.S. Department of the Interior**

**Bureau Name**

*Bureau Field Station (State Office, Regional Office, etc.)*

**County, State**

**Description of the Proposed Action and the Purpose and Need for the Action**

[*Provide a description of the proposed action and the purpose and need for the action. Provide any pertinent facts such as: applicable legal land description, statutory citations, and other agency involvements.*]

**Plan Conformance**

[*State that the Proposed Action is consistent with any land and resource management plans as required by appropriate Federal, State, or local statutes having a bearing on the decision.*]
[*State that the Proposed Action was designed in conformance with all bureau standards and incorporates appropriate guidelines for specific required and desired conditions relevant to project activities.*]  [*insert findings for other applicable laws.*]

**Compliance with the National Environmental Policy Act**

[*State that the Proposed Action is categorically excluded from further documentation under the National Environmental Policy Act (NEPA) in accordance with 516 DM 2, Appendix 1, 1.12 (or 1.13 or both).*]  [*insert reasons.*]

[*State that the application of this categorical exclusion is appropriate in this situation because there are no extraordinary circumstances potentially having effects which may significantly affect the environment.*]  [*Clearly state that none of the exceptions apply. If any apply, then the categorical exclusions cannot be utilized.*]  [*State that these extraordinary circumstances are contained in 516 DM 2, Appendix 2.*]

I considered [*insert any pertinent situations that were brought up during the design of the activities and explain why there is no potential for significant effects*].

**Persons and Agencies Consulted**

[*Explain how the public was made aware of this proposed activity. Describe people and agencies consulted regarding the development of the action and steps taken based on this consultation.*]

**Decision and Rationale on Action**

I have decided to implement [*insert description of actions, including mitigation measures and reference any maps and drawings*]. These actions meet the need for action. In addition, I have reviewed the plan conformance statement and have determined that the proposed action is in conformance with the approved land use plan and that no further environmental analysis is required.

**Implementation Date**

This project will be implemented on or after [*insert implementation date and identify any conditions related to implementation*].

_____          _____

[*Insert deciding official's name*]                                             Date
[*Insert deciding official's title*]
**Administrative Review or Appeal Opportunities**
[*State whether the decision is or is not subject to administrative appeal. If it is subject to appeal, provide the citation of the appeal rules and provide appeal information.*]

**Contact Person**

For additional information concerning this decision, contact [Insert contact name, title, office name, mailing address, and telephone number].

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

# APPENDIX 8
# Worksheet
# Determination of NEPA Adequacy (DNA)
### U.S. Department of the Interior
### Bureau of Land Management

OFFICE:

TRACKING NUMBER:

CASEFILE/PROJECT NUMBER:

PROPOSED ACTION TITLE/TYPE:

LOCATION/LEGAL DESCRIPTION:

APPLICANT (if any):

**A.  Description of the Proposed Action and any applicable mitigation measures**

**B.  Land Use Plan (LUP) Conformance**

LUP Name*_____          Date Approved _____

Other document _____          Date Approved _____

Other document _____          Date Approved _____

> *List applicable LUPs (for example, resource management plans; activity, project, management, or program plans; or applicable amendments thereto)*

The proposed action is in conformance with the applicable LUP because it is specifically provided for in the following LUP decisions:

The proposed action is in conformance with the LUP, even though it is not specifically provided for, because it is clearly consistent with the following LUP decisions (objectives, terms, and conditions):

**C.  Identify applicable National Environmental Policy Act (NEPA) documents and other related documents that cover the proposed action.**

List by name and date all applicable NEPA documents that cover the proposed action.

List by name and date other documentation relevant to the proposed action (e.g., biological assessment, biological opinion, watershed assessment, allotment evaluation, and monitoring report).

**D.  NEPA Adequacy Criteria**

**1.  Is the new proposed action a feature of, or essentially similar to, an alternative analyzed in the existing NEPA document(s)?  Is the project within the same analysis area, or if the project location is different, are the geographic and resource conditions sufficiently similar to those analyzed in the existing NEPA document(s)? If there are differences, can you explain why they are not substantial?**

Documentation of answer and explanation:

**2.  Is the range of alternatives analyzed in the existing NEPA document(s) appropriate with respect to the new proposed action, given current environmental concerns, interests, and resource values?**

Documentation of answer and explanation:

**3.  Is the existing analysis valid in light of any new information or circumstances (such as, rangeland health standard assessment, recent endangered species listings, updated lists of BLM-sensitive species)?  Can you reasonably conclude that new information and new circumstances would not substantially change the analysis of the new proposed action?**

Documentation of answer and explanation:

**4.  Are the direct, indirect, and cumulative effects that would result from implementation of the new proposed action similar (both quantitatively and qualitatively) to those analyzed in the existing NEPA document?**

Documentation of answer and explanation:

**5.  Are the public involvement and interagency review associated with existing NEPA document(s) adequate for the current proposed action?**

Documentation of answer and explanation:

**E.  Persons/Agencies /BLM Staff Consulted**

  Name                      Title                    Resource/Agency Represented

Note:  Refer to the EA/EIS for a complete list of the team members participating in the preparation of the original environmental analysis or planning documents.

**Conclusion**  (*If you found that one or more of these criteria is not met, you will not be able to check this box.*)

Based on the review documented above, I conclude that this proposal conforms to the applicable land use plan and that the NEPA documentation fully covers the proposed action and constitutes BLM's compliance with the requirements of the NEPA.

_____

Signature of Project Lead

_____

Signature of NEPA Coordinator

_____  _____

Signature of the Responsible Official:                                  Date

**Note:** The signed <u>Conclusion</u> on this Worksheet is part of an interim step in the BLM's internal decision process and does not constitute an appealable decision. However, the lease, permit, or other authorization based on this DNA is subject to protest or appeal under 43 CFR Part 4 and the program-specific regulations.

Appendix 8 - 164

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

This page intentionally left blank.

# APPENDIX 9
# Recommended EA Format

Following is a suggested, but optional, outline for an EA.  Refer to **Chapter 8,** *Preparing an Environmental Assessment* for descriptions of the content for these EA sections or chapters.

## 1.  Introduction

- Identifying Information
- Purpose and Need for Action
- Scoping and Public Involvement and Issues

## 2.  Proposed Action and Alternatives

- Description of Proposed Action
- Description of Alternatives Analyzed in Detail
- Alternatives Considered but not Analyzed in Detail

## 3.  Affected Environment

## 4.  Environmental Effects

- Direct and Indirect Effects
- Cumulative Effects
- Residual Effects

## 5. Tribes, Individuals, Organizations, or Agencies Consulted

## 6. List of Preparers

This page intentionally left blank.

# APPENDIX 10
# Items to Include in the Administrative Record

The administrative record needs to demonstrate all of the factors considered and the process used in reaching a decision.  The record must also document public involvement in the process.  Be aware that some documents in the Administrative Record are subject to the Freedom of Information Act and Privacy Act (consult your FOIA Officer).  Note this on the document itself, and indicate it in the database.  (If the administrative record is used in lawsuits, protests, and so forth, and if information is not filed in the administrative record, the courts or the IBLA may consider that it did not happen.)

Administrative records may include (but are not limited to) these documents:

**General Information**

- *Federal Register* Notices
- Interdisciplinary Team or Project Team Membership
- Preparation Plans
- Contract Information (if the project is contracted)

**Public Information**

- Public Involvement Plans
- Public Information Documents (letters, notices)
- News Reports and Clippings
- General Correspondence
- Meeting and Workshop Records (attendance lists, announcements)
- Scoping Report
- BLM Responses to Comments (if not included in the environmental document)
- Protests or appeals and the BLM's responses
- Mailing Lists
- Public Comments (from all phases of the project)

**External Communications**

- Other Federal Agencies
- Cooperating Agencies
- Tribes
- State Agencies
- Local Agencies
- Elected Officials (Governor, County commissioners, city officials, and so forth)
- Organizations
- Individuals
- Freedom of Information Act (FOIA) Requests and Responses (maintained by the FOIA Officer)

**Internal Communications**

- Project Management Correspondence
- Interdisciplinary Team–Project Team Correspondence (meeting notes, agendas)
- FOIA exempt documents
- Quality Assurance Determination

**Background Material/Supporting Information**

- Data
- Data Standards
- Metadata
- References
- Analyses (of alternatives, environmental consequences)
- Appendixes
- Special Reports (ACEC Report, Reasonably Foreseeable Development Scenarios, Mineral Assessments, Wild and Scenic River Suitability Assessments)
- Biological Assessments or Opinions
- Section 106 Consultation

**Environmental Documents**

- Draft EIS
- Final EIS
- Record of Decision or Decision Record

# APPENDIX 11
## *Federal Register* Illustrations

These illustrations were adopted from the Office of the Federal Register's *Federal Register Document Drafting Handbook*, October 1998 Revision.

**Illustration 1:  *Federal Register* Format Requirements**



H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

**Illustration 2:  Sample Notice**

7515-01

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

Public Meeting With Interested Vendors for Ordering

Reproductions of Still Photographs, Aerial Film, Maps, and

Drawings

AGENCY: National Archives and Records Administration.

ACTION: Notice of meeting.

SUMMARY: The National Archives and Records Administration (NARA)

will hold a meeting to discuss the continued privatization of

reproduction services for still pictures, aerial film, maps, and

drawings. On March 6, 199x, NARA began a test phase of new

procedures for the delivery of reproduction services for records

which NARA customers request from the Still Picture Branch,

the Cartographic and Architectural Branch, and the Nixon

Presidential Materials Staff. The National Archives and

Records Administration permitted vendors to set up work

stations in College Park, MD, where the still photographs,

cartographic, and architectural records are housed and made

available. The three units referred customer requests for

reproduction of these media to the vendors, who determined fees,

collected payments, performed the copying work, and mailed the

reproductions to the customers. The purpose of this one-year

1

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

**Illustration 2: Sample Notice (Continued)**

trial program was to: verify the degree to which the

privatization of the reproduction order fulfillments could

improve customer service; and ascertain the extent

to which digital scanning can satisfy requirements from

NARA's customers. The program is extended for one more year,

with some changes. All vendors interested in the program,

including vendors already participating, are invited to attend

the next scheduled meeting. A follow-up meeting has also been

scheduled to answer any remaining questions from possible

vendors, and to distribute copies of the memorandum of

agreement.

DATES: The meeting will be held on Wednesday, January 24, 199x,

at 2 p.m. The follow-up meeting will be he11d on Thursday,

February 15, 199x, at 2 p.m.

ADDRESSES: The meetings will be held in Archives II, Lecture

Rooms D and E, located at 8601 Adelphi Road, College Park, MD.

FOR FURTHER INFORMATION CONTACT: Michael Meetings, 301-000-0000.

Dated: January 2, 199x.

*Signature*

Type name,

Title.

2

H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

## Illustration 3:  Guidance on Writing a *Federal Register* Notice

**Capitals.** Type in all capital letters:

- The name of the agency or cabinet-level department (but not the name of the subagency) in the heading of a document.
- "FEDERAL REGISTER" in the parenthetical for dates that we are to compute.
- Preamble captions.

Example 27.

```
AGENCY:
ACTION:
SUMMARY:
DATES:
ADDRESSES:
FOR FURTHER INFORMATION CONTACT:
SUPPLEMENTARY INFORMATION:
```

**Copies.** Provide legible copies.

**Correction or adhesive tape.** Do not use correction or adhesive tape.

**Double-spacing.** Type the text of your document double-spaced.

**Headings.** Type document headings centered or flush with the left margin.

**Margins**

- One inch at the top, bottom, and right side.
- One and one-half inches on the left side.

**Page numbers.** Number the pages consecutively in one of the following places:

- Centered top.
- Centered bottom.
- Upper right-hand corner.

**Paper.** You must prepare your documents on 8½" × 11" white paper.

**Quotation marks.** Use quotation marks for names of books, journals, articles, and similar items.

**Quoted material.** Type quoted material:

- Single-spaced.
- Centered-block style.
- Without quotation marks.

**Single-sided copy.** You must type your document on one side only.

**Illustration 3:  Guidance on Writing a *Federal Register* Notice (Continued)**

### § Symbol.

Use the § symbol only for a CFR section and §§ symbol only for multiple sections. However, do not use a § symbol to begin a sentence; instead, spell out the word. Do not use the § symbol or the word "section" when the reference follows a title number and CFR as in 36 CFR 1200.1.

### Style.

Use the "U.S. Government Printing Office Style Manual" as a guide for punctuation, capitalization, spelling, compounding, and other style matters. You may obtain the GPO Style Manual from the Superintendent of Documents, Government Printing Office.

### References.

If your document relates to a previously published *Federal Register* document, you must cite the earlier document. A reference in a notice document to a previously published *Federal Register* document must identify the volume number, page number, and date of the issue in which the document appeared. (See example 28.)

Example 28. Reference to a previously published *Federal Register* document.

```
6x FR 12345, Jul. 23, 199x
```

A reference in a notice document to material contained in the CFR should identify the CFR title and part or section number. (See example 29.)

Example 29. Reference to material contained in the CFR.

```
36 CFR part 1200
36 CFR 1200.1
```

Appendix 11 - 174
H-1790-1 - NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK – (Public)

This page intentionally left blank.