Case 1:18-cv-00187-REB Document 30-15 Filed 07/06/18 Page 1 of 11

 U.S. Department of the Interior

# New Energy Frontier

Node / Report to Secretary Ken Salazar Regarding the Potential Leasing of 77 Parcels in Utah

Share

# Report to Secretary Ken Salazar Regarding the Potential Leasing of 77 Parcels in Utah

On January 17, 2009, a federal district court enjoined the U.S. Department of the Interior from entering into oil and gas leases for 77 parcels in Utah that had been included in a December 19, 2008 auction. The court entered a temporary injunction against the sale of the parcels after concluding that plaintiffs had established "a likelihood of success on the merits" regarding their claims that the proposed lease sales violated the National Environmental Policy Act, the Federal Land Policy and Management Act and the National Historic Preservation Act.[1]

On February 6, 2009, Secretary Ken Salazar concluded that the issues raised by the court, along with other concerns that had been raised about the lease sale, merited a special review.[2] Accordingly, Secretary Salazar directed that the leases be withdrawn and bonus payments be returned to the bidders. He subsequently requested that Deputy Secretary David J. Hayes lead a Departmental team that would evaluate the December lease sale and make recommendations regarding the matter.

This report responds to Secretary Salazar's request. The report is based on a review of the administrative record that accompanied the auction of the 77 parcels; an inspection of the parcels in question via overflight or on-the-ground inspection; interviews of BLM, National Park Service (NPS), and other Interior Department officials who were involved in lease-related decision-making; a listening session with state and local officials and representatives, followed by a public town hall meeting for interested members of the public (held in Vernal, Utah on May 26); and conference calls with industry representatives and conservationists.[3]

The review's findings and recommendations are:

Findings

- The lease sale that BLM's Utah office conducted in the fall of 2008, which culminated in the December 19, 2008 auctioning of 116 parcels, including the 77 parcels that are the focus of this report, deviated in important respects from the normal leasing process:

- The fall 2008 lease sale began in the customary fashion. On August 1, 2008, BLM informed representatives of the National Park Service of its intent to hold an oil and gas lease sale on November 18, 2008. It identified parcels that were proposed to be included in the sale, and requested input from the NPS "no later than September 5, 2008, in order to address your concerns prior to making a lease recommendation." In a parallel notice provided for BLM field office managers, BLM's State office indicated its intent to provide public notice of lands that would be offered for sale by October 3, 2008. The prior notice that BLM provided to the NPS regarding parcels that it proposed to include in a public lease sale conformed with long-standing BLM/NPS practice.[4] NPS responded to the August 1st pre-notification and provided timely input on the parcels that BLM identified as candidates for the fall oil and gas leasing sale.
- After soliciting input on the proposed lease sale from the National Park Service, BLM decided to expand the lease sale and delay the public announcement of parcels that were being offered for leasing from October 3, 2008 to November 4, 2008. BLM did not provide the National Park Service its customary opportunity to provide input on the lease sale, even though BLM had decided to greatly expand the lease sale from the 79 parcels that had been suggested in the August 1, 2008 pre-notification to 241 parcels that were announced on November 4, 2008. Among the new parcels added without prior notice to NPS were a number of parcels in the immediate vicinity of three National Park units (Arches National Park; Canyonlands National Park; and Dinosaur National Monument).
- A third party informed NPS of BLM's action two business days before BLM was scheduled to publicly announce on November 4, 2008 the expanded lease sale. Because it had not received prior notice and an opportunity to discuss the appropriateness of auctioning parcels next to units of the National Park system, NPS requested that BLM defer the late-added parcels from the lease sale until the next quarterly sale so that NPS could have a full opportunity to review and comment on the proposed lease sales. BLM refused to do so.
- After strong public concern was expressed regarding the proposed sale of many parcels near National Park units for oil and gas development, BLM provided NPS with a belated opportunity to request that parcels be removed from the auction that already had been publicly announced for sale.
- After a short but intensive period of negotiations, BLM agreed to remove parcels that were most objectionable to NPS due to their immediate proximity to Park boundaries.[5] NPS remained concerned about other parcels near the Parks with regard to their potential impacts on viewscapes, soundscapes and regional air quality, but NPS acquiesced with the BLM auction going forward so long as:
    - BLM would recommit in writing to BLM's historic consultation practices with NPS and, in addition, that BLM would provide NPS with advanced notice and an opportunity to consult before allowing exemptions, modifications or waivers to original lease terms.
    - BLM would meet with NPS and develop a plan to address how to address air quality models and "to identify viable modeling/analysis options." NPS made this request because ozone concentrations at Canyonlands National Park "are within about 90% of the current 8-hour ozone National Ambient Air Quality Standard (NAAQS) and may well exceed a new 8-hour standard the Environmental Protection Agency has proposed even without new sources of emissions."[6] (It also should be noted that the U.S. Environmental Protection Agency had expressed concerns to BLM regarding the need for quantitative air quality information regarding oil and gas leasing activity in the region.[7] )
- BLM's Utah State Office and NPS' Intermountain Regional Office subsequently entered into a Memorandum of Understanding on May 13, 2009 which memorialized BLM's historic consultation practices with NPS and BLM's

commitment to provide NPS with advanced notice and an opportunity to consult before allowing exemptions, modifications or waivers to original lease terms. [8]

- With regard to the air quality issues raised by NPS:
    - On January 15, 2009, a few days before leaving office, Bush Administration appointees representing BLM and the United States Forest Service executed a Memorandum of Understanding which asserted that quantitative air quality analysis would not be "appropriate" when making oil and gas planning decisions, or when undertaking "low-level energy development activity." [9]
    - On February 11, 2009, BLM and NPS officials engaged in a professionally facilitated meeting to address NPS's request to develop a plan for addressing air quality issues in the airsheds surrounding the three National Park units potentially impacted by oil and gas leasing activities. The facilitator described the talks as ending in an "impasse"; no agreement was reached between BLM and NPS regarding whether and/or how to undertake quantitative air quality analysis to cover oil and gas leasing activity in the region. [10]
- Because NPS's jurisdiction is tied to its National Park units, NPS did not address parcels that were proposed for sale and were not in the vicinity of one of its parks. Some of the 77 parcels that were subject to the court's injunction are near other unique and sensitive landscapes, including Nine Mile Canyon, an area that is world renown for its sophisticated, extensive, and potentially fragile rock art, and Desolation Canyon, a deep river canyon that is upstream of the Grand Canyon and one that rivals its beauty. [11]
- The lands associated with the 77 leases in question are covered by three Resource Management Plans ("RMPs") that BLM signed on October 31, 2008, only 4 days before the lease sale was noticed to the public. These RMPs are general planning documents that cover several million acres of public lands in BLM's Moab, Vernal and Price districts (the three RMPs are hereinafter referred to as the "Utah RMPs"). The Utah RMPs had been developed over a period of several years. They include the following features:
    - As a general matter, the Utah RMPs exclude a relatively small proportion of potentially available BLM lands from oil and gas drilling. By way of example, the Utah RMPs provide BLM with the discretion to lease the large majority of lands that it identified as having "wilderness characteristics" for oil and gas development.[12] Likewise, the Utah RMPs provide BLM with the discretion to allow oil and gas development on parcels in the immediate proximity of National Park units and a number of other sensitive landscapes, including lands that have wilderness characteristics, and lands that have other values that may not be consistent with oil and gas development (e.g., hiking, biking, river rafting and other recreational activity that is prevalent in the region). The RMPs identify a menu of potential stipulations that BLM can append to leases to mitigate the environmental impacts associated with oil and gas development of the land.
    - The Utah RMPs are high level planning documents; they do not provide BLM officials with guidance on whether individual parcels should be made available for oil and gas development when such parcels are near National Park units and other sensitive landscapes or when such parcels have wilderness characteristics or other values that may not be consistent with oil and gas development. Guidance from BLM is necessary, given the strong competing values that BLM officials must take into account when making leasing decisions for individual parcels in eastern and southern Utah. The unique canyons and mesas that dominate the landscape in this region and Utah's "red rock" areas are among America's most treasured landscapes.[13] Illustrating the point, Arches National Park attracts more than one million visitors a year, and it is estimated that BLM lands in the vicinity of Arches National Park and Canyonlands National Park attract more than two million recreational visitors per year. On the other hand, extensive oil and gas and related infrastructure development is taking place in some other areas covered by the Utah RMPs. In

- particular, intensive oil and gas development is occurring in the Uinta Basin, which is primarily covered by the Vernal RMP.
  - The Utah RMPs do not model existing air quality in the region or attempt to aggregate, in a quantitative way, the impacts that additional oil and gas leasing may have on air quality in the region. As manifested in the Memorandum of Understanding that was signed by political appointees on January 15, 2009, BLM takes the position that quantitative air quality impacts need not be evaluated until operators request permission to initiate development on specific parcels or, in some cases, when operators develop a concentrated plan of development for a given area. However, individual drilling activities often are exempt from air permitting requirements. BLM does not have a mechanism for evaluating the impact of oil and gas development on air quality in the region, despite the fact that air quality levels for some health-based parameters, such as ozone, are marginal and may be deteriorating.

Recommendations

1. **1. Communication and Cooperation Needs To Be Improved Between BLM and the National Park Service and Other Stakeholders Regarding Leasing Decisions**

BLM's decision to auction off oil and gas development rights on lands that are immediately adjacent to some of our nation's most visited and treasured national parks reflects a failure in communication and cooperation between BLM and the National Park Service. Although BLM responded and came to the negotiating table when the National Park Service and the public heavily criticized BLM's decision to lease parcels for oil and gas development on the doorstep of some of Utah's most beautiful national parks, it should not take a public relations melt-down to trigger a meaningful dialogue between the two agencies. Better communication and cooperation is needed between BLM-Utah and Park units in the Intermountain Region. BLM should improve its understanding of the importance of Park values that would be implicated by oil and gas drilling activity occurring alongside the border of and in proximity to a National Park or Monument. This standard should equally apply to BLM managed units of the National Landscape and Conservation System (NCLS). And for its part, it is important that the Park Service understand the need for BLM to evaluate potential multiple uses of BLM lands, in accordance with the Federal Land Policy and Management Act.

Likewise, BLM should seek better communication and cooperation with other stakeholders who have concerns regarding decisions to allow oil and gas development on other sensitive landscapes that have unique values, but which are not near a National Park or Monument, such as Nine Mile Canyon and Desolation Canyon. BLM has its own inherent stewardship responsibilities that should inform its decision-making when evaluating whether to allow commercial development of BLM lands in or near sensitive, treasured landscapes. BLM officials also should be attentive to the input of other stakeholders who seek to protect such lands because of the competing values they represent – whether it be wilderness characteristics associated with the lands, competing recreational interests, or other values.

Some observers may point out that the process of putting together the areas' Resource Management Plans should have provided the opportunity to foster communication and cooperation between BLM and other interested agencies and stakeholders. Because RMPs are high level planning documents, however, they do not make individual leasing decisions for specific parcels; those must be made on a case-by-case basis. As a result,

the type of communication and input needed between BLM and the National Park Service regarding potential oil and gas leasing next to National Park units did not occur in the RMP process.

The Utah RMPs illustrate this point. They adopted a broad planning level presumption that the large majority of available BLM lands should potentially be made available for oil and gas development, including lands with wilderness characteristics and lands immediately adjacent to the National Parks. But they did not focus on how BLM officials should weigh competing considerations when deciding, for example, whether to offer or defer a request to nominate a parcel adjacent to Arches National Park or in a wilderness quality area for potential oil and gas development.

Thus, while some proponents argue that the RMP process provided all of the input needed to make individual leasing decisions, that is clearly not the case. Decisions whether to offer specific parcels for oil and gas development must be made on a case-by-case basis, taking into account competing resource values and site-specific circumstances. This decision will be better informed if important stakeholders such as the National Park Service, the State, industry representatives, and other interested organizations are provided a meaningful opportunity for input and dialogue before parcels are announced for public sale. That did not occur here. The new MOU between BLM and NPS should help avoid a repeat of this situation, but we recommend that BLM consider more systematic and bureau-wide initiatives for improving communication and cooperation with important stakeholders when considering what parcels might be offered in potential lease sales.

2. **BLM Should Develop Guidance to Assist BLM Officials In Making Parcel-Specific Leasing Decisions**

As noted above, BLM has not identified the criteria that BLM officials should apply when deciding whether individual parcels should be made available for oil and gas development. The proximity of such parcels to National Park units, NLCS units and other sensitive landscapes, the fact that parcels may have wilderness characteristics or other values that may not be consistent with oil and gas development, and the relative intensity of existing investments in the immediate area of proposed leasing, including oil and gas drilling activities and related infrastructure, are factors that presumably should have a bearing on leasing decisions for individual parcels.

BLM should develop and issue decision-making criteria that fills this important void and provides a rational basis to better assist BLM officials on how they should weigh competing considerations when deciding whether an individual parcel that is available for leasing as a general matter (e.g, where an RMP would otherwise allow leasing of the parcel in question) should, in fact, be leased and for what purpose(s), given site-specific considerations.[14] The factors that are relevant to individual leasing decisions, such as proximity to special landscapes (including, but not limited to, parks), to wilderness qualities, and to the presence of existing development and infrastructure, among other factors, should be identified by such guidance. New BLM guidance should then suggest approaches for weighing such factors in the decision-making process.

3. **It May Be Appropriate to Reinstate Some of the 77 Parcels; Others Should Not Be Leased for Oil and Gas Developmentt**

As noted above, site-specific considerations can and should have an important bearing on whether individual leases should be offered for oil and gas development in the context of expansive RMPs, such as those involved here. Because BLM has not developed guidance regarding how site-specific factors should be weighed in determining whether specific parcels should be offered for oil and gas development, managed to protect their

wilderness values, or opened up for recreational purposes, the preparers of this report are not in a position to make final determinations regarding the ultimate disposition of the 77 parcels in question.

To address this need, we recommend that the acting BLM Director appoint a multi-disciplinary team of experienced BLM officials who have not been involved in decision-making regarding the 77 parcels in question to make site-specific decisions on whether to reinstate any of the 77 parcels. The BLM team should do its work expeditiously; companies who successfully bid on specific parcels should receive timely feedback on whether they will be able to develop those parcels.[15] In proceeding with this exercise, the BLM team should review protests that have been lodged against each of the parcels in question and address those protests when making its final decisions.

After conducting this evaluation, the BLM team should determine whether: (1) the parcels should be reoffered to the original bidders under the same conditions as previously specified (in which case the winning bidders should have the opportunity to repay their bonus payments and move toward execution of their leases); (2) the parcels should be reoffered for oil and gas development, but under different terms than had been specified in the original offering (in which case the parcels should be subjected to a new auction process); or (3) the parcels should be deferred from leasing.

In connection with the BLM team's review of the 77 parcels, the review team has identified several groupings of parcels that are relevant:

14 Parcels Located Within Already Existing Gas Development And Infrastructure Areas

A set of 14 parcels are located near current production areas that are largely already dedicated to oil and gas development, and which have existing infrastructure to facilitate such development. These factors suggest that reinstatement of the sale of these leases may be appropriate. The BLM team should seek to confirm, on a site-by-site basis, that the stipulations associated with each parcel are adequate, given the specific topographical and locational characteristics of each parcel. As noted above, the BLM team also should review protests that have been lodged against each of the parcels in question and address those protests when making its final decisions.

These parcels are located as follows:

- Central Uinta Basin: parcels 90, 91, 93, 94, 96, 97, 98, 112, 115, 116.
- Southern Uinta Basin: parcels 209, 210, 211, 212.

16 Parcels Located Within More Limited Development Areas

A second set of 16 parcels is located where the intensity of existing production is more limited. The parcels in this second grouping, however, are not near particularly sensitive landscapes and they do not appear to trigger strong concerns regarding recreation or other alternative uses. These factors suggest that reinstatement of the sale of these leases may be appropriate. The BLM team should seek to confirm, on a site-by-site basis, that the stipulations associated with each parcel are adequate, given the specific topographical and locational characteristics of each parcel. As noted above, the BLM team also should review protests that have been lodged against each of the parcels in question and address those protests when making its final decisions.

These parcels are located as follows:

- East of Green River, UT: parcels 159, 187.
- Southeast of Green River, UT: parcels 162, 163, 164, 166, 167, 168, 169, 170, 171, 175.
- South of Green River, UT: parcels 361, 368, 369, 370.

47 Parcels Requiring More Detailed Site-Specific Analysis

The remaining 47 parcels require more detailed site-specific analysis. These parcels fall within three broad categories.

The first category includes parcels that are near two sensitive landscapes that have special cultural and physical attributes: Nine Mile Canyon and Desolation Canyon. Some oil and gas development is beginning to occur in these areas, and parts of the areas are subject to on-going environmental reviews. With regard to Nine Mile Canyon, however, concerns have been raised regarding potential impacts that existing and potential future development on mesas above Nine Mile Canyon may have on the cultural resources in the canyon and on other values associated with the canyon. (BLM has designated Nine Mile Canyon as an "ACEC": an Area of Critical Environmental Concern.) Likewise, Desolation Canyon is a world-class river canyon that has outstanding natural landscape characteristics. Significant acreage in the Desolation Canyon area has been classified as a Wilderness Study Area that is off-limits to oil and gas development.

Additional oil and gas development potentially may be appropriate in both of these areas, but given the special nature of the resources in and around Nine Mile Canyon and Desolation Canyon, a careful, site-specific examination by a the multi-disciplinary BLM team should be undertaken. The BLM team should seek to confirm, on a site-by-site basis, that the stipulations associated with each parcel are adequate, given the specific topographical and locational characteristics of each parcel. The BLM team also should review protests that have been lodged against each of the parcels in question and address those protests when making its final decisions.

The parcels are located as follows:

- Desolation Canyon: parcels 86, 87, 335, 337, 338, 339, 340, 341, 342, 343, 345, 348, 349, 350, 355.
- Nine Mile Canyon: parcels 83, 328, 330, 331, 332.

The second category of the 47 parcels includes six parcels that are in or adjacent to White River Canyon. White River Canyon is a unique landscape. It is located in the highly productive Uinta Basin. Some of the mesas above the canyon have been leased and developed. Additional gas development in the area potentially is appropriate, particularly if new wells can be drilled on already-existing drilling pads, but given the special nature of the White River Canyon area, a careful, site-specific examination by the multi-disciplinary BLM team is appropriate, with special attention given to the stipulations proposed for each parcel. (A number of the parcels have "no surface occupancy" restrictions which would mitigate impacts to the canyon.) In addition, the BLM team should review protests that have been lodged against each of the parcels in question and address those protests when making its final decisions.

The parcels are located as follows:

- White River Canyon: parcels 106, 109, 110, 111, 136, 137.

The third category of the 47 parcels includes parcels that are in the Moab region, in an area of limited existing oil and gas development, of potentially high recreational values, and within a ten mile radius of Arches National

Park or Canyonlands National Park. As explained below, while we do not believe that all leasing activity should be delayed pending the completion of the air quality analyses that are recommended below, parcels that are close to national parks or monuments (the parcels here are in a band that is only 5 to 10 miles from these national park units) should receive heightened scrutiny because their development could more immediately impact air quality in the nearby parks.

The sole additional parcel is in the northern portion of the Vernal area, adjacent to Dinosaur National Monument. Although that parcel is on land that already has been disturbed, there is very limited oil and gas development in the area and the immediacy of the parcel to the National Monument recommends it for a more deliberative review by the BLM team.

The BLM team also should review protests that have been lodged against each of the parcels in question and address those protests when making its final decisions.

To summarize, the parcels that fall into this category include:

- West of Arches National Park: parcels 174, 176, 177, 180, 181, 182, 183, 184, 185, 186, 196, 197.
- East of Arches National Park: parcel 242.
- East of Canyonlands National Park: parcels 201, 202, 203, 205, 206, 207, 208.
- West of Dinosaur National Monument: parcel 101.

4. **Air Quality Analysis**

The National Park Service's and the Environmental Protection Agency's concerns about the lack of robust quantitative air quality data and analysis regarding baseline conditions, and the potential contributions that additional oil and gas development may have on air quality in the region, appear to be well-founded. While some analyses of air quality issues have been undertaken in the areas covered by the Utah RMPs and others are underway, attention to the issue remains both limited and fragmented.

We recommend that BLM move forward with a comprehensive air quality strategy for the region, in consultation with the National Park Service, the Environmental Protection Agency, and state officials. The comprehensive strategy should include:

- An analysis of whether and, if so what, additional monitoring is needed in the Utah RMP areas to adequately characterize air quality in the region for key parameters.
- A plan to install and maintain any additional monitoring stations, in cooperation with other agencies and interested stakeholders.
- The initiation of a programmatic air quality environmental impact statement that will analyze current air quality in the Utah RMP areas, and will model the impacts that alternative development scenarios may have on air quality in the areas. Questions regarding the geographic area or areas that should be the subject of such programmatic analyses should be determined through the EIS scoping process.

We recognize that the court relied on the absence of quantitative air modeling in granting a temporary restraining order against execution of the 77 parcels at issue here. The court acted in the context of BLM's unwillingness to make any commitment to undertake quantitative air quality analyses for any leasing activity. As

noted above, this report is recommending that BLM initiate a comprehensive air quality analysis for the region. As the BLM team reviews individual leasing decisions, it should evaluate whether the approval of some of the leases for oil and gas development can go forward without waiting for the completion of the comprehensive air analysis. Factors that may be relevant in that regard include whether the parcels are in areas where extensive oil and gas production already is occurring; the nature of the stipulations attached to leases which may minimize air impacts; the proximity of the parcels to areas that may be most sensitive to potential air impacts (e.g., Nine Mile Canyon, Desolation Canyon, and the three National Park units); and the availability of relevant air quality analysis pertaining to the areas in question. (In that regard, we understand that some air quality analytical work is underway in connection with the West Tavaputs EIS process; it may have relevance to the air quality questions associated with Nine Mile Canyon and Desolation Canyon. Also, we understand that an industry-sponsored Uinta Basin study is nearing completion; it also may have some relevance to some of the parcels).

---

Endnotes

[1] More specifically, the court concluded that "[b]y not engaging in quantitative ozone dispersion modeling," BLM was "unable to assess the concentration of pollution in the air and therefore cannot adequately measure those pollutants which are expressed in ambient concentrations." The court continued: "Thus, the plaintiffs have made the requisite likelihood of success showing as to their NEPA claim . . . BLM cannot rely on EISs that lack air pollution and ozone level statistics." Similarly, the court determined that plaintiffs made a showing of success on the merits for their National Historic Preservation Act and Federal Land Policy and Management Act )(FLMPA) claims because BLM's failure to take into account the effect of air pollution on areas outside of Nine Mile Canyon made it unable to determine if the lease sale had the potential "to cause effects on historic properties."

[2] As explained in the Secretary's February 6 memorandum to the BLM State Director: "There has been considerable controversy surrounding this lease sale, including questions about the degree of coordination between the BLM and other Federal agencies, including the National Park Service, and the adequacy of the environmental review and analysis performed in connection with certain parcels as well as the underlying Resource Management Plans. On January 17, 2009, a Federal district court issued a Temporary Restraining Order enjoining issuance of oil and gas leases for 77 of the parcels offered. Given the concerns raised about the adequacy of the consideration given to important values many members of the public associate with these 77 parcels, such as sensitive landscapes and cultural resources, and my belief that the issues raised merit further review, I am directing you to withdraw the 77 parcels that were covered by the January 17, 2009, Temporary Restraining Order from further consideration in this lease sale."

[3] In addition to Deputy Secretary Hayes, the review team included Acting BLM Director Mike Pool and Acting National Park Service Director Dan Wenk. Messrs. Pool and Wenk contributed to the findings and recommendations, but Mr. Hayes, as the team leader, has adopted the findings and recommendations as his own.

[4] This practice had been memorialized in a Memorandum of Understanding executed in 1993. The MOU had expired, but the practice continued to be followed on a routine basis, as illustrated by the August pre-notification of the proposed fall lease sale.

[5] *See* Attachment A (the attached maps show, in blue, the parcels adjacent to the National Park units that were publicly announced for auction, but which were removed prior to the auction after NPS strongly objected and public attention was drawn to proposed oil and gas development immediately adjacent to the parks).

[6] *See generally* Attachment B (Memorandum from Regional Director, Intermountain Region, NPS to Director, Utah State Office, BLM (Nov. 25, 2008)).

[7] *See* Attachment C.

[8] *See* Attachment D.

[9] *See* Attachment E.

[10] The facilitator's report on the February 11, 2009 meeting is not attached; it is captioned as "protected from disclosure: deliberative process, attorney-client communication."

[11] See Attachment F (map depicting the location of the 77 parcels at issue).

[12] The Moab RMP identified 266,471 acres as having wilderness characteristics, but it did not "select" the large majority of that acreage (218,724) to be managed for their wilderness characteristics. See Moab RMP at page 28. Likewise, the Vernal RMP identified 277,596 acres as having wilderness characteristics, but it did not select the majority of that acreage (171,418 acres) to be managed for their wilderness characteristics. The Price RMP identified 937,440 acres as having wilderness characteristics, but it did not select the large majority of that acreage (840,330 acres) to be managed for their wilderness characteristics.

[13] A large number of protests are being lodged against leasing decisions in this area. By way of example, a significant concentration of protests have been lodged against proposed leases on BLM lands that are west of Arches National Park. Many of these lands have compelling landscape characteristics and are heavily used for recreational purposes.

[14] The Mineral Leasing Act provides that all lands subject to the MLA "which are known or believed to contain oil or gas deposits may be leased by the Secretary [of the Interior]." 30 U.S.C. 226(a)(emphasis added). The Supreme Court has held that the MLA gives the Secretary broad discretion not to offer an oil and gas tract for leasing. Udall v. Tallman, 380 U.S. 1,4 (1965). More recently, the U.S. Court of Appeals for the Ninth Circuit has held that refusing to issue leases is a legitimate exercise of the Secretary's discretion under the MLA. Bob Marshall Alliance v. Hodel, 852 F.2d 1223, 123-40 (9th Cir. 1988). See also Marathon Oil Co. v. Babbitt, 966 F. Supp. 1024 (D. Colo. 1997), aff'd, 1999 U.S. App. LEXIS 123 (10th Cir.), The IBLA has expressly held that lands identified for oil and gas leasing in an RMP are open for permissible uses, and thus BLM has no duty to offer them for lease, even when BLM has received a pre-sale non-competitive offer to lease. Richard D. Sawyer, 160 IBLA 158, 163 (2003).

[15] We also are recommending that the acting Director of the National Park Service identify NPS officials who will be made available to work with the BLM team with regard to evaluating potential impacts that leasing activity may have on National Park units. As with the BLM team, these individuals should not have had prior involvement in this matter.

Back to top

U.S. Department of the Interior



Protecting America's Great Outdoors and Powering Our Future

| About | Our Priorities | Resources |
|---|---|---|
| Meet the Secretary | American Energy | Cobell / Land Buy-back |
| Bureaus | Climate Change | Deepwater Horizon |
| For Employees | Jobs | Hurricane Sandy |
| | Regulatory Reform | Open Government Initiative |
| | Stewardship | Strategic Plan |
| | Tribal Nations | |

Contact Us

FOIA | OPEN GOVERNMENT | INTEGRITY OF SCIENTIFIC    USA.GOV | BUSINESSUSA | WHITE HOUSE | NO FEAR ACT | INSPECTOR GENERAL |
& SCHOLARLY ACTIVITIES | AGENCY FINANCIAL REPORT | BUDGET & PERFORMANCE | TRIBAL LEADERS DIRECTORY

DOI Home   |   Contact Us   |   Privacy Policy   |   Disclaimer   |   Notices   |   Accessibility   |   Copyright   |   Digital Media Guide   |   Site Map

U.S. Department of the Interior, 1849 C Street NW, Washington, DC 20240. feedback@ios.doi.gov