BART M. DAVIS, Idaho Bar No. 2696
United States Attorney

CHRISTINE G. ENGLAND, California Bar No. 261501
Assistant United States Attorney
District of Idaho
Washington Group Plaza IV
800 East Park Boulevard, Suite 600
Boise, Id 83712-7788
Tel: (208) 334-1211; Fax: (208) 334-1414
Email: Christine.England@usdoj.gov

JEFFREY H. WOOD
Acting Assistant Attorney General

JOHN S. MOST, Virginia Bar No. 27176
LUTHER L. HAJEK, Colorado Bar No. 44303
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
999 18th St., South Terrace – Suite 370
Denver, CO 80202
Tel: (303) 844-1376; Fax: (303) 844-1350
E-mail: Luke.Hajek@usdoj.gov

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, *et al.*,<br><br>   Plaintiffs,<br><br>   vs.<br><br>RYAN K. ZINKE, Secretary of the Interior, *et al.*,<br>   Defendants. | Case No. 1:18-cv-00187-REB<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION [ECF No. 30]** |

Defendants' Opposition to Motion for Preliminary Injunction [ECF No. 30]

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 3

    I.      Legal Background ................................................................................................ 3

            A.     Federal Land Policy and Management Act................................................ 3

            B.     National Environmental Policy Act ......................................................... 4

            C.     Oil and Gas Leasing on Public Lands....................................................... 6

    II.     Factual Background ............................................................................................ 8

            A.     BLM's Oil and Gas Leasing Reform Guidance........................................ 8

            B.     Upcoming Oil and Gas Lease Sales........................................................ 10

STANDARDS OF REVIEW ........................................................................................... 11

    I.      Judicial Review Under the Administrative Procedure Act ................................. 11

    II.     Standard for Obtaining Preliminary Injunctive Relief........................................ 12

ARGUMENT .................................................................................................................. 13

    I.      Plaintiffs Are Not Likely to Succeed on the Merits of Their Claims ................... 13

            A. Plaintiffs Have Failed to Adequately Demonstrate Standing ......................... 13

            B.     Plaintiffs' Motion for a Preliminary Injunction Fails to Challenge Final Agency Action and Therefore Is Not Reviewable Under the Administrative Procedure Act..................................................................... 17

            C.     Plaintiffs' Preliminary Injunction Motion Is Not Ripe for Review ......... 21

            D.     Plaintiffs Are Unlikely to Succeed on Their APA, FLPMA, and NEPA Claims....................................................................................... 25

                  1.     Instruction Memorandum 2018-034 Is a Statement of Policy and Did Not Require Notice and Comment Rulemaking ............ 25

                  2.     The Procedures in Instruction Memorandum 2018-034 Are Consistent with FLPMA and NEPA ............................................ 26

                        a.     Section 309(e) of FLPMA ................................ 27

          b.     Public Involvement Under NEPA ..................................... 30

       3.     The Requirements Applicable to the Issuance of New Regulations Do Not Apply Because BLM Has Not Changed Its Regulations .............................................................................. 32

II.    Plaintiffs Have Failed to Demonstrate Irreparable Harm ..................................... 33

    A.    Plaintiffs Have Failed to Demonstrate Any Irreparable Harm to the Environment Due to the Upcoming September and December Lease Sales .......................................................................................................... 34

    B.    An Alleged Bureaucratic Commitment to Leasing Is Not a Sufficient Basis for Irreparable Injury ...................................................................... 36

    C.    Alleged Procedural Harms Due to Difficulties in Commenting on Upcoming Lease Sales Are Not Sufficient to Demonstrate Irreparable Injury ................................................................................... 38

III.   The Balance of Harms and the Public Interest Weigh Against an Injunction ...... 39

CONCLUSION .................................................................................................................... 40

# TABLE OF AUTHORITIES

## Cases

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967) ................................................................................................ 21, 23

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ...................................................................................... 13

*Am. Trucking Ass'ns v. City of Los Angeles*,
  559 F.3d 1046 (9th Cir. 2009) ...................................................................................... 13

*Amigos Bravos v. U.S. Bureau of Land Mgmt.*,
  Nos. 6:09-cv-00037-RB-LFG, 6:09-cv-00414-RB-LFG, 2011 WL 7701433 (D.N.M. Aug. 3,
  2011) .................................................................................................................... 8, 35

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987) .......................................................................................... 34, 35, 36

*Ass'n of Flight Attendants-CWA v. Huerta*,
  785 F.3d 710 (D.C. Cir. 2015) ...................................................................................... 19

*BBK Tobacco & Foods, LLP v. U.S. Food & Drug Admin.*,
  672 F. Supp.2d 969 (D. Ariz. 2009) .............................................................................. 23

*Bennett v. Spear*,
  520 U.S. 154 (1997) ........................................................................................ 17, 18, 20

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs.*,
  524 F.3d 938 (9th Cir. 2008) ............................................................................. 5, 31, 32

*Blanco v. Burton*,
  No. Civ.A. 06-3813, 2006 WL 2366046 (E.D. La. Aug. 14, 2006) ................................... 35, 37

*California v. U.S. Bureau of Land Mgmt.*,
  277 F. Supp. 3d 1106 (N.D. Cal. 2017) .......................................................................... 33

*Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm'n*,
  449 F.2d 1109 (D.C. Cir. 1971) ..................................................................................... 38

*Catron Cty. Bd. of Comm'rs, N.M. v. U.S. Fish & Wildlife Serv.*,
  75 F.3d 1429 (10th Cir. 1996) ....................................................................................... 36

*Cheyenne Tribe v. Hodel*,
  851 F.2d 1152 (9th Cir. 1988) ....................................................................................... 37

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) .................................................................................................... 14

*Columbia Riverkeeper v. U.S. Coast Guard*,
  761 F.3d 1084 (9th Cir. 2014) ................................................................................. 17, 18

*Colwell v. Dep't of Health & Human Servs.*,
   558 F.3d 1112 (9th Cir. 2009) .......................................................... 18, 19, 22, 23

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
   452 F.3d 798 (D.C. Cir. 2006) ............................................................ 19, 20

*Drakes Bay Oyster Co. v. Jewell*,
   747 F.3d 1073 (9th Cir. 2014) ........................................................... 39

*Earth Island Inst. v. Carlton*,
   626 F.3d 462 (9th Cir. 2010) ............................................................. 18, 20

*Earth Island Inst. v. Ruthenbeck*,
   490 F.3d 687 (9th Cir. 2007) ............................................................. 22

*Earth Island Inst. v. U.S. Forest Serv.*,
   351 F.3d 1291 (9th Cir. 2003) ........................................................... 17

*Fisheries Survival Fund v. Jewell*,
   236 F. Supp. 3d 332 (D.D.C. Feb. 15, 2017) ..................................... 35

*Friends of the Earth v. Hall*,
   693 F. Supp. 904 (W.D. Wash. 1988) ............................................... 38

*Fund for Animals v. Norton*,
   281 F. Supp.2d 209 (D.D.C. 2003) ................................................... 31

*Fund for Animals, Inc. v. Lujan*,
   962 F.2d 1391 (9th Cir. 1992) ........................................................... 34

*Havasupai Tribe v. Provencio*,
   876 F.3d 1242 (9th Cir. 2017) ........................................................... 17

*Idaho ex rel. Kempthorne v. U.S. Forest Serv.*,
   142 F. Supp.2d 1248 (D. Idaho 2001) .............................................. 38

*Indus. Customers for Nw. Utils. v. Bonneville Power Admin.*,
   408 F.3d 638 (9th Cir. 2005) ............................................................. 20

*Isaacson v. Horne*,
   716 F.3d 1213 (9th Cir. 2013) ........................................................... 27

*Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008) ............................................................. 12

*Lujan v. Def. of Wildlife*,
   504 U.S 555 (1992) ............................................................................ 16

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ........................................................................... 16, 21, 22

*Mada-Luna v. Fitzpatrick*,
   813 F.2d 1006 (9th Cir. 1987) ........................................................... 19

*Massachusetts v. Watt,*
   716 F.2d 946 (1st Cir. 1983) ........................................................................ 36

*Mazurek v. Armstrong,*
   520 U.S. 968 (1997) .................................................................................... 12

*McFarland v. Kempthorne,*
   545 F.3d 1106 (9th Cir. 2008) .................................................................... 12

*Munaf v. Geren,*
   553 U.S. 674 (2008) .................................................................................... 13

*Nat. Res. Def. Council v. Hodel,*
   618 F. Supp. 848 (E.D. Cal. 1985) ............................................................ 29

*Nat'l Mining Ass'n v. McCarthy,*
   758 F.3d 243 (D.C. Cir. 2014) ................................................................... 19

*Nat'l Park Hosp. Ass'n v. Dep't of the Interior,*
   538 U.S. 803 (2003) .............................................................................. 21, 22

*Nat'l Res. Def. Council v. Jamison,*
   815 F. Supp. 454 (D.D.C. 1992) ................................................................ 26

*Norton v. S. Utah Wilderness All.,*
   542 U.S. 55 (2004) ....................................................................................... 3

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.,*
   475 F.3d 1136 (9th Cir. 2007) .................................................................... 12

*Ohio Forestry Ass'n v. Sierra Club,*
   523 U.S. 726 (1998) .............................................................................. 22, 23

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.,*
   465 F.3d 977 (9th Cir. 2006) ...................................................................... 17

*Organized Vill. of Kake v. U.S. Dep't of Agric.,*
   795 F.3d 956 (9th Cir. 2015) ...................................................................... 32

*Pennaco Energy, Inc. v. U.S. Dep't of the Interior,*
   377 F.3d 1147 (10th Cir. 2004) .................................................................... 6

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.,*
   499 F.3d 1108 (9th Cir. 2007) .................................................................... 32

*River Runners for Wilderness v. Martin,*
   593 F.3d 1064 (9th Cir. 2010) .................................................................... 12

*Robertson v. Methow Valley Citizens Council,*
   490 U.S. 332 (1989) ..................................................................................... 4

*Sierra Club v. Envtl. Prot. Agency,*
   873 F.3d 946 (D.C. Cir. 2017) ............................................................... 19, 20

*Sierra Club v. Marsh*,
   872 F.2d 497 (1st Cir. 1989) ........................................................................... 36, 37

*Sierra Club v. U.S. Army Corps of Eng'rs*,
   645 F.3d 978 (8th Cir. 2011) .................................................................................. 38

*Slope Borough v. Minerals Mgmt. Serv.*,
   No. 3:07-cv-45-RRB, 2007 WL 1106110 (D. Alaska Apr. 12, 2007) ..................... 35

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ................................................................................. 14, 15, 16, 22

*Toilet Goods Ass'n v. Gardner*,
   387 U.S. 158 (1967) ........................................................................................... 21, 22

*Tribal Vill. of Akutan v. Hodel*,
   859 F.2d 662 (9th Cir. 1988) .................................................................................. 35

*Truckers United for Safety v. Fed. Highway Admin.*,
   139 F.3d 934 (D.C. Cir. 1998) ................................................................................ 22

*United States v. Dang*,
   488 F.3d 1135 (9th Cir. 2007) ................................................................................ 27

*United States v. Salerno*,
   481 U.S. 739 (1987) .......................................................................................... 27, 28

*W. Energy All. v. Salazar*,
   No. 10-cv-237F, 2011 WL 3738240 (D. Wyo. Aug. 12, 2011) ............................... 19

*W. Watersheds Project v. Kraayenbrink*,
   538 F. Supp. 2d 1302 (D. Idaho 2008) .................................................................... 28

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982) .......................................................................................... 12, 39

*West v. Sec'y of Dep't of Transp.*,
   206 F.3d 920 (9th Cir. 2000) .................................................................................. 38

*Wilderness Ass'n v. Fry*,
   408 F. Supp. 2d 1032 (D. Mont. 2006) .................................................................... 38

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .................................................................................. 12, 13, 33, 40

*Wyo. Outdoor Council v. U.S. Forest Serv.*,
   165 F.3d 43 (D.C. Cir. 1999) .................................................................................. 23

**Statutes**

Administrative Procedure Act,
   5 U.S.C. §§ 701-06 ................................................................................................. 12

Mineral Leasing Act,
30 U.S.C. §§ 181–287.................................................................. 6. 7, 8, 9, 34, 35

Natural Environmental Policy Act,
42 U.S.C. § 4332(2)(C).............................................................................. 4

Federal Land Policy and Management Act,
43 U.S.C. §§ 1701(a)(1)-(8), 1712(a), 1739(e)........................................ 3, 27, 28

**Regulations**

Council on Environmental Quality, NEPA and Agency Planning,
40 C.F.R. §§ 1500.1-1508.28(a) ........................................................... 4, 7, 30

Bureau of Land Mangement Planning, Programming, Budgeting,
43 C.F.R. §§ 1601.0-5(n), 1601.0-6............................................................ 6, 28

Bureau of Land Management Resource Management Planning,
43 C.F.R. § 1610.5-3(a) ............................................................................ 7

Bureau of Land Management Oil and Gas Leasing,
43 C.F.R. § 3100.0-3............................................................................... 6

Bureau of Land Management Competive Leasing,
43 C.F.R. §§ 3120.1-1 - 3120.5-1 .................................................. 7, 8, 9, 26, 34

Bureau of Land Management Drilling Applications and Plans,
43 C.F.R. § 3162.3-1 (2017)..................................................................... 8, 35

Implementation of the National Environmental Policy Act of 1969,
43 C.F.R. pt. 46.120-46.305(b)............................................................ 5, 7, 25, 32

Department of Interior: Bureau of Land Management; Onshore Oil and Gas Operations; Federal
and Indian Oil and Gas Leases; Onshore Oil and Gas Order Number 1; Approval of Operations,
72 Fed. Reg. 10,308 (Mar. 7, 2007)............................................................ 8

Department of Interior: Bureau of Land Management; Onshore Oil and Gas Operations; Federal
and Indian Oil and Gas Leases; Onshore Oil and Gas Order Number 1; Approval of Operations,
82 Fed. Reg. 2906 (Jan. 10, 2017) ............................................................ 8

## INTRODUCTION

The Motion for a Preliminary Injunction (ECF No. 30) filed by Plaintiffs Western Watersheds Project and the Center for Biological Diversity (collectively, "Plaintiffs") should be denied.  Plaintiffs seek to enjoin the U.S. Bureau of Land Management's ("BLM") application of a guidance document, Instruction Memorandum ("IM") 2018-034, with respect to upcoming oil and gas lease sales.  They claim that, by following the procedures in the guidance document, BLM will provide for inadequate public comment periods on draft environmental assessments ("EA") and insufficient protest periods for upcoming lease sales and that BLM should have gone through a rulemaking process prior to issuing the guidance document.  Plaintiffs' motion fails for multiple reasons.

First, Plaintiffs' preliminary injunction motion is premature.  Plaintiffs do not seek relief as to oil and gas sales that have already occurred (many of which are challenged in their complaint).  Instead, Plaintiffs seek to have the Court order prospective relief as to the procedures used to prepare for lease sale decisions that have not yet occurred.  *See* Pls.' Opening Br. in Supp. of Mot. for Prelim. Inj. ("Pls. Mem.") at 2-3 (ECF No. 30-1).  The Court lacks jurisdiction to entertain such a request because BLM has taken no final agency action—a prerequisite for judicial review under the Administrative Procedure Act ("APA")—with respect to those lease sales.  In addition, because no decisions have yet been made regarding those lease sales, Plaintiffs cannot demonstrate that they have standing or that their claims are ripe for review.

Second, Plaintiffs have failed to demonstrate that they are likely to succeed on the merits of the claims argued in the preliminary injunction motion.  BLM was not required to go through a rulemaking process to change a guidance document, and the procedures in the guidance are

consistent with the provisions in BLM's regulations regarding public participation under the

Federal Land Policy and Management Act ("FLPMA") and the National Environmental Policy

Act ("NEPA").  For oil and gas leasing, BLM typically conducts FLPMA and NEPA compliance

in stages, beginning with broad land use plans supported by environmental impact statements

("EIS"), lease sales supported by additional NEPA documentation that tiers to the analysis in the

previously prepared EISs, and development plans, which may be approved after additional

environmental review.  Public comment may occur in any or all of these three stages.  This

process meets the requirements for public participation, and Plaintiffs have failed to demonstrate

otherwise with respect to the lease sales they seek to enjoin.

Third, Plaintiffs have failed to demonstrate a likelihood of irreparable injury, which a

party must show in order to seek the extraordinary remedy of preliminary injunctive relief.  They

cannot demonstrate that an injunction at this time, and in the context of this facial challenge to

IM 2018-034, is necessary to avoid irreparable harm to the environment.  Plaintiffs will have

ample opportunity to seek injunctive relief as to specific lease sales once they are final.  And

even then, the issuance of a lease would not result in any immediate ground disturbing activity—

such activity can only occur if subsequently approved by BLM at the permitting stage.

Plaintiffs, therefore, cannot show that any alleged environmental harms are imminent.  Similarly,

the procedural harms Plaintiffs claim, *e.g.*, difficulty in submitting comments in shorter time

periods, do not satisfy Plaintiffs' burden of showing imminent and irreparable injury.  Plaintiffs

will have ample opportunity to challenge BLM's procedures for public involvement if and when

they challenge discrete and final lease sales.  Their attempt to do so preemptively at this time, via

a facial challenge to a guidance document, fails for lack of any imminent irreparable harm.

For these reasons and others discussed below, Plaintiffs' motion should be denied.

# BACKGROUND

## I.   Legal Background

### A.   Federal Land Policy and Management Act

BLM manages the federal lands under its jurisdiction under a broad multiple use mandate.  FLPMA charges BLM with protecting environmental, ecological, and recreational values while also providing for "multiple use and sustained yield" management.  43 U.S.C. § 1701(a)(1)-(8).  FLPMA's definition of "multiple use" calls for the "combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific, and historical values . . . ." *Id.* § 1702(c).  The Supreme Court has described multiple use management as "a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which the land can be put. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004).

In order to meet the management objectives of FLPMA, the statute requires BLM to prepare land use plans, which BLM refers to as resource management plans ("RMP"), setting forth goals and objectives for the management of particular management units.  *See* 43 U.S.C. § 1712(a).  The statute provides that land use plans shall be developed "with public involvement." *Id.*  A separate provision of FLPMA also provides that the Secretary of the Interior:

> shall establish procedures, including public hearings where appropriate, to give the Federal, State, and local governments and the public adequate notice and an opportunity to comment upon the formulation of standards and criteria for, and to participate in, the preparation and execution of plans and programs for, and the management of, the public lands.

43 U.S.C. § 1739(e).

**B.      National Environmental Policy Act**

NEPA serves the dual purpose of informing agency decision-makers of the significant

environmental effects of proposed major federal actions and ensuring that relevant information is

made available to members of the public so that they "may also play a role in both the

decisionmaking process and the implementation of that decision."  *See Robertson v. Methow*

*Valley Citizens Council*, 490 U.S. 332, 349 (1989).  To meet these dual purposes, NEPA requires

that an agency prepare a comprehensive EIS for "major Federal actions significantly affecting

the quality of the human environment."  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.3.  Not every

federal action or proposal, however, requires an EIS.  As set forth in the Council on

Environmental Quality's ("CEQ") regulations implementing NEPA, an agency may prepare an

EA to determine whether the impacts of an action will be significant, and if not, the agency may

prepare a finding of no significant impact ("FONSI").  *See* 40 C.F.R. §§ 1501.3, 1501.4(c), (e),

1508.9, 1508.13.  An agency may tier its analysis to a prior, broader NEPA analysis, meaning

that the prior analysis is incorporated by reference and need not be repeated in the later NEPA

document.  40 C.F.R. §§ 1502.20, 1508.28.  Tiering is appropriate when an agency first develops

a general plan or program and then considers a site-specific project to implement that plan.  40

C.F.R. § 1508.28(a).

Public participation in the development of environmental reviews is an important

component of NEPA.  *See* 40 C.F.R. §§ 1500.1(b), 1500.2(d).  If an agency prepares an EIS, it

must request comments from the public on a draft EIS.  40 C.F.R. § 1503.1(a)(4).  If an agency

prepares an EA, CEQ's regulations are more flexible and require that the agency "involve

environmental agencies, applicants, and the public, to the extent practicable."  40 C.F.R. §

1501.4(b).  The Ninth Circuit has interpreted this as follows:  "An agency, when preparing an

EA, must provide the public with sufficient environmental information, considered in the totality

of circumstances, to permit members of the public to weigh in with their views and thus inform

the agency decision-making process." *Bering Strait Citizens for Responsible Res. Dev. v. U.S.*

*Army Corps of Eng'rs.*, 524 F.3d 938, 953 (9th Cir. 2008).  The Ninth Circuit also held that "the

circulation of a draft EA is not required in every case" and the public participation required by

NEPA may be accomplished "through other means."  *Id.* at 952.  There is no minimum time

period for public comment on a draft EA.  *See id.* at 952-53.

The Department of the Interior has promulgated regulations implementing NEPA.  *See* 43

C.F.R. pt. 46.  Under these regulations, BLM is required to prepare an EA for many actions.  43

C.F.R. § 46.300.  The regulations require that BLM "to the extent practicable, provide for public

notification and public involvement when an environmental assessment is being prepared," but

"the methods for providing public notification and opportunities for public involvement are at

the discretion of the Responsible Official."  43 C.F.R. § 46.305(a).  Interior's regulations do not

require the circulation of a draft EA, but BLM offices "may seek comments on an environmental

assessment if they determine it to be appropriate, such as when the level of public interest or the

uncertainty of effects warrants."  *Id.* § 46.305(b).  If BLM revises an EA based on comments

received, it need not circulate the revised EA for another public comment period.  *Id.*  BLM must

notify the public of the availability of an EA and FONSI after they have been completed.  *Id.* §

46.305(c).

In some instances, BLM may rely on an existing NEPA document to satisfy its

obligations under NEPA.  *See* 43 C.F.R. §§ 46.120(c), 46.300(a)(2).  In such instances, BLM

will prepare a determination of NEPA adequacy ("DNA") to confirm that the environmental

impacts of an action have already been analyzed in a prior NEPA document.  *See* BLM NEPA

Handbook at 22-24 (ECF No. 30-14).  In considering whether the use of a DNA is appropriate, BLM officials are required to consider "whether the public involvement and interagency review associated with existing EAs or EISs are adequate for the new proposed action."  *Id.* at 23.  If the applicable BLM official determines that additional public input is necessary, BLM may incorporate additional public input through a variety of means, including "external scoping, public notification before or during [the] review of the existing EA or EIS, public meetings, or public notification or review of a completed DNA Worksheet."  *Id.* at 24.

**C.**     **Oil and Gas Leasing on Public Lands**

The Mineral Leasing Act ("MLA"), 30 U.S.C. §§ 181–287, authorizes the Secretary of the Interior to offer certain federal minerals for lease, including oil and gas.  The Secretary has delegated this authority to BLM for onshore minerals.  *See* 43 C.F.R. § 3100.0-3.  In accordance with the MLA, BLM has promulgated regulations that govern the leasing and development of federal onshore oil and gas on public lands and federal mineral estates.  *See* 43 C.F.R. Parts 3100-3180.

BLM employs a three-stage decision-making process for managing public lands for oil and gas leasing and development.  *See Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147, 1151–52 (10th Cir. 2004).  First, BLM broadly assesses the presence of minerals and other resources on public lands through land-use planning, which includes determining areas open to and closed to potential oil and gas development, and determining, for open areas, what conservation stipulations should apply to future leases.  43 C.F.R. § 1601.0-5(n).  The RMPs that result from this process guide future decision making but do not authorize specific projects, unless expressly stated.  *See id.*  The RMPs developed are supported by EISs prepared in accordance with NEPA.  43 C.F.R. § 1601.0-6.  The EISs analyze the potential environmental

impacts of oil and gas development under different alternatives based on reasonably foreseeable development scenarios.  Once BLM issues an RMP, subsequent, more specific decisions implementing specific projects must conform to the plan.  43 C.F.R. § 1610.5-3(a).

In the second stage of oil and gas management, BLM conducts a NEPA review and holds competitive oil and gas lease sales on a quarterly basis, as required by the MLA.  30 U.S.C. § 226(b)(1)(A); *see* 43 C.F.R. Subpart 3120; 43 C.F.R. § 3120.1-2(a).  Lands that may be offered for leasing include: lands formerly subject to oil and gas leases that "have terminated, expired, been canceled or relinquished"; lands selected by the authorized officer; lands where federal mineral resources are being drained by the development of connected non-federal resources; and lands identified in "expression[s] of interest" from the public. 43 C.F.R. § 3120.1-1.  For each oil and gas lease sale, BLM may prepare one or more EAs that "tier" to an EIS prepared at the RMP stage.  *See* 40 C.F.R. §§ 1502.20, 1508.28 (NEPA regulations on tiering).  If appropriate, BLM may prepare a DNA for a lease sale.  *See* 43 C.F.R. §§ 46.120(c), 46.300(a)(2).  Once BLM completes required analysis and identifies parcels to be offered, it holds a competitive lease sale, where the parcels are auctioned and sold to the highest qualified bidder.  43 C.F.R. §§ 3120.5-1, 3120.5-3.  Forty-five days in advance of sales, BLM state offices post on agency webpages, and in the responsible district or field offices, notices that include lists of parcels proposed to be offered, and their stipulations.  *See* 30 U.S.C. § 226(f); 43 C.F.R. § 3120.4-2.  Any interested party may protest the offering of a parcel for sale within ten days of posting of the notice.  *See* Updating Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews, IM 2018-034 § IV.B (2018), https://www.blm.gov/policy/im-2018-034 (last checked Aug. 10, 2018) ("IM 2018-034").

The third stage of oil and gas management occurs after lease issuance, when BLM determines whether, and under what conditions, it will approve specific development proposals.[1] 30 U.S.C. § 226(g); 43 C.F.R. § 3162.3-1 (2017); Onshore Order No. 1, Approval of Operations, 82 Fed. Reg. 2906, 2914 (Jan. 10, 2017), amending 72 Fed. Reg. 10,308, 10,334 (Mar. 7, 2007). Before an oil and gas operator may undertake any drilling or surface disturbance, it must submit an application for a permit to drill ("APD"). BLM reviews the application, completes additional environmental review to ensure NEPA compliance, decides whether to approve the permit, and imposes any necessary conditions on its approval. *See* 43 C.F.R. § 3162.3-1; *see also Amigos Bravos v. U.S. Bureau of Land Mgmt.*, Nos. 6:09-cv-00037-RB-LFG; 6:09-cv-00414-RB-LFG, 2011 WL 7701433, at *5 (D.N.M. Aug. 3, 2011).

## II.    Factual Background

### A.    BLM's Oil and Gas Leasing Reform Guidance

IM 2018-034 is a guidance document regarding BLM's oil and gas leasing process. It supersedes Oil and Gas Leasing Reform Land Use Planning and Lease Parcel Reviews, IM 2010-117 (2010), https://www.blm.gov/policy/im-2010-117 (last checked Aug. 10, 2018) ("IM 2010-117"). The purpose of IM 2018-034 is to "streamline the leasing process to alleviate unnecessary impediments and burdens, to expedite the offering of lands for lease, and to ensure quarterly oil and gas lease sales are consistently held in accordance with the Mineral Leasing Act (30 U.S.C. § 226), Executive Order 13783, and Secretary Order 3354." IM 2018-034 at 1.

---

[1] The development of the lease does not necessarily occur soon after lease issuance and may occur any time during the 10-year lease term. *See* 43 C.F.R. § 3120.2-1. If a lease is committed to a unit, development may not occur until later. *See* 43 C.F.R. §§ 3180.0-1–.0-3 (providing for development of oil and gas resources under a unit agreement).

In keeping with this purpose, IM 2018-034 changes preexisting policy in a number of ways.  Significantly for purpose of Plaintiffs' preliminary injunction motion, the new guidance makes four specific changes.  First, it adopts a six-month timeframe for BLM's review of parcels after they have been identified for consideration through an expression of interest ("EOI").  *Id.* § III.A.  Previously there was no time limit.

Second, the guidance states that "State and field offices may provide for public participation during the NEPA process as part of the review of parcels identified for potential leasing."  *Id.* § III.B.5.  The prior guidance stated that "State and field offices will provide for public participation as part of the review of parcels identified for potential leasing."  IM 2010-117 § III.C.7.

Third, the new guidance leaves to the discretion of the state office or field office the form of NEPA compliance documentation that is required to support the leasing of parcels.  IM 2018-034 § III.D.  Under the guidance, the applicable BLM officer can choose to prepare a DNA, if sufficient NEPA analysis already exists, or may choose to prepare an EA or an EIS.  *See id.*  The prior guidance provided that "the NEPA compliance documentation for oil and gas leasing must include an opportunity for public review."  *Id.* IM 2010-117 § III.E.   It also provided that, if a DNA was used, "[a]lthough not required by law or regulation, field offices will provide a 30-day public review and comment period for the DNA."  *Id.*  Similarly, if BLM relied on an EA, the policy provided that "[a]lthough not required by law or regulation, field offices will provide a 30-day public review and comment period for the EA."  *Id.*

Fourth, the new guidance, IM 2018-034, provides for a 10-day protest period following the public notice of the sale.  IM 2018-034 § IV.B.  Public notice of the sale is to be given 45 days prior to the sale.  *Id.* § IV.A; *see also* 30 U.S.C. § 226(f); 43 C.F.R. § 3120.4-2.  The prior

guidance provided for a 30-day protest period.  IM 2010-117 § III.H.  It also provided that public

notice of the sale was to be provided 90 days prior to the lease sale.  *Id.* § III.G.

### B.      Upcoming Oil and Gas Lease Sales

BLM has a number of planned lease sales in September and December.  While Plaintiffs

request relief as to all upcoming lease sales, their brief and declarations appear to focus mainly

on lease sales in Utah, Nevada, Wyoming, and Colorado.[2]  *See* Pls. Mem. at 12-15.  A summary

of those lease sales and the associated public comment periods are set forth below.

*Colorado:*  A lease sale is scheduled for September 6, 2018.  Wells Decl. ¶ 3.b.  To

support the lease sale, BLM completed an EA and circulated it for a 15-day comment period on

March 22, 2018.  *Id.*  The Center for Biological Diversity submitted comments on the draft EA.

*Id.*  BLM posted a notice of the sale on July 20, 2018, initiating a ten-day protest period.  *Id.*

BLM expects to hold a subsequent lease sale on December 7, 2018.  *Id.*  BLM initiated a 15-day

public scoping process for an EA on July 19, 2018, during which the Center for Biological

Diversity submitted comments, and plans to provide a 15-day public comment period beginning

in August.  *Id.*

*Nevada:*  A lease sale is scheduled for September 11, 2018.  Wells Decl. ¶ 3.f.  BLM is

relying on a DNA for this lease sale and did not hold a public comment period.  *Id.*  BLM posted

a notice of the sale on July 27, 2018, initiating a ten-day protest period.  *Id.*  Another lease sale is

scheduled for December 2018.  *Id.*  BLM plans to circulate a draft EA for a 15-day public

comment period in August.  *Id.*

---

[2] Plaintiffs' brief also refers to upcoming lease sales in Montana and the Dakotas.  *See* Pls. Mem.
at 12-14.  Additional information regarding these lease sales and other upcoming lease sales is
provided in the Declaration of Steve Wells ("Wells Decl.").

*Utah:*  A lease sale is planned for September 11, 2018.  Wells Decl. ¶ 3.g.  To support the September lease sale, BLM completed three EAs and circulated two of them (Salt Lake and Fillmore) for a 15-day comment period.  *Id.*  For the third EA (Price/Richfield), BLM held a 15-day scoping period.  *Id.*  The Center for Biological Diversity and Western Watersheds Project submitted comments.  *Id.*  BLM posted a notice of the sale on July 26, 2018, initiating a ten-day protest period.  *Id.*  BLM expects to hold another lease sale in December.  *Id.*  BLM provided a 15-day public scoping period beginning on July 16, 2018, during which the Center for Biological Diversity and Western Watersheds Project submitted comments.  *Id.*  BLM plans to prepare four EAs and two DNAs for the December 2018 lease sale.  Wells Decl. ¶ 4.g.

*Wyoming:*  A lease sale is planned for September 18-20, 2018.  Wells Decl. ¶ 3.h.  BLM completed three separate EAs to support the lease sale.  *Id.*  Two EAs analyzed the potential impacts of leasing parcels in the High Plains and Wind River/Bighorn Basin Districts, and those EAs were posted for a 30-day public comment periods on January 23, 2018.  *Id.*  The other EA analyzed the potential impacts associated with the leasing of additional parcels located in all three BLM Wyoming districts, and that EA was posted for a two-week public comment period on May 24, 2018.  *Id.*  Both Center for Biological Diversity and Western Watersheds Project commented on those documents.  *Id.*  BLM posted a notice of the sale on Aug. 1, 2018, initiating a ten-day protest period.  *Id.*  BLM expects to hold another lease sale in December 2018.  *Id.*  A two-week public comment period on a draft EA is scheduled to begin on August 24, 2018.  *Id.*

## STANDARDS OF REVIEW

## I.     Judicial Review Under the Administrative Procedure Act

Agency decisions are reviewed under the judicial review provisions of the APA, 5 U.S.C. §§ 701-06.  *See Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008).  Under the APA,

agency decisions may be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  In accordance with that standard, an agency's decision will be overturned

> [O]nly if the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*McFarland v. Kempthorne,* 545 F.3d 1106, 1110 (9th Cir. 2008) (citation and quotation marks omitted).  The standard of review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (citation omitted).  The APA "does not allow the court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (citation omitted).

## II.       Standard for Obtaining Preliminary Injunctive Relief

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).  To obtain a preliminary injunction, a plaintiff must, at a minimum, demonstrate four elements: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of an injunction, (3) that "the balance of equities tips in his favor," and (4) that the injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  A party *must* demonstrate a "likelihood of success on the merits" in order to obtain a preliminary injunction.  *Munaf v. Geren*, 553 U.S. 674, 690 (2008) (citation omitted).

Furthermore, a party seeking preliminary injunctive relief must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (rejecting a "possibility" of irreparable harm standard); *see also Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) ("To the extent that our cases have suggested a lesser standard, they are no longer controlling, or even viable") (footnote omitted).  The Ninth Circuit has held that, notwithstanding the *Winter* decision, a preliminary injunction may issue if the plaintiffs can show "that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (citation omitted).

## ARGUMENT

### I.     Plaintiffs Are Not Likely to Succeed on the Merits of Their Claims

#### A.     Plaintiffs Have Failed to Adequately Demonstrate Standing

Plaintiffs have failed to demonstrate that they have standing to seek relief regarding the claims at issue in their preliminary injunction motion.  Plaintiffs lack standing regardless of whether their motion is viewed as a facial challenge to IM 2018-034 or an as applied challenge to the planned lease sales in September and December.  They lack standing for a facial challenge because they can demonstrate no harm from the issuance of the IM itself; rather, any such harm would come from the issuance of leases and the eventual development of oil and gas leases.  And they have failed to demonstrate standing for an as applied challenge because they do not demonstrate any imminent, concrete harms to their interests in the environment from the September and December lease sales.

To establish Article III standing, the Plaintiffs must show that IM 2018-034 threatens to cause them an "'injury in fact' that is concrete and particularized." *Summers v. Earth Island*

*Inst.*, 555 U.S. 488, 493-94 (2009).  This injury "must be actual and imminent, not conjectural or hypothetical."  *Id.* at 493.  Such injuries "must be *certainly* impending to constitute injury in fact" – "[a]llegations of *possible* future injury' are not sufficient."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted).  Plaintiffs must also demonstrate that the injury is fairly traceable to the challenged action and that it is likely that a favorable judicial decision will prevent or redress the injury.  *Summers,* 555 U.S. at 493.

To the extent Plaintiffs' preliminary injunction motion raises a facial challenge to IM 2018-034, Plaintiffs lack standing because they have failed to demonstrate that the IM itself causes concrete harm to their interests in the environment.  *See Summers*, 555 U.S. at 493-97.  Plaintiffs' claims are analogous to the claims in *Summers*.  In that case, environmental groups challenged Forest Service regulations governing the procedures for implementing NEPA in the context of fire-rehabilitation activities.  *Id.* at 490-91.  The Plaintiffs challenged one application of the regulations to a particular project, a claim that was settled, and also brought a facial challenge to six other provisions in the regulations.  *Id.* at 491.  The Supreme Court found that, in the absence of allegations of harm from a particular application of the regulations, the Plaintiffs had failed to demonstrate standing.  *Id.* at 494-95.  Further, the mere allegation of a "procedural injury, namely, that [the plaintiffs] have been denied the ability to file comments on some Forest Service actions and will continue to be so denied" were insufficient to establish standing because they were not tied to any particular Forest Service action.  *Id.* at 496.  As the Court put it, "a procedural right in *vacuo*" is insufficient to establish standing.  *Id.*  Thus, to the extent that Plaintiffs are asserting procedural harms, *i.e.*, truncated public involvement—without also challenging actions to which those procedures apply, they lack standing to do so under *Summers*.

To the extent that Plaintiffs are bringing an as-applied challenge to the procedures in IM 2018-034, they also fail to demonstrate standing because they fail to allege, or demonstrate through declarations, that they have suffered or will suffer particular harms from the lease sales they seek to enjoin.[3]  As an initial matter, it is not even clear which lease sales Plaintiffs seek to enjoin.  The Complaint lists the Utah September Lease Sale as a "Pending Action."  Compl. ¶¶ 258-64 (ECF No. 1).  In their motion, Plaintiffs seek injunctive relief as to "upcoming leases proposed for the September and December 2018 quarterly lease auctions."  Pls. Mem. at 3.  Their declarations appear to focus on September 2018 lease sales in Nevada, Utah, Colorado, and Wyoming.  *See* Declaration of Michael Saul ("Saul Decl.") ¶¶ 35-42 (ECF No. 30-2); Declaration of Erik Molvar ("Molvar Decl.") ¶¶ 35-42 (ECF No. 30-3); Declaration of Kelly Fuller ("Fuller Decl.") ¶¶ 47-49 (ECF No. 30-4).

Plaintiffs' declarations are insufficient to establish an injury for purposes of Article III standing from the September 2018 lease sales.  Allegations of "generalized harm to the . . . environment will not alone support standing," but Plaintiffs may establish standing by showing that such harm "affects the recreational or even the mere esthetic interests of the plaintiff."  *Summers*, 555 U.S. at 494.  Plaintiffs' declarations contain insufficient detail to show that Plaintiffs' members will be harmed from the leasing of particular parcels in the September lease sales.  One declarant states, with respect to the December 2018 Wyoming lease sale, that "I have extensively explored these areas both as part of my professional efforts to advocate for their protection and for personal recreation."  Molvar Decl. ¶ 49.  The allegation that a member of an

---

[3] For the reasons discussed in sections I.B. and I.C., *infra*, the Court lacks jurisdiction over a challenge to upcoming lease sales because no final decisions regarding those lease sales have yet been made, and therefore any challenges to such leasing decisions fail because there is no final agency action and the claims are not ripe.

organization has visited a large area and may visit it again is an insufficient basis for standing. *See Summers*, 555 U.S. at 496 ("[S]ome-day intentions—without any description of concrete plans, or indeed any specification of <u>when</u> the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require.") (quoting *Defs. of Wildlife*, 504 U.S. at 564); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 887-89 (1990) (The "bare allegation of injury" that plaintiff used land "in the vicinity" of the action failed to show standing.) (citation omitted).

Other allegations in the declarations are even less specific. *See*, *e.g.*, Fuller Decl. ¶ 51 ("WWP staff, members, and supporters regularly visit sage-grouse leks and the sagebrush ecosystem, for spiritual, recreational, aesthetic, scientific, or other reasons."). Other allegations relate to areas that have already been leased. *See*, *e.g.*, Declaration of Laura Cunningham ("Cunningham Decl.") ¶¶ 12-15 (alleging a personal interest in areas leased in the June 2018 Nevada lease sale); Declaration of Kevin Emmerich ("Emmerich Decl.") ¶¶ 26-30 (alleging that he camped and hiked in the area of the June 2018 Nevada lease sale).

Plaintiffs have simply failed to allege injuries with sufficient specificity to establish standing to seek relief as to all of the September and December 2018 lease sales in the western states, *i.e.*, New Mexico, Colorado, Montana, the Dakotas, Utah, Nevada, and Wyoming. Nor could they, as BLM has not issued decision records approving any of the September or December lease sales and has not yet finally determined what parcels will be offered for lease, let alone issued leases for particular parcels. Accordingly, Plaintiffs have failed to demonstrate standing.

**B.      Plaintiffs' Motion for a Preliminary Injunction Fails to Challenge Final Agency Action and Therefore Is Not Reviewable Under the Administrative Procedure Act**

NEPA and FLPMA do not provide a private right of action, and therefore Plaintiffs'

claims must be brought under the APA.  *See Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d

1291, 1300 (9th Cir. 2003).  The APA requires that a plaintiff challenge final agency action.  *Or.*

*Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006).  Agency action is

"final" if (1) it "mark[s] the 'consummation' of the agency's decisionmaking process," and (2) is

"one by which 'rights or obligations have been determined,' or from which 'legal consequences

will flow.'"  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation omitted).  In determining

whether an action is a final agency action, courts should consider "both the practical and legal

effects of the agency action."  *Havasupai Tribe v. Provencio*, 876 F.3d 1242, 1249-50 (9th Cir.

2017) (quoting *Or. Nat. Desert Ass'n*, 465 F.3d at 982) (internal quotation marks omitted).

Another factor that a court should consider is whether the agency has issued a decision or other

document that "has the status of law or comparable legal force."  *Columbia Riverkeeper v. U.S.*

*Coast Guard*, 761 F.3d 1084, 1095 (9th Cir. 2014) (quoting *Or. Nat. Desert Ass'n*, 465 F.3d at

987).  An agency pronouncement that does not have the force and effect of law is not a final

agency action under the APA.  *See id.*

IM 2018-034 is not a final agency action because it does not meet either of the two

prongs of the *Bennett* test.  First, IM 2018-034 is not the "consummation" of the agency's

decision-making process.  *Bennett*, 520 U.S. at 177-78.  In order to meet this first prong, "the

action 'must not be of a merely tentative or interlocutory nature.'"  *Or. Nat. Desert Ass'n*, 465

F.3d at 984 (quoting *Bennett*, 520 U.S. at 178).  Rather, a court should consider "whether the

agency has rendered its last word on the matter to determine whether an action is final and is ripe

for judicial review." *Id.* (citation and quotation marks omitted).  IM 2018-034 merely establishes guidelines for certain procedures that BLM will follow in reviewing parcels for potential leasing, conducting environmental analyses of the proposed parcels, and considering and responding to protests.  *See* IM 2018-034 § III.  Further, the IM leaves considerable discretion to BLM state office and field office staff as to precisely what procedures to follow.  *See, e.g., id.* § III.D. ("The state/field office will determine the appropriate form of NEPA compliance documentation.").[4] Accordingly, IM 2018-034 is not the consummation of the agency's decision-making process.

Second, IM 2018-034 is not an action that determines "rights or obligations" or from which "legal consequences will flow."  *Bennett*, 520 U.S. at 177-78.  The key inquiry is whether the guidance document has the force and effect of law.  *See Columbia Riverkeeper*, 761 F.3d at 1095.  IM 2018-034 does not have such legal effect.  The guidance itself does not affect the legal rights or obligations of the oil and gas industry or the Plaintiffs.  Nor does the guidance create legally enforceable requirements for BLM.  *See Earth Island Inst. v. Carlton*, 626 F.3d 462, 473-74 (9th Cir. 2010) (in order to create legally enforceable obligations with the force and effect of law, an agency must promulgate a substantive rule in accordance with applicable procedural requirements).  Instead, the legally enforceable obligations regarding BLM's leasing process exist under FLPMA, NEPA, and BLM's regulations.

Further, the guidance is a general statement of policy.  General statements of policy are distinguished from substantive rules, which undergo notice and comment rulemaking, by the extent to which they leave discretion to agency staff as to how to follow the policy and whether "it effectively replaces agency discretion with a new 'binding rule of substantial law.'"  *Colwell*

---

[4] Indeed, Plaintiffs recognize that BLM field offices are applying their own procedures based on the guidance in IM 2018-034.  *See* Pls. Mem. at 12 (asserting that BLM offices have used "15-day comment periods," a timeframe that is not stated in IM 2018-034).

*v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1124 (9th Cir. 2009) (quoting *Mada-Luna v.*
*Fitzpatrick*, 813 F.2d 1006, 1013-14 (9th Cir. 1987)).  IM 2018-034 does not create new binding
substantive requirements and it gives BLM officials ample discretion in conducting the leasing
process—in fact, it gives BLM more discretion than the previous guidance in IM 2010-117.  *See*
IM 2018-034 § III.B. (allowing BLM the discretion to determine whether to gather additional
data for compliance with NEPA and other statutes, to determine conformity with applicable
resource management plans, to determine whether to conduct a site visit, and to determine the
degree of public participation in the parcel review and NEPA process).[5]

In determining whether guidance documents should be considered final agency actions,
the Ninth Circuit has looked to precedent in the D.C. Circuit.  *See*, *e.g.*, *Colwell*, 558 F.3d at
1124.  And in several instances, the D.C. Circuit has ruled that guidance documents directing
subordinate officials on certain issues did not constitute final agency action subject to judicial
review under the APA.  *See Sierra Club v. Envtl. Prot. Agency*, 873 F.3d 946, 952-53 (D.C. Cir.
2017) (EPA guidance document regarding the methodology for evaluating particulate matter was
not a final agency action); *Ass'n of Flight Attendants-CWA v. Huerta*, 785 F.3d 710, 717-19
(D.C. Cir. 2015) (FAA guidance document regarding carry-on baggage was a general statement
of policy, not a substantive rule, and therefore not a final agency action); *Nat'l Mining Ass'n v.*
*McCarthy*, 758 F.3d 243, 250-53 (D.C. Cir. 2014) (EPA guidance document recommending
pollutant limits for discharge permits was not a final agency action); *Ctr. for Auto Safety v. Nat'l*

---

[5] In support of their final agency action argument, Plaintiffs rely on *W. Energy All. v. Salazar*,
No. 10-cv-237F, 2011 WL 3738240 (D. Wyo. Aug. 12, 2011).  *See* Pls. Mem. at 17.  In that case,
the court found that the IM at issue had "adopted a final, binding and substantive change to . . .
its past practices."  2011 WL 3738240, at *7.  IM 2018-034, in contrast, does not establish
binding norms and instead leaves to BLM's discretion what procedures to follow at various steps
in the review process.  *See* IM 2018-034 §§ III.B., D.

Defendants' Opposition to Motion for Preliminary Injunction [ECF No. 30]          19

*Highway Traffic Safety Admin.*, 452 F.3d 798, 807-11 (D.C. Cir. 2006) (guidance for conducting automobile recalls was a general statement of policy and not a final agency action).

In all of those cases, the court found that the guidance document at issue did not have binding legal effect, *see*, *e.g.*, *Sierra Club*, 873 F.3d at 952, and the same is true of IM 2018-034.[6] Put another way, if BLM were to deviate from the guidance, a private litigant could not file suit to enforce the guidance because it has no legal effect. *See Carlton*, 626 F.3d at 473-74. Further, Plaintiffs have failed to offer any support for the notion that the alteration of the protest period determines "rights or obligations" within the meaning of *Bennett*, 520 U.S. at 177-78. Cases involving agency guidance typically involve standards directed towards the regulated industry. *See*, *e.g.*, *Sierra Club*, 873 F.3d 952-53. In contrast, the guidance at issue here directs the *agency* to follow a particular process in considering parcels for lease and conducting environmental reviews. It establishes no obligations or duties for outside parties.[7] Further, the guidance merely revises the timing of the protest period, which itself was a product of prior

---

[6] Just because a guidance document is not subject to a facial challenge does not mean that the guidance will escape judicial review. If the agency applies the guidance "in a particular situation," the substance of the guidance, assuming that it was followed by the agency, will be subject to review in an as-applied challenge. *Ctr. for Auto Safety*, 452 F.3d at 80. If the Court finds their facial challenge to IM 2018-034 to be premature, Plaintiffs will have ample opportunity to challenge the guidance in the context of final lease sale decisions.

[7] The Ninth Circuit has stated that certain factors guide the final agency action inquiry— "whether the [action] amounts to a definitive statement of the agency's position, whether the [action] has a direct and immediate effect on the day-to-day operations of the party seeking review, and whether immediate compliance [with the terms] is expected." *Indus. Customers for Nw. Utils. v. Bonneville Power Admin.*, 408 F.3d 638, 646 (9th Cir. 2005). These factors weigh against a finding of final agency action here because the guidance leaves the discretion to BLM officers as to what NEPA documentation to use and what degree of public participation to allow and it has no immediate effect on the regulated community or anyone else—instead, the guidance only applies when BLM is going through a lease sale decision process.

policy.  *See* IM 2010-117 § III.H.  The revision of the protest period does not affect substantive

rights or obligations and therefore does not meet the *Bennett* test.

Accordingly, Plaintiffs have failed to demonstrate that the issuance of IM 2018-034 was a

final agency action subject to judicial review under the APA.

### C.  Plaintiffs' Preliminary Injunction Motion Is Not Ripe for Review

The claims that Plaintiffs seek to have adjudicated in their motion for a preliminary

injunction are not ripe for review.  Plaintiffs are asking the Court to issue an injunction setting

the procedures that BLM must follow for lease sales that have not yet been authorized and before

knowing what parcels will even be offered for lease.  Therefore, the claim that they seek to

litigate in the preliminary injunction motion and their requested relief are not ripe for the Court's

review.

The ripeness doctrine "prevent[s] the courts, through avoidance of premature

adjudication, from entangling themselves in abstract disagreements over administrative policies,

and also . . . protect[s] the agencies from judicial interference until an administrative decision has

been formalized and its effects felt in a concrete way by the challenging parties."  *Abbott Labs. v.

Gardner*, 387 U.S. 136, 148-49 (1967).  A case is not "'ripe' for judicial review under the APA

until the scope of the controversy has been reduced to more manageable proportions, and its

factual components fleshed out, by some concrete action applying the regulation to the claimant's

situation in a fashion that harms or threatens to harm him."  *Nat'l Wildlife Fed'n*, 497 U.S. at

891; *see also Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).

Even purely legal challenges to an agency policy or regulation are generally not ripe for

review until claims are raised "in the context of a specific application" of the regulation or policy

instead of a "generalized challenge."  *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 163-64

(1967); *see also Nat'l Park Hosp. Ass'n*, 538 U.S. at 812 ("[W]e conclude that judicial resolution

of the question presented here should await a concrete dispute about a particular concession

contract."); *Earth Island Inst. v. Ruthenbeck*, 490 F.3d 687, 696 (9th Cir. 2007) (finding

challenge to regulations not applied to any "specified project" are "not fit for judicial decision"),

*aff'd in part, rev'd in part on other grounds*, 555 U.S. 488 (2009); *Colwell*, 558 F.3d at 1128

(finding that a challenge to agency guidance was not ripe for review and stating that when the

guidance is applied in a particular context "we will be in a better position to determine whether

the [guidance] functions as a substantive rule or as a general statement of policy"); *see also*

*Truckers United for Safety v. Fed. Highway Admin.*, 139 F.3d 934, 938 (D.C. Cir. 1998).

Except when a special statutory provision authorizes direct review, or where the

regulation requires immediate adjustment of conduct under threat of serious penalties, a

regulation is *presumed not to be ripe* until it has been applied in a manner that threatens concrete

harm to a plaintiff's interests. *Nat'l Wildlife Fed'n*, 497 U.S. at 891. In considering whether an

agency action is ripe for review, the Supreme Court has directed that courts consider three

factors: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial

intervention would inappropriately interfere with further administrative action; and (3) whether

the courts would benefit from further factual development of the issues presented." *Ohio*

*Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998).

Here, Plaintiffs are seeking relief either based solely on their facial challenge to IM 2018-

034 or on the basis of an as-applied challenge to upcoming lease sales (which are not even

challenged in their Complaint). Either way, their motion for a preliminary injunction is

premature. Their facial challenge to IM 2018-034 is not ripe for review and certainly is not a

basis for preliminary injunctive relief. *See, e.g., Ohio Forestry*, 523 U.S. at 733-37; *Toilet*

*Goods*, 387 U.S. 163-64.  Likewise, their as-applied challenge fails because, as discussed above,

BLM is still in the process of considering which parcels to lease in the upcoming lease sales.

Until those decision-making processes have been completed and the guidance has been applied

in the context of those lease sales, Plaintiffs' challenges to IM 2018-034 are not ripe for review.

*See Colwell*, 558 F.3d at 1128; *see also BBK Tobacco & Foods, LLP v. U.S. Food & Drug*

*Admin.*, 672 F. Supp.2d 969, 973-77 (D. Ariz. 2009) (finding challenge to FDA guidance

document not ripe for review).

Application of the *Ohio Forestry* factors demonstrates that the claims that Plaintiffs seek

to litigate in their preliminary injunction motion are not ripe.  First, deferring judicial review

until BLM has implemented IM 2018-034 will not cause "direct and immediate" hardship to

Plaintiffs.  *Abbott Labs.*, 387 U.S. at 152; *see also Ohio Forestry*, 523 U.S. at 733–35.  IM 2018-

034 itself "create[s] no legal rights or obligations."  *Ohio Forestry*, 523 U.S. at 733.  Nor does

IM 2018-034 allow any oil and gas development to take place.  *See id.* (finding no hardship

where a forest plan did "not give anyone a legal right to cut trees [or] abolish anyone's legal

authority to object to trees being cut.")  When oil and gas lease sales take place and assuming

that leases are issued, Plaintiffs will then be able to challenge actual leasing decision and leases

and,[8] if necessary, seek preliminary injunctive relief well in advance of any permitting decision

that would allow the development of oil and gas leases.  But the Plaintiffs must wait until those

processes are completed before challenging them.[9]

---

[8] A NEPA claim challenging a leasing decision is not ripe until a lease has actually been issued.
*See Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 50 (D.C. Cir. 1999) (finding
plaintiff's claim premature when it "brought its NEPA action before any leases had actually been
issued by the BLM").

[9] Indeed, Plaintiffs do not list the September and December lease sales as challenged actions in
their Complaint.  The Complaint refers to the Utah September 2018 lease sale as a "pending

Second, allowing a facial challenge to IM 2018-034 in the context of a preliminary injunction motion will interfere with the ongoing administrative processes relating to the September and December lease sales.  The processes may vary depending on the particular circumstances of each lease sale, and IM 2018-034 leaves considerable discretion to BLM officers as to what NEPA documentation to use and the degree of public participation to allow. *See* IM 2018-034 §§ III.B.5, III.D.  The Court should allow those processes to be completed before making a ruling on the legal validity of the agency's process.

Finally, the Court would benefit from deferring consideration of Plaintiffs' challenge to IM 2018-034 in the context of the September and December lease sales until it can review the factual circumstances relating to those lease sales and BLM's application of IM 2018-034.  IM 2018-034 leaves agency officials considerable discretion in how to conduct the leasing and environmental review process, and the factual circumstances of each leasing process will inform the Court's considering as to whether BLM's leasing processes complied with FLPMA and NEPA.  *See* IM 2018-034 § III.  After the leasing processes have been completed, the Court will be in a better position to evaluate Plaintiffs' claims.

Accordingly, Plaintiffs are not likely to succeed on the merits of the claims that they seek to litigate in the preliminary injunction because those claims are not ripe.

---

action." Compl. ¶¶ 258-64.  But an action that is pending is not ripe for review.  The Complaint includes claims challenging lease sales that have already taken place, *see*, *e.g.*, *id.* ¶¶ 150-57, but their motion for a preliminary injunction does not seek relief as to lease sales that have already occurred.  *See* Pls. Mem. at 23, 37 (requesting that the Court enjoin the implementation of IM 2018-034 as to BLM lease sales occurring in September 2018 or later).  In other words, Plaintiffs are seeking prospective relief as to lease sales that have not taken place.  Such relief is not appropriate under the APA.

**D.     Plaintiffs Are Unlikely to Succeed on Their APA, FLPMA, and NEPA Claims**

Even if the Court reaches the merits of Plaintiffs' claims, Plaintiffs are not likely to

succeed on the claims they raise in the preliminary injunction motion for the reasons discussed

below.

**1.     Instruction Memorandum 2018-034 Is a Statement of Policy and Did Not Require Notice and Comment Rulemaking**

IM 2018-034 does not establish any new rules and therefore BLM was not required to go

through a rulemaking process to issue it.  Plaintiffs argue that because BLM replaced the

procedures in IM 2010-117 with new ones, it must go through a rulemaking.  *See* Pls. Mem. at

17-20.  Plaintiffs are wrong because the regulations, not the guidance, create binding

requirements for BLM.  BLM's new guidance is entirely consistent with BLM's regulations, and

therefore a rulemaking was not required to issue the guidance.

The procedures in IM 2018-034, including those to which Plaintiffs object, are entirely

consistent with the procedures in BLM's regulations.  With respect to public participation, the

IM provides that BLM "may provide for public participation during the NEPA process," IM

2018-034 § III.B.5.  Similarly, the regulations provide that an agency may provide for public

involvement "to the extent practicable."  43 C.F.R. § 46.305(a).  IM 2018-034 does not require a

30-day public comment period for either an EA or a DNA.  *See* IM 2018-034 §§ III.B.5., III.D.

The regulations likewise do not require a comment period of that length, and instead state that

agencies "may seek comments on an environmental assessment if they determine it to be

appropriate."  43 C.F.R. § 46.305(b).  Indeed, BLM expressly noted in its 2010 guidance that a

30-day comment period for either an EA or DNA was "not required by law or regulation."  IM

2010-117 § III.E.  A 30-day protest period also is not required by BLM's regulations, which only

require BLM to give 45-days advance notice of a lease sale. 43 C.F.R. § 3120.4-2. Finally, Plaintiffs point to no requirement in the regulations that would limit BLM's ability to adopt a set length of time for review of parcels, which BLM set at six months. *See* IM 2018-034 § III.A. Plaintiffs have pointed to no provision of IM 2018-034 that is inconsistent with the regulations, and for that reason, no rulemaking was required.[10]

For the same reason, the procedures in the IM also do not in any way conflict with the Department of the Interior's NEPA regulations, which are discussed above and which BLM follows in order to fulfill its obligations under both NEPA and FLPMA during the leasing process. Contrary to Plaintiffs' assertions, BLM's adoption of IM 2018-034 did not change the requirements in the regulations for the public comment period on EAs. The IM changed the process in IM 2010-117, but the comment periods in IM 2010-117 were not required by BLM's regulations. *See* IM 2010-117 § III.E. Therefore, there was no requirement for BLM to go through a rulemaking to change the procedures outlined in IM 2010-117.

### 2. The Procedures in Instruction Memorandum 2018-034 Are Consistent with FLPMA and NEPA

Plaintiffs have failed to show that they are likely to succeed on their claims that the procedures in IM 2018-034 are inconsistent with the public participation requirements in FLPMA and NEPA. As a threshold matter, because Plaintiffs are challenging IM 2018-034 on its face, they face a higher burden of demonstrating success. "A facial challenge to a legislative

---

[10] *Natural Resources Defense Council v. Jamison*, 815 F. Supp. 454 (D.D.C. 1992) is distinguishable because, in that case, the Department of the Interior, at the time of the suit, had not adopted regulations regarding public participation in the coal leasing process. *See id.* at 468-69.

Act is,[11] of course, the most difficult challenge to mount successfully, since the challenger must

establish that no set of circumstances exists under which the Act would be valid." *United States*

*v. Salerno*, 481 U.S. 739, 745 (1987); *see also Isaacson v. Horne*, 716 F.3d 1213, 1230 (9th Cir.

2013).  While Plaintiffs discuss particular instances in which IM 2018-034 is being applied, their

claim is pled as a facial challenge to the IM, *see* Compl. ¶¶ 308-31, and they seek relief as to all

upcoming lease sales in western states, not just particular applications of IM 2018-034.  *See* Pls.

Mem. at 37.  Therefore, their claim should be viewed as a facial challenge, and in order to show

a likelihood of success on the merits, they must meet the higher standard applicable to such a

challenge, *i.e.*, that there is no set of facts under which the procedures in the IM would be valid.

*See Salerno*, 481 U.S. at 745.  Plaintiffs fail to do so.

### a.       Section 309(e) of FLPMA

Plaintiffs raise a number of arguments to support their FLPMA claims, but none of them

demonstrate a likelihood of success on the merits.  First, they claim that by giving BLM officers

the discretion to decide whether, and to what extent, to allow public participation, *see* IM 2018-

034 § III.B.5, BLM has violated the requirement in Section 309(e) of FLPMA, 43 U.S.C. §

1739(e), to provide for public participation in the leasing process.  *See* Pls. Mem. at 21-22.

Plaintiffs cannot show that the procedure in the IM is facially invalid because, under the IM,

BLM will provide for public participation when it deems such participation to be appropriate.  In

fact, for most of the upcoming September lease sales, BLM has provided for public participation

in some form, either through comments on a draft EA or scoping comments.  Wells Decl. ¶ 3.

And in many of those instances, the Center for Biological Diversity and Western Watersheds

---

[11] The same standard applies to a facial challenge to a regulation, *see United States v. Dang*, 488
F.3d 1135, 1142 (9th Cir. 2007), and therefore by extension to the guidance document
challenged here, which Plaintiffs claim should have gone through a rulemaking process.

Project have submitted comments. *Id.* Where there was no specific public participation on the EA for the lease sale, there was public participation during the preparation of the governing RMP, which included comments on proposals to make areas available for oil and gas leasing. *Id.*; *see also* 43 C.F.R. § 1601.0-6. These leasing processes were sufficient to meet the public participation requirements of FLPMA.

Further, contrary to Plaintiffs' broad reading of Section 309(e), the statute gives considerable discretion to the Department of the Interior as to how to incorporate public participation into its management of public lands. The statute requires the Department of the Interior to establish procedures for the public "to comment upon the formulation of standards and criteria for, and to participate in, the preparation and execution of plans and programs for, and the management of, the public lands." 43 U.S.C. § 1739(e). Thus, the statute leaves a great deal of discretion to the Department of the Interior as to the nature and timing of public participation in particular contexts. It is true that BLM may not entirely shut out the public from decision making. *See W. Watersheds Project v. Kraayenbrink*, 538 F. Supp. 2d 1302, 1315-16 (D. Idaho 2008), *aff'd in part and vacated in part*, 632 F.3d 472 (9th Cir. 2011).[12] But the IM does not do so and Plaintiffs have not offered evidence that they have been cut off from public participation

---

[12] The regulations at issue in *Kraayenbrink* removed certain organizations from a list of "interested publics" that would receive notices of issues concerning grazing allotments and eliminated public involvement from a variety of actions involving grazing, including "adjustments to allotment boundaries," "changes in active use," and the "issuance or renewal of individual permits or leases." 538 F. Supp. 2d at 1309. Unlike those regulations, the procedures adopted in IM 2018-034 do not exclude particular groups from decision-making and do not preclude public involvement in particular actions.

in BLM's leasing decisions.  Therefore, the Court should find that Plaintiffs have not met their burden of proving that the IM is invalid under any set of circumstances.[13]

Second, Plaintiffs similarly argue that by allowing BLM to prepare a DNA and by allowing BLM to avoid public comment for particular lease sales, the IM violates Section 309(e). *See* Pls. Mem. at 22.  Again, this does not show that there is no set of circumstances under which the IM would be valid because BLM will not necessarily prepare DNAs for each lease sale and it may allow for some form of public comment, in the form of scoping or comments on a draft EA, which it has done, or will do, for the upcoming September lease sales.  Wells Decl. ¶ 3.  Whether a DNA would provide sufficient NEPA coverage and whether the absence of a comment period for a particular lease sale would not meet NEPA's public participation requirement will depend on the nature of the prior NEPA analysis on which BLM relies and the sufficiency of other public participation opportunities in BLM's leasing program.  Those issues are best addressed in the context of particular lease sales.  *See Nat. Res. Def. Council*, 618 F. Supp. at 881.

Third, Plaintiffs argue that BLM has relegated public participation to the protest period, which they contend is not as valuable because it occurs later in the decision-making process.  Pls. Mem. at 22-23.  Even if Plaintiffs were correct in asserting that the protest opportunity alone does not provide adequate public involvement under FLPMA, however, BLM does not rely solely on the protest period for this purpose.  As detailed above, for each of the proposed upcoming lease sales, there has been at least some opportunity for public involvement other than the protest period.

---

[13] The uncertainty in how the guidance will be applied demonstrates the lack of ripeness of the facial challenge.  *See Nat. Res. Def. Council v. Hodel*, 618 F. Supp. 848, 881 (E.D. Cal. 1985) (declining to rule on the merits of a facial challenge to the public participation provisions of BLM regulations because to do so "would merely entangle the Court in an abstract disagreement over administrative policy").

Fourth, Plaintiffs argue that 15-day comment periods on draft EAs and 10-day protest periods, which they assert have been recently used for certain lease sale decision processes, are insufficient to allow for meaningful public comment.  Plaintiffs' declarants assert that the shorter periods make it difficult for them to submit comments within the deadlines.  *See*, *e.g.*, Fuller Wells Decl. ¶ 37.  These assertions, however, do not show that BLM violated FLPMA. Defendants appreciate that preparing and submitting comments on lease sales is hard work and requires diligence on the part of interested organizations and individuals.  Plaintiffs have not shown, however, that the shorter time periods have precluded them from submitting timely comments or protests.  In fact, they have submitted numerous comments.  *See* Wells Decl. ¶ 3. Nor have they sought to enjoin lease sales that have already occurred using shortened comment periods.  Therefore, they have failed to meet their burden of demonstrating that the use of a 15-day comment period on a draft EA or a 10-day protest period is *per se* unlawful.[14]

Accordingly, Plaintiffs have failed to show a likelihood of success on their claim that IM 2018-034, on its face, violates Section 309(e) of FLPMA.

### b.    Public Involvement Under NEPA

Plaintiffs have also failed to show that the procedures in IM 2018-034 violate NEPA under the standard for a facial challenge.  In terms of public participation, when an agency prepares an EA, it must "involve environmental agencies, applicants, and the public, to the extent practicable."  40 C.F.R. § 1501.4(b).  This means, as the Ninth Circuit has interpreted it, that: "An agency, when preparing an EA, must provide the public with sufficient environmental

---

[14] Plaintiffs assert that the acres offered for leasing (11,859,396 acres) in 2017 was much higher than in prior years, but the same chart shows that only 792,823 acres received bids, which is comparable to, or lower than the acreage that received bids in the preceding eight years.  *See* BLM Oil and Gas Statistics, Table 11, https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/oil-and-gas-statistics (last visited Aug. 10, 2018).

information, considered in the totality of circumstances, to permit members of the public to

weigh in with their views and thus inform the agency decision-making process." *Bering Strait*,

524 F.3d at 953.  Further, "the circulation of a draft EA is not required in every case" and the

public participation required by NEPA may be accomplished "through other means."  *Id.* at 952.

According to Ninth Circuit law, there is no minimum time period for public comment on a draft

EA.  *See id.* at 952-53.

Plaintiffs claim that BLM has violated NEPA by, in some instances, allowing only 15-

day comment periods on a draft EA, and in other instances relying on a DNA.  Pls. Mem. at 27.

This argument conflates their facial challenge to IM 2018-034 with particular applications of the

policy.  On its face, IM 2018-034 allows BLM to determine what NEPA documentation to rely

on and to choose the length of particular comment periods.  IM 2018-034 § III.D.  Therefore,

Plaintiffs have not shown that the policy is invalid under any set of circumstances—the standard

for a facial challenge—and therefore have not shown that they are entitled to broad relief as to

any and all applications of the policy.

To the extent the court considers whether certain applications of the policy have, or will,

violate NEPA, Plaintiffs also have failed to meet their burden of demonstrating a NEPA

violation.[15]  Citing an out of circuit district court opinion, Plaintiffs argue that a 15-day comment

period on an EA is not sufficient under NEPA.  Pls. Mem. at 26-27 (citing *Fund for Animals v.

Norton*, 281 F. Supp.2d 209, 226 (D.D.C. 2003)).  But the Ninth Circuit has set no minimum

time period for comments on a draft EA and, indeed, does not require that a draft EA be

---

[15] As discussed in sections I.B. and I.C., *supra*, challenges to upcoming lease sales are not justiciable because Plaintiffs do not challenge final agency action and the claims are not ripe.  To the extent that the Court, nevertheless, considers Plaintiffs' arguments about the comment periods and protest periods applicable to upcoming lease sales, they are without merit.

circulated at all.  Instead, the Ninth Circuit views the sufficiency of public comment based on the "totality of circumstances."  *Bering Strait*, 524 F.3d at 953.  Further, the use of a DNA is appropriate if the agency has already analyzed the impacts of its leasing decision in another NEPA document and has provided sufficient opportunity for public participation during the preparation of that earlier document.  *See* 43 C.F.R. §§ 46.120(c), 46.300(a)(2).

Plaintiffs have failed to show that BLM has failed to allow sufficient public comment with respect to any of the upcoming lease sales when viewed in the totality of the circumstances. For the September lease sale in Wyoming, for example, in addition to the public comments that were accepted and considered in the development of the various governing RMPs (including comments on areas proposed to be open for oil and gas leasing under the plans), BLM circulated two draft EAs for public comment (one for 30 days and one for two weeks).  Wells Decl. ¶ 3.h. That was sufficient to comply with NEPA.

> **3.** **The Requirements Applicable to the Issuance of New Regulations Do Not Apply Because BLM Has Not Changed Its Regulations**

Plaintiffs argue that IM 2018-034 is invalid because BLM did not appropriately explain the bases for its new policy and its reasons for departing from the old policy.  *See* Pls. Mem. at 27-29.  These arguments assume that BLM's new policy made changes to its regulations and therefore required BLM to meet the APA requirements for a rulemaking.  *See Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1115-16 (9th Cir. 2007) (reviewing Department of Agriculture regulations regarding the import of cattle); *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 962, 966-70 (9th Cir. 2015) (reviewing whether the U.S. Forest Service had adequately explained the reasons for

adopting new regulations governing the Tongass National Forest). These standards do not apply here because BLM did not, and was not required to, engage in a rulemaking to issue the policy.[16]

For the reasons discussed in section I.D.1, *supra*, BLM was not required to go through rulemaking to issue IM 2018-034. The policy is not a regulation, and instead is a non-binding, unenforceable guidance document, which creates procedures within the framework of existing regulations. It makes no changes to BLM's existing FLPMA or NEPA regulations, and therefore BLM was not required to justify changes to its policy, as it would for changes to its regulations. Because IM 2018-034 makes no changes to existing regulations, and does not deviate from existing regulations, Plaintiffs' arguments regarding the requirements for changing regulations have no legal basis.

In sum, for all of the foregoing reasons, Plaintiffs are unlikely to succeed on the merits of their claims.

## II. Plaintiffs Have Failed to Demonstrate Irreparable Harm

Plaintiffs have failed to demonstrate imminent, irreparable harm, which is necessary in order to obtain preliminary injunctive relief. *Winter*, 555 U.S. at 22. To obtain emergency injunctive relief, Plaintiffs bear the burden of proving it is "likely"—and not just possible—that they will suffer substantial and immediate irreparable injury to their interests *before a decision on the merits can be rendered*. *Winter*, 555 U.S. at 22. Plaintiffs have not and cannot demonstrate such harm. IM 2018-034 itself causes Plaintiffs no harm, and the upcoming lease sales also will not result in imminent harm to the environment because subsequent stages of

---

[16] In *California v. U.S. Bureau of Land Management*, 277 F. Supp. 3d 1106 (N.D. Cal. 2017), BLM sought to temporarily postpone the effectiveness of certain provisions in its regulations regarding natural gas production by invoking section 705 of the APA. *See id.* at 1112, 1121-22. BLM is not invoking section 705 here; nor is it seeking to postpone the effectiveness of any of its regulations.

agency review and approval are necessary before any oil and gas development can occur.

Moreover, the procedural harms alleged by Plaintiffs, standing alone, are insufficient to

demonstrate irreparable injury.

### A.     Plaintiffs Have Failed to Demonstrate Any Irreparable Harm to the Environment Due to the Upcoming September and December Lease Sales

Plaintiffs have demonstrated no imminent, irreparable harm to the environment from

BLM's application of IM 2018-034 to individual oil and gas lease sales in September and

December.  They argue that the issuing of leases will eventually result in harm to sagebrush

ecosystems and the species that rely on it, including sage grouse. *See* Pls. Mem. at 30-32.

Plaintiffs are entitled to no presumption of irreparable harm based upon alleged harm to the

environment.  *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544-45 (1987) (reversing

a preliminary injunction premised on Ninth Circuit's presumption of irreparable damage when an

agency fails to evaluate thoroughly the environmental impact of a proposed action); *Fund for

Animals, Inc. v. Lujan*, 962 F.2d 1391, 1400 (9th Cir. 1992) ("Merely establishing a procedural

violation of NEPA does not compel the issuance of a preliminary injunction.").  And Plaintiffs

have failed to demonstrate that irreparable harm to the environment will occur in the absence of

an injunction.

Here, no harm to the environment is imminent because a lease sale, and subsequent

issuance of a lease, is merely a preliminary first step in the approval of oil and gas development

and does not authorize any on the ground disturbance.  As discussed in background section I.C.,

*supra*, in a lease sale, after conducting appropriate NEPA analyses, as well as reviews under

other statutes, BLM state offices hold competitive oil and gas lease sales to offer lands for

leasing.  *See* 30 U.S.C. § 226(b)(1)(A); *see also* 43 C.F.R. Subpart 3120; 43 C.F.R. § 3120.1-

2(a).  But even after the lease sales are completed, bids are accepted, and leases issued, no oil

and gas development can occur without further approval from BLM.  No development can occur until BLM determines whether, and under what conditions, it will approve specific development proposals.  30 U.S.C. § 226(g); 43 C.F.R. § 3162.3-1 (2017).  That decision is made through review of an APD, which BLM may approve following additional NEPA compliance, subject to any necessary conditions of approval.  *See* 43 C.F.R. § 3162.3-1; *see also Amigos Bravos*, 2011 WL 7701433, at *5.[17]

Because the lease sale itself does not authorize ground disturbing activity, courts have consistently held that merely holding an oil and gas lease sale does not result in the irreparable harm to the environment necessary for granting a preliminary injunction.  *See Vill. of Gambell*, 480 U.S. at 544-45 (reversing preliminary injunction regarding oil and gas lease because "injury to subsistence resources from exploration was not at all probable"); *Tribal Vill. of Akutan v. Hodel*, 859 F.2d 662, 664 (9th Cir. 1988) (dissolving a preliminary injunction regarding an oil and gas lease sale and finding that "none of the activities of the lease sale sage results in harm to the environment); *Blanco v. Burton*, No. Civ.A. 06-3813, 2006 WL 2366046, at *15-19 (E.D. La. Aug. 14, 2006) (denying injunction and finding that holding an offshore oil and gas lease sale did not result in imminent environmental harm); *N. Slope Borough v. Minerals Mgmt. Serv.*, No. 3:07-cv-45-RRB, 2007 WL 1106110, at *4 (D. Alaska Apr. 12, 2007) (denying preliminary injunction regarding an oil and gas lease sale); *cf. Fisheries Survival Fund v. Jewell*, 236 F. Supp.3d 332, 336-38 (D.D.C. Feb. 15, 2017) (denying preliminary injunction regarding an offshore wind energy lease for lack of irreparable harm).  Likewise, in this case Plaintiffs have

---

[17] Given that it is not yet known which parcels will be leased and what mitigation would be required for any oil and gas development plans that are ultimately approved for such leased parcels, Plaintiffs cannot demonstrate that irreparable environmental harm will occur.

failed to show that the lease sales, when they occur, will result in imminent environmental harm.[18]

### B.   An Alleged Bureaucratic Commitment to Leasing Is Not a Sufficient Basis for Irreparable Injury

Plaintiffs cannot rely on the theory of bureaucratic momentum to demonstrate irreparable harm.  This theory was espoused in *Massachusetts v. Watt*, 716 F.2d 946 (1st Cir. 1983).  In that decision, Judge Breyer enjoined a lease sale on the outer continental shelf off the coast of Massachusetts based, in part, on the theory that, if the lease sale were allowed to go forward, it would engender a "bureaucratic commitment" to the lease sale, which he found was a type of irreparable harm.  *Id.* at 952-53.  This theory, however, has not stood the test of time.  Just four years later, the Supreme Court issued its decision in *Village of Gambell*, in which it refuted the notion that harm to the environment may be presumed and reversed the preliminary injunction of an offshore oil and gas lease sale.  *See* 480 U.S. 531, 544-45 (1987).

In light of the Supreme Court's decision in *Village of Gambell*, the First Circuit revisited its *Watt* decision in *Sierra Club v. Marsh*, 872 F.2d 497 (1st Cir. 1989).  *Marsh* did not involve a leasing decision, but instead involved the development of marine cargo terminals.  *Id.* at 498.  In any event, the court clarified its prior statements in *Watt* regarding irreparable harm, explaining that it did not mean that a procedural harm would constitute irreparable harm:

> Rather, the harm at stake is a harm to the *environment*, but the harm consists of the added *risk* to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment.

---

[18] *Catron County Board of Commissioners, New Mexico v. U.S. Fish and Wildlife Service*, 75 F.3d 1429 (10th Cir. 1996), relied on by Plaintiffs, Pls. Mem. at 31, involved the designation of critical habitat under the Endangered Species Act, *id.* at 1432-33, and therefore is irrelevant here.

*Id.* at 500.  Thus, ultimately, harm to the environment must be at stake in a motion for a preliminary injunction, and a plaintiff cannot rely solely on alleged procedural violations of harm to meet their burden of demonstrating irreparable harm.  *See id.*; *see also Blanco*, 2006 WL 2366046, at *18-19 (discussing *Watt*, *Village of Gambell*, and *Marsh* and rejecting the bureaucratic momentum argument).

Plaintiffs claim that the Ninth Circuit and other circuits have adopted the First Circuit's view, but in fact, the Ninth Circuit has been critical of the bureaucratic momentum argument. *See N. Cheyenne Tribe v. Hodel*, 851 F.2d 1152 (9th Cir. 1988).  In *Hodel*, following summary judgment proceedings, the district court issued an injunction at first voiding previously issued oil and gas leases, but later changing the injunction to suspension of the leases.  *Id.* at 1154-55.  The plaintiffs challenged the revision of the injunction, arguing that they should be vacated, because, among other reasons, allowing the leases to stand would engender a "bureaucratic commitment" to the leases.  *Id.* at 1156.  The Ninth Circuit acknowledged that "[b]ureaucratic rationalization and bureaucratic momentum are real dangers, to be anticipated and avoided by the Secretary." *Id.* at 1157.  But the court further explained that "[w]e see no reason to suppose that the Secretary will feel greater commitment to the original project if the leases are not voided but held in abeyance until a new evaluation is made."  *Id.*  The court did remand the injunction based on other considerations, but did not order that the leases be vacated based on the plaintiffs' bureaucratic momentum argument.  *See id.* at 1157-58.  Further, it should be noted that the lease sale itself was not enjoined and an injunction relating to the leases issued only after the case was decided on summary judgment.  *See id.* 1154-55.

The other cases cited by Plaintiffs do not support the proposition that a lease sale should be enjoined based solely on the notion that bureaucratic momentum is a form of irreparable

harm.  *See West v. Sec'y of Dep't of Transp.*, 206 F.3d 920, 930 (9th Cir. 2000) (finding a NEPA violation and ordering additional NEPA review prior to additional highway construction); *Idaho ex rel. Kempthorne v. U.S. Forest Serv.*, 142 F. Supp.2d 1248, 1264 (D. Idaho 2001) (reversing a preliminary injunction regarding a Forest Service rule pending additional information from the government); *Mont. Wilderness Ass'n v. Fry*, 408 F. Supp. 2d 1032, 1038 (D. Mont. 2006) (enjoining surface disturbing activities relating to gas leases following a summary judgment decision); *Friends of the Earth v. Hall*, 693 F. Supp. 904, 948-50 (W.D. Wash. 1988) (issuing permanent injunction against the construction of a Navy port following summary judgment). None of the cases that Plaintiffs cite support the notion that a court may enjoin an oil and gas lease sale on the basis that the lease sale may lead to a bureaucratic commitment to the leases.[19]

In sum, Plaintiffs cannot rely on alleged bureaucratic momentum to take the place of irreparable harm to their interests in the environment.

### C.    Alleged Procedural Harms Due to Difficulties in Commenting on Upcoming Lease Sales Are Not Sufficient to Demonstrate Irreparable Injury

To support their irreparable harm argument, Plaintiffs also rely on alleged procedural difficulties in commenting on draft NEPA documents and submitting protests within the periods allowed by the new guidance.  *See* Pls. Mem. at 34-35.  Defendants understand that the preparation of comments and protests can be time consuming.  However, Plaintiffs fail to point

---

[19] Plaintiffs cite a number of other cases for the proposition that a court may issue an injunction "where no immediate surface-disturbing activities are likely."  Pls. Mem. at 32 (citing cases). *Watt* and *Marsh* have already been addressed.  The remaining cases do not support the notion that a court may find irreparable harm to the environment where surface disturbing activities are not imminent.  *See Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 995 (8th Cir. 2011) (upholding an injunction where the plaintiff had demonstrated harm to its interests in the environment); *Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1128-29 (D.C. Cir. 1971) (ordering the Atomic Energy Commission to revise its NEPA regulations).

to any authority for the proposition that such difficulties constitute irreparable harm for purposes of obtaining injunctive relief.  Plaintiffs will have ample opportunity to challenge BLM's procedures for public involvement with respect to individual lease sales if and when BLM reaches final leasing decisions.  But their request that the Court preemptively enjoin leasing decisions that have not yet been made fails for lack of imminent irreparable harm.

## III.   The Balance of Harms and the Public Interest Weigh Against an Injunction

The balance of the harms and the public interest weigh against an injunction. "When the Government is a party, these . . . two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  "[When] an injunction is asked [for] which will adversely affect a public interest . . . the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." *Weinberger*, 456 U.S. at 312-13 (citation omitted).  Thus, a court may deny injunctive relief even when a plaintiff has demonstrated a likelihood of success on the merits and that it would suffer immediate irreparable harm, neither of which are true in this case.

Plaintiffs posit that the balance of harms is in their favor because their proposed preliminary injunction is narrowly tailored to certain provisions in IM 2018-034.  Pls. Mem. at 36.  Specifically, they ask that BLM be required to use a 30-day comment period on draft EAs and a 30-day protest period pending the resolution of the case on the merits.  *Id.*  Plaintiffs ignore the fact that for most of the upcoming lease sales in September, the NEPA process has already occurred, and the protest period is already underway.  Wells Decl. ¶ 3.  And for the December sales, many of the scoping periods have already occurred, and the public comment periods have begun, or are imminent.  *Id.*  Therefore, what Plaintiffs are asking for is, in effect, an injunction of the lease sales, *i.e.*, until the processes that Plaintiffs request have been completed.

The government has an interest in conducting the lease sales as planned.  BLM staff have spent several months preparing for the many lease sales that Plaintiffs now seek to enjoin.  Wells Decl. ¶¶ 4-5.  It would require significant time and effort now to postpone the lease sales and redo the NEPA public comment processes and protest periods for several different lease sales. *Id.* ¶¶ 6-8.  In addition, postponement of the lease sales could exacerbate the financial loss to the United States from drainage of unleased lands by adjacent non-federal wells, and would prevent the orderly development of Federal onshore oil and gas resources.  *Id.* ¶ 9.  Plaintiffs have not demonstrated that they have a right to disrupt the lease sales and compel BLM to undertake a substantial amount of additional work prior to a ruling on the merits.  The interests of companies who may bid on potential leases, and other parties, are also at stake.

Plaintiffs also argue that there is a public interest in requiring BLM to involve the public in land management decisions and to avoid harm to the environment.  Pls. Mem. at 36.  As to the former, Plaintiffs have not shown that public participation regarding the lease sales was insufficient, but even if they had, an alleged statutory violation is not a sufficient basis for injunctive relief.  *See Winter*, 555 U.S. at 32-33.  As to the latter, as discussed above, a major shortcoming of Plaintiffs' motion is that they have failed to demonstrate that irreparable harm to the environment will be caused by the lease sales, as opposed to the approval of development plans, which will occur later, assuming that lessees ever apply for the approval of such plans.

Accordingly, Plaintiffs have not shown that the balance of the harms or the public interest are in their favor.

**CONCLUSION**

For the reasons stated above, Plaintiffs' Motion for a Preliminary Injunction should be denied.

Respectfully submitted this 10th day of August, 2018,

BART M. DAVIS, Idaho Bar No. 2696
United States Attorney

CHRISTINE G. ENGLAND, California Bar No. 261501
Assistant United States Attorney
District of Idaho
Washington Group Plaza IV
800 East Park Boulevard, Suite 600
Boise, Id 83712-7788
Telephone: (208) 334-1211
Facsimile:   (208) 334-1414
E-mail: Christine.England@usdoj.gov

JEFFREY H. WOOD
Acting Assistant Attorney General

JOHN S. MOST, Virginia Bar No. 27176
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC 20044
Tel: (202) 724-7386; Fax: (202) 526-6665
E-mail: John.Most@usdoj.gov

LUTHER L. HAJEK, Colorado Bar No. 44303
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
999 18th Street
South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1376; Fax: (303) 844-1350
E-mail: Luke.Hajek@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of August, 2018, I filed a copy of the foregoing Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction [ECF No. 30] electronically through the CM/ECF system, which caused all parties or counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

<u>Attorneys for Plaintiffs Western Watersheds Project and Center for Biological Diversity</u>

Laurence J. Lucas
llucas@advocateswest.org

Talasi B. Brooks
tbrooks@advocateswest.org

Todd C. Tucci
ttucci@advocateswest.org

<u>Counsel for Intervenor-Defendant State of Wyoming</u>

Erik Edward Petersen
erik.petersen@wyo.gov

Michael M. Robinson
mike.robinson@wyo.gov

Paul A. Turcke
pat@msbtlaw.com

<u>Counsel for Intervenor-Defendant Western Energy Alliance</u>

Bret A. Sumner
bsumner@bwenergylaw.com


*/s/ Luther L. Hajek*
Luther L. Hajek