Laurence ("Laird") J. Lucas (ISB # 4733)
llucas@advocateswest.org
Todd C. Tucci (ISB # 6526)
ttucci@advocateswest.org
Talasi B. Brooks (ISB # 9712)
tbrooks@advocateswest.org
Sarah K. Stellberg (ISB # 10538)
sstellberg@advocateswest.org
Advocates for the West
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, and CENTER FOR BIOLOGICAL DIVERSITY,<br><br>     Plaintiffs,<br><br>     v.<br><br>RYAN K. ZINKE, Secretary of Interior; DAVID BERNHARDT, Deputy Secretary of Interior; and UNITED STATES BUREAU OF LAND MANAGEMENT, an agency of the United States,<br><br>     Defendants. | Case No. 1:18-cv-00187-REB<br><br>**FIRST SUPPLEMENTAL DECLARATION OF KELLY FULLER** |

I, Kelly Fuller, declare as follows:

1.      The following facts are personally known to me, and if called as a witness I would and could truthfully testify to these facts.

2.      I submit this Declaration to support and more fully elaborate on my first Declaration filed in this matter, ECF No. 30-4.  Since the time when I submitted that Declaration,

SUPPLEMENTAL FULLER DECLARATION -                                                                                     1

new facts and circumstances about BLM's implementation of IM 2018-034 have emerged that will be useful to the Court.

3. Under IM 2018-034, BLM no longer consistently allows public comment on Draft Environmental Assessments (EAs) for oil and gas sales, when it prepares them at all. Where BLM does allow the public to comment on Draft EAs, it now typically provides only 15 days, which is extraordinarily brief. In other sales, BLM has replaced public comment on draft EAs with an early "scoping" stage, also typically 15-days, and the EA is not provided for comment until the 10-day protest period.

4. For example, in the New Mexico 3rd Quarter sale, BLM did not provide its environmental analysis for public review until the 10-day protest period. Based on current BLM webpages, it appears that BLM will do that again during the New Mexico-Oklahoma 4th Quarter lease sale. Similarly, in the upcoming Utah 4th Quarter oil and gas lease sale, BLM told me it will not provide any NEPA document for the public's review until the beginning of the 10-day protest period.

5. This approach to public involvement reduces the public's ability to contribute substantive information to the agency's analysis, for several reasons. First, during the scoping period, BLM only provides the public with proposed parcel lists, proposed lease stipulations, and simple maps. BLM scoping maps do not show where the parcels lie with reference to other resources of concern, such as important species habitats. To see whether the lease parcels are in those areas, you must create your own maps by layering BLM GIS files with GIS data you have gotten from another source, such as state wildlife agency GIS files for sage-grouse Priority Habitat Management Areas. Most members of the public are not able to do this, but even for groups with in-house GIS mapping capabilities, this is challenging because BLM does not

SUPPLEMENTAL FULLER DECLARATION -                                                                                   2

consistently post GIS files for the parcels online. Second, the public must develop comments based only on the parcel lists, BLM's incomplete maps, and whatever information they can gather themselves, also a difficult task.  Third, where BLM does not publish its draft EA for public comment, it typically publishes the EA simultaneously with the start of the 10-day protest period.  This means that the public must review BLM's EA for the first time *and* articulate other grounds for protesting the lease sale, all within the 10-day protest period.  My experience is that, despite previous scoping, these EAs commonly omit information that the public would need to fairly evaluate the environmental impacts of the action.  Consequently, protesting the lease sale involves identifying and gathering new information that BLM failed to consider in its EA and presenting it to the agency during the protest period.  This is an incredibly difficult task to complete in a 10-day period, and even large groups with significant resources have been unable to submit their own scoping comments or protests on lease sales of concern.

      6.      BLM is also increasingly relying on Determinations of NEPA Adequacy (DNAs) rather than EAs for its lease sales.  DNAs are particularly time-consuming and difficult to protest because they forcibly rely on past NEPA analyses.  The public must locate these prior NEPA documents and determine whether they actually discuss impacts of leasing the parcels at issue. In the case of the Nevada 3rd Quarter oil and gas lease sale, for instance, BLM relied on past NEPA lease sale analyses that didn't actually encompass the areas where the parcels were located.  The practice of relying on DNAs is especially problematic because it limits public participation to the protest process.  In the Utah 4th Quarter lease sale, for instance, BLM is proposing to lease parcels near Moab, Utah—one of the most popular areas for mountain biking and other outdoor recreation in the country—under a DNA.  Because the sale is being done under a DNA, the public will be limited to participating via a formal protest, which is difficult

SUPPLEMENTAL FULLER DECLARATION -    3

for the average layperson to write unless they receive skilled help. Protests must conform to heightened substantive, format, signature, and delivery requirements. If the public gets that format wrong, BLM will summarily reject their protest without considering its content.

7. Participating is particularly difficult because of overlapping comment and/or protest periods. For example, between July 30th and August 13th this year (a 14-day period), I worked on four separate protests for 3rd Quarter lease sales, as well as scoping comments for a 4th Quarter lease sale. This difficulty intensifies when BLM releases multiple EAs and DNAs for a single lease sale. For instance, in the case of the 4th Quarter Utah sale, I understand BLM intends to issue four EAs and two DNAs, divided by Field Office, at the start of the protest period. The public will have to evaluate all six documents in just 10 days in Utah alone.

8. These changes directly result from IM 2018-034. In telephone calls on July 30, 2018 and August 14, 2018 I inquired of Utah BLM why they were no longer releasing draft EAs for public comment. The employee I spoke to during those calls told me that IM 2018-034's expedited timeframe for NEPA analysis means they can only involve the public once, or, at most, twice. That employee believed that by allowing the public to weigh in at scoping and then protest when the EA is released, it gets them the most "bang for their buck." They stated that their office is receiving a lot of complaints from NGOs about this process. However, they claimed that the process is meant to allow BLM to comply with aggressive deadlines, not to stymie public participation. They also told me that different states are implementing the IM in different ways and the different BLM state offices will confer to try to determine what works best.

9. In a telephone call on August 15, 2018, an employee of Nevada BLM also told me that the decision of how long to allow for EA comment periods is now made at the field

SUPPLEMENTAL FULLER DECLARATION - 4

office level under the current IM, whereas the previous IM required a 30-day comment period. That employee told me that under IM 2018-034, field offices and district offices that formerly wrote one or two lease sale EAs a year are now writing up to four. The employee would not tell me whether BLM has been given more resources to do this. Nevada BLM also said because of the shortened processing times, their field offices now give other agencies less time to comment on proposed lease parcels than in the past. This includes Nevada's state wildlife agency, but I could not tell from what I was told whether it also includes tribes.

10. In a telephone call on August 16, 2018, an employee of the Montana-Dakotas BLM told me that they had shortened EA comment periods for lease sale to 15 days from 30 because "everyone was crunched" by the new policy and it was the best they could come up with. In addition, that employee stated that Montana-Dakotas BLM field offices and district offices would not be writing multiple lease sale EAs a year and instead would rely on a new bureau-wide streamlining process. No new staff were being provided; they simply had to absorb extra work.

11. The condensed timeframes under IM 2018-034 also require interested parties to more carefully track upcoming sales so deadlines aren't missed. This process is time-intensive. Because BLM state offices do not post information in a uniform location or format, there is often confusion about where the public can locate lease sale documents. For instance, I have had to call each BLM State office to learn where BLM posts information about upcoming sales in that state. In California, BLM told me to look on BLM's National Fluid Lease System website for lease sale information. In Idaho, BLM staff advised me to look at both the ePlanning website and BLM's Idaho lease sale web page. Utah BLM said they are posting notices on the BLM's

State lease sale webpage. Montana-Dakotas BLM directed me to both the National Fluid Lease System website and BLM's ePlanning website.

12. Even if you succeed at locating the correct web pages, it still can be difficult to understand exactly what is happening because BLM now issues numerous EAs and DNAs for a single quarterly sale. For Wyoming's 3rd Quarter lease sale, I, despite having more than 10 years of experience tracking and evaluating BLM NEPA documents, thought that there were only two EAs, when there were actually three. It wasn't until another group notified me that there was a third EA that I recognized my own error.

13. The expanded geographic scope of sales also substantially increases the workload for every sale, even if roughly the same number of parcels are offered. Under the former rotating system, parcels were generally clustered in a discrete area. Now, under IM 2018-034, parcels are scattered across the entire state. This means that the sales now occur in a number of different BLM Field Offices, each governed by its own Resource Management Plan (RMP). To understand whether the sale is lawful, you must review each RMP and its supporting EIS, especially since the sales often tier to the EIS supporting the RMP. For the 3rd Quarter Wyoming lease sale's 10-day protest period, I reviewed nine RMPs and their EISs. For the 4th Quarter Montana-Dakotas 15-day EA comment period, I have seven RMPs and their EISs to review.

14. Tracking down and reviewing these old RMPs and EISs is time consuming. Some date back to the 80s and are not available online. For instance, the 4th Quarter Montana sale EA references a 1987 EIS supporting an RMP. Most of the 31-year-old EIS is available online, but not Chapters 3 and 4, which are the most important from an RMP discussion perspective. When, as in the case of the Montana sale, the RMP and supporting EIS are not easily publicly available,

SUPPLEMENTAL FULLER DECLARATION - 6

you have to request the documents from BLM and hope that you receive them within the time for public participation. In this instance, BLM initially told me they were online, then realized they weren't and emailed them to me. Tracking the documents down took two days of the 15-day comment period. In the meantime, another 15-day EA comment period started in Nevada.

15. The sage-grouse context provides a useful illustration of why access to the information in old EISs is often critical for adequate public participation. Many EAs for upcoming lease sales in sage-grouse habitat tier to EISs for BLM's 2015 sage-grouse plans. But when you look closely at those documents, you see that the sage-grouse population data in them is older than their publication dates, and in some cases, BLM simply copied and pasted text from old field office EISs. This population data is often out of date, sometimes by over a decade. Tiering to the old data introduces errors into the analysis, and the difficulties locating the old RMPs and EISs makes it even harder to track these errors. This is especially frustrating because BLM works with state fish and game departments and has access to updated sage-grouse population data, but with rare exceptions, they are not using that information in preparing their lease sale analyses. It falls upon the public to point out the errors. This matters because most local sage-grouse populations are declining, in some places rapidly. If BLM doesn't inform itself with current grouse information when making leasing decisions in sage-grouse habitat, it pushes the bird closer to extinction.

16. The overall effect of these circumstances—difficulty locating lease sale documents, tightened comment deadlines, substitution of scoping for comment periods, increased reliance on DNAs, and truncated protest periods—is chaos. Staff who work on these issues with environmental organizations are getting exhausted by the short deadlines, and that creates a greater possibility of errors, or of letting a sale that could seriously damage sensitive

SUPPLEMENTAL FULLER DECLARATION - 7

resources that are important to our members slip through the cracks. Even large environmental organizations with whom I collaborate are being overwhelmed by the demands of IM 2018-034. The interested public, whether intentionally or unintentionally, is largely being cut out of the process due to difficulties figuring out what is going on and how to participate. When groups or local community members cannot independently contribute to scoping comments or protests on proposed lease sales, it means their expertise and perspectives are not brought to light.

17. The demands of the new leasing procedures have taken a toll in unrelated programs, as well. Staff who work on these issues must focus exclusively on oil and gas leasing decisions during the comment and protest period intervals to meet the 10- and 15-day deadlines. Typically, a round of simultaneous 10-day protests is now immediately followed by two weeks of simultaneous EA comment periods. In my case, this has diverted my attention completely away from the other focus of my position—mining—for up to a month at a time. I have consequently been unable to weigh in on several mining projects and have missed mining oversight meetings that I would have attended if BLM had not shortened the oil and gas lease sale protest and comment periods.

18. This list includes one mine in which WWP has invested significant organizational resources in opposing and which will set regulatory precedent in its state. In addition, the 10-day 3rd Quarter protest periods coincided with the deadline for comments on the Forest Service's proposed changes to sage-grouse plans in five states. I have developed significant expertise in sage-grouse issues that is specific to each state that would have been valuable to our comments, but the input that I could provide was severely limited because of the 10-day protest periods for these oil and gas lease sales that were happening at the same time.

19.     The diversion of my time from competing projects has lingering impacts because of administrative exhaustion requirements. By failing to submit comments on a mining project, for example, or even failing to raise particular issues in our comments, WWP may forfeit its right to challenge that project in court.

20.     In sum, BLM is not posting lease sale documentation in any one consistent centralized location.  It is increasingly relying on DNAs.  Where BLM does prepare EAs, it is sometimes relying on IM 2018-034 to only allow for public comment at scoping and during the protest period, and not on the draft EA.  All comment and protest periods have been seriously abbreviated under IM 2018-034.  The difficulties associated with providing meaningful input in the extremely short periods is straining the resources of nonprofit groups and individuals. This causes us to work at an exhausting pace and it diverts us from other work that is important to our members and the natural resources they care about.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this August 23, 2018 in Depoe Bay, Oregon.

_____
Kelly Fuller