# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, and CENTER FOR BIOLOGICAL DIVERSITY, | Case No.: 1:18-cv-00187-REB |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| vs. | **(Docket No. 30)** |
| RYAN K. ZINKE, Secretary of Interior; DAVID BERNHARDT, Deputy Secretary of Interior; and UNITED STATES BUREAU OF LAND MANAGEMENT, an agency of the United States, | **and** |
| Defendants, | **PRELIMINARY INJUNCTION** |
| and, | |
| STATE OF WYOMING; WESTERN ENERGY ALLIANCE, | |
| Defendants-Intervenors. | |

Pending before the Court is Plaintiffs' Motion for Preliminary Injunction (Dkt. No. 30). The Court has heard oral argument from counsel and has carefully considered the record. Being fully advised, the Court enters the following Memorandum Decision and Order:

## I. SUMMARY OF DECISION

The Bureau of Land Management ("BLM") is a federal agency that, among other things, handles the leasing of oil and gas rights on certain federal lands. The procedures that BLM follows in doing so changed earlier this year when it put into place an Instruction Memorandum ("IM"), supplying new instructions to the agency's offices about how to handle such leases. This new directive is known as IM 2018-034.

**MEMORANDUM DECISION AND ORDER AND PRELIMINARY INJUNCTION - 1**

Plaintiffs Western Watersheds Project and Center for Biological Diversity (collectively "WWP" or Plaintiffs) contend that IM 2018-034 unlawfully constrains environmental review of, and public participation in, BLM oil and gas lease decisions that affect and threaten sage-grouse populations and habitats across the western United States. WWP asks the Court to stop BLM, through a preliminary injunction, from conducting oil and gas lease sales under the procedures of IM 2018-034 and instead follow the requirements which existed previously – specifically those contained in IM 2010-117 (issued in 2010, during the prior presidential administration) – until the legal challenges to IM 2018-034 can be adjudicated on the merits.

After the Complaint was filed, two parties, the State of Wyoming ("Wyoming") and an oil and gas industry association known as Western Energy Alliance ("WEA"), asked the Court to allow their intervention to participate in the lawsuit, which the Court allowed.

On September 6, 2018, the Court conducted a hearing to consider WWP's request for a preliminary injunction. The Court took under advisement the arguments of the parties, both in the written briefing and the oral argument, and now issues this Memorandum Decision and Order upon the Motion for a Preliminary Injunction. Under the legal standards that apply to preliminary injunctions and the requirements of federal law found in the Federal Land Policy and Management Act ("FLPMA"), the National Environmental Policy Act ("NEPA"), and the Administrative Procedure Act ("APA"), the Court concludes that Plaintiffs have shown a substantial case for success on the merits of their claims and that irreparable harm is likely to result in the absence of an injunction. Further, the Court concludes, after a weighing of the equities and the public interest, that such equities tip in favor of, and the public interest is best served by, granting the Motion. Although this Memorandum Decision and Order reflects that the Court is persuaded on the present record that Plaintiffs have a likelihood of success on the merits, this is *not* a final decision on the merits of the case.

The preliminary injunction requires that, for oil and gas leases scheduled for the fourth quarter of 2018 and thereafter, BLM must (1) re-implement certain provisions contained in IM 2010-117 as to the nature of, and time periods for, public involvement and protest in the oil and gas leasing process; and (2) discontinue the use of conflicting procedures contained in IM 2018-034. In general, the requirement that BLM return to the provisions of IM 2010-117 on these specific matters will allow a fuller opportunity for public involvement and comment in BLM's decision-making processes affecting potential oil and gas leases on federal lands in areas of federally-recognized sage-grouse habitat. Doing so will remedy for present purposes the harm and hardships caused by BLM's curtailment or preclusion of the opportunity for meaningful public participation in the oil and gas leasing process (as implemented in IM 2018-034), which on the present record appears to violate public participation requirements of both FLPMA and NEPA. Further, the requirements of the preliminary injunction will serve the public interest by providing BLM with the benefit of more meaningful public participation in the agency decision-making process. The details of what is required of BLM to comply with the preliminary injunction are found in the body of this Memorandum Decision and Order.

The preliminary injunction does *not* apply to BLM oil and gas lease procedures on federal lands that are not within federally-recognized boundaries encompassing greater sage-grouse habitat management areas (as described and depicted more fully below). Plaintiffs contend that their standing to bring this lawsuit and the alleged injuries they have suffered or will suffer are directly tied to those areas of the federally-owned or federally-managed lands. Further, the preliminary injunction does not apply to oil and gas leases that have been the subject of sales already conducted or that are currently scheduled in the remainder of the third quarter of 2018. For those oil and gas leases, the weighing of the hardships and the public interest does not tip in favor of Plaintiffs, but rather tips in Defendants' favor, and those who have received such

leases or are bidding, or have bid, upon such leases.  Finally, the preliminary injunction does not affect the existing six-month "Parcel Review Timeframe" implemented in IM 2018-034.

## II. <u>BACKGROUND</u>

Broadly speaking, this case challenges what WWP contends are unlawful actions by the Trump Administration, through Federal Defendants, to promote and expedite oil and gas leasing on public lands that, according to WWP, "will adversely impact essential habitats and populations across the range of the greater sage-grouse . . ., and violate bedrock environmental laws including [FLPMA], [NEPA], and the [APA]."  Compl. ¶ 1 (Dkt. 1).  More specifically, WWP alleges that Federal Defendants have issued a series of orders, scientific reports, and directives that cast aside and disregard previously implemented protections for sage-grouse populations.  At the same time, contends WWP, such actions also limit or preclude opportunities for public involvement during the oil and gas leasing process – materializing (as of the time that WWP initiated this case) in eight "final" BLM oil and gas lease sales (three in Montana, one in Utah, and four in Wyoming) that impact sage-grouse habitats.  *See id*. at ¶¶ 1-14, 73-225.

WWP challenges these leasing actions as violating the 2015 Sage-Grouse Plan Amendments to BLM Resource Management Plans, FLPMA, NEPA, and the APA.  *See id*. at ¶¶ 276-307.  WWP additionally challenges two recently-implemented BLM IMs that WWP claims revised BLM oil and gas leasing and development decision process without any public procedures (notice and comment) or environmental review:  (1) IM 2018-026, which overrides the "prioritization" requirement of the 2015 Sage-Grouse Plan Amendments (prioritizing oil and gas leasing outside of identified sage-grouse habitat); and (2) IM 2018-034, which impacts environmental analysis of oil and gas leasing and development decisions, while limiting public notice and involvement in those decisions.  *See id*. at ¶¶ 98-112.  The pending motion for injunctive relief pertains to IM 2018-034 only.

**MEMORANDUM DECISION AND ORDER AND PRELIMINARY INJUNCTION - 4**

Issued on January 31, 2018, IM 2018-034 contains this language as to its claimed purpose:

> **Purpose:** This Instruction Memorandum (IM) sets out the policy of the Bureau of Land Management (BLM) to simplify and streamline the leasing process to alleviate unnecessary impediments and burdens, to expedite the offering of lands for lease, and to ensure quarterly oil and gas lease sales are consistently held in accordance with the Mineral Leasing Act (30 U.S.C. § 226), Executive Order 13783, and Secretary Order 3354.

IM 2018-034, "Purpose" p. 1, attached as Ex. A to Lucas Decl. (Dkt. 30-11). IM 2018-034 "supersedes existing policy" contained in IM 2010-117 and replaces "any conflicting guidance or directive found in the BLM Manual or Handbook." *Id.*

According to WWP, BLM issued IM 2018-034 without any public notice, comment, or environmental review, and directs BLM offices to discard procedures under the previous IM 2010-117 for environmental reviews and limit public involvement in oil and gas leasing decisions. Such action, WWP contends, violates FLPMA, NEPA, and the APA. WWP seeks injunctive relief prohibiting Federal Defendants from implementing certain IM 2018-034's provisions, while reinstating corresponding provisions from IM 2010-117 – in particular:

- Enjoin IM 2018-034, Section III.A – "Parcel Review Timeframes" and reinstate IM 2010-117, Section III.A – "Parcel Review Timeframes";

- Enjoin IM 2018-034, Section III.B.5 – "Public Participation" and reinstate IM 2010-117, Section III.C.7 – "Public Participation";

- Enjoin IM 2018-034, Section III.D – "NEPA Compliance Documentation" and reinstate IM 2010-117, Section III.E – "NEPA Compliance Documentation"; and

- Enjoin IM 2018-034, Section IV.B – "Lease Sale Parcel Protests" and reinstate IM 2010-117, Section III.H – "Lease Sale Parcel Protests."

*See* WWP's Mot. for PI 2 (Dkt. 30).

A comparison of the pertinent language from the two IMs (with supplied emphases) illustrates the different templates they provide for oil and gas leasing:

| **Enjoin IM 2018-034** | **Reinstate IM 2010-117** |
|---|---|
| § III.A – <u>Parcel Review Timeframes</u><br><br>*State/field offices are required, by statute, and implementing regulation, to hold quarterly lease sales, when eligible lands are available for lease.  Lease sales should occur in the last month of each calendar year quarter.*<br><br>*The BLM accepts Expressions of Interest (EOI) in lands for potential leasing through the National Fluids Lease Sale System (NFLSS).  Members of the public submit EOIs electronically to the BLM using NFLSS.  Once submitted, the public can view all EOIs submitted to the BLM.  The EOI submitter can track its EOI status using the EOI-specific tracking number provided by NFLSS.  NFLSS can display the dates when the EOI was submitted to, and accepted by, the BLM, and its status, such as pending review by the state office, field office, or surface management agency.  The BLM also uses the NFLSS to describe lands that the BLM has identified for leasing consideration.  NFLSS provides a link to upcoming lease sales.  The BLM will identify in NFLSS a deadline for receiving EOIs for each upcoming sale.  The deadline will be six months prior to the lease sale month.  This EOI deadline also will be posted on the state office website along with the upcoming lease sale schedule.*<br><br>***The timeframe for parcel review for a specific lease sale is to be no longer than 6 months.***  *This will include adjudicating and creating the preliminary parcel list from all timely received EOIs and the other lands identified for leasing consideration in the NFLSS, recognizing there will be exceptions due to unforeseen circumstances, including delays associated with SMA consent.* | § III.A. – <u>Parcel Review Timeframes</u><br><br>*State offices will continue to hold sales four times per year, as required by the Mineral Leasing Act . . ., when eligible lands are determined by the state office to be available for leasing.  However, state offices will develop a sales schedule* ***with an emphasis on rotating lease parcel review responsibilities among field offices throughout the year to balance the workload and to allow each field office to devote sufficient time and resources to implementing the parcel review policy established in this IM***.  *State offices will extend field office review timeframes, as necessary, to ensure there is adequate time for the field offices to conduct comprehensive parcel reviews.*<br><br>***[No timeframe for parcel review]*** |

| | |
|---|---|
| *BLM will no longer use a rotating schedule for lease sales, as described in IM No. 2010-117.* Each state office will review all lands that are identified in EOIs that were submitted before the EOI cutoff date for a particular quarterly lease sale and will offer all parcels determined to be eligible and available within the state office's jurisdiction | |
| § III.B.5 – <u>Public Participation</u><br><br>State and field offices **may provide for public participation** during the NEPA process as part of the review of parcels identified for potential leasing | § III.C.7 – <u>Public Participation</u><br><br>State and field offices **will provide for public participation** as part of the review of parcels identified for potential leasing through the NEPA compliance documentation process (see section III.E). State and field offices will identify groups and individuals with an interest in local BLM oil and gas leasing, including surface owners of split estate lands where Federal minerals are being considered for leasing. Interested groups, individuals, and potentially affected split estate surface owners will be kept informed of field office leasing and NEPA activities through updated websites and email lists, and will be invited to comment during the NEPA compliance process. |
| § III.D – <u>NEPA Compliance Documentation</u><br><br>The state/field office will determine the appropriate form of NEPA compliance documentation for all lease sale parcels on BLM-managed lands, including parcels for federal subsurface minerals in split estate lands.<br><br>If, through the lease parcel review process, the authorized officer confirms that the proposed leasing action has been adequately analyzed in existing NEPA document(s) and is in conformance with the approved RMP, a Determination of NEPA Adequacy (DNA) will be used to document NEPA compliance for the leasing decision. If the authorized officer deems additional analysis to be necessary, then the BLM can prepare an Environmental Assessment (EA) | § III.E – <u>NEPA Compliance Documentation</u><br><br>The IDPR Team will complete site-specific NEPA compliance documentation for all BLM surface and split estate lease sale parcels. The IDPR Team may include the review of multiple parcels in a single document. Site-specific NEPA compliance documentation must incorporate appropriate information gained through the lease parcel review process described above. **In accordance with this IM, the NEPA compliance documentation for oil and gas leasing must include an opportunity for public review, as described below, and the filed office must verify that all legal requirements have been met (e.g., ESA and NHPA).**<br><br>If, through the lease parcel IDPR Team review process, the authorizing official confirms that the proposed leasing action is adequately analyzed in an existing NEPA document, such that prepared during |

or Environmental Impact Statement (EIS), as appropriate.

**If the BLM concludes that a DNA will adequately document that existing NEPA analysis is sufficient to support the proposed action and the action is consistent with the RMP, no further public comment period is required for the DNA.**

The State Director or the officer with delegated decision-making authority will use the information provided by the field office authorized officer to determine which parcels to include on an upcoming lease sale.

the MLP process, and is in conformance with the approved RMP, a Determination of NEPA Adequacy (DNA) may be used to document NEPA compliance for the leasing decision . . . . **Although not required by law or regulation, field offices will provide a 30-day public review and comment period for the DNA. After consideration of any public comments received on the document, the field office will either finalize the DNA or initiate other appropriate NEPA compliance review.** It is expected that the DNA process will only be appropriate in cases where the existing NEPA documentation has adequately incorporated the most current program-specific guidance. If a DNA is not appropriate, then the field office will determine the appropriate NEPA compliance documentation (e.g., environmental assessment (EA) or environmental impact statement (EIS)) to be prepared.

Most parcels that the field office determines should be available for lease will require site-specific NEPA analysis. This analysis will typically take the form of an EA, which would be tiered, as appropriate, to the RMP/EIS or a MLP/EA or EIS, if one has been completed for any of the parcels. Scoping for these EAs is optional; however, the interdisciplinary review of lease sale parcels will provide input on the issues, impacts, and potential alternatives to be addressed in the EA. The EA will analyze a no action alternative (no leasing), a proposed leasing action (leasing the parcel(s) in conformance with the land use plan), and any alternatives to the proposed action that may address unresolved resource conflicts. In cases where the field office determines that the necessary terms and conditions under which leasing would be appropriate are not in conformance with the RMP, it will be necessary to amend the RMP before leasing is appropriate. If it is necessary to amend the RMP, the leasing EA (or EIS) must either meet the standards for NEPA documentation to support a plan amendment . . ., or the affected lease parcels must be withdrawn or deferred from leasing until a plan amendment or revision can be completed at a later date.

**Although not required by law or regulation, field offices will provide a 30-day public review and**

| | |
|---|---|
| | *comment period for the EA and unsigned Finding of No Significant Impact (FONSI) of oil and gas leasing before forwarding the leasing recommendation to the State Director* . . . .  *Note: Plan amendments are subject to additional public involvement and protest requirements . . . .  The field office will finalize the EA and FONSI considering any public comment received on those documents.  If a FONSI is not warranted, the field office may recommend that the parcel be withheld from leasing or that an EIS be prepared to address the site-specific issues in compliance with NEPA* |
| § IV.B – <u>Lease Sale Parcel Protests</u><br><br>***A 10-day public protest period will begin the day the sale notice is posted, along with applicable NEPA documentation.***  *State offices should attempt to resolve protests in a signed decision before the sale of the protested parcels.  Parcels subject to protests that are not resolved (i.e., pending protests) will be offered for lease sale.  A decision to deny or dismiss a protest will advise the protesting parties of their right to appeal to the Interior Board of Land Appeals (IBLA) and will state that an appeal will not automatically halt the auction process.*<br><br>*The number of parcels protested and the status of the protests (i.e., protests dismissed, denied, upheld, or pending) must be publicly posted the day before the sale starts on the BLM state office website and the internet auction website so that bidders understand the protest status of each parcel.  Protests upheld should be posted on the state office website and the NFLSS, using normal processes with amendments/notices to withdraw the parcel, no later than the day before the sale starts, and if applicable, on the online leasing website for the sale no later than the day before the sale starts.*<br><br>***[Public notice of the sale is to be given 45 days prior to the sale § IV.A]*** | § III.H – <u>Lease Sale Parcel Protests</u><br><br>***A 30-day protest period will begin the day the sale notice is posted, as it has in the past.  The earlier posting of the sale notice will provide the state and field offices with at least 60 days to review protests before the oil and gas lease sale.***  *The process outlined in this IM – which includes site-specific parcel analysis and increased public participation – will help identify, address, and resolve most issues before the lease sale.  When possible, state offices should attempt to resolve protests before the sale of the protested parcels.  Protests that are not resolved do not prevent bidding on protested parcels at the auction.  Protest decisions should advise the protesting parties of their right to appeal denied protests to the Interior Board of Land Appeals (IBLA), but that appeals will not automatically halt the auction or issuance of leases.*<br><br>***[Public notice of the sale is to be given 90 days prior to the sale § III.G]*** |

*Compare* IM 2018-034, *with* IM 2010-117, attached as Ex. B to Lucas Decl. (Dkt. 30-12)

(emphasis added) (internal citations omitted); *see also, e.g.*, Compl. at ¶¶ 105-112.

## III. <u>LEGAL STANDARDS</u>

### A. Administrative Procedure Act ("APA")

"Challenges to final agency actions are reviewed under the deferential standard of the

[APA]." *Greater Yellowstone Coal. v. Larson*, 641 F. Supp. 2d 1120, 1129 (D. Idaho 2009).

Agency compliance with NEPA and FLPMA is reviewed under the APA. *See Ctr. for*

*Biological Diversity v. U.S. Dep't of Interior*, 581 F.3d 1063, 1070 (9th Cir. 2009).

Under the APA, the reviewing court must set aside the agency's decision if it is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, . . . in

excess of statutory jurisdiction, . . . [or] without observance of procedure required by law." 5

U.S.C. § 706(2)(A), (C), (D). Such a review is "deferential and narrow, establishing a high

threshold for setting aside agency action." *River Runners for Wilderness v. Martin*, 593 F.3d

1064, 1067 (9th Cir. 2010). A court must not substitute its judgment for that of the agency.

Neither should a court just "rubber-stamp" administrative decisions. *Ariz. Cattle Growers' Ass'n*

*v. U.S. Fish and Wildlife Servs.*, 273 F.3d 1229, 1236 (9th Cir. 2001). Instead, the court must

presume the agency action to be valid and uphold it if a reasonable basis exists for the action.

*See Nw. Ecosystem All. v. U.S. Fish and Wildlife Servs.*, 475 F.3d 1136, 1140 (9th Cir. 2007).

Nevertheless, where an agency "entirely failed to consider an important aspect of the

problem," the decision is arbitrary and capricious and must be set aside. *Motor Vehicle Mfrs.*

*Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

### B. Preliminary Injunction

Within the frame of Rule 65, a preliminary injunction requires that a party establish (1) a

likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of

preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest.  *See Winter v. Natural Res. Def. Council*, 555 U.S. 7, 201 (2008).

As to a likelihood of success on the merits, that factor has been measured in various ways, including "reasonable probability," "fair prospect," "substantial case on the merits," and "serious legal questions . . . raised."  *See Lair v. Bullock*, 697 F.3d 1200, 1204 (9th Cir. 2012).  Such formulations "are largely interchangeable," but require "'at a minimum'" that a petitioner must show that there is a "'substantial case for relief on the merits.'"  *Id*. (quoting *Leiva-Perez v. Holder*, 640 F.3d 962, 968 (9th Cir. 2011)).  "The standard does not require [a plaintiff] to show that 'it is more likely than not that [it] will win on the merits.'"  *Id*. (quoting *Leiva-Perez*, 640 F.3d at 966); *but see All. for the Wild Rockies v. Farnsworth*, 2017 WL 1591840, *3 (D. Idaho 2017) ("'[S]erious questions going to the merits' *requires more than showing that 'success is more likely than not' . . . .*") (emphasis added).  "[S]erious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted).[1]

Ordinarily, a preliminary injunction maintains the status quo pending a final decision on the merits.  *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see also Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004) (noting that courts issue injunctive orders to maintain status quo, not "to enjoin all possible breaches of the law.").  "While courts are given considerable discretion in deciding whether a preliminary injunction should enter, injunctive

---

[1] There is an arguably uncertain interplay between *Cottrell's* "sliding scale" approach and the *Winter* factors.  However, even if certain *Winter* factors, in the exercise of a trial court's discretion, may serve to overcome less obvious (or perhaps inapplicable) factors under *Cottrell*, a preliminary injunction cannot issue without a threshold showing of a substantial claim to relief.

relief is not obtained as a matter of right and is considered to be an extraordinary remedy that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Idaho Rivers United v. Probert*, 2016 WL 2757690, *6 (D. Idaho 2016). Still, because "haste . . . is often necessary" in deciding whether to grant a preliminary injunction, such relief "is customarily granted [or denied] on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Camenisch*, 451 U.S. at 395. Accordingly, findings of fact and conclusions of law issued at the preliminary injunction phase generally are not binding at later stages in the proceeding. *See Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 631 n.5 (9th Cir. 2016).

## IV. DISCUSSION

### A. Federal Defendants' Opposition

Part and parcel with their overall critique of WWP's likelihood of success on the merits of their underlying claims, Federal Defendants argue that the Court lacks the authority to issue a preliminary injunction in the first instance when (1) WWP has failed to adequately demonstrate standing; (2) WWP's Motion fails to challenge final agency action and therefore is not reviewable under the APA; and (3) WWP's Motion is not ripe for review. *See* Fed. Defs.' Opp. to Mot. for PI 13-24 (Dkt. 52). The Court is not persuaded by these arguments.

#### 1. WWP Has Standing

Article III of the United States Constitution limits judicial power to deciding cases and controversies. This limitation, known as the standing doctrine, requires that a plaintiff have a "personal stake in the outcome of the controversy . . . to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 442 U.S. 490, 490-99 (1975). A plaintiff must establish that "he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural and hypothetical; it must be fairly traceable to the

challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury."  *Jayne v. Sherman*, 706 F.3d 994, 999 (9th Cir. 2013).

Relying on *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009), Federal Defendants argue that WWP lacks standing for failure "to demonstrate that the IM [2018-034] itself causes concrete harm to their interests in the environment."  Fed. Defs.' Opp. to Mot. for PI 14.  In *Summers*, a group of environmental organizations sought a nationwide injunction against the enforcement of Forest Service regulations that exempted small-scale fire-control and timber-salvage projects from the notice, comment, and appeal process that applied to more substantial land management decisions.  *Summers*, 555 U.S. at 490.  The plaintiffs specifically challenged a 238-acre salvage sale of timber, called the Burnt Ridge Project, in the Sequoia National Forest.  *See id*. at 491.  In mid-litigation, the parties settled their dispute over the Burnt Ridge Project.  *See id*.  After the settlement was in place, the district court proceeded to invalidate five regulations and grant a nationwide injunction enjoining their enforcement.  *See id*. at 492.  The Ninth Circuit affirmed.  *See id*.

Reversing, the Supreme Court rejected the plaintiffs' claimed procedural injury – namely, that they had been denied the ability to file comments on some Forest Service actions and will continue to be so denied.  *See id*. at 496.  Pointing to the fact that the Burnt Ridge Project had already been resolved, Justice Scalia undercut the plaintiffs' argument, reasoning:

> We know of no precedent for the proposition that when a plaintiff has sued to challenge the lawfulness of certain action or threatened action but has settled that suit, he retains standing to challenge the basis for that action (here, the regulation in the abstract), apart from any concrete application that threatens imminent harm to his interests.  Such a holding would fly in the face of Article III's injury-in-fact requirement.
>
> Respondents have identified no other application of the invalidated regulations that threatens imminent and concrete harm to the interests of their members.

. . . .

But deprivation of a procedural right without some concrete interest that is affected by the deprivation – a procedural right *in vacuo* – is insufficient to create Article III standing. Only a person who has been accorded a procedural right to protect *his concrete interests* can assert that right without meeting all the normal standards for redressibility and immediacy. Respondents alleged such injury in their challenge to the Burnt Ridge Project, claiming that but for the allegedly unlawful abridged procedures they would have been able to oppose the project that threatened to impinge on their concrete plans to observe nature in that specific area. But Burnt Ridge is now off the table.

*Id*. at 494-97 (emphasis in original) (internal quotation marks and citation omitted). Federal Defendants submit that this same rationale applies equally to WWP's claims here. *See* Fed. Defs.' Opp. to Mot. for PI 14 ("Thus, to the extent that Plaintiffs are asserting procedural harms, *i.e.*, truncated public involvement – without also challenging actions to which those procedures apply, they lack standing to do so under *Summers*.").

WWP *has* identified several specific applications of IM 2018-034 in the 2018 lease sales across the sage-grouse range – each one allegedly threatening lands that various staff and members of WWP use and enjoy. *See, e.g.*, Compl. at ¶¶ 130-225 (identifying current leases that "threaten sage-grouse habitats and populations"). In other words, unlike the already-settled Burnt-Ridge Project that evaporated the plaintiffs' procedural claims in *Summers*, there is no equivalent circumstance here. *Summers* is therefore distinguishable from this case.

Regardless, though reversing the Ninth Circuit and ruling that the plaintiffs lacked standing, *Summers* nonetheless confirmed the rule that environmental organization plaintiffs can assert the standing of their members. *See Summers*, 555 U.S. at 494 ("While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice."). On that score, the effort by the plaintiffs in *Summers* to meet that measure of standing fell short. The plaintiffs filed an affidavit from Jim Bensman – a member of one of the plaintiff organizations – that purported to relate a threatened interest *beyond* the Burnt Ridge Project. *See id*. at 495. The

Court held that Bensman's representation of general plans to visit "several unnamed National Forests in the future" was insufficient to establish standing because Bensman "fail[ed] to allege that *any* particular timber sale or other project claimed to be unlawfully subject to the regulations will impede a specific and concrete plan of Bensman's to enjoy the National Forests." *Id*. (emphasis in original). The Court emphasized that although he referred to a series of projects, Bensman did not "assert . . . any firm intention to visit their locations, saying only that [he] 'wants to' go there . . . . Such 'some day' intentions – without any description of concrete plans, or indeed any specification of *when* the some day will be – do not support a finding of . . . 'actual or imminent' injury . . . ." *Id*. at 496 (emphasis in original) (internal quotation marks and citations omitted). Thus, the Court concluded that there was "a chance, but . . . hardly a likelihood, that Bensman's wanderings w[ould] bring him to a parcel about to be affected by a project unlawfully subject to the regulations." *Id* at 495.

In contrast, here, WWP's supporting declarations establish that its members frequently and extensively utilize the areas where oil and gas leases overlap with sage-grouse habitats and populations. For example:

- "[T]he Wyoming September 2018 lease sale contains parcels within the Thunder Basin National Grassland, an area that I have visited repeatedly and for which I have advocated strong conservation protections since 2001. I have viewed sage-grouse in this area, camped and hiked in this area, and engaged in photography of this area." Molvar Decl. ¶ 47 (Dkt. 30-3).

- "The Wyoming December 2018 lease sale contains parcels in Kinney Rim and Adobe Town that are not only priceless due to their outstanding archaeological, scenic, and paleontological values, but also for the excellent sagebrush steppe habitat they provide for sage-grouse. . . . I have extensively explored these areas both as part of my professional efforts to advocate for their protection and for personal recreation over the past two decades or more." *Id*. at ¶ 49.

- "The June 2018 Nevada lease sale on the Battle Mountain District also includes parcels I have visited in my yearly sage-grouse viewing trips in March, which provide important sage-grouse habitat. I frequently travel to Nevada, including to Monitor Valley, where oil and gas leasing is proposed. I have viewed and

photographed sage-grouse on a lek (sage-grouse mating ground) in Monitor Valley that is adjacent to one of the lease parcels in years past, and plan to return there in 2019 and other future dates in hopes of viewing this iconic species." *Id*. at ¶ 50.

- "On several occasions, I have visited the area where the Normally Pressured Lance (NPL) oil and gas development is proposed . . . . During these visits, I have engaged in wildlife viewing – particularly pronghorn and golden eagles, looked for sage-grouse, and enjoyed the unspoiled scenic vistas and undisturbed sage-grouse habitats in these areas. Major portions of the NPL project area are Priority Habitat Management Areas designated under the Wyoming Greater Sage-Grouse RMP Amendments, and/or winter concentration areas important for the entire sage-grouse population in the Upper Green River Valley." *Id*. at ¶ 51.

- "I have a long history of recreational experience traveling to and inventorying lands on Nevada BLM's Tonopah and Shoshone-Eureka Field Offices, including extensive experiences viewing sage-grouse in the Little Fish Lake and Monitor Valleys where oil and gas leasing will occur as part of the June 2018 lease sale." Cunningham Decl. ¶ 12 (Dkt. 30-5).

- "I have in the past enjoyed hiking, birdwatching, wildlife-viewing, photography, field-sketching, and camping in several of the areas where June oil and gas lease sales are occurring, including: Monitor Valley, Little Fish Lake Valley, Hot Creek Valley, and Big Sand Springs Valley." *Id*. at ¶ 13.

- "I have been visiting the Monitor Valley every summer since 2006, and I plan to return this summer and in the future as often as I can during vacations. Seeing oil rigs in the vista would negatively impact my ability to escape artificial human developments and seek solitude, quiet, and natural wild landscapes. I have walked around Monitor Valley in the areas of oil and gas leases 006, 002, 011, and 014 to botanize, photograph scenic landscapes, and birdwatch on the valley floor. I plan to return to the Monitor Valley to explore new trailheads in the Monitor Range, and look for sage-grouse, in August 2018." *Id*. at ¶ 14.

- "I have camped in Little Fish Lake Valley in the green Monster trailhead that accesses the Table Mountain Wilderness Area in the Monitor Range, as well as at clear Creek trailhead, which accesses an impressive gorge on the east side of the Monitor Range overlooking Little Fish Lake Valley. This is in the vicinity of oil and gas leases 019 and 025, which I have traveled through to access hiking points and photographic vistas. Oil and gas drilling here would ruin the feel of wild, remote Nevada that I am seeking. I plan to go back here to camp and hike in July 2018." *Id*. at ¶ 15.

- "For recreational purposes I have hiked into the Hot Creek Range, camping in the mountains from an access road at South Sixmile Canyon by Morey Peak, driving through the Hot Creek Valley from Highway 6 at Tybo junction. This

lies in numerous proposed oil and gas leases in Hot Creek Valley, and would impact my experience of camping and hiking in a remote area." *Id*. at ¶ 16.

- "I have toured the Hot Creek Canyon road that enters at Hot Creek Ranch in the vicinity of oil and gas leases 049, 045, and 048. This is a very scenic canyon with stream, meadows, cliffs, and rock formations. I have undertaken wildlife viewing here of desert bighorn sheep, viewing wild horses, landscape photography, botanizing, birdwatching, hiking, and camping. Oil and gas drilling at the mouth of this canyon would negatively affect my ability to escape the signs of industrial developments." *Id*. at ¶ 17.

- "I have hiked and camped at Lunar Crater Volcanic Field, which is south of the Big Sands Springs lease area, but in view of the lease area. I have visited this area several times since 1992. There is also a BLM-signed interpretive area . . . that shows a relatively recent basalt volcanic flow in Big Sand Spring Valley that could be in lease areas 134 and 128. This area has a very remote and wild feel, and I come here to get away from urban developments and experience the spiritual renewal that wild central Nevada landscapes can provide. Oil and gas developments would destroy this feel." *Id*. at ¶ 19.

- "I have visited many of the parcels offered in the Nevada June oil and gas lease sales during personal and professional trips and am gravely concerned about the impacts the sale and development of those parcels will have on the environment." Emmerich Decl. ¶ 26 (Dkt. 30-7).

- "I have hiked and camped in the vicinity of the following leases: 008, 009, 011, 006, 002, 014, 010, and 008 – Monitor Range and Monitor Valley. I have personally seen Greater sage-grouse in this part of Monitor Valley. . . . . I have plans to visit Monitor Valley several times in the future. The development of these oil and gas leases will impact my visitor experience to Monitor Valley in the following ways . . . ." *Id*. at ¶ 27.

- "I have hiked and camped in the vicinity of the following leases: 053, 056, 058, 021, 022, 027, 025, 052, 050, and 019 – Little Fish Lake Valley. I have seen Greater sage-grouse here. . . . I have plans to visit Little Fish Lake Valley again in the future. The development of these oil and gas leases will impact my visitor experience to Little Fish Lake Valley in the following ways . . . ." *Id*. at ¶ 28.

- "I have hiked and camped in the vicinity of the following leases: 100, 111, 105, 097, 099, 049, 045, and 046 – the Hot Creek Range and Hot Creek Valley. . . . I have seen a Greater sage-grouse in this region. . . . I have plans to visit the Hot Creek Range and Hot Creek Valley in the future. The development of these oil and gas leases will impact my future visitor experience . . . ." *Id*. at ¶ 29.

- "I have hiked and camped in the vicinity of the following leases: 134, 138, 142, 136, and 101. The development of these oil and gas leases will impact my future visitor experience in the following ways . . . ." *Id*. at ¶ 30.

- "For educational, professional, and recreational purposes, I have camped, hiked, and viewed sage-grouse in Nevada's Monitor Valley, where, under the procedures established by IM 2018-034, oil and gas leases within greater sage-grouse Priority Habitat Management Areas were sold as part of BLM's June 2018 Nevada oil and gas lease sale." Saul Supp. Decl. ¶ 12 (Dkt. 63-2).

- "On May 15-16, 2018, I camped in the Monitor Valley on Mosquito Creek, and had the opportunity to view and photograph over ten greater sage-grouse exhibiting dancing behavior on a lek in the Monitor Valley north of Mosquito Creek. The Monitor Valley and Monitor Range provide extraordinary opportunities for solitude, natural beauty, and viewing of greater sage-grouse and pronghorn, and I intend to return again in the spring of 2019 to camp, hike, and attempt to observe greater sage-grouse." *Id.* at ¶¶ 13-14 (attaching photo).

- "The Monitor Valley is currently undisturbed by oil and gas exploration or development. Potential oil and gas exploration, development, and/or infrastructure authorized by BLM leasing activity will adversely affect the recreational and aesthetic qualities of the area, and has the potential to limit opportunities for continued greater sage-grouse viewing on the (currently-undisturbed) leks in the Valley." *Id.* at ¶ 16.

These individuals assert that past and future oil and gas leasing decisions, driven in-part by IM 2018-034's alleged accelerated timelines and detours around public participation, will cause aesthetic, recreational, scientific, and spiritual injury across the sage-grouse range. Such statements support organizational standing. *See Cottonwood Envtl. L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1081 (9th Cir. 2015) ("Unlike Bensman's affidavit in *Summers*, these declarations sufficiently establish "a geographic nexus between the individual asserting the claim and the location suffering an environmental impact.").

Finally, independent of injuries related to the issuance of leases and the eventual development of oil and gas leases themselves, WWP members also provide in-depth accounts of how simply attempting to "comply" with IM 2018-034 over the past year has resulted in separate, tangible, procedural injuries. They describe having to devote more of otherwise limited personal and organizational resources in response to the abbreviated comment and protest periods. *See, e.g.*, Fuller Decl. ¶¶ 37-52 (Dkt. 30-4); Fuller Supp. Decl. ¶¶ 17-19 (Dkt. 63-1);

Saul Decl. ¶¶ 21-46 (Dkt. 30-2); Saul Supp. Decl. at ¶ 11; *see also infra*. Even if *Summers* could be read to say that standing in procedural injury cases presupposes an implementing project as representing the necessary "concrete harm," the Ninth Circuit has since concluded otherwise. *See Cottonwood*, 789 F.3d at 1081 ("This is not the first time we have held that a plaintiff has *standing to challenge programmatic management direction without also challenging an implementing project that will cause discrete injury*. . . . '[A] procedural injury is complete after [the action] has been adopted, so long as [ ] it is fairly traceable to some action that will affect the plaintiff's interests.' . . . . *Cottonwood was not required to challenge directly any specific project because . . . the 'procedural injury [was] complete.*'") (citing and quoting *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1179 (9ᵗʰ Cir. 2011); *Jayne*, 706 F.3d at 999-1000)) (emphasis added); *see also Cottonwood*, 789 F.3d at 1081, n.7 ("Here, Cottonwood does not allege the 'deprivation of a procedural right without some concrete interest that is affected by the deprivation . . .,' but rather 'a procedural requirement the disregard of which could impair a separate concrete interest of theirs.'") (quoting *Summers*, 555 U.S. at 496; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 (1992)). In short, WWP has demonstrated harm in this separate respect as well.

With all this in mind, the Court is persuaded that there is a sufficient basis for standing as presented in the current record.

### 2. IM 2018-034 is a Final Agency Action

The APA permits judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. "'[A]gency action' includes the whole or a part of an agency rule, order, license, sanction, relief or the equivalent or denial thereof, or failure to act[.]" 5 U.S.C. § 551(13). Such a list is "meant to cover comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457,

478 (2001). Agency action is "final" when two conditions are met: (1) "the action must mark the consummation of the agency's decision-making process – it must not be of a merely tentative or interlocutory nature"; and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks and citation omitted).

In measuring the finality of an action, the "agency's characterization of its action as being provisional or advisory is not necessarily dispositive"; instead, "courts consider whether the practical effects of an agency's decision make it a final agency action, regardless of how it is labeled." *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1094-95 (9th Cir. 2014) "[E]ven if the agency does not label its decision or action as final, it may be reviewable [under the APA] if it 'has the status of law or comparable legal force' or if 'immediate compliance with its terms is expected.'" *Id.* (quoting *Or. Natural Desert Ass'n*, 465 F.3d 977, 987 (9th Cir. 2006)). Therefore, the court must "focus on both the 'practical and legal effects of the agency action,' and define the finality requirement 'in a pragmatic and flexible manner.'" *Havasupai Tribe v. Provencio*, 876 F.3d 1242, 1250 (9th Cir. 2017) (quoting *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d at 982).

Federal Defendants argue that IM 2018-034 is not a final agency action because it does not meet either of the two prongs of the above-referenced *Bennett* test. *See* Fed. Defs.' Opp. to Mot. for PI 17. The Court disagrees.

       *a.*      *IM 2018-034 Was the Consummation of BLM's Decision-Making Process*

Stating that IM 2018-034 "merely establishes guidelines that BLM will follow in reviewing parcels for potential leasing," Federal Defendants argue that it ultimately "leaves considerable discretion to BLM state and field offices as to precisely what procedures to follow." Fed. Defs.' Opp. to Mot. for PI 18. But this position contradicts the actual language used within

IM 2018-034 which is more edict in nature than "merely tentative or interlocutory…." For

example, IM 2018-034:

- "sets out the policy of the Bureau of Land Management (BLM) to simplify and streamline the leasing process to alleviate unnecessary impediments and burdens, to expedite the offering of lands for lease, and to ensure quarterly oil and gas lease sales are consistently held in accordance with the Mineral Leasing Act (30 U.S.C. § 226), Executive Order 13783, and Secretary Order 3354." IM 2018-034, "Purpose" p. 1; *see also id*. at "Background" p. 4 (same).

- "supersedes existing policy announced in IM No. 2010-117, *Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews*, issued on May 17, 2010, and replaces any conflicting guidance or directive found in the BLM Manual or Handbook." *Id*. at "Purpose" p. 1.

- "applies to the leasing of Federal minerals under Bureau of Land Management (BLM) administered surface, state-owned surface, and private surface estates." *Id*. at "Policy/Action" p. 1.

- "will be implemented across the BLM as described." *Id*. at p.1, n.1.

- "(1) addresses land use planning, lease parcel review, lease sales and lease issuance, and IM implementation; and (2) directs the BLM to incorporate the revised policy, as appropriate, into affected BLM handbooks and manuals." *Id*.

- provides that "[t]he timeframe for parcel review for a specific lease sale is to be no longer than 6 months[,]" to "include adjudicating and creating the preliminary parcel list from all timely received EOIs and the other lands identified for leasing consideration in the NFLSS" except in unforeseen circumstances. *Id*. at § III.A p. 2.

- provides that, "[i]f, through the lease parcel review process, the authorized officer confirms that the proposed leasing action has been adequately analyzed in existing NEPA document(s) and is in conformance with the approved RMP, a Determination of NEPA Adequacy (DNA) will be used to document NEPA compliance for the leasing decision." *Id*.

- provides that, "[i]f the BLM concludes that a DNA will adequately document that existing NEPA analysis is sufficient to support the proposed action and the action is consistent with the RMP, no further public comment period is required for the DNA." *Id*.

- establishes "[a] 10-day public protest period [that] will begin the day the sale notice is posted, along with applicable NEPA documentation" and "[p]arcels

subject to protests that are not resolved (i.e., pending protests) will be offered for lease sale." *Id*. at § IV.B. p. 3

- "is effective immediately in order to achieve full compliance with the parcel review 6-month timeframe" and "will guide leasing procedures for all current and future parcels under review by the field offices as of the date of this IM." *Id*. at "Implementation Timeframe" p. 4.

In these provisions, IM 2018-034 goes beyond a general statement of policy; rather, it implements a required template for BLM's oil and gas leasing process in language that can only be understood as "finally determinative of the issues or rights to which it is addressed." *Pacific Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 48 (D.C. Cir. 1974); *see also infra*. At the same time, IM 2018-034 contains other provisions that allow the state and field offices to choose whether or how to perform certain tasks. *See, e.g.*, IM 2018-034, § III.B.1-5 pp. 2-3 ("Field offices have the discretion to form an Interdisciplinary Parcel Review (IDPR) Team of resource specialists to review lease sale parcels . . . . Lease sale parcel review may including the following steps . . . . .");[2] *see also id*. at § III.D ("The state/field office will determine the appropriate form of NEPA compliance documentation for all lease sale parcels on BLM-managed lands . . . ."). But those areas of choice operate only within the confines of the otherwise required procedures found elsewhere (as described above) in IM 2018-034.

It can be said that IM 2018-034 is a patchwork of both policy and rule. *See* 5 U.S.C. § 551(4) (defining "rule" as "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy"). But

---

[2] Germane here, IM 2018-034 goes on to describe certain of the "following steps" in more compulsory terms. *See, e.g.* IM 2018-034, § III.B.1 ("State/field offices *will gather and evaluate* existing environmental resource information and compile documentation of compliance with applicable laws, regulations, and executive orders . . . .) (emphasis added); *id*. at § III.B.2 ("State/field offices *will determine* whether leasing the parcel is in conformance with the RMP.") (emphasis added). While somewhat incongruous against the arguments put forward by the Government Defendants, these details are not dispositive on the question of whether IM 2018-034 is a final agency action.

the placement of a rule in tandem with a policy, or a policy in tandem with a rule, does not hide the rule or insulate the rule from judicial review.

Moreover, IM 2018-034 unequivocally replaces IM 2010-117 and was "effective immediately" (as of January 31, 2018) "across the BLM." *See supra*. Such definiteness lets the air out of any argument that IM 2018-034 operates only as provisional guidance. *See, e.g.*, *Chiang v. Kempthorne*, 503 F. Supp. 2d 343, 350 (D.D.C. 2007) (statement within "Guidelines" that "guidance [is] effective immediately" demonstrates that "there is nothing 'tentative' or 'interlocutory' about the Guidelines; rather they 'mark the consummation of the agency's decision-making process.'") (quoting *Bennett*, 520 U.S. at 178) (quotation marks and citation omitted). To be sure, since it was implemented in early 2018 BLM has utilized IM 2018-034 to prepare for and conduct competitive oil and gas lease sales, including the third and fourth quarter sales under consideration here. *See* Wells Decl. ¶¶ 2-3 (Dkt. 52-1); *see also* Fuller Supp. Decl. ¶¶ 8-11 (Dkt 63-1) (discussing recent difficulty in participating in comment/protest periods because of IM 2018-034's implementation); Saul Supp. Decl. ¶¶ 7-9 (same).

Together, these considerations support the conclusion that IM 2018-034 was the consummation of BLM's decision-making process – the first *Bennett* final agency action prong.

    b.    *IM 2018-034 Determines Rights/Obligations and Has Legal Consequences*

Federal Defendants argue that IM 2018-034 does not determine rights or obligations nor does it have legal consequences because it is only "a general statement of policy," infused with discretion throughout. Fed. Defs.' Opp. to Mot. for PI 18-19 ("IM 2018-034 does not create new binding substantive requirements and it gives BLM officials ample discretion in conducting the leasing process – in fact, it gives BLM more discretion than the previous guidance in IM 2010-117."). But this self-serving position largely ignores the definitive pronouncements contained

within IM 2018-034 that more accurately frame the scene. Those directive provisions make clear that IM 2018-034 is markedly different than IM 2010-117, and illustrate that IM 2018-034 expressly changes how BLM conducts its oil and gas leasing. *See supra*. Where there once was no deadline for BLM review of nominated lease parcels, IM 2018-034 now imposes a 6-month review period; where public participation in the NEPA review process was absolutely permitted, IM 2018-034 now leaves whether to have any public participation to BLM's discretion; where there was a 30-day public review and comment period for every lease sale, IM 2018-034 now eliminates that requirement; and, where there had been a 30-day protest period, IM 2018-034 now imposes a 10-day deadline for public protests of proposed lease sales, including sales as to which no specific prior public participation had been allowed. *Compare* IM 2010-117 §§ III.A, III.C.7, III.E, IV.B, *with* IM 2018-034 §§ III.A, III.B.5, III.D, III.H.

Even if some strands of discretion are involved in the layers of these provisions, they collectively prescribe and require an unmistakably different regulatory framework in which BLM now handles its oil and gas lease parcel reviews and leasing decisions and, likewise, in which WWP is (or, WWP contends, is not) able to participate in the same. As such, IM 2018-034 has practical effects on both BLM *and* WWP's rights and obligations in a manner different than IM 2010-117. *See, e.g.*, *W. Energy All. v. Salazar*, 2011 WL 3738240, *6-7 (D. Wyo. 2011) (finding *Bennett's* final agency action test satisfied, in part, where "Federal Respondents adopted a final, binding and substantive change to, (indeed 180 degree reversal of), its past practices concerning Section 390 CXs" and "the 2010 Instruction was a complete 'about-face' by the Federal Respondents compared to their past practices" while also "bind[ing] the Federal Respondents.").[3]

---

[3] Federal Defendants argue that *Western Energy Alliance* is inapplicable because IM 2018-034 "does not establish binding norms and instead leaves to BLM's discretion what

Additionally, legal consequences necessarily flow from the changes included within IM 2018-034 – namely, the shortened protest deadline (from 30 to 10 days). As described by WWP in its briefing, if interested parties "do not comply with this highly-abbreviated time-frame, they risk losing the ability to challenge a lease sale later, either through administrative appeal or in federal court." WWP's Reply ISO Mot. for PI 6 (Dkt. 63). The result of an untimely protest may be the same under either IM, but the fact that the IM 2018-034 deadline is only one-third as long as previously prescribed (and a ten day period which includes non-business days) greatly increases the peril of a member of the public missing the deadline, or being unable to finish the work upon a protest within the time period allowed. This risk is compounded by the overlapping comment and protest periods, combined with accelerated oil and gas lease parcel reviews generally, all of which are left in the wake of IM 2018-034. *See, e.g.*, Ex. 1 to Stellberg Decl. (illustrative table setting forth schedules for September 2018 and December 2018 oil and gas lease sales in BLM's western states, including public comment opportunities and protest deadlines). Plus, the burden of such constraints upon public participation and compressed protest periods falls most heavily upon members of the public, as those who have nominated potential lease parcels and BLM have had far more time to evaluate and consider the details of such parcels. Hence, there are cognizable and significant legal consequences that can be argued to result from IM 2018-034.

IM 2018-034 impacts the parties' rights and obligations while also contributing to a different milieu of legal consequences. Therefore, the Court is satisfied that *Bennett's* second final agency action prong is also met. Set against that backdrop, IM 2018-034 is a final agency

procedures to follow at various steps in the review process." Fed. Defs.' Opp. to Mot. for PI 19, n.5. But the fact of BLM's discretion now under IM 2018-034, in contrast to its lack of discretion under IM 2010-117, suggests that IM 2018-034 is a "final, binding, and substantive change to" IM 2010-117 – precisely what *Western Energy Alliance* contemplated.

action.  *See Indus. Customers of Nw. Utilities v. Bonneville Power Admin.*, 408 F.3d 638, 646

(9th Cir. 2005) ("In applying these principles, we have determined that certain factors provide an

indicia of finality, such as 'whether the [action] amounts to a definitive statement of the agency's

position, whether the [action] has a direct and immediate effect on the day-to-day operations of

the party seeking review, and whether immediate compliance [with the terms] is expected.'")

(quoting *Cal. Dep't of Water Res. v. FERC*, 341 F.3d 906, 909 (9th Cir. 2003)).

       3.    <u>WWP's Request for Injunctive Relief is Ripe</u>

      Ripeness is a justiciability doctrine designed "to prevent the courts, through avoidance of

premature adjudication, from entangling themselves in abstract disagreements over

administrative policies, and also to protect the agencies from judicial interference until an

administrative decision has been formalized and its effects felt in a concrete way by the

challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967).  According to

Federal Defendants, WWP's Motion is not ripe because WWP seeks "an injunction setting the

procedures that BLM must follow for lease sales that have not yet been authorized and before

knowing what parcels will even be offered for lease."  Fed. Defs.' Opp. to Mot. for PI, p. 21; *see

also id*. at 23 ("When oil and gas lease sales take place and assuming that leases are issued,

Plaintiffs will then be able to challenge actual leasing decisions and leases and, if necessary, seek

preliminary injunctive relief well in advance of any permitting decision that would allow the

development of oil and gas leases.").  This argument mirrors much of Federal Defendants'

argument on standing and the Court is also not persuaded by such argument as to ripeness.

      "'Absent [a statutory provision providing for immediate judicial review], a regulation is

not ordinarily considered the type of agency action 'ripe' for judicial review under [the APA]

until the scope of the controversy has been reduced to more manageable proportions, and its

factual components fleshed out, by some concrete action applying the regulation to the

claimant's situation in a fashion that harms or threatens to harm him . . . .'" *Nat'l Park Hosp. Ass'n v. Dept. of Interior*, 538 U.S. 803, 806 (U.S. 2003) (quoting *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 891 (1990)). Therefore, ripeness of a dispute over agency action is a function of: (1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented. *See Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998); *see also Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 940 (9th Cir. 2006). Such factors – any alone or considered collectively – support the Court's conclusion that WWP's claims are ripe.

To begin, WWP's claims extend beyond specific challenges to individual leases and leasing decisions:

> Hence, the heart of the dispute is not solely about how a local BLM office handled a lease sale, but rather over the legal propriety of "national policies" that Plaintiffs contend have eroded protections for the sage-grouse and cut the public out of oil and gas planning on public lands.
>
> . . . .
>
> It can reasonably be assumed, and Federal Defendants affirmatively contend, that there are state-specific interests in the discussed oil and gas lease sales. The subject-matter of this lawsuit, however, is much more expansive. Plaintiffs contend that, as to such sales (regardless of which state is involved), there are common violations of federal laws predicated on strategic policy directives from the Trump Administration, which, in turn, will result in cumulative impacts threatening sage-grouse across the sage-grouse range. The Plaintiffs' claims are not specific to any particular transferee district; hence, they argue, and the Court is persuaded, that nothing about *the fact of* the lease sales (and any corresponding local interest in the same) raises a compelling argument in favor of transfer. In short, they exist independently from whether Federal Defendants complied with federal law; the leases may be local, but the challenged national policies that created them are not.
>
> Plaintiffs do seek to upend the lease sales, but their challenges are not focused directly upon those sales. Hence, the fact that there is a remedy that seeks to prevent such sales is a piece of the venue analysis. It is not, however, a dispositive piece, as Plaintiffs' more far-reaching claim is that Defendants' oil and gas lease polices are fundamentally rotten to the core when it comes to sage-grouse protections.

9/4/18 MDO 9, 11, n.10 (Dkt. 66) (internal quotation marks and citations omitted); *see also supra* (discussing WWP's standing). As WWP reiterates, the "final agency action challenged in this Motion for Preliminary Injunction is IM 2018-034." WWP's Reply ISO Mot. for PI 12. In that focus, no further administrative action or further factual development is needed, and hence there is nothing to be considered under the second and third prongs in *Ohio Forestry's* ripeness analysis. The decision in *Cottonwood* confirms as much:

> Judicial intervention does not interfere with further administrative action when an agency's decision is "at an administrative resting place." *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 977 (9th Cir. 2003). Further, no additional factual development is necessary after a procedural injury has occurred. *See Ohio Forestry Ass'n*, 523 U.S. at 737 . . . (holding that a procedural dispute is ripe "at the time the [procedural] failure takes place.").

> The Forest Service's arguments rest on the false premise that Cottonwood is pursuing a substantive ESA claim. As explained above, Cottonwood does not argue for a particular substantive result, but rather alleges that the Forest Service failed to comply with the procedural requirements of the ESA when it declined to reinitiate consultation. When a party such as Cottonwood suffers a procedural injury, it "may complain of that failure at the time the failure take place, for the claim can never get riper." *Id*. at 737 . . . . The imminence of project-specific implementation "is irrelevant to the ripeness of an action raising a procedural injury." *Citizens for Better Forestry*, 341 F.3d at 977; *see also Seattle Audubon Soc'y v. Espy*, 998 F.2d 699, 703 (9th Cir. 1993). Because the alleged procedural violation – failure to reinitiate consultation – is complete, so too is the factual development necessary to adjudicate the case. *See [W. Watersheds Project v.] Kraayenbrink*, 632 F.3d [472], 486 [(9th Cir. 2011)].

*Cottonwood*, 789 F.3d at 1084; *see also W. Watersheds Project v. Kraayenbrink*, 2006 WL 2348080, *3 (D. Idaho 2006) ("WWP is challenging an agency decision based on an allegedly flawed process. The process is complete and the agency has made its decision based on that process. WWP's claim, therefore, is ready to be resolved. Nothing more could be gained from further factual development.").

Logically then, BLM's ongoing utilization of IM 2018-034 – in and of itself – causes hardship to WWP. *See Cottonwood*, 789 F.3d at 1084 ("Further, because the Forest Service is

actively applying the Lynx Amendments at the project-specific level, delayed review would cause hardship to Cottonwood and its members. . . . . Delayed review would cause Cottonwood and its members further hardship."); *see also Kraayenbrink*, 2006 WL 2348080 at *4 ("Requiring the public to wait for discrete BLM decisions under the new regulations places upon them a substantial burden since those very regulations could mean they get no notice of those decisions. . . . . Here, WWP has shown a unique injury from the barriers to public participation that would make it difficult to pursue challenges to discrete BLM decisions. . . . . WWP's challenges to the new rules on public participation are fit for resolution, and the Court would cause substantial hardship to WWP by withholding consideration."); *see also supra* (WWP declarations discussing burdens from expanded oil and gas lease sales and condensed review). The first prong in *Ohio Forestry's* ripeness analysis is therefore satisfied.

For these reasons, WWP's request for injunctive relief is ripe.

**B.     WWP Is Likely to Succeed on the Merits**

1.     Legal Framework

WWP alleges that Federal Defendants violated FLPMA and NEPA by (1) adopting IM 2018-034 without undertaking notice-and-comment rulemaking,[4] and (2) applying IM 2018-034 to exclude or sharply limit public participation in BLM oil and gas leasing decisions. *See* WWP's Mem. ISO Mot. for PI 4, 5.  The Court considers the strength of WWP's case on the merits against the legal framework governing FLPMA and NEPA claims.

---

[4] The record indicates that IM 2010-117, which WWP seeks to re-implement by judicial order, also was adopted without notice and comment procedures.  WWP acknowledges this, but contends that the Court can properly act within its discretion to require BLM to return to the procedures prescribed in IM 2010-117, and further contends that IM 2010-117 is "more consistent with FLPMA's mandates for public involvement in public lands decisions and were intended to improve BLM oil and gas leasing decisions . . . ."  WWP's Mem. ISO Mot. for PI 19, n.10.  The circumstances are incongruous, but so far as the Court is aware there has been no similar challenge to IM 2010-117.

a.      FLPMA

In enacting FLPMA in 1976, "Congress declared that it is the policy of the United States to manage the public lands 'in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values.'" *Ctr. for Biological Diversity*, 581 F.3d at 1075 (quoting 43 U.S.C. § 1701(a)(8)). FLPMA requires BLM to manage public lands on the basis of "multiple use and sustained yield" utilizing the resources "in the combination that will best meet the present and future needs of the American people . . . [taking] into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values[,]" and "achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use." 43 U.S.C. §§ 1701(a)(7), 1702(c), (h). According to the Supreme Court, "'[m]ultiple use management' is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put[.]" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004).

To help achieve these purposes, FLPMA requires that land use plans (known as Resource Management Plans ("RMPs") for BLM lands) be developed with "public involvement" and then used in managing the public lands. *See* 43 U.S.C. § 1712(a) ("The Secretary shall, with public involvement and consistent with the terms and conditions of this Act, develop, maintain, and, when appropriate, revise land use plans which provide by tracts of areas for the use of the public lands."). As to "public involvement," FLPMA Section 309(e) further directs that:

> In exercising his authorities under this Act, the Secretary, by regulation, shall establish procedures, including public hearings where appropriate, to give . . . the public adequate notice and an opportunity to comment upon the formulation of

standards and criteria for, and to participate in, the preparation and execution of
plans and programs for, and the management of, public lands.

43 U.S.C. § 1739(e); *see also* 43 U.S.C. § 1701(a)(5) (FLPMA Section 102(a)(5): "[I]t is the

policy of the United States that . . . the Secretary be required to establish comprehensive rules

and regulations after considering the views of the general public . . . ."); 43 U.S.C. § 1712(h)

(FLPMA Section 202(f): "The Secretary shall allow an opportunity for public involvement and

by regulation shall establish procedures, including public hearings where appropriate, to give . . .

the public, adequate notice and opportunity to comment upon and participate in the formulation

of plans and programs relating to the management of the public lands.").

    *b.*  *NEPA*

   NEPA "establishes a 'national policy [to] encourage productive and enjoyable harmony

between man and his environment,' and was intended to reduce or eliminate environmental

damage and to promote 'the understanding of the ecological systems and natural resources

important to' the United States." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756 (2004)

(quoting 42 U.S.C. § 4321). "[I]t is now well-settled that NEPA itself does not mandate

particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley

Citizens Council*, 490 U.S. 332, 350 (1989). NEPA "prohibits uninformed – rather than unwise –

agency action." *Id.* at 351. Council on Environmental Quality ("CEQ") regulations guide

federal agencies' compliance with NEPA. *See* 40 C.F.R. §§ 1500.1-1508.28.

   At the core of NEPA is the requirement that agencies prepare a detailed statement – an

Environmental Impact Statement ("EIS") – in connection with "proposals for . . . major Federal

actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

Among other requirements, an EIS must include an explanation of "the environmental impact of

the proposed action," "any adverse environmental effects which cannot be avoided should the

proposal be implemented," and "alternatives to the proposed action." *Id*. at §§ 4332(C)(i-iii).

Preparing the EIS "ensures that the agency, in reaching its decision, will have available, and will

carefully consider, detailed information concerning significant environmental impacts" and that

"the relevant information will be made available to the larger audience that may also play a role

in both the decision-making process and the implementation of that decision." *Robertson*, 490

U.S. at 349. "[T]he broad dissemination of information mandated by NEPA permits the public

and other government agencies to react to the effects of a proposed action at a meaningful time."

*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989).

    If an agency is unsure if an EIS is required (*i.e.*, unsure if the proposed project will have a

significant effect on the human environment), it may first prepare an Environmental Assessment

("EA") to assist in making that decision. 40 C.F.R. §§ 1501.3-1501.4. The EA is a "concise

public document" in which the agency must "briefly" discuss "the environmental impacts" and

"alternatives" to the proposed action. 40 C.F.R. § 1508.9. If, after preparing an EA, the agency

decides that an EIS is not necessary, the agency must prepare an explanatory Finding of No

Significant Impact ("FONSI") which "briefly present[s] the reasons why an action . . . will not

have a significant effect on the human environment." 40 C.F.R. § 1508.13.

    The salutary and critical role of the NEPA process has been described in myriad agency

decisions and court decisions over many decades. When properly implemented, NEPA

procedures "ensure[ ] that the agency will inform the public that it has indeed considered

environmental concerns in its decision-making process." *Balt. Gas & Elec. Co. v. Nat. Res. Def.

Council*, 462 U.S. 87, 97 (1983). Accordingly, CEQ regulations require agencies to "[m]ake

diligent efforts to involve the public in preparing and implementing their NEPA procedures," 40

C.F.R. § 1506.6(a); "[p]rovide public notice of NEPA-related hearings, public meetings, and the

availability of environmental documents so as to inform those persons and agencies who may be

interested or affected," *id*. at § 1506.6(b); "[s]olicit appropriate information from the public," *id*. at § 1506.6(d); and "[e]xplain in its procedures where interested persons can get information or status reports on environmental impact statements and other elements of the NEPA process," *id*. at § 1506.6(e). *See also id*. at § 1507.3(a) (agency must consult with CEQ while developing implementing procedures and "before publishing them in the Federal Register for comment."). Additionally, the CEQ Regulations require agencies preparing an EIS to make an initial draft available for public comment and to consider "develop[ing] and evaluating alternatives not previously given serious consideration" in response to comments. 40 C.F.R. §§ 1503.1, 1503.4.

### 2.   IM 2018-034 is Procedurally Invalid

IM 2018-034 was not preceded by a public notice and comment period before being implemented by BLM. WWP says that, because there was no notice and comment at the outset, IM 2018-034 was "dead on arrival" under both FLPMA and NEPA. *See* WWP's Mem. ISO PI 17-20. Federal Defendants say that this fact is inconsequential because of their position that IM 2018-034 "is a statement of policy and did not require notice and comment rulemaking." Fed. Defs.' Opp. to Mot. for PI 25.[5]

Under the APA, an agency generally must use notice and comment procedures to make any "rule." 5 U.S.C. § 553. The APA exempts from this requirement "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice . . . ." *Id*. at § 553(b)(3)(A). Setting aside the question of whether FLPMA incorporates this distinction,[6] it is

---

[5]   On this point, Federal Defendants seem to argue that, because IM 2018-034 is already substantively compliant with NEPA, any upfront notice and comment period is unnecessary pursuant to either FLPMA or NEPA. *See generally* Fed. Defs.' Opp. to Mot. for PI 25-32. Those specific arguments are addressed later in this Memorandum Decision in the context of WWP's *additional* claim that IM 2018-034 improperly limits public participation.

[6]   Though raising this question in their briefing (*see* WWP's Reply ISO Mot. for PI 15), WWP has stated that "FLPMA Section 310 further directs BLM to *follow APA rulemaking*

understood that a general statement of policy "advis[es] the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1012-13 (9th Cir. 1987). Such policies also "serve to educate and provide direction to the agency's personnel in the field, who are required to implement its policies and exercise its discretionary power in specific cases." *Id*. at 1013 (quotation marks and citations omitted). "The critical factor" in determining whether a directive constitutes a general statement of policy is "the extent to which the challenged [directive] leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the [announced] policy in an individual case." *Id*. Thus, to qualify as a statement of policy, two requirements must be satisfied: (1) the policy operates only prospectively, and (2) the policy does "not establish a binding norm," and is not "finally determinative of the issues or rights to which [it] address[es]," but instead leaves officials "free to consider the individual facts in the various cases that arise." *Id*. at 1014 (quotation marks and citations omitted).

There is space to argue both sides of the issue if only piecing out the content of IM 2018-034's wording. But, for reasons already articulated, IM 2018-034 is not a general statement of policy. It is written in binding terms. It is treated as binding in the field. *See supra*. Though it permits discretion in limited measure, it allows for no discretion as to essential details, *e.g.* a 6-month review period; no automatic public participation in the NEPA review process; elimination of a 30-day public review and comment period for each proposed lease, and imposition of a shortened, 10-day, protest period. *See supra*. These are requirements (not general statements of policy) for oil and gas leasing on BLM-administered lands.

---

*procedures*." WWP Mem. ISO Mot. for PI 18 (emphasis added) (citing 43 U.S.C. § 1740 ("The Secretary, with respect to the public lands, shall promulgate rules and regulations to carry out the purposes of this Act and of other laws applicable to the public lands . . . . The promulgation of such rules and regulations shall be governed by the provisions of chapter 5 of title 5 . . . .")).

As previously discussed, these procedures did not follow notice and comment

rulemaking. IM 2018-034 thus fails FLPMA's requirement that "the Secretary, *by regulation*,

shall establish procedures . . . to give the . . . the public adequate notice and an opportunity to

comment upon the formulation of standards and criteria for, and the management of, the public

lands." 43 U.S.C. § 1739(e) (emphasis added). A similar scenario was considered in *Natural*

*Resources Defense Council, Inc. v. Jamison*, 815 F. Supp. 454 (D.D.C. 1992). There, the

environmental plaintiffs challenged BLM's adoption of public participation procedures for coal

leasing spelled out in in a "competitive coal leasing handbook." *Id*. at 468 ("Plaintiffs' count

VIII challenges not the substance of the public participation procedures adopted by the Secretary,

but the lack of regulations implementing these provisions."). In granting summary judgment in

favor of the plaintiffs', the court found:

> Plaintiffs correctly assert that Congress has mandated implementation of the public
> participation provisions by regulation, leaving no discretion to the agency.
> Congress has addressed this precise question. Both sections 309(e) and 202(f) of
> FLPMA use the imperative "shall" and specify that their public participation
> opportunities will be established "by regulation." If the intent of Congress is clear,
> that is the end of the matter; for the court, as well as the agency, must give effect to
> the unambiguously expressed intent of Congress."
>
> Defendants respond to these undeniable facts by suggesting that plaintiffs'
> insistence on the protection provided by regulations "trivialize[s] Section 309(e) of
> FLPMA since public participation procedures are spelled out in an agency
> handbook, and the handbook cannot be changed such as to terminate public
> participation without violating the Federal Advisory Committee Act. Whether or
> not the stability of the current public participation rules is adequately guaranteed
> without additional regulations is a policy question. *Congress left the Secretary no*
> *discretion in how to provide that guarantee: notice and comment rulemaking*.
> Consequently plaintiffs' Motion for Summary Judgment must be granted.

*Jamison*, 815 F. Supp. at 468-69 (emphasis added) (internal quotation marks and citation

omitted).[7]

---

[7] Federal Defendants question *Jamison*'s import here, arguing that, in *Jamison*, "the
Department of the Interior, at the time of the suit, had not adopted regulations regarding public

Consistent with *Jamison*, IM 2018-034 did not adhere to FLPMA's requirement concerning notice and comment rulemaking.[8] IM 2018-034 is procedurally invalid.

3.     <u>IM 2018-034 Improperly Constrains Public Participation in BLM Oil and Gas Leasing Decisions</u>

It is well-settled that public involvement in oil and gas leasing is required under FLPMA and NEPA. *See Kraayenbrink*, 2006 WL 2348080 at *7 (FLPMA's and NEPA's "statutory language values public input on long-range issues ('preparation of plans and programs') as well as on day-to-day issues ('the management of' and 'execution of' those long-range plans).").  The question here is whether IM 2018-034 sufficiently allows for such public involvement.  The answer must be a complete "yes."  Here, the answer is "not quite."

FLPMA and NEPA parallel each other in their emphasis upon public participation, and their statutory framework reads largely in unison on such a requirement.  For example:

- "In exercising his authorities under this Act, the Secretary, by regulation, *shall* establish procedures, including public hearings where appropriate, *to give . . . the public adequate notice and an opportunity to comment upon the formulation of standards and criteria for, and to participate in, the preparation and execution of plans and programs for, and the management of, the public lands*." 43 U.S.C. § 1739(e) (emphasis added).

---

participation in the coal leasing process." Fed. Defs.' Opp. to Mot. for PI 26, n. 10.  But, as WWP notes, BLM has similarly "[not] adopted comprehensive regulations regarding public participation in the oil and gas leasing process like those at issue in *Jamison*" (beyond the Department of Interior's adoption of "general NEPA regulations").  WWP's Reply ISO Mot. for PI 14.  Federal Defendants offer no authority for equating NEPA's environmental review process to FLPMA Section 309(e).

[8] It is not necessary for the Court to rule upon whether IM 2018-034 violates the notice and comment procedures required under CEQ's NEPA regulations.  *See* 40 C.F.R. §§ 1507.3(a), 1506.6(a).  WWP's argument that there is such a violation overlaps with WWP's FLPMA argument vis à vis WWP's Fifth Claim for Relief.  *See* Compl. at ¶¶ 319-325; *see also Kraayenbrink*, 2006 WL 2348080 at *7 ("While the analysis of WWP's chance of success has proceeded to this point under NEPA, the same analysis can be made under [FLPMA] .  Public input has the same elevated role in FLPMA that it has under NEPA.  FLPMA requires BLM to give the "the public adequate notice and an opportunity to comment upon the formulation of standards and criteria for, and to participate in, the preparation and execution of plans and programs for, and the management of, the public lands.") (quoting 43 U.S.C. § 1739(e)).

- "The Secretary *shall allow an opportunity for public involvement* and by regulation shall establish procedures, including public hearings where appropriate, *to give . . . the public adequate notice and opportunity to comment upon and participate in the formulation of plans and programs relating to the management of the public lands*." 43 U.S.C. § 1712(h) (emphasis added).

- "The term 'public involvement' means *the opportunity for participation by affected citizens in rulemaking, decision-making, and planning with respect to the public lands*, including public meetings or hearings held at locations near the affected lands, or advisory mechanisms, or such other procedures as may be necessary to provide public comment in a particular instance." 43 U.S.C. § 1702(d) (emphasis added).

- "Federal agencies *shall to the fullest extent possible . . .* [i]mplement procedures to make the NEPA process more useful to decision-makers and the public" and *"[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment*." 40 C.F.R. § 1500.2(a),(d) (emphasis added).

- "NEPA procedures *must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken.* The information must be of high quality. Accurate scientific analysis, expert agency comments, *and public scrutiny are essential to implementing NEPA. . . .*" 40 C.F.R. § 1500.1(b) (emphasis added).

- "In determining whether to prepare an environmental impact statement the Federal agency shall . . . [if the proposed action is not covered by paragraph (a) of this section], prepare an environmental assessment. *The agency shall involve environmental agencies, applicants, and the public, to the extent practicable*, in preparing assessments required by § 1508.9(a)(1)." 40 C.F.R. 1501.4(b) (emphasis added).

- "Agencies *shall [m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures [and] solicit appropriate information from the public*." 40 C.F.R. § 1506.6(a),(d) (emphasis added).

On a very fundamental level, it strains common sense to see how these requirements are fulfilled when just comparing IM 2018-034 to IM 2010-117. That is, how can it be said that IM 2018-034 provides the required public participation "to the fullest extent possible" and "to the extent practicable," when it is dramatically more restrictive (at least on the issue of public participation) than the previously-established IM (IM 2010-117) it only recently replaced?

Further, and more obviously, IM 2018-034 eliminates the prior requirement contained in

IM 2010-117 that BLM "[s]tate and field offices *will* provide for public participation as part of

the review of parcels identified for potential leasing through the NEPA compliance

documentation process," swapping in its place the more discretionary "*may* provide for public

participation during the NEPA process . . . ." . *Compare* IM 2010-117 § III.C.7, *with* IM 2018-

034 § III.B.5 (emphasis added). Discretionary public participation opportunities are not

consistent with FLPMA and NEPA. *See W. Watersheds Project v. Kraayenbrink*, 538 F. Supp.

2d 1302, 1316 (D. Idaho 2008) ("Congress, in FLPMA, did not give the BLM any discretion to

cut the public out of these management and execution issues. Yet the BLM seeks to grant itself

that forbidden discretion in its regulatory revisions. Accordingly . . . WWP has met its 'heavy'

burden of proving that those revisions limiting public input constitute a facial violation of

FLPMA.");[9] *contra* Fed. Defs.' Opp. to Mot. for PI 27 ("Plaintiffs cannot show that the

procedure in [IM 2018-034] is facially invalid because, under the IM, BLM will provide for

public participation when it deems such participation to be appropriate.").

---

[9] In *Kraayenbrink*, the agency removed certain organizations from a list of "interested publics" who were to receive notice of issues concerning grazing allotments. The agency also eliminated public involvement from a variety of actions involving grazing, including "adjustments to allotment boundaries," "changes in active use," "emergency allotment closures," and the "issuance or renewal of individual permits or leases." *Kraayenbrink*, 538 F. Supp. 2d at 1309. Federal Defendants argue that, "unlike those regulations, the procedures adopted in IM 2018-034 do not exclude particular groups from decision-making and do not preclude public involvement in particular actions." Fed. Defs.' Opp. to Mot. for PI 28, n.12. The Court disagrees. *See infra* (discussing situations where IM 2018-034 no longer expressly allows for 30-day public review and comment periods). Separately, the Ninth Circuit's later remand to the district court for consideration of the plaintiffs' FLPMA claim under the *Chevron* framework is not immediately concerning here. *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 499-500 (9th Cir. 2011)). IM 2018-034 was not issued through notice and comment procedures. *See U.S. v. Mead Corp.*, 533 U.S. 218, 230 (2001) ("It is fair to assume generally that congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force. . . . . [T]he overwhelming number of our cases applying *Chevron* deference have reviewed the fruits of notice-and-comment rulemaking or formal adjudication.").

This concern is heightened because IM 2018-034 also departs from IM 2010-117 by declaring that public comment is *not* required in lease sales in which the agency issues a Determination of NEPA Adequacy ("DNA"),[10] and makes no provision for public comment on lease sales which have received an EA. *Compare* IM 2010-117 § III.E (allowing 30-day review and comment period, respectively), *with* IM 2018-034 § III.D ("If the BLM concludes that a DNA will adequately document that existing NEPA analysis is sufficient to support the proposed action and the action is consistent with the RMP, no further public comment period is required for the DNA," while silent on matter of EA). In turn, for a subset of lease sales, IM 2018-034 relegates any sort of contemporaneous public input to the much later-in-time (and, WWP would contend, the "*too* late in time") adversarial protest (with its 10-day deadline, rather than IM 2010-117's previous 30-day deadline) and appeals process, neutralizing and diminishing the substantive and practical value of such input. *See, e.g.*, *Kraayenbrink*, 538 F. Supp. 2d at 1309, 1314, 1316 (holding that BLM violated FLPMA and NEPA, in part, by "cut[ting] the interested public] out of the discussions between the BLM and the ranchers *at the formation stage of decisions*," even though public still had opportunity to protest and appeal grazing decisions, stating further: "[A] proposed decision carries with it an inevitable momentum favoring that result, an effect NEPA seeks to avoid by 'ensur[ing] that federal agencies are informed of environmental consequences *before making decisions* . . . .'" ) (quoting *Citizens for Better Forestry*, 341 F.3d at 970) (first emphasis added, second emphasis in original); *see also* 68 Fed. Reg. 33794-01, *33796 (June 5, 2003) (available at 2003 WL 21280722) ("The appeal process is not part of the public participation required by Section 309(e) of FLPMA.").

---

[10]  According to Federal Defendants, "[i]n some instances, BLM may rely on an existing NEPA document to satisfy its obligations under NEPA. In such instances, BLM will prepare a [DNA] to confirm that the environmental impacts of an action have already been analyzed in a prior NEPA document." Fed. Defs.' Opp. to Mot. for PI 5 (internal citations omitted).

The Ninth Circuit has ruled that federal agencies "must provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process." *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 953 (9th Cir. 2008). Despite this requirement, IM 2018-034 jettisoned prior processes, practices, and norms in favor of changes that emphasized economic maximization[11] to the detriment if not outright exclusion of pre-decisional opportunities for the public to contribute to the decision-making process affecting the management of public lands.[12] That choice was problematic when considering the Congressional directives for public involvement contained in FLPMA and NEPA

---

[11] Within its November 1, 2017 "Final Report: Review of the Department of Interior Actions That Potentially Burden Domestic Energy," the Department of Interior commented that, "[f]or too long, America has been held back by burdensome regulations on our energy industry," requiring the "[e]liminat[ion of] harmful regulations and unnecessary policies." 82 Fed. Reg. 50532-01, *50533, 50535 (November 1, 2017) (available at 2017 WL 4918980). As to IM 2010-117 specifically, the Report indicated that it "will be replaced with revised guidance for the purpose of establishing greater efficiencies in the oil and gas leasing process" because IM 2010-117 "resulted in longer time frames in analyzing and responding to protests and appeals, as well as longer lead times for BLM to clear and make available parcels for oil and gas lease sales." *Id.* at *50536. There is no mention of "public participation" in the Report.

[12] Federal Defendants understandably point out situations in which public participation existed with respect to upcoming lease sales. *See* Fed. Defs.' Opp. to Mot. for PI 27 ("In fact, *for most* of the upcoming September lease sales, BLM has provided for public participation in some form, either through comments on a draft EA or scoping comments.") (emphasis added) (citing Wells Decl. ¶ 3); *see also* Def.-Interv. WEA's Sur-Reply to Mot. for PI 4-7 (Dkt. 65-1) ("Importantly, Plaintiffs' supplementary declarations also ignore the fact that Plaintiffs were provided significant advance notice of the lease sales they seek to enjoin, and that Plaintiffs provided BLM with public comments on the lease sales . . . . Even more detrimental to Plaintiffs' allegations that the third and fourth quarter lease sales should be enjoined because IM 2018-034 prevents adequate notice and comment process is the fact that the NEPA process worked."). Even if true, these arguments ignore the flaws inherent in IM 2018-034 that do not dissolve away based upon what a federal agency has (or has not) done as to particular lease sales. *But see infra* (discussing harm and hardships).

and the apparent shortcomings of IM 2018-034 in allowing for public participation in BLM oil and gas leasing decisions.[13]

There is, to be sure, room for differing viewpoints about how federal lands are to be managed, and how the resources of federal lands are to be used. Conflicts are not unusual over decisions made by federal agencies, such as BLM, who have the responsibility to make those decisions and there is a well-understood zone of discretion in the law that is given to agencies in the consideration, making, and implementation of such decisions. As referenced earlier in this Memorandum Decision and Order, that discretion is hard-baked into the APA. *See supra* (citing 5 U.S.C. § 706(2)(A), (C), (D); *River Runners for Wilderness*, 593 F.3d at 1067).

But in this case, the record contains significant evidence indicating that BLM made an intentional decision to limit the opportunity for (and even in some circumstances to preclude entirely) any contemporaneous public involvement in decisions concerning whether to grant oil and gas leases on federal lands. BLM has discretion in those spaces, *so long as* the decisions made meet the requirements of the law – specifically, here, FLPMA and NEPA. The evidence illustrates that the intended result of the at-issue decisions was to dramatically reduce and even eliminate public participation in the future decision-making process. Doing so certainly serves to meet the stated "purpose" of IM 2018-034 – that is, reducing or precluding public participation will "streamline the leasing process to alleviate unnecessary impediments and burdens, to expedite the offering of lands for lease . . . ." IM 2018-034, "Purpose" p. 1. Yet, the route chosen by BLM to reach that destination is problematic because the public involvement requirements of FLPMA and NEPA cannot be set aside in the name of expediting oil and gas

---

[13] The Court has given careful consideration to Federal Defendants' contention that IM 2018-034 is consistent with BLM's regulations. *See* Fed. Defs.' Opp. to Mot. for PI 25-26. But even if true, the regulations contain a floor, not a cap. FLPMA and NEPA variously require public participation "to the fullest extent possible" and "to the extent practicable." *See supra*.

lease sales. The benefits of public involvement and the mechanism by which public involvement is obtained are not "unnecessary impediments and burdens."

In summary, IM 2018-034 is subject to judicial scrutiny under the APA as a reviewable agency action. And, where IM 2018-034 appears to be both procedurally and substantively invalid under FLPMA and NEPA, the APA is likewise implicated. The Court's findings on these points (as preliminary as they may be) are the product of applying the law to IM 2018-034's blueprint – which, when done, reveals that WWP has a reasonable likelihood of prevailing on its related FLPMA, NEPA, and APA claims. To be clear, this conclusion is grounded in the requirements of the statutes – the Court is not substituting its judgment in place of BLM's; nor, obviously, is the Court blindly rubber-stamping BLM's decisions.

## C.     WWP Is Likely to Suffer Irreparable Harm

Pointing to BLM's ongoing use of IM 2018-034 – with its shortened (or no) public comment and protest periods – WWP argues that it and the public will be irreparably harmed in three ways: (1) the environmental or aesthetic harms to public lands threatened by oil and gas leases; (2) the bureaucratic commitment to continued oil and gas leasing projects without unbiased examinations of their environmental impacts; and (3) the inability to fully and effectively contribute to whatever public participation process *may* take place due to IM 2018-034's significantly-compressed deadlines. *See* WWP's Mem. ISO Mot. for PI 30-35. The Court generally agrees.

IM 2018-034 limits WWP's ability to participate in the oil and gas leasing process, likely causing WWP (and groups like WWP) irreparable harm in the absence of an injunction. *See, e.g.*, *Kraayenbrink*, 2006 WL 2348080 at * 8 ("The public input of groups like WWP will be limited . . . and irreparable harm could result from the BLM making decisions without the full public input mandated by NEPA."). In not being allowed to participate at the leasing decision

stage, or in having to hurriedly clamber to do so because of IM 2018-034's changes because of the limited time frame and other constraints upon public participation, oil and gas leases have been (and will be) issued without the full benefit of public input. The activities associated with these leases and the rights granted to the lease holders can unquestionably significantly affect the quality of the human/natural environment. *See* Pls.' Mem. ISO Mot. for PI 31 31 (leases that do not include "no surface occupancy" restrictions allow oil and gas companies to "construct and maintain access roads, wells, drill pads, pipelines, and other infrastructure" which "irreparably harm public lands . . . by marring pristine landscapes, destroying fragile ecosystems, disturbing or displacing fish and wildlife populations, and eliminating recreation opportunities."); *see also supra* (quoting WWP members' declarations).

There is traction to WWP's argument that, even though a lease sale and subsequent lease issuance may not automatically authorize any on-the-ground disturbance (*see* Fed. Defs.' Opp. to Mot. for PI 34-35), the decision by BLM to commit to a particular outcome before completing a full NEPA analysis may foreclose or diminish the prospect for an open-minded examination of alternatives down the road. *See* WWP's Mem. ISO Mot. for PI 32-34; *see also* WWP's Reply ISO Mot. for PI, 21 ("The further the agency advances toward an outcome, the harder it will be to convince the agency to change direction. In the NEPA context, that risk is not purely procedural but rather grounded in the *environmental harm* caused by an outcome chosen through inadequate deliberation.") (emphasis in original). Federal courts elsewhere have held, sensibly in this Court's view, that "bureaucratic momentum" can support an argument of irreparable harm in circumstances similar to the instant record. For example, in *Sierra Club v. Marsh*, 872 F.2d 497 (1st Cir. 1989),[14] Judge (later Justice) Breyer concluded:

---

[14] *Sierra Club* clarified *Commonwealth of Mass. v. Watt*, 716 F.2d 946 (1st Cir. 1983) (also authored by, then, Judge Breyer), and considered whether the Supreme Court, in *Amoco*

[T]he harm at stake is a harm to the *environment*, but the harm consists of the added *risk* to the environment that takes place when governmental decision-makers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment. NEPA's object is to minimize that risk, the risk of uninformed choice, a risk that arises in part from the practical fact that bureaucratic decision-makers (when the law permits) are less likely to tear down a nearly completed project than a barely started project. . . . .

. . . .

A district court, when considering a request for a preliminary injunction, must realize the important fact of administrative life . . . : as time goes on, it will become ever more difficult to undo an improper decision (a decision that, in the presence of adequate environmental information, might have come out differently). The relevant agencies and the relevant interest groups . . . may become ever more committed to the action initially chosen. They may become ever more reluctant to spend the ever greater amounts of time, energy and money that would be needed to undo the earlier action and to embark upon a new and different course of action. Given the realities, the farther along the initially chosen path the agency has trod, the more likely it becomes that any later effort to bring about a new choice . . . will prove an exercise in futility.

. . . .

To repeat, the harm at stake in a NEPA violation *is* a harm to the *environment*, not merely to a legalistic "procedure," nor, for that matter, merely to psychological well-being. The way that harm arises may well have to do with the psychology of decision-makers, and perhaps a more deeply rooted human psychological instinct not to tear down projects once they are built. But the risk implied by a violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation. the difficulty of stopping a bureaucratic steam roller, once stared, seems to us . . . a perfectly proper factor for a district court to take into account in assessing that risk, on a motion for a preliminary injunction.

*Id*. at 500, 503-04 (emphasis in original) (internal citations omitted); *see also N. Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1158 (9th Cir. 1988) ("Bureaucratic rationalization and bureaucratic momentum are real dangers, to be anticipated and avoided by the Secretary."); *Nat. Res. Def. Council v. Houston*, 146 F.3d 1118, 1129 (9th Cir. 1998) ("Here, if the Biological Opinion had

---

*Prod. Co. v. Village of Gambell*, 480 U.S. U.S. 531 (1987) overruled *Watt*'s holding that, "if any such decision is made without the information that NEPA seeks to put before the decision-maker, the harm that NEPA seeks to prevent occurs." *Sierra Club*, 872 F.2d at 497-98. *Sierra Club* confirmed that *Village of Gambell* did not overturn *Watt*. *See id*. at 498.

been rendered before the contracts were executed, the [United States Fish and Wildlife Service] would have had more flexibility to make, and the Bureau [of Reclamation] to implement, suggested modifications to the proposed contracts. . . . . The failure to respect the process mandated by law cannot be corrected with post-hoc assessments of a done deal."); *Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 2017 WL 1829588, *12 (D. Or. 2017) ("The Court is persuaded by the reasoning in *Sierra Club* . . ., which discusses what is sometimes described as the 'bureaucratic steamroller' or 'bureaucratic momentum' theory . . . .) (citing other district courts in Ninth Circuit finding same theory persuasive); *Montana Wilderness Ass'n v. Fry*, 408 F. Supp. 2d 1032, 1038 (D. Mont. 2006) ("This case raises a concern over BLM's ability to fulfill its procedural obligations without favoring a predetermined outcome. Mr. Ott's testimony leaves the strong impression that he is motivated by an executive policy to maximize energy development. The wheels are in motion.") (citing *N. Cheyenne Tribe*, 851 F.2d at 1157); *Idaho ex. rel. Kempthorne v. U.S. Forest Serv.*, 142 F. Supp. 2d 1248, 1264 (D. Idaho 2001) ("The Court finds . . . there is merit in the wisdom of the First Circuit Court of Appeals analysis that the purpose of NEPA 'is to required consideration of environmental factors before project momentum is irresistible, before options are closed, and before agency commitments are set in concrete.'") (quoting *Watt*, 716 F.2d at 953); *Friends of the Earth v. Hall*, 693 F. Supp. 904, 913 (W.D. Wash. 1988) ("[T]he risk of bias resulting from the commitment of resources prior to a required thorough environmental review is the type of irreparable harm that results from a NEPA violation.") (citing *Watt*, 716 F.2d at 952-53).

The Court sees good reason to follow the lead of these other courts and concludes that an incomplete observance of environmental laws and procedure (through abbreviated NEPA reviews and less complete public comments or none at all), aided by agency inertia, combine to create irreparable harm. The Court is aware that WWP has made its views known (at least to

some degree) in various of the upcoming (or recently completed) oil and gas lease sales. *See, e.g.*, Wells Decl. ¶ 3 (table identifying September and December oil and gas lease sales along with comment schedules and fact of comments made); Ex. 1 to Stellberg Decl. (same); *see also* Def.-Interv. WEA's Sur-Reply to Mot. for PI 6-7 ("Plaintiffs request for injunctive relief for the September oil and gas lease sales is moot. Plaintiffs submitted detailed comments for the High Plains District EA and the Second WY EA during the comment periods. . . . . Simply put, Plaintiffs' claim of injury due to an allegedly compressed comment period simply does not hold up to the facts of this case."). However, the fact of such comments, without more, does not mean that WWP has meaningfully contributed, or as meaningfully as it could contribute in a different public participation framework, to the leasing decision process given the framework contained in IM 2018-034. The Court is satisfied that, on this record, WWP is likely to suffer irreparable harm in the absence of an injunction.

**D.**	**The Balance of Hardships Alongside the Public Interest Favors an Injunction for the Fourth Quarter Oil and Gas Lease Sales, But Not for the Third Quarter Oil and Gas Lease Sales[15]**

Where environmental injury is established, the Court must still engage in the traditional balancing of harms test before entering an injunction, which includes a consideration of the economic injuries that will result from imposition of an injunction. *See Idaho Conserv. League v. Atlanta Gold Corp.*, 879 F. Supp. 2d 1148, 1160-61 (D. Idaho 2012) (citing *Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008)). Even so, if irreparable environmental harm is likely, "the balance of harms will usually favor the issuance of an injunction to protect the environment." *Village of Gambell*, 480 U.S. 531, 545.

_____

[15] "When the government is a party, [the balance of hardships and public interest factors] merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

WWP contends that it has attempted to carefully style its requested injunctive relief, in that WWP seeks to prohibit Federal Defendants from implementing four provisions of IM 2018-034 in relation to third and fourth quarter (September and December) 2018 oil and gas lease sales and beyond; and to require, instead, that BLM follow provisions in IM 2010-117 which deal with the same subjects. *See supra*. WWP contends that it "do[es] not seek to halt any lease sale or reverse any lease upon this injunction motion." WWP's Reply ISO Mot. for PI, 1. Notwithstanding whatever description WWP assigned to the request, the Court concludes that WWP's Motion essentially requests that, moving forward, Federal Defendants be required to comply with IM 2010-117 and not IM 2018-034.

The record indicates that the majority of (if not all) third quarter 2018 lease sales are either completed or in their final stages. *See* Fed. Defs.' Opp. to Mot. for PI 39 (as of August 10, 2018: "Plaintiffs ignore the fact that for most of the upcoming lease sales in September, the NEPA process has already occurred, and the protest period is already underway.") (citing Wells Decl. ¶ 3 (identifying "sale dates" of September 5-6, 11, 18-20, 2018); *see also* Ex. 1 to Stellberg Decl. (same). This is significant because, given the timing of the litigation notwithstanding its expedited handling, WWP's requested relief arguably seeks to unwind completed or nearly-completed sales. Regardless of whether WWP seeks – directly or indirectly – such relief as to completed or nearly-completed sales, imposing such requirements on BLM as to such sales at this point in time would upend the time, effort, and expense expended by Federal Defendants and other involved parties in preparing for the third quarter lease sales. *See* Wells Decl. ¶¶ 4-8 (discussing BLM resources devoted to preparing for September lease sales, noting that "[d]elaying the September lease sales would cause business uncertainty and disrupt those planning and protest efforts, and result in a waste of the associated private resources" and require BLM "to post amendments to their notices of competitive lease sales and issue press releases to

inform the public of the postponements and announce the new comment and protest periods.");

*see also* Def.-Interv. Wyoming's Opp. to Mot. for PI 8-11 (Dkt. 50) (discussing Wyoming's and

its citizens "substantial socioeconomic benefits from federal oil and gas leasing);[16] Def.-Interv.

WEA's Opp. to Mot. for PI 6-8 (discussing members' extensive efforts and "due diligence costs"

to date and "significant harm" in even "slight delay" in lease issuance and anticipated revenues).

As previously described, WWP has participated in some number of the public comment

periods leading up to the September lease sales. WWP will have opportunity to protest leases

that have been or are soon to be issued. All in all, and on the current record, the Court concludes

that the balance of hardships and the public interest do not support a preliminary injunction

affecting the further denouement of the third quarter oil and gas lease sales.

However, the equation changes when applied to the fourth quarter oil and gas lease sales,

and subsequent sales. The Federal Defendants and some entities represented by the Intervenor

Defendants may well be working on or have completed work connected to such sales. *See* Wells

Decl. ¶¶ 4, 7, 8. Even so, such sales are sufficiently in the future that the importance of the

hardships faced by WWP and others, who would involve themselves in the public participation

process concerning upcoming sales along with the overall public interest, outweigh the interests

of the Defendants.[17] Further, the provisions of IM 2010-117 are not new, and therefore are

---

[16] Though properly considered in deciding what best serves the public interest, Wyoming's tax/royalty revenue would not be eliminated if immediate future sales are conducted under some of the prior IM 2010-117 procedures. Such revenues are inchoate unless and until leases are issued and production obtained.

[17] Weighing the nature of WWP's alleged organizational hardship is an imprecise task. WWP has submitted declarations stating that the changes in the oil and gas leasing process has disrupted the organization's usual work patterns, has caused difficulty in being able to meet the workload that has been created (in scope and in quality), and requires that some staff people work long hours and take time away from other responsibilities. Such difficulties may arise from a shortage of qualified personnel, or a lack of resources to hire additional staff people, or an internal decision about allocation of the organization's resources. But the hardships described in

already well-known to BLM and to those who are interested in obtaining future oil and gas leases. IM 2010-117 served as the procedural framework for BLM oil and gas leases for nearly ten years before IM 2018-034 was implemented. In this light, the suggested benefits of proceeding with the fourth quarter oil and gas lease sales using IM 2018-034 are outweighed by the benefit of returning a fuller opportunity for public participation, consistent with IM 2010-117. Hence, the Court will enter a preliminary injunction applicable to the prospective fourth quarter 2018 (and subsequent) oil and gas lease sales, consistent with the terms identified herein. *See infra.*

## E.     The Preliminary Injunction Will Be Geographically Limited

Though an extraordinary remedy, a preliminary injunction is proper in this instance. Still, its scope must be narrowly and specifically tailored to fit the dispute that gives rise to its issuance, and not more. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) ("'Injunctive relief . . . must be tailored to remedy the specific harm alleged.' 'An overbroad injunction is an abuse of discretion.'") (quoting *Lamb-Weston v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991)).

This case is tied to oil and gas leases that affect greater sage-grouse habitats. [18] WWP goes to great lengths to document the history surrounding the 2015 Sage-Grouse Plan

---

this record do not necessarily go away with IM 2010-117. Nor is the fact of having too much work to do in a short amount of time a hardship that is, for some reason, weightier than similar challenges faced by other litigants in the lawsuits that WWP brings. Perhaps WWP could hire more people or prioritize resources in a different manner. Those are the choices of the organization, not a place for supposition or imposition by the Court. Ultimately, however, such issues do not preclude entry of injunctive relief, given the full extent and nature of the irreparable harm involved here. *See supra.*

[18] WWP filed a "suggestion" at the outset of this case, requesting that case be reassigned *sua sponte* to U.S. District Judge B. Lynn Winmill because of similar issues in two other sage-grouse-related cases Judge Winmill is presiding over. *See* Not. of Related Cases, 2-4 (Dkt 3) ("The present case and these two related cases all involve *legal challenges over the conservation*

Amendments which identified priority sage-grouse habitats and imposed management

restrictions intended to protect sage-grouse from adverse impacts of oil and gas leasing

development. *See, e.g.*, Compl. at ¶¶ 1-14, 30-66, 73-114. Indeed, the threshold point on which

WWP justifies this lawsuit depends upon that overlay and the connections within pertaining to

sage-grouse habitat. *See supra* (generally discussing Court's 9/4/18 Memorandum Decision and

Order denying Federal Defendants' Motion to Sever and Transfer). Implementing a nationwide

injunction to *all* oil and gas lease sales *throughout* the United States, without regard to whether

such lease sales implicate sage-grouse habitat, is not justified. Hence, the preliminary injunction

applies to oil and gas lease sales contained in whole or in part within the Sage-Grouse Plan

Amendments' recognized "Planning Area Boundaries" encompassing "Greater Sage-Grouse

Habitat Management Areas," as indicated in the following BLM map:

*///*

*///*

*///*

*///*

*///*

*///*

*///*

*///*

*of greater sage-grouse on public lands administered by [BLM]* . . . . Judge Winmill also has
substantial experience and knowledge regarding greater sage-grouse science, public lands
management, and conservation needs from other prior litigation, as referenced in the Complaint
herein (¶ 25). . . . . That knowledge and experience is useful and directly relevant to the
adjudication of the claims presented in this case, including because this case presents Second and
Third Claims for Relief (Complaint ¶¶ 285-307) which allege that BLM is violating FLPMA,
NEPA, and the APA in not applying the best available science in approving the oil and gas
leasing and development decisions challenged in this case.").



Figure 1-5: Regional and Sub-Regional Boundaries with Greater Sage-Grouse Habitat Management Areas (BLM Administered Lands)

*Id.*, ¶ 53 (attaching BLM's Rocky Mountain ROD, p. 1-13; *see also* BLM's Great Basin ROD, p. 1-13). The preliminary injunction does not apply to gas and lease sales that are outside such boundaries.

**MEMORANDUM DECISION AND ORDER AND PRELIMINARY INJUNCTION - 51**

**F.     A Bond is Justified**

Rule 65(c) states that a preliminary injunction may issue "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P.  65(c). Plaintiffs argue that, as "non-profit environmental groups seeking to advance the public interest in this litigation[,] . . . the Court should waive the bond requirement, or impose a nominal bond of $100 under the public interest exception to [Rule] 65(c)."  WWP's Mem. ISO Mot. for PI 37 (citing *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999) (upholding nominal bond where there was public interest underlying the litigation, cost to government would be minimal, and class advancing public interest had unremarkable financial means)).[19]

The decision as to whether to require security, and how much, is a discretionary task. *See Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) ("'Rule 65(c) invests the district court with discretion as to the amount of security required, if any.'") (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) ("'The district court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review.'") (quoting *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985)).  And, the nature of the involved "public interest" is contested, with Federal Defendants and Defendant-Intervenors contending that they are the ones advancing the

---

[19]     Aside from noting the "several months preparing for the many lease sales" and the related time and effort involved with "postpon[ing] the lease sales and redo[ing] the NEPA public comment processes and protest periods for several different lease sales," Federal Defendants do not tender any substantive evidence on the issue, nor do they specifically respond to WWP's argument that Rule 65(c)'s security requirement be waived.  The Defendant-Intervenors similarly focus upon the time, effort and expense expended by those who would bid upon such leases, if offered, and upon the revenues lost to the state and federal government and the affected states.  *See supra*.

public interest. The Court is satisfied, for present purposes, that WWP has the better of the argument as to who is best serving the public interest in ensuring the benefit of public involvement in BLM's oil and gas leasing program. But that is not dispositive of the issue.

There is a line of cases, not referenced by any of the parties, that hints at a so-called "NEPA exemption" to the bond requirement. *See Earth Island Inst. v. U.S. Forest Serv.*, 2006 WL 3359192, *1 (E.D. Cal. 2006) ("Although the language employed by Rule 65(c) is mandatory in nature, it has long been the rule that plaintiffs who seek preliminary injunctive relief in actions to enforce [NEPA] are excused from the general rigor of the rule's security requirement.") (citing *Friends of the Earth, Inc. v. Brinegar*, 518 F.2d 322, 323 (9th Cir. 1975); *Van De Kamp*, 766 F.2d at 1325-26). Thus, the theory goes, NEPA actions serve the public interest and, therefore, the plaintiffs who pursue these claims should not be required to post a bond. But these cases largely presume that such plaintiffs are often public interest groups possessing *few resources*; and that requiring bonds from them would relatedly discourage or preclude meaningful judicial review. *See id.*

In the instant case, neither WWP nor CBD has provided information concerning its financial condition even though, as non-profit corporations, federal law requires that their recently filed Form 990 returns be available for public inspection. Hence, their financial status is not clear from the record, and the contention that they are non-profit environmental groups is not a basis to conclude that they possess insufficient resources to post a bond when seeking injunctive relief.

Although this nettlesome issue is sometimes glossed over, it was touched upon in the *Earth Island* decision. There, the intervenor defendants pointed out that the plaintiffs' (also non-profit environmental groups) 2004 published tax returns show total year-end assets of $5.99 million for Earth Island Institute and $2.35 million for the Center for Biological Diversity (also a

Plaintiff in this case) and argued that the plaintiffs "'should be able to afford a sizeable bond' without potentially thwarting the viability of environmental citizen actions." *See Earth Island*, 2006 WL 3359192 at *2 (citation omitted). The court, however, required a $1,000 bond, indicating that the plaintiffs had "proffered evidence that an increased bond would severely impact their ability to pursue environmental litigation through this case and others." *Id.*; *see also id.* at *2-3 (discussing declarations addressing impact of substantial bond and how assets reflected on tax returns are not indicative of discretionary funds available to pay "dramatically increased bond amount"); *compare with Save Our Sonoran*, 408 F.3d at 1126 (upholding $50,000 bond where plaintiff had opportunity at bond hearing to show that "imposition of anything other than a nominal bond would constitute an undue hardship," but plaintiff "did not tender such evidence at the hearing"). Plaintiffs offer up no such evidence here.

There is, in addition to those uncertain details, the further uncertainty of what "costs and damages" will be "sustained" by BLM if, after the case is fully considered on the merits, it is found that BLM was wrongfully enjoined or restrained. That is the touchstone of Rule 65(c). BLM has contended that there will be need for, in effect, some backtracking in developing and posting updated sales schedules as well as the need to publish press releases to inform the public of the extensions of the comment/protest periods. *See* Wells Decl. ¶¶ 7-8. There perhaps would be some overlap of personnel effort from what has been done to what needs to be done, and perhaps some additional hard costs, but in an electronic communication age any such hard costs would be minimal. The time and effort of employees in doing that rewind would also be minimal, as the details of the changes are limited and the revised process by which the potential sales will be considered and implemented is already a path on the agency's floorboards. Further, as to the effort already expended on such potential sales by persons or entities connected to the Defendant-Intervenors, there is no reason to believe that any of that effort and expense will go to

waste.  If the circumstances after a greater opportunity for public involvement support a sale, then the sale will occur.  If the circumstances after a greater opportunity for public involvement do not support a sale, or result in BLM placing conditions for the sale to meet other responsibilities of the agency in regard to protecting sage-grouse or other environmental interests, then the purposes of FLPMA and NEPA have been met and there is little if any room for a potential lessee, or a successful lessee, to feel aggrieved.

In consideration of the matters described above, and in the exercise of the Court's discretion, the Court concludes that a bond amount of $10,000.00 is sufficient in this case.[20]  The injunction is effective immediately.  The bond amount must be paid into the registry of the Court, either by surety bond, or a cash deposit, no later than the end of the Court's business day on Friday, September 28, 2018.

## V.  ORDER

Based on the foregoing, IT IS HEREBY ORDERED that Plaintiffs' Motion for Preliminary Injunction (Dkt. No. 30) is GRANTED, in part, and DENIED, in part, as follows:

1.      Plaintiffs' Motion for Preliminary Injunction is GRANTED and therefore a preliminary injunction is issued, enjoining and restraining the Government Defendants and those persons and entities described in Rule 65(d)(2), in this manner:

a.      For fourth quarter/December 2018 (and succeeding) oil and gas lease sales, IM 2018-034, Section III.B.5 – "Public Participation" is enjoined and replaced with IM 2010-117, Section III.C.7 – "Parcel Review Timeframes."

---

[20]  *See, e.g.*, *W. Watersheds Project v. Bureau of Land Mgmt.*, 2009 WL 3335365, *7 (D. Idaho 2009) (ordering plaintiffs to post $9,000 bond pursuant to Rule 65(c)).

b.     For fourth quarter/December 2018 (and succeeding) oil and gas lease sales, IM 2018-034, Section III.D – "NEPA Compliance Documentation" is enjoined and replaced with IM 2010-117, Section III.E – "NEPA Compliance Documentation."

c.     For fourth quarter/December 2018 (and succeeding) oil and gas lease sales, IM 2018-034, Section IV.B – "Lease Sale Parcel Protests" is enjoined and replaced with IM 2010-117, Section III.H – "Lease Sale Parcel Protests."

d.     The preliminary injunction applies *only* to oil and gas lease sales contained in whole or in part within the Sage-Grouse Plan Amendments' recognized "Planning Area Boundaries" encompassing "Greater Sage-Grouse Habitat Management Areas."

2.     Plaintiffs' Motion for Preliminary Injunction is DENIED insofar as:

a.     IM 2018-034 applies to the third quarter/September 2018 oil and gas lease sales; no part of IM 2010-117 will be applied to the third quarter/September 2018 oil and gas lease sales.

b.     For fourth quarter/December 2018 (and succeeding) oil and gas lease sales, IM 2018-034, Section III.A – "Parcel Review Timeframes" will not be enjoined and will not be replaced with IM 2010-117, Section III.A – "Parcel Review Timeframes."[21]

///

///

///

///

///

---

[21]  This assumes that IM 2010-117's public participation provisions can be fulfilled within IM 2018-034's 6-month time-frame for parcel review.  The record is undeveloped on this issue and/or the Court is not clear that the such provisions conflict.

3.      No later than the close of the Court's business day on September 28, 2018,

Plaintiffs are required pursuant to Rule 65(c) to post $10,000.00 as security, in cash or by surety

in a form compliant with applicable federal law.

DATED: September 21, 2018

Ronald E. Bush
Chief U.S. Magistrate Judge