Paul A. Turcke (ISB No. 4759)
MSBT Law, Chtd.
7699 West Riverside Drive
Boise, ID 83714
(208) 331-1800 (phone)
(208) 331-1202 (fax)
pat@msbtlaw.com

Erik E. Petersen, WSB No. 7-5608
Michael M. Robinson WSB No. 6-2658
Senior Assistant Attorneys General
Wyoming Attorney General's Office
2320 Capitol Avenue
Cheyenne, WY  82002
(307) 777-6946 (phone)
(307) 777-3542 (fax)
erik.petersen@wyo.gov
mike.robinson@wyo.gov

*Attorneys for the State of Wyoming*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, and CENTER FOR BIOLOGICAL DIVERSITY,<br><br>Plaintiffs,<br><br>v.<br><br>RYAN ZINKE, Secretary of Interior; DAVID BERNHARDT, Deputy Secretary of Interior; and UNITED STATES BUREAU OF LAND MANAGEMENT, an agency of the United States,<br><br>Defendants,<br><br>STATE OF WYOMING, and WESTERN ENERGY ALLIANCE,<br><br>Intervenor-Defendants. | Case No. 1:18-cv-00187-REB<br><br><br>**STATE OF WYOMING'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OR IN THE ALTERNATIVE TO TRANSFER** |

## INTRODUCTION

On April 30, 2018, Plaintiffs Western Watersheds Project and the Center for Biological Diversity (collectively, the Interest Groups) brought suit challenging eight Bureau of Land Management (BLM) oil and gas lease sales and two Department of the Interior Instruction Memoranda. (Dkt. No. 1). On October 17, 2018, the Interest Groups filed a First Amended Complaint challenging five additional lease sales from June and September, 2018. (Dkt. No. 78). The Interest Groups also added a new claim unrelated to any of the other oil and gas lease sales. Specifically, the Interest Groups now challenge BLM's approval of the Normally Pressured Lance Natural Gas Project (NPL Project). (*Id*. at 74-83). This represents a drastic change in the scope of this case. It also introduces a project that has no connection to Idaho or the other lease sales.

This Court has denied a motion to sever and transfer the oil and gas lease sales. (Dkt. No. 66). However, the NPL Project is qualitatively different than the oil and gas lease sales. First, the oil and gas lease sales were only for the exclusive opportunity to develop the leased lands. By contrast, the NPL Project is a plan to develop natural gas and condensate resources in a specific field under leases held by Jonah Energy. Second, the oil and gas lease sales were subject to the disputed instruction memoranda, but BLM did not apply those memoranda to the NPL Project. Next, the oil and gas leases were not considered as discrete actions but as "the cumulative impact of environmental factors acting in a widespread area stretching beyond RMP boundaries." (Dkt. No. 66). But the NPL Project is a discrete action covered by two Wyoming-specific RMPs that apply only to lands within Sublette County, Wyoming. The RMPs that govern the NPL Project include provisions developed by the State of Wyoming and only applicable within the State. Finally, the NPL Project was part of an extraordinary collaboration among interested stakeholders, including Wyoming, federal agencies, environmental advocacy groups, sportsmen's organizations,

private individuals, and others. The NPL Project was entirely the product of work done in Wyoming. In short, the NPL Project is so differently situated than the oil and gas leases that different pragmatic and legal considerations apply. Those considerations – the current right by Jonah Energy to develop the field, the applicability of distinct RMPs tied to specific real property governed by conservation requirements that exist only in Wyoming – mean that the venue for any legal review for the NPL Project is properly the District Court for the District of Wyoming.

The federal Defendants and proposed Intervenor-Defendant Jonah Energy's arguments for dismissal are comprehensive and compelling. Accordingly, Wyoming will not repeat them but rather will adopt and incorporate them into this memorandum. Wyoming will focus its argument on why, if the motions to dismiss are denied, the Court should  sever and transfer the Interest Groups' claims challenging the NPL Project to the District Court for the District of Wyoming.

## BACKGROUND

### I.      The NPL Project.

Development of the NPL Project is subject to, and implemented in accordance with, approved land use plans for the Pinedale Resource Management Plan (RMP) and the Green River RMP, as amended by the 2015 conservation plans adopted for the protection of the greater-sage grouse and its habitat (2015 Plans). (ROD at 3) (Dkt. No. 78 at 75). The 2015 Plans adopt and incorporate the Wyoming Core Area strategy developed by Wyoming, which prioritizes conservation management of the greater-sage grouse in those geographic areas containing core populations of the species.

On August 27, 2018, BLM's Wyoming State Director approved the NPL Project. (ROD at 1). Located in Sublette County, Wyoming, the NPL Project consists of roughly 140,859 acres covering lands and minerals administered by BLM (96.3 percent of the area), the State of

Wyoming (3.6 percent), and private land owners (0.06 percent). *See* Record of Decision, United States Department of the Interior, Bureau of Land Management, Normally Pressured Lance Natural Gas Development Project (August 2018) (ROD) at 2.[1]

Jonah Energy LLC anticipates developing up to 3,500 directionally drilled wells over a ten-year period. (*Id*. at 2-3). The project has an expected life of 40 years. (*Id*.). Jonah Energy estimates the NPL Project will produce up to 7 trillion cubic feet of gas and between 17.5 and 140 million barrels of oil. BLM Press Release, *BLM Releases Record of Decision for Normally Pressured Lance Natural Gas Project* (Aug. 28, 2018).[2] The NPL Project will generate approximately $17.85 billion in revenue for Jonah Energy. *Id.* In addition to tax revenues, Wyoming expects to receive over a $1 billion in royalties alone. *Id.*

The ROD details development in greater sage-grouse habitat and mandates that development be in accordance with the Wyoming Sage-Grouse RMP amendments. (ROD at 8). Jonah Energy commits to applying the greater sage-grouse protection measures and management set forth in the Wyoming Sage-Grouse RMP amendments on leases that pre-date those amendments. (*Id*.). The State of Wyoming has concurrent jurisdiction to review the development proposals proposed as part of the project to ensure compliance with Wyoming Executive Order 2015-4, *Greater Sage-Grouse Core Area Protection* (July 29, 2015). [3] The NPL Project must comply with the density and disturbance, timing and distance, noise, infrastructure and mitigation

---

[1]    *Available at*:   https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=76405

[2]    *Available at*:   https://www.blm.gov/press-release/blm-releases-record-decision-normally-pressured-lance-natural-gas-project.

[3]*Available at*:   https://wgfd.wyo.gov/WGFD/media/content/PDF/Habitat/Sage%20Grouse/SG_Executive_Order.pdf

requirements and restrictions as set forth in the Wyoming Sage-Grouse RMP amendments for areas within and outside primary habitat management areas. (*Id*. at 8-10). Importantly, BLM will undertake mitigation efforts to avoid and minimize impacts within the Core Areas consistent with the Wyoming Executive Order 2015-4. (*Id*. at 10); Wyoming Executive Order 2015-4, Attachment H at 1; State of Wyoming Revised Greater Sage-Grouse – Compensatory Mitigation Framework (July 10, 2017).[4]

BLM allows limited development in greater sage-grouse winter concentration areas within the NPL Project if permitted under the Core Area strategy. (*Id*. at 10). A seasonal development and density limitation applies to winter concentration areas that prohibits surface or other disruptive activities from December 1 through March 14. (ROD at 11). There is limited knowledge about the greater sage-grouse's use of the winter concentration areas within the NPL Project area. United States Department of the Interior, Bureau of Land Management, Normally Pressured Lance Natural Gas Development Project, Final Environmental Impact Statement (FEIS) at 2-12, 4-341 (May 2018). Jonah Energy will voluntarily fund a study that will look at the potential impacts of oil and gas development on winter concentration areas. (FEIS, Jonah Energy Comments at 6-7). "A study will be conducted concurrently with limited development activities to better understand the impacts of development in Winter Concentration Areas. The results of the study, current information, and current guidance at the time of site-specific permitting will inform BLM understanding of impacts and subsequent development in Winter Concentration Areas, and analysis during subsequent site-specific NEPA reviews." (ROD at 10). Wyoming and the Sage-Grouse Implementation Team (SGIT) will use the information obtained from the study as part of

---

[4] *Available at*: https://wgfd.wyo.gov/WGFD/media/content/Habitat/20170710-Revised-Habitat-Mitigation-Framework.pdf

the ongoing efforts to conserve the greater sage-grouse. *See* Wyo. Stat. Ann. § 9-19-101 (creating SGIT).

In its First, Second, Third and Seventh Claims for Relief in their First Amended Complaint, the Interest Groups challenge BLM's approval of the NPL Project. (Dkt. No. 78 at 100-08, 116-20). The Interest Groups argue that the NPL Project violates three federal laws, the Administrate Procedure Act, the National Environmental Policy Act (NEPA), and the Federal Land Policy and Management Act. (*Id.*). In summary, the Interest Groups contend that the NPL Project is inconsistent with the 2015 Plans because, among other things, it does not prioritize oil and gas development outside of sage-grouse habitats and ensure effective conservation of winter habitat. (*Id.* at 118-19). Further, the Interest Groups claim the NPL Project will negatively impact certain pronghorn antelope and BLM failed to adequately include mitigation measures for those impacts. (*Id.* at 119-20). Finally, the Interest Groups argue the NPL Project is in violation of NEPA because BLM failed to consider reasonable alternative actions and did not consider the direct, indirect, and cumulative impacts of alternatives on greater sage-grouse and pronghorn. (*Id.*).

In asserting venue in Idaho, the Interest Groups ignore the fundamental differences between the NPL Project and the oil and gas leases it challenges in its other claims. The NPL Project did not implicate the disputed regional or national policies; rather, RMPs specific to real property located entirely within the State of Wyoming govern the Project and development under the Project is subject to conservation management developed in Wyoming applying only to Wyoming sage-grouse habitat.

## II.   Wyoming's Core Area strategy for conservation of the greater sage-grouse.

One of the key considerations for determining whether the interest of justice favor transfer of an action is "the local interest in the controversy." To assist the Court in understanding the

interest of Wyoming in the NPL Project, the development of Wyoming's unique process for the conservation of the greater sage-grouse and its habitat is set forth in some detail.

The greater sage-grouse is a sagebrush dependent bird species native to western areas of the United States. *See* U.S. Fish and Wildlife Service, *The Greater Sage-grouse: Facts, Figures and Discussion* (July 15, 2015) at 1.[5] Since the greater sage-grouse is not a threatened or endangered species, Wyoming has regulatory authority over the species. *Kleppe v. New Mexico*, 426 U.S. 529, 545 (1976); s*ee* Endangered and Threatened Wildlife and Plants; 12-Month Finding on a Petition to List Greater Sage-Grouse (Centrocercus urophasianus) as an Endangered or Threatened Species, 80 Fed. Reg. 59858, 59882-83 (Oct. 2, 2015). Approximately 37% of the total population of the greater sage-grouse resides in Wyoming, more than twice as much as the next closest state. *The Greater Sage-grouse: Facts, Figures and Discussion* at 1; 80 Fed. Reg. at 59882. Wyoming and the federal government have designated approximately 8.6 million acres as priority areas of conservation. *See id* at 2. The federal government owns or controls roughly 56% of that land. *Id.*

For more than a decade, the State of Wyoming, other western states, private land owners, and the federal government have undertaken one of the largest, multi-state conservation efforts in recent history to protect the greater sage-grouse population. *See* Department of Interior, Office of the Secretary, *Historic Conservation Campaign Protects Greater Sage-Grouse* (Sept. 9, 2015).[6] In 2010, the United States Fish and Wildlife Service found that the greater sage-grouse warranted

---

[5]  *Available  at*:  https://www.fws.gov/greatersagegrouse/factsheets/GreaterSageGrouseCanon_FINAL.pdf.

[6]  *Available  at*:  http://www.fws.gov/news/ShowNews.cfm?ID=F5B7455D-0824-997C-47667F8ABBFFBA86

listing under the Endangered Species Act but that such listing was precluded by pending proposals to list and delist other species. *See* Endangered and Threatened Wildlife and Plants; 12-Month Finding on a Petition to List Greater Sage-Grouse (Centrocercus urophasianus) as an Endangered or Threatened Species, 75 Fed. Reg. 13910 (March 23, 2010); 16 U.S.C. § 1533(b)(3)(B).

Wyoming has also undertaken efforts to maintain and improve sage-grouse habitat while striking a proper balance between protecting species and supporting the state's economy. Wyoming Executive Order 2015-4 at 1. Wyoming's conservation efforts to protect the greater sage-grouse are critical to the State because the listing of the greater sage-grouse would greatly impact the state's economy. In Wyoming, commodity production from sage-grouse habitat generates approximately $18.4 billion in revenues, which represents nearly one-quarter of the total economic output of the state's economy. Temple Stoellinger and David Taylor, *A Report on the Economic Impact to Wyoming's Economy from a Potential Listing of the Sage Grouse*, 17 Wyo. L. Rev 79, 96 (2016).[7]

In light of the potential economic impact of a listing, Wyoming has undertaken substantial conservation efforts in order to preserve the greater sage-grouse and its habitat. Wyoming's sage-grouse conservation strategy focuses on creating, protecting, and managing greater sage-grouse Core Areas. Wyoming Executive Order 2015-4 at 3. Under this strategy, a top priority for management of the greater-sage grouse are those geographic areas containing core populations of the species. *Id.* The "Core Area" strategy is the cornerstone of Wyoming's greater sage-grouse conservation effort. *Id*. at 3-6. The Core Area incorporates high-density population areas containing the habitats that support the life cycle of the species. *Id*. at 3-5. Core Areas "encompass

---

[7] *Available at*: https://repository.uwyo.edu/cgi/viewcontent.cgi?referer=https://www.google.com/&httpsredir=1&article=1372&context=wlr

approximately 83 percent of the breeding population of sage-grouse in Wyoming on approximately 24 percent of the total land surface of the State." 80 Fed. Reg. at 59882; Wyoming Executive Order 2015-4 at 5. The 2015 Plans incorporate the Wyoming Core Area concept. 80 Fed. Reg. at 59882. "Core habitats designated by [Wyoming] have been identified as [priority habitat management areas] on BLM and [United States Forest Service (USFS)] lands, while non-core habitats are designated as [general habitat management areas]" … though "BLM and USFS have adopted the more precise disturbance measurements developed by [Wyoming]. 80 Fed. Reg. at 59883. In addition, the 2015 Plans adopted more stringent protections for fluid and non-energy leasable mineral programs for lands in Wyoming. *Id*. Wyoming also includes natural disturbances, such as wildfires, in its disturbance measures, which no other state does. *Id*. at 59882-83. NPL must comply with the Core Area strategy when developing within the 48,034 acres of the Project that are within sage-grouse Primary Habitat Management Area (PHMA). (ROD at 4-5); *See* 80 Fed. Reg. at 59883 ("Core habitats designated by [Wyoming] have been identified as PHMA on BLM and USFS lands[.]").

On December 29, 2009, BLM's State Office in Wyoming issued an instruction memorandum recognizing the state's expertise in implementing the core area strategy and directing BLM field offices in Wyoming to manage greater sage-grouse habitat consistent with the state's core area strategy. Wyoming Bureau of Land Management Instruction Memorandum No. WY-2012-012, *Greater Sage-Grouse Habitat Management Policy on Wyoming BLM Administered Public Lands including the Federal Mineral Estate* at 1-2 (Dec. 29, 2009).[8] Because of the implementation of the Wyoming's core area strategy conservation effort, BLM exempted

---

[8] *Available at*: http://www.blm.gov/style/medialib/blm/wy/resources/efoia/IMs/2012.Par.56874 .File.dat/wy2012-019.pdf

its field offices in Wyoming from the BLM's national standards regarding the management of the greater sage-grouse. Bureau of Land Management National Instructional Memorandum No. 2012-043, *Greater Sage-Grouse Interim Management Policies and Procedures* (Dec. 22, 2011).[9] Within Wyoming, BLM and the State work together to manage the species and its habitats based upon Wyoming's Core Area strategy.

Through four Records of Decision issued in September of 2015, and an earlier Record of Decision for the BLM's Lander Field Office, the Bureau and the Forest Service amended 98 BLM Resource Management Plans (ARMPAs) and Forest Service Land and Resource Management Plans (LMPAs) addressing the management of sage-grouse habitats, including the Wyoming Plans. *See, e.g.,* Wyoming Bureau of Land Management, *Approved Resource Management Plan for Greater Sage-Grouse* (Sep. 15, 2015). [10] The Wyoming Plans proposed various alternatives, but each adopted a similar alternative. *Id.* These alternatives aligned BLM's approach with Wyoming's Core Area strategy for managing and conserving the greater sage-grouse. *Id.* Thus, the Wyoming Plans provide for "consistent [greater sage-grouse] habitat across the range … and [focus] on a landscape-scale approach to conserving [greater sage-grouse] habitat." *Id.*[11]

Conservation of the greater sage-grouse is not a static undertaking. SGIT is a collaborative body composed of state and federal agencies, industry, and non-governmental organizations such

---

[9] *Available at*: http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/2012/IM_2012-043.html

[10]  *Available at*:  https://eplanning.blm.gov/epl-front-office/projects/lup/9153/63189/68431/002_Wyoming_ARMPA_Main-Body.pdf

[11] The Interest Groups previously challenged the 2015 ARMPAs and LMPAs in this Court. *See W. Watersheds Proj. v. MacGregor*, 1:16-cv-00083-BLW. The Court stayed the case pending proposed amendments to those plans. (*See* Dkt. No. 113 in that case). The Interest Groups do not challenge the 2015 ARMPAs or LMPAs in this proceeding. (Dkt. No. 78 at 22).

as conservation and sportsmen's groups. *See* Wyo. Stat. Ann. § 9-19-101. The Wyoming Legislature has tasked the SGIT to "review data and make recommendations to the governor regarding actions and funding" and "regulatory actions necessary to maintain and enhance sage grouse populations and sage grouse habitats in Wyoming." *Id*. In 2017, Wyoming entered into a Memorandum of Understanding (MOU) with BLM, the Forest Service, the Fish and Wildlife Service, and the Natural Resources Conservation Service to "develop intergovernmental communication and mechanisms to provide a cohesive and consistent conservation strategy for the Greater sage-grouse and its habitat in Wyoming. *See* Memorandum of Understanding, To Promote a Cohesive and Consistent Conservation Strategy for the Greater Sage-Grouse and its Habitat in Wyoming at 1 (March 1, 2017).[12] Under the MOU, the parties "agree to work collaboratively and put forth a good faith effort to achieve mutually acceptable outcomes consistent with the goals of [Wyoming Executive Order] 2015-4 and the respective federal plans." *Id*. at 5. The MOU establishes a framework to achieve "a no net loss or net conservation gain through compensatory mitigation for projects in Greater sage-grouse habitat." *Id*. at 1, 5-7. The NPL Project must comply with the compensatory mitigation requirements set forth in Wyoming Executive Order 2015-4 for disturbances in PHMAs and winter concentration areas. (ROD at 25-27); *See* Wyoming Executive Order, Attachment H at 1.

The Core Area strategy has been extremely successful not only in preserving greater sage-grouse habitat but in reducing disturbances. Wyoming has 15.8 million acres of Core Area greater sage-grouse habitat located on private, state, and federal lands. (Attachment A, Budd Declaration at 3). Since implementation of the Core Area strategy, the number of Core Areas subject to

---

[12] *Available at*: https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd534481.pdf

disturbance has decreased by 246,405 acres. *Id*. The percent of all 15.8 million Core Area acreage in disturbance has declined from 7.7 percent to 6.2 percent since 2008. *Id*.

The significant and on-going efforts by Wyoming over the last decade have not come cheap. Since 2006, Wyoming has allocated over $50 million to implement the Core Area conservation strategy, as well as other conservation efforts aimed towards protecting the greater sage-grouse. Stoellinger and Taylor, at 9. "The state has also approved funding for over 70 conservation easements totaling $100 million in long-term sage-grouse conservations efforts." *Id*. at 92. Wyoming expended substantial resources in time, money, and the dedication of its citizens and lawmakers to ensure successful implementation of the Core Area strategy. The application of the Core Area strategy in the NPL Project reflects those efforts.

## LEGAL STANDARD

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(b). The transfer inquiry is a two-step process. Initially, the court must determine whether the action "might have been brought" in the transferee court, and the court must make an "individualized, case-by-case consideration of convenience and fairness." *Inherent.com v. Martindale-Hubbell*, 420 F. Supp. 2d 1093, 1098 (N.D. Cal. 2006) (citing *Hatch v. Reliance Ins. Co.*, 758 F.2d 409, 414 (9th Cir. 1985) and *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000)). The second step requires the court to consider three factors: (1) convenience of the parties; (2) convenience of the witnesses; and (3) interests of justice. *Meijer, Inc. v. Abbott Labs*, 544 F. Supp. 2d 995, 999 (N.D. Cal. 2008). In evaluating the "interests of justice" factor, the Ninth Circuit looks to the following considerations:

(1) plaintiff's choice of forum, (2) convenience of the parties, (3) convenience of the witnesses, (4) ease of access to the evidence, (5) familiarity of each forum with the applicable law, (6) feasibility of consolidation with other claims, (7) any local interest in the controversy, and (8) the relative court congestion and time to trial in each forum.

*Papasan v. Dometic Corp.*, 2018 WL 1367341, at *2 (N.D. Cal. March 16, 2018). "The list is non-exclusive, and courts may consider other factors, or only those factors which are pertinent to the case at hand." *Papasan*, 2018 WL 1367341, at *2 (quoting *Martin v. Glob. Tel*Link Corp.*, 2015 WL 2124379, at *2 (N.D. Cal. May 6, 2015)).

## ARGUMENT

As the federal Defendants and proposed Intervenor-Defendant Jonah Energy have already shown, this Court should dismiss the claims related to the NPL Project because the Interest Groups have improperly asserted venue based on their residence in the District of Idaho. (Dkt. No. 78 at 8). An action against an agency of the United States or any officer, director, or employee thereof may be brought in the judicial district where the plaintiff resides "if no real property is involved in the action." 28 U.S.C. § 1391(e)(1)(C). This case unequivocally involves real property located exclusively in Wyoming. Therefore, as the federal Defendants and proposed Intervenor-Defendant Jonah Energy compellingly demonstrate in their motions to dismiss, this Court should dismiss all claims challenging the NPL Project. Wyoming adopts and incorporates these arguments by reference. Wyoming focuses its argument on the reasons why this Court, if it denies the motions to dismiss, should, in the alternative, sever the claims related to the NPL Project and transfer them to the District Court for the District of Wyoming.

This Court should sever and transfer the NPL Project because the RMPs that govern the NPL Project incorporate a conservation scheme for the greater sage-grouse and its habitat that is unique to Wyoming. That scheme, the Core Area strategy, provides more comprehensive

protections to the greater sage-grouse and its habitat than found in Idaho or any other state. The Core Area strategy focuses on management of the geographic areas containing the core population of the species. The strategy tracks all forms of disturbance, not only including those caused by humans but also disturbances that are the consequence of natural phenomena such as wildfires. (Attachment A, Budd Declaration at 3). Permits for development within Core Areas are limited to a five percent surface disturbance and, if exceeded, compensatory mitigation is required. *Id*. No other state has similar conservation requirements or invested the time and energy Wyoming did to develop its unique strategy. Because of its distinct conservation scheme, Wyoming's "local interest in the controversy" particularly weighs in favor of transfer.

Further, the sovereign interests of Wyoming in the management of wildlife and in the development of natural resources within its borders favors granting the federal Defendants and Jonah Energy's motions to transfer. This is particularly true with respect to the NPL Project, where the Interest Groups are not challenging any agency action that occurred in Idaho. (Dkt. No. 78 at 74-83). Indeed, the agency action concerns real property located entirely within the borders of Wyoming, and, the Interest Groups have alleged a violation of a resource management plan for the conservation of the greater sage-grouse that contains provisions unique to Wyoming. Because the greater sage-grouse is not an endangered or threatened species, management of the species resides exclusively with Wyoming. The Interest Groups' claims against the NPL Project impact interests within Wyoming and *only* within Wyoming. In contrast, Idaho has no property or economic interests at stake and will suffer no impacts, environmental or financial, if the Interest Groups prevail on their claims. Accordingly, the interests of Wyoming, as set forth below, carry considerable weight in favor granting the motion to transfer venue to the District of Wyoming.

I.     The "local interest in having local controversies decided at home" weighs in favor of transferring the Interest Groups' claims regarding the NPL Project to the District of Wyoming.

In weighing a motion to transfer venue, this Court must consider "the local interest in having local controversies decided at home." *See Decker Coal Co. v. Commonwealth Edison Co.*, 834 F.2d 730, 843 (9th Cir. 1987). "[C]ourts have observed that environmental cases often have a particularly strong basis for finding a localized interest in the region touched by the challenged action." *Sierra Club v. United States Dep't of State*, 2009 WL 3112102 *3 (N.D. Cal. 2009). With regard to the NPL Project, the local interests of Wyoming far outweigh any local interests the Interest Groups attribute to Idaho.

II.    Wyoming's sovereign authority to regulate wildlife within the State weighs heavily in favor of transfer.

Wyoming has an interest in actions that may affect its sovereign authority over the wildlife within its borders. A state has broad trustee and police powers over wild animals within its jurisdiction. *Kleppe*, at 545. Wyoming has "the power and duty to protect, preserve, and nurture the wild game" living within its borders. *O'Brien v. State*, 711 P.2d 1144, 1149 (Wyo. 1986). Wyoming's interest over wildlife within its borders is substantial. *See Baldwin v. Fish & Game Comm'n of Mont.*, 436 U.S. 371, 390 (1978).

The Wyoming legislature has enacted a comprehensive regulatory scheme to conserve, manage and protect the wildlife living in Wyoming. *See* Wyo. Stat. Ann. §§ 23-1-101 through 23-6-304. The Wyoming Game and Fish Commission and the Wyoming Game and Fish Department provide for the enforcement and administration of these laws. *See* Wyo. Stat. Ann. §§ 23-1-302(xvi), 23-1-401. Wyoming law empowers the state to "provide an adequate and flexible system for control, propagation, management, protection and regulation of *all* Wyoming wildlife." Wyo. Stat. Ann. § 23-1-103 (emphasis added). "Wildlife" is defined to include "all wild mammals, birds,

fish, amphibians, reptiles, crustaceans and mollusks, and wild bison designated by the Wyoming game and fish commission and the Wyoming livestock board within Wyoming." Wyo. Stat. Ann. § 23-1-101(a)(xiii). The greater sage-grouse is an upland game bird in the state, and is therefore managed by the state. *See* Wyo. Stat. Ann. § 23-1-103; Wyoming Game and Fish Comm'n Regs., Ch. 11, § 3.

Unquestionably, Wyoming has substantial interests in continuing its greater sage-grouse conservation management strategy. The 2015 Plans, which the Interest Groups claim the NPL Project violates, incorporated Wyoming's Core Area strategy for managing and conserving the greater sage-grouse. 80 Fed. Reg. at 59882-83. This is not a situation where there are RMPs that apply across state lines and there are allegations of violations that affect sage-grouse on a broad basis. *Cf. W. Watersheds Proj. v. Salazar*, 2009 WL 1299626 (D. Idaho 2009). The NPL Project is subject to two Wyoming-specific RMPs: the Pinedale RMP and the Green River RMP. (ROD at 3). Earlier in these proceedings, this Court denied a motion by the defendants to sever and transfer the various oil and gas lease sales to courts in the states where the sales took place. (Dkt. No. 66). In support of that decision, this Court found that venue in Idaho was appropriate because the resolution of the Interest Groups' claims required consideration of the "impact of environmental factors acting in a widespread area stretching beyond RMP boundaries." (Dkt. No. 66 at 12) (*quoting Salazar*, 2009 WL 1299626 at *3). That is not the case here. The Interest Groups' claims challenging the NPL Project do not "stretch beyond RMP boundaries." Rather, the RMPs that govern the Interest Groups claims apply only to lands located entirely within Wyoming. More specifically, those RMPs incorporate Wyoming's Core Area strategy for greater sage-grouse conservation. Therefore, the challenge to the NPL Project is completely different from what this Court considered in the motion to transfer the oil and gas leases because there is no "broad"

environmental issue that crosses RMP or state boundaries. Resolution of the Interest Groups' challenge to the NPL Project will require the application and analysis of standards that do not apply in any other state but Wyoming.

The development of Wyoming's conservation strategy has spanned over a decade and involved a collaborative effort that included diverse stakeholders, including multiple federal agencies, private industry, conservation organizations, sportsmen's groups, citizens and lawmakers. The resulting Core Area strategy is the cornerstone of Wyoming's conservation efforts for the greater sage-grouse. This Court has already recognized the efficacy of the Core Area strategy: "The [Core Area strategy] is a serious and coordinated effort by stake holders in Wyoming to counter the effects of drilling." *W. Watersheds Proj. v. Salazar*, 2012 WL 5880658 *7 (D. Idaho Nov. 20, 2012).

In addition to the years of work and resources put into developing the 2015 Plans, Wyoming has, since 2006, allocated over $50 million to implement the Core Area strategy, as well as other conservation efforts aimed towards protecting the greater sage-grouse, including over 70 conservation easements totaling $100 million in long-term sage-grouse conservation efforts. *See* Stoellinger and Taylor, at 91-92. Wyoming has expended substantial resources in time, money, and the dedication of its citizens and lawmakers to ensure successful implementation of the Core Area strategy.

At its core, the Interest Groups claims against the NPL Project are a challenge to Wyoming's Core Area strategy. The intent of the Core Area strategy is to preserve and conserve the greater sage-grouse and its habitat as it exists in Wyoming. The Wyoming-specific RMPs incorporated the regulatory framework established by the Core Area as part of the 2015 Plan amendments. This strategy does not apply to sage-grouse conservation plans applicable in Idaho

17

or in any other state. The NPL Project concerns natural gas development exclusively within Sublette County, Wyoming. Only Wyoming will feel impacts, whether financial or environmental, from the NPL Project. Only Wyoming's regulatory scheme is at issue under the Interest Groups' challenge. In contrast, Idaho has no interests whatsoever at stake in this proceeding. Accordingly, Wyoming's interest in the controversy easily outweighs any other state's interest and the Court should recognize that interest by transferring the Interest Groups' claims against the NPL Project to the District of Wyoming.

## III.   Wyoming's fiscal interest also weighs heavily in favor of transfer.

In addition, Wyoming has substantial financial resources at stake. Oil and Gas development, particularly on federal land, is a critical part of Wyoming's economy. For example, in 2015 on lands administered by the BLM, 14,747 leases produced over 1.22 trillion cubic feet of natural gas and 44.6 billion barrels of oil. Bureau of Land Management, *Wyoming Oil and Gas Lease Sales*.[13] The revenue the NPL Project would generate for Wyoming is substantial. If Jonah Energy realizes its projected $17.85 billion return from the NPL Project, Wyoming would receive around $1.1 billion in royalties. BLM Press Release, *BLM Releases Record of Decision for Normally Pressured Lance Natural Gas Project* (Aug. 28, 2018).[14] On top of that, Wyoming will receive severance and ad valorem taxes on production. Wyo. Stat. Ann. § 39-13-102(m).

The NPL Project would also provide substantial economic benefits to the surrounding local

---

[13]   *Available   at*:   https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/leasing/regional-lease-sales/wyoming

[14]   *Available   at*:   https://www.blm.gov/press-release/blm-releases-record-decisionnormallypressured-lance-natural-gas-project

communities and counties. FEIS, Appx. H at H-8, H-9.[15] Indeed, the economic impact on the local economy from the high paying jobs directly created by the NPL Project and the secondary jobs created in response is hard to overstate.

The NPL Project would create a considerable number of direct and indirect jobs. In the development phase, the NPL Project would employ approximately 726 workers. *Id*. at H-4. The development workers would average $90,361 in salary and benefits. *Id*. at H-6. When in production, the NPL Project would employ roughly 228 workers. *Id*. at H-4. Production workers would average $157,828 in salary and benefits. *Id.* at H-8. Further, each worker on the NPL Project would generate an estimated 5.5 secondary jobs in the regional economy. *Id*. at H-8. The NPL Project would employ workers at wage and benefit levels considerably greater than the local median income thus benefiting not only the individual employee but the local economy in general. United States Census Bureau, Quick Facts, Sublette County, Wyoming (median income for 2012-16 in Sublette County is $76,004.).[16]

All of this activity occurs exclusively in Wyoming. The development of the Core Area strategy and its incorporation into 2015 Plans for the management and conservation of the sage-grouse occurred in Wyoming and developed through the dedicated work of this State's citizens, scientists, policymakers and governmental agencies. The NPL Project while largely on federally-owned or controlled lands, also encompasses almost 6,000 acres of State-owned or private land within Wyoming. The revenues generated from those leases support critical programs benefiting Wyoming residents. Wyoming has a significant interest in the NPL Project, fiscally and in the

---

[15]   *Available at*:   https://eplanning.blm.gov/epl-front-office/projects/nepa/57654/148585/182441/Appendix_H:_Economic_Modeling_Report.pdf

[16] *Available at*: https://www.census.gov/quickfacts/sublettecountywyoming

management of its natural resources, including conservation of the greater sage-grouse. The State of Idaho has no commensurate interest. Consequently, the interests of justice favor transferring the claims challenging the NPL Project to the District Court for the District of Wyoming.

## CONCLUSION

The NPL Project is materially different from the other claims in this case. The NPL Project is not a lease sale; it is the adoption of a plan by the Wyoming BLM office for the development of field entirely within Sublette County, Wyoming. The NPL Project is intrinsically tied to real property located exclusively in Wyoming. Two, discrete RMPs, that only apply to lands within Wyoming, govern the NPL Project. The RMPs incorporate a conservation measure, the Core Area strategy, developed by the State of Wyoming. The Core Area Strategy imposes conditions on development, particularly with respect to development density and mitigation, which are unique to Wyoming. The NPL Project is, therefore, fundamentally different on a factual and legal basis than the oil and gas lease claims. Those differences, including the Wyoming-specific greater sage-grouse conservation scheme, emphasize the local nature of the issues raised by the claims against the NPL Project when compared with the oil and gas leases.

This Court should grant the federal Defendants and the proposed Intervenor-Defendant Jonah Energy's motions to dismiss for the reasons expressed in therein. In the alternative, this Court should recognize the distinctive Wyoming-centered nature of the NPL Project and, in the interests of justice, transfer of the claims challenging the NPL Project to the District of Wyoming.

Dated this 16th day of November, 2018.

THE STATE OF WYOMING


/s/ Michael M. Robinson
Erik E. Petersen, WSB No. 7-5608
Michael M. Robinson WSB No. 6-2658
Senior Assistant Attorneys General
Wyoming Attorney General's Office
2320 Capitol Avenue
Cheyenne, WY  82002
(307) 777-6946 (phone)
(307) 777-3542 (fax)
erik.petersen@wyo.gov
mike.robinson@wyo.gov

/s/ Paul A. Turcke
Paul A. Turcke (ISB No. 4759)
MSBT Law, Chtd.
7699 West Riverside Drive
Boise, ID 83714
(208) 331-1800 (phone)
(208) 331-1202 (fax)
pat@msbtlaw.com

*Attorneys for the State of Wyoming*

## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2018, I caused the foregoing to be electronically filed with the Court using the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Laurence J. Lucas
llucas@advocateswest.org

Talasi B. Brooks
tbrooks@advocateswest.org

Todd C. Tucci
ttucci@advocateswest.org

Sarah Stellberg
sstellberg@advocateswest.org

Christine G. England
Christine.england@usdoj.gov

Ausey H. Robnett, III
arobnett@LCLattorneys.com

Gail L. Wurtzler
Gail.wurtzler@dgslaw.com

John S. Most
john.most@usdoj.gov

Luther L. Hajek
luke.hajek@usdoj.gov

Bret A. Sumner
bsumner@bwenergylaw.com

Michael K. Cross
mcross@bwenergylaw.com

Malinda Morain
mmorain@bwenergylaw.com

Kathleen C. Schroder
katie.schroder@dgslaw.com


/s/ Michael M. Robinson
Michael M. Robinson