Bret Sumner, *Pro Hac Vice*
Malinda Morain, *Pro Hac Vice*
BEATTY & WOZNIAK, P.C.
216 Sixteenth St., Suite 1100
Denver, CO 80202-5115
Telephone: 303-407-4499
Fax: 800-886-6566
Email: bsumner@bwenergylaw.com

Paul A. Turcke, ISB #4759
MSBT LAW
7699 West Riverside Drive
Boise, ID 83714
Telephone: 208-331-1800
Fax: 208-331-1202
Email: pat@msbtlaw.com

Attorneys for Defendant-Intervenor Western Energy Alliance

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **WESTERN WATERSHEDS PROJECT**, *et al.*, | |
| Plaintiffs, | Case No. 1:18-cv-00187-REB |
| v. | |
| **RYAN K. ZINKE,** Secretary of the Interior, *et al.*, | **DEFENDANT-INTERVENORS WESTERN ENERGY ALLIANCE AND STATE OF WYOMING'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (PHASE ONE) [Dkt. 135]** |
| Defendants, | |
| **WESTERN ENERGY ALLIANCE**, *et al.* | |
| Defendant-Intervenors. | |

**INTRODUCTION**

The management of federal lands is a balancing act. Congress granted the Secretary of the Department of the Interior (Secretary) and the Bureau of Land Management (BLM) significant discretion to manage lands under the principles of multiple use and sustained yield. Within this discretionary authority, the Federal Land Policy and Management Act (FLPMA) requires that the Secretary provide the public with notice and the opportunity to comment on public lands management. The regulations that implement the National Environmental Policy Act (NEPA) also require public involvement in certain circumstances. Although statutes and regulations specifically define parameters for public involvement in other contexts, neither statute nor regulation specifically defines the appropriate level of public involvement related to the issuance of oil and gas leases. Accordingly, what constitutes "adequate" notice remains in the Secretary's discretion and depends on the facts and circumstances of the decision.

Western Watersheds Project (WWP) and the Center for Biological Diversity (CBD) (collectively, the Advocacy Groups) seek to vacate leases sold at competitive auction during June and September 2018, based on the premise that the agency failed to provide adequate public participation during the lease sale process. Specifically, the Advocacy Groups argue that BLM acted unlawfully by following the guidance provided by Instruction Memorandum (IM) 2018-034, which provides for shorter public comment periods than provided by a prior IM. While the Advocacy Groups clearly disagree with the level of involvement afforded to the public in these lease sales, they fail to meet their burden to demonstrate that BLM abused its substantial discretion and violated the public participation requirements in either FLPMA or NEPA.

To be clear, public participation "to the extent practicable" is not an issue of whether an agency could have done more; indeed, more participation is always possible. And the Administrative Procedure Act (APA) does not authorize relief where the Advocacy Groups, or this

Court, would have done things differently. To avoid a subjective, and potentially endless debate about the appropriate level of participation, courts have stated that adequate participation is a fact-intensive inquiry into whether the public was precluded from providing information to the agency to facilitate the requisite "hard look" under NEPA. Here, the Advocacy Groups have not shown that BLM exceeded its discretion to provide for public participation during any of the challenged lease sales because they have not shown that BLM precluded the Advocacy Groups from submitting substantive comments necessary to identify issues for BLM to consider.

The administrative record demonstrates that BLM provided, and the Advocacy Groups made extensive use of, multiple opportunities to submit extensive and detailed comments. Indeed, the Advocacy Groups reiterated the same complaints at various stages in the land use planning process, including submitting: (1) comments on the draft RMPs, (2) comments on the applicable resource management plans (RMPs), (3) protests of the final RMPs, (4) comments on the notice of intent to offer parcels in each of these lease sales, (5) comments on draft environmental assessments (EAs), and (6) protests on BLM's lease sale decision records. In no way is this a situation where the Advocacy Groups were shut out of the process.

Ultimately, the Advocacy Groups disagree with BLM's decision to offer lease parcels for sale. While they may believe the process under IM 2018-034 to be unfair, under the APA standard of review, they have not shown that BLM abused its discretion or violated FLPMA or NEPA by providing an opportunity for public comment on the challenged lease sales consistent with IM 2018-034. Therefore, and for the reasons already discussed by the Federal Defendants, this Court should grant Federal Defendants and Defendant Intervenors' motions for summary judgment on the Advocacy Groups' Fourth and Fifth Claims.

# LEGAL FRAMEWORK

## I.    The Administrative Procedure Act

This Court reviews the Advocacy Groups' claims under the APA, 5 U.S.C. §§ 701 through 706. Under the APA, judicial review of federal agency actions is "deferential." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010). Under Section 706, a court may only set aside an agency action if the court determines, based upon the administrative record, that the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Marsh v. Or. Nat. Res. Council,* 490 U.S. 360, 378 (1989). "The court may not substitute its judgment for that of the agency concerning the wisdom or prudence of [the agency's] action." *River Runners*, 593 F.3d at 1070 (citation omitted).

## II.   The Federal Land Policy and Management Act

BLM manages public lands pursuant to FLPMA, 43 U.S.C. §§ 1701 through 1787. FLPMA mandates that BLM manage public lands under the principles of multiple use and sustained yield, in accordance with applicable land use plans, to meet the needs of present and future generations. 43 U.S.C. § 1701(a)(7), (8) & (12); 43 U.S.C. § 1732(a) & (b); 43 C.F.R. § 1610.5-3. FLPMA identifies "mineral exploration and production" as one of the "principal or major uses" of public lands. 43 U.S.C. § 1702(*l*).

BLM executes its duty to manage public lands through land use plans, commonly referred to as RMPs. The objective of resource management planning is "to maximize resource values for the public through a rational, consistently applied set of regulations and procedures which promote the concept of multiple use management and ensure participation by the public, state, and local governments." 43 C.F.R. § 1601.0-2. With respect to oil and gas resources, RMPs designate which lands will remain open (or closed) to oil and gas leasing and development. 43 C.F.R. § 1601.0-5(n). Additionally, RMPs identify the stipulations and mitigation measures that may be attached

to leases or as conditions of approval for subsequent permits for exploration or development projects. *Id.*

FLPMA requires public involvement during the development of RMPs, but it does not establish specific parameters for public participation. 43 U.S.C. § 1712(a). Rather, FLPMA vests discretion in the Secretary to establish regulations to give "the public adequate notice and opportunity to comment on … the preparation and execution of plans and programs for, and the management of, the public lands." 43 U.S.C. § 1739(e).

## III.    The National Environmental Policy Act

NEPA is a procedural statute promulgated to ensure that an agency makes a fully informed and well-considered decision. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978). NEPA requires an agency to take a "hard look" at the environmental consequences of a proposed action and prescribes public dissemination of relevant environmental information. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). NEPA "prescribes the necessary process [and] does not mandate particular results." *Wyo. Farm Bureau Fed'n v. Babbitt*, 199 F.3d 1224, 1240 (10th Cir. 2000) (citations omitted). NEPA "does not require agencies to elevate environmental concerns over other appropriate considerations." *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1022 (10th Cir. 2002) (citation omitted).

The Council on Environmental Quality's NEPA implementing regulations address public participation. Specifically, BLM must provide a period for review and public comment after preparing a draft Environmental Impact Statement (EIS). 40 C.F.R. § 1503.1. Agencies have significantly more discretion when determining whether public comment is required with respect to EAs. *TOMAC v. Norton,* 433 F.3d 852, 861 (D.C. Cir. 2006). BLM regulations state that the extent of public participation in EAs is left to the discretion of the decision-maker.

43 C.F.R. § 46.305(a). BLM regulations require the agency to consider public comments that are received and to notify the public of the availability of EAs. 43 C.F.R. § 46.305(a)(1), (c); *see also Bering Strait Citizens for Responsible Res. Dev. v. U. S. Army Corps of Eng'rs*, 524 F.3d 938, 952 (9th Cir. 2008) (draft EAs need not be provided for public comment).

## IV.    BLM's Onshore Oil and Gas Management Process

BLM's statutory and regulatory framework for oil and gas decision-making forms the basis for the appropriate scope of public participation. BLM is required to conduct a number of NEPA reviews at key junctures in the three-staged decision-making process for federal oil and gas resources, and BLM provides varying levels of public participation at each stage.

First, BLM must prepare a planning EIS in conjunction with its preparation and approval of a new or revised RMP. 43 C.F.R. § 1601.0-6. BLM's extensive planning process allows multiple opportunities for public involvement and comment on the agency's proposed uses for the geographic area in question, including future oil and gas leasing and development. 43 C.F.R. § 1610.2.

Second, before holding a competitive oil and gas lease sale, BLM must determine whether offering nominated parcels for lease is in conformance with the applicable RMP. 43 C.F.R. § 1610.5-3. BLM must determine whether oil and gas leasing on the parcels in question have been sufficiently analyzed in an existing NEPA document (e.g., the EIS accompanying the RMP), or whether additional NEPA analysis is required. 40 C.F.R. § 1501.4. After performing NEPA review and analysis on the nominated parcels, BLM may decide to offer some, all, or none of the parcels for sale at a quarterly oil and gas lease sale. 43 C.F.R. § 3120.5-1. This analysis also helps inform BLM which stipulations to attach to lease parcels offered for sale.

Third, upon receiving an application for permit to drill (APD) or development plan from the lessee, BLM is required to undertake a site-specific environmental review to determine the

necessary level of additional NEPA analysis. 43 C.F.R. § 3162.5-1. BLM must undertake appropriate NEPA analysis prior to approving any exploratory or development permit. *Id.* Under the regulatory requirements of Onshore Order No. 1, BLM will conduct an on-site review prior to approving any APD. Oil and Gas Operations; Federal and Indian Oil and Gas Leases; Onshore Oil and Gas Order Number 1, Approval of Operations, 72 Fed. Reg. 10,308, 10,334 (Mar. 7, 2007). The lessee's proposed drilling and surface use plans must be approved by BLM before the lessee is allowed to perform any surface disturbing activities. 43 C.F.R. § 3162.3-1.

## FACTUAL BACKGROUND AND STANDARD OF REVIEW

The Alliance and the State of Wyoming adopt the Factual Background and Standard of Review as set forth by Federal Defendants in their Memorandum in Support of their Cross Motion. (Dkt. No. 140-1 at 7-11).

## ARGUMENT

To determine whether BLM abused its discretion with regard to public comment, this Court must look to the totality of the circumstances, including what additional information the Advocacy Groups allege they would have provided if offered more opportunity. The Advocacy Groups fail to identify any information that they would have provided with additional public notice and opportunity to comment. To the contrary, the Advocacy Groups' comments and protests demonstrate that BLM provided adequate public notice and comment and adequate protest periods. Accordingly, they cannot show that BLM acted unlawfully by conducting lease sales consistent with the IM's guidance.[1]

---

[1] In order to respect this Court's page limitations, the Defendant Intervenors adopt and incorporate the Federal Defendants' arguments on topics not addressed in this memorandum.

I.      **The Advocacy Groups Fail to Show BLM Exceeded Its Discretion by Adjusting the Time Allowed for Public Comment.**

Based upon the Ninth Circuit's "totality of the circumstances" standard, BLM's exercise of discretion in affording public comment and protest periods for the lease sales is entirely reasonable under the APA standard of review and is in accordance with both FLPMA and NEPA. *See Bering Strait Citizens*, 524 F.3d at 953. BLM afforded numerous opportunities for public review and comment, at both the federal land use planning and lease sale stages, as to which lands open to oil and gas leasing, and under what terms, conditions, and restrictions.

The Advocacy Groups' NEPA challenge rests on the presumption that BLM was required to provide the opportunity for public comment on an EA "to the extent practicable." 40 C.F.R. § 1501.4(b). Their FLPMA challenge alleges that BLM failed to provide adequate notice and opportunity to comment. 43 U.S.C. § 1739(e). Interior's regulations provide that "the methods for providing public notification and opportunities for public involvement [at the EA stage] **are at the discretion of the Responsible Official**." 43 C.F.R. § 46.305(a) (emphasis added). As confirmed by the Ninth Circuit, NEPA does not require the circulation of a draft EA for public comment in every case. *Bering Strait Citizens*, 524 F.3d at 953. When preparing an EA, an agency is only required to provide the public with "sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process." *Id.*

BLM's determination of what constitutes "practicable" under its own regulation is afforded substantial discretion. *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 613 (2013) (finding that a court defers to agency's interpretation of its own regulation, even if that is not the "best" reading of the regulation). Where statutes and regulations do not dictate the required level of public involvement, BLM has discretion to determine the appropriate amount. 43 C.F.R. § 46.305(a).

And "a court is not permitted to simply substitute its judgment for that of the agency." *Klamath Siskiyou Wildlands Ctr. v. Grantham*, 424 F. App'x 635, 638 (9th Cir. 2011).

As this Court and other courts within the Ninth Circuit have recognized, it is appropriate to look to what additional information a plaintiff would have offered had it been given additional opportunity for public notice and comment. *Alliance for the Wild Rockies v. Farnsworth*, 2017 U.S. Dist. LEXIS 66606, at *7 (D. Idaho May 1, 2017) (Winmill, J.), (citing *Sequoia ForestKeeper v. Elliott*, 50 F. Supp. 3d 1371, 1387 (E.D. Cal. 2014)). In *Elliott*, the court acknowledged that "to the extent practicable" is a fact-intensive inquiry. 50 F. Supp. 3d at 1387. Courts must look at the agency's NEPA documents and the information provided by the parties challenging the decision. *Id.* In that case, the court found that it could only provide relief to a challenging party if the plaintiff could show that the plaintiff would have provided additional information to the agency that, if considered, would present "a seriously different picture of the environmental landscape." *Id.* (quoting *Nat'l Comm. For the New River v. FERC*, 373 F.3d 1323, 1330 (D.C. Cir. 2004). And the court found it telling that the plaintiffs could not identify "any specific information that they would have included in their comments but did not . . . . They only generally contend that they were unable to prepare comments that were adequately responsive." *Id.* at 1388. In essence, the court acknowledged the underlying purpose of NEPA as a whole as well as the public comment process—to ensure evaluation of environmental impacts. *Id.*; *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 642 (9th Cir. 2004). Similarly here, Advocacy Groups cannot show BLM failed to consider any comments. Thus, no abuse of discretion.

As illustrated by *Farnsworth* and *Elliott*, the Advocacy Groups cannot simply rely on conclusory allegations, in the abstract, that public participation was inadequate. Rather, they must demonstrate that "they would have been able to put information before Defendants that would

have been substantially different from what the Defendants did consider." *Elliott*, 50 F. Supp. 3d at 1388. Thus, the Advocacy Groups are not just required to provide evidence of information they would have provided had they had adequate time, but also that such information would have been **substantially** different. As explained below, the Advocacy Groups cannot make this showing. Rather, the administrative record shows that they have made the same lengthy objections during the public comment period and the protest period of every stage of the three-stage process to date.

## II. The Advocacy Groups' Comments and Protests Demonstrate That BLM Did Not Violate NEPA or FLPMA.

The Advocacy Groups' failure to show arbitrary and capricious agency action or an abuse of discretion is apparent when their allegations are viewed in the larger context of BLM's three-stage onshore oil and gas program. The Advocacy Groups allege that the agency violated the APA during the lease sales because it failed to involve the public "to the extent practicable." (Dkt. No. 135-1 at 10). However, the administrative record illustrates that the public in general, and these plaintiffs in particular, have had a full and fair opportunity for public comment on BLM's land use decisions related to the lease sales, from the extended public scoping period in 2011 on the underlying Greater Sage Grouse RMPs to the Advocacy Groups' objections to these parcels being offered for lease over seven years later in 2018.

The Advocacy Groups cannot carry their burden of proving that public participation related to the lease sales was unlawfully restricted because they fail to identify any information that they were unable to provide BLM. *Farnsworth*, 2017 U.S. Dist. LEXIS 66606, at *17. To the contrary, the administrative record shows that the Advocacy Groups had adequate opportunity for public participation, because they repeatedly offered the same information, documentation, and comments at every stage of the land use planning and lease sale processes.

The Advocacy Groups' substantive claims in their First Amended Complaint focus on four key issues: (1) the lease sales did not conform to underlying RMPs, including failing to prioritize leasing and development outside greater sage-grouse habitat; (2) the lease sales failed to follow the best available science; (3) BLM failed to prepare an EIS; and (4) the lease sales failed to address direct, indirect, and cumulative impacts of leasing on greater sage-grouse, including failure to conduct a range-wide analysis and consider alternatives that would prohibit or limit leasing in greater sage-grouse habitat. *See* Dkt. No. 78 ¶¶ 282–282a, 291, 304–05, 330. The Administrative Record shows that the Advocacy Groups have raised these same issues repeatedly to BLM over a seven year period, from the land use planning and lease sale process to the eventual leasing of these parcels. (*See e.g.* IDMT_0005023 at IDMT_0005162; GBR_0001989 at GBR_0002005, 2026; WO_0024925 at WO_0024933; WY_000768 at WY_000769; WY9_053639-40; LFO_0022822 at LFO_0022828-60; NV_0055937 at NV_0055972; WY9_052458; WY9_000779; BH_0019252; BUF_0088496; WY019262-65; WY024026; WY027436); *Farnsworth*, 2017 U.S. Dist. LEXIS 66606, at *17. BLM afforded adequate public participation for the Advocacy Groups to flag each of the issues that they have raised as issues of concern at every stage of the land use planning process, including the challenged Lease Sale Decisions. Accordingly, the Advocacy Groups' arguments lack merit.

### A.     BLM Provided Ample Opportunity for Public Participation on the Underlying RMPs.

The administrative record demonstrates that the Advocacy Groups had adequate public notice and opportunity for engagement at the land use planning stage that underlies the leases in question. They provided information and comments to BLM at the scoping stage, the draft EIS stage, and the protest stage on the 2015 Greater Sage Grouse Resource Management Plan

Amendments, which determined what lands BLM would designate as open and closed for leasing and on what terms, i.e. conditions of approval and stipulations, BLM would offer any leases.

First, at the Scoping Stage in 2011, BLM filed a Notice of Intent to Prepare Environmental Impact Statements and Supplemental Environmental Impact Statements to Incorporate Greater Sage-Grouse Conservation Measures Into Land Use Plans and Land Management Plans. 76 Fed. Reg. 77008 (Dec. 9, 2011) (Notice of Intent). The Notice of Intent initiated a 60-day public scoping process. 76 Fed. Reg. at 77009. The 60-day period was extended until March 23, 2012, resulting in a 106-day comment period. 78 Fed. Reg. 79004 (Dec. 27, 2013).

During the scoping period, the Advocacy Groups filed extensive comments on the proposed RMP revisions, including comments on which portions of the land use planning area should be designated as "open" or "closed" for oil and gas leasing. Specific comments included requests that BLM not lease in greater sage-grouse habitat, that it create additional areas of critical environmental concern closed to leasing, and that it impose timing limitations and density and disturbance caps. (*See, e.g.,* WWP Scoping Cmts., IDMT_0005023 at IDMT_0005162 (proposed Sage-grouse Recovery Alternative recommended no new leasing or permits, imposition of timing limitations and stipulations based on best available science); CBD Scoping Cmts., GBR_0001989 at GBR_0002005, 2026 (requesting use of science based restrictions, prohibition or limitation of leasing in core habitat, disturbance caps, protection of seasonal habitat and buffers); WWP and CBD Rangewide Sage Grouse Conservation Recommendations, WO_0024925 at WO_0024933 (same); WWP and CBD Cmts. on WY Core Area Strategies, WY_000768 at WY_000769 (conservation strategies do not follow best available science)).

In 2013, BLM published draft EISs for the 2015 RMP amendments, providing another 90-day comment period. 78 Fed. Reg. at 79004. The Advocacy Groups again filed extensive

comments on what lands to open to oil and gas leasing, as well as comments on their views on the best available science, reasonable range of alternatives, cumulative impacts, protection of wintering habitat, establishment of baseline conditions, prohibition of leasing in greater sage-grouse habitat, and imposition of density and disturbance caps. (*See* CBD Cmts. on WY Draft EIS, WY9_053635 at WY9_053639–40; CBD Cmts. on Lewiston FO Draft EIS, LFO_0022822 at LFO_0022828–60; CBD Cmts. on NE CA/NV Draft EIS, NV_0055937 at NV_0055972; WWP Cmts. on WY Draft EIS, WY9_052458).

After BLM issued the Final EISs in 2015, the Advocacy Groups protested each of the proposed RMP amendments, alleging the same concerns brought in this suit, including that BLM inappropriately opened areas to oil and gas leasing, and failed to: consider range-wide impacts; consider a reasonable range of alternatives; utilize a proper baseline; adopt protective measures; and withdraw areas from leasing. (*See* WWP and CBD Protest of WY GrSG Proposed RMPA and Final EIS, WY9_000779; WWP and CBD Protest of Bighorn Basin Proposed RMPA and Final EIS, BH_0019252; WWP and CBD Protest of Buffalo Proposed RMPA and Final EIS BUF_0088496).

In sum, the Advocacy Groups had multiple opportunities, and hundreds of days, to provide comments and submit additional information for BLM's consideration on BLM's proposed land use plans underlying the lease sales at issue here, including those land use plans' designation of lands as open or closed to oil and gas leasing as well as the applicable stipulations attached to those leases. The Advocacy Groups engaged in this public comment period and provided BLM with information for it to consider in evaluating those land use plans. The administrative record, therefore, provides robust documentation of the Advocacy Groups' opportunity to comment on the underlying land use plans.

**B.      BLM Provided Ample Opportunity for Public Participation at the Lease Stage.**

In addition to the extensive opportunity for public comment on oil and gas leasing decisions that BLM provided during the initial phase of the land use planning process, BLM also provided the Advocacy Groups extensive opportunities for public involvement at the leasing stage. They submitted detailed comments on each of the lease sale EAs, arguing the exact same issues raised in this litigation during the following phases: (1) Notification of Intent to Offer; (2) the Draft EA, (3) the Notice of Lease Sale; and (4) the protest periods.

For example, for the Wyoming September 2018 Lease Sale, the Advocacy Groups were notified of the Intent to Offer Parcels for Lease for many of the parcels included in this Sale on January 23, 2018, for which BLM provided a 30-day comment period, and an overlapping 34-day comment period on the draft EA. (WY019262-65). On May 8, 2018, BLM-Wyoming made available the EA announcing a second batch of parcels for inclusion in the September sale. (Third Quarter 2018 Lease Sale EA, Part 2 at WY024026). Next, they had an additional 14-day period to comment on the Notification of Intent for these parcels. (*Id.*). Notwithstanding the fact that BLM is not even required to notice a draft EA or provide for public comment, BLM provided the Advocacy Groups and the general public a 10-day protest period on the Lease Sale EA. (Notice of WY Sept. 2018 Lease Sale at WY027436). Not including the overlapping comment periods, BLM provided a total of sixty-one days to comment on the September 2018 Wyoming Lease Sale, and a list of potential parcels for inclusion over eight months prior to the actual sale. These comment periods complied with BLM's statutory obligations, and were within BLM's discretion.

The Advocacy Groups provided comments at each of these stages, raising the same concerns that they raised at the RMP stage and in this litigation. (*See* WY Sept. 2018 Lease Sale EA Appendix F, WY027957 at WY027958–70 (CBD and WWP Cmts. alleged failure to prioritize

outside habitat, conform to RMP, and use best available science)). The Advocacy Groups filed an extensively detailed 62-page protest of the Wyoming September 2018 Lease sale, challenging all parcels offered. (CBD and WWP Protest at WY028356 (IM 2018-034 improperly limited public participation, failed to adequately analyze impacts to resources, failed to conform to underlying RMPs, failed to use best available science, and failed to prioritize leasing outside greater sage-grouse habitat.)).

The Advocacy Groups provided similar comments for the Wyoming Second Quarter Lease Sale. CBD filed a protest alleging that BLM was obligated to prepare an EIS, failed to analyze impacts, and should have not leased parcels. (CBD Cmts. on WY June 2018 Lease Sale EA, WY004629; *see also* CBD Cmts. on WY June 2018 Lease Sale EA, WY005948 (alleging failure to disclose cumulative impacts, use best available science, consider reasonable alternative, and conform to the 2015 GrSG RMPAs); CBD and WWP Cmts. on WY June 2018 Lease Sale EA (same); CBD and WWP Cmts. on NV June 2018 Lease Sale EA, NV001850 (failure to prepare an EIS, failure to adequately analyze impacts, failure to provide baseline conditions, failure to conform to RMPA)).

The Advocacy Groups filed two protests of the Wyoming June 2018 Lease Sale, totaling more than 130 pages and protesting every parcel offered. (CBD Protest WY009182; CBD and WWP Protest WY009682). In these protests, as with their RMP protests, they alleged that BLM failed to use the best available science, failed to conform to underlying RMPs, failed to prioritize leasing, or adequately analyze impacts to resources. (WY009682–9716; *see also* WY0099198–9200, 9211 (BLM failed to prepare an EIS and should not lease parcels)).

The same is true of the other challenged lease sales. For the Utah September 2018 Lease Sale, the Advocacy Groups alleged that the EA failed to conform to the Utah RMPA, including

prioritizing outside habitat, and failed to assess impacts from private lands. (CBD and WWP Cmts. on Utah September 2018 Lease Sale EA, UT2815; CBD and WWP Cmts. on Utah September 2018 Lease Sale EA, UT023003).

For the June 2018 Nevada Lease Sale, the Advocacy Groups filed a 66-page protest against all lease parcels offered. CBD and WWP Protest of June 2018 NV Lease Sale, NV002039. They specifically alleged that BLM failed to prepare an EIS, failed to adequately analyze impacts to resources, failed to consider reasonable alternatives, and failed to conform to the underlying RMP—including prioritization of leasing outside habitat. *Id.* For the September 2018 Nevada Lease Sale, the Advocacy Groups filed a 50-page protest, again protesting all parcels. (CBD and WWP Protest of September 2018 NV Lease Sale, NV001310). They argued that the use of a determination of NEPA adequacy was improper, BLM should have prepared an EIS, IM 2018-034 improperly limited public participation, failed to properly analyze impacts, and failed to conform to the underlying RMP. (*Id.*).

Over the last eight years, the Advocacy Groups have continually commented on and protested leasing decisions in land use planning and subsequent lease sales. Their comments and protests repeat common themes and criticisms, most notably that: BLM should not lease in greater sage-grouse habitat; conservation measures need to follow best available science; and BLM should prepare an EIS. At this stage of the litigation, the validity of these claims is not at issue; rather the Court is tasked with evaluating whether BLM failed to provide adequate public participation in the leasing process under NEPA and FLPMA. Their extensive participation shows that, looking at the totality of the circumstances, BLM provided adequate public participation, and that BLM was fully advised of the Advocacy Groups' positions.

The Advocacy Groups do not point to any statutory or regulatory mandates that prescribe certain timeframes for public participation during the leasing stage of BLM's oil and gas management process. Dkt. 135-1 at 19-20. Instead, they claim that a **prior** IM afforded them more time to protest, and therefore BLM abused its discretion by reducing that time. *Id.* However, adequate public participation is not adjudicated by whether BLM could have done more, but whether the level of public participation provided the Advocacy Groups the opportunity to flag issues for the agency so that BLM could take the necessary "hard look" required by NEPA. *Farnsworth*, 2017 U.S. Dist. LEXIS 66606, at *7; *Bering Strait Citizens*, 524 F.3d 938 at 953. Here, the Advocacy Groups' litigation claims mirror the comments and protests that they submitted in connection with the 2015 Greater Sage-Grouse RMP amendments and the lease sales. This confirms that, under the totality of the circumstances, they have been afforded adequate opportunity for public involvement. As Judge Winmill stated, where public comments cover the same issues the Advocacy Groups now raise in litigation, they had enough information to identify issues and the agency provided adequate public notice and opportunity for comment. *Farsnworth*, 2017 U.S. Dist. LEXIS 66606, at *17. As such, the Advocacy Groups have not shown BLM abused its significant discretion or that its decisions were arbitrary and capricious.

## III. Vacatur of The Leases Is Not the Proper Remedy

The Advocacy Groups argue that the proper remedy tied to their allegations of inadequate public participation is for the Court to: (1) vacate the "challenged provisions" of IM 2018-034; (2) vacate the lease sales; and (3) restore the prior IM until BLM completes notice-and-comment rulemaking on the current IM.[2] (Dkt. No. 135-1 at 19-20). The Advocacy Groups' requested relief

---

[2] The Advocacy Groups also make the rather incredible claim that they reserve the right to move this Court to **compel** BLM to promulgate rules governing public participation in the oil and gas leasing process. (Dkt. No. 135-1 at 20).

is not supported by federal law because procedural violations support procedural, not substantive, remedies. Moreover, any alleged failure to provide adequate public comment pales in comparison to the unnecessary and costly cancellation of issued leases.

### A.     A violation of a procedural statute necessitates a procedural remedy

NEPA is a procedural statute promulgated to ensure that an agency makes an informed decision. *Vt. Yankee Nuclear Power Corp.*, 435 U.S. at 551. As such, the proper remedy for a procedural violation—such as the failure to provide for adequate public involvement under FLPMA and NEPA—is procedural. Courts routinely recognize this in the specific context of federal oil and gas leases. For example, as Federal Defendants note in their response brief, (Dkt. No. 141 at 45), the Ninth Circuit's decision in *Conner v. Burford* specifically rejected the proposal of lease cancellation and merely "enjoin[ed] the federal defendants from permitting any surface-disturbing activity to occur on any of the leases until they have fully complied with NEPA and the ESA." (Dkt. No. 140-1 at 36) (quoting *Connor v. Burford*, 848 F.2d 1441, 1461 (9th Cir. 1988)).

Other courts have also held that for a NEPA violation related to oil and gas leasing, the remedy is continued suspension of the leases pending execution of the proper procedure, not lease cancellation. *Mont. Wilderness Ass'n v. Fry*, 408 F. Supp. 2d 1032, 1038 (D. Mont. 2006); *Wilderness Soc'y v. Wisely*, 524 F. Supp. 2d 1285, 1306 n.12 (D. Colo. 2007); see also *Willow Creek Ecology v. U.S. Forest Serv.*, 225 F. Supp. 2d 1312, 1316 (D. Utah 2002) (for procedural violations of procedural statutes such as NEPA, remedies "are limited to procedural remedies.").

The federal district court in Colorado faced a very similar issue in *The Wilderness Society, v. Wisely*. 524 F. Supp. 2d at 1285. In that case, the Advocacy Groups brought a similar APA legal challenge for an alleged violation of NEPA. *Id*. The *Wisely* court recognized its very limited role was to review the procedures BLM undertook prior to offering specific lands for oil and gas development, and not to review the substantive policy decisions implicit in that decision. *Id. at*

1293-94. Although the court eventually determined that BLM's NEPA analyses were not sufficient to support leasing, the court did not cancel the oil and gas leases, acknowledging the potential adverse impacts to real property interests. *Id*. at 1312 n.12. Rather, the Court simply prohibited further surface disturbing actions on the leases until BLM complied with its procedural obligations under NEPA.

Similarly, a federal district court in Utah suspended, rather than cancelled, leases after a finding of NEPA violations. *S. Utah Wilderness All. v. U.S. Dep't of the Interior*, No. 06-CV-342-DAK, 2007 WL 2220525, at *1 n.3, *2 (D. Utah July 30, 2007) (rejecting argument that cancellation is necessary to "wipe the slate clean"). Specifically, the court held that, "[p]laintiffs are not entitled to any relief under NEPA beyond that which BLM's suspension decision has already afforded." *Id*. at *2. The court also found that cancellation was not necessary because BLM was obligated to honor its NEPA obligations on remand even if the court only suspended the leases. *Id*. at *1-*2; *see also Wilderness Society*, 524 F. Supp. 2d at 1312 n.12.

The Ninth Circuit accepts that agencies will comply with remand orders, whether those leases are suspended or canceled. *See Northern Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1157 (9th Cir. 1988) ("[The court] see[s] no reason to suppose that the Secretary will feel greater commitment to the original project if the leases are not voided but held in abeyance until a new evaluation is made."). As illustrated by these cases and others cited by Federal Defendants, (Dkt. 141 at 44-45), NEPA does not mandate vacatur of the leases. Consistent with these cases, the proper remedy for a procedural violation of NEPA would be lease suspension under 43 C.F.R. § 3103.4-4, not lease cancellation. This remedy would provide an opportunity for BLM to conduct additional NEPA review and analysis. It also would provide the leaseholders with the security of their property interests pending compliance with NEPA, particularly as the Advocacy Groups have

not alleged any additional analysis they assert that they will need to provide if the Court orders additional public comment on these lease sales.

### B.       Suspension, not Cancellation, is Warranted under the 9th Circuit Test

Suspension is also in line with the balancing test outlined by the D.C. Circuit and utilized by the Ninth Circuit when considering remedies on remand, including in the *Oregon Natural Desert Association* case cited by the Advocacy Groups. (Dkt. 135-1 at 24) (citing *Or. Nat. Desert Ass'n v. Zinke*, 250 F. Supp. 3d 773 (D. Or. 2017)). Under this test, courts weigh the seriousness of the agency's alleged error against "'the disruptive consequences of an interim change that may itself be changed." *Wood v. Burwell*, 837 F.3d 969, 976 (9th Cir. 2016). Here, the balance clearly tips against vacatur.

As explained above, the Advocacy Groups have not articulated any consequences of BLM's alleged error in not allowing for public comment. The Advocacy Groups have neither identified any additional comments they would have provided, nor do they speculate as to how BLM's decision would have changed. Thus, the effect of any error is minimal.

On the other hand, vacatur will have enormously disruptive consequences, not solely limited to the millions of dollars in lease sale revenue that the federal government (and the relevant states) will need to repay. Between the four challenged lease sales,[3] this would require BLM to refund over 125 million dollars' worth of revenues to purchasers. (*See* Challenged Lease Sale Results, NV 004109, UT046540, WY013763, WY032936). As 48% of the revenues received from these lease sales are provided to the States, Defendant Wyoming received nearly 44 million dollars of those revenues. This represents a massive disruptive consequence to the federal government, the affected state governments, and the lessees. As the Ninth Circuit has acknowledged, economic

---

[3] No parcels were sold in the 2018 September Nevada competitive lease sale.

consequences are absolutely valid considerations when weighing whether to vacate these leases. *See Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 994 (9th Cir. 2012) (denying vacatur where doing so would be economically disastrous").

## CONCLUSION

BLM is afforded substantial discretion under FLPMA to create regulations governing the land use planning process. BLM regulations require certain levels of public participation for development of RMPs and for the issuance of EISs, but not for EAs and lease sales. Accordingly, it was reasonable for BLM to exercise its substantial discretion and issue guidance governing the public participation process in this context.

The Advocacy Groups bear the burden of showing that public involvement was insufficient, under the totality of the circumstances, to allow them to identify issues for BLM to consider in its NEPA analysis, not just that BLM should have provided more time. The Advocacy Groups cannot point to any statutes or regulations that indicate public participation in the Phase One Lease Sales was inadequate, nor can they point to any information that they were not able to bring in protests or comments due to the public participation provided. Consequently, the Advocacy Groups cannot succeed on their Fourth and Fifth Claims, and the Court should grant summary judgment in favor of Federal Defendants and Intervenor Defendants.

Respectfully submitted this 26th day of June 2019.

s/ Malinda Morain
Bret Sumner, *Pro Hac Vice*
Malinda Morain, *Pro Hac Vice*
Michael Cross, *Pro Hac Vice*
BEATTY & WOZNIAK, P.C.
216 Sixteenth St., Suite 1100
Denver, CO 80202-5115
Telephone: 303-407-4499
Fax: 800-886-6566
E-mail: bsumner@bwenergylaw.com
        mmorain@bwenergylaw.com
        mcross@bwenergylaw.com

Paul Turcke
MSBT LAW
7699 West Riverside Drive
Boise, ID 83714
Telephone: 208-331-1800
Fax: 208-331-1202
Email: pat@msbtlaw.com

*Attorneys for Defendant-Intervenor Western
Energy Alliance*

s/Erik E. Petersen
Erik E. Petersen, WSB No. 7-5608
Senior Assistant Attorney General
Wyoming Attorney General's Office
2320 Capitol Avenue
Cheyenne, WY  82002
Telephone: 307-777-6946
Fax: 307-777-3542
Email: erik.petersen@wyo.gov

*Attorneys for Defendant-Intervenor State of
Wyoming*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 26th day of June 2019, I served a true and correct copy of the foregoing **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (PHASE ONE) [Dkt. 135]** via the Court's electronic case filing system which will cause the foregoing to be served upon all counsel of record.


*/s/ Malinda Morain*
Malinda Morain