Laurence J. ("Laird") Lucas (ISB # 4733)
llucas@advocateswest.org
Todd C. Tucci (ISB # 6526)
ttucci@advocateswest.org
Sarah Stellberg (ISB #10538)
sstellberg@advocateswest.org
Advocates for the West
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, and CENTER FOR BIOLOGICAL DIVERSITY, | Case No. 1:18-cv-00187-REB |
| Plaintiffs, | **PLAINTIFFS' COMBINED RESPONSE/REPLY BRIEF ON CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT (PHASE ONE) (ECF NOS. 135, 140, 148)**\*\* |
| v. | |
| DAVID BERNHARDT, Secretary of Interior, *et al.*, | |
| Defendants. | |

*\* Official Defendant automatically substituted per Fed. R. Civ. P. 25(d)*

\*\* This brief totaling 30 pages complies with the page limits of District of Idaho Local Rule 7.1 because it is a combined response brief opposing Federal Defendants' and Intervenors' Phase One summary judgment motions (ECF Nos. 140 & 148) and a reply brief in support of Plaintiffs' Phase One summary judgment motion (ECF No. 135).

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 2

I.     IM 2018-034 IS A FINAL AGENCY ACTION ................................................. 2

      A.     IM 2018-034 Was the Consummation of BLM's Decision-Making Process ........ 2

      B.     IM 2018-034 Determines Obligations of Agency Decision-makers and Rights of Public Commenters, and Has Legal Consequences ........................................... 3

II.     IM 2018-034 IS PROCEDURALLY AND SUBSTANTIVELY INVALID ................... 6

      A.     BLM Unlawfully Issued IM 2018-034 Without Notice-and-Comment Procedures Required Under FLPMA and the APA ............................................... 6

      B.     IM 2018-034 Is Substantively Invalid ................................................................. 9

           1.     IM 2018-034 Is Contrary to BLM's Public Participation Mandates Under NEPA and FLPMA .......................................................................... 9

           2.     IM 2018-034 Is an Arbitrary and Capricious Change in Policy ............. 10

III.     IM 2018-034 WAS APPLIED TO THE PHASE ONE LEASE SALES TO UNLAWFULLY RESTRICT PUBLIC INVOLVEMENT ......................................... 12

      A.     All Phase One Sales Allowed Just 10-Day Protest Periods ................................ 12

      B.     The September 2018 Comment Periods Were Not Adequate Either .................. 14

           1.     September 2018 Wyoming Lease Sale .................................................... 14

           2.     September 2018 Utah Lease Sale ........................................................... 15

           3.     September 2018 Nevada Lease Sale ....................................................... 16

           4.     These Comment Periods Did Not Involve the Public "To the Extent Practicable" ............................................................................................ 18

      C.     The Prior RMP Comment and Protest Periods Do Not Somehow Cure BLM's Violations in Approving the Phase One Lease Sales ............................. 19

IV.     THE COURT SHOULD VACATE IM 2018-034 AND THE UNLAWFULLY-ISSUED LEASES ............................................................................................ 20

      A.     Vacatur Is the Presumptive Remedy for Unlawful Agency Actions. ................. 20

B.     Defendants Have Not Shown that Vacatur of IM 2018-034 Is Unwarranted........21

C.     Defendants Have Not Shown that Vacatur of the Lease Sales is Unwarranted.....24

   1.     Seriousness of Legal Deficiencies .............................................................25

   2.     Disruptive Consequences of Vacatur ........................................................26

CONCLUSION.....................................................................................................................30

# TABLE OF AUTHORITIES

**Cases**

*A.L. Pharma, Inc. v. Shalala*,
   62 F.3d 1484 (D.C. Cir. 1995) ............................................................................... 30

*Alliance for the Wild Rockies v. Farnsworth*,
   No. 2:16-CV-433-BLW, 2017 WL 1591840 (D. Idaho May 1, 2017) ......................... 16, 19

*Allied–Signal, Inc. v. U.S. Nuclear Regulatory Commission*,
   988 F.2d 146 (D.C. Cir. 1993) ............................................................................... 20

*AquAlliance v. U.S. Bureau of Reclamation*,
   312 F. Supp. 3d 878 (E.D. Cal. 2018) ..................................................................... 20

*Association of Flight Attendants-CWA v. Huerta*,
   785 F.3d 710 (D.C. Cir. 2015) ................................................................................. 4

*Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*,
   462 U.S. 87 (1983) ................................................................................................ 25

*Bennett v. Spear*,
   520 U.S. 154 (1997) ............................................................................................ 2, 3

*Blue Mountains Biodiversity Project v. Blackwood*,
   161 F.3d 1208 (9th Cir. 1998) ........................................................................... 17, 19

*Bob Marshall Alliance v. Lujan*,
   804 F. Supp. 1292 (D. Mont. 1992)........................................................................ 24

*Boise Cascade Corp. v. U.S. Environmental Protection Agency*,
   942 F.2d 1427 (9th Cir. 1991) ............................................................................... 10

*California v. Block*,
   690 F.2d 753 (9th Cir. 1982) ................................................................................. 25

*California Communities Against Toxics v. U.S. Environmental Protection Agency*,
   688 F.3d 989 (9th Cir. 2012) ........................................................................... 20, 28

*California ex rel. Lockyer v. United States*,
   575 F.3d 999 (9th Cir. 2009) ................................................................................. 22

*California Trout v. Federal Energy Regulatory Commission*,
   572 F.3d 1003 (9th Cir. 2009) ................................................................................. 5

*Center for Auto Safety v. National Highway Traffic Safety Administration*,
452 F.3d 798 (D.C. Cir. 2006) ........................................................................ 4

*Center for Environmental Health v. Vilsack*,
No. 15-cv-01690-JSC, 2016 WL 3383954 (N.D. Cal. June 20, 2016) ................................. 21

*Center for Food Safety v. Vilsack*,
734 F. Supp. 2d 948, 953 (N.D. Cal. 2010) ........................................................ 27

*Christopher v. SmithKline Becham Corp.*,
567 U.S. 142 (2012) .................................................................................. 19

*Colorado Environmental Coalition v. Office of Legacy Management*,
819 F. Supp. 2d 1193 (D. Colo. 2011) ............................................................... 25

*Columbia Riverkeeper v. U.S. Coast Guard*,
761 F.3d 1084 (9th Cir. 2014) ...................................................................... 3

*Connor v. Burford*,
848 F.2d 1441 (9th Cir. 1988) ...................................................................... 24

*CropLife America v. U.S. Environmental Protection Agency*,
329 F.3d 876 (D.C. Cir. 2003) ...................................................................... 22

*Darby v. Cisneros*,
509 U.S. 137 (1993) ................................................................................. 6

*Decker v. Northwest Environmental Defense Center*,
568 U.S. 597 (2013) ................................................................................. 18

*Defenders of Wildlife v. Salazar*,
776 F.Supp.2d 1178 (D. Mont. 2011) ................................................................. 22

*Diné Citizens Against Ruining Our Environment v. Bernhardt*,
923 F.3d 831 (10th Cir. 2019) ................................................................... 24, 29

*Diné Citizens Against Ruining Our Environment v. Jewell*,
312 F. Supp. 3d 1031 (D.N.M. 2018) ................................................................. 29

*Diné Citizens Against Ruining Our Environment v. U.S. Office of Surface Mining
Reclamation & Enforcement*,
No. 12-CV-01275-JLK, 2015 WL 1593995 (D. Colo. Apr. 6, 2015) ........................... 28, 29, 30

*Eason Land Co. v. Secretary of U.S. Department of Interior*,
No. 14-cv-00951-SU, 2015 WL 1538501 (D. Or. Apr. 7, 2015) ...................................... 6

*Electronic Privacy Information Center v. U.S. Department of Homeland Security*,
653 F.3d 1 (D.C. Cir. 2011) ................................................................. 8

*Federal Communications Commission v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .................................................................. 10, 12

*Friends of the Capital Crescent Trail v. Federal Transit Administration*,
218 F. Supp. 3d 53 (D.D.C. 2016) ........................................... 21

*Heartland Regional Medical Center v. Sebelius*,
566 F.3d 193 (D.C. Cir. 2009) ................................................. 21

*High Country Conservation Advocates v. U.S. Forest Service*,
67 F. Supp. 3d 1262 (D. Colo. 2014) .................................. 21, 28

*Frozen Food Express v. United States*,
351 U.S. 40 (1956) ..................................................................... 5

*Fund For Animals v. Norton*,
281 F. Supp. 2d 209 (D.D.C. 2003) ......................................... 18

*Humane Society of the U.S. v. Locke*,
626 F.3d 1040 (9th Cir. 2010) ................................................. 20

*Idaho Farm Bureau Federation v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995) ........................................ 1, 20, 24, 27

*Idaho Watersheds Project v. Hahn*,
307 F.3d 815 (9th Cir. 2002) ............................................... 6, 17

*Idaho Watersheds Project v. Hahn*,
No. 97-cv-519-S-BLW (D. Idaho Mar. 31, 1999) .............................. 16

*Mada-Luna v. Fitzpatrick*,
813 F.2d 1006 (9th Cir. 1987) .................................................... 7

*McLouth Steel Products Corp. v. Thomas*,
838 F.2d 1317 (D.C. Cir. 1988) .................................................. 4

*Metcalf v. Daley*,
214 F.3d 1135 (9th Cir. 2000) ................................................. 27

*Montana Wilderness Association v. Fry*,
408 F. Supp. 2d 1032 (D. Mont. 2006) .................................. 24, 28

*Mt. St. Helens Mining and Recovery Ltd. Partnership v. United States*,
384 F.3d 721 (9th Cir. 2004) ................................................................. 23

*National Mining Association v. McCarthy*,
758 F.3d 243 (D.C. Cir. 2014) ................................................................ 4

*Natural Resources Defense Council v. Houston*,
146 F.3d 1118 (9th Cir. 1998) ........................................................ 27, 28

*Natural Resources Defense Council v. Jamison*,
815 F. Supp. 454 (D.D.C. 1992) ........................................................ 8–9

*Natural Resources Defense Council v. U.S. Environmental Protection Agency*,
643 F.3d 311 (9th Cir. 2013) ................................................................. 4

*Natural Resources Defense Council v. U.S. Environmental Protection Agency*,
676 F. Supp. 2d 307 (S.D.N.Y. 2009) .................................................. 29

*New Mexico ex rel. Richardson v. BLM*,
565 F.3d 683 (10th Cir. 2009) ....................................................... 17, 20

*Northern Cheyenne Tribe v. Hodel*,
851 F.2d 1152 (9th Cir. 1988) .............................................................. 24

*Organized Village of Kake v. U.S. Department of Agriculture*,
795 F.3d 956 (9th Cir. 2015) ................................................................ 12

*Pacific Gas & Electric Co. v. Federal Power Commission*,
506 F.2d 33 (D.C. Cir. 1974) ................................................................. 3

*Paulsen v. Daniels*,
413 F.3d 999 (9th Cir. 2005) ........................................................... 2, 22

*Pit River Tribe v. U.S. Forest Service*,
469 F.3d 768 (9th Cir. 2006) ................................................................ 24

*Pollinator Stewardship Council v. U.S. Environmental Protection Agency,*
806 F.3d 520 (9th Cir. 2015) ................................................................ 20

*Public Employees for Environmental Responsibility v. U.S. Fish & Wildlife Service*,
189 F. Supp. 3d 1 (D.D.C. 2016) .................................................... 28–29

*Sacora v. Thomas*,
   628 F.3d 1059 (9th Cir. 2010) ....................................................... 7

*San Juan Citizens Alliance v. BLM*,
   326 F.Supp.3d 1227 (D.N.M. 2018) ............................................. 24

*Sequoia ForestKeeper v. Elliott*,
   50 F.Supp.3d 1371 (E.D. Cal. 2014)............................................. 19

*Sierra Club v. U.S. Environmental Protection Agency*,
   873 F.3d 946 (D.C. Cir. 2017) ........................................................ 4

*Southern Utah Wilderness Alliance v. U.S. Department of the Interior*,
   No. 06-CV-342-DAK, 2007 WL 2220525 (D. Utah July 30, 2007) ..................................... 25

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*,
   282 F. Supp. 3d 91 (D.D.C. 2017)............................................. 29, 30

*Turtle Island Restoration Network v. U.S. Department of Commerce*,
   672 F.3d 1160 (9th Cir. 2012) ....................................................... 22

*U.S. Army Corps of Engineers v. Hawkes Co.*,
   136 S. Ct. 1807, 1815 (2016) ......................................................... 6

*Western Energy Alliance v. Salazar*,
   No. 10-cv-237F, 2011 WL 3738240 (D. Wyo. Aug. 12, 2011)............................................. 4

*Western Oil Gas v. U.S. Environmental Protection Agency*,
   633 F.2d 803 (9th Cir. 1980) .................................................... 25, 27

*Western Watersheds Project v. USDA APHIS Wildlife Services*,
   No. 1:17-cv-206-BLW, 2018 WL 6251358 (D. Idaho Nov. 29, 2018) ............................... 24

*Western Watersheds Project v. Kraayenbrink*,
   632 F.3d 472 (9th Cir. 2011) ....................................................... 11

*Western Watersheds Project v. Kraayenbrink*,
   538 F. Supp. 2d 1302 (D. Idaho 2008) ..................................... 5, 10

*Western Watersheds Project v. U.S. Department of Interior*,
   No. 1:15-cv-47-REB (D. Idaho Sept. 30, 2016) ............................... 6

*Wilderness Society v. U.S. Forest Service*,
   850 F. Supp. 2d 1144 (D. Idaho 2012) ........................................ 15

*Wilderness Society v. Wisely*,
    524 F. Supp. 2d 1285 (D. Colo. 2007).................................................................... 25

*Willow Creek Ecology v. U.S. Forest Service*,
    225 F. Supp. 2d 1312 (D. Utah 2002)................................................................... 25

**Statutes**

5 U.S.C. § 551............................................................................................................ 22

5 U.S.C. § 706............................................................................................ 8, 9, 20, 21, 23

43 U.S.C. § 1739.................................................................................................... 5, 10

**Regulations**

40 C.F.R. § 1500.1 ................................................................................................... 5, 25

40 C.F.R. § 1500.2 ................................................................................................... 5, 18

40 C.F.R. § 1501.4................................................................................................... 5, 18

40 C.F.R. § 1502.5.10 ................................................................................................. 27

40 C.F.R. § 1506.6..................................................................................................... 5, 9

43 C.F.R. § 46.120...................................................................................................... 16

43 C.F.R. § 46.305 ....................................................................................................... 5

**Other Authorities**

Department Hearings and Appeals Procedures; Cooperative Relations; Grazing
Administration—Exclusive of Alaska, 60 Fed. Reg. 9,893 (Feb. 22, 1995).............................. 11

General Accounting Office, *Onshore Oil and Gas: BLM's Management of Public Protests
to Its Lease Sales Needs Improvement,* GAO-10-670 (July 2010) ........................................... 14

## INTRODUCTION

Defendants say "Plaintiffs' claims challenging IM 2018-034 are without merit" but offer only the same arguments the Court rejected in its Preliminary Injunction Order (ECF No. 74), *i.e.*, that IM 2018-034 is a "guidance" document immune from judicial review and does not violate NEPA, FLPMA, or the APA. The Court can readily reject these arguments and enter judgment for Plaintiffs because IM 2018-034 imposes binding requirements on BLM, was adopted unlawfully, and has real-world impacts harming Plaintiffs and the public.

Those real-world impacts include the severe restriction of public involvement in BLM's June and September 2018 "Phase One" lease sales in Nevada, Utah, and Wyoming. Defendants and Intervenors claim "no harm, no foul" from BLM's application of IM 2018-034 to the Phase One lease sales, since Plaintiffs were able to submit comments and protests. But they do not even acknowledge, much less refute, the many declarations from Plaintiffs and other public interest organizations detailing how BLM's deliberate effort to curtail public input under IM 2018-034 in fact hindered their participation on those sales. The Court should thus hold the sales unlawful.

The normal remedy under the APA is to vacate and set aside unlawful agency action. That presumption applies equally to IM 2018-034 and the Phase One lease sales here. While equitable considerations may justify leaving an unlawful action in place while an agency cures its violations, *see Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405–06 (9th Cir. 1995), Defendants and Intervenors fail to demonstrate such equitable circumstances—particularly environmental harm—to justify deviating from the normal remedy here. To the contrary, Defendants and Intervenors pursued the Phase One sales with full knowledge of Plaintiffs' lawsuit and the likely public participation violations, so they should not now benefit by having those decisions left intact in any manner.

The Ninth Circuit has also made clear that "[t]he effect of invalidating an agency rule is to reinstate the rule previously in force." *Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005). Here, that means IM 2010-117 is reinstated upon vacatur of IM 2018-034. Defendants claim the "irony of this lawsuit" is that IM 2010-117 also did not go through notice-and-comment procedures. But there is nothing ironic about Plaintiffs seeking meaningful relief for the legal violations they have proven. IM 2010-117 better preserves public input into BLM oil and gas leasing, consistent with NEPA and FLPMA; and reinstating it avoids a regulatory vacuum that Defendants apparently want the Court to allow. And contrary to their objection that IM 2010-117 would impose procedures of "Plaintiffs' making," it was, quite obviously, crafted by BLM itself. The Court should thus reinstate the provisions of IM 2010-117 until BLM complies with its FLPMA duty to adopt regulations for public participation in its oil and gas leasing decisions

## ARGUMENT

## I.   IM 2018-034 IS A FINAL AGENCY ACTION.

Defendants rehash their argument that IM 2018-034 is mere "guidance" and thus not a reviewable action under the APA. But the Court previously considered and rejected those same arguments in its PI Order, and Defendants provide no basis for reaching a different result now.

### A.   IM 2018-034 Was the Consummation of BLM's Decision-Making Process.

Under the first prong of *Bennett v. Spear*, 520 U.S. 154 (1997), IM 2018-034 is a final action because it was the consummation of BLM's decision-making process on the issues it addressed. *See* BLMW828–832 (copy of IM 2018-034). The IM states that "[t]his policy is effective immediately," and "will be implemented across the BLM." BLMW831–832. It requires a parcel review timeframe "no longer than 6 months," BLMW829, and mandates that a "10-day public protest period will begin the day the sale notice is posted." BLMW831. This language is

not "tentative or interlocutory," *see Bennett,* 520 U.S. at 178, but rather definitive and binding.

The record also shows that BLM field offices believed compliance with IM 2018-034 was mandatory. *See, e.g.,* WY7816 ("the IM was effective immediately, so . . . 10 day protest was in effect"); WY20522 (memo announcing Wyoming BLM's "double up" process for adding parcels to "comply" with IM 2018-034). This underscores its finality. *See Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1094–95 (9th Cir. 2014) (agency action is final if "immediate compliance with its terms is expected").

Defendants concede that "the IM is final in the sense that BLM intended the procedures would govern" until changed. Defs. Opp. at 13 (ECF No. 141). But they contend that IM 2018-034 cannot be considered final because it left certain matters to the discretion of field staff, such as the type of NEPA document to use. *Id.* at 13–14. This argument is unavailing. Defendants do not claim that BLM staff have discretion to revisit the issues which IM 2018-034 did conclusively address, and the fact that IM 2018-034 did not comprehensively determine all aspects of BLM's lease review process does not render it any less final. *See Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974) (action must be "finally determinative of the issues . . . to which it is addressed"). As to Defendants' chosen example, IM 2018-034 *does* constrain the discretion of BLM staff on the type of NEPA document to use. *See* BLMW830 (if "the authorized officer confirms that the proposed leasing action has been adequately analyzed in existing NEPA document(s) . . . [a DNA] will be used"). IM 2018-034 thus meets the first *Bennett* prong, as the Court correctly ruled. *See* PI Order at 20–23.

## B.     IM 2018-034 Determines Obligations of Agency Decision-makers and Rights of Public Commenters, and Has Legal Consequences.

IM 2018-034 is also an action by which "rights or obligations have been determined" and from which "legal consequences will flow" under the second *Bennett* prong, 520 U.S. at 178.

PLAINTIFFS' RESPONSE/REPLY ON CROSS MOTIONS FOR PARTIAL SUMM. J. (PHASE ONE) - 3

Contrary to Defendants' argument, courts consider this prong met where, as here, the agency action alters the obligations of agency officials, regardless of its effect on private parties. *See McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1320 (D.C. Cir. 1988) ("If a statement denies the decisionmaker discretion in the area of its coverage . . . then the statement is binding, and creates rights or obligations."); *Nat. Res. Def. Council v. EPA*, 643 F.3d 311, 319–20 (9th Cir. 2013) (guidance binding on EPA regional administrators was final); *W. Energy All. v. Salazar*, No. 10-cv-237F, 2011 WL 3738240, at *6–7 (D. Wyo. Aug. 12 2011) (BLM IM was a final agency action where it "bind[s] the Federal Respondents").[1] IM 2018-034 binds BLM staff in several ways, including the requirements to complete the lease review process in 6 months and to allow only a 10-day protest period. As the Court aptly characterized it, the provisions of IM 2018-034 "collectively prescribe and require an unmistakably different regulatory framework in which BLM now handles its oil and gas lease parcel reviews and leasing decisions." PI Order at 25.[2]

---

[1] Defendants argue the IM in *Western Energy* violated the Energy Policy Act, while "IM 2018-034 does not contravene a specific statutory requirement to conduct NEPA in a particular way." Defs. Opp. at 16. To the contrary, as the Court agreed in its PI Order, IM 2018-034 does contravene both NEPA and FLPMA. But such statutory violations are not needed for the IM to be a final agency action, as long as the *Bennett* test is satisfied—as it is here.

[2] Defendants cite several D.C. Circuit cases where agency guidance documents were held not to be final actions, *see* Defs. Opp. at 15, but they are inapposite because none of them bound the agency or any other party, in contrast to IM 2018-034. *See Sierra Club v. EPA*, 873 F.3d 946, 952–53 (D.C. Cir. 2017) (change to guidance on calculating certain air emissions not final action where "on its face and as applied" guidance was not binding, allowing alternative methods to be used); *Ass'n of Flight Attendants-CWA v. Huerta*, 785 F.3d 710, 717–19 (D.C. Cir. 2015) (FAA notice to safety inspectors that did not bind airlines—which "are free to ignore" it—not a final action); *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 250-53 (D.C. Cir. 2014) (EPA guidance to staff on handling surface coal mining permits had no binding effect on regulated entities or states, and was not final action); *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 807–11 (D.C. Cir. 2006) (agency guidance to automakers on voluntary "regional recalls" which did not threaten any enforcement action not a final action).

While this alone is sufficient to satisfy the second prong of *Bennett*, IM 2018-034 also has "legal consequences" by purporting to alter BLM's legal duty, under both FLPMA and NEPA, to facilitate public involvement in its leasing decisions. NEPA regulations provide that agencies "shall" and "must" involve the public. 40 C.F.R. §§ 1501.4(b), 1506.6, 1500.2(d), 1500.1(b); 43 C.F.R. § 46.305(a). The Ninth Circuit has clarified that the NEPA regulations mean an agency "must permit some public participation when it issues an EA." *Cal. Trout v. Fed. Energy Regulatory Comm'n*, 572 F.3d 1003, 1016 (9th Cir. 2009). FLPMA similarly requires public involvement in public lands decisions. *See* 43 U.S.C. § 1739(e). IM 2018-034 contravenes these requirements by making public participation discretionary, stating in section III.B.5 that BLM offices "*may* provide for public participation during the NEPA process." BLMW830. As this Court held, "[d]iscretionary public participation opportunities are not consistent with FLPMA and NEPA." PI Order at 38; *see also W. Watersheds Project v. Kraayenbrink*, 538 F. Supp. 2d 1302, 1315–16 (D. Idaho 2008) (holding unlawful BLM regulatory revision that sought to grant BLM "forbidden discretion" not to involve the public). By purporting to alter BLM's legal duty under NEPA and FLPMA, IM 2018-034 thus has legal consequences.

Defendants ignore these legal consequences and contend the second prong of *Bennett* is not met because IM 2018-034 has no "immediate and practical" effect on Plaintiffs' rights or obligations. Defs. Opp. at 14. But the IM did have an "immediate and practical impact" on Plaintiffs and the interested public, including by eliminating mandatory comment periods; limiting protest periods to just 10 days; and increasing the scale of leasing the public must comment on at each step. *See* ECF Nos. 30-2 to 30-8, 63-1, 63-2, 135-3 to 135-7 (supporting declarations); *see also Frozen Food Express v. United States*, 351 U.S. 40, 43–44 (1956)

(considering the "immediate and practical impact" of agency order); *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016) (affirming "pragmatic" approach to finality).

Defendants also argue that Plaintiffs are not legally harmed by IM 2018-034 limiting protests to just 10 days because FLPMA does not require a protest period. Defs. Opp. at 25–26. But that is irrelevant to the analysis of whether IM 2018-034 is a final action. BLM has provided for protests as part of its leasing process since at least 1985. *See* WY39055–67 (BLM Manual Handbook 3100-1 (1985)); *see also* WY39697-706 (IM 2005-176, providing a 30-day protest period). Interested parties risk dismissal in federal court for failure to exhaust administrative remedies if they do not follow the protest process.[3] Additionally, as the Phase One sales here illustrate, protest periods are now commonly the *only* opportunity for the public to submit site-specific and up-to-date information to BLM on proposed leases, since IM 2018-034 mandates use of DNAs, without public comment, under certain circumstances. *See* Section III.B, *infra*. These, too, are "immediate and practical impact[s]" satisfying the second *Bennett* prong.

## II.   IM 2018-034 IS PROCEDURALLY AND SUBSTANTIVELY INVALID.

### A.   BLM Unlawfully Issued IM 2018-034 Without Notice-and-Comment Procedures Required Under FLPMA and the APA.

Defendants again insist that IM 2018-034 is simply a "general statement of policy" and thus exempt from notice-and-comment requirements. *See* Defs. Opp. at 17–20. But Plaintiffs

---

[3] Defendants have repeatedly argued in other cases—including unsuccessfully before this Court—that a party's failure to follow BLM administrative review procedures constitutes a failure to exhaust administrative remedies. *See, e.g., Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 824–29 (9th Cir. 2002); *W. Watersheds Project v. U.S. Dep't of Interior*, No. 1:15-cv-47-REB (D. Idaho Sept. 30, 2016), ECF No. 52. Defendants now seem to concede such exhaustion is not required under the APA and *Darby v. Cisneros*, 509 U.S. 137 (1993). *See* Defs. Opp. at 26. But their exhaustion argument has succeeded in other cases, and there is no assurance BLM won't seek dismissal on this ground again. *See, e.g., Eason Land Co. v. Sec'y of U.S. Dep't of Interior*, No. 2:14-cv-00951-SU, 2015 WL 1538501, at *9 (D. Or. Apr. 7, 2015) (plaintiffs failed to exhaust after they elected not to file a protest or appeal).

have already shown, and the Court agreed, that IM 2018-034 is not a policy statement but rather a substantive rule unlawfully adopted without notice-and-comment procedures required under FLPMA and the APA. *See* PI Order at 33–35.

Under the APA, the "critical factor" in distinguishing a general statement of policy from a substantive rule is "the extent to which the challenged [directive] leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the [announced] policy in an individual case." *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013 (9th Cir. 1987) (internal citation omitted) (alteration in original). IM 2018-034 fails this standard. It is written in binding terms and leaves BLM officials no discretion as to the details relevant here: that BLM must use a 6-month parcel review period; that participation is not required for every lease sale; and that BLM must allow only a 10-day protest period. "These are requirements (not general statements of policy)." *See* PI Order at 34.[4]

Defendants argue that, "to a certain extent, [IM 2018-034] could also be considered to be an interpretive rule, as it advises the public about how it will carry out the oil and gas leasing process in accordance with existing rules and regulations." Defs. Opp. at 18. However, interpretive rules cannot be "inconsistent with" existing laws or "impose new rights or obligations." *See Sacora v. Thomas*, 628 F.3d 1059, 1070 (9th Cir. 2010). IM 2018-034 fails on both counts. As explained above, *supra* section I.B, it is inconsistent with NEPA and FLPMA by purporting to make public participation discretionary. Additionally, IM 2018-034 imposes a legal

---

[4] The Court declined to enjoin the IM's 6-month limit for parcel reviews on the assumption that "public participation provisions can be fulfilled" within that time. PI Order at 56. The record now before the Court shows otherwise. *See* Supp. Fuller Decl. ¶¶ 8–10 (BLM staff admitting that analyses were expedited and comment periods shortened because "everyone was crunched" by the 6-month deadline). The prior rule, IM 2010-117, imposed no deadline. Because IM 2018-034 was unlawfully adopted, this provision should now be vacated; and reinstating IM 2010-117 would allow BLM field offices a longer timeframe, if necessary for adequate NEPA compliance.

right or obligation by requiring BLM to provide a 10-day protest period. BLMW831 (IM 2018-034 at IV.B). This protest right is not elsewhere codified. Thus, far from merely interpreting existing regulations, BLM has impermissibly effected a substantive change in existing law by informal means. *See Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 6–7 (D.C. Cir. 2011) (interpretive rule cannot be used to effect "a substantive regulatory change").[5]

Defendants warn that "[i]f Plaintiffs are correct, then . . . BLM also would be prohibited from providing any sort of guidance to its field offices on how to conduct the NEPA process in particular contexts." Defs. Opp. at 24. This extremist position ignores the obvious fact that BLM could have lawfully provided mere *guidance* to field staff about the length of comment periods or similar matters covered by IM 2018-034. But that is not what BLM attempted here. Rather, BLM prescribed a binding and "unmistakably different regulatory framework" for its leasing program, PI Order at 24.  If BLM objects to the time a proper rulemaking process would take, its complaints should be addressed to Congress.

Finally, Defendants assert that *Natural Resources Defense Council v. Jamison*, 815 F. Supp. 454 (D.D.C. 1992), involved a "failure to act" claim under APA § 706(1), and argue Plaintiffs should have brought a similar claim here to compel BLM regulations regarding public involvement in oil and gas leasing. Defs. Opp. at 19.  But the availability of an APA § 706(1) "failure to act" claim does not preclude Plaintiffs from challenging IM 2018-034 as a *de facto* rule which was unlawfully adopted without any public involvement.[6]

---

[5] Moreover, Defendants' argument that "Plaintiffs have failed to demonstrate in any way that the procedures in IM 2018-034 are inconsistent with regulations," Defs. Opp. at 18, completely ignores the Court's prior holding to the contrary. *See* PI Order at 36–42.

[6] Defendants' reading of *Jamison* is also doubtful, as it appears the court there focused on plaintiffs' challenge under APA § 706(2) to BLM's guidance manual as unlawfully promulgated without notice-and-comment, like here. *Compare* 815 F. Supp. at 461 (expressly analyzing a

For these reasons and those previously briefed,[7] the Court should hold that BLM

unlawfully adopted IM 2018-034 without notice-and-comment procedures.

**B.      IM 2018-034 is Substantively Invalid.**

These procedural claims are sufficient grounds to vacate IM 2018-034, but Plaintiffs have

also shown that the substance of IM 2018-034 is facially invalid, on two independent grounds.

1.      <u>IM 2018-034 Is Contrary to BLM's Public Participation Mandates Under
NEPA and FLPMA</u>

Defendants claim that IM 2018-034 satisfies NEPA and FLPMA because it "allows BLM

officials to provide for public participation when it deems such participation to be appropriate."

Defs. Opp. at 23. This argument is unavailing. While IM 2018-034 may not dictate the length of

any comment period, it impermissibly grants BLM discretion to entirely shut the public out from

leasing decisions, by replacing "will" with the discretionary "may." *Compare* IM 2010-117 §

III.C.7, *with* IM 2018-034 § III.B.5. As the Court correctly held, "[d]iscretionary public

participation opportunities are not consistent with FLPMA and NEPA." PI Order at 38.

For lease sales approved through a DNA, the IM also categorically declares that public

comment is not required. Even assuming a DNA without fresh public comment satisfies

NEPA—which Plaintiffs dispute—this practice violates FLPMA Section 309(e)'s requirement

for public input on all management decisions—regardless of whether a *different decision* was

---

different claim under § 706(1)); *with id.* at 468 (claim regarding FLPMA § 309(e) not
mentioning § 706(1) or its unique standard). Even accepting Defendants' reading, *Jamison*
applies equally here in holding that BLM cannot evade FLPMA § 309(e) by structuring public
participation through internal guidance, instead of proper regulations.

[7] Defendants offer no defense to Plaintiffs' separate argument that BLM's failure to seek any
public comment on its NEPA procedures under IM 2018-034 violated 40 C.F.R. § 1506.6
(agencies must "make diligent efforts to involve the public in preparing . . . . their NEPA
procedures."). *See* Pls. Op. Br. at 9–10 (ECF 125-1). This too demonstrates that the issuance of
IM 2018-034 without any public involvement was procedurally improper.

previously studied under NEPA.

Defendants next argue that whether BLM allows sufficient public involvement under FLPMA Section 309(e) "should be judged in the context of all of the prior planning and public involvement that preceded the leasing decision." Defs. Opp. at 23. However, FLPMA expressly requires public participation in *both* planning and management decisions. *See* 43 U.S.C. § 1712(a) (RMP development); 43 U.S.C. § 1739(e) (management decisions). Defendants' position would improperly render Section 309(e) meaningless. *See Boise Cascade Corp. v. EPA*, 942 F.2d 1427, 1432 (9th Cir. 1991) ("[w]e must interpret statutes as a whole, giving effect to each word" such that no provisions are rendered "inconsistent, meaningless or superfluous.").

Defendants also fail to persuasively distinguish *Kraayenbrink*, 538 F. Supp. 2d 1302. Def Opp. at 24. They claim the grazing regulation amendments there "fundamentally eliminate[d] public involvement from actions that the public was previously invited to provide input on." Defs. Opp. at 18. But IM 2018-034 eliminates public involvement from sales approved with a DNA and removes the previously-guaranteed comment period on lease sale EAs, leaving the decision to allow public input to the discretion of BLM officials, like *Kraayenbrink*. *See* 538 F. Supp. 2d at 1315 ("BLM asserts that the revisions do not prevent it from seeking public input at its discretion. Assuming that is true, the revisions would violate FLPMA.").

### 2.   IM 2018-034 Is an Arbitrary and Capricious Change in Policy

IM 2018-034 was also arbitrary and capricious because BLM failed to provide a reasoned explanation for limiting public participation in oil and gas leasing compared to IM 2010-117. BLM "must show that there are good reasons for [a] new policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). And if the "new policy rests upon factual findings that contradict those which underlay its prior policy," the agency must "provide a more detailed

justification than what would suffice for a new policy created on a blank slate." *Id.*

Here, BLM issued IM 2010-117 in response to DOI's 2009 Report which recommended reforms to BLM's lease review process, including greater public participation to improve leasing decisions. *See* ECF No. 30-15 (2009 Report). IM 2010-117 aimed to improve the quality and transparency of BLM's reviews and provide meaningful public involvement in the process, including through the required 30-day NEPA comment and protest periods. *See* BLMW450 (IM 2010-117, Purpose). Ensuring meaningful public participation in BLM's land management decisions is not only mandated by FLPMA and NEPA, as explained above, but helps ensure that BLM makes sound public lands decisions in accordance with its statutory mandates—as BLM has recognized. *See, e.g.,* 60 Fed. Reg. 9,893, 9,895 (Feb. 22, 1995) (In adopting regulations for increased public involvement in grazing management, BLM explained that "the public interest will be best served if a wide range of interests are represented when decisions are being made" and "increased public participation is essential to achieving lasting improvements in the management of our public lands"); *see also W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 487–89, 494 (9th Cir. 2011) (noting BLM's recognition that "public input helps identify environmental impacts," and criticizing later changes to reduce public involvement as "discordant with the lessons learned from the history of . . . increased public participation.").

As they did during the preliminary injunction phase, Defendants argue that reducing public comment and protest periods was justified because the October 2017 DOI Report concluded that IM 2010-117 resulted in delays and "unnecessary impediments and burdens" in approving oil and gas leases. *See* Defs. Opp. at 28. But the rationales stated in IM 2018-034 and the 2017 Report reveal that BLM only took into account costs and delays under IM 2010-117, while completely ignoring the benefits of increased public participation and better decision-

making that it previously acknowledged.

"An agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate." *Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 969 (9th Cir. 2015) (quoting *Fox*, 556 U.S. at 537) (Kennedy, J., concurring)). Without considering *both* costs and benefits of public participation, BLM's adoption of IM 2018-034 was arbitrary and capricious. *See California v. BLM*, 277 F. Supp. 3d 1106, 1122 (N.D. Cal. 2017) (BLM was arbitrary and capricious where it "only took into account the costs to the oil and gas industry of complying with the [prior rule] and completely ignored the benefits.").  Accordingly, the Court should grant partial summary judgment to Plaintiffs holding IM 2018-034 unlawful.

## III.   IM 2018-034 WAS APPLIED TO THE PHASE ONE LEASE SALES TO UNLAWFULLY RESTRICT PUBLIC INVOLVEMENT.

Defendants and Intervenors do not dispute that BLM followed and applied IM 2018-034 in approving the Phase One sales. But they argue that does not matter, since BLM allowed public comment on most of the sales and Plaintiffs were able to submit comments and protests. Intervenors also argue that Plaintiffs had adequate opportunities at the RMP development stage to make their views known. None of these arguments has merit.

### A.   All Phase One Sales Allowed Just 10-Day Protest Periods.

It is undisputed that BLM allowed only a 10-day protest period on each Phase One sale. *See* Pls. SOF ¶¶ 22–23 (June 2018 WY), ¶¶ 29–30 (June 2018 NV), ¶¶ 33–35 (Sept. 2018 NV), ¶ 41 (Sept. 2018 UT); Defs' SOF, ¶ 12 (Sept. 2018 WY). This fact alone is dispositive in showing that the Phase One lease sales were unlawful.

Defendants again argue that FLPMA does not require protests, so Plaintiffs have no legal basis for complaining that IM 2018-034 shortened the prior 30-day protest period under IM

2010-117 to just 10 days. But as already discussed above, the fact that BLM provides for protests

in the oil and gas leasing process means that Plaintiffs and other members of the public must

utilize it, or risk losing their ability to challenge lease sales in court. *See* Section I.B, *supra.*

Moreover, as Plaintiffs' declarations establish, BLM's shortening of the protest period to

just 10 days substantially limited the ability of Plaintiffs and others to provide meaningful input

to BLM on the proposed Phase One lease sales. *See* Emmerich Decl. ¶¶ 21 (ECF No. 30-7)

(explaining that the shorter protest period compromised Basin and Range Watch's participation

for the June 2018 Nevada sale; "I had to have it finished 2 days before the deadline to get it in on

time—I live in a small community that doesn't have overnight mail and protests cannot be

submitted electronically. . . . A lot of details had to be eliminated to meet the deadline"); Baker

Decl. ¶ 39 (ECF No. 30-6) (Upper Green River Alliance "could have provided historical

knowledge and scientific research [regarding September 2018 Wyoming sale] that BLM may not

have had time or resources to research and employ, but we were not able to because of the

extremely short protest period and competing priorities"); Harrison Decl. ¶¶ 12, 14 (ECF No. 30-

8) (10-day protest period does not allow for adequate participation of groups like Wyoming

Wilderness Association); Molvar Decl. ¶ 26 (ECF No. 30-3) (WWP "would have provided more

sage-grouse and migratory bird information for the June 2018 Battle Mountain oil and gas lease

sale protest in Nevada" but for extremely short protest period).

BLM's decision to allow just a 10-day protest period for these sales was also arbitrary

and capricious, as BLM lacked any reasoned basis for departing from its prior practice. Prior to

IM 2018-034, BLM staff "acknowledged that the protest process can serve as a check on agency

decisions to offer parcels for lease sale," and that "protests brought issues to their attention that

they may not otherwise have factored into their decision making and therefore ultimately

improved their decisions." U.S. Gov't Accountability Off., GAO-10-670, *Onshore Oil and Gas: BLM's Management of Public Protests to Its Lease Sales Needs Improvement* 18 (2010), https://www.gao.gov/products/GAO-10-670. Again, IM 2018-034 never took into account these benefits of protests, but only focused on costs and delays in issuing oil and gas leases under the Trump Administration's "energy dominance agenda." For the Phase One lease sales, BLM thus had no reasoned basis for departing from its prior practices and allowing only 10-day protest periods, other than IM 2018-034. As already explained, IM 2018-034 was unlawful, in part, because it too lacked a reasoned basis in reversing its prior practice. Thus, each Phase One lease sale was arbitrary and capricious in allowing only 10-day protest periods pursuant to IM 2018-034, and must be held unlawful by the Court.

### B.    The September 2018 Comment Periods Were Not Adequate Either.

Defendants contend that each Phase One lease sale allowed adequate public comment, while downplaying facts showing that BLM shortened or eliminated comment periods on the September 2018 Phase One sales in ways that foreclosed meaningful public involvement.[8]

#### 1.    September 2018 Wyoming Lease Sale

BLM released two draft EAs in January 2018 for the first batch of parcels proposed for the September 2018 Wyoming sale, and allowed 30-day comment periods—before IM 2018-034 was released. Pls. SOF ¶¶ 43–45. After IM 2018-034 issued, BLM staff added a second "double up" batch of 256 additional parcels to comply with IM 2018-034. *See* WY18972; Pls. SOF ¶¶ 48. The large second batch of parcels was spread across all but two BLM Wyoming field offices.

---

[8] Whether BLM's NEPA documents adequately studied impacts and alternatives of the Phase One sales, and whether the Phase One sales violate requirements of the 2015 Sage-grouse Plans and FLPMA, are issued raised in Plaintiffs' First, Second and Third Claims for Relief, which are not addressed in these Phase One summary judgment briefings. Plaintiffs reserve the right to address those claims if the Court does not hold unlawful and vacate the sales in Phase One.

Pls. SOF ¶ 47. BLM posted a draft EA for this second batch on May 24, 2018 and allowed just a 14-day comment period—and then a problem with BLM's public comment portal caused difficulties in filing within that abbreviated timeframe. *Id.* ¶ 49.

BLM thus implemented IM 2018-034 to allow just 14 days (10 business days) for the public to review and comment on the May 2018 draft EA for the second batch of parcels—which were double the number of the parcels addressed in the two January draft EAs, and covered much more of the state and sage-grouse habitats. These abbreviated procedures prevented Plaintiffs and others from being able to provide detailed, site-specific information. Baker Decl. ¶ 39 (ECF No. 30-6) (Upper Green River Alliance was unable to provide comments on this sale due to the shortened deadlines); Harrison Decl. ¶¶ 12, 14 (ECF No. 30-8) (Wyoming Wilderness Association had insufficient time "to bring a lot of information to BLM's attention because the EA was a rushed, poor-quality, uninformative document"); Molvar Decl. ¶ 26 (ECF No. 30-3) (limited time meant WWP had to sign on to group comments rather than comment independently to bring its "organizational sage-grouse expertise to bear").

### 2.    September 2018 Utah Lease Sale

On March 30, 2018, BLM released two draft EAs covering parcels in the Fillmore and Salt Lake Field Offices proposed for the September 2018 lease sale, and under IM 2018-034 allowed just a 15-day comment period. Pls. SOF ¶ 38.  For the remaining parcels, BLM posted only a proposed parcel list and sought "scoping" comments. *Id.* Defendants state that a third EA was prepared for these parcels, but it was never circulated for public comment. *See* Defs. SOF ¶ 17.  Defendants argue that a scoping period may be sufficient under NEPA, but the notice here was by no means "reasonably thorough," as required under *Wilderness Soc'y v. U.S. Forest Serv.*, 850 F. Supp. 2d 1144, 1164 (D. Idaho 2012). It provided only a bare-bones list of parcel

coordinates and stipulations, without any information about the surface resources or potential adverse impacts of oil and gas development. *Compare* UT36657 (scoping notice here), *with All. for Wild Rockies v. Farnsworth*, No. 2:16-CV-433-BLW, 2017 WL 1591840, at *6 (D. Idaho May 1, 2017) (holding Forest Service's public involvement sufficient where it sent two scoping letters, each 20 pages, that described the project in detail, included maps, and explained the potential impacts on affected resources; and *also* held multiple public meetings).

3.   September 2018 Nevada Lease Sale

Finally, for the September 2018 Nevada sale, BLM did not issue any EAs for public comment—it relied instead on two DNAs with *no comment period* to avoid doing any NEPA analysis. *See* Pls. SOF ¶¶ 33–35. Defendants do not contest these facts but assert that BLM is under no obligation to involve the public when using DNAs, because a DNA relies on prior NEPA analysis that already underwent public comment. *See* Defs. Opp. at 32–34. This argument fails for two reasons: *first,* the use of a DNA was improper as BLM's prior NEPA analysis never analyzed the site-specific effects of oil and gas development on these parcels; and *second,* BLM violated its own NEPA Handbook in not allowing fresh public comment on the DNAs.

It is first important for the Court to recognize that neither NEPA itself, nor the CEQ NEPA regulations, make any provision for use of DNAs. It is the Department of Interior's NEPA regulations that purport to allow BLM and other Interior agencies to utilize them. *See* 43 C.F.R. § 46.120. DNAs are "NEPA checklist" forms designed to allow BLM employees to determine whether they can rely on existing NEPA documents in place of new analysis. This Court and others have previously rejected BLM's attempt to rely on such "NEPA checklists" instead of performing new NEPA analysis. *See Idaho Watersheds Proj. v. Hahn*, No. 97-cv-519-S-BLW (D. Idaho Mar. 31, 1999) (ECF No. 129) (holding NEPA checklist improper, when BLM

renewed Owyhee grazing permits based on EIS lacking site-specific analysis of affected lands),

*aff'd* 307 F.3d 815 (9th Cir. 2002).

Here, the DNAs improperly relied on prior NEPA analysis containing no site-specific

analysis of the September 2018 Nevada lease parcels. BLM determined that EISs prepared for

the Wells and Elko field office RMPs, plus prior lease sale EAs from 2015, 2016 and 2017 for

entirely different parcels, sufficiently analyzed the impacts of the September 2018 Nevada Lease

Sale. NV3Q880-935 (Ely); NV3Q1914-37 (Elko). However, RMP EISs cannot be used in place

of pre-leasing NEPA analysis. *See New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 688,

717–19 (10th Cir. 2009) ("NEPA requires BLM to conduct site-specific analysis before the

leasing stage"); *Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir.

1998) (The "existence of a programmatic EIS for a forest plan" does not "obviate[] the need for

any future project-specific EIS."). Nor did the prior lease sale EAs analyze any of the September

2018 parcels. *Id.* BLM staff recognized this but determined to utilize DNAs anyway under the

rationale that the parcels "are adjacent/same valley to parcels analyzed in past [sic]." *See*

NV3187. Just because other sales in the "same valley" may have been previously evaluated does

not mean that the September 2018 parcels were also adequately assessed, since locations matter

very much to sage-grouse and other wildlife resources—one parcel might be PHMA with a lek,

whereas a  parcel miles away but in the same valley may not be important habitat. Likewise,

developments since the prior EAs—including fires and energy projects—may affect the same

sage-grouse populations and habitats. BLM's avoidance of any site-specific analysis of this

particular lease sale thus violated NEPA.

Regardless of whether the DNAs were proper, Defendants' failure to provide a fresh

comment period was arbitrary and capricious, as it disregards BLM's own NEPA handbook. *See*

*Town of Barnstable v. Fed. Aviation Admin.*, 659 F.3d 28, 34 (D.C. Cir. 2011) (agency was arbitrary and capricious where it departed, without explanation, from its own internal guidelines). In discussing use of DNAs, BLM's NEPA Handbook provides: "In general, where the new proposed action has not already been discussed during public involvement for the existing EA or EIS, some additional public involvement for the new proposed action will be necessary." BLMW298-99. It is undisputed that the prior EAs and EISs did not discuss the September 2018 sale, so at a bare minimum, BLM should have allowed further public comment before approving that leasing decision. BLM's reliance on IM 2018-034 to avoid any NEPA review or public comment demonstrates that the September 2018 Nevada sale was thus arbitrary, capricious, and contrary to its NEPA duties.

        4.    <u>These Comment Periods Did Not Involve the Public "To the Extent Practicable"</u>

As this Court persuasively reasoned, "it strains common sense" to see how BLM met its obligation under NEPA to involve the public "to the fullest extent possible," 40 CFR § 1500.2, and "to the extent practicable," 40 C.F.R. § 1501.4(b), when these comment periods were far more restrictive than the 30-day period BLM previously allowed under IM 2010-117. PI Order at 37; *see also Fund For Animals v. Norton*, 281 F. Supp. 2d 209, 226 (D.D.C. 2003) (holding two-week comment period on EA insufficient). The record reveals no exigent circumstances that might have warranted this newly-expedited timeframe.

Intervenors wrongly suggest that BLM's determination that 30-day comment periods are no longer practicable is entitled to *Auer* deference. Interv. Opp. at 7 (citing *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 613 (2013). *Auer* deference is only applicable to agency interpretations of their own regulations, *Decker*, 568 U.S. at 613, and in this case BLM is interpreting CEQ's NEPA regulations. Even if *Auer* was applicable, an agency interpretation is given no deference

where, as here, it reflects a change in prior practice. *See Christopher v. SmithKline Becham Corp.*, 567 U.S. 142, 158–59 (2012). BLM also lacked any reasoned basis for departing from its prior 30-day comment period on each sale, rendering this change in policy arbitrary and capricious. *See supra* Section II.B.2.[9]

On both grounds—the sharply curtailed protest and comment periods—these June and September 2018 Phase One sales must be held unlawful.

### C.    The Prior RMP Comment and Protest Periods Do Not Somehow Cure BLM's Violations in Approving the Phase One Lease Sales.

Intervenors claim that prior comment and protest periods on the governing RMPs and 2015 Sage-grouse Plans somehow provided Plaintiffs adequate opportunities to provide input to BLM on the Phase One lease sales. *See* Interv. Opp. at 9–12. The Court may readily reject this diversionary argument, since NEPA requires public notice and comment at the site-specific level, which RMP-level NEPA analysis usually does not provide. *See Blue Mts. Biodiversity Project*, 161 F.3d at 1214 (9th Cir. 1998) ("Nothing in the tiering regulations suggests that the existence of a programmatic EIS for a forest plan obviates the need for any future project-specific EIS"). The fact that prior EISs contained general discussions of oil and gas development does not

---

[9] Intervenors wrongly claim that Plaintiffs must prove they would have provided "substantially different" information had they been given more time. Interv. Opp. at 9. This standard misconstrues *Sequoia ForestKeeper v. Elliott*, 50 F. Supp. 3d 1371 (E.D. Cal. 2014), where the central issue was whether BLM violated NEPA by not publicly disclosing certain agency reports. *Id.* at 1383. The court held that BLM provided sufficient public information because the "specificity and scope" of plaintiffs' comments showed they were adequately informed and would not have provided "substantially different" input with access to the reports. *Id.* at 1388. In *Alliance for the Wild Rockies v. Farnsworth,* No. 2:16-CV-433-BLW, 2017 WL 1591840 (D. Idaho May 1, 2017), this Court similarly considered whether BLM provided sufficient *information*, as opposed to sufficient *time* or *opportunities* to comment. Nonetheless, Plaintiffs satisfy Intervenors' standard, because their declarations establish that they and other organizations were hampered due to the abbreviated deadlines. *See infra* Section IV.C.1 (summarizing declarations).

eliminate BLM's duty to provide site-specific NEPA analysis—and public comment—before approving specific lease sales. *Richardson*, 565 F.3d at 688 ("NEPA requires BLM to conduct site-specific analysis before the leasing stage").

## IV.   THE COURT SHOULD VACATE IM 2018-034 AND THE UNLAWFULLY ISSUED LEASES.

### A.   Vacatur Is the Presumptive Remedy for Unlawful Agency Actions.

The APA directs that a reviewing court "*shall . . . hold unlawful and set aside* agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2) (emphasis added). Thus, when a court determines that an agency's decision was unlawful under the APA, vacatur is the presumptive remedy.

As the Ninth Circuit explained in *Idaho Farm Bureau*, however, "when equity demands, the regulation can be left in place while the agency follows the necessary procedures" to correct an unlawful action. 58 F.3d at 1405. But the Ninth Circuit has cautioned courts to employ their equitable discretion to depart from this statutory remedy in "rare" or "limited" circumstances, and only when "equity demands" an unlawful decision be left in place on remand. *See Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010); *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015). When determining whether to vacate, the Ninth Circuit looks to the factors described in *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993), which are: (1) the seriousness of an agency's errors, and (2) the disruptive consequences that would result from vacatur. *See Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012). "[C]ourts may decline to vacate agency decisions when vacatur would cause serious and irremediable harms that significantly outweigh the magnitude of the agency's error." *AquAlliance v. U.S. Bureau of Reclamation*, 312 F. Supp. 3d 878, 881 (E.D. Cal. 2018) (internal citations omitted).

The burden is on the defendant agency to show that compelling equities demand anything less than vacatur. *See Ctr. for Envtl. Health v. Vilsack*, No. 15-cv-01690-JSC, 2016 WL 3383954, at *13 (N.D. Cal. June 20, 2016) ("given that vacatur is the presumptive remedy for a procedural violation such as this, it is Defendants' burden to show that vacatur is unwarranted").

Intervenors assert that "violation of a procedural statute necessitates a procedural remedy." Interv. Opp. at 17. That contradicts the plain language of the APA directing vacatur of actions found to be "without observance of procedure required by law." 5 U.S.C. § 706(2). Courts have long held that vacatur is the "standard remedy for a NEPA violation." *See Friends of the Capital Crescent Trail v. Fed. Transit Admin.*, 218 F. Supp. 3d 53, 59 (D.D.C. 2016); *High Country Conserv. Advocates v. U.S. Forest Serv.*, 67 F. Supp. 3d 1262, 1263 (D. Colo. 2014).

## B.    Defendants Have Not Shown that Vacatur of IM 2018-034 Is Unwarranted.

Defendants and Intervenors mount no argument that vacatur of IM 2018-034 is inappropriate, nor do the equities weigh in their favor. Under the first *Allied-Signal* factor, BLM's deliberate decision to bypass notice-and-comment procedures in adopting IM 2018-034 was a serious violation of both the APA and FLPMA. *See, e.g.*, *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) ("Failure to provide the required notice and to invite public comment . . . is a fundamental flaw that 'normally' requires vacatur of the rule."). The second *Allied-Signal* factor likewise weighs in Plaintiffs' favor as vacating IM 2018-034 would involve minimal disruption. Under the Court's Preliminary Injunction Order, BLM has already returned to the provisions of IM 2010-117 for sales involving sage-grouse habitat, without any claimed hardship—let alone the type of serious consequences required to disrupt the presumptive APA remedy of vacatur.

Rather than argue against vacatur, Defendants suggest that once IM 2018-034 is vacated,

BLM cannot be compelled to reinstate the rule previously in effect: IM 2010-117. This position

is flawed for several reasons. First, while Defendants concede the rule of automatic

reinstatement, Defs. Opp. at 29, they wrongly argue that it applies only to "regulations." In fact,

reinstatement extends to prior agency "rules"—a category into which IM 2010-117 undoubtedly

falls. *See Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005) ("The effect of invalidating an

agency rule is to reinstate the rule previously in force.").[10] Regardless of how it was promulgated

or labelled, IM 2010-117 constitutes a rule, as is its successor IM 2018-034. *See* 5 U.S.C. §

551(4) (defining "rule" as "the whole or part of an agency statement of general or particular

applicability and future effect designed to implement, interpret, or prescribe law or policy").

Therefore, reinstatement of IM 2010-117 should occur as a matter of law after vacatur of

IM 2018-034, regardless of whether the Court's order explicitly announces reinstatement. *See*

*Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 672 F.3d 1160, 1165 (9th Cir.

2012) (noting that reinstatement of the prior rule "operates as a matter of law under the vacatur,

and it would have occurred even if the Consent Decree had remained silent on the subject"); *see*

*also Defs. of Wildlife v. Salazar*, 776 F. Supp. 2d 1178, 1186 (D. Mont. 2011) ("Agency [Wolf

Delisting] Rule is invalid and the wolves must be placed back under the protections of the ESA

pursuant to the Rule previously in force. The law imposes this requirement.").

Even absent automatic reinstatement, the Court is well within its equitable discretion to

order this type of remedy as permanent injunctive relief. *See Cal. ex rel. Lockyer v. United*

*States*, 575 F.3d 999, 1019–20 (9th Cir. 2009) (treating reinstatement of prior Roadless Rule as

---

[10] The D.C. Circuit has suggested this principle extends to prior "practices." *CropLife Am. v. EPA*, 329 F.3d 876, 884–85 (D.C. Cir. 2003); *see also Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 672 F.3d 1160, 1165 (9th Cir. 2012) (reinstating a prior biological opinion).

an injunction warranted "to avoid further degradation of the nation's roadless areas").[11] Here, permanent injunctive relief is warranted on the same grounds that justified the preliminary injunction. The equities favor reinstating IM 2010-117 to avoid a regulatory vacuum in which BLM is free to continue excluding public involvement, through informal means, as IM 2018-034 expressly allowed. Such a vacuum would subvert Congress's intent under FLPMA Section 309(e)—that public participation be guaranteed through the stability of an agency rule—and Congress's intent under both NEPA and FLPMA to ensure that public lands decisions are made with public involvement. Moreover, reinstatement of IM 2010-117 would give BLM an incentive to undertake the rulemaking that is long overdue under FLPMA Section 309.

Defendants find it "iron[ic]" that Plaintiffs would seek reinstatement of IM 2010-117, as it was also issued without a notice-and-comment rulemaking process. Defs. Opp. at 1. There is nothing ironic about Plaintiffs seeking to preserve public input into BLM oil and gas leasing. By contrast, Defendants seek to allow BLM to continue, through informal means, the same unlawful process set forth in IM 2018-034, even though Plaintiffs have prevailed. Similar concerns about rewarding illegal agency actions have motivated the Ninth Circuit in crafting judicial remedies. *See Cal. ex rel. Lockyer*, 575 F.3d at 1019–20 (expressing discomfort with "allow[ing] a major environmental rule that the Court has determined was improperly repealed to nonetheless remain permanently repealed"). What's more, no court has yet ruled on the legality of IM 2010-117 and

---

[11] Defendants claim this Court "may not order BLM to follow particular rules in conducting its oil and gas leasing program," Defs. Opp. at 29, but they quote a case dealing with APA § 706(1), not at issue here. *See Mt. St. Helens Mining and Recovery Ltd. P'ship v. United States*, 384 F.3d 721, 728 (9th Cir. 2004) (APA "§ 706(1) generally only allows the district court to compel an agency to take action, rather than compel a certain result"). That case does not purport to delimit a court's equitable authority for § 706(2) violations. Even more spurious is their claim that Plaintiffs seek to "order BLM to follow a different procedure of [the Court's], or Plaintiffs', making," Defs. Opp. at 1, when BLM itself crafted the procedures in IM 2010-117.

the Court should not presume it is unlawful in considering remedies. *See W. Watersheds Proj. v. USDA APHIS Wildlife Services*, No. 1:17-cv-206-BLW, 2018 WL 6251358, at *2 (D. Idaho Nov. 29, 2018). Even if IM 2010-117 was unlawful, the Court has discretion to leave that rule in place where "equity demands." *See Idaho Farm Bureau*, 58 F.3d at 1405.

In sum, vacatur and reinstatement are the presumptive remedies, and the equities clearly favor this outcome. Thus, the Court's order should vacate the challenged sections of IM 2018-034 and reinstate the prior provisions of IM 2010-117 until BLM complies with its FLPMA duty to adopt regulations for public participation in oil and gas leasing decisions.

### C.      Defendants Have Not Shown that Vacatur of the Lease Sales is Unwarranted.

Defendants likewise have not met their burden to show that unusual circumstances warrant anything less than vacatur of the Phase One leases unlawfully issued in BLM's June and September 2018 sales in Nevada, Utah, and Wyoming. Vacatur is a common and appropriate form of relief for oil and gas leases and permits issued in violation of NEPA. *See, e.g.*, *San Juan Citizens Alliance v. BLM*, 326 F. Supp. 3d 1227 (D.N.M. 2018) (vacating oil and gas leases for NEPA violation); *Bob Marshall Alliance v. Lujan*, 804 F. Supp. 1292, 1298 (D. Mont. 1992) (cancelling leases due to NEPA and ESA violation); *Diné Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831 (10th Cir. 2019) (vacating BLM drilling permits due to NEPA violations); *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 788 (9th Cir. 2006) (vacating geothermal lease extensions due to BLM's violation of NEPA and historic preservation laws).[12]

---

[12] Defendants and Intervenors argue lease suspension is the more appropriate remedy, Int. Opp. at 17–18, Def. Opp. at 36, but the cases they cite are either distinguishable or unpersuasive. *See Connor v. Burford*, 848 F.2d 1441 (9th Cir. 1988) (ordering suspension where plaintiffs did not argue for lease vacatur); *N. Cheyenne Tribe v. Hodel*, 851 F.2d 1152 (9th Cir. 1988) (district court did not abuse discretion in suspending rather than voiding coal leases adopted in violation of NEPA, but not dismissing vacatur as a proper remedy); *Mont. Wilderness Ass'n v. Fry*, 408 F.

Just as in these cases, the *Allied Signal* factors and other equitable considerations tip decidedly toward vacatur.

1.   <u>Seriousness of Legal Deficiencies</u>

As for the first *Allied-Signal* factor, BLM's deliberate decision to subvert public involvement in its leasing decisions is not a minor violation, as Defendants and Intervenors portray it. Rather, "public comment procedures are at the heart of the NEPA review process." *California v. Block*, 690 F.2d 753, 770 (9th Cir. 1982); *see also Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983) (public involvement is one of NEPA's twin aims); 40 C.F.R. § 1500.1(b) ("[P]ublic scrutiny [is] essential to implementing NEPA."). Moreover, as the Ninth Circuit has made clear, "relief for agency procedural error should be a strict reconstruction of procedural rights" through vacatur, except in "unusual" circumstances. *W. Oil & Gas v. U.S. Envtl. Protection Agency*, 633 F.2d 803, 813 (9th Cir. 1980).

Nor were Defendants' violations harmless. Again, the record shows that IM 2018-034 hampered or prevented the participation of numerous public interest groups, including Plaintiffs, in the lease sales at issue. *See* Cunningham Decl. ¶¶ 8 (ECF No. 30-5) (Basin and Range Watch

---

Supp. 2d 1032, 1038 (D. Mont. 2006) (suspending leases where intervening National Monument declaration prohibiting new leasing meant vacatur would permanently stop parcels from being leased, a unique separation-of-powers concern not present here); *Colo. Envtl. Coal. v. Office of Legacy Mgmt.*, 819 F. Supp. 2d 1193 (D. Colo. 2011) (staying uranium leases where plaintiffs challenged programmatic NEPA review of uranium leasing expansion but failed to demonstrate why issuing leases without further NEPA review was arbitrary and capricious), *amended on reconsideration*, No. 08-CV-01624-WJM-MJW, 2012 WL 628547 (D. Colo. Feb. 27, 2012); *S. Utah Wilderness All. v. U.S. Dep't of the Interior*, No. 06-CV-342-DAK, 2007 WL 2220525 (D. Utah July 30, 2007) (dismissing action as moot due to BLM's voluntary lease suspension, but not discussing remedies); *Willow Creek Ecology v. U.S. Forest Serv.*, 225 F. Supp. 2d 1312 (D. Utah 2002) (same); *Wilderness Soc'y v. Wisely*, 524 F. Supp. 2d 1285 (D. Colo. 2007) (not addressing vacatur case law or equitable balancing).

[12] Intervenors argue that the economic consequences would be "not solely limited to" lost lease revenue but offer no other concrete evidence of such harm. *See* Int. Opp. at 19).

hindered in participating in Nevada lease sales due to IM 2018-034); Emmerich Decl. ¶¶ 17–23 (ECF No. 30-7) ("shorter periods make it harder for [Basin and Range Watch] to mobilize the interested public and write detailed comments," and for Nevada June 2018 sale "[t]he protest period was also effectively even shorter than 10 days because I had to have it finished 2 days before the deadline to get it in on time . . . . A lot of details had to be eliminated to meet the deadline"); Baker Decl. ¶ 39 (ECF No. 30-6) (Upper Green River Alliance was unable to provide comments on the Wyoming September lease sale parcels due to the shortened deadlines); Harrison Decl. ¶¶ 12, 14 (ECF No. 30-8) (Wyoming Wilderness Association had insufficient time "to bring a lot of information to BLM's attention [regarding September 2018 sale] because the EA was a rushed, poor-quality, uninformative document. I simply couldn't do an adequate job"); Molvar Decl. ¶ 26 (ECF No. 30-3) (for September 2018 Wyoming sale, WWP could not comment independently to bring its "organizational sage-grouse expertise to bear" and "would have provided more sage-grouse and migratory bird information for the June 2018 Battle Mountain oil and gas lease sale protest in Nevada" but for the extremely short protest period); *see also* Stellberg Decl. Ex. 2 (ECF No. 63-3) (Colo. Gov. Hickenlooper expressing concerns that IM 2018-034 "created significant barriers for . . . State staff to adequately review parcels).

In this case, vacating the leases is particularly appropriate because the leasing decisions were made pursuant to IM 2018-034—a rule *designed* to circumvent public involvement and itself issued unlawfully without any public comment. Denying vacatur of actions implementing this unlawful rule would provide a perverse incentive for agencies to avoid notice-and-comment by issuing then quickly implementing *de facto* rules, without consequence.

2. <u>Disruptive Consequences of Vacatur</u>

The effects of lease vacatur do not outweigh the seriousness of BLM's violations. The

Ninth Circuit has found remand without vacatur warranted only in rare circumstances, namely where vacatur risks harm to the environment, *Idaho Farm Bureau*, 58 F.3d at 1405, or would thwart the statute at issue, *Western Oil & Gas*, 633 F.2d at 813. For example, in *Idaho Farm Bureau*, the court declined to vacate a procedurally flawed ESA listing rule because it would risk "potential extinction" of the species. 58 F.3d at 1405. Similarly, in *Western Oil & Gas,* the Ninth Circuit declined to vacate an EPA list of "nonattainment areas," issued without notice and comment, because of "a desire to avoid thwarting in an unnecessary way the operation of the Clean Air Act." 633 F.2d at 813. *See also Ctr. for Food Safety v. Vilsack*, 734 F. Supp. 2d 948, 951 (N.D. Cal. 2010) ("[T]he Ninth Circuit has only found remand without vacatur warranted by equity concerns in limited circumstances, namely serious irreparable environmental injury").

No such unusual circumstances exist here. Vacatur here would *avoid* harm to the environment and *further* the purposes of NEPA and FLPMA, by ensuring that BLM's remedial NEPA process is not a "post-hoc assessments of a done deal." *Nat. Res. Def. Council v. Houston*, 146 F.3d 1118, 1029 (9th Cir. 1998); *see* 40 C.F.R. § 1502.5 (NEPA process must "not be used to rationalize or justify decisions already made.").

As this Court already found, allowing "BLM to commit to a [leasing decisions] before completing a full NEPA analysis may foreclose or diminish the prospect for an open-minded examination of alternatives." *See* PI Order at 43. Simply ordering an additional comment period, while leaving the leases intact, would subvert the NEPA process and give the public little chance of convincing BLM to impose more environmentally protective stipulations, or to withdraw leases it already issued. Federal courts frequently consider this risk of bureaucratic momentum in ordering vacatur. *See Metcalf v. Daley*, 214 F.3d 1135, 1146 (9th Cir. 2000) (questioning whether, absent vacatur, a new NEPA document would "be a classic Wonderland case of first-

the-verdict, then-the-trial?"); *Houston,* 146 F.3d at 1029 (upholding vacatur of water contracts to "ensure[] that environmental concerns will be properly factored into the decision-making process as intended by Congress"); *Mont. Wilderness Ass'n v. Fry*, 408 F. Supp. 2d 1032, 1037–38 (D. Mont. 2006) (noting "the public's interest in the NEPA process will be degraded if the process is reduced to a series of hurdles to be cleared en route to a predetermined result" and questioning "BLM's ability to fulfill its procedural obligations without favoring a predetermined outcome . . . motivated by an executive policy to maximize energy development."); *Diné Citizens Against Ruining Our Env't v. U.S. Office of Surface Mining Reclam. & Enf't*, No. 12-CV-01275-JLK, 2015 WL 1593995, at *3 (D. Colo. Apr. 6, 2015) (remand without vacatur risks making NEPA "a mere bureaucratic formality"); *High Country Conservation Advocates v. U.S. Forest Serv.*, 67 F. Supp. 3d 1262, 1265 (D. Colo. 2014) (vacating lease modifications because "NEPA's goals of deliberative, non-arbitrary decision-making would seem best served by the agencies approaching these actions with a clean slate").

Plaintiffs acknowledge that vacatur will require BLM to refund lease revenues collected from the June and September 2018 lease sales.[13] However, cases denying vacatur on the basis of economic harm have generally involved far more extreme circumstances. *See, e.g.*, *Cal. Cmtys. Against Toxics*, 688 F.3d at 993–94 (vacatur would cause needed power plant to stay off line and cause blackouts and air pollution due to the use of diesel generators). Vacatur here would not cause severe disruptions, such as power blackouts, or halt a nearly complete project.

Courts have also questioned allowing economic harm to weigh against vacatur in environmental cases, *see Ctr. for Food Safety*, 734 F. Supp. 2d at 953; *PEER v. U.S. Fish &*

---

[13] Intervenors argue that the economic consequences would be "not solely limited to" lost lease revenue but offer no other concrete evidence of such harm. *See* Interv. Opp. at 19.

*Wildlife Serv.*, 189 F. Supp. 3d 1 (D.D.C. 2016); *Nat. Res. Def. Council v. EPA*, 676 F. Supp. 2d

307, 316–17 (S.D.N.Y. 2009), or found that economic harms do not outweigh environmental

risks, *Diné Citizens*, 2015 WL 1593995 (vacatur would be warranted upon NEPA violation

despite $400,000 in monthly losses); *Diné Citizens Against Ruining Our Env't v. Jewell*, 312 F.

Supp. 3d 1031 (D.N.M. 2018) (vacatur warranted despite "hundreds of thousands or millions" of

lost oil and gas revenues), *rev'd in part on other grounds,* 923 F.3d 831 (10th Cir. 2019).

     Moreover, giving strong weight to economic loss would provide perverse incentives for

agencies and industry to invest heavily in potentially illegal projects up front. As Judge Boasberg

of the D.C. District Court explained in rejecting claimed economic disruption of "hundreds of

millions of dollars" allegedly lost from vacating an unlawful approval of a pipeline project:

> [D]enying vacatur on the basis of alleged economic harm risks creating undesirable
> incentives for future agency actions. If projections of financial distress are sufficient to
> prevent vacatur, the Court fears that agencies and third parties may choose to devote as
> many resources as early as possible to a challenged project – and then claim disruption in
> light of such investments. Such a strategy is contrary to the purpose of NEPA, which
> seeks to ensure that the government "looks before it leaps." . . . Finding that vacatur's
> alleged financial harms are dispositive under the second prong of *Allied-Signal* may
> encourage agencies to instead act first and ask later. In sum, although the Court concludes
> that there is likely to be <u>some</u> economic disruption from vacatur, this factor does not
> weigh heavily in Defendants' favor under the *Allied-Signal* test.

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engrs*, 282 F. Supp. 3d 91, 106 (D.D.C. 2017).

     Finally, in weighing the equities, the Court should consider that BLM proceeded with the

June and September 2018 auctions with full knowledge of this lawsuit (and similar claims raised

in their administrative protests). BLM's decisions to nonetheless unlawfully constrain public

input, and the lessees' decisions to nonetheless bid on these leases, were made at their own risk.

Any economic harm from the predictable and avoidable result of vacatur should not weigh in

their favor. *See, e.g.*, *Diné Citizens*, 312 F. Supp. 3d at 1112 (vacatur warranted, despite

economic losses, where "the company assumed some risk of economic disruption"); *NRDC*, 676

F. Supp. 2d at 317 (self-inflicted harm does not weigh against vacatur); *Standing Rock Sioux*, 282 F. Supp. 3d at 104 (company assumed risk by proceeding "with full knowledge that Plaintiffs were contesting" the pipeline); *Diné Citizens*, 2015 WL 1593995, at *3 (vacatur warranted despite expense, given that "the responsibility for such delay and expense lies with Respondents"). This is not a case in which private entities proceeded in good faith reliance on an agency decision that was later, and unexpectedly, held invalid. *Cf. A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995) (declining to vacate drug approval to avoid inequitable disruption to manufacturer that "relied on it in good faith for over thirteen years").

For all these reasons, the *Allied-Signal* factors and broader equities point decidedly toward vacatur of the leases, rather than suspension.

## CONCLUSION

For these reasons and those previously briefed, the Court should grant Plaintiffs' Phase One partial summary judgment motion, reverse and vacate IM 2018-034 and the Phase One June and September 2018 lease sales, and reinstate the relevant provisions of IM 2010-117.

Dated: July 31, 2019

Respectfully submitted.

/s/ *Sarah K. Stellberg*    .
Sarah Stellberg (ISB #10538)
Laurence ("Laird") J. Lucas (ISB # 4733)
Todd C. Tucci (ISB # 6526)

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of July, 2019, I filed a copy of the foregoing PLAINTIFFS'
COMBINED RESPONSE/REPLY BRIEF ON CROSS-MOTIONS FOR PARTIAL
SUMMARY JUDGMENT (PHASE ONE) (ECF NOS. 135, 140, 148) electronically through the
CM/ECF system, which caused all parties or counsel of record to be served by electronic means,
as more fully reflected on the Notice of Electronic Filing.

**Counsel for Federal Defendants**

John Shaughnessy Most
U.S. Dept. of Justice
john.most@usdoj.gov

Luther L. Hajek
U.S. Dept. of Justice
luke.hajek@usdoj.gov

Christine Gealy England
christine.england@usdoj.gov

**Counsel for Defendant-Intervenors
Western Energy Alliance, State of
Wyoming, and Jonah Energy**

Bret A. Sumner
bsumner@bwenergylaw.com

Michael K Cross
mcross@bwenergylaw.com

Paul A. Turcke
pat@msbtlaw.com

Erik Edward Petersen
erik.petersen@wyo.gov

Malinda Morain
mmorain@bwenergylaw.com

Michael M. Robinson
mike.robinson@wyo.gov

Kathleen C Schroder
katie.schroder@dgslaw.com

Gail L Wurtzler
gail.wurtzler@dgslaw.com

Ausey H Robnett , III
arobnett@LCLattorneys.com