Paul A. Turcke, ISB #4759
MSBT LAW
7699 West Riverside Drive
Boise, ID 83714
Telephone: 208-331-1800
Fax: 208-331-1202
Email: pat@msbtlaw.com

Erik E. Petersen, WSB No. 7-5608
Senior Assistant Attorney General
Wyoming Attorney General's Office
2320 Capitol Avenue
Cheyenne, WY  82002
(307) 777-6946 (phone)
(307) 777-3542 (fax)
erik.petersen@wyo.gov

*Counsel for the State of Wyoming*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> RYAN K. ZINKE, Secretary of the Interior, *et al.*, <br><br> Defendants, <br><br> STATE OF WYOMING, WESTERN ENERGY ALLIANCE, <br><br> Defendant-Intervenors. | Case No. 1:18-cv-00187-REB <br><br> **DEFENDANT-INTERVENORS STATE OF WYOMING AND WESTERN ENERGY ALLIANCE'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 148]** |

# INTRODUCTION

As the federal Defendants, the State of Wyoming, and the Western Energy Alliance (Alliance) have already shown, the Bureau of Land Management acted lawfully when it issued: (1) Instruction Memorandum 2018-034; and (2) the leases challenged in this litigation. In light of the federal Defendants' comprehensive reply brief, Wyoming and Alliance will limit their reply to the following two topics: (1) what constitutes public participation "to the extent practicable" in the oil and gas context; and (2) what the appropriate remedy should be in the event that this Court rules in favor of the Advocacy Groups. Wyoming and Alliance adopt and incorporate by reference the arguments advanced by the federal Defendants on all other topics.

# ARGUMENT

**I.  The Advocacy Groups misunderstand the meaning of the phrase "to the extent practicable" as used in the NEPA context.**

The Advocacy Groups argue that the Bureau failed to provide public participation at the leasing stage "to the extent practicable" as required by the National Environmental Policy Act (NEPA). (ECF_158 at 18-19). In the context of a NEPA challenge, "to the extent practicable" is an inherently vague phrase that requires "a fact-intensive inquiry made on a case-by-case basis." *Sequoia ForestKeeper v. Elliott*, 50 F. Supp. 3d 1371, 1387 (E.D. Cal. 2014); (ECF_148-1 at 7-9).

The Advocacy Groups disagree and argue that the concept is simple: if an agency has been able to do something before, it is inherently practicable, and anything less than what has been done before violates the "to the extent practicable" language. (ECF_158 at 18-19). This overly simplistic reasoning does not hold water. It also conflicts with existing Ninth Circuit case law.

Specifically, the Advocacy Groups argue that, because the Bureau previously allowed for longer public participation periods than those provided for in Instruction Memorandum 2018-034, the now-shorter public participation periods are a *per se* violation of the "to the extent practicable" language in NEPA. (*See* ECF_158 at 18-19). But, as the federal Defendants make clear, there is nothing in NEPA to support this interpretation (*See* ECF_162 at 5-8). Moreover, a simple hypothetical exercise shows why this interpretation cannot be what Congress intended.

Let us imagine that, two years from now, President Elizabeth Warren is in office, and she has appointed former-Governor Jay Inslee as her Secretary of the Interior. Let us further imagine that Secretary Inslee issues an Instruction Memorandum that provides for a full year of public participation on an Environmental Assessment prior to the issuance of an oil & gas lease.[1] Under the

---

[1] Lest one think this hypothetical extreme, while a candidate for President, Governor Inslee stated that he intended to halt all new leasing of fossil fuels from

2

Advocacy Groups' reasoning, the Bureau could never retreat from this commitment to public participation because it was once practicable in the eyes of one administration. That cannot be what Congress intended when it used the phrase "to the extent practicable" in NEPA. And yet, while the scope of the timeframes is different here, the concept is the same. The Advocacy Groups argue that once the Bureau allowed a thirty-day comment period, it became *per se* "practicable." Not so.

    Fortunately, the Court of Appeals for the Ninth Circuit has provided guidance to this Court on how to interpret the phrase "to the extent practicable" in the NEPA context, and it looks nothing like the Advocacy Groups' statutory interpretation. *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 953 (9th Cir. 2008). In *Bering Strait*, the Ninth Circuit determined that, when faced with providing for public involvement "to the extent practicable" in the NEPA context, the **"rule"** is that the agency must consider "the totality of the circumstances." *Id*. This brings us back to the case-by-case nature of the analysis. *Sequoia ForestKeeper*, 50 F. Supp. 3d at 1387. The Ninth Circuit applied this rule in *Bering Strait*, finding that the United States Army Corps of Engineers met the "to the extent practicable" test because the "totality of the circumstances" showed that: (1) information about the project was widely

---

federal land on "Day 1," despite the fact that this would violate a host of statutes, including the Mineral Leasing Act.

disseminated; and (2) the agency received a "high level" of public comment. *Bering Strait*, 524 F.3d at 953.

That is precisely what happened here. The Advocacy Groups were well aware of the proposed actions, and they commented on them.[2] (ECF_141 at 9-11, 30-35). The Bureau disseminated information about the project widely, and the agency received a high level of public comment from the Advocacy Groups. *See id*. Thus, just as in *Bering Strait*, when one considers the "totality of the circumstances," it is clear that the Bureau provided adequate opportunity to the Advocacy Groups to share their opinions with the agency. *Id*.; *Bering Strait*, 524 F.3d at 953.

The Advocacy Groups disagree, but they never once discuss the "totality of the circumstances" rule in their response brief. (*See* ECF_158). Indeed, they entirely fail to respond to the *Bering Strait* case. *Id*. Moreover, the Advocacy Groups point to no information that "if properly considered, [would] present a 'seriously different picture of the environmental landscape.'" *Sequoia ForestKeeper*, 50 F. Supp. 3d at 1387. Instead, they rely on a suite of declarations. (ECF_158 at 25-26). But these declarations simply allege that, if the Bureau had provided more time for public participation, some organizations would have

---

[2] Indeed, the Bureau provided the Advocacy Groups with multiple opportunities over seven years to voice their opinions, and they have done so. (ECF_148-1 at 10).

submitted **more** information, rather than meaningfully **new** information. *Id*. That almost perfectly tracks what the district court rejected in *Sequoia ForestKeeper*. 50 F. Supp. 3d at 1388 ("the court can find nothing … that indicates that information [p]laintiffs could [have provided to the agency] would 'present a seriously different picture' of the environmental issues being contested").

The Advocacy Groups argue that the Defendants failed to acknowledge their declarations from various individuals. (ECF_158 at 1). But these declarations can be grouped into one general theme: if I had more time, I could have said more. Well, of course that is true. There is no doubt that some of the Advocacy Groups' declarants could produce a multi-volume treatise longer than Churchill's *History of the English Speaking Peoples* solely on the topic of how the Bureau could have done things better, if only he or she had the time. But that is not the test. The test, viewed in the totality of the circumstances, is whether the Advocacy Groups were given the opportunity to put the Bureau on notice. They had this opportunity, and they availed themselves of it. (ECF_141 at 9-11, 30-35). Moreover, they have not shown that, if they had more time, they would have introduced **any** evidence that would have presented a seriously different picture than the one the Bureau already had. Accordingly, the Advocacy Groups' "to the extent practicable" argument lacks merit, and this Court should find in favor of the Bureau.

## II.     BLM's issuance of IM 2018-034 was not procedurally improper

Plaintiffs assert that the Defendants "offer no defense" to their three-sentence argument that the CEQ regulations require that agencies "make diligent efforts to involve the public in preparing their NEPA procedures." (ECF_135-1 at 14-15) (citing 40 C.F.R. §1506.6(a)).

As is clear by the language of the regulation, and recognized by the court in *Bering Strait*, the CEQ regulations regarding public involvement are "general in approach. . . ." 524 F.3d at 952. Just as the Ninth Circuit determined that they do not rigidly require the circulation of a draft EA, nor do they require a full notice-and-comment rulemaking for an Instruction Memorandum. *Id.*; (*see also* ECF_141 at 26-29; 43 C.F.R. § 46.305 (BLM regulation indicates that "methods for providing public notification and opportunities for public involvement are at the discretion of the Responsible Official")). The CEQ regulations offer neither an independent basis, nor additional support, for Plaintiffs' arguments that IM 2018-034 required notice-and-comment rulemaking. In fact, the BLM regulations confirm that public involvement is to be at the discretion of the Responsible Official. 43 C.F.R. § 46.305(a).

## III.    Vacatur of the lease decisions and IM-2018-034 is not the appropriate remedy.

As the Defendants have already discussed, if this Court grants the Advocacy Groups' motion for summary judgment, this Court should not vacate the leases in

6

question. (ECF_140-1 at 35-36); (ECF_148-1 at 16-20); (ECF_158 at 24-30). Nor should the Court put itself in the business of selecting between the policies of two Presidential administrations. (*See* ECF_37-39). Vacating the leases would cause significant disruption, including requiring the Bureau to return over $125 million to the lessees, over half of which has already been distributed to the states as required by federal law. (ECF_162 at 15). Instead of taking this drastic and unnecessary measure, the Court could instead enjoin surface disturbing activities during the pendency of any NEPA remand. This would avoid the disruption of vacatur while simultaneously preventing any potential environmental harm. The latter approach is a much more sensible solution.

A similar scenario recently played out in the District Court for the District of Columbia. *WildEarth Guardians. v. Bernhardt.*, No. 16-cv-1724-RC (Mar. 19, 2019 D.D.C.) (slip opinion attached as Exhibit A). In that case, the plaintiffs alleged that the Bureau failed to adequately consider climate change prior to authorizing oil and gas leases in Wyoming. (*Id.*). The district court agreed. (*Id.* at 57). As here, the plaintiffs asked the district court to vacate the leases at issue. (*Id.*). As here, the plaintiffs asked the court to apply the test laid out in *Allied-Signal v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). (*Id.*). The court did so and found that vacatur was not appropriate. (*Id.* at 57-59).

Notably, while the district court recognized that vacating the leases could have significant, disruptive effects on both public and private economic interests, the court did "not deny vacatur [] on the basis of alleged economic harm alone." (*Id*. at 58 n.35). Rather, the court refrained from vacating the leases because there was a "serious possibility" that the agency could justify its action on remand. (*Id*. at 59). The same is true here, as this Court must "assume the [Bureau] will comply with the law." *N. Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1157 (9th Cir. 1988).

In order to "guard against the possibility that BLM did not choose correctly the first time around, the Court enjoin[ed] BLM from issuing any [drilling permits] for the Wyoming Leases while the agency" prepared a corrective NEPA analysis. (Ex. A at 59). In concluding, the district court stated that "[c]ompliance with NEPA cannot be reduced to a bureaucratic formality, and the Court expects [BLM] not to treat remand as an exercise in filling out proper paperwork post hoc." (*Id*. (citation omitted)). The court also recognized that "[a]fter BLM's work on remand, [p]laintiffs may again address whether BLM fulfilled its NEPA obligations." This approach was entirely sensible when contrasted with the alternative of vacatur.

Here, as discussed above and previously in Defendant-Intervenors' Motion (ECF_149 at 10-17), Plaintiffs have not shown the alleged error was "serious" as Plaintiffs fail to show either that they were prevented from submitting new information or that any of that information would have altered the agency's

8

decision. Thus, should this Court find in favor of the Advocacy Groups, Wyoming and the Alliance ask that this Court follow the sound judgment of the D.C. district court and refrain from vacating the leases.

## CONCLUSION

For the reasons discussed above and in prior filings, the State of Wyoming and the Western Energy Alliance respectfully request that this Court grant summary judgment to the Defendants. In the event that this Court rules in favor of the Advocacy Groups, the State and the Alliance ask that this Court refrain from vacating the leases, as many courts have done before.

Respectfully submitted this 28th day of August 2019.

/s/ *Erik Petersen*
Erik E. Petersen, WSB No. 7-5608
Senior Assistant Attorney General
Wyoming Attorney General's Office
2320 Capitol Avenue
Cheyenne, WY  82002
(307) 777-6946 (phone)
(307) 777-3542 (fax)
erik.petersen@wyo.gov

Paul Turcke
MSBT LAW
7699 West Riverside Drive
Boise, ID 83714
Telephone: 208-331-1800
Fax: 208-331-1202
Email: pat@msbtlaw.com

*Attorneys for Defendant-Intervenor State of Wyoming*

/s/ *Malinda Morain*
Bret Sumner, *Pro Hac Vice*
bsumner@bwenergylaw.com
Malinda Morain, *Pro Hac Vice*
mmorain@bwenergylaw.com
Michael Cross, *Pro Hac Vice*
mcross@bwenergylaw.com
BEATTY & WOZNIAK, P.C.
216 Sixteenth St., Suite 1100
Denver, CO 80202-5115
Telephone: 303-407-4499
Fax: 800-886-6566

*Attorneys for Defendant-Intervenor Western Energy Alliance*

10

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of August 2019, I served a true and correct copy of the foregoing via the Court's electronic case filing system which will cause the foregoing to be served upon all counsel of record.

/s/ Erik Petersen

Erik Petersen