# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, and CENTER FOR BIOLOGICAL DIVERSITY,<br><br>    Plaintiffs,<br><br>vs.<br><br>RYAN K. ZINKE, Secretary of Interior; DAVID BERNHARDT, Deputy Secretary of Interior; and UNITED STATES BUREAU OF LAND MANAGEMENT, an agency of the United States,<br><br>    Defendants,<br><br>and,<br><br>STATE OF WYOMING; WESTERN ENERGY ALLIANCE,<br><br>    Defendants-Intervenors. | Case No.: 1:18-cv-00187-REB<br><br>**MEMORANDUM DECISION AND ORDER RE:**<br><br>**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (PHASE ONE)**<br>**(Dkt. 135)**<br><br>**FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br>**(Dkt. 140)**<br><br>**DEFENDANT-INTERVENORS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br>**(Dkt. 148)** |

Pending before the Court are the following motions: (1) Plaintiffs' Motion for Partial Summary Judgment (Phase One) (Dkt. 135); (2) Federal Defendants' Motion for Partial Summary Judgment (Phase One) (Dkt. 140); and (3) Defendant-Intervenors' Motion for Partial Summary Judgment (Dkt. 148). The Court has heard oral argument from counsel and has carefully considered the record. Being fully advised, the Court enters the following Memorandum Decision and Order.

## I. <u>SUMMARY OF DECISION</u>

The Bureau of Land Management ("BLM") is a federal agency that, among other things, handles the leasing of oil and gas rights on certain federal lands. The procedures for doing so changed in 2018 with the implementation of a new Instruction Memorandum ("IM"), supplying

**MEMORANDUM DECISION AND ORDER - 1**

changed instructions to the agency's offices about how to handle such leases. This new direction is known as IM 2018-034.

Plaintiffs Western Watersheds Project and Center for Biological Diversity (collectively "WWP" or "Plaintiffs") contend that IM 2018-034 unlawfully restricts public participation in and environmental review of BLM oil and gas lease decisions that affect and threaten sage-grouse populations and habitats across the western United States. WWP asks the Court to (1) vacate the challenged provisions of IM 2018-034 and reinstate the rules previously in effect under IM 2010-117 (issued during the prior presidential administration), until BLM changes these procedures through notice-and-comment rulemaking; and (2) vacate the leases and underlying decision documents for those lease sales utilizing IM 2018-034.

Soon after the Complaint was filed, the State of Wyoming ("Wyoming") and an oil and gas industry association known as Western Energy Alliance ("WEA") (collectively "Defendant-Intervenors"), asked to intervene in the lawsuit, which the Court allowed.[1]

Initially, the Court conducted a hearing to consider WWP's request for a preliminary injunction. On September 21, 2018, under the legal standards that apply to preliminary injunctions and the requirements of federal law found in FLPMA, NEPA, and the APA, the Court concluded that WWP showed a substantial case for success on the merits of their claims and that irreparable harm was likely to result in the absence of a preliminary injunction. Further,

---

[1] Plaintiffs' First Amended Complaint added the Normally Pressured Lance Natural Gas Development Project ("NPL Project") to the "Final Actions" collectively challenged in the First, Second, and Third Claims for Relief; it also added a new Seventh Claim for Relief alleging that the NPL Project's Environmental Impact Statement ("FEIS") and Record of Decision ("ROD") were deficient under the Federal Land Policy and Management Act ("FLPMA"), the National Environmental Policy Act ("NEPA"), and the Administrative Procedure Act ("APA"). The proponent of the NPL Project, Jonah Energy LLC ("Jonah"), then moved to intervene, which the Court also allowed, but later severed WWP's NPL Project-related claims and transferred them to the United States District Court for the District of Wyoming. *See generally* 7/9/19 MDO (Dkt. 150).

**MEMORANDUM DECISION AND ORDER - 2**

the Court concluded, after weighing the equities and the public interest, that such equities tipped in favor of, and the public interest was best served by, issuing a preliminary injunction.

The preliminary injunction required that, for oil and gas leases scheduled for the fourth quarter of 2018 and thereafter, BLM must (1) re-implement certain provisions contained in IM 2010-117 as to the nature of, and time periods for, public involvement and protest in the oil and gas leasing process; and (2) discontinue the use of conflicting procedures contained in IM 2018-034.  In general, these interim requirements allowed a fuller opportunity for public involvement and comment in BLM's decision-making processes affecting potential oil and gas leases on federal lands in areas of federally-recognized sage-grouse habitat – at least until the merits of WWP's claims could be adjudicated and resolved.

The preliminary injunction did not apply to BLM oil and gas lease procedures on lands that are not within federally-recognized boundaries encompassing sage-grouse habitat management areas; nor did it apply to oil and gas leases that had been the subject of sales already conducted up to that point in time or that were currently scheduled in the remainder of the third quarter of 2018.  Federal Defendants did not appeal the Court's preliminary injunction order, but instead postponed upcoming December 2018 lease sales in sage-grouse habitats to follow the procedures of IM 2010-117.

Following the filing of the Administrative Record for IM 2018-034 and the pertinent lease sales, on October 15, 2019, the Court conducted a hearing to consider the parties' cross-motions for summary judgment.  Under the legal standards that apply to motions for summary judgment (alongside injunctions generally and, again, FLPMA, NEPA, and the APA), the Court is persuaded that the rationale behind issuing the preliminary injunction remains solid and, as such, enters partial summary judgment in WWP's favor.  In doing so, the Court finds that IM 2018-034's at-issue provisions are set aside and replaced by IM 2010-117's corresponding

**MEMORANDUM DECISION AND ORDER - 3**

provisions until BLM changes these procedures through notice-and-comment rulemaking.  As with the preliminary injunction, however, this relief applies only to oil and gas lease sales contained in whole or in part within sage-grouse habitat management areas.  Additionally, the June and September 2018 oil and gas lease sales in Nevada, Utah, and Wyoming that applied IM 2018-034 are set aside.

## II.  **BACKGROUND**

The Court has previously described the general contours of this case.  *See* (Dkts. 54, 66, 74, 111, 150).[2]  Broadly speaking, WWP challenges what it contends are unlawful actions by the Trump Administration, through Federal Defendants, to promote and expedite oil and gas leasing on public lands.  WWP alleges that the manner and fact of such leasing "will adversely impact essential habitats and populations across the range of the greater sage-grouse . . ., and violate bedrock environmental laws including [FLPMA], [NEPA], and the [APA]."  First Am. Compl. ¶ 1 (Dkt. 78).  More specifically, WWP alleges that Federal Defendants have issued a series of orders, scientific reports, and directives that cast aside and disregard previously-implemented protections for sage-grouse populations.  At the same time, contends WWP, such actions also limit or preclude opportunities for public involvement during the oil and gas leasing process – materializing in five "final" lease sales that impact sage-grouse habitats (the June 2018 Nevada, September 2018 Nevada, June 2018 Wyoming, September 2018 Wyoming, and September 2018 Utah lease sales, collectively identified as the "Phase One" lease sales).  *See id*. at ¶¶ 1a, 225a-225ll; *see also* WWP's Mem. ISO MPSJ, p. 3 (Dkt. 135-1).

---

[2]  Accordingly, for reasons of efficiency and consistency, the Court will integrate those portions of its September 21, 2018 Memorandum Decision and Order and Preliminary Injunction where appropriate, particularly when understanding that it previously examined in depth WWP's likelihood of success on the merits alongside similar (if not identical) arguments renewed here, with the Court now moving on to the actual merits of WWP's claims in the context of the parties' cross-motions for summary judgment.

**MEMORANDUM DECISION AND ORDER - 4**

According to WWP, these leasing actions violate the 2015 Sage-Grouse Plan

Amendments to BLM Resource Management Plans, FLPMA, NEPA, and the APA.  *See* First

Am. Compl., ¶¶ 276-307 (Dkt. 78).  Further, WWP asserts, two recently-implemented BLM IMs

revised previously existing BLM leasing processes without any public procedures (notice and

comment) or environmental review:  (1) IM 2018-026, which overrides the "prioritization"

requirement of the 2015 Sage-Grouse Plan Amendments (prioritizing oil and gas leasing outside

of identified sage-grouse habitat); and (2) IM 2018-034, which impacts environmental analyses

of oil and gas leasing and development decisions, while limiting public notice and involvement

in those decisions.  *See id*. at ¶¶ 98-112.  The pending motions pertain to IM 2018-034 under

WWP's Fourth and Fifth Claims for Relief.

IM 2018-034, issued on January 31, 2018, claims this purpose:

> **Purpose:**  This Instruction Memorandum (IM) sets out the policy of the Bureau of
> Land Management (BLM) to simplify and streamline the leasing process to
> alleviate unnecessary impediments and burdens, to expedite the offering of lands
> for lease, and to ensure quarterly oil and gas lease sales are consistently held in
> accordance with the Mineral Leasing Act (30 U.S.C. § 226), Executive Order
> 13783, and Secretary Order 3354.

IM 2018-034, "Purpose" p. 1 (BLMW828).  It "supersedes existing policy" contained in IM

2010-117 and replaces "any conflicting guidance or directive found in the BLM Manual or

Handbook."  *Id*.

According to WWP, BLM issued IM 2018-034 without any public notice, comment, or

environmental review, and directs BLM offices to discard procedures under the previous IM

2010-117 for environmental reviews and limit public involvement in oil and gas leasing

decisions.  Such action, WWP contends, violates FLPMA, NEPA, and the APA.  WWP requests

that the Court vacate the challenged provisions of IM 2018-034 and the leases issued in reliance

on IM 2018-034, while reinstating corresponding provisions from IM 2010-117 until BLM

**MEMORANDUM DECISION AND ORDER - 5**

completes a proper notice-and-comment rulemaking to govern its lease review process – in particular:

- Vacate IM 2018-034, Section III.A – "Parcel Review Timeframes" and reinstate IM 2010-117, Section III.A – "Parcel Review Timeframes";

- Vacate IM 2018-034, Section III.B.5 – "Public Participation" and reinstate IM 2010-117, Section III.C.7 – "Public Participation";

- Vacate IM 2018-034, Section III.D – "NEPA Compliance Documentation" and reinstate IM 2010-117, Section III.E – "NEPA Compliance Documentation"; and

- Vacate IM 2018-034, Section IV.B – "Lease Sale Parcel Protests" and reinstate IM 2010-117, Section III.H – "Lease Sale Parcel Protests."

*See* WWP's Mem. ISO MPSJ, p. 19 (Dkt. 135-1).

A comparison of the pertinent language from the two IMs (with supplied emphases) illustrates the differences in their respective templates for oil and gas leasing:

| **Vacate IM 2018-034** | **Reinstate IM 2010-117** |
|---|---|
| § III.A – <u>Parcel Review Timeframes</u> | § III.A. – <u>Parcel Review Timeframes</u> |
| *State/field offices are required, by statute, and implementing regulation, to hold quarterly lease sales, when eligible lands are available for lease.  Lease sales should occur in the last month of each calendar year quarter.* | *State offices will continue to hold sales four times per year, as required by the Mineral Leasing Act . . ., when eligible lands are determined by the state office to be available for leasing.  However, state offices will develop a sales schedule **with an emphasis on rotating lease parcel review responsibilities among field offices throughout the year to balance the workload and to allow each field office to devote sufficient time and resources to implementing the parcel review policy established in this IM**.  State offices will extend field office review timeframes, as necessary, to ensure there is adequate time for the field offices to conduct comprehensive parcel reviews.* |
| *The BLM accepts Expressions of Interest (EOI) in lands for potential leasing through the National Fluids Lease Sale System (NFLSS). Members of the public submit EOIs electronically to the BLM using NFLSS.  Once submitted, the public can view all EOIs submitted to the BLM.  The EOI submitter can track its EOI status using the EOI-specific tracking number provided by NFLSS.  NFLSS can display the dates when the EOI was submitted to, and accepted by, the BLM, and its status, such as pending review by the state* | |

**MEMORANDUM DECISION AND ORDER - 6**

| | |
|---|---|
| *office, field office, or surface management agency.  The BLM also uses the NFLSS to describe lands that the BLM has identified for leasing consideration.  NFLSS provides a link to upcoming lease sales.  The BLM will identify in NFLSS a deadline for receiving EOIs for each upcoming sale.  The deadline will be six months prior to the lease sale month.  This EOI deadline also will be posted on the state office website along with the upcoming lease sale schedule.* | ***[No timeframe for parcel review]*** |
| ***The timeframe for parcel review for a specific lease sale is to be no longer than 6 months.***  *This will include adjudicating and creating the preliminary parcel list from all timely received EOIs and the other lands identified for leasing consideration in the NFLSS, recognizing there will be exceptions due to unforeseen circumstances, including delays associated with SMA consent.* | |
| ***BLM will no longer use a rotating schedule for lease sales, as described in IM No. 2010-117.***  *Each state office will review all lands that are identified in EOIs that were submitted before the EOI cutoff date for a particular quarterly lease sale and will offer all parcels determined to be eligible and available within the state office's jurisdiction* | |
| § III.B.5 – <u>Public Participation</u><br><br>*State and field offices **may provide for public participation** during the NEPA process as part of the review of parcels identified for potential leasing* | § III.C.7 – <u>Public Participation</u><br><br>*State and field offices **will provide for public participation** as part of the review of parcels identified for potential leasing through the NEPA compliance documentation process (see section III.E). State and field offices will identify groups and individuals with an interest in local BLM oil and gas leasing, including surface owners of split estate lands where Federal minerals are being considered for leasing. Interested groups, individuals, and potentially affected split estate surface owners will be kept informed of field office* |

| | |
|---|---|
| | *leasing and NEPA activities through updated websites and email lists, and will be invited to comment during the NEPA compliance process.* |
| § III.D – <u>NEPA Compliance Documentation</u><br><br>*The state/field office will determine the appropriate form of NEPA compliance documentation for all lease sale parcels on BLM-managed lands, including parcels for federal subsurface minerals in split estate lands.*<br><br>*If, through the lease parcel review process, the authorized officer confirms that the proposed leasing action has been adequately analyzed in existing NEPA document(s) and is in conformance with the approved RMP, a Determination of NEPA Adequacy (DNA) will be used to document NEPA compliance for the leasing decision.  If the authorized officer deems additional analysis to be necessary, then the BLM can prepare an Environmental Assessment (EA) or Environmental Impact Statement (EIS), as appropriate.*<br><br>***If the BLM concludes that a DNA will adequately document that existing NEPA analysis is sufficient to support the proposed action and the action is consistent with the RMP, no further public comment period is required for the DNA.***<br><br>*The State Director or the officer with delegated decision-making authority will use the information provided by the field office authorized officer to determine which parcels to include on an upcoming lease sale.* | § III.E – <u>NEPA Compliance Documentation</u><br><br>*The IDPR Team will complete site-specific NEPA compliance documentation for all BLM surface and split estate lease sale parcels.  The IDPR Team may include the review of multiple parcels in a single document.  Site-specific NEPA compliance documentation must incorporate appropriate information gained through the lease parcel review process described above.  **In accordance with this IM, the NEPA compliance documentation for oil and gas leasing must include an opportunity for public review, as described below, and the field office must verify that all legal requirements have been met (e.g., ESA and NHPA).***<br><br>*If, through the lease parcel IDPR Team review process, the authorizing official confirms that the proposed leasing action is adequately analyzed in an existing NEPA document, such as that prepared during the MLP process, and is in conformance with the approved RMP, a Determination of NEPA Adequacy (DNA) may be used to document NEPA compliance for the leasing decision . . . .  **Although not required by law or regulation, field offices will provide a 30-day public review and comment period for the DNA.  After consideration of any public comments received on the document, the field office will either finalize the DNA or initiate other appropriate NEPA compliance review.**  It is expected that the DNA process will only be appropriate in cases where the existing NEPA documentation has adequately incorporated the most current program-specific guidance.  If a DNA is not* |

**MEMORANDUM DECISION AND ORDER - 8**

*appropriate, then the field office will determine the appropriate NEPA compliance documentation (e.g., environmental assessment (EA) or environmental impact statement (EIS)) to be prepared.*

*Most parcels that the field office determines should be available for lease will require site-specific NEPA analysis. This analysis will typically take the form of an EA, which would be tiered, as appropriate, to the RMP/EIS or a MLP/EA or EIS, if one has been completed for any of the parcels. Scoping for these EAs is optional; however, the interdisciplinary review of lease sale parcels will provide input on the issues, impacts, and potential alternatives to be addressed in the EA. The EA will analyze a no action alternative (no leasing), a proposed leasing action (leasing the parcel(s) in conformance with the land use plan), and any alternatives to the proposed action that may address unresolved resource conflicts. In cases where the field office determines that the necessary terms and conditions under which leasing would be appropriate are not in conformance with the RMP, it will be necessary to amend the RMP before leasing is appropriate. If it is necessary to amend the RMP, the leasing EA (or EIS) must either meet the standards for NEPA documentation to support a plan amendment . . ., or the affected lease parcels must be withdrawn or deferred from leasing until a plan amendment or revision can be completed at a later date.*

***Although not required by law or regulation, field offices will provide a 30-day public review and comment period for the EA and unsigned Finding of No Significant Impact (FONSI) of oil and gas leasing before forwarding the leasing recommendation to the State Director . . . .***
*Note:  Plan amendments are subject to additional public involvement and protest*

| | *requirements . . . .  The field office will finalize the EA and FONSI considering any public comment received on those documents.  If a FONSI is not warranted, the field office may recommend that the parcel be withheld from leasing or that an EIS be prepared to address the site-specific issues in compliance with NEPA* |
|---|---|
| § IV.B – <u>Lease Sale Parcel Protests</u><br><br>***A 10-day public protest period will begin the day the sale notice is posted, along with applicable NEPA documentation.***  *State offices should attempt to resolve protests in a signed decision before the sale of the protested parcels.  Parcels subject to protests that are not resolved (i.e., pending protests) will be offered for lease sale.  A decision to deny or dismiss a protest will advise the protesting parties of their right to appeal to the Interior Board of Land Appeals (IBLA) and will state that an appeal will not automatically halt the auction process.*<br><br>*The number of parcels protested and the status of the protests (i.e., protests dismissed, denied, upheld, or pending) must be publicly posted the day before the sale starts on the BLM state office website and the internet auction website so that bidders understand the protest status of each parcel.  Protests upheld should be posted on the state office website and the NFLSS, using normal processes with amendments/notices to withdraw the parcel, no later than the day before the sale starts, and if applicable, on the online leasing website for the sale no later than the day before the sale starts.*<br><br>***[Public notice of the sale is to be given 45 days prior to the sale § IV.A]*** | § III.H – <u>Lease Sale Parcel Protests</u><br><br>***A 30-day protest period will begin the day the sale notice is posted, as it has in the past.  The earlier posting of the sale notice will provide the state and field offices with at least 60 days to review protests before the oil and gas lease sale.***  *The process outlined in this IM – which includes site-specific parcel analysis and increased public participation – will help identify, address, and resolve most issues before the lease sale.  When possible, state offices should attempt to resolve protests before the sale of the protested parcels.  Protests that are not resolved do not prevent bidding on protested parcels at the auction.  Protest decisions should advise the protesting parties of their right to appeal denied protests to the Interior Board of Land Appeals (IBLA), but that appeals will not automatically halt the auction or issuance of leases.*<br><br>***[Public notice of the sale is to be given 90 days prior to the sale § III.G]*** |

*Compare* IM 2018-034 (BLMW828-32), *with* IM 2010-117 (BLMW450-60) (emphasis added)

(internal citations omitted); *see also, e.g.*, First Am. Compl. at ¶¶ 105-112 (Dkt. 78).

**MEMORANDUM DECISION AND ORDER - 10**

# III.  LEGAL STANDARDS

## A.    Administrative Procedure Act ("APA")

Federal agency compliance with NEPA and FLPMA is reviewed under the APA (neither

NEPA nor FLPMA provides a private right of action).  *See Ctr. for Biological Diversity v. U.S.*

*Dep't of Interior*, 581 F.3d 1063, 1070 (9th Cir. 2009); *Earth Island Inst. v. U.S. Forest Serv.*,

351 F.3d 1291, 1300 (9th Cir. 2003).  Under the APA, an agency action must be upheld unless it

is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5

U.S.C. § 706(2)(A).[3]  "A rule is arbitrary and capricious 'if the agency has relied on factors

which Congress has not intended it to consider, entirely failed to consider an important aspect of

the problem, offered an explanation for its decision that runs counter to the evidence before the

agency, or is so implausible that it could not be ascribed to a difference in view or the product of

agency expertise.'"  *Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1190 (9th Cir.

2010) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463

U.S. 29, 43 (1983)).

"[T]he touchstone of 'arbitrary and capricious' review under the APA is 'reasoned

decision-making.'"  *Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d 1061,

1080 (9th Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52).  Courts will sustain an

agency action if the agency has "examine[d] the relevant data and articulate[d] a satisfactory

explanation for its action including a 'rational connection between the facts found and the choice

made.'"  *Id.* (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (internal quotation omitted)).

This standard also applies to how an agency considers and responds to "significant comments"

---

[3]  The APA goes on to highlight additional grounds for overturning agency actions, including, *inter alia*, agency actions "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or "without observance of procedure required by law."  5 U.S.C. § 706(2)(C)-(D).

**MEMORANDUM DECISION AND ORDER - 11**

that raise points that could change a proposed rule. *Id*. (quoting *Am. Mining Congress v. EPA*, 965 F.2d 759, 771 (9th Cir. 1992) (internal quotation omitted)).

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, in a case involving review of a final agency action under the APA, the court's role is limited to reviewing the administrative record, and the standard set forth in Rule 56 does not apply. *See Colorado River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 200 (D.D.C. 2012) (citing *Catholic Health Initiatives v. Sebelius*, 658 F. Supp. 2d 113, 117 (D.D.C. 2009), *rev'd on other grounds*, 617 F.3d 490 (D.C. Cir. 2010)). "Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Id*. (citation omitted); *see also Occidental Eng'g Co. v. Immigration & Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir. 1985). Summary judgment is thus a mechanism for deciding, as a matter of law, whether the agency action passes muster under the APA. *See N.w. Motorcycle Ass'n v. U.S. Dep't Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994); *Occidental Eng'g*, 753 F.2d at 769-70.

In deciding whether an agency's action was arbitrary and capricious, courts should be "highly deferential" to the agency's decision, *Providence Yakima*, 611 F.3d at 1190, and not "substitute [the court's own] judgment for that of the agency." *J & G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1051 (9th Cir. 2007). "[C]ourts will 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Id*. at 1052 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). "Moreover, '[w]here the agency's line-drawing does not appear irrational and the [party challenging the agency action] has not shown that the consequences of the line-

**MEMORANDUM DECISION AND ORDER - 12**

drawing are in any respect dire . . . [courts] will leave that line-drawing to the agency's discretion.'" *Id*. (quoting *Leather Indus. of Am. v. EPA*, 40 F.3d 392, 409 (D.C. Cir. 1994)). However, the agency cannot engage in post-hoc rationalizations; "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 87 (1943).  And when an agency changes position it must provide "good reasons" for the shift.  *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Despite this forgiving standard, there is no room for a court to "rubber-stamp" an administrative decision.  There must be "a substantive inquiry[,] . . . a thorough, probing, in-depth review" of the agency action.  *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971).  If, after such review, the court holds an agency action to be arbitrary and capricious, "the proper course [is] to remand to the [a]gency."  *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 657 (2007); *see also Fed. Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20, (1952) (when reviewing the administrative decision, "the function of the reviewing court ends when an error of law is laid bare."); *but see infra*.

**B.      Federal Land Policy and Management Act ("FLPMA")**

In enacting FLPMA in 1976, "Congress declared that it is the policy of the United States to manage the public lands 'in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values.'"  *Ctr. for Biological Diversity*, 581 F.3d at 1075 (quoting 43 U.S.C. § 1701(a)(8)). FLPMA requires management of public lands based on "multiple use and sustained yield," utilizing the resources "in the combination that will best meet the present and future needs of the American people . . . [taking] into account the long-term needs of future generations for

**MEMORANDUM DECISION AND ORDER - 13**

renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values[,]" and "achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use."  43 U.S.C. §§ 1701(a)(7), 1702(c),(h).  "'Multiple use management' is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put[.]"  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004).

To help achieve these purposes, FLPMA requires that land use plans (known as Resource Management Plans ("RMPs") for BLM lands) be developed with "public involvement" and then used in managing the public lands.  *See* 43 U.S.C. § 1712(a) ("The Secretary shall, with public involvement and consistent with the terms and conditions of this Act, develop, maintain, and, when appropriate, revise land use plans which provide by tracts of areas for the use of the public lands.").  As to "public involvement," FLPMA Section 309(e) further directs that:

> In exercising his authorities under this Act, the Secretary, by regulation, shall establish procedures, including public hearings where appropriate, to give . . . the public adequate notice and an opportunity to comment upon the formulation of standards and criteria for, and to participate in, the preparation and execution of plans and programs for, and the management of, public lands.

43 U.S.C. § 1739(e); *see also* 43 U.S.C. § 1701(a)(5) (FLPMA Section 102(a)(5):  "[I]t is the policy of the United States that . . . the Secretary be required to establish comprehensive rules and regulations after considering the views of the general public . . . ."); 43 U.S.C. § 1712(f) (FLPMA Section 202(f):  "The Secretary shall allow an opportunity for public involvement and by regulation shall establish procedures, including public hearings where appropriate, to give . . . the public, adequate notice and opportunity to comment upon and participate in the formulation of plans and programs relating to the management of the public lands.").  FLPMA Section 310 further requires APA compliance in promulgating such procedures.  *See* 43 U.S.C. § 1740 ("The

**MEMORANDUM DECISION AND ORDER - 14**

Secretary, with respect to the public lands, shall promulgate rules and regulations to carry out the purposes of this Act and of other laws applicable to the public lands . . . .  The promulgation of such rules and regulations shall be governed by the provisions of chapter 5 of title 5 . . . .")).

## C.     National Environmental Policy Act ("NEPA")

NEPA encourages "'productive and enjoyable harmony between man and his environment,' and was intended to reduce or eliminate environmental damage and to promote 'the understanding of the ecological systems and natural resources important to' the United States."  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756 (2004) (quoting 42 U.S.C. § 4321). Particular results are not mandated, but NEPA does "prescribe[] the necessary process" to avoid "uninformed – rather than unwise – agency action."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-351 (1989).  Council on Environmental Quality ("CEQ") regulations guide federal agencies' compliance with NEPA.  *See* 40 C.F.R. §§ 1500.1-1508.28.

At its core, NEPA requires that agencies prepare a detailed statement – an Environmental Impact Statement ("EIS") – in connection with "proposals for . . . major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  Among other things, an EIS must include an explanation of "the environmental impact of the proposed action," "any adverse environmental effects which cannot be avoided should the proposal be implemented," and "alternatives to the proposed action."  *Id*. at §§ 4332(C)(i)-(iii).  The process of preparing the EIS "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts" and that "the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision."  *Robertson*, 490 U.S. at 349.  "[T]he broad dissemination of information mandated by NEPA permits the

public and other government agencies to react to the effects of a proposed action at a meaningful time." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989).

In deciding whether an EIS is required (*i.e.*, will the proposed project have a significant effect on the human environment), the agency may first prepare an Environmental Assessment ("EA") to assist in making that decision.  40 C.F.R. §§ 1501.3-1501.4.  A "concise public document," the EA is used to "briefly" discuss "the environmental impacts" and "alternatives" to the proposed action.  40 C.F.R. § 1508.9.  If the decision is that an EIS is not necessary, an explanatory Finding of No Significant Impact ("FONSI") is required to "briefly present…why an action . . . will not have a significant effect on the human environment."  40 C.F.R. § 1508.13.

Hence, there is a salutary and critical role of the NEPA process in agency decision-making which has been described in myriad agency decisions and court decisions over many decades.  When properly implemented, NEPA procedures "ensure[ ] that the agency will inform the public that it has indeed considered environmental concerns in its decision-making process." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983).  Accordingly, CEQ regulations require agencies to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures,"  40 C.F.R. § 1506.6(a); "[p]rovide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected," *id.* at § 1506.6(b); "[s]olicit appropriate information from the public," *id.* at § 1506.6(d); and "[e]xplain in its procedures where interested persons can get information or status reports on environmental impact statements and other elements of the NEPA process," *id.* at § 1506.6(e).  *See also id.* at § 1507.3(a) (agency must consult with CEQ while developing implementing procedures and "before publishing them in the Federal Register for comment.").  Additionally, CEQ Regulations require agencies preparing an EIS to make an initial draft available for public comment and to

**MEMORANDUM DECISION AND ORDER - 16**

consider "develop[ing] and evaluating alternatives not previously given serious consideration" in response to comments.  40 C.F.R. §§ 1503.1, 1503.4.

## IV.  DISCUSSION

The parties' arguments relative to IM 2018-034 itself, and its application to the Phase One lease sales are, for the most part, already well-understood in this case, having been raised since the action's inception and again now against the frame of a surrounding administrative record.  The arguments have been distilled down to these:  (1) whether IM 2018-034 is a final agency action; (2) whether IM 2018-034 is procedurally and/or substantively invalid under the APA, FLPMA, and/or NEPA; (3) whether IM 2018-034's application to the Phase One lease sales restricted public comment; and (4) the proper remedy, if any is necessary.  Each issue is considered and decided below.[4]

### A.     IM 2018-034 is a Final Agency Action

The APA permits judicial review of "final agency action for which there is no other adequate remedy in court."  5 U.S.C. § 704; *see also Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006).  "'[A]gency action' includes the whole or a part of an agency rule, order, license, sanction, relief or the equivalent or denial thereof, or failure to act[.]"  5

---

[4]  As part of their Motion for Partial Summary Judgment, Plaintiffs argue that they have standing.  *See* WWP's Mem. ISO MPSJ, pp. 6-7 (Dkt. 135-1).  Neither Federal Defendants nor Defendant-Intervenors argue otherwise.  *See generally* Fed. Defs.' Mem. ISO MSJ & Opp. to WWP's MPSJ (Dkt. 141); Def.-Intervs.' Mem. ISO MPSJ & Opp. to WWP's MPSJ (Dkt. 149).  Thus, for the reasons already articulated in the Court's September 21, 2018 Memorandum Decision and Order and Preliminary Injunction, Plaintiffs have standing to pursue the claims resolved here.  *See* 9/21/18 MDO, pp. 12-19 (Dkt. 74) ("[WWP's members] assert that past and future oil and gas leasing decisions, driven in part by IM 2018-034's alleged accelerated timelines and detours around public participation, will cause aesthetic, recreational, scientific, and spiritual injury across the sage-grouse range. . . . .  Finally, independent of injuries related to the issuance of leases and the eventual development of oil and gas leases themselves, WWP members also provide in-depth accounts of how simply attempting to "comply" with IM 2018-034 over the past year has resulted in separate, tangible, procedural injuries.").

**MEMORANDUM DECISION AND ORDER - 17**

U.S.C. § 551(13).  Such a list is "meant to cover comprehensively every manner in which an agency may exercise its power."  *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 478 (2001).  Agency action is "final" when two conditions are met:  (1) "the action must mark the consummation of the agency's decision-making process – it must not be of a merely tentative or interlocutory nature"; and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (internal quotation marks and citation omitted).

In measuring finality, the "agency's characterization of its action as being provisional or advisory is not necessarily dispositive"; instead, "courts consider whether the practical effects of an agency's decision make it a final agency action, regardless of how it is labeled."  *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1094-95 (9th Cir. 2014).  "[E]ven if the agency does not label its decision or action as final, it may be reviewable [under the APA] if it 'has the status of law or comparable legal force' or if 'immediate compliance with its terms is expected.'"  *Id*. (quoting *Or. Nat. Desert Ass'n*, 465 F.3d at 987).  Therefore, the court must "focus on both the 'practical and legal effects of the agency action,' and define the finality requirement 'in a pragmatic and flexible manner.'"  *Havasupai Tribe v. Provencio*, 876 F.3d 1242, 1250 (9th Cir. 2017) (quoting *Or. Nat. Desert Ass'n*, 465 F.3d at 982).

The Court previously addressed this issue when considering WWP's request for a preliminary injunction.  The Federal Defendants argued then that IM 2018-034 was not final because it did not meet either prong of the *Bennett* test.  *See* Fed. Defs.' Opp. to Mot. for P.I., p. 17 (Dkt. 52).  The Court disagreed.  *See* 9/21/18 MDO, pp. 19-26 (Dkt. 74).  Here, Federal Defendants maintain their position that "the issuance of IM 2018-034 was not a final agency action and therefore it is not reviewable under the [APA]."  Fed. Defs.' Mem. ISO MSJ & Opp. to WWP's MPSJ, p. 12 (Dkt. 141). The Court's view, however, has not changed.

**MEMORANDUM DECISION AND ORDER - 18**

1.    IM 2018-034 Was the Consummation of BLM's Decision-Making Process

Stating that IM 2018-034 "merely establishes guidelines for certain procedures that BLM will follow in reviewing parcels for potential leasing, conducting environmental analyses of the proposed parcels, and considering and responding to protests," Federal Defendants argue that it ultimately "leaves considerable discretion to BLM state and field office staff as to precisely what procedures to follow."  *Id.* at pp. 12-13.  But the *actual* language used within IM 2018-034 is more edict in nature than "merely tentative or interlocutory . . . ."  For example, IM 2018-034:

- "sets out the policy of the Bureau of Land Management (BLM) to simplify and streamline the leasing process to alleviate unnecessary impediments and burdens, to expedite the offering of lands for lease, and to ensure quarterly oil and gas lease sales are consistently held in accordance with the Mineral Leasing Act (30 U.S.C. § 226), Executive Order 13783, and Secretary Order 3354."  IM 2018-034, "Purpose" p. 1 (BLMW828); *see also id.* at "Regional Teams/Background" p. 4 (BLMW831).

- "supersedes existing policy announced in IM No. 2010-117, *Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews*, issued on May 17, 2010, and replaces any conflicting guidance or directive found in the BLM Manual or Handbook."  *Id.* at "Purpose" p. 1 (BLMW828).

- "applies to the leasing of Federal minerals under Bureau of Land Management (BLM) administered surface, state-owned surface, and private surface estates."  *Id.* at "Policy/Action" p. 1 (BLMW828).

- "will be implemented across the BLM as described."  *Id.* at pp.1, 5, n.1 (BLMW832).

- "(1) addresses land use planning, lease parcel review, lease sales and lease issuance, and IM implementation; and (2) directs the BLM to incorporate the revised policy, as appropriate, into affected BLM handbooks and manuals."  *Id.* at "Policy/Action" p. 1 (BLMW828).

- provides that "[t]he timeframe for parcel review for a specific lease sale is to be no longer than 6 months[,]" to "include adjudicating and creating the preliminary parcel list from all timely received EOIs [(Expressions of Interest)] and the other lands identified for leasing consideration in the NFLSS" except in unforeseen circumstances.  *Id.* at § III.A. p. 2 (BLMW829).

- provides that, "[i]f, through the lease parcel review process, the authorized officer confirms that the proposed leasing action has been adequately analyzed

**MEMORANDUM DECISION AND ORDER - 19**

in existing NEPA document(s) and is in conformance with the approved RMP, a Determination of NEPA Adequacy (DNA) will be used to document NEPA compliance for the leasing decision." *Id.* at § III.D. p.3 (BLMW830).

- provides that, "[i]f the BLM concludes that a DNA will adequately document that existing NEPA analysis is sufficient to support the proposed action and the action is consistent with the RMP, no further public comment period is required for the DNA." *Id.*

- establishes "[a] 10-day public protest period [that] will begin the day the sale notice is posted, along with applicable NEPA documentation" and "[p]arcels subject to protests that are not resolved (i.e., pending protests) will be offered for lease sale." *Id.* at § IV.B. p. 4 (BLMW831).

- "is effective immediately in order to achieve full compliance with the parcel review 6-month timeframe" and "will guide leasing procedures for all current and future parcels under review by the field offices as of the date of this IM." *Id.* at "Implementation Timeframe" p. 4 (BLMW831).

In these provisions, IM 2018-034 is much more than a general statement of policy; rather, it implements a *required* template for BLM's oil and gas leasing process in language that can only be understood as "finally determinative of the issues or rights to which it is addressed." *Pacific Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 48 (D.C. Cir. 1974); *see also* Fed. Defs.' Mem. ISO MSJ & Opp. to WWP's MPSJ, p. 13 (Dkt. 141) ("[Federal] Defendants do not dispute that the IM [2018-034] is final in the sense that BLM *intended the procedures would govern oil and gas leasing until the procedures were changed . . . .*") (emphasis added); *infra* (discussing whether IM 2018-034 is procedurally invalid).

Federal Defendants point out that IM 2018-034 contains other provisions that allow the state and field offices to choose whether or how to perform certain tasks. *See* Fed. Defs.' Mem. ISO MSJ & Opp. to WWP's MPSJ, pp. 13-14 (Dkt. 141) (citing IM 2018-034, § III.D. p. 3 (BLMW 830) ("The state/field office will determine the appropriate form of NEPA compliance documentation for all lease sale parcels on BLM-managed lands . . . .")); *see also* IM 2018-034, § III.B. pp. 2-3 (BLMW829-30) ("Field offices have the discretion to form an Interdisciplinary

**MEMORANDUM DECISION AND ORDER - 20**

Parcel Review (IDPR) Team of resource specialists to review lease sale parcels . . . .  Lease sale parcel review may include the following steps . . . .").[5]  But such discretionary places only exist within what are otherwise required, not discretionary, procedures found elsewhere (as described above) in IM 2018-034.  *See* WWP's Resp./Reply on XMPSJ, p. 3 (Dkt. 158) ("[Federal] Defendants do not claim that BLM staff have discretion to revisit the issues which IM 2018-034 did conclusively address, and the fact that IM 2018-034 did not comprehensively determine all aspects of BLM's lease review process does not render it any less final.").

Perhaps it can be said that IM 2018-034 is a patchwork of both policy and rule.  *See* 5 U.S.C. § 551(4) (defining "rule" as "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy").  But the placement of a rule in tandem with a policy, or a policy in tandem with a rule, does not hide the rule or insulate the rule from judicial review.

Moreover, IM 2018-034 unequivocally replaces IM 2010-117 and was "effective immediately" (as of January 31, 2018) "across the BLM."  *See supra*.  Such definiteness lets the air out of any argument that IM 2018-034 operates only as provisional guidance.  *See, e.g.*, *Chiang v. Kempthorne*, 503 F. Supp. 2d 343, 350 (D.D.C. 2007) (statement within "Guidelines" that "guidance [is] effective immediately" demonstrates that "there is nothing 'tentative' or 'interlocutory' about the Guidelines; rather they 'mark the consummation of the agency's decision-making process.'") (quoting *Bennett*, 520 U.S. at 178) (quotation marks and citation

---

[5]  Germane here, IM 2018-034 goes on to describe certain "following steps" in more compulsory terms.  *See, e.g.*, IM 2018-034, § III.B.1. p. 3 (BLMW830) ("State/field offices *will gather and evaluate* existing environmental resource information and compile documentation of compliance with applicable laws, regulations, and executive orders . . . .") (emphasis added); *id.* at § III.B.2 p. 3 ("State/field offices *will determine* whether leasing the parcel is in conformance with the RMP.") (emphasis added).  While somewhat incongruous against the arguments put forward by Federal Defendants, these details are not dispositive on the question of whether IM 2018-034 is a final agency action.

**MEMORANDUM DECISION AND ORDER - 21**

omitted).  To be sure, the administrative record indicates that (after it was implemented in early

2018) BLM field offices believed compliance with IM 2018-034 was mandatory, and adhered to

IM 2018-034 to prepare for and conduct competitive oil and gas lease sales, including the third

and fourth quarter 2018 sales originally under consideration here.  For example:

- Two days after BLM issued IM 2018-034, Wyoming BLM staff began discussing how it would impact their lease review schedule, including their planned 30-day protest period:

  > [Christopher Hite]:  *Do we implement the 10 day protest period for the 2nd Quarter 2018 Sale Notice that we're about to post?*  Merry was asking.  *IM 2018-034 is effective.*  We're nearing the completion of the Sale Notice, and there is public anticipation of a February 6 posting date.  NGOs will likely feel shorted, particularly since we're posting 134 days before the start of the sale (90 days posting period, minus 1 week posting delay, plus 6 week 'buffer' due to online sales schedule pushing Wyoming sale dates back to late quarter).  *My staff will need to modify language in the Sale Notice, if we limit the protest period to 10 days.  Please decide before you leave today.*

  > Added thought.  You could keep the 30 day protest period for this sale, using the rationale that our last posting from the scheduled date would possibly escape the attention of parties interested in protesting, *and it would be unfair to also unexpectedly give them one third of the normal time for submitting protests.  We can commit to implementing a 10 day protest period for our next Sale Notice posting.*

  > [Duane Spencer]:  Merry brought this up to me.  I binged WO and there was some debate*, but the point was made that the IM [2018-034] was effective immediately, so 45 day posting and 10 day protest was in effect.  Based upon that, I want to use the 45 day posting and 10 day appeal since I don't want WY as the first office spotlighted for not following the IM.*

  2/2/18 emails between Hite & Spencer (WY7816) (emphasis added).

- A February 6, 2018 email titled "Changes to BLM oil and gas lease sale postings and review schedules," confirmed BLM would not post the Sale Notice until the regulatory deadline (45 days before the sale) and would give the public only 10 days to protest:

  > Good morning.  Last Wednesday (January 31) BLM's National Office released Instruction Memorandum 2018-034, Updating Oil

**MEMORANDUM DECISION AND ORDER - 22**

and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews. *This national policy requires changes to the scheduling of reviews, and postings, associated with BLM oil and gas lease sales. As a result, the Sale Notice for BLM Wyoming's Second Quarter (June 20-21) 2018 lease sale now will be posted on May 4, 2018.*

2/6/18 email from Hite (WY7826) (emphasis added).

- A May 16, 2018 email discussed changes to June 20-21, 2018 lease sale in light of IM 2018-034:

> I apologize again for the change in sale dates. I regret that this will require changes throughout the website that you have designed for this sale. *We were attempting to post our Sale Notice no earlier than 45 days before the first day of our sale. Federal law requires the Sale Notice to be posted "at least" 45 days prior to the sale start. So, we were told to post right up against the regulatory deadline.* Unfortunately, we inadvertently missed posting on the target date (Friday, May 4). Although we posted on the following business day (Monday, May 7) the delayed posting left us with less than 45 days before the start of the sale. As a result, we had to change our protest submittal deadline, and we had to move our sale dates.

5/16/18 email from Hite (WY9624) (emphasis added); *see also* Wells Decl. ¶¶ 2-3 (Dkt. 52-1) (BLM Division Chief for Division of Fluid Minerals referencing table detailing schedules for September 2018 and December 2018 lease sales); Fuller Supp. Decl. ¶¶ 8-11 (Dkt. 63-1) (discussing recent difficulty in participating in comment/protest periods because of IM 2018-034's implementation); Saul Decl. ¶¶ 7-9 (Dkt. 63-2) (same); *infra*.

All of this underscores IM 2018-034's finality. *See Columbia Riverkeeper*, 761 F.3d at 1094-95 (agency action is final if "immediate compliance with its terms is expected"). And, while BLM field offices may have applied IM 2018-034 for lease sales in sage-grouse habitat areas up *until* the Court issued its September 21, 2018 Memorandum Decision and Order and Preliminary Injunction (its reach being limited only to federal lands encompassing sage-grouse habitat management areas (*see supra*)), BLM *continued* to follow IM 2018-034 in other lease sales (non-sage-grouse habitat areas) *after* the preliminary injunction issued. *See* WWP's Mem. ISO MPSJ, p. 9, n.2 (Dkt. 135-1) (citing *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023

**MEMORANDUM DECISION AND ORDER - 23**

(D.C. Cir. 2000) ("If an agency acts as if a document issued at headquarters is controlling in the field . . . then [it] is for all practical purposes 'binding'")).  Together, these considerations support the conclusion that IM 2018-034 was the consummation of BLM's decision-making process – the first *Bennett* "final agency action" prong.

2.      IM 2018-034 Determines Rights/Obligations and Has Legal Consequences

Federal Defendants argue that IM 2018-034 does not determine rights or obligations nor does it have legal consequences because it is only "a general statement of policy," infused with discretion throughout.  Fed. Defs.' Mem. ISO MSJ & Opp. to WWP's MPSJ, p. 14-15 (Dkt. 141) ("IM 2018-034 does not impose rights or obligations and gives BLM officials ample discretion in conducting the leasing process.").  Such a description is incomplete, at best, as it largely ignores the definitive pronouncements of IM 2018-034 that more accurately frame the scene.

These directives make clear that IM 2018-034 is markedly different than IM 2010-117, and illustrate that IM 2018-034 expressly changes how BLM conducts its oil and gas leasing. *See supra*.  Where once there was no deadline for BLM review of nominated lease parcels, IM 2018-034 now imposes a six-month review period; where previously public participation in the NEPA review process was always permitted, IM 2018-034 now provides no such guarantee, leaving the subject entirely to BLM's discretion; where there was a 30-day public review and comment period for every lease sale, IM 2018-034 now eliminates that requirement; and, where there had been a 30-day protest period, IM 2018-034 now imposes a 10-day deadline for public protests of proposed lease sales, including sales as to which no specific prior public participation had been allowed.  *Compare* IM 2010-117, §§ III.A, III.C.7, III.E, III.H pp. 5, 7-9 (BLMW454, 56-58), *with* IM 2018-034, §§ III.A, III.B.5, III.D, IV.B pp. 2-4 (BLMW829-31).

Even if some strands of discretion are involved in the layers of these provisions, they collectively prescribe and require an unmistakably different regulatory framework for BLM's

**MEMORANDUM DECISION AND ORDER - 24**

administration of oil and gas lease parcel reviews and leasing decisions, and, likewise, the

manner in which WWP is (or, WWP contends, is not) able to participate in the same.  As such,

IM 2018-034 contains significant substantive and procedural changes in BLM decision-making

practices and upon the rights and abilities of parties like WWP to participate in or challenge such

practices and decisions – all in a manner markedly different than IM 2010-117.[6]  *See, e.g.*, *W.*

*Energy All. v. Salazar*, 2011 WL 3738240, *6-7 (D. Wyo. 2011) (finding *Bennett's* final agency

action test satisfied, in part, where "Federal Respondents adopted a final, binding and substantive

change to, (indeed 180 degree reversal of), its past practices concerning Section 390 CXs

[(categorical exclusion from review under NEPA)]" and "the 2010 Instruction was complete

'about-face' by the Federal Respondents compared to their past practices" while also "bind[ing]

the Federal Respondents.");[7] *see also Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 216

---

[6]  The cases Federal Defendants cite to show that IM 2018-034 is an agency guidance document, and therefore not a final agency action, are inapposite here.  *See* Fed. Defs.' Mem. ISO MSJ & Opp. to WWP's MPSJ, p. 15 (Dkt. 141).  None of them bound the agency or any other party.  *See Sierra Club v. EPA*, 873 F.3d 946, 952-53 (D.C. Cir. 2017) (change to guidance on how to measure proposed transportation project's impact on ambient air quality not binding where guidance explicitly stated agency "was open to considering better, alternative methods," as was subsequently applied in practice and modified over time); *Ass'n of Flight Attendants-CWA v. Huerta*, 785 F.3d 710, 717-19 (D.C. Cir. 2015) (FAA notice for aviation safety inspectors dealing with expanded use of passenger portable electronic devices not binding given that airlines "are free to ignore" it); *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 250-53 (D.C. Cir. 2014) (EPA "final guidance" instructing EPA staff to recommend limitations for state-issued National Pollutant Discharge Elimination permits not binding because it was "legally meaningless," imposed no obligations or prohibitions on regulated entities, state permitting authorities were "free to ignore it," and EPA itself characterized it as lacking legal impact); *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 807-11 (D.C. Cir. 2006) (agency guidance to automakers on voluntary "regional recalls" represent "nothing more than a privileged viewpoint in the legal debate" and not binding when agency is not bound to apply guidelines in an enforcement action, but instead "remains free to exercise discretion in assessing proposed recalls and in enforcing the Act").

[7]  To their credit, Federal Defendants acknowledge that *Western Energy Alliance* "found that an IM issued by BLM was a reviewable final agency action" and that it is "[t]he only case that [they] are aware of that involved an IM regarding agency procedures . . . ."  Fed. Defs.' Mem. ISO MSJ & Opp. to WWP's MPSJ, p. 16 (Dkt. 141); Fed. Defs.' Reply ISO MSJ, p. 3

(D.C. Cir. 2007) (agency actions that "bind[ ] private parties or the agency itself with the 'force of law'" are final) (quoting *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002));

*Appalachian Power*, 208 F.3d at 1023 (finding EPA "guidance" to be final because it was binding and unequivocal, reasoning:  "[T]he entire Guidance, from beginning to end . . . reads like a ukase.  It commands, it requires, it orders, it dictates."); *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1320 (D.C. Cir. 1988) ("If a statement denies the decisionmaker discretion in the area of its coverage, so that he, she, or they will automatically decline to entertain challenges to the statement's position, then the statement is binding, and creates rights or obligations . . . ."); *Nat. Res. Def. Council v. EPA*, 643 F.3d 311, 319-20 (9th Cir. 2013) ("[T]he Guidance binds EPA regional directors and thus qualifies as final agency action."); *cf. U.S. v. Kaycee Bentonite Corp.*, 64 IBLA 183, 214 (1982) (BLM line officers bound to follow binding direction in instructional memoranda).

Additionally, legal consequences necessarily flow from the changes included within IM 2018-034.  IM 2018-034 alters BLM's legal duty under both FLPMA and NEPA to facilitate public involvement in its leasing decisions.  *See infra* (discussing transition from mandatory

---

(Dkt. 162).  Still, they argue it is wrongly-decided and distinguishable regardless because the IM there was directly contrary to statutory requirements within the Energy Policy Act, whereas "IM 2018-034 does not contravene a specific statutory requirement to conduct NEPA in a particular way."  Fed. Defs.' Mem. ISO MSJ & Opp. to WWP's MPSJ, p. 16 (Dkt. 141).  Setting aside whether *Western Energy Alliance* requires an underlying statutory conflict, where BLM has adopted de facto substantive new rules in IM 2018-034 without following the requisite notice-and-comment procedures (*see infra*), they represent de facto final agency action.  *See, e.g.*, *Ctr. for Auto Safety*, 452 F.3d at 806 (D.C. Cir. 2006) (when challenging substantive rules improperly promulgated without notice and comment, petitioner must show that they "either (1) reflect 'final agency action,' 5 U.S.C. § 704, or (2) constitute a de facto rule or binding norm that could not properly be promulgated absent the notice-and-comment rulemaking required by § 553 of the APA.  These two inquiries are alternative ways of viewing the question before the court. *Although, if appellants could demonstrate the latter proposition they would implicitly prove the former, because the agency's adoption of a binding norm obviously would reflect final agency action.  In either case, appellants would have a viable cause of action*.") (emphasis added).

**MEMORANDUM DECISION AND ORDER - 26**

public participation in parcel reviews under IM 2010-117, to more discretionary public

participation under IM 2018-034).  Further, the elimination of comment periods under certain

circumstances, as well as the shortened protest periods, have an immediate and practical impact

on WWP, similarly-situated parties, and the public on the whole.  As described by WWP in its

briefing, "[i]nterested parties risk dismissal in federal court for failure to exhaust administrative

remedies if they do not follow the protest process."  WWP's Resp./Reply on XMPSJ, p. 6 (Dkt.

158);[8] *but compare also id*. at p. 6, n.3, *with* Fed. Defs.' Mem. ISO MSJ & Opp. to WWP's

MPSJ, p. 26 (Dkt. 141) (disputing possibility for waiver of claims for failure to file timely

protest/exhaust administrative remedies).

This potential risk is compounded by the overlapping comment and protest periods,

combined with accelerated oil and gas lease parcel review generally, all of which are left in IM

2018-034's wake.  *See, e.g.*, Ex. 1 to Stellberg Decl. (Dkt. 63-3) (illustrative table setting forth

schedules for September 2018 and December 2018 oil and gas lease sales in BLM's western

states, including public comment opportunities and protest deadlines).  Plus, the burden of such

constraints upon public participation and compressed protest periods falls most heavily upon

members of the public, as those who have nominated potential lease parcels and BLM have had

far more time to evaluate and consider the details of such parcels.  Hence, there are cognizable

and significant legal consequences – for both BLM and entitles like WWP – that can be argued

to result from IM 2018-034.  *See Appalachian Power*, 208 F.3d at 1023 ("The short of the matter

is that the Guidance, insofar as relevant here, is final agency action, reflecting a settled agency

---

[8]  The result of an untimely protest may be the same under either IM 2018-034 or IM
2010-117, but the fact that IM2018-034's deadline is only one-third as long as previously
prescribed (and in that, a ten-day period which includes *non*-business days) greatly increases the
peril of a member of the public missing the deadline, or being unable to finish the work upon a
protest within the time period allowed.

position which has legal consequences both for State agencies administering their permit

programs and for companies like those represented by petitioners who must obtain Title V

permits in order to continue operating.").

IM 2018-034 impacts the parties' rights and obligations while also contributing to a

different milieu of legal consequences.  Therefore, the Court is satisfied that *Bennett's* second

final agency action prong is also met.  Set against this backdrop, IM 2018-034 is a final agency

action.  *See Indus. Customers of Nw. Utilities v. Bonneville Power Admin.*, 408 F.3d 638, 646

(9th Cir. 2005) ("In applying these principles, we have determined that certain factors provide an

indicia of finality, such as 'whether the [action] amounts to a definitive statement of the agency's

position, whether the [action] has a direct and immediate effect on the day-to-day operations of

the party seeking review, and whether immediate compliance [with the terms] is expected.'")

(quoting *Cal. Dep't of Water Res. v. FERC*, 341 F.3d 906, 909 (9th Cir. 2003)).

## B.     IM 2018-034 is Procedurally and Substantively Invalid

### 1.     BLM Promulgated IM 2018-34 Without Following Notice-And-Comment Rulemaking Procedures Mandated by Federal Law

IM 2018-034 did not have a public notice-and-comment period before being

implemented by BLM.  As a result, WWP says, IM 2018-034 was effectively "dead on arrival"

under the APA, FLPMA, and NEPA.  *See* WWP's Mem. ISO MPSJ, pp. 7-10 (Dkt. 135-1).

Federal Defendants contend no rulemaking was required before issuing IM 2018-034 because it

"is a general statement of policy and established only internal procedures for BLM field offices

to follow."  Fed. Defs.' Mem. ISO MSJ & Opp. to WWP's MPSJ, p. 17 (Dkt. 141).

As a general matter, the APA requires an agency to use notice-and-comment procedures

to make any "rule."  5 U.S.C. § 553(b)-(c); *see also* 43 U.S.C. § 1740 (FLPMA Section 310

directing BLM to follow APA procedures when issuing rules and regulations).  The APA

**MEMORANDUM DECISION AND ORDER - 28**

exempts from this requirement "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice . . . ."  *Id.* at § 553(b)(3)(A).  As indicated earlier, the hallmark of a substantive agency rule is that it carries the force and effect of law via the creation of new rights or duties.  *See supra*; *see also Sacora v. Thomas*, 628 F.3d 1059, 1070 (9th Cir. 2020) (interpretative rules cannot be "inconsistent with" existing laws or "impose new rights or obligations").  By contrast, it is understood that a general statement of policy "advis[es] the public prospectively of the manner in which the agency proposes to exercise a discretionary power."  *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1012-13 (9th Cir. 1987).  Such policies "serve to educate and provide direction to the agency's personnel in the field, who are required to implement its policies and exercise its discretionary power in specific cases."  *Id.* at 1013 (quotation marks and citations omitted).  "The critical factor" in determining whether a directive constitutes a general statement of policy is "the extent to which the challenged [directive] leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the [announced] policy in an individual case."  *Id.*

Thus, to qualify as an exempted statement of policy, two requirements must be satisfied: (1) the policy operates only prospectively; and (2) the policy does "not establish a binding norm," and is not "finally determinative of the issues or rights to which [it] address[es]," but instead leaves officials "free to consider the individual facts in the various cases that arise."  *Id.* at 1014 (quotation marks and citations omitted).  It is "well-established that an agency may not label a substantive change to a rule an interpretation simply to avoid the notice and comment requirements."  *Air Transp. Ass'n of Am. v. Fed. Aviation Admin.*, 291 F.3d 49, 55 (D.C. Cir. 2002); *see also Appalachian Power*, 208 F.3d at 1024.

Piecing out the content of IM 2018-034's wording leaves space to argue both sides of the issue, but for reasons already articulated, IM 2018-034 is not a general statement of policy.  It is

**MEMORANDUM DECISION AND ORDER - 29**

written in binding terms.  It is effective immediately.  It outlines the leasing procedures for all

current and future parcels under review by BLM field offices and correspondingly creates

binding legal obligations.  And, it is treated as binding in the field.  *See supra*.  It does not clarify

existing policy as much as it creates it.  Though discretion exists in limited degree on some

details, IM 2018-034 allows for no discretion on essential details such as (1) the six-month

review period; (2) no automatic public participation in the NEPA review process; (3) elimination

of a 30-day public review and comment period for each proposed lease; and (4) imposition of a

shortened, 10-day protest period.  *See id*.[9]  These are requirements – not general statements of

clarifying policy – for oil and gas leasing on BLM-administered lands.[10]

Despite the substantive revisions contained in IM 2018-034's oil and gas leasing

framework, its procedures did not follow notice-and-comment rulemaking.  *See supra*.  IM 2018-

034 thus fails FLPMA's requirement that "the Secretary, by *regulation*, shall establish

procedures . . . to give . . . the public adequate notice and an opportunity to comment upon the

formulation of standards and criteria for, and the management of, the public lands."  43 U.S.C.

§ 1739(e) (emphasis added); *see also* 43 U.S.C. § 1712(f).  A similar scenario was considered in

*Natural Resources Defense Council, Inc. v. Jamison*, 815 F. Supp. 454 (D.D.C. 1992).  There,

the plaintiffs challenged BLM's adoption of public participation procedures for coal leasing

spelled out in a "competitive coal leasing handbook."  *Id*. at 468 ("Plaintiffs' count VIII

challenges not the substance of the public participation procedures adopted by the Secretary, but

---

[9]  Moreover, as discussed during oral argument, nothing in the record reveals that anyone within BLM exercised any discretion in applying something other than the procedures outlined within IM 2018-034.  This helps buttress the notion that IM 2018-034 was indeed binding and consistently used in the field and, thus, indicative of a substantive rule rather than an interpretive policy.

[10]  And, as highlighted to follow, certain of these requirements constrain public participation in BLM oil and gas leasing decisions in violation of FLPMA and NEPA.  *See infra*.

**MEMORANDUM DECISION AND ORDER - 30**

the lack of regulations implementing these provisions.").  In granting summary judgment in the

plaintiffs' favor, the court found:

> Plaintiffs correctly assert that Congress has mandated implementation of the public participation provisions by regulation, leaving no discretion to the agency. Congress has addressed this precise question.  Both sections 309(e) and 202(f) of FLPMA use the imperative "shall" and specify that their public participation opportunities will be established "by regulation."  If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.
>
> Defendants respond to these undeniable facts by suggesting that plaintiffs' insistence on the protection provided by regulations "trivialize[s] Section 309(e) of FLPMA since public participation procedures are spelled out in an agency handbook, and the handbook cannot be changed such as to terminate public participation without violating the Federal Advisory Committee Act.  Whether or not the stability of the current public participation rules is adequately guaranteed without additional regulations is a policy question.  Congress left the Secretary no discretion in how to provide that guarantee:  notice and comment rulemaking.  Consequently plaintiffs' Motion for Summary Judgment on this count must be granted.

*Jamison*, 815 F. Supp. at 468-69 (emphasis added) (internal quotation marks and citation

omitted).

In sum, IM 2018-034 is a substantive rule that, consistent with *Jamison*, should have

been issued through APA/FLPMA notice-and-comment procedures.  It was not.[11]  IM 2018-034

is therefore procedurally invalid.

---

[11]  This also applies to WWP's overlapping argument that IM 2018-034 violates the notice-and-comment procedures required under CEQ's NEPA regulations.  *See* WWP's Mem. ISO MPSJ, pp. 9-10 (Dkt. 135-1) (BLM's issuance of IM 2018-034 also violated its obligation to 'make diligent efforts to involve the public in preparing . . . [its] NEPA procedures.'") (quoting 40 C.F.R. § 1506.6); *see also* First Am. Compl., ¶¶ 319-325 (Dkt. 78) (Within WWP's Fifth Claim for Relief:  "BLM did not provide public notice or an opportunity to comment on IM 2018-034 before promulgating it, in violation of FLPMA and CEQ regulations. . . .  Accordingly, IM 2018-034 must be held unlawful and set aside under the APA as without observance of procedure required by FLPMA and CEQ regulations.").  In other words, a violation of FLPMA's notice-and-comment rulemaking requirement extends to NEPA's similar notice-and-comment rulemaking requirement.  *See, e.g.*, *W. Watersheds Project v. Kraayenbrink*, 2006 WL 2348080, *7 (D. Idaho 2006) ("While the analysis of WWP's chance of success has proceeded to this point under NEPA, the same analysis can be made under [FLPMA].  Public input has the same

2.     IM 2018-034 Improperly Constrains Public Participation in BLM Oil and Gas
       Leasing Decisions

Public involvement in oil and gas leasing is required under FLPMA and NEPA.  *See Kraayenbrink*, 2006 WL 2348080 at *7 (FLPMA's and NEPA's "statutory language values public input on long-range issues ('preparation [. . .] of plans and programs') as well as on day-to-day issues ('the management of' and 'execution of' those long-range plans).  This same language promotes early public participation at the 'formulation' stage, before the decision is made.") (quoting 43 U.S.C. § 1739(e)).  The question here is whether IM 2018-034 sufficiently allows for such public involvement.  The answer must be a complete "yes."  Here, the answer is "no, not quite."

FLPMA and NEPA neatly parallel each other in their emphasis upon public participation, with their statutory framework largely in unison on such a requirement.  For example:

- "In exercising his authorities under the Act, the Secretary, by regulation, *shall* establish procedures, including public hearings where appropriate, *to give . . . the public adequate notice and an opportunity to comment upon the formulation of standards and criteria for, and to participate in, the preparation and execution of plans and programs for, and the management of, the public lands*." 43 U.S. C. § 1739(e) (emphasis added).

- "The Secretary *shall allow an opportunity for public involvement*  and by regulation shall establish procedures, including public hearings where appropriate, *to give . . . the public adequate notice and opportunity to comment upon and participate in the formulation of plans and programs relating to the management of the public lands*."  43 U.S.C. § 1712(f) (emphasis added).

- "The term 'public involvement' means *the opportunity for participation by affected citizens in rulemaking, decision-making, and planning with respect to the public lands,* including public meetings or hearings held at locations near the affected lands, or advisory mechanisms, or such other procedures as may be necessary to provide public comment in a particular instance."  43 U.S.C. § 1702(d) (emphasis added).

---

elevated role in FLPMA that it has under NEPA.  FLPMA requires BLM to give "the public adequate notice and an opportunity to comment upon the formulation of standards and criteria for, and to participate in, the preparation and execution of plans and programs for, and the management of, the public lands.") (quoting 43 U.S.C. § 1739(e)).

- "Federal agencies *shall to the fullest extent possible* . . . [i]mplement procedures to make the NEPA process more useful to decision-makers and the public" and "*[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment*." 40 C.F.R. § 1500.2(b),(d) (emphasis added).

- "NEPA procedures *must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken*. The information must be of high quality. Accurate scientific analysis, expert agency comments, *and public scrutiny are essential to implementing NEPA* . . . ." 40 C.F.R. § 1500.1(b) (emphasis added).

- "In determining whether to prepare an environmental impact statement the Federal agency shall . . . if the proposed action [does not normally require either an EIS or an EA], prepare an [EA]. *The agency shall involve environmental agencies, applicants, and the public, to the extent practicable*, in preparing assessments required by § 1508.9(a)(1)." 40 C.F.R. 1501.4(b) (emphasis added); *see also* 43 C.F.R. §§ 46.305(a), 46.435(a) (discussing obligation under NEPA to provide for public involvement and seek public comment when preparing EAs and EISs).

- "Agencies *shall [m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures [and] solicit appropriate information from the public*." 40 C.F.R. § 1506.6(a),(d) (emphasis added).

On a very fundamental level, it strains common sense to see how these requirements are met when comparing IM 2018-034 to its predecessor, IM 2010-117. That is, how can it be said that IM 2018-034 provides the required public participation "to the fullest extent possible" and "to the extent practicable," when it is dramatically more restrictive on the issue of public participation than what was called for in IM 2010-117?

Further, IM 2018-034 eliminates the prior requirement contained in IM 2010-117 that BLM "[s]tate and field offices *will* provide for public participation as part of the review of parcels identified for potential leasing through the NEPA compliance documentation process," swapping in its place the more discretionary "*may* provide for public participation during the NEPA process . . . ." *Compare* IM 2010-117, § III.C.7 (BLMW456), *with* IM 2018-034, § III.B.5 (BLMW830). Discretionary public participation is not compliant with FLPMA and

**MEMORANDUM DECISION AND ORDER - 33**

NEPA.  *See W. Watersheds Project. v. Kraayenbrink*, 538 F. Supp. 2d 1302, 1316 (D. Idaho

2008) ("Congress, in FLPMA, did not give the BLM any discretion to cut the public out of these

management and execution issues.  Yet the BLM seeks to grant itself that forbidden discretion in

its regulatory revisions.  Accordingly . . . WWP has met its 'heavy' burden of proving that those

revisions limiting public input constitute a facial violation of FLPMA.").[12]

This concern is heightened because IM 2018-034 also departs from IM 2010-117 by

declaring that public comment is no longer required in lease sales in which the agency issues a

DNA,[13] and there is no provision for public comment on lease sales which have received an EA.

---

[12]  In *Kraayenbrink*, the agency removed certain organizations from a list of "interested publics" who were to receive notice of issues concerning grazing allotments.  *Kraayenbrink*, 538 F. Supp. 2d at 1309.  The agency also eliminated public involvement from a variety of actions involving grazing, including "adjustments to allotment boundaries," "changes in active use," "emergency allotment closures," and the "issuance or renewal of individual permits or leases."  *Id*.  This Court granted the plaintiff's motion for partial summary judgment, holding that the regulatory revisions improperly limited public involvement under NEPA and FLPMA.  *See id*. at 1312-16, 1325.  Federal Defendants argue that *Kraayenbrink* is distinguishable, claiming that, unlike the regulations considered there, "the procedures adopted in IM 2018-034 do not exclude particular groups from decision-making and do not eliminate public involvement in particular actions."  Fed. Defs.' Mem. ISO MSJ & Opp. to WWP's MPSJ, p. 24 (Dkt. 141).  The Court disagrees – IM 2018 not only granted BLM discretion in determining whether to involve the public in oil and gas leasing decisions (*see supra*), it eliminated previously-permitted public involvement from sales approved with a Determination of NEPA Adequacy ("DNA"), and seemed to remove the previously-guaranteed comment period on lease sale EAs (*see infra*).  In this sense, this case aligns with Federal Defendants' own characterization of *Kraayenbrink*.  *See* Fed. Defs.' Mem. ISO MSJ & Opp. to WWP's MPSJ, p. 24 (Dkt. 141) (Federal Defendants summarizing *Kraayenbrink* as follows:  "Thus, the procedures in the regulations were changed – not just, as in the present case, to change 'will' to 'may' – but to fundamentally eliminate public involvement from actions that the public was previously invited to provide input on.").

[13]  According to Federal Defendants, "BLM may use a DNA if it has already analyzed the impacts of its leasing decision in another NEPA document and has provided sufficient opportunity for public participation during the preparation of that earlier document."  Fed. Defs.' Mem. ISO MSJ & Opp. to WWP's MPSJ, pp. 22-23 (Dkt. 141) (citing 43 C.F.R. §§ 46.120(c), 46.300(a)(2)); *see also id*. at pp. 32-33.  This naturally presumes an "apples to apples" comparative, site-specific analysis.  *See* WWP's Resp./Reply on XMPSJ, pp. 16-18 (Dkt. 158) (in context of September 2018 Nevada Lease Sale:  "[T]he use of a DNA was improper as BLM's prior NEPA analysis never analyzed the site-specific effects of oil and gas development on these parcels; and . . . BLM violated its own NEPA Handbook in not allowing fresh public

---

**MEMORANDUM DECISION AND ORDER - 34**

*Compare* IM 2010-117, § III.E p. 8 (BLMW457) (allowing 30-day review and comment period, respectively), *with* IM 2018-034, § III.D p. 3 (BLMW830) ("If the BLM concludes that a DNA will adequately document that existing NEPA analysis is sufficient to support the proposed action and the action is consistent with the RMP, no further public comment period is required for the DNA," while silent on matter of EA).[14]  In turn, for a significant subset of lease sales (those involving DNAs and EAs), IM 2018-034 eliminates contemporaneous public involvement entirely and relegates any sort of public input to the much later-in-time (and, WWP would contend, too late in time) adversarial protest period with a 10-day deadline (rather than IM 2010-117's previous 30-day deadline), neutralizing and diminishing the substantive and practical value of such upfront input.  *See, e.g.*, *Kraayenbrink*, 538 F. Supp. 2d at 1309, 1314-16 (holding that BLM violated FLPMA and NEPA, in part, by "cut[ting the interested public] out of the discussions between the BLM and the ranchers *at the formulation stage of decisions*," even though public still had opportunity to protest and appeal grazing decisions, stating further:  "[A] proposed decision carries with it an inevitable momentum favoring that result, an effect NEPA

---

comment on the DNAs.") (citing (BLMW298) (BLM NEPA Handbook, stating:  "In general, where the new proposed action has not already been discussed during public involvement for the existing EA or EIS, some additional public involvement for the new proposed action will be necessary.")); *see also* Fuller Supp. Decl. ¶ 6 (Dkt. 63-1) ("In the case of the Nevada 3rd Quarter oil and gas lease sale, for instance, BLM relied on past NEPA lease sale analyses that didn't actually encompass the areas where the parcels were located.  The practice of relying on DNAs is especially problematic because it limits public participation to the protest process.").

[14]  The Court has given careful consideration to Federal Defendants' and Defendant-Intervenors' arguments that NEPA does not require the circulation of an EA in every case, that the lease sale protest is a creature of BLM's regulations, and, more generally, that IM 2018-034 is consistent with BLM regulations.  *See* Fed. Defs.' Mem. ISO MSJ & Opp. to WWP's MPSJ, pp. 21-26 (Dkt. 141); Def.-Intervs.' Mem. ISO MPSJ & Opp. to WWP's MPSJ, p. 7 (Dkt. 149).  But this ignores the fact that IM 2010-117 previously required circulation and comment on DNAs and EAs and that BLM's regulations represent floors, not caps – all the while keeping in mind that FLPMA and NEPA variously require public participation "to the fullest extent possible" and "to the extent practicable."  *See supra*.

**MEMORANDUM DECISION AND ORDER - 35**

seeks to avoid by 'ensur[ing] that federal agencies are informed of environmental consequences *before making decisions . . . .'*") (quoting *Citizens for Better Forestry*, 341 F.3d at 970 (first emphasis added, second emphasis in original)); *see also, e.g.*, 68 Fed. Reg. 33796 (June 5, 2003) (available at 2003 WL 21280722) (in context of BLM wildfire management decisions: "The appeal process is not part of the public participation required by Section 309(e) of FLPMA.").

There are differing viewpoints about how federal lands are to be managed, and how the resources of federal lands are to be used. Disagreement is common over decisions made by federal agencies, such as BLM, who have the responsibility to make those decisions and there is a well-understood zone of discretion in the law that is given to agencies in the consideration, making, and implementation of such decisions. *See, e.g.*, *Kraayenbrink*, 538 F. Supp. 2d at 1313 ("Public participation is, by nature, messy. To manage it, agencies must be 'given ample latitude to adapt their rules and policies to changed circumstances.'") (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 42). As referenced earlier, that discretion is hard-baked into the APA. *See supra* (citing 5 U.S.C. §§ 706(2)(A), (C)-(D); *Providence Yakima*, 611 F.3d at 1190; *J & G Sales Ltd.*, 473 F.3d at 1051). But in this case, the record contains compelling evidence that BLM made an intentional decision to limit the opportunity for (and, in some circumstances, to preclude entirely) contemporaneous public involvement in decisions concerning whether to grant oil and gas leases on federal lands.

BLM contends that it has discretion in these spaces. *See generally* Fed. Defs.' Mem. ISO MSJ & Opp. to WWP's MPSJ, pp. 21-25 (Dkt. 141) ("Plaintiffs cannot show that the procedure in the IM [2018-034] is facially invalid, however, because the IM allows BLM officials to provide for public participation when it deems such participation to be appropriate."); *see also* Def.-Intervs.' Mem. ISO MPSJ & Opp. to WWP's MPSJ, p. 7 (Dkt. 149) ("BLM's exercise of discretion in affording public comment and protest periods for the lease sales is entirely

**MEMORANDUM DECISION AND ORDER - 36**

reasonable under the APA standard of review and is in accordance with both FLPMA and

NEPA.").  However, that discretion exists so long as the decisions made meet the requirements

of the law – specifically, here, FLPMA and NEPA.  *See Kraayenbrink*, 538 F. Supp. 2d at 1315

("*The BLM asserts that the revisions do not prevent it from seeking public input at its discretion.*

*Assuming that is true, the revisions would violate FLPMA.  The mandatory use of the term*

*'shall' removes the BLM's discretion to pick and choose the circumstances for public input.*

Under the specific circumstances listed in the statute – the 'formulation of standards and criteria

for, and . . . the preparation and execution of plans and programs for, and the management of, the

public lands' – the BLM must provide for public input.") (emphasis added); *Churchill Co. v.*

*Norton*, 276 F.3d 1060, 1072 (9th Cir. 2001) ("We must . . . strictly interpret the procedural

requirements in NEPA and the CEQ regulations 'to the fullest extent possible' consistent with

the policies embodied in NEPA.  '[G]rudging, pro forma compliance will not do.'") (quoting

*Lathan v. Brinegar*, 506 F.2d 677, 687 (9th Cir. 1974)).  Here, BLM inescapably intended to

reduce and even eliminate public participation in the future decision-making process.  Regardless

of the reasons for doing so, the fact of doing so in the manner pursued by BLM cannot be

reconciled with FLPMA's and NEPA's overarching mandates.  IM 2018-034 is therefore

substantively invalid.

To recap, IM 2018-034 is subject to judicial scrutiny under the APA as a reviewable

agency action.  And, where, as in the case here, IM 2018-034 is both procedurally and

substantively invalid under FLPMA and NEPA, the APA is likewise implicated.  The Court's

findings on these points are the product of applying the law to IM 2018-034's blueprint.  To be

clear, this conclusion is grounded in the requirements of the statutes – the Court is not

substituting its judgment in place of BLM's; nor, obviously, is the Court blindly rubber-stamping

BLM's decisions.

**MEMORANDUM DECISION AND ORDER - 37**

3.      IM 2018-034's Issuance Was Arbitrary and Capricious

Under the APA, agency action may be set aside if it is arbitrary and capricious.  *See supra* (citing 5 U.S.C. § 706(2)(A)).  Under this standard, an agency must "examine the relevant data and articulate a satisfactory explanation for its action," including departures from prior policy – in short, agency action requires "reasoned decision-making."  *See supra* (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 52; *see also F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agencies "may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books," and "must show that there are good reasons for the new policy.").

With this standard in mind, WWP argues that IM 2018-034 is arbitrary and capricious as no acceptable reason was provided for implementing IM 2018-034 and, in doing so, BLM improperly reduced public participation from oil and gas leasing on public lands.  *See* WWP's Mem. ISO MPSJ, pp. 12-15 (Dkt. 135-1) ("The record reveals no contemporaneous analysis by BLM that would explain or justify its determination that longer comment and protest periods were not 'practicable' or 'possible,' or even a record of how IM 2018-034 was developed.  This violates the fundamental requirement that an agency must actually 'articulate a satisfactory explanation for its action' including a 'rational connection between the facts found and the choice made.'") (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).  Federal Defendants counter that IM 2018-034 did not require notice-and-comment rulemaking; therefore, they contend, it could not be arbitrary and capricious and, regardless, "the record provides a sufficient explanation" for its adoption.  Fed. Defs.' Mem. ISO MSJ & Opp. to WWP's MPSJ, pp. 27-28 (Dkt. 141).  For the reasons that follow, the Court concludes that IM 2018-034's issuance was arbitrary and capricious.

**MEMORANDUM DECISION AND ORDER - 38**

To repeat, IM 2018-034 is a final agency action that required notice-and-comment rulemaking.  *See supra*.  Therefore, contrary to Federal Defendants' position, IM 2018-034 is not immune from being arbitrary and capricious if the justification for its implementation is lacking.

On that score, federal agencies "must provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process." *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 953 (9th Cir. 2008); *see also Kraayenbrink*, 538 F. Supp. 2d at 1315 ("The clear meaning of the statutory language . . . is that public input is required on long-range issues ('preparation . . . of plans and programs') as well as on day-to day issues ('the management of' and 'execution of' those long-range plans).").  Despite this requirement, in implementing IM 2018-034, BLM jettisoned prior processes, practices, and norms in favor of changes that emphasized economic maximization – to the detriment, if not outright exclusion of pre-decisional opportunities for the public to contribute to the decision-making process affecting the management of public lands.

For example, within its October 24, 2017 "Final Report:  Review of the Department of Interior Actions That Potentially Burden Domestic Energy" (prepared in response to Executive Order (EO) 13783)[15], the Department of Interior commented that, "[f]or too long, America has been held back by burdensome regulations on our energy industry," requiring the "[e]liminat[ion

---

[15]  On March 28, 2017, President Trump issued EO 13783, titled "Promoting Energy Independence and Growth."  (BLMW 759).  It directed that all executive departments and agencies "immediately review existing regulations that potentially burden the development or use of domestically produced energy resources and appropriately suspend, revise, or rescind those that unduly burden the development of domestic energy resources beyond the degree necessary to protect the public interest or otherwise comply with the law." *Id*.  EO 13783 gave all federal agencies 180 days to submit a final report with "specific recommendations that, to the extent permitted by law, could alleviate or eliminate aspects of agency actions that burden domestic energy production."  (BLMW 760).

**MEMORANDUM DECISION AND ORDER - 39**

of] harmful regulations and unnecessary policies."  82 Fed. Reg. 50532-01, *50533, 35

(November 2017) (available at 2017 WL 4918980); *see also* (BLMW 777-78).  As to IM 2010-

117 specifically, the Report indicated that it "will be replaced with revised guidance for the

purpose of establishing greater efficiencies in the oil and gas leasing process" because IM 2010-

117 "resulted in longer time frames in analyzing and responding to protests and appeals, as well

as longer lead times for BLM to clear and make available parcels for oil and gas lease sales."  82

Fed. Reg. 50532-01 at *50536; *see also* (BLMW 784).  There is no mention of "public

participation" in the Report.

In this context, IM 2018-034 was a mechanism for unharnessing prior constraints upon

oil and gas leasing by specifically reducing or eliminating public involvement in the oil and gas

leasing process *because* such public involvement hindered the oil and gas production industry.

Doing so certainly served to meet the stated "purpose" of IM 2018-034 – that is, reducing or

precluding public participation will "streamline the leasing process to alleviate unnecessary

impediments and burdens, to expedite the offering of lands for lease . . . ."  IM 2018-034,

"Purpose" p. 1 (BLMW828).  But the route chosen by BLM could not reach that destination

because the public involvement requirements of FLPMA and NEPA cannot be set aside in the

name of expediting oil and gas lease sales.  It is axiomatic that the benefits of public involvement

and the protocol by which public involvement is obtained are not "unnecessary impediments and

burdens."

The agency's administrative record reveals no analysis that would explain or justify the

transition from IM 2010-117 to 2018-034 and the resulting curtailment of the public's

involvement in oil and gas leasing decisions on public land.  *See California v. Bureau of Land

Mgmt.*, 277 F. Supp. 3d 1106, 1122 (N.D. Cal. 2017) (BLM agency action was arbitrary and

capricious where it "only took into account the costs to the oil and gas industry of complying

**MEMORANDUM DECISION AND ORDER - 40**

with the [prior administration's] Rule and completely ignored the benefits that would result from

compliance. . . .  If the words 'justice so requires' are to mean anything, they must satisfy the

fundamental understanding of justice:  that it requires an impartial look at the balance struck

between the two sides of the scale, as the iconic statue of the blindfolded goddess of justice

holding the scales aloft depicts.  Merely to look at only one side of the scales, whether solely the

costs or solely the benefits, flunks this basic requirement.  As the Supreme Court squarely held,

an agency cannot ignore 'an important aspect of the problem.'") (quoting *Motor Vehicle Mfrs.*

*Ass'n*, 463 U.S. at 43).  Faster and easier lease sales, at the expense of public participation, is not

enough, highlighting that IM 2018-034's issuance was arbitrary and capricious.

**C.   The Phase One Lease Sales Were Conducted Under IM 2018-034 and Restricted
Public Involvement**

The parties do not dispute that BLM applied (either partially or completely) IM 2018-034

in approving the Phase One lease sales.  *Compare* WWP's Mem. ISO MPSJ, pp. 15-18 (Dkt.

135-1), *with* Fed. Defs.' Mem. ISO MSJ & Opp. to WWP's MPSJ, pp. 30-35 (Dkt. 141), Def.-

Intervs.' Mem. ISO MPSJ & Opp. to WWP's MPSJ, pp. 13-16 (Dkt. 149).  A table contrasting

the five lease sales, their NEPA documentation, and their respective comment and protest

periods generally reflects this:

| Phase One Lease Sale | NEPA Compliance | Comment Period | Protest Period (post-IM 2018-034) |
|---|---|---|---|
| June 2018 Wyoming | EA (pre-IM 2018-034) | 30 | 10 |
| June 2018 Nevada | EA (pre-IM 2018-034) | 30 | 10 |
| September 2018 Wyoming | 2 EAs (pre-IM 2018-034) | 30 | 10 |
|  | EA | 14 | 10 |
| September 2018 Nevada | 2 DNAs | 0 | 10 |
| September 2018 Utah | 2 EAs | 17 | 10 |
|  | EA | 0 | 10 |

**MEMORANDUM DECISION AND ORDER - 41**

*See id.*; *see also* Ex. 1 to Stellberg Decl. (Dkt. 63-3). Rather, the dispute between the parties on this issue[16] centers on the legal significance, if any, in applying IM 2018-034's abbreviated comment and protest periods to the Phase One lease sales in light of WWP's actual submission of comments and protests to those same sales.[17] Federal Defendants and Defendant-Intervenors say that WWP was never prevented from submitting substantive comments on the Phase One lease sales for BLM's consideration, and that WWP, in fact, did so. *See* Fed. Defs.' Mem. ISO MSJ & Opp. to WWP's MPSJ, pp. 31-34 (Dkt. 141); Def.-Intervs.' Mem. ISO MPSJ & Opp. to WWP's MPSJ, pp. 2, 6, 9-10, 13-16 (Dkt. 149). In response, WWP does not claim that they were completely shut out of the process, arguing instead that IM 2018-034 (with its corresponding shortened/non-existent comment periods and shortened protest periods) improperly precluded *meaningful* public involvement – consistent with NEPA and FLPMA –

---

[16] Federal Defendants and Defendant-Intervenors understandably also argue that the procedures in IM 2018-034 are already consistent with FLPMA and NEPA such that their application to the Phase One lease sales likewise complied with NEPA and FLPMA. *See* Fed. Defs.' Mem. ISO MSJ & Opp. to WWP's MPSJ, pp. 31-35 (Dkt. 141); Def.-Intervs.' Mem. ISO MPSJ & Opp. to WWP's MPSJ, pp. 7-9 (Dkt. 149). However, the Court has already concluded that IM 2018-034 is procedurally and substantively invalid. *See supra*.

[17] Defendant-Intervenors additionally argue that "BLM provided ample opportunity for public participation on the underlying RMPs," and that WWP "made extensive use of [the] multiple opportunities to submit extensive and detailed comments . . . at various stages in the land use planning process, including submitting (1) comments on the draft RMPs, (2) comments on the applicable [RMPs], [and ] (3) protests of the final RMPs . . . . Def.-Intervs.' Mem. ISO MPSJ & Opp. to WWP's MPSJ, pp. 2, 9-12 (Dkt. 149). This argument misses the point to the extent it does not address whether the later-in-time application of IM 2018-034 to the Phase One lease sales improperly restricts public participation under NEPA and FLPMA. *See* WWP's Resp./Reply on XMPSJ, pp. 17, 19-20 (Dkt. 158) ("RMP EISs cannot be used in place of pre-leasing NEPA analysis. . . . The fact that prior EISs contained general discussions of oil and gas development does not eliminate BLM's duty to provide site-specific NEPA analysis – and public comment – before approving specific lease sales.") (citing *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 688 (10th Cir. 2009); *Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998)).

**MEMORANDUM DECISION AND ORDER - 42**

relative to the Phase One lease sales.  *See* WWP's Mem. ISO MPSJ, pp. 15-18 (Dkt. 135-1);

WWP's Resp./Reply on XMPSJ, pp. 25-26 (Dkt. 158).  The Court agrees.

Essentially, Federal Defendants' and Defendant-Intervenors' position on the issue boils

down to a "no harm no foul" argument.  But if accepted, such a position penalizes WWP for

*simply trying* to comply with IM 2018-034's new requirements while presuming that their actual

efforts in doing so adequately incorporated the full breadth and depth of their position on a

particular lease sale.  The fact of such comments, without more, does not mean that WWP has

meaningfully contributed, or as meaningfully as it could have and would have contributed in a

different public participation framework, to the leasing decision process given the protocol

contained in IM 2018-034.[18]  WWP's supporting declarations confirm as much.

June 2018 Nevada Lease Sale

- "In 2018, Basin and Range Watch submitted comments opposing
  Environmental Assessment DOI-BLM-NV-B020-2018-0017-EA June 2018
  Competitive Oil and Gas Lease Sale.  The lease sale covers 300,000 acres on
  Nevada BLM's Battle Mountain District, including important sage-grouse
  habitat.  We expressed concerns about water quality, habitat impacts, cultural
  resources and visual contacts. . . .  Drafting these comments was more difficult
  than for other projects I have commented on in the past because BLM's

---

[18]  Defendant-Intervenors claim that WWP must demonstrate that they would have
provided "substantially different" information had they been given more time.  Def.-Intervs.'
Mem. ISO MPSJ & Opp. to WWP's MPSJ, pp. 6, 8-9 (Dkt. 149) (citing *Alliance for the Wild
Rockies v. Farnsworth*, 2017 WL 1591840 (D. Idaho 2017); *Sequoia ForestKeeper v. Elliott*, 50
F. Supp. 3d 1371 (E.D. Cal. 2014)).  But the cases Defendant-Intervenors cite for this
proposition relate to whether the public had been given sufficient information to comment upon.
*See Farnsworth*, 2017 WL 1591840 at *6 ("Moreover, Alliance filed comments during the
public comment period and those comments cover the same issues it now raises, *showing that it
had enough information to flag these issues for the Forest Service*.") (citing *Sequoia
ForestKeeper*, 50 F. Supp. 3d 1371 at 1388) (rejecting argument that public outreach on logging
project was insufficient in part because "the specificity and scope of information Plaintiffs did
provide in their comments shows that they were adequately informed of the issues.")).  Here, the
issue is not whether the public had enough information, but whether the public had enough time
to digest and respond to the information provided.  *Farnsworth* and *Sequoia ForestKeeper*
therefore do not squarely apply.  Regardless, Defendant-Intervenors' proposed standard is
largely satisfied because the record indicates that WWP and other organizations were impacted
by IM 2018-034's abbreviated deadlines.  *See infra.*

**MEMORANDUM DECISION AND ORDER - 43**

environmental analysis was incredibly vague and provided little meaningful site-specific analysis. . . . After the Final EA came out (with no major changes), Basin and Range Watch protested the BLM's Decision Record and Finding of No Significant Impact for the project in May of 2018.  BLM made protesting very difficult by limiting the protest period to only 10 days. . . . The lease area concerns over 300,000 acres that could experience a direct and cumulative basis.  Had this lease sale been reviewed with an Environmental Impact Statement or at least a longer protest period, I would have had more time to visit the region. . . . The protest period was also effectively even shorter than 10 days because I had to have it finished 2 days before the deadline to get it in on time . . . . A lot of details had to be eliminated to meet the deadline. . . . If I had more time to write the protest, I could have provided a wealth of site-specific information that I simply couldn't provide working under such a tight deadline and on such short notice.  I also wanted to raise more meaningful issues about cultural resources and wanted to consult more people from Native American tribes over their concerns about water contamination, but the short ten-day window made it very problematic to contact people living in these rural regions. . . . The shorter periods make it harder for us to mobilize the interested public and write detailed comments to inform the agency's decision-making." Emmerich Decl. ¶¶ 17-23 (Dkt. 30-7).

- "WWP's ability to provide input on [the June 2018 Nevada] lease sales suffered due to the new extremely short public comment and protest periods under IM 2018-034."  Fuller Decl. ¶¶ 54-55 (Dkt. 30-4); *see also id*. at ¶ 47 ("I was not able to . . . provide as much sage-grouse and migratory bird information as I would have liked to for the Nevada June Battle Mountain lease sale.").

- "Similarly, we would have provided more sage-grouse and migratory bird information for the June 2018 Battle Mountain oil and gas lease sale protest in Nevada, but were not able to because of the extremely short protest period and competing priorities."  Molvar Decl. ¶ 26 (Dkt. 30-3).

- "Basin and Range Watch has been interested in becoming more involved in opposing oil and gas leases in Monitor Valley and Little Fish Lake Valley, because of its long-standing interest in conserving ecosystems from development, energy extraction, and fragmentation.  However, it has been hindered by the short deadlines to comment on such lease sales over so large an area."  Cunningham Decl. ¶ 8 (Dkt. 30-5).

September 2018 Wyoming Lease Sale

- "The extremely short new comment periods are too brief to allow [WWP's] staff, members, and supporters to conduct site visits with BLM to observe on-the-ground conditions.  This impoverishes BLM decision-making because many [WWP] staff, members, and supporters have been engaged with management of lands at stake in these oil and gas leasing decisions for years and could provide valuable insight into ecological changes over time.  We are

also not able to provide as much information as we would like in our comments to BLM. For the September 2018 Wyoming oil and gas lease sales, [WWP] signed on to group comments but were not able to comment independently or bring our organizational sage-grouse expertise to bear as much as we would have liked to . . . ."  Molvar Decl. ¶¶ 25-26 (Dkt. 30-3).

- "WWP's ability to provide input on [the September 2018 Wyoming] lease sales will suffer due to the new extremely short protest periods. . . .  The upcoming September 2018 BLM Wyoming lease sale is an especially challenging one for the public because BLM Wyoming held a 30-day public comment period for two Environmental Assessments analyzing 106 parcels but then held only a two-week Environmental Assessment comment period for an additional 254 parcels.  Thus, for the additional 254 parcels, the public had more than twice the number of parcels to review in less than half the amount of time."  Fuller Decl. ¶¶ 56-57 (Dkt. 30-4); *id*. at ¶ 47 ("I was not able to draft independent comment for the September Wyoming lease sale . . . .").

- "[D]ue to the shortened comment period, [Upper Green River Alliance was] unable to provide comments on the September lease sale parcels which lie just south of Pinedale and with which we are personally familiar, due to work schedules and personal commitments.  We could have provided historical knowledge and scientific research that BLM may not have had time or resources to research and employ, but we were not able to because of the extremely short protest period and competing priorities."  Baker Decl. ¶ 39 (Dkt. 30-6).

- "Wyoming Wilderness Association also commented on the third quarter lease sale.  However, this lease sale was under the impact of IM 2018-034 and contained numerous mistakes, incorrect information, and a poor analysis overall.  We only had a limited time to provide essential information to the BLM in our comment, which reduced our ability to ensure the BLM had the best information possible about the effected lands in the lease sale.  The now-optional comment period, and 10-day protest period, under BLM's new IM 2018-034 do not allow for adequate public participation.  For example, I had four days when I learned about part two of the third quarter lease sales to file a comment with maps, inventories, and information to fill in some of the gaps in BLM's analysis.  I needed to bring a lot of information to BLM's attention because the EA was a rushed, poor-quality, uninformative document.  I simply couldn't do an adequate job to provide the full look at the environmental consequences that the BLM needs to have before they make final decisions on where leasing should occur.  Four days is not an adequate amount of time to field check parcels offered for leasing, as well as do all of the research need to understand the environmental impacts of the leasing decisions and also write comments."  Harrison Decl. ¶¶ 12-14 (Dkt. 30-8).

- "Based on BLM's minimal disclosure and necessarily-rushed review of available public information, [the September 2018 Wyoming] lease sale would also have severe and unexamined consequences on winter and migration

habitats for mule deer and pronghorn, and on the scenic, watersheds, and recreational values of irreplaceable portions of the Northern Red Desert." Saul Decl. ¶ 35 (Dkt. 30-2).

- "BLM provided the public with only ten days – from August 2 through August 13 – to map and evaluate resource values and proposed stipulations for over 350,000 acres of public land in greater sage-grouse, mule deer, and pronghorn habitat across multiple regions of Wyoming, from the Red Desert to the Powder River Basin." Saul Supp. Decl. ¶ 9 (Dkt. 63-2).

September 2018 Nevada Lease Sale

- "Nevada's third and fourth quarter 2018 lease sales have not yet been announced, but based on recent patterns of activity, we expect that hundreds of thousands of acres of public land, much of it within Priority or General Habitat Management Areas for greater sage-grouse, will be proposed for lease with minimal (or no, if [DNAs] are used) environmental disclosure and analysis, requiring [CBD] to attempt to compile accurate and detailed information for hundreds of square miles of remote Nevada basins within a fifteen-day comment period and ten-day protest period." Saul Decl. ¶ 36 (Dkt. 30-2).

- "Under IM 2018-034, for its third quarter Nevada oil and gas competitive lease sale, BLM has relied on two DNAs . . . .  BLM provided no opportunity for public comment whatsoever on these DNAs, and did not disclose them to the public until the issuance of a Lease Sale Notice and commencement of a 10-day protest period on July 27, 2018.  This provided the public with only seven business days and two cursory six-page documents in order to attempt to evaluate the potential consequences of leasing and development of nearly 300,000 acres of Nevada lands across hundreds of square miles, including 74 parcels containing designated greater sage-grouse habitat.  This protest period also coincided with a simultaneous protest period for a BLM Utah third-quarter lease sale involving an additional approximately 26,000 acres of greater sage-grouse habitat." Saul Supp. Decl. ¶ 8 (Dkt. 63-2).

September 2018 Utah Lease Sale

- "In September 2018, we are expecting the following leases will be offered for sale in Utah:  seven parcels totaling 8,832 acres in Juab County on the Fillmore Field Office and 26 parcels totaling 36,396 acres on the Salt Lake Field Office. . . . WWP's ability to provide input on these lease sales has and will suffer due to the new extremely short public comment and protest periods." Fuller Decl. ¶ 58 (Dkt. 30-4).

- "As the BLM acknowledged, the Rich population area is one of the largest and most stable in Utah, and important for connectivity to grouse populations in Idaho and Wyoming.  Nevertheless, BLM has failed to engage in analysis, as required by the RMP, as to whether these parcels are appropriate for leasing, or

**MEMORANDUM DECISION AND ORDER - 46**

whether its management objectives could be better met by prioritizing the leasing of other lands and minerals outside of [Priority Habitat Management Areas]."  Saul Decl. ¶ 38 (Dkt. 30-2).

- Saul Supp. Decl. ¶ 8 (Dkt. 63-2) (discussed *supra* in relation to September 2018 Nevada lease sale).

General Considerations

- "The shortened public comment and protest periods under the new BLM IM 2018-034 have made it much harder to track, submit comments on, and protest lease sales and development projects that will harm sensitive habitats and wildlife, or have been done without adequate legal compliance. . . .  Rather than conducting the extensive independent research necessary to truly understand on-the-ground conditions on the parcels at issue, I now must work from my personal knowledge base and without adequate time for outreach to WWP's members to ensure their knowledge of the leasing areas is included.  This means that the public record is not as rich and does not have as much value in informing the agency's consideration of relevant issues, which is even more important since the quality of the agency's analysis is also suffering under the pressures to quickly offer nominated parcels for leasing.  Because of the short timeframes, I am unable to provide as much sage-grouse or other wildlife information as I would like to because there is not enough time.  When I am the primary drafter of comments, I am unable to address as many issues as I would like to, and when I contribute to other groups' comments on behalf of WWP I often do not have sufficient time to review and draft comprehensive sections on sage-grouse and other wildlife issues because of the short turnaround time to complete drafts for sign-on. . . .  I simply cannot adequately participate in leasing decisions on behalf of WWP under the constraints imposed by these new polices in IM 2018-034.").  Fuller Decl. ¶¶ 37, 45-46, 48 (Dkt. 30-4).

- "Participating is particularly difficult because of overlapping comment and/or protest periods.  For example, between July 30th and August 13th [2018] (a 14-day period), I worked on four separate protests for 3rd Quarter lease sales, as well as scoping comments for a 4th Quarter lease sale.  This difficulty intensifies when BLM releases multiple EAs and DNAs for a single lease sale.  For instance, in the case of the 4th Quarter Utah sale, I understand BLM intends to issue four EAs and two DNAs, divided by Field Office, at the start of the protest period.  The public will have to evaluate all six documents in just 10 days in Utah alone.  These changes directly result from IM 2018-034. . . .  The overall effect of these circumstances – difficulty locating lease sale documents, tightened comment deadlines, substitution of scoping for comment periods, increased reliance on DNAs, and truncated protest periods – is chaos.  Staff who work on these issues with environmental organizations are getting exhausted by the short deadlines, and that creates a greater possibility of errors, or of letting a sale that could seriously damage sensitive resources that are important to our members slip through the cracks.  Even large environmental organizations with

**MEMORANDUM DECISION AND ORDER - 47**

whom I collaborate are being overwhelmed by the demands of IM 2018-034. The interested public, whether intentionally or unintentionally, is largely being cut out of the process due to difficulties figuring out what is going on and how to participate.    When groups or local community members cannot independently contribute to scoping comments or protests on proposed lease sales, it means their expertise and perspectives are not brought to light." Fuller Supp. Decl. ¶¶ 7-8, 16 (Dkt. 63-1); *see also id.* at ¶ 18 ("In addition, the 10-day 3rd Quarter protest periods coincided with the deadline for comments on the Forest Service's proposed changes to sage-grouse plans in five states.  I have developed significant expertise in sage-grouse issues that is specific to each state that would have been valuable to our comments, but the input that I could provide was severely limited because of the 10-day protest periods for these oil and gas lease sales that were happening at the same time.").

- "Due to the extremely short new comment periods, [WWP's] staff are rarely able to conduct site visits with BLM to observe on-the-ground conditions. This impoverishes BLM decision-making because as [WWP] staff, I have been engaged with management of lands at stake in these oil and gas leasing decisions and could provide valuable insight into ecological changes over time, especially since I have been studying the ecological history of Nevada native plant and animal communities and landscapes for decades." Cunningham Decl. ¶ 7 (Dkt. 30-5).

- "The abbreviated comment and protest periods presently provided by [BLM] for oil and gas lease sales are plainly inadequate to allow me full and thorough scrutiny, and to provide substantive, knowledgeable comments on proposals to lease parcels of public land for oil and gas development.  It takes time, sometimes weeks or months and certainly more than 10 days, to review habitat maps for pronghorn, sage-grouse, mule deer and moose in an area proposed for leasing.    It takes a huge amounts of time to consider all the potential consequences from leasing and drilling, based on what we know already. . . . BLM places a huge, impossible burden on my ability to oversee responsible management of public lands.  I am harmed beyond measure by BLM's thoughtless directive."  Baker Decl. ¶¶ 34-35 (Dkt. 30-6); *see also id.* at ¶ 38 ("Due to the short, new comment periods, Upper Green River Alliance staff and supporters are rarely able to meet with BLM professionals, or conduct site visits with BLM to observe on-the-ground conditions.  This ham-strings our staff, supporters and interested, public land owners and managers alike, for each group has experience, education, and local, historical knowledge that can inform and improve BLM decision-making, and could provide valuable insight into ecological changes over time.").

- "If BLM leasing policies, including IM 2018-034, continue to be applied to future lease sales, including the third and fourth quarter lease sales for 2018 (to be conducted in September and December, 2018, respectively), [CBD] will continue to suffer harm, both in the increased difficulty of providing detailed and documented comments and protests on multiple large lease sales in an

**MEMORANDUM DECISION AND ORDER - 48**

abbreviated time-frame, and, more concretely, when oil and gas leases are issued, and development foreseeably occurs, on public lands that have never been fully and accurately examined for the wildlife and other resources that may be affected."  Saul Decl. ¶ 33 (Dkt. 30-2); *see also* Saul Supp. Decl. ¶ 11 (Dkt. 63-2) ("As a result of these large lease sales, minimal or non-existent comment periods, increased use of DNAs, restrictive filing methods, and shortened and overlapping comment periods, the Center has been required to divert staff resources from other priorities in order to evaluate, respond to, and inform its members, other nongovernmental organizations, and the general public regarding potential impacts from BLM oil and gas leasing actions.").

The point here is that, with more time to comment on the Phase One lease sales, WWP and other organizations would have more meaningfully participated in the process and, relatedly, put BLM on notice.[19]  Yet, in not being allowed to participate at the leasing decision stage, or in having to hurriedly clamber to do so because of IM 2018-034's condensed comment and protest periods, oil and gas leases have been issued without the full benefit of public input.  Whether described as incomplete or inadequate, the limits drawn on public involvement by the remodeling contained in IM 2018-034 (*see supra*), weighted further by the cloud of agency inertia often present in such a process, demonstrate that IM 2018-034 restricted public involvement in the Phase One lease sales.

---

[19]  The submitted declarations indicate that IM 2018-034's changes in the oil and gas leasing process has disrupted various organizations' usual work patterns, has caused difficulty in being able to meet the workload that has been created (in scope and quality), and requires that some staff work long hours and take time away from other responsibilities.  *See supra*.  Such difficulties may arise from a shortage of qualified personnel, or a lack of resources to hire additional staff people, or an internal decision about allocation of an organization's resources.  Such averred hardships, however, do not go away with IM 2010-117.  Nor is the fact of having too much work to do in a short amount of time a hardship that is, for some reason, weightier than similar challenges faced by other litigants in the lawsuits that WWP brings.  Perhaps WWP could hire more people or prioritize resources in a different manner.  Those are the choices of the organization, not a place for presumption by the Court.  Ultimately, however, such laments, whether commonplace or extreme, do not preclude the relief WWP seeks here, given the full extent and nature of the restraint on the public's involvement and related harm.  *See supra*.

**MEMORANDUM DECISION AND ORDER - 49**

**D.** **IM 2018-034's At-Issue Provisions Are Set Aside and IM 2010-117's Corresponding Provisions Are Reinstated, But Only Within Certain Geographic Boundaries[20]**

WWP requests that the Court vacate the challenged provisions of IM 2018-034, and to restore the status quo ante through an order directing BLM to follow the procedures under IM 2010-117 until it completes a proper notice-and-comment rulemaking to govern its lease review process. *See* WWP's Mem. ISO MPSJ, p. 19 (Dkt. 135-1). This would involve the following:

- Vacating IM 2018-034, Section III.A – "Parcel Review Timeframes" and reinstating IM 2010-117, Section III.A – "Parcel Review Timeframes";

- Vacating IM 2018-034, Section III.B.5 – "Public Participation" and reinstating IM 2010-117, Section III.C.7 – "Public Participation";

- Vacating IM 2018-034, Section III.D – "NEPA Compliance Documentation" and reinstating IM 2010-117, Section III.E – "NEPA Compliance Documentation"; and

- Vacating IM 2018-034, Section IV.B – "Lease Sale Parcel Protests" and reinstating IM 2010-117, Section III.H – "Lease Sale Parcel Protests."

Vacatur is the presumptive remedy when a court finds an agency's decision unlawful under the APA. *See* 5 U.S.C. § 706(2)(A) ("The reviewing court *shall* hold unlawful *and set aside* agency action, finding, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law[.]") (emphasis added); *Se Alaska Conserv. Council v. U.S. Army Corps of Eng'rs*, 486 F.3d 638, 654 (9th Cir. 2007) ("Under the APA, the normal remedy for an unlawful agency action is to 'set aside' the action. In other words, a court should vacate the agency's action and remand to the agency to act in compliance with its statutory obligations.").

---

[20] The parties do not specifically address the Court's earlier consideration of the *Winter* factors in the preliminary injunction context, except insofar as taking a stand on the "actual" (as opposed to "likelihood of") success on the merits. Therefore, where appropriate, the Court's previous analysis concerning the propriety of preliminary relief, coupled now with the Court's consideration of those merits here, is applicable to any permanent injunctive relief analysis as well. *See* 9/21/18 MDO, pp. 10-12, 29-49 (Dkt. 74).

**MEMORANDUM DECISION AND ORDER - 50**

However, vacatur is not required in every case.  *See Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9ᵗʰ Cir. 2012) ("A flawed rule need not be vacated.").  When equity demands, [a flawed action] can be left in place while the agency follows the necessary procedures to correct its action."  *Id*. (quoting *Idaho Farm Bureau v. Babbitt*, 58 F.3d 1392, 1405 (9ᵗʰ Cir. 1995) (internal quotation marks omitted)).  Nonetheless, vacatur is only rarely *not* imposed.  *See Humane Soc'y v. Locke*, 626 F.3d 1040, 1053 n.7 (9ᵗʰ Cir. 2010) ("In rare circumstances, when we deem it advisable that the agency action remain in force until the action can be reconsidered or replaced, we will remand without vacating the agency's action.").

In deciding whether to vacate an agency decision, courts in the Ninth Circuit look to two factors described in *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993).  *See Cal. Cmtys.*, 688 F.3d at 993.  First, the Court considers the seriousness of the agency's errors and, second, the disruptive consequences that would result from vacatur. *See id*. at 992.  "Put differently, 'courts may decline to vacate agency decisions when vacatur would cause serious and irremediable harms that significantly outweigh the magnitude of the agency's error.'"  *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*, 109 F. Supp. 3d 1238, 1242 (N.D. Cal. 2015) (quoting *League of Wilderness Defs./Blue Mountains Biodiversity Project v. United States Forest Serv.*, 2012 WL 13042847, *6 (D. Or. 2012)).  Remand without vacatur can be appropriate where "serious irreparable environmental injury" would result from vacatur.  *Ctr. for Food Safety v. Vilsack*, 734 F. Supp. 2d 948, 951 (N.D. Cal. 2010).  Further, other practical concerns may be weighed in considering the consequences of vacatur.  *See Cal. Cmtys.*, 688 F.3d at 993-94 (delay to "much needed power plant," possibly resulting in blackouts, is a "severe" consequence of vacatur that may be considered in balance).  The burden is on BLM to show that compelling equities demand anything less than vacatur.  *See Ctr. for Envtl. Health v. Vilsack*, 2016 WL 3383954, *13 (N.D.

Cal. 2016) ("given that vacatur is the presumptive remedy for a procedural violation such as this, it is Defendants' burden to show that vacatur is unwarranted").

Here, the seriousness of IM 2018-034's deficiencies – *Allied-Signal's* first prong – "should be measured by the effect the error has in contravening the purposes of the statute[s] in question," here, the APA, FLPMA, and NEPA.  *Oregon Natural Desert Assoc. v. Zinke*, 250 F. Supp. 3d 773, 774 (D. Or. 2017) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 314-15 (1982)).  IM 2018-034 was not issued through required notice-and-comment procedures and, separately, improperly constrains public participation; IM 2018-034 is procedurally and substantively invalid under the APA, FLPMA, and NEPA.  *See supra*.  As such, the seriousness of BLM's error – with respect to compliance with notice-and-comment rulemaking protocol, informed decision-making, and insuring meaningful public participation – is self-evident and weighs heavily in WWP's favor.

Moreover, the disruptive consequences in setting aside IM 2018-034 – *Allied Signal's* second prong – are not as pronounced as they might initially appear.  Under the Court's September 21, 2018 Memorandum Decision and Order and Preliminary Injunction, BLM has already returned to the provisions of IM 2010-117 for sales involving sage-grouse habitat.  *See* 9/21/18 MDO, p. 49 (Dkt. 74) ("IM 2010-117 served as the procedural framework for BLM oil and gas leases for nearly ten years before IM 2018-034 was implemented.  In this light, the suggested benefits of proceeding with the fourth quarter oil and gas lease sales using IM 2018-034 are outweighed by the benefit of returning to a fuller opportunity for public participation, consistent with IM 2010-117."); *see id*. at pp. 55-56 (issuing preliminary injunction that replaces IM 2018-034 with IM 2010-117).  BLM has not claimed any hardship from this approach, let alone the type of serious consequences required to disrupt the APA's presumptive vacatur remedy.  Accordingly, the consequences that would result from IM 2018-034's vacatur also

**MEMORANDUM DECISION AND ORDER - 52**

weigh in WWP's favor, especially when considering that setting IM 2018-034 aside in favor of IM 2010-117 will result in more reasoned decision-making and arguably less "serious irreparable environmental injury." *Ctr. for Food Safety*, 734 F. Supp. 2d at 951.

Because the seriousness of BLM's errors outweighs the disruptive consequences resulting from vacatur, IM 2018-034's relevant provisions are set aside until BLM completes a compliant notice-and-comment rulemaking to govern its lease review process. Even in that setting, however, BLM argues that IM 2018-034's vacatur cannot be replaced by IM 2010-117 because (1) such automatic reinstatement only applies to regulations, not guidance documents like IMs; (2) IM 2010-117 suffers from the same alleged procedural deficiencies as IM 2018-034; and (3) the Court cannot order BLM to conduct its oil and gas leasing program in a particular way. *See* Fed. Defs.' Mem. ISO MSJ & Opp. to WWP's MPSJ, pp. 28-30 (Dkt. 141). The Court disagrees.

First, IM 2018-034, like IM 2010-117, is a final agency action, made up of both policy and rule. *See supra* ("[I]t can be said that IM 2018-034 is a patchwork of both policy and rule. But the placement of a rule in tandem with a policy, or a policy in tandem with a rule, does not hide the rule or insulate the rule from judicial review.") (internal citation omitted). "The effect of invalidating an agency *rule* is to reinstate the *rule* previously in force." *Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005). Reinstatement extends to prior agency rules, not just regulations.

Second, while the record indicates that IM 2010-117 was also adopted without notice-and-comment rulemaking, there has been no similar challenge to IM 2010-117. And, even if IM 2010-117 was unlawful, the Court has discretion to leave that rule in place where "equity demands." *See, e.g.*, *Idaho Farm Bureau*, 58 F.3d at 1405 (though presented in different context, reasoning still applicable here: "Ordinarily when a regulation is not promulgated in compliance

**MEMORANDUM DECISION AND ORDER - 53**

with the APA, the regulation is invalid.  However, when equity demands, the regulation can be left in place while the agency follows the necessary procedures.") (internal citation omitted); *Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1020 (9th Cir. 2009) ("Having concluded that the repeal of the Roadless Rule and the promulgation of the State Petitions Rule violated both [NEPA] and the Endangered Species Act, the district court reasoned that it was necessary to reinstate the protections of the Roadless Rule in order to avoid further degradation of the nation's inventoried roadless areas.  We conclude that this was not an abuse of discretion.").  To avoid either a regulatory vacuum with no operative IM governing oil and gas lease sales, or proceeding with IM 2018-034 despite IM 2010-117's closer adherence to FLPMA's and NEPA's public involvement mandates, the equities favor reinstating IM 2010-117 moving forward.

Third, with IM 2010-117's prospective reinstatement, the Court is not  "order[ing] BLM to follow a different procedure of its own, or [WWP's] making."  Fed. Defs.' Mem. ISO MSJ & Opp. to WWP's MPSJ, p. 1 (Dkt. 141).  It is BLM's own rule – BLM itself crafted the prior IM 2010-117, followed IM 2010-117 for nearly ten years until IM 2018-034's implementation, and has followed IM 2010-117 again with respect to oil and gas lease sales in sage-grouse habitat since September 2018.

Accordingly, IM 2018-034's at-issue provisions are set aside and IM 2010-117's corresponding provisions are reinstated, consistent with the terms identified herein.  *See infra*.  However, as with the preliminary injunction, the scope of said vacatur and reinstatement will be narrowly and specifically tailored to fit the dispute generating such a remedy.

This case is tied to oil and gas leases that affect greater sage-grouse habitats.  WWP goes to great lengths to document the history surrounding the 2015 Sage-Grouse Plan Amendments which identified priority sage-grouse habitats and imposed management restrictions intended to

**MEMORANDUM DECISION AND ORDER - 54**

protect sage-grouse from adverse impacts of oil and gas leasing development.  *See, e.g.*, First Am. Compl. ¶¶ 1-14, 30-66, 73-114 (Dkt. 78).  Indeed, the threshold point on which WWP justifies this lawsuit depends upon that overlay and the connections within pertaining to sage-grouse habitat.  *See generally* 9/4/18 MDO (Dkt. 66) (denying Federal Defendants' Motion to Sever and Transfer, stating:  "[T]he heart of the disputes is not solely about how a local BLM office handled a lease sale, but rather over the legal propriety of national policies' that Plaintiffs content have eroded protections for the sage-grouse and cut the public out of oil and gas planning on public lands.") (internal quotation marks and citation omitted).  Even so, the Court concludes that a decision that would install a nationwide directive to *all* oil and gas lease sales *throughout* the United States, without regard to whether such lease sales implicate sage-grouse habitat, is not justified.

Therefore, the remedy here – setting aside certain of IM 2018-034's provisions in favor of IM 2010-117's – applies to oil and gas lease sales contained in whole or in part within the Sage-Grouse Plan Amendments' recognized "Planning Area Boundaries" encompassing "Greater Sage-Grouse Habitat Management Areas," as indicated in the following BLM map:

///

///

///

///

///

///

///

///

///

**MEMORANDUM DECISION AND ORDER - 55**



Figure 1-5: Regional and Sub-Regional Boundaries with Greater Sage-Grouse Habitat Management Areas (BLM Administered Lands)

*See* First Am. Compl. ¶ 53 (Dkt. 78) (attaching BLM's Rocky Mountain ROD, p. 1-13).  To be clear, the vacatur of IM 2018-034 and reinstatement of IM 2010-117 does not apply to oil and gas lease sales that are outside such boundaries.

**MEMORANDUM DECISION AND ORDER - 56**

E.       **The Phase One Lease Sales Are Set Aside**

Applying the *Allied-Signal* factors, WWP also argues that the Phase One lease sales

themselves should be vacated.  *See* WWP's Mem. ISO MPSJ, pp. 19-20 (Dkt. 135-1).  Again,

even with the presumption of vacatur for unlawful agency actions, the Court maintains discretion

to leave the Phase One lease sales in place while BLM attempts to cure the deficiencies raised.

*See supra*; *see also Allied*-Signal, 988 F.2d at 150-51 ("The decision whether to vacate depends

on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency

chose correctly) and the disruptive consequences of an interim change that may itself be

changed.").  Though a closer decision than whether to set aside IM 2018-034 (*see supra*), the

*Allied-Signal* factors likewise apply to set aside the Phase One lease sales.

As with IM 2018-034, the seriousness of the deficiencies in the Phase One lease sales –

the first *Allied-Signal* factor – is readily apparent, tethered as they are to IM 2018-034.  The

Phase One lease sales restricted public involvement.  *See supra*.  In contrast to what NEPA

requires towards its goal of informed decision-making, this reality is unquestionably a serious

deficiency.  *See California v. Block*, 690 F.2d 753, 770-71 (9th Cir. 1982) ("NEPA's public

comment procedures are at the heart of the NEPA review process. . . .  This reflects the

paramount Congressional desire to internalize opposing viewpoints into the decision-making

process to ensure that an agency is cognizant of all the environmental trade-offs that are implicit

in a decision."); 40 C.F.R. § 1500.1(b) ("NEPA procedures must insure that environmental

information is available to public officials and citizens before decisions are made and before

actions are taken.  The information must be of high quality.  Accurate scientific analysis, expert

agency comments, and public scrutiny are essential to implementing NEPA").  Accordingly, the

seriousness of the shortcomings inherent within the Phase One lease sales weighs heavily in

WWP's favor.

However, the disruptive consequences in actually setting aside the Phase One lease sales instead of suspending them – the second *Allied-Signal* factor – is less clear.  At the forefront of any argument against vacating the Phase One lease sales is the amount of money involved. Federal Defendants and Defendant-Intervenors point out that, if vacated, the lease rights will be terminated and BLM would be required to return over $125 million to the lessees, including revenues received from these lease sales already disbursed to the respective states pursuant to 30 U.S.C. § 191(b).  *See* Fed. Defs.' Reply ISO MSJ, p. 15 (Dkt. 162); Def.-Intervs.' Mem. ISO MPSJ & Opp. to WWP's MPSJ, p. 19 (Dkt. 149).  According to the Ninth Circuit, economic impacts are a worthy consideration with respect to the disruptive consequences of vacatur.  *See Cal. Cmtys.*, 688 F.3d at 994.

If the need to return such sums is the equivalent of economic "harm," then the amount from the lease sales already received is undeniably significant, but still not of the magnitude that courts recognize as warranting a suspension over vacatur.  *See id*. at 993-94 (finding that vacatur would cause needed power plants to stay off-line and cause blackouts, reasoning in part: "Stopping construction would also be economically disastrous" because it was a "billion-dollar venture employing 350 workers"); *see also infra* (discussing inherent potential for delay, inconvenience, and losses in oil and gas industry, such that disruptive consequences of voiding issued oil and gas leases "might not be great").  This is especially so in environmental cases.  *See Ctr. for Food Safety*, 734 F. Supp. 2d at 953 ("In light of the limited circumstances in which the Ninth Circuit has determined that equity warranted remanding without a vacatur, *it is not clear that economic consequences is a factor the Court may consider in environmental cases*.") (emphasis added) (citing *Nat. Res. Def. Council, Inc. v. U.S. Dept. of Interior*, 275 F. Supp. 2d 1136, 1146 n.21 (C.D. Cal. 2002) (noting the "differences in character" between the potential irreversible environmental harm and any potential economic harm to private developers)); *but*

**MEMORANDUM DECISION AND ORDER - 58**

*see WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 85 (D.D.C. 2019) (denying vacatur but

enjoining BLM from issuing permits to drill pending further NEPA analysis).[21]   Otherwise

agencies would potentially be incentivized to invest heavily in potentially-illegal projects

upfront, only to claim later that the economic consequences in setting aside those projects would

be too massive to unwind.  *See, e.g.*, *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,

282 F. Supp. 3d 91, 106 (D.D.C. 2017) ("[D]enying vacatur on the basis of alleged economic

harm risks creating undesirable incentives for future agency actions.  If projections of financial

distress are sufficient to prevent vacatur, the Court fears that agencies and third parties may

choose to devote as many resources as early as possible to a challenged project – and then claim

disruption in light of such investments.  Such a strategy is contrary to the purpose of NEPA,

which seeks to ensure that the government 'looks before it leaps.'").[22]   Additionally, the

---

[21]   Federal Defendants and Defendant-Intervenors urge the Court to follow *WildEarth Guardians*.  *See* Fed. Defs.' Reply ISO MSJ, p. 15 (Dkt. 162); Def.-Intervs.' Reply ISO MPSJ, pp. 7-9 (Dkt. 163).  There, the plaintiffs alleged that BLM failed to adequately consider climate change prior to authorizing oil and gas leases in Wyoming.  The district court agreed, but after applying the *Allied-Signal* factors, did not vacate the leases, choosing instead to remand, enjoining BLM from issuing drilling permits for the Wyoming leases until BLM prepared a corrective NEPA analysis.  *See WildEarth Guardians*, 368 F. Supp. 3d at 83-85.  Of importance in *WildEarth Guardians*, however, was the nature of the NEPA violation – a failure to fully discuss the environmental effects of the lease sales.  *See id.* at 84.  According to the district court, this was easily remedied by incorporating an analysis that was previously omitted.  *See id.* ("[N]othing in the record indicates that on remand the agency will necessarily fail to justify its decisions to issue EAs and FONSIs.  Thus, though the disruptive consequences of vacatur might not be great, the probability that [BLM] will be able to justify retaining [its prior leasing decisions] is sufficiently high that vacatur . . . is not appropriate.  Instead, the Court remands the EAs and FONSIs to BLM so that the agency may address the deficiencies identified by the Court above.") (internal quotation marks and citations omitted).  But here, owing to the different nature of the NEPA violation involved (restrained public involvement), there is no similar assurance that BLM can legitimately justify its decisions; allowing for additional public involvement to address the NEPA violations necessarily injects more uncertainty into the process.  Until then, "we do not know what we do not know."  *WildEarth Guardians* is therefore distinguishable.

[22]   Significantly, the responsibility for the economic rewind that would follow setting aside the Phase One lease sales lies with BLM and not with WWP.  BLM proceeded with the June and September 2018 auctions under IM 2018-034, fully aware of WWP's challenge to the

---

**MEMORANDUM DECISION AND ORDER - 59**

connection to "harm" in this case is not ultimately certain, as there is an open question as to whether and what number (including what revenues might follow) of such leases might still issue, even if unwound, when the process again unfolds under the provisions of IM 2010-117.

In sum, setting aside the Phase One lease sales will not be so disruptive as to merit an exception from the standard remedy of vacatur. Instead, because of the violations already welded into the Phase One lease sale process, vacatur here will avoid harm to the environment and further the purposes of NEPA and FLPMA. The possible alternative of suspending the leases pending further public comment is not enough, because doing so would not satisfy NEPA's purpose of ensuring that federal agencies meaningfully consider the potential environmental impacts of a proposed action *before* undertaking that action. *See* 40 C.F.R. § 1506.1(a)-(b); 42 U.S.C. § 4332(C)(v). As described previously, without a real limitation on the Phase One lease sales as BLM addresses and corrects its NEPA violations, BLM's "compliance" with NEPA could become a mere bureaucratic formality. *See* 9/21/18 MDO, pp. 43-46 (Dkt. 74) (discussing "bureaucratic momentum" in whether WWP is likely to suffer irreparable harm if preliminary injunction is not entered, stating: "[T]he decision by BLM to commit to a particular outcome before completing a full NEPA analysis may foreclose or diminish the prospect for an open-minded examination of alternatives down the road."); *but see N. Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1157 (9ᵗʰ Cir. 1988) ("We assume the Secretary will

---

same. *See Standing Rock Sioux Tribe*, 282 F. Supp. 3d at 104 ("Defendants' *cri de coeur* over lost profits and industrial inconvenience is not fully convincing. Such is the nature of doing business, especially in an area fraught with bureaucracy and litigation. Dakota Access began pumping oil into the pipeline with full knowledge that Plaintiffs were contesting the easement allowing them to do so. By nonetheless proceeding with its venture, the company assumed some risk of economic disruption."); *see also WildEarth Guardians*, 368 F. Supp. 3d at 84, n.35 (same).

**MEMORANDUM DECISION AND ORDER - 60**

comply with the law.").  Vacatur will ensure the opportunity for objective evaluation of the lease sales, free of any taint.  Accordingly, the Phase One lease sales are set aside.

## V.  <u>ORDER</u>

Based on the foregoing, IT IS HEREBY ORDERED that:

1.      Plaintiff's Motion for Partial Summary Judgment (Phase One) (Dkt. 135) upon the Fourth and Fifth Claims for Relief in the First Amended Complaint is GRANTED as follows:

       a.      IM 2018-034's at-issue provisions are set aside and IM 2010-117's corresponding provisions are reinstated until BLM completes a proper notice-and-comment rulemaking to govern its lease review process.  Specifically:

          i.      For all succeeding oil and gas lease sales, use of IM 2018-034, Section III.A – "Parcel Review Timeframes" is enjoined and replaced with IM 2010-117, Section III.A – "Parcel Review Timeframes";[23]

---

[23]  Within its preliminary injunction ruling, the Court did not enjoin IM 2018-034's six-month parcel review provision on the assumption that "IM 2010-117's public participation provisions can be fulfilled" within that time.  9/21/18 MDO, p. 56, n.21 (Dkt. 74) ("The record is undeveloped on this issue and/or the Court is not clear that such provisions conflict.").  Upon closer examination, IM 2018-034's aggressive six-month parcel review time-frame contributed towards inhibiting adequate public participation.  *See, e.g.*, Fuller Supp. Decl. ¶ 8 (Dkt. 63-1) ("In telephone calls on July 30, 2018 and August 14, 2018, I inquired of Utah BLM why they were no longer releasing draft EAs for public comment.  The employee I spoke to during those calls told me that *IM 2018-034's expedited timeframe for NEPA analysis means they can only involve the public once, at most twice*.") (emphasis added); *see also id.* at ¶ 9 ("Nevada BLM also said because of the shortened processing times, their field offices now give other agencies less time to comment on proposed lease parcels than in the past."); *id.* at ¶ 10 ("In a telephone call on August 16, 2018, an employee of the Montana-Dakotas BLM told me that they had shortened EA comment periods for lease sales to 15 days from 30 *because 'everyone was crunched' by the new policy and it was the best they could come up with*.") (emphasis added).  It is now clear to the Court that IM 2018-034's constrained public involvement is a product of its simultaneously shortened parcel review timeframe.  In this sense, then, IM 2010-117's public participation provisions cannot be fulfilled within IM 2018-034's six-month parcel review provision.

**MEMORANDUM DECISION AND ORDER - 61**

    ii. For all succeeding oil and gas lease sales, use of IM 2018-034, Section III.B.5 – "Public Participation" is enjoined and replaced with IM 2010-117, Section III.C.7 – "Public Participation";

    iii. For all succeeding oil and gas lease sales, use of IM 2018-034, Section III.D. – "NEPA Compliance Documentation" is enjoined and replaced with IM 2010-117, Section III.E – "NEPA Compliance Documentation"; and

    iv. For all succeeding oil and gas lease sales, use of IM 2018-034, Section IV.B – "Lease Sale Parcel Protests" is enjoined and replaced with IM 2010-117, Section III.H – "Lease Sale Parcel Protests."

  b. The relief set forth herein applies *only* to oil and gas lease sales contained in whole or in part within the Sage-Grouse Plan Amendments' recognized "Planning Area Boundaries" encompassing "Greater-Sage-Grouse Habitat Management Areas."

  c. The Phase One lease sales applying IM 2018-034 – the June and September 2018 lease sales in Nevada, Utah, and Wyoming – are set aside

  2. Federal Defendants' Motion for Partial Summary Judgment (Phase One) (Dkt. 140) is DENIED.

  3. Defendant-Intervenors' Motion for Partial Summary Judgment (Dkt. 148) is DENIED.



DATED: February 27, 2020

Ronald E. Bush
Chief U.S. Magistrate Judge