Bret Sumner, *Pro Hac Vice*
bsumner@bwenergylaw.com
Malinda Morain, *Pro Hac Vice*
mmorain@bwenergylaw.com
BEATTY & WOZNIAK, P.C.
216 Sixteenth St., Suite 1100
Denver, CO 80202-5115
Telephone: 303-407-4499
Fax: 800-886-6566

Cherese D. McLain, ISB #7911
cdm@msbtlaw.com
MSBT LAW
950 W. Bannock Street, Suite 520
Boise, ID 83702
Telephone: 208-331-1800
Fax: 208-331-1202

Attorneys for Defendant-Intervenor Western Energy Alliance.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| **WESTERN WATERSHEDS PROJECT**, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>**DAVID BERNHARDT,** Secretary of the Interior, *et al.*,<br><br>    Defendants,<br><br>**WESTERN ENERGY ALLIANCE**,<br><br>    Defendant-Intervenor. | Case No. 1:18-cv-00187-REB<br><br>**MEMORANDUM IN SUPPORT OF MOTION FOR STAY PENDING APPEAL** |

On February 27, 2020, this Court granted Plaintiffs' Partial Motion for Summary Judgment and entered an Order (Doc. 174, hereinafter "Order"), which, among other relief: (1) "set aside" the challenged lease sales in Nevada, Wyoming, and Utah; (2) "set aside" specific provisions of BLM Instruction Memorandum 2018-034 until BLM conducted formal notice-and-

comment rulemaking under the Administrative Procedures Act (APA); and (3) required BLM to re-implement 2010 policy guidelines of former President Obama's administration that had been cancelled and replaced, and which suffered from the same purported notice-and-comment deficiency that the Court found for the 2018 Instruction Memorandum it set aside.

A stay pending appeal of the portion of the Court's Order setting aside the oil and gas leases is necessary to preserve the status quo and to prevent irreparable harm to Western Energy Alliance (Alliance) members, the State of Wyoming, and local governments. The harm to Alliance member companies is real and immediate in terms of lost jobs, lost revenue, lost sunk investment, and harm to contiguous assets tied to lease acreage for purposes of business planning, lease and contractual obligations, and development plans. This economic harm is only exacerbated by the current state of the economy. Fragmentation of planned drilling units is also likely to result in environmental harm due to increased surface disturbance from the inability to apply efficient development plans across larger contiguous leased acres. Thus, for the reasons outlined below, the Alliance respectfully requests this Court enter the requested stay.

**I.   STANDARD FOR MOTION TO STAY**

A stay of an order is "an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case." *Nken v. Holder*, 556 U.S. 418, 433, 129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009). A party seeking a stay must establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of relief, that the balance of equities tip in the party's favor, and that a stay is in the public interest. *Humane Soc'y of the United States v. Gutierrez*, 558 F.3d 896, 896 (9th Cir. 2009). These elements are substantially similar to those governing the grant of a preliminary injunction because similar concerns arise in both situations. *Nken*, 556 U.S. at 434.

## II. ARGUMENT

The Court should grant the Alliance's Motion because the Alliance satisfies the substantive requirements for a stay pending appeal. Alliance is likely to succeed on the merits of its appeal, Alliance members will suffer irreparable harm not limited to the amounts paid to BLM to acquire the leases if the leases are vacated, the balance of equities tip in favor of a stay, and a stay to preserve the status quo pending appeal is in the public interest.

### A. Alliance is Likely to Succeed on the Merits of their Appeal

Alliance does not waive any ground for appeal, and incorporates the grounds for likelihood of success on the success on the merits from Federal Defendants and the State of Wyoming's motion as if fully articulated herein.

For purposes of this motion, Alliance asserts that this Court failed to defer to BLM's discretion under the Federal Land Policy and Management Act (FLPMA) to determine the level and procedures for public involvement in the federal land use planning and leasing process. Under the APA, review of federal agency actions is "deferential." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010). The court "may not substitute its judgment for that of the agency concerning the wisdom or prudence of [the agency's] action." *Id.* at 1070. An essential element of agency's discretion is the freedom to change positions, "either with or without a change in circumstances." *Id.* at 1075.

Rather than defer to Congress's grant of broad discretion to BLM in its organic statute—FLPMA—to determine the method and appropriate level of public involvement in land use planning and leasing, this Court created a new standard for public involvement by evaluating only a single stage of a multi-step, multi-year land use planning and leasing process that includes multiple rounds of public comment. Doc. 141 at 5 (discussing three-stage decision-making process for managing public lands for oil and gas leasing and development). This Court decided,

despite the numerous opportunities for public input provided by BLM throughout that process, and regardless of the immense backlog of nominated parcels due to the previous policy, that it—not BLM—was in a better position to determine the proper level and method of public involvement for all oil and gas lease sales. Ignoring the Ninth Circuit's totality of the circumstances test, the Court substituted and imposed its own subjective view over the statutory and regulatory discretion afforded to the agency, in contravention of express statutory language and long-established legal precedent.

In addition, the Court's action inappropriately legislated and enacted a new statutory standard under FLPMA for public involvement at the leasing stage, and imposed previously extinguished policy guidelines from the prior presidential administration onto the current one; an impermissible and unlawful infringement of the judicial branch onto the Congressional and Executive Branches in violation of the separation of powers clause of the U.S. Constitution.

Under FLPMA, Congress requires only that the Secretary of the Interior (Secretary) (through delegated authority to BLM) establish procedures for the public to participate in the preparation of plans and programs for the management of public lands. 43 U.S.C. §§ 1702(d), 1712(f), 1739(e). BLM's organic statute provides sole discretion to BLM on how to do so. *Id.* This Court concluded that because BLM's policy allowed for less public involvement at a single stage of the land use planning and leasing process than it provided in a previous presidential administration, BLM's IM 2018-034 was "presumptively invalid" under FLPMA. It found this as to all of the challenged lease sales, regardless of the specifics of each sale, and regardless of the totality of circumstances, including the substantial opportunities for public review and comment that BLM provided on its federal land use plans that designate which lands are open and closed for leasing, and at the stage where BLM determines what specific parcels proposed to be offered

for lease for each sale. Order at 34; *Bering Strait Citizens for Responsible Res. Dev. v. United States Army Corps of Eng'rs*, 524 F.3d 938, 953 (9th Cir. 2008). This is clear error.

The Court impermissibly superseded the express acknowledgment of the Secretary's discretion in 43 C.F.R. § 46.305(a) (BLM's regulations implementing FLPMA) to determine the method and opportunities for public involvement in the management of federal lands at the leasing stage. This section specifically notes that BLM "*may* seek comments on an environmental assessment if they determine it to be appropriate. . . ." 43 C.F.R. § 46.305(b) (emphasis added); *see also Bering Strait*, 524 F.3d at 953) (requiring consideration of public participation under the "totality of the circumstances" and noting that a draft EA is not a requirement in every case at the leasing stage).

Ignoring the APA, FLPMA, BLM's own regulations implementing FLPMA, and Ninth Circuit Court precedent, this Court instead determined that providing for more efficient leasing of oil and gas parcels was less important in its view than *any* reduction in opportunity for public participation, even a reduction of a mere 15 days, despite a lack of evidence that public participation was meaningfully restricted in any way. *See*, e.g. Ex. 9, Demonstrative introduced at the October 15, 2019 hearing (evidencing totality of the public comment periods). Plaintiffs offered no additional information that they would have submitted, nor that any of this information would have changed BLM's decision to offer the oil and natural gas parcels for lease. *Nat'l Comm. for the New River, Inc. v. FERC*, 373 F.3d 1323, 1330 (D.C. Cir. 2004). This is a consummate example of a Court substituting its own preferences for the reasoned determination of an agency, and is clear error. *J & G, Sales Ltd. v. Truscott*, 473 F.3d 1043, 1051 (9th Cir. 2007).

**B.   Alliance Members will Suffer Irreparable Harm if the Court Denies a Stay**

As evidenced by the accompanying declarations and the Motions to Stay filed by Federal Defendants and the State of Wyoming, Alliance members will suffer irreparable harm if the Court does not grant the stay. *See* Cryer Declaration, attached as Exhibit 1; Beavers Declaration, attached as Exhibit 2; Sgamma Declaration, attached as Exhibit 3; DeDominic Declaration, attached as Exhibit 4; Icenogle Declaration, attached as Exhibit 5; Ballard Declaration, attached as Exhibit 6; Aviki Declaration, attached as Exhibit 7; and Dunham Declaration, attached as Exhibit 8. As this Court acknowledged, "economic impacts are a worthy consideration with respect to the disruptive consequences of vacatur." Order at 58, citing *Cal. Cmtys. Against Toxics v. United States EPA*, 688 F.3d 989, 994 (9th Cir. 2012). Imposing the drastic substantive remedy of vacatur and cancellation of real property interests for discrete procedural violations under the APA is contrary to legal precedent and imposes severe harm upon the companies holding the leases, and their employees.

    1.   Monetary Harm

Alliance members have specific economic and real property interests in the affected leases. *See generally* Ex. 1-8. Although companies may be compensated by the federal government for the amounts paid to BLM to acquire the lease, the remainder of these costs are irreparable. Companies will not recuperate their "sunk" costs in evaluating which parcels to nominate for lease, bid on, and develop; in evaluating and developing business and drilling plans on purchased parcels; and in delayed revenue streams, including amounts spent internally and paid to third-party contractors. Ex. 1 ¶¶ 4-8 (millions of dollars in losses); Ex. 2 ¶¶ 5, 6, 8 ($9.6 million in acquisition costs and far greater amount in lost costs and expected revenue); Ex. 3 ¶¶ 9-10 (noting cost of evaluating prospective leases, geological research, due diligence, nominating parcels, budgeting capital allocation, creating development and exploration

strategies, and critical infrastructure investments); Ex. 4 ¶¶ 5-7 (investment losses of $7 million and an additional $3.5 million in technical and scientific and operational work); Ex. 5 ¶¶ 4-8 ($5 million in acquisition, evaluation, and permitting costs, $81 million in loss of total revenue, and tax revenue losses from a projected one-billion dollar total revenue projection over the 30-year life of wells); Ex. 6 ¶¶ 4-9 (total losses of $78 million); Ex. 7 ¶¶ 4-8 (irreparable losses due to commitment of critical infrastructure to develop leases, including gas gathering and processing plants), Ex. 8 ¶¶ 9-12 (total projected economic impacts across three states, including lost jobs, lost wages, and lost revenue of $416.2 million).

The economic impacts of the Court's Order are staggering. The upstream oil and gas industry currently supports 30,966 jobs across the three states, including direct employment, indirect jobs from suppliers, and induced jobs in other industries that result from the spending generated from oil and gas development. Ex. 8 ¶ 9. These jobs are expected to contribute over $2.1 billion in wages, including $1.1 billion in direct wages, $491 million in supplier wages, and $547 million in induced wages across the three impacted states. *Id.*

The economic impacts of the loss of projected wells on these leases include the loss of 925 direct and 1,290 total jobs across Nevada, Utah, and Wyoming, as well as $85 million dollars in direct and $103 million in total wages. Ex. 8 ¶ 12. In addition, loss of the leases is projected to cause $187 million in lost investment, and $20 million in lost royalties. Ex. 8 ¶ 11. Loss of total economic output for these leases, if vacated, is projected to be $416 million, with $329 million of those impacts falling solely within Wyoming. *Id.* ¶ 12.

At least two companies have active wells on these leases. Ex. 1 ¶ 6; Ex. 6 ¶ 6. One company has nine producing wells, with sunk costs of over $29 million in drilling and $4.8 million on seismic exploration. Ex. 6 ¶ 6. Plugging and abandoning a single well of the other

7

operator would strand an estimated 219,000 barrels of oil and 4.24 billion cubic feet of natural gas. Ex. 1 ¶ 6. Although prices fluctuate in the best of times (and this is far from the best of times), at the average WTI crude oil price ($57.02/barrel) and natural gas price ($10.46/thousand cubic feet) from the Energy Information Administration[1] in 2019, this would equal a loss of approximately $12.4 million in oil value and $44.3 million in natural gas values, or a total of $56.8 million from a single company and a single well. *Id.* Impacts to another leaseholder include $5 million in sunk investment and $81 million in lost opportunity costs. Ex. 5 ¶ 8. A third leaseholder would lose over $7 million in lease acquisition costs that cannot be recouped by a mere refund of the sale price. Ex. 4 ¶ 5.

Contrary to the Court's assumption, the bulk of these investments would not be recouped if the leases were "unwound" and reissued under the previous administration's guidance, IM 2010-117, as there is no guarantee if or when such parcels would be re-offered for lease, or if the company that already invested those dollars would secure the winning bid if they were offered again. *See* Mineral Leasing Act, 30 U.S.C. § 226(b)(1)(A) (requiring the Secretary to accept the "the highest bid from a responsible qualified bidder which is equal to or greater than the national minimum acceptable bid"); Ex. 4 ¶ 5 (evidencing $3.5 million in irrevocable costs); Ex. 5 ¶ 5 ($4.4 million in irrevocable costs), Ex. 6 ¶ 6 ($42 million in capital expenditures on the threatened leases and adjoining spaced acreage). In fact, because current leaseholders have invested in these leases and proved up the value of them with the existing wells, the leases are much more valuable to a potential future bidder, who would have all the advantages of the companies' work without having made any investment, thereby potentially repeating unearned rewards.

---

[1] EIA Short-Term Energy Outlook forecasts, March 11, 2020, https://www.eia.gov/outlooks/steo/report/prices.php.

Nor would these irreparable losses be limited to the companies that purchased the leases. Often, to develop a federal oil and gas lease, companies must meet their relevant state's minimum acreage requirements for the drilling oil or natural gas wells. *See, e.g.* Wyo. Stat. Ann. § 30-5-109(b). The Mineral Leasing Act allows companies to join their federal lessees with other leases to establish drilling and spacing units that must conform to state well spacing patterns, i.e. drilling blocks of 1200 acres. Once joined, BLM must approve a "communitization agreement," which combines small tracts, of which at least one is a federal parcel, into a large enough unit to comply with the required spacing under state laws. 30 U.S.C. § 226(m); 43 C.F.R. § 3217.11.

Upon vacatur of the leases, mineral owners' ability within these units would be uncertain, as state oil and gas commissions lack jurisdiction and the authority to "force pool" the interests of the federal government without the Secretary's consent. *Kirkpatrick Oil & Gas Co. v. United States,* 675 F.2d 1122, 1125 (10th Cir. 1982). Thus, without sufficient acreage to form a communitized area, lessees of contiguous parcels risk forfeiting both their federal and their non-federal leases in the area, as lease terms and other commercial agreements dictate strict timelines for development, and expire on their terms if those timelines are not met.

At least three companies that purchased a parcel in the relevant lease sales have had their leases dedicated to one or more federal units or have developed drilling plans for horizontal wells perforating federal minerals. Ex. 1 ¶ 6, Ex. 5 ¶ 7, Ex. 6 ¶ 5. Loss of the federal lease could imperil the viability of the entire unit or horizontal wells, with irrevocable losses to owners of all the oil and natural gas interests within the unit. Ex. 1 ¶ 6 (single well with remaining reserves of 219,000 barrels of oil and 4.24 BCF natural gas), Ex. 6 ¶¶ 5-6 ($42 million in capital expenditures, including $11.5 million in drilling and completion on the federal leases and $17.9

million on drilling and completion on adjoining spaced acreage, and an additional $4.8 million in money spent on seismic exploration).

Environmental harm is also likely due to loss of leases that reduces the ability to combine acreage into a coherent leasehold in order to create efficient development plans to minimize surface disturbance and impacts to Greater Sage Grouse (GrSG) habitat consistent with state and federal protection plans. Federal units allow for uniform development. Thus, vacatur of these leases could result in piece-meal development and exploration that will result in more surface disturbance potentially more environmental impacts in critical areas. Ex. 3 ¶ 8 (contiguous lease parcels enable efficient development and minimal surface impacts); Ex. 5 ¶ 7 (piece-meal development and exploration likely to result in additional surface disturbance).

Furthermore, companies other than the lease purchasers and those with contiguous mineral rights would be irreparably harmed by vacatur. Ex. 7 ¶ 5 (evidencing $165 million dollar gas processing plant constructed based on a dedicated agreement covering federal leases). Oil and natural gas development requires infrastructure to support its operations. Companies have invested in infrastructure and formed contracts to support development of these leases, including natural gas gathering and processing facilities devoted to development of oil and natural gas produced from the leases. Ex. 7 ¶ 5. The Order will also impact non-purchasers' real property and financial interests. *Id*.

Thus, contrary to the Court's order, these costs would not be borne solely by the party the Court assigned the responsibility for the economic rewind—BLM. *See* Order at 59-60, n. 22. Public and private oil and natural gas companies (Ex. 1, Ex. 2, Ex. 4, Ex. 5, and Ex. 6), private mineral owners (Ex. 3 ¶ 8), and private surface owners (Ex. 3 ¶ 8), service providers (Ex. 7 ¶ 5),

and state and local governments (Ex. 3 ¶ 8), will bear the burden of the losses of the financial rewind and resulting stranded minerals.

In its Order, the Court dismissed the costs of refunding the leases as not warranting against vacatur, because considering these costs could incentivize agencies and companies to devote resources to a threatened project. Order at 58. This fear is unfounded and has no basis in the Administrative Record, nor is it consistent with how oil and natural gas companies plan for development of resources.

Oil and natural gas exploration companies consider many factors when determining which assets to develop, including reserve estimates, geology, availability of contiguous parcels, and return on investment. *See, e.g.* Ex. 1 ¶ 7, Ex. 6 ¶ 5. Companies and their trade associations actively look to mitigate, not to invite, legal risk. *See* Ex. 3 ¶ 4 (Sgamma Declaration evidencing Alliance's efforts to mitigate litigation risk); Ex. 6 ¶ 5 (Ballard Declaration discussing planning for area involved many factors, none of which were imperiled nature of the leases). There is simply no basis in the record to assume that denying vacatur of the oil and gas leases will result in companies devoting significant amounts of capital into their riskiest assets to attempt to prevail in an unfavorable jurisdiction, particularly here where BLM and the lease purchasers conduced the June and September 2018 lease sales in full compliance with this Court's previous Order. Doc. 74.

In addition, in the current state of affairs, it is impossible for companies to target or avoid development of challenged federal leases, as environmental groups have raised challenges to nearly every federal oil and gas lease issued in the West by the current and previous administrations since 2015. Ex. 3 ¶ 4, Sgamma Declaration at Ex. A (detailing 43 BLM oil and gas lease sales challenged in just 5 of 24 lease sale cases monitored by Alliance). Essentially,

following the Court's line of argument would dissuade oil and natural gas companies from developing any federal lease issued after 2015, and, for the reasons explained above, much of the contiguous and pooled parcels.

While effectively enjoining development on every oil and gas lease issued by the federal government may be these Plaintiffs' ultimate goal, a nationwide injunction prohibiting investment in federal oil and gas leases is at minimum, unprecedented relief and an unnecessary remedy. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (noting an injunction is a "drastic and extraordinary remedy"). Plaintiffs have neither requested nor met the standard for a permanent injunction on BLM's federal oil and gas leasing program, nor shown that such extraordinary relief is warranted under the circumstances, particularly where these lease sales complied with this Court's order over a year ago. To allow Plaintiffs to impose an effective injunction on federal oil and gas development through the simple act of ***filing*** a lawsuit would be an end run around hundreds of years of American jurisprudence on injunctive relief, not to mention would run contrary to the purposes of FLPMA and the Mineral Leasing Act.

In sum, Alliance's declarations evidence tens of millions of dollars in investment that cannot be recouped, hundreds of millions of dollars in lost future revenue, and two billion dollars of harm to the economies of the three states that would occur if the leases are vacated. This alone warrants the requested relief.

### 2. Non-Monetary Harm

The harm suffered by Alliance members would not be limited to monetary harm if the stay is not granted. There is no question that once the leases are vacated, that action cannot be undone such that the vacated leases "spring" back into existence at a future date if the Ninth Circuit determines vacatur was unwarranted. The real property interest acquired by the federal leaseholders would be terminated effective as of the date of cancelation.

Furthermore, there is a risk of further environmental harm due to cancelation of the leases. All federal oil and gas leases impose lease stipulations and mitigation measures to protect environmental and historical interests in and around the federal leases. *See, e.g.* WY018445, September 2018 WY Lease Sale EA discussing attachment of stipulations to lease parcels during issuance; WY018943-44, showing stipulations and codes applied to each lease parcel. If companies are able to develop contiguous lease parcels after the termination of their accompanying federal leases, development of those minerals will not be subject to the stipulations imposed on development of federal leases, many of which are imposed specifically to protect GrSG populations. Isolated development of contiguous minerals could therefore cause more of the harm that Plaintiffs seek to prevent through their lawsuit. Ex. 3 ¶ 8 (noting planned drilling involving these leases minimizes surface impacts), Ex. 5 ¶ 7 (vacatur would encourage piece-meal exploration and development and could result in greater levels of surface disturbance).

### C. The Balance of Harms Weighs in Favor of a Stay

Alliance detailed the significant economic impacts to the companies that submitted declarations, and to states that would benefit from the economic output created on the vacated leases. *See supra*. In contrast, there is no credible evidence of "harm" that would result to the public or any party if the Court stayed vacatur of the leases and preserved the status quo pending review. In their briefing on summary judgment, Plaintiffs identified no new information regarding environmental impacts or harms that they were unable to provide as a result of issuance of the leases under the 2018 IM. *See* Order at 43, n. 18.

Although the Court found that Plaintiffs would have contributed more "meaningfully" with an additional 15 days of public comment, Plaintiffs did not point to any concrete environmental harm that resulted from issuing the leases without the additional opportunity for

public comment. Order at 43. To the contrary, the record shows that BLM issued these leases with all of the protections required under the 2015 GrSG Plan Amendments issued by the previous administration. *See e.g.* September 2018 WY Part Two Lease Sale EA at WY018983 (noting that all leases would apply lease stipulations as required by appropriate RMPs, including the 2015 GrSG ARMPs); WY018943-44, showing stipulations and codes applied to each lease parcel.

In addition, the record does not show that Plaintiffs' comments filed under the longer previous public comment periods are any more substantive than those for the leases at issue. In fact, the record shows a consistency in Plaintiffs' comments at each stage of the land use planning process, and consistency over multiple leases sales over multiple years that span both the Obama and Trump Presidential administrations. *See* Doc. 149 at 9-10. Even a year and a half after issuance of the first of the challenged leases, Plaintiffs have still provided no credible evidence of harm as a result of lease issuance. Thus, the balance of harms weighs in favor of granting a stay due to the economic and non-economic harms alleged by Alliance.

### D. Issuance of the Stay is in the Public Interest

Finally, as previously stated, Plaintiffs have failed to prove the likelihood of any irreparable environmental injury as a result of the issuance of the leases, nor is there any evidence that further harm would occur if the Court enters the requested stay. To the contrary, it is in the public interest that federal oil and gas leasing development continue consistent with the stipulations under which the parcels were offered pending appellate review. Alliance members and other oil and natural gas companies rely on regulatory certainty when allocating millions of dollars to evaluate prospective leases. Furthermore, as explained above federal oil and gas leasing raises billions of dollars for federal, state and local governments, and spurs the economy with revenue and job creation.

The Order not only requires the federal government to return lease sale revenues, but by sowing considerable uncertainty in the entire federal leasing process, disrupts upcoming lease sales and associated leasing revenue, and further puts at risk future royalty revenue to federal and state governments. The Order will strand companies' significant investments of capital to date and has the potential to remove protections for the Greater Sage Grouse and increase surface disturbance and hence, environmental impacts on adjacent leases. This would harm state and local governments which rely on revenue from oil and natural gas extraction on these and contiguous parcels. In addition, vacatur creates regulatory uncertainty, which discourages investment in these three states. As no additional harm will occur from preserving the status quo pending appellate review, the public interest favors granting the Stay.

### III. CONCLUSION

For the reasons outlined above, Proposed Defendant-Intervenor Western Energy Alliance respectfully requests that the Court grant its motion to stay the portion of the Order setting aside the challenged lease sales pending appeal to the Ninth Circuit.

Respectfully submitted this 30th day of March, 2020.

/s/ Malinda Morain
Bret Sumner, *Pro Hac Vice*
bsumner@bwenergylaw.com
Malinda Morain, *Pro Hac Vice*
mmorain@bwenergylaw.com
BEATTY & WOZNIAK, P.C.
216 Sixteenth St., Suite 1100
Denver, CO 80202-5115
Telephone: 303-407-4499
Fax: 800-886-6566

Cherese D. McLain
cdm@msbtlaw.com
MSBT LAW
7699 West Riverside Drive
Boise, ID 83714
Telephone: 208-331-1800
Fax: 208-331-1202

*Attorneys for Defendant-Intervenor Western Energy Alliance*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 30th day of March 2020, I served a true and correct copy of the foregoing **MEMORANDUM IN SUPPORT OF MOTION FOR STAY PENDING APPEAL** via the Court's electronic case filing system which will cause the foregoing to be served upon all counsel of record.

*/s/ Malinda Morain*
Malinda Morain