James Kaste, WSB No. 6-3244 (*pro hac vice application pending*)
Deputy Attorney General
Elliott Adler, WSB No. 7-6434 (*pro hac vice application pending*)
Assistant Attorney General
Wyoming Attorney General's Office
2320 Capitol Avenue
Cheyenne, WY  82002
(307) 777-7895 (phone)
(307) 777-3542 (fax)
james.kaste@wyo.gov
elliott.adler@wyo.gov

Cherese D. McLain (ISB No. 7911)
MSBT Law, Chtd.
7699 W. Riverside Dr.
Boise, ID 83714
Telephone: (208) 331-1800
Facsimile: (208) 331-1202
Email: cdm@msbtlaw.com

*Attorneys for the State of Wyoming*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, *et al.*<br>　　　Plaintiffs,<br><br>　　　　v.<br><br>RYAN ZINKE, Secretary of Interior, *et al*<br>　　　Defendants,<br><br>STATE OF WYOMING, WESTERN ENERGY ALLIANCE,<br><br>　　　Intervenor-Defendants. | Case No. 1:18-cv-00187-REB<br><br>**INTERVENOR-DEFENDANT STATE OF WYOMING'S MEMORANDUM IN SUPPORT OF MOTION FOR STAY PENDING APPEAL** |

i

## INTRODUCTION

Under Federal Rule of Appellate Procedure 8(a)(1), the State of Wyoming requests that that this Court stay that portion of its February 27, 2020, order vacating $125 million in lease sales by the Bureau of Land Management across Wyoming, Nevada, and Utah pending appeal. (ECF_174 at 57-61). Wyoming, its municipalities, and its citizens are not the cause of the violations found by the Court, but they are directly and substantially injured by the remedy the Court imposed. Wyoming relies on revenues from lease sales to fund critical state programs, including, but not limited to, public education, highways, and local governments. Wyoming already received its portion of the proceeds from these lease sales and distributed them to fund a wide-array of services at the state and local level. Without a stay pending appeal, the State of Wyoming will suffer irreparable harm from either the forced repayment of those funds or the withholding of revenues from future sales.

Wyoming is likely to succeed on the merits of its appeal from that portion of the Court's order vacating the lease sales because the Court did not accord any weight to the interests of the beneficiaries of the lease sale proceeds when it assessed the disruptive consequences of vacatur. In its assessment of the disruptive consequences of vacating the leases, the Court considered the consequences to the Bureau and to industry, but not the impact on the beneficiaries of the proceeds already distributed. But these impacts are irreparable and a necessary consideration in a full assessment of the disruptive consequences of vacatur. Had the Court considered the disruptive consequences of clawing back the "undeniably significant" amount of funds from the States that had already received them, it likely would have imposed a different remedy. (ECF_174 at 58). The Court has ample discretion in choosing to vacate lease sales, but it can abuse that discretion, and

it did so here by failing to consider the impact of its decision on the inculpable bystanders who will bear the brunt of the Court's chosen remedy.

## BACKGROUND

On February 27, 2020, the Court granted partial summary judgment to the Plaintiffs, Western Watersheds Project and Center for Biological Diversity (Advocacy Groups) and vacated Instruction Memorandum (IM) 2018-034. (ECF_174). The Bureau issued this IM to provide guidance intended to help streamline and expedite the oil and gas leasing process. (ECF_140-1 at 7-8). Key among the document's provisions were a series of adjustments to public comment and protest periods held subsequent to public notice of a lease sale. (*Id.* at 8-9). The Bureau reasoned that because: (1) the Federal Land Management Policy Act (FLPMA) and the National Environmental Policy Act (NEPA) left the appropriate length of those public participation periods to the Bureau's discretion, and (2) the existing durations for public comment and protest periods were enumerated in a prior 2010 IM, it was appropriate for the Bureau to adjust those timeframes in a subsequent IM. (*Id.* at 21-24).

The Court held that IM 2018-034 was both procedurally and substantively invalid. (ECF_174 at 28-37). With regard to procedural invalidity, the Court reasoned that IM 2018-034 was a substantive rule, not merely guidance, because it established binding requirements for public comment and protest periods. (*Id.* at 29-30). Therefore the Bureau could not issue the IM without adhering to notice and comment rulemaking procedures. (*Id.*). Concerning substantive invalidity, the Court held that IM 2018-034 violated both FLPMA and NEPA public participation requirements. (*Id.* at 37). Although neither statute mandates a specific process for public participation, the Court found that IM 2018-034 violated the general mandates found in both statutes. (*Id.* at 32-33). Specifically, while the former 2010 IM directed the Bureau to provide a

thirty day comment period and protest period for every lease sale, the 2018 IM made the length of the comment period discretionary and the protest period ten days. (*Id.* at 33-35). The Court found this change exceeded the Bureau's discretion and violated the general public participation mandates of both NEPA and FLPMA. (*Id.* at 37). In light of these deficiencies, the Court set aside IM 2018-034 and reinstated the 2010 IM. (*Id.* at 50-54).

The Court then considered whether the oil and gas leases sold in accordance with the 2018 IM should be vacated. (*Id.* at 61-62). The Court found that the value of public comment and the insufficient magnitude of the lease sales weighed in favor of vacatur. (ECF_174 at 58-59). In reaching this conclusion, this Court did not analyze the lease sales individually even though three of the five sales that occurred in Wyoming offered the same thirty day comment period provided by the 2010 IM. (*Id.* at 41). Furthermore, while the Court acknowledged that economic harms were an appropriate consideration, the Court did not consider the disproportionate economic harm to Wyoming. (*Id.* at 57-60) (mentioning only that vacatur would unwind the distribution of $125 million, but not how this would impact the individual state intervenors). The Court reasoned that any economic harm was "not ultimately certain" since sale revenues could be returned and the parcels resold, without considering that vacating the leases results in a $47.5 million loss in revenue already distributed to and spent by Wyoming. (*Id.* at 59-60; Dockter Aff. ¶12).

The Court's decision imposes significant economic impacts on Wyoming. For every lease sale carried out by the Bureau in Wyoming, the State receives 49% of the total sale revenues. (Dockter Aff. ¶5). From June 2018 to February 2019 Wyoming's share of bids from individual lease sales was more than $89 million, of which $47.5 million was attributable to the June and September 2018 lease sales. (Dockter Aff. ¶6). These revenues are distributed to schools, local governments, the State highway fund, the University of Wyoming, the State general fund, and the

State budget reserve account. (Dockter Aff. ¶7). For July 2018 through June 2019, the State Treasurer's Office distributed lease royalties in the amount $281,953,516 to schools, $13,365,000 to the University of Wyoming, $64,597,500 to the highway fund, and $18,562,500 to Wyoming's ninety eight separate cities and towns. (Dockter Aff. ¶10). For towns like Edgerton, Wyoming, which operate on an average annual budget of just over $300,000 annually, every bit of the tens of thousands it receives from these revenues are vital to the residents who live there.[1] Consequently, forcing repayment or withholding future revenues in the amount of $47.5 million significantly impacts essential government services in Wyoming.

## ARGUMENT

A party seeking a stay pending appeal must demonstrate that four criteria weigh in favor of the stay: (1) a strong showing that the movant is likely to succeed on the merits; (2) that the movant will be irreparably injured absent a stay; (3) that the issuance of the stay will not substantially injure the other parties; and (4) that the stay is in the public interest. *Nken v. Holder*, 556 U.S. 418, 425-26 (2009). With regard to the first factor, it is not necessary that the movant demonstrate that they are more likely than not to succeed on the merits. *Leiva-Perez v. Holder*, 640 F.3d 962, 966-67 (9th Cir. 2011). Rather, the movant need only make a "demonstration of a substantial case on the merits" or, in other words, a "serious question going to the merits." *Id.* To satisfy the second factor, the movant must show that irreparable harm is "likely" as opposed to a mere "possibility" absent a stay. *Id.* at 968-69. For factors three and four, the movant must balance the harm of granting the stay to the opposing party and public against harm to the movant if the

---

[1] Laura Hancock, In Edgerton, already suffering from the bust, a cut in state funds could worsen budget woes, Star Tribune, Feb. 1, 2016, https://trib.com/news/state-and-regional/govt-and-politics/in-edgerton-already-suffering-from-the-bust-a-cut-in/article_98b18d92-d072-5dcb-92e6-9138cac2d625.html (discussing how Edgerton depends on dwindling state revenues to maintain the town's ailing infrastructure and utilities).

4

stay is not granted. So long as the harms to the movant outweigh those to the opposing party and public, factors three and four are satisfied. *Id.* at 970. Although the Ninth Circuit views the first two factors as the most critical, the court employs a "continuum" approach wherein a "stronger showing of one element may offset a weaker showing of another." (*Id.* at 964-966). Therefore, so long as the movant demonstrates the minimum quantum of likely success with regard to each factor, a strong showing on one factor individually can justify a stay. (*Id.*).

### I. Wyoming is likely to succeed on the merits of its appeal of the Court's decision to vacate the lease sales.

Vacatur of an unlawful agency action normally accompanies a remand. *Alsea Valley All. v. Dep't of Commerce*, 358 F.3d 1181, 1185 (9th Cir. 2004). This is because "[o]rdinarily when a regulation is not promulgated in compliance with the APA, the regulation is invalid." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995). When equity demands, however, the regulation can be left in place while the agency reconsiders or replaces the action, or to give the agency time to follow the necessary procedures. *See Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010); *Idaho Farm Bureau Fed'n*, 58 F.3d at 1405. A federal court "is not required to set aside every unlawful agency action," and the "decision to grant or deny injunctive or declaratory relief under APA is controlled by principles of equity." *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) (citations omitted).

This equitable analysis consists of two factors: (1) the seriousness of the agency's errors; and (2) the disruptive consequences that would result from vacatur. *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150051 (D.C. Cir. 1993); *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 993 (9th Cir. 2012). Utilizing this analysis, the Ninth Circuit has declined to vacate agency action when merely technical violations have occurred, the violations clearly will be cured on remand, and when significant disruptive consequences will occur with vacatur. *See,*

5

*e.g., Cal. Cmtys.*, 688 F.3d at 993-94 (EPA conceded errors with implementing final rule and requested remand and court found vacatur during remand would delay implementation of critical power plant, be "economically disastrous" and likely create blackouts); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405-06 (9th Cir. 1995) (delay to final rule could have wiped out a species of snail); *W. Oil & Gas Ass'n v. EPA*, 633 F.2d 803, 813 (9th Cir. 1980) (vacatur would have thwarted "the operation of the Clean Air Act in the State of California during the time the deliberative process [was] reenacted").

When assessing the disruptive consequences of vacatur, courts should consider the economic consequences of vacatur. *See, e.g., Cal. Cmtys.*, 688 F.3d at 994. Those consequences include the impact on third parties not before the court. *See, e.g., Sierra Club v. U.S. Dep't of Agric., Rural Utilities Serv.,* 841 F. Supp. 2d 349, 362 (D.D.C. 2012) (finding that the possibility of correcting errors on remand combined with substantial financial loss and injury to third parties counseled against vacatur). Even where the economic disruption may only be in the realm of the tens of millions, a court must consider the disruptive consequences on third parties of unwinding actions already taken pursuant to the challenged agency decision. *See, e.g., Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 93-94, 97-98 (D.C. Cir. 2002) (finding that, although claimed losses from the agency's action may have been in the tens of millions, "crops were plowed under…and [t]he egg ha[d] been scrambled" pursuant to the agency's program).

Here the Court did not consider the impacts of vacatur on the most affected third parties—the beneficiaries of the proceeds of the lease sales—at all. This was not the result of the failure of these parties to make their interests known to the Court. In fact, the Court was aware of Wyoming's substantial interest in the revenues from the lease sales at issue from the State's initial filing with the Court. *See Wyo's Memo. In Supp. of Mot. to Intervene* (ECF_13-1). Armed with the knowledge

6

that vacatur would harm these interests, the Court abused its discretion when it failed to consider them when it weighed the disruptive consequences of vacatur.

The Court's assessment of the magnitude of harm resulting from vacatur was undeniably affected by its failure to consider Wyoming's interests. The Court concluded that while significant, the proceeds of the lease sales were not of a magnitude warranting suspension of the lease sales over vacatur. (ECF_174 at 58). But magnitude of harm can only be meaningfully measured against the ability of the person or entity to withstand the blow. An economic loss of $10,000 might be more than an individual can bear, and equity might warrant a different result for that individual than it would against a corporation or a state facing a similar loss. Here, a loss to Wyoming of $47.5 million that it has already received has enormous consequences for Wyoming's schools, roads, and municipal governments. From June 2018 through February 2019 Wyoming's share of bids from lease sales was $89,731,682 including the $47.5 million dollars in revenues from the sales at issue in this case. (Docktor Aff. ¶6). Thus, over half of Wyoming's share of the bids from individual lease sales for this period are imperiled by the Court's remedy. For towns like Edgerton, Wyoming that depend on the tens of thousands it received from those revenues to fund its $300,000 annual budget these revenues are absolutely critical.

The direct revenue loss is not the only significant economic impact to Wyoming that the Court declined to consider. The Court's remedy will ripple through Wyoming's economy. Jobs, investments, and tax revenues will all be lost. In its *Memorandum in Support of Stay Pending Appeal*, Western Energy Alliance lays out these losses in detail. Wyoming will not reiterate those substantial and pervasive economic losses here, but fully endorses Western Energy Alliance's recitation of them. Needless to say, the Court's narrow view of the disruptive consequences of

vacatur, which was limited to the lease sale proceeds, does reflect the full measure of loss to Wyoming.

The Court's failure to weigh Wyoming's interests in the lease sale proceeds presents a serious question on appeal about whether the Court abused its discretion when it vacated the lease sales rather than taking less drastic and disruptive action. *Leiva-Perez*, 640 F.3d at 966-67. This alone is sufficient for the Court to conclude that Wyoming has met the first element necessary to obtain a stay pending appeal. Even so, the Court also abused its discretion when it considered the lease sales as a group rather than looking at the seriousness of the deficiencies of each lease sale individually.

The Court found that public participation in the five lease sales was so constrained by IM 2018-034 that the Bureau precluded meaningful public participation in violation of both FLPMA and NEPA. (ECF_174 at 42-43). This determination was based in large part on the restrictive public comment period outlined in IM 2018-034. (*Id.* at 32-33). However, the June and September 2018 lease sales in Wyoming provided a thirty day comment period consistent with the 2010 IM. (*Id.* at 41). Although IM 2018-034 could theoretically have reduced the public comment period provided for these lease sales, the facts show that it did not. Thus, these lease sales did not suffer from the most serious deficiency identified by the Court in its ruling on the merits. Yet, the Court did not take this fact into account when it imposed a uniform, rather than a narrowly tailored, remedy. This too was an abuse of discretion.

Moreover, the Court's remedy was excessive in relation to the procedural violations the Court found. The Court reasoned that anything short of vacatur would incentivize illegal agency actions and neglect NEPA's ultimate purpose that agencies meaningfully consider environmental harms. (ECF_174 at 59). But the routine remedy for a procedural error in leasing decisions is

remand, even though the same incentive identified by the Court could be found in every such case. *See, e.g., Mont. Wilderness Ass'n v. Fry*, 408 F. Supp. 2d 1032, 1038 (D. Mont. 2006); *Wilderness Soc'y v. Wisely*, 524 F. Supp. 2d 1285, 1306 n.12 (D. Colo. 2007); *Willow Creek Ecology v. U.S. Forest Serv.*, 225 F. Supp. 2d 1312, 1316 (D. Utah 2002) ("[R]emedies under NEPA are limited to procedural remedies."). In fact, other courts have explicitly rejected the notion espoused by the Court here that federal agencies will fail to abide by their obligations under the law on remand absent a remedy that cancels the original action. *See, e.g., Northern Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1157 (9th Cir. 1988) ("[The court] see[s] no reason to suppose that the Secretary will feel greater commitment to the original project if the leases are not voided but held in abeyance until a new evaluation is made."); *S. Utah Wilderness All. v. U.S. Dep't of the Interior*, No. 06-CV-342-DAK, 2007 WL 2220525, at *1 n.3, *2 (D. Utah July 30, 2007) (finding that cancellation was not necessary because the Bureau was obligated to honor its NEPA obligations on remand). Because the presumption of regularity of government action applies to the proceedings of the agency on remand, the Court abused its discretion when it vacated the lease sales rather than suspending them.

The Court's failure to comprehensively review the disruptive consequences of its decision, its failure to consider the signification differences between lease sales, and its excessive remedy raise "serious question[s] going to the merits" on appeal. *Leiva-Perez*, 640 F.3d at 966-67. While the questions are serious, the answers are clear. Wyoming is likely to succeed in its appeal of these questions and, thus, meets the first element necessary to obtain a stay pending appeal.

**II.     The State of Wyoming will suffer irreparable harm without a stay.**

The State of Wyoming and its citizens will suffer irreparable harm absent a stay. The forced repayment or future withholding of $47.5 million dollars from the State's budget will have

enormous consequences for essential public services. In granting vacatur the Court focused heavily on the idea that vacating the leases meant only that the Bureau would have to return $125 million to lessees and that industry lessees would merely have to forgo uncertain profits from future development. (ECF_174 at 59-60). According to the Court, because those losses could be mitigated by simply offering the vacated parcels for sale again at a later date, the economic consequences were not "so disruptive as to merit an exception from the standard remedy of vacatur." (*Id.*). This overlooks that clawing back $47.5 million or withholding that amount of future revenues from Wyoming means either that the State's cities, towns, and highways will lose funds that were already spent and vital to future municipal operations or that those entities' future budgets will have to be drastically reduced.

While courts in the Ninth Circuit have held that economic harm alone is not enough to demonstrate irreparable harm, they have also acknowledged that the denial of economic benefits can translate to irreparable human hardship. *See, e.g., Plata v. Schwarzenegger*, No. C01-1351 TEH, 2008 WL 4847080, at *4-5 (N.D. Cal. Nov. 7, 2008) (holding that defendant's claims of purely economic harm were insufficient for a stay, but plaintiff prison facility would be irreparably harmed if $250 million in funding were not disbursed as this economic harm translated to a lack of funding for infrastructure necessary for the well-being of inmates). Consequently, the promise of "compensation at some future date" is inadequate to mitigate real harm suffered by the blameless beneficiaries of those funds. *See Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983) (finding that defendant's claim of administrative inconvenience and expense were insufficient to show irreparable harm, however delaying issuance of $12 million in funds to plaintiffs based on future compensation after appeal would cause irreparable harm since those funds translated to vital benefits for the poor, elderly, and disabled). Such is the case here.

Vacatur of the leases is not a mere administrative inconvenience or expense to Wyoming. It is not a loss of business profit to be made up another day. Rather, it represents a denial of funding for public school children, government offices that provide services to the elderly and disabled, and critical infrastructure relied on by all citizens. The tens of millions of dollars in lease sale revenues impacted by this Court's holding in fiscal year 2019 directly funded substantial disbursements to Wyoming's cities and towns, public schools, the University of Wyoming, and the highway fund. Absent a stay, the local government offices and schools that have already received and spent these funds will face a significant loss of money needed to support their services. For certain towns that operate on a few hundred thousand dollars annually and host populations with large percentages living below the poverty line, a loss of tens of thousands in lease royalties will be devastating. By failing to address Wyoming's unique impacts as distinct from those to industry and the federal government, the Court's order subjects Wyoming and its citizens to irreparable harm. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,* 282 F. Supp. 3d 91, 106 (D.D.C. 2017) (finding that mere economic harms to industry is in the nature of doing business); *contra Golden Gate Rest. Ass'n v. City & Cty. of San Francisco,* 512 F.3d 1112, 1127 (9th Cir. 2008) (holding that the City was entitled to a stay of court's order enjoining its ordinance because the ordinance provided necessary funding for employees' healthcare).

Because Wyoming, its municipalities, and its citizens will suffer irreparable harm as a result of the Court's decision to vacate the lease sales, Wyoming has meet its burden of demonstrating the second element of the test for a stay pending appeal.

**III.     Issuance of a stay will not substantially injure the Advocacy Groups.**

The Advocacy Groups will not be harmed by staying the Court's remedy and maintaining the status quo pending appeal. The Advocacy Groups asserted and the Court agreed that the Bureau

committed a procedural error in the leasing process by adhering to the provisions of IM 2018-034. But there is no evidence before the Court that this procedural error caused or will cause a concrete impact to either the Advocacy Groups or the environment.

First, the Advocacy Groups have failed to provide any evidence that actually demonstrates that if they had more time to comment they would have provided the Bureau information that would have led to a different result. They certainly have had more than sufficient time to bring that evidence to the Court's attention in the nearly two years since this case was filed. But they have offered no such information in support of their claims of harm. Thus, they have yet to demonstrate that the Bureau's failure to provide a few extra days to prepare their comments caused them any substantive as opposed to procedural harm. But, as importantly, there is no evidence before the Court that a stay pending appeal will result in significant harm to the environment.

"Mineral leasing and development on federal public lands is usually conducted through a five stage decision-making process in accordance with, *inter alia,* the Mineral Leasing Act of 1920 and the Federal Onshore Oil and Gas Leasing Reform Act of 1987." *Chihuahuan Grasslands All. v. Norton*, 507 F. Supp. 2d 1216, 1221 (D.N.M. 2007). The first stage of mineral leasing and development involves the development of a Resource Management Plan. *Id.* The second stage of involves the actual lease of discrete parcels. *Id.* The offering and subsequent issuance of oil and gas leases is strictly an administrative exercise, which, in and of itself, does not cause or directly result in any surface disturbance. "Once a mineral lease is granted, the lessee proceeds to the third stage the process, where the lessee 'explores' the parcel for mineral resources, which may involve various methods." *Id*. "If mineral deposits are found, the lessee proceeds with full-field development in the fourth stage." *Id.* Critically, in order to proceed to full-field development at the fourth stage, a developer must submit an Application for Permit to Drill to the Bureau and obtain

the agency's approval. "In the fifth and final stage of the mineral leasing and development process, the BLM oversees reclamation of the lease parcel[.]" *Id.*

Because the administrative act of leasing does not itself authorize any surface disturbing activities, a stay pending appeal by itself will not result in full-field development that would imperil the environment. Much more needs to happen before the environmental consequences of development become a reality. While some of those consequences might occur during the temporary period that the stay is in place, there is no evidence before the Court that full-field development will be completed in the near term. More importantly, the leases were issued with all of the protections required under the 2015 Greater Sage Grouse Plan Amendments. *See, e.g.,* September 2018 WY Part Two Lease Sale EA at WY018983. Thus, even according to the Advocacy Groups, any development that might occur while the appeal is pending must follow the most stringent measures ever implemented by the Bureau for the protection of the greater sage grouse. (*See* ECF_165 18-23). And any harm that might occur in spite of these measures pales in comparison to the irreparable harm to Wyoming.

Because neither the Advocacy Groups nor the environment will suffer substantial injury as a result of a stay pending appeal, Wyoming has demonstrated that it has met the third element of the test for a stay pending appeal.

**IV.    A Stay is in the public interest.**

A stay of this Court's vacatur decision is in the public interest because the people of Wyoming have an interest in well-funded local government services, public education, and highways. Although this Court did not address harm to the State intervenors, the reality is that the citizens of Wyoming represent more than a half-million members of the public. And, when weighing the balance of harms, this Court should consider how vacating $47.5 million in funding

13

will affect those people. *Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) (finding that "in considering the public interest…[the court should] consider the hardship to all individuals covered by the [challenged] Ordinance, not limited to parties, as well as the indirect hardship to their friends and family members, if a stay is denied.). The revenues at issue in this case impact public education, an institution that the Supreme Court has stated is essential to providing "the basic tools by which individuals might lead economically productive lives to the benefit of us all." *Plyler v. Doe*, 457 U.S. 202, 221 (1982). The revenues at issue in this case impact funding for vital government services that ensure the well-being of municipal citizens and maintenance of city infrastructure. *Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) (finding that the city demonstrated staying an ordinance funding employee benefits because "the general public has an interest in the health of San Francisco residents and workers"). These consequences, along with the fact that suspension and remand are available as remedy to any harms to the environment and public participation, sharply tip the balance in favor of staying this Court's decision pending appeal.

## CONCLUSION

Because there are substantial questions concerning the merits of this Court's decision, irreparable harms imposed on Wyoming and its citizens will result from the Court's chosen remedy, and the harm to the Advocacy Groups and interests of the public weigh in favor of a stay, this Court should grant Wyoming's motion for stay pending appeal.

Dated this 31st day of March 2020.

/s/ Cherese D. McLain
Cherese D. McLain (ISB No. 7911)
MSBT Law, Chtd.
7699 W. Riverside Dr.
Boise, ID 83714
Telephone: (208) 331-1800
Facsimile: (208) 331-1202
Email: cdm@msbtlaw.com

/s/ Elliott Adler
James Kaste (WSB No. 6-3244)
Deputy Attorney General
(*pro hac vice application pending*)
Elliott Adler (WSB No. 7-6434
Assistant Attorney General
(*pro hac vice application pending*)
Wyoming Attorney General's Office
2320 Capitol Ave.
Cheyenne, Wyoming 82002
Telephone: (307) 777-7895
Facsimile: (307) 777-3542
james.kaste@wyo.gov
elliott.adler@wyo.gov

*Counsel for the State of Wyoming*

# CERTIFICATE OF SERVICE

I certify that on March 31, 2020, I electronically filed the foregoing with the Clerk of the U.S. District Court of Idaho using the CM/ECF system which sent a Notice of Electronic filing to the parties of record.

/s/ Elliott Adler
Elliott Adler