Laurence J. ("Laird") Lucas (ISB # 4733)
llucas@advocateswest.org
Sarah Stellberg (ISB #10538)
sstellberg@advocateswest.org
Todd C. Tucci (ISB # 6526)
ttucci@advocateswest.org
Advocates for the West
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, and CENTER FOR BIOLOGICAL DIVERSITY,<br><br>    Plaintiffs,<br><br>    v.<br><br>DAVID BERNHARDT*, Secretary of Interior, *et al.*,<br><br>    Defendants,<br><br>    and<br><br>STATE OF WYOMING; WESTERN ENERGY ALLIANCE,<br><br>    Intervenors. | Case No. 1:18-cv-00187-REB<br><br>**PLAINTIFFS' OPENING BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT (PHASE TWO)** |

*\* Official Defendant automatically substituted
per Fed. R. Civ. P. 25(d)*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

     A.     Greater Sage-Grouse and Threats from Oil and Gas Development...................... 2

     B.     2015 Sage-Grouse Conservation Plans .................................................................. 5

     C.     Oil and Gas Leasing and Development Process ...................................................... 9

     D.     The Challenged Phase Two Lease Sales ................................................................ 10

STANDARD OF REVIEW ............................................................................................. 14

ARGUMENT .................................................................................................................. 15

I.     BLM VIOLATED NEPA BY FAILING TO CONSIDER THE REASONABLE
     ALTERNATIVE OF DEFERRING PRIORITY SAGE-GROUSE HABITAT ............ 15

II.     BLM VIOLATED NEPA BY FAILING TO TAKE A "HARD LOOK" AT THE
     DIRECT AND INDIRECT IMPACTS ON SAGE-GROUSE ....................................... 19

     A.     BLM Failed Assess Baseline Conditions in Each Lease Area ........................... 19

     B.     BLM Failed to Assess the Site-Specific Impacts of Each Lease Sale on
     Greater Sage-Grouse. ........................................................................................... 22

     C.     Tiering to the Generic, Programmatic Analyses in the 2015 RMP EISs Does
     Not Cure These Deficiencies ................................................................................ 28

III.     BLM VIOLATED NEPA BY FAILING TO TAKE A "HARD LOOK" AT THE
     CUMULATIVE IMPACTS ON SAGE-GROUSE ....................................................... 32

     A.     None of the Lease Sale EAs Analyze Cumulative Effects to Sage-Grouse ....... 33

     B.     Tiering to the Cumulative Impacts Analyses in the 2015 RMP EISs Does
     Not Satisfy NEPA. ................................................................................................ 34

IV.     VACATING THE PHASE TWO LEASE SALES IS THE PROPER REMEDY ......... 37

CONCLUSION............................................................................................................... 39

## TABLE OF AUTHORITIES

**Cases**

*Allied–Signal, Inc. v. U.S. Nuclear Regulatory Commission*,
  988 F.2d 146 (D.C. Cir. 1993) .............................................................................. 37

*Bering Strait Citizens for Responsible Resource Development v. U.S. Army Corps of Engineers*,
  524 F.3d 938 (9th Cir. 2008) ................................................................................ 33

*Blue Mountains Biodiversity Project v. Blackwood*,
  161 F.3d 1208 (9th Cir. 1998) ................................................................. 15, 25, 27

*Bob Marshall Alliance v. Lujan*,
  804 F. Supp. 1292 (D. Mont. 1992) ....................................................................... 38

*California v. Block*,
  690 F.2d 753 (9th Cir.1982) ........................................................................... 19, 22

*City of Tenakee Springs v. Block*,
  778 F.2d 1402 (9th Cir. 1985) ............................................................................... 28

*Coalition to Protect Puget Sound Habitat v. U.S. Army Corps of Engineers*,
  No. 17-cv-1209-RSL, 2020 WL 3100829 (W.D. Wash. June 11, 2020) .............................. 38

*Conner v. Burford*,
  848 F.2d 1441 (9th Cir. 1988) ....................................................... 10, 22, 23, 27

*Diné Citizens Against Ruining Our Environment v. Bernhardt*,
  923 F.3d 831 (10th Cir. 2019) ......................................................................... 38–39

*Friends of the Earth, Inc. v. Laidlaw Environmental Services*,
  528 U.S. 167 (2000) ................................................................................................ 15

*Great Basin Mine Watch v. Hankins*,
  456. F.3d 955 (9th Cir. 2006) ............................................................................... 33

*Great Basin Resource Watch v. Bureau of Land Management*,
  844 F.3d 1095 (9th Cir. 2016) ....................................................................... 19, 33

*High Country Conservation Advocates v. United States Forest Service*,
  951 F.3d 1217 (10th Cir. 2020) ....................................................................... 16, 18

*Idaho Conservation League v. U.S. Forest Service*,
  No. 1:18-CV-504-BLW, 2020 WL 2115436, at *2 (D. Idaho May 4, 2020) ..................... 38

*Idaho Sporting Congress, Inc. v. Rittenhouse*,
   305 F.3d 957 (9th Cir. 2002) ............................................................... 32

*Klamath-Siskiyou Wildlands Center v. Bureau of Land Management*,
   387 F.3d 989 (9th Cir. 2004) ............................................. 15, 28, 36–37

*Marble Mountain Audubon Society v. Rice*,
   914 F.2d 179 (9th Cir. 1990) ............................................................... 26

*Metcalf v. Daley*,
   214 F.3d 1135 (9th Cir. 2000) ............................................................. 15

*Methow Valley Citizens Council v. Regional Forester*,
   833 F.2d 810 (9th Cir. 1987) ............................................................... 19

*Montana Wildlife Federation v. Bernhardt*,
   No. 18-cv-69-GF-BMM, 2020 WL 2615631 (D. Mont. May 22, 2020) ...................... 1, 8, 38

*Muckleshoot Indian Tribe v. U.S. Forest Service*,
   177 F.3d 800 (9th Cir. 1999) ............................................. 17, 28, 34, 35

*National Family Farm Coalition v. U.S. Environmental Protection Agency*,
   No. 19-70115, 2020 WL 2901136 (9th Cir. June 3, 2020) ............................. 37, 38

*National Wildlife Federation v. National Marine Fisheries Service*,
   524 F.3d 917 (9th Cir. 2007) ............................................................... 14

*Native Ecosystems Council v. U.S. Forest Service*,
   428 F.3d 1233 (9th Cir. 2005) ............................................................. 16

*Native Fish Society v. National Marine Fisheries Services*,
   992 F. Supp. 2d 1095 (D. Or. 2014) ...................................................... 18

*Native Village of Point Hope v. Jewell*,
   740 F.3d 489 (9th Cir. 2014) ............................................. 23, 32, 33, 34, 37

*Natural Resources Defense Council v. Houston*,
   146 F.3d 1118 (9th Cir. 1998) ............................................................. 38

*New Mexico ex rel. Richardson v. Bureau of Land Management*,
   565 F.3d 683 (10th Cir. 2009) ............................................. 18, 22, 23, 24

*New Mexico ex rel. Richardson v. Bureau of Land Management*,
   459 F. Supp. 2d 1102 (D.N.M. 2006) ...................................................... 24, 29

*Northern Alaska Environmental Center v. Kempthorne*,
457 F.3d 969 (9th Cir. 2006) ....................................................................... 16, 23

*Northern Plains Resource Council v. Surface Transportation Board*,
668 F.3d 1067 (9th Cir. 2011) ...................................................................... 20, 22

*Oregon Natural Desert Association v. Jewell*,
823 F.3d 1258 (9th Cir. 2016) ................................................................. 19–20, 22

*Oregon Natural Desert Association v. Rose*,
921 F.3d 1185 (9th Cir. 2019) ...................................................................... 19, 25

*Oregon Natural Resource Council Fund v. Goodman*,
505 F.3d 884 (9th Cir. 2007) ............................................................................. 26

*Pacific Coast Federation of Fishermen's Associations v. U.S. Department of the Interior*,
655 F. App'x 595 (9th Cir. 2016) ...................................................................... 17

*Pacific Rivers Council v. U.S. Forest Service*,
689 F.3d 1012, 1031 (9th Cir. 2012) ................................................................. 31

*Pit River Tribe v. U.S. Forest Service*,
469 F.3d 768 (9th Cir. 2006) ............................................................... 22, 28, 39

*Pollinator Stewardship Council v. U.S. Environmental Protection Agency*,
806 F.3d 520 (9th Cir. 2015) ............................................................................. 37

*Protect Our Communities Foundation v. LaCounte*,
939 F.3d 1029 (9th Cir. 2019) ........................................................................... 28

*San Juan Citizens Alliance v. U.S. Bureau of Land Management*,
326 F. Supp. 3d 1227 (D.N.M. 2018) ................................................................ 38

*Save the Yaak Committee v. Block*,
840 F.2d 714 (9th Cir. 1988) ............................................................................. 34

*Sierra Club v. Peterson*,
717 F.2d 1409 (D.C. Cir. 1983) ......................................................................... 22

*Western Organization of Resource Councils v. U.S. Bureau of Land Management*,
No. 16-cv-21, 2018 WL 1475470 (D. Mont. Mar. 26, 2018) ............................. 18

*Western Watersheds Project v. Abbey*,
719 F.3d 1035 (9th Cir. 2013) ...................................................................... 16, 18

*Western Watersheds Project v. Kraayenbrink*,
   632 F.3d 472 (9th Cir. 2011) .................................................................... 14, 15

*Western Watersheds Project v. Ruhs*,
   701 F. App'x 651 (9th Cir. 2017) ................................................................... 30

*Western Watersheds Project v. Zinke*,
   No. 1:18-CV-00187-REB, 2020 WL 959242 (D. Idaho Feb. 27, 2020) ............................. 38

*Westlands Water District v. United States Department of the Interior*,
   376 F.3d 853 (9th Cir. 2004) .......................................................................... 18

*Wild Wilderness v. Allen*,
   871 F.3d 719 (9th Cir. 2017) .......................................................................... 16

*WildEarth Guardians v. Montana Snowmobile Association*,
   790 F.3d 920 (9th Cir. 2015) .............................................................. 14, 20, 21, 22

*WildEarth Guardians v. U.S. Bureau of Land Management*,
   18-cv-73, 2020 WL 2104760 (D. Mont. May 1, 2020) ............................... 17, 18, 23, 24, 38

*WildEarth Guardians v. Zinke*,
   368 F. Supp. 3d 41 (D.D.C. 2019) ........................................................... 24, 28–29

*Yates Petroleum Corporation*,
   176 IBLA 144, 156-57 (2008) ......................................................................... 10

**Statutes**

5 U.S.C. § 706 ................................................................................. 14, 37

30 U.S.C. § 226 ...................................................................................... 9

42 U.S.C. § 4332 .................................................................................... 15

43 U.S.C. § 1712 ..................................................................................... 9

43 U.S.C. § 3120.1-1 ................................................................................. 9

**Regulations**

40 C.F.R. § 1500.1 .................................................................................. 16

40 C.F.R. § 1502.20 ................................................................................. 30

40 C.F.R. § 1502.14 ........................................................................... 15, 16, 17

40 C.F.R. § 1502.16 ................................................................................................ 15

40 C.F.R. § 1508.7 .................................................................................................. 33

40 C.F.R. § 1508.8 .................................................................................................. 15

40 C.F.R. § 1508.9 .................................................................................................. 16

40 C.F.R. § 1508.20 ................................................................................................ 28

40 C.F.R. § 1508.25 ................................................................................................ 15

43 C.F.R. § 46.420 .................................................................................................. 16

43 C.F.R. § 1601.0-6 ................................................................................................. 9

43 C.F.R. § 3101.1-2 ............................................................................................... 10

43 C.F.R. § 3107.2-1 ............................................................................................... 10

43 C.F.R. Part 3120 ................................................................................................... 9

43 C.F.R. § 3120.2-1 ........................................................................................... 9, 10

43 C.F.R. § 3120.2-3 ............................................................................................... 25

43 C.F.R. § 3120.6 .................................................................................................. 10

43 C.F.R. § 3162.3-1 ............................................................................................... 10

43 C.F.R. § 3120.3-2 ................................................................................................. 9

## Other Authorities

Endangered and Threatened Wildlife and Plants; 12-Month Findings for Petitions to List
the Greater SageGrouse (Centrocercus urophasianus) as Threatened or Endangered,
75 Fed. Reg. 13,910 (Mar. 23, 2010) ............................................................. Passim

Endangered and Threatened Wildlife and Plants; 12-Month Finding on a Petition To List
Greater Sage-Grouse (Centrocercus urophasianus) as an Endangered or Threatened
Species; Proposed Rule, 80 Fed. Reg. 59,858 (Oct. 2, 2015) .......................... Passim

## GLOSSARY OF ACRONYMS

APA – Administrative Procedure Act

ARMPA – Approved Resource Management Plan Amendment

APD – Application for Permit to Drill

BLM – United States Bureau of Land Management

CEQ – Council on Environmental Quality

COT – Conservation Objectives Team

EA – Environmental Assessment

EIS – Environmental Impact Statement

ESA – Endangered Species Act

FONSI – Finding of No Significant Impact

GHMA – General Habitat Management Area

IM – Instruction Memorandum

NEPA – National Environmental Policy Act

NSO – No Surface Occupancy

NTT – National Technical Team

PHMA – Priority Habitat Management Area

ROD – Record of Decision

RDF – Required Design Feature

RFD – Reasonably Foreseeable Development

RMP – Resource Management Plan

RHMA – Restoration Habitat Management Area

## INTRODUCTION

Pursuant to the Court's Order Re: Phase Two Litigation Schedule (ECF No. 230), Plaintiffs respectfully move for partial summary judgment holding unlawful and vacating the "Phase Two" lease sales, *i.e.*, BLM's February 2017 Wyoming, June 2017 Wyoming and Montana, and September 2017 Wyoming oil and gas lease sales.

BLM conducted the Phase Two lease sales before adopting the national policies challenged in this case, including IM 2018-034, which the Court held unlawful in its Phase One merits decision (ECF No. 174), and IM 2018-26 regarding "prioritization," which the parties will address in Phase Three briefing.[1] But as explained below, these lease sales threaten substantial loss and fragmentation of the greater sage-grouse's remaining habitat—risks that BLM failed to properly examine, in violation of the National Environmental Policy Act (NEPA).

BLM approved the Phase Two lease sales based on six separate Environmental Assessments (EAs) that share numerous common NEPA deficiencies, including BLM's failure to: (1) consider the reasonable alternative of deferring priority sage-grouse habitat; (2) assess baseline conditions of sage-grouse habitat and populations in the lease area; (3) evaluate the foreseeable, site-specific impacts to sage-grouse from lease development; and (4) assess the cumulative impacts of lease development when combined with other local threats to sage-grouse.

Although the EAs purport to "tier" to BLM's Environmental Impact Statements (EISs) for the 2015 Sage-Grouse Conservation Plans, that programmatic analysis lacks the specificity NEPA requires at the leasing stage. BLM acknowledged this in the 2015 EISs and committed to

---

[1] In a decision last month, District Judge Morris vacated IM 2018-026 and three lease sales issued under that IM, finding that they conflicted with BLM's obligation under the 2015 Sage-Grouse Plans to "prioritize" oil and gas leasing outside sage-grouse habitat. *See Mont. Wildlife Fed'n v. Bernhardt*, No. 18-cv-69-GF-BMM, 2020 WL 2615631 (D. Mont. May 22, 2020).

undertake more detailed NEPA analysis before approving specific actions under those 2015

plans—but refused to do so here. Delaying all site-specific analysis to the drilling stage is

likewise improper, as courts have long held that NEPA requires at least *some* site-specific

analysis at the leasing stage where it can reasonably be done.

Accordingly, based on the NEPA violations shown below, Plaintiffs respectfully request

that the Court grant partial summary judgment in their favor, declare that the Phase Two lease

sales were unlawful under NEPA and the Administrative Procedure Act (APA), and vacate the

challenged Phase Two leases and their supporting EAs, FONSIs, and Decision Records.[2]

<u>**BACKGROUND**</u>

**A.**     **Greater Sage-Grouse and Threats from Oil and Gas Development**

Greater sage-grouse once numbered in the millions across the western U.S. and Canada,

but loss and fragmentation of their native sagebrush-steppe habitats have caused populations to

decline precipitously over the last century. *See* 75 Fed. Reg. 13,910, 13,921 (Mar. 23, 2010)

(WO_0027093–199).[3] The current population of greater sage-grouse is estimated at less than

10% of historic population levels, and the species occupies only about half of its historic range.

---

[2] Because the NEPA violations shown here require reversal of the Phase Two lease sales under the Third Claim for Relief in Plaintiffs' Second Amended Complaint (ECF No. 165), Plaintiffs are not pursuing their additional challenges to the Phase Two sales under their First and Second Claims for Relief (alleging FLPMA violations).

[3] Citations to the administrative record use the Bates stamp provided by BLM. For the Court's convenience, Plaintiffs also provide the name and internal page number of most record materials. Documents with the Bates stamp prefix "BLM-MT" are located on the CD lodged on March 19, 2019 (ECF No. 128). Documents with Bates numbers WY072445 and higher are located on the thumb drive lodged on May 21, 2019 (ECF No. 136). Documents with Bates numbers between WY000001 and WY072444 are located in the "Wyoming Lease Sale Records" folder of the external drive lodged on April 17, 2019 (ECF No. 131). Documents with the Bates stamp prefix "WO_" are located in the "2015 RMP Amendment Records \ Washington Office_GRSG_AR" folder of that same drive.

*See id.* at 13,917–21. The greater sage-grouse is a "sagebrush obligate" species, meaning it depends on sagebrush habitat for food and cover throughout the year. *Id.* at 13,915. The fate of the species thus depends on stemming further loss and fragmentation of sagebrush habitat. *Id.* at 13,962; WO_0026078 (NTT Report at 6); WO_0026184 (COT Report at 31).

Oil and gas development is one of the "greatest threat[s]" to the species. 80 Fed. Reg. 59,858, 59,888–90 (Oct. 2, 2015); WY060308 (Wyoming 9 EIS at 1-12) (describing energy development as the "primary threat" in the bird's eastern range); *see also* 75 Fed. Reg. at 13,942–48 (describing impacts). Well pads, access roads, pipelines, powerlines, storage tanks, compressor stations, and other surface infrastructure results in the direct loss and fragmentation of sage-grouse habitat. *Id.* at 13,946–47. The patchy nature of these surface disturbances magnifies the loss, as fragmentation can render habitat too small or isolated to be of use to sage-grouse. *Id.* at 13,927, 13,962. Disturbed soils also create ideal conditions for establishment of invasive weeds (e.g., cheatgrass). *Id.* at 13,935–37. Once established, invasive weeds are difficult to remove and can increase the frequency and intensity of wildfires that further destroy sagebrush. *Id.* at 13,932. Restoration of degraded sagebrush habitats is incredibly slow and difficult, even where required, and disturbed sites may never return to suitability for sage-grouse. *Id.* at 13,917; 13,948; WY060858 (Wyoming 9 EIS at 3-328).

Oil and gas development can also increase bird mortality through vehicle collisions and by introducing perching structures that facilitate avian predation. WY060860 (Wyoming 9 EIS at 3-240). Produced water storage facilitates the spread of mosquito-transmitted West Nile Virus, which is deadly to sage-grouse. WY060860 (Wyoming 9 EIS at 3-240). Noise and human presence from oil and gas operations are also known to produce stress responses in sage-grouse, reduce their reproductive success, and cause birds to abandon suitable habitat, resulting in

population declines. *Id.* at 13,948. Sage-grouse are thought to abandon landscapes once the density of human development exceeds 3 percent. 80 Fed. Reg. at 59,919; BLM-MT-2Q17-001971 (Miles City EIS, Public Comment Appendix at Pub-23).

Numerous scientific studies have found declines of sage-grouse populations following energy development, even with mitigation measures in place. WY060858 (Wyoming 9 EIS at 3-238); 75 Fed. Reg. at 13,943–48. Studies suggest that at least a 4-mile year-round lek buffer is required to maintain sage-grouse populations, and even that distance would "not be large enough to offset all the impacts" of energy development. *See* WO_0026092–93 (NTT Report at 20–21); *see also* WO_0065649 (2014 USGS report, reporting effects out to 12 miles for oil and gas development and recommending lek buffer between 3.1 and 5 miles).

Several characteristics make sage-grouse particularly sensitive to oil and gas development. First, sage-grouse have strong "site fidelity," meaning they are intensely loyal to their breeding grounds ("leks"), nesting habitat, and wintering areas. 80 Fed. Reg. at 59,866. Birds may return to disturbed areas even if they can no longer successfully reproduce or survive there, which limits their adaptability to human disturbance. *Id.* Second, sage-grouse tend to self-select habitats that maximize survival and reproductive success, meaning that when birds are forced to relocate, it is often to suboptimal habitat. WY061538 (Wyoming 9 EIS at 4-334). Third, sage-grouse require connectivity between seasonal habitats, including leks and nearby nesting areas, wetter summer habitats, and lower-elevation wintering areas. 75 Fed. Reg. at 13,916–17. Even non-migratory populations can have seasonal movements exceeding 6 miles. *Id.*; 80 Fed. Reg. at 59,867. When human development—such a roads and pipelines—cuts across a landscape, it can inhibit birds from accessing required habitats and thus cause "functional" habitat loss. 75 Fed. Reg. at 13,927.

B.      2015 Sage-Grouse Conservation Plans

The U.S. Fish and Wildlife Service ("Service") determined in 2010 that Endangered

Species Act (ESA) listing for the greater sage-grouse was "warranted, but precluded" by higher

priority species. *See* 75 Fed. Reg. 13,910 (March 5, 2010). The Service identified the primary

threats to the species as habitat loss and fragmentation, coupled with a lack of adequate

regulatory mechanisms to protect habitat across the bird's range. *Id.*

Federal agencies (mainly BLM and Forest Service) manage roughly half the remaining

sage-grouse habitat, making their management key to ensuring persistence of the species. 80 Fed.

Reg. at 59,866. Thus, in response to the Service's "warranted, but precluded" finding, BLM and

Forest Service undertook a multi-state planning effort to review and amend their land

management plans to increase protections for sage-grouse and avoid ESA listing. *See generally*

WY067927–28, 40–48 (Rocky Mountain ROD at S-1 to S-2, 1-6 to 1-14).

To advise the planning process, the BLM chartered a National Technical Team ("NTT")

of scientific experts to review the best available science and recommend conservation measures

for incorporation into the land-use plans. *Id.* The National Technical Team produced a December

2011 report ("NTT Report"), which identified oil and gas development as one of the primary

threats to greater sage-grouse. *See* WO_0026073–146 (NTT Report). It observed that impacts to

grouse from oil and gas development "are universally negative and typically severe."

WO_0026091. The NTT Report found "[t]here is strong evidence from the literature to support

that surface-disturbing energy . . . development within priority sage-grouse habitats is not

consistent with a goal to maintain or increase populations or distribution." *Id.*  The NTT Report

therefore recommended that all sage-grouse priority habitats be closed to new oil and gas

leasing. WO_0026094. It concluded that simply applying buffers around leks "at any distance is

unlikely to be effective," and that "[e]ven a 4-mile NSO [no surface occupancy] buffer would not be large enough to offset all the impacts reviewed above." WO_0026092–93. The Service convened a separate "Conservation Objectives Team" (COT) of federal and state experts, which released its own COT Report in 2013, WO_0026147–261, that similarly recommended avoiding new energy development in sage-grouse habitat. WO_0026196. More broadly, the COT Report expressed "an urgent need to 'stop the bleeding' of continued population declines and habitat losses." WO_0026184.

In September 2015, the BLM and Forest Service finalized their sage-grouse planning effort by adopting amendments to 98 land use plans across the bird's range. *See generally* WY067927–28 (Rocky Mountain ROD at S-1 to S-2) (discussing 2015 Plans). BLM analyzed its proposed RMP amendments in 15 separate EISs, as illustrated below (Figure ES-1 from Wyoming 9 EIS, WY060259):



Relevant to the Phase Two lease sales challenged here, the 2015 Sage-Grouse Plans included separate EISs and RMP amendments for various BLM field offices, including the:

(a)   Miles City RMP/EIS, which encompasses BLM's Miles City Field Office in eastern Montana (BLM-MT-2Q17-000589 to 002112);

(b)   Bighorn Basin RMP/EIS, which encompasses BLM's Cody and Worland Field Offices in north/central Wyoming (WY063652–6623);

(c)   Buffalo RMP/EIS, which encompasses BLM's Buffalo Field Office in northeastern Wyoming (WY057293–60247);

(d)   "Wyoming Nine" RMP/EIS,[4] which encompasses BLM lands across most of southern Wyoming, including BLM's Casper, Rock Springs, Kemmerer, Newcastle, Pinedale, and Rawlins Field Offices (WY060248–3651);

(e)   Lander RMP/EIS, which encompasses BLM's Lander Field Office in central Wyoming, and was approved in 2014 before BLM finalized the 2015 Sage-Grouse Plans but contains similar requirements (WY053928–5899).

BLM approved the 2015 Sage Grouse Plans through two separate Records of Decision (RODs)—one for the Great Basin region, the western half of the sage-grouse range, and another for the Rocky Mountain region, the eastern half of the range. *See* WY067926 (Rocky Mountain ROD). The RMPs at issue here were approved in the Rocky Mountain ROD, with the exception of the Lander RMP which was approved in a separate 2014 ROD. WY067936.

All of the 2015 Sage-Grouse Plans adopted tiered habitat designation and management systems. The highest protection was afforded to Priority Habitat Management Areas (PHMA), which are areas "identified as having the highest habitat value[.]" WY067949 (Rocky Mountain ROD at 1-15). The 2015 Plans also designated General Habitat Management Areas (GHMA), which include occupied habitat outside of PHMAs for which lesser protections apply. *Id.* The Billings and Miles City, Montana plans also created a third category, Restoration Habitat

---

[4] The name "Wyoming Nine" refers to the nine separate resource management plans—six BLM and three Forest Service—analyzed in this document.

Management Area (RHMA), which contains high-value habitat impacted by ongoing development, where the plans emphasize habitat restoration to maintain viable populations. *Id.*

Rather than close sage-grouse habitat to new oil and gas leasing, as experts had recommended, the 2015 Sage-Grouse Plans directed BLM to "prioritize" oil and gas leasing and development outside sage-grouse habitat. WY067959 (Rocky Mountain ROD at I-25). The purpose of this requirement "is to further limit future surface disturbance and encourage new development in areas that would not conflict with" greater sage-grouse. *Id.* BLM explained that it intended prioritization to "guide development to lower conflict areas and as such protect important habitat." *Id.*; *see also Mont. Wildlife Fed'n*, 2020 WL 2615631, at *2–3, 8–9.

The 2015 Sage-Grouse Plans also impose various oil and gas lease stipulations, required design features, and caps on development density within certain habitats. However, as relevant here to the Phase Two lease sales, many of those measures are inconsistent with the best available science and recommendations in the NTT and COT Reports. For example, whereas those Reports and other science recommended prohibiting surface disturbance within 4 miles of all leks, WO_0026093–95 (NTT Report at 21–23), the 2015 Wyoming plans all require only a 0.25-mile lek buffer in GHMA and 0.6-mile lek buffer in PHMA. WY067952–53 (Rocky Mountain ROD at 1-18 to 1-19). As the U.S. Fish and Wildlife Service has stated: "The rationale for using a 0.4-km (0.25-mi) buffer as the basic unit for active lek protection is not clear, as there is no support in published literature for this distance affording any measure of protection." 75 Fed. Reg. at 13,978 (underscore added). The Miles City RMP is more protective of PHMA, where it prohibits surface disturbance on oil and gas leases entirely, but the plan imposes only a 0.6-mile lek buffer in GHMA. WY067952–53 (Rocky Mountain ROD at 1-18 to 1-19).

BLM itself acknowledges that these inadequate buffers will not support viable sage-grouse populations, even combined with added seasonal restrictions during spring breeding and nesting. BLM-MT-2Q17-001272 (Miles City EIS at 4-112); WY061549 (Wyoming 9 EIS at 4-345). Buffer sizes of 0.2 mile, 0.5 mile, 0.6 mile and 1.0 mile result in an estimated lek persistence of 5 percent, 11 percent, 14 percent, and 30 percent, respectively. BLM-MT-2Q17-001310 (Miles City EIS at 4-150).

### C.      Oil and Gas Leasing and Development Process

The Mineral Leasing Act of 1920, 30 U.S.C. § 226, authorizes the leasing of lands owned by the United States for the purpose of oil and gas exploration and development. Oil and gas leasing and development under the Mineral Leasing Act occur through a three-phase process.

First, BLM develops a Resource Management Plan (RMP) to guide future management of land and resources within the planning area, as required by FLPMA. *See* 43 U.S.C. § 1712(a). Among other decisions, the RMP determines which lands are "open" to possible oil and gas leasing and under what conditions. Designating an area as "open" does not mandate leasing of such parcels. *See* WY040141–50 (BLM Instruction Memorandum (IM) 2010-117). BLM must prepare an EIS to evaluate the impacts of the proposed RMP. 43 C.F.R. § 1601.0-6.

Second, BLM issues leases through quarterly competitive lease sales. 43 U.S.C. § 3120.1-1. Industry can nominate parcels for inclusion in an upcoming lease sale. 43 C.F.R. § 3120.3-2. BLM decides whether each nominated parcel will be offered or deferred from the sale, and whether any additional lease stipulations are necessary to protect other resource values. *See* WY040141–50 (IM 2010-117); WY040419–35 (BLM Manual 3120 – Competitive Leases). BLM then offers its chosen parcels in quarterly lease auctions, in accordance with 43 C.F.R. Part 3120. If a parcel is nominated but receives no bids, it can be leased non-competitively for a two-

year period after the sale. 43 C.F.R. § 3120.6. Leases have a 10-year term, but can be held

indefinitely if the lease is producing oil or gas "in paying quantities." *Id.* §§ 3120.2-1; 3107.2-1.

A lease conveys the "exclusive right to drill for, mine, extract, remove and dispose of all the oil

and gas," in the lease parcel. *See* WY103092 (sample lease). A lease also conveys the right to

disturb the lease surface to explore for or extract the oil and gas—subject only to lease

stipulations, nondiscretionary statutes, and other "reasonable measures" BLM might impose. 43

C.F.R. § 3101.1-2.

Third, the lessee must submit an Application for Permit to Drill (APD) to the local BLM

field office for approval to conduct drilling or other surface disturbance on the lease. *See* 43

C.F.R. § 3162.3-1. BLM may impose conditions of approval (COAs) on a drilling permit to

address impacts to other resources. *Id.* However, BLM has long asserted that its authority to

condition drilling, beyond the requirements of lease stipulations and other nondiscretionary

statutes, is limited to "reasonable measures." 43 C.F.R. § 3101.1-2. These measures can include

controls on the timing, design, and pace of development. *Id.* Once a lease is sold, BLM can no

longer prohibit development of the lease minerals altogether, even if impacts to sensitive

resources cannot be avoided. *Id.*; 43 C.F.R. § 3162.3-1; *see also Yates Petroleum Corp.*, 176

IBLA 144, 156-57 (2008); *Connor v. Burford*, 848 F.2d 1441, 1451 (9th Cir. 1988).

### D.    The Challenged Phase Two Lease Sales

The four Phase Two lease sales suffer from common defects. Each sale included a

substantial number of parcels in sage-grouse habitat, even after some early deferrals of sage-

grouse parcels. Each sale was supported by one or more EAs that examined just two alternatives:

(1) no action, and (2) the proposed action of offering all leases selected by BLM. Each of the

lease sale EAs "tiered" to the EIS prepared for the governing RMP for its analysis of greater

sage-grouse impacts, deferring all site-specific analysis to the APD phase. Relevant details specific to each sale are discussed below and in Plaintiffs' SOF.

1.   <u>February 2017 Wyoming</u>

In February 2017, BLM conducted a competitive oil and gas lease sale offering 283 Wyoming lease parcels, covering 184,784 acres. WY090111 (Notice of Competitive Lease Sale). The parcels are located in BLM's Buffalo, Casper, and Newcastle Field Offices, which span two BLM District Offices: High Plains and Wind River / Bighorn Basin. BLM prepared a separate EA, FONSI, and Decision Record for each District Office. WY090976–1038 (High Plains EA); WY092019–23 (High Plains FONSI); WY090965–75 (High Plains Decision Record); WY092035–88 (Wind River EA); WY092189–93 (Wind River FONSI); WY092024–34 (Wind River Decision Record). The High Plains EA tiers to the Buffalo RMP/EIS and the Wyoming 9 RMP/EIS, and the Wind River EA tiers to the Lander RMP/EIS and the Bighorn Basin RMP/EIS. *Id.* BLM examined just two alternatives in each EA: (1) no action, and (2) the proposed action of offering all leases. *See* WY090995 (Feb. 2017 High Plains EA at 16); WY092050 (Feb. 2017 Wind River EA at 2-1).

The sale consisted almost entirely of sage-grouse habitat—99.9% of the acreage and 282 of the 283 parcels offered. *See* WY090970–75. Of these, 36 parcels are located in PHMA. *Id.* BLM field staff had proposed deferring substantial numbers of sage-grouse parcels from the sale in accordance with BLM's obligation to "prioritize" leasing outside the bird's habitat, but BLM's Washington, D.C. headquarters overruled this decision and dozens of sage-grouse parcels were returned to the sale list. WY075180; *compare* WY073896–902 (original delete/defer list) *with* WY075181–987 (delete/defer list after Washington Office review).

Plaintiffs and other commenters identified numerous impacts to greater sage-grouse that BLM did not adequately evaluate under NEPA, and requested that BLM consider deferring additional sage-grouse habitat. *See* WY079361–70; WY079329–40. BLM refused to consider this alternative or further analyze sage-grouse impacts. *See* WY091974–83, WY092002–03, WY092006–09 (Feb. 2017 High Plains EA, Appendix F, at 16–25, 44–45, 48–51); WY092119–25 (Feb. 2017 Wind River EA, Attachment 2 at 13–19).

### 2. June 2017 Montana

In June 2017, BLM conducted a competitive oil and gas lease sale offering 156 Montana lease parcels, covering 69,056 acres. BLM-MT-2Q17-002270 (Notice of Competitive Lease Sale). BLM prepared an EA and FONSI to analyze the sale, which tiered to the EIS prepared for the 2015 Miles City RMP. BLM-MT-2Q17-002407 (June 2017 Montana EA at 2). BLM examined just two alternatives in the EA: (1) no action, and (2) the proposed action of offering all leases. BLM-MT-2Q17-002410 (June 2017 Montana EA at 5).

The sale included 69 parcels in greater sage-grouse habitat, including 1 parcel in PHMA 2 parcels in RHMA, and 66 parcels in GHMA. BLM-MT-2Q17-002426. Plaintiffs again submitted comments requesting that BLM perform more site-specific analysis of the impacts to greater sage-grouse and consider an alternative that would defer additional sage-grouse habitat. BLM-MT-2Q17-002686–759; BLM-MT-2Q17-003366–74. BLM refused to consider this alternative or further analyze sage-grouse impacts. BLM-MT-2Q17-002678–79 (June 2017 Montana EA, Comment Response Table at 17–18).

### 3. June 2017 Wyoming

In June 2017, BLM conducted a competitive oil and gas lease sale offering 26 Wyoming lease parcels, covering 31,925 acres. WY102075 (Notice of Competitive Lease Sale). The

parcels are located in BLM's Kemmerer and Pinedale Field Offices, both located in the High

Desert District Office. WY102607. BLM prepared an EA (WY102600–700), FONSI

(WY102733–44), and Decision Record (WY102594–99) to analyze and approve the sale. The

EA tiered to the Wyoming Nine RMP/EIS. WY102608 (June 2017 Wyoming EA at 3).

BLM examined just two alternatives in the EA: (1) no action, and (2) the proposed action

of offering all proposed leases. WY102612 (June 2017 Wyoming EA at 7). The EA's Table of

Contents refers to an "Alternative C -Defer Parcels for Sage Grouse" but the body of the EA

contains no mention of such an alternative. WY102602 (June 2017 Wyoming EA at iii).

All 26 parcels are located in sage-grouse habitat, including 6 in PHMA. *See* WY102701

(June 2017 Wyoming EA, Appendix A); WY102652 (June 2017 Wyoming EA at 47). Again,

Plaintiffs and others identified numerous impacts to greater sage-grouse that BLM did not

adequately evaluate under NEPA and requested that BLM consider a middle-ground alternative

that would defer additional sage-grouse habitat. WY102821–55. BLM again refused to consider

this alternative or further analyze sage-grouse impacts.

### 4. September 2017 Wyoming

In September 2017, BLM conducted a competitive oil and gas lease sale offering 140

Wyoming lease parcels, covering 118,055 acres. WY111922 (Notice of Competitive Lease Sale).

The parcels are located in BLM's Buffalo, Newcastle, Casper, Worland, and Lander Field

Offices, which span two BLM District Offices: High Plains and Wind River / Bighorn Basin.

BLM prepared a separate EA and FONSI/Decision Record for each District Office. WY113308–

83 (High Plains EA); WY113294–307 (High Plains FONSI/Decision Record); WY113571–634

(Wind River EA); WY113558–570 (Wind River FONSI/Decision Record). The High Plains EA

tiers to the Buffalo RMP/EIS and the Wyoming 9 RMP/EIS, and the Wind River EA tiers to the

Lander RMP/EIS and the Bighorn Basin RMP/EIS. *Id.* BLM examined just two alternatives in each EA: (1) no action, and (2) the proposed action of offering all proposed leases. WY113328–9 (Sept. 2017 High Plains EA at 17–18); WY113585 (Sept. 2017 Wind River EA at 2-1).

Of the 140 parcels offered, 123 were in greater sage-grouse habitat, roughly 40% of this in PHMA. WY113304–07 (Sept. 2017 High Plains FONSI / Decision Record, Attachment 1). Plaintiffs and others again identified numerous impacts to greater sage-grouse that BLM did not adequately evaluate under NEPA and requested that BLM consider deferring additional sage-grouse habitat. WY110243-75; WY110280-312; WY079329–40. BLM declined to consider this alternative or further analyze sage-grouse impacts. WY113534–5, WY113551–57 (Sept. 2017 High Plains EA, Appendix F at 6–7, 23–29); WY113669–72, WY113698–708 (Sept. 2017 Wind River EA, Attachment 2 at 11–14, 40–53).

## STANDARD OF REVIEW

Courts review agency NEPA decisions under the Administrative Procedure Act (APA). *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011). The APA instructs a reviewing court to "hold unlawful and set aside" agency action deemed "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The court "must engage in a careful, searching review to ensure that the agency has made a rational analysis and decision on the record before it." *Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 927 (9th Cir. 2007).

NEPA requires agencies to take a "hard look" at the environmental consequences of their actions. *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 925–28 (9th Cir. 2015). Agencies must analyze and publicly disclose all "direct," "indirect," and "cumulative" impacts of their proposed actions and study reasonable alternatives to lessen or avoid those impacts. *See* 42

U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.14, 1502.16, 1508.7, 1508.8, 1508.25. Courts apply a "rule of reason" to ensure that the agency has taken the requisite "hard look" under NEPA. *See Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 992–93 (9th Cir. 2004). An agency's "'hard look' 'must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made.'" *Kraayenbrink*, 632 F.3d at 491 (*quoting Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000)). "General statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Blue Mtns. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998).

## ARGUMENT

As described above, BLM followed identical courses in analyzing and approving the Phase Two lease sales—resulting in identical NEPA violations, explained below, that require the Court to set aside and vacate all four Phase Two lease sales.[5]

## I.     BLM VIOLATED NEPA BY FAILING TO CONSIDER THE REASONABLE ALTERNATIVE OF DEFERRING PRIORITY SAGE-GROUSE HABITAT.

BLM violated NEPA in approving each Phase Two sale without analyzing the reasonable, citizen-proposed alternative of deferring all leases in sage-grouse priority habitat.

---

[5] In addition to the relevant standing declarations already before the Court, *see* Mover Decl., ECF No. 30-2; Supp. Molvar Decl., ECF No. 135-7; Ratner Decl., ECF No. 135-5, Plaintiffs submit additional declarations that document their members' use and enjoyment of lands within and near the Phase Two lease parcels, and how lease development would injure their continued use and enjoyment of those areas. *See* 2d. Supp. Molvar Decl.; Supp. Ratner Decl.; Osher Decl. (submitted herewith). These injuries would be redressed by a favorable decision vacating and/or requiring BLM to properly analyze the full impacts of the Phase Two leases under NEPA, thus satisfying all elements of Article III standing. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81 (2000).

NEPA requires that federal agencies evaluate "all reasonable alternatives" to their proposed actions, including the "no action" alternative. 40 C.F.R. § 1502.14(a), (d). The discussion of alternatives is the "heart" of NEPA because it "present[s] the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. §§ 1500.1(b)–(c). The obligation to consider alternatives is "lessened but still extant when preparing an EA instead of an EIS." *Wild Wilderness v. Allen*, 871 F.3d 719, 728 (9th Cir. 2017); 40 C.F.R. § 1508.9(b).

NEPA also requires agencies to "briefly discuss" the reason for eliminating a proposed alternative from detailed study. 40 C.F.R. § 1502.14(a). Agencies may properly eliminate alternatives that are "similar to alternatives actually considered . . . [or] are infeasible, ineffective, or inconsistent with the basic policy objectives for management of the area." *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006); *see also* 43 C.F.R. § 46.420(b) (defining reasonable alternatives as those "that are technically and economically practical or feasible and meet the purpose and need of the proposed action."). However, "[t]he existence of a viable but unexamined alternative renders an EA inadequate." *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013) (internal quotation omitted).

An agency thus violates NEPA where it declines to consider a proposed alternative without adequately explaining why that alternative is not reasonable. *See Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005) (agencies must provide "an appropriate explanation" for eliminating an alternative); *High Country Conservation Advocates v. U.S. Forest Serv.*, 951 F.3d 1217, 1224–25 (10th Cir. 2020) ("[w]here the agency omits an alternative but fails to explain why that alternative is not reasonable, the EIS is inadequate"); *see*

*also Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999) (per

curiam) (finding alternatives analysis inadequate where agency failed to provide proper

explanation for rejecting middle-ground alternative); *Pac. Coast Fed'n of Fishermen's Ass'ns v.*

*U.S. Dep't of the Interior*, 655 F. App'x 595, 599 (9th Cir. 2016) (same); *WildEarth Guardians*

*v. U.S. BLM*, 18-cv-73, 2020 WL 2104760, at *7 (D. Mont. May 1, 2020) (same).

For each of the four lease sales here, BLM considered only two alternatives: (1) leasing

*all* proposed parcels (the proposed alternative) and (2) leasing *none* (the "no action" alternative).

For each sale, Plaintiffs and others requested that BLM study a middle-ground alternative that

would defer parcels in sage-grouse PHMA. BLM rejected this citizen-proposed alternative for

each lease sale without adequate explanation.

For the June 2017 Wyoming and Montana sales, BLM provided no coherent explanation

at all for rejecting this alternative. *See* BLM-MT-2Q17-002679 (June 2017 Montana EA,

Comment Response Table at 17) (referring to comment response #10 on unrelated issue);

WY102602, 12 (June 2017 Wyoming EA at iii, 7) (listing a sage-grouse deferral alternative in

the Table of Contents but failing to explain why it wasn't analyzed in the body of the EA). For

the February and September 2017 Wyoming sales, BLM claimed that the impacts of this

alternative were "imbedded within" or "effectively addresse[d]" by the no-action alternative and

thus need not be considered. WY091974, WY092008 (Feb. 2017 High Plains EA, Appendix F at

16, 50); WY092124 (Feb. 2017 Wind River EA, Attachment 2 at 18); WY113556–57 (Sept.

2017 High Plains EA, Appendix F at 28–29). This argument fails because BLM's analysis of the

"no action" alternative did not present the environmental effects of a partial-deferral option "in

comparative form" so as to "provide "a clear basis for choice among options," as required by

NEPA. 40 C.F.R. § 1502.14. Moreover, while agencies may reject alternatives that are not

"significantly distinguishable" from those already analyzed, *Westlands Water Dist. v. U.S. Dept. of the Interior*, 376 F.3d 853, 868 (9th Cir. 2004), the alternative of deferring only priority sage-grouse habitat differs significantly from the no-action alternative.

BLM's "imbedded" rationale is also inconsistent with a long line of authorities holding that agencies must consider reasonable alternatives that scale back the proposed action; such alternatives cannot be dismissed for sharing some elements of the "no action" alternative. *See, e.g.*, *WildEarth Guardians v. U.S. BLM*, 2020 WL 2104760, at *7 (failure to analyze proposed alternative of deferring oil and gas parcels overlying usable groundwater from lease sale was unreasonable); *High Country Conservation Advocates*, 951 F.3d at 1224–25 (failure to analyze partial closure of planning area to coal leasing was unreasonable); *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 707 (10th Cir. 2009) (failure to analyze alternative of partial closure of planning area to oil and gas leasing rendered EIS inadequate); *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013) (failure to consider alternative that reduced level of grazing rendered EA inadequate);  *W. Org. of Res. Councils v. BLM*, No. 16-cv-21, 2018 WL 1475470, at *6 (D. Mont. Mar. 26, 2018) (failure to consider alternative of decreased acreage available for coal leasing violated NEPA); *Native Fish Soc. v. Nat'l Marine Fisheries Servs.*, 992 F. Supp. 2d 1095, 1110 (D. Or. 2014) (failure to consider smaller release of hatchery fish "somewhere in the middle" of 1,000,000 smolts and zero smolts rendered EA inadequate). So too here: BLM violated NEPA by failing to consider the reasonable, middle-ground alternative of scaling back leasing in sage-grouse habitat.

In sum, BLM failed to provide an adequate explanation for its rejection of an alternative that would have deferred all priority sage-grouse habitat. The proffered explanations do not establish that this alternative was infeasible, ineffective, or inconsistent with the basic policy

objectives for management of these areas. In fact, deferring all PHMA was an eminently

reasonable alternative considering BLM's obligation under the 2015 Sage-Grouse Plans to

prioritize new leasing outside sage-grouse habitat. Consideration of a middle-ground alternative

would have better informed BLM's compliance with this "prioritization" obligation, fostered

public involvement in the "prioritization" process, and enabled a more reasoned choice about

which parcels to offer. *Methow Valley Citizens Council v. Reg. Forester*, 833 F.2d 810, 815 (9th

Cir. 1987) ("range of alternatives must be sufficient to permit a reasoned choice"). BLM's

decision to approve the lease sales without considering this viable alternative violated NEPA.

## II.     BLM VIOLATED NEPA BY FAILING TO TAKE A "HARD LOOK" AT THE DIRECT AND INDIRECT IMPACTS ON SAGE-GROUSE.

BLM violated NEPA by failing to take a "hard look" at the impacts of its Phase Two

lease sales on greater sage-grouse. NEPA requires site-specific analysis as soon as is reasonably

possible, and before any "irreversible and irretrievable commitment of resources." *See California

v. Block*, 690 F.2d 753 (9th Cir. 1982). Oil and gas leases constitute such a commitment.

Nonetheless, BLM provided *no* site-specific information or analysis pertaining to sage-grouse in

the Phase Two lease sale EAs, instead "tiering" back to generic discussions in the 2015 RMP

EISs and deferring site-specific analysis to the drilling stage, in violation of NEPA.

### A.     BLM Failed to Assess Baseline Conditions in Each Lease Area.

Agencies have a duty under NEPA "to assess, in some reasonable way, the actual

baseline conditions" of the affected environment. *Oregon Nat. Desert Ass'n v. Rose*, 921 F.3d

1185 (9th Cir. 2019). "Without establishing the baseline conditions" before a project begins,

"there is simply no way to determine what effect the project will have on the environment and,

consequently, no way to comply with NEPA." *See Great Basin Res. Watch v. BLM*, 844 F.3d

1095, 1101 (9th Cir. 2016); *see also Or. Nat. Desert Ass'n v. Jewell*, 823 F.3d 1258 (9th Cir.

2016) (reversing decision due to inadequate baseline information on sage-grouse); *N. Plains Resource Council v. Surface Transp. Board*, 668 F.3d 1067 (9th Cir. 2011) (reversing due to inadequate baseline information on wildlife species, including sage-grouse); *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 925–28 (9th Cir. 2015) (reversing due to inadequate baseline information on big game winter range).

BLM violated this core NEPA duty by failing to assess the baseline conditions of sage-grouse populations and habitat in each lease area. None of the Phase Two lease sale EAs contain any information on local population trends; habitat function and conditions; the extent of existing leasing and anthropogenic development; or the lease area's role in population connectivity. Most disclose a single fact: the *number* or *acreage* of sage-grouse parcels. *See* WY091025 (Feb. 2017 High Plains EA at 46); WY092081 (Feb. 2017 Wind River EA at 3-31); WY102612 (June 2017 Wyoming EA at 7); BLM-MT-2Q17-002426 (June 2017 Montana EA at 21); WY113621 (Sept. 2017 Wind River EA at 3-36); WY113355 (Sept. 2017 High Plains EA at 44). Two EAs provide somewhat more information by disclosing that the PHMA parcels are proximate to existing leases held by production. *See* WY113623 (Sept. 2017 Wind River EA at 3-38 to 3-40); WY102652–53 (June 2017 Wyoming EA at 47–48). But no similar information is provided for GHMA parcels. Only one EA discloses the basic habitat function of each parcel. WY102614–23 (June 2017 Wyoming EA at 9–18).

BLM had at its disposal, through its own databases and from cooperating state agencies,[6] far more detailed information on: (1) lek locations and seasonal habitat use (nesting, brood-

---

[6] State agencies maintain and share with BLM sage-grouse population data collected through annual spring counts of male birds on their leks. BLM also maintains a GIS layer mapping sage-grouse seasonal habitat use and two GIS layers of habitat conditions: "habitat degradation" (% human development in unit area), and "sagebrush availability" (% sagebrush habitat in unit area). *See generally* WY062037–63 (Wyoming 9 EIS at Appendix D-24 to D-50); BLM-MT-

rearing, winter habitat); (2) annual lek counts and breeding population trends; (3) the percentage of habitat already affected by anthropogenic disturbance; and (4) evidence of other recent disturbances, such as wildfires, development approvals, and West-Nile virus outbreaks.

The administrative record reveals that BLM actually collected some of this data—but never disclosed it publicly or used it to refine its NEPA analysis. *See, e.g.*, WY099466–71; WY075151–66; WY106976–7013 (all mapping parcels and leks in relation to producing wells); WY088545–51 (disclosing whether density of existing disturbance around parcels exceeds 5%); *cf. Mont. Snowmobile Ass'n*, 790 F.3d at 925–28 (holding that maps and "polygon analysis" of wildlife habitat contained in the administrative record, but not included or referenced in the EIS for public review, could not be used to substantiate NEPA analysis). The ready availability of such data makes its absence from the NEPA analysis all the more unreasonable.

Adequate baseline information was necessary for BLM and the public to meaningfully evaluate the potential effects of each lease sale on greater sage-grouse. Without information on the habitat function of each parcel, BLM and the public were unable to identify areas such as wintering grounds or connectivity corridors where leasing might disproportionately impact the species. *See* WY061483 (Wyoming 9 EIS at 4-279) (noting disproportionate effect of loss of winter habitat); 80 Fed. Reg. at 59,867 (noting importance of connectivity corridors). Without information on population trends or habitat conditions, BLM and the public were also unable to identify areas that would be particularly susceptible to the added impact of oil and gas development. This omission is particularly problematic given the sage-grouse's sensitivity to the density of human development. *See, e.g.*, 80 Fed. Reg. at 59,919; BLM-MT-2Q17-001310

---

2Q17-001697–1719 (Miles City EIS at Appendix GRSG MON) (both describing the "Greater Sage-Grouse Monitoring Framework").

(Miles City EIS at 4-150) (both discussing density-dependent effects). The lack of baseline data also "limited [the public] to two-dimensional advocacy" of arguing for the inclusion of more or less habitat "but not for the protection of particular areas." *Mont. Snowmobile Ass'n*, 790 F.3d at 927. As a result, BLM "effectively stymied" the public's ability to inform and challenge its decisionmaking. *Id.*

The absence of baseline data is a serious defect that alone renders the lease sale EAs inadequate. *See ONDA v. Jewell*, 840 F.3d at 568–73; *N. Plains Res. Council*, 668 F.3d at 1083–85; *Montana Snowmobile Ass'n*, 790 F.3d at 925–28.

**B.    BLM Failed to Assess the Site-Specific Impacts of Each Lease Sale on Greater Sage-Grouse.**

BLM also failed to conduct *any* analysis of the site-specific impacts of each lease sale on greater sage-grouse, or reasonably explain why this analysis was not possible, instead deferring all site-specific analysis to the APD stage.

NEPA requires federal agencies to take a hard look at the "site-specific impacts" of their actions prior to any "irreversible and irretrievable commitment of resources." *See Block*, 690 F.2d at 765 (discussing timing of site-specific impacts analysis). Once this critical point is reached, "any vague prior programmatic statements are no longer enough" to satisfy NEPA. *See Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 784 (9th Cir. 2006). In the oil and gas context, the "irreversible and irretrievable commitment of resources" occurs upon issuance of a lease that does not reserve the "absolute right to prevent all surface-disturbing activity," such as those here. *See Connor*, 848 F.2d at 1449–50; *Richardson*, 565 F.3d at 718 (same); *Sierra Club v. Peterson*, 717 F.2d 1409, 1414–15 (D.C. Cir. 1983) (same).

Such analysis cannot be deferred to the APD stage. *Connor*, 848 F.2d at 1449–50; *see also Richardson*, 565 F.3d at 718–19; *Peterson*, 717 F.2d at 1414–15. Once a lease is issued,

BLM loses the authority to preclude development on that parcel and its ability to place restrictions on drilling is far more limited. *See supra* p. 10. "The government's inability to fully ascertain the precise extent" of future development at the leasing stage "is not . . . a justification for failing to estimate what those effects might be before irrevocably committing to the activity." *Conner*, 848 F.2d at 1450.

Thus, the Ninth Circuit "for decades has held that NEPA requires at least *some* 'site specific analysis' at the [oil and gas] leasing stage." *See WildEarth Guardians v. U.S. BLM*, 2020 WL 2104760, at *5; *see also N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 975–76 (9th Cir. 2006) (finding "no question" that site-specific analysis is required before leasing); *Conner*, 848 F.2d at ("an EIS assessing the full environmental consequences of leasing must be prepared . . . when the leases are issued"); *Richardson*, 565 F.3d at 716 (holding that NEPA requires "site-specific analysis" at the leasing stage where such analysis is possible). BLM must provide as much specificity "as is reasonably possible" and in "sufficient detail to foster informed decision-making" about which parcels to offer for lease. *See Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 496–99 (9th Cir. 2014); *WildEarth Guardians*, 2020 WL 2104760, at *5, *16 (requiring analysis "as specific as the information [BLM] has at the leasing stage allows").

While a parcel-by-parcel analysis is not always required, NEPA demands some analysis particular to the areas being leased. For example, the Ninth Circuit has upheld as "sufficiently site-specific" a lease sale EIS that analyzed how local resources in the lease area would be impacted under two development scenarios. *Kempthorne*, 457 F.3d at 976. In contrast, in *WildEarth Guardians v. U.S. BLM*, 2020 WL 2104760, the court found that a lease sale EA lacked the required specificity where it discussed groundwater impacts in only general terms without addressing the particulars of the area to be leased, even though "BLM possessed the

information necessary to undertake a more specific analysis [.]" *Id.* at *5–*7. Similarly, in

*WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 67–68 (D.D.C. 2019), the court held that a

lease sale EA lacked sufficient specificity where it failed to provide estimates of greenhouse gas

emissions attributable to the lease parcels, where BLM had sufficient information at that stage to

"reasonably foresee and forecast" such impacts. *Id.* at 67. The court acknowledged that BLM

tiered to detailed, quantitative emissions analysis for the entire planning area from the 2015 RMP

EISs but held that BLM had a duty to "supplement those EISs with more specific . . . analyses"

for the particular leases at issue. *Id.* at 53, 71. Finally, in *Richardson*, the Tenth Circuit found

that NEPA required BLM to conduct site-specific NEPA analysis before issuing an oil and gas

lease, rejecting an argument that BLM could simply tier to the RMP EIS. 565 F.3d at 716–20. As

the district court there further explained, the RMP EIS "merely discusses the Otero Mesa area in

general," rendering it inadequate "to satisfy the site-specificity requirements of NEPA." *New

Mexico ex rel. Richardson v. BLM*, 459 F. Supp. 2d 1102, 1119 (D.N.M. 2006).

BLM here failed to provide *any* site-specific analysis of sage-grouse impacts. To the

extent that the EAs discuss sage-grouse at all, they offer only vague, cursory statements about

possible effects. *See, e.g.*, WY113621 (Sept. 2017 Wind River EA at 3-36) ("Indirect effects

from leasing may occur"); WY092081 (Feb. 2017 Wind River EA at 3-31) (same); WY113376

(Sept. 2017 High Plains EA at 65) ("There are many sources of habitat fragmentation, all of

which may affect the Greater Sage-grouse" and "it is possible that wildlife populations and

habitats could be impacted"); WY091034–35 (Feb. 2017 High Plains EA at 55–56) (same);

WY102676 (June 2017 Wyoming EA at 71) ("Direct and or indirect impacts could result in

habitat fragmentation, reduced breeding success and/or nest abandonment"); BLM-MT-2Q17-

002447 (June 2017 Montana EA at 42) (providing no analysis). Such "[g]eneral statements about

possible effects" do not constitute a hard look. *Blue Mtns. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998); *see also Rose*, 921 F.3d at 1191 (same).

It was reasonably possible for BLM to conduct some manner of site-specific analysis here. At the leasing stage, the location of possible development has been narrowed down to individual lease parcels, which by law cannot exceed 4 square miles (2,560 acres). 43 C.F.R. § 3120.2-3. As explained above, BLM had available a wealth of information about sage-grouse populations in these areas, including: (1) lek locations and seasonal habitat mapping; (2) annual lek counts and breeding population trends; (3) calculations of the density of existing anthropogenic disturbance; and (4) evidence of other recent disturbances, such as wildfires, development approvals, and West-Nile virus outbreaks. BLM also had at its disposal a "Reasonably Foreseeable Development" (RFD) scenario capable of projecting the rate of well drilling and surface disturbance on these lease parcels. *See, e.g.*, BLM-MT-2Q17-002602 (June 2017 Montana EA at 197) (RFD Scenario). Also available was an abundance of scientific literature documenting the adverse effects of oil and gas development on sage-grouse. *See, e.g.*, BLM-MT-2Q17-001309–10 (Miles City EIS at 4-149 to 4-150) (summarizing literature).

This information enabled a far more specific analysis of sage-grouse impacts than BLM performed. For example, BLM could have estimated the acres of sage-grouse habitat that would be lost or fragmented from lease development. BLM also could have analyzed, in quantitative or qualitative terms, whether lease development would impact the viability of local leks and populations. Areas that are particularly susceptible to additional habitat loss—due to declining populations or recent disturbance events (e.g., wildfires)—could have been flagged, as could sage-grouse wintering areas, the loss of which is known to disproportionately harm the species. *See* WY061483 (Wyoming 9 EIS at 4-279) (noting disproportionate effect); WY061542

(Wyoming 9 EIS at 4-338) (winter habitat difficult to restore); 80 Fed. Reg. 59,867 (loss of winter habitats "can have impacts disproportionate to their makeup on the landscape").

BLM could also have identified connectivity corridors that, if developed, might contribute to a loss of genetic connectivity between populations. Federal agencies have long acknowledged that loss of population connectivity is a key factor contributing to the rangewide decline of greater sage-grouse. *See* WY060858 (Wyoming 9 EIS at 3-238); 75 Fed. Reg. at 13,923–24 (explaining that maintaining connectivity is "essential for sage-grouse persistence"). Connectivity should have been a particular concern for parcels in the Buffalo Field Office, which provides a "genetic link between much larger populations within Montana," WY057883 (Buffalo EIS at 508), and the Miles City planning area, which provides important connectivity to the small and imperiled sage grouse populations in North and South Dakota, BLM-MT-2Q17-001332, 339 (Miles City EIS at 4-172, 179).[7] But again, BLM failed to analyze or even disclose possible connectivity impacts, in violation of NEPA. *See, e.g.*, *Marble Mtn. Audubon Soc'y v. Rice*, 914 F.2d 179 (9th Cir. 1990) (holding that the Forest Service violated NEPA where it failed to analyze the possible impacts of a timber sale on a wildlife connectivity corridor); *Or. Natural Res. Council Fund v. Goodman*, 505 F.3d 884 (9th Cir. 2007) (same).

---

[7] *See also* BLM et al., Greater Sage-Grouse Conservation in Montana Fact Sheet, https://www.blm.gov/sites/blm.gov/files/Programs_FishandWildlife_MTGrSGFactSheet.pdf ("Montana is the northern-most stronghold for greater sage-grouse and is key to the species' survival. Montana . . . populations play an important role in connectivity with greatly reduced populations to the north (Canada) and east (the Dakotas), as well as with more robust populations to the south (Wyoming and Idaho).").

The Miles City lease parcels are located in a region linking the North Dakota sage-grouse population with the species' remaining range. *Compare* BLM-MT-2Q17-002241 (Miles City lease sale map) *with* WY067941 (Rocky Mountain ROD at 1-7) (sage-grouse habitat map).

PLS.' OPENING BRIEF IN SUPPORT OF MOT. FOR PARTIAL S.J. (PHASE TWO) - 26

BLM's claim that it was not "possible" to conduct any more detailed analysis is entirely unsupported. *See, e.g.*, BLM-MT-2Q17-002441 (impacts "discussed to the extent possible"); WY091984–99 (more specific analysis not "possible"). None of the above-mentioned examples require knowledge of the exact locations of future wells, roads, pipelines, and other facilities. Moreover, the Ninth Circuit has long held that the "inability to fully ascertain the precise extent of the effects of mineral leasing . . . is not . . . a justification for failing to estimate what those effects might be before irrevocably committing to the activity." *Conner*, 848 F.2d at 1450.

In sum, BLM offered only "[g]eneral statements about possible effects and some risk" without a reasonable "justification regarding why more definitive information could not be provided." *Blue Mtns. Biodiversity Project*, 161 F.3d at 1213. As a result, the lease sale EAs failed to meaningfully inform BLM and the public of the implications of each sale for local and regional sage-grouse survival and recovery. Further site-specific analysis was necessary to meaningfully decide whether particular parcels should be withdrawn, and whether additional stipulations were warranted to avoid severe impacts. *See* IM 2010-117 (listing these functions of pre-leasing NEPA compliance). Such analysis would also have aided BLM's compliance with the "prioritization" obligation of the 2015 Sage-Grouse Plans. Moreover, as the agency itself stressed in adopting the 2015 Sage-Grouse Plans, "any activities that result in loss or degradation of sagebrush habitats that are important to the species should be closely evaluated for their impacts on sage-grouse." WY060858 (Wyoming 9 EIS at 3-238). BLM's decision to proceed to leasing without such information was arbitrary, capricious, and in violation of NEPA.

**C.**     **Tiering to the Generic, Programmatic Analyses in the 2015 EISs Does Not Cure These Deficiencies.**

BLM cannot save its inadequate lease sale EAs by tiering to the NEPA analysis for the governing RMPs. The 2015 RMP EISs are programmatic documents that analyzed effects to sage-grouse in a generic fashion, without the site-specificity required at the leasing stage.[8]

NEPA regulations encourage agencies to "tier" to prior environmental analysis for a broad plan or program when analyzing subsequent site-specific projects to eliminate repetitive discussions. 40 C.F.R. § 1508.20. However, agencies cannot rely wholesale on prior analysis unless it analyzed the "site-specific effects" of the particular project at issue. *See* WY039848 (BLM NEPA Handbook, H-1790-1, at 27). The Ninth Circuit has long held that "[a]gencies cannot rely on a general discussion in a programmatic EIS . . . to satisfy its NEPA obligations for a site-specific action." *Protect Our Cmtys. Found. v. LaCounte*, 939 F.3d 1029, 1039 (9th Cir. 2019); *see also City of Tenakee Springs v. Block*, 778 F.2d 1402, 1407 (9th Cir. 1985) ("Where there are large scale plans for regional development, NEPA requires both a programmatic and a site-specific EIS."); *Pit River Tribe*, 469 F.3d at 784 (holding that programmatic analysis of geothermal development did not obviate the need for site-specific NEPA analysis for leases in particular locations); *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989 (9th Cir. 2004) (holding that programmatic EIS addressing effects of logging across the planning area was not sufficient NEPA compliance for individual timber sales); *Muckleshoot*, 177 F.3d at 810 (holding that general analysis of a land exchange program in RMP EIS was insufficient NEPA compliance for specific land-exchange project); *see also WildEarth Guardians v. Zinke*, 368 F.

---

[8] Plaintiffs and others are contesting the 2015 Sage-Grouse Plans and the adequacy of the associated EISs in a related lawsuit, *W. Watersheds Project v. Bernhardt*, 1:16-cv-083-BLW (D. Idaho). Plaintiffs here are not challenging any aspect of the 2015 Plans or the sufficiency of the RMP EISs themselves.

PLS.' OPENING BRIEF IN SUPPORT OF MOT. FOR PARTIAL S.J. (PHASE TWO) - 28

Supp. 3d at 67–68 (lease sale EA must provide more "specific environmental analyses" than RMP EIS); *Richardson*, 565 F.3d at 716–20 (same).

Tiering to the 2015 RMP EISs was therefore not a substitute for further site-specific analysis particular to each Phase Two lease sale. The RMP EISs are broad in their geographic scope, each covering a planning area of millions of acres. *See, e.g.*, WY060259 (Wyoming 9 EIS at ES-3) (39 million acres). Although the documents provide an overview of the general condition of greater sage-grouse across each planning area, they do not assess the baseline conditions of leks, populations, or habitat in particular locations. Large-scale trends may obscure what is occurring in individual locations across each planning area. *See* WY091034 (Feb. 2017 High Plains EA at 55) (noting that population trends "have varied throughout the [planning area] based on specific local conditions"); WY113377 (Sept. 2017 High Plains EA at 66) (same); BLM-MT-2Q17-001993 (Miles City EIS at Appendix Pub-45) (acknowledging that baseline data is "generalized in order to apply a wide-ranging landscape perspective"). Moreover, the RMP EISs observe that the impacts of development "would vary geographically," yet undertake no location-specific analysis. *See, e.g.*, WY061716 (Wyoming 9 EIS at 4-512) (noting that impacts vary by location); WY058697 (Buffalo EIS at 1292 (same).

The RMP EISs' analysis of the effects of oil and gas development on sage-grouse was also vague and generalized. A member of the public looking to this analysis for any "quantified or detailed information" on the impacts from any given lease sale would come up empty-handed. While BLM included some generic discussions of the types of effects oil and gas development causes, and possible mitigation measures, its "analysis" of how sage-grouse would fare under various plan alternatives consisted mostly of ranking each plan alternative as "more" or "less" protective than others. *See* BLM-MT-2Q17-001290–91 (Miles City EIS at 4-130 to 4-131)

(analyzing impacts of Alternative E, proposed plan); WY054324–27, 29–31 (Lander EIS at 961–64, 966–68) (analyzing impacts of Alternative D, proposed plan); WY058676–77, WY058679–80 (Buffalo EIS at 1271–72, 1274–75) (analyzing impacts of Alternative D, proposed plan); WY064715–17, WY064744–46 (Bighorn Basin EIS at 4-306 to 4-308, 4-335 to 4-337) (analyzing impacts of Alternative D, proposed plan); WY061544–50 (Wyoming 9 EIS at 4-340 to 4-346) (analyzing impacts of proposed plan).

For these reasons, the RMP EISs concede that they lack sufficient detail to inform later implementation decisions. For example, the Wyoming Nine RMP EIS repeatedly describes its analysis as "broad and qualitative," and commits that as "specific actions that may affect the area come under consideration," BLM will conduct more "quantified or detailed and specific analysis" that expands upon the plan-level analysis. *See* WY062673–3651 (Wyoming 9 EIS at Appendix O). The other EISs contain similar acknowledgments. *See* WY065358–80 (Bighorn Basin EIS at Appendix A-87 to A-109) (repeatedly stating same); WY067211 (Buffalo ARMPA at 81) (stating that EIS constituted NEPA compliance only "for the broad-scale decisions made in this RMP" and committing to additional NEPA analysis for implementing decisions); BLM-MT-2Q17-000192 (Miles City ARMPA at 3-2) (similar).[9]

Finally, BLM's use of tiering was further inappropriate as the lease sale EAs do not even fairly <u>summarize</u> that prior analysis. 40 C.F.R. § 1502.20 (requiring agencies to "summarize the issues" discussed in prior analysis when tiering); WY039847 (BLM NEPA Handbook, H-1790-1, at 26) (requiring BLM to "summarize the previous analysis"). The Ninth Circuit has held that

---

[9] BLM has acknowledged in prior cases that "because its programmatic RMPs cover larger regions, . . . site-specific analyses will be necessary in future projects covering more narrowly defined areas." *W. Watersheds Project v. Ruhs*, 701 F. App'x 651, 653 (9th Cir. 2017).

this requirement "is not a mere formality" and that more thorough discussion is required where the incorporated material "is an important part of the environmental analysis." *See Pacific Rivers Council v. U.S. Forest Serv.*, 689 F.3d 1012, 1031 (9th Cir. 2012), *vacated as moot*, 133 S.Ct. 2843 (2013).[10] Here, two of the EAs omit even a basic summary of the incorporated analysis. *See* BLM-MT-2Q17-002447 (June 2017 Montana EA at 42) (no summary); WY092078–82 (Feb. 2017 Wind River EA at 3-28 to 3-32) (stating only that "effects . . . may occur"). Perhaps worse, the remaining four EAs grossly mischaracterize the findings of the RMP EISs in variously claiming that sage-grouse habitat would be "protect[ed]," WY113624; that impacts to greater sage-grouse would be "minimized," WY113320, WY113377; and that impacts to all wildlife would be insignificant, WY102675–78.

These statements do not fairly summarize the RMP EISs, which concluded that oil and gas development could have significant negative effects on greater sage-grouse. All of the 2015 EISs acknowledge that the 0.25- and 0.6-mile lek buffers used in Wyoming are inadequate for "viable Greater Sage-Grouse populations to persist." *See, e.g.*, WY061549 (Wyoming 9 EIS at 4-345); WY057884 (Buffalo EIS at 509) ("[e]nergy development within two miles of leks is projected to reduce the average probability of lek persistence . . . to 5 percent"). The Buffalo RMP EIS found that the degree of oil and gas development allowed under that plan could "cause substantial loss of the biological integrity and habitat function of ecosystems" and "significant" impacts to greater sage-grouse, WY058679–80, contributing to a possible "[l]oss of population viability . . . within the [Buffalo] planning area[.]" WY058677 (Buffalo EIS at 1272, 1274–75); *see also* WY054650 (Lander EIS at 1287) (projecting "substantial adverse impacts to greater

---

[10] Opinions that have been vacated as moot may still be cited for their persuasive value. *DHX, Inc. v. Allianz AGF MAT, Ltd.*, 425 F.3d 1169, 1176 (9th Cir. 2005).

PLS.' OPENING BRIEF IN SUPPORT OF MOT. FOR PARTIAL S.J. (PHASE TWO) - 31

sage-grouse" from oil and gas development in Buffalo's Powder River Basin). The Wyoming

Nine EIS acknowledged that "population function could decline" due to oil and gas development

even in accordance with the revised plans. WY061473 (Wyoming 9 EIS at 4-269); WY061546

(Wyoming 9 EIS at 4-342). The Lander RMP EIS observed that oil and gas development outside

designated Core Area would likely render such habitat "unusable by greater sage-grouse" and

have a "spill-over effect" in adjacent priority habitat. WY054651 (Lander EIS at 1288). BLM's

lease sale EAs fail to accurately summarize that prior analysis, instead "improperly

minimize[ing] negative side effects" in violation of BLM's hard look mandate. *See Idaho*

*Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002).

For all these reasons, the faulty lease sale EAs cannot be saved by tiering to the 2015

RMP EISs. That analysis was far too generic to foster informed decision-making about leasing in

particular locations. The RMP EISs themselves acknowledged as much by committing BLM to

further site-specific analysis for implementing decisions. Moreover, BLM's summary of that

prior analysis in the lease sale EAs was misleading at best, falsely claiming that residual effects

to sage-grouse after all mitigation measures were imposed would be minimal.

## III.    BLM VIOLATED NEPA BY FAILING TO TAKE A "HARD LOOK" AT THE CUMULATIVE IMPACTS ON SAGE-GROUSE.

BLM also violated NEPA by failing to analyze the cumulative impacts of the Phase Two

lease sales on greater sage-grouse. Tiering to the RMP EISs is insufficient, as again these

documents are far too coarse and geographically broad. And BLM cannot delay such analysis to

the APD phase, because "[i]t is only at the lease sale stage that the agency can adequately

consider cumulative effects." *Native Vill. of Point Hope*, 740 F.3d at 504.

A.      None of the Lease Sale EAs Analyze Cumulative Effects to Sage-Grouse.

NEPA requires agencies to consider how their decisions will cumulatively affect the

environment when "added to other past, present, and reasonably foreseeable future actions" by

the agency or third parties. 40 C.F.R. § 1508.7. BLM utterly failed to provide such analysis here.

Not one EA contains any discussion of how exploration and development of the parcels might

combine with nearby conditions and projects to affect sage-grouse. *See Great Basin Mine Watch

v. Hankins*, 456. F.3d 955, 972–74 (9th Cir. 2006) (holding that a cumulative impacts analysis

was insufficient because it failed to discuss impacts from existing operations and how those

impacts might combine with the proposed project); *Great Basin Res. Watch v. BLM*, 844 F.3d

1095, 1105–06 (9th Cir. 2016) (same). Furthermore, the EAs failed to assess in any way the

cumulative effects to sage-grouse from the development of multiple parcels in the same lease

sale. *See Native Vill. of Point Hope*, 740 F.3d at 504 (faulting agency for failing to take into

account the cumulative effects flowing from leasing multiple parcels).

These failures are particularly problematic due to the sage-grouse's sensitivity to habitat

fragmentation and to the density of surrounding industrial, agricultural, and other activities. *See,

e.g.*, BLM-MT-2Q17-001309–10 (Miles City EIS at 4-149 to 4-150) (discussing density-

dependent effects). Given those sensitivities, exploration and development of a particular set of

parcels could have a significant effect on sage-grouse when viewed in the aggregate or when

combined with the effects of nearby activities. Without any analysis of cumulative effects in

these EAs, the public and the relevant decision-makers were utterly in the dark as to that threat.

*See Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938,

953 (9th Cir. 2008) ("An agency, when preparing an EA, must provide the public with sufficient

environmental information . . . to permit members of the public to weigh in with their views and thus inform the agency decision-making process").

BLM cannot later make up for its failures to conduct proper cumulative effects analyses in these six EAs. It is vital that an agency consider the cumulative effects stemming from leasing and development of multiple parcels at the lease sale stage, because "[i]t is only at the lease sale stage that the agency can adequately consider" such effects. *Native Vill. of Point Hope*, 740 F.3d at 504. "A later . . . site-specific environmental analysis" of the effects of developing an individual parcel "is an inadequate substitute for an estimate of" the combined effects of "the lease sale as a whole." *Id.* Moreover, at the APD stage, the location of parcels set for development is fixed, and the agency can no longer preclude development of a particular parcel by not offering it for sale. BLM's ability to impose protective conditions on drilling is also far more limited at the APD stage. *See supra* p. 10. Later parcel-scale cumulative impacts analyses thus cannot inform the vital decision of which parcels should be included in the lease sale, and which stipulations should be attached. Therefore, leasing is the point at which information about the cumulative impacts is "useful to the decisionmaker in deciding whether, or how, to alter the program to lessen" those impacts. *Muckleshoot*, 177 F.3d at 810 (citation omitted); *see also Save the Yaak Comm. v. Block*, 840 F.2d 714, 718 (9th Cir. 1988) ("Proper timing is one of NEPA's central themes. An assessment must be prepared early enough so that it can serve practically as an important contribution to the decisionmaking process") (internal quotation and citation omitted).

## B.   Tiering to the Cumulative Impacts Analyses in the 2015 RMP EISs Does Not Satisfy NEPA.

The EAs' faulty cumulative effects analyses are not saved by tiering to the RMP EISs. Again, the RMP EISs are programmatic documents that analyze cumulative effects to sage-

grouse at a large geographic scale with little, if any, site- or area-specific detail. *See* BLM-MT-2Q17-001298–339 (Miles City EIS at 4-138 to 4-179) (cumulative effects analysis focusing on overall effects to sage-grouse in Management Zone I, an area much larger than the Miles City Field Office's jurisdiction); WY058688–744 (Buffalo EIS at 1283–1339) (cumulative effects analysis focusing on overall effects to sage-grouse in Management Zone I, an area much larger than the High Plains District Office's jurisdiction); WY061713–90 (Wyoming 9 EIS at 4-509 to 4-586) (cumulative effects analysis focusing on overall effects to sage-grouse in most of Wyoming and over multiple management zones); WY054645–58 (Lander EIS at 1282–95) (cumulative effects analysis focusing on overall effects to sage-grouse across Wyoming); WY065154–206 (Bighorn Basin EIS at 7-1 to 7-53) (cumulative effects analysis focusing on overall effects to sage-grouse across Management Zone II/VII).

The cumulative impacts analysis contained in each RMP EIS is useful to the kinds of decisions made at the RMP stage, such as how many total acres in each management zone to open up to leasing with various restrictions, *e.g.*, WY065168–72 (Bighorn Basin EIS at 7-15 to 7-19), and what size protective buffer should be placed around leks throughout a management zone, *e.g.*, BLM-MT-2Q17-001335 (Miles City EIS at 4-175). But this sort of "coarse-grained" analysis is not useful to the decisions made in connection with an individual lease sale—such as which parcels to include in the sale—because it lacks sufficient detail about conditions and possible cumulative effects in the area of the lease sale. *See Muckleshoot*, 177 F.3d at 809–10 (noting that a proper cumulative impacts discussion "must analyze the combined effects of the actions in sufficient detail to be useful to the decisionmaker in deciding whether, or how, to alter the program to lessen cumulative impacts") (citation and internal quotation omitted).

The RMP EISs themselves concede that they are not adequately site-specific for the task of informing decisionmakers at the lease sale stage. The Wyoming Nine EIS, for instance, states that "[t]he magnitude of each threat [to sage-grouse] would vary geographically and may have more or less impact on [sage-grouse] in some parts of the [management zone], depending on such factors as climate, land use patterns, and topography." WY061716 (Wyoming 9 EIS at 4-512). The Buffalo EIS says precisely the same thing. WY058697 (Buffalo EIS at 1292). The Bighorn Basin EIS states that, "[i]n some localized areas, small [sage-grouse] populations may be at continued risk due to the cumulative effect of reasonably foreseeable future infrastructure and energy development projects over the next 20 years, when combined with unplanned events such as wildfires, drought, or West Nile virus outbreaks." WY065203 (Bighorn Basin EIS at 7-50). These statements confirm what becomes obvious when the RMP EISs are considered as a whole: their focus is on the *net effect* that the programmatic choices made in the RMPs will have on sage-grouse populations over broad geographic regions, not on how lease sales and other smaller-scale actions will affect the species in particular areas. *See, e.g.*, WY058740–41 (Buffalo EIS at 1335–36) (concluding that, under the proposed alternative, sage-grouse "would experience a net conservation gain" in Management Zone 1). For that reason, the RMP EISs cannot alone serve as adequate NEPA documents for leasing decisions.

The situation here is strikingly similar to that confronted by the Ninth Circuit in *Klamath-Siskiyou Wildlands Center*. In that case, BLM argued that the faulty cumulative impacts analyses in two EAs prepared in connection with timber sales could be "saved" by tiering to an earlier EIS prepared in connection with a RMP. 387 F.3d at 997. The court disagreed, observing that the EIS lacked "any *specific* information about the cumulative effects" in the areas of the timber sales, and did not "reveal the incremental impact that can be expected [in the area of the timber sales]

as a result of each of *these* . . . timber sales." *Id.* In other words, the RMP EIS could not save the

EAs "because it did not account for the specific impacts of" the timber sales considered in the

EAs. *Id.* at 998 (citation and internal quotation omitted). So too here—the RMP EISs do not

consider how the effects of *these* lease sales involving *these* parcels might combine with other

actions to affect sage-grouse.

In summary, BLM has never taken a "hard look" at the cumulative impacts associated

with the six lease sales at issue—not in the EAs prepared in connection with those lease sales,

which include no analysis of cumulative impacts, and not in the RMP EISs, which, by their

nature, cannot possibly have accounted for such impacts. And BLM cannot delay analyzing the

cumulative impacts of the lease sales until the APD stage, because "[i]t is only at the lease sale

stage that the agency can adequately consider cumulative effects of the lease sale on the

environment." *Native Vill. of Point Hope*, 740 F.3d at 504.

## IV.     VACATING THE PHASE TWO LEASE SALES IS THE PROPER REMEDY.

Based on these NEPA violations, the Court should vacate the Phase Two leases. Vacatur

is the statutorily-prescribed and standard remedy for APA violations. *See* 5 U.S.C. § 706(2)(A);

*Pollinator Stewardship Council v. U.S. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (vacatur required

except in "limited circumstances"); *Nat'l Family Farm Coal. v. U.S. EPA*, No. 19-70115, 2020

WL 2901136 (9th Cir. June 3, 2020) (same). To determine whether vacatur is appropriate, courts

"weigh the seriousness of the agency's errors against the disruptive consequences" of vacatur. *Id.*

(quoting *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C.

Cir. 1993)).

BLM's errors here were serious. The agency violated numerous fundamental provisions

of NEPA in approving these lease sales, both understating and ignoring the risks to greater sage-

grouse as a result. It is far from clear that, after proper NEPA analysis and public scrutiny, BLM

will decide to simply reissue these leases and under the same terms. Moreover, vacatur would

ensure that BLM's remedial NEPA processes are not "post-hoc assessments of a done deal." *Nat.*

*Res. Def. Council v. Houston*, 146 F.3d 1118, 1029 (9th Cir. 1998).

The practical effects of vacatur do not outweigh the seriousness of BLM's violations. As

this Court previously found, the return of lease revenues does not rise to the level of disruptive

consequences warranting remand without vacatur. *See W. Watersheds Project v. Zinke*, No. 1:18-

CV-00187-REB, 2020 WL 959242, at *28–30 (D. Idaho Feb. 27, 2020); *see also Nat'l Family*

*Farm Coal.*, 2020 WL 2901136, at *19 (vacating pesticide registration despite far-reaching

economic consequences on farmers left with unusable product); *Idaho Conservation League v.*

*U.S. Forest Serv.*, No. 1:18-CV-504-BLW, 2020 WL 2115436, at *2 (D. Idaho May 4, 2020)

(vacating mine approval despite economic loss to mining company and layoffs); *Coal. to Protect*

*Puget Sound Habitat v. U.S. Army Corps. of Eng'rs*, No. 17-cv-1209-RSL, 2020 WL 3100829, at

*5 (W.D. Wash. June 11, 2020) (vacating nationwide aquaculture permit despite allegedly

"devastating" economic consequences that would befall shellfish producers).

Numerous courts have found vacatur warranted under similar circumstances. *See, e.g.,*

*WildEarth Guardians v. U.S. BLM*, 2020 WL 2104760, at *13 (vacating oil and gas leases due to

NEPA violations); *Mont. Wildlife Fed'n*, 2020 WL 2615631, at *11–12 (vacating oil and gas

leases due to FLPMA violations); *San Juan Citizens Alliance v. BLM*, 326 F. Supp. 3d 1227

(D.N.M. 2018) (vacating oil and gas leases due to NEPA violation); *Bob Marshall Alliance v.*

*Lujan*, 804 F. Supp. 1292, 1298 (D. Mont. 1992) (vacating leases due to NEPA and ESA

violations); *Diné Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831 (10th Cir.

2019) (vacating drilling permits due to NEPA violations); *Pit River Tribe*, 469 F.3d at 788

(vacating geothermal lease extensions due to NEPA violation).

## **CONCLUSION**

For these reasons, Plaintiffs respectfully request that the Court grant their motion, hold

that the Phase Two lease sales were approved in violation of NEPA and the APA, and vacate: (1)

BLM's decision records approving the February 2017 Wyoming, June 2017 Wyoming, June

2017 Montana, and September 2017 Wyoming oil and gas lease sales; (2) the EAs and FONSIs

for those sales, and (3) all leases issued in connection with those sales.

Dated: June 18, 2020            Respectfully submitted.

                               */s/ Sarah K. Stellberg*
                               Sarah Stellberg
                               Laurence ("Laird") J. Lucas
                               Todd C. Tucci
                               ADVOCATES FOR THE WEST

                               *Attorneys for Plaintiffs*