BART M. DAVIS, Idaho Bar No. 2696
United States Attorney

CHRISTINE G. ENGLAND, California Bar No. 261501
Assistant United States Attorney
District of Idaho
1291 West Myrtle Street, Suite 500
Boise, ID 83702
Tel: (208) 334-1211; Fax: (208) 334-1414
Email: Christine.England@usdoj.gov

JEAN E. WILLIAMS
Deputy Assistant Attorney General

LUTHER L. HAJEK, Colorado Bar No. 44303
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
999 18th St., South Terrace – Suite 370
Denver, CO 80202
Tel: (303) 844-1376; Fax: (303) 844-1350
E-mail: Luke.Hajek@usdoj.gov

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, *et al.*, | Case No. 1:18-cv-00187-REB |
| Plaintiffs, | |
| vs. | **DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (PHASE TWO)** |
| DAVID BERNHARDT, Secretary of the Interior, *et al.*, | |
| Defendants, | |
| and | |
| STATE OF WYOMING, *et al.*, | |
| Defendant-Intervenors. | |

Defendants' Memorandum in Support of Motion for Partial Summary Judgment
and in Opposition to Plaintiffs' Motion for Partial Summary Judgment (Phase Two)

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

    I.     Legal Background .................................................................................................. 2

          A.     National Environmental Policy Act ........................................................... 2

          B.     Federal Land Policy and Management Act ................................................ 4

          C.     Oil and Gas Leasing on Public Lands ....................................................... 5

    II.    Factual Background ............................................................................................... 7

          A.     The Greater Sage Grouse Plan Amendments of 2015 ............................... 7

          B.     Oil and Gas Lease Sales at Issue in Phase Two ...................................... 11

               1.     June 2017 Montana Sale ............................................................... 11

               2.     February 2017 Wyoming Sale ...................................................... 12

               3.     June 2017 Wyoming Sale .............................................................. 13

               4.     September 2017 Wyoming Sale ..................................................... 14

STANDARD OF REVIEW ............................................................................................... 15

ARGUMENT .................................................................................................................... 16

    I.     BLM's Alternatives Analysis Complied With NEPA ......................................... 16

          A.     Plaintiffs Have Waived Their Alternatives Claim for the Montana Sale and the June 2017 Wyoming Sale ..................................................... 16

          B.     BLM's Analysis of Alternatives Was Sufficient to Comply With NEPA ....................................................................................................... 17

    II.    BLM Appropriately Analyzed Impacts to Sage Grouse ..................................... 21

          A.     The EAs Appropriately Tiered to the EISs Prepared in Conjunction with the Sage Grouse Plan Amendment Process Completed in 2015 ...... 21

          B.     BLM Analyzed the Baseline Conditions in Each Lease Area ................. 25

          C.     BLM Analyzed Impacts to Sage Grouse In Sufficient Detail at the Oil and Gas Leasing Stage ..................................................................... 31

III.    BLM Appropriately Analyzed the Cumulative Impacts to Sage Grouse in
        Each of the Lease Areas........................................................................................ 41

IV.     If the Court Finds a Legal Violation, It Should Not Immediately Vacate the
        Leases and Should Instead Allow Briefing on the Appropriate Scope of the
        Remedy ................................................................................................................. 48

CONCLUSION.................................................................................................................... 50

# TABLE OF AUTHORITIES

**Cases**

*Alaska Envtl. Ctr. v. Kempthorne*,
  457 F.3d 969 (9th Cir. 2006) ........................................................................ 23, 32, 33, 38, 47

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
  988 F.2d 146 (9th Cir. 1993) ........................................................................................... 48

*Am. Wild Horse Campaign v. Bernhardt*,
  963 F.3d 1001 (9th Cir. 2020) ......................................................................................... 17

*Am. Wild Horse Campaign v. Zinke*,
  353 F. Supp. 3d 971 (D. Nev. 2018) ................................................................................ 17

*Amigos Bravos v. U.S. Bureau of Land Mgmt.*,
  Nos. 6:09-cv-00037-RB-LFG; 6:09-cv-00414-RB-LFG, 2011 WL 7701433 (D.N.M. Aug. 3,
  2011) ................................................................................................................................... 7

*Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*,
  751 F.3d 1054 (9th Cir. 2014) ......................................................................................... 18

*Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*,
  126 F.3d 1158 (9th Cir. 1997) ........................................................................................... 4

*Barnes v. U.S. Dep't of Transp.*,
  655 F.3d 1124 (9th Cir. 2011) ......................................................................................... 17

*Bay Neighborhood Council v. Karlen*,
  444 U.S. 223 (1980) ............................................................................................... 2, 4, 25

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*,
  524 F.3d 938 (9th Cir. 2008) ..................................................................................... 30, 41

*Blue Mtns. Biodiversity Project v. Blackwood*,
  161 F.3d 1208 (9th Cir. 1998) ................................................................................... 37, 38

*Cal. Cmtys. Against Toxics v. EPA*,
  688 F.3d 989 (9th Cir. 2012) ........................................................................................... 48

*California v. Block*,
  690 F.2d 753 (9th Cir. 1982) ...................................................................................... 4, 18

*Cheyenne Tribe v. Hodel*,
  851 F.2d 1152 (9th Cir. 1988) ......................................................................................... 48

*Cheyenne Tribe v. Norton*,
  503 F.3d 836 (9th Cir. 2007) ........................................................................................... 48

*City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*,
  123 F.3d 1142 (9th Cir. 1997) ......................................................................................... 18

*Colo. Envtl. Coal. v. Office of Legacy Mgmt.*,
   819 F. Supp. 2d 1193 (D. Colo. 2011) ................................................................. 49

*Conner v. Burford*,
   848 F.2d 1441 (9th Cir. 1988) ............................................................ 31, 33, 48, 49

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.*,
   No. 3:17-CV-553-LRH-WGC, 2019 WL 236727 (D. Nev. Jan. 15, 2019) ...... 38, 39

*Ctr. for Envtl. Law and Policy v. Bureau of Reclamation*,
   655 F.3d 1000 (9th Cir. 2011) ........................................................................ 41, 42

*Earth Island Inst. v. U.S. Forest Serv.*,
   697 F.3d 1010 (9th Cir. 2012) ............................................................................. 18

*Great Basin Mine Watch v. Hankins*,
   456 F.3d 955 (9th Cir. 2006) ............................................................................... 44

*Great Basin Res. Watch v. Bureau of Land Mgmt.*,
   844 F.3d 1095 (9th Cir. 2016) .................................................................. 26, 27, 44

*High Country Conservation Advocates v. U.S. Forest Serv.*,
   951 F.3d 1217 (10th Cir. 2020) ........................................................................... 20

*Idaho Cmty. Action Network v. U.S. Dep't of Transp.*,
   545 F.3d 1147 (9th Cir. 2008) ........................................................................ 18, 20

*Idaho Farm Bureau Fed'n v. Babbitt*,
   58 F.3d 1392 (9th Cir. 1995) ............................................................................... 48

*Klamath Sikiyou Wildlands Ctr. v. Boody*,
   468 F.3d 549 (9th Cir. 2006) ................................................................................. 5

*Klamath-Siskiyou Wildland Center v. Bureau of Land Mgmt.*,
   387 F.3d 989 (9th Cir. 2004) .......................................................................... 46, 47

*Kleppe v. Sierra Club*,
   427 U.S. 390 (1976) ................................................................................... 4, 42, 46

*Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008) ............................................................................... 15

*Marble Mtn. Audubon Soc'y v. Rice*,
   914 F.2d 179 (9th Cir. 1990) ............................................................................... 41

*McFarland v. Kempthorne*,
   545 F.3d 1106 (9th Cir. 2008) ............................................................................. 15

*Montana Wilderness Ass'n v. Fry*,
   408 F. Supp. 2d 1032 (D. Mont. 2006) ................................................................ 49

*Montana Wilderness Ass'n. v. Connell*,
   725 F.3d 988 (9th Cir. 2013) ............................................................................... 41

*Montana Wildlife Federation v. Bernhardt*,
   No. 18-cv-69-GF-BMM, 2020 WL 2615631 (D. Mont. May 22, 2020) ........................... 10, 39

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
   177 F.3d 800 (9th Cir. 1999) ..................................................................................... 46

*N. Plains Res. Council v. Surface Transp. Bd.*,
   668 F.3d 1067 (9th Cir. 2011) .............................................................................. 28, 29

*Native Village of Point Hope v. Jewell*,
   740 F.3d 489 (9th Cir. 2014) ........................................................................ 32, 44, 45

*Neighbors of Cuddy Mountain v. Alexander*,
   303 F.3d 1059 (9th Cir. 2002) ................................................................................... 46

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*,
   565 F.3d 683 (10th Cir. 2009) ........................................... 20, 31, 33, 34, 35, 36

*Northcoast Envtl. Ctr. v. Glickman*,
   136 F.3d 660 (9th Cir. 1998) ..................................................................................... 40

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
   475 F.3d 1136 (9th Cir. 2007) ................................................................................... 16

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,
   18 F.3d 1468 (9th Cir. 1994) ..................................................................................... 16

*Or. Nat. Desert Ass'n v. Rose*,
   921 F.3d 1185 (9th Cir. 2019) .............................................................................. 26, 38

*Or. Natural Resources Council Fund v. Goodman*,
   505 F.3d 884 (9th Cir. 2007) ..................................................................................... 40

*Pac. Rivers Council v. U.S. Forest Serv.*,
   689 F.3d 1012 (9th Cir. 2012) ................................................................................... 24

*Pennaco Energy, Inc. v. U.S. Dep't of Interior*,
   377 F.3d 1147 (10th Cir. 2004) ............................................................................... 4, 5

*Protect Our Communities Found. v. LaCounte*,
   939 F.3d 1029 (9th Cir. 2019) .............................................................................. 22, 23

*River Runners for Wilderness v. Martin*,
   593 F.3d 1064 (9th Cir. 2010) ................................................................................... 16

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) ..................................................................................................... 2

*Russell Country Sportsmen v. U.S. Forest Serv.*,
   668 F.3d 1037 (9th Cir. 2011) ................................................................................... 19

*S. Or. Citizens Against Toxic Sprays, Inc. v. Clark*,
   720 F.2d 1475 (9th Cir. 1983) .............................................................................. 22, 42

*Seattle Audubon Soc. v. Moseley*,
 80 F.3d 1401 (9th Cir. 1996) ............................................................................................. 18

*Selkirk Conservation All. v. Forsgren*,
 336 F.3d 944 (9th Cir. 2003) .................................................................................. 42, 44, 45

*Sierra Club v. Peterson*,
 717 F.2d 1409 (D.C. Cir. 1983) ........................................................................................ 31

*Sierra Forest Legacy v. Sherman*,
 646 F.3d 1161 (9th Cir. 2011) ............................................................................. 22, 28, 42

*Swanson v. U.S. Forest Serv.*,
 87 F.3d 339 (9th Cir. 1996) ............................................................................................ 4, 23

*Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*,
 608 F.3d 592 (9th Cir. 2010) ............................................................................... 18, 22, 32

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
 435 U.S. 519 (1978).......................................................................................................... 16, 18

*W. Org. of Res. Councils v. Bernhardt*,
 412 F. Supp. 3d 1227 (D. Mont. 2019).............................................................................. 10, 12

*W. Org. of Res. Councils v. U.S. Bureau of Land Mgmt.*,
 No. CV 16-21-GF-BMM, 2018 WL 1475470 (D. Mont. Mar. 26, 2018) .............................. 20

*W. Watersheds Project v. Abbey*,
 719 F.3d 1035 (9th Cir. 2013)............................................................................................... 20

*W. Watersheds Project v. Bernhardt*,
 No. 1:18-cv-187-REB, 2020 WL 959242 (D. Idaho Feb. 27, 2020) ..................................... 49

*W. Watersheds Project v. Lueders*,
 122 F. Supp. 3d 1039 (D. Nev. 2015).................................................................................. 45

*W. Watersheds Project v. Schneider*,
 417 F. Supp. 3d 1319 (D. Idaho 2019) ................................................................................ 46

*W. Watersheds Project v. U.S. Bureau of Land Mgmt.*,
 774 F. Supp. 2d 1089 (D. Nev. 2011)................................................................................. 22

*W. Watersheds Project v. Zinke*,
 No. 1:18-cv-187-REB, 2020 WL 2462817 (D. Idaho May 12, 2020)..................................... 49

*Westlands Water Dist. v. U.S. Dep't of Interior*,
 376 F.3d 853 (9th Cir. 2004) ............................................................................................. 18

*WildEarth Guardians v. Bureau of Land Mgmt.*,
 No. CV-18-GF-BMM, 2020 WL 2104760 (D. Mont. May 1, 2020) ................................ 20, 39

*Wildearth Guardians v. Montana Snowmobile Association*,
 790 F.3d 920 (9th Cir. 2015) ............................................................................................. 28

*WildEarth Guardians v. Zinke*,
   368 F. Supp. 3d 41 (D.D.C. 2019) ........................................................................ 38, 39, 49

*Wilderness Society v. Wisely*,
   524 F. Supp. 2d 1285 (D. Colo. 2007) ........................................................................ 49

**Statutes**

30 U.S.C. § 226(b)(1)(A) ........................................................................ 6

30 U.S.C. § 226(f) ........................................................................ 6

30 U.S.C. § 226(g) ........................................................................ 6

30 U.S.C. §§ 181–287 ........................................................................ 5

42 U.S.C. § 4332(2)(C) ........................................................................ 3

43 U.S.C. § 1702(e) ........................................................................ 4

43 U.S.C. § 1712(a) ........................................................................ 4

43 U.S.C. § 1712(e) ........................................................................ 5

43 U.S.C. §§ 1701-1787 ........................................................................ 4

5 U.S.C. § 706(2)(A) ........................................................................ 15

5 U.S.C. §§ 701-06 ........................................................................ 15

**Regulations**

40 C.F.R. § 1500.3 ........................................................................ 4, 23

40 C.F.R. § 1501.3 ........................................................................ 3

40 C.F.R. § 1501.4(c) ........................................................................ 3

40 C.F.R. § 1501.4(e) ........................................................................ 3

40 C.F.R. § 1502.1 ........................................................................ 3

40 C.F.R. § 1502.14(a) ........................................................................ 18

40 C.F.R. § 1502.20 ........................................................................ 3, 6, 21, 23

40 C.F.R. § 1502.21 ........................................................................ 3, 23

40 C.F.R. § 1508.13 ........................................................................ 3

40 C.F.R. § 1508.28 ........................................................................ 3, 6

40 C.F.R. § 1508.28(a) ........................................................................ 3

40 C.F.R. § 1508.28(b) ........................................................................ 22

40 C.F.R. § 1508.9 ........................................................................ 3

40 C.F.R. § 1508.9(b) ........................................................................ 18

43 C.F.R. § 1601.0-5(n) ................................................................................................. 4, 5

43 C.F.R. § 1601.0-6 ..................................................................................................... 4, 5

43 C.F.R. § 1610.5-3(a) ................................................................................................. 5, 6

43 C.F.R. § 3100.0-3 ......................................................................................................... 5

43 C.F.R. § 3100-3180 ...................................................................................................... 5

43 C.F.R. § 3120 ................................................................................................................ 6

43 C.F.R. § 3120.1-1(a) ..................................................................................................... 6

43 C.F.R. § 3120.1-1(e) ..................................................................................................... 6

43 C.F.R. § 3120.1-2(a) ..................................................................................................... 6

43 C.F.R. § 3120.2-1 .......................................................................................................... 7

43 C.F.R. § 3120.4-2 .......................................................................................................... 6

43 C.F.R. § 3120.5-1 .......................................................................................................... 6

43 C.F.R. § 3120.5-3 .......................................................................................................... 6

43 C.F.R. § 3162.3-1 ....................................................................................................... 6, 7

43 C.F.R. § 46.120(c) ......................................................................................................... 6

43 C.F.R. § 46.300(a)(2) .................................................................................................... 6

**Other Authorities**

72 Fed. Reg. 10,308, 10,334 (Mar. 7, 2007) ...................................................................... 7

75 Fed. Reg. 13,910, 13,920 (Mar. 23, 2010) .................................................................... 7

76 Fed. Reg. 77,008 (Dec. 9, 2011) ................................................................................... 8

80 Fed. Reg. 57,332 (Sept. 23, 2015) ................................................................................ 8

80 Fed. Reg. 57,333 (Sept. 23, 2015) ................................................................................ 8

80 Fed. Reg. 57,633 (Sept. 24, 2015) ................................................................................ 8

80 Fed. Reg. 57,639 (Sept. 24, 2015) ................................................................................ 8

80 Fed. Reg. 59,858, 59,684 (Oct. 2, 2015) ................................................................... 7, 8

82 Fed. Reg. 2906, 2914 (Jan. 10, 2017) ........................................................................... 6

## INTRODUCTION

The U.S. Bureau of Land Management's ("BLM") June 2017 Montana oil and gas lease sale, and its February, June, and September 2017 Wyoming lease sales, all fully complied with the National Environmental Policy Act ("NEPA").  NEPA requires the analysis of environmental impacts, but does not require BLM to avoid leasing parcels for oil and gas development merely because some harm to the environment may occur.

Plaintiffs' NEPA claims in this case rest on the notion that the Court must focus its evaluation primarily, if not entirely, on the six EAs prepared in conjunction with its leasing decisions.  But this argument ignores that BLM's leasing process proceeds in multiple phases:  a planning stage where BLM decides what areas are open for leasing, a leasing decision phase where BLM offers particular parcels for sale, and a development phase where BLM approves oil and gas development, including the drilling of particular wells.  BLM conducts an appropriate level of NEPA analysis at each stage, and each subsequent stage builds on relevant portions of pre-existing analysis.  At the leasing stage, therefore, it is appropriate for BLM to tier to and incorporate the analyses in the environmental impact statements ("EIS") prepared at the land use planning stage, and that is what BLM has done here.

BLM also appropriately conducted new analysis—in the form of lease sale-specific environmental assessments—based on information available to it at the time of the challenged lease sales.  But, here again, Plaintiffs ignore that BLM's analysis proceeds in stages, and that BLM does not know at the leasing stage where future development projects will be proposed within leases and thus where drilling will occur.  As a result, NEPA does not require BLM to conduct the kind of site specific analysis that Plaintiffs demand until the final (development) stage, when BLM receives and processes the various lessees' applications for permits to drill.

Finally, it is important to recognize what this case is not about.  It is not about whether the applicable land use plans, and thus BLM's leasing decisions, contain sufficient protections for Sage Grouse.  Plaintiffs have chosen not to argue their claims under the Federal Land Policy and Management Act ("FLPMA"), and for good reason, as BLM's leasing decisions conform to the requirements of the land use plans.  Thus, Plaintiffs' repeated suggestions that the protections in the land use plans are insufficient to protect Sage Grouse are irrelevant to the issues before the Court.  Nonetheless, it should be noted that BLM deferred dozens of parcels in Sage Grouse habitat out of concern for the potential impacts to Sage Grouse.

In sum, summary judgment should be granted to Defendants on all claims.  If, however, the Court rules in favor of Plaintiffs on any of their claims, Defendants request that the leases not be vacated pending further NEPA analysis or, at the very least, that the Court stay its vacatur to allow the government time to consider whether to appeal.

## BACKGROUND

### I.  Legal Background

#### A.  National Environmental Policy Act

NEPA serves the dual purpose of informing agency decision-makers of the significant environmental effects of proposed major federal actions and ensuring that relevant information is made available to the public so that they "may also play a role in both the decisionmaking process and the implementation of that decision."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  NEPA is procedural in nature.  It is "well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process."  *Id.* at 350 (citing *Stryker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 227-28 (1980)).  "Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed – rather than unwise – agency action."  *Robertson*, 490 U.S. at 351.

To meet these dual purposes, NEPA requires that an agency prepare a comprehensive EIS for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.3.  The Council on Environmental Quality's ("CEQ") regulations implementing NEPA provide guidance as to the nature and content of an EIS.  *See* 40 C.F.R. § 1502.1 (1978).  Those regulations direct the preparer to include an analysis of alternatives to the proposed action in an EIS, *see id.* § 1502.14, and further instruct that the document should include discussions of direct, indirect, and cumulative impacts, *id.* §§ 1502.16 (a)-(b), 1508.7, 1508.8.  Not every federal action or proposal, however, requires an EIS.  CEQ's regulations provide that an agency may prepare an EA to determine whether the impacts of an action will be significant, and if not, the agency may prepare a finding of no significant impact ("FONSI") and forego preparation of an EIS.  *See* 40 C.F.R. §§ 1501.3, 1501.4(c),  (e), 1508.9, 1508.13.

An agency may tier its analysis to a prior, broader NEPA analysis, meaning that the prior analysis is incorporated by reference and need not be repeated in the later NEPA document.  40 C.F.R. §§ 1502.20, 1508.28.  "Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review . . . ."  40 C.F.R. § 1502.20.  Tiering is appropriate in situations where an agency develops a general plan or program to be followed by site-specific projects implementing the plan.  40 C.F.R. § 1508.28(a).  An agency also may incorporate prior analyses by reference, and in doing so, should cite the prior analyses and briefly summarize them.  40 C.F.R. § 1502.21.

In reviewing the sufficiency of an agency's NEPA analysis, a court should evaluate whether the agency has presented a "'reasonably thorough discussion of the significant aspects

of the probable environmental consequences.'" *California v. Block*, 690 F.2d 753, 761 (9th Cir.

1982) (citation omitted). "The reviewing court may not 'fly speck' an EIS and hold it

insufficient on the basis of inconsequential, technical deficiencies." *Ass'n of Pub. Agency*

*Customers v. Bonneville Power Admin.*, 126 F.3d 1158, 1183-84 (9th Cir. 1997) (citation

omitted); *see also Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 343 (9th Cir. 1996); 40 C.F.R. §

1500.3 ("[I]t is the Council's intention that any trivial violation of these regulations not give rise

to any independent cause of action."). In addition, a reviewing court may not force an agency to

elevate environmental concerns over other appropriate considerations. *See Stryker's Bay*

*Neighborhood Council*, 444 U.S. at 227. A reviewing court also is not to "substitute its

judgment for that of the agency." *Block*, 690 F.2d at 761. Rather, "[o]nce satisfied that a

proposing agency has taken a 'hard look' at a decision's environmental consequences, the review

is at an end." *Id.* (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).

### B.      Federal Land Policy and Management Act

Under FLPMA, 43 U.S.C. §§ 1701-1787, BLM manages the public lands, including

federal oil and gas resources, *see* 43 U.S.C. § 1702(e), through a multi-step planning and

decision-making process. *Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147, 1151–

52 (10th Cir. 2004). BLM first develops a resource management plan ("RMP") for a planning

area, setting forth long-term goals and objectives for management of public lands. 43 U.S.C. §

1712(a). Consistent with agency FLPMA regulations, 43 C.F.R. § 1601.0-6, the RMPs

developed by BLM are analyzed in EISs, prepared in accord with NEPA. The EISs provide an

analysis of the potential environmental impacts of management and use of the land and

resources, including oil and gas, based on reasonably foreseeable development scenarios.

An RMP is not a decision to undertake site-specific action. 43 C.F.R. § 1601.0-5(n).

Once BLM issues an RMP, subsequent, more focused decisions implementing specific projects

must conform to the plan. *See* 43 U.S.C. § 1712(e) (authorizing management decisions to implement land use plans); 43 C.F.R. § 1610.5-3(a) (requiring that future resource authorizations "conform to the approved plan"); *Klamath Sikiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 557 (9th Cir. 2006) (FLPMA "require[s] BLM to manage public lands in accordance with resource management plans once they have been established."). As relevant here, one of the project-specific land-use decisions BLM is regularly required to make pursuant to the Mineral Leasing Act is whether to offer parcels for oil and gas leasing in a lease sale, as discussed below.

      **C.**      **Oil and Gas Leasing on Public Lands**

      The Mineral Leasing Act ("MLA"), 30 U.S.C. §§ 181–287, authorizes the Secretary of the Interior to offer certain federal minerals for lease, including oil and gas. The Secretary has delegated this authority to BLM for onshore minerals. *See* 43 C.F.R. § 3100.0-3. BLM has promulgated regulations under the MLA that govern the leasing and development of federal onshore oil and gas on public lands and federal mineral estates. *See* 43 C.F.R. § 3100-3180.

      BLM employs a three-stage decision-making process for managing public lands for oil and gas leasing and development. *See Pennaco*, 377 F.3d at 1151-52. First, BLM broadly assesses the presence of minerals and other resources on public lands through land-use planning, which includes determining areas open to and closed to potential oil and gas development, and determining, for open areas, what conservation stipulations should apply to future leases. 43 C.F.R. § 1601.0-5(n). The RMPs that result from this process guide future decision making but do not authorize specific projects, unless expressly stated. *See id.* These RMPs are supported by EISs prepared in accordance with NEPA. 43 C.F.R. § 1601.0-6. The EISs analyze the potential environmental impacts of oil and gas development under different alternatives based on

reasonably foreseeable development scenarios.  After BLM issues an RMP, subsequent decisions implementing specific projects must conform to the plan.  43 C.F.R. § 1610.5-3(a).

In the second stage of the oil and gas program, BLM conducts a NEPA review and holds competitive oil and gas lease sales on a quarterly basis, as required by the MLA.  30 U.S.C. § 226(b)(1)(A); *see* 43 C.F.R. § 3120; 43 C.F.R. § 3120.1-2(a).  Lands that may be offered for leasing include: lands formerly subject to oil and gas leases that "have terminated, expired, been canceled or relinquished"; lands selected by the authorized officer; lands where federal mineral resources are being drained by the development of connected non-federal resources; and lands identified in "expression[s] of interest" from the public.  43 C.F.R. §§ 3120.1-1(a),  (e).  For each oil and gas lease sale, BLM may prepare one or more EAs that "tier" to an EIS prepared at the RMP stage.  *See* 40 C.F.R. §§ 1502.20, 1508.28 (NEPA regulations on tiering).  If BLM determines that pre-existing NEPA analysis adequately assesses the impacts of a proposed lease sale, BLM may instead issue a determination of NEPA adequacy for the lease sale.  *See* 43 C.F.R. §§ 46.120(c), 46.300(a)(2).  Once BLM completes required analysis and identifies parcels to be offered, it holds a competitive lease sale, where the parcels are auctioned and sold to the highest qualified bidder.  43 C.F.R. §§ 3120.5-1, 3120.5-3.  In preparation for these sales, BLM state offices post on agency webpages, and in the responsible district or field offices, notices identifying the parcels proposed to be offered and the stipulations that would attach to each parcel 45 days in advance of the planned sale.  *See* 30 U.S.C. § 226(f); 43 C.F.R. § 3120.4-2.  Any interested party may protest the offering of a parcel for sale.

The third stage of oil and gas management occurs after lease issuance, when BLM determines whether, and under what conditions, it will approve specific development proposals.  30 U.S.C. § 226(g); 43 C.F.R. § 3162.3-1; Onshore Order No. 1, Approval of Operations, 82

Fed. Reg. 2906, 2914 (Jan. 10, 2017), *amending* 72 Fed. Reg. 10,308, 10,334 (Mar. 7, 2007).

The development of the lease does not necessarily occur soon after lease issuance and may occur

at any time during the 10-year lease term.  *See* 43 C.F.R. § 3120.2-1.  Before an oil and gas

operator may undertake any drilling or surface disturbance, it must submit an application for a

permit to drill ("APD").  BLM reviews the application, completes additional environmental

review, as necessary, to ensure NEPA compliance, decides whether to approve the permit, and

imposes any necessary conditions on its approval.  *See* 43 C.F.R. § 3162.3-1; *see also Amigos*

*Bravos v. U.S. Bureau of Land Mgmt.*, Nos. 6:09-cv-00037-RB-LFG; 6:09-cv-00414-RB-LFG;

2011 WL 7701433, at *5 (D.N.M. Aug. 3, 2011).

## II.     Factual Background

### A.     The Greater Sage Grouse Plan Amendments of 2015

The Greater Sage Grouse once occupied nearly half a million square miles across the

West and numbered in the millions.  75 Fed. Reg. 13,910, 13,920 (Mar. 23, 2010).  As a result of

habitat fragmentation and loss caused by energy development, fire, agricultural conversion, and

other factors, Sage Grouse now occupy a little over half of their historic range, and the current

population is estimated to be in the hundreds of thousands.  *See* 75 Fed. Reg. at 13,924-62,

13,986; 80 Fed. Reg. 59,858, 59,684 (Oct. 2, 2015).  For this reason, in 2010, the U.S. Fish and

Wildlife Service ("FWS") found that listing the Sage Grouse under the ESA was warranted, but

precluded by higher priority listing actions.  75 Fed. Reg. at 13,910.

Spurred by the FWS's finding and, in particular, the FWS's determination that existing

federal land use plans were inadequate to protect Sage Grouse from further declines, BLM and

the Forest Service engaged in a widespread public planning process to amend and revise their

land use plans to protect the Sage Grouse and its habitat with the goal of avoiding the listing of

the species under the ESA.  Beginning in December 2011, BLM and the U.S. Forest Service

commenced a national planning effort to incorporate sage grouse conservation measures into

their land management plans in ten western states.  *See* 76 Fed. Reg. 77,008 (Dec. 9, 2011).  For

planning purposes, greater sage grouse habitat was divided into two regions: (1) the Great Basin

(or Western) Region, covering California, Nevada, Oregon, Idaho, and parts of Utah and

southwestern Montana, and (2) the Rocky Mountain (or Eastern) Region, covering most of the

rest of Montana, North and South Dakota, Wyoming, Colorado, and parts of Utah. *Id.* at 77,009.

The two regions were further divided into sub-regions.  *See* BLM-MT-2Q17-000023 (map).

The agencies engaged in 15 sub-regional planning efforts, and each was analyzed in a

separate NEPA process during which the agencies prepared an EIS.  BLM-MT-2Q17-000032.

BLM and the Forest Service completed those planning and NEPA analyses in September 2015,

and each agency issued two records of decision ("RODs") approving new or amended RMPs (or

forest plan amendments, in the case of the Forest Service), one per agency for the Great Basin

Region and one per agency for the Rocky Mountain Region.[1]  Collectively, these four RODs

approved, amended, or revised ninety-eight land use plans (the "Plan Amendments") to establish

increased protections for Sage Grouse.

Following the issuance of the Plan Amendments, FWS reviewed the status of the Sage

Grouse and concluded that listing under the ESA was not warranted.  *See* 80 Fed. Reg. 59,858

(Oct. 2, 2015).  FWS found that one of the key circumstances that had changed since its 2010

"warranted, but precluded" finding was that the Plan Amendments "provide adequate

---

[1] *See* 80 Fed. Reg. 57,639 (Sept. 24, 2015) (notice of BLM's Rocky Mountain Region ROD); 80 Fed. Reg. 57,633 (Sept. 24, 2015) (notice of BLM's Great Basin Region ROD); 80 Fed. Reg. 57,333 (Sept. 23, 2015) (notice of the Service's Great Basin Region ROD); 80 Fed. Reg. 57,332 (Sept. 23, 2015) (notice of the Service's Rocky Mountain Region ROD).

Defendants' Memorandum in Support of Motion for Partial Summary Judgment
and in Opposition to Plaintiffs' Motion for Partial Summary Judgment (Phase Two)      8

mechanisms to reduce and minimize new disturbance in the most important areas for the species." *Id.* at 59,882.  In its conclusion, FWS emphasized that its determination that a listing was not warranted was dependent upon the "continued implementation of the regulatory mechanisms and conservation efforts," including the Plan Amendments.  *Id.* at 59,941.

Five of the RMPs that were approved and/or amended as part of the 2015 plan amendment process are relevant here.  In Montana, the applicable RMP is the Miles City Field Office RMP, BLM-MT-2Q17-000157-588, which was accompanied by an EIS, BLM-MT-2Q17-000589-2112).  In Wyoming, there are four applicable sets of RMPs or RMP amendments ("RMPA") and accompanying EISs:  the Bighorn Basin RMPs, which encompass BLM's Cody and Worland Field Offices, WY068071-68673 (Cody RMP), WY068674-69312 (Worland RMP), and EIS, WY063652-66623; the Buffalo RMP, WY067095-922, and EIS, WY057293-60247; the Wyoming Nine RMPA, WY066624-67094, and EIS, WY060248-63651; and the Lander RMP, WY056783-57292, and EIS, WY053928-55899.  The applicable RMPs were approved by the Rocky Mountain Region ROD, WY067923, with the exception of the Lander RMP, which was approved by a separate ROD issued in 2014.  WY067936.

The Sage Grouse Plan Amendments contain measures to protect Sage Grouse and its habitat from the impacts of development and other threats.  The protective measures vary based on how the habitat is designated.  The highest degree of protections is accorded to priority habitat management areas ("PHMA") and less restrictive protections are applied in general habitat management areas ("GHMA").  WY067949.  The protective measures are directed to various types of threat to Sage Grouse habitat, including oil and gas development, the development of renewable energy projects, grazing, mining, and wildfire.  WY067952-55.  In the Miles City Field Offices, there are also areas designated as restoration habitat management areas

("RHMA"), which are designed to balance protections for Sage Grouse with resource needs in a manner that maintains enough quality habitat to allow some residual populations to persist. WY067949; BLM-MT-2Q17-000175.

In order to protect Sage Grouse, the Plan Amendments contain a number of restrictions on oil and gas development.  In Montana, PHMA is open to fluid mineral leasing only with a no surface occupancy ("NSO") restriction; in Wyoming PHMA is open to fluid mineral leasing subject to an NSO stipulation for activities occurring within 0.6 miles of an occupied lek and a timing restriction from March 15 to June 30.  BLM-MT-2Q17-000038; WY067952.  In GHMA in the Montana Miles City Field Office, oil and gas leasing is permitted subject to an NSO restriction within 0.6 miles of a lek and a controlled surface use ("CSU") stipulation.  BLM-MT-2Q17-000179.  In Wyoming, oil and gas leasing is permitted in GHMA subject to an NSO restriction within 0.25 miles of an occupied lek and a timing limitation.  WY067953.  The Plan Amendments contain further density restrictions, noise restrictions, and mitigation that further restricts the ability to conduct oil and gas development within habitat management areas.  *See*, *e.g.*, WY066659-63, WY066677-81 (Wyoming Nine RMPA).  The Plan Amendments also contain an objective to prioritize the leasing of areas outside of Sage Grouse habitat.  *See*, *e.g.*, WY066649.[2]

---

[2] FLMPA claims involving the prioritization objective were briefed in a case brought in the District of Montana, and those claims are now on appeal.  *See Montana Wildlife Federation v. Bernhardt*, No. 18-cv-69-GF-BMM, 2020 WL 2615631 (D. Mont. May 22, 2020), *appeal docketed*, No. 20-35615 (July 13, 2020).  Plaintiffs have chosen not to pursue their FLPMA claims in this case, and therefore they are waived and summary judgment should be granted to Defendants on those claims.  *See W. Watersheds Project v. Lueders*, 122 F. Supp. 3d 1039, 1055 (D. Nev. 2015).

Defendants' Memorandum in Support of Motion for Partial Summary Judgment and in Opposition to Plaintiffs' Motion for Partial Summary Judgment (Phase Two)      10

**B.      Oil and Gas Lease Sales at Issue in Phase Two**

There are four leasing decisions at issue in this case.  One relates to a Montana lease sale,

and the remainder involve lease sales in Wyoming.  Each of the sales is discussed below.

**1.      June 2017 Montana Sale**

For the June 2017 Montana sale, BLM offered 156 parcels covering 69,056 acres.  BLM-

MT02Q17-002270 (sale notice).  In conjunction with its leasing decision for the sale, BLM

prepared an EA.  BLM-MT-2Q17-002402.  The EA tiered to the EIS prepared for the Miles City

Field Office RMP and conformed to the requirements of that plan.  BLM-MT-2Q17-002407.  Of

the 156 parcels offered for sale, 1 parcel was in PHMA, 66 parcels in GHMA, 2 parcels in

RHMA, and 87 parcels not in Sage Grouse habitat.  BLM-MT-2Q17-2426.  The EA incorporated

by reference the analysis of impacts to Sage Grouse in Chapter 4 of the Miles City Field Office

EIS, pages 4-105 – 4-179.  BLM-MT—2Q17-002447; BLM-MT-2Q17-001265-1339.  BLM

applied the applicable stipulations from the Miles City RMP to the lease parcels.  BLM-MT-

2Q17-002447; BLM-MT-2Q17-002461-2595. (EA Appendix A).  The EA analyzed two

alternatives in detail: the proposed action (offering 156 industry-nominated parcels for sale) and

the no action alternative (offering no parcels for sale).  BLM-MT-2Q17-002410.

BLM held a 30-day public comment period on the EA, BLM-MT-2Q17-002455-56, and

Plaintiffs submitted comments.  BLM-MT-2Q17-002686-759 (CBD); BLM-MT-2Q17-003366-

74 (WWP).  CBD's letter addressed potential impacts to Sage Grouse, BLM-MT-2Q17-002721-

28, but it did not propose an alternative that would provide greater protection for Sage Grouse.

Likewise, WWP's letter raised concerns about impacts to Sage Grouse from BLM's leasing

decision, BLM-MT-2Q17-003366-74, but WWP did not propose an alternative for BLM to

analyze.  Instead, WWP stated that it hoped that BLM would "choose the no action alternative."

BLM-MT-2Q17-003371.  BLM decided to offer all nominated parcels for sale.

### 2.     February 2017 Wyoming Sale

In the February 2017 Wyoming sale, BLM offered 283 parcels covering 184,784 acres.

WY090111; WY090160-67.  BLM prepared two EAs in conjunction with this sale.  The High

Plains EA analyzed parcels in BLM's Buffalo, Casper, and Newcastle Field Offices.

WY090976-91038.  The analysis in the High Plain EA tiers to and incorporates by reference the

analysis in the EISs supporting the Buffalo, Casper, and Newcastle Plan Amendments (the

Buffalo and Wyoming Nine EISs).  WY090986.  The Wind River/Bighorn Basin EA analyzed

parcels in the Worland and Lander Field Offices.  WY092035-88.  In addition, two parcels

overlap both the Lander and Rawlins Field Offices.  WY092041.  Thus, the Wind River/Bighorn

EA tiers to and incorporates by reference the analyses in the EISs for the Worland, Lander, and

Rawlins Plan Amendments (the Bighorn Basin and Wyoming Nine EISs).  *Id.*

In the High Plains District, there were 318 expressions of interest ("EOI").  BLM

deferred 46 parcels comprised of 61,922.86 acres out of concern for Sage Grouse conservation.

WY09082-83.  Other parcels were deferred for other reasons, leaving a total of 271 parcels.

WY090985.  In the Wind River/Bighorn Basin District, BLM deferred 3 parcels in Sage Grouse

habitat, leaving 10 parcels, which are nearly entirely in GHMA.  WY092042; WY092081.  Thus,

of the initial 332 parcels, 281 parcels were analyzed in the EAs and offered for sale.

WY090160-67.  Subsequently, 2 of the parcels were split, resulting in 283 parcels, WY092009,

and two additional parcels were created due to communitization agreements being approved after

the posting of the Feb. 7, 2017 Notice of Competitive Oil and Gas Lease Sale.  WY090754-58.

Thus, on the day of the lease sale, 285 parcels were offered for sale.  WY092392.  Of those, 26 parcels are in PHMA, and all but one of the remaining parcels are in GHMA.  WY090970-75.

Each EA analyzed two alternatives in detail: the proposed leasing action and the no action alternative.  WY090995; WY092050.  The Wind River/Bighorn EA also considered an alternative to lease all of the parcels with only standard terms and conditions, but eliminated it from further consideration because such an alternative was not consistent with the governing RMPs.  WY092050.  CBD submitted comments during the public comment periods on the EAs.  WY079361-70; WY092108-27.  In their comments, CBD raised a number of concerns about the EAs' analyses of impacts to Sage Grouse and stated that the EAs did not consider an alternative that "would defer all remaining parcels located in Sage Grouse [habitat]."  WY079369. In response, BLM explained that the potential impacts of not leasing some of the parcels were "imbedded within the No Action alternative," and therefore the analysis of another separate alternative was not necessary.  WY092008; WY092124.

### 3.    June 2017 Wyoming Sale

In the June 2017 Wyoming sale, BLM offered 26 parcels totaling 31,925 acres.  WY102075.  The parcels are located in BLM's Kemmerer, Pinedale, and Rawlins Field Offices,  WY102607, and were analyzed in one EA.  WY102600-700.  The EA tiers to and incorporates the analysis of potential impacts to Sage Grouse contained in the Wyoming Nine EIS supporting the Plan Amendments to the Kemmerer, Pinedale, and Rawlins RMPs.  WY102608, 102652-53, 102676-77.  Of the 26 parcels offered for sale, 6 are in PHMA and the remainder are in GHMA.  WY102652.  A total of 53 parcels were deferred from the sale out of concern for Sage Grouse.  WY102606-07.

The EA analyzes two alternatives in detail: the proposed action and the no action alternative.  WY102612.  The EA also considered an alternative that would have offered all parcels with an NSO stipulation, but BLM chose not to analyze that alternative in detail because it would not have conformed to the governing RMPs.  WY102612.  BLM posted the EA for a 30-day public comment period, WY102611, but Plaintiffs did not submit comments. WY102718-32.  CBD subsequently submitted a protest letter, WY102821-55, in which it stated that the EA did not analyze an alternative that would defer all parcels in Sage Grouse habitat. WY102853.  BLM denied the protest as untimely.  WY102816-20.

### 4.      September 2017 Wyoming Sale

In the September 2017 Wyoming sale, BLM offered 140 parcels totaling 118,055 acres. WY111922.  The parcels are located in BLM's Buffalo, Casper, and Newcastle Field Offices within the High Plains District, and the Worland and Lander Field Offices in the Wind River/Bighorn Basin District.  WY113319; WY113579.  BLM prepared two EAs for the sale, one for each district office.  WY113571-634; WY113320.  The analyses of impacts to Sage Grouse in the EAs tiered to and incorporated by reference the analyses in the EISs supporting the applicable Plan Amendments for the field office.  WY113320, 113355-56, 113363, 113376-77; WY113581, 113622-24.

Of the 137 identified in the decision record, 123 parcels are in Sage Grouse habitat, and 43% of the acreage is in PHMA.[3]  WY113304-07.  In the High Plains District, BLM deferred 3 parcels because they were within Wyoming Core habitat that had not been previously designated

---

[3] A total of 144 parcels were analyzed in the EAs for the sale:  133 parcels in the High Plains EA, WY109520, and 11 in the Wind River/Bighorn Basin EA.  WY109748.  Subsequently, 1 parcel was added when a parcel was split in two.  WY112615-17.  Later, BLM announced that 4 parcels would be deferred to avoid conflicts between oil and gas development and coal development, leaving a total of 137 parcels offered for sale.  WY113114-15.

Defendants' Memorandum in Support of Motion for Partial Summary Judgment
and in Opposition to Plaintiffs' Motion for Partial Summary Judgment (Phase Two)      14

as PHMA in the applicable Plan Amendments.  WY113315.  BLM deferred an additional 14

parcels comprising 12,807.22 acres in Sage Grouse habitat designated in the Plan Amendments.

WY113315-16.  In the Wind River/Bighorn Basin District, BLM deferred 8 parcels in Sage

Grouse habitat.  WY113577-78.

Each EA analyzed the proposed action and the no action alternative.  WY113328-39;

WY113585.  The Wind River/Bighorn Basin EA also considered an alternative that would have

offered all parcels with only standard terms and conditions, but BLM rejected that alternative

because it would not be in conformance with the applicable RMPs.  WY113585.  During the

public comment period, CBD submitted two similar comment letters to BLM regarding the two

EAs.  WY110243-75; WY110280-312.  CBD stated that the EAs did not consider an alternative

that would defer all parcels in Sage Grouse habitat.  WY110267; WY110303.  In response, BLM

explained that by analyzing the no action alternative, BLM had effectively analyzed deferring

parcels from the sale.  WY113556-57; WY113707-08.

## STANDARD OF REVIEW

Agency decisions are reviewed under the judicial review provisions of the APA, 5 U.S.C.

§§ 701-06.  *See Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008).  Under the APA,

agency decisions may be set aside if they are "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  In accordance with that standard,

an agency's decision will be overturned

> [O]nly if the agency relied on factors which Congress has not intended it to
> consider, entirely failed to consider an important aspect of the problem, offered an
> explanation for its decision that runs counter to the evidence before the agency, or
> is so implausible that it could not be ascribed to a difference in view or the
> product of agency expertise.

*McFarland v. Kempthorne*, 545 F.3d 1106, 1110 (9th Cir. 2008) (citation and internal quotation

marks omitted).  The standard of review is "highly deferential, presuming the agency action to be

valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (citation omitted).  The APA "does not allow the court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (citation omitted).  APA claims are resolved on summary judgment based on the agency's administrative record.  *See Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994).

## ARGUMENT

## I.     BLM's Alternatives Analysis Complied With NEPA

BLM analyzed a reasonable range of alternatives in the EAs for the leasing decisions. For two of the lease sales, Plaintiffs waived the argument that BLM was required to analyze additional alternatives by not proposing such alternatives during the public comment periods on the EAs.  But even to the extent the issue has not been waived, Plaintiffs have failed to demonstrate that analysis of additional alternatives was required by NEPA.

### A.     Plaintiffs Have Waived Their Alternatives Claim for the Montana Sale and the June 2017 Wyoming Sale

Plaintiffs have waived their alternatives argument with respect to the Montana sale and the June 2017 Wyoming lease sale by not proposing a viable alternative during the public comment period on the EAs.  As the Supreme Court has explained, "administrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that 'ought to be' considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider matters 'forcefully presented.'"  *Vermont Yankee*

*Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 553-54 (1978) (citation omitted); *see also Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1135–36 (9th Cir. 2011).

Here, Plaintiffs submitted comments on the EA for the Montana sale, BLM-MT-2Q17-002686-759 (CBD); BLM-MT-2Q17-003366-74 (WWP), but those comments did not propose an alternative for BLM to analyze.  While CBD's letter discussed potential impacts to Sage Grouse, BLM-MT-2Q17-002721-28, it did not, with sufficient clarity, propose an alternative to the ones set forth in the EA.  *See Am. Wild Horse Campaign v. Zinke*, 353 F. Supp. 3d 971, 982 (D. Nev. 2018) (a plaintiff is not to make comments with "laser precision," but it may not make "vague requests during the comment period and then claim that the agency should have known exactly what it was referring to"), *aff'd sub nom. Am. Wild Horse Campaign v. Bernhardt*, 963 F.3d 1001 (9th Cir. 2020).  WWP's letter did not propose any other alternative and, in fact, requested that BLM "choose the no action alternative."  BLM-MT-2Q17-003371.

As to the June 2017 Wyoming sale, Plaintiffs did not submit comments during the public comment period on the EA.  *See* WY0102718-32.  CBD subsequently submitted a protest letter, WY102821-55, but it did not submit comments during the comment period when they could have informed BLM's NEPA analysis.  Because Plaintiffs did not submit comments during the comment period, their alternatives argument is waived.  *See Barnes*, 655 F.3d at 1136 (finding that an alternatives claim was waived because the plaintiffs failed to raise the issue in their comments).

Accordingly, the alternatives claim is waived as to the Montana sale and the June 2017 Wyoming sale.

**B.    BLM's Analysis of Alternatives Was Sufficient to Comply With NEPA**

To the extent that the issue has not been waived, BLM's analysis of alternatives in all of the EAs fully complied with NEPA.  Under NEPA, an agency is required to analyze a reasonable

range of alternatives.  *See City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997); *see also Block*, 690 F.2d at 767.  An agency need not consider alternatives that are "remote and speculative," or reconsider alternatives that are sufficiently similar to alternatives already considered by the agency.  *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004) (quoting *Vermont Yankee*, 435 U.S. at 551).  "An agency is under no obligation to consider every possible alternative to a proposed action, nor must it consider alternatives that are unlikely to be implemented or those inconsistent with its basic policy objectives." *Seattle Audubon Soc. v. Moseley*, 80 F.3d 1401, 1404 (9th Cir. 1996). An agency is free to reject alternatives, but must "briefly discuss the reasons for their having been eliminated."  40 C.F.R. § 1502.14(a).

The standard for reviewing an alternatives analysis in an EA is less demanding than for an EIS.  *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008) ("[W]hereas with an EIS, an agency is required to '[r]igorously explore and objectively evaluate all reasonable alternatives,' *see* 40 C.F.R. § 1502.14(a), with an EA, an agency only is required to include a brief discussion of reasonable alternatives. *See* 40 C.F.R. § 1508.9(b)."); *In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1073 (9th Cir. 2014).  Furthermore, an agency can meet NEPA requirements when considering just two alternatives (a "no action" alternative and a "proposed alternative") in its EA.  *See   N. Idaho Cmty. Action Network*, 545 F.3d at 1153–54;  *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1021–23 (9th Cir. 2012); *Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 608 F.3d 592, 602 n.11 (9th Cir. 2010).

Here, BLM satisfied its obligations under NEPA by analyzing the proposed action and the no action alternative and reasonably explaining why other alternatives were not analyzed in

detail.  And insofar as Plaintiffs suggested an additional alternative for analysis during the

comment period, BLM adequately analyzed that as well.  In CBD's comments on the February

2017 Wyoming sale, for example, it asked BLM to evaluate an alternative that "would defer all

remaining parcels located within sage-grouse [PHMA] *and [GHMA]*."  WY079369 (emphasis

added).[4]  BLM effectively did just that.  Given that nearly all of the parcels offered in the sale

were in PHMA or GHMA, *see* WY090970-75, CBD was effectively proposing an alternative

that would have offered virtually no parcels in the sale.  Therefore, as BLM explained, adequate

analysis of CBD's proposal was embedded in BLM's consideration of the no action alternative.

WY092008; *see also* WY092124.  The same is true of the September 2017 Wyoming sale, where

the plaintiffs similarly suggested that BLM analyze an alternative that would defer *all* parcels in

Sage Grouse habitat.  WY110267; WY110303.  And as with the prior sale, BLM responded that

by analyzing the no action alternative, it had effectively analyzed the alternative proposed by

Plaintiffs of deferring all Sage Grouse parcels from the sale.  WY113556-57; WY113707-08.

Given that 123 out of 137 parcels identified in the decision record are in Sage Grouse habitat,

WY113304-07, BLM's response was reasonable.  As the Ninth Circuit and CEQ have explained,

an agency need not analyze an alternative that is a "minor variation of one of the alternatives

discussed" and is "qualitatively within the spectrum of alternatives that were [already]

discussed."  *Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1045 (9th Cir. 2011)

(quoting Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act

Regulations, 46 Fed. Reg. 18,026, 18,035 (Mar. 23, 1981)).

---

[4] Defendants note that CBD's request asked for the analysis of an alternative deferring all parcels in Sage Grouse habitat "at least until such time as BLM completes a strategy for the implementation of the sage-grouse plan amendments."  WY079369.  Given that, at the time of CBD's letter relating to the February sale, the 2015 Sage Grouse Plan Amendments had been completed for nearly a year, it is not clear exactly what CBD meant by its request.

Plaintiffs also argue that BLM should have analyzed "a middle-ground alternative that would defer parcels in sage-grouse PHMA." Pls.' Opening Br. in Supp. of Mot. for Partial Summ. J. (Phase Two) at 17, ECF No. 247-1 ("Pls.' Br."). As discussed above, the argument fails at the threshold for two of the sales, because Plaintiffs never even proposed such an alternative during the comment period. Even if the argument is not waived, however, it fails on the merits. The cases that Plaintiffs cite for the proposition that an agency should consider a middle ground alternative, *see* Pls.' Br. at 18, are irrelevant here because, as discussed above, Plaintiffs are essentially proposing that BLM lease almost no parcels at all.[5] Further, *WildEarth Guardians v. BLM*, No. CV-18-GF-BMM, 2020 WL 2104760 (D. Mont. May 1, 2020), is inapposite here because the court found the alternatives analysis to be inadequate where BLM had failed to explain why stipulations that the plaintiffs proposed could not be applied, an issue not present here. *See id.* at *8. Plaintiffs' reliance on *Western Watersheds Project v. Abbey*, 719 F.3d 1035 (9th Cir. 2013), is likewise misplaced because, in that case, the court faulted BLM for not analyzing a no grazing or reduced grazing alternative, not because BLM did not analyze a middle ground alternative. *See id.* at 1050-51.

Finally, Plaintiffs ignore the fact that BLM deferred a significant number of parcels from its sales, thus effectively adopting a middle ground alternative. Those deferrals are summarized as follows: February 2017 Wyoming sale—49 parcels, WY09082-83; WY092042; June 2017 Wyoming sale—53 parcels, WY102606–08; September 2017 Wyoming sale—25 parcels.

---

[5] Plaintiffs cite multiple cases involving EISs for land use planning documents. *See High Country Conservation Advocates v. U.S. Forest Serv.*, 951 F.3d 1217 (10th Cir. 2020); *W. Org. of Res. Councils v. U.S. Bureau of Land Mgmt.*, No. CV 16-21-GF-BMM, 2018 WL 1475470, at *1 (D. Mont. Mar. 26, 2018); *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683 (10th Cir. 2009). These cases do not apply here because the requirement to analyze alternatives in an EA is less demanding than the requirement for an EIS. *See N. Idaho Cmty. Action Network*, 545 F.3d at 1153.

WY113315–16, WY113320–21; WY113577–78, WY113581.  For the Montana sale, there were

no deferrals (and no requests for deferrals), but out of 156 parcels, only 1 parcel was in PHMA,

66 in GHMA, and 2 in RHMA.  BLM-MT-2Q17-002426; *see also* BLM-MT-2Q17-000002.

In sum, BLM considered a reasonable range of alternatives and was not required to

analyze other alternative in more detail.

## II.     BLM Appropriately Analyzed Impacts to Sage Grouse

BLM adequately analyzed impacts to Sage Grouse from its leasing decisions in the EISs

for the 2015 Sage Grouse Plan Amendments and the EAs for the lease sales.

### A.     The EAs Appropriately Tiered to the EISs Prepared in Conjunction with the Sage Grouse Plan Amendment Process Completed in 2015

The EAs appropriately tiered to the analyses in the EISs prepared during the Sage Grouse

plan amendment process that culminated in 2015.  Plaintiffs' arguments that BLM's tiering to,

and incorporation of, the analyses in those documents was improper is wrong and misapprehends

how the NEPA process works in the context of oil and gas leasing.  Plaintiffs argue that the prior

EISs cannot "cure" the analyses in the EAs supporting the lease sales, Pls.' Br. at 28, but that

framing of the issue improperly inverts the analysis.  Tiering is an accepted—indeed,

encouraged—NEPA practice in which the agency conducts an analyses at successive phases of a

planning process or project.  *See* 40 C.F.R. § 1502.20 (encouraging agencies to tier so that they

may "focus on the actual issues ripe for decision at each level of environmental review").  When

an agency conducts NEPA in this fashion, the appropriate question is whether the prior NEPA

document and the current one, taken together, provide sufficient analysis to comply with NEPA,

not whether a prior analysis "cures" a later one.

"'Tiering, or avoiding detailed discussion by referring to another document containing

the required discussion, is expressly permitted' and encouraged under NEPA, so long as the

tiered-to-document has been subject to NEPA review." *W. Watersheds Project v. U.S. Bureau of Land Mgmt.*, 774 F. Supp. 2d 1089, 1098 (D. Nev. 2011) (quoting 40 C.F.R. § 1502.20), *aff'd*, 443 Fed. App'x. 278 (9th Cir. 2011); *See also Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1184 (9th Cir. 2011).  In the oil and gas context, tiering consists of conducting environmental analysis for broad planning level decisions and then building off to those analysis in more specific, subsequent decisions.  *See* 40 C.F.R. § 1508.28(b).  "Together, the EA and the programmatic EIS must provide the information necessary reasonably to enable the decision-maker to consider the environmental factors and to make a reasoned decision." *S. Or. Citizens Against Toxic Sprays, Inc. v. Clark*, 720 F.2d 1475, 1480 (9th Cir. 1983) (internal quotation marks and citation omitted).  Thus, "[o]nly where neither the general nor the site-specific documents address significant issues is environmental review rejected." *W. Watersheds Project*, 774 F. Supp. 2d at 1099 (citing *Te-Moak Tribe*, 608 F.3d at 602-07).

The EAs that BLM prepared in this case expressly tiered to, and incorporated by reference, the relevant analyses contained in the EISs prepared during the Sage Grouse plan amendment process.  BLM-MT-2Q17-002447 (Montana sale); WY090986-87 (February 2017 Wyoming sale, High Plains EA); WY092040-41, WY092081-82 (February 2017 Wyoming sale, Wind River/Bighorn Basin EA); WY102608, WY102675-77 (Wyoming June 2017 sale); WY113320-21, WY113355-56, WY133376-77 (September 2017 Wyoming sale, High Plains EA); WY113576, WY113621-25 (September 2017 Wyoming sale, Wind River/Bighorn Basin EA).  Thus, the Court must evaluate the prior EISs and the EAs together when evaluating BLM's NEPA compliance with respect to the leasing decisions.

Plaintiffs argue that BLM cannot rely "wholesale" on the prior EISs, but this strawman argument mischaracterizes the EAs at issue here.  Pls.' Br. at 28-29 (citing, *e.g.*, *Protect Our*

*Communities Found. v. LaCounte*, 939 F.3d 1029, 1039 (9th Cir. 2019)).  The EAs do not rely

wholesale on prior EISs.  Instead, they appropriately tier to and incorporate the prior analyses of

potential environmental impacts of oil and gas development based on reasonably foreseeable

development scenarios.  But even if the EAs *had* relied "wholesale" on the planning-level EIS,

there would be nothing per se inappropriate about it.  *See LaCounte*, 939 F.3d at 1039 (holding

that a planning level EIS sufficiently analyzed the site-specific action at issue).  In addition, the

appropriate degree of NEPA analysis is context specific.  As discussed further below, the Ninth

Circuit has not required BLM to prepare site specific analyses in the context of oil and gas

leasing decisions.  *See N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 977 (9th Cir. 2006)

(BLM was not required to conduct a "parcel by parcel examination of potential environmental

effects" to support a decision to offer a large area for oil and gas leasing).

Plaintiffs suggest that BLM's use of tiering was improper because the EAs did not

summarize the prior analyses contained in the EISs.  *See* Pls.' Br. at 30 (citing 40 C.F.R. §

1502.20).  The applicable regulation states that the agency "need only summarize the issues

discussed in the broader statement."  40 C.F.R. § 1502.20.  Plaintiffs ignore the regulation

governing incorporation by reference, which allows that agency to "cut down on bulk" and

requires only that the prior content be cited and "its content briefly described."  40 C.F.R. §

1502.21.  Together, these regulations require only a brief summary of prior analyses—which

BLM adequately provided here—and the Court should not find an EA to be "insufficient on the

basis of inconsequential, technical deficiencies."  *Swanson*, 87 F.3d at 343; 40 C.F.R. § 1500.3

("[I]t is not the Council's intention that any trivial violation of these regulations give rise to an independent cause of action."). [6]

Specifically, Plaintiffs argue that the Montana EA and the Wind River/Bighorn Basin EA for the February 2017 Wyoming sale lacked a summary of the prior analyses. *See* Pls.' Br. at 31. Both EAs, however, expressly incorporated by reference the prior EISs and briefly described their contents, thus meeting the requirement of the regulation. BLM-MT-2Q17-002447; WY090986. As to the remaining EAs, Plaintiffs concede that the EAs summarized the prior findings in the EISs, but argue that the summaries provided were inaccurate. *See* Pls.' Br. at 31. For example, they argue that the Wind River/Bighorn Basin EA for the September 2017 lease sale is inaccurate when it says that Sage Grouse would be protected. WY113624. This contention finds no support in the record, however, ass a fair reading of that section of the EA indicates that Sage Grouse would be protected through the application of the required stipulations and other conditions in the applicable RMP.

Plaintiffs, nevertheless, argue that the statement in the EA is inaccurate because they dispute that the requirements of the RMPs are sufficient to protect Sage Grouse. *See* Pls.' Br. at 31-32. But Plaintiffs cannot refute that BLM has complied with the requirements of the RMPs as amended through the 2015 Sage Grouse plan amendment process—indeed, they do not bring a FLPMA claim alleging that BLM's leasing decisions do not conform to the applicable RMPs.

---

[6] Plaintiffs argue that the requirement to summarize prior NEPA documents is "not a mere formality," but the case they rely on (in addition to being vacated) is inapposite. Pls.' Br. at 31 (quoting *Pac. Rivers Council v. U.S. Forest Serv.*, 689 F.3d 1012, 1031 (9th Cir. 2012), *vacated as moot*, 133 S.Ct. 2843 (2013)). In that case, the agency attempted to incorporate by reference two biological assessments prepared in conjunction with its Endangered Species Act compliance. *Id.* at 1031-32. Biological assessments are not NEPA documents and they were not attached as appendices to the EIS for public review. *See id.* No similar issues are presented in this case because BLM incorporated prior NEPA documents that underwent public comment (as Plaintiffs are undoubtedly aware).

Further, the protections they complain about, *e.g.*, lek buffers, were put in place as a result of the 2015 Sage Grouse plan amendment process. As a result of that process, FWS found that with the protections of federal and state plans in place, a listing of the Sage Grouse under the ESA was not warranted. 80 Fed. Reg. at 59,938. In that finding, FWS expressly noted that the "States of Wyoming, Montana, and Oregon completed plans with regulatory mechanisms that effectively reduce the loss and fragmentation of sage-grouse habitats." *Id.* at 59,936. Therefore, it is accurate to state that the Wyoming RMPs provide protections for Sage Grouse.

Further, the fact that oil and gas development generally may cause impacts to Sage Grouse does not violate NEPA. Plaintiffs point to various statements in the EISs describing impacts to Sage Grouse that may occur. *See*, *e.g.*, WY058679-80 (Buffalo EIS) (describing the need for continuous habitat and the harm to Sage Grouse that may occur from the fragmentation of that habitat). But the fact that BLM has analyzed potential impacts to Sage Grouse shows *compliance* with NEPA, not non-compliance. NEPA requires analysis of impacts, but does not require BLM always to choose actions that are the most protective of the environment. *See Strycker's Bay*, 444 U.S. at 227 (NEPA requires informed decision-making, but does not require an agency to "elevate environmental concerns over other appropriate considerations").

In sum, BLM's use of tiering and incorporation by reference was proper, and the Court should evaluate BLM's NEPA compliance based on both the EISs supporting the RMPs and the EAs prepared for the leasing decisions at issue.

### B.     BLM Analyzed the Baseline Conditions in Each Lease Area

BLM appropriately analyzed the baseline conditions in each of the leasing areas. That analysis is set forth in the EAs and incorporates applicable analysis from the EISs supporting the 2015 RMPs and RMPAs. Plaintiffs' claim that BLM did not collect and disclose sufficient information about Sage Grouse and its habitat in the applicable areas should be rejected.

In order to conduct a NEPA analysis, the agency must establish a baseline of environmental conditions. *Or. Nat. Desert Ass'n v. Rose*, 921 F.3d 1185, 1190 (9th Cir. 2019). This baseline enables the agency to evaluate the impacts that the proposed action would have on the environment. *See id.* To establish a baseline, "[a]n agency need not conduct measurements of actual baseline conditions in every situation—it may estimate baseline conditions using data from a similar area, computer modeling, or some other reasonable method." *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016).

Here, BLM appropriately established baseline environmental conditions regarding Sage Grouse in each of the leasing areas. The analysis with respect to each of the sales is briefly discussed below.

*Montana June 2017.* The EA for the June 2017 Montana sale explains that 1 lease parcel is in PHMA, 2 parcels in RHMA, and 66 parcels in GHMA. BLM-MT-2Q17-002426. None of the parcels are within 3.1 miles of a Sage Grouse lek. *Id.* The remaining 87 parcels are not in Sage Grouse habitat. *Id.* The EA also refers to Chapter 2 of the Miles City RMP, which contains additional discussion of Sage Grouse and its habitat. *Id.*; BLM-MT-2Q17-000175-190. The RMP shows how many acres of PHMA, RHMA, and GHMA are in each county within the planning area. BLM-MT-2Q17-00177. Additional analysis of baseline conditions relating to Sage Grouse is set forth in the Miles City EIS. BLM-MT-2Q17-00864-75.

*Wyoming February 2017 sale.* Two EAs were prepared for this lease sale: the High Plains EA and the Wind River/Bighorn Basin EA. The High Plains EA states that there are approximately 3,624,598 acres of PHMA within the High Plains District. WY091017. The parcels in PHMA and GHMA are referenced in Appendix A to the EA and identified in Appendix C. WY091025; WY091039-52; WY091055-935. Further information about the

condition of Sage Grouse, its habitat, and population trends is contained in the Buffalo EIS and the Wyoming Nine EIS.  WY057882-87 (Buffalo EIS); WY060856-61, WY060903-08 (Wyoming Nine EIS).  The Wind River/Bighorn Basin EA discloses that 457.02 acres (3.58% of the acreage offered) is in PHMA and 12,469.76 acres (96.42% of the acreage offered) is in GHMA.  WY092081.  All 10 parcels in Sage Grouse habitat are in the Lander Field Office, and the EA refers to the analysis of baseline conditions in the Lander EIS.  *Id.*; WY055727-29 (Lander EIS) (discussing Sage Grouse habitat conditions and populations).  The EA also refers to the baseline conditions analyzed in the Bighorn Basin EIS.  WY092982; WY064226-30 (Bighorn Basin EIS).

*June 2017 Wyoming sale.*  The EA for the June 2017 Wyoming sale discloses that of the 28 parcels offered for sale, 6 are in PHMA and 21 parcels are in GHMA.  WY102612, 102652. The EA further explains that the 6 parcels in PHMA are "proximate or adjacent to existing production (within 2 miles of leases currently held by production), have moderate to very high potential for oil and gas development, and only one has an active [Sage Grouse] lek within its boundaries."  WY102652-53.  The parcels offered within PHMA are also in areas that do not exceed the 5% cumulative disturbance threshold.  WY102653.  The EA also explains that the parcels in PHMA may provide nesting, breeding, or wintering habitat to Sage Grouse.  *Id.* Additional analysis of the baseline is contained in the Wyoming Nine EIS to which the EA tiers. WY060856-61, WY060903-08 (Wyoming Nine EIS).

*September 2017 Wyoming sale.*  Two EAs were prepared for the September 2017 Wyoming sale:  the High Plains EA and the Wind River/Bighorn Basin EA.  The High Plains EA states that there are approximately 3,624,598 acres of PHMA within the High Plains District. WY1133555-56.  Of the 158 parcels analyzed in the EA, 75 are in PHMA (44% of the acreage)

and 61 are in GHMA (51% of the acreage).  WY113363.  The parcels in PHMA and GHMA are

referenced in Appendix A to the EA and identified in Appendix C.  WY113363; WY113384-93;

WY113396-507.  Further information about the condition of Sage Grouse, its habitat, and

population trends is contained in the Buffalo EIS and the Wyoming Nine EIS.  WY057882-87

(Buffalo EIS); WY060856-61, WY060903-08 (Wyoming Nine EIS).  The Wind River/Bighorn

Basin EA discloses that of the 11 parcels analyzed in the EA, 2 parcels are within PHMA.

WY113621-24.  Overall, of the 6,586.16 acres offered for sale, 10.32% is in Sage Grouse

habitat:  8.52% of the acreage offered is in PHMA and 1.8% is in GHMA.  WY113624.

Additional analysis of the baseline conditions with respect to Sage Grouse is contained in the

Bighorn Basin EIS.  WY092982; WY064226-30 (Bighorn Basin EIS).

The analyses of baseline conditions described above satisfies NEPA.  Plaintiffs cite two

cases involving Sage Grouse to support their position that the baseline analyses were inadequate,

but neither of those cases is at all similar to the facts presented here.  In *Northern Plains*

*Resource Council v. Surface Transportation Board*, 668 F.3d 1067 (9th Cir. 2011), the court

found that the agency had not established baseline conditions with respect to Sage Grouse and

other wildlife because it had not gathered data on those species and instead required the applicant

to conduct surveys only as mitigation *after* the construction of the rail line was approved.  *See id.*

at 1183-85.  In *Wildearth Guardians v. Montana Snowmobile Association*, 790 F.3d 920 (9th Cir.

2015), the court found that the Forest Service had violated NEPA by not providing information

or maps showing where big game winter range was within the applicable area.  *Id.* at 925-28.  In

contrast, the EISs prepared during the plan amendment process and the EAs prepared for the

leasing decisions contain ample information regarding the location of Sage Grouse, particular

kinds of habitat, and Sage Grouse leks in the applicable areas, as well as maps showing types of

Sage Grouse habitat.[7]  *See, e.g.*, BLM-MT-2Q17-000182-85, -000272-77 (maps) (Miles City

RMP); BLM-MT-2Q17-000866-70, -001118, -001290-91 (Miles City EIS); WY06818-20,

WY060856-61, WY060903-09, WY060954-55, WY601189-92, WY061917-45 (maps)

(Wyoming Nine EIS); WY057877-87, WY059177 (maps 36-40) (Buffalo EIS); WY068113

(map), WY068374-75, WY068716 (map), WY068977-78, WY068999-69002 (Cody and

Worland RMPs); WY064226-30 (Bighorn EIS); WY055345-51, WY055727-29, WY054291-92

(Lander EIS); *see also* WY072143-444 (Wyoming Statewide Sage-Grouse Job Completion

Report 2016).

Nevertheless, Plaintiffs argue that BLM had additional information in its own databases

and through the state agencies that it could have disclosed in the EAs.  *See* Pls.' Br. at 20-21.

Plaintiffs are correct that BLM generally obtains information from state agency databases.  *See*,

*e.g.*, BLM-MT-2Q17-000864-66; WY057682083.  But Plaintiffs point to no additional

information regarding lek data or population trends that BLM should have considered.  Instead,

they merely speculate that additional updated information could have been in the state databases.

To the extent Plaintiffs are claiming that BLM was required to update its information based on

the state databases, they are incorrect.  Because the EISs for the Plan Amendments were

completed in 2015, the information obtained during the plan amendment process was 1 or at

most 2 years old, and therefore BLM did not rely on stale data in preparing the EAs.  *See N.*

*Plains Resource Council*, 668 F.3d at 1085-87 (finding that reliance on surveys that were 10

years old and older violated NEPA).

---

[7] The state agencies, as well as BLM, do not generally disclosure the exact location of leks out of
concern for the protection of Sage Grouse and its habitat.  *See*
https://wgfd.wyo.gov/Habitat/Sage-Grouse-Management/Sage-Grouse-Lek-Viewing-Guide;
http://fwp.mt.gov/fishAndWildlife/management/sageGrouse/.

Plaintiffs also argue that there is additional information in the record about Sage Grouse populations that was not disclosed to the public and was not analyzed during the NEPA process. *See* Pls.' Br. at 21 (citing WY099466-71; WY075151-66; WY106976-7013; WY088545-51). The documents that Plaintiffs cite are preliminary analyses of the parcels in relation to Sage Grouse habitat.  *See*, *e.g.*, WY099466-71.  BLM used that information to aid in its analysis and, in some instances, to make decisions to defer parcels in Sage Grouse habitat.  WY090982-83. Moreover, within PHMA and/or GHMA, the EA indicates that NSO, CSU, and/or timing limitation ("TLS") stipulations were applied to protect Sage Grouse.  WY091025, WY091055-935 (High Plains EA Appendix C).  For example, parcel WY-1702-027 contains CSU and TLS stipulations, *see* WY091058-62, and more specifically, it contains a TLS stipulation "to seasonally protect Greater Sage-Grouse breeding, nesting and early brood-rearing habitats outside of designated PHMA (Core and Connectivity), within two miles of an occupied lek." WY091062.  Thus, contrary to Plaintiffs assertion, the record shows that BLM did analyze information about Sage Grouse populations and used such information to make decisions about which parcels to lease and what stipulations to apply.

To the extent Plaintiffs are claiming that all of the information BLM analyzed during the NEPA process was required to be circulated with the EA for public review and comment in the same form that BLM evaluated it, they are incorrect.  The Ninth Circuit has stated that in order to meet the public participation requirement of NEPA, "An agency, when preparing an EA, must provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process."  *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 953 (9th Cir. 2008).  BLM clearly did so here by providing 30-

day public comment periods on the EAs, together with the ample public review opportunities afforded during the planning amendment process.  There was ample information in the EAs for the public to weigh in with their views, and the fact that BLM did not include in the EA all of the descriptions or maps it considered during the NEPA process does not render the description of the baseline inadequate.

In sum, BLM provided adequate baseline information on Sage Grouse habitat within the leasing areas.

### C.     BLM Analyzed Impacts to Sage Grouse In Sufficient Detail at the Oil and Gas Leasing Stage

BLM conducted an appropriate analysis of impacts to Sage Grouse at the oil and gas leasing stage.  Plaintiffs' argument to the contrary presumes that BLM was required to prepare a "site specific" analysis, but such an analysis is not required by Ninth Circuit precedent.  Further, Plaintiffs do not identify any site specific project, *i.e.*, specific oil and gas development projects that had been proposed to BLM at the time of its leasing decisions.  Absent specific proposals, there were no site specific projects for BLM to analyze, and BLM was not required to engage in speculative analysis of the possible impacts of future projects.

As a legal matter, Plaintiffs are incorrect that NEPA requires BLM to conduct a site specific analysis at the lease sale stage.  It is well established that the decision to offer oil and gas leases without an NSO stipulation is an "irretrievable commitment of resources" towards permitting development activities to occur, and thus the agency is required to conduct a NEPA analysis before making such a decision.  *See Conner v. Burford*, 848 F.2d 1441, 1451 (9th Cir. 1988); *see also New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 717-18 (10th Cir. 2009); *Sierra Club v. Peterson*, 717 F.2d 1409, 1414-15 (D.C. Cir. 1983).  Thus,

*Conner* establishes that the leasing decision triggers the obligation to comply with NEPA, but it does not dictate the degree of NEPA analysis that is required at the leasing stage.

Further, *Conner* does not require BLM to analyze the potential impacts of developing particular sites. At the time of a leasing decision, BLM does not know which sites will be developed within the leased parcels, which may encompass thousands of acres, and it has no development plans before it. It is therefore appropriate for BLM to leave the analysis of specific development plans to a later stage. *See N. Alaska*, 457 F.3d at 977 (BLM was not required to conduct a "parcel by parcel examination of potential environmental effects" to support a decision to offer a large area for oil and gas leasing); *Te-Moak Tribe*, 608 F.3d at 600 ("BLM, in some cases, may adapt its assessment of environmental impacts when the specific locations of an exploration project's activities cannot reasonably be ascertained until some time after the project is approved.").[8]

Indeed, in *Northern Alaska*, the Ninth Circuit clarified its prior ruling in *Conner* and addressed the very point that Plaintiffs are arguing here. *Northern Alaska* involved BLM's decision to offer a large area in northern Alaska—the Northwest Planning Area—for oil and gas leasing. 457 F.3d at 973. Relying on *Conner*, the plaintiffs argued that BLM was required to analyze the impacts of developing particular parcels before approving the area for leasing. *Id.* at 976. The Ninth Circuit explained, however, that on the issue of whether the analysis of particular parcels is required by NEPA, "*Conner* is of no assistance to plaintiffs, for we did not

--------------------------------

[8] *Native Village of Point Hope v. Jewell*, 740 F.3d 489 (9th Cir. 2014), involved the Bureau of Ocean Energy Management's offshore leasing program and therefore it has minimal relevance here. In any event, the Ninth Circuit cited approvingly its prior decision in *Northern Alaska*: "[a]t the earliest stage, the leasing stage we have before us, there is no way of knowing what plans for development, if any, may eventually materialize." *Id.* at 497 (quoting *N. Alaska*, 457 F.3d at 977).

discuss the degree of site specificity required in the EIS." *Id.* The court went onto explain that "NEPA applies at all stages of the process" and "[a]ny later plan for actual exploration will be subject to a period of review before being accepted, rejected or modified by the Secretary." *Id.* at 977. Therefore, the court concluded that at the time the decision was made to lease the area, "the government was not required to do a parcel by parcel examination of potential environmental effects." *Id.* Rather, "[s]uch analysis must be made at later permitting stages when the sites, and hence more site specific effects, are identifiable." *Id.* Thus, BLM was permitted by NEPA to defer the analysis of specific parcels until later stages of development.[9]

The Tenth Circuit's decision in *Richardson* is in accord with the Ninth Circuit's view that a site specific analysis is not generally required at the oil and gas leasing stage. *See Richardson*, 565 F.3d at 718. Like the Ninth Circuit in *Conner*, the Tenth Circuit concluded that the issuance of a non-NSO lease was an irreversible and irretrievable commitment of resources requiring the preparation of a NEPA analysis. *Id.* at 718. As to the level of analysis required at the leasing stage, the court found that it was a fact specific inquiry that was dependent on the information available to the agency about particular plans for exploration and development. *Id.* In that case, because BLM had information on particular plans for development at the time of its leasing decision, the potential impacts of such development were reasonably foreseeable at that time and required NEPA analysis. *Id.* at 718-19. But the court reached that decision because specific plans for development had already been developed, which is not the case here.

---

[9] Relying on *Conner*, Plaintiffs state, "Such analysis [*i.e.*, analysis of site specific impacts] cannot be deferred to the APD stage." Pls.' Br. at 22 (citing *Conner*, 848 F.2d at 1449-50). *Conner* does not hold that; instead, it says only that the agency cannot entirely avoid an analysis of environmental impacts at the leasing stage. 848 F.2d at 1449-51.

BLM appropriately analyzed potential impacts to Sage Grouse from its leasing decisions in the EAs for the leasing decisions and the underlying EISs for the 2015 Plan Amendments. The applicable analyses with respect to each of the four leasing decisions are discussed below.

*Montana June 2017.*  For the June 2017 Montana sale, BLM prepared a reasonably foreseeable development scenario ("RFD"), in which it estimated that the proposed lease sale would result in the development of 11 gas wells and 3 oils wells.  BLM-MT-2Q17-002603.  The wells are broken down by county.  *Id.*  For the analysis of direct, indirect, and cumulative effects from oil and gas development, the EA for the June 2017 Montana sale expressly incorporates by reference Chapter 4, pages 4-105-4-179, of the Miles City EIS.  BLM-MT-2Q17-002447; BLM-MT-2Q17-001265-1339.  Chapter 4 of the EIS analyzes the potential impacts to Sage Grouse from oil and gas development, as well as other types of impacts.  *See id.*  Specifically, it discloses the acreage of permanent and temporary disturbance under reach alternative.  BLM-MT-2Q17-001268-91; BLM-MT-2Q17-001641-46 (Disturbance Appendix).  And it analyzes the impacts to GHMA and PHMA from oil and gas development under each alternative.  *Id.*  The proposed alternative (alternative E, which was later selected) was the most protective alternative, and provided a "two-mile consideration," meaning a controlled surface use ("CSU") stipulation, on 652,000 acres of GHMA.  BLM-MT-2Q17-001290.

Under a CSU stipulation, surface occupancy and use within two miles of a lek active within the past five years may be restricted or prohibited.  BLM-MT-2Q17-001852 (Miles City RMP); BLM-MT-2Q17-002597 (EA).  The restriction on surface occupancy and use ensures that breeding, nesting, brood rearing, and winter habitat within GHMA will be protected.  BLM-MT-2Q17-001290.  In PHMA, the proposed alternative protects 817,000 acres of BLM administered land and a total of 1,329,000 acres of BLM administered mineral estate (including surface estates

owned by the state or private parties).  BLM-MT-2Q17-001291.  Further, the EIS explains that

the protections in the proposed alternative would conserve "breeding, nesting, brood rearing and

winter habitats for greater sage grouse."  *Id.*  The protections for sage grouse habitat, "coupled

with the 3% cumulative disturbance cap and a 5% project disturbance cap, ensure[] that BLM

administered lands will continue to provide connectivity and the multiple habitats available for

greater sage grouse."  *Id.*; *see also* BLM-MT-2Q17-1293-98.  The EIS also contains a lengthy

discussion of cumulative impacts, BLM-MT-2Q17-001292-1339, which will be discussed in

section III, *infra*.  Finally, as noted above, in the June 2017 lease sale, there was only 1 lease

parcel in PHMA, and none of the parcels are within 3.1 miles of a lek.  BLM-MT-2Q17-002426;

*see also* BLM-MT-2Q17-001679-80 (Buffer Appendix).

　　　　*Wyoming February 2017.*  As discussed above, two EAs were prepared for the February

2017 Wyoming sale:  the High Plains EA, WY090976-1038, and the Wind River/Bighorn EA,

WY0092035-88.  In the High Plains EA, BLM discusses the development that would occur in

the context of oil and gas leasing and explains that it would cause fragmentation of Sage Grouse

habitat.  WY091033-34.  The EA discusses population trends, explaining that Sage Grouse

populations in the High Plains District peaked in 2006, then declined, and more recently have

rebounded.  WY091034.  The EA explains that in order to "promote Greater Sage-grouse

conservation, additional restrictions on oil and gas leases are need to limit potential adverse

impacts from development activities.  *Id.*  Thus, when specific site development activities are

proposed, BLM will "conduct a site-specific review of the proposal and potential disturbance

within the current Greater Sage-grouse habitat boundaries."  *Id.*  In order to accomplish BLM's

Sage Grouse conservation objective, as well as the State of Wyoming's Greater Sage Grouse

conservation strategy, BLM may require additional measures to avoid impacts to Sage Grouse,

including density/disturbance limitations and timing restrictions in proximity to habitat. *Id.* The High Plains EA also incorporates by reference the analyses in the Buffalo EIS and the Wyoming Nine EIS, which contain extensive analyses of the potential impacts to Sage Grouse from oil and gas development. WY058634-744 (Buffalo EIS); WY061454-550 (Wyoming Nine EIS).

The Wind River/Bighorn EA discloses that, of the 10 parcels analyzed, 457.02 acres (3.58% of the acreage offered) would be in PHMA and 12,469.76 acres (96.42% of the acreage) would be in GHMA. WY092081. The EA explained that additional analysis would be conducted at the APD stage to evaluate potential impacts to Sage Grouse and to develop mitigation to avoid such impacts. *Id.* The EA tiers to and incorporates by reference the analysis of impacts to Sage Grouse in the Bighorn Basin EIS and the Lander EIS, and due to two parcels overlapping with the Rawlins Field Office, the Wyoming Nine EIS as well. WY092081-82. The referenced EISs contain thorough analyses of the potential impacts to Sage Grouse across the respective planning areas. WY064701-57 (Bighorn Basin EIS); WY054285-334; (Lander EIS). Two parcels that overlap with the Rawlins Field Office were analyzed in May 2016 EA, WY092082, which tiered to the Wyoming Nine EIS (WY061454-550).

*Wyoming June 2017.* The EA for the June 2017 Wyoming sale discusses the impacts of the leasing decision on Sage Grouse. WY102675-77. As discussed in the EA, oil and gas activity may lead to fragmentation of Sage Grouse habitat. WY102675. The EA also states that additional mitigation to protect Sage Grouse may be required following additional analysis at the time the parcels are developed. WY102675-76. The EA also expressly tiers to Section 4.14 of the Wyoming Nine EIS. WY012675. Section 4.14 of the EIS contains an extensive discussion of the potential impacts to Sage Grouse caused by oil and gas leasing and other causes. WY061454-550.

*Wyoming September 2017.*  For the September 2017 Wyoming sale, BLM prepared two

EAs:  the High Plains EA, WY113308-83, and the Wind River/Bighorn Basin EA, WY113571-

634.  The High Plains EA discusses impacts to Sage Grouse and population trends within the

High Plains District.  WY113376-77.  Further, the EA discusses the need to incorporate

additional mitigation to protect Sage Grouse from impacts due to oil and gas leasing and that

such measures would be evaluated when BLM considers APDs.  WY113377.  The High Plains

EA also incorporates by reference the analyses in the Buffalo EIS and the Wyoming Nine EIS,

which contain extensive analyses of the potential impacts to Sage Grouse from oil and gas

development.  WY058634-744 (Buffalo EIS); WY061454-550 (Wyoming Nine EIS).

The Wind River/Bighorn EA discloses that of the 11 parcels analyzed, two parcels are

within Sage Grouse habitat.  WY113621.  The EA explained that additional analysis would be

conducted at the APD stage to evaluate potential impacts to Sage Grouse and to develop

mitigation to avoid such impacts.  WY113621-22.  The EA tiers to and incorporates by reference

the analysis of impacts to Sage Grouse in the Bighorn Basin EIS and the Lander EIS, and due to

two parcels overlapping with the Rawlins Field Office, the Wyoming Nine EIS as well.

WY092081-82.  The referenced EISs contain thorough analyses of the potential impacts to Sage

Grouse across the respective planning areas.  WY064701-57 (Bighorn Basin EIS); WY054285-

334; (Lander EIS).  Two parcels that overlap with the Rawlins Field Office were analyzed in

May 2016 EA, WY092082, which tiered to the Wyoming Nine EIS (WY061454-550).

The analyses described above met BLM's NEPA obligations at the lease sale stage.

Plaintiffs argue that the analyses were too general.  *See* Pls.' Br. at 24-25 (citing *Blue Mtns.*

*Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998)).  The *Blue Mountains*

case, however, is inapposite here.  *Blue Mountains* involved the authorization of a timber sale,

after which logging can proceed without further approval from the agency.  *See* 161 F.3d at

1210.  In the context of the approved timber sale, the court found the analysis of the impacts of

erosion and increased sediment from logging to be insufficient.  *Id.*  at 1213.  But an oil and gas

lease sale is different.  As discussed above, the sale itself does not allow any immediate

development to occur; instead, actual development occurs after BLM's approval of an

application for drilling permits—a decision process that it itself subject to additional NEPA

analysis.  *See* Background, section I.C., *supra*.  It is also not known at the leasing stage where

and when development will occur.  *See id.*  Therefore, courts have allowed agencies to provide

more general NEPA analysis and to defer more detailed, site-specific analyses to a later stage,

when BLM is considering whether to approve drilling permits.  *See N. Alaska*, 457 F.3d at 977

("[W]e conclude that the government was not required at this stage to do a parcel by parcel

examination of potential environmental effects.  Such effects are currently unidentifiable,

because the parcels likely to be affected are not yet known."); *Center for Biological Diversity v.*

*U.S. Bureau of Land Mgmt.*, No. 3:17-CV-553-LRH-WGC, 2019 WL 236727, at *6 (D. Nev.

Jan. 15, 2019) (upholding an EA for an oil and gas leasing decision and rejecting the argument

that a site specific analysis was required at the lease sale stage).[10]

     The *Wildearth Guardians* cases that Plaintiffs rely on, *see* Pls.' Br. at 23-24, are different

because they involve the degree to which BLM can and should analyze greenhouse gas

emissions at the leasing stage.  In fact, in the cases brought in the District of Columbia, the court

agreed with the government that "BLM could not reasonably foresee the projects to be

_____

[10] *Oregon Natural Desert Association* likewise does not support Plaintiffs' arguments here
because in that case, the EA contained "virtually no references to any material in support of or in
opposition to its conclusions."  921 F.3d at 1191 (quoting *Blue Mtns. Biodiversity Project*, 161
F.3d at 1214).

undertaken on specific leased parcels, nor could it evaluate the impacts of those projects on a parcel-by-parcel basis." *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 66 (D.D.C. 2019). The Court found, however, that the analysis of greenhouse gas emission was different because BLM could analyze the potential impacts of the aggregate emissions across the leased area without analyzing the potential impacts of specific development projects. *Id.* at 67-69.

Similarly, the Montana court recognized that, due to the nature of BLM's multi-phase leasing process, NEPA does not require a detailed analysis of all impacts at the leasing stage. *See Wildearth Guardians*, 2020 WL 2104760, at *2, 5-6. As the court recognized, "BLM has no guarantee at the leasing stage of what, if any, projects may materialize for [a lease] parcel." *Id.* at *5. The court further recognized that "BLM's ability to assess impacts at the leasing stage may vary greatly depending on the impact that it considers." *Id.* The court found that additional analysis of impacts to water quality and greenhouse gas emissions could have been conducted at the leasing stage, *id.* at *6, 10-11, but those findings cannot be extended to impacts to Sage Grouse because such impacts are dependent on the location and type of oil and gas development project that may be subsequently proposed. Notably, in the case involving Sage Grouse in Montana, the plaintiffs made similar NEPA arguments to the ones that Plaintiffs make here, and the court did not reach the NEPA issues. *See Montana Wildlife Federation*, 2020 WL 2615631.

Plaintiffs argue that BLM could have conducted a more detailed analysis because it had information at its disposal regarding lek locations, population trends, and threats to Sage Grouse from oil and gas development. *See* Pls.' Br. at 25. But what they cannot, and do not, refute is that BLM did not have information about the *location* of site specific oil and development projects; nor does BLM know when they will be proposed or what the projects will entail. Therefore, BLM was not required to conduct a more detailed analysis at the lease stage. *See*

*Center for Biological Diversity*, 2019 WL 236727, at \*6.  The analysis that Plaintiffs are asking

for would have required BLM to speculate about the location of nature of drilling operations,

which generally occupy approximately 10 acres,[11] within lease parcels that may be 1,000 acres

or more.  WY098724 (showing that a lease parcel offered at the February 2017 Wyoming sale

was approximately 2,500 acres).  Such speculation is not required by NEPA.  *See Northcoast*

*Envtl. Ctr. v. Glickman*, 136 F.3d 660, 668 (9th Cir. 1998) ("NEPA does not require an agency to

consider the environmental effects [of] speculative or hypothetical projects.").

   Plaintiffs also stress the importance of connectivity corridors to Sage Grouse, relying

largely on the analyses in the EISs prepared by BLM.  *See* Pls.' Br. at 26.  Plaintiffs are wrong

that BLM did not consider connectivity habitat in its leasing process.  In fact, for the February

2017 sale, BLM recommended deferring several parcels in connectivity habitat.  *See*

WY088536-51.  Of the 20 parcels identified in PHMA connectivity habitat, 15 parcels were

deferred from the sale.  *Compare* WY088545-51 (list of parcels with recommended deferrals)

*with* WY090982-83 (list of parcels deferred due to Sage Grouse concerns in the High Plains EA).

Moreover, the importance of connectivity habitat is irrelevant to the fact that BLM cannot

identify where oil and gas development projects will occur at the leasing stage, and thus does not

support Plaintiffs' contention that a more site specific analysis was possible.  And the cases

Plaintiffs cite regarding the importance of connectivity habitat do not apply here because those

cases involved the impacts of specific projects on Sage Grouse habitat, not whether more

analysis was reasonably possible at the oil and gas leasing stage.  *See Or. Natural Resources*

---

[11] The area taken up by well pads and related equipment varies, but generally an oil and gas
location entails 2.75 to 23 acres of initial disturbance and 2 to 10 acres of long term disturbance,
depending on the number of wells and the type of wells on the well pad.  WY067743 (Buffalo
RMP Appendix O).

*Council Fund v. Goodman*, 505 F.3d 884, 892-93 (9th Cir. 2007) (finding that the Forest Service failed to adequately analyzed the impacts of a ski area expansion project on wildlife corridor); *Marble Mtn. Audubon Soc'y v. Rice*, 914 F.2d 179, 180-81 (9th Cir. 1990) (finding that the Forest Service failed to adequately analyze the impacts of a timber sale on a biological corridor).

In sum, Plaintiffs have failed to demonstrate that BLM's analysis of impacts to Sage Grouse at the oil and gas leasing stage violated NEPA.

## III.    BLM Appropriately Analyzed the Cumulative Impacts to Sage Grouse in Each of the Lease Areas

BLM appropriately analyzed the cumulative impacts to Sage Grouse from its leasing decisions.  Like its analysis of effects from the leasing decisions, the analysis of cumulative impacts tiers to the analysis of cumulative impacts in the EISs for the 2015 Sage Grouse plan amendment process, which was entirely appropriate.  In order to bolster their arguments, Plaintiffs seek to isolate the EAs from the EISs to which they expressly tier, but their arguments are contrary to NEPA.  Further, the EISs analyze impacts across geographic zones established by the Western Area Fish and Wildlife Agencies ("WAFWA"), which was eminently reasonable and is entitled to deference.

An EA must analyze the cumulative impacts of the proposed action.  *Bering Strait Citizens*, 524 F.3d at 954.  A "cumulative impact" is defined in CEQ's NEPA regulations as "the impact on the environment which results from the incremental impacts of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  *Montana Wilderness Ass'n.*, 725 F.3d at 1001 (quoting 40 C.F.R. § 1508.7).  The analysis of cumulative effects should include "some quantified or detailed information that results in a useful analysis."  *Ctr. for Envtl. Law and Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1007 (9th Cir. 2011) (citation

and internal quotation marks omitted).  "An agency may, however, characterize the cumulative effects of past actions in the aggregate without enumerating every past project that has affected an area."  *Id.*  As with the analysis of impacts, in analyzing cumulative impacts, an agency may tier to a prior NEPA analysis.  *See Sierra Forest Legacy*, 646 F.3d at 1184; *see also S. Or. Citizens Against Toxic Sprays*, 720 F.2d at 1480.

An agency's choice of the geographic scope of the cumulative impacts analysis is entitled to deference.  *Kleppe*, 427 U.S. at 414.  BLM's determination of the scope is a "task assigned to the special competency of the appropriate agencies."  *Id.*  The Ninth Circuit recognized the appropriateness of such deference in *Selkirk Conservation Alliance. v. Forsgren*, 336 F.3d 944 (9th Cir. 2003), in which it sustained decisions of the Forest Service and the Fish and Wildlife Service.  As the court noted, "[t]he task of selecting the geographic boundaries of an EIS requires a complicated analysis of several factors, such as the scope of the project considered, the features of the land, and the types of species in the area."  *Id.* at 958.  As discussed below, the EAs for the four leasing decisions at issue tiered to the EISs for the 2015 plan amendment processes, and each of those EISs applied appropriate geographic zones based on the habitat zones developed by WAFWA.  The applicable analyses are discussed below.

*Montana June 2017.*  The EA for the June 2017 Montana sale tiers to the extensive discussion of cumulative impacts in the Miles City EIS.  BLM-MT-2Q17-002454; BLM-MT-2Q17-001292-1339.  As explained in the EIS, the cumulative impacts analysis covers WAFWA Management Zone ("MZ") I.  BLM-MT-2Q17-001298.  WAFWA developed the management zones in coordination with BLM, the Forest Service, and other entities, and they later were incorporated into the National Greater Sage Grouse Conservation Strategy undertaken by BLM in conjunction with other federal and state agencies.  WY067940-46.  The management zones

were adopted by BLM and formed the basis for the division of the planning effort into two regions and multiple sub-regions.  WY067946; *see also* WY67944 (map of WAFWA MZs).

The cumulative impacts analysis sets forth the existing conditions with respect to Sage Grouse in MZ I, discusses population trends, and regional and statewide efforts regarding Sage Grouse conservation.  BLM-MT-2Q17-001300-08.  The EIS lists the past, present, and reasonably foreseeable projects relating to oil and gas activities across MZ I and analyzes the potential impacts of those activities when combined with the proposed action.  BLM-MT-2Q17-001308-39.

*Wyoming February 2017.*  For the February 2017 Wyoming sale, there are two EAs:  the High Plains EA and the Wind River/Bighorn EA.  The analysis of cumulative impacts in the High Plains EA tiers to and incorporates the analysis of cumulative impacts in the Buffalo EIS and Wyoming Nine EIS.  WY090986, WY091035.  The Buffalo EIS analyzes the cumulative impacts to Sage Grouse across WAFWA MZ I.  WY058693.  The EIS contains a thorough analysis of cumulative impacts.  WY058693-744; WY059065-70.  Among other things, the EIS analyzes the potential cumulative impacts of oil and gas development in light of past, present, and reasonably foreseeable future oil and gas projects.  *See*, *e.g.*, WY058707-13, WY058736-44.  The Wyoming Nine EIS likewise contains an analysis of cumulative impacts, which is discussed below in the context of the June 2017 Wyoming sale.

The Wind River/Bighorn EA tiers to and incorporates by reference the Bighorn Basin EIS, the Lander EIS, and the Wyoming Nine EIS.  WY092040-41.  The Bighorn Basin EIS analyzes cumulative impacts across WAFWA MZ II/VII, WY065154, and contains a thorough analysis of such impacts.  WY065154-212.  The Lander EIS, which was completed prior to the completion of the 2015 Plan Amendment process, analyzed cumulative impacts across the State

of Wyoming, WY054646, and contains a thorough analysis of such impacts.  WY054645-58.

Finally, the cumulative impacts analysis in the Wyoming Nine EIS is discussed below.

*Wyoming June 2017.*  The EA for the June 2017 Wyoming sale tiers to the discussion of

cumulative impacts in the Wyoming Nine EIS.  WY102692.  That analysis is set forth in Section

4.22 and 4.23 of the EIS.  WY061668-61790.  The EIS analyzes cumulative impacts across

WAFWA MZs I and II/VII and contains a lengthy listing and discussion of past, present, and

reasonably foreseeable future actions and analyzes their impacts.  *Id.*  The EIS discusses Sage

Grouse population trends in MZ I and II/VII and regional Sage Grouse conservation efforts.

WY061718-25.  Among other things, the EIS lists oil and gas related projects, and analyzes the

potential cumulative impacts of oil and gas development on Sage Grouse across WAFWA MZs I

and II/VII.  *See*, *e.g.*, WY061726-33, WY061756-60.

*Wyoming September 2017.*  There are two EAs for the September 2017 Wyoming sale.

The analysis of cumulative impacts in the High Plains EA tiers to and incorporates the analysis

of cumulative impacts in the Buffalo EIS and Wyoming Nine EIS.  WY113320, WY113379.

The analysis of cumulative impacts in the Wind River/Bighorn EA tiers to and incorporates by

reference the cumulative impacts analyses in the Bighorn EIS and the Lander EIS.  WY113576,

WY113621-25. The applicable analyses in the respective EISs are cited and described above.

By tiering to the cumulative impacts analyses in the EISs prepared as part of the 2015

Sage Grouse plan amendment process, BLM fulfilled its obligation to analyze the cumulative

impacts of its oil and gas leasing decisions.  Because Plaintiffs focus primarily on the EAs, and

not the EISs to which they tier, many of the cases they cite are simply inapposite.  *See Great*

*Basin Mine Watch v. Hankins*, 456 F.3d 955, 972-74 (9th Cir. 2006) (finding that two EISs

prepared for two gold mining permits failed to adequately analyze cumulative impacts); *Great*

*Basin Mine Res. Watch*, 844 F.3d at 1105-06 (finding that the cumulative impacts analysis in an

EIS relating to a molybdenum mine was inadequate); *Native Vill. of Point Hope*, 740 F.3d at 504

(finding inadequate the cumulative impacts analysis in an EIS for an offshore lease sale). Unlike

these cases, BLM here tiered to its earlier cumulative impacts analyses, which were more than

adequate to meet BLM's NEPA obligations. *See W. Watersheds Project v. Lueders*, 122 F.

Supp. 3d 1039, 1049-51 (D. Nev. 2015) (finding that BLM's analysis of cumulative impacts was

sufficient where the agency tiered to prior EISs).

In an effort to show that the cumulative impacts analyses for the leasing decisions were

inadequate, Plaintiffs cite to portions of the Miles City EIS, discussing the sensitivity of Sage

Grouse to habitat fragmentation. *See* Pls.' Br. at 33 (citing BLM-MT-2Q17-001309-10). But

Plaintiffs cannot have it both ways. They cannot ignore the EISs for the Sage Grouse Plan

Amendments for purposes of BLM's NEPA compliance and, at the same time, cite to those EISs

to show that BLM did not sufficiently analyze potential impacts to Sage Grouse. BLM's NEPA

compliance is based on both the analyses in the EISs and the analyses in the EAs.[12]

Taking a different tack, Plaintiffs then argue that reliance on the cumulative impacts

analyses in the EISs was improper because those analyses covered too great an area. *See* Pls.'

Br. at 34-35. They argue, for example, that the analysis of cumulative impacts in the Miles City

EIS is too broad because it covers all of WAFWA MZ I. *Id.* at 35. Plaintiffs are wrong because

an agency's choice of the geographic scope of the cumulative impacts analysis is entitled to

deference, and they have demonstrated no grounds for disturbing that deference here. *See*

_____

[12] Plaintiffs also argue that BLM cannot wait to analyze cumulative impacts at a later stage. *See*
Pls.' Br. at 34 (citing *Native Vill. of Point Hope*, 740 F.3d at 504). But that is not what
Defendants are arguing here; instead, Defendants are arguing that BLM appropriately tiered to
the EISs for the Sage Grouse Plan Amendments.

*Selkirk Conservation Alliance*, 336 F.3d at 958 (the choice of the geographic scope is based on several factors, including the "scope of the project considered, the features of the land, and the types of species in the area," and therefore "is a task assigned to the special competency of the appropriate agencies") (quoting *Kleppe*, 427 U.S. at 414); *see also Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1071 (9th Cir. 2002). The WAFWA MZs were used as a basis for the scope of the cumulative impacts analyses in the EISs precisely because they had been developed by experts based on geography, ecological conditions, and the location of Sage Grouse populations. *See* WY067940-46. Thus, it was appropriate for BLM to use a relatively broad geographic scope for the cumulative impacts analysis. *Cf. W. Watersheds Project v. Schneider*, 417 F. Supp. 3d 1319, 1333 (D. Idaho 2019) (stating, in a case involving a challenge to BLM's 2019 plan amendments, that "the sage grouse range covers multiple states and [] a key factor—connectivity of habitat—requires a large-scale analysis that transcends the boundaries of any single State").

Nevertheless, Plaintiffs argue that the analysis of large geographic areas in the EISs, while useful to BLM's decision-making process at the RMP stage, was too geographically broad to be of use at the leasing stage. *See* Pls.' Br. at 35. But Plaintiffs fail to explain why analyzing too much information, rather than too little, violates NEPA. They cite *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800 (9th Cir. 1999), but the case does not support Plaintiffs' arguments. In that case, the court found that tiering to an EIS prepared for a land use plan did not satisfy NEPA because the prior EIS, which had been prepared several years earlier, did not analyze the impacts of a land exchange and other logging projects that had subsequently proposed. *See id.* at 809-10. The case does not stand for the proposition that a cumulative impacts analysis that covers a broad a geographic range does not comply with NEPA.

Plaintiffs' reliance on *Klamath-Siskiyou Wildland Center v. Bureau of Land Management*, 387 F.3d 989 (9th Cir. 2004), also is unavailing.  As in this case, BLM argued that it satisfied its obligation to analyze cumulative impacts by tiering to a prior EIS, *see id.* at 997-98, but the similarities between the cases end there.  The *Klamath-Siskiyou* court found that the EIS in that case contained only "general statements about the cumulative effects of logging" in the watershed at issue.  *Id.* at 997.  In contrast, the EISs supporting the RMPs contain extensive, detailed analyses of the conditions in the planning areas and past, present, and reasonably future actions that would impact Sage Grouse.  *See*, *e.g.*, WY061668-61790 (Wyoming Nine EIS).

Plaintiffs also argue that the EISs "concede" that the analyses of cumulative impacts in those documents are inadequate for purposes of analyzing BLM's leasing decisions.  *See* Pls.' Br. at 36.  The EISs do no such thing.  One of the cited passages is from a list of assumptions in the Wyoming Nine EIS.  WY061716.  Another is from the summary section of the cumulative impacts analysis in the Bighorn Basin EIS, which indicates that energy development over the next 20 years may affect small populations of Sage Grouse in localized areas.  WY065202-03.  The analyses do cover broad areas, but from the standpoint of Sage Grouse conservation, it makes sense for BLM to analyze impacts to Sage Grouse populations over broad geographic regions.  When actual development plans are proposed, BLM will conduct analyses in more localized areas.  *See N. Alaska*, 457 F.3d at 977 ("Such analysis must be made at later permitting stages when the sites, and hence more site specific effects, are identifiable.").

In sum, Plaintiffs have failed to demonstrate that the cumulative impacts analyses supporting BLM's leasing decisions were inadequate to comply with NEPA.

**IV.    If the Court Finds a Legal Violation, It Should Not Immediately Vacate the Leases and Should Instead Allow Briefing on the Appropriate Scope of the Remedy**

If the Court finds that BLM violated NEPA with respect to the lease sales at issue, it should not vacate the leases sold and issued at those sales, but instead should suspend the oil and gas leasing decisions without vacating them.  Vacatur of a challenged action does not automatically flow from a NEPA violation.  "Whether agency action should be vacated depends on how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed."  *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (internal quotation marks and citation omitted).  "[W]hen equity demands," an agency's decision may "be left in place while the agency follows the necessary procedures." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995).  Vacatur of the leases will have substantial disruptive effects on the United States, affected states, and the lessees.  Further, any harm to the environment can be avoided through suspension of particular lease operations.

To avoid the unjust result of stripping lessees of their lease rights, the Ninth Circuit has on several occasions sanctioned a remedy short of vacating an oil and gas lease sale.  *See Conner*, 848 F.2d at 1460-61 & n.50 (modifying a district court's order regarding oil and gas leases to clarify that the leases were suspended, not set aside, and enjoining surface-disturbing activity pending compliance with NEPA and the ESA); *N. Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1157-58 (9th Cir. 1988) (upholding a district court decision to suspend coal mining operations, rather than void the leases pending corrective NEPA analysis); *N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 842-44 (9th Cir. 2007) (upholding a partial injunction for coalbed methane development pending the preparation of additional NEPA analysis).

Here, the vacatur of the lease sales would have significant disruptive consequences for the lessees, the affected States, and the United States.  The total value of the leases issued as part

of the subject lease sales totaled approximately $161 million.  Declaration of Rebecca Good ¶ 4.

In addition, as the intervenors will describe, the vacatur of the leases will have substantial effects

on the budgets of the affected states, as well as on lessees who have invested significant amounts

in the leases.  Accordingly, vacatur would have significant disruptive consequences.  *See Allied-*

*Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 151 (9th Cir. 1993) (declining to

vacate a rule due to the potential disruptive consequences).

Harm to the environment could be avoided during any remand period by enjoining

surface disturbing activities and suspending rather than vacating the leases.  *See Conner*, 848

F.2d at 1460-61 (enjoining surface disturbing activities pending compliance with NEPA and the

ESA); *WildEarth Guardians*, 368 F. Supp. 3d at 85 (enjoining BLM from issuing APDs pending

further NEPA analysis); *Wilderness Society v. Wisely*, 524 F. Supp. 2d 1285, 1305-06 (D. Colo.

2007) (enjoining activity on the leases pending further consultation under the ESA); *Montana*

*Wilderness Ass'n v. Fry*, 408 F. Supp. 2d 1032, 1038 (D. Mont. 2006) (enjoining surface

disturbing activities on oil and gas leases pending compliance with NEPA and the ESA); *Colo.*

*Envtl. Coal. v. Office of Legacy Mgmt.*, 819 F. Supp. 2d 1193, 1224 (D. Colo. 2011) (staying

leases issued pursuant to an EA and FONSI), *amended on reconsideration*, No. 08-CV-01624-

WJM-MJW, 2012 WL 628547 (D. Colo. Feb. 27, 2012).

Defendants recognize that the Court found vacatur to be appropriate in its Phase One

summary judgment decision.  *See W. Watersheds Project v. Bernhardt*, No. 1:18-cv-187-REB,

2020 WL 959242, at *30 (D. Idaho Feb. 27, 2020).  Phase One presented different issues,

however, and the Court found that the restriction of public involvement was a serious deficiency

warranting vacatur.  *Id.* at *28.  That issue is not present in Phase Two.  Further, in its later

decision granting Defendants' motion for stay pending appeal, the Court acknowledged that

whether vacatur was the appropriate remedy was "up for debate." *W. Watersheds Project v. Zinke*, No. 1:18-cv-187-REB, 2020 WL 2462817, at *4 (D. Idaho May 12, 2020).  Accordingly, Defendants request that, if the Court finds a legal violation, it order a suspension of operations and allow operators to submit requests to continue operations under appropriate circumstances rather than ordering the leases vacated.

If the Court nevertheless finds that vacatur is appropriate, Defendants request that the Court stay its vacatur for 60 days to allow Defendants the opportunity to consider whether to appeal and, if an appeal is filed, to seek a stay pending appeal.

## CONCLUSION

For the reasons stated above, summary judgment should be granted to Defendants on all of Plaintiffs' claims regarding the four leasing decisions at issue in Phase Two.

Respectfully submitted this 3rd day of August, 2020,

BART M. DAVIS, Idaho Bar No. 2696
United States Attorney

CHRISTINE G. ENGLAND, California Bar No. 261501
Assistant United States Attorney
District of Idaho
1291 West Myrtle Street, Suite 500
Boise, ID 83702
Tel: (208) 334-1211; Fax: (208) 334-1414
Email: Christine.England@usdoj.gov

JEAN E. WILLIAMS
Deputy Assistant Attorney General

LUTHER L. HAJEK, Colorado Bar No. 44303
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
999 18th Street
South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1376; Fax: (303) 844-1350

E-mail: [Luke.Hajek@usdoj.gov](mailto:Luke.Hajek@usdoj.gov)

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of August, 2020, I filed a copy of the foregoing Defendants' Memorandum in Support of Motion for Partial Summary Judgment and in Opposition to Plaintiffs' Motion for Partial Summary Judgment (Phase Two) electronically through the CM/ECF system, which caused all parties or counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

<u>Attorneys for Plaintiffs Western Watersheds Project and Center for Biological Diversity</u>

Laurence J. Lucas
llucas@advocateswest.org

Sarah Stellberg
sstellberg@advocateswest.org

Todd C. Tucci
ttucci@advocateswest.org

<u>Counsel for Intervenor-Defendant State of Wyoming</u>

Elliott John Adler
elliott.adler@wyo.gov

James Kaste
james.kaste@wyo.gov

Cherese De'Dominiq McLain
cdm@msbtlaw.com

<u>Counsel for Intervenor-Defendant Western Energy Alliance</u>

Bret A. Sumner
bsumner@bwenergylaw.com

Malinda Morain
mmorain@bwenergylaw.com

*/s/ Luther L. Hajek*
Luther L. Hajek