Thomas L. Sansonetti (*Pro Hac Vice*)
Andrew C. Emrich (*Pro Hac Vice*)
HOLLAND & HART LLP
555 17th Street, Suite 3200
Denver, CO 80202
Telephone:   (303) 290-1061 (T. Sansonetti)
                    (303) 290-1621 (A. Emrich)
Facsimile:   (303) 290-1606
tlsansonetti@hollandhart.com
acemrich@hollandhart.com

Alison C. Hunter (ISB #8997)
HOLLAND & HART LLP
P.O. Box 2527
Boise, ID 83701-2527
Telephone:  208.342.5000
Facsimile:  208.343.8869
achunter@hollandhart.com

*Counsel for Defendant-Intervenors*
*Peak Powder River Acquisitions, LLC, Titan*
*Exploration, LLC, and Rebellion Energy II, LLC*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, et al., | ) ) ) |
| Plaintiffs, | ) Case No. 1:18-cv-00187-REB |
| vs. | ) ) |
| DAVID BERNHARDT, Secretary of the Interior, et al., | ) **MEMORANDUM IN SUPPORT OF** ) **RENEWED JOINT MOTION FOR** ) **PARTIAL SUMMARY JUDGMENT** |
| Defendants, | ) **AND IN OPPOSITION TO** ) **PLAINTIFFS' MOTION FOR** |
| STATE OF WYOMING, et al., | ) **PARTIAL SUMMARY JUDGMENT** ) **(PHASE TWO)** |
| Defendant-Intervenors | ) ) |
| and | ) ) |
| PEAK POWDER RIVER ACQUISITIONS, LLC, et al., | ) ) ) |
| Defendant-Intervenors. | ) |

**Table of Contents**

Table of Authorities ............................................................................................................ ii

I.     INTRODUCTION ................................................................................................... 1

II.    FACTUAL BACKGROUND ................................................................................... 2

       A.     PPRA .............................................................................................................. 2

       B.     Rebellion II ................................................................................................... 3

       C.     Titan .............................................................................................................. 3

III.   ARGUMENT ............................................................................................................ 5

       A.     The Leases Should Not Be Vacated ............................................................ 6

              1.     Plaintiffs Cannot Satisfy the General Vacatur Test. ................... 6

              2.     Plaintiffs Cannot Satisfy the Test for Injunctive Relief. ........... 13

       B.     Plaintiffs Are Not Entitled to *Any* Broad Injunctive Relief,
              including Suspension of the Challenged Leases. .................................... 16

       C.     Any Injunctive Relief Should be Narrowly Tailored to Protect
              Intervenors' and Other Stakeholders' Interests from Unnecessary
              Disruption. ................................................................................................. 17

IV.    CONCLUSION ...................................................................................................... 20

# Table of Authorities

## Cases

Page(s)

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) ...................................................................6, 7, 12

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987) ...............................................................................16

*Beverly Hills Unified School Dist. v. Fed. Transit Admin.*,
2016 WL 4445770 (C.D. Cal., Aug. 12, 2016) ................................................12, 13

*Cal. Cmtys. Against Toxics v. EPA*,
688 F.3d 989 (9th Cir. 2012) ...................................................................6, 7, 12

*Conner v. Burford*,
848 F.2d 1441 (9th Cir. 1988) .......................................................................12

*Diné Citizens Against Ruining Our Env't v. Jewell*,
2015 WL 4997207 (D.N.M. Aug. 14, 2015) ...............................................................16

*Idaho Farm Bureau Fed'n. v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995) ....................................................................11, 12

*La. Fed. Land Bank Ass'n, FLCA v. Farm Credit Admin.*,
336 F.3d 1075 (D.C. Cir. 2003) .........................................................................12

*McDonald's Corp. v. Robertson*,
147 F.3d 1301 (11th Cir. 1998) ........................................................................15

*Mobil Oil Expl. & Producing Se., Inc. v. United States*,
530 U.S. 604 (2000) ......................................................................................16

*Monsanto v. Geertson Seed Farms*,
561 U.S. 139 (2010) ............................................................................6, 13, 14

*N. Cheyenne Tribe v. Norton*,
503 F.3d 836 (9th Cir. 2007) .......................................................................18, 19

*N.M. Dep't of Game & Fish v. Dep't of the Interior*,
854 F.3d 1236 (10th Cir. 2017) ........................................................................15

*Pac. Rivers Council v. U.S. Forest Serv.*,
942 F. Supp. 2d 1014 (E.D. Cal. 2013) ..................................................................7

*PGBA, LLC v. United States*,
389 F.3d 1219 (Fed. Cir. 2004) ........................................................................14

*Pollinator Stewardship Council v. EPA*,
  806 F.3d 520 (9th Cir. 2015) .................................................................6

*Radio-Television News Dirs. Ass'n v. FCC*,
  184 F.3d 872 (D.C. Cir. 1999) ..............................................................12

*Sierra Forest Legacy v. Rey*,
  577 F.3d 1015 (9th Cir. 2009) ..............................................................18

*Sierra Forest Legacy v. Sherman*,
  646 F.3d 1161 (9th Cir. 2011) ..............................................................13

*Union Oil Co. of Cal. v. Morton*,
  512 F.2d 743 (9th Cir. 1975) ................................................................16

*Virgin Islands Tel. Corp. v. FCC*,
  444 F.3d 666 (D.C. Cir. 2006) ..............................................................13

*WildEarth Guardians v. BLM*,
  870 F.3d 1222 (10th Cir. 2017) ............................................................12

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ....................................................................13, 15, 16

## Other Authorities

43 C.F.R. § 3162.3-1(c) .......................................................................7, 15

Camille Erickson, *Gordon Finalizes 'Devastating' Budget Cuts Totaling More
  than $250 Million*, Casper Star Tribune (Aug. 26, 2020).........................8

Peak Powder River Acquisitions, LLC, ("PPRA"), Titan Exploration, LLC, ("Titan"), and Rebellion Energy II, LLC ("Rebellion II"), (collectively "Intervenors") respectfully submit this memorandum in support of their Renewed Joint Motion for Partial Summary Judgment and in opposition to Plaintiffs' Motion for Partial Summary Judgment (Phase Two), submitted pursuant to this Court's September 14, 2020 Order allowing limited intervention (ECF No. 312) and the Court's August 19, 2020 Order (ECF No. 299).

## I.     INTRODUCTION

In their opening brief in support of partial summary judgment, Plaintiffs claim that the Bureau of Land Management's ("BLM") decisions to conduct the June 2017 Montana oil and gas lease sale, and its February, June, and September 2017 Wyoming lease sales (collectively, "2017 Lease Sales" or "Phase II Lease Sales") upon Environmental Assessments ("EA") and Findings of No Significant Impact ("FONSI") violated the National Environmental Policy Act ("NEPA"), and should be vacated until additional environmental studies are completed.  ECF No. 247-1.  Intervenors collectively own twenty-one leases that were acquired from Phase II Lease Sales and operate and/or have significant financial investment in thirteen wells that produce from Drilling Spacing Units ("DSUs") that include Phase II leases.

Plaintiffs' legal challenges to the 2017 Lease Sales are without merit and Plaintiffs' partial summary judgment motion should be denied and the summary judgement motions of the Federal Defendants, State of Wyoming, Western Energy Alliance ("WEA"), and Intervenors should be granted.  However, should the Court find that BLM did not fully satisfy its NEPA obligations for one or more contested lease sales, the Court should neither vacate nor suspend the contested leases, but instead narrowly tailor its remedy to address any  irregularities in BLM's NEPA compliance while protecting Intervenors' contractual and operational rights.

## II.     FACTUAL BACKGROUND

Intervenors adopt the legal and factual background sections and standard of review as set forth in the Federal Defendants' brief.  ECF No. 278-1 at 2-16.  Intervenors also adopt the Federal Defendants' Statement of Material Facts.  ECF No. 278-2.

### A.     PPRA

PPRA is a wholly-owned subsidiary of Peak BLM Lease, LLC ("Peak BLM").  ECF No. 260-2 ¶ 3.  Through an Administrative Services Agreement, PPRA's activities are managed by Peak Exploration & Production, LLC ("Peak Exploration").  *Id.*  Through an affiliate of Peak Exploration, PPRA's properties are administered by twenty-nine employees.  *Id.*  Peak Exploration's executives have extensive experience in federal oil and gas activities, including federal leasing.  *Id.*  PPRA has made a significant investment in oil and gas leasing, 100% of which has been in the Powder River Basin.  *Id.*  Since 2012, Peak Powder River Resources, LLC ("PPRR"), a wholly-owned subsidiary of Peak Exploration, has drilled and currently operates 96 horizontal wells in the Powder River Basin, with 65% of those wells involving federal minerals.  *Id.*  PPRR is currently the eighth largest oil producer in the State of Wyoming.  *Id.*

PPRA was successful in purchasing seven leases comprising 3,557 acres for a total of $19,955,000 ($5,610/acre) at the February 2017 BLM Wyoming lease sale.  *Id.* at ¶ 4.  None of PPRA's leases are located in priority sage-grouse habitat management areas ("PHMAs").  *Id.* at ¶ 5.  Each of PPRA's leases is at least thirteen miles from a designated PHMA, and the majority of PPRA's leases are located more than twenty miles from the nearest PHMA.  *Id.*

To date, there have been four wells drilled in DSUs that involve three of PPRA's seven leases.  *Id.* at ¶ 6.  The Josh Federal 22-42-73-3TH well ("Josh Federal Well"), which is operated by Navigation Powder River, LLC, is producing from a DSU that includes PPRA's Lease

WYW-185804.  *Id.*  The Josh Federal Well penetrates PPRA Lease WYW-185804 and is subject to federal Communitization Agreement ("CA") WYW-189780.  *Id.*

The Flatbow 142-26H well ("Flatbow Well"), which is operated by EOG Resources, Inc., is producing from a DSU that includes, but does not penetrate, PPRA Lease WYW-185806.  *Id.* The Flatbow Well was completed in April of 2016 and has been producing since that time.  *Id.* To date, PPRA has invested approximately $3.5 million, and the working interest partners have invested more than $14.2 million, in the development of the Flatbow Well.  *Id*. at 7. This well is subject to federal CA WYW-185324, which includes PPRA Lease WYW-185806.  *Id.* at 6.

### B.    Rebellion II

Rebellion II's executives have extensive experience in federal oil and gas activities, including in operations from drilling, completions and production of wells.  ECF No. 262-2 ¶ 3. Rebellion II has drilled two wells in DSUs that include a Phase II lease.  *Id*. at ¶¶ 9, 11.  The Diablo E-41474-6-7-4NH well ("Diablo Well") and the Coronado 8S 4174-17-20 MWB-1H well ("Coronado Well"), are both producing from a DSU that includes Lease WYW-185831 (owned by PPRA).  *Id*.  The Coronado Well, which penetrates Lease WYW-185831, is subject to federal CA WYW-189468.  *Id*. at ¶ 11.  The Diablo Well, which penetrates Lease WYW-185830 (owned by Titan), produces from a DSU that also includes Lease WYW-185829 (owned by Titan) and Lease WYW-185830.  *Id*. at ¶ 9.  The Diablo Well is subject to federal CA WYW-189469.  *Id*.  Each of these affected leases is a significant distance from any PHMA.  ECF Nos. 260-2 ¶¶ 4-5, 270-2 ¶¶ 6-7.  Rebellion II has invested more than $34 million in the development of the Diablo and Coronado Wells.  Suppl. O'Quinn Decl. at ¶ 4.

### C.    Titan

Titan is a privately held oil and gas exploration company.  ECF No. 270-2 ¶ 1.  Through one of its affiliates, Titan employs approximately twenty-six operations professionals.  *Id.* at ¶ 3.

These professionals have a combined 127 years of experience working in areas with both environmental stipulations and high levels of environmental sensitivity.  *Id.*  Titan's staff has worked on domestic oil and gas projects from the north slope of Alaska to the Gulf of Mexico, and internationally.  *Id.*  Titan has been operating in environmentally-sensitive areas with sage grouse stipulations since 2017, when Titan began investing in the Powder River Basin.  *Id.*

Titan was successful in purchasing fourteen Phase II leases at the February 2017 and September 2017 Wyoming BLM lease sales for a total of approximately $40 million.  Suppl. Inkster Decl. ¶ 3.  No part of Titan's Phase II leases is located within a sage grouse PHMA (or "core area").  In fact, each of Titan's Phase II leases is at least eleven miles from the nearest PHMA. ECF No. 270-2 ¶ 7.

In addition, Titan completed the Iberlin 4176-1324-002NH well ("Titan Iberlin Well") in 2019, in accordance with all state and federal permits.  *Id.* at ¶ 8.  Titan currently operates the Titan Iberlin Well.  *Id.*  Through a CA that has been submitted to BLM for approval, the Titan Iberlin Well produces oil and gas from a DSU that includes Titan Phase II Lease WYW-185876.  *Id.*  Using the July 1, 2020 commodity strip pricing, the Titan Iberlin Well has a net present value using a 10% discount ("PV10 value") to Titan of over $2.1 million.  *Id.*

Titan completed the T-Chair 4276-1201-004NH well ("T-Chair Well") in 2019 in accordance with all state and federal permits.  *Id.* at ¶ 9.  Titan currently operates the T-Chair Well.  *Id.*  Through a CA submitted to BLM for approval, the T-Chair Well produces oil and gas from a DSU that includes Titan Phase II Lease WYW-186324.  *Id.*  Using the July 1, 2020 commodity strip pricing, the T-Chair Well has a PV10 value to Titan of over $500,000.  *Id.*  To date, Titan has invested more than $20 million in the development of the Titan Iberlin and T-Chair Wells.  *Id.* at ¶ 10.

To date, there have been eight additional wells producing from DSUs that include two of

Titan's fourteen Phase II leases.  *Id.* at ¶ 11.  Titan has invested more than $26.5 million in these

eight wells, which are currently operated by EOG (wells collectively referred to as "EOG-

Operated Wells").  *Id.* at ¶ 12.  These EOG-Operated Wells (described below) all produce from

DSUs that include Phase II leases.  *Id.* at ¶ 11.

- The Flatbow 870-2833H well ("Flatbow Well") is producing from a DSU that includes Titan's Phase II Lease WYW-186303.  The Flatbow Well is subject to federal CA WYW-189134.  Using the July 1, 2020 commodity strip pricing, the Flatbow Well has an estimated PV10 value to Titan of over $1.1 million.

- The Telluride 2833-01H well, Telluride 2833-03H well, Telluride 2833-04H well, and Telluride 2833-2H well (collectively, "Telluride Wells") are each producing from a DSU that includes Titan's Phase II Lease WYW-186303. The Telluride Wells are subject to federal CA WYW-189134.  Using the July 1, 2020 commodity strip pricing, the Telluride Wells have an estimated net present value to Titan of over $6.3 million using a 10% discount (PV10).

- The Ballista 2-1004H well ("Ballista 2 Well") is producing from a DSU that includes Titan's Lease WYW-185796. The Ballista 2 Well is subject to federal CA WYW-186050.  Using the July 1, 2020 commodity strip pricing, the Ballista 2 Well has an estimated PV10 value to Titan of over $930,000.

- The Ballista 3-1023H well ("Ballista 3 Well") and the Ballista 4-1023H ("Ballista 4 Well") are producing from a DSU that includes Titan's Lease WYW-185796. The Ballista 3 and Ballista 4 Wells are subject to federal CA WYW-190112. Using the July 1, 2020 commodity strip pricing, the Ballista 3 and Ballista 4 Wells have an estimated PV10 value to Titan of over $1.8 million.

Of the wells in which Titan has an interest, the Titan Iberlin, the Ballista 3 and the Ballista 4

Wells penetrate Phase II leases, while the remaining wells operate in DSUs that contain one or

more Phase II leases.  Suppl. Inkster Decl. ¶ 4.

## III.   ARGUMENT

Plaintiffs are entitled to no relief in this case because their claims have no merit.  If,

however, this Court concludes that BLM's NEPA analysis for the any of the contested lease sales

is lacking, the Court should neither vacate nor suspend the Phase II leases.  Instead, any relief

should be narrowly tailored to address the specific shortcomings in BLM's NEPA analysis while

avoiding disruption to Intervenors' Phase II leases and operational wells in which they have an interest.

**A.      The Leases Should Not Be Vacated.**

The Court should reject Plaintiffs' draconian request to vacate all the Phase II leases. ECF No. 247-1 at 37-39.  In order to vacate the Phase II leases, Plaintiffs must satisfy the two-part general vacatur test.  *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989 (9th Cir. 2012). Moreover, because vacatur of the Phase II leases would operate as an injunction against lessees' contractual rights and ongoing operations, Plaintiffs must also prevail on the four-part test for injunctive relief.  *Monsanto v. Geertson Seed Farms*, 561 U.S. 139 (2010).  Because Plaintiffs can satisfy neither test, their request for vacatur must be rejected.

**1.      Plaintiffs Cannot Satisfy the General Vacatur Test.**

Under the Ninth Circuit's general vacatur test, "[w]hether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Cal. Cmtys.*, 688 F.3d at 993  (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)). Plaintiffs cannot satisfy either prong of this two-part test.

As to the first prong, the NEPA violations alleged by Plaintiffs are not so serious as to warrant vacatur. Plaintiffs' contentions are based on relatively narrow procedural issues pertaining to whether BLM issued an appropriate range of action alternatives in its leasing EAs and whether BLM is required to perform additional analysis before issuing the challenged leases. Each of Plaintiffs' claims goes to the *degree* of BLM's analysis.  The deficiencies alleged by Plaintiffs, even if proven, are not the type of "fundamental flaws" that would prevent BLM from making the same or substantially similar decisions on remand.  *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) ("We have also looked at whether the agency would

likely be able to offer better reasoning or whether by complying with procedural rules, it could

adopt the same rule on remand, or whether such *fundamental flaws* in the agency's decision

make it unlikely that the same rule would be adopted on remand." (emphasis added)); *see also*

*Allied-Signal*, 988 F.2d at 151 (declining to vacate because there was "at least a serious

possibility that the [agency would] be able to substantiate its decision on remand").

Before issuing the challenged leases, BLM carefully evaluated the adequacy of the

existing NEPA documentation and properly relied on the comprehensive 2015 RMP EISs to

support its decisions.  To the extent there is any error in BLM's NEPA analysis, the seriousness

of any such error can be "minimized" in this case by the fact that "additional analysis can be

completed at the site-specific level before any ground-disturbing actions take place."  *Pac.*

*Rivers Council v. U.S. Forest Serv.*, 942 F. Supp. 2d 1014, 1019, 1021 (E.D. Cal. 2013) (finding

the error in agency's NEPA analysis was not so serious as to warrant vacatur, in part, because

"additional analysis can be completed at the site-specific level before any ground-disturbing

actions take place").  The challenged decisions to conduct lease sales threaten no environmental

injury because "[n]o drilling operations, nor surface disturbance preliminary thereto" may occur

on any Phase II leases until the lessee obtains approval of an Application for Permit to Drill

("APD").  43 C.F.R. § 3162.3-1(c).

As to the second prong of the general vacatur test, the "disruptive consequences of an

interim change that may itself be changed" are here so severe as to foreclose vacatur of the

challenged leases.  *See Cal. Cmtys.*, 688 F.3d at 993.  The Federal Defendants have explained the

serious disruptive economic effects that would result from vacating all the challenged Phase II

leases.  ECF No. 278-1.  Similarly, the State of Wyoming has articulated the disastrous

consequences that would befall its budget, citizens, and local economy from vacating the three

Wyoming Phase II lease sales (ECF No. 283-1 at 24).  The economic impacts to Wyoming have

become even more acute in light of significant budget cuts that the Governor recently finalized due to the State's $1.7 billion revenue shortfall.  Camille Erickson, *Gordon Finalizes 'Devastating' Budget Cuts Totaling More than $250 Million*, Casper Star Tribune (Aug. 26, 2020), https://trib.com/news/state-and-regional/gordon-finalizes-devastating-budget-cuts-totaling-more-than-250-million/article_cf3180fb-34d2-5e9b-836b-165c2edb269b.html.

The disruptive consequences of vacatur to the Intervenors (and the other lessees)[1] would be similarly dire.  The Intervenors have collectively invested nearly $60 million in bonus payments to purchase leases in the 2017 Wyoming lease sales (ECF No. 260-2 at ¶ 10; Suppl. Inkster Decl. ¶ 3.) and another $84 million in drilling, completing, and producing oil and gas from wells that are located in DSU with Phase II leases (ECF No. 260-2 ¶¶ 6-7; ECF No. 270-2 ¶¶ 17-18; Suppl. O'Quinn Decl. ¶ 4).  Intervenors have collected and paid nearly $10 million in federal royalties, Wyoming severance taxes, and county ad valorem taxes. ECF No. 260-2 ¶ 7, ECF No. 270-2 ¶¶ 8-9, 11.

The significant financial interests in Phase II leases and associated wells of each of the Intervenors that would be at risk from vacatur of the 2017 Wyoming lease sales are highlighted below:

**PPRA**:

- PPRA has invested nearly $20 million to acquire its seven Phase II leases and has identified 170 prospective potential well locations in five different geologic reservoirs involving leases.  ECF No. 260-2 ¶¶ 4, 10.  PPRA has invested more than $3.5 million, and its working interest partners have invested more than $14.2 million, in the Flatbow Well, which is part of a CA with PPRA's Phase II Lease WYW-185806.  *Id.* at ¶ 7.  PPRA would be irreparably harmed if its Phase II leases are vacated or suspended as it would lose (1) the opportunity cost of the money paid in bonus bids; (2) the already sunk capital investments in these leases, (3) the potential future revenue from the existing

---

[1] The WEA has explained the disastrous consequences that would befall its members if the Phase II leases are vacated.  ECF No. 294-1 at 24-25 (and accompanying declarations).

Flatbow Well,  and (4) and the potential future revenue from planned development of PPRA's II leases.  Suppl. Vaughn Decl.  ¶¶ 4-6.

**Rebellion II:**

- Rebellion II has invested over $34 million in developing and completing the Diablo and Coronado Wells and has a significant present financial interest in production from those Wells.  ECF No. 262-2 ¶ 14; Suppl. O'Quinn Decl. ¶ 4. Because the Diablo and Coronado Wells each penetrate a Phase II lease, each of these wells is likely to be shut-in, and future potential may be permanently damaged, if Plaintiffs succeed in vacating (or even suspending) the Phase II leases. *Id.* ¶¶ 4-5. Revenue from the Diablo and Coronado wells is critical to Rebellion II's ability to sustain and operate its business.  Rebellion II would be irreparably harmed and stands to lose millions of dollars in net cash flow if it is forced to shut-in the wells or even suspend production for a significant about of time. *Id.* ¶ 6.  In addition to the lost future revenue, Rebellion II could potentially lose tens of millions of dollars in lost acreage value. *Id.* ¶ 9.

**Titan:**

- Titan has invested approximately $40 million to acquire its fourteen Phase II leases as well as more than $48 million in bonus bids to secure associated non-Phase II leases that would be rendered undrillable due to BLM regulations ("Undrillable Leases") if the Phase II leases are vacated or suspended. Suppl. Inkster Decl. ¶¶ 3, 5-6, 8, 10.  Titan has also invested more than $20 million in developing the Titan Iberlin and T-Chair Wells, and has a significant financial interest in the present production of those wells.  The ongoing operations of the Titan Iberlin, the T-Chair, and the EOG-Operated Wells may be seriously disrupted, and their future potential permanently compromised, if Plaintiffs succeed in vacating (or even suspending) Titan's Phase II leases. ECF No. 270-2 ¶¶ 6-10, 17. Titan also invested more than $26.5 million in the EOG-Operated Wells, each of which produces from a DSU that contains a Titan Phase II lease.  *Id.* at ¶¶ 11-12, 19.

- Titan would be irreparably harmed if its Phase II leases are vacated or suspended.  These harms include, but are not limited to: (1) the lost opportunity cost of approximately $84 million paid in bonus bids on both Phase II leases and its Undrillable Leases; (2) loss of the already sunk capital expenditures of $45.8 million in these leases, (3) loss of future revenue from the existing Titan Iberlin, T-Chair, and EOG-operated wells  if production from these wells is interrupted; (4) loss of potential future revenue from planned development of Titan's II leases; (5) loss of 28% of Titan's drillable acres, limiting Titan's future development capabilities.  Suppl. Inkster Decl.  ¶¶ 8-13.  Overall, Titan's business would shrink materially (around 30-40%) reducing its value, which is detrimental to Titan's investors, which include mostly University Endowments, Foundations and other Funds.  *Id.* at ¶ 13

If the Phase II leases are vacated, the nearly $60 million in lease bonuses paid by

Intervenors would be stranded while the United States and the State of Wyoming determine how

to refund these proceeds.  At present, it appears neither sovereign has a practical means to refund these payments to the lessees.  Moreover, each of Intervenors' wells that produce from DSUs that include Phase II wells may experience disruptions in production and Intervenors may lose the revenue stream from these wells that is associated with their Phase II leases.

The consequences are even worse in regard to wells that actually penetrate Phase II leases.  Each of Intervenors' wells that penetrate Phase II leases (Rebellion's Coronado and Diablo Wells, Titan's Iberlin Well, and the EOG-operated Titan Ballista 3 and Ballista 4 Wells) would likely have to be shut-in, resulting in a loss of Intervenors' investments in these wells on top of the significant additional costs to shut-in these wells.  For example, shutting in both of Rebellion II's operating wells would cost approximately $280,000, and Rebellion II would lose approximately $23 million in undiscounted net cash flow over the life of the wells.  Suppl. O'Quinn Decl. ¶¶ 6-7.  Ceasing production from the currently operating Diablo and Coronado Wells in the event of either vacatur or suspension of the Phase II leases would prevent Rebellion from receiving the expected revenue stream from these wells needed to support its business, in addition to more than $34 million Rebellion II spent in developing these wells.  *Id.* at ¶¶ 4, 8.

Both PPRA and Titan would face similarly dire consequences if their Phase II leases are vacated or suspended.  Vacating the twenty-one Phase II leases held by PPRA and Titan would deprive both companies of their real property interest in these leases with no guarantee as to when, how, or even if, BLM would refund the nearly $60 million in bonus bids PPRA and Titan paid for these leases.  Suppl. Vaughn Decl. ¶ 5; Suppl. Inkster Decl. ¶ 3.  Moreover, Titan stands to lose the $48 million in bonus bids that Titan paid for non-Phase II leases that would become undrillable if the Phase II leases are vacated or suspended due to BLM's spacing rules and rules against development of unleased minerals ("Undrillable Leases").  Suppl. Inkster Decl. ¶¶ 6, 10.

Both Titan and PPRA are small companies and the millions of dollars they have spent on purchasing and developing the Phase II leases is a significant percentage of their operating expenditures.  Any delay by BLM in refunding PPRA's and Titan's nearly $60 million in bonus bids for Phase II leases (plus $48 million in bonus bids for Titan's Undrillable Leases) would severely impede their business operations and future development operations.  Suppl. Vaughn Decl. ¶ 5; Suppl. Inkster Decl. ¶¶ 8, 10.   Both PPRA and Titan would also lose millions of dollars in capital expenditures in developing their Phase II leases, as well as loss of potential future revenue from their existing wells and planned development of their Phase II leases. Suppl. Vaughn Decl. ¶¶ 4- 6; Suppl. Inkster Decl. ¶¶ 4, 8, 11-14.   Finally, because Titan's Iberlin Well and two of the EOG-Operated Wells (Ballista 3 and Ballista 4 Wells) in which Titan has a significant financial interest penetrate Phase II leases, these wells would likely have to be shut-in, resulting in a loss of Titan's significant investment in the wells and the future revenue stream from the wells.  Suppl. Inkster Decl. ¶ 4.

Shutting in Intervenors' fully permitted, operating wells would be highly inequitable as BLM analyzed the site-specific environmental impacts of each of Intervenors' wells before approving APDs for these wells and Plaintiffs did not challenge any of these APDs.  Intervenors' wells that produce from DSUs or CAs that include Phase II leases are also at risk if the Phase II leases are vacated.  These impacts would be seriously disruptive and would ultimately prove unnecessary if BLM were to decide, on remand, to re-approve the 2017 Wyoming lease sales. *Idaho Farm Bureau Fed'n. v. Babbitt*, 58 F.3d 1392, 1405-06 (9th Cir. 1995) (noting expenditure of public resources constitutes equitable concern weighing against vacatur).

Furthermore, a lease sale is unique among agency actions because it requires bidders to publicly reveal the value they place on particular parcels.  Once the lease sale is held, it cannot be "rerun" without consideration of the original bids.  Vacatur of the Phase II Lease Sales would

be uniquely disruptive to Intervenors, who were successful bidders on twenty-one Phase II

leases, as well as on the overall market for Powder River Basin oil and gases leases.

Courts have refused to vacate agency decisions to avoid the kind of serious financial and

operational harms faced by Intervenors and the other interested parties here. *Cal. Cmtys.*, 688

F.3d at 994 (refusing to vacate EPA regulation to prevent "economically disastrous" impacts that

would occur from stopping construction of planned power plant); *Beverly Hills Unified School*

*Dist. v. Fed. Transit Admin*., 2016 WL 4445770, *8-11 (C.D. Cal., Aug. 12, 2016) (refusing to

vacate federal approval of subway extension project due to "dire" economic and operational

consequences for project applicant and public at large); *WildEarth Guardians v. BLM*, 870 F.3d

1222, 1239 (10th Cir. 2017) (directing district court to remand to BLM to revise EIS, and

declining to vacate leases where BLM erred on "a fairly narrow issue" and "the question remains

what will happen to the leases which have already been issued and whether mining the lease

tracts should be enjoined"); *Conner v. Burford*, 848 F.2d 1441, 1461, n. 50 (9th Cir. 1988)

 (clarifying district court's remedy order to not set aside oil and gas leases in order to avoid the

unnecessarily harsh result of completely divesting the lessees of their property rights); *La. Fed.*

*Land Bank Ass'n, FLCA v. Farm Credit Admin.*, 336 F.3d 1075, 1085 (D.C. Cir. 2003)

(remanding without vacatur in light of economic harm that would result from vacatur); *Idaho*

*Farm Bureau,* 58 F.3d at 1405-06 (finding vacatur was not warranted "when a more closely

tailored remedy is available.").

Given the seriously disruptive consequences of vacating the Phase II lease sales, and the

high likelihood that BLM could substantiate its Phase II leasing decisions on remand

(particularly for the leases outside the PHMAs), the Court should decline to vacate the Phase II

Lease Sales.  *Radio-Television News Dirs. Ass'n v. FCC*, 184 F.3d 872, 888 (D.C. Cir. 1999)

(Vacatur inappropriate when "there is at least a serious possibility that the [agency] will be able

MEMORANDUM IN SUPPORT OF RENEWED JOINT MOTION FOR PARTIAL SUMMARY
JUDGMENT -12

to substantiate its decision given an opportunity to do so, and when vacating would be
disruptive.") (quoting *Allied-Signal*, 988 F.2d at 151)).

### 2.    Plaintiffs Cannot Satisfy the Test for Injunctive Relief.

Because vacatur of the Phase II Lease Sales would operate as an injunction on current oil
and gas operations, there is no presumption that vacatur is the appropriate remedy even if the
Court finds a deficiency in BLM's NEPA analysis for any of the Phase II Lease Sales.  *Beverly
Hills Unified School Dist.*, 2016 WL 4445770 at *6 ("[T]o the extent that the vacatur currently
sought by Plaintiffs would have the effect of injunctive relief, it cannot be held that vacatur is the
presumptive remedy where a NEPA (or other environmental review) violation is found.").
Instead, Plaintiffs must satisfy the traditional four-part test for injunctive relief in addition to the
two-part *California Communities* vacatur test.  *Id.*; *see Sierra Forest Legacy v. Sherman*, 646
F.3d 1161, 1184 (9th Cir. 2011) ("Even in NEPA cases, an injunction should only issue if the
traditional four-factor test is satisfied") (internal quotations omitted); *Virgin Islands Tel. Corp. v.
FCC*, 444 F.3d 666, 671-72 (D.C. Cir. 2006) ("set aside" and "vacate" are synonymous).  And
"injunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing
that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22
(2008).

In *Monsanto*, the United States Supreme Court clarified that in challenges to federal
agency's NEPA decisions (as in other cases) "[a]n injunction should issue only if the traditional
four-factor test is satisfied." 561 U.S. at 157.  In so holding, the Supreme Court explicitly
overruled any precedent that "appear[ed] to presume than an injunction is the proper remedy for
a NEPA violation except in unusual circumstances. No such thumb on the scales is warranted."
*Id*.  Under this four-part test, Plaintiffs have the burden of demonstrating: (1) that they have
suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are

inadequate to compensate for that injury; (3) that considering the balance of hardships between

the plaintiffs and defendants, a remedy in equity is warranted; and (4) that the public interest

would not be disserved by an injunction.  *Id*. at 156-57.  Plaintiffs have not satisfied (and indeed,

cannot satisfy) their burden for injunctive relief under the facts of this case.

Here, Plaintiffs ask the Court to vacate the Phase II leases and "issue declaratory and/or

injunctive relief requiring Defendants to adhere to the requirements of NEPA, FLPMA, and the

APA in their ongoing and future oil and gas lease sales and development approvals."  ECF No.

165 at 88 (Prayer for Relief).  While Plaintiffs now claim they are *not* seeking an injunction

(ECF No. 315 at 28-29), this representation ignores the practical effect of asking the Court to

vacate the Phase II leases.  *See PGBA, LLC v. United States*, 389 F.3d 1219, 1228 (Fed. Cir.

2004) ("[R]elief in the form of an order setting aside the [decision] . . . is tantamount to a request

for injunctive relief.").[2]  If their Phase II leases are vacated, the Intervenors will face the

rescission of their binding lease contracts, will be effectively enjoined from any future

development on these lease tracts, and will likely be forced to shut-in producing wells that

penetrate Phase II leases.

As an initial matter, Plaintiffs have made *no* showing of irreparable injury in their

Phase II summary judgment brief.  *See* ECF No. 247-1 at 45-7.  While Plaintiffs have in their

---

[2] Plaintiffs incorrectly cite *Monsanto* for the proposition that vacatur and injunction are always distinct remedies.  *See* ECF No. 315 at 28.  The Supreme Court held no such thing.  On the contrary, the Supreme Court expressly declined to pass judgment on the nature or propriety of the district court's vacatur order as no party had challenged that remedy on appeal.  *Monsanto*, 561 U.S. at 156 ("Because petitioners and the Government do not argue otherwise, *we assume without deciding that the District Court acted lawfully in vacating the deregulation decision.*") (Emphasis added).  No party in *Monsanto* argued that the vacatur of the Animal and Plant Inspection Service's ("APHIS") decision to deregulate Roundup Ready Alfalfa constituted an injunction, so the Court accepted that remedy without further review.  In contrast, where, as here, the vacatur of BLM's leasing decision has the practical effect of an injunction, Plaintiffs must satisfy *Monsanto*'s four-part test for injunctive relief.  *PGBA, LLC,* 389 F.3d at 1228.

complaint (but not in their summary judgment brief) alleged injuries to their members from impacts of drilling operations on certain issued leases, (ECF No. 165 at ¶¶ 24, 299, 313), BLM has made clear that no such impacts can flow from the lease sales themselves because access to the leases will not be granted until an Operator is able to submit an APD that complies with all BLM regulations. WY055734. *See also* 43 C.F.R. § 3162.3-1(c) ("No drilling operations, nor surface disturbance preliminary thereto, may be commenced prior to the authorized officer's approval of the [APD]."). Because Plaintiffs have not shown, and cannot show, that they will be irreparably harmed by leaving the Phase II leases in place during remand, Plaintiffs' request for vacatur must fail. *See*, *e.g.*, *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) (applicant for injunctive relief must carry burden on all factors).

At best, Plaintiffs' alleged future injuries are based on a speculative chain of contingency because it is not possible to determine at this juncture whether or not a particular lease will be explored or developed. *E.g.*, *Winter*, 555 U.S. at 21–23 (injunctive relief may not issue on mere "possibility" of harm, especially when "this is not a case in which the defendant is conducting a new type of activity with completely unknown effects on the environment"); *N.M. Dep't of Game & Fish v. Dep't of the Interior*, 854 F.3d 1236, 1253 (10th Cir. 2017) (finding "speculative assertions are insufficient to carry the [plaintiff's] burden" of making a "clear showing" of irreparable harm).

Moreover, the balance of hardships between the Plaintiffs and Defendants (including Intervenors) here clearly tips in the Defendants favor. While Plaintiffs can establish *no* harm from leaving the Phase II leases in place, Defendants and Intervenors have demonstrated that they will suffer disastrous financial, operational, and other harms from vacatur of the Phase II leases. *See sec*. III-A-1 above. *See also* ECF No. 278-1 at 48-49; ECF No. 283-1 at 24.

Finally, the public interest would be disserved by a vacatur order which acts as an injunction.  In addition to the public interests articulated by the State of Wyoming (ECF No. 283-1 at 24), the public also has a strong interest in the orderly and safe production of oil and gas resources on public lands.  *Diné Citizens Against Ruining Our Env't v. Jewell*, 2015 WL 4997207, at *50 (D.N.M. Aug. 14, 2015) ("The oil-and-gas industry is an enormous job creator and economic engine in New Mexico, and shutting down portions of it [through injunctive relief] based on speculation about unproven environmental harms is against the public interest.").

Oil and gas development is carried out through private oil and gas companies, which acquire leases through a sealed bidding process and then engage in exploration efforts that, if successful, will lead to production.  In exchange for lease sales and royalties, lease operators obtain valuable contractual and property interests in the purchased leases.  *See, e.g.*, *Mobil Oil Expl. & Producing Se., Inc. v. United States*, 530 U.S. 604, 607–08 (2000); *Union Oil Co. of Cal. v. Morton*, 512 F.2d 743, 747 (9th Cir. 1975).  If the leases issued in the challenged Lease Sales are vacated as Plaintiffs request, leaseholders will lose the opportunity to seek BLM approval to explore for, and eventually produce, valuable mineral deposits, and fee mineral owners, federal, state, and local governments will lose significant royalty and tax revenues.  *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) (hypothetical environmental harm outweighed by "committed" oil company investments).  In sum, the demonstrated harm to the lessees, coupled with the public interest, weighs demonstrably against vacatur.  *See Winter*, 555 U.S. at 23–27 (aggregating harm to non-movants with public interest in denying injunctive relief).

### B.    Plaintiffs Are Not Entitled to *Any* Broad Injunctive Relief, including Suspension of the Challenged Leases.

Federal Defendants have suggested that instead of vacating the Phase II leases, "[h]arm to the environment could be avoided during any remand period by enjoining surface disturbing

activities and suspending rather than vacating the leases." ECF No. 278-1 at 58.  Intervenors

strongly oppose any remedy that would involve suspending their Phase II leases.

As an initial matter, Plaintiffs have not carried their burden to obtain *any* broad-based

injunctive relief, including suspension of the Phase II leases.  As explained at length in sec. III-

A-2 above, Plaintiffs cannot show that they will suffer any harm—let alone irreparable harm—

by allowing the Phase II leases to remain in place (and active) during any remand to BLM.  No

surface disturbance will occur unless and until a lessee submits, and BLM approves, an APD.

The Court could protect sensitive surface areas by, for example, enjoining BLM's approval of

APDs (or related surface disturbance) on leases with PHMAs pending BLM's completion of any

required supplemental NEPA analysis.

In contrast, a general suspension of Phase II leases would work great hardship on the

Intervenors.  If all Phase II leases are suspended, Intervenors' wells which produce from, or

penetrate, Phase II leases would need to be shut in.  Moreover, Intervenors' wells that produce

from DSUs with Phase II leases would also be threatened.  The following Intervenor wells would

be threatened by an order suspending all the Phase II leases, even though BLM has analyzed the

site-specific environmental impacts before approving an APD for each well: Flatbow Well

(PPRA), Diablo and Coronado Wells (Rebellion II), and Titan Iberlin, T-Chair Wells, and eight

EOG-Operated Wells (Titan).  As discussed above, just as the balance of harms and the public

interest weigh heavily against vacating the Phase II leases, so too do these concerns preclude

suspension of all Phase II leases or any other broad-based injunctive relief.

### C.      Any Injunctive Relief Should be Narrowly Tailored to Protect Intervenors' and Other Stakeholders' Interests from Unnecessary Disruption.

If the Court determines that some form of injunctive relief is warranted, such injunctive

relief should be narrowly tailored to preserve the status quo while avoiding undue hardship on

the Intervenors and the other stakeholders.  In addition to the severe harms to the Intervenors

outlined above, private mineral interest owners who own fee minerals in DSUs containing

Phase II leases, would be also severely harmed by any broad injunctive relief (including lease

vacatur or suspension) that prohibits oil and gas development from all Phase II leases.  The

interests of fee mineral owners are intertwined with the interests of Intervenors and should be

considered in weighing whether any Phase II injunction would be in the public interest.  *See*

Suppl. Inkster Decl. ¶ 15.  To give just one example, the Moore Mineral Trust stands to lose an

estimated $3 million or more in lost revenue from its 820 net mineral acres that are leased to

Titan within six DSUs that contain Phase II leases.  *Id*.  *See Sierra Forest Legacy v. Rey*, 577

F.3d 1015, 1022 (9th Cir. 2009) ("[W]hen deciding whether to issue a narrowly tailored

injunction, district courts must assess the harms pertaining to injunctive relief in the context of

that narrow injunction.") (Citation omitted); *N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843

(9th Cir. 2007) (holding that a partial injunction allowing some development to go forward

appropriately balanced phased development, which would not cause irreparable harm, with the

public's interest in clean energy development and prevention of environmental harms.).

Here, a narrowly tailored remedy is appropriate *if* the Court finds any deficiency in

BLM's NEPA analysis.  Plaintiffs' Complaint and their Phase Two opening brief focus on

impacts to PHMA habitat and the *surface* effects of oil and gas development to sage grouse

habitat.  *See, e.g*., ECF No. 164 ¶¶ 247, 305; ECF No. 247-1.  Two over-arching principles

should therefore guide the Court's consideration of remedy.  First, the Court should issue no

injunctive relief that disturbs sub-surface operations, including wells that penetrate the sub-

surface of Phase II leases without impacting the surface of those leases.  Second, the Court

should not enjoin any activities on leases that do not include PHMAs.

As an initial matter, Plaintiffs have not and cannot show that sub-surface oil and gas operations will disturb the sage-grouse habitat or activities. Similarly, all current oil and gas wells impacting federal leases are operating pursuant to BLM-approved APDs. Future wells could be developed from surface locations that would not impact sensitive sage grouse habitat. Accordingly, sub-surface oil and gas operations involving Phase II leases should be expressly excluded from any Phase II injunctive relief.

As discussed in sec. III-A-1 above, Rebellion II operates two wells, Titan operates one well, and Titan has a significant interest in two EOG-Operated wells, that penetrate Phase II leases. Each of these wells is at risk of being shut-in if all Phase II leases are suspended. Similarly, PPRA and Titan each have invested significant resources in wells which are operating in DSUs that contain one or more Phase II leases. Each of these wells is at the risk of being disrupted from any overly broad injunction of Phase II leases. In order to protect these currently-operating wells, the Court should exclude *all* sub-surface oil and gas operations from any injunctive relief.

Moreover, each of the wells listed above is operating according to a BLM-approved APD. Before issuing these APDs, BLM did additional site-specific environmental analyses to ensure that the permitted operations did not adversely impact the sage-grouse (as well as other sensitive resources). None of these APDs was challenged by Plaintiffs. Any injunctive or other relief that disturbs Intervenors' operational wells amounts to a collateral attack on these lawfully-issued APDs.

Second, Phase II leases that do not contain PHMAs should be exempt from any injunctive relief. Plaintiffs' primary argument in their Phase II summary judgement brief is that BLM should have analyzed an alternative that deferred oil and gas leasing in PHMA areas. ECF No. 247-1 at 15-16. However, none of the leases owned by Intervenors contains PHMAs. In

fact, each of these leases is located a considerable distance from any PHMA.  ECF No. 260-2 at

¶ 5; ECF No. 270-2 at ¶ 7; ECF No. 262-2 at ¶¶ 4-5.  As such, BLM would have issued each of

Intervenors' leases *even if* BLM had decided to forego oil and gas leasing in PHMA areas as

Plaintiffs now request.  Because operations on leases outside of PHMA areas will not disturb

PHMAs, these leases should be excluded from any injunction of Phase II lease activities.  *See,*

*e.g., N. Cheyenne Tribe*, 503 F.3d at 843 (holding that a partial injunction allowing some

development to go forward appropriately balanced phased development, which would not cause

irreparable harm, with the public's interest in clean energy development and prevention of

environmental harms.).

## IV.    CONCLUSION

The Court should grant Defendants' and Intervenors' Motions for Partial Summary

Judgment on Phase II and deny Plaintiffs' corresponding Motion in its entirety.  Should the

Court identify one or more deficiencies in BLM's NEPA analysis, the Court should neither

vacate nor suspend Intervenors' Phase II leases, but instead remand the leasing decisions to BLM

without vacating them.  Any interim relief should be narrowly tailored to address the specific

analytical shortcomings while avoiding disruption to Intervenors' Phase II leases and operational

wells in which they have a financial interest.


DATED:  September 18, 2020

HOLLAND & HART LLP

By: */s/ Alison C. Hunter*

*Counsel for Counsel for Defendant-*
*Intervenors Peak Powder River*
*Acquisitions, LLC, Titan Exploration, LLC,*
*and Rebellion Energy II, LLC*


MEMORANDUM IN SUPPORT OF RENEWED JOINT MOTION FOR PARTIAL SUMMARY
JUDGMENT -20

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 18th day of September, 2020, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Laurence J. Lucas                              Sarah Stellberg
Advocates for the West                         Advocates for the West
llucas@advocateswest.org                       sstellberg@advocateswest.org

Todd C. Tucci                                  John Shaughnessy Most
Advocates for the West                         U.S. Department of Justice
ttucci@advocateswest.org                       john.most@usdoj.gov

Luther L. Hajek                                Christine Gealy England
U.S. Department of Justice                     U.S. Attorney's Office
luke.hajek@usdoj.gov                           christine.england@usdoj.gov

Elliott John Adler                             James Kaste
Wyoming Attorney General's Office              Wyoming Attorney General's Office
elliott.adler@wyo.gov                          james.kaste@wyo.gov

Cherese De'Dominiq McLain                      Brett A. Sumner
MSBT Law, Chtd.                                Beatty & Wozniak, P.C.
cdm@msbtlaw.com                                bsumner@bwenergylaw.com

Malinda Morain                                 Andrew C. Lillie
Beatty & Wozniak, P.C.                         Hogan Lovells US LLP
mmorain@bwenergylaw.com                        andrew.lillie@hoganlovells.com

Jessica Black-Livingston                       Mark D. Gibson
Hogan Lovells US LLP                           Hogan Lovells LLP
jessica.livingston@hoganlovells.com            mark.gibson@hoganlovells.com

Lee Radford                                    William E. Sparks
Parsons Behle & Latimer                        Beatty & Wozniak, P.C.
lradford@parsonsbehle.com                      wsparks@bwenergylaw.com

By:   /s/ Alison C. Hunter
      Alison C. Hunter