Laurence J. ("Laird") Lucas (ISB # 4733)
llucas@advocateswest.org
Sarah Stellberg (ISB #10538)
sstellberg@advocateswest.org
Todd C. Tucci (ISB # 6526)
ttucci@advocateswest.org
Advocates for the West
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, and CENTER FOR BIOLOGICAL DIVERSITY,<br><br>Plaintiffs,<br><br>v.<br><br>DAVID BERNHARDT*, Secretary of Interior, *et al.*,<br><br>Defendants. | Case No. 1:18-cv-00187-REB<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO RENEWED JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT BY DEFENDANT-INTERVENORS PEAK POWDER RIVER ACQUISITIONS, LLC; TITAN EXPLORATION, LLC; AND REBELLION ENERGY II, LLC (ECF NO. 318)** |

*\* Official Defendant automatically substituted per Fed. R. Civ. P. 25(d)*

## INTRODUCTION

Plaintiffs Western Watersheds Project and Center for Biological Diversity respectfully oppose the Renewed Joint Motion for Partial Summary Judgment (Phase Two) filed by Defendant-Intervenors Peak Powder River Acquisitions, LLC, Titan Exploration, LLC, and Rebellion Energy II, LLC ("Intervenors") (ECF No. 318).

If the Court agrees that the Bureau of Land Management (BLM) violated the National Environmental Policy Act (NEPA) in issuing the Phase Two leases, the proper remedy is to vacate the leases. That is the remedy Congress itself ordered for agency actions held unlawful under the Administrative Procedure Act (APA). While the Court has equitable discretion to withhold that remedy under "rare" and "limited" circumstances, this is not such a case. Vacatur here will avoid irreparable environmental harm, preserve the integrity of the NEPA process, and avoid emboldening BLM to prepare similarly deficient NEPA analyses for future leasing decisions. While Intervenors suggest they will suffer dire economic consequences from vacatur, their claims are exaggerated and speculative. More importantly, economic losses are a common result of vacatur and do not rise to the level of harm the Ninth Circuit has found sufficient to withhold vacatur.

NEPA violations must have consequences for the statute to have any bite. Accordingly, Plaintiffs respectfully request that the Court award the presumptive remedy for BLM's violations and vacate the unlawful leases.

## ARGUMENT

**I.     THE PRESUMPTIVE REMEDY OF VACATUR IS APPROPRIATE.**

   **A.     It Is Intervenors' Burden to Show That Vacatur Is Unwarranted.**

Intervenors' first mistake is claiming that Plaintiffs carry the burden to establish that vacatur is warranted. *See* Mem. ISO Renewed Joint M. for Partial S.J. at 10 (ECF No. 318-1) (hereinafter "Interv. Br."). Quite the opposite. The APA unambiguously states that a "reviewing court *shall* . . . hold unlawful and set aside agency action" that is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] without observance of procedure required by law." 5 U.S.C. § 706(2) (emphases added). Vacatur is thus

the presumptive remedy under the APA, and it is Intervenors' burden to establish that compelling equities warrant anything less than that remedy. *See Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1094 (9th Cir. 2020) ("There is a presumption . . . in APA cases that the offending agency action should be set aside"); *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1122 (9th Cir. 2018) (defendants must "overcome the presumption of vacatur"); *Ctr. for Envtl. Health v. Vilsack*, 2016 WL 3383954, *13 (N.D. Cal. 2016) ("it is Defendants' burden to show that vacatur is unwarranted"); *Ctr. for Biological Diversity v. Provencio*, No. 10-cv-330, 2012 WL 13035479, at *2 (D. Ariz. Sept. 28, 2012) ("it is not plaintiffs' burden to show that the equities favor . . . vacatur of an agency decision held to violate NEPA").

Given the clear Congressional command in § 706(2)(A), the Ninth Circuit has cautioned that equitable exceptions to vacatur must be applied "sparingly" and in "rare" and "limited" circumstances. *Nat'l Family Farm Coal. v. U.S. EPA*, 960 F.3d 1120, 1145 (9th Cir. 2020); *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015); *Humane Soc'y v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010). In doing so, courts look to the two factors articulated in *Allied-Signal, Inc. v. United States Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-151 (D.C. Cir. 1993): "the seriousness of the order's deficiencies" and "the disruptive consequences" of vacatur. Specifically, a party opposing vacatur must show that "vacatur would cause serious and irremediable harms that significantly outweigh the magnitude of the agency's error.'" *Se. Alaska Conservation Council v. U.S. Forest Serv.*, No. 1:19-CV-00006-SLG, 2020 WL 5016932, at *1 (D. Alaska June 24, 2020) (*quoting Aqualliance v. U.S. Bureau of Reclamation*, 312 F. Supp. 3d 878, 881 (E.D. Cal. 2018).

As explained below, Intervenors fail to meet that heavy burden.

B.   **BLM's NEPA Violations Were Serious.**

The seriousness of BLM's NEPA violations, the first *Allied Signal* factor, points decidedly in favor of vacatur. Intervenors attempt to downplay these failings as "narrow procedural issues," but an inadequate "hard look," deficient cumulative effects analysis, or failure to evaluate reasonable alternatives each cuts to the heart of NEPA. These are exactly the type of "fundamental flaws" that warrant vacatur. *See Se. Alaska Conservation Council v. U.S. Forest Serv.*, No. 1:19-cv-6, 2020 WL 5016932, at *3 (D. Alaska June 24, 2020) (lack of site-specific analysis and adequate alternatives are "serious" NEPA errors that "strongly weigh in favor vacatur"); *League of Wilderness Defenders/Blue Mtns. Biodiversity Project v. U.S. Forest Serv.*, 3:10–CV–1397, 2012 WL 13042847 (D.Or. 2012) ("Cumulative impacts analysis is at the heart of [NEPA], and a failure to analyze cumulative impacts will rarely—if ever—be so minor an error as to satisfy this first *Allied–Signal* factor"); *Or. Nat. Desert Ass'n v. Zinke*, 250 F. Supp. 3d 773, 774 (D. Or. 2017) (faulty baseline analysis under NEPA is a serious deficiency warranting vacatur); *Ctr. for Food Safety v. Vilsack*, 734 F. Supp. 2d 948, 953 (N.D. Cal. 2010) (disagreeing that NEPA violations are "minor or insignificant"); *see also Pub. Emp. for Envtl. Responsibility v. U.S. Fish & Wildlife Serv.*, 189 F. Supp. 3d 1, 2-3 (D.D.C. 2016) (noting the "primacy of vacatur to remedy NEPA violations").

Moreover, to the extent Intervenors imply that procedural violations do not warrant vacatur, they are wrong. *See* 5 U.S.C. § 706(2)(D) (requiring courts to set aside agency action made "without observance of procedure required by law"). The Ninth Circuit has instructed courts to "vigorously enforce" procedural safeguards and that "relief for agency procedural error should be a strict reconstruction of procedural rights." *W. Oil & Gas Ass'n v. U.S. EPA*, 633 F.2d 803, 813 (9th Cir. 1980) (but declining to vacate Clean Air Act regulations where doing so

would cause more pollution and thus thwart the statute). The D.C. Circuit has likewise warned against "disparage[ing]" NEPA violations as "merely procedural." *See Oglala Sioux Tribe v. U.S. Nuclear Regulatory Comm'n*, 896 F.3d 520, 534 (D.C. Cir. 2018) ("If even 'significant' deficiencies in NEPA reviews are forgiven because they are merely procedural, there will be nothing left to the protections that Congress intended the Act to provide"); *see also Calvert Cliffs' Coordinating Comm., Inc. v. U. S. Atomic Energy Comm'n*, 449 F.2d 1109, 1114 (D.C. Cir. 1971) (explaining that NEPA was meant to be more than a "paper tiger" and "must be rigorously enforced by the reviewing courts").

Intervenors claim that the seriousness of any NEPA errors is "minimized" by the fact that BLM will conduct site-specific NEPA analysis before approving ground-disturbing activities. Interv. Br. at 7. There are two obvious problems with this argument. First, NEPA analysis at the APD stage is not an adequate substitute for pre-leasing analysis, as by then, BLM no longer has the option of withholding the lease (and thus prohibiting development altogether) to avoid harmful effects to greater sage-grouse. Second, the record shows that BLM has approved almost every existing well on the Phase Two leases without site-specific NEPA analysis. *See* ECF No. 315-1 (collecting the Categorical Exclusions BLM used to avoid site-specific NEPA analysis when approving existing wells on the Phase Two leases).

Finally, Intervenors claim there is a "high likelihood" that BLM will just reissue all Phase Two leases—but there is no evidence to support this claim. If true, it just makes vacatur all the more important to ensure that BLM does not improperly predetermine the outcome of its NEPA analysis. *See* 40 C.F.R. § 1502.5 (emphasizing that the NEPA process must "not be used to rationalize or justify decisions already made"). Here, BLM's faulty assessment of sage-grouse impacts, especially when combined with the agency's RMP obligation to prioritize leasing

outside greater sage-grouse habitat, raises serious doubts that BLM "chose correctly," *Allied–Signal*, 988 F.2d at 150, and it strongly suggest that "a different result <u>may</u> be reached" on remand, *Pollinator Stewardship*, 806 F.3d at 532 (underscore added). Thus, this first factor weighs heavily in favor of vacatur.

        **C.**    **The Practical Consequences of Vacatur Do Not Significantly Outweigh the Seriousness of BLM's Violations.**

The second *Allied Signal* factor likewise weighs in Plaintiffs' favor. The Ninth Circuit has found practical consequences sufficient to withhold vacatur in only a handful of specific situations. The most common is where vacatur would undermine the purpose of the underlying statute or cause harm to the prevailing plaintiff—a circumstance not present here. *See, e.g.*, *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) (declining to vacate ESA listing for the Bruneau snail due to concern over potential extinction of that species); *W. Oil & Gas v. U.S. EPA*, 633 F.2d 803 (9th Cir. 1980) (declining to vacate pollution reduction designations under the Clean Air Act to avoid "thwarting in an unnecessary way the operation of the Clean Air Act"); *Wood v. Burwell*, 837 F.3d 969, 976 (9th Cir. 2016) (noting district court denied vacatur to avoid denying Medicaid benefits to prevailing plaintiff class); *Davis County Solid Waste Mgmt. v. U.S. EPA*, 108 F.3d 1454, 1459-60 (D.C. Cir. 1997) (leaving pollution emissions guidelines in place as "greater emissions would occur" if the guidelines were vacated); *North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 1990) (allowing legally flawed rule to remain in place to "preserve the environmental values covered" by the rule). In contrast here, vacatur would *avoid* harm to Plaintiffs and the environment and *further* the purposes of NEPA by ensuring an objective analysis on remand.

The second scenario is where the agency's errors were minor and vacating would cause severe harms that significantly outweigh the consequences of not vacating. *See, e.g.*, *Cal. Cmtys.*

*Against Toxics v. U.S. EPA*, 688 F.3d 989, 994 (9th Cir. 2012) (declining to vacate rule where EPA offered evidence that it would likely reissue the same decision on remand and vacatur would result in significant public harms, including air pollution and power blackouts); *see also California v. Bernhardt*, Case No. 4:18-cv-05712-YGR, 54-55 (N.D. Cal. Jul. 15, 2020) (exception to vacatur warranted "where the agency's errors are minor and the consequences of vacating would be more harmful or disruptive than not vacating"); *Se. Alaska Conservation Council*, 2020 WL 5016932, at *1 (defendant must establish that "vacatur would cause serious and irremediable harms that significantly outweigh the magnitude of the agency's error.").

Here, the economic effects of lease vacatur do not outweigh the seriousness of BLM's violations or irreparable environmental harm vacatur would avoid. Economic costs are not an exceptional consequence of vacatur, and without more, do not justify withholding this statutory remedy. *Compare Cal. Cmtys. Against Toxics*, 688 F.3d at 993–94 (vacatur not warranted where it would cause power blackouts, air pollution that would undermine the Clean Air Act, and an "economically disastrous" halt to a "billion-dollar venture") *with Nat'l Family Farm*, 960 F.3d at 1145 (vacatur of pesticide registration warranted despite far-reaching economic consequences on farmers left with unusable product); *see also Mont. Wildlife Fed'n v. Bernhardt*, No. CV-18-69-GF-BMM, 2020 WL 2615631, at *11 (D. Mont. May 22, 2020) (finding that the economic costs of oil and gas lease vacatur do "not rise to the level of harm that the Ninth Circuit has previously considered significant enough to warrant remand without vacatur"); *Se. Alaska Conservation Council*, 2020 WL 5016932, at *5 (vacatur warranted for NEPA violations despite threatening viability of timber businesses and Southeast Alaska economy); *Or. Nat. Desert Ass'n v. Zinke*, 250 F. Supp. 3d 773, 775 (D. Or. 2017) (finding that the economic costs of vacating BLM's approval of a transmission line and wind turbine project "do not rise to the level found in

PLAINTIFFS' RESPONSE IN OPPOSITION TO RENEWED JOINT MOTION FOR PARTIAL S.J.
(PHASE TWO) BY DEFENDANT-INTERVENORS PPRA, REBELLION, AND TITAN - 7

*California Communities*"); *Diné Citizens Against Ruining Our Env't v. Jewell*, 312 F. Supp. 3d 1031, 1112–14 (D.N.M. 2018) (vacatur warranted due to environmental risks despite millions in lost oil and gas revenues), *rev'd in part on other grounds,* 923 F.3d 831 (10th Cir. 2019).[1]

Intervenors' claimed harms are also incredibly overblown and speculative. They note the millions of dollars they paid for their 21 leases, Interv. Br. at 8, but BLM has indicated that these sums would be refunded. *See* Good Decl. ¶ 11 (ECF No. 278-6). They also cite the nearly $10 million in royalties and taxes they have paid on existing production—but fail to explain why this is a cost of lease vacatur. *See* Interv. Br. at 8. Titan also claims that certain of its non-Phase Two leases would be rendered undrillable but does not explain *why*, making it impossible for Plaintiffs to respond factually to this claim. *See* Interv. Br. at 9. Intervenors also notably do not assert that they had actual, near-term development plans for such leases (especially during this market downturn), or that these leases could never be developed. Finally, Intervenors misleadingly suggest they will lose the investments made on their 13 producing wells. *Id.* In reality, only three of these wells penetrate a Phase Two lease and would be required to cease

---

[1] The cases Intervenors cite are all distinguishable. In *California Communities*, 688 F.3d at 994, the Ninth Circuit declined due vacate due to a combination of "severe" economically and environmentally harmful consequences, including disruptive power blackouts and air pollution that would undermine the very purpose of the Clean Air Act. *Id.* at 993–94. Even then the court affirmed that power plant operations could not start prior to finalization of the NEPA remand. *Id.* at 994. The Tenth Circuit in *WildEarth Guardians v. BLM*, 870 F.3d 1222, 1239 (10th Cir. 2017), did not determine that vacatur was inappropriate but rather remanded to the district court to fashion the appropriate remedy. In *La. Fed. Land Bank Ass'n, FLCA v. Farm Credit Admin.*, 336 F.3d 1075, 1085 (D.C. Cir. 2003), the D.C. Circuit declined to vacate where the agency merely failed to fully explain its decision, a far cry from BLM's failure here to undertake a proper environmental analysis under NEPA. In *Idaho Farm Bureau,* 58 F.3d at 1405-06, the court declined to vacate to avoid possible extinction to a snail species—a factor that weighs in *favor* of vacatur here. Finally, *Beverly Hills Unified School Dist. v. Fed. Transit Admin.*, 2016 WL 4445770, *8-11 (C.D. Cal., Aug. 12, 2016) was based on the court's flawed conclusion that there is no presumption in favor of vacatur, which is irreconcilable with Ninth Circuit precedent. The case also involved far more extreme public consequences of vacatur, such as delay of a much-needed mass transit upgrade, traffic congestion, and air pollution. *Id.*

PLAINTIFFS' RESPONSE IN OPPOSITION TO RENEWED JOINT MOTION FOR PARTIAL S.J. (PHASE TWO) BY DEFENDANT-INTERVENORS PPRA, REBELLION, AND TITAN - 8

production upon lease vacatur. *See* Interv. Br. at 2–5. The remaining 10 wells are merely located in a Drilling Spacing Unit ("DSU") that includes a Phase Two lease. *Id.* Intervenors speculate that wells "that produce from DSUs that include Phase II wells may experience disruptions in production" if the Phase Two leases are vacated, but they offer no explanation or evidence to back up this claim. In fact, BLM has specific procedures set up for this scenario, which would appear to allow production to continue after vacatur so long as proceeds attributable to the vacated lease, under the governing Communitization Agreement ("CA"), are placed in an interest-bearing escrow account ("Unleased Lands Account"). *See* BLM Manual 3160-9, .1.11.H.[2] Ironically, Intervenors would be worse off if the leases were merely suspended, as BLM has taken the position that an "Unleased Lands Account" cannot be created on a suspended lease. *See* Christiansen Declaration ¶ 12 (ECF No. 253-3).

Moreover, such economic consequences must be balanced against the irreparable environmental harm that vacatur would avoid. Intervenors falsely claim that BLM's APD approvals "ensure[d] that the permitted operations did not adversely impact the sage-grouse (as well as other sensitive resources)." Interv. Br. at 19 (notably providing no citation in support of this claim). This is a blatant factual misrepresentation.  In addition to the many other irreparable environmental consequences of drilling and fracking, Intervenors' wells pose obvious risks to greater sage-grouse. They are all in sage-grouse habitat and the majority within close proximity of sage-grouse leks. Because the wells are all located in GHMA, development is subject to almost no protections for sage-grouse.

---

[2] https://www.blm.gov/sites/blm.gov/files/uploads/mediacenter_blmpolicymanual3160-9.pdf.

PLAINTIFFS' RESPONSE IN OPPOSITION TO RENEWED JOINT MOTION FOR PARTIAL S.J. (PHASE TWO) BY DEFENDANT-INTERVENORS PPRA, REBELLION, AND TITAN - 9

For example, the T-Chair 4276-1201-004NH well is within 3 miles of 5 sage-grouse leks, the closest of these just 1.9 miles from the wellpad.[3] While lacking in much detail, BLM acknowledged that the project will "negatively affect the species." Similarly, the Telluride 2833-04H, Telluride 2833-2H, and Flatbow 870-2833H wells are located within 2 miles of 2 active sage-grouse leks.[4] The Telluride 2833-03H well is also located less than 2 miles from an occupied sage-grouse lek.[5] BLM nonetheless approved the Telluride wells with Categorical Exclusions lacking any site-specific analysis of greater sage-grouse impacts, instead tiering to the generic analysis from the February 2018 Lease Sale, RMP EIS, and an EA prepared for another oil and gas project in a different location ("Nine Mile Fed 1 POD"). That Nine Mile Fed 1 POD EA itself contained little discussion of sage-grouse impacts but nonetheless acknowledged that drilling would "negatively affect the species" with "both long and short-term effects to the local GSG population."[6] As one final example, BLM approved the Josh Federal 22-

---

[3] *See* Environmental Assessment: Titan Exploration LLC Oil and Gas Project: None Mile Federal 1 Plan of Development, DOI-BLM-WY-P070-2018-0103-EA https://eplanning.blm.gov/public_projects/nepa/114861/158209/193379/Titan_NineMileFed1POD_EA_20180926.pdf.

[4] *See* 390 CX#3: EOG Resources Inc., Flatbow 28 NENW Oil and Gas Plan of Development, DOI-BLM-WY-P070-2019-0033-CX, https://eplanning.blm.gov/public_projects/nepa/118458/20016654/250022150/Signed_Flatbow28NENW_CX.pdf.

[5] *See* 390 CX#1: EOG Resources Inc. Telluride 2833-01H and Telluride 2833-03H Applications for Permit to Drill, DOI-BLM-WY-P070-2019-0143-CX, https://eplanning.blm.gov/public_projects/nepa/1501181/20004304/250005146/EOG_Telluride2833-01H_03H_CX.pdf; Identification of Affected Resources, https://eplanning.blm.gov/public_projects/nepa/1501181/20004306/250005148/Telluride_01H_and_03H__Flatbow_28_NENW_Affected_Resource_List_BFO.pdf.

[6] *See* Environmental Assessment: Titan Exploration LLC Oil and Gas Project: None Mile Federal 1 Plan of Development, DOI-BLM-WY-P070-2018-0103-EA, https://eplanning.blm.gov/public_projects/nepa/114861/158209/193379/Titan_NineMileFed1POD_EA_20180926.pdf.

PLAINTIFFS' RESPONSE IN OPPOSITION TO RENEWED JOINT MOTION FOR PARTIAL S.J. (PHASE TWO) BY DEFENDANT-INTERVENORS PPRA, REBELLION, AND TITAN - 10

42-73-3TH well with a Categorical Exclusion[7] that contains no site-specific analysis of impacts to greater sage-grouse, even though the wellpad appears to be within 2 miles of a lek.[8]

**In none of these documents did BLM conclude that development would not adversely impact greater sage-grouse**. Indeed, the proximity of leks virtually assures they will. BLM itself acknowledges that "[e]nergy development within two miles of leks is projected to reduce the average probability of lek persistence from 87 percent to 5 percent." WY057884 (Buffalo RMP EIS at 509). "Current research suggests that impacts to leks from energy development are discernible out to a minimum of 4 miles, and that some leks within this radius have been extirpated as a direct result of energy development." *Id.* These results are expected even with application of a seasonal restriction on drilling and construction within 2 miles of the lek (which was not even required of all Intervenor wells). This is because "fewer than 50 percent of Greater Sage-Grouse are expected to nest in the protected [2-mile] area," WY057885, and development outside the breeding and nesting seasons nonetheless causes loss and avoidance of important nesting habitat. WY057885 ("Even with a timing limitation on construction activities, Greater Sage-Grouse avoid nesting in O&G fields because of the activities associated with operations and production"); *see also* BLM-MT-2Q17-001272 (projecting population losses even with application of a 0.25-mile lek buffer and 2-mile seasonal timing limitation, precisely what is applied in Wyoming GHMA).

---

[7] *See* 390 CX3: Navigation Powder River, LLC, Josh Federal 22-42-73-3TH Application for Permit to Drill, DOI-BLM-WY-P070-2019-0084-CX, https://eplanning.blm.gov/public_projects/nepa/122994/174154/211597/CX_JoshFed22-42-73-3TH_signed.pdf.
[8] *See* Appendix B, BLM Recommended Mitigation Measures (RMMs) for Conventional Application for Permit to Drill, https://eplanning.blm.gov/public_projects/nepa/122994/174156/211599/RMMsAppendixB_JoshFed22-42-73-3TH.pdf (applying a recommended mitigation measure applicable only to development within 2 miles of a sage-grouse lek).

PLAINTIFFS' RESPONSE IN OPPOSITION TO RENEWED JOINT MOTION FOR PARTIAL S.J. (PHASE TWO) BY DEFENDANT-INTERVENORS PPRA, REBELLION, AND TITAN - 11

While these environmental risks are clear from the available record, in weighing vacatur the Court "must also consider the risk of unforeseen harms" the agency's inadequate NEPA analyses may have overlooked. *See Diné Citizens*, 312 F. Supp. 3d at 1111. Courts have found that placing the burden on a prevailing Plaintiff in a NEPA case to establish environmental harm is "especially inappropriate because the inadequate EIS may well make doing so impossible." *Oglala Sioux*, 896 F.3d at 534–35.

Environmental harm is not necessary to obtain the APA's default remedy, but where present, it weighs strongly in favor of vacatur. *See, e.g.*, *Pollinator Stewardship*, 806 F.3d at 532 (focusing *Allied Signal* inquiry on whether vacatur would avoid or risk "possible environmental harm"); *N. Plains Res. Council v. U.S. Army Corps of Eng'rs*, No. 19-cv-44, 2020 WL 3638125, at *4 (D. Mont. May 11, 2020) ("A court largely should focus on potential environmental disruption, as opposed to economic disruption"); *Ctr. for Food Safety*, 734 F. Supp. 2d at 953 ("it is not clear that economic consequences is a factor the Court may consider in environmental cases"); *PEER v. U.S. Fish & Wildlife Serv.*, 189 F. Supp. 3d 1 (D.D.C. 2016) ("it is not clear that economic concerns are as relevant in an environmental case like this one"); *Nat. Res. Def. Council v. EPA*, 676 F. Supp. 2d 307, 316–17, 316 n.10 (S.D.N.Y. 2009) (similar).

Moreover, the Court should evaluate vacatur's potential disruptive consequences in light of the relevant statute's objectives. *See, e.g.*, *Idaho Farm Bureau*, 58 F.3d at 1405 (declining to vacate ESA listing to avoid harm that statute was designed to prevent); *W. Oil & Gas*, 633 F.2d at 813 (declining to vacate pollution reduction designations to avoid "thwarting in an unnecessary way the operation of the Clean Air Act"). Because NEPA was enacted in order "prevent or eliminate damage to the environment," 42 U.S.C. § 4321 (1988), the possibility of environmental harm should be given precedence in considering whether vacatur is appropriate.

*See also Oglala*, 896 F.3d at 529 ("We know that the environmental values protected by NEPA are of high order—because Congress told us so"); *Nevada Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993) ("[t]he purpose of NEPA is to protect the environment, not . . . economic interests[.]").

## II.   THE FOUR-FACTOR INJUNCTION TEST IS NOT APPLICABLE.

Intervenors next attempt to fashion a new rule from whole cloth, arguing that Plaintiffs must satisfy the four-factor injunction test to obtain the APA's statutory remedy because vacatur would have similar "practical effect" to an injunction. Interv. Br. at 13–14. In addition to being logically unsound, this position is barred by the plain text of APA and decades of binding case law.

Vacatur of an agency action is not tantamount to an "injunction." *See Alsea Valley All. v. Dep't of Commerce*, 358 F.3d 1181, 1186–87 (9th Cir. 2004). In *Alsea*, the Ninth Circuit observed that while vacatur "prohibits, as a practical matter, the enforcement of" an agency action, that is not the practical equivalent of "enjoining" a party from taking some action. *Id.* at 1186. Vacatur lacks several essential elements of an injunction: it does not specifically compel or prohibit any action by a third party, and it thus is not enforceable by contempt sanctions. *See Orange Cty., Cal. Airport Hotel Assocs. v. Hongkong & Shanghai Banking Corp.*, Ltd., 52 F.3d 821, 825–26 (9th Cir. 1995) (noting that the threat of contempt is an "essential attribute" of an injunction); *Gates v. Shinn*, 98 F.3d 463, 468 (9th Cir. 1996) (if an order "does not clearly describe prohibited or required conduct, it is not enforceable by contempt"). Thus, as the Supreme Court explained in *Monsanto*, vacatur is a "less drastic remedy" than an injunction.[9]

---

[9] Evading a vacatur order would of course open a party up to further legal attack. *Cf. Badger Catholic, Inc. v. Walsh*, 620 F.3d 775, 782 (7th Cir. 2010) (noting that a declaratory judgment, although not enforceable by contempt, is "a real judgment, not just a bit of friendly advice"). For

PLAINTIFFS' RESPONSE IN OPPOSITION TO RENEWED JOINT MOTION FOR PARTIAL S.J. (PHASE TWO) BY DEFENDANT-INTERVENORS PPRA, REBELLION, AND TITAN - 13

It is of course true that here, as in *Alsea*, lease vacatur will likely have the practical effect of halting further lease activity and requiring efforts to unwind the leases. This is because parties are presumed to adhere to the law. *See, e.g.*, *Ctr. for the Study of Servs. v. U.S. Dep't of Health & Human Servs.*, 874 F.3d 287, 293 (D.C. Cir. 2017) ("A government defendant is presumed to adhere to the law declared by the court"); *O.A. v. Trump*, 404 F. Supp. 3d 109, 153–54 (D.D.C. 2019) (vacating a rule, but refusing to grant injunctive relief because it appeared that the government "w[ould] abide by the Court's order"); *cf. Samuel L. Bray*, The Myth of the Mild Declaratory Judgment, 63 Duke L.J. 1091, 1112 (2014) (while not enforceable by contempt, "declaratory judgments are usually complied with"). However, that vacatur may, as a practical matter, require or prohibit some action does not render it an "injunction." *See Alsea*, 358 F.3d at 1186–87.[10]

Even if the two remedies were practically equivalent, Intervenors' position would be barred by the plain text of the APA. Unlike an injunction, which is a creature of equity, vacatur is a legal remedy created by statute. Congress did not require any evaluation of equitable factors

---

instance, were an oil and gas company to extract federal minerals without a valid lease, it would be subject to prosecution for mineral trespass. *See* 43 C.F.R. 9239.0-7. Were BLM to permit drilling on a vacated lease, it would be in clear violation of the Mineral Leasing Act, its implementing regulations, and the Federal Land Policy and Management Act. *See, e.g.*, 43 C.F.R. § 3161.2 (providing that, "[b]efore approving operations on [a] leasehold, [BLM] shall determine that the lease is in effect"). And if Federal Defendants failed to refund the bids, the bidders would undoubtedly have claims for restitution in the Court of Federal Claims. *See Gould, Inc. v. United States*, 67 F.3d 925, 930 (Fed. Cir. 1995). However, disregard of a straightforward vacatur order would not be subject to a contempt finding.

[10] Indeed, *Allied-Signal*'s "disruptive consequences" prong would make little sense if vacatur did not have such practical consequences. *See, e.g.*, *Nat'l Family Farm Coal. v. U.S. EPA*, 960 F.3d 1120, 1145 (9th Cir. 2020) (recognizing that vacatur would effectively prohibit growers from using pesticide product they had already purchased); *Cal. Cmtys. Against Toxics*, 688 F.3d at 994 (noting that vacatur would effectively prohibit construction of a power plant); *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (noting that vacatur would effectively prohibit the growth and sale of Roundup Ready Alfalfa).

PLAINTIFFS' RESPONSE IN OPPOSITION TO RENEWED JOINT MOTION FOR PARTIAL S.J. (PHASE TWO) BY DEFENDANT-INTERVENORS PPRA, REBELLION, AND TITAN - 14

as a prerequisite to vacatur under the APA. Instead, the relief it specifies is mandatory and automatic: the court "shall hold unlawful and set aside" unlawful agency action. 5 U.S.C. § 706(2)(A). Thus, it would be contrary to the APA's legislative scheme to impose on the prevailing plaintiff the heightened burden of satisfying the injunction factors to obtain such relief. *Cf. Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 397 (2013) (holding that where "Congress has enacted a statute requiring less than the typical injunctive relief factors. . . .they need not be applied" to award relief, even where tantamount to an injunction).

Intervenors' position is also contrary to numerous authorities confirming that a prevailing plaintiff under the APA need not satisfy the injunction test to obtain vacatur of an unlawful agency action. *See, e.g.*, *Oglala Sioux Tribe v. U.S. Nuclear Regulatory Comm'n*, 896 F.3d 520, 535 (D.C. Cir. 2018) (four-factor test for injunction "is not the standard for . . . vacatur" under the APA); *California v. Bernhardt*, No. 4:18-CV-05712-YGR, 2020 WL 4001480, at *44 n.47 (N.D. Cal. July 15, 2020) (rejecting argument that vacatur should be treated as injunctive relief); *High Country Conservation Advocates v. U.S. Forest Serv.*, 67 F. Supp. 3d 1262, 1264 n.1 (D. Colo. 2014) (rejecting agency's reliance on *Monsanto* because it controls only where a plaintiff is "seeking a permanent injunction" and not to the "narrow remedy of vacating each offending action"). The Ninth Circuit has also long held that vacatur is the presumptive remedy under the APA and that it is not a prevailing plaintiff's burden to establish that vacatur is warranted. *See supra* pp. 2–3.

The cases Intervenors cite provide no support for their contrary position. *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1184 (9th Cir. 2011) just articulates the unremarkable rule that "an injunction should only issue if the traditional four-factor test is satisfied." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 158 (2010) also merely held that injunctions are not

PLAINTIFFS' RESPONSE IN OPPOSITION TO RENEWED JOINT MOTION FOR PARTIAL S.J. (PHASE TWO) BY DEFENDANT-INTERVENORS PPRA, REBELLION, AND TITAN - 15

automatic in NEPA cases and can only issue after the four-part test is satisfied. *Monsanto* did not hold that vacatur requires satisfaction of the four-part injunction test or question the presumptive nature of that remedy. In fact, it observed that vacatur in that case had the same "practical effect" as an injunction, yet nonetheless deemed vacatur a "less drastic remedy." *Id.* at 165.

Intervenors also cite *PGBA, LLC v. United States*, 389 F.3d 1219, 1224–27 (Fed. Cir. 2004), a case that upon careful reading actually undermines their position. *PGBA* involved a claim under the Administrative Dispute Resolution Act (ADRA), as opposed to the APA. The court there contrasted the "mandatory 'shall-set-aside' language" of the APA with the discretionary remedies language of the ADRA, which "does not automatically require a court to set aside" an unlawful contract award. *Id.* It was only because the ADRA does not mandate vacatur that the Court found that application of the four-factor injunction test was proper. *Id.* at 1226–28. In a subsequent case clarifying *PGBA*, the Court of Federal Claims made clear that where "Congress has enacted a statute requiring *less* than the typical injunctive relief factors. . . . they need not be applied" to award relief that is tantamount to an injunction. *Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 397 (2013) (explaining that "to insert the injunctive relief requirements into the process would convert the [statutory remedy] to something other than what Congress created"); *see also Chapman Law Firm Co.*, 65 Fed. Cl. at 424 (explaining that where "Congress did not require any evaluation of injunctive relief factors as a prerequisite" to a statutory remedy, "it would be contrary to the legislative scheme to impose such an additional requirement").

Finally, *Beverly Hills Unified School Dist. v. Fed. Transit Admin.*, 2016 WL 4445770 (C.D. Cal., Aug. 12, 2016), an unpublished and nonbinding decision, was based on an obvious misreading of *Monsanto*. The court wrongly concluded that *Monsanto* eliminated the

presumption in favor of vacatur, which is irreconcilable with subsequent Ninth Circuit precedent. Other courts have also soundly rejected this reading of *Monsanto*. *See Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 78 (D.D.C. 2010) ("While the U.S. Supreme Court made clear in *Monsanto* that there is no presumption to other injunctive relief, . . . both the Supreme Court and the D.C. Circuit Court have held that remand, along with vacatur, is the presumptively appropriate remedy for a violation of the APA."); *League of Wilderness Defs.*, 2012 WL 13042847, at *2 ("Although the Supreme Court [in *Monsanto*] recently cautioned courts against granting injunctive relief as a matter of course in NEPA cases, it did not question the use of vacatur as a standard remedy.").

As a factual matter, Intervenors' proposal for a narrowly-tailored injunction is completely unworkable and unjust. *See* Interv. Br. at 18 –19. First, the notion that relief should be limited to parcels in sage-grouse Priority Habitat Management Areas (PHMA) ignores that most of Plaintiffs' claims apply equally to General Habitat Management Areas (GHMA). Intervenors' request would deprive Plaintiffs of a meaningful remedy as most of the challenged leases are located in GHMA. The record shows that these parcels support active sage-grouse populations and that their development would risk irreparable harm the species. Second, the request to exclude sub-surface oil and gas operations makes no sense, as such operations inherently require surface activity and noise that disturbs greater sage-grouse—e.g., operation of compressors and other equipment, on-site maintenance activities, hauling of produced water, and related road traffic. WY057878 (Buffalo RMP EIS at 503) ("O&G development includes direct loss of habitat from well pad and road construction as well as indirect disturbance effects from increased noise and vehicle traffic."); WY9_023810–34 (explaining that sage-grouse are highly sensitive to anthropogenic noise, including from road traffic, as it produces stress responses, interferes with

mating rituals, and disrupts communication between hens and their broods). Finally, allowing further production or development on the leases would defeat NEPA's fundamental requirement that agencies not take action until *after* fully and publicly analyzing the possible environmental consequences. *See* 40 C.F.R. § 1506.1(a) (2010) ("Until an agency issues a record of decision [finalizing the EIS] . . . , no action concerning the proposal shall be taken which would: (1) Have an adverse environmental impact; or (2) Limit the choice of reasonable alternatives.").

In sum, Intervenors' are wrong that vacatur is tantamount to an injunction, and their attempt to impose the four-factor injunction test to the statutory remedy of vacatur is barred by the plain text of the APA and longstanding judicial precedent.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Intervenors' Renewed Joint Motion for Partial Summary Judgment (Phase Two).

Dated: October 9, 2020   Respectfully submitted.

*/s/ Sarah Stellberg*
Sarah Stellberg (ISB #10538)
Laurence ("Laird") J. Lucas (ISB # 4733)
Todd C. Tucci (ISB # 6526)

Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

      I hereby certify that on this 9th day of October, 2020, I electronically filed the foregoing PLAINTIFFS' RESPONSE IN OPPOSITION TO RENEWED JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT BY DEFENDANT-INTERVENORS PEAK POWDER RIVER RESOURCES, LLC; TITAN EXPLORATION, LLC; AND REBELLION ENERGY II, LLC (ECF NO. 318) with the Clerk of the Court using the CM/ECF system, which sent a Notice of Electronic Filing (NEF) to all counsel of record in this matter to be served by electronic means, as more fully reflected on the NEF.

                                                     */s/ Sarah Stellberg*
                                                     Sarah Stellberg