RAFAEL M. GONZALES, JR.
Acting United States Attorney

CHRISTINE G. ENGLAND, California Bar No. 261501
Assistant United States Attorney
District of Idaho
1291 West Myrtle Street, Suite 500
Boise, ID 83702
Tel: (208) 334-1211; Fax: (208) 334-1414
Email: Christine.England@usdoj.gov

JEAN E. WILLIAMS
Acting Assistant Attorney General

LUTHER L. HAJEK, Colorado Bar No. 44303
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
999 18th St., South Terrace – Suite 370
Denver, CO 80202
Tel: (303) 844-1376; Fax: (303) 844-1350
E-mail: Luke.Hajek@usdoj.gov

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, *et al.*, | Case No. 1:18-cv-00187-REB |
| Plaintiffs, | **DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (PHASE THREE)** |
| vs. | |
| DEBRA HAALAND,[1] Secretary of the Interior, *et al.*, | |
| Defendants, | |
| and | |
| STATE OF WYOMING, *et al.*, | |
| Defendant-Intervenors. | |

---

[1] The Secretary of the Interior is substituted for her predecessor pursuant to Federal Rule of Civil Procedure 25(d).

Defendants' Memorandum in Support of Motion for Partial Summary Judgment
and in Opposition to Plaintiffs' Motion for Partial Summary Judgment (Phase Three)

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 2

    I.    Legal Background ..................................................................................... 2

        A.    National Environmental Policy Act .............................................. 2

        B.    Federal Land Policy and Management Act.................................... 3

        C.    Oil and Gas Leasing on Public Lands ........................................... 3

    II.    Factual Background .................................................................................. 4

        A.    The Sage Grouse Plan Amendments of 2015 ............................... 4

        B.    The Prioritization Objective.......................................................... 7

        C.    Oil and Gas Lease Sales at Issue in Phase Three......................... 8

            1.    September 2017 Utah Sale............................................. 9

            2.    February 2019 Wyoming Sale ..................................... 10

            3.    March 2019 Montana Sale ........................................... 11

STANDARDS OF REVIEW ................................................................................. 12

ARGUMENT .......................................................................................................... 12

    I.    Plaintiffs' Claims Should Be Dismissed for Improper Venue............... 12

    II.    BLM Complied With NEPA.................................................................. 16

        A.    BLM's Alternatives Analysis Complied With NEPA ............... 16

            1.    Plaintiffs Have Waived Their Alternatives Claim ....... 16

            2.    BLM's Analysis of Alternatives Fully Complied With NEPA .... 18

                a.    Utah Lease Sale................................................. 20

                b.    Wyoming Lease Sale ........................................ 21

                c.    Montana Lease Sale .......................................... 24

B.     BLM Appropriately Analyzed Impacts to Sage Grouse at the Oil and
       Gas Leasing Stage ..................................................................................... 25

C.     BLM Appropriately Analyzed the Cumulative Impacts to Sage
       Grouse in Each of the Lease Areas ........................................................... 35

III.   BLM Complied with FLPMA ................................................................................ 39

A.     The Prioritization Objective Does Not Require BLM to Defer
       Parcels in Sage Grouse Habitat ................................................................. 39

B.     The Leasing Decisions Complied with the Prioritization Objective ........ 41

IV.    If the Court Finds a Legal Violation, It Should Not Immediately Vacate the
       Leases and Should Instead Allow Briefing on the Appropriate Scope of the
       Remedy ................................................................................................................... 43

CONCLUSION ................................................................................................................... 45

# TABLE OF AUTHORITIES

Cases

*Al Otro Lado v. Wolf*,
  945 F.3d 1223 (9th Cir. 2019) ................................................................................. 45

*Alaska Envtl. Ctr. v. Kempthorne (N. Alaska I)*,
  457 F.3d 969 (9th Cir. 2006) ...................................................................... 26, 27, 31

*Alaska Envtl. Ctr. v. U.S. Dep't of the Interior (N. Alaska II)*,
  983 F.3d 1077 (9th Cir. 2020) .................................................... 27, 28, 32, 35

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
  988 F.2d 146 (9th Cir. 1993) ................................................................................. 44

*Am. Wild Horse Campaign v. Bernhardt*,
  963 F.3d 1001 (9th Cir. 2020) ............................................................................... 17

*Am. Wild Horse Campaign v. Zinke*,
  353 F. Supp. 3d 971 (D. Nev. 2018) ...................................................................... 17

*Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*,
  751 F.3d 1054 (9th Cir. 2014) ............................................................................... 19

*Ashley v. Andrus*,
  474 F. Supp. 495 (E.D. Wis. 1979) ........................................................................ 15

*Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*,
  126 F.3d 1158 (9th Cir. 1997) ................................................................................. 3

*Bark v. U.S. Forest Service*,
  958 F.3d 865 (9th Cir. 2020) ................................................................................. 38

*Barnes v. U.S. Dep't of Transp.*,
  655 F.3d 1124 (9th Cir. 2011) ............................................................................... 17

*Bay Neighborhood Council v. Karlen*,
  444 U.S. 223 (1980) ................................................................................................. 2

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Engineers*,
  524 F.3d 938 (9th Cir. 2008) ................................................................................. 35

*Cal. Cmtys. Against Toxics v. U.S. EPA*,
  688 F.3d 989 (9th Cir. 2012) ................................................................................. 43

*California v. Block*,
  690 F.2d 753 (9th Cir. 1982) ............................................................................. 3, 19

*Cascadia Wildlands v. Bureau of Land Mgmt.*,
  No. 6:12-cv-1739-AA, 2013 WL 5723315 (D. Or. Oct. 18, 2013) .................... 40, 41

*Cheyenne Tribe v. Hodel*,
  851 F.2d 1152 (9th Cir. 1988) ............................................................................... 43

*Cheyenne Tribe v. Norton*,
    503 F.3d 836 (9th Cir. 2007) ............................................................... 43

*City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*,
    123 F.3d 1142 (9th Cir. 1997) ............................................................. 18

*Colo. Envtl. Coal. v. Office of Legacy Mgmt.*,
    2012 WL 628547 (D. Colo. Feb. 27, 2012) .......................................... 45

*Colo. Envtl. Coal. v. Office of Legacy Mgmt.*,
    819 F. Supp. 2d 1193 (D. Colo. 2011) ................................................. 44

*Conner v. Burford*,
    848 F.2d 1441 (9th Cir. 1988) ................................................ 26, 43, 44

*Ctr. for Biological Diversity v. BLM, No. C-08-05646*,
    2009 WL 1025606 (N.D. Cal. Apr. 14, 2009) ...................................... 15

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
    No. 3:17-CV-553-LRH-WGC, 2019 WL 236727 (D. Nev. Jan. 15, 2019) ............... 31, 32, 40

*Ctr. for Biological Diversity v. U.S. Forest Service*,
    No. 2:17-cv-372, 2021 WL 855938 (S.D. Ohio Mar. 8, 2021) ................. 44

*Ctr. for Envtl. Law and Policy v. U.S. Bureau of Reclamation*,
    655 F.3d 1000 (9th Cir. 2011) ............................................................. 35

*Earth Island Inst. v. U.S. Forest Serv.*,
    697 F.3d 1010 (9th Cir. 2012) ....................................................... 19, 20

*Ferguson v. Lieurance*,
    565 F. Supp. 1013 (D. Nev. 1983) ....................................................... 15

*Further, WildEarth Guardians v. BLM*,
    457 F. Supp. 3d 880 (D. Mont. 2020) .......................................... 20, 21, 25

*Idaho Cmty. Action Network v. U.S. Dep't of Transp.*,
    545 F.3d 1147 (9th Cir. 2008) ............................................................. 19

*Idaho Farm Bureau Fed'n v. Babbitt*,
    58 F.3d 1392 (9th Cir. 1995) ............................................................... 43

*Idaho Sporting Congress, Inc. v. Rittenhouse*,
    305 F.3d 957 (9th Cir. 2002) ......................................................... 29, 30

*Kern v. U.S. Bureau of Land Management*,
    284 F.3d 1062 (9th Cir. 2002) ............................................................. 38

*Klamath Siskiyou Wildlands Ctr. v. Gerritsma*,
    962 F. Supp. 2d 1230 (D. Or. 2013) .................................................... 40

*Klamath-Siskiyou Wildland Center v. Bureau of Land Management*,
    387 F.3d 989 (9th Cir. 2004) ............................................................... 38

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976) ........................................................................................ 36

*Landis v. Watt*,
    510 F. Supp. 178 (D. Idaho 1981) ................................................................. 14

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) ......................................................................... 12

*Marble Mtn. Audubon Soc'y v. Rice*,
    914 F.2d 179 (9th Cir. 1990) ................................................................... 33, 34

*McFarland v. Kempthorne*,
    545 F.3d 1106 (9th Cir. 2008) ....................................................................... 12

*Misch v. Zee Enters., Inc.*,
    879 F.2d 628 (9th Cir. 1989) ......................................................................... 13

*Montana Wilderness Ass'n v. Connell*,
    725 F.3d 988 (9th Cir. 2013) ......................................................................... 35

*Montana Wilderness Ass'n v. Fry*,
    408 F. Supp. 2d 1032 (D. Mont. 2006) .......................................................... 44

*Montana Wildlife Fed'n v. Bernhardt*,
    No. 18-cv-69-GF-BMM, 2020 WL 2615631 (D. Mont. May 22, 2020) ............. 8, 9, 40, 42, 43

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
    177 F.3d 800 (9th Cir. 1999) ......................................................................... 38

*New Mexico ex rel. Richardson v. Bureau of Land Management*,
    565 F.3d 683 (10th Cir. 2009) ............................................................ 22, 23, 26

*Northcoast Envtl. Ctr. v. Glickman*,
    136 F.3d 660 (9th Cir. 1998) ......................................................................... 32

*Norton v. S. Utah Wilderness*,
    All., 542 U.S. 55 (2004) ................................................................................. 40

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
    475 F.3d 1136 (9th Cir. 2007) ....................................................................... 12

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,
    18 F.3d 1468 (9th Cir. 1994) ......................................................................... 12

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*,
    No. 2:10-cv-1331-SU, 2014 WL 4832218 (D. Or. Sept. 29, 2014) ..................... 40

*Or. Natural Desert Ass'n v. Jewell*,
    840 F.3d 562 (9th Cir. 2016) ......................................................................... 29

*Or. Natural Res. Council Fund v. Goodman*,
    505 F.3d 884 (9th Cir. 2007) ......................................................................... 33

*Pennaco Energy v. U.S. Dep't of Interior,*
  377 F.3d 1147 (10th Cir. 2004) ........................................................................ 3

*Plains Res. Council v. Surface Transp. Bd.,*
  668 F.3d 1067 (9th Cir. 2011) ......................................................................... 29

*Protect Our Communities Found. v. LaCounte,*
  939 F.3d 1029 (9th Cir. 2019) ......................................................................... 26

*Reuben H. Donnelley Corp. v. FTC,*
  580 F.2d 264 (7th Cir. 1978) ........................................................................... 14

*River Runners for Wilderness v. Martin,*
  593 F.3d 1064 (9th Cir. 2010) ......................................................................... 12

*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 332 (1989) ........................................................................................... 2

*S. Or. Citizens Against Toxic Sprays, Inc. v. Clark,*
  720 F.2d 1475 (9th Cir. 1983) .................................................................... 26, 36

*Santa Fe Int'l Corp. v. Watt,*
  580 F. Supp. 27 (D. Del. 1984) .................................................................... 15, 22

*Seattle Audubon Soc. v. Moseley,*
  80 F.3d 1401 (9th Cir. 1996) ........................................................................... 19

*Selkirk Conservation All. v. Forsgren,*
  336 F.3d 944 (9th Cir. 2003) ................................................................. 36, 37, 39

*Shell Oil Co. v. Babbit,*
  920 F. Supp. 559 (D. Del. 1996) ...................................................................... 15

*Sierra Forest Legacy v. Sherman,*
  646 F.3d 1161 (9th Cir. 2011) ..................................................................... 25, 35

*Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior,*
  608 F.3d 592 (9th Cir. 2010) ....................................................................... 19, 21

*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council,*
  435 U.S. 519 (1978) ............................................................................... 17, 18, 19

*W. Organization of Resource Councils v. U.S. Bureau of Land Mgmt.,*
  2021 WL 718857 ............................................................................................. 16

*W. Watersheds Project v. Abbey,*
  719 F.3d 1035 (9th Cir. 2013) ................................................................. 23, 24, 25

*W. Watersheds Project v. Bernhardt, No. 1:18-cv-187-REB,*
  2020 WL 959242 (D. Idaho Feb. 27, 2020) ..................................................... 45

*W. Watersheds Project v. Salazar,*
  Civ. No. 08-0516-E-BLW, 2009 WL 1299626 (D. Idaho May 7, 2009) ................ 15

*W. Watersheds Project v. Salazar*,
   Civ. No. 08-435-E-BLW, 2010 WL 375003 (D. Idaho Jan. 25, 2010) ................................... 15

*W. Watersheds Project v. Schneider*,
   417 F. Supp. 3d 1319 (D. Idaho 2019) ................................................................................. 39

*W. Watersheds Project v. Zinke*,
   No. 1:18-cv-187-REB, 2020 WL 2462817 (D. Idaho May 12, 2020)..................................... 45

*Westlands Water Dist. v. U.S. Dep't of Interior*,
   376 F.3d 853 (9th Cir. 2004) ............................................................................................... 19

*Wildearth Guardians v. Montana Snowmobile Ass'n*,
   790 F.3d 920 (9th Cir. 2015) ............................................................................................... 29

*WildEarth Guardians v. Zinke*,
   368 F. Supp. 3d 41 (D.D.C. 2019) ........................................................................................ 44

*Wilderness Society v. Wisely*,
   524 F. Supp. 2d 1285 (D. Colo. 2007) ................................................................................. 44

Statutes

5 U.S.C. § 706(2)(A)............................................................................................................... 12

5 U.S.C. §§ 701-06 ................................................................................................................ 12

28 U.S.C. § 1391(e)(1)............................................................................................................ 13

28 U.S.C. § 1391(e)(1)(B) ...................................................................................................... 14

28 U.S.C. § 1391(e)(1)(C) ................................................................................................. 13, 14

28 U.S.C. § 1406 .................................................................................................................... 12

30 U.S.C. § 226(b)(1)(A)........................................................................................................... 4

30 U.S.C. § 226(g) .................................................................................................................... 4

42 U.S.C. § 4332(2)(C)............................................................................................................. 2

43 U.S.C. § 1712(a) .................................................................................................................. 3

43 U.S.C. § 1712(e) .................................................................................................................. 3

43 U.S.C. §§ 1701-1787 ........................................................................................................... 3

Rules

Fed. R. Civ. P. 12(h)(1)........................................................................................................... 13

Fed. R. of Civ. P. 25(d)............................................................................................................. 1

Regulations

40 C.F.R. § 1502.1 (1978) ........................................................................................................ 2

40 C.F.R. § 1502.14(a) .................................................................................... 19

40 C.F.R. § 1508.9(b) ..................................................................................... 19

40 C.F.R. §§ 1501.3 ......................................................................................... 2

40 C.F.R. §§ 1502.20 ................................................................................... 4, 25

40 C.F.R. Part 1500 (2018) ............................................................................... 2

43 C.F.R. § 1601.0-5(n) .................................................................................... 3

43 C.F.R. § 1601.0-6 ........................................................................................ 3

43 C.F.R. § 1610.5-3(a) .................................................................................... 3

43 C.F.R. § 3120.1-1(a) .................................................................................... 4

43 C.F.R. § 3120.1-2(a) .................................................................................... 4

43 C.F.R. § 3120.4-2 ...................................................................................... 18

43 C.F.R. § 3162.3-1 (2017) ............................................................................. 4

43 C.F.R. §§ 46.120(c) ..................................................................................... 4

43 C.F.R. pt. 3120 ............................................................................................ 4

Federal Register

43 Fed. Reg. 55978 (Nov. 29, 1978) .................................................................. 2

51 Fed. Reg. 15618 (Apr. 25, 1986) .................................................................. 2

72 Fed. Reg. 10,308, 10,334 (Mar. 7, 2007) ..................................................... 4

75 Fed. Reg. 13,910 (Mar. 23, 2010) ................................................................ 4

76 Fed. Reg. 77,008 (Dec. 9, 2011) .................................................................. 4

80 Fed. Reg. 59,858 (Oct. 2, 2015) ................................................................... 5

80 Fed. Reg. 59,858, 59, 882 (Oct. 2, 2015) ................................................... 30

82 Fed. Reg. 2906, 2914 (Jan. 10, 2017) ........................................................... 4

Other Authorities

S. Rep. No. 87-1992, at 6 (1962), *reprinted in* 1962 U.S.C.C.A.N. 2784, 2789 (Aug. 31, 1962)
................................................................................................................ 14

## INTRODUCTION

The U.S. Bureau of Land Management's ("BLM") September 2017 Utah oil and gas lease sale, February 2019 Wyoming lease sale, and March 2019 Montana lease sale all fully complied with the National Environmental Policy Act ("NEPA") and the Federal Land Policy and Management Act ("FLPMA").

Plaintiffs' NEPA claims in this case focus on the individual environmental assessments ("EA") prepared in conjunction with each of the challenged lease sales, but those EAs do not stand in isolation.  At the leasing stage, it is appropriate for BLM to tier to and incorporate the analyses in corresponding environmental impact statements ("EIS") prepared at the land use planning stage, and that is what BLM did here.  The EAs at issue tier to the EISs that were prepared in conjunction with the comprehensive Greater Sage Grouse ("Sage Grouse") planning effort that was completed in 2015 and resulted in the issuance of 98 new or amended land use plans providing increased protections for Sage Grouse.  Together, the EAs and EISs provide ample NEPA analysis for BLM's leasing decisions.

With respect to FLPMA, Plaintiffs essentially argue that it was necessary for BLM to defer parcels in Sage Grouse habitat, or at least the highest priority habitat, in order to meet the prioritization objective in BLM's 2015 Sage Grouse Plans.  The plans, however, do not require BLM to defer parcels in Sage Grouse habitat.  BLM has complied with the prioritization objective by requiring appropriate stipulations, including the avoidance of any surface disturbing activities in the highest priority habitat.  These stipulations serve both to protect Sage Grouse habitat and to deter development.  Moreover, BLM did defer a large number of parcels in Sage Grouse habitat from the sales.

In sum, summary judgment should be granted to Defendants on all claims.

# BACKGROUND

## I.     Legal Background

### A.     National Environmental Policy Act

NEPA serves the dual purpose of informing agency decision-makers of the significant environmental effects of proposed major federal actions and ensuring that relevant information is made available to the public so that they "may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  NEPA is procedural in nature.  It is "well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Id.* at 350 (citing *Stryker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 227-28 (1980)).

To meet these dual purposes, NEPA requires that an agency prepare a comprehensive EIS for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  The regulations implementing NEPA provide guidance as to the nature and content of an EIS.  *See* 40 C.F.R. § 1502.1 (1978).[2]  Not every federal action or proposal requires an EIS.  CEQ's regulations provide that an agency may prepare an EA to determine whether the impacts of an action will be significant, and if not, the agency may prepare a finding of no significant impact ("FONSI") and forego preparation of an EIS.  *See* 40 C.F.R. §§ 1501.3, 1501.4(c), (e), 1508.9, 1508.13.

---

[2] The Council on Environmental Quality promulgated regulations implementing NEPA in 1978, 43 Fed. Reg. 55978 (Nov. 29, 1978), and a minor substantive amendment to those regulations in 1986, *see* 51 Fed. Reg. 15618 (Apr. 25, 1986).  More recently, the Council published a new rule, effective September 14, 2020, further revising the 1978 regulations.  The claims in this case arise under the 1978 regulations, as amended in 1986.  All citations to the Council's regulations in this brief refer to those regulations as codified at 40 C.F.R. Part 1500 (2018).

In reviewing an agency's NEPA analysis, a court should evaluate whether the agency has presented a "'reasonably thorough discussion of the significant aspects of the probable environmental consequences.'"  *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (citation omitted).  "The reviewing court may not 'fly speck' an EIS and hold it insufficient on the basis of inconsequential, technical deficiencies." *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 126 F.3d 1158, 1183-84 (9th Cir. 1997) (citation omitted).

### B.      Federal Land Policy and Management Act

Under FLPMA, 43 U.S.C. §§ 1701-1787, BLM manages the public lands, including federal oil and gas resources, *see id.* § 1702(e), through a multi-step planning and decision-making process.  *Pennaco Energy v. U.S. Dep't of Interior*, 377 F.3d 1147, 1151–52 (10th Cir. 2004).  BLM first develops a resource management plan ("RMP") for a planning area, setting forth long-term goals and objectives for management of public lands.  43 U.S.C. § 1712(a).  The RMPs developed by BLM are analyzed in EISs, prepared in accord with NEPA.  *See* 43 C.F.R. § 1601.0-6.  Once BLM issues an RMP, subsequent, more focused decisions implementing specific projects must conform to the plan.  *See* 43 U.S.C. § 1712(e); 43 C.F.R. § 1610.5-3(a).

### C.      Oil and Gas Leasing on Public Lands

BLM employs a three-stage decision-making process for managing public lands for oil and gas leasing and development.  *See Pennaco Energy*, 377 F.3d at 1151-52.  First, BLM broadly assesses the presence of minerals and other resources on public lands and prepares RMPs, which determine which areas will be open to oil and gas development and what conservation stipulations should apply to future leases.  43 C.F.R. § 1601.0-5(n).  The RMPs are supported by EISs prepared in accordance with NEPA.  43 C.F.R. § 1601.0-6.

In the second stage of the oil and gas program, BLM reviews proposed leases under NEPA and other statutes and holds competitive oil and gas lease sales on a quarterly basis, as

required by the Mineral Leasing Act.  30 U.S.C. § 226(b)(1)(A); *see* 43 C.F.R. pt. 3120; 43

C.F.R. § 3120.1-2(a).  Lands that may be offered for leasing include lands selected by the

authorized officer and lands identified in "expression[s] of interest" from the public.  43 C.F.R. §

3120.1-1(a), (e).  For each oil and gas lease sale, BLM may prepare one or more EAs that "tier"

to an EIS prepared at the RMP stage, *see* 40 C.F.R. §§ 1502.20, 1508.28, or it may issue a

determination of NEPA adequacy for the lease sale.  *See* 43 C.F.R. §§ 46.120(c), 46.300(a)(2).

In the third stage BLM considers whether, and under what conditions, to approve specific

development proposals.  30 U.S.C. § 226(g); 43 C.F.R. § 3162.3-1 (2017); Onshore Oil and Gas

Order No. 1, Approval of Operations, 82 Fed. Reg. 2906, 2914 (Jan. 10, 2017), *amending* 72

Fed. Reg. 10,308, 10,334 (Mar. 7, 2007).  Before an oil and gas operator may undertake any

drilling or surface disturbance, it must submit an application for a permit to drill ("APD").  BLM

reviews the application, completes additional environmental review, as necessary, to ensure

NEPA compliance, decides whether to approve the permit, and imposes any necessary conditions

on its approval.  *See* 43 C.F.R. § 3162.3-1.

## II.     Factual Background

### A.     The Sage Grouse Plan Amendments of 2015

In 2010, the U.S. Fish and Wildlife Service ("FWS") issued a finding that the listing of

the Sage Grouse under the Endangered Species Act ("ESA") was warranted, but precluded by

higher priority listing actions.  *See* 75 Fed. Reg. 13,910 (Mar. 23, 2010).  Based on this

determination, BLM and the Forest Service initiated a widespread public planning process to

amend and revise their land use plans to protect the Sage Grouse and its habitat with the goal of

avoiding the listing of the species under the ESA.  *See* 76 Fed. Reg. 77,008 (Dec. 9, 2011).  For

planning purposes, Sage Grouse habitat was divided into two regions: (1) the Great Basin (or

Western) Region, covering California, Nevada, Oregon, Idaho, and parts of Utah and southwestern Montana, and (2) the Rocky Mountain (or Eastern) Region, covering most of the rest of Montana, North and South Dakota, Wyoming, Colorado, and parts of Utah. *Id.* at 77,009. The two regions were further divided into sub-regions. *See* BLM-MT-March2019-001425 (map).

The agencies engaged in 15 sub-regional planning efforts, and each was analyzed in a separate NEPA process during which the agencies prepared an EIS. BLM-MT-March2019-001434. BLM and the Forest Service completed those planning and NEPA analyses in September 2015, and each agency issued two records of decision ("RODs") approving new or amended RMPs (or forest plan amendments, in the case of the Forest Service) – one per agency for the Great Basin Region and one per agency for the Rocky Mountain Region. BLM-MT-March2019-001411 (BLM Rocky Mountain ROD); BLM-MT-March2019-001559 (BLM Great Basin ROD). Collectively, the four RODs approved, amended, or revised ninety-eight land use plans (the "Sage Grouse Plans" or "Plans") to establish increased protections for Sage Grouse.

Following the issuance of the Plans, FWS reviewed the status of the Sage Grouse and concluded that listing under the ESA was not warranted. *See* 80 Fed. Reg. 59,858 (Oct. 2, 2015). FWS found that one of the key circumstances that had changed since its 2010 "warranted, but precluded" finding was that the Sage Grouse Plans "provide adequate mechanisms to reduce and minimize new disturbance in the most important areas for the species." *Id.* at 59,882. In its conclusion, FWS emphasized that its determination that a listing was not warranted was dependent upon the "continued implementation of the regulatory mechanisms and conservation efforts," including the Plans. *Id.* at 59,941.

Several of the RMPs that were approved and/or amended as part of the 2015 plan amendment process are relevant here.  In Montana, the applicable RMPs and EISs are:  the Billings RMP and EIS, BLM-MT-March2019-001653-5800; Miles City RMP and EIS, BLM-MT-March2019-009746-11701; HiLine RMP and EIS, BLM-MT-March2019-007401-9742; and South Dakota RMP and EIS, BLM-MT-March2019-012098-14161.  In Wyoming, the applicable RMPs or RMP amendments ("RMPA") and accompanying EISs are:  the Bighorn Basin RMPs, which encompass BLM's Cody and Worland Field Offices, WY068071-68673 (Cody RMP), WY068674-69312 (Worland RMP), and EIS, WY063652-66623; the Buffalo RMP, WY067095-922, and EIS, WY057293-60247; the Wyoming Nine RMPA, WY066624-67094, and EIS, WY060248-63651; and the Lander RMP, WY056783-57292, and EIS, WY053928-55899.  In Utah, the Utah RMP and EIS apply.  AR002057-5023.  The applicable RMPs and RMPAs were approved by the Rocky Mountain Region ROD, WY067923, and the Great Basin Region ROD. BLM-MT-March2019-001559.

The Sage Grouse Plans contain measures to protect Sage Grouse and its habitat from the impacts of development and other threats.  The protective measures vary based on how the habitat is designated.  The highest degree of protections is accorded to priority habitat management areas ("PHMA") and less restrictive protections are applied in general habitat management areas ("GHMA").  WY067949.  In Montana, there are also areas designated as restoration habitat management areas ("RHMA"), in which the focus is on restoration of Sage Grouse habitat in order to sustain or reestablish Sage Grouse populations.  BLM-MT-March2019001437.  The protective measures are directed to various types of threat to Sage Grouse habitat, including oil and gas development, grazing, mining, wildfire, and the development of renewable energy projects.  WY067952-55.

In order to protect Sage Grouse, the Plans contain a number of restrictions on oil and gas development.  In Montana and Utah, PHMA is open to fluid mineral leasing only with a no surface occupancy ("NSO") restriction.  BLM-MT-March2019-009768 (Miles City RMP); AR004655, 4800 (Utah RMPA).  In Wyoming PHMA is open to fluid mineral leasing subject to an NSO stipulation for activities occurring within 0.6 miles of an occupied lek and a timing restriction from March 15 to June 30.  WY067952.  In GHMA in the Montana Miles City Field Office, oil and gas leasing is permitted subject to an NSO restriction within 0.6 miles of a lek and a controlled surface use ("CSU") stipulation.  BLM-MT-March2019-009768.  In Wyoming, oil and gas leasing is permitted in GHMA subject to an NSO restriction within 0.25 miles of an occupied lek and a timing limitation.  WY067953.  The Plans contain further density restrictions, noise restrictions, and mitigation that further restricts the ability to conduct oil and gas development within habitat management areas.  *See*, *e.g.*, WY066659-63, WY066677-81 (Wyoming Nine RMPA).

> **B.     The Prioritization Objective**

The Plans also contain an objective to prioritize the leasing of areas outside of Sage Grouse habitat.  *See*, *e.g.*, WY066649.  The applicable Wyoming, Montana, and Utah RMPs and RMPAs state:

> Priority will be given to leasing and development of fluid mineral resources . . .
> outside of PHMAs and GHMAs.  When analyzing leasing and authorizing
> development of fluid mineral resources . . . in PHMAs and GHMAs, and subject
> to applicable stipulations for the conservation of [Sage Grouse], priority will be
> given to *development* in non-habitat areas first and then in the least suitable
> habitat for [Sage Grouse].

*See*, *e.g.*, WY066649 (Wyoming RMPA) (emphasis added); BLM-MT-March2019-009771 (Miles City RMP); AR004654 (Utah RMPA).

As required by the records of decision approving the Plans, on September 1, 2016, BLM issued Instruction Memorandum ("IM") 2016-143 (the "2016 IM") regarding the prioritization objective.  BLM-IM026-000749.  Following a change in administrations, on December 27, 2017, BLM issued a new IM regarding prioritization, IM 2018-026 (the "2018 IM").  BLM-IM026-001070.  The 2018 IM retained some of the same language as the 2016 IM, but shortened the guidance document and removed some of its instructions.  *See* BLM-IM026-001071-72.  The 2018 IM also added language explaining that, for leasing evaluations, BLM staff should prioritize the processing of parcels outside of Sage Grouse habitat only where there was a backlog of expressions of interest.  BLM-IM026-001071.

A district court in Montana ruled that the backlog guidance in the 2018 IM violated the Plans' prioritization objective and therefore violated FLPMA.  *See Montana Wildlife Fed'n v. Bernhardt*, No. 18-cv-69-GF-BMM, 2020 WL 2615631, at *8-9 (D. Mont. May 22, 2020), *appeal docketed*, No. 20-35615 (July 13, 2020).  The court also found that IM 2018-026 violated the prioritization objective because it misconstrued that objective and converted "the prioritization requirement into a mere procedural hurdle," and did not sufficiently encourage development of areas outside of Sage Grouse habitat.  *Id.* at *9.  Defendants have appealed the court's order with respect to one of the lease sales.

### C.    Oil and Gas Lease Sales at Issue in Phase Three

There are three leasing decisions at issue in this case: the September 2017 Utah lease sale, the February 2019 Wyoming lease sale, and the March 2019 Montana lease sale.  Each of the sales is discussed below.

### 1.     September 2017 Utah Sale

In the September 2017 Utah sale, BLM offered nine parcels comprising 14,943.09 acres of land managed by the Fillmore Field Office.  AR005124.  BLM prepared an EA to analyze the potential impacts of the sale.  AR001643-1724.  BLM circulated a preliminary draft of the EA on its website for a thirty-day public comment period, AR001682, and Plaintiffs submitted comments on the draft.  AR001445-69.  The EA analyzed two alternatives: the proposed action of leasing nine nominated parcels and the no action alternative.  AR001651-56.  The EA incorporates by reference the analysis contained in the EIS for the 2015 Utah RMP, as well as the 1986 House Range Resource Area ("HRRA") Proposed RMP and Final EIS and the 2009 Oil and Gas Leasing in the Fillmore Field Office EA.  AR001649-50.  Plaintiffs submitted a protest, AR005173-210, and BLM dismissed it.  AR005329-44.

The EA for the September 2017 sale explained that the oil and gas development potential in the eastern portion of Juab County, where the lease parcels are located, is low.  AR001651. Most of the parcels previously leased in this region have never been developed.  *Id*.  Over the last 60 years, only nine wells have been drilled in Juab County, and all those wells have been subsequently plugged and abandoned.  AR001652.  The actual surface disturbance and wells drilled in the area have never exceeded the development that BLM anticipated would occur based on the reasonably foreseeable development ("RFD") scenario in the HRRA RMP/ROD and the 2009 Fillmore FO Oil and Gas Leasing EA, which encompasses all of the parcels analyzed in the September 2017 Lease Sale EA.  AR001651-52.  BLM's RFD for the sale predicted the development of just five exploratory wells over ten years and zero producing wells. AR001651.  The four parcels in PHMA are offered with an NSO stipulation (meaning no disturbance of the parcel surface) as well as other lease notices and stipulations, consistent with

the 2015 Utah RMP, to minimize impacts to Sage Grouse habitat.  AR001676-77; AR001680; AR001688-1704.

### 2.   February 2019 Wyoming Sale

In the February 2019 sale, BLM offered 568 parcels covering 768,942 acres. WY146312-313.  BLM prepared an EA for the sale.  WY147434-773.  The analysis in the EA tiers to and incorporates by reference the analysis in the EISs supporting the 2015 Wyoming RMP/ROD, 2015 Bighorn Basin RMP/EIS, 2015 Buffalo RMP/EIS, and the 2014 Lander RMP/EIS. WY147442–43.  The EA analyzed three alternatives in detail: the proposed leasing action to offer all nominated parcels, a no action alternative, and the proposed action alternative, which deferred offering 79 whole parcels and parts of 27 other parcels for a variety of reasons. WY147447–50.  Most of the deferred parcels are within the Rock Springs planning area. WY147448.  Within that planning area, BLM deferred 69 whole parcels and portions of 15 other parcels that are located in PHMA.  *See* WY147449; WY147734-48 (showing deferrals in the Rock Springs Field Office).

BLM circulated a draft of the EA for a thirty-day public comment period.  WY147444. Plaintiffs submitted comments on the draft.  WY165466-548.  Plaintiffs asked BLM to analyze an alternative that would defer offering all parcels in Sage Grouse habitat.  WY165506. Plaintiffs later submitted a protest regarding the sale, WY146602-65, and BLM dismissed the protest.  WY147883-929.  In its protest decision, BLM explained that it was not required to conduct analysis of potential development at the leasing stage and that a more detailed analysis would be conducted when specific development projects were proposed.  WY147900.  BLM also explained that the alternative of not offering parcels in GHMA or PHMA was within the range of alternatives analyzed in the EA because the analysis of such alternatives was subsumed within

the no action alternative.  WY147909 (citing *Biodiversity Conservation Alliance*, 183 IBLA 97 (2013)); *see also* WY147887-89.

### 3.     March 2019 Montana Sale

For the March 2019 Montana/Dakotas sale, BLM offered 305 parcels covering 166,999 acres.  BLM-MT-March2019-014312.  Seventy-six parcels were carried over from the December 2018 sale based on this Court's preliminary injunction ruling.  BLM-MT-March2019-000034; BLM-MT-March2019-000088.  BLM prepared an EA for the March 2019 sale, BLM-MT-March2019-000021, and also relied on the EA that had been previously prepared from the December 2018 sale.  BLM-MT-March2019-000026; BLM-MT-March2019-031226.  Of the 305 parcels offered for sale, 61 parcels were in PHMA, 223 parcels were in GHMA, 3 parcels were in RHMA, and 18 parcels were not in Sage Grouse habitat. BLM-MT-March2019-000036; BLM-MT-March2019-0000090; BLM-MT-March2019-017662-70; BLM-MT-March2019-026914-17; BLM-MT-March2019-027089-91; BLM-MT-March2019-031292-93.  The EA tiered to the EISs prepared for the Miles City RMP, Billings RMP, HiLine RMP, and South Dakota RMP.  BLM-MT-March2019-27.

BLM held a 30-day public comment period on the EA, BLM-MT-March2019-017660-17661, and Plaintiffs submitted comments.  BLM-MT-March-016152-279; BLM-MT-016536-73.  Based on the public comments, BLM expanded the analysis in the final EA to include a third alternative.  Thus, the EA analyzed three alternatives in detail: the original proposed action, which would have offered 322 parcels for sale; the selected alternative, which deferred 17 parcels and offered 305 parcels for sale; and the no action alternative.  BLM-MT-March2019-0000034-37.  Plaintiffs submitted a protest, BLM-MT-March2019-014216-34, and BLM dismissed the protest.  BLM-MT-March2019-014173-92.

## STANDARD OF REVIEW

Agency decisions are reviewed under the judicial review provisions of the APA, 5 U.S.C.

§§ 701-06.  *See Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008).  Under the APA,

agency decisions may be set aside if they are "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  In accordance with that standard,

an agency's decision will be overturned

> [O]nly if the agency relied on factors which Congress has not intended it to
> consider, entirely failed to consider an important aspect of the problem, offered an
> explanation for its decision that runs counter to the evidence before the agency, or
> is so implausible that it could not be ascribed to a difference in view or the
> product of agency expertise.

*McFarland v. Kempthorne*, 545 F.3d 1106, 1110 (9th Cir. 2008) (citation and internal quotation

marks omitted).  The standard of review is "highly deferential, presuming the agency action to be

valid and affirming the agency action if a reasonable basis exists for its decision." *Nw.*

*Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (citation

omitted).  The APA "does not allow the court to overturn an agency decision because it disagrees

with the decision or with the agency's conclusions about environmental impacts." *River Runners*

*for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (citation omitted).  APA claims

are resolved on summary judgment based on the agency's administrative record.  *See Nw.*

*Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994).

## ARGUMENT

## I.      Plaintiffs' Claims Should Be Dismissed for Improper Venue

The claims should be dismissed for improper venue or, alternatively, transferred pursuant

to 28 U.S.C. § 1406.  The claims are actions affecting real property and the interests in property

conveyed through  the challenged lease sales, and therefore they involve real property for

purposes of the federal venue statute.  *See* 28 U.S.C. § 1391(e)(1).[3]  Because these claims

involve real property, the residence of Western Watersheds Project is insufficient to establish

proper venue under 28 U.S.C. § 1391(e)(1)(C).[4]

Venue is not proper in this district for challenges to the leasing decisions at issue because

all of the challenges pertain to public lands located outside of this district.  In actions against

federal agencies or officials, venue is proper "in any judicial district in which (A) a defendant in

the action resides, (B) a substantial part of the events or omissions giving rise to the claim

occurred, or a substantial part of property that is the subject of the action is situated, or (C) the

plaintiff resides if no real property is involved in the action."  28 U.S.C. § 1391(e)(1).  In this

case, Plaintiffs have asserted that venue is proper based solely on the third basis enumerated in

the statute—the residence of Western Watersheds Project and the presence of staff members of

the Center for Biological Diversity.  *See* Sec. Am. Compl. ¶ 18.[5]  As explained below, Plaintiffs

---

[3] Defendants moved to transfer the September 2017 Utah sale, and the Court denied the motion.
*See* Sept. 4, 2018 Mem. Decision and Order, ECF No. 66.  In doing so, the Court stated that
venue was proper and rejected an argument made by the intervenors that venue was improper
under 28 U.S.C. § 1391(e)(1) because the challenged leasing decisions involved "real property"
for venue purposes.  *See id.* at 10 n.7.  That venue decision is now on appeal in the context of
Defendants' appeal of the Court's Phase One summary judgment ruling regarding four of BLM's
leasing decisions (although not the same lease sale that Defendants originally sought to transfer).
*See* Defs.' Notice of Appeal, ECF No. 183.  The Ninth Circuit's resolution of the venue issue on
appeal may resolve whether venue is proper for the September 2017 Utah sale at issue here.  Oral
argument in the appeal is scheduled for May 6, 2021.

[4] Defendants have appropriately preserved their defense of improper venue.  *See* Defs.' Answer
to Pls.' Compl. ¶ 17 (denying Plaintiff's venue allegations as to the Utah sale); Defs.' Answer to
Pls.' Sec. Am. Compl. at 43 (Affirmative Defense No. 7) (averring an affirmative defense of
improper venue with respect to the Wyoming and Montana sales)); *see also* Fed. R. Civ. P.
12(h)(1) (providing that an objection to venue is preserved where a defendant objects to venue in
a responsive pleading); *Misch v. Zee Enters., Inc.*, 879 F.2d 628, 631-32 (9th Cir. 1989) (finding
that an objection to venue was waived when raised only after the filing of a motion for summary
judgment).

[5] Plaintiffs also allege that veue is proper because "Defendant BLM has offices and staff" in the
district, Sec. Am. Compl. ¶ 18, but there is no record evidence to suggest that any those officials

cannot base venue on this provision because this is a case where "real property is involved in the action."  28 U.S.C. § 1391(e)(1)(C).

A case involving oil and gas leases is a case that involves real property for venue purposes.  A letter from Deputy Attorney General Byron White at the time of enactment of the statute directly addressed this point and also raised the concern that the venue for such claims not be divorced from the locality where such claims arise:

> The principal demand for this proposed legislation comes from those who wish to seek review of decisions relating to public lands, such as the awarding of oil and gas leases, consideration of land patent applications and the granting of grazing rights or other interests in the public domain.  The applicants may reside in any State, or several States of the Union, and it would be unwise to have the Secretary sued in Maine with respect to an oil and gas lease in Wyoming.

S. Rep. No. 87-1992, at 6 (1962), *reprinted in* 1962 U.S.C.C.A.N. 2784, 2789 (Aug. 31, 1962).  The Senate Committee reviewing the bill agreed that the changes to the venue statute would apply specifically to management decisions on federal lands and that such challenges should be heard where the public land was located.  *See id.* at 3-4, 1962 U.S.C.C.A.N. at 2786-87.

The principle that venue for a case involving an oil and gas lease is only proper in a district where the lease is located should not be in doubt.  Several decisions addressed this point after the enactment of the amended venue statute.  In one case, the Chief Judge of the District of Idaho found that venue did not properly lie in Idaho for claims regarding the cancellation of oil and gas leases in Colorado, New Mexico, and Montana.  *Landis v. Watt,* 510 F. Supp. 178, 180

---

were involved in the leasing of lands in other districts.  Therefore, the mere presence of some BLM staff cannot serve as a basis for venue.  *See, e.g.*, *Reuben H. Donnelley Corp. v. FTC*, 580 F.2d 264, 266 n.3 (7th Cir. 1978) (a federal official's residence for venue purposes is the location where he or she performs official duties).  The third potential basis for venue likewise does not apply here because neither a substantial part of the events giving rise to the claim nor a substantial part of the property subject to the lawsuit is located in this district.  *See* 28 U.S.C. § 1391(e)(1)(B).

(D. Idaho 1981).  Similarly, a later decision in the District of Nevada found that a claim

challenging the rejection of applications for oil and gas leases was an action involving real

property.  *Ferguson v. Lieurance*, 565 F. Supp. 1013, 1015 (D. Nev. 1983).

Defendants acknowledge that some courts have reached the opposite conclusion, with

those courts reasoning that the claims at issue were only peripherally related to real property.

*See Shell Oil Co. v. Babbit*, 920 F. Supp. 559, 564-66 (D. Del. 1996) (holding that a case relating

to oil and gas leases did not involve real property for venue purposes because the only issue in

the case was the disclosure of certain documents); *Santa Fe Int'l Corp. v. Watt*, 580 F. Supp. 27,

28, 31 (D. Del. 1984) (holding that a case relating to oil and gas leases did not involve real

property because the claim involved Secretary Watt's decision that citizens of Kuwait could not

hold oil and gas leases); *Ashley v. Andrus*, 474 F. Supp. 495, 497 (E.D. Wis. 1979) (holding that

a case relating to oil and gas leases did not involve real property because the issue in the case

was whether a representative of an applicant for a leasehold was able to receive the leasehold

after the applicant's death).  But these cases do not undermine the sound principle that a case

generally involves real property when it challenges the issuance or non-issuance of an oil and gas

lease.  None of those cases involved direct challenges to leasing decisions; nor did the plaintiffs

in those cases seek to vacate lease interests.

Insofar as Judge Winmill has gone further, by rejecting that challenges to BLM's

management of federal lands involve real property for purposes of venue,[6] Defendants

respectfully disagree with those decisions.  Other courts have concluded that even claims

involving land use plans involve real property for venue purposes.  *See Ctr. for Biological*

---

[6] *See W. Watersheds Project v. Salazar*, Civ. No. 08-0516-E-BLW, 2009 WL 1299626, at *2 (D. Idaho May 7, 2009); *W. Watersheds Project v. Salazar*, Civ. No. 08-435-E-BLW, 2010 WL 375003, at *2 (D. Idaho Jan. 25, 2010).

*Diversity v. BLM*, No. C-08-05646, 2009 WL 1025606, at *3 (N.D. Cal. Apr. 14, 2009).  But

even putting aside this inter-district conflict, the present case involves leases, not land use plans.

And, notably, leases touch real property more directly than land use plans, as recently confirmed

by a district court in the District of Montana.  *See W. Organization of Resource Councils v. U.S.*

*Bureau of Land Mgmt.*, 2021 WL 718857, at * (Feb. 24, 2021) (distinguishing a case involving a

land use plan from "water rights, grazing land permits, and mineral rights," the latter of which

are interests involving real property).  And, as far as Defendants are aware, this Court was the

first to find, in a case challenging an oil and gas leasing decision, that venue was proper in a

district other than where the lease parcels were located.  *See* Sept. 4, 2018 Mem. and Order at 8-

10.  Because a case challenging oil and gas leases is a case that involves real property for venue

purposes, venue in this District is improper and the claims should be dismissed or, alternatively,

transferred to courts where venue would be proper.

## II.     BLM Complied With NEPA

### A.     BLM's Alternatives Analysis Complied With NEPA

BLM analyzed a reasonable range of alternatives in the EAs for the leasing decisions.

Plaintiffs argue that the range of alternatives considered was insufficient because BLM did not

analyze an alternative of deferring all parcels in PHMA.  *See* Pls.' Br. at 14.  But this claim has

been waived because Plaintiffs did not propose such an alternative during the public comment

periods on the draft EAs.  Even if the claim were not waived, it is without merit because BLM

was not required by NEPA to analyze such an alternative and the range of alternatives analyzed

for each sale was reasonable.

#### 1.     Plaintiffs Have Waived Their Alternatives Claim

Plaintiffs have waived their alternatives claim by not proposing the alternative of

deferring parcels in PHMA during the NEPA process.  As the Supreme Court has explained,

"administrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that 'ought to be' considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider matters 'forcefully presented.'" *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 553-54 (1978) (citation omitted); *see also Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1135–36 (9th Cir. 2011).

Here, Plaintiffs submitted comments for each of the sales, but they did not propose that BLM analyze an alternative of deferring parcels only on PHMA.  Contrary to Plaintiffs' assertion, commenters did not ask BLM "to study the alternative of deferring all parcels in sage-grouse PHMA" Pls.' Br. at 15, Instead, what Plaintiffs and other commenters suggested was that BLM analyze an alternative that would defer parcels in *all* Sage Grouse habitat.  And while it true that Plaintiffs urged BLM to withdraw parcels in PHMA from the sale, AR001448-49, BLM reasonably understood the comment to mean that the parcels should be withdrawn from the sale—not BLM should revise the EA to analyze an alternative of deferring parcels in PHMA. *See* AR001715.  The relevant comment letter did not clearly propose that BLM analyze an alternative to the ones set forth in the EA, and therefore the claim is waived as to the Utah sale. *See Am. Wild Horse Campaign v. Zinke*, 353 F. Supp. 3d 971, 982 (D. Nev. 2018) (a plaintiff is not to make comments with "laser precision," but it may not make "vague requests during the comment period and then claim that the agency should have known exactly what it was referring to"), *aff'd sub nom. Am. Wild Horse Campaign v. Bernhardt*, 963 F.3d 1001 (9th Cir. 2020).

As to the Wyoming sale, Plaintiffs likewise failed to propose that BLM analyze the alternative of deferring parcels only in PHMA.  Instead, in their comments on the draft EA

(which Plaintiffs do not cite in their brief), Plaintiffs asked BLM to analyze an alternative that "would defer all or selected remaining parcels located within [PHMA] and [GHMA]." WY165506.  And while Plaintiffs insist that they did propose a no-PHMA alternative, the letters they cite pertain to the administrative protest period after BLM's posting of the lease sale notice, *see* 43 C.F.R. § 3120.4-2, not the NEPA public comment period.  *See* 146602-65 (Plaintiffs' protest letter); WY146706-42 (Wyoming Outdoor Council protest letter).  A protest letter submitted after the EA is finalized and just a month prior to the lease sale does not serve the same purpose as a letter submitted months earlier during the public comment period provided by NEPA.  Raising an issue so late as to preclude its meaningful consideration, and for the purpose of preserving an issue for litigation, is exactly the type of gamesmanship the Supreme Court has prohibited.  *See Vermont Yankee*, 435 U.S. at 553-54.

Finally, as to the Montana sale, Plaintiffs did not ask BLM to analyze a no PHMA alternative.  Instead, they asked BLM to analyze "an alternative that does not offer additional PHMA or GHMA for leasing at this time."  BLM-MT-March2019-016563.  A letter submitted by the Wilderness Society likewise does not propose a no PHMA alternative.  *See* BLM-MT-March2019-016065.  Plaintiffs also refer to a letter submitted by the Western Environmental Law Center on their behalf, but even that letter did not propose that BLM analyze a no PHMA alternative.  *See* BLM-MT-March2019-016223-27.

Accordingly, the claim that BLM did not analyze an alternative of deferring parcels only in PHMA has been waived.

### 2.    BLM's Analysis of Alternatives Fully Complied With NEPA

To the extent the issue has not been waived, BLM's analysis of alternatives in all of the EAs fully complied with NEPA.  Under NEPA, an agency is required to analyze a reasonable range of alternatives.  *See City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142,

1155 (9th Cir. 1997); *see also Block*, 690 F.2d at 767.  An agency need not consider alternatives

that are "remote and speculative," or reconsider alternatives that are sufficiently similar to

alternatives already considered by the agency.  *Westlands Water Dist. v. U.S. Dep't of Interior*,

376 F.3d 853, 868 (9th Cir. 2004) (quoting *Vermont Yankee*, 435 U.S. at 551).  "An agency is

under no obligation to consider every possible alternative to a proposed action, nor must it

consider alternatives that are unlikely to be implemented or those inconsistent with its basic

policy objectives." *Seattle Audubon Soc. v. Moseley*, 80 F.3d 1401, 1404 (9th Cir. 1996). An

agency is free to reject alternatives, but must "briefly discuss the reasons for their having been

eliminated."  40 C.F.R. § 1502.14(a).

   The standard for reviewing an alternatives analysis in an EA is less demanding than for

an EIS.  *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir.

2008) ("[W]hereas with an EIS, an agency is required to '[r]igorously explore and objectively

evaluate all reasonable alternatives,' *see* 40 C.F.R. § 1502.14(a), with an EA, an agency only is

required to include a brief discussion of reasonable alternatives. *See* 40 C.F.R. § 1508.9(b).");  *In*

*Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751

F.3d 1054, 1073 (9th Cir. 2014).  Furthermore, an agency can meet NEPA requirements when

considering just two alternatives (a "no action" alternative and a "proposed alternative") in its

EA.  *See N. Idaho Cmty. Action Network*, 545 F.3d at 1153–54;  *Earth Island Inst. v. U.S. Forest*

*Serv.*, 697 F.3d 1010, 1021–23 (9th Cir. 2012); *Te-Moak Tribe of W. Shoshone of Nevada v. U.S.*

*Dep't of Interior*, 608 F.3d 592, 602 n.11 (9th Cir. 2010).  As described below, BLM satisfied its

obligations under NEPA by analyzing a reasonable range of alternatives for each of the leasing

decisions.

a.        **Utah Lease Sale**

In the EA for the Utah sale, BLM analyzed the proposed alternative of leasing nine

parcels and the no action alternative.  AR001654-56.  Particularly given the small scope of the

sale, the analysis of just two alternatives was sufficient to comply with NEPA.  *See*, *e.g.*, *Earth*

*Island Inst.*, 697 F.3d at 1021-23 (analysis of two alternatives in an EA for a forest restoration

project was sufficient to comply with NEPA).  Plaintiffs claim that they proposed that BLM

analyze the alternative of deferring just the parcels in PHMA, but record shows otherwise.

Instead, they requested that BLM make a decision not to lease the four parcels in PHMA.  *See*

AR 001448-49.  In response, BLM reasonably concluded that the required stipulations would be

sufficient to protect Sage Grouse habitat on the parcels.  AR001715.  BLM reasonably explained

that parcels in PHMA would be protected by an NSO stipulation, meaning that the surface of the

parcels would not be disturbed and therefore Sage Grouse habitat would be adequately protected.

*Id.*

Plaintiffs next argue that the NSO stipulation will not be sufficiently protective because

Sage Grouse habitat outside of PHMA could still be disturbed.  *See* Pls.' Br. at 16.  But whether

BLM sufficiently analyzed such impacts outside of PHMA is a separate question, and does not

bear whether BLM analyzed a sufficient range of alternatives.  As discussed below, and as

Plaintiffs appear to acknowledge, BLM did, in fact, analyze potential impacts to lands outside of

PHMA.  *See id.* (citing AR001676).  Further, *WildEarth Guardians v. BLM*, 457 F. Supp. 3d 880

(D. Mont. 2020), is inapposite here because that court found the alternatives analysis inadequate

where BLM had failed to explain why stipulations that the plaintiffs proposed could not be

applied—an issue not present here.  *See id.* at 890-91. BLM is applying stipulations, as it

explained in response to Plaintiffs' comments, and Plaintiffs did not offer any alternative stipulations for BLM to analyze.

### b.        Wyoming Lease Sale

BLM analyzed three alternatives in the EA for the February 2019 Wyoming sale, viz., offering 674 nominated parcels for sale, the no action alternative, and the proposed action, whereby only 584 parcels would be offered and the remaining parcels would be deferred. WY147445-47.  As of February 14, 2019, BLM had deferred a total of 98 parcels from the sale. WY147447 at n.2.  BLM also considered, but did not analyze in detail, an alternative that would have deferred all parcels in Sage Grouse habitat.  WY147450.  BLM explained that it did not analyze such an alternative in detail because deferring all parcels in Sage Grouse habitat that were otherwise available for leasing would not be in conformance with the applicable RMP, which opened such areas to leasing.  *See id.*

This explanation was entirely reasonable; an alternative that analyzed parcels only outside of Sage Grouse habitat would have included only three out of the 674 parcels nominated and considered for the sale.   WY147472.  BLM was not required to analyze such an alternative because it would not have been significantly different from the no action alternative.  *See Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of the Interior*, 608 F.3d 592, 602 (9th Cir. 2010) (an agency is not required to analyze an alternative that was not "significantly distinguishable" from one that was already analyzed).  Plaintiffs argue that the designation of lands as open in an RMP does not require those lands to be leased.  *See* Pls.' Br. at 17 (citing *Roy G. Barton*, 188 IBLA 331, 337 (2016).  But this arguments misses the point because, in the case of the Wyoming sale, deferring all parcels within Sage Grouse habitat (673 parcels) would not

have been consistent with the designation of such lands as open in the applicable RMPs despite the fact that they are in Sage Grouse habitat.

Further, BLM effectively considered alternatives that would defer some or all parcels in Sage Grouse habitat because such alternatives are subsumed within the no action alternative. *See* WY147888. In *Biodiversity Conservation Alliance*, 183 IBLA 97 (2013), environmental groups challenged an oil and gas leasing decision in Wyoming and alleged that BLM had violated FLPMA and NEPA. Specifically, the plaintiffs argued that BLM should have analyzed a "sage-grouse conservation alternative" that would have deferred all parcels in Wyoming Core Areas. *Id.* at 124. The IBLA rejected that claim, explaining that BLM had adequately considered that alternative "in the course of considering the no action alternative, under which all of the public lands proposed for leasing would not be leased, and thus would not be developed for oil and gas purposes." As the IBLA explained:

> Subsumed under the no action alternative was not leasing any or all of the parcels within Core Areas, including the 42 parcels now at issue, or the multitude of combinations of these parcels. BLM is not required to devise a multitude of alternatives that specifically involve not leasing different groupings of the various parcels proposed for leasing.

*Id.* at 124-25. The IBLA thus concluded that BLM had satisfied its obligation to consider a range of alternatives because BLM had considered the potential impacts of "not leasing all of the proposed parcels, which necessarily includes not leasing any one or any one grouping of these parcels." *Id.* at 125; *see also Biodiversity Conservation Alliance*, 171 IBLA 218, 238 (2007). That reasoning applies with equal force here.

And while Plaintiffs contend that courts have rejected the IBLA's reasoning, the authorities they cite are inapposite. They point to a footnote in *New Mexico ex rel. Richardson v. Bureau of Land Management*, 565 F.3d 683 (10th Cir. 2009), stating that the consideration of alternatives at either end of a spectrum does not relieve the agency from considering "any other

alternative along the spectrum." *Id.* at 711 n.32.  But the decision at issue in *Richardson* was fundamentally different from the one presented in *Biodiversity Conservation Alliance* or one at issue in this case.  The plaintiffs in *Richardson* challenged a land use plan amendment that opened previously closed areas on the Chihuahuan Desert grassland for leasing.  *See id.* at 688-90.  The plaintiffs argued that BLM should have analyzed an alternative that closed the Otero Mesa—a particularly environmentally sensitive portion of the planning area—to leasing, and the court agreed.  *See id.* at 710-11.  But the decision in that case was whether to open areas for leasing at the RMP stage, not whether to lease particular parcels that are already available for leasing.  As explained by the IBLA in reasoning that is not disturbed by *Richardson*, the no action alternative subsumes the potential alternatives of not leasing particular parcels or combinations of parcels.  *See Biodiversity Conservation Alliance*, 183 IBLA at 124-25.

Finally, BLM appropriately stated in response to Plaintiffs' protest that BLM analyzed a number of alternatives at the RMP stage, including an alternative to close PHMA to development.  WY147889.  This underscores how different this case is from the *Richardson* case. At the RMP stage, BLM analyzed a range of alternatives (not just two ends of a spectrum), and those alternatives included closing some or all of PHMA to leasing.  *See*, *e.g.*, WY057427 (Buffalo EIS) (Alternative B would have closed 490,491 acres of PHMA to oil and gas leasing). Having done that analysis at the RMP stage, it was not necessary for BLM, in the context of an EA at the leasing stage, to analyze a full suite of alternatives.  *Cf. W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050-51 (9th Cir. 2013) (finding that BLM violated NEPA when it did not analyze a no grazing or reduced grazing alternative either at the programmatic stage or in the EA for a grazing allotment).  And, as already discussed, BLM effectively did analyze both a no

action alternative and a no leasing in PHMA alternative because the no action alternative

subsumes the alternatives of not leasing any one particular parcel or groups of parcels.

### c. Montana Lease Sale

In the EA for the March 2019 Montana sale, BLM analyze three alternatives: the no

action, the original proposed action, and the selected alternative.  BLM-MT-March2019-000037.

In response to comments regarding the potential impacts to Sage Grouse habitat, BLM developed

the alternative that was ultimately selected.  The selected alternative defers 17 parcels that would

have been offered under the original proposed alternative.  BLM-MT-March2019-000035-37.

BLM deferred one parcel and parts of four others in Valley County, Montana in order to protect

State of Montana connectivity habitat that was not designated in the federal Plans.  BLM-MT-

March2019-000001.  BLM also deferred one parcel in Bowman County, North Dakota, and three

parcels in Harding County, South Dakota because off site development would negatively affect

active sage-grouse leks.  *Id.*; BLM-MT-March2019-000036.  Twelve other parcels in Sage

Grouse habitat were deferred for other reasons.  *Id.*

Plaintiffs complain that BLM arbitrarily rejected a no PHMA alternative on the grounds

that lease stipulations and compensatory mitigation were adequate to protect Sage Grouse

habitat.  Pls.' Br. at 19 (citing BLM-MT-March2019-000034).  But no such alternative was

proposed; instead, Plaintiffs asked BLM to analyze an alternative that would defer all parcels in

Sage Grouse habitat.  BLM-MT-March2019-016563.  BLM did, however, conclude as part of its

effects analysis that parcels offered for sale in PHMA would be protected because they were

subject to an NSO stipulation, without exceptions or waivers, as required by the applicable RMP.

*Id.*  That conclusion was reasonable.  *See* section II.B., *infra*.  Insofar as Plaintiffs insist that

BLM should have considered a "middle ground" alternative, declining to lease any parcels in

Sage Grouse habitat would not have been such an alternative because 95% of the parcels in the Montana sale are in designated Sage Grouse habitat.  BLM-MT-March2019-0014101.  BLM also was not required to analyze a Sage Grouse conservation alternative because not leasing any or all of the parcels containing Sage Grouse habitat was subsumed in the no action alternative.  *See Biodiversity Conservation Alliance*, 183 IBLA at 124-25.

Finally, insofar as Plaintiffs argue that other alternatives were viable, *see* Pls.' Br. at 20 (citing *Western Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013), the argument is a red herring.  BLM did not say that it rejected the no PHMA alternative because it was not viable; instead, as explained above, BLM did not analyze such an alternative because it was not proposed.  *Wildearth Guardians* also is of no assistance to Plaintiffs' arguments because Plaintiffs have presented no argument that there were other stipulations or mitigation that BLM should have considered.  *See* 457 F. Supp. 3d at 889-91.

In sum, BLM considered a reasonable range of alternatives and was not required to analyze other alternatives in more detail.

**B.     BLM Appropriately Analyzed Impacts to Sage Grouse**

BLM adequately analyzed impacts to Sage Grouse in the EISs supporting the 2015 Sage Grouse Plans and the lease-specific EAs.  As an initial matter, the EAs appropriately tiered to the analyses in the EISs prepared during the Sage Grouse plan amendment process that culminated in 2015.  Tiering is an accepted—indeed, encouraged—NEPA practice in which the agency conducts analyses at successive phases of a planning process or project.  *See* 40 C.F.R. § 1502.20 (encouraging agencies to tier so that they may "focus on the actual issues ripe for decision at each level of environmental review").  When an agency conducts NEPA in this fashion, the appropriate question is whether the prior NEPA document and the current one, taken together, provide sufficient analysis to comply with NEPA.  *See Sierra Forest Legacy v. Sherman*, 646

F.3d 1161, 1184 (9th Cir. 2011); *S. Or. Citizens Against Toxic Sprays, Inc. v. Clark*, 720 F.2d 1475, 1480 (9th Cir. 1983).

The EAs that BLM prepared in this case expressly tiered to, and incorporated by reference, the relevant analyses contained in the EISs prepared during the 2015 Sage Grouse plan amendment process.  *See* Factual Background §§ A., C.1.-3., *supra*.  Plaintiffs argue that BLM cannot rely "wholesale" on the prior EISs, Pls. Br. at 27, but this strawman argument mischaracterizes the EAs at issue here.  The EAs do not rely wholesale on prior EISs; instead, they appropriately tier to and incorporate the prior analyses of potential environmental impacts of oil and gas development based on reasonably foreseeable development scenarios.  But even if the EAs *had* relied "wholesale" on the planning-level EIS, there would be nothing per se inappropriate about it.  *See Protect Our Communities Found. v. LaCounte*, 939 F.3d 1029, 1039 (9th Cir. 2019) (holding that a planning level EIS sufficiently analyzed the site-specific action at issue).

Based on the analyses in the EISs for BLM's planning decisions and the EAs for the leasing decisions, BLM appropriately analyzed impacts to Sage Grouse at the oil and gas leasing stage.  The decision to offer oil and gas leases without an NSO stipulation is an "irretrievable commitment of resources" towards permitting development activities to occur, and thus the agency is required to conduct a NEPA analysis before making such a decision, *see Conner v. Burford*, 848 F.2d 1441, 1451 (9th Cir. 1988); *see also New Mexico ex rel. Richardson*, 565 F.3d at 717-18, including some amount of site specific analysis.  *N. Alaska Envtl. Ctr. v. Kempthorne* (*N. Alaska I*), 457 F.3d 969, 975-76 (9th Cir. 2006).  The Ninth Circuit has recognized, however that, at the leasing stage, "there is no way of knowing what plans for development, if any, may eventually materialize."  *Id.* at 977.  It has further acknowledged that "NEPA applies at all stages

of the process" and "[a]ny later plan for actual exploration by lessees will be subject to a period

of review." *Id.*  Thus, the Ninth Circuit has held that the government is "not required at [the

leasing] stage to do a parcel by parcel examination of potential environmental effects." *Id.*

Instead, "[s]uch analysis must be made at later permitting stages when the sites, and hence more

site specific effects, are identifiable." *Id.*  The Ninth Circuit has also made clear that courts

should "defer to the agency's judgment about the appropriate level of analysis so long as the

[relevant NEPA document] provides as much environmental analysis as is reasonably possible

under the circumstances, thereby providing sufficient detail to foster informed decision-making

at the stage in question." *N. Alaska Envtl. Ctr. v. U.S. Dep't of the Interior* (*N. Alaska II*), 983

F.3d 1077, 1088 (9th Cir. 2020) (citations and internal quotation marks omitted).  As discussed

below, BLM appropriately analyzed the potential impacts to Sage Grouse from its leasing

decisions both in the EAs for the leasing decisions and the underlying EISs for the 2015 Plans.

　　*Utah sale.*  BLM appropriately analyzed impacts to Sage Grouse for the September 2017

Utah sale.  In conjunction with the 2009 oil and gas implementation EA for the Fillmore Field

Office, BLM prepared an RFD, which predicted the development of five exploratory wells over

ten years and zero producing wells.  AR001651.  That estimate was based on the fact that only

nine wells have been drilled in the area over the past 60 years, and all of those are currently

plugged and abandoned.  AR001652.  If well development were to occur, the EA described the

potential impacts to Sage Grouse that would occur, including impacts from well pad and road

construction, production, waste water, and maintenance operations.  AR 001652-56.

　　With respect to Sage Grouse, the EA explained that the lease area included the Sheeprock

Mountains Population Area, which included areas designated as PHMA and GHMA.

AR001665.  Because of declines in male lek counts in the area, a hard trigger in the Utah RMPA

was met, meaning that some portions of the area would be subject to the stricter standards applicable to PHMA.  AR001666.  The EA identified four parcels in PHMA.  *Id.*; *see also* AR001714 (map).  The EA also described efforts to track individual Sage Grouse using transmitter data, the quality of the habitat, Sage Grouse sightings, alterations of the habitat, the location of the parcels in relation to leks, and the location relative to winter habitat, nesting habitat, and brood-rearing habitat.  AR001666-67.  The nearest active lek is located five miles from one of the parcels.  AR001667.

As far as potential impacts to Sage Grouse, the EA explained that all of the parcels in PHMA (which is all of the parcels in Sage Grouse habitat), would be offered with an NSO restriction, meaning that no ground-disturbing on the parcel would occur.  AR001676.  An exception could be applied under the Utah RMPA, but only if it would have no impacts on Sage Grouse or would reduce the impacts to Sage Grouse.  *Id.*  The EA also acknowledged that development could be pushed onto non-federal lands, but explained that based on the low quality of the habitat and the low level of anticipated development, the likelihood of impacts to Sage Grouse would be low.  AR001676-77; *see also* AR002479-80, 2484-86, 2661-65, 2799-802, 2827-30 (Utah EIS).

The analysis provided the decision-maker with sufficient information to make an informed decision at the leasing stage.  *See N. Alaska II*, 983 F.3d at 1088.  Plaintiffs argue that BLM ignored potential impacts on adjacent private land, Pls.' Br. at 21-22, but the record shows otherwise.  AR001676-77.  And contrary to Plaintiffs' assertions, BLM did disclose where the parcels, as well as existing wells, were located, in relation to existing leks, as well as winter, brood-rearing, and nesting habitat.  AR001667; AR001714.  BLM also gathered and analyzed telemetry data from radio-collared birds in the area where the parcels are located.  AR001666.

The cases that Plaintiffs rely on are inapposite because BLM did provide information and maps regarding the location of Sage Grouse habitat, different types of habitat, and leks in relation to the lease parcels.  *See Wildearth Guardians v. Montana Snowmobile Ass'n*, 790 F.3d 920, 925-28 (9th Cir. 2015) (agency failed to provide information regarding the location of big game); *N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1084 (9th Cir. 2011) (agency decided to conduct Sage Grouse surveys only after the approval of a project); *Or. Natural Desert Ass'n v. Jewell*, 840 F.3d 562 (9th Cir. 2016) (BLM assumed that Sage Grouse were absent from a project site during the winter without conducting surveys).

Plaintiffs also contend that BLM was required to conduct an analysis of the value of the Sheeprocks population relative to the Sage Grouse species if the Sheeprocks population were extirpated.  *See* Pls.' Br. at 22-23.  But there is nothing in the EA to suggest that the Sheeprocks population will be extirpated as a result of BLM's leasing decision.  The leased parcels are subject to an NSO stipulation and little development is expected to occur.  AR001676-77. Further, BLM analyzed the range-wide impacts of oil and gas development at the RMP stage. AR002799-802; *see also* section II.C., *infra*.  Therefore, this case is unlike *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957 (9th Cir. 2002), where the agency limited the geographic area of the cumulative impacts analysis to the "home range" of particular species.  *Id.* at 973.

*Wyoming sale.*  The EA for the Wyoming sale contains an extensive discussion of Sage Grouse populations in Wyoming and population trends.  W147470-73.  As noted in the EA, even before the adoption of the 2015 Sage Grouse Plans, the State of Wyoming had adopted a state plan for protection of Sage Grouse.  WY147470.  The Wyoming Plan and the fact that it would be implemented across all lands within Wyoming (not just federal lands) was noted in the FWS's

2015 finding that the Sage Grouse was not warranted for listing under the Endangered Species Act. *Id.*; *see also* 80 Fed. Reg. 59,858, 59, 882 (Oct. 2, 2015). As explained in the EA, 302 sale parcels are located wholly or partially in PHMA, two parcels contain connectivity habitat, three parcels are located outside of habitat, and the remainder are in GHMA. WY147471. Nine of the parcels in GHMA are within winter concentration areas. *Id.* Eighty-eight parcels within PHMA are within 0.6 miles of a lek, and therefore those portions are subject to an NSO restriction. *Id.* An additional 123 parcels are within 2 miles of a lek. *Id.*; WY147691-92 (maps).

The EA explains that conservation measures adopted by the State of Wyoming and the federal Wyoming Sage Grouse plans have been effective in reducing the amount of Sage Grouse habitat subject to oil and gas leasing. Since 2008, there has been a 74% reduction in the acreage of oil and gas lease parcels in PHMA. *Id.* There also has been a 57% reduction in the acreage of producing oil and gas wells within PHMA. *Id.* Sage Grouse population data compiled by the Wyoming Game and Fish Department ("WGFD") shows that populations have fluctuated in recent years, but populations are generally higher than they were in the mid-1990s. WY147471-72. Lek size decreased during the period from 2006 to 2013, but increased by 112% from 2013 to 2016. WY147472. In 2017, lek size declined modestly by 11%. *Id.* As explained in the EA, Sage Grouse populations tend to fluctuate and are influenced by the weather in particular years. *Id.* More spring precipitation is correlated with higher numbers of chicks and more males in the subsequent year. *Id.* The 2017 lek count data suggests that populations have stabilized. *Id.*

In its analysis of impacts, BLM explained that all of the parcels offered in Sage Grouse habitat are subject to a stipulation indicating that operators may be required to comply with measures to reduce impacts to Sage Grouse habitat and that such measures would be developed at the APD stage. WY147496. Further, parcels in Sage Grouse habitat are subject to the

requirements of the applicable 2015 Sage Grouse RMPs and RMPAs.  *Id.*  The impacts of oil and

gas development on Sage Grouse habitat are described in the EISs supporting the 2015 plans.

*Id.*; *see also* WY058634-744 (Buffalo EIS); WY061454-550 (Wyoming EIS); WY064701-57

(Bighorn EIS); WY054285-334 (Lander EIS).

BLM's analysis of impacts for the Wyoming sale was sufficient to comply with NEPA.

Nonetheless, Plaintiffs contend that BLM was required to conduct more site-specific analysis,

including estimating where potential development may occur in relation to leks.  *See* Pls.' Br. at

23-25.  But as discussed above, the sale itself does not allow any immediate development to

occur; instead, actual development occurs after BLM's approval of an application for drilling

permits—a decision process that is itself subject to additional NEPA analysis.  *See* Background,

section I.C., *supra*.  It is also not known at the leasing stage where and when development will

occur.  *See id.*; WY147893 (protest response, explaining that "for the BLM to provide a more

site-specific and detailed analysis of the impacts from lease development activities would require

the BLM to speculate on the density of drilling locations, the number, characteristics, and

specifications of related to production equipment, and the rate at which the leases would be

developed").  Due to the lack of such specific information regarding potential development

projects at the leasing stage, the Ninth Circuit has not required a more detailed analysis at the

leasing stage.  *See N. Alaska*, 457 F.3d at 977 (the government was not required to do a "parcel

by parcel examination of potential environmental effects" at the leasing stage); *see also Ctr. for*

*Biological Diversity v. U.S. Bureau of Land Mgmt.*, No. 3:17-CV-553-LRH-WGC, 2019 WL

236727, at *6 (D. Nev. Jan. 15, 2019) (upholding an EA for an oil and gas leasing decision and

rejecting the argument that a site specific analysis was required at the lease sale stage).  The

Court should defer to the agency's judgment that a more detailed site-specific analysis was not

reasonably possible without knowing about particular plans for development.  *N. Alaska II*, 983 F.3d at 1088.

Plaintiffs argue that BLM could have conducted a more detailed analysis because it had information regarding lek locations, population trends, and threats to Sage Grouse from oil and gas development, as well as an RFD prepared at the RMP stage.  *See* Pls.' Br. at 24-25.  But what they cannot, and do not, refute is that BLM did not have information about the location, timing, or composition of site specific oil and gas development projects.  Therefore, BLM was not required to conduct a more detailed analysis at the lease stage.  *See Ctr. for Biological Diversity*, 2019 WL 236727, at *6.  The analysis that Plaintiffs are asking for would have required BLM to speculate about the location and nature of drilling operations, which generally occupy only about 10 acres[7] within lease parcels that may be 1,000 acres or more.  WY098724 (showing that a lease parcel offered at the February 2017 Wyoming sale was approximately 2,500 acres).  Such speculation is not required by NEPA.  *See Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 668 (9th Cir. 1998) ("NEPA does not require an agency to consider the environmental effects [of] speculative or hypothetical projects.").

Plaintiffs also argue that BLM should have conducted additional analysis regarding the impacts of leasing on winter habitat and connectivity areas.  *See* Pls.' Br. at 25-26.  As already discussed, BLM did disclose which parcels overlapped such areas.  WY147471.  BLM could not, however, conduct a more detailed analysis of potential impacts to such areas because it did not know at the leasing stage where oil and gas development projects would occur.  The cases Plaintiffs cite regarding the importance of connectivity habitat do not apply here because those

---

[7] The area taken up by well pads and related equipment varies, but generally occupies 2.75 to 23 acres of initial disturbance and 2 to 10 acres of long term disturbance, depending on the number of wells and the type of wells on the well pad.  WY067743 (Buffalo RMP Appendix O).

Defendants' Memorandum in Support of Motion for Partial Summary Judgment
and in Opposition to Plaintiffs' Motion for Partial Summary Judgment (Phase Three)     32

cases involved the impacts of specific projects on Sage Grouse habitat, not whether more analysis was reasonably possible at the oil and gas leasing stage. *See Or. Natural Res. Council Fund v. Goodman*, 505 F.3d 884, 892-93 (9th Cir. 2007) (finding that the Forest Service failed to adequately analyzed the impacts of a ski area expansion project on wildlife corridor); *Marble Mtn. Audubon Soc'y v. Rice*, 914 F.2d 179, 180-81 (9th Cir. 1990) (finding that the Forest Service failed to adequately analyze the impacts of a timber sale on a biological corridor).  No specific oil and gas development projects are at issue here, and BLM was not required to conduct analysis of such potential projects at the leasing stage.

*Montana sale.*  The EA for the Montana sale analyzes population trends within Montana, as well as specific information regarding Sage Grouse populations in the lease area.  BLM-MT-March2019-000088-89.  Based on lek data provided by the State of Montana, BLM determined that there are 61 leks within four miles of proposed lease parcels and 45 leks within two miles of the parcels.  BLM-MT-March2019-000089.  There are also three active leks in South Dakota and two leks in North Dakota within 3.1 miles of a lease parcel.  *Id.*  The EA disclosed that, of 246 parcels nominated for the June 2017 and March 2019 sales, 230 were in PHMA, RHMA, or GHMA.  BLM-MT-March2019-000089-90; BLM-MT-March2019-026918-19.  The EA also analyzed scientific studies regarding the impacts of oil and gas leasing on Sage Grouse.  BLM-MT-March2019-000091.  Specifically, BLM considered research regarding a Sage Grouse migratory corridor between Saskatchewan and Valley County, Montana.  *Id.*

BLM analyzed the potential impacts of development on Sage Grouse in light of the expected level of development and the protective measures required by the Sage Grouse Plans.  BLM's RFD for the sale estimated that 55 wells would be developed over ten years.  BLM-MT-March2019-000092-93; *see also* BLM-MT-March2019-001269-99.  All except 18 of the parcels

are in PHMA, GHMA, or RHMA.  BLM-MT-March2019-000092.  But the EA explained that
each of the parcels in Sage Grouse habitat would be subject to protective stipulations, i.e., an
NSO stipulation in PHMA; and NSO, CSU, and timing limitation ("TL") stipulations in GHMA
and winter range, consistent with the applicable Sage Grouse plans and the State of Montana
plan.  BLM-MT-Marh2019-000092-93.  BLM also analyzed the potential impacts to
connectivity habitat identified by the State of Montana and potential impacts to Sage Grouse in
North and South Dakota, which do not have state plans for the protection of Sage Grouse.  BLM-
MT-March2019-000094-97; BLM-MT-March2019-031290-99.

       In light of the comments receive during the public comment period, BLM developed a
new alternative (the selected action), which was designed to avoid impacts to Sage Grouse where
such impacts would not be mitigated through stipulations required by the Sage Grouse Plans.
BLM-MT-March2019-000098.  BLM deferred three parcels in South Dakota and one in North
Dakota out of concern that off site development could negatively impact Sage Grouse habitat in
those areas.  *Id.*  And based on the research on connectivity habitat in Montana, BLM deferred
parcels in connectivity habitat.  BLM-MT-March2019-000098-99.  Other parcels to the east of
the connectivity area were offered pursuant to an NSO stipulation.  BLM-MT-March2019-
000099.  Thus, BLM appropriately analyzed potential impacts to Sage Grouse in the lease area
and took additional steps to minimize those impacts by deferring specific parcels.  Further,
BLM's analysis incorporated by reference the analyses in the EISs supporting the applicable
2015 Plans.  BLM-MT-March2019-010854-928 (Miles City EIS); BLM-MT-March2019-
003628-80 (Billings EIS); BLM-MT-March2019-008647-703 (HiLine EIS); BLM-MT-
March2019-013258-383 (South Dakota EIS).

In sum, BLM fully complied with NEPA by providing a reasonable site specific analysis of potential impacts at the leasing stage, which provided the decision-maker with sufficient information to make informed leasing decisions. *N. Alaska II*, 983 F.3d at 1088.

### C.     BLM Appropriately Analyzed the Cumulative Impacts to Sage Grouse in Each of the Lease Areas

BLM appropriately analyzed the cumulative impacts to Sage Grouse from its leasing decisions. Like its analysis of effects from the leasing decisions, the analysis of cumulative impacts tiers to the analysis of cumulative impacts in the EISs for the 2015 Sage Grouse plan amendment process, which was entirely appropriate. Further, the EISs analyze impacts across geographic zones established by the Western Area Fish and Wildlife Agencies ("WAFWA"), which was eminently reasonable and is entitled to deference.

An EA must analyze the cumulative impacts of the proposed action. *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Engineers*, 524 F.3d 938, 954 (9th Cir. 2008). A "cumulative impact" is defined in CEQ's NEPA regulations as "the impact on the environment which results from the incremental impacts of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Montana Wilderness Ass'n v. Connell*, 725 F.3d 988, 1001 (9th Cir. 2013) (quoting 40 C.F.R. § 1508.7). The analysis of cumulative effects should include "some quantified or detailed information that results in a useful analysis." *Ctr. for Envtl. Law and Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1007 (9th Cir. 2011) (citation and internal quotation marks omitted). "An agency may, however, characterize the cumulative effects of past actions in the aggregate without enumerating every past project that has affected an area." *Id.* As with the analysis of impacts, in analyzing cumulative impacts, an agency may tier to a prior NEPA analysis. *See Sierra Forest Legacy*, 646 F.3d at 1184; *see also*

*S. Or. Citizens Against Toxic Sprays*, 720 F.2d at 1480.  An agency's choice of the geographic scope of the cumulative impacts analysis is entitled to deference.  *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976); *Selkirk Conservation All. v. Forsgren*, 336 F.3d 944 (9th Cir. 2003).  As discussed below, BLM appropriately analyzed cumulative impacts with respect to each of the sales.

*Utah sale*.  In the EA for the Utah sale, BLM analyzed the potential impacts to Sage Grouse within Juab County, such as wildfire, invasive plant spread and conifer encroachment that could specifically affect the Sheeprocks population.  AR001680.  The EA also tiers to the extensive discussion of cumulative impacts in the EIS for the Utah RMPA. AR001649-50; AR003141-301.  As explained in the EIS, the cumulative impacts analysis for the Utah RMPA covers WAFWA zones III, IV, and II/VII.  AR003168-69.  The EIS analyzes potential cumulative impacts to Sage Grouse across this geographic area from a variety of threats, including wildfire, invasive weeds, infrastructure, grazing, energy development, and mining.  AR003168-3301.  The EIS analyzes cumulative impacts in light of past, present, and reasonably foreseeable actions, including oil and gas development, and analyzes the potential cumulative impacts of those actions.  AR003282-301.

*Wyoming sale.*  In the EA for the Wyoming sale, BLM explained that there are approximately 15,910,253 acres of Sage Grouse habitat in Wyoming.  WY147502.  Of that acreage, approximately 1,341,256 acres (8.4%) is subject to a federal oil and gas lease as of June 2018.  *Id.*  Any new lease parcels are subject to the 5% density and disturbance cap in the applicable Sage Grouse Plans.  *Id.*; *see also* WY066659.  The cumulative impacts of oil and gas development of the Wyoming leases are analyzed in the EISs supporting the applicable Sage Grouse RMPs and RPMAs.  *See* WY058688-744, 59065-70 (Buffalo EIS); WY065154-212

(Bighorn EIS); WY054645-58 (Lander EIS); WY061668-790 (Wyoming EIS).  The Wyoming

EIS, for example, analyzes Sage Grouse population trends and regional conservation efforts and

analyzes, among other things the potential cumulative impacts of oil and gas development across

WAFWA zones I and II/VII.  WY061718-33, 61756-60.

*Montana sale.*  As explained in the EA for the Montana sale, the State of Montana

provides a regulatory scheme for the protection of Sage Grouse habitat across all lands within the

state, which is important because 64% of Sage Grouse habitat in the state is on private land.

BLM-MT-March2019-000099-100.  The EA acknowledges the potential cumulative effects of

oil and gas development and incorporates the analysis of cumulative impacts in the EISs

supporting the 2015 Plans.  BLM-MT-March2019-00100-01; BLM-MT-March2019-04004-

4020; BLM-MT-March2019-008356-008698; BLM-MT-March2019-010887-010927; BLM-

MT-March2019-013258-013383.  Further, maps provided in Appendix E of the EA and

referenced in the discussion of cumulative impacts show that Sage Grouse habitat could be

impacted over time by oil and gas development.  BLM-MT-March2019-101; BLM-MT-

March20191300-09 (maps showing parcels leased from 2015 through 2018 and showing leased

parcels in relation to designated habitat and 3.1-mile lek buffers).  BLM determined that the

required mitigation in the Sage Grouse Plans and the State of Montana Plan (including lek

buffers, density and disturbance caps, and compensatory mitigation) would provide protection

for Sage Grouse within Montana.  BLM-MT-March2019-101.  The same state-level protections

would not apply in North and South Dakota, which led BLM to defer those parcels.  *Id.*

The analyses described above were sufficient to comply with NEPA.  Plaintiffs argue that

the EAs themselves contained little analysis of cumulative impacts, *see* Pls.' Br. at 31-33, but

that simply ignores the analyses in the EISs supporting the 2015 Plans, which contain analyses of

cumulative impacts across the range of the Sage Grouse. For that reason, *Bark v. U.S. Forest Service*, 958 F.3d 865, 872-73 (9th Cir. 2020), is inapposite. The analyses in the EISs did consider the impacts of multiple threats to Sage Grouse, including mining, grazing, and energy development, and therefore Plaintiffs' contention that BLM did not analyze such things is likewise baseless. *See* Pls.' Br. at 32-33. And unlike in *Kern v. U.S. Bureau of Land Management*, 284 F.3d 1062, 1075 (9th Cir. 2002), BLM did not defer the analysis of cumulative impacts, as Plaintiffs claim, *see* Pls.' Br. at 33, but instead analyzed cumulative impacts at the planning stage to allow BLM and the public a complete picture of cumulative impacts across the range of the Sage Grouse.

Plaintiffs' reliance on *Klamath-Siskiyou Wildland Center v. Bureau of Land Management*, 387 F.3d 989 (9th Cir. 2004), is unavailing. As in this case, BLM argued that it satisfied its obligation to analyze cumulative impacts by tiering to a prior EIS, *see id.* at 997-98, but the similarities between the cases end there. The *Klamath-Siskiyou* court found that the EIS in that case contained only "general statements about the cumulative effects of logging" in the watershed at issue. *Id.* at 997. In contrast, the EISs supporting the RMPs contain extensive, detailed analyses of the conditions in the planning areas and past, present, and reasonably future actions that would impact Sage Grouse. *See*, *e.g.*, WY061668-61790 (Wyoming Nine EIS). *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 801-11 (9th Cir. 1999), likewise does not support Plaintiffs' arguments because the court in that case found that a prior EIS did not analyze the potential impacts of a land exchange and other logging projects that were subsequently proposed. *Id.* at 809-10.

Plaintiffs also argue that the scope of the EISs was too broad and did not focus on the incremental impacts of the individual leasing decisions. But it was appropriate for the EISs, as

opposed to the EAs for the leasing decisions, to be broad in scope and cover potential cumulative impacts to Sage Grouse across a wide range.  *See Selkirk*, 336 F.3d at 958 (the agency's choice of geographic scope may be based on many factors, such as the "scope of the project considered, the features of the land, and the types of species in the area" and is entitled to deference).  The WAFWA zones were developed by experts based on geography, ecological conditions, and the location of Sage Grouse populations.  WY067940-46.  Thus, it was appropriate for BLM to apply the WAFWA zones in its cumulative impacts analyses, and Plaintiffs' arguments that the scope was too broad ring hollow.  *Cf. W. Watersheds Project v. Schneider*, 417 F. Supp. 3d 1319, 1333 (D. Idaho 2019) (stating, in the case challenging BLM's 2019 Sage Grouse plan amendments, that "the sage grouse range covers multiple states and [] a key factor—connectivity of habitat—requires a large-scale analysis that transcends the boundaries of any single State").

In sum, Plaintiffs have failed to demonstrate that the cumulative impacts analyses supporting BLM's leasing decisions were inadequate to comply with NEPA.

## III.     BLM Complied with FLPMA

BLM complied with the prioritization objective in making the leasing decisions at issue. BLM has a variety of tools to encourage development outside of Sage Grouse habitat and was not required to defer parcels to meet the prioritization objective.  Further, leasing lands does not guarantee future development.

### A.     The Prioritization Objective Does Not Require BLM to Defer Parcels in Sage Grouse Habitat

BLM may meet the prioritization objective through various means and is not required to defer parcels in Sage Grouse habitat.  Instead, BLM may meet the prioritization objective by reviewing the parcels proposed for leasing and making informed decisions about whether to lease the parcels based on the potential impacts on Sage Grouse populations, the stipulations and

conditions that would be applied to protect Sage Grouse habitat, the number of parcels proposed, and BLM's workload, among other factors.  BLM also may comply with the objective by requiring restrictive stipulations, such as an NSO stipulation, which deter development in Sage Grouse habitat.  BLM need not defer parcels in Sage Grouse habitat to meet the objective.

The district court decision in the District of Montana addressing this issue likewise did not mandate deferral.  *See Mont. Wildlife Fed'n*, 2020 WL 2615631, at *8-11.  The Court held that the 2018 IM violated the prioritization objective because it treated the objective only as a procedural hurdle.  *See id.* at *9.  The Court indicated that BLM had deferred parcels in the past, and observed that doing so was a mechanism for encouraging development outside of Sage Grouse habitat.  *Id.*  But deferral is not a requirement.  Indeed, in its ruling on Defendants' motion for stay pending appeal, the Court stated, "The Court's Order does not require deferral of parcels.  Rather, it points to deferral of parcels as *an* appropriate mechanism to accomplish the prioritization objective and one which BLM has previously used."  August 25, 2020 Order at 4, *Mont. Wildlife Fed'n v. Bernhardt*, No. CV-18-69-GF-BMM, ECF No. 189.

BLM's interpretation and implementation of its own RMPAs is entitled to deference by the Court.  BLM has "'a great deal of discretion in deciding how to achieve' compliance with an RMP."  *See Klamath Siskiyou Wildlands Ctr. v. Gerritsma*, 962 F. Supp. 2d 1230, 1235 (D. Or. 2013) (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004)); *see also Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, No. 2:10-cv-1331-SU, 2014 WL 4832218, at *30 (D. Or. Sept. 29, 2014) (stating, in reference to RMP standards, that "BLM's interpretation of its own regulations is entitled to deference"); *Cascadia Wildlands v. Bureau of Land Mgmt.*, No. 6:12-cv-1739-AA, 2013 WL 5723315, at *6 (D. Or. Oct. 18, 2013) (BLM retains significant discretion in interpreting an RMP).  Thus, BLM's interpretation of the objectives in the

applicable RMPAs to prioritize areas outside of Sage Grouse habitat management areas for oil and gas leasing is entitled to deference and should be upheld.

### B.      The Leasing Decisions Complied with the Prioritization Objective

For each of the leasing decisions at issue, BLM identified parcels in Sage Grouse habitat, analyzed whether required stipulations would be sufficient to protect such habitat, and deferred parcels, as appropriate, to protect Sage Grouse habitat.  Contrary to Plaintiffs' assertions, BLM's action were sufficient to meet the general prioritization objective in the applicable plans and BLM was not required to defer additional parcels in order to meet the objective.

*Utah sale.*  For the Utah sale, BLM followed IM 2016-143, the standard adopted by the Obama administration.  AR001665.  BLM offered nine parcels for sale, four of which are in PHMA.  AR001666.  As BLM explained in its protest decision, the 2016 IM did not require BLM to defer parcels in Sage Grouse habitat.  AR005314; *see also* BLM-IM026-000751-52. Rather, the IM directed BLM to apply certain factors listed in the IM and to use its discretion to decide which parcels to lease. BLM-IM026-000752-53.  For the Utah sale, nine parcels were nominated by the oil and gas industry for leasing.  AR005315.  BLM evaluated the parcels in light of the factors in the 2016 IM and determined that it could lease all of them.  *Id.*  This conclusion was reasonable in light of the direction in IM 2016-143 to consider certain factors in its leasing decisions, but not mandating that BLM defer parcels in PHMA or GHMA.  Further, the four parcels in PHMA were offered with an NSO restriction, thus deterring development and furthering the prioritization objective.  AR001676.

*Wyoming sale.*  In the EA for the Wyoming sale, BLM disclosed that 302 of the parcels offered for sale overlap with PHMA, and all but three of the remaining parcels are in Sage Grouse habitat.  WY147471.  Nonetheless, BLM deferred 67 parcels in PHMA, 16 parcels in

GHMA, and one parcel in PHMA/GHMA, as well as several partial parcels in Sage Grouse

habitat, from the sale. *See* WY147447-49; WY143755-96 (parcel delete/defer table);

WY147728-64 (lease parcel disposition table); WY145684-99 (parcel list posted with lease sale

notice). Each parcel offered within this habitat was subject to the protective stipulations required

by the 2015 Sage Grouse plans. WY145714. The EA also noted that, since 2008, there has been

a 74% reduction in federal oil and gas lease acreage in PHMA. WY147471. Given these

factors, BLM complied with the prioritization objective and was not required to defer additional

parcels in order to comply with the objective. *See*WY147888.

    *Montana sale.* For the Montana sale, based on comments received during the public

comment period, BLM deferred three parcels in South Dakota and one in North Dakota out of

concern that off site development could negatively impact Sage Grouse habitat in those areas.

BLM-MT-March2019-000098. BLM also deferred one parcel and portions of four others

because they were located within connectivity habitat identified by the State of Montana and

would not be adequately protected by the stipulations in the Sage Grouse Plans. BLM-MT-

March2019-000098-99. Other parcels to the east of the connectivity area were offered pursuant

to an NSO stipulation. BLM-MT-March2019-000099.

    Although deferral of parcels in Sage Grouse habitat is not required by the prioritization

objective, it is one method of encouraging development outside of Sage Grouse habitat in

furtherance of the prioritization objective, *see Mont. Wildlife Fed'n*, 2020 WL 2615631, at *9,

and BLM appropriately availed itself of that option here. *See* BLM-MT-March2019-014189

(explaining in a protest response that "BLM developed Alternative C to be consistent with the

prioritization objective in the 2015 sage-grouse RMPs)." In developing the alternative, BLM

conducted a parcel by parcel review and identified Sage Grouse habitat in particular parcels that

could be harmed due to oil and gas development even with required stipulations.  *Id.*; *see also*

BLM-MT-March2019-014203-04.  By conducting a review of the parcels, requiring appropriate

stipulations, and deferring parcels in Sage Grouse habitat that would not be sufficiently protected

by the stipulations in the Sage Grouse RMPs, BLM complied with the prioritization objective.

**IV.    If the Court Finds a Legal Violation, It Should Not Immediately Vacate the Leases and Should Instead Allow Briefing on the Appropriate Scope of the Remedy**

If the Court finds that BLM violated NEPA with respect to the lease sales at issue, it

should not vacate the leases sold and issued at those sales, but instead should suspend the oil and

gas leasing decisions without vacating them.  Vacatur of a challenged action does not

automatically flow from a NEPA violation.  "Whether agency action should be vacated depends

on how serious the agency's errors are and the disruptive consequences of an interim change that

may itself be changed."  *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir.

2012) (internal quotation marks and citation omitted).  "[W]hen equity demands," an agency's

decision may "be left in place while the agency follows the necessary procedures."  *Idaho Farm*

*Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995).  Vacatur of the leases will have

substantial disruptive effects on the United States, affected states, and the lessees.  Further, any

harm to the environment can be avoided through suspension of particular lease operations.

To avoid the unjust result of stripping lessees of their lease rights, the Ninth Circuit has

on several occasions sanctioned a remedy short of vacating an oil and gas lease sale.  *See*

*Conner*, 848 F.2d at 1460-61 & n.50 (modifying a district court's order regarding oil and gas

leases to clarify that the leases were suspended, not set aside, and enjoining surface-disturbing

activity pending compliance with NEPA and the ESA); *N. Cheyenne Tribe v. Hodel*, 851 F.2d

1152, 1157-58 (9th Cir. 1988) (upholding a district court decision to suspend coal mining

operations, rather than void the leases pending corrective NEPA analysis); *N. Cheyenne Tribe v.*

*Norton*, 503 F.3d 836, 842-44 (9th Cir. 2007) (upholding a partial injunction for coalbed methane development pending the preparation of additional NEPA analysis).

Here, the vacatur of the lease sales would have significant disruptive consequences for the lessees, the affected States, and the United States.  The total value of the leases issued as part of the subject lease sales totaled approximately $89 million.  *See* Decl. of William J. Beck ¶ 4; Decl. of Andrew Gibbs ¶ 4; Decl. Melinda Moffitt ¶ 4.  In addition, as the intervenors will describe, the vacatur of the leases would have substantial effects on the budgets of the affected states, as well as on lessees who have invested significant amounts in the leases.  Accordingly, vacatur would have significant disruptive consequences.  *See Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 151 (9th Cir. 1993) (declining to vacate a rule due to the potential disruptive consequences).

Harm to the environment could be avoided during any remand period by enjoining surface disturbing activities and suspending rather than vacating the leases.  *See Conner*, 848 F.2d at 1460-61 (enjoining surface disturbing activities pending compliance with NEPA and the ESA); *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 85 (D.D.C. 2019) (enjoining BLM from issuing APDs pending further NEPA analysis); *Ctr. for Biological Diversity v. U.S. Forest Service*, No. 2:17-cv-372, 2021 WL 855938, at *2-4 (S.D. Ohio Mar. 8, 2021) (enjoining the issuance of new APDs and further surface disturbance pending additional NEPA analysis); *Wilderness Society v. Wisely*, 524 F. Supp. 2d 1285, 1305-06 (D. Colo. 2007) (enjoining activity on the leases pending further consultation under the ESA); *Montana Wilderness Ass'n v. Fry*, 408 F. Supp. 2d 1032, 1038 (D. Mont. 2006) (enjoining surface disturbing activities on oil and gas leases pending compliance with NEPA and the ESA); *Colo. Envtl. Coal. v. Office of Legacy Mgmt.*, 819 F. Supp. 2d 1193, 1224 (D. Colo. 2011) (staying leases issued pursuant to an EA and

FONSI), *amended on reconsideration*, No. 08-CV-01624-WJM-MJW, 2012 WL 628547 (D. Colo. Feb. 27, 2012).

Defendants recognize that the Court found vacatur to be appropriate in its Phase One summary judgment decision. *See W. Watersheds Project v. Bernhardt*, No. 1:18-cv-187-REB, 2020 WL 959242, at *30 (D. Idaho Feb. 27, 2020). Phase One presented different issues, however, and the Court found that the restriction of public involvement was a serious deficiency warranting vacatur. *Id.* at *28. That issue is not present in Phase Three. Further, in its later decision granting Defendants' motion for stay pending appeal, the Court acknowledged that whether vacatur was the appropriate remedy was "up for debate." *W. Watersheds Project v. Zinke*, No. 1:18-cv-187-REB, 2020 WL 2462817, at *4 (D. Idaho May 12, 2020). Accordingly, Defendants request that, if the Court finds a legal violation, it order a suspension of operations and allow operators to submit requests to continue operations under appropriate circumstances rather than ordering the leases vacated.

If the Court nevertheless finds that vacatur is appropriate, Defendants request that the Court stay its vacatur for 60 days to allow Defendants the opportunity to consider whether to appeal and, if an appeal is filed, to seek a stay pending appeal. *See Al Otro Lado v. Wolf*, 945 F.3d 1223, 1224 (9th Cir. 2019).

## CONCLUSION

For the reasons stated above, summary judgment should be granted to Defendants on all of Plaintiffs' claims regarding the three leasing decisions at issue in Phase Three.

Respectfully submitted this 16th day of April, 2021,

RAFAEL M. GONZALES, JR.
Acting United States Attorney

CHRISTINE G. ENGLAND, California Bar No. 261501

Assistant United States Attorney
District of Idaho
1291 West Myrtle Street, Suite 500
Boise, ID 83702
Tel: (208) 334-1211; Fax: (208) 334-1414
Email: Christine.England@usdoj.gov

JEAN E. WILLIAMS
Acting Assistant Attorney General

LUTHER L. HAJEK, Colorado Bar No. 44303
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
999 18th Street
South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1376; Fax: (303) 844-1350
E-mail: Luke.Hajek@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of April, 2021, I filed a copy of the foregoing Defendants' Memorandum in Support of Motion for Partial Summary Judgment and in Opposition to Plaintiffs' Motion for Partial Summary Judgment (Phase Three) electronically through the CM/ECF system, which caused all parties or counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

Attorneys for Plaintiffs Western Watersheds Project and Center for Biological Diversity

Laurence J. Lucas
llucas@advocateswest.org

Sarah Stellberg
sstellberg@advocateswest.org

Todd C. Tucci
ttucci@advocateswest.org

Counsel for Intervenor-Defendant State of Wyoming

Kelly Marie Shaw
kelly.shaw@wyo.gov

James Kaste
james.kaste@wyo.gov

Cherese De'Dominiq McLain
cdm@msbtlaw.com

Counsel for Intervenor-Defendant Western Energy Alliance

Bret A. Sumner
bsumner@bwenergylaw.com

Malinda Morain
mmorain@bwenergylaw.com

Counsel for Intervenor-Defendant Anschutz Exploration Corporation

Jessica Black-Livingston
jessica.livingston@hoganlovells.com

Mark D. Gibson
mark.gibson@hoganlovells.com

Andrew C. Lillie
andrew.lillie@hoganlovells.com

Lee Radford
LRadford@parsonsbehle.com

Counsel for Intervenor-Defendants Peak Powder River Resources, LLC, Peak Powder River
Acquisitions, LLC, Rebellion Energy II, LLC, and Seven Sisters Oil & Gas, LLC

Andrew Charles Emrich
acemrich@hollandhart.com

Alison C. Hunter
ACHunter@hollandhart.com

Thomas L. Sansonetti
tlsansonetti@hollandhart.com

Counsel for Intervenor-Defendant Chesapeake Exploration, L.L.C.

William E. Sparks
wsparks@bwenergylaw.com


                              /s/ Luther L. Hajek
                              Luther L. Hajek