Bret Sumner, *Pro Hac Vice*
bsumner@bwenergylaw.com
Malinda Morain, *Pro Hac Vice*
mmorain@bwenergylaw.com
BEATTY & WOZNIAK, P.C.
216 Sixteenth St., Suite 1100
Denver, CO 80202-5115
Telephone: 303-407-4499
Fax: 800-886-6566

Cherese D. McLain, ISB #7911
cdm@msbtlaw.com
MSBT LAW
7699 West Riverside Drive
Boise, ID 83702
Telephone: 208-331-1800
Fax: 208-331-1202

Attorneys for Defendant-Intervenor Western Energy Alliance.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **WESTERN WATERSHEDS PROJECT**, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>**DEBRA HAALAND,** Secretary of the Interior, *et al.*,<br><br>    Defendants,<br><br>**WESTERN ENERGY ALLIANCE**,<br><br>    Defendant-Intervenor. | Case No. 1:18-cv-00187-REB<br><br><br>**MEMORANDUM IN SUPPORT OF WESTERN ENERGY ALLIANCE'S PHASE THREE MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................i

TABLE OF AUTHORITIES ........................................................................................iii

INTRODUCTION ...........................................................................................................1

BACKGROUND ..............................................................................................................3

    I.       LEGAL BACKGROUND ................................................................................3

          A.     Standard of Review Under the Administrative Procedures Act (APA) ...........3

          B.     Federal Land Policy and Management Act (FLPMA) .......................................3

          C.     Mineral Leasing Act and Nature of Federal Leases ..........................................4

    II.      FACTUAL BACKGROUND ..........................................................................5

          A.     The Governing Resource Management Plans ....................................................5

          B.     Habitat and Federal Oil and Gas in the State of Wyoming ...............................6

          C.     The Prioritization Objective and the State of Wyoming ...................................7

ARGUMENT ....................................................................................................................7

    I.       VENUE .............................................................................................................7

    II.      BLM's Leasing Decisions Complied with NEPA .........................................8

          A.     Plaintiffs Waived Arguments They Failed to Raise During the Public
Comment Period on the Draft EA .....................................................................8

          B.     BLM Analyzed a Reasonable Range of Alternatives Under NEPA ................8

               1.     BLM's Alternatives Comply with NEPA ...............................................9

               2.     BLM Fully Analyzed, and Rejected, WWP's "Citizen
Alternative" in the 2015 GrSG Plans ...................................................10

          C.     BLM's Tiering and Effects Analyses Complied Fully with NEPA ...............11

               1.     BLM Tiered to Previous Analyses of Direct and Indirect
Effects in the Governing RMPs, as well as other State and
Federal Resources ................................................................................11

               2.     BLM Conducted Site Specific Review and Imposed All
Required Lease Stipulations .................................................................13

          D.     BLM Appropriately Analyzed Cumulative Impacts Under NEPA ...............14

               1.     BLM Tiered to the Environmental Analyses of the 2015
GrSG Plans ...........................................................................................15

               2.     BLM Reasonably Imposed and Relied Upon the Density
Disturbance Calculation Tools for Wyoming and Montana .................16

    III.     BLM Complied with FLPMA in Conforming its Leasing Decisions to the
Governing 2015 GrSG Plans and Exercising its Substantial Discretion on
How Best to Achieve Its Own Prioritization Objective ...............................18

|   |   |   |   |
|---|---|---|---|
|   | A. | BLM Complied Fully with FLPMA and the Governing 2015 GrSG Plans | 18 |
|   | B. | BLM Reasonably Implemented Measures to Achieve the Prioritization Management Objective of the Governing 2015 GrSG Plans | 19 |
| IV. | | Vacatur is an Improper Remedy | 21 |
|   | A. | A Procedural Deficiency Requires a Procedural Remedy | 21 |
|   | B. | WWP Inappropriately Conflates the Leasing Decisions with the Leases | 22 |
|   | C. | Ninth Circuit Balancing Test Supports Remand | 23 |
| CONCLUSION | | | 24 |
| CERTIFICATE OF SERVICE | | | 26 |

# TABLE OF AUTHORITIES

## CASES

*Allied-Signal v. U.S. Nuclear Regulatory Comm'n,* 988 F.2d 146 (D.C. Cir. 1993) ................................ 23

*Barnes v. DOT,* 655 F.3d 1124 (9th Cir. 2011) ........................................................... 8

*Bass Enters. Prod. Co. v. U.S.,* 45 Fed. Cl. 120 (Fed. Cl. 1999) ......................................... 5

*Cal. Cmtys. Against Toxics v. U.S. EPA,* 688 F.3d 989 (9th Cir. 2012) ................................... 23

*Conner v. Burford,* 848 F.2d 1441 (9th Cir. 1988) ........................................... 21, 22, 23, 24

*Ctr. for Biological Diversity v. BLM,* 833 F.3d 1136 (9th Cir. 2016) ..................................... 3

*DOT v. Pub. Citizen,* 541 U.S. 752 (2004) ................................................................. 8

*Headwaters, Inc. v. BLM,* 914 F.3d 1174 (9th Cir. 1990) ................................................. 10

*'Ilio'ulaokalani Coal. v. Rumsfeld,* 464 F.3d 1083 (9th Cir. 2006) ....................................... 9

*Landis v. Watt,* 510 F. Supp. 178 (D. Idaho 1981) ......................................................... 5

*Lands Council v. McNair,* 537 F.3d 981 (9th Cir. 2008) .................................................. 19

*Marsh v. Or. Nat. Res. Council,* 490 U.S. 360 (1989) ..................................................... 3

*Mont. Wilderness Ass'n v. Fry,* 408 F. Supp. 2d 1032 (D. Mont. 2006) .................................... 21

*N. Alaska Envtl. Ctr. v. DOI,* 983 F.3d 1077 (9th Cir. 2020) ............................................ 11

*N. Alaska Envtl. Ctr. v. Kempthorne,* 457 F.3d 969 (9th Cir. 2006) ..................................... 11

*Nat'l Mining Ass'n v. Zinke,* 877 F.3d 845 (9th Cir. 2017) ............................................... 3

*Native Ecosystems Council v. U.S. Forest Serv.,* 428 F.3d 1233 (9th Cir. 2005) .......................... 9

*Norton v. S. Utah Wilderness Alliance,* 542 U.S. 55 (2004) ........................................... 4, 20

*Or. Nat. Desert Ass'n v. BLM,* 531 F.3d 1114 (9th Cir. 2008) ............................................ 4

*Protect Our Cmtys. Found. v. LaCounte,* 939 F.3d 1029 (9th Cir. 2019) ................................... 9

*River Runners for Wilderness v. Martin,* 593 F.3d 1064 (9th Cir. 2010) .................................. 3

*U.S. Postal Serv. v. Gregory,* 534 U.S. 1 (2001) .......................................................... 3

*Union Oil Co. v. Morton,* 512 F.2d 743 (9th Cir. 1975) .................................................... 5

*Utah v. Babbitt,* 830 F. Supp. 586 (D. Utah 1993) ......................................................... 5

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,* 435 U.S. 519 (1978) ................... 8, 21

*Westlands Water Dist. v. DOI,* 376 F.3d 853 (9th Cir. 2004) ............................................ 10

*Wildearth Guardians v. Bernhardt,* No. 1:19-cv-00505-RB-SCY, 2020 U.S. Dist. LEXIS
   218159 (D.N.M. Nov. 19, 2020) ..................................................................... 23

*WildEarth Guardians v. Zinke,* 368 F. Supp. 3d 41 (D.D.C. 2019) ....................................... 24

*Wilderness Soc'y v. Wisely,* 524 F. Supp. 2d 1285 (D. Colo. 2007) ................................. 5, 21, 22

*Willow Creek Ecology v. U.S. Forest Serv.,* 225 F. Supp. 2d 1312 (D. Utah 2002 ....................... 21

*Yazzie v. U.S. EPA,* 851 F.3d 960 (9th Cir. 2017) ........................................................ 3

## STATUTES

28 U.S.C. § 1391 ......................................................................................................... 5, 7

30 U.S.C. § 188 ............................................................................................................... 5

30 U.S.C. § 226 ............................................................................................................... 4

42 U.S.C. § 4332 ........................................................................................................... 22

43 U.S.C. § 1701 ............................................................................................................. 3

43 U.S.C. § 1702 ............................................................................................................. 3

5 U.S.C. § 706 ........................................................................................................... 3, 22

## REGULATIONS

40 C.F.R. § 1500 ............................................................................................................. 9

40 C.F.R. § 1508 ........................................................................................................... 10

43 C.F.R. § 1601 ......................................................................................................... 3, 4

43 C.F.R. § 3108 ............................................................................................................. 5

43 C.F.R. § 3120 ............................................................................................................. 4

43 C.F.R. 3100 ............................................................................................................... 4

## INTRODUCTION

There is no legal or factual basis for this phase of the case to be heard in Idaho. It is well settled that federal oil and gas leases are real property interests. None of the real property interests at issue are in Idaho. None of the Bureau of Land Management (BLM) lease sales at issue occurred in Idaho. The BLM Field Offices in Idaho were not involved in any manner in the decision-making as to which lease parcels to offer for sale, and under what terms and conditions, in Wyoming, Utah, or Montana. Under the plain language of the federal venue and transfer statutes, this phase of the case should be dismissed, or in the alternative, severed and transferred to the respective Districts where the real property interests are located.

In the event this District retains jurisdiction, Western Watersheds Project (WWP) has failed to meet its burden to show that the BLM leasing decisions at issue were made in contravention of the Administrative Procedures Act (APA). As long-established Supreme Court precedent prescribes, the APA is a procedural statute — not a substantive one. Even if the reviewing court disagrees with the ultimate decisions made by the federal agency, a district court cannot substitute its subjective opinion as to what decision the agency should have made. BLM's organic statute, the Federal Land Policy and Management Act (FLPMA), provides BLM with significant discretion on how it should best comply with and implement its own federal land use plans and aspirational management objectives when making subsequent leasing decisions.

Here, the administrative record details that BLM offered nominated parcels for lease in full compliance with the governing 2015 federal land use plans (2015 GrSG Plans) as required under FLPMA. Moreover, BLM's leasing decisions are supported by robust administrative records detailing the extensive environmental reviews and analyses conducted by BLM, including tiering to the underling analyses from the Environmental Impact Statements (EISs) prepared for the 2015 GrSG Plans, in full compliance with the National Environmental Policy Act (NEPA).

As related to the Wyoming lease sale at issue, it is significant that BLM reviewed and analyzed leasing and development within priority habitat management areas (called "core areas" by the State of Wyoming), documenting a decrease in leasing and development activity by approximately 75% over the course of the past several years:



WY144340 (BLM Wyoming February 2019 Lease Sale EA) ("The current area of Federal oil and gas leases in PHMAs is the lowest since before the BLM adopted and revised and amended RMP's designed to increase conservation of Greater sage-grouse and their habitats. This trend has continued since the 2014-2015 revisions and amendments were finalized."). This record evidence further demonstrates that the governing 2015 GrSG Plans work (including BLM's prioritization framework) and that BLM's leasing decisions in Wyoming were entirely reasonable under FLPMA and the APA. BLM's decisions are reasonable and should be upheld.

# BACKGROUND

## I.    LEGAL BACKGROUND

The Alliance incorporates by reference the legal backgrounds of the Federal Defendants and the State of Wyoming and provides the following additional legal framework and precedent.

### A.    Standard of Review Under the Administrative Procedures Act (APA)

Under Section 706 of the APA, a court may only set aside an agency action if the court determines, based upon the administrative record, that the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Marsh v. Or. Nat. Res. Council,* 490 U.S. 360, 378 (1989); *Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 868 (9th Cir. 2017). The standard is "highly deferential" and a court is to presume the agency action is valid if a reasonable basis exists for the decision. *Yazzie v. U.S. EPA*, 851 F.3d 960, 968 (9th Cir. 2017); *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010).

The Ninth Circuit has expounded on this principle, explaining that "[t]he court may not substitute its judgment for that of the agency concerning the wisdom or prudence of [the agency's] action." *River Runners*, 593 F.3d at 1070 (citation omitted); *see also U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 6-7 (2001); *Marsh*, 490 U.S. at 378; *Ctr. for Biological Diversity v. BLM*, 833 F.3d 1136, 1150 (9th Cir. 2016).

### B.    Federal Land Policy and Management Act (FLPMA)

FLPMA identifies "mineral exploration and production" as one of the "principal or major uses" of public lands. 43 U.S.C. § 1702(l). FLPMA contains an express declaration of Congressional policy that the BLM manage public lands "in a manner which recognizes the Nation's need for domestic sources of minerals, [and other commodities] from the public lands." 43 U.S.C. § 1701(a)(12); 43 C.F.R. § 1601.0-2.

With respect to oil and gas resources, RMPs designate which lands will remain open (or closed) to oil and gas leasing and development. 43 C.F.R. § 1601.0-5(n). Additionally, to address potential resource impacts identified during the extensive environmental analyses to inform the plans, RMPs identify the stipulations and mitigation measures that may be attached to leases or as conditions of approval for subsequent permits for exploration or development projects. *Id.*

The management of federal lands is a balancing act. Congress granted the Secretary of the Department of the Interior (Secretary) and the BLM significant discretion in managing federal lands and minerals. As the Supreme Court has explained BLM's responsibilities under FLPMA, "'[m]ultiple use management' is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put . . ." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 58, 66 (2004) (explaining that BLM has "a great deal of discretion" in deciding how to achieve FLPMA obligations); *Or. Nat. Desert Ass'n v. BLM*, 531 F.3d 1114, 1135 (9th Cir. 2008) (explaining BLM's "wide authority" to manage public lands "allows it ample discretion").

### C.    Mineral Leasing Act and Nature of Federal Leases

The Mineral Leasing Act (MLA) directs the BLM to conduct oil and gas lease sales "at least quarterly." 30 U.S.C. § 226(b)(1)(A). The MLA also grants the Interior Secretary exclusive authority to administer operations on such mineral leases, *see* 30 U.S.C. § 226(g), which Interior has delegated exclusively to BLM. *See* 43 C.F.R. pt. 3100. BLM's oil and gas regulations provide that all lands "available for leasing **shall** be offered for competitive bidding." 43 C.F.R. § 3120.1-1 (emphasis added).

Federal oil and gas leases vest lessees with "the exclusive right to drill for, mine, extract, remove and dispose of all the oil and gas" subject to the lease. BLM Form 3110-11 – Offer to Lease and Lease for Oil and Gas (2008). This District has confirmed that a challenge to BLM's oil and gas

leasing decisions do involve "real property interests" under 28 U.S.C. § 1391(e); *Landis v. Watt*, 510 F. Supp. 178, 180 (D. Idaho 1981). This is consistent with state and federal holdings that federal oil and gas leases constitute real property interests. *See Union Oil Co. v. Morton*, 512 F.2d 743, 747 (9th Cir. 1975) (a mineral lease granted under the Mineral Leasing Act "does convey a property interest enforceable against the Government"); *Wilderness Soc'y v. Wisely*, 524 F. Supp. 2d 1285, 1306 n.12 (D. Colo. 2007) (refusing to void BLM's decision to resume leasing "as doing so might affect *property interests* obtained by lessees as a result of the lease sale.") (emphasis added); *Bass Enters. Prod. Co. v. U.S.*, 45 Fed. Cl. 120 (Fed. Cl. 1999) (holding that BLM's refusal to permit drilling on lease constituted taking of cognizable property right); *Utah v. Babbitt*, 830 F. Supp. 586, 594 n.14 (D. Utah 1993) ("A traditional oil and gas lease is an actual conveyance of a real property interest. . .").

Under the Mineral Leasing Act, Congress provided that the only appropriate method for the Secretary of the Interior to cancel a federal oil and gas lease with a well capable of production of oil or gas in paying quantities is a proceeding in the U.S. district court in which the lease is located. 30 U.S.C. § 188; 43 C.F.R. § 3108.3. Such proceeding can only occur after notice to the lessee. *Id.*

## II. FACTUAL BACKGROUND

The Alliance incorporates the factual backgrounds of the Federal Defendants and the State of Wyoming and provides the following additional facts in support of its Cross-Motion.

### A. The Governing Resource Management Plans

In 2015, BLM issued a series of land use plan amendments that provided management prescriptions and aspirational objectives to manage and conserve greater sage grouse (GrSG) and its habitat (2015 GrSG Plans). *See* Billings RMP (BLM-MT-March2019-001653-5800); Miles City RMP (BLM-MT-March2019-009746-11701); HiLine RMP (BLM-MT-March2019-007401-9742); Bighorn Basin RMPs (WY068071-68673; WY068674-69312; WY063652-66623; WY63652-66623); Buffalo

RMP (WY067095-922; WY057293-60247); Wyoming Nine RMPA (WY066624-67094; WY60248-63651); Lander RMP (WY056783-57292; WY053928-55899); Utah RMP (AR002057-5023).

As explained in the Records of Decision (ROD) for the 2015 GrSG Plans, prioritization is just a single aspirational objective within a comprehensive package for GrSG habitat conservation. As related to oil and gas leasing and development, through the application of buffers, No Surface Occupancy (NSO) stipulations, timing stipulations, density caps, required design features, and additional conservation requirements, the 2015 GrSG Plans effectively reduce impacts on GrSG habitat, and require improvement to GrSG habitat over the life of the plan. *See* WY067960-61. As the ROD states: "all forms of new development in PHMAs and GHMAs would be closed, excluded, avoided, or developed only if the resultant effect were a net conservation gain to the GRSG or its habitat, ensuring that existing habitat would be protected or restored through compensatory mitigation." WY067960.

For the 2015 GrSG Plans, BLM promulgated a requirement that federal oil and gas leases offered within priority habitat management areas include an NSO lease stipulation for all states other than Wyoming. An NSO lease means that the lessee cannot disturb any surface on that lease and must develop the underlying minerals through the construction of well pads located off-lease. In Wyoming, lease parcels within priority habitat (called "core areas" by the State of Wyoming) must include numerous lease stipulations, including an NSO provision prohibiting surface disturbance within 0.6 miles of an active greater sage grouse lek. WY024067-072.

## B.    Habitat and Federal Oil and Gas in the State of Wyoming

The State of Wyoming has the highest percentage of sage grouse habitat of any state in the west, with approximately 71% of the state's surface designated as habitat. Wyoming is also unique in that nearly 48% of the state's lands are federally owned. Wyoming also has one of the largest federal oil and gas production outputs in the United States. For the 2015 GrSG Plans governing federal

lands and minerals in Wyoming, BLM adopted the State of Wyoming's core area strategy for conserving greater sage grouse. WY144339 (as explained Wyoming February 2019 Lease Sale EA).

The applicable 2015 GrSG Plans for Wyoming designated these lands comprising the challenged leases as "open" for oil and gas leasing. WY068028 (noting acreage open for fluid mineral leasing with standard lease terms, "major constraints" and "moderate restraints," as well as acres closed for oil and gas leasing before and after issuance of the 2015 GrSG Plans).

### C.    The Prioritization Objective and the State of Wyoming

One of BLM's many enumerated goals and objectives of the 2015 GrSG Plans was to establish a system to prioritize nominated parcels (Expressions of Interest or EOIs) in each quarterly competitive oil and gas lease sale. Prioritization in Wyoming is inherently complex as the land use plans designated most federal lands in Wyoming as "open" for oil and gas leasing, and approximately 70% of the state is designated as greater sage-grouse habitat.

BLM promulgated a series of tools to achieve its aspirational prioritization management objective. The prioritization of nominated lease parcels is just one such tool; the other tools include imposition of lease stipulations and other management prescriptions to encourage leasing and development outside of priority habitat. WY067960-61; WY024067-24072.

### ARGUMENT

### I.    VENUE

The Alliance incorporates the legal arguments advanced by the Federal Defendants and the State of Wyoming regarding transfer and venue. The challenged lease sales sold federal leases that constitute "real property rights" pursuant to 28 U.S.C. § 1391(e) and thus venue based on Plaintiffs' residence is improper in this District. Indeed, as a general matter, and to provide additional context, Idaho does not have any significant oil and gas resources nor any significant revenue from federal oil and gas leases. In totality, as of the end of the Fiscal Year 2020, there were only thirteen existing

federal oil and gas leases in Idaho (only two of which were producing), contrasted with over 13,000 federal leases within the State of Wyoming covering nearly 9 million acres, over half of which are currently producing. *See* BLM Oil and Gas Statistics, available at https://www.blm.gov/programs-energy-and-minerals-oil-and-gas-oil-and-gas-statistics.

## II.    BLM's Leasing Decisions Complied with NEPA

### A.    Plaintiffs Waived Arguments They Failed to Raise During the Public Comment Period on the Draft EA

As detailed in the administrative record throughout the comment process for the Lease Sales, WWP requested BLM analyze an alternative deferring *all* leases within GrSG habitat. WWP did not submit comments advocating that BLM analyze an alternative that defers offering nominated parcels within PHMA, which it now argues BLM should have analyzed and adopted. Under the APA and NEPA, WWP cannot whimsically change its proposed alternative, after the fact, and then fault BLM for not responding to it. These statutes require WWP to provide BLM meaningful comments so that the Bureau had the opportunity to consider WWP's position and make any appropriate response or revisions. *DOT v. Pub. Citizen*, 541 U.S. 752, 764-65 (2004). WWP only raised an alternative requesting deferral of all parcels within GrSG habitat; it did not request a PHMA-only deferral alternative. It cannot now fault BLM for failing to analyze something WWP failed to raise when BLM could actually respond to their proposal. *Id.* (citing *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,* 435 U.S. 519, 553 (1978)); *Barnes v. DOT,* 655 F.3d 1124, 1135-36 (9th Cir. 2011).

The Alliance agrees with and incorporates Federal Defendants' arguments regarding WWP's waiver of its alternatives claim. Fed. Def's Br., ECF 379 at 25-27.

### B.    BLM Analyzed a Reasonable Range of Alternatives Under NEPA

Should the Court find that WWP did not waive its alternatives claim, BLM nonetheless analyzed a reasonable range of alternatives in full compliance with NEPA. As BLM explained, the

challenged decisions tiered to and incorporated by reference the alternatives already analyzed in the 2015 GrSG Plans. The BLM, under President Obama's Administration, rejected WWP's proposed "citizen alternative" in authorizing the 2015 GrSG Plans. NEPA does not require BLM to re-analyze this rejected alternative again at the leasing phase.

The record shows that BLM analyzed a reasonable range of alternatives in the Lease Sale EAs, appropriately tiered to previous analyses, focused on the issues relevant to the leasing stage, and in fact addressed WWP's concerns in response to comments and through the utilization of NSO stipulations across all PHMA habitat in Montana and Utah, and NSO stipulations consistent with the BLM Wyoming plans and the Wyoming Core Area Strategy. BLM-MT-March2019-014189-90; WY147450; WY147886 (explaining BLM considered deferring all GrSG PHMA and/or GHMA parcels but did not fully analyze because "it would not be in conformance with the respective RMPs . . ."); WY147909-910. In fact, the BLM Wyoming 2015 GrSG Plans adopted the Wyoming Core Area Protection Strategy, which the U.S. Fish and Wildlife Service specifically approved of in stating it "provides an excellent model for meaningful conservation of sage-grouse . . . ." WY070300. At no point did WWP argue that these stipulations and the Wyoming Strategy were insufficient to preserve GrSG and its habitat.

### 1.    BLM's Alternatives Comply with NEPA

Under NEPA, the federal agency's purpose and need statement defines the range of reasonable alternatives. NEPA requires BLM to consider reasonable alternatives that will accomplish the intended purpose of the proposed action, as that action is articulated in the NEPA document's purpose and need statement. 40 C.F.R. § 1500.2(e); *'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1097 (9th Cir. 2006). NEPA does not require BLM to analyze alternatives that do not meet the purpose and need of the agency action. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1248 (9th Cir. 2005); *Protect Our Cmtys. Found. v. LaCounte*, 939 F.3d 1029, 1039 (9th Cir. 2019)

(rejecting suggestion that BIA failed to consider any mid-range alternatives "that entailed building some but not all of the proposed ridgeline turbines.").

Here, BLM articulated the purpose and need for the lease sales within the context of its statutory authority to act and congressional mandates in the Mineral Leasing Act (MLA), FLPMA, and the Federal Onshore Oil & Gas Leasing Reform Act of 1987 (FOOGLRA). The Lease Sale EAs recognize BLM's responsibility under the MLA to promote the development of oil and gas within the public domain. *See, e.g.,* BLM-MT-March2019-000026 (Montana March 2019 EA purpose to "respond to EOIs to lease parcels for oil and gas development"); AR001648 (Utah Sept. 2017 EA); WY147442 (BLM Wyoming Feb. 2019 EA). BLM's stated purpose and need of the proposed actions—to offer parcels for lease—is consistent with BLM's statutory mandates and is reasonable.

## 2. BLM Fully Analyzed, and Rejected, WWP's "Citizen Alternative" in the 2015 GrSG Plans

NEPA does not require BLM to conduct a "separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequence." *Westlands Water Dist. v. DOI*, 376 F.3d 853, 868 (9th Cir. 2004) (quoting *Headwaters, Inc. v. BLM*, 914 F.3d 1174, 1181 (9th Cir. 1990)). NEPA requires BLM to tier "[f]rom an [EIS] on a specific action at an early stage" to a subsequent analysis at a later stage. 40 C.F.R. § 1508.28(b).

NEPA did not require BLM to reconsider WWP's proposed alternatives deferring all leases in either priority or general habitat because both were considered by BLM at the federal land use planning stage when promulgating the 2015 GrSG Plans. The underlying 2015 GrSG Plans analyzed in detail an "Alternative C—Citizen Groups' Recommended Alternative One" that, exactly like WWP's proposed alternative here, proposed closing all PHMA and GHMAs to fluid mineral leasing. WY068005. Rather than conducting unnecessary and duplicative analysis at the leasing stage, BLM property tiered to and relied upon the 2015 GrSG Plans. NEPA does not require BLM to repeat its analysis of WWP's proposed, and rejected, alternative. WWP's argument that BLM was required to

re-analyze its new, after-the-fact alternative proposal is an improper and untimely challenge to the underlying 2015 GrSG Plans and does not evidence a NEPA violation at the leasing stage.

### C.       BLM's Tiering and Effects Analyses Complied Fully with NEPA

Significantly, for federal oil and gas lease sales, the Ninth Circuit has held that NEPA does not require a "parcel by parcel examination of potential environmental effects" before offering oil and gas parcels for lease. *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 977 (9th Cir. 2006); *N. Alaska Envtl. Ctr. v. DOI*, 983 F.3d 1077 (9th Cir. 2020). In *Kempthorne*, in holding such site-specific review is not appropriate at the leasing stage, the Ninth Circuit explained that at this stage "there is no way of knowing what plans for development, if any, may eventually materialize." 457 F.3d at 977.

BLM complied fully with NEPA in tiering to, and relying upon, the extensive environmental analyses it performed in promulgating its 2015 GrSG Plans and in incorporating the environmental protections of the governing plan into the leasing stage. BLM further complied with NEPA by conducting adequate site-specific reviews to determine which nominated lease parcels to offer for competitive sale, and under what stipulations, terms, and conditions consistent with the governing 2015 GrSG Plans.

WWP has not met their burden under the APA to show that BLM's analysis of direct and indirect impacts was legally insufficient for any challenged lease sales. Indeed, WWP's allegations are contradicted by the robust administrative record for each lease sale at issue.

### 1.       BLM Tiered to Previous Analyses of Direct and Indirect Effects in the Governing RMPs, as well as other State and Federal Resources

Pursuant to FLPMA, and extensive collaboration between BLM and the State of Wyoming, BLM's 2015 GrSG Plans for Wyoming adopted the State of Wyoming's GrSG conservation strategy. WY066746-752 (2015 Wyoming GrSG Plan, Appendix B); WY067359-411 (2015 Buffalo Field Office GrSG Plan, Appendix B at Table B.1). In addition to building on previous analyses conducted by the BLM at the land use planning stage, BLM also incorporated the states' previous

work as part of their authority to manage non-listed species within their borders. *See, e.g.,* WY144312-313 (Section 1.4 of WY Feb. 2019 Lease Sale EA detailing BLM's tiering and conformance with the governing federal land use plans). Wyoming developed the Core Area Strategy, in conjunction with land management agencies and experts, to identify Core Areas which were subsequently identified as PHMA under the governing BLM land-use plans, and thus underly BLM's parcel-by-parcel analysis. *See* WY144339.

Next, at the leasing stage, BLM incorporated and imposed all applicable fluid mineral lease stipulations (promulgated in the governing plans) onto each of the leases offered in the challenged sales. This necessarily involved site-specific analyses because BLM had to determine which resource values were present on each parcel in order to impose the applicable lease stipulations.

For the Wyoming February 2019 Lease Sale, for example, BLM relied on detailed maps that included the parcels nominated for sale along with site-specific wildlife resources present on or near the parcels, existing infrastructure and development (including oil and gas, and mining), as well as adjacent oil and gas leases that are active but not yet producing, and those that are developed and held by production. *See, e.g.,* Maps at WY141377-384; WY144555-560 (courtesy copies attached for ease of reference as Exhibit 2). To inform its decision making and which lease stipulations to impose, BLM also relied upon maps that detailed parcels proposed for deletion or deferral from the sale, *see, e.g.,* WY144777-778, and nominated parcels within proximity to greater sage grouse leks. *See, e.g.,* WY144779.

BLM also relied upon a detailed annual report, comprising over 300 pages, on sage-grouse prepared by the State of Wyoming Game & Fish Department. *See* WY072143-72444. This annual report details key trends for sage-grouse populations, male lek attendance during breeding season, monitoring data, sage-grouse hunting and harvest data, and ongoing conservation strategies employed at the state, federal and local levels. *Id.* BLM relied upon this report, and quoted from it

12

extensively, in its EAs for the Wyoming February 2019 Lease Sale to help inform its decisions on which nominated parcels to offer for sale, and what stipulations, terms and conditions to impose. WY144340-341.

### 2. BLM Conducted Site Specific Review and Imposed All Required Lease Stipulations

At the leasing stage, BLM applied the applicable GrSG stipulations from the governing 2015 GrSG Plans, and documented their analysis extensively in the administrative record, which is summarized for the Wyoming leases in Exhibit 1 for ease of reference. The imposition of these restrictive lease stipulations is extensive, and necessarily requires a parcel-by-parcel analysis by BLM to determine which stipulations apply to each parcel.

The documentation for this parcel-specific review process is comprised of hundreds of pages within the administrative record. *See, e.g.,* WY144371-514 (BLM Wyoming February 2019 Lease Sale EA Section 5.1 detailing imposition of all applicable site-specific lease stipulations and restrictions for all nominated parcels to be offered for sale); WY144515-536 (chart detailing parcel specific resource values and imposed lease stipulations to address these resources for all nominated parcels to be offered for sale at the BLM Wyoming February 2019 Lease Sale).

For example, from the Wyoming February 2019 Lease Sale, BLM imposed the following GrSG lease stipulations on a single parcel offered for sale, WY-184Q-516:

- Prohibiting surface disturbance and surface occupancy within a 0.6-mile radius of the perimeter of occupied GrSG leks in Core Area;

- Restricting or prohibiting surface disturbing and disruptive activities from March 15 to June 30 to seasonally protect GrSG breeding, nesting, and early brood-rearing habitats inside designated core;

- Restricting or prohibiting surface disturbing or disruptive activities from December 1 to March 14 to seasonally protect GrSG winter concentration areas;

- Restricting surface occupancy or use to no more than an average of one oil and gas or mining location per 640 acres using the DDCT, and restricting the cumulative value of all

13

applicable surface disturbances, existing or future to 5 percent of the DDCT area, to protect Core Area from habitat fragmentation and loss;

- Stating that the lease does not guarantee the lessee the right to occupy the surface of the lease for purpose of producing oil and natural gas within Greater Sage-Grouse designated Core Area; and,

- Restricting activities from March 15 to June 30 to seasonally protect GrSG breeding, nesting, and early brood-rearing habitats outside PHMA (Core and Connectivity), within two miles of an occupied lek, as mapped by the Applicable Field Office GIS database.

WY144469 (WY Feb. 2019 EA). To impose these restrictions, BLM necessarily had to conduct a site-specific review of each parcel to determine which resources may be present, for example, winter concentration areas, so that the lease stipulation could be applied to address those resources.

Thus, BLM necessarily conducted a site-specific review consistent with its NEPA obligations because it was required to make a parcel-by-parcel determination of whether lands were open for oil and gas leasing, and if open, what environmental and wildlife resources are present on that specific parcel of land, and then what lease-specific stipulations and mitigation measures the governing land use plans required BLM to impose. *See, e.g.,* WY144371-514 (parcels specific lease stipulations); WY144515-536 (parcel specific resource values); WY144552-560 (Section 5.4 of the BLM Wyoming February 2019 Lease Sale EA detailing maps of wildlife resources in relation to specific lease parcels, including nominated parcels in general habitat, WY144554, and priority habitat, WY144553).

### D.      BLM Appropriately Analyzed Cumulative Impacts Under NEPA

The Alliance incorporates by reference the arguments advanced by the Federal Defendants and State of Wyoming.

Based upon the record before BLM, it was entirely reasonable for the agency to render its leasing decisions based upon the cumulative change in leasing and development in priority habitat in Wyoming. BLM analyzed data to determine whether the overall goals of prioritizing leasing and development were being achieved through implementation of the 2015 GrSG Plans, and adoption

of the State of Wyoming's conservation strategy. As detailed in the BLM Wyoming EA for the February 2019 Lease Sale:

> [o]n a cumulative basis, the development and implementation of the current sage-grouse conservation strategy bean in 2008, there has been a 73% reduction in Federal oil and gas leases in PHMA. Similarly, there has been a 48% reduction in the area of Federal oil and gas leases that are Held by Production (HBP) within PHMAs.

WY144340. In light of these facts, combined with the extensive record used by BLM to inform its decision-making, BLM's leasing decisions are entirely reasonable under the APA.

### 1.      BLM Tiered to the Environmental Analyses of the 2015 GrSG Plans

BLM appropriately tiered to, and relied upon, its cumulative impacts analyses for the governing 2015 GrSG Plans in full compliance with NEPA. These NEPA analyses are methodical, extensive, and thorough. For example, BLM spent over 122 pages analyzing cumulative impacts in the 2015 Wyoming GrSG Plan. WY061668-790. From a geographic standpoint, BLM analyzed cumulative impacts by the Western Association of Fish and Wildlife Agencies (WAFWA) sage-grouse management zones and explained in detail the conditions and threats to the species for each. WY061703-714. BLM explained in detail its methodology and the extensive underlying documents and data relied upon for its analyses. WY061714-716. BLM explained the assumptions and indicators it used to shape the contours of its analyses. WY061716-717. BLM explained baseline conditions, including GrSG habitat and population trends. WY061717-719. The agency also discussed in detail the on-going regional and state efforts to manage threats to, and conserve, the species. WY061719-726.

Next in terms of reasonably foreseeable impacts analyses, BLM identified a detailed list of projects and activities by BLM Field Office with the greatest likelihood to generate potential cumulative impacts. WY061669-691. BLM also identified relevant cumulative actions and considered those incremental impacts, including more than 28 large-scale projects that could have a

cumulative effect. WY060726-727. BLM examined in detail the potential threats to GrSG in the relevant management zones. WY061727-779.

This analysis included, among other things, acres open and closed to oil and gas leasing in PHMAs and related impact analyses, including lease stipulation data and analysis. WY061729-733 (Management Zone 1) and WY061755-760 (Management Zone II/VII). BLM then presented conclusions under each of the alternatives analyzed, WY061779-781, as well as the land use plan amendments proposed for adoption, WY061781-783. BLM's analyses comply fully with NEPA and based upon these analyses, its decision to offer nominated parcels for lease is entirely reasonable under the APA.

### 2. BLM Reasonably Imposed and Relied Upon the Density Disturbance Calculation Tools for Wyoming and Montana

As relevant to WWP's arguments related to direct and indirect effects, and also cumulative impacts, it is significant that, as a lease stipulation and part of their future permitting procedures, BLM and the State of Wyoming require a lessee to conduct a detailed site-specific analysis using the Density Disturbance Calculation Tool (DDCT), developed by the State of Wyoming to ensure compliance with the density and disturbance limitations in PHMA. WY070401-423; WY072181; WY072183-187 (Wyoming Executive Order 2015-5). BLM adopted the State of Wyoming's DDCT Framework and related WY Executive Order (EO) which restricts development—such as limiting surface disturbance to a maximum of 5%. BLM's 5% cap (imposed through lease stipulations) is essentially a cap on both site-specific and cumulative impacts. The DDCT is a spatially-based tool that calculates both the average density of disruptive activities and the total surface disturbance within the area affected by the proposed project, or the DDCT assessment area. WY072181; WY072183-187; WY066764 (2015 Wyoming GrSG Plan, App. D); WY067460 (2015 Buffalo GrSG Plan, App. D). The DDCT assessment process is further described in the 2015 Wyoming GrSG Plan at Appendix D, WY066760-818 and the Buffalo RMP at Appendix D, WY067455-518.

Wyoming's DDCT analyzes in detail potential future impacts on habitat before even authorizing a drilling project. After leasing, and as part of the permitting stage of the onshore program, the BLM reviews proposals for development of federal leases for consistency with the applicable resource management plan to determine whether they conform with the GrSG density and disturbance limitations. WY066764-765 (2015 Wyoming GrSG Plan, App. D); WY066659; WY067460 (2015 Buffalo RMP, App. D). If the proposed activity occurs within a PHMA, the BLM will use the DDCT process to evaluate whether the disturbance from the activity exceeds the limit on the amount of disturbance allowed with the activity or project area. *Id.* Flowcharts included in the Wyoming DDCT illustrate how the WY DDCT process fits into the permitting process. WY070404.

Montana BLM uses a similar tool. *See, e.g.,* 2015 Miles City GrSG Plan, Appendix E, BLM-MT-March2019-009940-44.

The DDCT acts as a backstop at the site-specific development level and is used to enforce a 5% disturbance cap in Wyoming's core habitat. Under the DDCT process, if current disturbance within the activity area or the anticipated disturbance from the proposed activity exceeds this threshold, then BLM will defer until the project disturbance within the area has been reduced below the threshold, redesigned to eliminate additional disturbance, or relocated outside of PHMA. WY066764 (2015 Wyoming GrSG Plan, App. D); WY067460 (2015 Buffalo RMP, App. D). To the extent that development cannot be moved outside of PHMA, the Wyoming Executive Order and the 2015 GrSG Plans for Wyoming prohibit surface occupancy within a 0.6-mile radius of the perimeter of an occupied lek to avoid disturbing mating GrSG and to maintain habitat integrity. WY072188 (Wyoming Executive Order); *see, e.g.*, Wyoming Feb. 2019 Lease Sale EA at WY147652.

In sum, BLM's reliance on cumulative impacts analyses from the underlying FEISs for the governing 2015 GrSG Plans is entirely reasonable. WWP's arguments are without legal merit and devoid of supporting administrative record evidence. Indeed, WWP does not even take issue with

BLM's lease stipulation imposition of the State of Wyoming's DDCT tool to assess impacts at the development stage. BLM's leasing decisions are reasonable and must be affirmed.

## III. BLM Complied with FLPMA in Conforming its Leasing Decisions to the Governing 2015 GrSG Plans and Exercising its Substantial Discretion on How Best to Achieve Its Own Prioritization Objective

The 2015 Wyoming GrSG Plans designated the lands and minerals at issue in the Wyoming February 2019 lease sale as "open" for oil and gas leasing. WY068028 (noting acreage open for fluid mineral leasing with standard lease terms, "major constraints" and "moderate restraints," as well as acres closed for oil and gas leasing before and after issuance of the 2015 RMPAs). Overall, the ROD for the Rocky Mountain Region 2015 GrSG Plans contains 148 pages of policy, priorities, and guidance for BLM in protecting GrSG and its habitat. WY067923-68070. The associated 2015 Wyoming GrSG Plan contains 470 pages of land management guidance for the field offices to implement. WY066624-67094.

Throughout the ROD and 2015 GrSG Plans, BLM's overall objective for oil and gas development and management is to "avoid, minimize and compensate" to conserve GrSG and its habitat. The ROD and 2015 GrSG Plans also prescribe a number of measures to achieve this "avoid, minimize and compensate" objective, including significant access restrictions within areas deemed priority habitat and only somewhat less access restrictions within areas deemed general habitat, including NSO stipulations, WY024067-069, timing limitations, WY024069-24072, density disturbance caps, WY066764; WY024066-069, and seven pages of required design features, WY066758, all developed to reduce potential impacts to GrSG.

### A. BLM Complied Fully with FLPMA and the Governing 2015 GrSG Plans

For the lease sales at issue, the robust administrative record demonstrates that BLM complied with the 2015 GrSG Plans, including the imposition of all applicable stipulations and mitigation measures. *See* Exhibit 1 (chart listing applicable lease stipulations attached to each parcel

offered at February 2019 Wyoming lease sale as documented in the administrative record); *see also* WY018808; WY066650 (summary of allocation decisions); WY012887-88 (noting three categories of stipulations applied to protect habitat for identified species, and the ability of BLM to deny development to oil and gas operators unable to show compliance with federal and state regulations and laws); WY067956-960 (discussing lease restrictions in PHMAs and GHMAs including stipulations, habitat protection measures); WY068028-029 (table showing increased land use restrictions on acreage through the RMP process); WY013217 (explaining the Wyoming DDCT and that if surface disturbance levels are met or exceeded Applications for Permit to Drill would be subsequently denied despite valid lease rights).

Within the overall context of the governing federal land use plans, and the totality of the circumstances, BLM's decision to offer the parcels for competitive sale was entirely reasonable, lawful, supported by the record, and in full compliance with FLPMA. WWP has failed to meet its burden to show otherwise, or that BLM's decision was arbitrary, capricious, an abuse of discretion or contrary to law as required under the governing APA standard of review.

### B.   BLM Reasonably Implemented Measures to Achieve the Prioritization Management Objective of the Governing 2015 GrSG Plans

Particularly given the highly technical nature of the subject matter, BLM is entitled to deference in determining both what it meant by a "prioritization objective" in the 2015 GrSG Plans and how it exercised its discretion to prioritize oil and gas development consistent with its governing land use plans. *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (noting a court is "not 'free to impose on the agency [its] own notion of which procedures are 'best' or most likely to further some vague, undefined public good.'") (internal citations omitted). The court must conduct a "particularly deferential review" of an agency's judgment about areas within that agency's discretion, as long as they are "reasonable." *Id.* (citation and internal quotations omitted).

As detailed in the 2015 GrSG Plans and explained in the February 2019 EA for the Wyoming lease sale, BLM's decision to encourage development outside of GrSG habitat can be achieved not only through the deferral of parcels, but through application of more stringent lease stipulations and mitigation measures on parcels within GrSG habitat. While WWP prefers a BLM management decision outcome that requires 100% deferral of leasing, such a deferral would not comply with the governing 2015 GrSG RMPs, which designated these lands as open for oil and gas leasing. Moreover, WWP takes no issue with the myriad of lease stipulations and restrictions BLM imposed on such parcels. Exhibit 1. The 2015 GrSG Plans' goal of prioritizing merely guide BLM's actions, but are not "specific statutory commands." *Norton*, 542 U.S. at 71.

While WWP disagrees with BLM's decision, mere disagreement is not enough to meet its burden of proof to show that BLM's decision violated the APA or FLPMA by implementing the 2015 GrSG Plans in the manner BLM deemed best to meet its own prioritization objective for leasing and development. BLM's decision to offer nominated parcels for competitive sale under all applicable stipulations and restrictions was not unreasonable under the APA standard. WY012876 (noting BLM's use of "stipulations to encourage lessees to acquire leases outside of GRSG [and] PHMA due to fewer restrictions in those areas than in higher priority habitat management areas" and that "BLM will continue to work with parties who file expressions of interest and potential lessees to voluntarily prioritize leasing in less-sensitive areas."). BLM's decision complies entirely with the plain language of the governing 2015 GrSG Plans and falls squarely within BLM's discretionary authority that Congress afforded to it under FLPMA.

The record demonstrates that BLM's decision to offer parcels in the 2019 February Wyoming lease sale complied with the 2015 GrSG Plans. WY144312-313. Nothing in the 2015 GrSG Plans prohibited BLM from considering all of the nominated parcels submitted for a given lease sale. *Id.*; *see also* BLM-MT-March2019-028361 (2016 Guidance, noting that it "does not prohibit

leasing or development in GHMA or PHMA as the GRSG Plans will allow for leasing and development by applying prioritizing sequencing, stipulations, required design features, and other management measures to achieve the conservation objectives and provisions in the GRSG Plans."). The 2015 GrSG Plans only required that if parcels were offered within GrSG habitat, that decision "would conform to the conservation objectives and provisions in the GRSG Plans." BLM-MT-March2019-028363. BLM has done so here, and WWP has not met its burden under the APA to show otherwise, particularly in light of the robust administrative records supporting BLM's leasing decisions.

## IV.   Vacatur is an Improper Remedy

### A.   A Procedural Deficiency Requires a Procedural Remedy

NEPA is a procedural statute promulgated to ensure that an agency makes an informed decision. *Vt. Yankee Nuclear Power Corp.*, 435 U.S. at 551. Similarly, FLPMA is a procedural statute detailing the parameters and process by which BLM promulgates federal land use plans. WWP challenges the process by which BLM prioritized parcels under FLPMA. As such, the proper remedy is procedural. *Id.* at 558 (noting that violations of procedural statutes do not warrant substantive remedies and cannot be imposed simply "because the court is unhappy with the result reached.").

Courts routinely impose procedural remedies in the specific context of federal oil and gas leases. For example, the Ninth Circuit specifically rejected  lease cancellation and merely "enjoin[ed] the federal defendants from permitting any surface-disturbing activity to occur on any of the leases until they have fully complied with NEPA. . .." *Conner v. Burford*, 848 F.2d 1441, 1461 (9th Cir. 1988)); *Mont. Wilderness Ass'n v. Fry*, 408 F. Supp. 2d 1032, 1038 (D. Mont. 2006); *Wisely*, 524 F. Supp. 2d at 1306 n.12; *see also Willow Creek Ecology v. U.S. Forest Serv.*, 225 F. Supp. 2d 1312, 1316 (D. Utah 2002) (for procedural violations of procedural statutes such as NEPA, remedies "are limited to procedural remedies.").

*Wilderness Society v. Wisely* presents an analogous case. 524 F. Supp. 2d at 1285. There, a group brought a similar APA legal challenge for an alleged violation of NEPA. *Id.* The *Wisely* court recognized its very limited role in APA review was to review the procedures BLM undertook prior to offering specific lands for oil and gas leasing and development, and not to review the substantive policy decisions implicit in that decision. *Id.* Thus, a substantive remedy of lease cancelation is improper here.

### B.    WWP Inappropriately Conflates the Leasing Decisions with the Leases

WWP's request that this Court vacate both the challenged agency action (*i.e.*, the decision to offer parcels for lease), and the subsequent action, execution of the lease contracts between BLM and the leaseholders. This is beyond the court's jurisdiction under the APA because the federal government has not waived its sovereign immunity under the MLA or FLPMA for third-party challenges to the lease contracts.

NEPA and FLPMA do not contain a private right of action. Thus, WWP brings claims under the APA. 5 U.S.C. § 706(2)(A); ECF 375-1 at 13. WWP challenges Federal Defendants' process in evaluating the environmental effects of, and in prioritizing parcels for, BLM's decision to offer certain parcels for lease. WWP does not challenge the lease contracts or their stipulations, conditions, or terms. *Conner*, 848 F.2d at 1460-61 (noting that similar challenge seeking to enforce compliance with NEPA and the ESA actually challenged the public's right to administrative compliance with the procedural statutes, not to adjudicate the rights of the lessees.). It is the process BLM engaged in in reaching the leasing decisions, and the NEPA analysis regarding those decisions, not execution of the lease contracts, that necessitated NEPA compliance. *Id.* at 1421; 42 U.S.C. § 4332(2)(C). Thus, if any "action" is vacated, it should be the decision, not the subsequently issued lease contracts themselves.

This is not a distinction without a difference. This court recently found that certain leaseholders were not "necessary parties" to this action. ECF 272. Although Alliance disputes that leaseholders are not necessary parties, the Ninth Circuit's decision in *Conner v. Burford* controls here. In *Conner*, the Ninth Circuit based its holding that joinder of the leaseholders was not necessary on the fact that it was declining to cancel the challenged lease contracts. *Conner*, 848 F.2d at 1461, n.50. In so doing, the Ninth Circuit noted that completely divesting lessees of their property rights for a NEPA violation by the federal government was an "unnecessarily harsh result" when the parties holding the lease contracts and real property rights were not before the court. *Id.*

Similarly, here, as the court precluded the intervention of individual lease holders, now divesting those lease holders of their property rights through the cancelation of their leases is an "unnecessarily harsh result." *Id.*; *see also Wildearth Guardians v. Bernhardt*, No. 1:19-cv-00505-RB-SCY, 2020 U.S. Dist. LEXIS 218159, at *69 (D.N.M. Nov. 19, 2020)) (noting lease cancellation would be "gross over-exaggeration and a mark of judicial overreach. . .").

## C.    Ninth Circuit Balancing Test Supports Remand

Remand without vacatur is also the result dictated by *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012). Under *Cal. Cmtys.*, the district court weighs the seriousness of the error against the disruptive consequences of the vacatur. *Id.*, *Allied-Signal v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). Here, the disruptive consequences outweigh any alleged deficiency.

Vacatur of the leases would result in irreparable harm to Alliance members, including monetary and non-monetary losses. Monetary losses are not limited to the approximately $89 million dollars in face value paid to the United States for these leases. Fed. Def's Br., ECF 379 at 53 of 57. Alliance members have also spent significant funds—totaling in the millions of dollars—in evaluating which parcels to nominate for lease, and which leases to develop. Exhibit 3, Sgamma

Decl. ¶ 5 ("Alliance member companies have invested nearly one hundred million dollars in bonus payments and advanced rentals on these leases and many more millions evaluating, nominating, investigating, and developing these leases."); *Id.* at ¶ 8; Exhibit 4, McMaster Decl. ¶ 5-8 ("tens of millions of dollars" invested in preparation for development of these leases). In addition to the capital expenditures on the federal leases, companies have also expended significant amounts acquiring adjoining private acreage and surface rights necessary to development of their federal leases. Ex. 4, McMaster Decl. ¶¶ 5. Vacatur would also imperil companies' revenue streams and perpetuate business uncertainty. Ex. 4, McMaster Decl. ¶ 7. Loss of these revenues will not only impact local communities, but also the State of Wyoming, and charitable organization investors. *Id.*

The Ninth Circuit recognized the inherent value in oil and gas leases in *Conner,* 848 F.2d at 1461 (noting significant economic value in the exclusive right to engage in oil and gas activities granted by a federal oil and gas lease). Environmental harm could be minimized by enjoining any further surface approvals pending supplemental NEPA review. *WildEarth Guardians v. Zinke,* 368 F. Supp. 3d 41, 84 (D.D.C. 2019).

## CONCLUSION

The Alliance requests this Court deny WWP's Motion and grant the Alliance's motion for summary judgment in its entirety and uphold the challenged leasing decisions. In the event, the Court finds a deficiency that rises to the level of an APA violation, then it should remand to BLM without vacatur to allow BLM the opportunity to conduct an additional review to cure those deficiencies, and inform whether there are other terms, conditions or lease stipulations that could be lawfully imposed from the governing 2015 GrSG Plans to address any found deficiencies not supported by the administrative record and underlying plans.

Respectfully submitted this 30th day of April 2021.

/s/ Bret A. Sumner
Bret A. Sumner, *Pro Hac Vice*
bsumner@bwenergylaw.com
Malinda Morain, *Pro Hac Vice*
mmorain@bwenergylaw.com
BEATTY & WOZNIAK, P.C.
216 Sixteenth St., Suite 1100
Denver, CO 80202-5115
Telephone: 303-407-4499
Fax: 800-886-6566

Cherese D. McLain
cdm@msbtlaw.com
MSBT LAW
7699 West Riverside Drive
Boise, ID 83714
Telephone: 208-331-1800
Fax: 208-331-1202

*Attorneys for Defendant-Intervenor*
*Western Energy Alliance*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 30th day of April 2021, I caused to be served a true and correct copy of the foregoing **MEMORANDUM IN SUPPORT OF WESTERN ENERGY ALLIANCE'S PHASE THREE MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** via the Court's electronic case filing system which will cause the foregoing to be served upon all counsel of record.

*/s/ Bret A. Sumner*
Bret A. Sumner