# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, *et al.*, | Case No.: 1:18-cv-00187-REB |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER RE:** |
| vs. | |
| | **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (PHASE TWO)** |
| DAVID BERNHARDT, Secretary of the Interior, *et al.*, | **(Dkt. 247)** |
| Defendants, | **FEDERAL DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (PHASE TWO)** |
| and | **(Dkt. 278)** |
| STATE OF WYOMING, *et al.*, | **DEFENDANT-INTERVENOR STATE OF WYOMING'S MOTION FOR PARTIAL SUMMARY JUDGMENT (PHASE TWO)** |
| Defendant-Intervenors. | **(Dkt. 283)** |
| | **DEFENDANT-INTERVENOR WESTERN ENERGY ALLIANCE'S PHASE TWO CROSS-MOTION FOR SUMMARY JUDGMENT** |
| | **(Dkt. 294)** |
| | **PLAINTIFF'S MOTION TO STRIKE WEA EXHIBITS** |
| | **(Dkt. 314)** |
| | **DEFENDANT-INTERVENORS PEAK POWDER RIVER ACQUISITIONS, LLC'S, TITAN EXPLORATION, LLC'S, AND REBELLION ENERGY II, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT (PHASE TWO)** |
| | **(Dkt. 318)** |

**MEMORANDUM DECISION AND ORDER - 1**

Pending before the Court are the following motions:  (1) Plaintiffs' Motion for Partial Summary Judgment (Phase Two) (Dkt. 247); (2) Federal Defendants' Motion for Partial Summary Judgment (Phase Two) (Dkt. 278); (3) Defendant-Intervenor State of Wyoming's Motion for Partial Summary Judgment (Phase Two) (Dkt. 283); (4) Defendant-Intervenor Western Energy Alliance's Phase Two Cross-Motion for Summary Judgment (Dkt. 294); (5) Plaintiffs' Motion to Strike WEA Exhibits (Dkt. 314); and (6) Defendant-Intervenors Peak Powder River Acquisitions, LLC's, Titan Exploration, LLC's, and Rebellion Energy II, LLC's Motion for Partial Summary Judgment (Phase Two) (Dkt. 318).  Having carefully considered the record, participated in oral argument, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I.  <u>GENERAL BACKGROUND</u>

Whereas Phase One of this action dealt specifically with Instruction Memorandum ("IM") 2018-034 and a subset of five oil and gas leases that applied IM 2018-034 (Plaintiffs' Fourth and Fifth Claims for Relief), Phase Two addresses four separate Bureau of Land Management ("BLM") lease sales conducted in greater sage-grouse habitat (Plaintiff's Third Claim for Relief)[1] – BLM's February 2017 Wyoming, June 2017 Wyoming and Montana, and September 2017 Wyoming oil and gas lease sales.[2]  Here is the relevant factual backdrop:

### A.     Greater Sage-Grouse Plan Amendments of 2015

1.      Greater sage-grouse once occupied nearly half a million square miles across the West and numbered in the millions.  *See* Pls.' SOF No. 1 (Dkt. 247-2).  The current population

---

[1]  Plaintiffs are not pursuing their additional challenges to the Phase Two lease sales under their First and Second Claims for Relief.  *See* Pls.' Mem. ISO MSJ, p. 2 n.2 (Dkt. 247-1).

[2]  BLM conducted the Phase Two lease sales before adopting the national policies challenged in this case, including IM 2018-034 and IM 2018-026 (which the parties will address during Phase Three of this action).

**MEMORANDUM DECISION AND ORDER - 2**

of greater sage-grouse is estimated at less than 10% of historic levels, and the species occupies only about half its historic range. *See id.*

2.     Oil and gas development is one of the "greatest threat[s]" to greater sage-grouse. *See id.* at No. 7 (quoting 80 Fed. Reg. 59,858, 59,888-90 (Oct. 2, 2015)); *see also* WY 60308 ("While energy development has been identified as the primary threat to the greater sage-grouse within its eastern range, this area is not immune to the threat of wildfire."). Well pads, access roads, pipelines, powerlines, storage tanks, compressor stations, and other surface infrastructure result in the direct loss and fragmentation of greater sage-grouse habitat. *See* Pls.' SOF No. 9. The patchy nature of these disturbances magnifies the loss, as fragmentation can render habitat too small or isolated to be of use to greater sage-grouse. *See id.* at No. 10; *see also* WY 60858 ("In Wyoming, information suggests that greater sage-grouse populations are negatively affected by energy development activities, especially those that degrade important sagebrush habitat, even when mitigation measures are implemented. Greater sage-grouse populations can repopulate areas developed for resource extraction after habitat reclamation for the species. However, there is no evidence that populations attain their previous levels, and reestablishment of sage-grouse in a reclaimed area may take 20 to 30 years, or longer.") (internal citations omitted). Noise and human presence from oil and gas operations are also known to produce stress responses in greater sage-grouse, reduce their reproductive success, and cause birds to abandon suitable habitat, resulting in population declines. *See* Pls.' SOF No. 16.

3.     Research suggests that buffer margins of 0.2 mile, 0.5 mile, 0.6 mile, and 1.0 mile result in estimated lek persistence of 5%, 11%, 14%, and 30%, respectively. *See id.* at No. 21. Further, at least a 4-mile, year-round lek buffer is required to maintain greater sage-grouse populations, and even that distance would "not be large enough to offset all the impacts" of energy development. *See id.* at No. 22 (quoting WO 26092-93).

**MEMORANDUM DECISION AND ORDER - 3**

4.    In 2010, the U.S. Fish and Wildlife Service ("FWS") decided that Endangered Species Act ("ESA") listing for the greater sage-grouse was "warranted, but precluded" by higher priority species.  *See id*. at No. 23 (quoting 75 Fed. Reg. 13,910 (March 5, 2010)).  The FWS identified the primary threats to greater sage-grouse as habitat loss and fragmentation, coupled with a lack of adequate regulatory mechanisms.  *See id*.  Federal agencies manage roughly half the remaining greater sage-grouse habitat.  *See id*. at No. 24.

5.    In response to the FWS's "warranted, but precluded" finding, BLM and the U.S. Forest Service ("FS") undertook a multi-state planning effort to review and amend their land management plans to increase protections for greater sage-grouse and avoid ESA listing.  *See id*. at No. 25.

6.    To inform and advise the planning process, BLM chartered a National Technical Team ("NTT") of scientific experts to review the best available science and recommend conservation measures for incorporation into the land-use plans.  *See id*. at No. 26.  A December 2011 report ( the "NTT Report") was produced, identifying oil and gas development as one of the primary threats to greater sage-grouse.  *See id*. at No. 27.  The NTT Report observed that impacts to greater sage-grouse from oil and gas development "are universally negative and typically severe."  *See id*. (quoting WO 26091).  It also found that "[t]here is strong evidence from the literature to support that surface-disturbing energy . . . development within priority sage-grouse habitats is not consistent with a goal to maintain or increase populations or distribution."  *See id*.  The NTT Report recommended that all sage-grouse priority habitats be closed to new oil and gas leasing.  *See id*. at No. 28 (citing WO 26094).  It concluded that simply applying buffers around leks "at any distance is unlikely to be effective," and that "[e]ven a 4-mile NSO [(no surface occupancy)] buffer would not be large enough to offset all the impacts reviewed above."  *See id*. (quoting WO 26092-93).

**MEMORANDUM DECISION AND ORDER - 4**

7.      For its part, the FS convened a separate Conservation Objectives Team ("COT")

of federal and state experts, releasing its own report (the "COT Report") in March 2013 that

similarly recommended avoiding new energy development in greater sage-grouse habitat.  *See id*.

at No. 29 (citing WO 26147-261).  The COT Report expressed "an urgent need to 'stop the

bleeding' of continued population declines and habitat losses."  *See id*. (quoting WO 26184).

8.      BLM and the FS finalized their greater sage-grouse planning effort in September

2015 by adopting amendments to 98 land use plans (the "Plan Amendments"), with the objective

of increasing protections across the bird's range.  *See id*. at No. 30.  BLM analyzed its proposed

Plan Amendments in 15 separate environmental impact statements ("EISs").  *See id*. at No. 31.

BLM approved the Plan Amendments through two separate Records of Decision ("RODs") – (1)

the Great Basin region (the western half of the greater sage-grouse range), and (2) the Rocky

Mountain region (the eastern half of the greater sage-grouse range).  *See id*. at No. 32.[3]

---

[3]  Five of the Resource Management Plans ("RMPs") that were approved and/or amended as part of the Plan Amendments (alongside their EISs) are relevant here:

- Miles City RMP/EIS, which encompasses BLM's Miles City Field Office in eastern Montana.  BLM-MT-2Q17-157-588 (RMP), BLM-MT-2Q17-589-2112 (EIS).

- Bighorn Basin RMPs/EIS, which encompass BLM's Cody and Worland Field Offices in north/central Wyoming.  WY 68071-673 (Cody RMP), WY 68674-69312 (Worland RMP), WY 63652-66623 (EIS).

- Buffalo RMP/EIS, which encompasses BLM's Buffalo Field Office in northeastern Wyoming.  WY 67095-922 (RMP), WY57293-60247 (EIS).

- "Wyoming Nine" RMP/EIS, which encompasses BLM lands across most of southern Wyoming, including BLM's Casper, Rock Springs, Kemmerer, Newcastle, Pinedale, and Rawlins Field Offices.  WY 66624-67094 (RMP), WY 60248-63651 (EIS).

- Lander RMP/EIS, which encompasses BLM's Lander Field Office in central Wyoming.  WY 56783-57292 (RMP), WY 53928-55899 (EIS).

Fed. Defs.' SOF No. 5 (Dkt. 278-2).  These RMPs (except for the Lander RMP) were approved by the Rocky Mountain ROD.  *See id*. (citing WY 67923, 67936 (addressing Lander RMP)).

**MEMORANDUM DECISION AND ORDER - 5**

9.     The Plan Amendments adopted tiered habitat designations – the highest protection was afforded to Priority Habitat Management Areas ("PHMA"), which are areas "identified as having the highest habitat value"; lesser protections applied to General Habitat Management Areas ("GHMA"), which included occupied habitat outside of PHMAs.  *See id*. at 33 (quoting WY 67949).  The Plan Amendments directed BLM to "prioritize" oil and gas leasing and development outside of identified PHMAs and GHMAs, stating further:

> This is to further limit future surface disturbance and encourage new development in areas that would not conflict with [greater sage-grouse].  This objective is intended to guide development to lower conflict areas and as such protect important habitat and reduce the time and cost associated with oil and gas leasing development by avoiding sensitive areas, reducing the complexity of environmental review and analysis of potential impacts on sensitive species, and decreasing the need for compensatory mitigation.

*See id*. at No. 35 (quoting WY 67959).

10.     Following the issuance of the Plan Amendments, the FWS reviewed the status of the greater sage-grouse and concluded that listing under the ESA was not warranted.  *See* Fed. Defs.' SOF No. 4.  The FWS found that one of the key circumstances that had changed since its 2010 "warranted, but precluded" finding was that the Plan Amendments "provide adequate mechanisms to reduce and minimize new disturbance in the most important areas for the species."  *See id*. (quoting 80 Fed. Reg. 59,858, 59,882  (Oct. 2, 2015)).  The FWS emphasized that its decision that a listing was not warranted was dependent upon the "continued implementation of the regulatory mechanisms and conservation efforts," including the Plan Amendments.  *See id*. (quoting 80 Fed. Reg. at 59,941).

**B.     The Challenged Phase Two Lease Sales**

<u>February 2017 Wyoming</u>

11.     In February 2017, BLM conducted a competitive oil and gas lease sale, offering 283 Wyoming lease parcels, covering 184,784 acres.  *See* Pls.' SOF No. 38.

**MEMORANDUM DECISION AND ORDER - 6**

12.     The parcels are located on BLM land managed by the Buffalo, Casper, and Newcastle Field Offices, which span two BLM District Offices (High Plains and Wind River/Bighorn Basin).  *See id*. at SOF No. 39.  BLM prepared a separate Environmental Assessment ("EA"), Finding of No Significant Impact ("FONSI"), and Decision Record for each District Office.  *See id*. (citing WY 90976-1038 (High Plains EA), WY 92019-23 (High Plains FONSI), WY 90965-75 (High Plains Decision Record), WY 92035-88 (Wind River EA), WY 92189-93 (Wind River FONSI), WY 92024-34 (Wind River Decision Record)); *see also* Fed. Defs.' Resp. to Pls.' SOF No. 39 (Dkt. 279-1) (providing clarification of Wind River/Bighorn Basin EA and FONSI).

13.     The High Plains EA tiers to the Buffalo RMP/EIS and the Wyoming Nine RMP/EIS; the Wind River EA tiers to the Lander RMP/EIS and the Bighorn Basin RMP/EIS.  *See* Pls.' SOF No. 40; *see also* Fed. Defs.' Resp. to Pls.' SOF No. 39 (clarifying that "[t]he Wind River EA [also] tiers to and incorporates by reference the information found in the Rawlins planning documents (Rawlins RMP and Wyoming Sage-Grouse 9-Plan).").

14.     BLM examined just two alternatives in each EA:  (1) no action; and (2) the proposed action of offering all leases.  *See* Pls.' SOF No. 41 (citing WY 90995, 92050).

15.     Nearly all (99.9%) of the acreage offered at the sale, and 282 of the 283 parcels, consists of greater sage-grouse habitat.  *See id*. at SOF No. 42 (citing WY 90970-75).  Thirty-six of the parcels are located in PHMA.  *See id*.; *see also* Fed. Defs.' Resp. to Pls.' SOF No. 43 (clarifying that, for the parcels offered, 26 were located entirely within PHMA, while 10 parcels overlapped PHMA and GHMA).

16.     Wyoming BLM initially identified 89 parcels that could be deferred from the sale as being in greater sage-grouse habitat.  Fed. Defs.' Resp. to Pls.' SOF No. 43 (citing WY 73896-73902).  BLM headquarters evaluated these parcels and recommended that 42 of the 89

**MEMORANDUM DECISION AND ORDER - 7**

parcels should be deferred, while the other 47 parcels were appropriate to offer.  *See id*. (citing WY 75149-75150, 75169-75).  Another eight parcels were deferred because of habitat mapping changes resulting from a revision to the Wyoming Governor's Executive Order on Greater Sage Grouse Core Area Protection, so that 50 parcels total were deferred from the sale.  *See id*. (citing WY 75261-62).  After further BLM review and consultation with the State Director, two parcels originally proposed for deferral were then moved forward to be offered (ultimately resulting in a total of 48 deferred parcels from the sale).  *See id*. (citing WY 75834-38).

17.    According to Plaintiffs, "[they] and other commenters identified numerous impacts to greater sage-grouse that BLM did not adequately evaluate under [the National Environmental Policy Act ("NEPA")] and requested that BLM consider deferring additional sage-grouse habitat."  Pls.' SOF No. 44 (citing WY 79361-70, 79329-40).  Plaintiffs claim that BLM did not consider this alternative or further analyze impacts to greater sage-grouse.  *See id*. at SOF No. 45 (citing WY 92006-09, 92119-25); *but see* Fed. Defs.' Resp. to Pls.' SOF No. 45 ("BLM explained in its responses to comments that the potential impacts of not leasing some of the parcels were 'imbedded within the No Action alternative,' and therefore the analysis of another separate alternative was not necessary.") (quoting WY 92008, 92124).

June 2017 Montana

18.    In June 2017, BLM conducted a competitive oil and gas lease sale, offering 156 Montana lease parcels covering 69,056 acres.  *See* Pls.' SOF No. 46.

19.    BLM prepared an EA and FONSI to analyze the sale, which tiered to the EIS prepared for the Miles City RMP.  *See id*. at No. 47.

20.    BLM examined just two alternatives in the EA:  (1) no action; and (2) the proposed action of offering all leases.  *See id*. at No. 48 (citing BLM-MT-2Q17-2410).

**MEMORANDUM DECISION AND ORDER - 8**

21.     The sale included 69 parcels in greater sage-grouse habitat, including one parcel in PHMA, two parcels in Restoration Habitat Management Areas ("RHMA"), and 66 parcels in GHMA.  *See id*. at No. 49 (citing BLM-MT-2Q17-002426); *see also* BLM-MT-2Q17-35 (defining RHMA as:  "BLM-administered lands where maintaining populations is a priority, a balance between ongoing and future resource use so that enough quality habitat is maintained to allow some residual population in impacted areas to persist and that emphasizes the restoration of habitat to reestablish or restore sustainable populations.").

22.     According to Plaintiffs, "[they] submitted comments requesting that BLM perform more site-specific analysis of the impacts to greater sage-grouse and consider an alternative that would defer additional sage-grouse habitat."  Pls.' SOF No. 50 (citing BLM-MT-2Q17-2686-759, 3366-74); *but see* Fed. Defs.' Resp. to Pls.' SOF No. 50 (acknowledging that Plaintiffs' comment letters requested additional site-specific analyses, but that Plaintiff Western Watersheds Project's ("WWP") comment "did not specifically request for certain additional alternatives to be analyzed.").  Plaintiffs claim that BLM did not consider this alternative or further analyze greater sage-grouse impacts.  *See* Pls.' SOF No. 51 (citing BLM-MT-2Q17-2678-79); *but see* Fed. Defs.' Resp. to Pls.' SOF No. 51 (disputing statement because "[t]he reference to 'this alternative' implies that Plaintiffs proposed an additional alternative to be analyzed, which they did not.").

June 2017 Wyoming

23.     In June 2017, BLM conducted a competitive oil and gas lease sale, offering 26 Wyoming lease parcels, covering 31,925 acres.  *See* Pls.' SOF No. 52.

24.     BLM prepared an EA, FONSI, and Decision Record to analyze and approve the sale, which tiered to the Wyoming Nine RMP/EIS.  *See id*. at No. 53.

**MEMORANDUM DECISION AND ORDER - 9**

25.    BLM examined just two alternatives in the EA:  (1) no action; and (2) the proposed action of offering all proposed leases.  *See id*. at No. 54 (citing WY 102612).  The EA also refers to a third alternative – "Alternative C – Defer Parcels for Sage Grouse" – in the Table of Contents, but the body of the EA contains no mention of such an alternative.  *See id*. (citing WY 102602).

26.    All 26 parcels are located in greater sage-grouse habitat, including six in PHMA.  *See id*. at No. 55 (citing WY 102701, 102652); *but see* Fed. Defs.' Resp. to Pls.' SOF No. 56 ("WY BLM did defer 46 parcels (all in habitat) and offered for lease the remaining parcels (all within habitat).") (citing WY 102850).

27.    According to Plaintiffs, "[they] and others identified numerous impacts to greater sage-grouse that BLM did not adequately evaluate under NEPA and requested that BLM consider a middle-ground alternative that would defer additional sage-grouse habitat."  *See* Pls.' SOF No. 56 (citing WY 102821-55); *but see* Fed. Defs.' Resp. to Pls.' SOF No. 56 ((1) disputing that Plaintiffs submitted comments on the EA, but instead "subsequently submit[ted] a protest letter"; (2) discussing letter's "[p]rotests specific to sage-grouse"; and (3) discussing deferral of certain parcels for sale) (citing WY 102821-55).  Plaintiffs claim that BLM did not consider this alternative or further analyze greater sage-grouse impacts.  *See* Pls.' SOF No. 57; *but see* Fed. Defs.' Resp. to Pls.' SOF No. 57 (disputing statement because "[t]he reference to 'this alternative' implies that a middle-ground alternative was proposed during the public comment period on the EA, which it was not.").

September 2017 Wyoming

28.    In September 2017, BLM conducted a competitive oil and gas lease sale, offering 140 Wyoming lease parcels, covering 118,055 acres.  *See* Pls.' SOF No. 58.

**MEMORANDUM DECISION AND ORDER - 10**

29.     The parcels are located in BLM's Buffalo, Newcastle, Casper, Worland, and Lander Field Offices, which span two BLM District Offices (High Plains and Wind River/Bighorn Basin).  *See id*. at No. 59.  BLM prepared a separate EA and FONSI/Decision Record for each District Office.  *See id*. at No. 60 (citing WY 113308-83 (High Plains EA), WY 113294-307 (High Plains FONSI/Decision Record), WY 113571-634 (Wind River EA), WY 113558-570 (Wind River FONSI/Decision Record)).

30.     The High Plains EA tiers to the Buffalo RMP/EIS and the Wyoming Nine RMP/EIS; the Wind River EA tiers to the Lander RMP/EIS and the Bighorn Basin RMP/EIS. *See id*.

31.     BLM examined just two alternatives in each EA:  (1) no action; and (2) the proposed action of offering all leases.  *See id*. at No. 61. (citing WY 113328-29, 113585).

32.      According to Plaintiffs, of the 140 parcels offered, 123 were in greater sage-grouse habitat, with roughly 40% of this in PHMA.  *See id*. at No. 62 (citing WY 113304-07); *but see* Fed. Defs.' Resp. to Pls.' SOF No. 62 (clarifying that "WY 113307 shows 137 parcels were offered.  13 parcels were not located in PHMA or GHMA (WY 113304).  43% of the total offered acreage was PHMA and this was approximately 24% of the offered parcels.") (citing WY 113307).

33.     According to Plaintiffs, "[they] and other commenters identified numerous impacts to greater sage-grouse that BLM did not adequately evaluate under NEPA and requested that BLM consider deferring additional sage-grouse habitat."  Pls.' SOF No. 63 (citing WY 110243-75, 110280-312).  Plaintiffs claim that BLM did not consider this alternative or further analyze greater sage-grouse impacts.  *See id*. at No. 64 (citing WY 113534-35, 113551-57, 113669-72, 113698-108); *but see* Fed. Defs.' Resp. to Pls.' SOF No. 64 ("BLM explained that

**MEMORANDUM DECISION AND ORDER - 11**

by analyzing the no action alternative, BLM had effectively analyzed deferring parcels from the sale.") (citing WY 113556-57, 113707-08).

### C.     The Phase Two Action

34.     Plaintiffs assert that the above-referenced Phase Two lease sales threaten substantial loss and fragmentation of the greater sage-grouse's remaining habitat – risks that, Plaintiffs say, BLM failed to properly examine in violation of NEPA.  *See generally* Pls.' Second Am. Compl., ¶¶ 300-313 (Dkt. 165).  They claim that, because BLM followed identical courses in analyzing and approving the Phase Two lease sales, each sale suffers from the same four NEPA violations – specifically (1) BLM failed to consider the reasonable alternative of deferring priority greater sage-grouse habitat; (2) BLM failed to take a "hard look" at the direct and indirect impacts on greater sage-grouse by (a) failing to assess baseline conditions in each lease area, and (b) failing to assess the site-specific impacts of each lease sale on greater sage-grouse; and (3) BLM failed to take a "hard look" at the cumulative impacts on greater sage-grouse.  *See generally* Pls.' Mem. ISO MSJ, pp. 15-37.  Plaintiffs submit that these violations require the Court to set aside and vacate all four Phase Two lease sales.  *See id*. at pp. 37-39.

35.     Federal Defendants and Defendant-Intervenors – (1) State of Wyoming ("Wyoming"), (2) Western Energy Alliance ("WEA"), and (3) Peak Powder River Acquisitions, LLC ("PPRA"), Titan Exploration, LLC ("Titan"), and Rebellion Energy II, LLC ("Rebellion II") (collectively the "Intervenor Lease Owners")) oppose each of Plaintiffs' arguments and likewise move for summary judgment on each of the same issues.  *See generally* Fed. Defs.' Mem. ISO MSJ and Opp. to Pls.' MSJ (Dkt. 278-1); Wyo.'s Mem. ISO MSJ and Opp. to Pls.' MSJ (Dkt. 283-1); WEA's Mem. ISO MSJ and Opp. to Pls.' MSJ (Dkt. 294-1); Interv. Lease

Owners' Mem. ISO MSJ and Opp. to Pls.' MSJ (Dkt. 318-1);[4] *see also* AEC's Amicus Brief

(Dkt. 328) (opposing vacatur of leases in event lease sales are deficient under NEPA).

36.     On February 25, 2021, the Court heard oral argument on the parties' cross-

motions for summary judgment (Dkts. 247, 278, 283, 294, 318).  This Memorandum Decision

and Order addresses those arguments, in turn resolving the at-issue motions along with Plaintiffs'

related Motion to Strike (Dkt. 314) speaking to certain of WEA's exhibits.

## II.  LEGAL STANDARDS

### A.     Administrative Procedure Act ("APA")

Because NEPA does not provide a private right of action, compliance with its mandates

is reviewed under the APA.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882-83 (1990)

(stating that judicial review of agency action proceeds under APA where statute at issue, NEPA,

does not provide cause of action).  Under the APA, an agency action must be upheld unless it is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

§ 706(2)(A).  "A [decision] is arbitrary and capricious 'if the agency has relied on factors which

Congress has not intended it to consider, entirely failed to consider an important aspect of the

problem, offered an explanation for its decision that runs counter to the evidence before the

agency, or is so implausible that it could not be ascribed to a difference in view or the product of

agency expertise.'"  *Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1190 (9th Cir.

---

[4]  On September 14, 2020, the Court permitted the Intervenor Lease Owners to intervene for the sole purpose of addressing remedies related to those Phase Two lease sales and related wells in which they claim an interest.  *See* 9/14/20 Order (Dkt. 312).  Their briefing therefore speaks only to Plaintiffs' claim that the Phase Two lease sales should be vacated.  *See generally* Interv. Lease Owners' Mem. ISO MSJ and Opp. to Pls.' MSJ (Dkt. 318-1).  Separately, WEA *additionally* argues that Plaintiff WWP does not have legal standing to challenge the Wyoming lease sales and that all claims must similarly be dismissed as to the June 2017 Wyoming lease sale.  *See* WEA's Mem. ISO MSJ and Opp. to Pls.' MSJ, pp. 5-6.

2010) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463

U.S. 29, 43 (1983)).

The "touchstone of 'arbitrary and capricious' review under the APA is 'reasoned

decision-making.'"  *Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d 1061,

1080 (9th Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52).  Courts sustain an

agency action if the agency has "examine[d] the relevant data and articulate[d] a satisfactory

explanation for its action including a 'rational connection between the facts found and the choice

made.'"  *Id*. (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (internal quotation omitted)).

This standard also applies to how an agency considers and responds to "significant comments"

that raise points that could change a decision.  *Id*. (quoting *Am. Mining Congress v. EPA*, 965

F.2d 759, 771 (9th Cir. 1992) (internal quotation omitted)).

Summary judgment is typically appropriate where "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  However, in a case involving review of a final agency action under

the APA, the court's role is limited to reviewing the administrative record, and the standard set

forth in Rule 56 does not apply.  *See Colorado River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d

191, 200 (D.D.C. 2012) (citing *Catholic Health Initiatives v. Sebelius*, 658 F. Supp. 2d 113, 117

(D.D.C. 2009), *rev'd on other grounds*, 617 F.3d 490 (D.C. Cir. 2010)).  Rather, under the APA,

"it is the role of the agency to resolve factual issues to arrive at a decision that is supported by

the administrative record, whereas 'the function of the district court is to determine whether or

not as a matter of law the evidence in the administrative record permitted the agency to make the

decision it did.'"  *Id*. (citation omitted); *see also Occidental Eng'g Co. v. Immigration &

Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir. 1985).  Summary judgment is then the

mechanism for deciding whether, as a matter of law, the agency action passes muster under the

**MEMORANDUM DECISION AND ORDER - 14**

APA.  *See N.w. Motorcycle Ass'n v. U.S. Dep't Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994);

*Occidental Eng'g*, 753 F.2d at 769-70.

In considering whether an agency's action was arbitrary and capricious, courts are

"highly deferential" to the agency's decision, *Providence Yakima*, 611 F.3d at 1190, and are not

to "substitute [the court's own] judgment for that of the agency." *J & G Sales Ltd. v. Truscott*,

473 F.3d 1043, 1051 (9th Cir. 2007).  "[C]ourts will 'uphold a decision of less than ideal clarity if

the agency's path may reasonably be discerned.'"  *Id*. at 1052 (quoting *Motor Vehicle Mfrs.*

*Ass'n*, 463 U.S. at 43).  "Moreover, '[w]here the agency's line-drawing does not appear irrational

and the [party challenging the agency action] has not shown that the consequences of the line-

drawing are in any respect dire . . . [courts] will leave that line-drawing to the agency's

discretion.'"  *Id*. (quoting *Leather Indus. of Am. v. EPA*, 40 F.3d 392, 409 (D.C. Cir. 1994)).

However, the agency cannot engage in post-hoc rationalizations; "[t]he grounds upon which an

administrative order must be judged are those upon which the record discloses that its action was

based." *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 87 (1943).  Further, when an

agency changes position, it must provide "good reasons" for the shift.  *See F.C.C. v. Fox*

*Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Despite this forgiving standard, there is no room for a court to "rubber-stamp" an

administrative decision.  Instead, the court must make "a substantive inquiry[,] . . . a thorough,

probing, in-depth review" of the agency action.  *Native Ecosystems Council v. U.S. Forest Serv.*,

418 F.3d 953, 960 (9th Cir. 2005) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401

U.S. 402, 415-16 (1971)).  If, after such review, the court concludes that an agency action was

arbitrary and capricious, "the proper course [is] to remand to the [a]gency." *Nat'l Ass'n of Home*

*Builders v. Defs. of Wildlife*, 551 U.S. 644, 657 (2007); *see also Fed. Power Comm'n v. Idaho*

**MEMORANDUM DECISION AND ORDER - 15**

*Power Co.*, 344 U.S. 17, 20, (1952) (when reviewing administrative decision, "the function of the reviewing court ends when an error of law is laid bare.").

**B.    National Environmental Policy Act ("NEPA")**

NEPA encourages "'productive and enjoyable harmony between man and his environment,' and was intended from its outset to reduce or eliminate environmental damage and to promote 'the understanding of the ecological systems and natural resources important to' the United States." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756 (2004) (quoting 42 U.S.C. § 4321). Particular results are not mandated, but NEPA does "prescribe[ ] the necessary process" to avoid "uninformed – rather than unwise – agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-351 (1989). Council on Environmental Quality ("CEQ") regulations guide federal agencies' compliance with NEPA. *See* 40 C.F.R. §§ 1500.1-1508.28.

At its core, NEPA requires that agencies prepare a detailed statement – an EIS – in connection with "proposals for . . . major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Among other things, an EIS must include an explanation of "the environmental impact of the proposed action," "any adverse environmental effects which cannot be avoided should the proposal be implemented," and "alternatives to the proposed action." *Id*. at §§ 4332(C)(i)-(iii). The process of preparing the EIS "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts" and that "the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision." *Robertson*, 490 U.S. at 349. "[T]he broad dissemination of information mandated by NEPA permits the public and other government

agencies to react to the effects of a proposed action at a meaningful time." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989).

To assist in deciding whether an EIS is required (*i.e.*, will the proposed project have a significant effect on the human environment?), the responsible agency may first prepare an Environmental Assessment ("EA").  40 C.F.R. §§ 1501.3-1501.4.  A "concise public document," the EA is used to "briefly" discuss "the environmental impacts" and "alternatives" to the proposed action.  40 C.F.R. § 1508.9.  If the decision is that an EIS is not necessary, an explanatory Finding of No Significant Impact ("FONSI") is required to "briefly present…why an action . . . will not have a significant effect on the human environment."  40 C.F.R. § 1508.13. Regarding the "threshold question of NEPA applicability," the less deferential standard of 'reasonableness' applies to threshold agency decisions that certain activities are not subject to NEPA's procedures."  *Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 667 (9th Cir. 1998).

"Courts apply a 'rule of reason' standard in reviewing the adequacy of a NEPA document" – asking whether it "contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences."  *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 992 (9th Cir. 2004) (quoting *Churchill Cty v. Norton*, 276 F.3d 1060, 1071 (9th Cir. 2001)).  "This inquiry involves 'a pragmatic judgment whether the [document's] form, content, and preparation foster both informed decision-making and informed public participation.'"  *Protect Our Cmtys. Found. v. LaCounte*, 939 F.3d 1029, 1035 (9th Cir. 2019) (quoting *Churchill Cty.*, 276 F.3d at 1071); *see also California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982).  To accomplish this, "NEPA imposes procedural requirements designed to force agencies to take a 'hard look' at environmental consequences."  *Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir. 2005) (citation omitted).

**MEMORANDUM DECISION AND ORDER - 17**

Hence, there is a critical, salutary role of the NEPA process in agency decision-making, a purpose described in myriad agency decisions and court decisions over many decades.  When properly implemented, NEPA procedures ensure that the agency "will inform the public that it has indeed considered environmental concerns in its decision-making process."  *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983); *see also* 40 C.F.R. § 1500.1(b) ("Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA.").  However, while "a court must '[e]nsure that the agency has taken a hard look at environmental consequences,' a court cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'"  *Friends of the Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 913 (9th Cir. 2018) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)); *see also Bair v. Cal. State Dep't of Transp.*, 867 F. Supp. 2d 1058, 1065 (N.D. Cal. 2012) ("Once the agency does the required hard look, it is free to choose to proceed with action that will have an adverse impact on the environment, at least insofar as NEPA is concerned, the idea being that if we are going to destroy the environment, we should do so with ou[r] eyes wide open and not by accident.").

An agency may also promulgate categorical exclusions from NEPA review for actions "which do not individually or cumulatively have a significant effect on the human environment."  40 C.F.R. § 1508.4.  If a proposed action falls within a categorical exclusion, the agency is not required to prepare an EA or EIS.  *See id.*  "An agency satisfies NEPA if it applies its categorical exclusions and determines that neither an EA nor an EIS is required, *so long as the application of the exclusions to the facts of the particular action is not arbitrary and capricious*."  *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1446 n.5 (9th Cir. 1996) (*as amended* June 17, 1996) (emphasis added).

**MEMORANDUM DECISION AND ORDER - 18**

### III. <u>DISCUSSION</u>

Plaintiffs argue that the Phase Two lease sales should be set aside and vacated because each of them, having been identically analyzed and approved by BLM, violated NEPA in the same identical ways – namely, that BLM (1) failed to consider the reasonable alternative of deferring priority greater sage-grouse habitat; (2) failed to take a "hard look" at the direct and indirect impacts on greater sage-grouse by (a) failing to assess baseline conditions in each lease area, and (b) failing to assess the site-specific impacts of each lease sale on greater sage-grouse; and (3) failed to take a "hard look" at the cumulative impacts on greater sage-grouse. Each issue is considered below. Preliminarily, however, the Court addresses WEA's jurisdictional claim that WWP lacks standing to challenge the Wyoming lease sales, and that both Plaintiffs lack standing to challenge (or waived their challenge to) the June 2017 Wyoming lease sale.

### A. Plaintiffs Have Standing to Challenge the Wyoming Lease Sales; Alternatively, Neither Plaintiff Has Waived Their Challenge to Any of the Phase Two Lease Sales

WEA argues that WWP "does not have legal standing as it waived its challenge to the Wyoming lease sales and must be dismissed as a party to these claims," and that "all claims must be dismissed against the June 2017 [Wyoming] sale." WEA's Mem. ISO MSJ and Opp. to Pls.' MSJ, p. 5 (Dkt. 294-1). In support of this position, WEA states:

> Plaintiff WWP did not submit comments on any of the BLM Wyoming Draft Lease Sale EAs. Although Plaintiff [Center for Biological Diversity] CBD did submit comments on both February and September Wyoming Lease Sale EAs, they did not submit any comments related to the June 2017 Wyoming sale. Thus, Plaintiffs have waived all their NEPA claims as to that sale. Further, neither Plaintiff advocated for their now-preferred alternative during the NEPA process. Thus, this Court must dismiss WWP as a party as to the Wyoming lease sales because WWP "forfeited" these claims when it failed to raise them before BLM at a time when BLM could have responded to them. Similarly, it must dismiss all claims related to the June 2017 Wyoming sale.

*Id.* at p. 6 (citing *DOT v. Pub. Citizen*, 541 U.S. 752, 764-65 (2004); *Barnes v. DOT*, 655 F.3d 1124, 1135-36 (9th Cir. 2011)).[5]  Whether couched in terms of a lack of standing, failure to exhaust, and/or waiver, WEA's argument is without merit.

First, exhaustion is not an element of standing.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (explaining standing elements); *Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1294, 1298-99 (9th Cir. 2014) (separately addressing standing and exhaustion).  Regardless, while WEA and Federal Defendants may be correct that an issue not first raised with an agency is generally waived in a subsequent judicial proceeding, *Pub. Citizen*, 541 U.S. at 764, that is not the case when another party raises the issue (or the agency itself considered it).  *See Glacier Fish Co. v. Pritzker*, 832 F.3d 113, 1120 n.6 (9th Cir. 2016) ("We generally do not invoke the waiver rule so long as an issue was raised with sufficient clarity to allow the decision-maker to understand and rule on the issue raised, whether the issue was considered sua sponte by the agency or was raised by someone other than the petitioning party.") (internal quotation, citations omitted).  Plaintiffs' arguments were raised below – by either Plaintiffs themselves, other parties, or BLM itself.  *See* Pls.' Resp./Reply Brief ISO MSJ, p. 2 (Dkt. 315) (citing WY 82218-27, 79361-70, 79329-40, 102821-55, 110243-75, 110280-312, BLM-MT-2Q17-2686-759, 3366-74).  Therefore, Plaintiffs, including WWP, are not precluded from challenging the Wyoming lease sales in the first instance.

Second, although courts generally will not consider issues not first raised during the administrative process, commenters "need not state their claims in precise legal terms" and need only raise an issue "with sufficient clarity to allow the decision-maker to understand and rule on

---

[5]  Federal Defendants also argue that Plaintiffs waived their "alternatives claim" for the June 2017 Wyoming lease sale, *as well as* the June 2017 Montana lease sale.  *See* Fed. Defs.' Mem. ISO MSJ and Opp. to Pls.' MSJ, pp. 16-17.  These arguments largely coincide with WEA's and are therefore addressed together.

**MEMORANDUM DECISION AND ORDER - 20**

the issue raised." *Nat'l Park & Conservation Ass'n v. BLM*, 606 F.2d 1058, 1065 (9th Cir. 2010); *see also Protect Our Cmtys. Found. v. LaCounte*, 939 F.3d 1029, 1037-38 (9th Cir. 2019) ("*Public Citizen* indicates that to preserve an argument that an alternative analysis is deficient, comments must merely identify 'any rulemaking alternative beyond those evaluated' or urge the agency 'to consider alternatives.'") (quoting *Pub. Citizen*, 541 U.S. at 764). These standards are met here with respect to the June 2017 Wyoming and Montana lease sales.

As to the June 2017 Wyoming lease sale, CBD/Plaintiffs filed a protest three months before[6] the sale date that specifically addressed leasing decisions in greater sage-grouse habitat and proposed an alternative that considered deferring priority habitat. *See* WY 102853 ("**The BLM fails to consider reasonable alternatives prioritizing leasing outside of Sage-Grouse Core Areas, Priority Habitat and/or Sagebrush Focal Areas**. . . . The EA does not even consider an alternative, regularly considered and adopted by other field offices, [that] would defer <u>all</u> remaining parcels located within sage grouse Sagebrush Focal Areas and Priority Habitat Management Areas, consistent with the prioritization objective of its amended RMPs. NEPA's alternatives requirement requires that BLM give consideration to such a reasonable habitat prioritization alternative.") (emphases in original). BLM read and considered the protest. *See* WY 102485. What's more, BLM even independently contemplated – but apparently decided

---

[6] Federal Defendants imply that Plaintiffs waived the issue by not raising it during the draft EIS comment period. *See* Fed. Defs.' Mem. ISO MSJ and Opp. to Pls.' MSJ, p. 17 ("CBD subsequently submitted a protest letter, but it did not submit comments during the comment period when they could have informed BLM's NEPA analysis."). But waiver does not apply when an agency had a fair opportunity to consider the issue. *See Protect Our Cmtys*., 939 F.3d at 1037 ("We will not invoke the waiver rule . . . if an agency has had an opportunity to consider the issue); *Glacier Fish*, 832 F.3d at 1120 n.6 (same); *see also Wildearth Guardians v. U.S. BLM*, 457 F. Supp. 3d 880, 890 (D. Mont. 2020) ("BLM bears the responsibility to remedy a valid NEPA claim if a protest raises a valid claim. There would be no point otherwise in a member of the public raising a NEPA violation at the protest stage. *BLM offers no reason why it could allow a NEPA violation to go unresolved solely because the party failed to bring up the exact NEPA violation at an earlier point*.") (emphasis added).

**MEMORANDUM DECISION AND ORDER - 21**

against – an express sage-grouse deferral alternative. *See* WY 102602 (EA's Table of Contents referencing "Alternative C – Defer Parcels for Sage Grouse," but containing no such discussion within body of EA).

In the same way, CBD/Plaintiffs lodged objections as to the June 2017 Montana lease sale, stating in relevant part:

> In addition, the RMP's protections for priority habitats are inadequate. After years of deferring oil and gas leases in PHMAs, the BLM throws open Priority Habitats to future mineral leasing, with discretionary language about the priority for leasing being outside Priority Habitats which is completely nonbinding, under stipulations inadequate to protect sage-grouse from further significant population declines in the Priority Habitats. An NSO leasing of fluid minerals in Priority Habitats is insufficient to prevent major impacts even if no exceptions are permitted because it incentivizes leaseholders to line up drilling rigs and industrial infrastructure along the boundary of Priority Habitats. Science shows that the impact of a single producing well can extend for 1.9 miles and the disturbance of drilling extends 3 miles or more into surrounding habitats. This would result in a significant loss of habitat function inside Priority Habitats on lands located within several miles of the PHMA boundary. *BLM must withdraw all parcels within PHMAs from the lease sale*.

BLM-MT-2Q17-2727-28 (emphasis added). It is true that these objections are not preceded by the phrase "BLM must consider an alternative that . . . .," but such precise legal phrasing is not required to avoid waiver and put BLM on notice. *See Protect Our Cmtys.*, 939 F.3d at 1037 ("None of these comments precisely alerted BIA that NEPA might require it to consider an alternative that included only some of the ridgeline turbines. *But we do not require precise legal formulations*.") (internal quotation omitted, emphasis added).[7]

---

[7] Plaintiffs do not dispute that WWP's letter concerning the June 2017 Montana lease sale "did not propose any other alternative and, in fact, requested that BLM 'choose the no action alternative.'" Fed. Defs.' Mem. ISO MSJ and Opp. to Pls.' MSJ, p. 17 (quoting BLM-MT-2Q17-3371). However, given CBD's more nuanced comments, any distinction in this respect is without any real legal difference. *See supra*.

**MEMORANDUM DECISION AND ORDER - 22**

Combined, this is enough to put BLM on notice of the issues (while belying any

suggestion that Plaintiffs did not submit any comments proposing an alternative for BLM to

analyze for the June 2017 Wyoming and Montana lease sales).  *See Idaho Sporting Cong., Inc. v.*

*Rittenhouse*, 305 F.3d 957, 965 (9th Cir. 2002) (claimants bringing administrative appeals may

alert decision-maker to problem "in general terms, rather than using precise legal formulations"

and "there is no bright-line standard as to when this requirement has been met and we must

consider exhaustion arguments on a case-by-case basis") (citing *Native Ecosystems Council v.*

*Dombeck*, 304 F.3d 886, 900 (9th Cir. 2002)).

**B.**     **BLM Failed to Consider the Reasonable Alternative of Deferring Priority Sage-Grouse Habitat**

NEPA requires agencies to include in an EIS, among other things, a detailed discussion

of alternatives considered when deciding on a proposed action.  *See* 42 U.S.C. §§ 4332(C)(iii),

(E); *HonoluluTraffic.com v. Fed. Transit Admin.*, 742 F.3d 1222, 1231 (9th Cir. 2014).  Analysis

of a proposed action and its alternatives "is the heart of the [EIS]" and is necessary to ensure that

the agency has before it and takes into account all possible approaches to, and potential

environmental impacts of, a particular project.  40 C.F.R. § 1502.14; *see also Wild Wilderness v.*

*Allen*, 871 F.3d 719, 728 (9th Cir. 2017) (obligation to consider alternatives "lessened but still

extant when preparing an EA instead of an EIS"); 40 C.F.R. § 1508.9(b) (applying analysis of

proposed alternatives to EA).  The reasonable range of alternatives is derived from the Purpose

and Need section of the EIS.  *See City of Carmel-by-the-Sea v. United States Dept. of Transp.*,

123 F.3d 1142, 1155 (9th Cir. 1997); 40 C.F.R. § 1502.13.  "Agencies enjoy considerable

discretion in defining the purpose and need of a project, but they may not define the project's

objectives in terms so unreasonably narrow, that only one alternative would accomplish the goals

of the project." *HonoluluTraffic.com*, 742 F.3d at 1230 (internal quotation omitted).  Those

**MEMORANDUM DECISION AND ORDER - 23**

challenging the failure to consider an alternative have a duty to show that the alternative is viable. *See City of Angoon v. Hodel*, 803 F.2d 1016, 1021-22 (9th Cir. 1986).

"Judicial review of the range of alternatives considered by an agency is governed by a rule of reason that requires an agency to set forth only those alternatives necessary to permit a reasoned choice." *HonoluluTraffic.com*, 742 F.2d at 1231 (internal quotation omitted). "The 'rule of reason' guides both the choice of alternatives as well as the extent to which the [EIS] must discuss each alternative." *Carmel-by-the-Sea*, 123 F.3d at 1155 (citations omitted). "An agency is under no obligation to consider every possible alternative to a proposed action, nor must it consider alternatives that are unlikely to be implemented or those inconsistent with its basic policy objectives." *HonoluluTraffic.com*, 742 F.2d at 1231 (internal quotation omitted); *see also* 43 C.F.R. § 46.420(b) (defining reasonable alternatives as "alternatives that are technically and economically practical or feasible and meet the purpose and need of the proposed action."). Nor does an agency need to discuss alternatives similar to alternatives actually considered, or alternatives which are "infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area." *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006) (internal citation and quotation omitted). NEPA regulations do not outline a numerical requirement to satisfy the alternatives requirement. *See Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005).[8]

---

[8] Federal Defendants state that "an agency can meet NEPA requirements when considering just two alternatives (a 'no action' alternative and a 'proposed alternative') in its EA." Fed. Defs.' Mem. ISO MSJ and Opp. to Pls.' MSJ, p. 18. But this is possible "[s]o long as 'all reasonable alternatives' have been considered *and* an appropriate explanation is provided as to why the agency did not consider any of the proposed alternatives." *Native Ecosystems*, 428 F.3d at 1246 (emphasis added); *see also Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1016 (9th Cir. 2006) (holding that agency adequately considered alternatives because explanations for eliminating alternatives "were not arbitrary or capricious").

**MEMORANDUM DECISION AND ORDER - 24**

What NEPA requires is that the agencies "[r]igorously explore and objectively evaluate all reasonable alternatives" that relate to the purposes of the project and briefly discuss the reasons for eliminating any alternatives from detailed study in the EIS. *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1087 (9th Cir. 2014); *see also Carmel-by-the-Sea*, 123 F.3d at 1155 n.10 (quoting 40 C.F.R. § 1502.14(a)); *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 870-72 (9th Cir. 2004) (agency can explain why it eliminated suggested alternatives from detailed consideration in response to public comments). "The existence of a viable but unexamined alternative renders an [EIS] inadequate." *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038 (9th Cir. 2008) (internal quotation omitted). "[T]he crucial inquiry for the Court is whether [the] selection and discussion of alternatives fosters informed decision-making and informed public participation." *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982).

Here, for each of the Phase Two lease sales, BLM considered only two alternatives: (1) leasing all proposed parcels (the proposed alternative), and (2) leasing none (the "no action" alternative). *See supra*. But, for each of these lease sales, Plaintiffs requested that BLM additionally study a middle-ground alternative that would defer parcels in sage-grouse PHMA. *See id*. Plaintiffs contend that BLM rejected this "citizen-proposed" alternative for each lease sale without adequate explanation in violation of NEPA. Pls.' Mem. ISO MSJ, pp. 17-19. Federal Defendants and Defendant-Intervenors disagree, arguing that BLM's alternatives are reasonable and comply with NEPA and that BLM had already fully analyzed Plaintiffs' "citizen alternative" in any event within the 2015 RMPs. *See generally* Fed. Defs.' Mem. ISO MSJ and Opp. to Pls.' MSJ, pp. 17-21; WEA's Mem. ISO MSJ and Opp. to Pls.' MSJ, pp. 6-10; Wyo.'s Mem. ISO MSJ and Opp. to Pls.' MSJ, pp. 14-18.

**MEMORANDUM DECISION AND ORDER - 25**

Within the applicable EA for the corresponding Phase Two lease sale, Federal

Defendants offered[9] various justifications for rejecting Plaintiffs' proposed (but ultimately

rejected) alternative – these are identified in the chart below:

| Lease Sale | EA | Justification |
|---|---|---|
| February 2017 Wyoming | High Plains EA | • "[T]he impacts from an alternative that would consider not leasing in core are imbedded within the No Action alternative."  WY 91974 |
| | Wind River/BB EA | • "[T]he impacts from an alternative that would consider not leasing in core are imbedded within the No Action alternative."  WY 92124<br>• "No other alternatives . . . would meet the purpose and need of the proposed action."  WY 92050 |
| June 2017 Montana | Miles City EA | • No explanation.  BLM-MT-2Q17-2410 |
| June 2017 Wyoming | High Desert EA | • "No other alternatives . . . would meet the purpose and need of the proposed action alternative analysis."  WY 102613 |
| September 2017 Wyoming | High Plains EA | • "The . . . RMPs, through the revision/amendment process, considered a range of alternatives."  WY 113556<br>• "[T]he no action alternative, effectively addresses deferring all the parcels from lease sale."  WY 113556. |
| | Wind River/BB EA | • "No other alternatives . . . would meet the purpose and need of the proposed action."  WY 113585 |

*See* Appx. to Pls.' Resp./Reply Brief ISO MSJ, p. 31.  For the reasons that follow, each

justification (as well as any additional ones offered later) is without merit.

First, Plaintiffs' proposed alternative does not align with the no action alternative (for the

February and September 2017 Wyoming lease sales).  Plaintiffs' partial-deferral alternative

_____

[9]  Plaintiffs argue that the "Court may affirm each of the six EAs . . . only on the grounds that particular EA invoked for rejecting Plaintiffs' alternative – not the *post hoc* rationalizations of counsel."  Pls.' Resp./Reply Brief ISO MSJ, p. 4.  This Decision attempts to address both.

**MEMORANDUM DECISION AND ORDER - 26**

involves the deferral of some (but not all) parcels.  The no action alternative, however,

contemplates that no parcels be offered for lease.  The distinction is obvious and highlights the

existence of an alternative in between an all-or-nothing approach.  This means that Plaintiffs'

proposed alternative – even if promoting the deferral of parcels within greater sage-grouse

habitat (including both PHMA and GHMA)[10] – speaks to and advocates for the deferral of at

least a subset of those same parcels (for example, deferring those parcels in PHMA).  Hence, the

existence of such an alternative stands uniquely and substantively apart from both the proposed

action and no action alternatives.  *See, e.g.*, WY 79368-69 ("The High Plains District February

2017 leasing EA fails to meet this core NEPA obligation by arbitrarily excluding from

consideration *any alternative* that could meaningfully preserve BLM Wyoming offices' authority

to adopt effective and scientifically credible conservation measures for greater sage-grouse.")

(emphasis added); *see also* WY 110303 (same).  In short, Plaintiffs' proposed alternative was not

and could not have been realistically "imbedded" within the no action alternative.

Second, it is unclear how Plaintiffs' proposed alternative was inconsistent with the

purpose and need of any of the proposed actions (as stated in the EAs for the February, June, and

---

[10]  Federal Defendants focus on this aspect of Plaintiffs' proposed alternative, arguing that, because nearly all of the parcels offered in the two lease sales were in PHMA or GHMA, it amounted to an "alternative that would have offered virtually no parcels in the sale."  *See* Fed. Defs.' Mem. ISO MSJ and Opp. to Pls.' MSJ, p. 19 ("[B]y analyzing the no action alternative, [BLM] had effectively analyzed the alternative proposed by Plaintiffs of deferring all Sage Grouse parcels from the sale.").  Plaintiffs dispute this hyper-technical, encompassing reading of their proposed alternative.  *See* Pls.' Resp./Reply Brief ISO MSJ, p. 5 (citing WY 79331) (noting that, for February 2017 Wyoming lease sale, comment stated, in part:  "'No leasing in Core Areas' is one reasonable alternative").  Still, Federal Defendants' approach ignores not only the space between the proposed action and no action alternatives that Plaintiffs' proposed alternative occupies (*see infra*), but also how, even if true, deferring "virtually all" parcels from the lease sales (because "nearly all" of the parcels were in PHMA or GHMA) still does not square up with the no action alternative itself.  *See, e.g.*, *Colorado Envtl. Coal. v. Salazar*, 875 F. Supp. 2d 1233, 1248-50 (D. Colo. 2012) (agencies may not reject otherwise reasonable alternative out of hand simply because it shares some characteristics of no action alternative).

**MEMORANDUM DECISION AND ORDER - 27**

September 2017 Wyoming lease sales).  To be sure, BLM was already obligated to prioritize new leasing outside greater sage-grouse habitat via the 2015 Plan Amendments;[11] had previously deferred parcels in greater sage-grouse habitat before commencing the NEPA process; and, had even listed a specific alternative that contemplated the same deferral of parcels for greater sage-grouse within the June 2017 Wyoming EA's Table of Contents (though not actually discussing that alternative *at all* in the EA's body).  *See supra*.  These concepts were not mutually exclusive such that, without more, Plaintiffs' proposed alternative was not contrary to the purpose and need of the proposed actions.  *See, e.g.*, WY 102608 (June 2017 Wyoming EA defining "purpose and need" as "provid[ing] for exploration and development of additional oil and gas resources to help meet the nation's need for energy sources, *while protecting other resource values in accordance with guidance laws, regulations, and Land Use Planning decisions*.") (emphasis added); *compare with* WY 92046, 113581 (stated purposed for February and September 2017 Wyoming EAs was "to make mineral resources available[.]").[12]

Third, the September 2017 Wyoming (High Plains) EA's suggestion that the RMPs adequately considered a range of alternatives misses the point.  If the RMP *planning* alternatives

---

[11]  In this sense, WEA's argument that Plaintiffs' proposed alternative  "was contrary to BLM's governing statutory mandates . . . and the plain language of the governing land use plans that designated these lands as open for oil and gas leasing" is misplaced.  WEA's Mem. ISO MSJ and Opp. to Pls.' MSJ, p. 9.  There is no obligation to lease nominated parcels or prioritize mineral development over other land uses.

[12]  To the extent BLM's objective was to *maximize* the availability of mineral resources, it would violate NEPA.  *See supra* ("Agencies enjoy considerable discretion in defining the purpose and need of a project, but they may not define the project's objectives in terms so unreasonably narrow, that only one alternative would accomplish the goals of the project.") (quoting *HonoluluTraffic.com*, 742 F.3d at 1230); *see also Nat'l Parks & Conservation Ass'n*, 606 F.3d at 1070 ("An agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action.").

**MEMORANDUM DECISION AND ORDER - 28**

simultaneously represented *leasing* alternatives moving forward, there would be no requirement to conduct the analysis which is the "heart" of NEPA, to-wit, to analyze *alternatives* for any project undertaken pursuant to a land use plan, including the oil and gas lease sales at play here. The Court will not stake such broad ground here; indeed, doing so would potentially obviate the need to consider and examine viable, site-specific alternatives presented by others following the public comment period, further contributing to the Court's reluctance in endorsing this isolated rationale for rejecting Plaintiffs' proposed alternative.[13]

In sum, for the most part, the Court takes no issue with the amount of detail that BLM provided here in rejecting Plaintiffs' proposed alternative; instead, it takes issue with the substance of those responses and finds it lacking. *See, e.g.*, *Wildearth Guardians*, 457 F. Supp. 3d at 892.[14] BLM's responses tell Plaintiffs nothing about *why* or *how* their proposed alternative either is subsumed by the no action alternative/RMPs, or does not meet the purpose and need of the proposed actions. *See id.* ("BLM cannot satisfy NEPA without some explanation beyond the conclusory one that it provided to Wildearth."). This is not enough. BLM violated NEPA by failing to provide an adequate explanation of why it failed to consider the reasonable alternative of deferring priority greater sage-grouse habitat.[15]

---

[13] The Court also notes Plaintiffs' dispute with Defendant-Intervenors' claim that the 2015 RMP EISs already considered and rejected the option of closing all PHMA to leasing. *See* Pls.' Resp./Reply Brief ISO MSJ, p. 9 ("The 2015 Buffalo RMP EIS did not consider an alternative that would close PHMA to leasing, and most (53 of 81) of the Phase Two PHMA parcels are in that field office."). The argument also incorrectly assumes that Plaintiffs' proposed alternative does not contemplate something less than the complete closure of PHMA to leasing. *See supra.*

[14] Of course, the June 2017 Montana lease sale provided no explanation at all for rejecting Plaintiffs' proposed alternative. *See supra.*

[15] Federal Defendants point out that BLM deferred a significant number of parcels from its sales already, amounting to a *de facto* consideration of a middle-ground alternative. *See* Fed. Defs.' Mem. ISO MSJ and Opp. to Pls.' MSJ, p. 20. But the post-deferral proposed actions are

**MEMORANDUM DECISION AND ORDER - 29**

**C.      BLM Failed to Take a Hard Look at the Direct and Indirect Impacts to Greater Sage-Grouse**

NEPA requires site-specific analysis as soon as is reasonably possible, and before any "irreversible and irretrievable commitment of resources." *California v. Block*, 690 F.2d 753, 765 (9th Cir. 1982).  Oil and gas leases can constitute such a commitment.  *See Connor v. Burford*, 848 F.2d 1441, 1451 (9th Cir. 1988) ("unless surface-disturbing activities may be absolutely precluded, the government must complete an EIS before it makes an irretrievable commitment of resources by selling non-NSO leases."); *see also N. Alaska Envtl. Ctr. v. U.S. Dept. of Interior*, 983 F.3d 1077, 1086 (9th Cir. 2020) ("*NAEC*") ("A lease that does not retain an absolute right to prohibit surface-disturbing activities, even if it retains the right to impose mitigating conditions, constitutes an irreversible and irretrievable commitment of resources and therefore does require a site-specific EIS.").  There is no dispute that the Phase Two lease sales required such a site-specific analysis (at least to some degree); the parties disagree, however, on whether that requirement was satisfied here – in particular, whether BLM properly assessed baseline conditions in each lease area and, relatedly, whether BLM properly assessed the impacts of each lease sale on greater sage-grouse.  Plaintiffs claim BLM did not, while Federal Defendants and Defendant-Intervenors claim BLM did.  *Compare generally* Pls.' Mem. ISO MSJ, pp. 19-32, *with* Fed. Defs.' Mem. ISO MSJ and Opp. to Pls.' MSJ, pp. 21-41; WEA's Mem. ISO MSJ and Opp. to Pls.' MSJ, pp. 10-20; Wyo.'s Mem. ISO MSJ and Opp. to Pls.' MSJ, pp. 18-23.

1.      BLM Failed to Assess Baseline Conditions in Each Lease Sale Area

"NEPA requires that the agency provide the data on which it bases its environmental analysis." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1083 (9th

---

still proposed actions that must go through the NEPA analysis; they do not somehow exist to displace this requirement. *See* Pls.' Resp./Reply Brief ISO MSJ, p. 10 ("A proposed action cannot serve as an alternative to itself.").

**MEMORANDUM DECISION AND ORDER - 30**

Cir.2011).  "Such analyses must occur before the proposed action is approved" because "'once a project begins, the pre-project environment becomes a thing of the past and evaluation of the project's effects becomes simply impossible.'"  *Id.* (quoting *LaFlamme v. F.E.R.C.*, 852 F.2d 389, 400 (9th Cir. 1988)).  Thus, "[e]stablishing appropriate baseline conditions is critical to any NEPA analysis."  *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1101 (9th Cir. 2016).  "Without establishing the baseline conditions which exist . . . before [a project] begins, there is simply no way to determine what effect the [project] will have on the environment and, consequently, no way to comply with NEPA."  *Id.*  "An agency need not conduct measurements of actual baseline conditions in every situation . . . [b]ut whatever method the agency uses, its assessment of baseline conditions 'must be based on accurate information and defensible reasoning.'"  *Id.* (quoting *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 570 (9th Cir. 2016)).

Plaintiffs argue that BLM failed to assess the baseline conditions of greater sage-grouse populations and habitat in each lease area, claiming that, while the Phase Two lease sale EAs disclose the number or acreage of greater sage-grouse parcels, none of them provide an evaluation of actual "baseline conditions," including "information on local population trends; habitat function and conditions; the extent of existing leasing and anthropogenic development; or the lease area's role in population connectivity."  Pls.' Mem. ISO MSJ, p. 20.  Federal Defendants disagree, countering that BLM appropriately analyzed the baseline conditions in each of the leasing areas via the EAs themselves, alongside the incorporated RMP EISs.  *See* Fed. Defs.' Mem. ISO MSJ and Opp. to Pls.' MSJ, p. 25; *see also* WEA's Mem. ISO MSJ and Opp. to Pls.' MSJ, p. 10.  Plaintiffs' challenge on this point therefore turns on how well these EAs and RMP EISs confront and assess the requisite baseline conditions.  The Court concludes that each of them falls short.

**MEMORANDUM DECISION AND ORDER - 31**

To begin, Federal Defendants' briefing confirms that, for the most part, the EAs' utility in analyzing baseline conditions extends only to understanding the amount of particular greater sage-grouse parcels associated with the Phase Two lease sales.  *See* Fed. Defs.' Mem. ISO MSJ and Opp. to Pls.' MSJ, pp. 26-28.[16]  Though unquestionably important and useful, such fact-based information is only a simple snapshot inventory of involved greater sage-grouse parcels; it is not, however, any sort of *analysis* of the baseline conditions.  In other words, the EAs themselves do not sufficiently speak to baseline conditions.

But the EAs do not exist in isolation – they incorporate/tier to the RMP EISs and, according to Federal Defendants, collectively operate to address the baseline conditions leading up to the Phase Two lease sales, in compliance with NEPA.  *See, e.g.*, *id.* ("The EA also refers to Chapter 2 of the Miles City RMP" (for June 2017 Montana lease sale); "Further information about the condition of Sage Grouse, its habitat, and population trends is contained in the Buffalo EIS and the Wyoming Nine EIS. . . .   The EA also refers to the baseline conditions analyzed in the Bighorn Basin EIS" (for February 2017 Wyoming lease sale); "Additional analysis of the baseline is contained in the Wyoming Nine EIS to which the EA tiers" (for June 2017 Wyoming lease sale); "Further information about the condition of Sage Grouse, its habitat, and population trends is contained in the Buffalo EIS and the Wyoming Nine EIS. . . .   Additional analysis of the baseline conditions with respect to Sage Grouse is contained in the Bighorn Basin EIS" (for September 2017 Wyoming lease sale)).  A careful examination of these RMP EISs, however, reveals that they are equally limited in understanding and evaluating baseline conditions.

---

[16]  Plaintiffs acknowledge that the September 2017 Wind River/Bighorn Basin EA and June 2017 Wyoming EA also disclosed that PHMA parcels are proximate to existing leases held by production (but then question why "no similar information is provided for GHMA parcels") and that the June 2017 Wyoming EA also disclosed the basic habitat function for each parcel. Pls.' Mem. ISO MSJ, p. 20; *see also* Pls.' Resp./Reply Brief ISO MSJ, p. 12 n.4 (noting that June 2017 Montana and Wyoming EAs "disclose somewhat more information" but still lacking).

It is to be expected that the RMP EISs contain *a lot* of information relating to greater sage-grouse, with Federal Defendants' references to the same in this context being equally voluminous.  Yet, on the whole, the RMP EISs merely provide an overview of the general condition of greater sage-grouse across each planning area, setting the stage for future land use decisions in broad strokes (and as of that point in time).[17]  For example, the delineation of administrative habitat classifications (GHMA and PHMA) within these materials – while absolutely relevant toward understanding an overview of the Phase Two lease sales' geographic footprint – is too generalized to be helpful in assessing baseline conditions of a specific lease area.  *See, e.g.*, Pls.' Resp./Reply Brief ISO MSJ, p. 12 ("For example, the maps could not reasonably be used to obtain information about individual parcels because of their scale and format.").

Moreover, albeit plentiful and expansive, the content of such historical accounts spread across the RMP EISs cannot be distilled down to represent up-to-date baseline conditions of greater sage-grouse populations and habitat in each lease sale area.  *See id*. at pp. 12-13 ("[D]escriptions of how sage-grouse numbers have historically trended across an entire planning area do not assist BLM or the public in determining whether individual leks or populations in the lease areas are stable or tanking. . . . .  [N]one of the pages Federal Defendants cite contain the baseline information required under NEPA, such as identifying leks and seasonal habitat use *within the lease parcels*.") (emphasis added); *See also, e.g.*, *W. Watershed Project v. Ruhs*, 701 F. Appx. 651, 653 (9th Cir. 2017) ("Because these prior analyses [(the Ely Proposed RMP/EIS)]

---

[17]   Federal Defendants state that, "[b]ecause the EISs for the Plan Amendments were completed in 2015, the information obtained during the plan amendment process was 1 or at most 2 years old, and therefore BLM did not rely on stale data in preparing the EAs."  Fed. Defs.' Mem. ISO MSJ and Opp. to Pls.' MSJ, p. 29.  Plaintiffs disagree, responding that, "[o]f the little baseline data contained in the cited pages, most is also outdated by 5-10 years . . . ."  Pls.' Resp./Reply Brief ISO MSJ, p. 12.

**MEMORANDUM DECISION AND ORDER - 33**

cover larger regions, they note that site-specific analyses will be necessary in future projects covering more narrowly defined areas.").  NEPA requires this so that the "boots-on-the-ground" characteristics of lease parcels can be understood and examined comparatively, one against another, vis à vis potential lease sales.

At bottom, the RMP EISs cannot be scoured for information that could amount to the baseline conditions at the time of the Phase Two lease sales.  NEPA requires more, so that the leasing decisions' effects on greater sage-grouse can be meaningfully gauged.  *See N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d at 1084) (reversing due to inadequate baseline information on greater sage-grouse lek locations and wintering habitat areas); *Wildearth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920 (9th Cir. 2015) (same, but for big game winter range within applicable project area).

2.    BLM Failed to Assess the Impacts of the Lease Sales on Greater Sage-Grouse

"NEPA requires that the evaluation of a project's environmental consequences take place at an early stage in the project's planning process."  *Jayne v. Sherman*, 706 F.3d 994, 1007-08 (9th Cir. 2013) (citing *Friends of Yosemite Valley v. Norton*, 348 F.3d 789 (9th Cir. 2003)); *see also Wildearth Guardians*, 457 F. Supp. 3d at 885 ("NEPA's 'hard look' obligation requires agencies to consider potential environmental impacts, including 'all foreseeable direct and indirect impacts,' and 'should involve a discussion of adverse impacts that does not improperly minimize negative side effects.'") (quoting *Kempthorne*, 457 F.3d at 975).  "That requirement, however, is tempered by (1) the statutory command that [a reviewing court] focuses upon a proposal's parameters as the agency defines them, and (2) the preference to defer detailed analysis until a concrete development proposal crystallizes the dimensions of a project's probable environmental consequences."  *Jayne*, 706 F.3d at 1007-08 (internal quotations, citation omitted).  "To accommodate these concerns, NEPA requires a full evaluation of site-specific

**MEMORANDUM DECISION AND ORDER - 34**

impacts only when a critical decision has been made to act on site development, i.e., when the agency proposes to make an irreversible and irretrievable commitment of the availability of resources to a project at a particular site."  *Id.*; *see also Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 784 (9th Cir. 2006) ("Once a critical decision is made, though, any vague prior programmatic statements are no longer enough.").  Such a site-specific evaluation must include "data-gathering and analysis of system-wide impacts."  *See Friends of Yosemite Valley*, 348 F.3d at 801 (finding data-gathering and analysis of system-wide impacts not required at programmatic EIS stage); *Block*, 690 F.2d at 761 (explaining that considerations regarding the adequacy of a programmatic EIS may differ from those for a site-specific EIS).

Plaintiffs argue that BLM "failed to conduct *any* analysis of the site-specific impacts of each lease sale on greater sage-grouse, or reasonably explain why this analysis was not possible, instead deferring all site-specific analysis to the APD [(application for permit to drill)] stage."[18] Pls.' Mem. ISO MSJ, p. 22.  Federal Defendants disagree, claiming that "BLM conducted an appropriate analysis of impacts to Sage Grouse *at the oil and gas leasing stage.  See* Fed. Defs.' Mem. ISO MSJ and Opp. to Pls.' MSJ, p. 31 (emphasis added); *see also id.* at p. 32 ("At the time of the leasing decision, BLM does not known which sites will be developed within the leased parcels, which may encompass thousands of acres, and it has no development plans before it.  It is therefore appropriate for BLM to leave the analysis of specific development plans to a later

_____

[18]  BLM employs a three-stage decision-making process for managing public lands for oil and gas leasing and development – first, BLM broadly assesses the presence of minerals and other resources on public lands through land-use planning, which includes determining areas open to and closed to potential oil and gas development, and determining, for open areas, what conservation stipulations should apply to future leases; second, BLM conducts a NEPA review and holds competitive oil and gas lease sales on a quarterly basis pursuant to the Mineral Leasing Act; and third, BLM determines whether, and under what conditions, it will approve specific development proposals (the lessee must submit an APD to the local BLM field office for approval to conduct drilling or other surface disturbance on the lease).  *See generally* Fed. Defs.' Mem. ISO MSJ and Opp. to Pls.' MSJ, pp. 5-7; Pls. Mem. ISO MSJ, pp. 9-10.

**MEMORANDUM DECISION AND ORDER - 35**

stage."). From this, the question to be resolved is not whether an analysis of the site-specific impacts of the Phase Two lease sales is needed (it is), but whether BLM analyzed those impacts in enough detail at the oil and gas leasing stage. The Court concludes that it did not sufficiently conduct such an analysis.

"The Ninth Circuit for decades has held that NEPA requires at least *some* 'site-specific analysis' at the leasing stage, when this stage represents an 'irretrievable commitment of resources.'" *Wildearth Guardians*, 457 F. Supp. 3d at 888 (quoting *Kempthorne*, 457 F.3d at 975-76 ("There is no question here that approval of the leasing program represents an irretrievable commitment of resources. The issue is whether it was sufficiently site-specific.")); *see also Conner*, 848 F.2d at 1451 (agreeing with District of Columbia Circuit in *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983), that "an EIS assessing the full environmental consequences of leasing must be prepared at the point of commitment – when the leases are issued."). Even so, a parcel-by-parcel analysis is not necessarily required. *See Wildearth Guardians*, 457 F. Supp. 3d at 888 (speaking to BLM's multi-stage oil and gas leasing projects: "BLM has no guarantee at the leasing stage of what, if any, projects may materialize for that parcel," while also acknowledging that the ability to assess impacts at leasing stage "will vary greatly depending on the location of a well within a specific parcel"). "As a result, BLM's analysis may be relatively general at the leasing stage," but still may comply with "NEPA's hard-look requirement with a forecast as specific as the information it has at the leasing stage allows." *Id*. at 888-89 (citing *Ctr. for Biological Diversity v. BLM*, 2018 WL 236727, at *10 (D. Nev. 2019)); *see also Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 498 (9th Cir. 2014) (deferring to agency's judgment about appropriate level of analysis "so long as the EIS provides as much environmental analysis as is reasonably possible under the circumstances, thereby 'provid[ing] sufficient detail to foster informed decision-making' at the stage in question.")

**MEMORANDUM DECISION AND ORDER - 36**

(quoting *Friends of Yosemite Valley*, 348 F.3d at 800).  Hence, mindful of the obligation to

examine site-specific impacts at the leasing stage, the Court examines the extent to which BLM

addressed the same – specifically, impacts pertaining to greater sage-grouse.  *See, e.g.*, Fed.

Defs.' Mem. ISO MSJ and Opp. to Pls.' MSJ, pp. 31-32 ("Thus, *Conner* establishes that the

leasing decision triggers the obligation to comply with NEPA, but it does not dictate the degree

of NEPA analysis that is required at the leasing stage.").

The involved EAs speak generally to the impacts of the Phase Two lease sales on greater

sage-grouse.  For example, the February 2017 Wind River EA states:

> The greater sage-grouse is a BLM sensitive species that is ubiquitous in the
> WR/BBD.  There are no direct impacts to sage-grouse or their habitat through
> the administrative action of leasing.  Indirect effects from leasing may occur
> to sage-grouse habitat if development were to occur at the time of a site-
> specific application, such as an APD, the area will be evaluated for sage-
> grouse and further conditions of approval to mitigate adverse impacts to sage-
> grouse habitat may be imposed at that time.

WY 92081; *see also* WY 113621 (same for September 2017 Wind River EA); WY 113376-77

(mostly same for September 2017 High Plains EA, but stating:  "There are many sources of

habitat fragmentation, all of which may affect the Greater Sage-grouse" and "it is possible that

wildlife populations and habitats could be impacted by these activities [(if a lease is

developed)]."); WY 91034-35 (same for February 2017 High Plains EA); WY 102676 (mostly

same for June 2017 Wyoming EA, but stating:  "In the event post-lease development without

appropriate stipulations were to occur on leases in Greater Sage-Grouse habitat it could

potentially result in surface disturbing and/or disruptive activities within 2 miles or greater of

grouse lek or other known nesting habitats during the nesting period, within winter concentration

areas, and/or within ¼ mile or greater of leks that are located outside of PHMA, during the

breeding season and/or direct mortality.  Direct and/or indirect impacts could result in habitat

fragmentation, reduced breeding success and/or nest abandonment as well as cause Greater Sage-

**MEMORANDUM DECISION AND ORDER - 37**

Grouse to move to less suitable winter habitat."); BLM-MT-2Q17-2447 (no analysis for June

2017 Montana EA).  Plaintiffs submit that such statements within the EAs are not enough to

constitute the required "hard look" at the direct and indirect impacts on greater sage-grouse.  *See*

Pls.' Mem. ISO MSJ, pp. 24-25 ("Such '[g]eneral statements about possible effects' do not

constitute a hard look.") (quoting *Blue Mtns. Biodiversity Project v. Blackwood*, 161 F.3d 1208,

1213 (9th Cir. 1998)).

The Court agrees.  Even in the EAs themselves, the agency acknowledges the hamstrung

nature of its site-specific analyses.  *See, e.g.*, WY 91020 (February 2017 High Plains EA:  "The

BLM cannot determine at the leasing stage whether or not a nominated parcel will actually be

sold and, if it is sold and a lease is issued, whether or not the lease would be explored or

developed.  Because well location(s) cannot be determined at this point, *the impacts discussed in

this chapter are not site-specific*.") (emphasis added); WY 113358 (same for September 2017

High Plains EA); WY 102661 (mostly same for June 2017 Wyoming EA, adding:  ""[T]he

impacts listed below are more generic, rather than site-specific.").  And it is for this exact reason

(the inchoate nature of the oil and gas leasing/development process) that Federal Defendants

argue that such site-specific analyses are impossible at the leasing stage (and consequently not

necessary under NEPA).  *See* Fed. Defs.' Mem. ISO MSJ and Opp. to Pls.' MSJ, pp. 39-40

("[W]hat [Plaintiffs] cannot, and do not, refute is that BLM did not have information about the

*location* of site specific oil and development projects; nor does BLM know when they will be

proposed or what the projects will entail.  Therefore, BLM was not required to conduct a more

detailed analysis at the lease stage.  The analysis that Plaintiffs are asking for would have

required BLM to speculate about the location and nature of drilling operations, which generally

occupy approximately 10 acres, within lease parcels that may be 1,000 acres or more.  Such

speculation is not required by NEPA.") (internal citations omitted, emphasis in original).

**MEMORANDUM DECISION AND ORDER - 38**

Federal Defendants' argument in this respect tracks logically enough.  But to the extent they suggest a complete deferral of a site-specific impacts analysis to a time when a project comes into better focus, the Court cannot agree.  To be clear, that such an analysis may be required later at the APD stage does not mean that it is unnecessary at the leasing stage – it is, and depends "on the specificity of the 'reasonably foreseeable' environmental impacts in light of the factual context."  *NAEC*, 983 F.3d at 1088-89 (quoting *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 718 (10th Cir. 2009)); *see also id*. at 1088 ("If it is reasonably possible to analyze the environmental consequences of a particular type at a particular stage, the agency is required to perform that analysis.") (internal quotation omitted).  Plaintiffs contend that BLM could have and should have done more at the leasing stage, and a choice not to do so violates NEPA.  *See* Pls.' Mem. ISO MSJ, p. 25 ("It was reasonably possible for BLM to conduct some manner of site-specific analysis here.").

According to Plaintiffs, BLM had at its disposal (though its own databases and from cooperating state agencies) "far more detailed information" on:  (1) lek locations and seasonal habitat use (nesting, brood-rearing, winter habitat); (2) annual lek counts and breeding population trends; (3) the percentage of habitat already affected by anthropogenic disturbance; and (4) evidence of other recent disturbances, such as wildfires, development approvals, and West-Nile virus outbreaks.  *Id*. at pp. 20-21, 25 (citing WY 99466-71, 75151-66, 106976-7013, 88545-51); *see also* Pls.' Resp./Reply Brief ISO MSJ, pp. 14, 17 (citing same and Folder G of Admin. Rec. Drive, WY 62037-63, 62058, 62070).  Further, already-embedded Reasonably Foreseeable Development Scenario(s) ("RFDs") projected the rate of well drilling and surface disturbances on the leased parcels.  *See, e.g.*, Pls.' Mem. ISO MSJ, p. 25 (citing BLM-MT-2Q17-2602 (June 2017 Montana EA:  "The [RFD] scenario for the area of analysis is based on information contained in the 2015 MCFO FEIS . . . .  The MCFO RFD contains projections of

**MEMORANDUM DECISION AND ORDER - 39**

the number of possible oil and gas wells that could be drilled and produced in the MCFO area and it is used to analyze the projected wells [(in terms of high, medium, or low potential development)] for the 190 nominated lease parcels . . . .")); Pls.' Resp./Reply Brief ISO MSJ, p. 17 (citing same and WY 60413 ("Table 2-10. Reasonably Foreseeable Development Scenario for Federal Oil and Gas and Coalbed Natural Gas Wells and Associated Surface Disturbance Acres"), WY 106997 (lease sale map delineating areas as having high, medium, and low "Oil & Gas Potential")).

The upshot of this is to highlight the existence of additional information and data that could have informed a more site-specific impacts analysis than what BLM actually performed (without knowing the exact locations of future wells, roads, pipelines, and other facilities). *See Conner*, 848 F.2d at 1450-51 ("The government's inability to fully ascertain the precise extent of the effects of mineral leasing in a national forest is not, however, a justification for failing to estimate what those effects might be before irrevocably committing to the activity. Appellants' suggestion that we approve now and ask questions later is precisely the type of environmentally blind decision-making NEPA was designed to avoid.") (internal citation omitted).

Federal Defendants acknowledge the existence of such information and even tout how "BLM used that information to aid in its analysis and, in some instances, to make decisions to defer parcels in Sage Grouse habitat." Fed. Defs.' Mem. ISO MSJ and Opp. to Pls.' MSJ, pp. 30, 40 ("Thus, contrary to Plaintiffs assertion, the record shows that BLM did analyze information about Sage Grouse populations and used such information to make decisions about which parcels to lease and what stipulations to apply.").[19] Paradoxically, these particular

---

[19] WEA makes a similar argument, equating BLM's imposition of stipulations required under the RMPs and application of its Density Disturbance Calculation Tool as examples of site-specific analyses. *See* WEA's Mem. ISO MSJ and Opp. to Pls.' MSJ, p. 11-15. But these are

attempts to describe the nature of BLM's analysis instead serve to underscore Plaintiffs' point –

namely, that BLM did not engage in a transparent analysis of the direct and indirect impacts of

the Phase Two lease sales on greater sage-grouse, consistent with what NEPA calls for.  *See* Pls.'

Resp./Reply Brief ISO MSJ, pp. 14-15 (citing *Blue Mtns. Biodiversity Project*, 161 F.3d at 1214

("[The EA] is where the Forest Service's defense of its position must be found."); *Mont.*

*Snowmobile*, 790 F.3d at 925-28 (administrative record materials not included or inadequately

referenced in EIS cannot substantiate NEPA analysis and need for public access to information

about impacts)).

Moreover, as before, BLM's tiering to the RMP EISs only goes so far.  For the most part,

these materials considered impacts to greater sage-grouse as between various plan alternatives.

*See* BLM-MT-2Q17-1290-91 (Miles City EIS); WY 54324-27, 29-31 (Lander EIS); WY 58676-

77 (Buffalo EIS); WY 64715-17, 64744-46 (Bighorn Basin EIS); WY 61544-50 (Wyoming Nine

EIS).  The resulting hierarchy amongst the alternatives does not (and cannot) reflect the sort of

effective *site-specific* impacts analysis contemplated by NEPA.[20]  Most importantly, BLM

---

less NEPA-required analyses of site-specific impacts and more formulaic, intra-office (not
public) applications of measures aligning with given circumstances.  They are not the same.

[20]  This disconnect is apparent when cross-referencing the seemingly inconsistent
statements between the later EAs and the earlier RMP EISs.  *E.g.*, *Compare* WY 113624
(September 2017 Wind River EA:  "The Proposed Action alternative would allow mineral
development to occur while protecting sage-grouse habitats."), *with* WY 54650-51 (Lander EIS:
"On the limited amount of federal lands where stipulations apply, greater sage-grouse will
receive the lower level of protection applied to non-Core Area, which will likely lead to
substantial impacts to greater sage-grouse because only ¼ mile around leks will be closed to
surface disturbance. . . .  Increased levels of noise and human activity, ,combined with smaller
lek buffers and increased habitat fragmentation from surface disturbance, will likely render these
areas avoided or unusable by greater sage-grouse."); *compare also* WY 113377 (September 2017
High Plains EA:  "With application of SOPs, applied mitigation, required design features and
COAs identified for Greater Sage-grouse under the proposed RMP amendment/revision, impacts
caused by surface-disruptive activities would be minimized."), *with* WY 58677 (Buffalo EIS:
"Loss of population viability of Greater Sage-Grouse could occur within the planning area . . . .

**MEMORANDUM DECISION AND ORDER - 41**

expressly deferred such analysis to later implementing decisions.  *See, e.g.*, WY 62675 (Wyoming Nine EIS:  "Land use plan-level analyses are typically broad and qualitative rather than quantitative or focused on site-specific actions. . . .  As specific actions that may affect the area come under consideration, the BLM and the Forest Service will conduct subsequent NEPA analyses that include site-specific project and implementation-level actions.  The site-specific analyses will tier to the plan-level analysis and expand the environmental analysis when more specific information is known.  In addition, as required by NEPA, the public will be offered the opportunity to participate in the NEPA process for implementation of actions."): WY 65365 (mostly same for Bighorn Basin EIS); WY 67211 (Buffalo ARMPA characterizing NEPA compliance as "broad-scale" and that "implementation of these and other decisions in the RMP may require additional site-specific NEPA analysis."); BLM-MT-2Q17-192 (Miles City ARMPA:  "While the MCFO PRMP/FEIS constitutes compliance with NEPA for the broad-scale decisions made in this ARMP, the BLM will continue to prepare environmental assessments (EAs) and EISs where appropriate as part of implementation level planning and decision-making.").  Simply put, the RMP EISs are too generic to foster informed decision-making about leasing in particular locations.

The Court is aware that the question is a close one and the Court has considered the respective arguments and the record carefully, attentive to the various factors tugging in each direction and the ample room for argument to fill the resultant void.  Federal Defendants and Defendant-Intervenors attempt to fill that space primarily by arguing that more detailed impacts analyses are either impossible or unnecessary at the leasing stage and should be deferred to the APD stage.  But, as described above, that is not necessarily correct.  Site-specific analyses need

---

Management actions under Alternative D for special status wildlife species would have significant impacts to Greater Sage-Grouse.").

**MEMORANDUM DECISION AND ORDER - 42**

not absolutely wait until situations coalesce into a more clear-cut shape and become more definite.  On this record, it was reasonably possible for BLM to synthesize available information and analyze in better detail the site-specific impacts of the lease sales on greater sage-grouse.

**D.      BLM Failed to Take a Hard Look at the Cumulative Impacts on Greater Sage-Grouse**

"NEPA requires an agency to consider the cumulative impacts of a project."  *Jones v. Nat'l Marine Fisheries Serv.*, 741 F.3d 989, 1000 (9th Cir. 2013).  A "cumulatively significant impact" is an impact on the environment that results from "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions."  *Kern v. U.S. BLM*, 284 F.3d 1062, 1075 (9th Cir. 2002).  "Reasonably foreseeable means sufficiently likely to occur such that a person of ordinary prudence would take it into account in reaching a decision."  40 C.F.R. § 1508.1(aa).  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.  *See Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 868 (9th Cir. 2005).  "[I]n considering cumulative impacts, an agency must provide 'some quantified or detailed information; . . . [g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not have been provided.'"  *Id*. (quoting *Neighbors of Cuddy Mtn. v. U.S. Forest Serv.*, 137 F.3d 1372, 1379-80 (9th Cir. 1998)).  "This cumulative analysis 'must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects.'"  *Id*. (quoting *Kern*, 284 F.3d at 1075).

Plaintiffs contend that BLM violated NEPA by failing to analyze the cumulative impacts of the Phase Two lease sales on greater sage-grouse, arguing that none of the lease sale EAs addressed cumulative impacts and that tiering to the RMP EISs is again insufficient because

these documents are "far too coarse and geographically broad." Pls.' Mem. ISO MSJ, pp. 32-37.

Federal Defendants do not try to maintain that the EAs sufficiently analyze cumulative effects,

arguing instead that the EAs tiered to the RMP EISs "and each of those EISs applied appropriate

geographic zones based on the habitat zones developed by WAFWA [(the Western Area Fish

and Wildlife Agencies)," which was "eminently reasonable and is entitled to deference." Fed.

Defs.' Mem. ISO MSJ and Opp. to Pls.' MSJ, pp. 41-44 ("By tiering to the cumulative impacts

analyses in the EISs prepared as part of the 2015 Sage Grouse plan amendment process, BLM

fulfilled its obligation to analyze the cumulative impacts of its oil and gas leasing decisions.").

Setting aside the possible interrelationship between an impacts analysis and a cumulative effects

analysis (and how a faulty impacts analysis (*see supra*) may inform in the same faulty way a

cumulative effects analysis), the Court concludes once more that the tiered-to RMP EISs lack the

necessary quantified or detailed information.

There is no question that the RMP EISs discuss cumulative impacts. Those earlier-in-

time discussions, however, are no substitute for more precise cumulative impact analyses for

later-in-time lease sales. This is because the RMP EISs consider cumulative effects to greater

sage-grouse at a large geographic scale, as opposed to the specific locales affected by each lease

sale. *See id*. (Federal Defendants noting how each EIS covers particular WAFA Management

Zones). This may be useful to the kinds of decisions made at the RMP stage (e.g., how many

*total* acres in each management zone to open up to leasing with various restrictions), but they are

not a one-size-fits-all cumulative impacts discussion capable of taking into account a more

nuanced/focused situation particular to greater sage-grouse to help inform decision-making on

related lease sales. *See Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 809 (9th

Cir. 1999) ("The EIS must analyze the combined effects of the actions in sufficient detail to be

useful to the decision-maker in deciding whether, or how, to alter the program to lessen

**MEMORANDUM DECISION AND ORDER - 44**

cumulative impacts.  Detail is therefore required in describing the cumulative effects of a

proposed action with other proposed actions.") (internal quotations, citations omitted).[21]

The RMP EISs acknowledge as much.  *See, e.g.*, WY 61668, 61716 (Wyoming Nine EIS:

"Site-specific actions are rarely addressed in an RMP or LRMP.  As a result, the cumulative

impact analysis is also broad and general in nature.  The analysis presents ranges and qualitative

conclusions as opposed to bounded quantified details.  These cumulative impacts will then be

considered in subsequent NEPA documents that analyze specific projects or programs. . . .  The

magnitude of each threat would vary geographically and may have more or less impact on

Greater Sage-Grouse in some parts of the [management zone], depending on such factors as

climate, land use patterns, and topography."); WY 58697 (mostly same for Buffalo EIS); WY

65203 (Bighorn Basin EIS:  "In some localized areas, small populations may be at continued risk

due to the cumulative effect of reasonably foreseeable future infrastructure and energy

development projects over the next 20 years, when combined with unplanned events such as

wildfires, drought, or West Nile virus outbreaks."); BLM-MT-2Q17-1163-64 (Miles City

ARMPA:  "The [cumulative impacts] analysis remains general because decisions about other

actions in the planning area could be made by many other public and private entities, and the

location, timing, and magnitude of such actions cannot be predicted.").  The RMP EISs'

straightforward announcement of their substantive limitations moving forward naturally

undercuts any argument that they are acceptably quantified and detailed to amount to a NEPA-

---

[21] Responding to certain of Federal Defendants' positions, the Court does not take issue with WAFA's choice of geographic scope pertaining to the cumulative impacts analyses within the RMP EISs.  *See* Fed. Defs.' Mem. ISO MSJ and Opp. to Pls.' MSJ, p. 45.  But this extends only insofar as the RMPs go and not necessarily to subsequent agency actions involving a much smaller scale – in other words, any deference in this respect is not unlimited.  Moreover, Federal Defendants suggest that analyzing "too much information, rather than too little," actually complies with NEPA.  *See id.* at p. 46.  In theory, yes, but not when too much information results in a lack of quantified or detailed information.

**MEMORANDUM DECISION AND ORDER - 45**

compliant cumulative impacts analysis for the Phase Two lease sales.  *See, e.g.*, *Ruhs*, 701 F.

Appx. at 653.

 This is especially the case when the RMP EISs did not discuss – and could not have

discussed – the "incremental impact that can be expected" from the Phase Two lease sales

themselves, including the development of multiple parcels in the same lease sale.  *See Klamath-*

*Siskiyou Wildlands Ctr. v. BLM ("KSWC")*, 387 F.3d 989, 997-98 (9th Cir. 2004).  In *KSWC*, the

Ninth Circuit provided guidance on the appropriate level of analysis that an EA should reflect –

"[a] proper consideration of the cumulative impacts of a project requires some quantified or

detailed information; . . . [g]eneral statements about possible effects and some risk do not

constitute a hard look absent a justification regarding why more definitive information could not

be provided."  *Id*. at 993.  There, BLM had divided an original timber-sale project into four

component timber sales, preparing EAs for two of them.  *See id*. at 991-92.  Upon challenge, the

Ninth Circuit held that the two EAs were "legally insufficient" because they "*do not sufficiently*

*identify or discuss the incremental impact that can be expected from each successive timber sale,*

*or how those individual impacts might combine or synergistically interact with each other to*

*affect the . . . environment*."  *Id*. at 997 (emphasis added); *see also id*. at 997-98 (finding EAs

could not be saved by tiering to EIS that likewise failed to analyze specific impacts of timber

sales themselves).

 Analogously, the RMP EISs here do not consider how the collective effects of the Phase

Two lease sales (and the parcels contained therein) might combine alongside other actions and

nearby conditions to affect greater sage-grouse.  *See, e.g.*, *id*. at 994 ("Sometimes the total

impact from a set of actions may be greater than the sum of the parts . . . .  [T]he addition of a

small amount here, a small amount there, and still more at another point could add up to

something with a much greater impact . . . .").  Where likely consequences involve more habitat

**MEMORANDUM DECISION AND ORDER - 46**

fragmentation for greater sage-grouse, the failure to fully discuss these cumulative impacts is not insignificant.

"In a cumulative impacts analysis, an agency must take a 'hard look' at all actions." *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 603 (9ᵗʰ Cir. 2010). An agency cannot satisfy this requirement under NEPA with "[g]eneral statements about possible effects and some risk," it much take the next step and show how actions (in this case, the Phase Two lease sales) cumulatively effect greater sage-grouse. *See Ocean Advocates*, 402 F.3d at 868 (internal quotation, citation omitted). Here, neither the EAs nor the RMP EISs contained a quantified assessment of the Phase Two lease sales' combined impacts on greater sage-grouse.

### E.     The Phase Two Lease Sales Are Remanded Without Vacatur

Based upon their contentions regarding BLM's NEPA violations, Plaintiffs argue that the Court should set aside and vacate the Phase Two lease sales. *See* Pls.' Mem. ISO MSJ, pp. 37-39.  Presumptively, vacatur is the remedy when a court finds an agency's decision unlawful under the APA.  *See* 5 U.S.C. § 706(2)(A) ("The reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law[.]"  *Se. Alaska Conserv. Council v. U.S. Army Corps of Eng'rs*, 486 F.3d 638, 654 (9ᵗʰ Cir. 2007) ("Under the APA, the normal remedy for an unlawful agency action is to 'set aside' the action.  In other words, a court should vacate the agency's action and remand to the agency to act in compliance with its statutory obligations.").

However, vacatur is not required in every case.  *See Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9ᵗʰ Cir. 2012) ("A flawed rule need not be vacated.").  When equity demands, [a flawed action] can be left in place while the agency follows the necessary procedures to

**MEMORANDUM DECISION AND ORDER - 47**

correct its action." *Id.* (quoting *Idaho Farm Bureau v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir.

1995) (internal quotation marks omitted)).  Nonetheless, vacatur is only rarely *not* imposed.  *See*

*Humane Soc'y v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010) ("In rare circumstances, when

we deem it advisable that the agency action remain in force until the action can be reconsidered

or replaced, we will remand without vacating the agency's action.").

      Ultimately, "[t]he decision whether to vacate depends on 'the seriousness of the order's

deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive

consequences of an interim change that may itself be changed.'"  *Allied-Signal v. U.S. Nuclear*

*Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (quoting *Int'l Union, United Mine*

*Workers of Am. v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 967 (D.C. Cir. 1990)).

When an agency likely can come to the same conclusion on remand, the "seriousness of the

agency's errors" weighs in favor of remand without vacatur.  *See Pollinator Stewardship Council*

*v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015); *see also Standing Rock Sioux Tribe v. U.S. Army*

*Corps of Eng'rs*, 282 F. Supp. 3d 91, 97 (D.D.C. 2017) ("Put otherwise, this Court must

determine whether there is at least a serious possibility that the agency will be able to

substantiate its decision on remand, and whether vacatur will lead to impermissibly disruptive

consequences in the interim.") (internal quotation omitted).

      In the assessment of this Court, the failings of the assembly of the BLM's EAs relate, for

the most part, to the absence and/or incompleteness of analyses (relating to a single species and

not as to any other resource).  *See Wildearth Guardians*, 457 F. Supp. 3d at 897 ("In other words,

the Court does not fault BLM for providing a faulty analysis of cumulative impacts or impacts to

groundwater, it largely faults BLM for failing to provide *any* analysis.") (emphasis in original).

And, according to Plaintiffs, much of the information that may more fully inform these analyses

already exists in a way that may ultimately corroborate BLM's position on the issues in question.

**MEMORANDUM DECISION AND ORDER - 48**

*See supra*; *see also* 2/27/20 MDO, p. 59 n.21 (this Court acknowledging during Phase One of

case that "a failure to fully discuss the environmental effects of the lease sales [may be] easily

remedied by incorporating an analysis that was previously omitted) (citing *Wildearth Guardians*

*v. Zinke*, 368 F. Supp. 3d 41, 83-85 (D.D.C. 2019) ("[N]othing in the record indicates that on

remand the agency will necessarily fail to justify its decisions to issue EAs and FONSIs.  Thus,

though the disruptive consequences of vacatur might not be great, the probability that [BLM]

will be able to justify retaining [its prior leasing decisions] is sufficiently high that vacatur . . . is

not appropriate.  Instead, the Court remands the EAs and FONSIs to BLM so that the agency

may address the deficiencies identified by the Court above.") (internal quotation marks and

citations omitted)).

With this in mind, despite their NEPA-related shortcomings, the Court will not vacate the

Phase Two lease sales.  Instead, the Court will enjoin BLM from (1) issuing any new APDs for

the Phase Two leases, and (2) any further surface disturbing activities thereon, remanding the

EAs to BLM to substantiate the conclusions drawn in its EAs or revise them as necessary.

Unless and until the concerns referenced in this Memorandum Decision and Order are

sufficiently addressed, BLM may not authorize new drilling/surface disturbing activities on the

leased parcels.  *See Wildearth*, 368 F. Supp. 3d at 85 ("To guard against the possibility that BLM

did not choose correctly the first time around, the Court enjoins BLM from issuing any APDs for

the Wyoming Leases while the agency works to substantiate its EAs and FONSIs.").

"Compliance with NEPA cannot be reduced to a bureaucratic formality, and the Court expects

[BLM] not to treat remand as an exercise in filling out the proper paperwork *post hoc*." *Standing*

*Rock*, 282 F. Supp. 3d at 109.[22]

---

[22] As before, the Court acknowledges the possible need to continue limited operations
under appropriate circumstances to preserve the status quo where development is already

**MEMORANDUM DECISION AND ORDER - 49**

## IV.  <u>ORDER</u>

Based on the foregoing, IT IS HEREBY ORDERED that:

1.     Plaintiffs' Motion for Partial Summary Judgment (Phase Two) (Dkt. 247) is

GRANTED, in part, and DENIED, in part, as follows:

a.     Plaintiffs have standing to challenge the Wyoming lease sales;

alternatively, neither Plaintiff has waived their challenge to any of the Phase Two lease sales.  To

the extent appropriate, Plaintiffs' Motion for Partial Summary Judgment (Phase Two) (Dkt. 247)

is granted in this respect.

b.     BLM (1) failed to consider the reasonable alternative of deferring priority

sage-grouse habitat; (2) failed to take a hard look at the direct and indirect impacts to greater

sage-grouse; and (3) failed to take a hard look at the cumulative impacts on greater sage-grouse.

Plaintiffs' Motion for Partial Summary Judgment (Phase Two) (Dkt. 247) is granted in this

respect.

c.     The Phase Two lease sales are remanded without vacatur.  Plaintiffs'

Motion for Partial Summary Judgment (Phase Two) (Dkt. 247) is denied in this respect.

2.     Federal Defendants' Motion for Partial Summary Judgment (Phase Two) (Dkt.

278), Defendant-Intervenor State of Wyoming's Motion for Partial Summary Judgment (Phase

Two) (Dkt. 283), Defendant-Intervenor Western Energy Alliance's Phase Two Cross-Motion for

Summary Judgment (Dkt. 294), Defendant-Intervenors Peak Powder River Acquisitions, LLC's,

---

underway.  *See* 5/12/20 MDO, p. 10, n.6 (Dkt. 226); *see also* Fed. Defs.' Mem. ISO MSJ and
Opp. to Pls.' MSJ, p. 50.  Any party seeking to modify the suspended status of any applicable
Phase Two lease must include "information about the nature and need for such work to allow
other parties to respond to the motion and for the Court to make an informed decision upon the
request."  5/12/20 MDO, pp. 10-11, n.6.  "The nature of such details is intended not only to assist
the Court in assessing the request, but also to allow for potential stipulated agreements upon such
relief," as has happened previously.  8/17/20 MDO, p. 19, n. 14.

**MEMORANDUM DECISION AND ORDER - 50**

Titan Exploration, LLC's, and Rebellion Energy II, LLC's Motion for Partial Summary

Judgment (Phase Two) (Dkt. 318) (collectively "Defendant/Defendant-Intervenor Motions") are

GRANTED in part, and DENIED, in part, as follows:

a.      Plaintiffs have standing to challenge the Wyoming lease sales;

alternatively, neither Plaintiff has waived their challenge to any of the Phase Two lease sales.  To

the extent appropriate, the Defendant/Defendant-Intervenor Motions (Dkts. 278, 283, 294, 318)

are denied in this respect.

b.      BLM (1) failed to consider the reasonable alternative of deferring priority

sage-grouse habitat; (2) failed to take a hard look at the direct and indirect impacts to greater

sage-grouse; and (3) failed to take a hard look at the cumulative impacts on greater sage-grouse.

The Defendant/Defendant-Intervenor Motions (Dkts. 278, 283, 294, 318) are denied in this

respect.

c.      The Phase Two lease sales are remanded without vacatur.  The

Defendant/Defendant-Intervenor Motions (Dkts. 278, 283, 294, 318) are granted in this respect.

3.      This action is remanded.  Consistent with NEPA and the APA, BLM must address

the deficiencies identified by the Court; until the concerns referenced in this Memorandum

Decision and Order are sufficiently addressed, BLM may not authorize new drilling/surface

disturbing activities on the leased parcels.

4.      Plaintiffs' Motion to Strike WEA Exhibits (Dkt. 314) is DENIED as moot.

DATED: June 9, 2021

Ronald E. Bush
Chief U.S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 51**